IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| DRUMMOND COMPANY, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 2:11-CV-3695-RDP |
| | ) |
| TERRENCE P. COLLINGSWORTH, individually | ) |
| and as an agent of Conrad & Scherer, LLP; and | ) |
| CONRAD & SCHERER, LLP, | ) |
| | ) |
| Defendants. | ) |

**DECLARATION OF TERRENCE P. COLLINGSWORTH IN FURTHER SUPPORT OF
DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION
TO DRUMMOND'S MOTION TO COMPEL**

I, Terrence P. Collingsworth, declare under penalty of perjury of the laws of the United States of

America and the State of Alabama, that:

1.      I am a partner at Conrad & Scherer, LLP and lead counsel for the plaintiffs in

*Balcero v. Drummond Co., Inc.*, No. 2:09-cv-1041-RDP (N.D. Ala. filed May 27, 2009); *Baloco

v. Drummond Co., Inc.*, No. 7:09-cv-0557-RDP, 2012 WL 4009432 (N.D. Ala. Sept. 12, 2012),

*appeal docketed*, No. 12-15268-BB (11th Cir. Oct. 15, 2012); and *Melo v. Drummond Co., Inc.*,

No. 2:13-cv-0393-RDP (N.D. Ala. filed Feb. 26, 2012). I am also a Defendant in the present libel

case, *Drummond Co., Inc. v. Collingsworth, et al.*, No. 2:11-cv-3695-RDP (N.D. Ala. filed Oct.

21, 2011). I provide this declaration based on my personal knowledge and can testify under oath

to all of the facts herein.

2.      Attached hereto as Exhibit 1 is a true and correct copy of an article by Frank

Bayak, *Alabama Coal Company Accused of Bankrolling Colombia's Killer Right-Wing Militias*,

Washington Post, July 6, 2007.

3.      Attached hereto as Exhibit 2 is a true and correct copy of an article by Dorothy

Kosich, *Activists pursue Drummond Coal over Colombian union leader murders*, Mineweb, May

29, 2009. The article states:

> Former AUC [United Self-Defense Forces of Columbia] head Salvatore Mancuso
> has testified both in court and before U.S. congressional committees that
> Drummond Company and its subsidiary Drummond Ltd. "had provided
> substantial support to the AUC and had paid the AUC to assassinate the top union
> leaders at the Drummond coal mine in Cesar Province, Colombia."

Mancuso is currently in a Virginia prison awaiting sentencing on charges of drug trafficking. He

appeared on the same 2007 episode of *60 Minutes* as did I, and he stated there that Chiquita

Brands International, Inc. ("Chiquita"), Dole Foods, Inc. ("Dole") and many other multinational

firms supported the AUC. I did not meet Mancuso until September 2012 at the prison where he is

being held. When I interviewed him, he confirmed that Drummond Company, Inc.

("Drummond") was one of the other companies that had provided substantial support to the

AUC, and that most of that support was provided to Mancuso's subordinate, alias "Jorge 40."

Mancuso will provide us with a declaration. I have interviewed numerous other people who told

me of their personal knowledge that Drummond provided substantial support to the AUC and/or

that Drummond and the AUC coordinated operations to drive the guerilla forces away from

Drummond's facilities and/or that Drummond officials had a direct role in the murder of the

Drummond union leaders. Most of these people have declined to provide a written statement or

testify against Drummond, citing their concern that they or their family members would face

violent retaliation from Drummond.

4.      I have reviewed numerous articles and statements that predate the letters at issue

in Drummond's lawsuit against me for libel that assert in one way or another that there is

credible evidence of Drummond's role in participating in human rights violations with the AUC. These articles and statements will be part of our defense against Drummond's frivolous libel case. One example is the June 28, 2007 statement of Rep. Eliot L. Engel, at that time Chair of the House Foreign Affairs Committee. At a hearing on the role of U.S. multinationals financing the AUC in Colombia, he stated, "[I]n Colombia we have very credible allegations of a US-owned company, Drummond Coal, having paid a terrorist group to kill 3 prominent trade union leaders in 2001." *See* U.S. Fed. News, *Chairman Engel Issues Statement Regarding U.S. Corporate Involvement with Colombian Paramilitaries*, 2007 WLNR 12299306 (June 28, 2007). I have researched using all available public sources and was unable to find any indication that Drummond has sued anyone but me for libel relating to statements about Drummond's human rights violations in Colombia.

5.      Attached hereto as Exhibit 3 is a true and correct copy of an excerpt of the January 25, 2013 Sentencing Decision by the 11th Circuit Criminal Court of Colombia for Jaime Blanco Maya, and an English translation of the original Spanish version.

6.      I met with three representatives of the Colombian government's Prosecutor's Office from the *Fiscalia 118 Especializada de Derechos Humanos* (Prosecutor's Office Unit 118 Specialized in Human Rights) for the purpose of assisting their investigation into the role of various Drummond officials, including Garry Drummond, in the murder of the Drummond union leaders. As far as I know, the investigation is ongoing.

7.      At the Letters Rogatory Hearing of Jaime Blanco Maya, he testified that he explained to FBI agents Manuel Ortega and Marc Varry (sic) "the intermediary role that I played through Charris between Mr. Jim [Adkins] as a Drummond representative and the AUC of

Colombia." *Balcero* ECF No. 396-15[1] (Defs.' Mot. for Summ. J., Ex. N) at 32:8-33:6.

8.      At the Letters Rogatory Hearing of Jhon Jairo Esquivel Cuadrado (alias "El Tigre"), he testified that two U.S. FBI agents, one named Manuel Ortega, and a representative of the Colombian Administrative Security Department ("DAS"), visited him to discuss the link between Drummond and the AUC. *Balcero* ECF No. 396-11 (Defs.' Mot. for Summ. J., Ex. J) at 64:8-65:3, 159:3-21.

9.      Attached hereto as Exhibit 4 is a true and correct copy of the March 19, 2007 Factual Proffer of Chiquita Brands International, Inc. in the criminal case *United States v. Chiquita Brands International, Inc.*, No. 07-055 (D.D.C. Mar. 19, 2007).

10.     Attached hereto as Exhibit 5 is a true and correct copy of the U.S. Department of State's Country Report on Human Rights Practices in Colombia for 2012 (2013).

11.     Attached hereto as Exhibit 6 is a true and correct copy of a BBC article, *Colombia's ex-spy chief charged*, BBC News, Feb. 23, 2007. The article reported that the former head of DAS, Jorge Noguera, was arrested on charges that he had supplied the names of trade union leaders and human rights workers to the AUC and other right-wing paramilitary groups, and that individuals on this "hit list" were murdered. Noguera was arrested based on testimony from his former aide, Rafael Garcia.

12.     Attached hereto as Exhibit 7 is a true and correct copy of the original Spanish and an English translation of an article by G. Reyes, *Links confirmed between the DAS and paramilitaries*, El Nuevo Herald, June 29, 2007. The article reported that Colombia's Prosecutor's Office investigated Garcia's assertions that Noguera had provided the names of trade union leaders and human rights workers to the United Self-Defense Forces of Colombia

---

[1] All references to "*Balcero* ECF No." refer to items from the docket of *Balcero v. Drummond Co., Inc.*, No. 2:09-cv-1041-RDP (N.D. Ala. filed May 27, 2009).

("AUC") and other right-wing paramilitary groups, and pronounced them "correct." Garcia elaborated that Noguera provided the hit list names to a relative of AUC leader alias Jorge 40, and described the hit list as an "extermination campaign."

