IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

DRUMMOND COMPANY, INC.,      )
                             )
    Plaintiff ,          )
                             )
                             )
vs.                          )
                             )      Case No. 2:11-cv-3695-RDP-TMP
                             )
TERRENCE P. COLLINGSWORTH,   )
individually and as agent of Conrad & Scherer, )      **OPPOSED**
LLP; and CONRAD & SCHERER, LLP, )
                             )
                             )
    Defendants .         )
                             )


## DRUMMOND COMPANY, INC.'S EMERGENCY MOTION FOR SANCTIONS[1]


William Anthony Davis, III (ASB-5657-D65W)    Sara E. Kropf
H. Thomas Wells, III (ASB-4318-H62W)    LAW OFFICE OF SARA KROPF PLLC
Benjamin T. Presley (ASB-0136-I71P)    1001 G St. NW, Suite 800
STARNES DAVIS FLORIE LLP    Washington, DC 20001
P.O. Box 59812    (202) 627-6900
Birmingham, AL  35259
(205) 868-6000
fax: (205) 868-6099

*Attorneys for Drummond Company, Inc.*

---

[1] Drummond is filing this motion to correct a typographical omission on page 12 of its Emergency Motion for Sanctions (Doc. 101).

{B1750055}

# TABLE OF CONTENTS

Table of Authorities .................................................................................................................... ii

Factual Background ....................................................................................................................2

    A. Drummond's Subpoenas to Parker Waichman, LLP and Michael R. Hugo, Esq...........5

        1. "If we don't like what we see, we don't pay."...................................................6

        2. "As opposed to him saying Drummond had nothing at all to do with it?"...................................................................................................................8

        3. Mr. Collingsworth's Attorney Cooperation Agreement with Ivan Otero dated January 27, 2009. ................................................................................11

    B. Undisclosed Payments Revealed by Other Third-Party Subpoenas ...........................12

Argument ..................................................................................................................................13

I.     DEFENDANTS SHOULD PRODUCE THEIR SERVERS, COMPUTER HARD DRIVES AND EMAIL ACCOUNTS FOR FORENSIC EXAMINATION BY AN INDEPENDENT EXPERT.. .............13

II.    SANCTIONS ARE APPROPRIATE HERE. ..............................................................................17

    A. Defendants' Misrepresentations About Discovery Warrant Sanctions........................17

    B. Defendants' Spoliation of Evidence Warrants Sanctions. ...........................................19

Certificate of Service ...............................................................................................................22

# TABLE OF AUTHORITIES

**Cases**                                                                                                      **Page(s)**

*Adams v. City of Montgomery*,
    282 F.R.D. 627 (M.D. Ala. 2012) ...................................................................................18

*Ameriwood Indus. Inc. v. Liberman*,
    No. 4:06-cv-524-DJS, 2006 WL 3825291 (E.D. Mo. Dec. 27, 2006) ..............................16

*Balboa Threadworks, Inc. v. Stucky*,
    No. 05-1157-JTM-DWB, 2006 WL 763668 (D. Kan. Mar. 24, 2006) ..............................16

*Bank of Magnolia v. M & P Global Financial Services, Inc.*,
    258 F.R.D. 514 (S.D. Fla. 2009) ...................................................................................16

*Carlucci v. Piper Aircraft Corp., Inc.*,
    775 F.2d 1440 (11th Cir. 1985) ....................................................................................18

*Chevron Corp. v. Donziger*,
    No. 11 Civ. 0691(LAK), 2014 WL 815553 (S.D.N.Y. Mar. 4 2014) ..............................15

*Chilcutt v. U.S.*,
    4 F.3d 1313 (5th Cir. 1993) ....................................................................................18, 19

*Cox v. American Cast Iron Pipe Co.*,
    784 F.2d 1546 (11th Cir.), *cert. denied*, 479 U .S. 883, 107 S.Ct. 274, 93 L.Ed.2d 250
    (1986) ..........................................................................................................................18

*Diepenhorst v. Battle Creek*,
    No. 1:05-cv-734, 2006 WL 1851243 (W.D. Mich., June 30, 2006) ................................15

*Evans v. Mobile County Health Department*,
    No. CA-10-0600-WS-C, 2012 WL 206141 (S.D. Ala. Jan. 24, 2012) .......................19, 20

*Fair Housing of Marin v. Combs*,
    285 F.3d 899 (9th Cir. 2002) .........................................................................................19

*Flury v. Daimler Chrysler Corp.*,
    427 F.3d 939 (11th Cir. 2005) .......................................................................................19

*Gratton v. Great American Communications*,
    173 F.3d 1373 (11th Cir. 1999) .....................................................................................18

*Hudson v. AIH Receivable Management Services,*
   No. 10-2287-JAR-KGG, 2012 WL 1194329 (D. Kan. Mar 14, 2012), *as modified,* No.
   10-2287-JAR, 2012 WL 1215250 (D. Kan. Apr 9, 2012) ..................................................20

*In re Weekley Homes, L.P.,*
   295 S.W.3d 309 (Tex. 2009) ..........................................................................................15

*Jackson v. Murphy,*
   468 F. App'x 616 (7th Cir. 2012) ...................................................................................19

*Jacobson v. Starbucks Coffee Co.,*
   No. 05-1338-JTM, 2006 WL 3146349 (D. Kan. Oct. 31, 2006) ......................................16

*Link v. Wabash R. Co.,*
   370 U.S. 626 (1962).......................................................................................................19

*Malautea v. Suzuki Motor Co., Ltd.,*
   987 F.2d 1536 (11th Cir. 1993) .....................................................................................18

*Scruggs v. International Paper Co.,*
   No. CV411-203, 2012 WL 1899414 (S.D. Ga. May 24, 2012)...................................19, 20

*Simon Prop. Group L.P. v. Simon, Inc..,*
   194 F.R.D. 639 (S.D. Ind. 2000).....................................................................................16

*White v. Graceland College Center for Professional Development & Lifelong Learning, Inc.,*
   No. 07-2319-CM, 2009 WL 722056 (D. Kan., Mar. 18, 2009).........................................15

*Wynmoor Community Council, Inc. v. QBE Ins. Corp.,*
   280 F.R.D. 681 (S.D. Fla. 2012)................................................................................15, 16

**Statutes and Rules**                                                            **Page(s)**

28 U.S.C. § 1927.....................................................................................................................1

Fed. R. Civ. P. 37 ...................................................................................................................1

It is time that Defendants stop hiding behind claims of privilege—or worse, withholding documents and misrepresenting their existence—so that the parties and the Court can get to the bottom of what actually occurred with witnesses in Colombia. Pursuant to a third-party subpoena Defendants labeled as "harassment," Drummond recently received numerous emails to which Mr. Collingsworth was a party that he has neither produced nor logged. These emails reflect additional payments to and discussions of payments to witnesses in Colombia—documents that the Court ordered Defendants to produce last October.