13.     Garcia has also provided testimony that he witnessed a Drummond manager[2] provide a "suitcase filled with money" to a representative of the AUC leader Rodrigo Tovar Pupo (Jorge 40) to assassinate the leaders of the Drummond union, Valmore Locarno Rodriguez and Victor Hugo Orcasita Amaya. *See* Ex. 9 ¶¶ 5-6. Garcia gave this testimony while he was in prison in Colombia, and he agreed to testify in the trial of *Romero v. Drummond Co., Inc.*, 552 F.3d 1303 (11th Cir. 2008) ("*Drummond I*"). However, while a Letters Rogatory was issued to obtain his testimony, the Colombian government, under President Uribe, refused to act on the request. At this time, Colombia was lobbying the U.S. Congress to approve a Free Trade Agreement and the Vice President of Colombia, Francisco Santos, had specifically promised that the Colombian government would act on the Letters Rogatory to show its commitment to the rule of law and human rights, issues that were being held up as reasons for the U.S. not to approve the Free Trade Agreement. In the midst of the *Drummond I* trial, on July 18, 2007, 12 members of Congress wrote to Vice President Santos reminding him of this promise. *See* Letter from Reps. Michaud, et al., attached hereto as Exhibit 10. Still, no action was taken by the Colombian government (and the Free Trade Agreement was not approved that year). The trial judge in *Drummond I*, Judge Bowdre, having previously denied the plaintiffs' motion for a continuance to allow for additional time to obtain the Garcia testimony, concluded the trial without this crucial evidence, resulting in a verdict in favor of the defense.

---

[2] In his May 2006 declaration, a true and correct English translation of which is attached hereto as Exhibit 8, Garcia identified the Drummond official as Drummond Ltd. President Augusto Jimenez. He later corrected this in a new declaration, a true and correct copy of which is attached hereto as Exhibit 9, and identified the official as Drummond's Director of Community Relations, Alfredo Araujo. *See* Ex. 9 ¶¶ 6-7.

14.    After providing his testimony against DAS Director Noguera, which also implicated several other high-ranking officials in the Uribe Administration, Garcia repeatedly petitioned the government to provide him and his family with security protection, but the Uribe Administration denied his requests. *See* Juan Forero, *Colombian Unravels Government-Paramilitary Ties*, Washington Post, Mar. 20, 2007, a true and correct copy of which is attached hereto as Exhibit 11. In late 2008, Garcia was suddenly freed, well before his sentence was up, and was released to the streets of Bogotá. He contacted me immediately and claimed that he was only released so he could be killed without it obviously being at the hands of the government, which would be the case if he were murdered in prison. I assisted Garcia with the logistics of getting out of Colombia and moving to a safe country. I also attempted to assist him in obtaining asylum or some other form of entry to the United States so he could provide his evidence, not only about Drummond, but also about the extensive drug trafficking from Colombia through Venezuela. Garcia was unable to obtain entry into the United States, and he then disappeared. We lost contact with him for at least a year. I have since met with him three times in various other countries, and he has to date refused to testify against Drummond, claiming it would be too dangerous for him and his family if he were to do so.

15.    In addition to the "hit list" of targeted human rights activists at DAS exposed by Garcia, private security companies and members of the Colombian military launched a program called "Operation Dragon," which likewise targeted human rights activists for execution. According to a report by the Robert F. Kennedy Center for Justice and Human Rights, a true and correct copy of which is attached hereto as Exhibit 12, an August 2004 investigation revealed that Operation Dragon targeted "over 175 union leaders, human rights workers and members of the political opposition." *See* Ex. 12 at 1. The head of Operation Dragon was a Colombian

Lieutenant Colonel, Julian Villate Leal. *Id*. A raid on Lt. Col. Villate's home uncovered documents indicating he had possession of the security plans provided to the targeted human rights activists in the witness protection plans established by the government of Colombia. The government agencies that were supposed to be protecting these witnesses were aware of Operation Dragon. *Id*. at 1-2. Several of the union leaders on the Operation Dragon hit list were threatened by AUC members and were referred to as "Indumiles." *Id*. at 2. In Lt. Col. Villate's papers seized in the raid, he too referred to the targeted individuals as "Indumiles." *Id*.

16. Attached hereto as Exhibit 13 is a true and correct copy of an article released by the Associated Press and published by the Birmingham News, Frank Bayak, *Colombian senator says he was target[,] Says security head plotted his killing*, April 25, 2007. In the article, then-Senator and current Mayor of Bogotá, Colombia, Gustavo Petro, said "the prosecutor general's office has testimony that retired Colombian army Col. Julian Villate met in January with assassins in the coastal city of Santa Marta to plan his killing." *Id*. at 1.

17. After the public scandal over the exposure of Operation Dragon and Lt. Col. Villate's role therein, he was hired briefly by the U.S. Embassy in Bogotá to perform security work. *See* Relevant Excerpts of the Deposition of Julian Villate Leal, a true and correct copy of which is attached hereto as Exhibit 14, at 20:10-18. Lt. Col. Villate was put in charge of coordinating security for the U.S. Embassy and the staff. *Id*. at 22:15-23:10. After a brief stint at the U.S. Embassy, on July 9, 2005, Lt. Col. Villate was hired by Drummond to be the security coordinator for Drummond's port in Colombia. *Id*. at 31:15-19, 38:7-12. Drummond was aware of the allegations of Lt. Col. Villate's participation in Operation Dragon when the company hired him. *Id*. at 33:14-34:13. Once a formal process began in 2011 to charge him for his participation in Operation Dragon, as per the operation of law in Colombia, Lt. Col. Villate's contract with

Drummond was suspended. *Id*. at 35:6-21.

18.     The April 25, 2007 Associated Press article by Frank Bayak referenced in paragraph 16, *supra* (attached hereto as Exhibit 13), also reports that the President of the national mining union Sintraminercol, Francisco Ramirez, said that "Drummond hired Villate to break up the union at its Colombia operations." Ex. 13 at 2.

19.     Drummond hired James Adkins in 1995 as a security advisor after he was fired by the CIA due to his illegal conduct in assisting the Contras in the Iran-Contra scandal, a fact that Drummond and Drummond Ltd. knew when he was hired. *Balcero* ECF No. 470-4 (Dep. of James Adkins, Defs.' Notice of Filing, Ex. D) at 19:21-21:17, 48:21-52:9. Adkins was found by Independent Counsel Lawrence E. Walsh to have violated the law in providing support to the Contras, falsifying CIA financial accounts to hide his crime, and lying to investigators. *Id*. at 39:6-17; Relevant Excerpts of Final Report of the Independent Counsel for Iran/Contra Matters, Ex. 5 to Dep. of James Adkins, *Balcero v. Drummond Co., Inc.*, No. 2:09-cv-1041-RDP (N.D. Ala. filed May 27, 2009), attached hereto as Exhibit 15.

20.     My first involvement in human rights issues involving Garry Drummond or any of his companies occurred over 12 years ago, in May of 2001. The Canadian Labour Congress (CLC), the federation of all labor unions in Canada, invited me to Toronto to address its members on global human rights issues. Specifically, I was asked to explain the Alien Tort Statute (ATS), 28 U.S.C. § 1350, and discuss its prospects as a tool for human rights enforcement in the global economy. I was put on a panel with Francisco Ramirez Cuellar, a prominent Colombian labor lawyer. At that time, I had already been working in Colombia for about a year on human rights issues involving the Coca-Cola Company, and I therefore knew about Mr. Ramirez. He worked as a labor lawyer in the mining sector, and like most labor

activities in Colombia, he had survived several attempts on his life by paramilitary groups operating in the mining areas of Colombia, primarily in Cesar Province.

21.     I listened to Mr. Ramirez's presentation and learned that he was in Canada because there had been a recent attempt on his life in Colombia, and the CLC invited him to Canada for a few months so he would be safe and could make other plans for security when he returned to Colombia. While he survived that most recent assassination attempt, Mr. Ramirez told us about the recent March 13, 2001 murders of Valmore Locarno Rodriguez and Victor Hugo Orcasita Amaya, the President and Vice President, respectively, of the union at Drummond's coal mine in Colombia. Mr. Ramirez explained that Colombia's main paramilitary group, the AUC, murdered the Drummond union leaders, but that the union believed Drummond directed the executions of the union leaders because the company was in heated negotiations with the union, which had threatened a strike.