Specifically, Mr. Collingsworth pressed for the payment of close to $100,000 for Jaime Blanco's criminal legal fees, which in his view would "win the case," and the alternative of not making the payments would result in Blanco "saying Drummond had nothing at all to do with it." In another series of emails, Mr. Collingsworth discusses a plan to bring $20,000 in cash to Colombia to provide to a witness for "the initial draft of the information," and states that another $10,000 may have to be paid later, but "[i]f we don't like what we see, we don't pay." These are but a few examples of documents that Drummond recently obtained from third parties, but have never been produced by Defendants, have never been listed on a privilege log, and have been affirmatively represented, under oath, not to exist.

Drummond hereby moves for sanctions against Defendants Terrence P. Collingsworth and Conrad & Scherer, LLP, pursuant to Rule 37(b) of the Federal Rules of Civil Procedure, 28 U.S.C. § 1927 and this Court's inherent power. Drummond requests that this Court order the Defendants to produce the hard drives from computers utilized by Defendants' litigation team during their pursuit of litigation against Drummond for forensic imaging and analysis by an independent expert. Drummond also requests that this Court order an independent forensic analysis of all file management and email servers utilized by Defendants and their litigation

team.  Drummond further requests sanctions for Defendants' repeated misrepresentations under oath and Defendants' failure to produce responsive documents in their possession.  Finally, Drummond asks that this Court treat this motion as an emergency motion and render an expedited ruling to ensure crucial evidence is preserved and not destroyed.

## FACTUAL BACKGROUND

Defendants have consistently delayed and hampered Drummond's discovery efforts through evasive answers, unexplained delays, and outright misrepresentations.  *See* Doc. 62 (Drummond's Suppl. Br. in Support of its Mtn. to Compel) at 3-6 (setting forth examples of this conduct); Doc. 89 (Drummond's Reply Brief Pursuant to the Court's Directions at the October 10, 2013 Hearing) at 11-13 (detailing Defendants' consistent and repeated failure to disclose witness payments).[2]  One of the most notable misrepresentations, which Defendants have made in both this Court and in other tribunals around the country, is that they have produced all documents showing payments to witnesses:

> MR. SMITH:  The question is are the security payments information discoverable?
>
> THE COURT: Yeah, discoverable in the defamation action.
>
> MR. SMITH: Your Honor, we think they are, and we have produced responsive documents. With exception of one that is on our Privilege Log, we have produced all responsive documents.[3]

---

[2] To date, Defendants have not produced a single financing document, despite the facts that Drummond's requests were served over a year ago, this Court specifically ordered Defendants to produce financing documents over six months ago, and Defendants represented that such documents would be produced over a month ago.  *See* Doc. 91 (Defs' Opp to Drummond's Mtn to Ext Discovery) at 3 (stating that financing documents would be produced "within the next 21 days").  To Drummond's knowledge, Defendants also have not provided a single document to Magistrate Judge Putnam for *in camera* review, nor have they furnished a privilege log to him.

[3] Drummond, at present, has no reason to believe Defendants' counsel has knowingly withheld responsive documents.  But when this representation was made to the Court, Mr. Collingsworth was sitting at counsel's table and did not correct it.

Doc. 63 (Oct. 10, 2013 Hrg. Transcript) at 26:9-16.  Drummond's most recent written discovery requests focus on payments to witnesses.  Ex. A, Defs' Responses to Pltf's 3rd Interrogatories and Requests for Production.[4]  On March 20, 2014, Defendants objected to Drummond's requests as duplicative of prior requests and represented, yet again, that "[a]ll relevant non privileged documents related to payments provided for witness security[5] have been produced in the present litigation and/or in *Balcero*."  *Id.* at 6.

This is not the only Court in which the Defendants have represented that all documents showing payments to witnesses have been produced.  For example, in response to subpoenas served by Drummond on Parker Waichman, LLP and Daniel Kovalik, Mr. Collingsworth testified that he had "reviewed our responses on behalf of Plaintiffs in the *Balcero* litigation to document requests served on them by Drummond, as well as my responses as a defendant in the libel action brought against me by Drummond, and we have produced all responsive non-privileged documents to Drummond in those cases."  *See* Ex. B, Aug. 19, 2013 Collingsworth Decl. ¶ 20 (E.D.N.Y); Ex. C, Aug. 19, 2013 Collingsworth Decl. ¶ 19 (W.D. Pa.).  Similarly, in response to a subpoena issued to International Rights Advocates ("IRA"), Mr. Collingsworth testified that "in my capacity as Defendant in the libel action and as counsel in the *Balcero* litigation, I provided all responsive, non-privileged documents in my custody, possession or control, including those in the files of IRAdvocates."  Ex. D, Aug. 16, 2013 Collingsworth Decl.

---

[4] Unless otherwise noted, the designation "Ex. __" refers to evidentiary exhibits to the Declaration of H. Thomas Wells, III, filed contemporaneously herewith.

[5] Drummond, of course, did not limit its request to documents relating to "security" payments, but rather defined "payments" to include, "without limitation, direct payments, payments to their friends or relatives, payments of their attorneys' fees, payments to a security company or otherwise for security, payments for lodging, meals, moving costs or other expenses, and any other payment that provided any sort of benefit (for whatever reason) to any witness. The term also includes any payments made at the direction, suggestion or request of any witness, regardless of the recipient." Ex. A, Drummond's 3d Req. for Prod. at 5.