22.     At the conclusion of the CLC program, Mr. Ramirez asked me if I was willing to travel to Colombia to meet the families of Locarno and Orcasita, as well as the surviving leaders of the Drummond union, to discuss whether legal action could be taken under the ATS or any other mechanism in the United States. I agreed to do so and traveled there in August 2001 to begin my investigation of Drummond's role in the murders of the union leaders.

23.     Mr. Ramirez and I ultimately became colleagues and friends, and are currently working on several cases in Colombia together, including the Drummond human rights cases. He serves as my local counsel. Across the years, Mr. Ramirez has told me about several additional attempts on his life, and he has received countless death threats because of his work to highlight the abuses against workers in the mining sector, including those by Drummond.

24.     It was widely known and undisputed that the AUC in Colombia was targeting

labor and human rights leaders for execution often because such leaders were labeled "leftists" or "guerilla sympathizers" by a government official or someone representing powerful business interests. In a typical example of its human rights reporting from the era in which the AUC killed such people with absolute impunity in Colombia, the U.S. Department of State reported that in 1999, after plaintiffs in the human rights cases alleged Drummond joined forces with the AUC, the following occurred:

> Paramilitary groups and guerillas were responsible for the vast majority of political and extrajudicial killings during the year. Throughout the country, paramilitary groups killed, tortured and threatened civilians suspected of sympathizing with guerillas in an orchestrated campaign to terrorize them into fleeing their homes, thereby depriving guerillas of civilian support. . . . The AUC paramilitary umbrella organization . . . exercised increasing influence during the year, extending its presence through violence and intimidation into areas previously under guerilla control. . . . [Some paramilitary groups] are actually the paid private armies of narcotics traffickers or large landowners.

U.S. Dep't of State, Country Report on Human Rights Practices in Colombia for 1999, at 2 (2000), a true and correct copy of which is attached hereto as Exhibit 16.

25. The problem was so acute that numerous governments around the world instituted programs that issued visitor visas to endangered Colombian human rights activists to at least offer a temporary safe haven. The U.S. government initiated a program in 2002, administered by the AFL-CIO, that brought endangered trade union leaders to the U.S. for a year of training and safety. A true and correct copy of the description of this program is attached hereto as Exhibit 17.

26. Sometime in 2003, in conjunction with the U.S. program to provide assistance to endangered Colombian activists, the Colombian government agreed to provide security protection for the activists when they returned from abroad. *See id.* at 1. Mr. Ramirez was one of the Colombian labor and human rights activists who received this security from the Colombian

government, which provided him with both armed security guards and an armored vehicle. The guards were supplied by DAS, which, as noted in paragraphs 11-15, *supra*, was later found to be providing the names and security plans of human rights activists like Mr. Ramirez to the AUC. It is my recollection that on every occasion I visited Mr. Ramirez from 2003 until early 2007, he was accompanied by one or two armed security guards and we traveled in his armored vehicle. He was also required by his security team to wear a bulletproof vest when we traveled. He expressed concern to me on several occasions that he did not trust the DAS-provided security guards.

27.     Attached hereto as Exhibit 18 is a true and correct copy of the May 13, 2004 Declaration of Jimmy Rubio. He was an employee of the Drummond mine in Colombia and was active in the union there, SINTRAMIENERGETICA. *Id.* ¶ 2. He rose to the position of Secretary of Education. *Id.* ¶ 3. His sister was killed by the AUC in 2002. *Id.* AUC Commander Tolemaida then was about to kill him because he was on a hit list, but a Colombian military officer intervened. *Id.* ¶ 4. Mr. Rubio then sought out the regional head of the AUC, Alexander Pianeta Vargas, to find out why he and other members of his family were on the list, at which point Vargas agreed to take them off the list. *Id.* ¶ 5. Mr. Rubio knew where to find Commander Vargas, and he often saw him on Drummond property collecting fuel and supplies. Vargas told him Vargas had permission "from above" to use the Drummond facilities. *Id.* ¶ 6.

28.     A few weeks before the union leaders Locarno and Orcasita were murdered, Mr. Rubio saw Vargas coming out of the offices of Drummond's Director of Community Relations, Alfredo Araujo, in Valledupar. Commander Vargas told him that he was picking up his monthly quota from Araujo, and he showed Mr. Rubio two checks made out to Vargas and signed by Araujo. *Id.* Vargas also told Mr. Rubio that Araujo and his family had set up the AUC in the

region. *Id.*

29.     A few days before the murder of the union leaders, Mr. Rubio ran into Vargas and another AUC leader, Nicolas Capitolino, who boasted about killing union leaders from the oil workers' union. Vargas then said there was going to be another big operation. *Id.* ¶ 7. After the union leaders were murdered, Capitolino boasted to Mr. Rubio that he had participated in the murders, and that someone from inside Drummond had assisted in identifying the bus that Locarno and Orcasita were on to aid the assassination. Capitolino showed Mr. Rubio Locarno's gun, which he took from him after he was murdered. *Id.* ¶ 8.

30.     Mr. Rubio personally told me when I was preparing him for his deposition that he would testify to all of the facts in his declaration and would add details regarding other AUC leaders and members he had seen at Drummond's facilities. By this time, Mr. Rubio had fled for his life because, as he told me, he "knew too much about Drummond and the AUC." He was living in Venezuela with his wife in a small town near the Colombian border. On March 18, 2005, a few days before Mr. Rubio was to be deposed in the *Drummond I* case, his father-in-law, who still lived in Colombia, was murdered. *See* April 1, 2005 Declaration of Jimmy Rubio, attached hereto as Exhibit 19, ¶ 5. According to Mr. Rubio, "my father-in-law's tongue was cut out when he was murdered – a sign that he was killed because he, or others close to him, such as myself, was speaking out against the paramilitaries. **I have no doubt that this gruesome murder occurred so that I did not testify in this case**." *Id.* (emphasis added).

31.     There were a number of procedural battles with Drummond that then followed to try to reschedule Mr. Rubio's deposition, but he ultimately disappeared and we were unable to obtain his testimony for the *Drummond I* trial. My investigators later found him again in a remote area of Venezuela, well after the *Drummond I* trial was over. I spoke with him by phone

and he told me that his wife, whose father had been murdered, refused to let him testify and risk his life, so they disappeared. Because he was not likely to be available for trial once he had disappeared, Judge Bowdre in *Drummond I* refused to allow Mr. Rubio's declaration to be considered as evidence.

32.     Carmen Josefa Amaya Daza was Jane Doe VI, a plaintiff in *Drummond I*, and she was my client. Her son, Victor Orcasita, is one of the Drummond union leaders who was murdered. I have reviewed my file, and she was deposed by Drummond in that case on April 7, 2005. A few weeks later, on May 8 and 9, she received threatening phone calls. *See* Declaration of Carmen Josefa Amaya Daza, attached hereto as Exhibit 20, ¶ 2. Shortly thereafter, on May 17, 2005, she received a threat from the AUC written inside a sympathy card. It stated, "because you are a snitch, talking and complaining to the gringos, what's going to happen to you is the same thing that happened to your son, you are going to have to leave town, this is serious, because we don't mess around." *Id.* ¶ 2 & attachment thereto.

33.     Attached hereto as Exhibit 21 is a true and correct copy of the original Spanish and an English translation of a full-page ad Drummond placed in several important newspapers in Colombia, including *El Tiempo*, attacking me personally with false assertions about my intentions to cause economic damage to the Colombian economy. This ad put my life in danger, as it used the same coded language that the paramilitaries used when targeting leftist guerillas by accusing them of damaging business interests. During the *Drummond I* trial, numerous witnesses testified that when Drummond managers called a union leader a "guerilla" or "leftist", this was the equivalent of alerting the AUC that the person was targeted for assassination. When Drummond published the ad attacking me, my local counsel, Francisco Ramirez, was alarmed and reminded me that this was the same tactic Drummond had used to attack the union leaders

before they were murdered. He advised me to not travel to Colombia for a while to let the situation calm down.