¶ 5 (D.C.).  Defendants have consistently used this misrepresentation to portray Drummond's third party subpoenas as improper harassment.

Defendants are also refusing to fully search the email accounts and computers belonging to individuals on their litigation team, despite the following representation, under oath, from Mr. Collingsworth:

> Moreover, **in my capacity as Defendant in the libel action and as counsel in the *Balcero* litigation, I provided all responsive, non-privileged, and relevant documents in my custody, possession or control, and I interpreted my obligation to produce documents as including documents in the custody, possession or control of those who work with me on a case.**  Thus, the subpoenas to Daniel Kovalik, Francisco Ramirez Cuellar, Rebecca L. Pendleton, Lorraine M. Leete, Charity S. Ryerson, and Susana Tellez are duplicative of requests already made to me as a defendant in the libel action, and/or duplicative of requests that were made to Plaintiffs in the *Balcero* action. Given the duplicative nature of the requests, and that they were served on individuals that Drummond knows are part of my current or former legal teams, they are designed to harass and create an undue burden for Daniel Kovalik, Francisco Ramirez Cuellar, Rebecca L. Pendleton, Lorraine M. Leete, Charity S. Ryerson, and Susana Tellez.

Ex. D, Aug. 16, 2013 Collingsworth Decl. ¶ 12 (emphasis added).  IRA has not produced a single document in response to Drummond's subpoena.  Nor has IRA produced a privilege log.  And contrary to Mr. Collingsworth's sworn testimony, a recent letter from Defendants reveals that they have *not* searched for documents and emails of Francisco Ramirez or Ricardo Garzon, both of whom appear on documents showing payments to witnesses.  Ex. E, March 18, 2014 Ltr. from B. Smith.  With respect to the IRA computers and emails that Defendants contend they have "searched," Drummond knows that discoverable documents from these computers and email accounts that directly bear on payments to witnesses exist that have never been produced or logged by Defendants.

**A.     Drummond's Subpoenas to Parker Waichman, LLP, and Michael R. Hugo, Esq.**

Two of the pertinent third-party subpoenas that Drummond issued were to Parker Waichman, LLP ("Parker Waichman") and Michael R. Hugo, a law firm and lawyer that served as co-counsel with Mr. Collingsworth in *Balcero*.  Ex. F, Drummond's Subpoena to Parker Waichman, LLP; Ex. G, Drummond's Subpoena to Michael Hugo, Esq.  Among other things, Drummond's subpoena to Parker Waichman commanded the production of documents relating to requests for payment or other assistance from witnesses, including documents relating to requests for payment or assistance to Jaime Blanco Maya, a key witness in *Balcero*.  Defendants moved to quash Drummond's subpoena, and Mr. Collingsworth testified in a supporting declaration that "[a]ny document that Parker Waichman has or had in its custody, possession or control was provided to them by me or my staff or I have the identical documents in my custody, possession or control."  Ex. B, Aug. 16, 2013 Collingsworth Decl. ¶ 4 (E.D.N.Y.).  Mr. Collingsworth further testified that he had already produced all documents which were responsive to Drummond's subpoena.  *Id.* at ¶ 5; 20.  Indeed, in characterizing the subpoena as "serial discovery" and "harassment," Defendants' motion to quash represented that documents relating to payments and communications with witnesses "not only *could* be obtained by another source previously during discovery, all responsive, non-privileged requested documents *already have been* produced to Drummond by Defendants in the underlying defamation suit and in the *Balcero* litigation."  Ex. H, Defs' Mtn. to Quash DCI's Subpoena to Parker Waichman, LLP (1:13-mc-00690-JBW) at 9 (emphasis in original).[6]

---

[6] In order for Defendants to be able to make this representation in August, any "privileged" documents would need to have already been reviewed and segregated, and therefore should have appeared on the privilege log ordered by this Court in October. *See* note 6 *infra*.

On October 15, 2013, this Court held that payments to witnesses were properly within the scope of discovery and not subject to any privilege or work product protection. Doc. 64.[7] Parker Waichman agreed to comply with this Court's order and produce documents in its possession that were responsive to Drummond's subpoena. Parker Waichman ultimately produced numerous responsive documents pertinent to witness payments, *none* of which had ever been produced or logged by Defendants. Included in those documents are the following:

1.    **"If we don't like what we see, we don't pay."**

On November 16, 2010, Mr. Collingsworth (tc@iradvocates.com) emailed Andy Alonso and Fred Rosenthal, attorneys at Parker Waichman, regarding a trip to Colombia to meet with a witness on Tuesday, December 7, 2010. As the email reveals, Mr. Collingsworth planned to pay that witness up to $30,000 in cash, but only if he liked what he saw:

> Andy, glad to hear you can make the trip to Colombia.
>
> To confirm, you need to get to Barranquilla, Colombia. There is an Avianca flight from Miami. Not sure if there is something direct from NYC area. Copa/Continental also flies there – I think through Panama.
>
> As per our discussion, you are going to arrive Monday Dec 6 and return Dec 8. We will do two meetings on Tuesday.
>
> **In order to receive the initial draft of the information the witness requires 20k. There may be another 10 later for follow up. <u>If we don't like what we see, we don't pay.</u>** Bob Perillo (who is my guy in the banana zone) and I are very familiar with the facts. We know what they are – this guy is going to be providing more details and corroborating information.
>
> As you can only bring 10k cash into Colombia (and they are serious – if they check you and find more, they keep it by law), you need to bring 10k yourself and

---

[7] This Court also ordered Defendants to produce a supplemental privilege log containing every document claimed to be privileged. Doc. 64. Defendants produced this privilege log on December 20, 2013, and indicated in the cover letter that the only items left to be searched for and logged were "financial documents" and certain billing records. Ex. I, Dec. 20, 2013 Letter from B. Smith.

have 10k wired to me and I'll bring it. My wiring information is below. Let me know when you have your flight info.

Cheers,
Terry

Ex. J, Nov. 16, 2010 Collingsworth e-mail (FRR(2)00007-00008) (emphasis added).