34.     Among the documents we provided to the Drummond defendants as part of the extensive discovery in the *Balcero* case were the following documents regarding funds for security provided to Jesus Charris Castro, Libardo Duarte, and Jose Gelvez Albarracin, all witnesses in the *Balcero* case: PLS00005028-00005043, PLS00005018-00005021 and PLS00005024-00005025. *See* Decl. of H. Thomas Wells in Supp. of Pl.'s Mot. to Compel ("Wells Decl."), Ex. U (PLS00005028-00005043), ECF No. 44-6; Ex. BB (PLS00005018-00005021), ECF No. 44-13; Ex. DD (PLS00005024-00005025), ECF No. 44-15.

35.     We also provided documents showing that security funds were provided to alias "Halcon" even though Halcon is not a witness in the *Balcero* case, has not provided any evidence that will be used in the *Balcero* case, and has not performed any services for the case. These documents were produced as PLS00004592-00004649 in *Balcero*, and are attached in the present libel case as Exhibit HH to the Wells Declaration in Support of Drummond's Motion to Compel, ECF No. 44-19. As is detailed with references to testimony in Defendants' Opposition to Drummond's Motion to Compel in the present case, these security funds were provided because the family members of Charris, Duarte and Gelvez received concrete death threats, and our team did the only thing we could by moving the families to a safe haven. *See* Defs.' Opp'n to Mot. to Compel at 4, ECF No. 46.

36.     Without waiving any privilege, including work product or attorney client, the sole promise I made to any witness in the *Balcero* case was that if they testified and they or a family member received a credible death threat, we would do whatever we could to provide security or to provide a safe haven until such time as the danger had subsided. I described how in the United

States, in a similar situation, when prosecutors pursue Mafia figures, the people willing to testify against them are in grave danger, and the prosecutors often put the witnesses in witness protection programs to keep them alive. Unfortunately, virtually all of the witnesses who had given statements against Drummond and were about to testify received threats against themselves or their family members. If a witness received a more general threat, I would discuss it with them and we would agree to be vigilant, and the witness would notify me immediately if there was any further threat. Others took their own security precautions by, for example, relocating to a relative's home in another area of Colombia. If there was a credible death threat against a witness or a family member, I considered it my legal and ethical duty to take what steps I could to keep that person safe.

37.     In the case of Jairo Jesus Charris Castro, he first provided a declaration in roughly June 2009 to my team detailing Drummond's connections to the AUC. Attached hereto as Exhibit 22 is this first handwritten declaration provided by Charris. Prior to providing my team with a declaration, Charris' testimony was taken on several occasions by Colombian authorities. On May 7, 2009, Charris testified that the murder of Drummond union leaders Orcasita and Locarno was planned by Drummond executives. *See* Relevant Excerpts of May 7, 2009 Letters Rogatory Testimony of Jairo Jesus Charris, a true and correct copy of the original Spanish and an English translation of which is attached hereto as Exhibit 23, at DRUM0000016-17. Charris also testified in this hearing that he had not disclosed these details in the previous two statements taken shortly after his arrest because he was concerned for his family's safety, as they still lived in La Loma, Cesar, which is near the Drummond mine. *Id*. at DRUM0000036. It is worth noting that under Colombian law against self- incrimination, witnesses are not required to remain silent in order to protect themselves under the law against self-incrimination, as they are in the United

States. Under Colombian law, witnesses are no longer testifying under penalty of perjury – in other words, they are allowed to lie – when testifying about their own participation in criminal acts, as "[t]he oath . . . will not have negative penal effects insofar as the testimony refers to his own conduct." Attached hereto as Exhibit 24 is a true and correct copy of an excerpt of the July 28, 2005 decision by the Colombian Constitutional Court confirming the effect of this law.

38.     Charris again detailed Drummond's connections to the AUC and Drummond executives' roles in the murders of the union leaders in June 2009 at a hearing before Colombian authorities. *See* Relevant Excerpts of June 23, 2009 Letters Rogatory Testimony of Jairo Jesus Charris Castro, the original Spanish and an English translation of which is attached hereto as Exhibit 25, at DRUM00000470. In this hearing, Charris also expressed concern for his family's safety, since they still lived in La Loma, and he was worried that Drummond would retaliate against them because of his testimony against Drummond. *Id*. at DRUM00000491. In July 2009, several months after Charris had begun providing my team and the Colombian authorities with evidence of Drummond's role in the murder of the Drummond union leaders, I made the decision to move Charris' family out of La Loma, as their lives were in grave danger because Charris was then providing my team with evidence against Drummond. I authorized the wire of 3,000,000 Colombian pesos (COP) (roughly $1,500 USD) to cover their moving costs on July 30, 2009. This wire was produced in *Balcero* as PLS00005028, and is attached in the present libel case as Exhibit U to the Wells Declaration, ECF No. 44-6. Charris finalized his declaration detailing Drummond's links to the AUC on roughly September 2, 2009, a true and correct copy of the original Spanish and an English translation of which is attached hereto as Exhibit 26. In this declaration, he stated:

> Finally, I must state my fear, because while some members of the AUC are in jail giving testimony under the Justice and Peace Process, the majority of AUC

members continue to operate and present great danger for the people who are talking. For example, I myself moved my family from Cesar to a safer place because I am sure they would be harmed because I am giving this declaration. Drummond officials and AUC members are still free.

*Id.* ¶ 17. Starting on September 21, 2009, I authorized a monthly wire to Charris' family in order to keep them in a safe haven, since their lives were still at great risk because of the information Charris was providing us about Drummond's connections to the AUC. Documentation of this security assistance has been produced as PLS00005028-00005043 in *Balcero*, and is attached in the present libel case as Exhibit U to the Wells Declaration, ECF No. 44-6.

39.     Despite the security measures we have taken to keep Charris' family safe, Charris himself continues to live under high risk of assassination. In 2011, just before he was to give testimony in the *Balcero* case, Charris was transferred to a high security prison because of the high risk of an assassination attempt against him. When his testimony was finally taken in the *Balcero* case in May 2012, Charris wore a bulletproof vest due to the security threat, as required by Colombian prison officials. *See* Relevant Excerpts of May 2012 Deposition of Jairo Charris Castro[3], a true and correct copy of which is attached hereto as Exhibit 27, at 11:13-12:6. Additionally, Charris testified:

I have been in danger from the time I've started clarifying the facts as to the death of the union members. For this reason . . . Drummond headed by Mr. Garry Drummond and Mr. Adkins would not really rest until they would put me down inside or outside the jail, and this danger would be extended to my family members as well because there are too many powerful people such as Drummond in general and a former commander of the AUC, Oscar Jose Ospino Pacheco, alias Tolemaida . . . .

*Id.* at 12:15-13:7.

40.     All security measures we undertook to protect Charris' family were taken because

---

[3] A full version of Charris' May 2012 deposition is available at *Balcero* ECF No. 411-55 (Pls.' Opp'n to Mot. for Summ. J., Ex. 54).

of the mortal danger they faced as a result of Charris providing us with information about Drummond's criminal relationship with the AUC. Even before his arrest, long before he met anyone from my team, in July 2008, Charris acknowledged Drummond's links to the AUC in an April 2, 2008 email he sent to Drummond Ltd. President Augusto Jimenez, stating that "the multinational Drummond was the one that ordered the job on the 3 union leaders," and that Jim Adkins had told Charris that the murder of the Drummond union leaders "was authorized by Mr. Gary Drummond, Augusto Jiménez, Alfredo Araujo, General Peña Rios and Colonel Luis Carlos Rodriguez." Attached hereto as Exhibit 28 is a true and correct copy of this April 2, 2008 email. Charris also stated in his email, "I am a witness to all the coordinations between the company Drummond and the AUC." *Id.* The fundamental essence of Charris' testimony expressed in this April 2, 2008 email has not changed to this day.