Fred Rosenthal responded on November 29, copying Mike Hugo, and asked Collingsworth to "discuss with [Mike Hugo] why 20,000 cash is needed because **I see this as a recipe for disaster but u know this situation better than I**." *Id.* (emphasis added). Collingsworth responded: "FRED, I reviewed with Andy in detail – there is no other way to do this." *Id.* He also stated that "[t]his is a very important trip; we've put this guy off and we need this information. If you don't wire me the 10k TODAY, I won't get it in time." *Id.*

Although the heading of the email references "Dole," documents produced by both Parker Waichman and Defendants suggest that this money was paid to a witness in *Balcero*. Collingsworth's urgent request for a $10,000 transfer was made on November 29. The next day, Parker Waichman sent Mr. Collingsworth $10,000 in the "Drummond (Rail) ATS" case. Ex. K, PWDOCS 000021. The date of the meeting with the witness was December 7. Mr. Collingsworth's *Balcero* billing records dated December 7, 2010 contain an 8.5 hour entry with the description "Met with FR[8] and Ivan Otero; met PRIVILEGED; NON-RESPONSIVE." Ex. L, CS 7680. Presumably, the redacted information will reveal the identity of this witness.

The emails clearly reflect the payments have nothing to do with security. Yet, financing documents produced by Mike Hugo show that the $10,000 wire Mr. Collingsworth received on November 30, 2010 was described as payment for "security." Ex. M, HUGODOCS000317. This completely undermines Defendants' hollow claim that their admitted payments to other

---

[8] Based on documents received to date, "FR" is believed to be shorthand for Francisco Ramirez.

witnesses – including Charris, Duarte, Albarracin and alias "Halcon" – were for "security." These recently discovered documents reflect that "security" is being used as a euphemism to describe payments to a witness contingent wholly on whether Mr. Collingsworth "like[d]" what he saw.

### 2. "As opposed to him saying Drummond had nothing at all to do with it?"

Parker Waichman also produced numerous emails in which Mr. Collingsworth advocates the payment of up to $100,000 to Jaime Blanco Maya for his criminal legal fees to defend against Colombian criminal charges arising out of the murder of the union leaders.  Ex. N, "Money for JBM" emails.[9]  Mr. Collingsworth views these payments as critical, stating it "will win the case if we can" make the payments, the alternative being Blanco "saying Drummond had nothing at all to do with it." *Id.*

Blanco, of course, is one of Defendants' key witnesses. He was an independent food contractor at Drummond's Colombian mine and testified during the letters rogatory proceeding about Drummond's supposed relationship with the paramilitaries.  Including these newly discovered documents, the timeline for Blanco is as follows:

| Sept. 8, 2010 | Blanco is arrested and testifies before the Fiscalia.  During this testimony, Blanco is *not* represented by Ivan Otero.  Blanco testifies that Charris is an extortionist, that Blanco has never met El Tigre, and the notion that payments were funneled through his company to paramilitaries is "something that is absolutely false and accounting-wise impossible.  It is what we call a numerical reality."  Significantly, Blanco also testifies: |
| --- | --- |
| | "I want to state before Mr. Prosecutor with all due respect that a lot of interests are moving with respect to this issue since the only objective of this moment is to link DRUMMOND to a civil proceeding so that a proceeding be reopened in the United States, the proceeding that had already been closed.  It is merely a financial interest.  **It would be good that the Office of the Prosecutor would look into the labor unions, NGOs and a large amount of lawyers who are offering money to these demobilized groups** |

[9] The initials for Jaime Blanco Maya are "JBM."

| | |
|---|---|
| | **that are in precarious financial conditions so that they say what they want to hear or say**." Doc. 99-3 (Sept. 8, 2010 Blanco Decl.) at 11 (emphasis added). |
| Feb. – Mar. 2011 | Mr. Collingsworth—who happens to be a lawyer, affiliated with labor unions, and the executive director of an NGO—begins communicating with Blanco, and offers to help Blanco with the FBI as well as with a civil case. *Balcero* Doc. 396-15, Blanco Dep. at 183-88; Ex. O, Feb. – Mar., 2011 Emails with Blanco. |
| Some point prior to April 7, 2011 | Blanco apparently asks Collingsworth to provide money for his criminal legal fees. Documents showing this request and Collingsworth's response have never been produced, but the following documents recently produced by Parker Waichman reflect discussions about whether to provide such funds. |
| April 7, 2011 | Collingsworth emails Parker Waichman attorneys regarding whether they can pay Blanco's legal fees, stating the "idea is that if he does not have great representation in Colombia, he will be convicted of murders of union leaders and Drummond will benefit from this" Ex. N, "Money for JBM" emails at PWEMAIL000074. |
| April 11, 2011 | Collingsworth follows up on this request, saying, "I will see the key guy Jaime in Colombia on [Thursday] and need some feedback on the issue of his lawyer." *Id.* at PWEMAIL000073. |
| April 12, 2011 | Collingsworth follows up again: "ALSO, I have not heard from PWA on the most important question I asked. I'm seeing Jaime Thursday and need to know if we are ethically permitted to help him with his attorneys fees. This will win the case if we can (I'm not asking PWA to do anything other than tell me if we are permitted to do this. Next step will be how much, when, etc)." *Id.* at PWEMAIL000070-71.  A Parker Waichman attorney responds in several numbered paragraphs, including: "3) Regarding Jaime Blanco, we strongly feel that helping him with his attorney fees should be avoided based on the ethical implications." *Id.* at PWEMAIL000068-69.  Collingsworth responds: "The response to number 3 is not at all helpful. Give me some law and analysis – this is extremely important." *Id.* at PWEMAIL000068. |
| April 13, 2011 | A Parker Waichman attorney asks, in regard to paying close to $100,000 for Blanco's legal fees: "If paying his legal fees is going to be disclosed at some point in his deposition (which I'm sure we can all agree it will be), would it be of any real value to our case if his credibility as a witness is significantly damaged as the payment will likely be viewed as a form of bribery?" *Id.* at PWEMAIL000066-67.  Collingsworth responds to this question with another question: **"As opposed to him saying Drummond had nothing at all to do with it?"** *Id.* at |

| | PWEMAIL000066 (emphasis added) |
|---|---|
| May 23-34, 2011 | Mike Hugo, a Parker Waichman attorney at the time, recommended to Collingsworth that they meet in person to discuss the issue, stating that "[t]his is a HUGE sum of money that carries even larger ramifications. The only way to really air it out, is in person. There are several nuances that I simply will not discuss on the phone or in an email for security and professional reasons." Ex. P, May 23-24, 2011 Emails at GF000020-21. |
| | A suggestion is made that the in person meeting take place on June 6, but Collingsworth states: "That's too late if we are talking about Jaime. According to him, he needs an answer end of this week to keep his lawyers." *Id.* at GF000015-16. |
| | Insisting on a commitment regarding payment of Blanco's attorney's fees, Collingsworth stated that it was "probably the highest priority for what I think is our best case" and that he was "worried about losing a breakthrough witness with documents in a case I've been working on for 9 years." *Id.* at GF000012-14. |