41.     Another individual for whom I have authorized taking security measures to protect is José Joaquin Pinzon Diaquiz, alias "Halcon." Documentation of the assistance to Halcon was produced in *Balcero* as PLS00004592-00004649, and is attached in the present libel case as Exhibit HH to the Wells Declaration, ECF No. 44-19. As Drummond is well aware, Halcon escaped an attempt on his life immediately following his cooperation with plaintiffs in providing evidence of Drummond's support for and cooperation with the AUC, and our legal team agreed to take measures to help him reach a safe haven outside of Colombia. *See* Pls.' Resp. to Defs.' Fifth Set of Interrogs., Resp. No. 7, *Balcero v. Drummond Co., Inc.*, No. 2:09-cv-1041-RDP (N.D. Ala. filed May 27, 2009), a true and correct copy of which is attached hereto as Exhibit 29. Halcon could not return to his home in Colombia because he was certain he would be executed in retaliation for providing us information about Drummond's support for the AUC. Halcon believes Tolemaida ordered his execution because Tolemaida has been paid by persons

acting on behalf of Drummond to silence any former AUC members who are willing to speak the truth about Drummond's relationship with the AUC. *Id*. Security funds to Halcon were discontinued in October 2012 because we were not using any testimony he provided us for the *Balcero* case, and any danger he faced had dissipated. Although Halcon was identified as an individual with knowledge in plaintiffs' Rule 26 disclosures in *Balcero*, Halcon was never intended to be a witness in the *Balcero* litigation. I decided that the draft statement he provided us did not advance our evidence in the *Balcero* case, and therefore it was not worth the risk or expense of taking his deposition. We made clear to Drummond that Halcon was not a witness in the *Balcero* litigation and we never sought to depose Halcon or otherwise preserve his testimony through the Letters Rogatory process, which was required in the *Balcero* case since Halcon resided in Panama, where he had been moved for safety reasons.

42.     Around December 2010, *Balcero* witness Libardo Duarte provided an interview to renowned Colombian journalist, Gonzalo Guillen, in which he detailed links between Drummond and the AUC, which occurred before I or anyone on my team met or communicated with him. *See Demobilized Paramilitary Links Drummond to Paramilitaries*, Noticias Uno, Dec. 13, 2010, a true and correct copy of the original Spanish and an English translation of which is attached hereto as Exhibit 30.  After Mr. Guillen put us in contact with Duarte, he provided us with a signed declaration on February 27, 2011, detailing how Drummond paid the AUC during the civil conflict to commit extrajudicial killings. *Balcero* ECF No. 137-1 (Pls.' Notice of Supp. Factual Material, Ex. A). It was not until after Duarte's family was threatened and forced to flee from their home that we took measures to keep them safe. Duarte's family was first threatened in March 2011, shortly after Duarte's declaration was produced in the *Balcero* case on March 4, 2011. *Id*. In March 2011, Duarte's domestic partner and two youngest children were threatened

by two men on the street, who told his family they would be killed if Duarte failed to "stop talking to the *gringos*." *See* Apr. 6, 2011 Declaration of Libardo Duarte, a true and correct copy of which is attached hereto as Exhibit 31, ¶¶ 5-6. A few days after they were threatened on the street, shots were fired at the home of Duarte's family, and they were forced to flee out of fear for their safety, leaving behind their home, jobs and the schools attended by Duarte's children. *Id.* ¶¶ 7-11. Two wires of $2,500 each were sent to Duarte's family so they could relocate to an undisclosed, safe location in late April 2011. Documentation of these wires was produced in *Balcero* as PLS00005018-5025, and is attached in the present libel case as Exhibits BB and DD to the Wells Declaration, ECF Nos. 44-13 and 44-15. We sent the $5,000 in two separate wires because there was a limit of under $5,000 per wire to Colombia. Duarte's Letters Rogatory testimony was taken on April 16 and May 23, 2012, and in all material respects, he confirmed the testimony he had provided in his February 27, 2011 declaration.

43.     The journalist who originally interviewed Duarte, Gonzalo Guillen, has received several threats due to his work uncovering the crimes of politicians, companies, and other powerful individuals in Colombia. He was forced to flee Colombia just last month after receiving death threats, and after the Colombian Ministry of the Interior revealed that it "had 'very precise and sensitive' information about a plan to murder Guillen and [additional journalists], who had exposed the connections of [Governor] Jose Francisco 'Kiko' Gomez Cercha with paramilitaries." *Colombian journalist leaves country due to threats*, Global Post, Oct. 17, 2013, a true and correct copy of which is attached hereto as Exhibit 32.

44.     *Balcero* witness Jose Gelvez Albarracin's family was also forced to flee after receiving threats when Gelvez began talks with my team regarding links between Drummond and the AUC, and we have already produced documents showing the security measures taken to

protect his family from retaliation. Drummond has mistakenly referred to the November 2011 security payment as being paid to Duarte's family, when this actually was used to cover the costs incurred by Gelvez's family when they were forced to move because they feared for their lives. *See* Wells Decl., Exhibit EE, ECF No. 44-16 (produced in *Balcero* as PLS00005026). Gelvez's family was forced to flee months after he first provided us with a declaration detailing Drummond's relationship with the AUC on February 25, 2011, a true and correct copy of which is attached hereto as Exhibit 33 (produced in *Balcero* as PLS00003737-00003741). Attached hereto as Exhibit 34 (produced in *Balcero* as PLS00003743-00003758) is a true and correct copy of an undated draft declaration of Gelvez in which he expressed concerns for his family. He wrote, "And as you know, these mining companies continue operating in Colombia and still have much power in this country, and the most sensitive issues are left unpunished. It is no secret that these people will not hesitate to eliminate me or my family for giving this declaration." *Id.* at PLS00003758. It was not until nearly a year after Gelvez first provided details about Drummond's relationship with the AUC that a single transfer of $2,084 USD was sent to Gelvez's wife, Celina Lombardi Nieves, on November 28, 2011, to cover the costs of her and their children's forced move. *See* Wells Decl., Exhibit EE, ECF No. 44-16 (produced in *Balcero* as PLS00005026). Gelvez's Letters Rogatory testimony was taken on March 16 and April 20, 2012, and in all material respects, he confirmed the testimony he had provided in his February 25, 2011 declaration.

45.     Oscar Jose Ospino Pacheco, alias Tolemaida, is the sole AUC witness in the *Balcero* case to provide Drummond with a declaration that denies there was a relationship between Drummond and the AUC. As established in paragraphs 46-50, *infra*, there is substantial evidence that Drummond paid Tolemeida to bribe and/or threaten various AUC witnesses to

keep quiet about Drummond's relationship with the AUC.

46.     Attached hereto as Exhibit 35 is a true and correct copy of the February 28, 2012

Declaration of Javier Ernesto Ochoa Quiñonez (alias "El Mecanico"). He states:

> The day after I executed my declaration, on May 29, 2007, I was visited by
> Alexander Pianeta. He said that he was there on behalf of my AUC Commander,
> alias "Tolemaida", and that if I valued my family, I would not speak about
> Drummond. He also said that if I retracted my statement, Tolemaida would take
> care of me financially. The threat against my family was a serious one. As I stated
> in my May 28, 2007 statement, I was constantly concerned about whether I could
> say the wrong thing and endanger my family.

*Id.* ¶ 5. He also states:

> In 2010, my commander, Tolemaida, was arrested and was in La Picota prison in
> Bogota. I was taken, along with another AUC colleague, "JJ," by bus to La Picota
> and we met with Tolemaida. He said to us both that he was going to meet with
> Garry Drummond to make sure that we were all well provided for because we did
> not talk about Drummond. Tolemaida promised me 200 million Colombian pesos
> if I remained quiet about Drummond. Tolemaida also told us we had nothing to
> worry about because our good friend from Drummond, Alfredo Araujo, now had
> a son working as the Secretary to the Attorney General. Tolemaida showed me a
> letter from Araujo's son telling Tolemaida that he could count on his
> collaboration and support.