The documents produced to date do not reflect the resolution to the issue of the payment of Blanco's criminal legal fees. What is known is that Ivan Otero, a member of Collingsworth's legal team, ultimately began representing Blanco in his criminal proceeding in Colombia. *Balcero* Doc. 396-15, Blanco Dep. at 187-88. On September 15, 2011, $25,650 was wired to Otero, described as an expense for "Case Management & Investigative." Ex. K, PWDOCS 000021.[10] On October 14, 2011, Blanco gave Mr. Collingsworth a declaration which completely contradicted his prior testimony to the Fiscalia and implicated Drummond in financing the AUC.

Less than two weeks ago, Mr. Collingsworth signed, under oath, answers to interrogatories seeking all instances in which payments[11] were either made to witnesses, offered

---

[10] Drummond has no doubt there are records of additional transfers to Otero. But despite being ordered on October 15, 2013 to produce, or log and produce to a magistrate for *in camera* inspection, documents pertaining to financing, Doc. 64, Defendants have still—five-and-a-half months later—failed to produce a single financing document to Drummond or to Magistrate Putnam for *in camera* review.

[11] As explained in note 4 *supra*, the definition of "payment" in the interrogatories would encompass any payment of Blanco's attorneys' fees.

to witnesses, or requested by witnesses but not provided. Ex. A, Defs' Ans. to 3d Interrog. Nos. 1-3, 7. Mr. Collingsworth responded that all relevant and non-privileged documents had already been produced. *Id.* Whether or not Blanco's criminal legal fees were paid or merely requested to be paid, neither the payment nor the request were disclosed.

**3.  Mr. Collingsworth's Attorney Cooperation Agreement with Ivan Otero dated January 27, 2009.**

Mr. Collingsworth testified that Otero was promised a contingency fee interest in the cases against Drummond in approximately December 2008. Collingsworth Decl. (Doc. 69) at ¶ 51. Mr. Collingsworth also testified that this agreement was only verbal, and that an agreement for the *Baloco* case was just recently memorialized into writing in 2012. *Id.*; Doc. 69-38. However, one of the documents recently produced by Mike Hugo (but not by Collingsworth) is a written contingency fee agreement between Collingsworth and Otero from January 2009. Ex. Q, Jan. 27, 2009 Attorney Cooperation Agreement.

That agreement, signed by both Collingsworth and Otero, promises Otero "25% of the net recovery of attorneys fees for any new cases developed and filed as a result of Ivan Otero Mendoza's investigation and identification of victims of Drummond's collaboration with the AUC." *Id.* Significantly, the Agreement also provides that Conrad & Scherer will transfer $80,000 to Otero's bank account in Colombia. *Id.* According to the Agreement, Otero was to use this money "to investigate the facts regarding Drummond's collaboration with AUC paramilitaries, particularly with respect to providing security for Drummond's railroad line that runs from the mine outside La Loma to the port in Santa Marta, Colombia." *Id.* The agreement further provides that Otero will use these funds to pay for "travel expenses, hiring consultants, and providing necessary security during the investigation," and designates the $80,000 payment as "the sole payment for these services." *Id.*

Like the above emails, this Agreement belies the Defendants' contention that they have already produced all documents regarding "security" payments. The Agreement clearly provides that Otero was to be provided $80,000 to pay for "necessary security" and to "assist key witnesses with any security measures they need, including relocation, to allow them to provide evidence for the case." *Id.* Drummond previously set forth a timeline demonstrating how Otero's clients' testimony radically changed to implicate Drummond after Otero was promised a contingency fee interest in *Balcero*. Doc. 99 at 4-7. The January 27, 2009 Agreement now shows that the witnesses' radical change in testimony was precipitated not only by Otero's contingency fee interest, but also by Defendants' promise of an $80,000 payment to Otero that was supposedly used for witness "security." Defendants have not produced a single document showing which witnesses ultimately received this money, what "security" was provided, or what this $80,000 was used for.[12]

### B.    Undisclosed Payments Revealed by Other Third-Party Subpoenas

Drummond's third party discovery efforts have revealed hundreds of additional cash payments by the Defendants to individuals in Colombia and Panama that have yet to be disclosed. In fact, based on the documents Drummond has received to date, it appears that the

---

[12] The issue of whether certain of Defendants' communications with Ivan Otero are shielded from discovery as attorney work-product is currently pending before this Court. Those communications, which are the fruit of an unethical contingency fee agreement with critical fact witnesses' criminal lawyer, are not protected by the work product doctrine. Drummond also notes that the Defendants have only logged communications with Otero between February 7, 2011 and December 17, 2012. Doc. 62-8, Defs' Priv. Log Entry Nos. 66-160. As the January 27, 2009 Agreement shows, however, Defendants promised Otero a 25% contingency fee agreement in *Balcero* over 2 years prior to the first entry, and they agreed to pay him $80,000 for "travel expenses" and witness "security." Yet, not a single communication regarding this Agreement, or the $80,000 payment, has been logged. Presumably, all such communications would reflect how the need for this money was characterized and how it was actually spent. By not logging any communications with Otero that predate February 7, 2011, which surely exist, Defendants have waived any privilege or work product protection over them. *See* Doc. 63 (Oct. 10, 2013 Hrg. Transcript) at 46:4-16.