*Id.* ¶ 8. Additionally, he says, "It is common knowledge and I personally heard from several

sources that Tolemaida received over one million U.S. dollars from Drummond to keep us all

quiet, however, he never sent me or my family any money." *Id.* ¶ 9.

47.     Attached hereto as Exhibit 36 is a true and correct copy of the March 1, 2012

Declaration of Jose Aristides Peinado Martinez. He states:

> Tolemaida was captured much later than the rest of us in 2010. Under the pretense
> of requesting that I testify with him under the Justice and Peace process because
> he was my former commander, Tolemaida has requested that I be brought to
> Bogota to testify three times. The last time was about six or seven months ago. On
> each of these occa[]sions he told me that Drummond was willing and ready to pay
> me if I kept quiet about what I know. Recently, lawyers for Drummond have
> requested a meeting with me, but I have declined to meet them.

*Id.* ¶ 28.

48.     Attached hereto as Exhibit 37 is a true and correct copy of the December 4, 2009

Declaration of Alcides Mattos Tabares. He states:

> I understand that Drummond wanted to hide the truth of what had happened, having testimonies that excluded the company's participation in the homicides of the unionists. To that end, Alexander Pianeta, alias "Reyes," an army official and member of the Front, was taken to Bogotá in order to testify that all the actions had been carried out due to the fact that the unionists had been members of the guerrillas. Initially, they had me in mind. "Tolemaida" had offered me, through alias "Cebolla," a huge sum of money so that I testified to that extent, that the deaths were a product of their militancy in subversion. Sometime later, the lawyer José Daza Ortíz, who attended to the business interests of "Tolemaida" and of the Front, confirmed the offer of money that was made to me.

*Id.* ¶ 20.

49.     At the deposition of Alcides Mattos Tabares, *Balcero* ECF No. 396-10, he

testified:

> Q.     Have you spoken with Tolemaida?
>
> A.     Yes, in Barranquilla.
>
> Q.     And did Mr. – did you discuss with Tolemaida the murder of the Drummond union leaders?
>
> A.     Yes. We had our differences because he did not want me to testify. Moreover he threatened me. He told me that he had enough money to buy all of the witnesses. Exactly he told me that Drummond had given him money to fix the process.
>
> Q.     This is something he told you supposedly?
>
> A.     Supposedly, no. He did tell me.

*Id.* at 123:6-16.

50.     Tabares further testified:

> Q.     Let me break it down so we don't have a problem. On the April 29th – April 23rd, 2009 testimony for Charris what did you tell the prosecutor and the judge about your testimony?

A.        The safety of my family because they had been threatened.

Q.        Did the prosecutor or judge respond to your concern?

A.        Well, before then, before the prosecutor number 12, before the human rights Court, I had denounced that situation.

Q.        What situation are you referring to?

A.        To death threats. I made – I denounced this, you know, all the way from Barranquilla during one of the free versions before I believe Judge Daisy Jaramillo. I denounced the fact that an attorney hired by Tolemaida had gone – I think his name was Cesar Vaca – to the model penitentiary to threaten me. And that I remember this was something that happened to an extent that the guards had to react because I got very angry when I received these threats from Tolemaida.

Q.        And what was the nature of the threat?

A.        The testimony. You know, the testimony that I was beginning to provide during the justice and peace process and this was way before this.

Q.        Was there something that either Tolemaida himself or his lawyer Vagas or Vaca told you not to say?

A.        Yes. They didn't want me to testify. You know, they just didn't want me to provide testimony during the entire justice and peace process.

Q.        Testimony about what?

A.        Anything that pertained to the relationship between society and the AUC; anything pertaining to the death of the woman judge; anything pertaining to the link between the military and the AUC; anything pertaining to the deaths of the Drummond union leaders; anything pertaining to the politics, the relationship between politics and the front; anything pertaining to the creation of a political group for the front.

Q.        And you told Mr. Jeffress earlier that when you were in the jail in Barranquilla the same time as Tolemaida he offered you money; is that correct?

A.        (Speaking Spanish)

Q.        Let me ask another question then.

A.        Yes, and also –

Q.    What did he tell you exactly?

A.    Well, in Barranquilla Tolemaida offered all of us who were there in Barranquilla, all of the members of the front, money. He even proposed that I retract all of the statements that I had previously given because he had received monies – and he told me just like this, he had received monies from Drummond and that he was going to give everyone some money. And then after this apparently he had problems with everyone at the front because apparently he didn't give money to anyone. And in spite of this he was taking luxuries inside the jail and, of course, people got angry. Like, for example, building a door for the cell that costs 2 or 3 million pesos.

Q.    Did Tolemaida ever threaten you directly about the Drummond testimony?

A.    Yes, of course.

Q.    Can you tell me what he said?

A.    I remember that after a collective free version that was invalid legally for the reasons that I gave before, we had a small skirmish, you know, with me and one of the other candidates. And, you know, he practically told us that we had families outside and that he had money to – with which to do whatever he wanted. And, you know, that free version that was shown on the video lasted 6 or 12 weeks, but I was only there twice. And other candidates were only in attendance two or three days.

Q.    Were you present when Tolemaida either offered money to or threatened any of the other members of the Juan Andrés Álvarez Front besides you?

A.    Yes, of course.

Q.    Can you tell me who?

A.    Francisco Gaviria.

Q.    Anybody else?

A.    No. I only remember Francisco Gaviria and he denounced this.

*Id.* at 160:7-164:8.

51.    Ivan Otero Mendoza is a very experienced criminal defense lawyer in Colombia.

He is based in Valledupar, Cesar, where Drummond has offices, and which is the nearest city to

the Drummond mine. Mr. Otero was very familiar with the facts and issues regarding Drummond's participation in human rights crimes in Colombia before he ever met me. I knew of Mr. Otero by reputation for several years before I met him in November 2008. We discussed various matters, including whether he could help us in the Drummond cases. He ultimately agreed to join our team and began working with us in December 2008. He is a key member of our Colombia team and spends most of his time working on developing facts, assisting with various logistical issues, facilitating my interviews with various witnesses, and providing advice on procedural issues within the Colombian judicial system. We have a verbal cooperation agreement in the *Balcero* case in which he is to receive 17% of any contingency fee award of attorney fees, and our other local counsel, Francisco Ramirez, is to receive 16%. We have yet to convert this to a written agreement. We also had a similar verbal agreement in the *Baloco* case, which we recently memorialized. A true and correct copy of that agreement is attached hereto as Exhibit 38. Mr. Otero is also a member of our legal team in other Colombia cases, including those against Chiquita and Dole.

52.     Mr. Otero has been receiving serious death threats since he started working with us on the Drummond cases. A true and correct copy of the original Spanish and an English translation of his declaration detailing the facts of these threats and his security concerns is attached hereto as Exhibit 39.

53.     Attached hereto as Exhibit 40 is a true and correct copy of the original Spanish and an English translation of the declaration of Danilo Rueda, a human rights defender whose organization provides security to at-risk witnesses who testify to human rights abuses in Colombia, including those carried out by paramilitary groups. His organization has also provided for the relocation and protection of these witnesses' threatened family members.