Defendants sent roughly $300,000 in cash via Western Union and MoneyGram to Colombia and Panama to over 20 different individuals.[13]  Wells Decl. ¶ 3.  Many of the payment recipients are unknown.  Thus, Drummond's most recent discovery requests asked the Defendants to identify the recipients and produce all documents associated with these payments.  Defendants flatly refused to provide any response whatsoever to these requests.  Ex. A, Defs' Responses to Pltf's 3rd Interrogatories.

One payment recipient whose identity *is* known is Isnardo Ropero.  Mr. Ropero testified against Drummond in *Romero v. Drummond Co., Inc.*, 7:03-cv-00575-KOB (N.D. Ala.).  Documents produced by Western Union reflect that Defendants paid Ropero nearly $9,000 between July 18, 2007 and February 25, 2008.  Wells Decl. ¶ 4; Ex. R, Isnardo Ropero Payment Documents.  Defendants have not produced a single document relating to these payments and, if their most recent discovery responses are credited, those payments necessarily could not have been for security, because "[a]ll relevant non privileged documents related to payments for witness security have been produced in the present litigation and/or in *Balcero*."  Ex. A, Defs' Responses to Pltf's 3rd Interrogatories No. 5.

The first three payments to Ropero were sent by Daniel Kovalik, who was co-counsel with Mr. Collingsworth in *Romero*.  The first payment—for $1,890—was sent from Pittsburgh, Pennsylvania to Panama on July 16, 2007.  Western Union records reflect that this cash payment was received on July 18, 2007.  This is the same day that Isnardo Ropero's videotaped deposition was played for the jury in *Romero*.  *See Romero* Doc. 506-7 (Trial Transcript Vol. VI) at 1092-1169.

---

[13] This figure does *not* include the approximately $7,000 in direct bank wires to the families of Duarte and Albarracin, or the approximately $36,000 deposited directly into the bank account of Charris's wife by staff working for Francisco Ramirez.

**ARGUMENT**

I.  **DEFENDANTS SHOULD PRODUCE THEIR SERVERS, COMPUTER HARD DRIVES AND EMAIL ACCOUNTS FOR FORENSIC EXAMINATION BY AN INDEPENDENT EXPERT.**

Defendants' effort to conceal their payments to witnesses has gone on long enough. Defendants are knowingly withholding relevant, non-privileged documents that reveal a rampant and multifaceted scheme to pay hundreds of thousands of dollars to Colombian witnesses and their criminal lawyer. As this Court has already recognized, the work product doctrine was never meant to shield this type of conduct from discovery. Doc. 64. There is no question that these documents should have been produced, or at the very least logged, by the Defendants. They were not.

Moreover, Defendants' failure to produce or log these documents has been accompanied by their repeated misrepresentation – under oath – that all such documents had already been produced. Indeed, the emails discussed above were written using Mr. Collingsworth's IRAdvocates email address. Yet, Collingsworth testified under oath that "any non-privileged documents that are responsive to the request to IRAdvocates have already been produced." Ex. B, Aug. 19, 2013 Collingsworth Decl. ¶ 20 (E.D.N.Y).

Under these circumstances, Defendants should be ordered to produce the hard drive of any computer, as well as the entire email mailbox of any email address, utilized by Mr. Collingsworth's litigation team in their pursuit of litigation against Drummond so that this material may be forensically imaged, examined, and preserved.[14] Drummond rightly has no confidence in Defendants' discovery responses and has unequivocal proof that critical and responsive documents are neither being produced nor logged. Thus forensic imaging is needed:

---

[14] Prior to filing this motion, Drummond asked the Defendants if they would be willing to produce their hard drives and email accounts for forensic analysis due to concerns over evidence preservation, and stated a response was needed by April 1. Defendants did not respond.

A forensic image, otherwise known as a "mirror image" will "replicate bit for bit sector for sector, all allocated and unallocated space, including slack space, on a computer hard drive." A mirror image "contains all the information in the computer, including embedded, residual, and deleted data." A Court must be mindful of the potential intrusiveness of ordering forensic imaging, however. Before compelling such imaging the court must weigh inherent privacy concerns against its utility. The Court should consider "whether the responding party has withheld requested information, whether the responding party is unable or unwilling to search for the requested information, and the extent to which the responding party has complied with discovery requests." "When a requesting party demonstrates ... the responding party's failure to produce requested information, the scales tip in favor of compelling forensic imaging." *Id.* at 426, 928 N.E.2d 763 citing, *White v. Graceland College Center for Professional Development & Lifelong Learning, Inc.,* 2009 WL 722056, *7 (D. Kan., Mar. 18, 2009); *Diepenhorst v. Battle Creek,* 2006 WL 1851243, *3 (W.D. Mich., June 30, 2006); *In re Weekley Homes, L.P.,* 295 S.W.3d 309 (Tex. 2009).

*Wynmoor Community Council, Inc. v. QBE Ins. Corp.*, 280 F.R.D. 681, 686-687 (S.D. Fla. 2012). Indeed, where litigants have demonstrated an unwillingness or inability to properly search for responsive documents, courts have compelled them to produce their hard drives for forensic imaging.

For example, the Southern District of New York addressed a case involving the lawyer Stephen Donziger, who represented the plaintiffs in a long-running Alien Tort Statute-related case against Chevron Corporation.[15] The court there ordered Donziger to produce his hard drive for forensic imaging after he repeatedly failed to adequately respond to a subpoena:

> [T]here is evidence that at least suggests that Donziger may have erased or is withholding still other responsive documents. *See* letter, Randy M. Mastro, Jan. 21, 2011, at 1. Among other things, documents produced by Donziger have not included a good many relevant documents that were originated by or sent to Donziger that have been produced by others pursuant to subpoenas in other

---

[15] Donziger has just recently been found by that court to be liable under RICO for unlawfully pursuing a case against Chevron through the use of bribery in Ecuador. *See Chevron Corp. v. Donziger*, No. 11 Civ. 0691(LAK), 2014 WL 815553 (S.D.N.Y. Mar. 4 2014) (due to its length, the opinion is published on Westlaw in 7 parts; only the first part is cited here). Privilege logs filed in connection with that case reflect emails involving both Mr. Collingsworth and Mr. Donziger. *See* Drummond's Mot. to Compel (Doc. 43) at 11 n.11. Yet, Defendants have neither produced nor logged any communications involving Donziger.