54.     One former Drummond worker and union member unrelated to the *Balcero* case, Anibal Perez Parra, was forced to send his family out of Colombia in August 2012 in order to keep them safe after they were threatened immediately following a public speech Mr. Perez made focusing on Drummond's unlawful conduct in Colombia. *See* Relevant Excerpts of Declaration of Anibal Perez Parra, a true and correct copy of which is attached hereto as Exhibit 41, ¶¶ 12-13. The unidentified armed men who threatened Mr. Perez's wife told her "'they didn't like snitches,'" and that Mr. Perez's wife would find Mr. Perez gunned down because that was what people "'seeking transparency of multinationals' operations deserve.'" *Id.* Early this year, Mr. Perez released photos to the press of Drummond dumping tons of coal into the ocean at their port in Santa Marta, and ever since this publication, the death threats against him have intensified. *Id.* ¶ 14 & Ex. C thereto (Parker Crooks, *Drummond Coal Spill Whistleblower Receives Death Threats,* Columbia Reports, Mar. 6, 2013). Shortly after Mr. Perez released these photos to the press, he received several phone calls in which he was called a snitch, as well as an email message telling him that "**we declare you** . . . **and anyone who attempts to go against our source of financial support**" a military target. *Id.* ¶ 19 (emphasis in original). In April 2013, Mr. Perez survived an assassination attempt in which one of his bodyguards was injured. *Id.* ¶¶ 11, 21. While Mr. Perez has been provided with bodyguards by the Colombian government, his family has not, and he still fears for his and his family's life due to his work exposing Drummond's crimes in Colombia. *Id.* ¶¶ 1, 21-22. As Mr. Perez states in his declaration:

> [W]hile Drummond violates human rights, workers' rights, environmental rights, unions, communities, destroys marine life, syndicates the murder of union leaders, and has ties to paramilitaries, this company continues [to] remain[] with impunity. It is us, the defenders of human rights, workers' health rights, and those advocates for those fired by the multinational Drummond, who have to live day by day with the fear and terror of possibly being assassinated and have to leave our countries

as if we were the criminals or terrorists.

*Id.* ¶ 22.

55. Attached hereto as Exhibit 42 is a true and correct copy of the original Spanish and English translation of an article in a Colombian news magazine, *Those who linked Uribe to the paramilitaries are threatened*, Semana, Sept. 17, 2013. The article describes two judges who called for an investigation of former President Uribe's links to the paramilitaries, and who have subsequently received death threats.

56. Paul Wolf contacted me in March 2007 and asked if I would be willing to collaborate to bring a case against Chiquita for war crimes and extrajudicial killings committed in Colombia. Chiquita had just pled guilty to supporting the AUC in Colombia, a federal felony because the AUC is a designated terrorist organization. *See* Ex. 4, cited in paragraph 9, *supra.* I agreed, and the basic understanding was that Wolf would go to Colombia, and, using his existing contacts, would evaluate the cases of potential clients and sign attorney-client contracts with heirs of persons who had been killed by the AUC while it was acting on behalf of Chiquita, and I would be primarily responsible for litigating the cases. Ultimately, on June 7, 2007, I drafted and filed a complaint on behalf of 144 legal heirs of 173 decedents. All of these plaintiffs were clients who signed attorney-client agreements with Wolf and me to jointly represent them after meeting with Wolf or his team in Colombia. That case, *Does 1-144 v. Chiquita Brands International, Inc.*, 1:07-cv-1048-PLF (D.D.C. filed June 7, 2007), was filed in the U.S. District Court for the District of Colombia. It was the first case filed against Chiquita following its guilty plea. Shortly thereafter, other lawyers began filing similar civil cases, and Chiquita moved under multidistrict litigation (MDL) procedures to bring the cases together in a single forum. The cases were ultimately brought together, over our objection, for pre-trial issues before Judge Kenneth A.

Marra in the Southern District of Florida, *In re Chiquita Brands Int'l, Inc. Alien Tort Statute*, 792 F. Supp. 2d 1301 (S.D. Fla. 2011) ("*Chiquita* MDL").

57.    After the *Chiquita* MDL case was filed, Wolf continued to do the ground work for our team in Colombia. In short order, it became clear to me that Wolf had both professional and personality issues that required me to take steps to limit his participation in our joint cases. I had at least two meetings with him during which we discussed our options, but when we were unable to agree, he told me he was going to contact our joint clients and persuade them to renounce my representation of them. After learning of Wolf's plan, I sent him a letter dated May 5, 2008, a true and correct copy of which is attached hereto as Exhibit 43. Among other things, I stated:

> Paul, whether you want to or not, the ethical rules require us to provide notice, informed consent, and choice to our clients. They are entitled to know who is representing them, and if you do ultimately decide to try to go it alone, they are entitled to make the choice between you, and me, my firm and the other extremely experienced lawyers who have agreed to join my team. ***I seriously question whether you have the experience, the knowledge, the temperament, and the resources to represent hundreds of people against Chiquita and Covington and Burling. Indeed, as we have told you on several occasions, given the shoddy work on many of the intake forms you provided me, we can't even be sure that many of the people you've identified as clients have real claims.*** Regardless of who ultimately represents them, there is an enormous amount of work to do in getting back down to Colombia and getting more detailed information from the people you've identified. As part of this process, if necessary, the clients are entitled to know that they have a choice in representation, and they are entitled to make the choice.

*Id*. at 1-2 (emphasis added).

58.    Rather than comply with the rules of ethics and give our joint clients informed consent and choice, as I had urged, Wolf directed his team in Colombia to contact our joint clients and persuade them to renounce our joint representation of them. *See* Aug. 25, 2008 Declaration of Paul Wolf, a true and correct copy of which is attached hereto as Exhibit 44, ¶ 5. Wolf and I continue to be in dispute over this issue, and, unfortunately, resolution of the joint representation issues will ultimately be resolved by the courts.

59. After Wolf and I parted company, he then began a relationship with another law firm working on a *Chiquita* MDL case. The firm was called Searcy, Denny, Scarola, Barnhardt, and Shipley, PA, and Jack Scarola is the head of that team. When I learned Mr. Scarola was going to begin working with Wolf, I advised him of the facts of my prior issues with Wolf.

60. In the midst of my dispute with Wolf, Judge Marra directed all of the *Chiquita* MDL participants to designate a lead counsel. As Wolf and I were still officially on the pleadings of our case as co-counsels, one of us had to be designated as lead counsel. Since Wolf would not agree that I should be lead counsel with my firm, Conrad & Scherer, LLP, on August 22, 2008, I filed a motion requesting that I be named as lead counsel. A true and correct copy of this motion is attached hereto as Exhibit 45.

61. In response, on September 12, 2008, Wolf filed a truly astounding declaration, a true and correct copy of which is attached hereto as Exhibit 46. In a public filing, for Chiquita and the entire world to see, Wolf provided his own assessment of the new cases he had obtained beyond the initial 144 joint cases he still shared with me. He called some cases his "weakest" and others his "strongest." *Id*. ¶ 5. He revealed that under the new arrangement with Mr. Scarola's firm, the firm would have the first right of refusal for his new cases, presumably selecting "the strongest," leaving the other cases with Wolf, who stated that he must look for another firm to represent those clients. *Id*. ¶¶ 9-10. I am not aware that any other firm has stepped up to take the "weakest" of Wolf's new cases.

62. In another remarkable publicly-filed declaration, Wolf recently admitted he had no means of support and took a job as a temporary worker through an employment agency, which assigned him to work for Mayer Brown, LLP. *See* Mar. 2, 2013 Declaration of Paul Wolf, a true and correct copy of which is attached hereto as Exhibit 47, ¶ 20. The 2,800 Chiquita

clients Wolf purports to have (*see* Ex. 44 ¶ 3) would presumably be concerned their lawyer is working as a temp and has essentially admitted in a public filing, which Chiquita no doubt has accessed, that he currently lacks the financial capacity to represent them.

63.     Presumably because of the embarrassing declaration Wolf filed, Mr. Scarola persuaded Wolf to agree that I be named lead counsel for our joint cases. Wolf did so, and the court ultimately issued an order that I be designated lead counsel for the D.C. cases. A true and correct copy of this order is attached hereto as Exhibit 48.