> proceedings. In this electronic era, the likelihood that Donziger does not have those documents on his hard drives, absent some purging of those hard drives, seems remote. Moreover, a forensic examination might well succeed in determining whether any such purges occurred, who initiated them, and when they took place and in recovering some or all of the purged documents

Ex. S, Jan 21, 2011 Order from *In re Application of Chevron Corp.*, 10-mc-00002(LAK), (S.D.N.Y.) (Kaplan, J) (ordering the production of Steven Donziger's hard drives for imaging by Chevron). *See also Wynmoor Community Council, Inc.*, 280 F.R.D. at 687 ("It would appear that Plaintiffs are either unwilling or unable to conduct a search of their computer systems for documents responsive to Defendant's discovery requests. In light of the foregoing, the Court believes that a forensic examination of Plaintiffs' computers is warranted."); *Bank of Magnolia v. M & P Global Financial Services, Inc.*, 258 F.R.D. 514, 519-520 (S.D. Fla. 2009) (finding the forensic imaging of a defendant's hard drives appropriate, "particularly in light of the recovery of apparently responsive documents by the Plaintiffs from third party sources").[16]

Importantly, a forensic analysis of Defendants' hard drives and email will also aid in determining the extent to which evidence has been improperly destroyed. *See Union Pump Co. v. Centrifugal Technology, Inc.*, 404 F. App'x 899, 903 (5th Cir. 2010) (forensic analysis of hard drives revealed that the computers "had been deleted using memory wiping software designed

---

[16] *See also Jacobson v. Starbucks Coffee Co.*, No. 05-1338-JTM, 2006 WL 3146349 (D. Kan. Oct. 31, 2006) (a mirror image of the defendant's hard drive for the plaintiff's inspection was warranted given the defendant's history of incomplete and inconsistent responses to production requests); *Simon Prop. Group L.P. v. Simon, Inc.,* 194 F.R.D. 639, 641 (S.D. Ind. 2000) (allowing plaintiff to inspect defendant's computer system because plaintiff demonstrated "troubling discrepancies with respect to defendant's document production"); *Ameriwood Indus. Inc. v. Liberman,* No. 4:06CV524-DJS, 2006 WL 3825291, *1 (E.D. Mo. Dec. 27, 2006) (granting motion to compel imaging of defendant's hard drive because the court had "cause to question whether defendants have produced all responsive documents"); *Balboa Threadworks, Inc. v. Stucky,* No. 05-1157-JTM-DWB, 2006 WL 763668, at *4 (D. Kan. Mar. 24, 2006) (permitting imaging of defendants' computer where defendants' representation that no responsive materials existed on computer was contradicted by their production of e-mail created on that computer).

specifically for that purpose"). If Defendants' discovery responses are believed, and they have produced all responsive documents in their possession, they have clearly destroyed other responsive documents that are now being produced by third-parties.

In order to preserve and obtain documents that have been improperly withheld from discovery by Defendants, Drummond requests that the Court order Defendants to immediately make available to an independent forensic computer consultant for examination and imaging: (1) all hard drives from any computer by Defendants' litigation team in litigation against Drummond—including, but not limited to Conrad & Scherer, LLP email accounts and IRA emails accounts; (2) .pst files containing the entire e-mail mailbox for any email address used by Defendants' litigation team; and (3) any and all file management servers, backup servers or databases which could contain emails or other relevant documents that have heretofore not been produced by Defendants. These hard drives, email mailboxes, and servers contain discoverable and crucial evidence intentionally withheld from production by the Defendants, including evidence that directly bears on the true purpose of the Defendants' payments to witnesses on whose testimony they are relying to support the truth of their defamatory letters. A copy of a proposed order is attached to this motion for the Court's consideration.[17]

## II. SANCTIONS ARE APPROPRIATE HERE.

### A. Defendants' Misrepresentations About Discovery Warrant Sanctions

---

[17] Drummond is cognizant of the gravity of its requested relief, especially when juxtaposed with this Court's stated concern of allowing discovery in certain areas while other cases filed by Mr. Collingsworth remain pending. The proposed order, however, will insulate both this Court and Drummond from material that may not be discoverable in this defamation action and provides for an independent expert to perform the forensic analysis of this material. Then, an independent reviewer and Magistrate Judge Putnam will review the results for responsive, non-privileged documents. Only after that screening process will any documents be produced to Drummond. Importantly, Defendants' hard drives, documents and emails will be preserved, and additional material could later be easily produced according to this Court's ongoing rulings on discovery issues.

Because Defendants have consistently refused to produce responsive, non-privileged documents in their possession, Drummond has been relegated to conducting extensive third party discovery all across the country, at great time and expense.[18] That third party discovery has revealed documents in Defendants' possession which should have been produced long ago that are clearly not "work product." Drummond's discovery efforts also prove that Mr. Collingsworth has repeatedly lied under oath about the existence of those documents.

This Court has broad authority under Rule 37 to control discovery. *Cox v. American Cast Iron Pipe Co.,* 784 F.2d 1546 (11th Cir.), *cert. denied*, 479 U .S. 883, 107 S.Ct. 274, 93 L.Ed.2d 250 (1986). "Rule 37 sanctions are intended to prevent unfair prejudice to the litigants and ensure the integrity of the discovery process." *Gratton v. Great American Communications*, 173 F.3d 1373, 1375 (11th Cir. 1999). Improperly withholding discoverable documents is sanctionable conduct under Rule 37. *See Malautea v. Suzuki Motor Co., Ltd.*, 987 F.2d 1536, 1539 (11th Cir. 1993) (upholding a default judgment sanction after "the defendants stubbornly withheld discoverable information by improperly objecting to interrogatories and by providing only partial responses to the interrogatories they answered"); *Adams v. City of Montgomery*, 282 F.R.D. 627, 635-636 (M.D. Ala. 2012) (sanctioning a defendant for its "shifting privilege assertions" and for improperly withholding documents which "went to the heart of Adams' retaliation claim").

Where a failure to produce discoverable documents is accompanied by willful conduct, severe sanctions are appropriate. Indeed, "[i]f this case is not a paradigm of the abuse that sanctions under Rule 37 are to correct, we would have great difficulty hypothesizing one that is."