64.     Operating within the group of lawyers for the plaintiffs in the *Chiquita* MDL, all of us, ***except Wolf***, signed a Common Interest Confidentiality Agreement. Wolf has repeatedly disclosed confidential discussions to Chiquita and the world at large in various documents he has filed, including the October 8, 2013 declaration he provided to Drummond, which Drummond filed with this Court. *See* Decl. of H. Thomas Wells in Supp. of Pl.'s Supplemental Br. in Supp. of its Mot. to Compel ("Wells Supplemental Decl."), Ex. RR, ECF No. 62-5. There, Wolf references, without context, a discussion the MDL group had regarding the ethics of providing security to witnesses. *Id.* ¶ 20. Without waiving any work product or common interest privilege, given the false accusation made by Wolf, I must add that the context for the discussion was that I told the group that, in the *Drummond I* case, after several witnesses gave me detailed statements and before they were to testify, they and their family members were threatened with death by persons acting on behalf of Drummond. I explained to the group that we must be prepared to address this in the *Chiquita* MDL case, as it was likely we would face a similar situation when we finally began discovery. This was a preliminary discussion to allow the group to thoroughly review the legal, ethical and practical issues of addressing the need for security when a witness is threatened with death or other violent retaliation. We also discussed other issues that I cannot

presently disclose, as they continue to be protected by work product and common interest privilege, and Wolf has yet to reveal these discussions to Chiquita or make any false assertions about them.

65.     Wolf does not have personal knowledge of how the lawyers for the plaintiffs in the *Chiquita* MDL resolved any of the issues we discussed regarding witness security or any other matter. Shortly after these initial discussions, in roughly September 2011, the group voted unanimously to exclude Wolf from our joint discussions, as he was revealing portions of those discussions to Chiquita in his various inappropriate filings, and he refused to abide by other rules to which we had agreed governing our joint prosecution of the cases. Wolf is aware I was an advocate for taking this position. In at least two different group meetings when Wolf was present by phone, before we took this action, I expressed my opinion that Wolf should be excluded from our joint discussions because his public disclosures were so unprofessional and inappropriate that it appeared he was sabotaging our litigation, and had certainly demonstrated that he was grossly incompetent. I also pointed out Wolf was a perpetual free-rider in that he lacked financial or legal resources, and was unfairly reaping the benefit of our work and resources.

66.     After we excluded Wolf from our joint discussions, he went on a rampage against some of the other lawyers involved in the *Chiquita* MDL. He filed an ethics charge against Jack Scarola and others in his firm with the Florida Bar Association. That charge was summarily dismissed by the Bar Association. *See* Oct. 30, 2013 Declaration of Jack Scarola, a true and correct copy of which is attached hereto as Exhibit 49.

67.     Wolf also filed a complaint in federal court against another firm involved in the *Chiquita* MDL, Boies, Schiller & Flexner, LLP. In a representation dispute, he filed claims for antitrust violations, invasion of privacy, tortious interference, fraud, negligence and malpractice.

The firm's motion to dismiss is pending. *See* Defs.' Mot. to Dismiss for Lack of Jurisdiction, *Does 1-98 v. Boies, Schiller & Flexner, LLP*, Case No. 9:13-cv-80146-KAM (S.D. Fla. Feb. 19, 2013), ECF No. 20. He also filed ethics charges with the Florida Bar Association against three members of that firm, which were summarily dismissed. *See* Mar. 15, 2013 Declaration of Douglas A. Mitchell, a true and correct copy of which is attached hereto as Exhibit 50, ¶ 9.

68.     In the declaration he provided to Drummond, Wolf describes several vague statements that he claims another lawyer, Mike Hugo, made to him. *See* Wells Supplemental Decl., Ex. RR ¶¶ 11-18, ECF No. 62-5. These hearsay assertions are made even less reliable and credible because they are deliberately general. Wolf does not claim to have heard from Hugo about what a purported payment of $50,000 was for. *Id*. ¶ 15. Wolf does not know the name of the supposed security company mentioned by Hugo. *Id*. ¶ 16. Wolf claims there was a discussion of my payment of witnesses through a security company, but does not say who said what, what was the context, or what was the result of the discussion. *Id*. ¶ 18.

69.     Contrary to Wolf's vague reference to an unnamed security firm, there is no security firm that I have used for security in Colombia, and there is certainly no firm of any kind that I have used to convey payments of any sort to anyone in Colombia. As the voluminous documents Defendants have produced to Drummond establish, any funds sent for security in Colombia were sent directly by my firm to the proper recipient. I have used a team of private investigators that was initially called Princeton Global Holdings and is now called Secure Pointe Partners, LLC to investigate some aspects of Drummond's operations in Colombia. What they actually have investigated for me and their findings are confidential work product. Secure Pointe Partners has absolutely nothing to do with providing security for our legal team or any witnesses in the Drummond case. They were retained by me solely as private investigators. Without

waiving any privilege, it is true that I have had numerous discussions with Mike Hugo while he worked at Parker Waichman LLP, and with others at that firm regarding invoices for investigative services sent to us by Secure Pointe that we all agreed were unacceptably high.

70.     Daniel Kovalik is the Associate General Counsel for the United Steelworkers Union. He was my co-counsel in the *Drummond I* litigation and participated in all aspects of factual research and trial preparation with me and my team. While he is not acting as co-counsel in either the *Baloco*, *Balcero*, or *Melo* cases, I remain in regular contact with him and often ask him questions about facts or issues that we had addressed in *Drummond I* that are once again relevant in my current cases.

71.     Hendrik van Bilderbeek was arrested on charges of money laundering during the Presidency of Alvaro Uribe. Henrick van Bilberbeek has always maintained these charges were false and were the result of the illegal collaboration between Drummond and Uribe to steal the Llanos Oil concession in Colombia and transfer it to Drummond. I have seen documentation of the objective fact that when the oil concession was seized from Llanos, it was immediately transferred to Drummond. Once Uribe's term concluded and President Santos took office, the Colombian government released Henrick van Bilderbeek. Llanos Oil is in discussions with the Colombian government regarding the implications of these events.

72.     Without waiving any privilege, including work product or attorney client, I can say that I have had an attorney-client relationship with Hendrik van Bilderbeek and his brother, Albert van Bilderbeek. Attached hereto as Exhibit 51 is a true and correct copy of an attorney-client agreement dated May 3, 2010 that memorializes that relationship. The nature of the representation is that I agreed to investigate and explore the options for them to bring a case against Drummond based on Drummond's role in the false imprisonment of Hendrik van

Bilderbeek and the theft of the Llanos Oil concession. The representation was solely based on a contingency fee agreement, and I was never otherwise compensated by Llanos Oil. This work for the van Bilderbeek brothers had an obvious and substantial overlap with my work for the *Balcero* plaintiffs, as both cases require evidence of Drummond's unlawful acts and improper relationship with the Colombian government during the Uribe administration. Drummond has put the facts of what happened to Llanos Oil in Colombia at issue in the libel case by stating falsely and without any factual basis that Llanos Oil and I have conspired to damage Drummond's business.

73.     Albert van Bilderbeek did arrange for me to meet with his personal bankers in Zurich, Switzerland to allow me to present a proposal to obtain a loan to finance our Drummond litigation. I met with two gentlemen at their offices in Zurich. I do not recall their names or the name of their company. At the conclusion of our discussion, the bankers declined to provide any financing, stating that they did not understand U.S. litigation and could not objectively assess the risk to their investment.

74.     As I stated at the outset of this libel litigation, I drafted the three letters at issue in the case. After completing our review of any documents related to the three letters and producing those documents to Drummond, my recollection was refreshed, and I remembered that I did receive some minor assistance from Albert van Bilderbeek in finalizing the two letters to the Dutch government. He mainly provided me with the names and correct spelling of the appropriate officials in the Dutch government who were to receive the letters. I also received minor assistance from my staff in formatting and finalizing the letters. I was the sole author of the text of the letters, and the assertions therein were based on my knowledge and belief as to the facts of Drummond's unlawful conduct in Colombia.

75. On November 5, 2013, Defendants' counsel, Bradley Smith, sent a letter to counsel for Drummond summarizing their October 28, 2013 meet and confer and detailing outstanding discovery issues. A true and correct copy of the letter is attached hereto as Exhibit 52.

Executed this 7th day of November, 2013 in Washington, D.C.

_____
Terrence P. Collingsworth