---

[18] Defendants have filed a motion to quash nearly every third party subpoena issued by Drummond, leading to miscellaneous discovery proceedings in California, New York, Pennsylvania, and Washington, D.C.

*Carlucci v. Piper Aircraft Corp., Inc.*, 775 F.2d 1440, 1449 (11th Cir. 1985) (a litigant who improperly interferes with discovery proceedings and misrepresents the existence of discoverable documents is properly subject to severe sanctions). Here, Defendants have "not only intentionally withheld documents that [they] knew existed, but [they] also knowingly made blatant misrepresentations to the district court about the existence of those documents." *Chilcutt v. U.S.*, 4 F.3d 1313, 1322-1323 (5th Cir. 1993) (affirming the district court's severe sanction of deeming "the liability facts of the plaintiff's case established"). *See also Fair Housing of Marin v. Combs*, 285 F.3d 899, 905-906 (9th Cir. 2002) (upholding district court's sanction of a default judgment where "Combs not only failed to produce the documents as ordered, but also misrepresented to both counsel and to the district court that the documents did not exist"); *Jackson v. Murphy*, 468 F. App'x 616 (7th Cir. 2012) (affirming the district's court's dismissal of a plaintiff's claim as a sanction where he forged a document and perjured himself in an affidavit).

### B.  Defendants' Spoliation of Evidence Warrants Sanctions

If the Court concludes that Defendants destroyed or failed to preserve key documents, then it has the authority to impose sanctions for such spoliation of evidence. The Court may impose sanctions for spoliation based on the Court's inherent authority to control the judicial process. *Link v. Wabash R. Co.,* 370 U.S. 626, 630-31 (1962) (stating that a court's inherent power is "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.").

Sanctions for spoliation are "applied where a party destroys or fails to preserve evidence ahead of reasonably foreseeable litigation, if not in the face of actual litigation." *Scruggs v. International Paper Co.*, No. CV411-203, 2012 WL 1899414, at *1 (S.D. Ga. May 24, 2012)

(citing *Flury v. Daimler Chrysler Corp.,* 427 F.3d 939, 943–46 (11th Cir. 2005)). These sanctions "prevent unfair prejudice to litigants and to insure the integrity of the discovery process." *Flury*, 427 F.3d at 944. Sanctions range from an "adverse inference instruction" to the jury to an award of attorney's fee and expenses. *Id.* at 947; *Evans v. Mobile County Health Department,* 2012 WL 206141 at * 10–13 (S.D. Ala. Jan. 24, 2012) (imposing spoliation sanctions, including an adverse inference instruction and an award of attorney's fees and expenses, based on the defendant's destruction of computer evidence).

Sanctions for spoliation "extend to negligent, reckless, and intentional evidence destruction." *Scruggs*, 2012 WL 1899414, at *1 (citing *Hudson v. AIH Receivable Management Services,* 2012 WL 1194329 at * 4 (D. Kan. Mar 14, 2012) (sanction warranted for negligent destruction of emails), *as modified,* 2012 WL 1215250 (D. Kan. Apr 9, 2012)).

There can be little question that Defendants were under an obligation to preserve documents showing that they had made payments to witnesses. Such an obligation would exist whether the payments were appropriate or not, since evidence of witness payments would be relevant to the bias of the witnesses. This obligation to preserve this evidence arose as soon as Defendants filed their first lawsuit against Drummond. Given that Defendants have effectively been litigating these claims against Drummond since 2002, the duty to preserve this evidence has been in effect from then until the present.

Defendants' failure to produce emails about witness payments that were then produced by third parties—combined with their vehement and repeated misrepresentations as to what had been produced—supports the conclusion that this failure was willful and in bad faith.

\*      \*      \*

In light of the above-described conduct, and because the documents improperly withheld (or destroyed) bear directly on a central issue in this case, Drummond requests that this Court enter the following sanctions against the Defendants:

- Award Drummond its attorneys' fees and costs incurred in preparing this motion and in responding to Defendants' motion to quash Drummond's subpoena to Parker Waichman, LLP and IRAdvocates;

- Order the Defendants to produce Defendants' servers, hard drive(s) and email .pst files immediately for forensic imaging by an independent expert;

- Order the Defendants to pay for the costs of retaining an independent computer forensic expert to perform a forensic image and analysis of Defendants' servers, hard drive(s) and .pst files, as well as the costs of any independent review of documents recovered;

- Strike Defendants' affirmative defenses. Alternatively, Drummond requests an adverse inference instruction be given to the jury on the issue of actual malice; and

- Drummond further requests that this Court sanction Defendants in any other manner it deems appropriate.

## CONCLUSION

At this point, Drummond has no reason to believe that it is receiving accurate or complete discovery responses from Defendants, or that Defendants have any intention to actually produce or log all responsive documents pertinent to their payments, or other offers of assistance, to witnesses in Colombia. The documents discovered to date reveal a disturbing pattern of conduct which should not be allowed to be shielded by claims of work-product or privilege, or hidden by outright lack of disclosure. Drummond, and this Court, should be permitted to determine exactly what has occurred with witnesses (and their lawyers) in Colombia.

Respectfully submitted,

/s/ H. Thomas Wells, III
William Anthony Davis, III (ASB-5657-D65W)
H. Thomas Wells, III (ASB-4318-H62W)
Benjamin T. Presley (ASB-0136-I71P)
STARNES DAVIS FLORIE LLP
P.O. Box 59812
Birmingham, AL 35259
(205) 868-6000
fax: (205) 868-6099

/s/ Sara E. Kropf
Sara E. Kropf
LAW OFFICE OF SARA KROPF PLLC
1001 G St. NW, Suite 800
Washington, DC 20001
(202) 627-6900

*Attorneys for Drummond Company, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on **April 2, 2014**, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

John W. Clark, Jr., Esq.
Bradley J. Smith, Esq.
Eric D. Bonner, Esq.
Clark, Hair & Smith, P.C.
1000 Urban Center Drive
Suite 125
Birmingham, Alabama 35242

/s/ H. Thomas Wells, III
H. Thomas Wells, III (ASB-4318-H62W)