

FILED
2015 Jul-16  PM 03:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| DRUMMOND COMPANY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:11-cv-3695-RDP-TMP |
| | ) | |
| TERRENCE P. COLLINGSWORTH, | ) | **FILED UNDER SEAL PURSUANT TO** |
| individually and as agent of Conrad & Scherer, | ) | **COURT ORDER** |
| LLP; and CONRAD & SCHERER, LLP, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' RESPONSE TO DRUMMOND COMPANY, INC.'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW, AND DEFENDANTS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Kenneth E. McNeil, *Pro Hac Vice*
Texas State Bar No. 13830900
Stuart V. Kusin, *Pro Hac Vice*
Texas State Bar No. 11770100
SUSMAN GODFREY LLP
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone: 713/651-9366
Facsimile: 713/654-6666
kmcneil@susmangodfrey.com
skusin@susmangodfrey.com

Lindsey Godfrey Eccles, *Pro Hac Vice*
WASB No. 33566
SUSMAN GODFREY LLP
1201 Third Avenue
Suite 3800
Seattle, Washington 98101
Telephone: 206/516-3880
Facsimile: 206/516-3883
leccles@susmangodfrey.com

*Attorneys for Terrence P. Collingsworth and Conrad & Scherer LLP*

<u>**Of Counsel for Defendants Terrence P. Collingsworth and Conrad & Scherer LLP**</u>

Christopher S. Niewoehner
Admitted *pro hac vice*
Steptoe & Johnson LLP
115 South LaSalle Street,
Suite 3100
Chicago, IL 60604
Tel: 312-577-1240
Fax: 312-577-1370
cniewoehner@steptoe.com

Kendall R. Enyard
Savannah E. Marion
Admitted *pro hac vice*
Steptoe & Johnson LLP
1330 Connecticut Avenue
NW
Washington, DC 20036
Tel: 202-429-6405
Fax: 202-429-3902
kenyard@steptoe.com
smarion@steptoe.com

Robert K. Spotswood
Michael T. Sansbury
William T. Paulk
SPOTSWOOD SANSOM & SANSBURY
LLC
One Federal Place
1819 Fifth Avenue North, Suite 1050
Birmingham, Alabama 35203
Tel: 205-986-3620
Fax: 205-986-3639
rks@spotswoodllc.com
msansbury@spotswoodllc.com
wpaulk@spotswoodllc.com

Conrad & Scherer, LLP and Terrence P. Collingsworth hereby respond to Drummond's Proposed Findings of Fact and Conclusions of Law, and submit their own Proposed Findings of Fact and Conclusions of Law, pursuant to the Court's May 21, 2015 Order, Doc. 233, and the Court's May 22, 2015 Text Order. This document, and its exhibits, are being filed under seal in accordance with the Court's July 15, 2015 Order, Doc. 277. These are preliminary and subject to further opportunity to respond to Drummond's reply to this preliminary document.

## DEFENDANTS' RESPONSE TO DRUMMOND'S PROPOSED FINDINGS OF FACT

Mr. Collingsworth and Conrad & Scherer lodge a standing objection to Drummond' use of the word "Defendants" throughout its proposed findings of fact and conclusions of law.

### *Ivan Otero Mendoza*

1.      Ivan Otero is a "key member" of Defendants' litigation team. Doc. 69 (Nov. 7, 2013 Collingsworth Decl.) at ¶ 51. **UNDISPUTED that Otero was co-counsel with Conrad & Scherer in the *Balcero* case. DISPUTED as phrased because "key member" and "litigation team" are ambiguous.**

2.      Ivan Otero joined Defendants' litigation team in December 2008.  Doc. 69 (Nov. 7, 2013 Collingsworth Decl.) at ¶ 51. **UNDISPUTED that Otero became co-counsel with Conrad & Scherer in the *Balcero* case in or around December 2008. DISPUTED because the phrase "litigation team" is ambiguous.**

3.      Ivan Otero has a contingency fee agreement with Mr. Collingsworth in both *Baloco* and *Balcero* entitling him to 17% of any recovery against Drummond.  Doc. 69 (Nov. 7, 2013 Collingsworth Decl.) at ¶ 51. **UNDISPUTED that Otero had a contingency fee agreement with Mr. Collingsworth in both *Baloco* and *Balcero*. DISPUTED because Otero's contingency fee percentage in *Balcero* was 16%. *See* Doc. 69-38.**

4.      Ivan Otero represented Jhon Jairo Esquivel Cuadrado ("El Tigre") at the time El Tigre signed a declaration against Drummond in 2009.  Doc. 69-29 (*Balcero* Pls' July 16, 2012 Resp. to Drum. 5th Irogs) at p. 11; Doc. 69-39 (Nov. 5, 2013 Otero Decl.) ¶ 4. **DISPUTED. As explained in his declaration submitted in opposition to Drummond's sanctions motion, Otero did not represent El Tigre as of 2009.** *See* **Doc. 187-2, ¶¶ 21-22, 27.[1] Further, as explained in the attached declaration of Christian Levesque, a senior associate with Conrad & Scherer who drafted this interrogatory response, the reference to Otero in Doc. 69-29, at p.11, as being "his [El Tigre's] counsel" was simply a mistake and was made based on Ms. Levesque's confusion as to Otero's role at that time.** *See* **Exhibit A (Decl. of Christian Levesque), ¶¶ 5-7.[2]**

5.      Ivan Otero represented Alcides Manuel Mattos Tabares ("Samario") at the time Samario signed a declaration against Drummond in 2009.  Doc. 69-29 (*Balcero* Pls' July 16, 2012 Resp. to Drum. 5th Irogs) at p. 11; Doc. 69-39 (Nov. 5, 2013 Otero Decl.) ¶ 4. **DISPUTED. As explained in his declaration submitted in opposition to Drummond's sanctions motion, Otero did not represent Samario as of 2009.** *See* **Doc. 187-2, ¶¶ 21-22, 27. Further, as explained in the attached declaration of Christian Levesque, a senior associate with Conrad & Scherer who drafted this interrogatory response, the reference to Otero in Doc. 69-29, at p.11, as being "his [Samario's] counsel" was simply a mistake and was made based on Ms.**

---

[1] Drummond has cited to the publically-filed, redacted document numbers. For consistency, Defendants do the same. Defendants note, however, that Doc. 174, and its redacted exhibits, are located in un-redacted form (and under seal) at Doc. 180. Document 187, and its redacted exhibits, are located in un-redacted form (and under seal) at Doc. 189.

[2] New exhibits submitted by defendants with this filing are identified by letter. Exhibits identified by number are exhibits attached to Drummond's proposed findings of fact. Citations to documents and evidence already in the record in this or other federal court cases will be referred by to "Doc." number and, for cases other than this one, case number.

Levesque's confusion as to Otero's role at that time. *See* **Exhibit A (Decl. of Christin Levesque), ¶¶ 5-7.**

6.     Ivan Otero represented Jaime Blanco as his criminal lawyer. *Balcero* Doc. 396-15 (Blanco Dep.) at 2, 187-188; Ex. 2 (Sept. 11, 2014 B. Scherer Affidavit) at ¶ 5; Doc. 69-39 (Nov. 5, 2013 Otero Decl.) ¶ 4. **UNDISPUTED that Otero represented Blanco in matters unrelated to Drummond. Otherwise, DISPUTED.** *See* **Doc. 187-2 (Otero Decl.) ¶ 52 ("I did not represent Blanco as an attorney in relation to the charges that he had a role in the murder of the Drummond union leaders.);** *id.* **¶ 73 ("Again, I was not Blanco's attorney on the Drummond matter, and did not provide any privileged attorney advice to him on the matter. Blanco had retained other attorneys to represent him in his criminal case involving Drummond.").**

7.     Ivan Otero appeared as counsel on behalf of Jairo Jesus Charris Castro ("Charris") during Charris's deposition in *Balcero*. *Balcero* Doc. 411-55 (Charris Dep.) at 129, 164-166. **DISPUTED.**

8.     In or around April 2009, Defendants provided Ivan Otero with an $80,000 payment. Doc. 174-7 (Defs' 1ˢᵗ Am. Resp. to Drummond's 3ʳᵈ Irogs, No. 2) at 9-10. **UNDISPUTED that Otero received an $80,000 payment as a retainer fee in April 2009.** *See* **Doc. 174-7 (Defs.' Am. and Supp. Resps. to Drummond's Third ROGS Nos. 2 & 8), at 9-10 (explaining that Otero received an $80,000 retainer in April 2009).**

9.     Otero provided some or all of this $80,000 to one or more witnesses who provided testimony against Drummond in *Balcero*. *Id.* **DISPUTED as there is no evidence to defendants' knowledge that Otero used any of this money, which was a retainer fee, for witness security assistance.**

10.     To date, Defendants have not produced any documents or disclosed any information showing what witness(es) received any part of this $80,000 payment. **UNDISPUTED because, to the best of their knowledge, defendants do not possess any such documents.**

11.     To date, Defendants have not produced any documents which reflect how this $80,000 was spent. **UNDISPUTED because, to the best of their knowledge, defendants do not possess any such documents.**

12.     On or about April 19, 2012, Defendants provided Ivan Otero with a $10,000 cash payment.  Ex. 3 (CS_TC 000423). **UNDISPUTED.**

13.     Otero provided some or all of this $10,000 to one or more witnesses who provided testimony against Drummond in *Balcero*.   Ex. 3 (CS_TC 000423). **DISPUTED. Drummond has not produced any evidence that Otero provided all or part of this cash payment to any witness who provided testimony against Drummond in *Balcero*.**

14.     To date, Defendants have not produced any documents or disclosed any information showing what witness(es) received any part of this $10,000 payment. **UNDISPUTED, as there is no evidence that any of this money was paid to witnesses.**

15.     To date, Defendants have not produced any documents which reflect how this $10,000 was spent. **DISPUTED. Ex. 3 (CS_TC 000423) states that this money was paid to Otero "for logistical and security issues associated with getting testimony from new AUC witnesses."**

### *Alias "Halcon"*

16.     Defendants disclosed alias "Halcon" as a witness in their Rule 26 *Balcero* initial disclosures, identifying him as a witness who purportedly had knowledge of Drummond's

collaboration with the AUC.  Doc. 69 (Nov. 7, 2013 Collingsworth Decl.) ¶ 41; *see also* Doc. 50-4. **UNDISPUTED that Halcon was identified as a witness in the Rule 26 initial disclosures in *Balcero*. DISPUTED because the Rule 26 disclosures did not identify him as someone "who purportedly had knowledge of Drummond's collaboration with the AUC." Halcon was identified in Doc. 50-4 as someone with "responsive facts," and Drummond was subsequently informed that Halcon was not going to be a witnesses. *See* Doc. 174-7, at 9 (Defs.' Am. & Supp. Resp. Drummond's 3rd ROGs Nos. 2 and 8) (explaining that Drummond was informed on July 16, 2012, that Halcon would not be a witness).**

17.     Defendants' Rule 26 disclosures in this defamation case incorporate all of the witnesses listed in their Rule 26 initial disclosures in *Balcero*.  Ex. 4 (Defendants' Rule 26 Initial Disclosures).  **UNDISPUTED that defendants' initial disclosures in this defamation case identified "[a]ll Parties and witnesses in collateral lawsuits which are identified as follows," and that *Balcero* was one of the cases listed.**

18.     Alias "Halcon" was paid in excess of $50,000 by Defendants and their litigation team.   Doc. 44-19.  **UNDISPUTED that Halcon received witness assistance payments through Jose Pinzon. Halcon required security assistance to allow him to flee Colombia after he "escaped an attempt on his life immediately following his cooperation with plaintiffs in providing evidence of Drummond's support for and cooperation with the AUC." Doc. 69 (Nov. 7, 2013 Collingsworth Decl.) ¶ 41.**

19.     Defendants' litigation team made the majority of the payments to "Halcon" by sending international monetary transfers via Western Union and MoneyGram to a man named Jose Pinzon in Colombia.  Doc. 44-19. **UNDISPUTED THAT payments were sent to Jose Pinzon for the benefit of Halcon because Pinzon had a bank account in Colombia, and**

Halcon, who was in Panama, did not have a bank account. *See* **Exhibit B (July 15, 2015 Collingsworth Decl.), ¶ 17.**

20.   At present, the known payments to alias "Halcon" span from approximately June of 2007 to October of 2012.  Doc. 44-19; Ex. 5 (June 2007 payment); Doc. 69 (Nov. 7, 2013 Collingsworth Decl.) ¶ 41.  **UNDISPUTED that payments ended in approximately October 2012. The security risk had dissipated, and it was clear at that time that his testimony was not credible and he would not be used as a witness. Drummond was informed of this fact in 2012. Doc. 69 (Nov. 7, 2013 Collingsworth Decl.) ¶ 41.**

### *Jose Gelvez Albarracin ("El Canoso")*

21.   Gelvez was one of Defendants' fact witnesses in *Balcero* who accused Drummond of collaborating with the AUC.  *Balcero* Doc. 396-24. **UNDISPUTED because the documents cited, Gelvez's deposition, makes clear that Drummond collaborated with the AUC.**

22.   Defendants are relying on Gelvez's testimony to support the truth of the defamatory statements at issue in this case.  *See* Doc. 43-10 (Defs.' 2d Am. Resp. to 1st Req. for Prod.) at Nos. 1, 3-16, 18-20, 22-26, 29-33. **UNDISPUTED.**

23.   On or about November 28, 2011, Defendants paid $2,084 to Jose Gelvez Albarracin's ("El Canoso") wife, Celina Lombardi Nieves.  Doc. 44-16. **UNDISPUTED.**

### *Jairo de Jesus Charris Castro ("Charris")*

24.   Charris was one of Defendants' fact witnesses in *Balcero* who accused Drummond of collaborating with the AUC.  *Balcero* Doc. 407-3. **UNDISPUTED.**

25.     Defendants are relying on Charris's testimony to support the truth of the defamatory statements at issue in this case.  *See* Doc. 43-10 (Defs.' 2d Am. Resp. to 1st Req. for Prod.) at Nos. 1, 3-16, 18-20, 22-26, 29-33. **UNDISPUTED.**

26.     On or about June 23, 2009, Defendants' litigation team provided a $1,500 payment to Charris via team member Ricardo Garzon.  Ex. 6 (CS_TC 3175). **UNDISPUTED that Charris received a $1,500 witness assistance payment through Ricardo Garzon, which was to relocate Charris' family. As explained in prior interrogatory responses, Charris expressed concern for his family during his criminal testimony in June 2009 against Drummond. Doc. 174-7, at 6. Consistent with Mr. Collingsworth's promise to witnesses in the *Balcero* case who received credible, or whose families received credible, threats to "do whatever we could to provide security or to provide a safe haven until such time as the danger had subsided," Doc. 69, ¶ 36— a promise Mr. Collingsworth freely expressed to Drummond and the Court—Mr. Collingsworth authorized the payment of these security expenses. DISPUTED because Ricardo Garzon was not a member of "Defendants' litigation team," which is an ambiguous term.**

27.     On or about July 30, 2009, Defendants' litigation team provided a 3,000,000 (approximately $1,446) Colombian peso payment to Charris' relative, Mery Luz Molina Morales.  Doc. 44-6; *http://www.oanda.com/currency/converter/*. **UNDISPUTED that a witness assistance payment was made on or about July 30, 2009 to Mery Luz Molina, who defendants understand to be the sister-in-law of Charris' wife. As explained in prior interrogatory responses, Charris expressed concern for his family during his criminal testimony in June 2009 against Drummond. Doc. 174-7, at 6. Charris reiterated those concerns to Mr. Collingsworth in July 2009. *Id.* Consistent with Mr. Collingsworth's**

promise to witnesses in the *Balcero* case who received credible, or whose families received credible, threats to "do whatever we could to provide security or to provide a safe haven until such time as the danger had subsided," Doc. 69 ¶ 36— a promise Mr. Collingsworth freely expressed to Drummond and the Court—Mr. Collingsworth authorized the payment of these security expenses. **DISPUTED because** "**Defendants' litigation team**" **is an ambiguous term.**

28.     On or about September 3, 2009, after being paid approximately $3,000 and being promised continuing monthly payments, Charris signed a declaration for use in the Defendants' civil cases against Drummond. Doc. 43-15. **UNDISPUTED that Charris signed a declaration after witnesses assistance payments were made to Charris' family for security and safety reasons.**

29.     Between August 2009 and present day, Defendants' litigation team has made monthly payments to Charris by depositing approximately 1,500,000 Colombian pesos (approximately $840) per month into a bank account held by Charris' wife, Claudia Pinzon Ballesteros. Doc. 44-6; Ex. 1 (May 21, 2015 Hrg. Tr.) at 56:23-57:18; *http://www.oanda.com/currency/converter/*. **UNDISPUTED that witness assistance payments continued to be made after August 2009 for protection of Charris' family due to the continuing threats and consequences of relocating the family from a rural area into the city. Defendants have previously explained the details of these payments to Drummond and the Court.** *See* **Doc. 174-7, at 6-7. DISPUTED to the extent this statement implies that payments were always made into a bank account held by Charris' wife, as the payment method varied due to the dangers of receiving payments the same way. DISPUTED to the extent an ambiguous term like "litigation team" is used.**

30.     At present, Defendants' payments to Charris exceed $40,000.  Doc. 44-6; Ex. 1 (May 21, 2015 Hrg. Tr.) at 56:23-57:18; *http://www.oanda.com/currency/converter/.* **UNDISPUTED that witness assistance payments were made to Charris' family for relocation and safety reasons and that those payments exceeded $40,000.**

### *Jaime Blanco Maya ("Blanco")*

31.     Jaime Blanco was one of Defendants' fact witnesses in *Balcero* who accused Drummond of collaborating with the AUC.  *Balcero* Doc. 396-15. **UNDISPUTED.**

32.     Defendants are relying on Blanco's testimony to support the truth of the defamatory statements at issue in this case.  *See* Doc. 43-10 (Defs.' 2d Am. Resp. to 1st Req. for Prod.) at Nos. 1, 3-16, 18-20, 22-26, 29-33. **UNDISPUTED.**

33.     Prior to May of 2011, Blanco had never testified that Drummond collaborated with the AUC. **DISPUTED. Blanco made statements to prosecutors, and to Mr. Collingsworth and Mr. Otero, about Drummond's collaboration before May 2011. Exhibit B (July 15, 2015 Collingsworth Decl.) ¶ 18.**

34.     Prior to May 22, 2011, Blanco requested that Defendants pay him $150,000.  Doc. 231-11 (Defs' 3rd Am. Resp. to Drummond's Third Interrogatories No. 2). **UNDISPUTED that Blanco requested payment of his legal fees. DISPUTED to the extent it attempts to draw a legal conclusion that Conrad & Scherer is deemed to know of any agreements or payments by Albert Van Bilderbeek to pay for the legal fees of Blanco. *See* Doc. 231-11, at 47 of 80 ("William Scherer, managing partner of Conrad & Scherer, LLP, did not know the information detailed above in Defendant Collingsworth's response about Mr. Blanco. Mr. Scherer only just learned about this in the course of preparing this supplementary response.").**

35.     In April and May of 2011, Mr. Collingsworth exchanged communications with his former *Balcero* co-counsel at Parker Waichman, LLP regarding paying Jaime Blanco's criminal legal fees.   Docs. 101-15 & 101-16. **UNDISPUTED that Mr. Collingsworth exchanged communications with Parker Waichman about Blanco's criminal legal fees in or around April 2011.**

36.     Parker Waichman, LLP declined to provide the money to make the payments. **Defendants object to use of privileged information inadvertently produced by Parker Wichmann and will move to exclude this fact. Subject to, and without waiving, that objection, UNDISPUTED. Furthermore, the statement is based on inadvertently produced documents to which Defendants cannot fully respond without waiving work product protection. If the Court wants to include these privileged documents as part of the hearing, defendants request the opportunity to submit work product protected documents to the Court for in camera review.**

37.     In July 2011, Mr. Collingsworth met with Ivan Otero and Jaime Blanco in a prison in Colombia, and during that meeting Mr. Collingsworth stated to Blanco that he would ask Mr. Albert van Bilderbeek to pay Blanco's criminal legal fees.  Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8. **UNDISPUTED that, in that conversation, Mr. Blanco also asked Mr. Collingsworth if Conrad & Scherer would assist Mr. Blanco in paying attorney's fees related to his criminal defense. At that time, Mr. Blanco was facing criminal charges related to the murder of the Drummond mine union leaders near La Loma, in Cesar Province, Colombia. Mr. Collingsworth communicated to Mr. Blanco that Mr. Collingsworth thought that Albert Van Bilderbeek would assist Mr. Blanco with funds towards his attorney's fees if Mr. Blanco was able to use his many contacts to help**

investigate the facts regarding Drummond's illegal acquisition of the Llanos Oil Company's oil concession in Colombia and provide that information to Mr. Van Bilderbeek." Document 174-2, at 4-5.

38.     In July 2011, Mr. Collingsworth contacted Mr. Albert van Bilderbeek and requested that he pay Blanco.  Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8. **DISPUTED because date is not certain and mischaracterizes the request for assistance to Blanco.** *See supra* **Resp. ¶ 37.**

39.     Mr. Albert van Bilderbeek agreed to make these payments and to send the money to Blanco using Ivan Otero as an intermediary. Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **UNDISPUTED that Albert van Bilderbeek paid Blanco's criminal legal fees using Ivan Otero as an intermediary. DISPUTED to the extent it implies that Mr. Collingsworth knew about the details of the arrangement between Albert van Bilderbeek and Blanco.** *See supra* **Response to ¶¶ 37-38, and Doc. 174-2, at 5-6 ("While the idea of payments by Mr. Van Bilderbeek arose in the context of discussing legal fees, Mr. Collingsworth does not know the details of the final agreement between Mr. Blanco and Mr. Van Bilderbeek. Mr. Collingsworth ultimately assisted Mr. Van Bilderbeek in sending the funds that Mr. Van Bilderbeek agreed to provide to Mr. Blanco. Mr. Collingsworth understood that Mr. Van Bilderbeek sent those funds via Mr. Otero, who also did work for Mr. Van Bilderbeek. Mr. Collingsworth does not recall knowing the total amount of funds that Mr. Blanco received from Mr. Van Bilderbeek or for what purpose Mr. Blanco used those funds.").**

40.     In September 2011, Mr. Albert van Bilderbeek sent an international wire transfer in the amount of approximately $60,000 to Ivan Otero. Doc. 174-2 (Defs' 2nd Am. Resp. to

Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED as inaccurate, misleading, and mischaracterizes the evidence. *See* Doc. 174-2, at 6 ("Mr. Collingsworth understood that Mr. Van Bilderbeek planned to send a wire to Mr. Otero of approximately $60,000 in about September 2011 as part of Mr. Van Bilderbeek's arrangement with Mr. Blanco. Mr. Collingsworth does not recall knowing how much of that wire was paid to Mr. Blanco, if it was sent at that time, but did understand that Mr. Blanco received a first payment pursuant to his agreement with Mr. Van Bilderbeek."); *see also* Doc. 174-20 (CS_TC001458-59) (discussing a wire payment generally, without specific amounts).**

41.     Ivan Otero delivered this $60,000 payment to Blanco.  Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED as there is no evidence to Mr. Collingsworth's knowledge that this payment was actually $60,000 or that Otero delivered all or part of any of this payment to Blanco. Doc. 174-2 ("Mr. Collingsworth does not recall knowing how much of that wire was paid to Mr. Blanco, if it was sent at that time . . . ."); Doc. 174-20 (CS_TC001458-59) (discussing a wire payment generally, without specific amounts).**

42.     Mr. Collingsworth offered, facilitated and confirmed receipt of this $60,000 payment.  Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **UNDISPUTED that Mr. Collingsworth confirmed that a payment was made by Albert van Bilderbeek to Otero in July 2011. DISPUTED because Mr. Collingsworth did not "offer" or "facilitate" this payment. Further DISPUTED because Mr. Collingsworth did not know whether this payment was actually $60,000.**

43.     In addition to Mr. Collingsworth, who is the Managing Partner of Conrad & Scherer, LLP's Washington, D.C. office, Christian Levesque and Susana Tellez, both of whom

are Conrad & Scherer, LLP employees and part of Defendants' litigation team, appear on emails discussing this payment.  Doc. 174-20. **UNDISPUTED that Christian Levesque and Susana Tellez are Conrad & Scherer employees and appear on these emails. DISPUTED to the extent the phrase "litigation team" is ambiguous as well as the term "employees" Terry Collingsworth is a partner at Conrad & Scherer.  Further DISPUTED to the extent it attempts to draw a legal conclusion that Conrad & Scherer is deemed to know of any such agreements or payments by Albert Van Bilderbeek to pay for the legal fees of Blanco.** *See* **Doc. 174-2, at 6-7 ("William Scherer, managing partner of Conrad & Scherer, LLP, did not know about the payments that Albert Van Bilderbeek arranged to make to Mr. Blanco via Mr. Otero or Mr. Blanco's attempt to delay finalizing his declaration in the Drummond case pending Mr. Van Bilderbeek's fulfillment of his arrangement with Mr. Blanco. Mr. Scherer has only just learned about it in the course of Defendants' response to discovery requests in this case. No Conrad & Scherer money was used to make those payments.").**

44.     Defendants knew and intended that the September 2011 payment referenced in Paragraph 42 would be delivered to Blanco.  Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED.** *See* **Doc. 174-2, at 5-6 ("Mr. Collingsworth ultimately assisted Mr. Van Bilderbeek in understood that Mr. Van Bilderbeek sent those funds via Mr. Otero, who also did work for Mr. Van Bilderbeek. Mr. Collingsworth does not recall knowing the total amount of funds that Mr. Blanco received from Mr. Van Bilderbeek or for what purpose Mr. Blanco used those funds sending the funds that Mr. Van Bilderbeek agreed to provide to Mr. Blanco."). Further DISPUTED to the extent it attempts to draw a legal conclusion that Conrad & Scherer is deemed to know of any agreements or payments by Albert Van Bilderbeek to pay for the legal fees of**

Blanco. *See* Doc. 174-2, at 6-7 ("William Scherer, managing partner of Conrad & Scherer, LLP, did not know about the payments that Albert Van Bilderbeek arranged to make to Mr. Blanco via Mr. Otero or Mr. Blanco's attempt to delay finalizing his declaration in the Drummond case pending Mr. Van Bilderbeek's fulfillment of his arrangement with Mr. Blanco. Mr. Scherer has only just learned about it in the course of Defendants' response to discovery requests in this case. No Conrad & Scherer money was used to make those payments.").

45.     Blanco refused to sign his declaration against Drummond until he received this payment.   Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8. **UNDISPUTED that "Mr. Blanco did not want to finalize his declaration in the Drummond case until Mr. Van Bilderbeek satisfied his obligations to Mr. Blanco, apparently expecting that Mr. Collingsworth could intervene in that situation." *See* ROG 174-2, at 6. But, there was nothing improper about this payment. Mr. Blanco was preparing to admit to his crimes under oath and would need legal assistance to counsel him to protect his rights. This payment facilitated obtaining truthful testimony from Blanco, who was otherwise hesitant to provide it for fear of the legal insecurity it would create. *See* Doc. 187-2 (Otero Decl.) ¶ 66 ("To the extent Blanco was hesitant to make a sworn statement, it was because he would need assistance for attorney's fees for a full trial and any appeal, once he made a truthful statement, and that's why he sought help in getting the money from the Bilderbeeks.").**

46.     The month after receiving this $60,000 payment, Blanco signed a declaration for Defendants to be used in Defendants' civil cases against Drummond.   *Balcero* Doc. 246-11. **UNDISPUTED that Blanco signed a declaration in or around October 2011.**

47.     In December of 2011, Mr. Collingsworth facilitated and confirmed another payment from Mr. Albert van Bilderbeek to Ivan Otero.  Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **UNDISPUTED that Mr. Collingsworth confirmed that a payment was made, in an unspecified amount, by Albert van Bilderbeek to Otero in December 2011. Doc. 174-20 (CS_TC001457, CS_TC002572). But, Mr. Collingsworth did not "facilitate" this payment December 2011.** *See* **Doc. 174-2, at 6 ("Mr. Collingsworth also understood that Mr. Van Bilderbeek was going to make a second payment to Mr. Blanco as part of their agreement, and that Mr. Van Bilderbeek sent a wire to Mr. Otero in about December 2011. Mr. Collingsworth is not aware of how much of that wire Mr. Blanco received, if any.").**

48.     Defendants have not produced any documents reflecting the amount of this December 2011 payment. **UNDISPUTED because, to the best of their knowledge, defendants are not in possession of any documents reflecting the amount of a December 2011 payment.**

49.     Ivan Otero delivered the December 2011 [payment] to Blanco.  Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED. There is no evidence that Otero delivered all or part of a payment made to him in December 2011 to Blanco.**

50.     Defendants knew and intended that the December 2011 payment would be delivered to Blanco.  Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **UNDISPUTED that Mr. Collingsworth understood that the payment made in December 2011 to Otero would be delivered to Blanco. But, Mr. Collingsworth is not aware of how much, if any, of that payment Blanco received. Doc. 174-2, at 6 ("Mr. Collingsworth also understood that Mr. Van Bilderbeek was going to make a second**

15

payment to Mr. Blanco as part of their agreement, and that Mr. Van Bilderbeek sent a wire to Mr. Otero in about December 2011. Mr. Collingsworth is not aware of how much of that wire Mr. Blanco received, if any."). **DISPUTED to the extent it attempts to draw a legal conclusion that Conrad & Scherer is deemed to know of any agreements or payments made by Albert Van Bilderbeek to pay for the legal fees of Blanco.** *See* **Doc. 174-2, at 6-7 ("William Scherer, managing partner of Conrad & Scherer, LLP, did not know about the payments that Albert Van Bilderbeek arranged to make to Mr. Blanco via Mr. Otero or Mr. Blanco's attempt to delay finalizing his declaration in the Drummond case pending Mr. Van Bilderbeek's fulfillment of his arrangement with Mr. Blanco. Mr. Scherer has only just learned about it in the course of Defendants' response to discovery requests in this case. No Conrad & Scherer money was used to make those payments.").**

51.    In July of 2012, Mr. Collingsworth facilitated and confirmed another $35,000 payment from Mr. Albert van Bilderbeek to Ivan Otero. Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **UNDISPUTED that Mr. Collingsworth confirmed that a payment was made by Albert van Bilderbeek to Otero in July 2012. DISPUTED because Mr. Collingsworth did not "facilitate" this payment.** *See* **Doc. 174-2, at 6 ("Mr. Collingsworth is also aware that Mr. Van Bilderbeek made a payment of $35,000 to Mr. Otero in about July 2012.").**

52.    Ivan Otero delivered this money to Blanco. Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED. There is no evidence that Otero delivered any of this money to Blanco.**

53.    Defendants knew and intended that this July 2012 payment would be delivered to Blanco. Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-

20. **DISPUTED because Mr. Collingsworth did not "know" a payment made in July 2012 would be delivered to Blanco.** *See* **Doc. 174-2, at 6 ("Mr. Collingsworth is also aware that Mr. Van Bilderbeek made a payment of $35,000 to** <u>Mr. Otero</u> **in about July 2012." (emphasis added)). Further DISPUTED to the extent it attempts to draw a legal conclusion that Conrad & Scherer is deemed to know of any agreements or payments made by Albert Van Bilderbeek to Blanco.** *See* **Doc. 174-2, at 6-7 ("William Scherer, managing partner of Conrad & Scherer, LLP, did not know about the payments that Albert Van Bilderbeek arranged to make to Mr. Blanco via Mr. Otero or Mr. Blanco's attempt to delay finalizing his declaration in the Drummond case pending Mr. Van Bilderbeek's fulfillment of his arrangement with Mr. Blanco. Mr. Scherer has only just learned about it in the course of Defendants' response to discovery requests in this case. No Conrad & Scherer money was used to make those payments.").**

54.     Defendants did not disclose the payments to Jaime Blanco until January 9, 2015, when they served their Second Amended Response to Drummond's Third Interrogatories No. 2. Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2). **DISPUTED to the extent that the privilege log of over 12,000 documents produced by the Defendants in December 2014 included these payments, and weeks later, interrogatories were formally amended and documents produced.**

### *Libardo Duarte ("Bam Bam")*

55.     Libardo Duarte was one of Defendants' fact witnesses in *Balcero* who accused Drummond of collaborating with the AUC. *Balcero* Doc. 407-31. **UNDISPUTED.**

56.     Defendants are relying on Duarte's testimony to support the truth of the defamatory statements at issue in this case.  *See* Doc. 43-10 (Defs.' 2d Am. Resp. to 1st Req. for Prod.) at Nos. 1, 3-16, 18-20, 22-26, 29-33. **UNDISPUTED.**

57.     On or about April 18, 2011, Defendants sent a $5,000 payment via international bank wire to Libardo Duarte's wife, Katerin Durango Avendaño. Ex. 7 (CS 11416). **UNDISPUTED that there was an attempt to send $5,000 to Katerin Durango Avendaño on or about April 18, 2011, but the wire transfer was not successful. Doc. 174-14 ("Defs.' Reply Memo. Crime-Fraud Exception"), at 8 n.6. This attempted wire payment was to relocate Duarte's family to another city after they received death threats following his testimony.** *See* **Doc. 174-7, at 6 (Defs.' Am. & Supp. Objects. & Resps. Drummond's 3rd ROGs Nos. 2 and 8);** *see also* **Doc. 69 (Nov. 7, 2013 Collingsworth Decl.) ¶ 42.**

58.     On or about April 18, 2011, Defendants sent a $2,500 payment via international bank wire to Libardo Duarte's wife, Leydi Johana Perez Valencia.  Doc. 44-13 (PLS 5020). **UNDISPUTED that this payment was sent to Leydi Johana Perez Valencia, who is Duarte's daughter. This payment was to relocate Duarte's family to another city after they received death threats following his testimony.** *See* **Doc. 174-7, at 6 (Defs.' Am. & Supp. Objects. & Resps. Drummond's 3rd ROGs Nos. 2 and 8). This payment was previously disclosed in** *Balcero***.**

59.     On or about April 29, 2011, Defendants sent a $2,500 payment via international bank wire to Libardo Duarte's wife, Katerin Durango Avendaño.  Doc. 44-15 (PLS 5024-5025). **UNDISPUTED. This payment was to relocate Duarte's family to another city after they received death threats after Drummond received Duarte's declaration before he was to give**

his testimony. *See* **Doc. 174-7, at 6 (Defs.' Am. & Supp. Objects. & Resps. Drummond's 3rd ROGs Nos. 2 and 8). This payment was previously disclosed in** *Balcero***.**

60.     On or about May 21, 2011, Defendants provided a 2,000,000 Colombian peso ($1,102.54) payment to Libardo Duarte and/or his family.  Ex. 8 (CS_TC 3657).  **UNDISPUTED that this payment was made to the family of Duarte to complete their security arrangements.** *See* **Ex. 8 (CS_TC 3657). DISPUTED because Mr. Collingsworth, not "Defendants," arranged for these funds.** *Id.*

61.     The May 21, 2011 payment to Libardo Duarte was a cash payment delivered by Lorraine Leete, a member of Defendants' litigation team.  Ex. 8 (CS_TC 3657).  **UNDISPUTED that this payment was made to the family of Duarte to complete their security arrangements.** *See* **Ex. 8 (CS_TC 3657).**

*Alcides Manuel Mattos Tabares ("Samario") and Jhon Jairo Esquivel Cuadrado ("El Tigre")*

62.     Samario and El Tigre were two of Defendants' fact witnesses in *Balcero* who accused Drummond of collaborating with the AUC.   *Balcero* Docs. 396-10 & 396-11. **UNDISPUTED.**

63.     Defendants are relying on El Tigre and Samario's testimony to support the truth of the defamatory statements at issue in this case.  *See* Doc. 43-10 (Defs.' 2d Am. Resp. to 1st Req. for Prod.) at Nos. 1, 3-16, 18-20, 22-26, 29-33. **UNDISPUTED.**

64.     On or about February 11, 2011, Defendants sent a $5,000 payment via international bank wire from Conrad & Scherer, LLP's Operating Account to Ivan Otero.  Doc. 174-8 (El Tigre and Samario payments). **UNDISPUTED that this payment was made to Ivan Otero. However, the parenthetical suggesting that Doc. 174-8 reflects that this payment was for the benefit of El Tigre and Samario is not accurate.**

65.     Defendants knew and intended that Otero would deliver this money to El Tigre and Samario and/or their families.    Doc. 174-8 (El Tigre and Samario payments). **UNDISPUTED that Mr. Collingsworth authorized this money "to be sent to Mr. Otero's bank account as money for security for Mr. Otero, Samario, and El Tigre." Doc. 231-11, at 42 of 80. DISPUTED that Mr. Collingsworth has specific knowledge of the security measures taken by Mr. Otero. Further DISPUTED to the extent it attempts to draw a legal conclusion that Conrad & Scherer is deemed to know of any agreements or payments made for the benefit of El Tigre or Samario or their families.** *See* **Doc. 231-11, at 44 of 80 (Conrad & Scherer Response) ("William Scherer, managing partner of Conrad & Scherer, LLP, was not directly involved in the actual day to day litigation of the Drummond matters. Mr. Scherer receives an estimated thousands of email a month. He did receive one email report in May 2011 which indicated that payments would be made to Mr. Otero for security that included a brief reference to security payments for families of El Tigre and Samario (see CS_TC000289). But Mr. Scherer was not aware of exactly what Mr. Otero was doing with this money. Certain lower-level employees at Conrad & Scherer, LLP, including employees in the accounting department, were aware of the monthly payments to Mr. Otero for security, but they were not in positions of authority, and in the belief of defendants those individuals were not aware of exactly what Mr. Otero did with the money." as it was received).**

66.     Ivan Otero delivered this February 11, 2011 payment to El Tigre and Samario and/or their families.    Doc. 174-8 (El Tigre and Samario payments). **DISPUTED that this payment was "delivered . . . to" El Tigre and Samario. Instead, some of this payment was used for the protection of El Tigre's and Samario's families.** *See* **Doc. 231-11, at 42 of 80**

("**Mr. Otero later explained that the money was used to provide $800 for both Samario and El Tigre for the relocation of their immediate family and $1000 each for support of their family during one month. Samario and El Tigre were in prison at this time. The remaining $1,400 was used to pay individuals providing protection for Otero.**"); *see also* **Doc. 187-2 (Otero Decl.) ¶¶ 37, 40, 42 ("It was very clear to me that the families of El Tigre and Samario needed security and relocation assistance. . . . As a result, I personally arranged to pay the families of El Tigre and Samario costs of security – in the form of relocation and security payments. . . .  The payments that were made were to protect the families.**").

67.     On or about April 22, 2011, Defendants sent a $2,700 payment via international bank wire from Conrad & Scherer, LLP's Operating Account to Ivan Otero.  Doc. 174-8 (El Tigre and Samario payments). **UNDISPUTED.**

68.     Ivan Otero delivered this April 22, 2011 payment to El Tigre and Samario. **DISPUTED that this payment was "delivered . . . to" El Tigre and Samario. Instead, this payment was used for the relocation of, and to provide security for, the families of El Tigre and Samario. *See* Doc. 187-2 (Otero Decl.) ¶¶ 37, 40, 42 ("It was very clear to me that the families of El Tigre and Samario needed security and relocation assistance. . . . As a result, I personally arranged to pay the families of El Tigre and Samario costs of security – in the form of relocation and security payments. . . .  The payments that were made were to protect the families.").**

69.     At some point prior to May 22, 2011, Defendants made a $5,400 payment to Ivan Otero. Doc. 174-8 (El Tigre and Samario payments); Doc. 174-9. **UNDISPUTED. This payment was made to set up security for Otero, and for the families of Samario and El Tigre. *See* Doc. 231-11, at 43 of 80 ("In about late May 2011, Mr. Collingsworth arranged**

to pay $5,400 to Mr. Otero for two missing security payments for Mr. Otero, Samario, and El Tigre.”); *see also* **Doc. 174-9 (explaining payment was for the security of the families of El Tigre and Samario, and security for Otero); Doc. 187-2 (Otero Decl.) ¶¶ 37, 40, 42 (“It was very clear to me that the families of El Tigre and Samario needed security and relocation assistance. . . . As a result, I personally arranged to pay the families of El Tigre and Samario costs of security – in the form of relocation and security payments. . . . The payments that were made were to protect the families.”).**

70.   Ivan Otero delivered this $5,400 payment to El Tigre and Samario.  Doc. 174-9. **DISPUTED that this payment was “delivered” “to” El Tigre and Samario. Instead, this payment was made to set up security for Otero, and for the families of Samario and El Tigre. *See* Doc. 231-11, at 43 of 80 (“In about late May 2011, Mr. Collingsworth arranged to pay $5,400 to Mr. Otero for two missing security payments for Mr. Otero, Samario, and El Tigre.”); *see also* Doc. 174-9 (explaining payment was for the security of the families of El Tigre and Samario, and security for Otero); Doc. 187-2 (Otero Decl.) ¶¶ 37, 40, 42 (“It was very clear to me that the families of El Tigre and Samario needed security and relocation assistance. . . . As a result, I personally arranged to pay the families of El Tigre and Samario costs of security – in the form of relocation and security payments. . . . The payments that were made were to protect the families.”).**

71.   Between June 2011 and present day, Defendants have sent monthly $2,700 payments via international bank wire from Conrad & Scherer, LLP’s Operating Account to Ivan Otero.  Doc. 174-8 (El Tigre and Samario payments); Ex. 1 (May 21, 2015 Hrg. Tr.) at 56:23-57:18.  **UNDISPUTED that beginning in June 2011, Conrad & Scherer, LLP “typically” made a wire transfer of $2,700 each month to Otero. *See* Doc. 231-11, at 43 of 80.**

**DISPUTED that Mr. Collingsworth had specific knowledge of the security measures taken by Mr. Otero. Further DISPUTED to the extent it attempts to draw a legal conclusion that Conrad & Scherer is deemed to know of any agreements or payments made for the security of the families of El Tigre and Samario.** *See* **Doc. 231-11, at 44 of 80 (Conrad & Scherer Response) ("William Scherer, managing partner of Conrad & Scherer, LLP, was not directly involved in the actual day to day litigation of the Drummond matters. Mr. Scherer receives an estimated thousands of email a month. He did receive one email report in May 2011 which indicated that payments would be made to Mr. Otero for security that included a brief reference to security payments for families of El Tigre and Samario (see CS_TC000289). But Mr. Scherer was not aware of exactly what Mr. Otero was doing with this money. Certain lower-level employees at Conrad & Scherer, LLP, including employees in the accounting department, were aware of the monthly payments to Mr. Otero for security, but in defendants' belief, those individuals were not aware of exactly what Mr. Otero did with the money" after he received it).**

72.    Ivan Otero has delivered those $2,700 monthly payments to El Tigre and Samario. Ex. 1 (May 21, 2015 Hrg. Tr.) at 56:23-57:18; Doc. 174-9. **DISPUTED. As explained above, these payments were used to provide security for the families of El Tigre and Samario. Doc. 187-2 (Otero Decl.) ¶¶ 37, 40, 42 ("It was very clear to me that the families of El Tigre and Samario needed security and relocation assistance. . . . As a result, I personally arranged to pay the families of El Tigre and Samario costs of security – in the form of relocation and security payments. . . .  The payments that were made were to protect the families.").**

73.    Defendants knew and intended that these monthly payments would be delivered to El Tigre and Samario by Ivan Otero.  Doc. 174-9. **UNDISPUTED that Mr. Collingsworth**

was aware that witness assistance payments were being made to Otero for the purpose of providing security to the families of El Tigre and Samario. But, these payments were not "delivered . . . to" El Tigre or Samario. DISPUTED that Mr. Collingsworth had specific knowledge of the security measures taken by Mr. Otero. Further DISPUTED to the extent it attempts to draw a legal conclusion that Conrad & Scherer is deemed to know of any agreements or payments made for the security of the families of El Tigre and Samario. Doc. 231-11, at 44 of 80 (Conrad & Scherer Response) ("William Scherer, managing partner of Conrad & Scherer, LLP, was not directly involved in the actual day to day litigation of the Drummond matters. Mr. Scherer receives an estimated thousands of email a month. He did receive one email report in May 2011 which indicated that payments would be made to Mr. Otero for security that included a brief reference to security payments for families of El Tigre and Samario (see CS_TC000289). But Mr. Scherer was not aware of exactly what Mr. Otero was doing with this money. Certain lower-level employees at Conrad & Scherer, LLP, including employees in the accounting department, were aware of the monthly payments to Mr. Otero for security, but to the best of defendants' knowledge, those individuals were not aware of exactly what Mr. Otero did with the money" after he received it.

74.    Defendants did not disclose their payments to El Tigre and Samario until November 17, 2014, when they produced documents reflecting payments to Ivan Otero and a redacted copy of Mr. Collingsworth's May 22, 2011 email to Parker Waichman, LLP lawyers, Bill Scherer, and Richard Drath.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-6. **UNDISPUTED that the defendants complied with the Court's October 15, 2014 Order to produce fact of payment documents, and that they did so on November 17, 2014.**

### *Representations to the Court Regarding Witness Payments*

75.     Every motion, brief, and other filing submitted to the Court by the Defendants in this matter has been filed on behalf of both Mr. Collingsworth and Conrad & Scherer, LLP. **DISPUTED. For example, Mr. Collingsworth submitted personal declarations not purporting to speak on behalf of Conrad & Scherer LLP.**

76.     Mr. Collingsworth has been the Managing Partner of Conrad & Scherer, LLP's Washington, D.C. office since 2008.   *See http://www.conradscherer.com/washington-d-c-office/*. **UNDISPUTED.**

77.     Prior to January 9, 2015, Mr. Collingsworth signed all of the Defendants' interrogatory responses in this case on behalf of both himself and Conrad & Scherer, LLP. **UNDISPUTED.**

78.     On July 5, 2011, Mr. Collingsworth signed interrogatory responses in *Balcero*. Doc. 88-4 (Collingsworth's July 5, 2011 *Balcero* Irog. Resp. No. 4). **UNDISPUTED.**

79.     At the time he signed these interrogatory responses, Mr. Collingsworth was acting as a partner of Conrad & Scherer, LLP.  *Id.* **DISPUTED as calls for a legal conclusion and nothing about this document indicates the capacity in which Mr. Collingsworth signed the interrogatories.**

80.     One of the interrogatories asked for a description of "anything of value offered or given by Plaintiffs, or anyone acting on Plaintiffs' behalf including counsel, to any person disclosed on Plaintiffs' Rule 26 disclosures, any former paramilitary or any other potential witness in this litigation." *Id.* **UNDISPUTED.**

81.     Mr. Collingsworth's response to this interrogatory stated as follows:  "Plaintiffs have provided Duarte with hamburgers and other food on several occasions, which were served

25

during meetings to discuss the facts in his February 2011 Declaration. Additionally, Plaintiffs are providing reasonable transportation, food, and lodging costs for Plaintiffs who will be deposed in Alabama between July 18-23, 2011. Plaintiffs have paid to relocate Plaintiff Claudia Balcero and her family after she and her family received death threats as a result of participating in this lawsuit." Doc. 88-4 (Collingsworth's July 5, 2011 *Balcero* Irog. Resp. No. 4). **UNDISPUTED that this response was provided, subject to objections based on vagueness and overbreadth of the phrase "anything of value offered or given . . . to any person disclosed on Plaintiffs' Rule 26 disclosures, any former paramilitary or any other potential witness in this litigation"; objections based on relevancy; and objections based on the attorney work product doctrine to the extent it sought information regarding "potential witnesses."** *See* **Doc. 88-4, at 6. Mr. Collingsworth interpreted this interrogatory literally to include only <u>direct</u> payments by defendants to witnesses, not to their family members.**

82.    At the time Mr. Collingsworth signed the interrogatory response set forth in the above paragraph, Defendants' litigation team had made payments to Halcon, Duarte, El Tigre, Samario and Charris. Doc. 44-19; Ex. 7 (CS 11416); Doc. 44-13 (PLS 5020); Ex. 8 (CS_TC000179); Doc. 174-8 (El Tigre and Samario payments); Doc. 174-9; Doc. 44-15 (PLS 5024-5025); Doc. 44-6. **UNDISPUTED that witness assistance payments had been made for the benefit of these witnesses or their families. DISPUTED to the extent it implies defendants had an obligation to disclose such payments based on a literal interpretation of the interrogatory. Further DISPUTED because "Defendants' litigation team" is ambiguous.**

83.    Also at this time, Mr. Collingsworth had offered to Blanco assistance with paying Blanco's criminal legal fees. Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2).

UNDISPUTED that Mr. Collingsworth had discussed with or met with Blanco prior to July 5, 2011, and that Blanco had requested assistance with his criminal legal fees. DISPUTED to the extent it implies Mr. Collingsworth offered that he or Conrad & Scherer would pay Blanco's criminal legal fees. Further DISPUTED because Blanco's **request** for assistance paying his attorney's fees was not responsive to this interrogatory.

84.    Mr. Collingsworth's interrogatory response described in Paragraph 81, *supra*, was false.  Doc. 44-19; Ex. 7 (CS 11416); Doc. 44-13 (PLS 5020); Ex. 8 (CS_TC000179); Doc. 174-8 (El Tigre and Samario payments); Doc. 174-9; Doc. 44-15 (PLS 5024-5025); Doc. 44-6. **DISPUTED. Mr. Collingsworth's interrogatory response was made subject to objections to the phrase "anything of value offered or given . . . to any person disclosed on Plaintiffs' Rule 26 disclosures, any former paramilitary or any other potential witness in this litigation," and, specifically, to the request for information about "potential witnesses." As explained in defendants' supplemental crime fraud brief filed with the Special Master on July 18, 2014, defendants interpreted this request literally not to include payments made to the families of witnesses. Doc. 174-14 ("Defs. Reply Mem. Crime-Fraud Exception") at 4. Thus, payments to the families of Duarte, El Tigre, Samario, and Charris were excluded under Mr. Collingsworth's interpretation. Furthermore, defendants objected to providing this information with respect to "potential" witnesses, which resulted in the exclusion of payments for the benefit of Halcon, who the *Balcero* plaintiffs did not consider to be a "witness." *Id.* at 4-5. Finally, the request did not seek information about requests for anything of value and, therefore, Blanco's requests for assistance with payment of his criminal legal fees was not responsive to this interrogatory.**

85.    At the time Mr. Collingsworth signed the interrogatory response described in Paragraph 81, *supra*, he knew it was false.  Doc. 44-19; Ex. 7 (CS 11416); Doc. 44-13 (PLS 5020); Ex. 8 (CS_TC000179); Doc. 174-8 (El Tigre and Samario payments); Doc. 174-9; Doc. 44-15 (PLS 5024-5025); Doc. 44-6. **DISPUTED because the interrogatory response was not false.** *See supra* **Resp. ¶ 84.**

86.    On November 8, 2011, Mr. Collingsworth filed an Opposition to the *Balcero* defendants' motion to compel. Doc. 174-21 (Collingsworth's Nov. 8, 2011 *Balcero* filing). **UNDISPUTED that plaintiffs' counsel in *Balcero*, including Mr. Collingsworth, filed this opposition.**

87.    Mr. Collingsworth submitted that Opposition as a partner of Conrad & Scherer, LLP.  *Id.* **DISPUTED to the extent it is unclear in what role Mr. Collingsworth appeared on this filing.**

88.    In that November 8, 2011 filing, Mr. Collingsworth represented the following to this Court:

> Defendants' Third Set of Interrogatories No. 4 requests that Plaintiffs "describe anything of value offered or given by Plaintiffs, or anyone acting on Plaintiffs' behalf including counsel, to any person disclosed on Plaintiffs' Rule 26 disclosures, any former paramilitary or any other potential witness." Defs' Ex. B (Pls' Joint Responses and Objections to Third Set of Interrogatories No. 4). In response, Plaintiffs provided responsive information relating to all Plaintiffs and witnesses and have not withheld responsive information on the grounds of attorney-client privilege as it relates to Plaintiffs or witnesses in this case.

Doc. 174-21 (Collingsworth's Nov. 8, 2011 *Balcero* filing) at 9. **UNDISPUTED that plaintiffs' counsel in *Balcero* made this representation.**

89.    At the time Mr. Collingsworth made the representation that the *Balcero* plaintiffs had "provided responsive information relating to all Plaintiffs and witnesses and have not

withheld responsive information on the grounds of attorney-client privilege as it relates to Plaintiffs or witnesses in this case," Defendants' litigation team had made payments to Halcon, Duarte, El Tigre, Charris, Samario and Blanco.  Doc. 44-19; Ex. 7 (CS 11416); Doc. 44-13 (PLS 5020); Ex. 8 (CS_TC000179); Doc. 174-8 (El Tigre and Samario payments); Doc. 174-9; Doc. 44-15 (PLS 5024-5025); Doc. 44-6. **UNDISPUTED that witness assistance payments had been made for the benefit of these witnesses or their families. DISPUTED that payments were made by defendants "to" these witnesses. Further DISPUTED to the extent it implies defendants had an obligation to disclose such payments based on the discovery requests outstanding at the time. Further DISPUTED because "Defendants' litigation team" is ambiguous.**

90.     Mr. Collingsworth's representation described in Paragraph 88, *supra*, was false. Doc. 44-19; Ex. 7 (CS 11416); Doc. 44-13 (PLS 5020); Ex. 8 (CS_TC000179); Doc. 174-8 (El Tigre and Samario payments); Doc. 174-9; Doc. 44-15 (PLS 5024-5025); Doc. 44-6. **DISPUTED. The *Balcero* plaintiffs' counsel's statement was not false, as all "responsive" and un-objected to discovery requests had been complied with. As explained in defendants' supplemental crime fraud brief filed with the Special Master on July 18, 2014, defendants interpreted the discovery requests in *Balcero* literally not to include payments made to the families of witnesses. Doc. 174-14 ("Defs. Reply Mem. Crime-Fraud Exception") at 4. Thus, payments to the families of Duarte, El Tigre, Samario, and Charris were excluded under defendants' interpretation. Furthermore, defendants objected to providing this information with respect to "potential" witnesses, which resulted in the exclusion of payments for the benefit of Halcon, who the *Balcero* plaintiffs did not consider to be a "witness." *Id.* at 4-5. Finally, the request did not seek information about <u>requests</u> for**

29

**anything of value and, therefore, Blanco's requests for assistance with payment of his criminal legal fees was not responsive to this interrogatory**

91.     At the time Mr. Collingsworth made the representation described in Paragraph 88, *supra*, he knew it was false.  Doc. 44-19; Ex. 7 (CS 11416); Doc. 44-13 (PLS 5020); Ex. 8 (CS_TC000179); Doc. 174-8 (El Tigre and Samario payments); Doc. 174-9; Doc. 44-15 (PLS 5024-5025); Doc. 44-6. **DISPUTED because plaintiffs' counsel's statement was not false. *See supra* Resp. ¶ 90.**

92.     On March 8, 2012, this Court ordered Defendants to disclose "anything of value" offered or given to any individuals listed on the *Balcero* plaintiffs' Rule 26 disclosures or any Colombian paramilitaries.  Doc. 174-22 (March 8, 2012 *Balcero* Mem. Op.) at 6-7. **DISPUTED. The effect of the portion of the order cited was to overrule the *Balcero* plaintiffs' objections to providing this information with respect to paramilitaries, even if they were only potential witnesses. To the extent there were other objections that were not affected by this order, those objections remained pending.**

93.     Defendants did not disclose to Drummond their payments to alias "Halcon," Charris, Duarte and Gelvez until after discovery closed in *Balcero*.  Doc. 44-19; Ex. 7 (CS 11416); Doc. 44-13 (PLS 5020); Ex. 8 (CS_TC000179); Doc. 44-15 (PLS 5024-5025); Doc. 44-6. **UNDISPUTED that the plaintiffs in *Balcero* disclosed the payments to Halcon, Charris, Duarte, and Gelvez after the close of discovery in *Balcero*. But, Drummond's insinuation that defendants, in their role as counsel for the *Balcero* plaintiffs, somehow acted in bad faith by the timing of this production is belied by the record.**

**The first discovery request served by Drummond that sought witness payment information was served on May 20, 2011. Exhibit C (May 20, 2011 Defs.' 2nd RFPs to**

Plaintiffs), No. 7.  It did not seek information about payments to family members. *Id.* The defendants, as counsel for the *Balcero* plaintiffs, objected to this request on the grounds that the phrase "anything of value offered or given . . . to any person disclosed on Plaintiffs' Rule 26 disclosures, any former paramilitary or any other potential witness in this litigation" was vague and overbroad; that the request sought irrelevant information; and that the request sought information protected by the attorney work product doctrine to the extent it sought information regarding "potential witnesses." Exhibit D (July 5, 2011 Pls.' Resp. Defs.' 2nd RFPs), No. 7.

After the parties filed competing motions to compel, the Court entered an order on March 8, 2012, overruling some of the *Balcero* plaintiffs' objections. Exhibit E (*Balcero* Doc. 332, 2:09-cv-01041, Mem. Op. & Order). On May 15, 2012, Drummond then served its fifth set of documents requests and interrogatories. Discovery closed in *Balcero* on June 29, 2012. By agreement with Drummond, the *Balcero* plaintiffs responded to the fifth interrogatories on July 16, 2012, and identified payments made to Halcon, a potential paramilitary witness, and vowed to produce documents reflecting these payments. Exhibit F (Pls.' Resp. Defs.' 5th ROG), No. 7. The *Balcero* plaintiffs produced Halcon-related documents a month later on August 16, 2012. *See* Doc. 43, at 18 n.13.

With respect to Charris, Duarte, and Gelvez, the first time Drummond issued discovery requests that sought information about payments made to witnesses' family members was in its fifth discovery requests served on May 15, 2012. Exhibit G (Pls.' Resp. Defs.' 5th RFP), No. 17. The *Balcero* plaintiffs responded to this set of discovery on June 29, 2012, the day discovery closed. *Id.* In their response, defendants, as counsel for the *Balcero* plaintiffs, objected "on the grounds that this request is overly broad to the extent it

seeks 'all documents referencing or relating to anything of value . . . to the family member of any Colombian paramilitary or to the family member of anyone listed on Attachment A,' as it seeks information that is not relevant or likely to lead to admissible evidence. In addition, the Court ruled on March 8, 2012 that such information is discoverable only as it relates to paramilitaries or those individuals listed on Plaintiffs' disclosures." *Id.* Drummond and defendants, as counsel for defendants, then met and conferred about this objection over the next several months. Without the *Balcero* plaintiffs' objections' lodged on June 29, 2012, being resolved, defendants, as counsel for the *Balcero* plaintiffs, agreed to produce documentation of funds provided to relocate the families of Duarte, Gelvez, and Charris after they had received death threats. *See* Doc. 174-14 ("Defs. Reply Mem. Crime-Fraud Exception"), at 6.

94.     Defendants never disclosed the payments to El Tigre, Samario and Blanco in *Balcero*. **UNDISPUTED that witness assistance payments for El Tigre, Samario, and Blanco, or their families, were not disclosed in *Balcero*. DISPUTED because payments were not made "to" these witnesses.**

95.     On March 8, 2012, this Court held a telephonic hearing in *Balcero*.  Doc. 174-23 (March 8, 2012 *Balcero* Hrg. Tr.). **UNDISPUTED.**

96.     During the March 8, 2012 telephonic hearing, Mr. Collingsworth represented to this Court that Llanos Oil had "no relationship" to the *Balcero* case.  Doc. 174-23 (March 8, 2012 *Balcero* Hrg. Tr.) at 8:20-9:7. **DISPUTED as misquotes transcript out of context. Mr. Collingsworth was saying that Llanos Oil had no "relationship" to the case as it related to Drummond. The facts and issues were not related, nor were there common witnesses that**

**Mr. Collingsworth was aware of. Mr. Blanco was not, and is not, a witness in the Llanos Oil case, but had contacts that could, and did, lead to facts specific to that case.**

97.     At the time Mr. Collingsworth represented that Llanos Oil had "no relationship" to the *Balcero* case, Albert van Bilderbeek of Llanos Oil had already made two payments to Jaime Blanco, totaling in excess of $60,000.  Doc. 174-2 (Defs' 2ⁿᵈ Am. Resp. to Drummond's 3ʳᵈ Irogs, No. 2) at pp. 4-8; Doc. 174-20. **UNDISPUTED that, as of the time of Mr. Collingsworth's statement, Albert Van Bilderbeek had made payments to Otero, and that Mr. Collingsworth understood that those payments were to be used to pay Blanco's criminal legal fees. There is no evidence of how much of this amount was delivered to Blanco, or that Mr. Collingsworth was aware of how much of that amount had been delivered to Blanco. *See* Doc. 174-2, at 6. DISPUTED to the extent this statement implies that Llanos Oil, rather than Albert Van Bilderbeek, was involved in the payments to Otero.**

98.     These two payments were offered, facilitated and confirmed by Mr. Collingsworth.  Doc. 174-2 (Defs' 2ⁿᵈ Am. Resp. to Drummond's 3ʳᵈ Irogs, No. 2) at pp. 4-8; Doc. 174-20. **UNDISPUTED that Mr. Collingsworth confirmed these payments were made by Albert van Bilderbeek to Otero. DISPUTED because Mr. Collingsworth did not "offer" or "facilitate" these payments, nor did he know whether, and how much, of these payments were delivered to Blanco.**

99.     Mr. Collingsworth's representation on March 8, 2012 that Llanos Oil had "no relationship" to the *Balcero* case was false.  Doc. 174-2 (Defs' 2ⁿᵈ Am. Resp. to Drummond's 3ʳᵈ Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED as misquotes transcript out of context. Mr. Collingsworth was saying that Llanos Oil had no "relationship" to the case as it related to Drummond. The facts and issues were not related nor were there common witnesses that**

**Mr. Collingsworth was aware of. Mr. Blanco was not, and is not, a witness in the Llanos Oil case, but had contacts that could and did lead to facts specific to that case. But, the statement was not complete and Mr. Collingsworth did not intend to deceive the Court by failing to elaborate on the relationship of Llanos Oil to this case.**

100.    At the time Mr. Collingsworth made the representation that Llanos Oil had "no relationship" to the *Balcero* case, he knew it was false. Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because the statement, when read in context, was not false. However, the statement was not complete and Mr. Collingsworth did not intend to deceive the Court by failing to elaborate on the relationship of Llanos Oil to this case.**

101.    On April 19, 2012, Jaime Blanco gave the first part of his letters rogatory testimony in *Balcero*. *Balcero* Doc. 396-15 (Blanco Dep.). **UNDISPUTED.**

102.    Mr. Collingsworth asked Jaime Blanco the following question: "Have you had any promises or benefits provided to you?" *Balcero* Doc. 396-15 (Blanco Dep.) at 16-17. **UNDISPUTED.**

103.    Jaime Blanco responded: "No, no kind whatsoever." *Balcero* Doc. 396-15 (Blanco Dep.) at 16-17. **UNDISPUTED.**

104.    As of April 19, 2012, Jaime Blanco had already received at least two payments from Albert van Bilderbeek. Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED as Mr. Collingsworth did not know at the time whether payments made from Albert van Bilderbeek to Otero had been delivered to Blanco and, if so, in what amounts. Furthermore, any payments Blanco did receive did not come from Mr. Collingsworth.**

34

105.    Mr. Collingsworth offered, facilitated and confirmed these payments to Jaime Blanco.  Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED to the extent it conflicts with Mr. Collingsworth's explanation of his involvement with Blanco.** *See* **Doc. 174-2, at 4-6.**

106.    Jaime Blanco's response of "No, no kind whatsoever" in response to Mr. Collingsworth's question was false.  *Balcero* Doc. 396-15 (Blanco Dep.) at 16-17; Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. DISPUTED as Mr. Collingsworth's question was ambiguous. **DISPUTED because Mr. Collingsworth did not know at the time whether payments made from Albert van Bilderbeek to Otero had been delivered to Blanco and, if so, in what amounts. Furthermore, any payments Blanco did receive did not come from Mr. Collingsworth.**

107.    At the time Jaime Blanco gave this testimony in response to Mr. Collingsworth's question, Mr. Collingsworth knew it was false.  Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because Mr. Collingsworth did not know at the time whether payments made from Albert van Bilderbeek to Otero had been delivered to Blanco and, if so, in what amounts. Furthermore, any payments Blanco did receive did not come from Mr. Collingsworth.**

108.    Mr. Collingsworth did not attempt to correct the record or elicit truthful testimony from Blanco regarding his receipt of payments from Albert van Bilderbeek.  *Balcero* Doc. 396-15 (Blanco Dep.). **DISPUTED because it assumes that Blanco testified incorrectly or falsely and that Mr. Collingsworth knew that at the time.**

109.    On May 16, 2012, Mr. Collingsworth signed an amended response to the interrogatory in *Balcero* asking him to disclose anything of value offered or given to witnesses

on the *Balcero* plaintiffs' Rule 26 disclosures or paramilitaries.  Doc. 88-5 (Collingsworth's May 16, 2012 *Balcero* Am. Interrogatory Resp**.). UNDISPUTED, although the actual requests states: "Describe anything of value offered or given by Plaintiffs, or anyone acting on Plaintiffs' behalf including counsel, to any person disclosed on Plaintiffs' Rule 26 disclosures, any former paramilitary or any other potential witness in this litigation."**

110.    At the time he signed these interrogatory responses, Mr. Collingsworth was acting as a partner of Conrad & Scherer, LLP. *Id*. **DISPUTED as calls for a legal conclusion and nothing about this document indicates the capacity in which Mr. Collingsworth signed the interrogatory.**

111.    Mr. Collingsworth's May 16, 2012 amended interrogatory response stated as follows:

> Plaintiffs have provided Duarte with hamburgers and other food on several occasions, which were served during meetings to discuss the facts in his February 2011 Declaration.   Additionally, Plaintiffs' counsel have provided reasonable transportation, food, and lodging costs for Plaintiffs who were deposed in Alabama between July 18-23, 2011 and between January 25- February 3, 2012. Plaintiffs have paid to relocate Plaintiff Claudia Balcero and her family after she and her family received death threats as a result of participating in this lawsuit.  Additionally, Plaintiffs' counsel has purchased lunch for witnesses during depositions that have occurred through the letters rogatory process.  After Mr. Rafael Garcia was released from prison without notice and because of fears for his safety, Plaintiffs arranged for a temporary safe house and his transportation to a third country, from where he has since relocated on his own.

Doc. 88-5 (Collingsworth's May 16, 2012 *Balcero* Am. Interrogatory Resp.). **UNDISPUTED that this response was provided, subject to objections based on vagueness and overbreadth of the phrase "anything of value offered or given . . . to any person disclosed on Plaintiffs' Rule 26 disclosures, any former paramilitary or any other potential witness in this litigation"; objections based on relevancy; and objections based on the attorney work**

36

product doctrine to the extent it sought information regarding "potential witnesses." *See* **Doc. 88-5, at 4.**

112.    At the time Mr. Collingsworth signed this May 16, 2012 interrogatory response, Defendants' litigation team had made payments to alias "Halcon," Duarte, Charris, Gelvez, Samario, El Tigre, and Blanco.  Doc. 44-19; Ex. 7 (CS 11416); Doc. 44-13 (PLS 5020); Ex. 8 (CS_TC000179); Doc. 44-15 (PLS 5024-5025); Doc. 44-6; Doc. 174-8 (El Tigre and Samario payments) Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **UNDISPUTED that Mr. Collingsworth had authorized witness assistance payments to be made to the witnesses, or their families, identified here. DISPUTED because the phrase "Defendants' litigation team" is ambiguous.**

113.    Mr. Collingsworth's May 16, 2012 interrogatory response was false.  Doc. 44-19; Ex. 7 (CS 11416); Doc. 44-13 (PLS 5020); Ex. 8 (CS_TC000179); Doc. 44-15 (PLS 5024-5025); Doc. 44-6; Doc. 174-8 (El Tigre and Samario payments) Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **UNDISPUTED that the interrogatory response was incomplete and should have included payments for security for Halcon. But, payments for security for Halcon were disclosed very shortly thereafter.** *See* **Exhibit F, Request No. 7.**

114.    At the time Mr. Collingsworth signed this May 16, 2012 interrogatory response, he knew it was false.  Doc. 44-19; Ex. 7 (CS 11416); Doc. 44-13 (PLS 5020); Ex. 8 (CS_TC000179); Doc. 44-15 (PLS 5024-5025); Doc. 44-6; Doc. 174-8 (El Tigre and Samario payments) Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **UNDISPUTED that the interrogatory was incomplete in that it did not include**

**payments for security for Halcon. But, payments for security for Halcon were disclosed very shortly thereafter.** *See* **Exhibit F, Request No. 7.**

115.    On July 1, 2013, Drummond filed a motion to compel responses to its First and Second written discovery requests, setting forth documentary evidence of Defendants' payments to Halcon, Charris and Duarte.  Doc. 43. **UNDISPUTED.**

116.    On July 18, 2013, Defendants filed "Terrence Collingsworth and Conrad & Scherer's Response to Drummond Company, Inc's Motion to Compel."   Doc. 46. **UNDISPUTED that counsel for defendants filed this response.**

117.    In "Terrence Collingsworth and Conrad & Scherer's Response to Drummond Company, Inc's Motion to Compel," Defendants made the following representation to this Court:

> In purporting to seek further discovery regarding payments made to witnesses, Drummond asserts, as if it had discovered a nefarious plot, that it "has evidence" Mr. Collingsworth "paid witnesses and their families." DR. Mot. 14.  First, all of the "evidence" Drummond has was produced by Plaintiffs in the *Balcero* case, and Plaintiffs produced every responsive document they had. Collingsworth Decl. ¶ 4."

Doc. 46 at 3. **UNDISPUTED that counsel for defendants made this representation.**

118.    At the time Defendants represented to this Court that they had already "produced every responsive document they had" related to payments to witnesses in the *Balcero* case, they had not disclosed the payments to El Tigre, Samario or Blanco.  Doc. 174-8 (El Tigre and Samario payments); Ex. 1 (May 21, 2015 Hrg. Tr.) at 56:23-57:18; Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **UNDISPUTED that, at the time of this response, documents relating to witness assistance payments for El Tigre, Samario, and Blanco, or their families, had not been disclosed. If outstanding objections to** *Balcero* **discovery requests were ignored, the statement was incomplete. But, it has been**

38

**corrected through supplemental discovery responses in this case. Mr. Collingsworth did not intend to mislead the Court.**

119.    Defendants' representation that they had already "produced every responsive document they had" related to payments to witnesses in the *Balcero* case was false. Doc. 174-8 (El Tigre and Samario payments); Ex. 1 (May 21, 2015 Hrg. Tr.) at 56:23-57:18; Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED that witness assistance payments for these witnesses, or their families, were responsive to discovery requests in *Balcero* that were not subject to outstanding objections. But, if outstanding objections to *Balcero* discovery requests were ignored, the statement was incomplete. But, it has been corrected through supplemental discovery responses in this case. Mr. Collingsworth did not intend to mislead the Court.**

120.    At the time Defendants made the representation that they had already "produced every responsive document they had" related to payments to witnesses in the *Balcero* case, they knew it was false. Doc. 174-8 (El Tigre and Samario payments); Ex. 1 (May 21, 2015 Hrg. Tr.) at 56:23-57:18; Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because the representation was not false, although it was incomplete if outstanding objections were ignored. Mr. Collingsworth did not intend to mislead the Court. *See supra* Resp. ¶ 119.**

121.    In "Terrence Collingsworth and Conrad & Scherer's Response to Drummond Company, Inc's Motion to Compel," Defendants also represented that they "have provided Drummond all responsive documents, and the only reason Drummond knows about the security payments is because Defendants provided the documents." Doc. 46 at 21. **UNDISPUTED that defendants' counsel made this representation.**

122.    At the time Defendants represented to this Court that they "have provided Drummond all responsive documents, and the only reason Drummond knows about the security payments is because Defendants provided the documents," they had not disclosed the payments to El Tigre, Samario or Blanco.  Doc. 174-8 (El Tigre and Samario payments); Ex. 1 (May 21, 2015 Hrg. Tr.) at 56:23-57:18; Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **UNDISPUTED that, at the time of this response, documents relating to witness assistance payments for El Tigre, Samario, and Blanco, or their families, had not been disclosed. If outstanding objections to *Balcero* discovery requests were ignored, the statement was incomplete. But, it has been corrected through supplemental discovery responses in this case. Mr. Collingsworth did not intend to mislead the Court.**

123.    Defendants' representation that they had "provided Drummond all responsive documents" related to payments to witnesses in the *Balcero* case was false.  Doc. 174-8 (El Tigre and Samario payments); Ex. 1 (May 21, 2015 Hrg. Tr.) at 56:23-57:18; Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED that witness assistance payments for these witnesses, or their families, were responsive to discovery requests in *Balcero* that were not subject to outstanding objections. But, if outstanding objections to *Balcero* discovery requests were ignored, the statement was incomplete. But, it has been corrected through supplemental discovery responses in this case. Mr. Collingsworth did not intend to mislead the Court.**

124.    At the time Defendants made the representation they had "provided Drummond all responsive documents" related to payments to witnesses in the *Balcero* case, they knew it was false.  Doc. 174-8 (El Tigre and Samario payments); Ex. 1 (May 21, 2015 Hrg. Tr.) at 56:23-57:18; Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-

40

20. **DISPUTED because the representation was not false, although it was incomplete if outstanding objections were ignored. Mr. Collingsworth did not intend to mislead the Court.** *See supra* **Resp. ¶ 123.**

125.    On July 18, 2013, Mr. Collingsworth submitted a declaration under penalty of perjury to this Court in support of "Terrence Collingsworth and Conrad & Scherer's Response to Drummond Company, Inc's Motion to Compel."   Doc. 47.  **UNDISPUTED that Mr. Collingsworth submitted this declaration. DISPUTED to the extent it implies this declaration was submitted by Mr. Collingsworth as a representative of Conrad & Scherer. Mr. Collingsworth signed it only in his individual capacity as a defendant.**

126.    In Paragraph 4 of Mr. Collingsworth's July 18, 2013 declaration, he testified that he had produced documents reflecting Defendants' payments to Duarte, Charris and Halcon. Doc. 47 (July 18, 2013 Collingsworth Decl.) ¶ 4. **UNDISPUTED that Mr. Collingsworth testified that documents reflecting payments to the families of, or third parties for the benefit of, Duarte, Charris, and Halcon were produced to Drummond in** *Balcero***.**

127.    Mr. Collingsworth's July 18, 2013 declaration does not disclose any of the payments to Blanco, El Tigre or Samario.  *See* Doc. 47 (July 18, 2013 Collingsworth Decl.), *generally*. **UNDISPUTED that, at the time of this response, documents relating to witness assistance payments for El Tigre, Samario, and Blanco, or their families, had not been disclosed.**

128.    Defendants cited Paragraph 4 of Mr. Collingsworth's sworn declaration as evidentiary support for their representation to this Court that "all of the 'evidence' Drummond has was produced by Plaintiffs in the *Balcero* case, and Plaintiffs produced every responsive document they had. Collingsworth Decl. ¶ 4."  Doc. 46 at 3. **UNDISPUTED.**

129.    At the time Defendants cited Mr. Collingsworth's sworn declaration and represented that they had already "produced every responsive document they had" related to payments to witnesses in the *Balcero* case, they knew this representation was false.  Doc. 174-8 (El Tigre and Samario payments); Ex. 1 (May 21, 2015 Hrg. Tr.) at 56:23-57:18; Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED. Witness assistance payments for these witnesses, or their families, were not responsive to discovery requests in *Balcero* that were not subject to outstanding objections. But, if outstanding objections to *Balcero* discovery requests were ignored, the statement was incomplete. But, it has been corrected through supplemental discovery responses in this case. Mr. Collingsworth did not intend to mislead the Court.**

130.    In Paragraph 5 of Mr. Collingsworth's July 18, 2013 declaration, he testified that "the sole promise I made to any witness in the *Balcero* case was that if they testified and they or a family member received a credible death threat, we would do whatever we could to provide security or a safe haven until such time as the danger had subsided."  Doc. 47 (July 18, 2013 Collingsworth Decl.) ¶ 5. **UNDISPUTED.**

131.    At the time Mr. Collingsworth signed this declaration, he had already offered, facilitated and confirmed at least three payments to Jaime Blanco from Albert van Bilderbeek that had nothing to do with "security or a safe haven."  Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED to the extent it conflicts with Mr. Collingsworth's explanation of his involvement with Blanco. *See* Doc. 174-2, at 4-6.**

132.    Mr. Collingsworth's testimony regarding the "sole promise" he made to "any witness in the *Balcero* case" is false.  Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs,

No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED to the extent it conflicts with Mr. Collingsworth's explanation of his involvement with Blanco.** *See* **Doc. 174-2, at 4-6.**

133.     At the time Defendants submitted Mr. Collingsworth's testimony regarding the "sole promise" he made to "any witness in the *Balcero* case," they knew it was false.  Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED to the extent it conflicts with Mr. Collingsworth's explanation of his involvement with Blanco.** *See* **Doc. 174-2, at 4-6.**

### *The Subpoena to International Rights Advocates ("IRAdvocates")*

134.     The payments to El Tigre, Samario, and Jaime Blanco are all discussed in emails written using Mr. Collingsworth's "tc@iradvocates.com" email address.  Doc. 174-6; Doc. 174-20; Doc. 101-15. **UNDISPUTED that some of the emails cited here were written using Mr. Collingsworth's "tc@iradvocates.com" email address. Defendants object to Drummond's reliance on and citation to inadvertently produced documents by defendants' former co-counsel that are subject to a clawback order in this case.**

135.     On July 22, 2013, Drummond served IRAdvocates with a subpoena commanding the production of documents and things.  Doc. 118-3 (IRAdvocates Subpoena); Ex. 9 (IRAdvocates Proof of Service). **UNDISPUTED.**

136.     Drummond's subpoena to IRAdvocates sought "[a]ny and all documents related or referring to *payments to individuals incarcerated in Colombia*, including but not limited to…Jaime Blanco Maya…Jhon Jairo Esquivel Cuadrado [El Tigre]…[and] Alcides Manuel Mattos Tabares [Samario]."  Doc. 118-3 (Drummond's Subpoena to IRAdvocates) at Req. No. 5 (emphasis added). **UNDISPUTED.**

137.   Drummond's subpoena to IRAdvocates also sought "[a]ny and all documents related or referring to ***payments to any family members*** of any individuals incarcerated in Colombia, including but not limited to…Jaime Blanco Maya…Jhon Jairo Esquivel Cuadrado [El Tigre]…[and] Alcides Manuel Mattos Tabares [Samario]."  Doc. 118-3 (Drummond's Subpoena to IRAdvocates) at Req. No. 6 (emphasis added). **UNDISPUTED.**

138.   Drummond's subpoena to IRAdvocates also sought "[a]ny and all documents related or referring to ***requests for*** payment or any form of assistance (whether monetary or nonmonetary in nature) by any individual incarcerated in Colombia… including but not limited to…Jaime Blanco Maya…Jhon Jairo Esquivel Cuadrado [El Tigre]…[and] Alcides Manuel Mattos Tabares [Samario]."  Doc. 118-3 (Drummond's Subpoena to IRAdvocates) at Req. No. 1 (emphasis added).**UNDISPUTED.**

139.   Drummond's subpoena to IRAdvocates also sought "[a]ny and all documents related or referring to ***requests for*** payment or any form of assistance (whether monetary or nonmonetary in nature) ***by any family member*** of any individual incarcerated in Colombia… including but not limited to…Jaime Blanco Maya…Jhon Jairo Esquivel Cuadrado [El Tigre]…[and] Alcides Manuel Mattos Tabares [Samario]."  Doc. 118-3 (Drummond's Subpoena to IRAdvocates) at Req. No. 2 (emphasis added). **UNDISPUTED.**

140.   On August 16, 2013, Mr. Collingsworth signed a declaration under penalty of perjury in support of Defendants' and IRAdvocates' motion to quash Drummond's subpoena to IRAdvocates.  Doc. 101-5 (Aug. 16, 2013 Collingsworth Decl.). **UNDISPUTED.**

141.   In Paragraph 5 of Mr. Collingsworth's August 16, 2013 declaration, Mr. Collingsworth testified that:

> I have reviewed the subpoenas Drummond has caused to be issued to IRAdvocates, ILRF, and Parker Waichman. They are essentially identical,

and the document requests contained in the three subpoenas have either already been served on me in my capacity as counsel in the *Balcero* case or as a Defendant in the underlying libel case. Moreover, in my capacity as Defendant in the libel action and as counsel in the *Balcero* litigation, I provided all responsive, non-privileged documents in my custody, possession or control, including those in the files of IRAdvocates. The subpoenas to IRAdvocates, ILRF, and Parker Waichman are duplicative of requests already made to me as a defendant in the libel action, and/or duplicative of requests to Plaintiffs in the *Balcero* action. Given the duplicative nature of the requests, they are designed to harass and create an undue burden for IRAdvocates, ILRF, Parker Waichman, and me personally.

Doc. 101-5 (Aug. 16, 2013 Collingsworth Decl.) ¶ 5. **UNDISPUTED.**

142.    At the time Mr. Collingsworth submitted this declaration testifying that Defendants had "provided all responsive, non-privileged documents in my custody, possession or control, including those in the files of IRAdvocates" responsive to the subpoena's requests, Defendants had not disclosed the payments to Blanco, El Tigre or Samario. Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **UNDISPUTED that, at the time of this response, documents relating to witness assistance payments for El Tigre, Samario, and Blanco, or their families, had not been disclosed. But, as Mr. Collingsworth explained in his declaration, he had produced "all responsive, non-privileged documents in my custody, possession or control"—*i.e.*, documents responsive to requests served on Mr. Collingsworth in his capacity as a defendant in the libel case or as counsel in the *Balcero* case that were not subject to outstanding objections. If outstanding objections to *Balcero* discovery requests were ignored, the statement was incomplete. But, it has been corrected through supplemental discovery responses in this case. Mr. Collingsworth did not intend to mislead the Court. Furthermore, this statement preceded the Court's October 15, 2013 and October 15, 2014**

45

Orders, which ruled on defendants' objections and broadened the scope of discovery regarding witness payments.

143.     Mr. Collingsworth's testimony in Paragraph 5 of his August 16, 2013 declaration that Defendants had "provided all responsive, non-privileged documents in my custody, possession or control, including those in the files of IRAdvocates" was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED. As Mr. Collingsworth explained in his declaration, he had produced "all responsive, non-privileged documents in my custody, possession or control"—*i.e.*, documents responsive to requests served on Mr. Collingsworth in his capacity as a defendant in the libel case or as counsel in the *Balcero* case that were not subject to outstanding objections. If outstanding objections to *Balcero* discovery requests were ignored, the statement was incomplete. But, it has been corrected through supplemental discovery responses in this case. Mr. Collingsworth did not intend to mislead the Court. Furthermore, this statement preceded the Court's October 15, 2013 and October 15, 2014 Orders, which ruled on defendants' objections and broadened the scope of discovery regarding witness payments.**

144.     At the time Mr. Collingsworth signed this August 16, 2013 declaration, he knew this testimony in Paragraph 5 was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because the representation was not false, although it was incomplete if outstanding objections were ignored. Mr. Collingsworth did not intend to mislead the Court. *See supra* Resp. ¶ 143.**

145.    In Paragraph 23 of Mr. Collingsworth August 16, 2013 declaration, he testified that:

> I have reviewed our responses on behalf of Plaintiffs in the *Balcero* litigation to document requests served on them by Drummond, as well as my responses as a defendant in the libel action brought against me by Drummond, and we have produced all responsive non-privileged documents to Drummond in those cases. I have never taken the position in the course of litigating the *Balcero* case or the libel litigation that documents within IRAdvocates' electronic or hard copy files were not within my possession, custody or control for the purpose of discovery. As Drummond's document requests to IRAdvocates are virtually identical to requests already made to the *Balcero* Plaintiffs and/or to me in the libel case, I can say that any non-privileged documents that are responsive to the requests to IRAdvocates have already been produced.

Doc. 101-5 (Aug. 16, 2013 Collingsworth Decl.) ¶ 23. **UNDISPUTED.**

146.    At the time Mr. Collingsworth submitted this declaration testifying that Defendants had "reviewed our responses on behalf of Plaintiffs in the *Balcero* litigation to document requests served on them by Drummond, as well as my responses as a defendant in the libel action brought against me by Drummond, and we have produced all responsive non-privileged documents to Drummond in those cases," Defendants had not disclosed the payments to Blanco, El Tigre or Samario.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **UNDISPUTED that, at the time of this statement, documents relating to witness assistance payments for El Tigre, Samario, and Blanco, or their families, had not been disclosed. But, as Mr. Collingsworth explained in his declaration, he had "produced all responsive non-privileged documents to Drummond in those cases"—*i.e.*, documents responsive to requests served on Mr. Collingsworth in his capacity as a defendant in the libel case or as counsel in the *Balcero* case that were not subject to outstanding objections. If outstanding objections to *Balcero* discovery requests were ignored, the statement was incomplete. But, it has been corrected**

through supplemental discovery responses in this case. **Mr. Collingsworth did not intend to mislead the Court. Furthermore, this statement preceded the Court's October 15, 2013 and October 15, 2014 Orders, which ruled on defendants' objections and broadened the scope of discovery regarding witness payments.**

147.    Mr. Collingsworth's testimony in Paragraph 23 of his August 16, 2013 declaration that Defendants had "produced all responsive non-privileged documents to Drummond" was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED. As Mr. Collingsworth explained in his declaration, he had "produced all responsive non-privileged documents to Drummond in those cases"—*i.e.*, documents responsive to requests served on Mr. Collingsworth in his capacity as a defendant in the libel case or as counsel in the *Balcero* case that were not subject to outstanding objections. If outstanding objections to *Balcero* discovery requests were ignored, the statement was incomplete. But, it has been corrected through supplemental discovery responses in this case. Mr. Collingsworth did not intend to mislead the Court. Furthermore, this statement preceded the Court's October 15, 2013 and October 15, 2014 Orders, which ruled on defendants' objections and broadened the scope of discovery regarding witness payments.**

148.    At the time Mr. Collingsworth signed this August 16, 2013 declaration, he knew this testimony in Paragraph 23 was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because the representation was not false, although it was incomplete if outstanding objections were ignored. Mr. Collingsworth did not intend to mislead the Court. *See supra* Resp. ¶ 147.**

149.    On August 16, 2013, Christian Levesque of Conrad & Scherer, LLP filed "International Rights Advocates' Motion to Quash Subpoena" in the United States District Court for the District of Columbia. *Drummond Company, Inc. v. Terrence P. Collingsworth, et al.*, Case No. 2:14-mc-00621-RDP (N.D. Ala.) Doc. 4. **UNDISPUTED.**

150.    "International Rights Advocates' Motion to Quash Subpoena" described Drummond's subpoena as an "improper and abusive use of [Drummond's] subpoena power," and requested that Drummond be sanctioned for issuing the subpoena. *Drummond Company, Inc. v. Terrence P. Collingsworth, et al.*, Case No. 2:14-mc-00621-RDP (N.D. Ala.) Doc. 4 at 19. **UNDISPUTED.**

151.    "International Rights Advocates' Motion to Quash Subpoena" represented that

> [T]he information [sought by Drummond's subpoena to IRAdvocates] not only *could* be obtained by another source previously during discovery, all responsive, non-privileged requested documents *already have been* produced to Drummond by Defendants in the underlying defamation suit and in the *Balcero* litigation.

*Drummond Company, Inc. v. Terrence P. Collingsworth, et al.*, Case No. 2:14-mc-00621-RDP (N.D. Ala.) Doc. 4 at 10 (emphasis in original). **UNDISPUTED.**

152.    At the time Conrad & Scherer, LLP submitted this motion to quash on behalf of IRAdvocates representing that "the information [sought by Drummond's subpoena to IRAdvocates] not only *could* be obtained by another source previously during discovery, all responsive, non-privileged requested documents *already have been* produced to Drummond by Defendants in the underlying defamation suit and in the *Balcero* litigation," Defendants had not disclosed the payments to Blanco, El Tigre or Samario.  Doc. 174-8 (El Tigre and Samario payments); Ex. 1 (May 21, 2015 Hrg. Tr.) at 56:23-57:18; Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **UNDISPUTED that, at the time of this**

statement, documents relating to witness assistance payments for El Tigre, Samario, and Blanco, or their families, had not been disclosed. But, "all responsive, non-privileged requested documents" had been "produced to Drummond by Defendants in the underlying defamation suit and in the *Balcero* litigation"—*i.e.*, documents responsive to requests served on Mr. Collingsworth in his capacity as a defendant in the libel case or as counsel in the *Balcero* case that were not subject to outstanding objections. If outstanding objections to discovery requests were ignored, the statement was incomplete. But, it has been corrected through supplemental discovery responses in this case. Mr. Collingsworth did not intend to mislead the Court. Furthermore, this statement preceded the Court's October 15, 2013 and October 15, 2014 Orders, which ruled on defendants' objections and broadened the scope of discovery regarding witness payments.

153.    Conrad & Scherer, LLP's representation on August 16, 2013, that "the information [sought by Drummond's subpoena to IRAdvocates] not only *could* be obtained by another source previously during discovery, all responsive, non-privileged requested documents *already have been* produced to Drummond by Defendants in the underlying defamation suit and in the *Balcero* litigation," was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED. As explained in the motion, "all responsive, non-privileged requested documents" had been "produced to Drummond by Defendants in the underlying defamation suit and in the *Balcero* litigation"—*i.e.*, documents responsive to requests served on Mr. Collingsworth in his capacity as a defendant in the libel case or as counsel in the *Balcero* case that were not subject to outstanding objections. If outstanding objections to discovery requests were ignored, the statement was incomplete. But, it has been corrected through supplemental**

discovery responses in this case. **Mr. Collingsworth did not intend to mislead the Court. Furthermore, this statement preceded the Court's October 15, 2013 and October 15, 2014 Orders, which ruled on defendants' objections and broadened the scope of discovery regarding witness payments.**

154.    At the time Conrad & Scherer, LLP represented to the United States District Court for the District of Columbia that "the information [sought by Drummond's subpoena to IRAdvocates] not only *could* be obtained by another source previously during discovery, all responsive, non-privileged requested documents *already have been* produced to Drummond by Defendants in the underlying defamation suit and in the *Balcero* litigation," it knew that representation was false. Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because the representation was not false, although it was incomplete if outstanding objections were ignored. Mr. Collingsworth did not intend to mislead the Court.** *See supra* **Resp. ¶ 154.**

155.    "International Rights Advocates' Motion to Quash Subpoena" also represented that

> Requests 1-8 seek information about 'any assistance,' including 'any payments' to 'any individual incarcerated in Colombia' and 'any family members of an individual incarcerated in Colombia.' *See* Exhibit 1. Although irrelevant to Drummond's libel claims, Defendants Mr. Collingsworth and Conrad and Scherer, LLP have already produced all responsive, nonprivileged documents regarding security provided to Drummond witnesses in the *Balcero* litigation.

*Drummond Company, Inc. v. Terrence P. Collingsworth, et al.*, Case No. 2:14-mc-00621-RDP (N.D. Ala.) Doc. 4 at 13-14. **UNDISPUTED.**

156.    At the time Conrad & Scherer, LLP submitted this motion to quash on behalf of IRAdvocates and made the representation quoted in Paragraph 155, Defendants had not

disclosed the payments to Blanco, El Tigre or Samario.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **UNDISPUTED that, at the time of this statement, documents relating to witness assistance payments for El Tigre, Samario, and Blanco, or their families, had not been disclosed. But, as the motion explains, Mr. Collingsworth and Conrad & Scherer had "already produced all responsive, nonprivileged documents regarding security provided to Drummond witnesses in the *Balcero* litigation"—*i.e.*, documents responsive to requests served in the *Balcero* case that were not subject to outstanding objections. If outstanding objections to *Balcero* discovery requests were ignored, the statement was incomplete. But, it has been corrected through supplemental discovery responses in this case. Mr. Collingsworth did not intend to mislead the Court. Furthermore, this statement preceded the Court's October 15, 2013 and October 15, 2014 Orders, which ruled on defendants' objections and broadened the scope of discovery regarding witness payments.**

157.    Conrad & Scherer, LLP's representation on August 16, 2013, that "Defendants Mr. Collingsworth and Conrad and Scherer, LLP have already produced all responsive, nonprivileged documents regarding security provided to Drummond witnesses in the *Balcero* litigation," was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED. As the motion explains, Mr. Collingsworth and Conrad & Scherer had "already produced all responsive, nonprivileged documents regarding security provided to Drummond witnesses in the *Balcero* litigation"—*i.e.*, documents responsive to requests served in the *Balcero* case that were not subject to outstanding objections. If outstanding objections to *Balcero* discovery requests were ignored, the statement was incomplete. But, it has been corrected through**

supplemental discovery responses in this case. Mr. Collingsworth did not intend to mislead the Court. Furthermore, this statement preceded the Court's October 15, 2013 and October 15, 2014 Orders, which ruled on defendants' objections and broadened the scope of discovery regarding witness payments.

158.   At the time Conrad & Scherer, LLP represented to the United States District Court for the District of Columbia that "Defendants Mr. Collingsworth and Conrad and Scherer, LLP have already produced all responsive, nonprivileged documents regarding security provided to Drummond witnesses in the *Balcero* litigation," it knew that representation was false. Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because the representation was not false, although it was incomplete if outstanding objections were ignored. Mr. Collingsworth did not intend to mislead the Court.** *See supra* **Resp. ¶ 157.**

159.   Request No. 30 of Drummond's subpoena to IRAdvocates sought "[a]ny and all documents related or referring to Llanos Oil or any of its principals, representatives, agents or employees." Doc. 118-3 (IRAdvocates Subpoena) at Req. No. 30. **UNDISPUTED.**

160.   International Rights Advocates' Motion to Quash Subpoena" represented that "[a]ll responsive, non-privileged, non-work-product documents sought by this request to IRAdvocates have already been produced by Defendant Collingsworth (IRAdvocates' Executive Director) in either the *Balcero* litigation or in the above-captioned libel case." *Drummond Company, Inc. v. Terrence P. Collingsworth, et al.*, Case No. 2:14-mc-00621-RDP (N.D. Ala.) Doc. 4 at 17. **UNDISPUTED.**

161.   At the time Defendants filed this motion to quash and represented that "[a]ll responsive, non-privileged, non-work-product documents sought by [Request No. 30] to

53

IRAdvocates have already been produced by Defendant Collingsworth (IRAdvocates' Executive Director) in either the *Balcero* litigation or in the above-captioned libel case," Defendants had not disclosed the payments to Blanco or their emails with Albert van Bilderbeek evidencing those payments. Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **UNDISPUTED that at the time this motion was filed documents reflecting payments by Albert van Bilderbeek to Otero had not been produced, nor had emails about those payments been produced. As the motion explains, however, "[a]ll responsive, non-privileged, non-work-product documents sought by this request to IRAdvocates have already been produced by Defendant Collingsworth (IRAdvocates' Executive Director) in either the *Balcero* litigation or in the above-captioned libel case"—*i.e.*, documents responsive to requests served on Mr. Collingsworth in his capacity as a defendant in the libel case or as counsel in the *Balcero* case that were not subject to outstanding objections. Furthermore, this statement preceded the Court's October 15, 2013 and October 15, 2014 Orders, which ruled on defendants' objections and broadened the scope of discovery regarding witness payments. In retrospect, and ignoring outstanding objections, to the extent the statement was incomplete or did not adequately explain the context, it has been supplemented in later filings in this case, as described elsewhere in these responses to Drummond's proposed findings of fact. Mr. Collingsworth did not intend to mislead the Court.**

162.    Defendants' representation on August 16, 2013, that "[a]ll responsive, non-privileged, non-work-product documents sought by [Request No. 30] to IRAdvocates have already been produced by Defendant Collingsworth (IRAdvocates' Executive Director) in either the *Balcero* litigation or in the above-captioned libel case" was false. Doc. 174-2 (Defs' 2nd Am.

Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED. As the motion explains, however, "[a]ll responsive, non-privileged, non-work-product documents sought by this request to IRAdvocates have already been produced by Defendant Collingsworth (IRAdvocates' Executive Director) in either the *Balcero* litigation or in the above-captioned libel case"—*i.e.*, documents responsive to requests served on Mr. Collingsworth in his capacity as a defendant in the libel case or as counsel in the *Balcero* case that were not subject to outstanding objections. Furthermore, this statement preceded the Court's October 15, 2013 and October 15, 2014 Orders, which ruled on defendants' objections and broadened the scope of discovery regarding witness payments. In retrospect, and ignoring outstanding objections, to the extent the statement was incomplete or did not adequately explain the context, it has been supplemented in later filings in this case, as described elsewhere in these responses to Drummond's proposed findings of fact. Mr. Collingsworth did not intend to mislead the Court.**

163.   At the time Defendants represented to the United States District Court for the District of Columbia that "[a]ll responsive, non-privileged, non-work-product documents sought by [Request No. 30] to IRAdvocates have already been produced by Defendant Collingsworth (IRAdvocates' Executive Director) in either the *Balcero* litigation or in the above-captioned libel case" they knew that representation was false. Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because the statement was not false. In retrospect, and ignoring outstanding objections, to the extent the statement was incomplete or did not adequately explain the context, it has been supplemented in later filings in this case, as described elsewhere in these responses to Drummond's proposed findings of fact. Mr. Collingsworth did not intend to mislead the Court.**

164.    On October 24, 2013, Mr. Collingsworth signed "Defendants' and Third-Party International Rights Advocates' Supplemental Brief in Further Support of Motion to Quash Subpoena and/or Motion for Protective Order." *Drummond Company, Inc. v. Terrence P. Collingsworth, et al.*, 2:14-mc-00621-RDP, Doc. 14 (Defs' Oct. 24, 2013 Supp. Br.). **UNDISPUTED.**

165.    This Supplemental Brief was signed by Mr. Collingsworth as a partner of Conrad & Scherer, LLP, and was filed on behalf of Mr. Collingsworth and Conrad & Scherer, LLP. *Id.* **DISPUTED as it does not indicate the capacity in which Mr. Collingsworth signed it, and disputed because it suggests Mr. Collingsworth signed the brief on behalf of himself and Conrad & Scherer, which he did not.**

166.    In that filing, Defendants represented:

[S]ince 2008 Conrad & Scherer and IRAdvocates files have overlapped for the purpose of the Drummond Litigation. ***The files for both entities were searched and responsive documents were produced.  On the documents produced, it will be clear from which entity the document originated.*** As to the logged documents, the files for both entities were researched and all responsive and privileged documents from both entities were logged.

*Id.* at 1 (emphasis in original). **UNDISPUTED that defendants quoted this language, which is from a letter sent by defendants' counsel to Drummond relating to discovery issues in libel case.** *See Drummond Company, Inc. v. Terrence P. Collingsworth, et al.*, **2:14-mc-00621-RDP, Doc. 13-1 (Oct. 18, 2013Decl. of Terry Collingsworth in Support of Defs.' Reply to Mot. Quash) (explaining that the letter quoted above is from "counsel for Defendants, to counsel for Drummond conveying Defendants' privilege log and, once again, attempting to resolve the outstanding discovery issues that substantially overlap with the issues raised by Drummond's subpoena to IRAdvocates in this matter").**

56

167.    At the time Defendants made this representation, none of the documents reflecting payments to El Tigre, Samario, or Blanco had been produced or logged. **UNDISPUTED that witness assistance payments to Blanco or to the families of El Tigre and Samario has not been produced or logged.**

168.    Defendants' October 24, 2013 representation in connection with the IRAdvocates subpoena that all documents responsive to the subpoena had already been either produced or logged was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED. The language quoted above from defense counsel's letter did not state that "documents responsive to the subpoena" had already been produced or logged. Instead, counsel's letter was explaining that IRAdvocates' files were searched in for purposes of responding to discovery requests in the libel case. And, as explained above, all responsive, non-privileged, non-work-product documents had been produced in the libel case. Furthermore, counsel's letter was dated October 2, 2013, and, therefore, it preceded the Court's October 15, 2013 and October 15, 2014 Orders, which ruled on defendants' objections and broadened the scope of discovery regarding witness payments.**

169.    At the time Defendants made this representation, they knew it was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **Disputed because counsel's statement was not false. In retrospect, and ignoring outstanding objections, to the extent the statement was incomplete or did not adequately explain the context, it has been supplemented in later filings in this case, as described elsewhere in these responses to Drummond's proposed findings of fact. Mr. Collingsworth did not intend to mislead the Court.**

170.    On or about April 4, 2014, the miscellaneous proceeding arising out of Drummond's subpoena to IRAdvocates was transferred to this Court pursuant to Fed. R. Civ. P. 45, where it remains pending.  *See Drummond Company, Inc. v. Terrence P. Collingsworth, et al.*, 2:14-mc-00641-RDP (N.D. Ala.). **UNDISPUTED.**

### *Subpoena to Daniel Kovalik*

171.    On July 22, 2013, Drummond served Daniel Kovalik with a subpoena commanding the production of documents and things.  Doc. 1-1 in *Drummond Company, Inc. v. Terrence P. Collingsworth, et al.*, 2:14-mc-00681-RDP (N.D. Ala.) (Drummond's Subpoena to Daniel Kovalik); Ex. 10 (Kovalik Proof of Service). **UNDISPUTED.**

172.    Drummond's subpoena to Daniel Kovalik sought "[a]ny and all documents related or referring to ***payments to individuals incarcerated in Colombia***, including but not limited to…Jaime Blanco Maya…Jhon Jairo Esquivel Cuadrado [El Tigre]…[and] Alcides Manuel Mattos Tabares [Samario]."  Doc. 1-1 in *Drummond Company, Inc. v. Terrence P. Collingsworth, et al.*, 2:14-mc-00681-RDP (N.D. Ala.) (Drummond's Subpoena to Daniel Kovalik) at Req. No. 13 (emphasis added). **UNDISPUTED.**

173.    Drummond's subpoena to Daniel Kovalik also sought "[a]ny and all documents related or referring to ***payments to any family members*** of any individuals incarcerated in Colombia, including but not limited to…Jaime Blanco Maya…Jhon Jairo Esquivel Cuadrado [El Tigre]…[and] Alcides Manuel Mattos Tabares [Samario]."  Doc. 1-1 in *Drummond Company, Inc. v. Terrence P. Collingsworth, et al.*, 2:14-mc-00681-RDP (N.D. Ala.) (Drummond's Subpoena to Daniel Kovalik) at Req. No. 14 (emphasis added). **UNDISPUTED.**

174.    Drummond's subpoena to Daniel Kovalik also sought "[a]ny and all documents related or referring to ***requests for*** payment or any form of assistance (whether monetary or

nonmonetary in nature) by any individual incarcerated in Colombia… including but not limited to…Jaime Blanco Maya…Jhon Jairo Esquivel Cuadrado [El Tigre]…[and] Alcides Manuel Mattos Tabares [Samario]."   Doc. 1-1 in *Drummond Company, Inc. v. Terrence P. Collingsworth, et al.*, 2:14-mc-00681-RDP (N.D. Ala.) (Drummond's Subpoena to Daniel Kovalik) at Req. No. 11 (emphasis added). **UNDISPUTED.**

175.   Drummond's subpoena to Daniel Kovalik also sought "[a]ny and all documents related or referring to ***requests for*** payment or any form of assistance (whether monetary or nonmonetary in nature) ***by any family member*** of any individual incarcerated in Colombia… including but not limited to…Jaime Blanco Maya…Jhon Jairo Esquivel Cuadrado [El Tigre]…[and] Alcides Manuel Mattos Tabares [Samario]."  Doc. 1-1 in *Drummond Company, Inc. v. Terrence P. Collingsworth, et al.*, 2:14-mc-00681-RDP (N.D. Ala.) (Drummond's Subpoena to Daniel Kovalik) at Req. No. 12 (emphasis added). **UNDISPUTED, although misquotes the request, which states "referring to requests for payment or other assistance."**

176.   On August 22, 2013, Defendants filed a "Motion for Protective Order and/or Motion to Quash Subpoena to Daniel M. Kovalik" in the United States District Court for the Western District of Pennsylvania.   Doc. 1 in *Drummond Company, Inc. v. Terrence P. Collingsworth, et al.*, 2:14-mc-00681-RDP (N.D. Ala.). **UNDISPUTED.**

177.   On August 19, 2013, Mr. Collingsworth signed a declaration under penalty of perjury in support of "Defendants' Motion for Protective Order and/or Motion to Quash Subpoena to Daniel M. Kovalik."   Doc. 101-4 (Aug. 19, 2013 Collingsworth Decl.). **UNDISPUTED.**

178.   In Paragraph 10 of his August 19, 2013 declaration, Mr. Collingsworth testified as follows:

I have reviewed the subpoenas Drummond has caused to be issued to
Daniel Kovalik, and the proposed subpoenas contained in the notice of
intent to serve Francisco Ramirez Cuellar, Rebecca L. Pendleton, Lorraine
M. Leete, Charity S. Ryerson, and Susana Tellez. They are essentially
identical, and the document requests contained in these subpoenas have
either already been served on me in my capacity as counsel in the *Balcero*
case or as a Defendant in the underlying libel case. Moreover, in my
capacity as Defendant in the libel action and as counsel in the *Balcero*
litigation, I provided all responsive, non-privileged, and relevant
documents in my custody, possession or control, and I interpreted my
obligation to produce documents as including documents in the custody,
possession or control of those who work with me on a case. Thus, the
subpoenas to Daniel Kovalik, Francisco Ramirez Cuellar, Rebecca L.
Pendleton, Lorraine M. Leete, Charity S. Ryerson, and Susana Tellez are
duplicative of requests already made to me as a defendant in the libel
action, and/or duplicative of requests that were made to Plaintiffs in the
*Balcero* action. Given the duplicative nature of the requests, and that they
were served on individuals that Drummond knows are part of my current
or former legal teams, they are designed to harass and create an undue
burden for Daniel Kovalik, Francisco Ramirez Cuellar, Rebecca L.
Pendleton, Lorraine M. Leete, Charity S. Ryerson, and Susana Tellez.

Doc. 101-4 (Aug. 19, 2013 Collingsworth Decl.) at ¶ 10.  **UNDISPUTED.**

179.    At the time Mr. Collingsworth submitted this declaration testifying that

Defendants had "provided all responsive, non-privileged, and relevant documents in my custody,

possession or control, and I interpreted my obligation to produce documents as including

documents in the custody, possession or control of those who work with me on a case"

responsive to the subpoena requests, Defendants had not produced any documents disclosing the

payments to Blanco, El Tigre or Samario.  Doc. 174-8 (El Tigre and Samario payments); Doc.

174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20.

**UNDISPUTED that, at the time of this response, documents relating to witness assistance**

**payments for El Tigre, Samario, and Blanco, or their families, had not been disclosed. But,**

**as Mr. Collingsworth explained in his declaration, he, in his "capacity as Defendant in the**

**libel action and as counsel in the *Balcero* litigation, [had] provided all responsive, non-**

**privileged, and relevant documents in [his] custody, possession or control"—*i.e.*, documents responsive to requests served on Mr. Collingsworth in his capacity as a defendant in the libel case or as counsel in the *Balcero* case that were not subject to outstanding objections. If outstanding objections to discovery requests were ignored, the statement was incomplete. But, it has been corrected through supplemental discovery responses in this case. Mr. Collingsworth did not intend to mislead the Court. Furthermore, this statement preceded the Court's October 15, 2013 and October 15, 2014 Orders, which ruled on defendants' objections and broadened the scope of discovery regarding witness payments.**

180.    Mr. Collingsworth's testimony in Paragraph 10 of his August 19, 2013 declaration that Defendants had "provided all responsive, non-privileged, and relevant documents in my custody, possession or control, and I interpreted my obligation to produce documents as including documents in the custody, possession or control of those who work with me on a case" was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED as mischaracterizes testimony, which did not state that "Defendants" provided responsive documents. As explained in his declaration, Mr. Collingsworth had produced "all responsive, non-privileged, and relevant documents in my custody, possession or control" that were served on him as a defendant in the libel action and as counsel in the *Balcero* litigation. And, if outstanding objections to discovery requests were ignored, the statement was incomplete. But, it has been corrected through supplemental discovery responses in this case. Mr. Collingsworth did not intend to mislead the Court.**

181.    At the time Mr. Collingsworth signed this August 19, 2013 declaration, he knew this testimony in Paragraph 10 was false.  Doc. 174-8 (El Tigre and Samario payments); Doc.

174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20.

**DISPUTED because the representation was not false, although it was incomplete if outstanding objections were ignored. Mr. Collingsworth did not intend to mislead the Court.** *See supra* **Resp. ¶ 181.**

182.    In Paragraph 19 of Mr. Collingsworth August 19, 2013 declaration, he testified that:

> I have reviewed our responses on behalf of Plaintiffs in the *Balcero* litigation to document requests served on them by Drummond, as well as my responses as a defendant in the libel action brought against me by Drummond, and we have produced all responsive non-privileged documents to Drummond in those cases. I have never taken the position in the course of litigating the *Balcero* case or the libel litigation that documents within IRAdvocates' electronic or hard copy files were not within my possession, custody or control for the purpose of discovery. As Drummond's document requests to IRAdvocates are virtually identical to requests already made to the *Balcero* Plaintiffs and/or to me in the libel case, I can say that any non-privileged documents that are responsive to the requests to IRAdvocates have already been produced.

Doc. 101-4 (Aug. 19, 2013 Collingsworth Decl.) at ¶ 19. **DISPUTED because this paragraph was clearly inadvertently copied from Mr. Collingsworth's August 16, 2013 declaration submitted in support of his motion to quash Drummond's subpoena to IRAdvocates, and was not a new, separate submission.** *Cf.* **Doc. 101-5, ¶ 23.**

183.    At the time Mr. Collingsworth signed this August 19, 2013 declaration testifying that Defendants had "reviewed our responses on behalf of Plaintiffs in the *Balcero* litigation to document requests served on them by Drummond, as well as my responses as a defendant in the libel action brought against me by Drummond, and we have produced all responsive non-privileged documents to Drummond in those cases," Defendants had not disclosed the payments to Blanco, El Tigre or Samario.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because**

this paragraph was clearly inadvertently copied from Mr. Collingsworth's August 16, 2013 declaration submitted in support of his motion to quash Drummond's subpoena to IRAdvocates, and was not a new, separate submission. *Cf.* Doc. 101-5, ¶ 23. For Mr. Collingsworth's substantive response to Drummond's accusations regarding paragraph 23, see *supra*, Response ¶ 146.

184.    Mr. Collingsworth's testimony in Paragraph 19 of his August 19, 2013 declaration that Defendants had "produced all responsive non-privileged documents to Drummond" was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because this paragraph was clearly inadvertently copied from Mr. Collingsworth's August 16, 2013 declaration submitted in support of his motion to quash Drummond's subpoena to IRAdvocates, and was not a new, separate submission. *Cf.* Doc. 101-5, ¶ 23. For Mr. Collingsworth's substantive response to Drummond's accusations regarding paragraph 23, see *supra*, Response ¶ 147.**

185.    At the time Mr. Collingsworth signed this August 19, 2013 declaration, he knew this testimony in Paragraph 19 was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because this paragraph was clearly inadvertently copied from Mr. Collingsworth's August 16, 2013 declaration submitted in support of his motion to quash Drummond's subpoena to IRAdvocates, and was not a new, separate submission. *Cf.* Doc. 101-5, ¶ 23. For Mr. Collingsworth's substantive response to Drummond's accusations regarding paragraph 23, see *supra*, Response ¶ 148.**

186.    On November 5, 2013, Mr. Collingsworth signed a declaration under penalty of perjury which was submitted in support of the Defendants' reply brief in support of their motion to quash Drummond's subpoena to Daniel Kovalik. *Drummond Company, Inc. v. Terrence P. Collingsworth, et al.*, 2:14-mc-00681-RDP (N.D. Ala.) Doc. 12-1 (Nov. 5, 2013 Collingsworth Decl.). **UNDISPUTED.**

187.    In Paragraph 9 of Mr. Collingsworth's November 5, 2013 declaration, he testified: "the sole promise I made to any witness in *Balcero* was that if they testified and they or a family member received a credible death threat, we would do whatever we could to provide security or to provide a safe haven until such time as the danger had subsided." *Drummond Company, Inc. v. Terrence P. Collingsworth, et al.*, 2:14-mc-00681-RDP (N.D. Ala.) Doc. 12-1 (Nov. 5, 2013 Collingsworth Decl.) at ¶ 9. **UNDISPUTED.**

188.    At the time Mr. Collingsworth submitted this declaration, he had already offered, facilitated and confirmed at least three payments to Jaime Blanco from Albert van Bilderbeek that had nothing to do with security.  Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED to the extent it conflicts with Mr. Collingsworth's explanation of his involvement with Blanco. *See* Doc. 174-2, at 4-6. Further DISPUTED because the phrase "security" is ambiguous.**

189.    Mr. Collingsworth's testimony regarding the "sole promise" he made to "any witness in the *Balcero* case" is false.  Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20.  **DISPUTED to the extent it conflicts with Mr. Collingsworth's explanation of his involvement with Blanco. *See* Doc. 174-2, at 4-6.**

190.    At the time Defendants offered Mr. Collingsworth's testimony regarding the "sole promise" he made to "any witness in the *Balcero* case," they knew it was false.  Doc. 174-2

(Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED to the extent it conflicts with Mr. Collingsworth's explanation of his involvement with Blanco.** *See* **Doc. 174-2, at 4-6.**

191.   On or about April 14, 2014, the miscellaneous proceeding arising out of Drummond's subpoena to Daniel Kovalik was transferred to this Court pursuant to Fed. R. Civ. P. 45, where it remains pending. *See Drummond Company, Inc. v. Terrence P. Collingsworth, et al.*, 2:14-mc-00681-RDP (N.D. Ala.). **UNDISPUTED.**

### *Subpoena to Parker Waichman, LLP*

192.   The request by Jaime Blanco for payment of his criminal legal fees, and the actual payments made to El Tigre and Samario, are all discussed in emails between Defendants and lawyers from Parker Waichman, LLP.   *See* Doc. 104 at 8-10; Doc. 101-15; Doc. 174-6. **UNDISPUTED that Blanco's request for assistance regarding his payment of criminal legal fees are discussed in emails between Defendants and lawyers from Parker Waichman, LLP. DISPUTED because there are no emails discussing payments "to" El Tigre and Samario. Defendants object to Drummond's use of privileged documents inadvertently produced by Parker Waichman that are subject to a clawback order from this Court.**

193.   On July 25, 2013, Drummond served a subpoena on Parker Waichman, LLP commanding the production of documents and things.  Doc. 101-7 (Drummond's Subpoena to Parker Waichman, LLP); Ex. 11 (Parker Waichman, LLP Proof of Service).  **UNDISPUTED.**

194.   Drummond's subpoena to Parker Waichman, LLP sought "[a]ny and all documents related or referring to *payments to individuals incarcerated in Colombia*, including but not limited to…Jaime Blanco Maya…Jhon Jairo Esquivel Cuadrado [El Tigre]…[and]

Alcides Manuel Mattos Tabares [Samario]." Doc. 101-7 (Drummond's Subpoena to Parker Waichman, LLP) at Req. No. 5 (emphasis added). **UNDISPUTED.**

195. Drummond's subpoena to Parker Waichman, LLP also sought "[a]ny and all documents related or referring to *payments to any family members* of an individual incarcerated in Colombia, including but not limited to…Jaime Blanco Maya…Jhon Jairo Esquivel Cuadrado [El Tigre]…[and] Alcides Manuel Mattos Tabares [Samario]." Doc. 101-7 (Drummond's Subpoena to Parker Waichman, LLP) at Req. No. 6 (emphasis added). **UNDISPUTED.**

196. Drummond's subpoena to Parker Waichman, LLP also sought "[a]ny and all documents related or referring to *requests for* payment or any form of assistance (whether monetary or nonmonetary in nature) by any individual incarcerated in Colombia… including but not limited to…Jaime Blanco Maya…Jhon Jairo Esquivel Cuadrado [El Tigre]…[and] Alcides Manuel Mattos Tabares [Samario]." Doc. 101-7 (Drummond's Subpoena to Parker Waichman, LLP) at Req. No. 1 (emphasis added). **UNDISPUTED.**

197. Drummond's subpoena to Parker Waichman, LLP sought "[a]ny and all documents related or referring to *requests for* payment or any form of assistance (whether monetary or nonmonetary in nature) *by any family member* of any individual incarcerated in Colombia… including but not limited to…Jaime Blanco Maya…Jhon Jairo Esquivel Cuadrado [El Tigre]…[and] Alcides Manuel Mattos Tabares [Samario]." Doc. 101-7 (Drummond's Subpoena to Parker Waichman, LLP) at Req. No. 2 (emphasis added). **UNDISPUTED.**

198. On August 8, 2013, Defendants served objections to Drummond's subpoena to Parker Waichman, LLP. Ex. 12 (Defs' Aug. 8, 2013 Objections). **UNDISPUTED that counsel for defendants served and signed objections to Drummond's subpoena to Parker Waichman.**

199.    In their August 8, 2013 objections, Defendants cited Mr. Collingsworth's sworn July 31, 2013 declaration and represented that "[a]ll of the document requests contained in this subpoena have either already been served on Mr. Collingsworth in his capacity as counsel in the *Balcero* case or as a Defendant in the underlying libel case in which he is a party. Any responsive documents in PWA's possession, custody, or control have already been produced in the *Balcero* action. Collingsworth Decl. ¶ 4." Ex. 12 (Defs' Aug. 8, 2013 Objections) at General Objection No. 2; Ex. 13 (July 31, 2013 Collingsworth Decl.). **UNDISPUTED that counsel for defendants cited Mr. Collingsworth's declaration, but DISPUTED that Mr. Collingsworth's declaration said "[a]ny responsive documents in PWA's possession, custody, or control have already been produced in the Balcero action." *Cf.* Ex. 13, ¶¶ 4-5.**

200.    At the time Defendants served these objections and represented that "[a]ny responsive documents in PWA's possession, custody, or control have already been produced in the *Balcero* action. Collingsworth Decl. ¶ 4," Defendants had not disclosed the payments to Blanco, El Tigre or Samario. Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because "Defendants" did not make this representation.**

201.    Defendants' August 8, 2013 representation that "[a]ny responsive documents in PWA's possession, custody, or control have already been produced in the *Balcero* action" was false. Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because "Defendants" did not make this representation.**

202.    At the time Defendants made this representation, they knew it was false. Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd

Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because "Defendants" did not make this representation.**

203.   On August 19, 2013, Mr. Collingsworth submitted a declaration signed under penalty of perjury in support of "Defendants' Memorandum of Points and Authorities in Support of Defendants' Motion for Protective Order and/or Motion to Quash Subpoena to Parker Waichman, LLP."  Doc. 101-3 (Aug. 19, 2013 Collingsworth Decl.). **UNDISPUTED.**

204.   In Paragraph 5 of Mr. Collingsworth's August 19, 2013, declaration, Mr. Collingsworth testified that:

> I have reviewed the subpoenas Drummond has caused to be issued to IRAdvocates, ILRF, and Parker Waichman. They are essentially identical, and the document requests contained in the three subpoenas have either already been served on me in my capacity as counsel in the *Balcero* case or as a Defendant in the underlying libel case. Moreover, in my capacity as Defendant in the libel action and as counsel in the *Balcero* litigation, I provided all responsive, non-privileged documents in my custody, possession or control, including those in the files of IRAdvocates. The subpoenas to IRAdvocates, ILRF, and Parker Waichman are duplicative of requests already made to me as a defendant in the libel action, and/or duplicative of requests to Plaintiffs in the *Balcero* action. Given the duplicative nature of the requests, they are designed to harass and create an undue burden for IRAdvocates, ILRF, Parker Waichman, and me personally.

Doc. 101-3 (Aug. 19, 2013 Collingsworth Decl.) ¶ 5. **UNDISPUTED.**

205.   At the time Mr. Collingsworth submitted this declaration testifying that Defendants had "provided all responsive, non-privileged documents in my custody, possession or control, including those in the files of IRAdvocates" responsive to the subpoena's requests, Defendants had not disclosed the payments to Blanco, El Tigre or Samario.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **UNDISPUTED that, at the time of this response, documents relating to witness assistance payments for El Tigre, Samario, and Blanco, or their families, had not**

been disclosed. But, as Mr. Collingsworth explained in his declaration, he had produced "all responsive, non-privileged documents in my custody, possession or control"—*i.e.*, documents responsive to requests served on Mr. Collingsworth in his capacity as a defendant in the libel case or as counsel in the *Balcero* case that were not subject to outstanding objections. If outstanding objections to discovery requests were ignored, the statement was incomplete. But, it has been corrected through supplemental discovery responses in this case. Mr. Collingsworth did not intend to mislead the Court. Furthermore, this statement preceded the Court's October 15, 2013 and October 15, 2014 Orders, which ruled on defendants' objections and broadened the scope of discovery regarding witness payments.

206.    Mr. Collingsworth's testimony in Paragraph 5 of his August 19, 2013 declaration that Defendants had "provided all responsive, non-privileged documents in my custody, possession or control, including those in the files of IRAdvocates" was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED. As Mr. Collingsworth explained in his declaration, he had produced "all responsive, non-privileged documents in my custody, possession or control"—*i.e.*, documents responsive to requests served on Mr. Collingsworth in his capacity as a defendant in the libel case or as counsel in the *Balcero* case that were not subject to outstanding objections. If outstanding objections to discovery requests were ignored, the statement was incomplete. But, it has been corrected through supplemental discovery responses in this case. Mr. Collingsworth did not intend to mislead the Court. Furthermore, this statement preceded the Court's October 15, 2013 and October 15, 2014**

Orders, which ruled on defendants' objections and broadened the scope of discovery regarding witness payments.

207.    At the time Mr. Collingsworth signed this August 19, 2013 declaration, he knew this testimony in Paragraph 5 was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because the representation was not false, although it was incomplete if outstanding objections were ignored. Mr. Collingsworth did not intend to mislead the Court.** *See supra* **Resp. ¶ 206.**

208.    In Paragraph 20 of Mr. Collingsworth August 19, 2013 declaration, he testified that:

> I have reviewed our responses on behalf of Plaintiffs in the *Balcero* litigation to document requests served on them by Drummond, as well as my responses as a defendant in the libel action brought against me by Drummond, and we have produced all responsive non-privileged documents to Drummond in those cases. I have never taken the position in the course of litigating the *Balcero* case or the libel litigation that documents within IRAdvocates' electronic or hard copy files were not within my possession, custody or control for the purpose of discovery. As Drummond's document requests to IRAdvocates are virtually identical to requests already made to the *Balcero* Plaintiffs and/or to me in the libel case.  I can say that any non-privileged documents that are responsive to the requests to IRAdvocates have already been produced.

Doc. 101-3 (Aug. 19, 2013 Collingsworth Decl.) ¶ 20. **DISPUTED because this paragraph was clearly inadvertently copied from Mr. Collingsworth's August 16, 2013 declaration submitted in support of his motion to quash Drummond's subpoena to IRAdvocates, and was not a new, separate submission.** *Cf.* **Doc. 101-5, ¶ 23;** *see supra* **Resp. ¶ 182.**

209.    At the time Mr. Collingsworth signed this declaration and testified that Defendants had "reviewed our responses on behalf of Plaintiffs in the *Balcero* litigation to document requests served on them by Drummond, as well as my responses as a defendant in the

libel action brought against me by Drummond, and we have produced all responsive non-privileged documents to Drummond in those cases," Defendants had not disclosed the payments to Blanco, El Tigre or Samario.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because this paragraph was clearly inadvertently copied from Mr. Collingsworth's August 16, 2013 declaration submitted in support of his motion to quash Drummond's subpoena to IRAdvocates, and was not a new, separate submission.** *Cf.* **Doc. 101-5, ¶ 23;** *see supra* **Resp. ¶ 183. For Mr. Collingsworth's substantive response to Drummond's accusations regarding paragraph 20, see** *supra***, Response ¶ 146.**

210.   Mr. Collingsworth's testimony in Paragraph 20 of his August 19, 2013 declaration that Defendants had "produced all responsive non-privileged documents to Drummond" was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because this paragraph was clearly inadvertently copied from Mr. Collingsworth's August 16, 2013 declaration submitted in support of his motion to quash Drummond's subpoena to IRAdvocates, and was not a new, separate submission.** *Cf.* **Doc. 101-5, ¶ 23;** *see supra* **REsp. ¶ 184. For Mr. Collingsworth's substantive response to Drummond's accusations regarding paragraph 20, see** *supra***, Response ¶ 147.**

211.   At the time Mr. Collingsworth signed this August 19, 2013 declaration, he knew this testimony in Paragraph 20 was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because this paragraph was clearly inadvertently copied from Mr. Collingsworth's August 16, 2013 declaration submitted in support of his motion to quash**

Drummond's subpoena to IRAdvocates, and was not a new, separate submission. *Cf.* Doc. 101-5, ¶ 23; *see supra* Resp. ¶ 185. For Mr. Collingsworth's substantive response to Drummond's accusations regarding paragraph 20, see *supra*, Response ¶ 148.

212.    On August 23, 2013, Defendants filed a "Memorandum of Points and Authorities in Support of Defendants' Motion for Protective Order and/or Motion to Quash Subpoena to Parker Waichman, LLP" in the United States District Court for the Eastern District of New York. Ex. 14 (Defs' Mtn to Quash Drummond's Subpoena to Parker Waichman, LLP). **UNDISPUTED.**

213.    Defendants' "Memorandum of Points and Authorities in Support of Defendants' Motion for Protective Order and/or Motion to Quash Subpoena to Parker Waichman, LLP" sought sanctions against Drummond for issuing the subpoena, stating "[s]anctions should be awarded based on Drummond's blatant disregard for its duties and responsibilities concerning its subpoena power with regard to third-parties." Ex. 14 (Defs' Mtn to Quash Drummond's Subpoena to Parker Waichman, LLP) at 17. **UNDISPUTED.**

214.    Defendants represented that "the information [sought by Drummond's subpoena to Parker Waichman, LLP] not only *could* be obtained by another source previously during discovery, all responsive, non-privileged requested documents *already have been* produced to Drummond by Defendants in the underlying defamation suit and in the *Balcero* litigation." Ex. 14 (Defs' Mtn to Quash Drummond's Subpoena to Parker Waichman, LLP) at 9 (emphasis in original). **UNDISPUTED.**

215.    At the time Defendants submitted this motion to quash and represented that "the information [sought by Drummond's subpoena to Parker Waichman, LLP] not only *could* be obtained by another source previously during discovery, all responsive, non-privileged requested

documents *already have been* produced to Drummond by Defendants in the underlying defamation suit and in the *Balcero* litigation," Defendants had not disclosed the payments to Blanco, El Tigre or Samario.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **UNDISPUTED that, at the time of this statement, documents relating to witness assistance payments for El Tigre, Samario, and Blanco, or their families, had not been disclosed. But, "all responsive, non-privileged requested documents" had been "produced to Drummond by Defendants in the underlying defamation suit and in the *Balcero* litigation"—*i.e.*, documents responsive to requests served on Mr. Collingsworth in his capacity as a defendant in the libel case or as counsel in the *Balcero* case that were not subject to outstanding objections. If outstanding objections to discovery requests were ignored, the statement was incomplete. But, it has been corrected through supplemental discovery responses in this case. Mr. Collingsworth did not intend to mislead the Court. Furthermore, this statement preceded the Court's October 15, 2013 and October 15, 2014 Orders, which ruled on defendants' objections and broadened the scope of discovery regarding witness payments.**

216.    Defendants' representation on August 23, 2013 that "the information [sought by Drummond's subpoena to Parker Waichman, LLP] not only *could* be obtained by another source previously during discovery, all responsive, non-privileged requested documents *already have been* produced to Drummond by Defendants in the underlying defamation suit and in the *Balcero* litigation" was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED. As explained in the motion, "all responsive, non-privileged requested documents" had been "produced to Drummond by Defendants in the underlying defamation suit and in the *Balcero***

litigation"—*i.e.*, documents responsive to requests served on Mr. Collingsworth in his capacity as a defendant in the libel case or as counsel in the *Balcero* case that were not subject to outstanding objections. If outstanding objections to discovery requests were ignored, the statement was incomplete. But, it has been corrected through supplemental discovery responses in this case. Mr. Collingsworth did not intend to mislead the Court. Furthermore, this statement preceded the Court's October 15, 2013 and October 15, 2014 Orders, which ruled on defendants' objections and broadened the scope of discovery regarding witness payments.

217.    At the time Defendants represented to the United States District Court for the Eastern District of New York that "the information [sought by Drummond's subpoena to Parker Waichman, LLP] not only *could* be obtained by another source previously during discovery, all responsive, non-privileged requested documents *already have been* produced to Drummond by Defendants in the underlying defamation suit and in the *Balcero* litigation," they knew that representation was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because the representation was not false, although it was incomplete if outstanding objections were ignored. Mr. Collingsworth did not intend to mislead the Court. *See supra* Resp. ¶ 216.**

218.    Defendants also represented that "Requests 1-8 seek information about 'any assistance,' including 'any payments' to 'any individual incarcerated in Colombia' and 'any family members of an individual incarcerated in Colombia.' . . . Defendants have already produced all responsive, nonprivileged documents regarding security provided to Drummond witnesses in the *Balcero* litigation."  Ex. 14 (Defs' Mtn to Quash Drummond's Subpoena to Parker Waichman, LLP) at 14-15. **UNDISPUTED, although it misquotes the statements made**

on these pages, which accurately state: "Requests 1-8 seek information about 'any form of assistance' to any individual or any family members of an individual 'incarcerated in Colombia' and any individual or family members of an individual with 'any connection to Colombian paramilitaries. . . .'"

219.   At the time Defendants submitted this motion to quash and represented that "Defendants have already produced all responsive, nonprivileged documents regarding security provided to Drummond witnesses in the *Balcero* litigation," Defendants had not disclosed the payments to Blanco, El Tigre or Samario.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **UNDISPUTED that, at the time of this statement, documents relating to witness assistance payments for El Tigre, Samario, and Blanco, or their families, had not been disclosed. But, as the motion explains, Defendants had "already produced all responsive, nonprivileged documents regarding security provided to Drummond witnesses in the *Balcero* litigation"—*i.e.*, documents responsive to requests served in the *Balcero* case that were not subject to outstanding objections. If outstanding objections to *Balcero* discovery requests were ignored, the statement was incomplete. But, it has been corrected through supplemental discovery responses in this case. Mr. Collingsworth did not intend to mislead the Court. Furthermore, this statement preceded the Court's October 15, 2013 and October 15, 2014 Orders, which ruled on defendants' objections and broadened the scope of discovery regarding witness payments.**

220.   Defendants' representation on August 23, 2013, that they "have already produced all responsive, nonprivileged documents regarding security provided to Drummond witnesses in the *Balcero* litigation" was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2

(Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED. As the motion explains, Defendants had "already produced all responsive, non-privileged documents regarding security provided to Drummond witnesses in the *Balcero* litigation"—*i.e.*, documents responsive to requests served in the *Balcero* case that were not subject to outstanding objections. If outstanding objections to *Balcero* discovery requests were ignored, the statement was incomplete. But, it has been corrected through supplemental discovery responses in this case. Mr. Collingsworth did not intend to mislead the Court. Furthermore, this statement preceded the Court's October 15, 2013 and October 15, 2014 Orders, which ruled on defendants' objections and broadened the scope of discovery regarding witness payments.**

221.    At the time Defendants represented to the United States District Court for the Eastern District of New York that "Defendants have already produced all responsive, nonprivileged documents regarding security provided to Drummond witnesses in the *Balcero* litigation" they knew that representation was false.    Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because the representation was not false, although it was incomplete if outstanding objections were ignored. Mr. Collingsworth did not intend to mislead the Court. *See supra* Resp. ¶ 220.**

222.    On October 30, 2013, Mr. Collingsworth signed a declaration under penalty of perjury which was submitted in support of the Defendants' reply brief in support of their motion to quash Drummond's subpoena to Parker Waichman, LLP.    Ex. 15 (Oct. 30, 2013 Collingsworth Decl.). **UNDISPUTED.**

223.    In Paragraph 10 of Mr. Collingsworth's October 30, 2013 declaration, he testified: "the sole promise I made to any witness in *Balcero* was that if they testified and they or a family member received a credible death threat, we would do whatever we could to provide security or to provide a safe haven until such time as the danger had subsided."  Ex. 15 (Oct. 30, 2013 Collingsworth Decl.) at ¶ 10. **UNDISPUTED.**

224.    At the time Mr. Collingsworth submitted this declaration, he had already offered, facilitated and confirmed at least three payments to Jaime Blanco from Albert van Bilderbeek that had nothing to do with security.  Doc. 174-2 (Defs' 2ⁿᵈ Am. Resp. to Drummond's 3ʳᵈ Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED to the extent it conflicts with Mr. Collingsworth's explanation of his involvement with Blanco.** *See* **Doc. 174-2, at 4-6.**

225.    Mr. Collingsworth's testimony regarding the "sole promise" he made to "any witness in the *Balcero* case" is false.  Doc. 174-2 (Defs' 2ⁿᵈ Am. Resp. to Drummond's 3ʳᵈ Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED to the extent it conflicts with Mr. Collingsworth's explanation of his involvement with Blanco.** *See* **Doc. 174-2, at 4-6.**

226.    Mr. Collingsworth knew this testimony in Paragraph 10 was false when he signed his October 30, 2013 declaration.  Doc. 174-2 (Defs' 2ⁿᵈ Am. Resp. to Drummond's 3ʳᵈ Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED to the extent it conflicts with Mr. Collingsworth's explanation of his involvement with Blanco.** *See* **Doc. 174-2, at 4-6.**

227.    At the time Defendants offered Mr. Collingsworth's testimony regarding the "sole promise" he made to "any witness in the *Balcero* case," they knew it was false.  Doc. 174-2 (Defs' 2ⁿᵈ Am. Resp. to Drummond's 3ʳᵈ Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED as the testimony is not false.** *See supra* **Resp. ¶ 225. Further DISPUTED because it fails to show that Conrad & Scherer knew it was false.**

### *October 2013 Motion to Compel Hearing*

228.    On October 10, 2013, this Court held a hearing on Drummond's motion to compel (Doc. 43).  Doc. 63 (Oct. 10, 2013 Hrg. Tr.).  **UNDISPUTED that the Court held a hearing on Drummond's motion to compel and on defendants' motion to compel.**

229.    At the October 10, 2013 hearing, the following exchange occurred between Defendants' counsel and Judge Proctor:

> THE COURT: Why wouldn't – if there's allegations or at least there's colorable allegations that your client participated in making security payments to witnesses, and those witnesses, after receiving the payments, changed their testimony in some form or fashion, why wouldn't that be discoverable in a defamation action where your client is accused of falsely stating that Drummond engaged in these criminal violations in three different letters?

> MR. SMITH: The question is are the security payments information discoverable?

> THE COURT: Yeah, discoverable in the defamation action.

> MR. SMITH: Your Honor, we think they are, and we have produced responsive documents. With exception of one that is on our Privilege Log, we have produced all responsive documents.

Doc. 63 (Oct. 10, 2013 Hrg. Tr.) at 25:25-26:16. **UNDISPUTED.**

230.    As of the date of this hearing when Defendants represented to this Court that "we have produced all responsive documents" relating to "security payments," Defendants had not disclosed the payments to Blanco, El Tigre or Samario.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **UNDISPUTED that as of the date of this hearing, documents relating to witness assistance payments to, or to the families of, El Tigre, Samario, or Blanco had not been made. But, defendants DISPUTE this statement because it mischaracterizes the transcript. Counsel for defendants admitted that documents relating to security payments were**

**discoverable** and then said that all "responsive documents"—documents responsive to a pending, un-objected to discovery request—had been produced. Counsel did not say, as Drummond's "fact" states, that "we have produced all responsive documents' relating to 'security payments.'" As discussed in detail in defendants' "Defendants' Sur-Reply in Opposition to Drummond's Renewed Motion for Sanctions and Request for an Evidentiary Hearing," Doc. 210, there was no discovery request served in this case as of October 2013 that clearly sought documents regarding witness assistance payments that was also not subject to outstanding objections. Further DISPUTED to the extent it implies that Conrad & Scherer had knowledge of these payments. Doc. 231-11, at 44 of 80 (Conrad & Scherer Response) ("William Scherer, managing partner of Conrad & Scherer, LLP, was not directly involved in the actual day to day litigation of the Drummond matters. Mr. Scherer receives an estimated thousands of email a month. He did receive one email report in May 2011 which indicated that payments would be made to Mr. Otero for security that included a brief reference to security payments for families of El Tigre and Samario (see CS_TC000289). But Mr. Scherer was not aware of exactly what Mr. Otero was doing with this money. Certain lower-level employees at Conrad & Scherer, LLP, including employees in the accounting department, were aware of the monthly payments to Mr. Otero for security, but those individuals were not aware of exactly what Mr. Otero did with the money. . . . Mr. Scherer became aware of this information about Mr. Otero's payments to El Tigre and Samario at approximately the same time that Mr. Otero executed his affidavit.").

231.   Defendants' October 10, 2013 representation in open court that they "have produced all responsive documents" relating to "security payments" was false.  Doc. 174-8 (El

Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because it mischaracterizes the transcript. Counsel for defendants admitted that documents relating to security payments were** <u>**discoverable**</u> **and then said that all "responsive documents"—documents responsive to a pending, un-objected to discovery request—had been produced. Counsel did not say, as Drummond's "fact" states, that "we have produced all responsive documents' relating to 'security payments.'" All documents responsive to a discovery request had been produced or logged, or were subject to outstanding objections. If outstanding objections to discovery requests were ignored, the statement was incomplete. But, it has been corrected through supplemental discovery responses in this case. Mr. Collingsworth did not intend to mislead the Court.**

232.    At the time Defendants represented in open court on October 10, 2013 that they "have produced all responsive documents" relating to "security payments," they knew this representation was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because the representation was not false, although it was incomplete if outstanding objections were ignored. Mr. Collingsworth did not intend to mislead the Court.** *See supra* **Resp. ¶  231.**

233.    Mr. Collingsworth was present for the October 10, 2013 hearing and was seated at Defendants' counsel table.  *See* Doc. 63 (Oct. 10, 2013 Hrg. Tr.) at 41. **UNDISPUTED.**

234.    Mr. Collingsworth knew that Defendants' counsel's representation to this Court that "we have produced all responsive documents" relating to "security payments" was false. Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because it mischaracterizes the**

testimony. Counsel for defendants admitted that documents relating to security payments were <u>discoverable</u> and then said that all "responsive documents"—documents responsive to a pending, un-objected to discovery request—had been produced. Counsel did not say, as Drummond's "fact" states, that "we have produced all responsive documents' relating to 'security payments.'" All documents responsive to a discovery request had been produced or logged, or were subject to outstanding objections. Therefore, this statement was not false. If outstanding objections to discovery requests were ignored, the statement was incomplete. But, it has been corrected through supplemental discovery responses in this case. Mr. Collingsworth did not intend to mislead the Court.

235.   Mr. Collingsworth did not attempt to correct his counsel's October 10, 2013 representation to the Court that Defendants "have produced all responsive documents" relating to "security payments." *See* Doc. 63 (Oct. 10, 2013 Hrg. Tr.) *generally*. **DISPUTED because it suggests that defendants' counsel's statement was incorrect. To the extent the response was incomplete, it has now been supplemented. Mr. Collingsworth did not intend to deceive the Court.**

236.   On October 15, 2013, the Court entered an order on the Drummond's motion to compel.  Doc. 64 (Oct. 15, 2013 Order). **UNDISPUTED that the Court entered an order on Drummond's motion to compel and on defendants' motion to compel.**

237.   This Court's October 15, 2013 Order held as follows:  "Interrogatories and requests for production on **payments to witnesses** are not overbroad and are properly within the scope of discovery. The fact of payments to witnesses are [sic] not subject to work product objections. Interrogatories and requests for production on **research regarding payments to witnesses** are not overbroad and are properly within the scope of discovery.  For any documents

(payments to witnesses or research regarding payments to witnesses) withheld on grounds of attorney client privilege or work product, the Magistrate Judge will examine the privilege log and related documents and will make independent findings for each issue remaining in dispute." Doc. 64 (Oct. 15, 2013 Order) at 3-4. **UNDISPUTED.**

### *Defendants' Claim that as of October 15, 2013 There Were No Outstanding Discovery Requests Even Arguably Seeking Disclosure of Witness Payments.   See Doc. 210, generally.*

238.   Defendants have represented to this Court that the first time Drummond served *any* requests which would even arguably call for the production of documents reflecting witness payments was in February 2014, when Drummond served its third set of document requests.  *See* Doc. 210, *generally*. **UNDISPUTED that defendants have argued that that Drummond could not make an "unassailable demonstration of an actual discovery request, an objection to that request, a motion compelling a response to that request, an order mandating a response, and a violation of that order." Doc. 210, at 2 (emphasis added). These are the requirements for obtaining sanctions under Rule 37, which Drummond has not satisfied.**

239.   On October 3, 2013, in response to Drummond's 1st and 2nd document requests, Defendants produced approximately 400 pages of documents relating to witness payments.  Doc. 231-7 (Oct. 3, 2013 B. Smith Ltr. and enclosures). **UNDISPUTED that defendants produced documents on October 3, 2013, that included information reflecting witness assistance payments. DISPUTED as there are only a few sample documents attached to Document 231-7, but Drummond has not produced any spreadsheets or explanation for whether the production set contained 400 pages of documents relating to witness payments.**

240.   This production included deposit slips reflecting additional deposits into the account of Charris's wife, as well as numerous documents relating to the payments to alias

"Halcon." *Id.* **UNDISPUTED that this production set included documents reflecting witness assistance payments made for the benefit of Charris' family. DISPUTED that this production included "numerous" documents relating to the payments "to" "Halcon." Drummond provides no summary or chart of the number of documents relating to Halcon, nor were payments made "to" "Halcon."**

241.    As described in Paragraphs 136-139, the subpoena to IRAdvocates sought documents relating to payments to, and requests for payments by, Blanco, El Tigre, Samario or any of their family members. **UNDISPUTED.**

242.    In Defendants' October 24, 2013 Supplemental Brief supporting their motion to quash the subpoena to IRAdvocates and for sanctions against Drummond for serving it, Defendants represented:

> Cutting through Drummond Company, Inc.'s ("Drummond") mudslinging and innuendo, the objective reality is Drummond fails to address the sole issue that should govern Movants' motion – that ***Drummond's subpoena to IRAdvocates duplicates the document requests served on Defendants***, and in responding to those requests, Defendants have also searched for and produced documents that were in the files of IRAdvocates.

*Drummond Company, Inc. v. Terrence P. Collingsworth, et al.*, 2:14-mc-00621-RDP, Doc. 14 (Defs' Oct. 24, 2013 Supp. Br.) at 1 (emphasis added). **UNDISPUTED.**

243.    In that same filing, Defendants also represented that the requests and objections in the principal defamation case pending in Alabama "are identical to those in this [miscellaneous proceeding]." *Id.* at 2. **UNDISPUTED.**

244.    Defendants further represented that "[t]here is absolutely no purpose served by Drummond's duplicative requests to IRAdvocates other than to burden the third party." *Id.* **UNDISPUTED.**

245.     With respect to their production on October 3, 2013 of 400 additional pages of documents reflecting witness payments, Defendants represented as follows:

> Drummond claims to be unhappy Defendants produced 400 additional pages of documents relating to security provided to two of the witnesses. Drummond Supp. Br. at 6, ECF No. 12. In addition to having a continuing duty to supplement, Defendants note there was a distinction between requests in the human rights cases and the libel litigation, and a broader request in the libel case for communications about security payments with the endangered witnesses netted more responsive documents.

*Id.* at 3. **UNDISPUTED.**

246.     Defendants interpreted the document requests in Drummond's 1st and 2nd Requests for Production as "broader" than Drummond's requests in *Balcero* related to witness payments.   *Id*. **DISPUTED because it mischaracterizes the excerpt from the brief. Defendants did not interpret Drummonds 1st and 2nd Requests for Production as a whole to be broader than Drummond's requests in *Balcero*. Instead, defendants explained that there was "a" broader request in the libel case. Further, simply acknowledging that a request is "broader" does not imply that the request is not subject to objection. To the extent the representation was incomplete in failing to explain the whole context, it has been supplemented. Mr. Collingsworth did not intend to deceive the Court.**

247.     Defendants interpreted Drummond's 1st and 2nd Requests for Production in this case to call for documents reflecting payments to Charris and Halcon.   Doc. 231-7 (Oct. 3, 2013 B. Smith Ltr. and enclosures). **UNDISPUTED that defendants interpreted Drummond's 1st and 2nd Requests for Production in this case, as well as one of the later served set of discovery requests in *Balcero*, to include documents reflecting payments made by Mr. Collingsworth and/or Conrad & Scherer directly to the family of Charris and to a third**

**party for the benefit of Halcon, and documents reflecting such payments had already been produced in *Balcero*.**

248.    On October 31, 2013, Defendants filed a "Reply Memorandum of Law in Support of Defendants' Motion for Protective Order and/or Motion to Quash Subpoena to Parker Waichman, LLP."  Ex. 16 (Defendants' Oct. 31, 2013 Reply Memorandum of Law in Support of Defendants' Motion for Protective Order and/or Motion to Quash Subpoena to Parker Waichman, LLP). **UNDISPUTED.**

249.    Defendants' "Reply Memorandum of Law in Support of Defendants' Motion for Protective Order and/or Motion to Quash Subpoena to Parker Waichman, LLP" represented that "Defendants disclosed the *fact* of security payments in *Balcero,* producing all responsive, non-privileged documents regarding funds provided to Drummond witnesses through June 2012, nearly a year after the letters at issue were sent.  And Defendants recently supplemented this with over 400 additional pages netted by the broader request in the libel case for all communications regarding security payments."  Ex. 16 (Defendants' Oct. 31, 2013 Reply Memorandum of Law in Support of Defendants' Motion for Protective Order and/or Motion to Quash Subpoena to Parker Waichman, LLP) at 3. **UNDISPUTED.**

250.    At the time Defendants represented to the Eastern District of New York that they had "disclosed the *fact* of security payments in *Balcero,* producing all responsive, non-privileged documents regarding funds provided to Drummond witnesses through June 2012," Defendants had not disclosed the payments to Blanco, El Tigre or Samario.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **UNDISPUTED that as of the time of this statement, documents reflecting**

**witness assistance payments to, or to the families of, Blanco, El Tigre, and Samario had not been disclosed.**

251.    Defendants' representation to the Eastern District of New York that they had "disclosed the *fact* of security payments in *Balcero,* producing all responsive, non-privileged documents regarding funds provided to Drummond witnesses through June 2012," was false. Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because defendants' statement was not false. At the time of this statement, there were unresolved objections pending in *Balcero* when that case was dismissed by the Court. Further, there were no pending, un-objected to discovery requests in this case that clearly called for witnesses assistance payments made for the benefit of Blanco, El Tigre, or Samario. To the extent the representation was incomplete in failing to explain the whole context, it has been supplemented. Mr. Collingsworth did not intend to deceive the Court.**

252.    At the time the Defendants represented to the Eastern District of New York that they had "disclosed the *fact* of security payments in *Balcero,* producing all responsive, non-privileged documents regarding funds provided to Drummond witnesses through June 2012," they knew this representation was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because the representation was not false. To the extent the representation was incomplete in failing to explain the whole context, it has been supplemented. Mr. Collingsworth did not intend to deceive the Court. *See supra* Response ¶ 251.**

***Defendants' Continued False Representations that Only "Three" Witnesses Had Been Paid***

253.     On November 7, 2013, Defendants filed with this Court "Defendants' Supplemental Brief in Further Opposition to Drummond's Motion to Compel."   Doc. 68. **UNDISPUTED that defendants' counsel submitted this brief.**

254.     Mr. Collingsworth submitted a declaration signed under penalty of perjury in support of "Defendants' Supplemental Brief in Further Opposition to Drummond's Motion to Compel."  Doc. 69 (Nov. 7, 2013 Collingsworth Decl.). **UNDISPUTED.**

255.     "Defendants' Supplemental Brief in Further Opposition to Drummond's Motion to Compel" made the following representation to this Court:

> In this first opportunity to respond fully in this Court to Drummond's accusations and innuendo, Defendants will show there were credible death threats made against many of the witnesses who were about to give depositions in *Balcero*, and with respect to three of them, Defendants concluded that their family members were in immediate danger.

Doc. 68 (Defendants' Supplemental Brief in Further Opposition to Drummond's Motion to Compel) at 3. **UNDISPUTED.**

256.     Defendants' representation that "three" of the witnesses in *Balcero* received payments is false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **UNDISPUTED that the statement was incomplete in light of other payments, and therefore wrong.  But it is DISPUTED to the extent that it was designed to intentionally mislead the Court.  It has been supplemented after the Court's October 15, 2014 order, which made clear that all payments – direct or indirect – to anyone related to witnesses had to be disclosed.** *See* **Doc. 187-21 (Collingsworth Decl. in Opp'n to Drummond Renewed Motion for Sanctions).**

257.    At the time Defendants made this representation, they knew it was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because the representation was not false, although it was incomplete. Mr. Collingsworth did not intend to mislead the Court.**

258.    Citing Paragraph 34 of Mr. Collingsworth's November 7, 2013 sworn declaration, Defendants made the following representation to this Court:

> As noted, from the outset of the human rights cases, counsel for Plaintiffs were open and clear in their intention of providing security to witnesses who were endangered. *See* Ex. 1 at 1-2. In *Balcero*, counsel for Plaintiffs (Defendants in this libel action) disclosed documents establishing they had provided necessary security to three witnesses, Duarte, Gelvez, and Charris. *See* TPC Decl. ¶ 34.

Doc. 68 (Defendants' Supplemental Brief in Further Opposition to Drummond's Motion to Compel) at 11. **UNDISPUTED.**

259.    Defendants' representation that "they had provided necessary security to three witnesses, Duarte, Gelvez, and Charris" was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because these three witnesses did receive payments and, therefore, this statement was not false. To the extent the representation was incomplete in failing to explain the whole context, it has been supplemented. Mr. Collingsworth did not intend to deceive the Court.**

260.    At the time Defendants made this representation to this Court, they knew it was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because the representation was not false, although it was incomplete. Mr. Collingsworth did not intend to mislead the Court.** *See supra* Resp. ¶ 259.

261.    Paragraph 34 of Mr. Collingsworth's November 7, 2013 sworn declaration, in which he testified that Defendants had provided security to only three witnesses, was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because it mischaracterizes Mr. Collingsworth's declaration, which does not state that "only" three witnesses were provided security. Mr. Collingsworth's statement in paragraph 34—that Drummond was provided documents in *Balcero* regarding funds for security for "to Jesus Charris Castro, Libardo Duarte, and Jose Gelvez Albarracin, all witnesses in the *Balcero* case"—was incomplete in failing to explain the whole context, and it has been supplemented. Mr. Collingsworth did not intend to deceive the Court.**

262.    At the time he signed his November 7, 2013 declaration, Mr. Collingsworth knew the testimony in Paragraph 34 was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because the representation was not false, although it was incomplete. Mr. Collingsworth did not intend to mislead the Court. *See supra* Resp. ¶ 261.**

263.    In Paragraph 36 of Mr. Collingsworth's November 7, 2013 declaration, he testified that "the sole promise I made to any witness in the *Balcero* case was that if they testified or if a family member received a credible death threat, we would do whatever we could to provide security or a safe haven until such time as the danger had subsided."  Doc. 69 (Nov. 7, 2013 Collingsworth Decl.) ¶ 36. **UNDISPUTED.**

264.    At the time Mr. Collingsworth submitted this declaration, he had already offered, facilitated and confirmed at least three payments to Jaime Blanco from Albert van Bilderbeek that had nothing to do with security.  Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs,

No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED to the extent it conflicts with Mr. Collingsworth's explanation of his involvement with Blanco.** *See* **Doc. 174-2, at 4-6.**

265.     Mr. Collingsworth's testimony regarding the "sole promise" he made to "any witness in the *Balcero* case" is false.  Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED to the extent it conflicts with Mr. Collingsworth's explanation of his involvement with Blanco.** *See* **Doc. 174-2, at 4-6.**

266.     At the time Mr. Collingsworth signed his November 7, 2013 declaration, he knew this testimony was false.  Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED to the extent it conflicts with Mr. Collingsworth's explanation of his involvement with Blanco.** *See* **Doc. 174-2, at 4-6. To the extent the representation was incomplete in failing to explain the whole context, it has been supplemented. Mr. Collingsworth did not intend to deceive the Court.**

267.     At the time Defendants offered Mr. Collingsworth testimony regarding the "sole promise" he made to "any witness in the *Balcero* case" in support of "Defendants' Supplemental Brief in Further Opposition to Drummond's Motion to Compel," they knew it was false.  Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED to the extent it conflicts with Mr. Collingsworth's explanation of his involvement with Blanco.** *See* **Doc. 174-2, at 4-6. Further DISPUTED because the "sole promise" statement from paragraph 36 of Mr. Collingsworth's declaration was not incorporated by the "Defendants" into this supplemental brief. To the extent the representation was incomplete in failing to explain the whole context, it has been supplemented. Mr. Collingsworth did not intend to deceive the Court.**

268.    On December 6, 2013, Defendants filed their "Memorandum of Law on Work Product Privilege and Renewing Motion to Compel Against Drummond."    Doc. 80. **UNDISPUTED.**

269.    In this filing, Defendants made the following representation to this Court:

> The three *Balcero* witnesses who received security assistance from Defendants, Libardo Duarte, Jose Gelvez Albarracin, and Jairo Jesus Charris Castro, all first provided a written statement to counsel for Plaintiffs or the Colombian authorities.

Doc. 80 (Memorandum of Law on Work Product Privilege and Renewing Motion to Compel Against Drummond) at 12. **UNDISPUTED.**

270.    At the time Defendants made this representation to this Court, they had been making what they claim are "security payments" to El Tigre and Samario for over two years, and Defendants' litigation team had made at least three payments to Jaime Blanco.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **UNDISPUTED that defendants made security payments to the families of El Tigre and Samario to protect them protect them from violent retaliation. DISPUTED as defendants did not make any payments "to" El Tigre or Samario. Further DISPUTED because the phrase "litigation team" is ambiguous, and no payments were made to Blanco by defendants.**

271.    Defendants' representation that "the three *Balcero* witnesses who received security assistance from Defendants" were "Libardo Duarte, Jose Gelvez Albarracin, and Jairo Jesus Charris Castro" is false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED. To the extent the representation was incomplete because it did not explain the entire context, it has been supplemented. Mr. Collingsworth did not intend to deceive the Court.**

272.    At the time Defendants made this representation to this Court, they knew it was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because the representation was not false, although it was incomplete because it did not explain the entire context. But, it has been supplemented. Mr. Collingsworth did not intend to mislead the Court.**

273.    In their "Memorandum of Law on Work Product Privilege and Renewing Motion to Compel Against Drummond," Defendants also made the following representation to this Court:

> The record is now straight. Defendants viewed it as their duty to do what was possible to protect witnesses and their families from violent retaliation. Defendants certainly made no secret of this security assistance because it was entirely necessary and proper.

Doc. 80 (Memorandum of Law on Work Product Privilege and Renewing Motion to Compel Against Drummond) at 10. **UNDISPUTED.**

274.    At the time Defendants made this representation to this Court, they had been making "security payments" to El Tigre and Samario for over two years, and Defendants' litigation team had made at least three payments to Jaime Blanco.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **UNDISPUTED that defendants made security payments to the families of El Tigre and Samario to protect them protect them from violent retaliation. DISPUTED that these payments were made "to" El Tigre or Samario. Further DISPUTED because the phrase "litigation team" is ambiguous, and no payments were made to Blanco by the defendants.**

275.    Defendants' representation that they "made no secret" of their "security assistance" to witnesses is false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2

(Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED as defendants, in their role as counsel for plaintiffs in *Balcero*, did disclose the fact that security assistance was provided to witnesses and/or their families because of the serious threats against witnesses and their family members. To the extent the representation was incomplete because it did not explain the entire context, it has been supplemented. Mr. Collingsworth did not intend to deceive the Court.**

276.     At the time Defendants made this representation to this Court, they knew it was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20 **DISPUTED because the representation was not false, although it was incomplete because it did not explain the entire context. It But, it has been supplemented. Mr. Collingsworth did not intend to mislead the Court.**

277.     On December 20, 2013, Defendants filed "Defendants' Reply Brief in Support of Memorandum of Law on Work Product Privilege and Renewing Motion to Compel Against Drummond." Doc. 87. **UNDISPUTED that defendants' counsel filed this brief.**

278.     In this filing, Defendants made the following representation to this Court:

> . . . [T]he facts are clear Defendants properly provided security assistance to three witnesses whose family members were threatened by Drummond's operatives in Colombia. Drummond's classic tactic of attacking Mr. Collingsworth now includes ignoring undisputed facts in the record. . .

Doc. 87 (Defendants' Reply Brief in Support of Memorandum of Law on Work Product Privilege and Renewing Motion to Compel Against Drummond) at 1-2. **UNDISPUTED that this statement was made in the context of arguing that witness security payments were ethical.**

279.    At the time Defendants made this representation to this Court, they had been making "security payments" to El Tigre and Samario for over two years, and Defendants' litigation team had offered and facilitated at least three payments to Jaime Blanco.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **UNDISPUTED that defendants made security payments to the families of El Tigre and Samario to protect them from violent retaliation. DISPUTED as defendants did not make any payments "to" El Tigre or Samario. Further DISPUTED because the phrase "litigation team" is ambiguous, and no payments were made to Blanco by defendants.**

280.    Defendants' representation to this Court that "the facts are clear Defendants properly provided security assistance to three witnesses" is false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED. The representation is true because these three witnesses, or their families, received witness assistance payments and it does not state that only three witnesses in *Balcero* received payments. To the extent the representation was incomplete in failing to explain the whole context, it has been supplemented. Mr. Collingsworth did not intend to deceive the Court.**

281.    At the time Defendants represented to this Court that "the facts are clear Defendants properly provided security assistance to three witnesses," they knew this representation was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because the representation was not false, although it was incomplete because it did not explain the**

**entire context. But, it has been supplemented. Mr. Collingsworth did not intend to mislead the Court.**

282.   On December 20, 2013, Defendants produced their "Supplemental Privilege Log." **UNDISPUTED.**

283.   "Defendants' Reply Brief in Support of Memorandum of Law on Work Product Privilege and Renewing Motion to Compel Against Drummond" makes the following representation to this Court:

> Defendants produced to Drummond today an updated log. The privilege log produced on October 2, 2013 and this [December 20, 2013] supplemental log list privileged documents, *if any*, responsive to Plaintiffs' first request for production nos. 1-63, 69, 70-72, 74, 75, 78-80, 82-89 and Plaintiffs' second request for production of documents nos. 1-13. Defendants will continue to produce documents responsive to cost and finance requests on a rolling basis.

Doc. 87 (Defendants' Reply Brief in Support of Memorandum of Law on Work Product Privilege and Renewing Motion to Compel Against Drummond) at 3-4 (emphasis added). **UNDISPUTED.**

284.   Drummond's 1st Requests for Production No. 43 sought "[f]rom January 1, 2000 to the present, all communications, including, but not limited to, e-mails, letters, faxes, voicemails, between Defendants and Llanos Oil or any of its principals, representatives, agents or employees." Doc. 43-10 at Req. No. 43. **UNDISPUTED.**

285.   Drummond's 2nd Requests for Production No. 8 sought "[a]ll documents reflecting communications between Defendants or anyone working on their behalf and Ivan Otero." Doc. 43-12 at Req. No. 8. **UNDISPUTED.**

286.   Defendants' December 20, 2013 "supplemental privilege log" did not include the July 19, 2012 email exchange between Albert van Bilderbeek and Mr. Collingsworth evidencing

a $35,000 wire to Ivan Otero for the benefit of Jaime Blanco.  Docs. 174-25 & 174-26 (Defs'
December 20, 2013 "Supplemental Privilege Log"); Doc. 174-20 at CS_TC 2827-2828.
**UNDISPUTED that this document was not included on the December 20, 2013 privilege**
**log.  This email was eventually logged and/or produced by the defendants in December**
**2014 after additional searches were performed and defendants' privilege log and**
**documents production set supplemented.**

287.    Defendants' December 20, 2013 "supplemental privilege log" did not include the
September 16, 2011 email from Collingsworth to Ivan Otero relating to another payment to
Jaime Blanco from Albert van Bilderbeek.  Docs. 174-25 & 174-26 (Defs' December 20, 2013
"Supplemental Privilege Log"); Doc. 174-20 at CS_TC001458 ("Dear Ivan, By now you should
have received 2 packages.  Just to be clear, the one from the brothers you know what that is.").
**UNDISPUTED that this document was not on the December 20, 2013 privilege log. This**
**email was eventually logged and/or produced by the defendants in December 2014 after**
**additional searches were performed and defendants' privilege log and documents**
**production set supplemented. DISPUTED because this statement incorrectly states that the**
**referenced email, CS_TC001458, was from Collingsworth to Otero. It was not, instead, it**
**was from Collingsworth to Susana Tellez, who was a paralegal at Conrad & Scherer.**

288.    Defendants' representation to this Court that their December 20, 2013 privilege
log "list[ed] privileged documents, if any, responsive to Plaintiffs' first request for production
nos. 1-63, 69, 70-72, 74, 75, 78-80, 82-89 and Plaintiffs' second request for production of
documents nos. 1-13" is false.  Docs. 174-25 & 174-26 (Defs' December 20, 2013
"Supplemental Privilege Log"); Doc. 174-20 at CS_TC 2827-2828; Doc. 174-20 at
CS_TC001458 ("Dear Ivan, By now you should have received 2 packages.  Just to be clear, the

one from the brothers you know what that is."). **UNDISPUTED that this was an incorrect statement. Documents responsive to these requests were later located and put on a privilege log. DISPUTED because this statement incorrectly states that the referenced email, CS_TC001458, was from Collingsworth to Otero. It was not, instead, it was from Collingsworth to Susana Tellez.**

289.     At the time Defendants represented to this Court that their December 20, 2013 privilege log "list[ed] privileged documents, if any, responsive to Plaintiffs' first request for production nos. 1-63, 69, 70-72, 74, 75, 78-80, 82-89 and Plaintiffs' second request for production of documents nos. 1-13," they knew this representation was false.  Docs. 174-25 & 174-26 (Defs' December 20, 2013 "Supplemental Privilege Log"); Doc. 174-20 at CS_TC 2827-2828; Doc. 174-20 at CS_TC001458 ("Dear Ivan, By now you should have received 2 packages. Just to be clear, the one from the brothers you know what that is."). **DISPUTED because Mr. Collingsworth did not intend to mislead the Court. Documents responsive to these requests were later discovered and included on a supplemental privilege log.**

290.     "Defendants' Reply Brief in Support of Memorandum of Law on Work Product Privilege and Renewing Motion to Compel Against Drummond" makes the following representation to this Court:

> As the [Defendants'] supplemental brief [Doc. 68] made clear, the facts are Defendants provided security assistance to three witnesses whose family members were threatened by Drummond's operatives in Colombia, which is entirely permissible under the ethical rules.

Doc. 87 (Defendants' Reply Brief in Support of Memorandum of Law on Work Product Privilege and Renewing Motion to Compel Against Drummond) at 15. **UNDISPUTED that this statement was made in the context of arguing that witness security payments were ethical.**

97

291.    At the time Defendants made this representation to this Court, they had been making "security payments" to El Tigre and Samario for over two years, and Defendants' litigation team had made at least three payments to Jaime Blanco.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **UNDISPUTED that defendants made security payments to the families of El Tigre and Samario to protect them protect them from violent retaliation. For a description of assistance payment to the families of El Tigre and Samario, see defendants' supplemental interrogatory responses filed in November 2014, Doc. 174-7, January 2015, Doc. 174-2, and March 2015, Doc. 231-11. To the extent the representation was incomplete in failing to explain the whole context, it has been supplemented. Mr. Collingsworth did not intend to deceive the Court.**

292.    Defendants' representation to this Court that "the facts are Defendants provided security assistance to three witnesses" is false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED. The representation is true because these three witnesses, or their families, received witness assistance payments. Further DISPUTED to the extent this statement was made in the context of arguing that witness security payments were ethical, and the number of witnesses was irrelevant to the arguments being made. To the extent the representation was incomplete in failing to explain the whole context, it has been supplemented. Mr. Collingsworth did not intend to deceive the Court.**

293.    At the time Defendants represented to this Court that "the facts are Defendants provided security assistance to three witnesses," they knew this representation was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd

Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because the representation was not false, although it was incomplete because it did not explain the entire context. But, it has been supplemented. Mr. Collingsworth did not intend to mislead the Court.**

294.    On January 22, 2014, Defendants filed "Defendants Terrence P. Collingsworth and Conrad & Scherer LLP's Response to Motion to Extend Scheduling Order Deadlines." Doc. 91. **UNDISPUTED that defendants' counsel filed this response.**

295.    In this filing, Defendants made the following representation to this Court:

> Only one category of document production remains pending which relates to financing of the litigation against Drummond. The subject documents are in a warehouse and finding them amongst all the other accounting documents has been extremely difficult. Defendants are near completion of their exhaustive search and will begin producing nonprivileged responsive documents related to cost within the next 21 days.

Doc. 91 ("Defendants Terrence P. Collingsworth and Conrad & Scherer LLP's Response to Motion to Extend Scheduling Order Deadlines") at 3. **UNDISPUTED that this statement was made in the context of opposing Drummond's motion to extend the discovery schedule, which was based on global discovery issues, but not specifically witness assistance payments.** *See* **Doc. 90.**

296.    At the time Defendants represented this Court that "[o]nly one category of document production remains pending which relates to financing of the litigation against Drummond," they had neither produced nor logged the documents reflecting their payments to Samario, El Tigre or Blanco. Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **UNDISPUTED that, as of January 22, 2014, defendants had not produced or logged documents reflecting witness assistance payments made indirectly to the families of the witnesses identified here. As of January 22, 2014, Drummond had not served in this case discovery requests that clearly**

sought such payments. **To the extent the representation was incomplete in terms of context, it has been supplemented. Mr. Collingsworth did not intend to mislead the Court.**

297.    Defendants' representation to this Court that "[o]nly one category of document production remains pending which relates to financing of the litigation against Drummond" was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED as the representation is was made in the context of opposing an effort by Drummond to extend the discovery schedule for reasons unrelated to witness security payments. To the extent the statement was incomplete in terms of context, it has been supplemented. Mr. Collingsworth did not intend to mislead the Court.**

298.    At the time Defendants' made the representation to this Court that "[o]nly one category of document production remains pending which relates to financing of the litigation against Drummond," they knew it was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because the representation was not false. To the extent the statement was incomplete in terms of context, it has been supplemented. Mr. Collingsworth did not intend to mislead the Court. l**

299.    On February 11, 2014, Drummond served its Third Interrogatories and Requests for Production on Defendants.  Doc. 101-2. **UNDISPUTED.**

300.    On March 20, 2014, Defendants served their responses to Drummond's Third Interrogatories and Requests for Production.  Doc. 101-2. **UNDISPUTED.**

301.    Defendants' March 20, 2014 responses to Drummond's Third Interrogatories are signed by Mr. Collingsworth "Individually, and on behalf of Conrad & Scherer, LLP Defendants." Doc. 101-2 at 17 of 38. **UNDISPUTED.**

302.    Drummond's Third Interrogatories No. 2, and Defendants' response thereto, state as follows:

> 2. Identify every instance in which Defendants (or any member of their litigation team) have offered to provide assistance (regardless of whether such assistance was actually provided) to any witness, any relative or friend of any witness, any Colombian paramilitary, or any relative of any Colombian paramilitary. For purposes of this interrogatory, "assistance" is meant to include, but not be limited to, solicitation of business proposals, legal advice, payment of attorneys' fees, provision of any attorney, prison transfers, negotiations or other communications with Colombian prosecutors, offers to communicate with contacts in Washington, D.C., offers to assist in requests for extradition, offers to communicate with the FBI, and assistance with sentencing.
>
> **ANSWERS: Defendants object on the grounds that this Interrogatory is overly broad, open-ended and intentionally vague. In addition, Defendants object that the request is not relevant to Plaintiff's claims and not reasonably calculated to lead to the discovery of admissible evidence. Further, Defendants object to the interrogatory as it is duplicative and repetitive to previous discovery requests. Without waiving their objections, Defendants state they have never offered assistance in order to influence testimony. Defendants have previously produced all non privileged documents containing facts responsive to this request. To the extent there is any new responsive information since the information was previously produced, Defendants will supplement by producing responsive documents to Plaintiff in lieu of providing a response to this Interrogatory pursuant to Fed. R. Civ. P. 33(d).**

Doc. 101-2 (Defs' Responses to Drummond's 3rd Irogs and RFPs) at pp. 11-12 of 38.

**UNDISPUTED.**

303.    At the time Defendants represented in a sworn interrogatory response that "**Defendants have previously produced all non privileged documents containing facts responsive to this request**," they had not disclosed or produced documents revealing the

payments to Samario, El Tigre or Blanco.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **UNDISPUTED that, as of the time of this interrogatory response, defendants had not produced documents reflecting witness assistance payments to the witnesses, or their families, identified here. DISPUTED to the extent this "fact" implies that defendants had an obligation at that point to produce such documents. Mr. Collingsworth interpreted this request literally (as written) to include only payments made directly to witnesses or their families (or to paramilitaries or their families) without carefully considering that other, potentially responsive witnesses existed. And, documents reflecting such payments (made directly to the families of Charris and Duarte) had already been produced. Defendants did not interpret this interrogatory as including payments made to Ivan Otero for the benefit of a witness's family. Furthermore, none of the defendants, nor any member of their "litigation team" offered to provide "assistance" to Blanco with respect to his attorney's fees. Instead, Mr. Collingsworth expressly told Blanco he could not pay his attorney's fees. Further DISPUTED because the statement does not acknowledge defendants' objections or defendants' statement that, if additional responsive information was found, they would provide documents reflecting that information. Defendants made good on that promise, and subsequently revised this interrogatory response and provided documents reflecting witness assistance payments made to these witnesses or their families through Ivan Otero following the Court's clarifying Order on October 15, 2014.**

304.    Defendants' representation in a sworn interrogatory response that "**Defendants have previously produced all non privileged documents containing facts responsive to this request**" is false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am.

Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED. The representation is not false based on defendants' reasonable (and literal) interpretation of the interrogatory. *See supra* Response ¶ 303. But, to the extent his statement was incomplete, it has been supplemented by later filings with the Court. Mr. Collingsworth did not intend to mislead the Court.**

305.    At the time Defendants served their sworn interrogatory response representing that "**Defendants have previously produced all non privileged documents containing facts responsive to this request,**" they knew this response was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED. The representation is not false based on defendants' reasonable (and literal) interpretation of the interrogatory. *See supra* Response ¶ 303. But, to the extent his statement was incomplete, it has been supplemented by later filings with the Court Mr. Collingsworth did not intend to mislead the Court.**

306.    In March 2014, Parker Waichman, LLP produced some documents in response to Drummond's third party subpoena that reflected discussions between Mr. Collingsworth and other lawyers at Conrad & Scherer, LLP and lawyers at Parker Waichman, LLP regarding paying Jaime Blanco's criminal legal fees. Docs. 101-15 & 101-17. **Defendants object to Drummond's use of privileged documents inadvertently produced by Parker Waichman that are subject to a clawback order from this Court. Subject to, and without waiving, that objection, UNDISPUTED.**

307.    Also included in the documents produced by Parker Waichman, LLP was an email exchange relating to transporting $20,000 in cash to Colombia to pay "the witness." Doc. 109-1. **UNDISPUTED that Parker Waichman inadvertently produced this document.**

**DISPUTED to the extent it implies this payment was to fact witness, which it was not. This payment was for a non-testifying consulting expert witness in a different case (the *Dole* case in L.A. Superior Court), and supporting evidentiary materials for this fact have been provided to the Special Master in this case. *See* Exhibit H (May 15, 2015 Collingsworth Decl.) ¶¶ 4-11. Defendants object to Drummond's use of privileged documents inadvertently produced by Parker Waichman that are subject to a clawback order from this Court.**

308.    None of these emails had been logged or produced by the Defendants, despite the fact that Mr. Collingsworth is either a sender or recipient of every single email.  Docs. 109-1, 101-15 & 101-17. **UNDISPUTED that these emails had not been logged or produced. DISPUTED to the extent this statement implies that defendants had an obligation to log these communications, or that such communications were responsive to an outstanding discovery request made prior to the production of these documents. The first set of interrogatory responses that would have captured these documents was served by Drummond on February 11, 2014, and defendants responded to those interrogatories on March 20—more than a week after Parker Waichman inadvertently produced these privileged documents.**

309.    On April 2, 2014, Drummond filed a motion for sanctions against Defendants, attaching many of the documents produced by Parker Waichman, LLP as exhibits.  Docs. 101, 101-12, 101-14, 101-15, 101-17, 101-18, 109-1. **UNDISPUTED that Drummond relied on documents improperly produced by Parker Waichman, even after counsel for defendants verbally notified counsel for Drummond that the documents contained privileged information. *See* Exhibit I (Decl. of Brad Smith, filed with Special Master on Aug. 25,**

2014), ¶ 7 ("On March 31, 2014, I received a telephone call from counsel for Drummond, Mr. H. Thomas Wells, III. T informed Mr. Wells that a number of documents in Parker Waichman's were privileged or were not relevant, although I did not identify any specific privileged documents in that conversation.").

310.   On April 14, 2014, Defendants filed "Defendants' Opposition to Drummond's Motion for Sanctions and Cross-Motion to Compel Drummond's Response to Defendants' Second Request for Production of Documents." Doc. 114. **UNDISPUTED.**

311.   In this filing, Defendants made the following representations to this Court:

> There is absolutely no issue of the propriety of Defendants' searches or the completeness of their production.
>
> Drummond's latest attacks are false and Defendants have now completed their document search and supplemental log in full compliance with the Court's discovery Order.

Doc. 114 (Defendants' Opposition to Drummond's Motion for Sanctions and Cross-Motion to Compel Drummond's Response to Defendants' Second Request for Production of Documents) at 1 & 2. **UNDISPUTED that these representations were made in the context of explaining why the Parker Waichman documents Drummond improperly relied on in its motion for sanctions (without first offering defendants any opportunity to explain in a meet and confer) were not previously produced—because the defendants were currently working, and had been working (as repeatedly explained to Drummond) to comply with the Court's October 15, 2013 Order.**

312.   At the time Defendants made these representations to this Court, they had not disclosed the payments to Samario, El Tigre or Blanco.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **UNDISPUTED that, as of the time of this representation, defendants had not**

produced documents reflecting witness assistance payments to the witnesses, or their families, identified here. DISPUTED to the extent this "fact" implies that defendants had an obligation at that point to produce such documents. Mr. Collingsworth interpreted Drummond's third interrogatories and requests for production literally (as written) to include only payments made directly to witnesses or their families (or to paramilitaries or their families), without carefully considering that other, potentially responsive witnesses existed. And, documents reflecting such payments (made directly to the families of Charris and Duarte), had already been produced. Defendants did not interpret Drummond's third interrogatories and requests for production as including payments made to Ivan Otero for the benefit of a witness's family. Furthermore, none of the defendants, nor any member made payments, or offered payment assistance, to Blanco with respect to his attorney's fees. Instead, Mr. Collingsworth expressly told Blanco he could not pay his attorney's fees.

313.    Defendants' representation to this Court that "there is absolutely no issue of the propriety of Defendants' searches or the completeness of their production" was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because, at the time this statement was made, defendants had outstanding objections to Drummond's third discovery requests, had interpreted the requests literally to exclude payments made through intermediaries to the family of witnesses or witnesses themselves, and, therefore, this statement was true as to un-objected to, outstanding discovery requests which defendants were in the process of responding to following the Court's October 15, 2013 Order. At the time, Mr. Collingsworth was mistaken about the search. Additional searches were performed, and**

discovery responses supplemented after the Court's October 15, 2014 Order. Mr. Collingsworth did not intend to mislead the Court.

314.    At the time Defendants represented to this Court that "there is absolutely no issue of the propriety of Defendants' searches or the completeness of their production," they knew this representation was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because this statement was not false when it was made and with respect to un-objected to, outstanding discovery requests. Further DISPUTED because it implies that defendants were aware and in possession of other responsive documents and were simply not producing them. At the time, Mr. Collingsworth was mistaken about the search. Additional searches were performed, and discovery responses supplemented after the Court's October 15, 2014 Order. Mr. Collingsworth did not intend to mislead the Court.**

315.    "Defendants' Opposition to Drummond's Motion for Sanctions and Cross-Motion to Compel Drummond's Response to Defendants' Second Request for Production of Documents" makes the following representation to this Court:  "Drummond has been on a pure fishing expedition" with respect to discovery requests targeting the "activities of and payments to or by…lawyers in Colombia."   Doc. 114 at 2. **DISPUTED. Furthermore, this is not a "representation," but, rather a characterization of Drummond's discovery efforts made in the context of explaining Drummond's failure to produce any of the same types of documents it sought from defendants.**

316.    At the time Defendants made this representation to this Court, they had not disclosed the payments to El Tigre, Samario or Blanco, all of which were conveyed to the witnesses by Ivan Otero, a "lawyer in Colombia" and a "key member" of Defendants' litigation

team.   Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20; Doc. 69 (Nov. 7, 2013 Collingsworth Decl.) ¶ 51. **DISPUTED. Further DISPUTED because payments were not conveyed by Otero "to" El Tigre or Samario. But, to the extent this representation was incomplete as it relates to witness assistance payments to the families of El Tigre and Samario, it was later supplemented. Mr. Collingsworth did not intend to mislead the Court.**

317.   Defendants' representation to this Court that "Drummond has been on a pure fishing expedition" with respect to discovery requests targeting the "activities of and payments to or by…lawyers in Colombia" was false.   Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED. Furthermore, this is not a "representation," but, rather, is a characterization of Drummond's discovery efforts made in the context of explaining Drummond's failure to produce any of the same types of documents it sought from defendants.**

318.   At the time they represented to this Court that "Drummond has been on a pure fishing expedition" with respect to discovery requests targeting the "activities of and payments to or by…lawyers in Colombia", Defendants knew this representation was false.   Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED. Furthermore, this is not a "representation," but, rather, is a characterization of Drummond's discovery efforts made in the context of explaining Drummond's failure to produce any of the same types of documents it sought from defendants.**

319.    "Defendants' Opposition to Drummond's Motion for Sanctions and Cross-Motion to Compel Drummond's Response to Defendants' Second Request for Production of Documents" makes the following representation to this Court:

> Now that Defendants have finally completed the supplemental production in response to this Court's [October 15, 2013] Order, they will produce any responsive documents to Drummond's Third Requests and are in the process of logging privileged documents, including any documents involving PW [Parker Waichman, LLP] and discussions of requests for assistance by witnesses. Drummond's assertion that such documents were improperly withheld from the response to Drummond's First and Second Requests for Production of Documents pursuant to this Court's Order, or logged in an untimely manner, is another transparent effort by Drummond to mislead the Court.

Doc. 114 at 4-5. **UNDISPUTED.**

320.    At the time Defendants made these representations to this Court, they had not disclosed the payments to Samario, El Tigre or Blanco.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **UNDISPUTED that payments to Blanco or the family members of El Tigre or Samario had not been disclosed. That is because only Drummond's third set of discovery requests—which defendants explained they were preparing to respond to—included discovery requests that would have clearly captured such payments. DISPUTED because no payments were made by the defendants "to" Samario, El Tigre, or Blanco.**

321.    Defendants' representation to this Court that they "have finally completed the supplemental production in response to this Court's Order" was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED. Defendants had completed supplemental production to Drummond's first and second discovery requests in response to the Court's October 15, 2013 Order. And, only Drummond's third set of discovery requests—which defendants**

**explained they were preparing to respond to—included discovery requests that would have clearly captured payments to Blanco and to the families of El Tigre and Samario. To the extent that more production was needed, this statement was a mistake. It was later corrected by supplementation. Mr. Collingsworth did not intend to mislead the Court.**

322.     At the time Defendants represented to this Court that they "have finally completed the supplemental production in response to this Court's Order," they knew this representation was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because the representation was not false. *See supra* Resp. ¶ 321. To the extent that more production was needed, this statement was a mistake. It was later corrected by supplementation. Mr. Collingsworth did not intend to mislead the Court.**

323.     Citing Mr. Collingsworth's sworn declaration, "Defendants' Opposition to Drummond's Motion for Sanctions and Cross-Motion to Compel Drummond's Response to Defendants' Second Request for Production of Documents" makes the following representation to this Court:

> *[T]here are no documents produced by PW or Defendants relating to a payment to Blanco because none was made by PW or Defendants for any purpose*. Collingsworth Decl. ¶ 8.

Doc. 114 at p. 16 of 37 (emphasis in original). **UNDISPUTED.**

324.     Mr. Collingsworth submitted a declaration signed under penalty of perjury in support of "Defendants' Opposition to Drummond's Motion for Sanctions and Cross-Motion to Compel Drummond's Response to Defendants' Second Request for Production of Documents." Doc. 114-2 (Apr. 14, 2014 Collingsworth Decl.). **UNDISPUTED.**

325.    In Paragraph 8 of Mr. Collingsworth's April 14, 2014 declaration, he testified as follows:  "There are no documents produced by PW or Conrad & Scherer relating to a payment to Blanco or his criminal lawyers because none was made by them."  Doc. 114-2 (Apr. 14, 2014 Collingsworth Decl.) at ¶ 8. **UNDISPUTED.**

326.    At the time Defendants filed their "Opposition to Drummond's Motion for Sanctions and Cross-Motion to Compel Drummond's Response to Defendants' Second Request for Production of Documents" and submitted Mr. Collingsworth's April 14, 2014 sworn declaration in support thereof, Mr. Collingsworth had offered facilitated and confirmed at least three payments to Jaime Blanco from Albert van Bilderbeek totaling at least $95,000.  Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED to the extent it conflicts with Mr. Collingsworth's explanation of his involvement with Blanco.** *See* **Doc. 174-2, at 4-6.**

327.    On January 9, 2015, Defendants produced documents relating to three payments to Jaime Blanco, all of which are emails including Mr. Collingsworth.   Doc. 174-20. **DISPUTED because these documents do not reflect that payments were made to Blanco.**

328.    Each of the payments to Blanco was delivered by Ivan Otero, a "key member" of Defendants' litigation team.  Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20; Doc. 69 (Nov. 7, 2013 Collingsworth Decl.) ¶ 51. **DISPUTED to the extent it implies these documents reflect payments to Blanco. Further DISPUTED to the degree terms like "key member" and "litigation team" are ambiguous.** *See supra* **Resp. ¶ 1.**

329.    Mr. Collingsworth's April 14, 2014 sworn declaration testimony stating that "[t]here are no documents produced by PW or Conrad & Scherer relating to a payment to Blanco or his criminal lawyers because none was made by them" was false.  Doc. 174-20. **DISPUTED**

because neither Parker Waichman nor Conrad & Scherer made a payment to Blanco or his criminal lawyers. To the extent the representation was incomplete in failing to explain the whole context, it has been supplemented. Mr. Collingsworth did not intend to deceive the Court.

330.    At the time Mr. Collingsworth signed his April 14, 2014 sworn declaration and testified that "[t]here are no documents produced by PW or Conrad & Scherer relating to a payment to Blanco or his criminal lawyers because none was made by them," he knew this testimony was false.  Doc. 174-20. **DISPUTED because this representation was not false. To the extent the representation was incomplete in failing to explain the whole context, it has been supplemented. Mr. Collingsworth did not intend to deceive the Court.**

331.    Defendants' representation to this Court that *"there are no documents produced by PW or Defendants relating to a payment to Blanco because none was made by PW or Defendants for any purpose"* was false.  Doc. 174-20. **DISPUTED because neither Parker Waichman nor the defendants made a payment to Blanco. To the extent the representation was incomplete in failing to explain the whole context, it has been supplemented. Mr. Collingsworth did not intend to deceive the Court.**

332.    At the time Defendants represented to this Court, citing Mr. Collingsworth's declaration testimony, that "*there are no documents produced by PW or Defendants relating to a payment to Blanco because none was made by PW or Defendants for any purpose,*" they knew that representation was false. Doc. 174-20. **DISPUTED because this representation was not false.**

333.    On or about April 17, 2014, Mr. Collingsworth sent a letter, on Conrad & Scherer letterhead, to Mr. Paul Wolf enclosing a draft motion for sanctions against Mr. Wolf pursuant to

Fed. R. Civ. P. 11 for statements made by Mr. Wolf in an April 6, 2014 court filing in another case. Ex. 17 (Apr. 17, 2014 Collingsworth Ltr. and draft motion). **UNDISPUTED.**

334.    Mr. Collingsworth's April 17, 2014 letter states that "we are exploring all other legal options as a result of your inexplicable campaign to make false and outrageous statements about me." Mr. Collingsworth also states "I have obtained from Drummond in the discovery process various communications you had with Drummond's counsel that include false and malicious statements." Ex. 17 (Apr. 17, 2014 Collingsworth Ltr. and draft motion). **UNDISPUTED.**

335.    The April 17, 2014 letter is signed by Mr. Collingsworth, and the draft motion for sanctions contains a signature line for Mr. Collingsworth and Eric Hager, both of whom are attorneys at Conrad & Scherer, LLP. Ex. 17 (Apr. 17, 2014 Collingsworth Ltr. and draft motion). **UNDISPUTED, but a draft, unfiled motion does not have any relevance, and should not be considered, in a statement of proposed findings of fact.**

336.    Defendants' draft motion seeks monetary sanctions in the form of "all of the reasonable attorney's fees and other expenses directly resulting from [Wolf's] violation [of Rule 11]," stating that such sanctions are needed in light of "the serious nature of Wolf's false accusations, and to send a clear message to any other party to this litigation that may be tempted to make similarly unfounded accusations." Ex. 17 (Apr. 17, 2014 Collingsworth Ltr. and draft motion) at 10 of 24. **UNDISPUTED, but a draft, unfiled motion should not properly be considered in a statement of proposed findings of fact.**

337.    Paul Wolf is a witness in this case. Approximately 7 months prior to the date that Defendants sent their April 17, 2014 letter and enclosure threatening sanctions against Mr. Wolf, he provided sworn declaration testimony in support of Drummond's motion to compel. Doc. 62-

5 (Sept. 6, 2013 Wolf Decl.). **Defendants object to any evidence by Paul Wolf—either his declaration (which is an improper breach of fiduciary duty) or his deposition (which is confidential pending determination of privileged statement made). DISPUTED to the extent this implies that Mr. Wolf is a "fact" witness in this case or has any personal knowledge sufficient to make him a competent witness to testify as to anything in his declaration. Further DISPUTED to the extent Drummond is implying that Mr. Collingsworth's letter and draft motion was in response to Mr. Wolf's declaration submitted in this case.**

338.    Defendants' draft motion for sanctions against Mr. Wolf states as follows:

> With respect to the false statements Wolf makes with regard to "payments" in his Response, first, Wolf falsely states that the documents and exhibits in the briefing for the Drummond case, on which Wolf purports to rely in listing persons who were "paid" by Collingsworth, reveal that Drummond's expert, R. Bernard Harwood, listed "various amounts" paid to "Samario," "El Tigre," and "Jaime Blanco." Response at 6. That is absolutely false. Mr. Harwood does not and cannot list any amounts paid to these individuals because there were no payments made to them by Mr. Collingsworth for any purpose. Any amount of investigation by Wolf - including a basic reading of Mr. Harwood's submission - would have revealed the statement about payments to "Samario," "El Tigre," and "Jaime Blanco" to be false.
>
> [. . .]
>
> Wolf's assertion that Collingsworth paid witnesses who "are all members of the AUC," Response at 8, is false on two levels and plainly lacking in evidentiary support. First, as noted, all security assistance related to any witness in the Drummond case went to family members of three witnesses, Charris, Gelvez and Duarte, to relocate them in response to death threats

Ex. 17 (Apr. 17, 2014 Collingsworth Ltr. and draft motion) at pp. 5-6, 7 of 24. UNDISPUTED, **but a draft, unfiled motion should not properly be considered in a statement of proposed findings of fact.**

339.    Defendants' representation that "there were no payments made to [Samario, El Tigre or Jaime Blanco] by Mr. Collingsworth for any purpose" was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED to the extent a draft, unfiled motion has any relevance, or should properly be considered, in a statement of proposed findings of fact. Further DISPUTED because the purported "representation" was never made. Further DISPUTED because Mr. Collingsworth did not make payments "to" Samario, El Tigre, or Blanco. Instead, Mr. Collingsworth arranged for security payments to be made to the families of El Tigre and Samario, and Albert van Bilderbeek made payments to Blanco via Otero.**

340.    Defendants' representation that "all security assistance related to any witness in the Drummond case went to family members of three witnesses, Charris, Gelvez and Duarte," was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED to the extent a draft, unfiled motion has any relevance, or should properly be considered, in a statement of proposed findings of fact. Further DISPUTED because the purported "representation" was never made. Further DISPUTED because Mr. Collingsworth did not make payments "to" Samario, El Tigre, or Blanco. Instead, Mr. Collingsworth arranged for security payments to be made to the families of El Tigre and Samario, and Albert van Bilderbeek made payments to Blanco via Otero. Further DISPUTED to the extent this is contradictory to the supplemental interrogatory responses filed by defendants relating to witness assistance payments for the families of El Tigre and Samario.**

341.    At the time Defendants sent Mr. Collingsworth's April 17, 2014 letter and draft motion for sanctions to Mr. Wolf, Defendants knew these representations were false.  Doc. 174-8

(El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because the purported "representation" was never made. Further DISPUTED to the extent a draft, unfiled motion has any relevance, or should properly be considered, in a statement of proposed findings of fact. Further DISPUTED because the statement was not false.**

342.    Defendants used these false representations to threaten Mr. Paul Wolf - a witness in this case – with monetary sanctions.  Ex. 17 (Apr. 17, 2014 Collingsworth Ltr. and draft motion). **DISPUTED because no "representations" set forth in the draft motion were ever made. Further DISPUTED because a draft, unfiled motion should not properly be considered in a statement of proposed findings of fact. Further DISPUTED because Mr. Collingsworth's letter had nothing to do with Mr. Wolf's alleged status as a "witness" in this case.**

343.    On April 21, 2014, in open court, this Court directly asked the Defendants to disclose the scope of witness payments in *Balcero*, and Defendants volunteered Mr. Collingsworth to respond to the question:

> [MR. WELLS]: …So the basis of their defense is these paramilitaries were telling the truth; and not only that, I reasonably believe that they were telling the truth. And if he was paying them and it looks like we're starting to build a record that almost everyone has been paid and I think we are going to be able to build a record that everyone was paid at some point, then that is very, very relevant to whether or not he reasonably believed –
>
> JUDGE PROCTOR: Let me ask that question to Mr. Smith.  Mr. Smith, consult with Mr. Collingsworth and let me know this. Is there a witness that I have received testimony from south of the Equator that didn't receive a security payment?
>
> MR. SMITH: Can he answer that?
>
> JUDGE PROCTOR: Sure.  I'm trying not to put him on trial.  I'm going through counsel.

MR. SMITH: I appreciate that, Your Honor.

MR. COLLINGSWORTH: Your Honor, the shortest way to the truth is to ask me the question. Thank you. Our papers have made it clear and I will say that a lot of the new ambush allegations that they've made, each time they make one if we get a chance to show you the facts, the facts clear up any misunderstanding of what happened. There were exactly in this case three witnesses whose family members were moved because they received death threats, and those were Charris, Helvez [Gelvez], Guartay [Duarte]. Those are the witnesses whose family members were moved. There was an additional person named Halcon who was participating in Drummond 1 way out there and I had little to do with. I never met the guy.

JUDGE PROCTOR: Drummond 1 in front of Judge Bowdre?

MR. COLLINGSWORTH: That's correct. He was relocated and at some point we began also helping him with his relocation assistance, but our interrogatory responses to them made clear we took him off the table, I found him not to be credible, and he is not a witness. So the three witnesses that I've mentioned, Charris, Guartay, and Helvez, are the family members of those people who were relocated.

JUDGE PROCTOR: Are those the only three besides Halcon who received security payments?

MR. COLLINGSWORTH: That's correct.

Doc. 123 (Apr. 21, 2014 Hrg. Tr.) at 30:1-31:19. **UNDISPUTED, as the transcript speaks for itself.**

344.    As of April 21, 2014, every single witness who had testified in letters rogatory proceedings in *Balcero* against Drummond had received payments. Doc. 44-19; Ex. 7 (CS 11416); Doc. 44-13 (PLS 5020); Ex. 8 (CS_TC000179); Doc. 44-15 (PLS 5024-5025); Doc. 44-6; Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. UNDISPUTED that the families of the witnesses who provided letters rogatory testimony in *Balcero* implicating Drummond received security assistance. **DISPUTED because the witnesses who testified in letters rogatory**

117

proceedings in *Balcero* **did not themselves receive payments from the defendants. Further DISPUTED because it implies that security assistance was somehow improper. Each of these witnesses' families required security payments because, after the witness provided a declaration, he or his family received serious, credible threats before giving their letters rogatory testimony. The payments received by Blanco from Albert van Bilderbeek is explained in defendants' January 9, 2015 supplemental interrogatory responses.** *See* **Doc. 174-2.**

345.    As of April 21, 2014, Samario, El Tigre and Charris were still receiving monthly payments.  Ex. 1 (May 21, 2015 Hrg. Tr.) at 56:23-57:18. **UNDISPUTED.**

346.    Mr. Collingsworth's representation in open court that there were "exactly" three witnesses in *Balcero* – Charris, Duarte and Gelvez – who received payments from the Defendants was false.  Doc. 187-21 (May 5, 2015 Collingsworth Decl.) ¶¶ 10 & 12; Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. UN**DISPUTED that this was inaccurate and incomplete. It was a mistake that was latter corrected by supplementation. Mr. Collingsworth did not intend to the deceive the Court and has apologized.**

347.    At the time Mr. Collingsworth represented in open court that there were "exactly" three witnesses in *Balcero* – Charris, Duarte and Gelvez – who received payments from the Defendants, he knew that representation was false.   Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **UNDISPUTED that the statements Mr. Collingsworth did make were inaccurate and wrong. Doc. 187-21 (May 5, 2015 Collingsworth Decl.) ¶ 10. It is further undisputed that Mr. Collingsworth did not intend to deceive or show disrespect to the Court.** *Id.* **¶ 2.**

348.    Mr. Collingsworth's reply of "[t]hat's correct" in response to Judge Proctor's question of "Are [Duarte, Charris and Gelvez] the only three besides Halcon who received security payments?" was false.   Doc. 187-21 (May 5, 2015 Collingsworth Decl.) ¶¶ 10 & 12; Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **UNDISPUTED that the statements were inaccurate and wrong. Mr. Collingsworth has apologized. This was a mistake. He did not intend to deceive the Court. It has been corrected by supplementation.**

349.    At the time Mr. Collingsworth stated "[t]hat's correct"  in response to Judge Proctor's question of "Are [Duarte, Charris and Gelvez] the only three besides Halcon who received security payments?", he knew that statement was false.   Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED. Mr. Collingsworth has filed a declaration in which he states that he had no adequate explanation for his statement. Doc. 187-21, ¶ 3. He did not intend to mislead the Court. He has apologized for this mistake. The record has been supplemented.**

350.    On April 21, 2014, in open court, Defendants' counsel represented as follows with respect to Jaime Blanco:

> JUDGE PROCTOR: The $100,000 criminal defense fee.  What is the basis -- that was troubling to me.  Let me hear from the defendant about the basis, the legal basis, proper basis, for that.
>
> MR. SMITH: Well, Your Honor, there was no payment made. . . .

Doc. 123 (Apr. 21, 2014 Hrg. Tr.) at 21:3-9. **UNDISPUTED.**

351.    At the time Defendants represented in open court that "there was no payment made" to Blanco, Defendants knew that Mr. Collingsworth had offered, facilitated and

confirmed at least three payments to Blanco.  Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because the statement is ambiguous about who allegedly made a payment to Blanco, which neither Parker Waichman nor defendants did. Further DISPUTED as there is no evidence in that Otero delivered all or part of any payment from Albert van Bilderbeek to Blanco. Further DISPUTED to the extent it implies any payments were actually confirmed by defendants as being made to Blanco or in any specific amount. But, the statement was incomplete and inaccurate. It has been corrected. Mr. Collingsworth did not intend to mislead the Court.**

352.    Defendants' representation in open court that "there was no payment made" to Blanco is false.  Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **UNDISPUTED to the extent it was incomplete in that the context was not explained. There were no direct payments from Conrad & Scherer. But, Mr. Collingsworth understood that Albert van Bilderbeek did agree to pay Blanco for investigative work. Defendants' response to this is set forth in detail in their January 9, 2015 supplemental interrogatory responses.** *See* **Doc. 174-2. Mr. Collingsworth has apologized for this inaccurate statement. The record has been supplemented.**

353.    At the time Defendants represented in open court that "there was no payment made" to Blanco, they knew that representation was false.  Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED in that there was no intent to deceive. This statement was incomplete in light of the overall context and therefore has been clarified by supplementation.**

354.    Mr. Collingsworth was seated at counsel's table when Defendants' counsel represented in open court that "there was no payment made" to Blanco.  *See* Doc. 123 (Apr. 21, 2014 Hrg. Tr.) *generally*. **UNDISPUTED.**

355.    Mr. Collingsworth did not correct Defendants' counsel's representation.  *See* Doc. 123 (Apr. 21, 2014 Hrg. Tr.) *generally*. **UNDISPUTED.**

356.    On May 22 and 27, 2014, Defendants produced approximately 698 pages of documents, which included emails, bank statements, wire transfer forms and expense ledgers. Ex. 18 (May 22 and 27, 2014 B. Smith emails). **UNDISPUTED that defendants produced documents on May 22 and 27, although the exact number and content of them is not obvious from this Exhibit.**

357.    Included in Defendants' May 22 and 27, 2014 document production were documents which, had they not been redacted, would have reflected the $2,700 monthly payments to Ivan Otero that Mr. Otero then delivered to El Tigre and Samario.  Docs. 174-10, 174-11, 174-18 & 174-19. **DISPUTED because there is no evidence that the payments referenced in these documents were intended for anyone other than Otero, or that Otero "delivered" these payments to El Tigre or Samario.**

358.    The portions of documents included in Defendants' May 22 and 27, 2014 production which reflected $2,700 monthly payments to El Tigre and Samario were redacted. Docs. 174-10, 174-11, 174-18 & 174-19. **UNDISPUTED that redactions covered over a reference to payments to Otero. This was a mistake. It has been corrected. The record has been supplemented. There was no intent by Mr. Collingsworth to deceive.  An effort to redact privileged "expenses" mistakenly also omitted the payment reference on payments which defendants have now made clear assisted families of El Tigre and Samario.**

359.    Mr. Collingsworth and Conrad & Scherer, LLP have a pending case against Dole Food Company, Inc. in California state court which alleges that Dole collaborated with Colombian paramilitaries.   *See Emperatriz Marina Mendoza Gomez, et al. v. Dole Food Company, Inc., et al.*, Case No. BC412620 (Los Angeles County Superior Court). **UNDISPUTED.**

360.    On May 30, 2014, Mr. Collingsworth, on behalf of Conrad & Scherer, LLP, signed a "Joint Status Conference Statement for June 2, 2014 Further Case Management Conference."  Ex. 19 (May 30, 2014 filing in Dole). **UNDISPUTED.**

361.    In that filing, Dole raised the issue of Defendants' witness payments, Ex. 19 (May 30, 2014 filing in Dole) at 9, and attached this Court's April 3, 2014 Order requiring Mr. Collingsworth and Conrad & Scherer to "maintain and preserve all hard drives and email accounts, in their present form, which have been utilized by Defendants' litigation team during their entire pursuit of litigation against Drummond until further direction of this court."  Doc. 105 (Apr. 3, 2014 Text Order). **UNDISPUTED.**

362.    Dole then requested that the California court likewise enter an order requiring Defendants to preserve all of their documents and emails:

> Dole Food will respectfully request that the Court enter an immediate, express evidence preservation order mandating that all documents and information—including electronically-stored information—in the possession, custody and control of Plaintiffs, Plaintiffs' counsel, their agents and other representatives concerning this matter, including, *inter alia,* documents and evidence reflecting any and all payments to or communications with current and former AUC paramilitaries, be preserved and requiring that Plaintiffs' counsel maintain and preserve all hard drives and e-mail accounts, in their present form, which have been utilized by Plaintiffs' counsel's litigation team during their entire pursuit of litigation against Dole Food until further order of the Court.

Ex. 19 (May 30, 2014 filing in Dole) at 11. **DISPUTED because Dole simply indicated its intent to make this request at a future status conference.** *See* **Ex. 19, at 11 ("As an initial matter, at the further status conference in this matter, Dole Food will respectfully request that the Court enter…").**

363.   In a section of this filing titled "Plaintiffs' Response to Dole's False and Malicious Accusations," Mr. Collingsworth and Conrad & Scherer, LLP made the following representation to the California state court:

> Plaintiffs object to Dole's attempt to prejudice this Court by repeating scandalous and false accusations made regarding Plaintiffs' counsel by hostile and adverse parties. Making an accusation covered by litigation privilege is, unfortunately, extremely easy. The litigation process will demonstrate that, as Plaintiffs' counsel have demonstrated in the *Drummond* matter, and will demonstrate in the *Wichman* matter, the allegations that Plaintiffs' counsel made "payments" to witnesses is completely false and malicious. As Dole has improperly burdened the Court with unsupported and false allegations, Plaintiffs provide Attachment D hereto, which is a brief filed in the *Drummond* matter, ECF No. 68, that demonstrates that no "payments" were made to witnesses in that case.  Instead, due to the incredibly dangerous conditions in Colombia and credible death threats made to family members of ***three*** of the many witnesses in the *Drummond* matter, counsel provided security assistance to relocate the family members who were threatened with death immediately prior to scheduled depositions of those three witnesses.

Ex. 19 (Defendants' May 30, 2014 filing in Dole) at 12 (emphasis added). **UNDISPUTED.**

364.   At the time Defendants submitted this filing in the Dole case, every single witness who had testified in letters rogatory proceedings in *Balcero* against Drummond had received payments. Doc. 44-19; Ex. 7 (CS 11416); Doc. 44-13 (PLS 5020); Ex. 8 (CS_TC000179); Doc. 44-15 (PLS 5024-5025); Doc. 44-6; Doc. 174-8 (El Tigre and Samario payments) Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because the witnesses who testified in letters rogatory proceedings in *Balcero* did not themselves receive payments from the defendants. Further DISPUTED because it implies**

**that security assistance was somehow improper. Each of these witnesses' families required security payments because, after the witness provided a declaration, he or his family received serious, credible threats before giving their letters rogatory testimony.**

365.    Defendants' representation that they "provided security assistance" to "family members of three of the many witnesses in the *Drummond* matter" was intended to mislead the court into believing that only three witnesses had received payments.  Doc. 174-8 (El Tigre and Samario payments) Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED. Mr. Collingsworth has recently corrected this statement. *See* Exhibit J.**

366.    At the time Defendants represented to the California state court that they "provided security assistance" to "family members of three of the many witnesses in the *Drummond* matter," they intended to mislead the Court into believing that only three witnesses had received payments.  Doc. 174-8 (El Tigre and Samario payments) Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20.  **DISPUTED. Mr. Collingsworth has recently corrected this statement. *See* Exhibit J.**

367.    Defendants also knew that their representations in their November 7, 2013 filing with this Court (Doc. 68) were false, *see* Paragraphs 253-267, *supra*, yet they offered those false representations to the California state court in support of their grossly misleading representation that they "provided security assistance" to "family members of three of the many witnesses in the *Drummond* matter."  Doc. 174-8 (El Tigre and Samario payments) Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20.  **DISPUTED for the reasons set forth in Paragraph 253-267. Further DISPUTED because the representations were not "grossly misleading" and have been corrected.**

368.   On July 9, 2014, Defendants filed with Special Master Mike Brown "Defendants' Supplemental Memorandum on the Scope of the Crime-Fraud Exception to Privileged Materials."  Doc. 174-13. **UNDISPUTED.**

369.   The phrase "three witnesses" appears five times in "Defendants' Supplemental Memorandum on the Scope of the Crime-Fraud Exception to Privileged Materials."  Doc. 174-13 at 4 & 15. **UNDISPUTED.**

370.   "Defendants' Supplemental Memorandum on the Scope of the Crime-Fraud Exception to Privileged Materials" makes the following representation to this Court:

> The other supposed source of support for Drummond's continued allegation is documents Defendants *themselves* provided to Drummond in *Balcero* discovery. Defendants thoroughly have documented these "payments" were actually security assistance provided to relocate family members of three witnesses who received credible death threats attributable to Drummond before the witnesses were to testify against Drummond. Ex. 3 at 8-10; Ex. 4 ¶¶ 37-40, 42, 44. The three witnesses who received security assistance, Libardo Duarte, Jose Gelvez Albarracin, and Jairo Jesus Charris Castro, all first provided a written statement to either plaintiffs' counsel (Defendants herein) or the Colombian authorities.

Doc. 174-13 at 4-5 (emphasis in original). **UNDISPUTED.**

371.   At the time Defendants represented to this Court that "[t]he three witnesses who received security assistance" were "Libardo Duarte, Jose Gelvez Albarracin, and Jairo Jesus Charris Castro," Defendants had been making monthly payments to El Tigre and Samario for more than three years.  Doc. 174-8 (El Tigre and Samario payments); Ex. 1 (May 21, 2015 Hrg. Tr.) at 56:23-57:18. **UNDISPUTED that this was a mistake. It was an incomplete and incorrect statement.  Mr. Collingsworth apologizes for it.  He did not mean to deceive the court, and indeed it was supplemented.**

372.   At the time Defendants represented to this Court that "[t]he three witnesses who received security assistance" were "Libardo Duarte, Jose Gelvez Albarracin, and Jairo Jesus

Charris Castro," Defendants had offered, facilitated and confirmed at least three payments to Jaime Blanco, totaling in excess of $95,000. Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED. See the defendants' responses to interrogatories on January 9, 2014 as they relate to Blanco, as well as defendants' supplemental interrogatories on witness assistance payments provided in this case.**

373.    Defendants' representation to this Court that "[t]he three witnesses who received security assistance" were "Libardo Duarte, Jose Gelvez Albarracin, and Jairo Jesus Charris Castro" is false. Doc. 174-8 (El Tigre and Samario payments); Ex. 1 (May 21, 2015 Hrg. Tr.) at 56:23-57:18; Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED to the extent it implies defendants represented that <u>only</u> three witnesses received security assistance. Further DISPUTED because these three witnesses, or their families, did receive security assistance, which was disclosed to Drummond. But this was incomplete in light of the context. It was a mistake. It has been supplemented. Mr. Collingsworth did not intend to mislead the Court.**

374.    At the time Defendants represented to this Court that "[t]he three witnesses who received security assistance" were "Libardo Duarte, Jose Gelvez Albarracin, and Jairo Jesus Charris Castro," they knew this representation was false. Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED. This statement by Mr. Collingsworth was a mistake. It was incomplete and in that sense inaccurate. It has been supplemented. Mr. Collingsworth did not intend to mislead the Court. See also defendants' responses to interrogatories on January 9, 2015, and other supplementation by defendants of interrogatory responses.**

375.   "Defendants' Supplemental Memorandum on the Scope of the Crime-Fraud Exception to Privileged Materials" makes the following representation to this Court:

> Defendants have explained repeatedly they found it necessary to provide security and relocation assistance to three witnesses whose lives were threatened as a result of providing testimony against Drummond. Defendants documented how such assistance was provided only after each of the three witnesses first provided Defendants with a statement implicating Drummond in war crimes, Defendants produced those statements to Drummond during discovery, and then the witnesses and/or their families received credible death threats.

Doc. 174-13 at p. 19-20 of 27 (emphasis in original). **UNDISPUTED that this statement was made in the context of explaining that security payments to witnesses, or their families, was ethical.**

376.   At the time Defendants represented to this Court that they "provide[d] security and relocation assistance to three witnesses," Defendants had been making monthly payments to El Tigre and Samario for more than three years.  Doc. 174-8 (El Tigre and Samario payments); Ex. 1 (May 21, 2015 Hrg. Tr.) at 56:23-57:18. **DISPUTED as defendants did not make payments to El Tigre and Samario. Instead, security assistance was provided to the family member of El Tigre and Samario after they received death threats. Further DISPUTED to the extent Drummond's statement mischaracterizes the statement in the brief to imply that <u>only</u> three witnesses received payments.**

377.   At the time Defendants represented to this Court that they "provide[d] security and relocation assistance to three witnesses," Defendants had offered, facilitated and confirmed at least three payments to Jaime Blanco, totaling in excess of $95,000.  Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED. See defendants' responses to interrogatories dated January 9, 2015, which set forth the supplementation on this issue. Doc. 174-2.**

378.   Defendants' representation to this Court that they "provide[d] security and relocation assistance to three witnesses" is false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **UNDISPUTED that the statement was incomplete and therefore wrong.  DISPUTED that the statement was made with the intent to  mislead the Court.  The incomplete statement has been supplemented.**

379.   At the time Defendants represented to this Court that they "provide[d] security and relocation assistance to three witnesses," they knew this representation was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED. This was a mistake. It was incomplete, but not intentionally stated to mislead the Court. It has been supplemented.**

380.   On July 11, 2014, Defendants produced to Drummond a "Supplemental" privilege log.  Doc. 174-12 (Defs' July 11, 2014 "Supplemental" Privilege Log). **DISPUTED. The reason is that the document is was not titled "Supplemental." The privilege log was not dated. But, it is undisputed that a privilege log was provided during this time frame *See* Exhibit K (July 11, 2014 Email to T. Wells). But, it is not clear that the privilege log attached at Doc. 174-2 was a new privilege log or simply a compilation of one or more of the privilege logs enclosed with the July 11 email in Exhibit K.**

381.   Defendants' July 11, 2014 "Supplemental" privilege log did not include the July 19, 2012 email exchange between Albert van Bilderbeek and Mr. Collingsworth evidencing a $35,000 wire to Ivan Otero for the benefit of Jaime Blanco.  Doc. 174-12 (Defs' July 11, 2014 "Supplemental" Privilege Log); Doc. 174-20 at CS_TC 2827-2828. **UNDISPUTED that this document was not included on the July 11, 2014 privilege log, although there is no evidence**

**defendants were aware of its existence and deliberately withheld it from the log. Furthermore, this email was eventually logged and/or produced by the defendants in December 2014 after additional searches were performed and defendants' privilege log and documents production set supplemented.**

382.    Defendants' July 11, 2014 "Supplemental" privilege log did not include the September 16, 2011 email from Collingsworth to Ivan Otero relating to another payment to Jaime Blanco from Albert van Bilderbeek.  Doc. 174-12 (Defs' July 11, 2014 "Supplemental" Privilege Log); Doc. 174-20 at CS_TC001458 ("Dear Ivan, By now you should have received 2 packages.  Just to be clear, the one from the brothers you know what that is.").  **DISPUTED because this statement incorrectly states that the referenced email, CS_TC001458, was from Collingsworth to Otero. It was not, instead, it was from Collingsworth to Susana Tellez, who was a paralegal at Conrad & Scherer. UNDISPUTED that this email was mistakenly not included on the July 11, 2014 privilege log, although there is no evidence defendants were aware of its existence and deliberately withheld it from the log. Furthermore, this email was eventually logged and/or produced by the defendants in December 2014 after additional searches were performed and defendants' privilege log and documents production set supplemented.**

383.    Defendants' July 11, 2014 "Supplemental" privilege log did not include the May 22, 2011 email from Mr. Collingsworth to Bill Scherer (Conrad & Scherer, LLP's managing partner), Richard Drath (Conrad & Scherer, LLP's CFO), and lawyers at Parker Waichman, LLP, in which Mr. Collingsworth states that they will need to pay Samario and El Tigre $2,700 per month "at least until we get the deps in the can."  Doc. 174-12 (Defs' July 11, 2014 "Supplemental" Privilege Log); Doc. 174-8 (El Tigre and Samario payments). **UNDISPUTED**

that this email was not on the privilege log. Its absence from the log was the result of a mistake. But, defendants later supplemented their privilege log and production to fix this mistake in December 2014 after additional searches were performed and defendants' privilege log and documents production set supplemented. **DISPUTED because it mischaracterizes Mr. Collingsworth's statement, which was "Gave Ivan $5,400 for security costs for him, ET, and Samario. Need to pay $2,700 per month to maintain until we get deps in the can, and depending on what happens, may need to do more for the families." Doc. 174-6, at 2-3. Further DISPUTED because this email was not sent "to" Bill Scherer and Richard Drath, who were only "cc" recipients of it.**

384.     Defendants' July 11, 2014 "Supplemental" privilege log did not include the April 20, 2011 email setting up the monthly payments to Samario and El Tigre.  Doc. 174-12 (Defs' July 11, 2014 "Supplemental" Privilege Log); Doc. 174-8 (El Tigre and Samario payments). **UNDISPUTED that this email was not on the privilege log. Its absence from the log was the result of a mistake. But, defendants later supplemented their privilege log and production to fix this mistake in December 2014 after additional searches were performed and defendants' privilege log and documents production set supplemented. DISPUTED because the April 20, 2011 email, located at Doc. 174-5, does not "set[] up the monthly payments to Samario and ET." Instead, the email establishes a recurring monthly payment "to Ivan Otero, for security." Doc. 174-5, at 2 (CS_TC000001).**

385.     On July 18, 2014, Defendants filed with Special Master Mike Brown "Defendants' Reply Memorandum on the Scope of the Crime-Fraud Exception to Privileged Materials."  Doc. 174-14. **UNDISPUTED.**

386.    The phrase "three witnesses" appears nine times in "Defendants' Reply Memorandum on the Scope of the Crime-Fraud Exception to Privileged Materials."  Doc. 174-14 at i, 2, 6, 7 & 8. **UNDISPUTED.**

387.    "Defendants' Reply Memorandum on the Scope of the Crime-Fraud Exception to Privileged Materials" makes the following representation to this Court:

> But the only thing fraudulent about Defendants' provision of security assistance to persons threatened with death by Drummond representatives is Drummond's false and misleading rendition of the record facts. Defendants previously documented, based on documents they disclosed in discovery in *Balcero,* that they provided security assistance to *relocate family members* of *three* witnesses, Libardo Duarte, Jose Gelvez Albarracin, and Jairo Jesus Charris Castro.

Doc. 174-14 at 2 (emphasis in original). **UNDISPUTED.**

388.    At the time Defendants represented to this Court that they "previously documented, based on documents they disclosed in discovery in *Balcero,* that they provided security assistance to *relocate family members* of *three* witnesses, Libardo Duarte, Jose Gelvez Albarracin, and Jairo Jesus Charris Castro," Defendants had been making monthly payments to El Tigre and Samario for more than three years.  Doc. 174-8 (El Tigre and Samario payments); Ex. 1 (May 21, 2015 Hrg. Tr.) at 56:23-57:18. **UNDISPUTED that security assistance payments had been made to the families of El Tigre and Samario. DISPUTED as defendants did not make payments to El Tigre and Samario. To the extent that this statement was incomplete as to the number of total families of witnesses receiving relocation payments, and incomplete in at least providing the factual context of the payments by Albert van Bilderbeek, that was a mistake. It has been corrected by supplementing the record.   It was not made to mislead the Court**

389.    At the time Defendants represented to this Court that they "previously documented, based on documents they disclosed in discovery in *Balcero,* that they provided security assistance to ***relocate family members*** of ***three*** witnesses, Libardo Duarte, Jose Gelvez Albarracin, and Jairo Jesus Charris Castro," Defendants had offered, facilitated and confirmed at least three payments to Jaime Blanco, totaling at least $95,000.  Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED.  See the defendants' responses to interrogatories dated January 9, 2015, and other supplemental interrogatory responses provided in this case.**

390.    Defendants' representation to this Court that they "previously documented, based on documents they disclosed in discovery in *Balcero,* that they provided security assistance to ***relocate family members*** of ***three*** witnesses, Libardo Duarte, Jose Gelvez Albarracin, and Jairo Jesus Charris Castro" is false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-20. **DISPUTED to the extent that the statement was correct in a literalist, technical sense that Conrad & Scherer had directly provided witness assistance payments to only three witnesses. But it was incomplete to the extent it implied that was all in terms of direct or indirect witness assistance payments. Furthermore, that response was supplemented after the Court's October 15, 2014 broad order on production or logging of witness assistance payment documents.**

391.    At the time Defendants represented to this Court that they "previously documented, based on documents they disclosed in discovery in *Balcero,* that they provided security assistance to ***relocate family members*** of ***three*** witnesses, Libardo Duarte, Jose Gelvez Albarracin, and Jairo Jesus Charris Castro," they knew this representation was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-20. **DISPUTED. *See supra* Resp. ¶ 391.**

392.    "Defendants' Reply Memorandum on the Scope of the Crime-Fraud Exception to Privileged Materials" also makes the following representation to this Court:

> Defendants fully complied with their discovery obligations in *Balcero,* producing evidence of the assistance provided to relocate families of threatened witnesses when, but not before, they were required to do so.

Doc. 174-14 at 3. **UNDISPUTED.**

393.    At the time Defendants represented to this Court that they had "fully complied with their discovery obligations in *Balcero*," Defendants had not disclosed the payments to Samario, El Tigre or Blanco.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **UNDISPUTED that defendants did not disclose in *Balcero* payments made to Blanco or payments made to the families of El Tigre and Samario, because there was not request in *Balcero* that would have captured such payments. DISPUTED to the extent the phrase "had not disclosed" implies that defendants were in possession of other responsive documents and were simply not producing them. Further DISPUTED because no payments were made "to" the witnesses identified here. Further DISPUTED the representation does not purport to identify particular witnesses and, therefore, the suggestion that this representation was false is not correct.**

394.    Defendants' representation to this Court that they had "fully complied with their discovery obligations in *Balcero*" is false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-20. **DISPUTED.**

395.    At the time Defendants represented to this Court that they had "fully complied with their discovery obligations in *Balcero*," they knew that representation was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-20. **DISPUTED.  To the extent objections had**

133

been made in the *Balcero* litigation, Collingsworth felt it was correct. He certainly did not intend to mislead the Court. But in the libel case, the statement was incomplete to the extent that it did not mention indirect witness assistance through Otero or by the Bilderbeeks. That was a mistake, particularly given that it would have made no difference if disclosed and would have avoided the innuendo of failure to disclose. That has been supplemented.

396.    "Defendants' Reply Memorandum on the Scope of the Crime-Fraud Exception to Privileged Materials" makes the following representation to this Court:

> In an amazing showing of audacity, Drummond's counsel, in accusing Mr. Collingsworth of fraud on the Court, is itself attempting to mislead the Court. The objective record of the disclosure of the documents reflecting security assistance clearly shows Defendants complied in good faith with their discovery obligations in *Balcero*.

Doc. 174-14 at 4. **UNDISPUTED.**

397.    At the time Defendants represented to this Court that "[t]he objective record of the disclosure of the documents reflecting security assistance clearly shows Defendants complied in good faith with their discovery obligations in *Balcero*," Defendants had not disclosed the payments to Samario, El Tigre or Blanco.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED. To the extent objections had been made in the *Balcero* litigation, Collingsworth felt it was correct. He certainly did not intend to mislead the Court.  But in the libel case, the statement was incomplete to the extent that it did not mention indirect witness assistance through Otero or by the Bilderbeeks. That was a mistake, particularly given that it would have made no difference if disclosed and would have avoided the innuendo of failure to disclose.  That has been supplemented.**

398.    Defendants' representation to this Court that "[t]he objective record of the disclosure of the documents reflecting security assistance clearly shows Defendants complied in good faith with their discovery obligations in *Balcero*" is false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-20. **DISPUTED.  To the extent objections had been made in the *Balcero* litigation, Collingsworth felt it was correct. He certainly did not intend to mislead the Court.  But in the libel case, the statement was incomplete to the extent that it did not mention indirect witness assistance through Otero or by the Bilderbeeks. That was a mistake, particularly given that it would have made no difference if disclosed and would have avoided the innuendo of failure to disclose.  That has been supplemented.**

399.    At the time Defendants represented to this Court that "[t]he objective record of the disclosure of the documents reflecting security assistance clearly shows Defendants complied in good faith with their discovery obligations in *Balcero*," they knew that representation was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-20. **DISPUTED.**

400.    "Defendants' Reply Memorandum on the Scope of the Crime-Fraud Exception to Privileged Materials" also makes the following representation to this Court:

> Even if there are competing expert views regarding this issue, there is no question Defendants' position in providing security relocation assistance to endangered family members of three witnesses is well-supported and cannot, by any stretch, be labeled a crime or fraud.

Doc. 174-14 at n.2. **UNDISPUTED.**

401.    At the time Defendants represented to this Court that "there is no question Defendants' position in providing security relocation assistance to endangered family members of three witnesses is well-supported and cannot, by any stretch, be labeled a crime or fraud," Defendants had not disclosed the payments to Samario, El Tigre or Blanco.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2)

at pp. 4-8; Doc. 174-20. **UNDISPUTED that payments made to Blanco or payments made to the families of El Tigre and Samario had not been disclosed. DISPUTED to the extent the phrase "had not disclosed" implies that defendants were in possession of other responsive documents and were simply not producing them. Instead, Mr. Collingsworth simply made a mistake in parsing discovery requests too finely. But, when the Court issued its October 15, 2014 Order clarifying and broadening the scope of discovery, Mr. Collingsworth and Conrad & Scherer supplemented any and all discovery responses and privilege logs necessary to fix the problem and come into complaint with the Court's Order. Further DISPUTED because no payments were made "to" the witnesses identified here by the defendants.**

402. Defendants' representation to this Court that "there is no question Defendants' position in providing security relocation assistance to endangered family members of three witnesses is well-supported and cannot, by any stretch, be labeled a crime or fraud" was intended to mislead the Court into believing that only three witnesses had received payments. Doc. 174-8 (El Tigre and Samario payments); Doc. 174-20. **DISPUTED.**

403. "Defendants' Reply Memorandum on the Scope of the Crime-Fraud Exception to Privileged Materials" also makes the following representation to this Court:

> Drummond's complaint it received the documents after the depositions of *the three witnesses* whose families were relocated, and that this was part of Defendants' concealment plan, *id.* at 5-9, is not only false, but is revealed to be the product of Drummond's failure to request such information sooner. If Drummond really thinks it needs to examine further *the three witnesses* whose family members were threatened, the remedy is to use this proceeding to take their depositions.

Doc. 174-14 at p. 12 of 27 (emphasis added). **UNDISPUTED.**

404.    At the time Defendants represented to this Court that there were "three witnesses" "whose families were relocated [and] whose family members were threatened," Defendants had not disclosed the payments to Samario, El Tigre or Blanco.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **UNDISPUTED that payments made to Blanco or payments made to the families of El Tigre and Samario had not been disclosed. Instead, Mr. Collingsworth simply made a mistake in parsing discovery requests too finely. Mr. Collingsworth had no intent to deceive Drummond or the Court. And, when the Court issued its October 15, 2014 Order clarifying and broadening the scope of discovery, Mr. Collingsworth and Conrad & Scherer supplemented any and all discovery responses and privilege logs necessary to fix the problem and come into compliance with the Court's Order. Further DISPUTED because Defendants made no payments directly "to" the witnesses identified here.**

405.    Defendants' representation to this Court that that there were "three witnesses whose families were relocated" and "whose family members were threatened," is false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-20. **DISPUTED to the extent it implies defendants represented that only three witnesses received security assistance. Further DISPUTED because these three witnesses, or their families, did receive security assistance, which was disclosed to Drummond.** *See supra* **Resp. ¶ 404.**

406.    At the time Defendants represented to this Court that that there were "three witnesses whose families were relocated" and "whose family members were threatened," they knew that representation was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-20. **DISPUTED because the representation was not false.** *See supra* **Resp. ¶ 404.**

137

407.    On July 18, 2014, Mr. Collingsworth signed a declaration under penalty of perjury which Defendants submitted in support of "Defendants' Reply Memorandum on the Scope of the Crime-Fraud Exception to Privileged Materials." Ex. 20 (July 18, 2014 Collingsworth Decl.). **UNDISPUTED.**

408.    In Paragraph 5 of Mr. Collingsworth's July 18, 2014 sworn declaration, he testified as follows:

> On January 11, 2013, after a series of meet and confers, the *Balcero* plaintiffs produced the documentation of funds provided to *relocate the family members of three witnesses*, Libardo Duarte ("Duarte"), Jose Gelvez Albarracin ("Gelvez"), and Jairo Jesus Charris Castro ("Charris"), because they received serious death threats.

Ex. 20 (July 18, 2014 Collingsworth Decl.) ¶ 5 (emphasis in original). **UNDISPUTED.**

409.    At the time Mr. Collingsworth testified that "the *Balcero* plaintiffs produced the documents of funds provided to *relocate the family members of three witnesses*, Libardo Duarte ("Duarte"), Jose Gelvez Albarracin ("Gelvez"), and Jairo Jesus Charris Castro ('Charris')," Defendants had been making monthly payments to El Tigre and Samario for more than three years.  Doc. 174-8 (El Tigre and Samario payments); Ex. 1 (May 21, 2015 Hrg. Tr.) at 56:23-57:18. **DISPUTED as defendants did not make payments directly to El Tigre and Samario. Otherwise UNDISPUTED, however, to the extent Drummond's statement, taken in isolation and out of context, implies that defendants represented only three witnesses received payments. Witness assistance payments had been made to the families of El Tigre and Samario for more than three years.**

410.    At the time Mr. Collingsworth testified that "the *Balcero* plaintiffs produced the documents of funds provided to *relocate the family members of three witnesses*, Libardo Duarte ("Duarte"), Jose Gelvez Albarracin ("Gelvez'), and Jairo Jesus Charris Castro ('Charris'),"

Defendants had offered, facilitated and confirmed at least three payments to Jaime Blanco, totaling in excess of $95,000.  Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED to the extent it conflicts with Mr. Collingsworth's explanation of his involvement with Blanco.** *See* **Doc. 174-2, at 4-6.**

411.    Mr. Collingsworth's sworn testimony that "the *Balcero* plaintiffs produced the documents of funds provided to *relocate the family members of three witnesses*, Libardo Duarte ("Duarte"), Jose Gelvez Albarracin ("Gelvez'), and Jairo Jesus Charris Castro ('Charris')," was intended to mislead the Court into believing that only three witnesses had received payments. Doc. 174-8 (El Tigre and Samario payments); Doc. 174-20. **DISPUTED. In fact, defendants have provided information to the Court, and Drummond, clarifying that the families of more than three witnesses received security assistance. Mr. Collingsworth did not intend to mislead the Court.**

412.    On July 23, 2014, Special Master Mike Brown held a hearing and the parties presented oral argument on the crime-fraud exception.  Ex. 21 (July 23, 2014 Hrg. Tr.). **UNDISPUTED.**

413.    Mr. Collingsworth was present at this July 23, 2014 hearing.  Ex. 21 (July 23, 2014 Hrg. Tr.). **UNDISPUTED.**

414.    Neither Mr. Collingsworth nor Defendants' counsel attempted to correct Mr. Collingsworth's representations that he made in open court on April 14, 2014 that "exactly three" witnesses in *Balcero* had been paid.  *See* Ex. 21 (July 23, 2014 Hrg. Tr.). **DISPUTED to the extent it implies that Mr. Collingsworth's prior statement was raised or even material to the topics discussed at the July 23 hearing, such that the opportunity to correct that**

**statement presented itself. Further DISPUTED because the representation has been corrected by Mr. Collingsworth.**

415.    Defendants and their counsel continued to represent to this Court that they had disclosed all of their witness payments to only "three witnesses."  *See* Ex. 21 (July 23, 2014 Hrg. Tr.) at 33 ("They are making the argument that they weren't disclosed. But when you look at their argument more closely, it's an argument of timeliness. [. . .] Now each one of these three witnesses were on record giving declarations about Drummond's relationship with the AUC prior to any security payment."). **DISPUTED because it implies that defendants repeated that "only" three witnesses had received security payments. Further DISPUTED because this statement was made in the context of responding to Drummond's crime-fraud arguments, for which the number of witnesses was not material.**

416.    Defendants' briefing on the crime-fraud exception, as well as the arguments made by Defendants' counsel at the July 23, 2014 hearing, led the Court to believe that Defendants were representing that they had disclosed all of their witness payments:

> **SPECIAL MASTER:** When I first showed up in this case and we had this hearing in July of last year, it was even told to me, I mean, the briefs were very clear to me that only three witnesses had been paid and you know, there were several statements. And that day I will say, I mean, Brad was not here solo.  Mr. Collingsworth was here. You know, there was not any -- there was [a] consistent theme of we've given you everything.

Ex. 22 (March 24, 2015 Hrg. Tr.) at 137:25-138:10. **DISPUTED as the transcript speaks for itself and this is an improper attempt to characterize opinion testimony as a "fact."**

417.    On August 14, 2014, Drummond wrote Defendants a letter regarding Defendants' document productions dated May 22 and 27, 2014, containing many documents which, had they not been redacted, would have revealed the $2,700 monthly payments to Ivan Otero for the benefit of El Tigre and Samario.  Doc. 174-15 (Aug. 14, 2014 Wells Ltr.). **DISPUTED that any**

**documents referenced in Drummond's August 14 letter, or any documents in the production set to which this letter was responding, revealed that payments to Otero were "for the benefit" of El Tigre and Samario.**

418.    Drummond's August 14, 2014 letter asked Defendants to "explain what has been redacted, including whether any of portions of the redacted emails, bank statements, and other documents produced on May 22nd and May 27th relate to payments to Colombian paramilitaries or other witnesses, as well as whether they relate to any money spent or received in connection with Defendants' pursuit of litigation against Drummond."  Doc. 174-15 (Aug. 14, 2014 Wells Ltr.) at p. 3. **UNDISPUTED.**

419.    Under many of the redactions in Defendants' May 22 and 27, 2014 document production was evidence of Defendants' payments to El Tigre and Samario.  Doc. 174-8 (El Tigre and Samario payments); Docs. 174-10, 174-11, 174-18 & 174-19. **DISPUTED because defendants did not make payments to El Tigre and Samario. Further DISPUTED because the redactions covered payments to Otero, with no indication other than "security" as to what the payments were for.**

420.    Defendants never responded to Drummond's August 14, 2014 letter. **DISPUTED because the issues raised by Drummond were subsequently addressed in later correspondence and before the Special Master.**

421.    On September 2, 2014, Drummond and Parker Waichman, LLP entered into a stipulation whereby Parker Waichman, LLP agreed to produce documents it was withholding on a claim of privilege in response to Drummond's subpoena to Special Master Mike Brown for *in camera* review.   Doc. 174-16 (Sept. 2, 2014 Stipulation Withdrawing Motion to Compel). **UNDISPUTED.**

422.    On September 12, 2014, Defendants' counsel sent a letter to Drummond's counsel regarding Drummond's written discovery requests.   Ex. 23 (Sept. 12, 2014 B. Smith Ltr.). **UNDISPUTED.**

423.    Defendants also sent this letter to Special Master Mike Brown.   Ex. 23 (Sept. 12, 2014 B. Smith Ltr.). **DISPUTED that this letter was "sent . . . to" the Special Master, who was merely one of six other people copied on the email correspondence transmitting this letter (which was addressed solely to Mr. Wells).**

424.    In their September 12, 2014 letter, Defendants made the following representation:

> Defendants are not in possession of documents referencing payments to witnesses involving Llanos Oil or its principals that are requested in Drummond's 1st RFP No. 62 and 63.

Ex. 23 (Sept. 12, 2014 B. Smith Ltr.) at 4. **UNDISPUTED.**

425.    At the time Defendants represented that "Defendants are not in possession of documents referencing payments to witnesses involving Llanos Oil or its principals," Defendants were in possession of multiple documents which reflect that Mr. Collingsworth offered, facilitated and confirmed at least three payments to Jaime Blanco from Albert van Bilderbeek – a principal of Llanos Oil.  Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED as there is no evidence in that Otero delivered all or part of any payment from Albert van Bilderbeek to Blanco. Further DISPUTED to the extent it implies any payments were actually confirmed as being made to Blanco.**

426.    Defendants' representation on September 12, 2014 that they "are not in possession of documents referencing payments to witnesses involving Llanos Oil or its principals" is false.  Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because it omits important limiting language in the request**

itself, to which defendants' counsel was specifically responding. Drummond's RFP 1-62, referenced by defendants' counsel, states IN FULL: "From January 1, 2000 to present, all documents evidencing any type of payment <u>from Llanos Oil or any of its principals</u>, representatives, agents or employees <u>to Defendants</u>." (emphasis added). Therefore, documents evidencing payments by Llanos Oil, or its principals, to Otero are not within the scope of this request, since Otero was not a "Defendant." Drummond's RFP 1-63, also referenced by defendants' counsel, was identical to 1-62, except it sought payments "from Defendants . . . to Llanos Oil or any of its principles."

427.    At the time Defendants made the representation that they "are not in possession of documents referencing payments to witnesses involving Llanos Oil or its principals," they knew that representation was false. Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED because the representation was not false.**

428.    In their September 12, 2014 letter, Defendants made the following representation:

> Defendants will supplement its [sic] interrogatory response to Drummond's 3rd Interrogatory No. 2 which relate [sic] to discussion of Jaime Blanco's legal fees. As you are aware, there were discussions related to assistance with criminal defense attorneys' [sic] because of additional legal fees directly related to Blanco's testimony in the human rights cases. There are no further discussions related to the payment of legal fees associated with any litigation involving Drummond.

Ex. 23 (Sept. 12, 2014 B. Smith Ltr.) at 5. **UNDISPUTED.**

429.    At the time Defendants represented that "[t]here are no further discussions related to the payment of legal fees associated with any litigation involving Drummond," Defendants were in possession of multiple documents which reflect that Mr. Collingsworth offered, facilitated and confirmed at least three payments to Jaime Blanco from Albert van Bilderbeek. Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20.

**DISPUTED as there is no evidence in that Otero delivered all or part of any payment from Albert van Bilderbeek to Blanco. Further DISPUTED to the extent it implies any payments were actually confirmed as being made to Blanco.**

430.   Defendants' representation on September 12, 2014 that they "[t]here are no further discussions related to the payment of legal fees associated with any litigation involving Drummond" is false.  Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED as the statement is ambiguous as to whether it is referring to Blanco's legal fees, or legal fees for others.**

431.   At the time Defendants made the representation that they "[t]here are no further discussions related to the payment of legal fees associated with any litigation involving Drummond," they knew that representation was false.  Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20.  **DISPUTED because the statement is ambiguous, not false.**

432.   In their September 12, 2014 letter, Defendants made the following representation:

> Defendants have done its [sic] best to produce or log all responsive documents which evidence or refer to security payments to witnesses associated with the human rights cases against Drummond.

Ex. 23 (Sept. 12, 2014 B. Smith Ltr.) at 5. **UNDISPUTED.**

433.   At the time Defendants represented that they "have done its [sic] best to produce or log all responsive documents which evidence or refer to security payments to witnesses associated with the human rights cases against Drummond," Defendants were in possession numerous documents which reflected payments to Samario, El Tigre and Blanco that had neither been produced nor logged.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-20.

**DISPUTED because payments were not made by defendants "to" Samario, El Tigre, or Blanco.**

434.    For example, Defendants had neither produced nor logged the May 22, 2011 email from Mr. Collingsworth to Bill Scherer (Conrad & Scherer, LLP's managing partner), Richard Drath (Conrad & Scherer, LLP's CFO), and lawyers at Parker Waichman, LLP, in which Mr. Collingsworth states that they will need to pay Samario and El Tigre $2,700 per month "at least until we get the deps in the can."  Doc. 174-8 (El Tigre and Samario payments).

**DISPUTED because it mischaracterizes Mr. Collingsworth's statement, which was "Gave Ivan $5,400 for security costs for him, ET, and Samario. Need to pay $2,700 per month to maintain until we get deps in the can, and depending on what happens, may need to do more for the families." Doc. 174-6, at 2-3. Further DISPUTED because this email was not sent "to" Bill Scherer and Richard Drath, who were only "cc" recipients of it.**

435.    At the time Defendants represented that they "have done its [sic] best to produce or log all responsive documents which evidence or refer to security payments to witnesses associated with the human rights cases against Drummond," Defendants had also previously produced documents that had been redacted to hide their payments to Samario and El Tigre. Docs. 174-10, 174-11, 174-18 & 174-19. **DISPUTED because the redactions did not reflect payments "to" Samario or El Tigre. Further DISPUTED because there is no evidence the redactions were made "to hide" the information redacted.**

436.    Defendants' representation that they "have done its [sic] best to produce or log all responsive documents which evidence or refer to security payments to witnesses associated with the human rights cases against Drummond" is false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-20; Docs. 174-10, 174-11, 174-18 & 174-19. **DISPUTED.**

437.   At the time Defendants represented that they "have done its [sic] best to produce or log all responsive documents which evidence or refer to security payments to witnesses associated with the human rights cases against Drummond," they knew this representation was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-20; Docs. 174-10, 174-11, 174-18 & 174-19. **DISPUTED. As explained in the declaration of Bill Scherer, managing partner of Conrad & Scherer, brought in a new legal team to ensure that the firm was in compliance with all discovery orders. Doc. 187-4, ¶ 14.**

438.   On September 23, 2014, Conrad & Scherer, LLP filed a brief and exhibits in a Florida state court proceeding styled *Conrad & Scherer, LLP v. William J. Wichmann, et al.*, Case No. 09-011600(5) (In the Circuit Court of the 17th Judicial Circuit In and For Broward County, Florida).  Ex. 24 (Sept. 23, 2014 Conrad & Scherer filing). **UNDISPUTED.**

439.   Included that filing were the sworn affidavits of Bill Scherer and Mr. Collingsworth, which Conrad & Scherer, LLP represented would "demonstrate privilege and provide additional explanation."  Ex. 24 (Sept. 23, 2014 Conrad & Scherer filing) at p. 1 of 325. **UNDISPUTED.**

440.   Mr. Collingsworth's affidavit is dated August 12, 2014, and is signed under penalty of perjury.  Ex. 24 (Sept. 23, 2014 Conrad & Scherer filing) at pp. 151-163 of 325. **UNDISPUTED.**

441.   In Paragraph 19 of his August 12, 2014 declaration, Mr. Collingsworth testified as follows:

> [T]he sole promise I made to any witness in *Balcero* case that if they testified and they or a family member received a credible death threat, we would do whatever we could to provide security or to provide a safe haven until such time as the danger subsided.

Ex. 24 (Sept. 23, 2014 Conrad & Scherer filing) at p. 155 of 325. **UNDISPUTED.**

442.     At the time Mr. Collingsworth signed this declaration, he had already offered, facilitated and confirmed at least three payments to Jaime Blanco from Albert van Bilderbeek that had nothing to do with security.  Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **UNDISPUTED that Mr. Collingsworth confirmed these payments, in unspecified amounts, were made by Albert van Bilderbeek to Otero. DISPUTED because Mr. Collingsworth did not "offer" or "facilitate" these payments, nor did he know whether, and how much, of these payments were delivered to Blanco. Further DISPUTED because the phrase "security" is ambiguous.**

443.     Mr. Collingsworth's testimony regarding the "sole promise" he made to "any witness in the *Balcero* case" is false.  Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED. Mr. Collingsworth did not make any "promise" to Blanco regarding assistance for his criminal legal fees. Instead, "Mr. Collingsworth raised the possibility that Mr. Albert Van Bilderbeek of the Netherlands might be interested in assisting Mr. Blanco with his attorney's fees. . . . In that conversation, Mr. Blanco also asked Mr. Collingsworth if Conrad & Scherer would assist Mr. Blanco in paying attorney's fees related to his criminal defense. At that time, Mr. Blanco was facing criminal charges related to the murder of the Drummond mine union leaders near La Loma, in Cesar Province, Colombia. Mr. Collingsworth communicated to Mr. Blanco that Mr. Collingsworth thought that Albert Van Bilderbeek would assist Mr. Blanco with funds towards his attorney's fees if Mr. Blanco was able to investigate the facts regarding Drummond's illegal acquisition of the Llanos Oil Company's oil concession in Colombia and provide that information to Mr. Van Bilderbeek." Document 174-2, at 4-5.**

444.    At the time he signed his August 12, 2014 declaration, Mr. Collingsworth knew that his testimony regarding the "sole promise" he made to "any witness in the *Balcero* case" was false.  Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED as the testimony is not false.** *See supra* **Resp. ¶ 443.**

445.    At the time Conrad & Scherer, LLP offered Mr. Collingsworth testimony regarding the "sole promise" he made to "any witness in the *Balcero* case," it knew this testimony was false.  Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED as the testimony is not false.** *See supra* **Resp. ¶ 443. Further DISPUTED as there is no evidence Conrad & Scherer knew it was false.**

446.    In Paragraphs 20 through 26 of his August 12, 2014 declaration, Mr. Collingsworth testified regarding Defendants' payments to Charris, Duarte, Gelvez, Halcon and Claudia Balcero.  Ex. 24 (Sept. 23, 2014 Conrad & Scherer filing) at pp. 155-158 of 325. **UNDISPUTED.**

447.    In Paragraph 26 of his August 12, 2014 declaration, Mr. Collingsworth testified that Claudia Balcero was the "final individual who received security measures."  Ex. 24 (Sept. 23, 2014 Conrad & Scherer filing) at p. 158 of 325. **UNDISPUTED.**

448.    At the time Mr. Collingsworth signed his August 12, 2014 declaration and testified that Charris, Duarte, Gelvez, Halcon and Claudia Balcero were the only people who were paid, Defendants had been making monthly payments to Samario and El Tigre for more than three years, and had offered, facilitated and confirmed at least three payments to Jaime Blanco from Albert van Bilderbeek.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-20. **DISPUTED because it mischaracterizes the testimony, as Mr. Collingsworth did not say the five people identified here "were the only people" who received any security assistance.**

Further DISPUTED because "Defendants" had not made any payments "to" Samario or El Tigre. Further DISPUTED because there is no evidence in that Otero delivered all or part of any payment from Albert van Bilderbeek to Blanco, or that "Defendants" confirmed any such payments. Further DISPUTED to the extent it implies that Conrad & Scherer was aware of these payments. *See* Doc. 231-11, at 44 of 80 (Conrad & Scherer response); Doc. 174-2, at 6-7 (Conrad & Scherer response).

449.    Mr. Collingsworth's August 12, 2014 declaration testimony that Charris, Duarte, Gelvez, Halcon and Claudia Balcero were the only people who were paid was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-20. **DISPUTED because it mischaracterizes the testimony, as Mr. Collingsworth did not say the five people identified here "were the only people" who received any security assistance.**

450.    At the time Mr. Collingsworth signed his August 12, 2014 declaration, he knew this testimony was false.  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-20. **DISPUTED as the testimony was not false.**

451.    At the time Conrad & Scherer, LLP submitted Mr. Collingsworth's August 12, 2014 declaration to the Florida state court, it knew that Mr. Collingsworth's testimony was false. Doc. 174-8 (El Tigre and Samario payments); Doc. 174-20. **DISPUTED as the testimony was not false.**

452.    On or about October 9, 2014, Parker Waichman, LLP produced the documents listed on its privilege logs to Special Master Mike Brown. **UNDISPUTED.**

453.    Included in those documents was the May 22, 2011 email from Mr. Collingsworth to Bill Scherer (Conrad & Scherer, LLP's managing partner), Richard Drath (Conrad & Scherer, LLP's CFO), and lawyers at Parker Waichman, LLP, in which Mr. Collingsworth states that they

will need to pay Samario and El Tigre $2,700 per month "at least until we get the deps in the can."  Doc. 174-8 (El Tigre and Samario payments); Doc. 174-17 (Parker Waichman, LLP Privilege Log) at 5.  **UNDISPUTED that this document was in Parker Waichman's document production set to the Special Master. DISPUTED because it mischaracterizes Mr. Collingsworth's statement, which was "Gave Ivan $5,400 for security costs for him, ET, and Samario. Need to pay $2,700 per month to maintain until we get deps in the can, and depending on what happens, may need to do more for the families." Doc. 174-6, at 2-3. Further DISPUTED because this email was not sent "to" Bill Scherer and Richard Drath, who were only "cc" recipients of it.**

454.    On November 17, 2014, Defendants produced documents, including the above May 22, 2011 email, which revealed their payments to El Tigre and Samario.  Doc. 174-8 (El Tigre and Samario payments).  **UNDISPUTED. But, DISPUTED it mischaracterizes Mr. Collingsworth's statement in the May 22, 2011 email, which is not included in Doc. 174-8. Mr. Collingsworth's statement was, "Gave Ivan $5,400 for security costs for him, ET, and Samario. Need to pay $2,700 per month to maintain until we get deps in the can, and depending on what happens, may need to do more for the families."**

455.    They also re-produced documents that had been previously produced in May 2014, but this time with the redactions of the $2,700 monthly payments removed.  Docs. 174-10, 174-11, 174-18 & 174-19. **UNDISPUTED.**

456.    On November 24, 2014, Defendants served amended interrogatory answers concerning their payments to witnesses.  While they disclosed that El Tigre and Samario had been paid, they swore that Jaime Blanco had merely requested a payment but that he had not been paid.  Doc. 174-7 (Defs' Am. Resp. to Drummond's 3rd Interrogatories, No. 2) at 11-12.

DISPUTED that defendants swore that Blanco "had not been paid." This interrogatory response explains that Blanco made a request for payment from the defendants. It is silent on the issue of whether Blanco ever received payments from a third party.

457.    At the time they signed these sworn interrogatory answers, Defendants knew that the answer concerning Jaime Blanco was false.  Doc. 174-20. **DISPUTED.**

458.    On January 9, 2015, Defendants produced documents and served their Second Amended Response to Drummond's Third Interrogatories No. 2, which revealed the payments to Jaime Blanco.  Doc. 174-2 (Defs' 2nd Am. Resp. to Drummond's 3rd Irogs, No. 2) at pp. 4-8; Doc. 174-20. **DISPUTED to the extent it implies this interrogatory response identified actual payments; it does not. Instead, it recites Mr. Collingsworth's understanding that one payment was made.**

### *Global Findings of Fact Regarding Defendants' Witness Payment Misrepresentations*

459.    This Court warned Defendants on multiple occasions of the seriousness of the situation and its concern regarding Defendants' witness payments.  *See* Doc. 63 (Oct. 10, 2013 Hrg. Tr.) at 45:23-46:12, 84:4-85:16; Doc. 105 (Apr. 3, 2014 Text Order); Doc. 123 (Apr. 21, 2014 Hrg. Tr.) at 19:6-16, 37:3-4. **UNDISPUTED.**

460.    Defendants repeatedly and intentionally misrepresented the scope and extent of their payments to witnesses in pleadings, interrogatory responses, sworn declarations, correspondence with the opposing party, and in open court. **DISPUTED.**

461.    Defendants misrepresented the scope and extent of payments to witnesses by their litigation team more than 50 times. **DISPUTED.**

462. Mr. Collingsworth submitted multiple sworn declarations signed under penalty of perjury to this and other Courts that contain knowingly false testimony, misrepresenting the scope and extent of their payments to witnesses. **DISPUTED.**

463. At the time Defendants made their misrepresentations regarding the scope and extent of their payments to witnesses, they knew those representations were false. **DISPUTED.**

464. On October 10, 2013, this Court made verbal discovery orders in open court pertaining to the production of documents that reflected Defendants' witness payments. **DISPUTED.**

465. On October 15, 2013, this Court entered a written discovery order that required Defendants to disclose documents and information reflecting the fact of payments to witnesses. Doc. 64 (Oct. 15, 2013 Order) at 2-3. **DISPUTED.**

466. Defendants repeatedly and willfully violated this Court's October 10th and October 15th discovery orders by refusing to produce responsive documents in their possession, custody and control, and then misrepresenting the existence of those documents for more than a year. **DISPUTED.**

467. Defendants' repeated misrepresentations regarding their witness payments were made with the intent to obstruct and delay the enforcement of this Court's orders. **DISPUTED.**

468. Defendants' misrepresentations regarding their witness payments were made in bad faith and with the intent to disrupt this litigation. **DISPUTED.**

469. Defendants' misrepresentations regarding their witness payments constitute a fraud on the Court. **DISPUTED.**

470. Defendants intentionally and improperly altered evidence by redacting portions of documents that reflected their witness payments. **DISPUTED.**

471.    Defendants' alteration of evidence was done in bad faith and with the intent to obstruct and delay the enforcement of this Court's orders. **DISPUTED.**

472.    Defendants' alteration of evidence was done in bad faith and with the intent to disrupt this litigation. **DISPUTED.**

473.    Defendants' alteration of evidence constitutes a fraud on the Court. **DISPUTED.**

474.    The Court finds Defendants' explanations for their conduct not to be credible. **DISPUTED.**

475.    The Court also specifically finds that Mr. Collingsworth's proffered excuses (Doc. 187-21) for his misrepresentations on April 14, 2014, in open court to be lacking in credibility. **DISPUTED.**

476.    The Court further specifically finds that Mr. Collingsworth's proffered excuses for his misrepresentations on April 14, 2014, are contradicted by Defendants' actions in the months following the April 14, 2014 hearing, during which time Defendants continued to falsely represent to this Court, to Drummond, and to other courts that they had disclosed all of their witness payments and improperly altered evidence that would have revealed additional witness payments. **DISPUTED.**

477.    Defendants' misconduct and misrepresentations caused unnecessary delay and greatly increased the burden on this Court. **DISPUTED.**

478.    Defendants' misconduct and misrepresentations caused Plaintiff to incur excessive and unnecessary attorneys' fees and costs. **DISPUTED.**

## DEFENDANTS PROPOSED FINDINGS OF UNDISPUTED FACTS

**A. Substantial evidence exists that witness assistance payments are not only acceptable but needed to get to the truth in the Colombia situation involved in this Litigation.**

1.    Defendants have presented testimony from Javier F. Peña concerning the heightened threats and risks to personal safety for witnesses in Columbia. *See* Declaration of Javier F. Peña. Doc. 187-5.

2.    Javier F. Peña is a retired, Special Agent in Charge of the Houston Field Division of the U.S. Drug Enforcement Administration ("DEA"). Doc. 187-5, Peña Decl., ¶ 1.

3.    Mr. Peña was the primary investigator into the Medellin Cartel and its leader, Pablo Escobar. Doc. 187-5, Peña Decl., ¶ 3.

4.    As a result of the investigation, Mr. Escobar was captured and subsequently killed, and the Medellin Cartel was dismantled. Doc. 187-5, Peña Decl., ¶ 3.

5.    For his efforts in the investigation, Mr. Peña received the DEA Award of Excellence and the Colombian Medal of Honor, the highest award given to non-citizens. Doc. 187-5, Peña Decl., ¶ 3.

6.    Throughout his tenure at the DEA, Mr. Peña was assigned to South American, Caribbean, and United States posts. Doc. 187-5, Peña Decl., ¶¶ 3-9.

7.    Mr. Peña's final position with the DEA was Special Agent in Charge of the Houston Division. Doc. 187-5, Peña Decl., ¶ 9.

8.    In that position, he led a team of nearly 600 individuals spread across southwest Texas. Doc. 187-5, Peña Decl., ¶ 9.

9.    Mr. Peña is an expert on the Medellin Cartel and Pablo Escobar. Doc. 187-5, Peña Decl., ¶ 10.

10.     The Medellin Cartel employed a "money or bullets" tactic. Doc. 187-5, Peña Decl., ¶ 22.

11.     The AUC and the Medellin Cartel worked together beginning in the mid-1980s. Doc. 187-5, Peña Decl., ¶ 13-15.

12.     The AUC has been designated as a foreign terrorist organization by the U.S. State Department. Doc. 187-5, Peña Decl., ¶ 16.

13.     Witnesses in Colombia will not tell the truth if they do not feel safe. Doc. 187-5, Peña Decl., ¶ 11.

14.     Criminal elements in Colombia utilize bribes, threats, and killing to prevent active and potential witnesses from speaking out against them. Doc. 187-5, Peña Decl., ¶ 12.

15.     Witnesses, such as confidential informants, who testify against high powered interests in Colombia face heightened threats and risk their personal safety. Doc. 187-5, Peña Decl., ¶¶ 18-20; 23.

16.     Confidential informants and their family receive financial support to provide for their safety. Doc. 187-5, Peña Decl., ¶ 24.

17.     This support includes immediate costs of moving and living expenses in a new city. Doc. 187-5, Peña Decl., ¶ 24.

18.     The DEA takes great care to preserve confidentiality as a leak could lead to the murder of criminal informants and innocent individuals. Doc. 187-5, Peña Decl., ¶ 21.

19.     Confidential informants are more likely to provide truthful information that could expose them to criminal liability if they have legal representation. Doc. 187-5, Peña Decl., ¶¶ 25, 29-30.

20.     Traditional methods of providing financial support to witnesses in the United States are not safe methods in Colombia. Doc. 187-5, Peña Decl., ¶ 26.

21.     Providing even a check to a confidential informant's bank account may not be safe due to security reasons. Doc. 187-5, Peña Decl., ¶ 26.

22.     It is sometimes necessary to continue to provide support to confidential informants even after they provide information. Doc. 187-5, Peña Decl., ¶ 27.

23.     The United States Embassy in Colombia recognizes that witness intimidation is a serious issue in the Colombian criminal justice system. Doc. 199-7.

24.     The United States Embassy in Colombia recognizes that violence and the threat of violence against witnesses and their families are common tools in Colombia that affect criminal cases. Doc. 199-7.

25.     Ivan Otero also presented evidence on his knowledge of threats and the need for witness assistance in Colombia.  See Affidavit of Ivan Otero, ("Otero Aff. "), Doc. 189-2.

26.     Ivan Otero is a criminal defense lawyer in Colombia. Doc. 189-2, Otero Aff. ¶¶ 1.

27.     Ivan Otero has been a law professor at a public university in Colombia for 14 years-teaching both criminal law and evidence. Doc. 189-2, Otero Aff. ¶ 1.

28.     It is Mr. Otero's experience that there are still serious threats in Colombia to witnesses to silence them or keep them from telling the truth. Doc. 189-2 Aff. ¶ 15.

29.     This appears to come from a culture of violence and intimidation related to both strife between various political groups, and the Medellin cartel, which developed chilling and effective techniques for silencing witnesses. Doc. 189-2, Otero Aff. ¶ 16.

30.     Ivan Otero has dealt with the Medellin-style threats of the AUC terrorists on a first-hand basis. Doc. 189-2, Otero Aff. ¶¶ 15-16.

31.     Ivan Otero previously represented various AUC terrorists. Doc. 189-2, Otero Aff. ¶¶ 18-19.

32.     Ivan Otero discontinued his representation of AUC terrorists after the Colombian government offered them reduced sentences for fully disclosing the truth. Doc. 189-2, Otero Aff. ¶¶ 20-21.

33.     The Colombian government instituted the Justice and Peace Program to demobilize the AUC. Under this program, in return for providing AUC members with reduced prison sentences, the AUC members would disarm, turn themselves in, and tell the truth about the crimes they had committed. Doc. 189-2, Otero Aff. ¶ 19.

34.     In the Justice and Peace program, the demobilized AUC member appears before a prosecutor and confesses the truth. The AUC member tells everything he knows about crimes committed related to his membership in AUC. Once the prosecutor corroborates that the demobilized AUC member has stated the truth, the prosecutor goes before a court and asks the court to impose the alternative sentence provided for in the Justice and Peace law, which is 5 to 8 years in jail. There is no trial in this program. Doc. 189-2, Otero Aff. ¶ 20.

35.     Under the Justice and Peace law, if it is determined that a former AUC member did not tell the truth about his activities, the reduced sentences could be revoked and the member would be subject to the maximum sentence of forty (40) years under Colombian law. Doc. 189-2, Otero Aff. ¶ 24.

36.     While visiting clients, Otero often visited former clients in prison. Doc. 189-2, Otero Aff. ¶ 26.

37.     Various AUC members told Ivan Otero that Drummond was involved in AUC funding but were hesitant to reveal the truth about Drummond's involvement with the AUC in light of threats from Drummond-friendly parties. Doc. 189-2, Otero Aff. ¶¶ 27-31, 32.

38.     The problem these former AUC members faced was that if Drummond's activities in financing the AUC came out, they would be implicated. And if they had not told the truth about the connection as part of the Justice and Peace program, they could lose their reduced sentences and would be subject to a maximum sentence of forty (40) years for the crimes they committed. Doc. 189-2, Otero Aff. ¶ 31.

39.     Various AUC members indicated that because they faced real threats, they feared for their families, and before they would testify truthfully under the Peace and Justice Program, they needed some assurance of protection for their families through relocation. Doc. 189-2, Otero Aff. ¶¶ 34, 36-37, 38, 43.

40.     As a result, Ivan Otero personally arranged security and relocation assistance for these AUC member's families. Doc. 189-2, Otero Aff. ¶¶ 37, 40, 42.

41.     Ivan Otero also personally received threats for pursing the underlying cases against Drummond. Doc. 189-2, Otero Aff. ¶¶ 74-77.

42.     These threats include death threats and assassination attempts that continue until this day. Doc. 189-2, Otero Aff. ¶ 76.

43.     Witnesses often raised concerns about the safety and security of the witnesses' family if they testified against Drummond. Doc. 174-7 (Defs' 1st Am. Resp. to Drummond's 3rd Irrogs, No. 2).

44.     It was Defendant Collingsworth's practice that if a witness raised concerns about the safety or security of the witness or the witness' family that Collingsworth would request that

the witness report any serious threats to Collingsworth or people working with him. Doc. 174-7, at 4.

45.     Collingsworth typically had such a conversation with potential witnesses and, at times, with potential plaintiffs. At times, witnesses, plaintiffs, and potential witnesses or plaintiffs, reported threats to themselves or their families Doc. 174-7, at 4-5.

46.     Collingsworth and his team would evaluate and address those reported threats. In cases where it was decided that there was a serious threat, Defendant Collingsworth would arrange to provide protection or security necessary to address such threats or Collingsworth would provide the witness or the witness' family assistance to find a safe haven. Doc. 174-7, at 5.

47.     At times, Defendant Collingsworth would reevaluate with the person or family receiving the protection assistance to determine whether such assistance was still necessary. Doc. 174-7 at 5.

48.     In many instances, Defendant Collingsworth or his team would travel to meet witnesses, plaintiffs, and potential witnesses or plaintiffs at their location. At times, witness plaintiffs, and potential witnesses or plaintiffs incurred costs, such as transportation, lodging, and food to attend these meetings or other court related proceedings. Doc. 174-7 at 5.

49.     Defendants typically arranged for that travel and paid for it directly. On those occasions where a fact witness or potential plaintiff had to travel to meet with Defendants, Defendants had a general practice to offer to pay for the witness' travel and related costs because they typically could not afford such costs themselves. Doc. 174-7 at 5.

50.     Defendants have also presented testimony from Charles W. Wolfram concerning the ethics of witness assistance payments made to witnesses or their families to provide for their

safety and assistance with witness attorney's fees. See Declaration of Charles W. Wolfram ("Wolfram Decl.") attached as Exhibit L.

51.      Mr. Wolfram addressed whether the Defendants violated Alabama's ethical rule 3.4(b) limiting the extent to which a lawyer may make payments to witnesses. Wolfram Aff. ¶ 2.

52.      Mr. Wolfram's opinion, which he is qualified to make, is that the Defendants have not violated ethical rule 3.4(b), based merely on witness-assistance payments for relocation or assistance with attorney fees. To the contrary, it is his opinion that the Defendants acted as would reasonable and ethical lawyers in the same or similarly extreme circumstances, to the extent they merely made witness-assistance payments for relocation or assistance with attorney fees. Wolfram Aff. ¶ 3

53.      Charles W. Wolfram is the Charles Frank Reavis Sr. Professor Emeritus at the Cornell Law School where he taught from 1981 until he retired in 1999. Wolfram Aff. ¶ 5.

54.      Mr. Wolfram continues academic writing as well as consulting with law firms about issues of legal and judicial ethics. Wolfram Aff ¶ 5.

55.      Most of Mr. Wolfram's professional time has been devoted to the subject of legal and judicial ethics. Wolfram Aff. ¶ 6.

56.      Mr. Wolfram is the author of the West Publishing treatise Modern Legal Ethics (1986).  Wolfram Aff. ¶ 6.

57.      He was also the chief reporter for the two-volume Restatement of the Law Governing Lawyers (2000) ("Restatement") prepared under the auspices of the American Law Institute. Wolfram Aff. ¶ 6.

58.     Mr. Wolfram's Modern Legal Ethics treatise and the Lawyers Restatement have discussed witness-payment issues. Mr. Wolfram's treatise, the Restatement and other works have been cited and relied upon by state and federal courts in many states. Wolfram Aff. ¶ 6.

59.     Mr. Wolfram's scholarly work has given him a national reputation in legal and judicial ethics. For example, his Modern Legal Ethics treatise was listed as one of the "Most Cited Treatises and Texts" published in the prior twenty years in Fred R. Shapiro, The Most-Cited Legal Books, 29 J. Leg. Studs. 397, 404 (2000), and is the only text on legal ethics cited. He has submitted expert opinions on a wide range of issues involving legal and judicial ethics in many state and federal courts, in courts in Australia, Canada, England, and Japan, and in administrative and arbitration tribunals both in the United States and abroad. Wolfram Aff. ¶ 7.

60.     Mr. Wolfram extensively considered the issue of witness payments in his scholarly work preparing the Lawyers' Restatement. He personally drafted Chapter 7 of the Lawyers' Restatement (Representing Clients in Litigation"), including Topic 4 ("Advocates and Evidence") which in turn includes section 117 ("Compensating a Witness") which is directly on point. In the course of that multi-year process, he extensively discussed and considered issues of witness payments in professional meetings of the American Law Institute held in connection with formulating it.  That process resulted in the present text of § 117 (Exhibit 4) specifically dealing with lawyers' compensating witnesses. Wolfram Aff. ¶ 8 and footnote 2.

61.     As a choice-of-law matter, potentially either Alabama or Florida's lawyer code rules might arguably apply. Both lawyer codes limit the extent to which a lawyer may permissibly make payments to a fact witness, although they are differently worded. Rule 3.4(b) of the Alabama Rules of Professional Conduct provides that: "A lawyer must not: . . . (b) Falsify evidence, counsel or assist a witness to testify falsely, or offer an inducement to a witness that is

prohibited by law . . . ." (The Alabama wording of the rule is the same as that of the corresponding ABA Model Rules of Professional Conduct, rule 3.4(b).) Florida Rule 4-3.4(b) is differently worded, stating that: "A lawyer must not: . . .(b) . . . offer an inducement to a witness, except that a lawyer may pay a witness reasonable expenses incurred by the witness in attending or testifying at proceedings . . . and reasonable compensation to a witness for the time spent preparing for, attending or testifying at proceedings." Wolfram Aff. ¶ 12.

62.     Mr. Wolfram assumed that the Alabama Rules would apply in a disciplinary proceeding in either Alabama or Florida. A reasonable, neutral, and informed Florida-admitted lawyer or Alabama-admitted lawyer practicing before this Court would reach a similar conclusion on the question of the ethical propriety of witness payments here, regardless of whether the Alabama Rules, the Florida Rules, or the ABA Model Rules were held to apply. Wolfram Aff. ¶ 13.

63.     Section 117 of the Lawyers' Restatement provides that "[a] lawyer may not offer or pay to a witness any consideration: (1) in excess of the reasonable expenses of the witness incurred and the reasonable value of the witness's time spent in providing evidence [excepting for payment of a non-contingent expert-witness fee]; . . ." The section's Comment b states that "reasonable expenses incurred by the witness in providing evidence . . . include the witness's reasonable expenses of travel to the place of a deposition or hearing or to the place of consultation with the lawyer and for reasonable out-of-pocket expenses, such as for hotels, meals, or child care. . . . [A] lawyer may also compensate a witness for the reasonable value of the witness's time or for expenses actually incurred in preparation for and giving testimony, such as lost wages caused by the witness's absence from employment." Wolfram Aff. ¶ 16.

64.     Drawing the line between permissible and impermissible witness payments requires accommodating two important considerations that can pull in opposing directions. On the one hand, a just society with a well-functioning system of adjudication should not leave lawyers routinely free to make limitless payments to fact witnesses. To put it plainly, a just legal system must prohibit bribing witnesses. Ours, of course, does. Reining in possible lawyer bribes to witnesses is obviously the objective of all of the ethical rules limiting witness payments. Wolfram Aff. ¶ 17.

65.     On the other hand, a just system must also not pursue an anti-bribery policy with such single-minded vigor that litigants with just claims cannot prove up their cases because potential witnesses would face burdensome financial costs or, as here, such serious risk of other hateful consequences that they would refuse to testify or to spend the time necessary to be prepared to testify fully and truthfully. Wolfram Aff. ¶ 17.

66.     The key elements of situations in which lawyers may permissibly make payments to witnesses are that 1) any payment to a witness should be reasonably related to the witness's role of giving testimony, and should not be measured by, for example, the value of the testimony to the client or lawyer bearing the payments; 2) the size of the payment to the witness should reflect actual costs borne by the witness; and 3) the costs should not be unreasonably large. Wolfram Aff. ¶ 19.

67.     Given the situations of the potential witnesses here, the threats to their and their families' welfare were directly related to their possible role as fact witnesses opposing Drummond and the position of the AUC. Wolfram Aff. ¶ 19, n. 8.

68.      The cost of serving as witness could require outlays for extra security, relocating to a distant place of residence, moving expenses, increased cost of communicating with family,

and the like, and at the same time the witness would be cut off from many customary sources of employment and income or those could be disrupted. Wolfram Aff. ¶ 19, n. 9.

69.     In Columbia as well as in the United States, no governmental organization exists to provide witness protection to potential witnesses to litigation involving civil claims, such as here. Further, non-governmental organizations (comparable to battered-spouse organizations) do not exist, either in Columbia or in the United States, to provide protection to threatened witnesses in civil litigation. Wolfram Aff. ¶ 21.

70.     Given the situation in Columbia, many reasonable lawyers would, if reluctantly, agree with the apparent assessment of the Defendant Lawyers that, unless they were prepared to pay witnesses to protect them and their families against credible threats of violence, there was no realistic prospect that they would be available to testify—at least to testify truthfully. Wolfram Aff. ¶ 22.

71.     Reasonable lawyers would also agree that, if such payments were made, failing to protect the identities and location of the potential witnesses would risk great harm to those persons and their families. Wolfram Aff. ¶ 22.

72.     The Defendant Lawyers therefore confronted a problem that would be highly unusual for any American lawyer. They had to do so without the benefit of hindsight and in the heat of active litigation. They had to make the difficult decision whether to abandon their clients for lack of witnesses willing to testify or to set out on uncharted witness-payment waters. Wolfram Aff. ¶ 23.

73.     There was no judicial precedent of definitive assistance at the time the Defendant Lawyers acted and certainly none dealing with a life-and-death situation such they faced with their threatened witnesses. Wolfram Aff. ¶ 23.

74.     Under Alabama Rule 3.4(b), the prohibition against witness payments does not bar all such payments, but only those "prohibited by law." The third paragraph of the accompanying comment adds the following additional explanation that "[w]ith regard to paragraph (b), it is not improper to pay a witness' expenses . . . ." Wolfram Aff. ¶ 24.

75.     The payments to the potential witnesses covered costs of protecting the witnesses and their families against threats that were targeted specifically because of those persons' potential roles as witnesses. Wolfram Aff. ¶ 24.

76.     Given the close and immediate connection between the Columbian witnesses' need for protection and the witnesses' future role as witnesses, there is no basis for differentiating between those needs and the need, for example, for a hotel room for those same witnesses should they need to travel to a distant city and remain overnight to testify, which all authorities accept as legitimate lawyer expenditures, or for costs of child care for a witness's child, which the Restatement Comment accepts as similarly legitimate. Wolfram Aff. ¶ 24.

77.     A very important concern is that defining permissible lawyer expenditures for witness protection in civil cases not encourage lawyers so disposed to enter routinely into arrangements to make supposed witness-protection payments to potential witnesses who report a threat of physical violence should they testify. Such arrangements would pose an unreasonable risk that the payments were nothing more than covert bribes. Wolfram Aff. ¶ 25.

78.     This case is distinguished from the typical civil case because here the challenged payments were made in a highly unusual setting. The alleged threats arose in a context of rampant lawlessness in Columbia that is both well documented and quite unlike any setting that one could point to in the United States. The general Columbian setting of out-of-control violence

also lends independent plausibility to the claim that such threats were made and to the claim that, without protecting the witnesses, those threats would silence them. Wolfram Aff. ¶ 25.

79.     Recognizing the validity of the witness payments involved here under Alabama Rule 3.4(b) would not unleash a flood of abusive payments. Wolfram Aff. ¶ 25.

80.     While attempted intimidation of witnesses is rather common in criminal cases in the United States, such attempted intimidation is comparatively quite rare in civil litigation. And, where such threats are made in civil cases, we can generally assume with confidence that local, state, or national law-enforcement authorities would actively seek to protect the physical wellbeing of a witness within the United States. In those typical situations, there would be no plausible need for civil-suit witness protection. Wolfram Aff. ¶ 25.

81.     Nongovernmental protection for U.S.-based witnesses in civil cases involving witnesses living in secure environments seems significantly less necessary than protecting witnesses living abroad in lawless environments such as that existing in Columbia. It is much less plausible to claim a similarly compelling need for nongovernmental witness protection in typical U.S. civil litigation. Wolfram Aff. ¶ 25.

82.     The facts here are hotly disputed—including on many questions of credibility. It is not appropriate for an expert to usurp this Court's role in arriving at conclusions on credibility issues. Issues of credibility should be left to the jury or other appropriate fact-finder. Wolfram Aff. ¶ 27.

83.     The Defendants did not act wrongfully in violation of a lawyer code rule in making payments to Colombian persons who were potential witnesses in matters that the Defendant Lawyers were handling and who and whose families faced the threat of violent

retaliation should they cooperate, merely by making witness-assistance payments for relocation costs or for assistance in paying attorney's fees. Wolfram Aff. ¶ 28.

84.     The Defendant Lawyers also had to act in an unprecedented situation in which there was nothing like a black-letter rule or certain judicial opinion on point. Wolfram Aff. ¶ 28.

85.     Defendants also presented testimony from Stephen J. T'Kach, Associate Director (Ret.) of the Office of Enforcement Operations of the Criminal Division, U.S. Department of Justice ("DOJ"), Washington, D.C. *See* Declaration of Stephen J. T'Katch (T'Katch Decl.") attached hereto as Exh. M.

86.     Prior to his retirement in August 2011, Mr. T'Katch worked for DOJ for twenty-two (22) years.  He began as an attorney-advisor in the Electronic Surveillance Unit ("ESU") in 1990, reviewing requests from federal prosecutors for electronic surveillance orders and providing legal guidance to Assistant United States Attorneys and law enforcement agents to assist them in obtaining DOJ approval to seek judicial authorization to conduct federal wiretaps in major criminal investigations nationwide.  T'Katch Decl. ¶ 3.

87.     In 1992, he was promoted to Deputy Chief of the ESU, where he supervised attorneys and staff and served as the primary DOJ electronic surveillance instructor for federal prosecutors and agents.  Over the course of this assignment, he was involved in hundreds of electronic surveillance requests for crimes involving narcotics, gangs, weapons, organized crime, and public corruption, among others, as well as narco-trafficking activities of various Columbian cartels.  T'Katch Decl. ¶ 3.

88.      In 1995, Mr. T'Katch was named as an Associate Director of the Office of Enforcement Operations ("OEO") and was concurrently appointed by the Department to serve as

the Director of the Witness Security Program, replacing the creator of the Program who had run it since the Program's inception in 1970. T'Katch Decl. ¶ 4.

89.     In addition to Mr. T'Katch's Program responsibilities, as an OEO Associate Director, he was responsible at times for other areas of supervision, including the International Prisoner Transfer Unit and the Immunities Unit, and served on a number of *ad hoc* committees as assigned by the Department.  During the absence of OEO leadership, he served as the OEO director. T'Katch Decl. ¶ 5.

90.     As director of the Witness Security Program: Mr. T'Katch was responsible for the daily management, oversight, and coordination of the Program and its $25+ million budget; formulated and implemented policies and guidelines regarding the use of the Program; supervised staff and Program activities with the Criminal Division, U.S. Marshals Service, and Federal Bureau of Prisons; traveled foreign and domestic to review security measures and to train and meet with international, federal, state, and local officials and program partners; served as primary domestic and foreign DOJ instructor on Program operations, including before an international class of foreign officials at INTERPOL headquarters; and testified regarding Program operations before the U.S. Senate Committee on the Judiciary and the House of Representatives, Subcommittee on Crime, Committee on the Judiciary. T'Katch Decl. ¶ 6.

91.     Just prior to his retirement in 2011, Mr. T'Katch also served as Deputy General Counsel for INTERPOL-Washington.  Since then, he has worked as a public-safety consultant and volunteer deputy sheriff in Wisconsin, where he also serves as interim director of a county emergency services operation. T'Katch Decl. ¶ 7.

92.     Mr. T'Katch's opinion, which he is qualified to make, is that the only way to ensure witness's appearance and to obtain truthful testimony in major cases involving violence

or violence-prone criminal enterprises is to assure the witness that they will be safe before, during, and after the completion of their testimony. T'Katch Decl. ¶ 8.

93.     An important part of the Federal Witness Security Program was paying monthly subsistence payments to witnesses and their families.  Neither Mr. T'Katch nor the Department of Justice viewed any of these subsistence payments or other payments or accommodations made as a "benefit" to the witness or their family.  Those payments did not make the witness or their family members "whole" given what they had lost. T'Katch Decl. ¶ 9.

94.     The Federal Witness Security Program is operated on a strict "Need to Know" basis, with each of the three main agency components sharing only that information necessary for the other to complete their tasks. T'Katch Decl. ¶ 10.

95.     The level of violence perpetrated on witnesses and their family members in Columbia was significantly worse than the situation confronted by witnesses in the United States. T'Katch Decl. ¶ 11.

96.     The Federal Witness Security Program was created because of a general failure of the Department's Organized Crime Section to bring successful prosecutions against members of the Mafia; witnesses were reluctant to testify, refused to testify, changed their testimony once up on the witness stand, or disappeared prior to their testimony.  T'Katch Decl. ¶ 13.

97.     In major cases involving violence or violence-prone criminal enterprises, the only way to ensure witness's appearance and to obtain truthful testimony is to assure the witness that they will be safe before, during, and after the completion of their testimony.  T'Katch Decl. ¶ 13.

98.     The main purpose of the Program is to provide safety and security to witnesses, which may include protection while in custody and/or relocation with a new identity to a new community. T'Katch Decl. ¶ 13.

99.     Since the Program's inception in 1970, nearly 10,000 witnesses and another 10,000 family members have been admitted into the Program; no one following the rules of the Program has ever been injured or killed. T'Katch Decl. ¶ 14.

100.    The successful operation of this Program is widely recognized as providing a unique and valuable tool in the government's battle against major criminal conspirators and organized crime.  The enviable record of the Program provides important support for law enforcement and prosecutors by eliminating an obstacle to obtaining testimony and getting to the truth; something more likely to occur when witnesses feel safe about testifying and reassured for their security, and their family's security, post-trial. T'Katch Decl. ¶ 14.

101.    The mere existence of the Program can itself foster truth telling; witnesses know in the back of their minds that a mechanism is available to protect them in the event that they are threatened.  This serves as a powerful means to obtain truthful testimony and reassures society that its government can protect those that have valuable, incriminating information about these criminal organizations and are willing to come forward and truthfully testify to that effect. T'Katch Decl. ¶ 14.

102.    Because of the extreme danger to witnesses and family members, U.S. Marshall Service ("USMS") protection requires witnesses to move out of their home and community. T'Katch Decl. ¶ 18.

103.    Witnesses and/or family members relocated to a new community are provided plane tickets or other transportation subsidies allowing them to reach their new community. USMS will provide initial lodging arrangements until suitable housing can be obtained.  Food and clothing will also be provided by USMS during this transition period.  USMS will also provide certain household furnishings, often times as replacement for items that witnesses were

forced to leave behind. T'Katch Decl. ¶ 19.

104.    Because witnesses and their family members generally arrive in the new relocation community with no employment, income, or assets, and with no support system, USMS will provide subsistence payments to them.  Those subsistence payments were expected to last for a period of approximately six to eighteen months; however, typically, witnesses were funded for longer periods.  T'Katch Decl. ¶ 20.

105.    Because each and every Witness Security case is unique, with facts and circumstances never the same, it is common for witnesses to remain on "funding" longer than eighteen months.  The duration and amount of subsistence payments could vary even among those witnesses that appear to be similarly situated.  T'Katch Decl. ¶ 21.

106.    Common reasons subsistence payments are extended would be failure to get a job, under employment-failure to get a job that paid sufficiently, or the need for the witness to get a further education. T'Katch Decl. ¶ 22.

107.    It is particularly common for families to be provided extended subsistence payments in situations where the witness/father was incarcerated.  This is due in part to difficulties in obtaining suitable employment for the mother, as well as the high cost or availability of day care. T'Katch Decl. ¶ 23.

108.    The more difficulties encountered in assimilating a witness into a new community, the longer the need for subsistence.  In some cases, witnesses have remained on funding for periods exceeding eight years.  T'Katch Decl. ¶ 24.

109.    Some witnesses continue to receive subsistence payments even after getting a job in their new community.  This is done to make sure that witnesses are not discouraged from getting jobs and to assist them in acclimating to their new community.  This also ensures that

witnesses receive enough money to live. T'Katch Decl. ¶ 25.

110.    Neither Mr. T'Katch nor the Department of Justice viewed any of these subsistence payments or other payments or accommodations made as a "benefit" to the witness or their family.  Those payments did not make the witness or their family members "whole" given what they had lost. T'Katch Decl. ¶ 32.

111.    The Internal Revenue Service ("IRS") has issued an opinion that these subsistence payments and other payments made to the witness by Program officials are neither income nor benefits and, thus, they are not taxed. T'Katch Decl. ¶ 33.

112.    The Witness Security Program is operated on a strict "Need to Know" basis, with each of the three main agency components sharing only that information necessary for the other to complete their tasks.  T'Katch Decl. ¶ 35.

113.    Despite serving as Director of the Program, with the full power and authority of the Attorney General to run the Program, Mr. T'Katch was never informed of a relocated witness's new location nor did he ask.  For Mr. T'Katch, or his immediate staff, to learn of a relocated witness's new identity or location resulted in a security breach and the witness would have to be relocated and provided with a new identity.  T'Katch Decl. ¶ 35.

114.    Likewise, if a federal prosecutor or agent inadvertently learned of a witness's new identity or location, such action would constitute a security breach and would require that the witness again be relocated. T'Katch Decl. ¶ 35.

115.    Elaborate systems were put into place to ensure that subsistence payments made to witnesses were kept secret.  Knowledge of how payments were made could compromise witness security. T'Katch Decl. ¶ 36.

116.    The Program took great care in making disclosures to defense attorneys of

information about, among other things, subsistence payments and other financial assistance to the witness to make sure their security was protected.  T'Katch Decl. ¶ 36.

117.     In certain cases, where the information was considered particularly sensitive and the defendants were considered unusually dangerous, some disclosures were made under seal to defense attorneys with an order of the court directing that defendant's counsel not share the information with the defendant. T'Katch Decl. ¶ 36.

118.     During the course of running the Witness Security Program for approximately 16 years, Mr. T'Katch reviewed every single application for Program services, which included dozens of individuals from Colombia or individuals involved with Colombian drug cartels.  As part of the application process, he was informed by law enforcement of the threats to these individuals in the United States and in their home country. T'Katch Decl. ¶ 38.

119.     The level of violence perpetrated on witnesses and their family members in Colombia is significantly worse than the situation confronted by witnesses in the United States. T'Katch Decl. ¶ 39.

120.     It was not unusual for Mr. T'Katch to receive calls from sponsoring federal prosecutors or law enforcement agents informing him of the serious, violent consequences witnesses would face if denied Program services and forced to return to Colombia.  T'Katch Decl. ¶ 39.

121.     Also, during personal interviews with a number of these Colombian national witnesses, Mr. T'Katch was also informed of the high level of violence in Colombia perpetrated against witnesses or against family members of witnesses once the witness's cooperation with authorities was discovered, including spouses and children killed and stuffed in 55-gallon

barrels, tortured and dismembered family members, and family members who were missing and presumed killed.  T'Katch Decl. ¶ 39.

122.     Witnesses in Colombia have been forced out of their homes or off farms that were taken over by cartel members or members of a paramilitary group operating in Columbia. Resistance was generally met with death. T'Katch Decl. ¶ 39.

123.     Colombian prosecutors and other high-ranking government have had difficulties operating a functional, viable, and secure witness security program in Columbia. T'Katch Decl. ¶ 40.

124.     Columbia faced a situation similar to the United States with the Mafia in the 1960's; they were confronted with witnesses who were reluctant to testify, refused to testify, changed their testimony once up on the witness stand, or disappeared prior to their testimony. T'Katch Decl. ¶ 40.

125.     As a result of the high level of violence committed by the cartels and others, combined with incredible levels of cash flowing through the country related to narco-trafficking, corruption was a serious issue in maintaining the necessary secrecy of such a program.  T'Katch Decl. ¶ 40.

126.     In addition, many different agencies in Colombia are involved in protection efforts, and it is not uncommon to have to report the whereabouts of witnesses to government officials who absolutely had no "need to know."  T'Katch Decl. ¶ 40.

127.     Colombia, unlike the United States, is not nearly as diverse, and the relocation of witnesses between cities or regions often raises suspicion or causes some to suspect the newcomer did not belong there.  Columbian officials are often frustrated with their attempts to successfully relocate witnesses within their country. T'Katch Decl. ¶ 40.

**B. Not all witnesses testifying against Drummond required witness assistance payments and most of those receiving such witness assistance payments have long been disclosed**

128. Defendants have previously disclosed witness assistance payments. Doc. 69, ¶¶ 34-35.

129. Drummond first served discovery requests seeking documents about witness payments related to witness protection in February 11, 2014. Doc. 187-17 (Pl.'s 3rd Reqs. for Produc.); Doc. 187-18 (Pl.'s 3rd Interrogs.) (together, "3rd requests").

130. Before Drummond served its 3rd Requests, Drummond possessed documents reflecting payments to Libardo Duarte, Jairo Jesus Charris Castro, Jose Gelvez Albarracin, and Jose Joaquin Pinzon Diaquiz ("Halcon"). Doc. 69, ¶¶ 34-35.

131. These documents were all acquired by Drummond during *Balcero*. Doc. 69, ¶¶ 34-35.

132. Even before Drummond served its 3rd Requests, defendants discussed the fact that some witnesses had received security payments. Doc. 69, ¶ 34.

133. Defendants have continued to disclose witness payments. *See* Docs, 174-7, 174-20, 231-11,

134. On November 24, 2014, Defendants filed their Amended and Supplemental Responses and Objections to Plaintiff's Third Set of Interrogatories Numbers 2 and 8. *See* Doc. 174-7 (Defs., Am. & Supp. Resp. Drummond's 3rd ROGS Nos. 2 and 8).

135. Defendants' responses included information regarding witness protection for the families of Libardo Duarte, Jairo Jesus Charris Castro, Jose Gelvez Albarracin, and Jose Joaquin Pinzon Diaquiz ("Halcon") which had previously been disclosed. *See* Doc. 69, ¶ 34, Doc 174-7.

136.    Defendants' responses also included information regarding payments to Ivan Otero, the use of funds received by Ivan Otero for witness protection for the families of El Tigre and Samario, and the proffer of testimony by Jaime Blanco Mayo and his requests for assistance with his legal fees in his criminal defense. *See* Doc 174-7.

137.    In addition Defendants' responses included information regarding witness protection to Claudia Jadith Balcero Giraldo, Isnardo Ropero, and Rafael Garcia, among other information disclosed in the responses.   *See* Doc 174-7.

138.    On January 9, 2015, Defendants filed their Second Amended and Supplemental Objections and Response to Plaintiff Drummond Company Inc's Third set of Interrogatories Number 2. *See* Doc. 174-20.

139.    Defendants' responses included additional information regarding Terry Collingsworth's discussions with Jaime Blanco Maya, including those discussing Albert van Bilderbeek. The Defendants' responses also included additional information regarding Rafael Garcia *See* Doc. 174-20.

140.    On March 5. 2015, Defendants filed their Third Amended and Supplemental Objections and Response to Plaintiff Drummond Company Inc's Third Set of Interrogatories Number 2. *See* Doc. 231-11.

141.    Defendants'      responses      included      additional      information      regarding Mr. Collingsworth's discussions with El Tigre and Samario and monies sent to Ivan Otero, and additional information regarding a prior request for payment of legal fees by Jaime Blanco Maya. *See* Doc. 231-11 at 4-6, 10.

142.    Defendants' responses also included additional information regarding Libardo Duarte's request for witness protection assistance for his family. *See* Doc. 231-11 at 8.

143.    In addition, Defendants' responses include information about requests for witness protection assistance by Jimmy Rubio Suarez for himself and his family. *See* Doc. 231-11 at 9.

144.    On March 19, 2015, Defendants filed their Fourth Amended and Supplemental Objections and Response to Plaintiff Drummond Company Inc's Third set of Interrogatories No. 2, attached as Exhibit N.

145.    Defendants' responses provided information regarding witness assistance provided to the *Romero* plaintiffs by Collingsworth's co-counsel at the time at the United Steel Workers of America. *See* Fourth Amended Responses, Exhibit N.

146.    On April 28, 2015, Defendants filed their Fifth Amended and Supplemental Objections and Responses to Plaintiff Drummond Company Inc.'s Third Set of Interrogatories Number 2, Attached as Exhibit O.

147.    Defendants' responses provided additional information regarding witness assistance provided to Edwin Guzman.  *See* Fifth Amended Responses, Exhibit O.

148.    Defendants' responses also provided information regarding witness assistance provided to "Tukan." *See* Fifth Amended Responses, Exhibit O.

149.    On April 28, 2015 Defendants filed their Amended and Supplemental Objections and Responses to Plaintiff Drummond Company Inc.'s Fourth Set of Interrogatories No. 2, attached as Exhibit  P .

150.    Defendants" responses provided additional information regarding Edwin Guzman. See Amended Response to Fourth Set of Interrogs, Exhibit P.

151.    On May 6, 2015, Defendants filed their Sixth Amended Supplemental Objections and Responses to Plaintiff Drummond Company Inc.'s Third Set of Interrogatories Number 2, attached as Exhibit Q.

152.     Defendants' responses provided additional information regarding witness assistance provided to Edwin Guzman and his family and witness protection and travel costs for the *Romero* plaintiffs. *See* Sixth Amended Responses, Exhibit Q.

153.     There are also a number of witnesses who gave testimony adverse to Drummond that, as far as Mr. Collingsworth is aware, did not receive direct or indirect witness protection payments from Conrad & Scherer. Exh. B, Collingsworth Supp. Decl. ¶ 20.

**C. There were legitimate reasons for the initially undisclosed witness payments to El Tigre, Samario, and Blanco**

154.     Payments made to Jhon Jairo Esquivel Cuadrado (Alias El Tigre) and Alcides Manuel Mattos Tabares (alias Samario) were made for legitimate purposes. *See* Doc. 189-2, Otero Aff. and Doc. 174-20.

155.     Otero previously represented El Tigre and Samario but did not represent them as of 2009. See Doc. 189-2, ¶¶ 21-22, 27.

156.     El Tigre and Samario were former clients that Otero visited in prison. Doc. 189-2, Otero Aff. 27.

157.     The reference to Otero in Doc. 69-29, at p. 11 as being "his [El Tigre's] counsel" and "his [Samarios'] counsel"  was simply a mistake and was made based on Ms. Levesque's confusion as to Otero's role at that time. See Declaration of Christian Levesque attached as Exhibit A.

158.     When Otero visited El Tigre and Samario, they complained that they were receiving threats from one or more people inside the prison who had close ties to Drummond that they were not to disclose anything about Drummond's financing of the AUC, or their lives and the lives of their families would be at risk. Doc. 189-2, Otero Aff. ¶ 28.

159.    El Tigre and Samario told Otero that if they did disclose what they knew about Drummond's activities, they faced very real threats and feared for their families if they did tell the truth in order to win reduced sentences under the Justice and Peace Program. Doc. 189-2, Otero Aff. ¶¶ 32, 34.

160.    El Tigre and Samario were very afraid of what Drummond would do and needed to know their families were safe before they were willing to make public the statements they made about Drummond. Doc. 189-2, Otero Aff. ¶¶ 35, 43.

161.    Ivan Otero believed the threats were real and severe and made security arrangements for the families of El Tigre and Samario. Doc. 189-2, Otero Aff. ¶¶ 38, 40, 42.

162.    Mr. Otero, an attorney and law professor, understood from his experience that his actions were legal under the laws of Colombia and absolutely necessary under the circumstances to protect their families. Doc. 189-2, Otero Aff. ¶¶ 41, 42.

163.    Ivan Otero became co-counsel with Conrad & Scherer in December 2008. Doc. 189-2, Otero Aff. ¶ 11.

164.    In or around April 2009, Defendants provided Ivan Otero with an $80,000 payment.  Doc. 174-7 (Defs' 1st Am. Resp. to Drummond's 3rd Irogs, No. 2) at 9-10.

165.    The payment was a retainer fee.   See Supp. Declaration of Terrence Collingsworth attached as Exhibit B.

166.    Collingsworth also met with El Tigre and Samario. Doc. 231-11 (Def's 3rd Am. Resp. to Drummond's 3rd Irogs, No. 2.) at 4.

167.    In late January 2011, Mr. Collingsworth met with El Tigre in the Barranquilla jail, at which time El Tigre claimed repeatedly that he was being threatened and told to stop talking

about Drummond. El Tigre indicated he would not give his final deposition in the *Balcero* case until his family was moved, temporarily, to a safe location. Doc. 231-11, at 4.

168.   Mr. Collingsworth also met with Samario in late January 2011 at a prison in Valledepar. Samario reported that 45 days previously he had been both threatened and offered money by the cousin of Alfredo Araujo to stop talking about Drummond. Samario also said that he was willing to be deposed in the *Balcero* case but that Mr. Collingsworth first needed to move his family to a safe place. Doc. 231-11 at 4-5.

169.   At about the same time, Mr. Collingsworth was told that Ivan Otero, his co-counsel in the *Balcero* litigation, was receiving threats and wanted security for the period in which depositions would be conducted of former AUC witnesses. Doc. 231-11 at 5.

170.   On or about February 2011, Mr. Collingsworth arranged for $5000 to be sent to Mr. Otero's bank account as money for security for Mr. Otero, Samario and El Tigre. Doc. 231-11 at 5.

171.   Mr. Otero later explained to Mr. Collingsworth that the money was used to provide $800 for both Samario and El Tigre for the relocation of their immediate family and $1000 each for support of their family during one month. Doc. 231-11 at 5.

172.   The remaining $1400 was used to pay individuals providing protection for Otero. Doc. 231-11 at 5.

173.   In or about March 2011, Samario and El Tigre prepared separate written statements detailing the death threats made against them and their families after they began to provide information, including information about Drummond's relationship with the AUC. Doc. 231-11 at 5.

174.    In April 2011, there was discussion about additional payments to Samario, El Tigre and Otero with additional economic support tied to the level of threats received. Doc. 231-11 at 5.

175.    Mr. Collingsworth did not object to a proposal that the families of Samario and El Tigre would each get $1000 each month for living expenses, as they had after their relocation, until the depositions were done. Doc. 231-11 at 5. Mr. Collingsworth believed at that time that the threat to the witnesses who were testifying against Drummond was substantial, but that it would be reduced after they had given their deposition. Doc. 231-11 at 5.

176.    Mr. Collingsworth also did not object that Mr. Otero should receive $700 each month for his own security during that period. On or about April 22, 2011, Conrad & Scherer sent a $2700 wire to a bank account for Otero. Doc. 231-11 at 5-6.

177.    In late May 2011, Mr. Collingsworth arranged to pay $5400 to Mr. Otero for two missing security payments for Mr. Otero, Samario, and El Tigre.  Mr. Collingsworth indicated that the $2700 monthly payments would continue until the depositions were done, and depending on what happened, more might have to be done for the families as El Tigre and Samario were rattled by the Drummond attorney's threats on their families. Doc. 231-11 at 6.

178.    Beginning in our about June 2011, Conrad & Scherer typically made a wire transfer of $2700 each month to Mr. Otero's bank account. At times Mr. Otero was reimbursed for case expenses as well. Doc. 231-11 at 6.

179.    Conrad & Scherer did not send monies directly to the families of Samario or El Tigre. Doc. 231-11. at 6.

180.    Mr. Collingsworth typically approved the monthly wire to Mr. Otero, which was sent for his approval along with other regular case expenditures. Doc. 231-11 at 6.

181.    The monthly wire approvals requested money only for Mr. Otero-they typically did not reference Samario or El Tigre. Doc. 231-11 at 6.

182.    Mr. Collingsworth was not directly aware at the time he approved payments to Otero of what he did with the money he received for Samario or El Tigre. Mr. Collingsworth followed a "need to know" approach to security payment assistance to witnesses and their families.  Doc. 231-11. Doc. at 6.  Mr. Otero began talking with Jaime Blanco Maya in prison in February 2011. Doc. 189-2, Otero Aff. ¶ 51.

183.    Blanco is a former subcontractor for Drummond. Doc. 189-2, Otero Aff. ¶ 53.

184.    Blanco grew up with Alfredo Araujo Castro, who is an executive with Drummond. See excerpt of Alfredo Arjaujo  deposition, pp. 132:2-12 attached hereto as Exhibit R.

185.    Blanco was an important figure in the investigation of Drummond's activities with the AUC, because Blanco faced criminal charges that he was involved in the killing of the Drummond labor union leaders in 2001. Doc. 189-2, Otero Aff. ¶ 54.

186.    Blanco has since been convicted of participating in the killing of Drummond labor union organizers. Doc. 189-2, Otero Aff. ¶¶ 62-63, 71.

187.    Blanco required legal counsel to advise him on the consequences of admitting his involvement in the murder of the union leaders. Doc. 189-2, Otero Aff. ¶ 69.

188.    Ivan Otero did not represent Blanco as an attorney in relation to the charges that he had a role in the murder of the Drummond union leaders. Doc. 189-2, ¶¶ 52, 73.

189.    Blanco's company had a contract with Drummond to provide food and other services to workers at its mine in La Loma. Doc. 189-2, Otero Aff. ¶ 53.

190.    Blanco carried out an investigation for the Bilderbeeks related to the claim of their company, Llanos Oil, against Drummond. Blanco told Otero the van Bilderbeeks owed him money for his investigative work and asked for help from Otero and Collingsworth to intervene with the brothers in the hope they would pay what they owed him. Doc. 189-2, Otero Aff. ¶ 64.

191.    Otero and Collingsworth agreed to contact the van Bilderbeeks to convince them to pay Blanco what he was owed. Doc. 189-2, Otero Aff. ¶¶ 64-65.

192.    Otero did not understand Blanco to be conditioning his testimony on receipt of this money. Doc. 189-2, Otero Aff. ¶ 65.

193.    Blanco provided truthful testimony about Drummond before he received any money from the van Bilderbeeks. Doc. 189-2, Otero Aff. ¶ 67.

194.    The Colombian court that convicted Blanco stated in the record of his judgment that Drummond, Garry Drummond, Alfredo Araujo Castro, and others should be investigated by the government of Colombia based on the evidence presented in that case. Doc. 189-2, Otero Aff. ¶ 71; Doc. 187-6 (Colombian Court Judgment).

195.    Conrad & Scherer did not make payments to Blanco. Doc. 114-2, ¶ 8.

196.    Conrad & Scherer did not make payments to Blanco's criminal defense lawyer. Doc. 114-2, ¶ 8.

197.    Parker Waichman did not make payments to Blanco. Doc. 114-2, ¶ 8.

198.    Parker Waichman did not make payments to Blanco's criminal defense lawyer. Doc. 114-2, ¶ 8.

199.    In regard to Collingsworth's dealings with Blanco, Mr. Blanco asked Mr. Collingsworth if Conrad & Scherer would assist Mr. Blanco in paying attorney's fees related to his criminal defense. Doc. 174-20 at 6.

200.     Mr. Blanco sought $150,000 in legal fees at one point prior to May 2011. 231-11 at 10.

201.     In about July 2011, Mr. Collingsworth met with Mr. Blanco and Ivan Otero in a prison in Colombia. Doc. 174-20 at 4.

202.     By that time, Mr. Blanco told Mr. Collingsworth that Mr. Blanco had been talking to U.S. government officials with the FBI about Drummond's assistance to the AUC, that Mr. Blanco had invoices of payments by Drummond to the AUC, that he was providing the computer records of those invoices to Mr. Collingsworth, and that he wanted Mr. Collingsworth to give his phone number to Mr. Jim Adkins, the former security chief at Drummond in Colombia, so that Mr. Blanco could tell Mr. Adkins that Mr. Blanco was going to tell the truth about what Drummond did to assist the AUC. Doc. 174-20 at 5.

203.     In that conversation, Mr. Blanco also asked Mr. Collingsworth if Conrad & Scherer would assist Mr. Blanco in paying attorney's fees related to his criminal defense. At that time, Mr. Blanco was facing criminal charges related to the murder of the Drummond mine union leaders near La Loma, in Cesar Province, Colombia. Mr. Collingsworth advised Mr. Blanco again how difficult it was for Mr. Collingsworth or his firm to make any such payments because, of, among other things, ethical reasons. But Mr. Collingsworth communicated to Mr. Blanco that Mr. Collingsworth thought that Albert van Bilderbeek would assist Mr. Blanco with funds toward his attorney's fees if Mr. Blanco was able to investigate the facts regarding Drummond's illegal acquisition of the Llanos Oil Company's oil concession in Columbia and provide that information to Mr. Van Bilderbeek. Doc. 174-20 at 5.

204.    While the idea of payments by Mr. Van Bilderbeek arose in the context of discussing legal fees, Mr. Collingsworth did not know the details of the final agreement between Mr. Blanco and Mr. Van Bilderbeek. 174-20 at 5-6.

205.    Mr. Collingsworth understood that Mr. Van Bilderbeek planned to send a wire to Mr. Otero of approximately $60,000 in about September 2011 as part of Mr. Van Bilderbeek's arrangement with Mr. Blanco. Mr. Collingsworth does not recall knowing how much of that wire was paid to Mr. Blanco, if it was sent at that time, but did understand that Mr. Blanco received a first payment pursuant to his agreement with Mr. Van Bilderbeek. Doc. 174-20, at 6.

206.    Mr. Collingsworth also understood that Mr. Van Bilderbeek was going to make a second payment to Mr. Blanco as part of their agreement, and that Mr. Van Bilderbeek sent a wire to Mr. Otero in about December 2011. Mr. Collingsworth is not aware of how much of that wire Mr. Blanco received, if any. Doc. 174-20 at 6.

207.    Mr. Collingsworth is also aware that Mr. Van Bilderbeek made a payment of $35,000 to Mr. Otero in about July 2012. Doc. 174-20 at 6.

208.    These payments were not made by Mr. Collingsworth or Conrad & Scherer. Doc. 174-20 at 4-8.

**D. Terry Collingsworth's disclosure misstatements were a mistake of judgment, not in bad faith, and any failure to disclose was fixed.**

209.    Terry Collingsworth is a partner in the Washington D.C. office of Conrad & Scherer. See Exh. B, Supp. Collingsworth Decl. ¶ 1.

210.    Terry Collingsworth has been an attorney for 32 years. Virtually all of his work has been in the area of human rights. Doc. 187-21, Collingsworth Aff., ¶ 2.

211.    Collingsworth works to help people who have been severely injured by violations of international human rights norms. Doc. 187-21, Collingsworth Aff., ¶ 2.

185

212.     Mr. Collingsworth grew up in Willoughby, Ohio. He graduated from Lakeland Community College in Lake County, Ohio with an Associate of Arts in 1972, then received a Bachelor of Arts from Cleveland State University in 1974, graduating *summa cum laude.*. He was the first person in his family to attend college and he supported himself throughout college working full-time as an overhead crane operator in Cleveland, Ohio.. See Exh. B, Collingsworth Supp. Decl. ¶ 2.

213.     In 1982, Mr. Collingsworth received his law degree from Duke University. He was a member of the law review and the *Order of the Coif,* graduating with highest honors.  See Exh. B, Collingsworth Supp. Decl. ¶ 3.

214.     Mr. Collingsworth taught Constitutional and Employment law at several law schools including Loyola Marymount, University of Utah, and Cleveland State University. See Exh. B, Collingsworth Supp. Decl. ¶ 4

215.     Before joining Conrad & Scherer in 2008, Collingsworth was General Counsel and Executive Director of the International Labor Rights Forum (ILRF), where he directed the ILRF's legal and advocacy work and also developed legislative proposals. He is also the founder and Executive Director of the International Rights Advocates. See Exh. B, Collingsworth Supp. Decl. ¶ 5-6.

216.     Mr. Collingsworth opened the Conrad & Scherer office in Washington D.C. in approximately May 2008. See Exh. B, Collingsworth Supp. Decl. ¶ 7.

217.     The Conrad & Scherer office headed up by Mr. Collingsworth is small. It primarily operates separately from the main Fort Lauderdale office of Conrad & Scherer and is almost exclusively focused on litigating human rights cases. See Exh. B, Collingsworth Supp. Decl. ¶ 8.

218.   The Washington D.C. staff working on cases does not spend a lot of their time on cases originating out of the Fort Lauderdale office. Likewise, cases handled in Fort Lauderdale are generally handled by personnel there with only marginal input from staff in the Washington D.C. office. . See Exh. B, Collingsworth Decl. ¶ 8.

219.   Virtually all of the cases in the D.C. office are human rights cases in which Collingsworth represents foreign nationals who have been injured by U.S. multinationals in their offshore operations. In all of these cases, the large defendant companies retain one or more large law firms to defend them, and Collingsworth and the D.C. office litigate in the challenging environment in which their opponents have virtually unlimited resources and they represent mostly indigent clients with a small team of dedicated and overworked human rights lawyers. See Exh. B, Collingsworth Decl. ¶ 9.

220.   Collingsworth often relies on interns and volunteers from the human rights organizations he works with to help with his cases. See Exh. B, Collingsworth Supp. Decl. ¶ 10.

221.   Currently, Collingsworth is lead counsel for the plaintiffs in *Balcero v. Drummond Co., Inc.*, No. 2:09-cv-1041-RDP (N.D. Ala. filed May 27, 2009); *Baloco v. Drummond Co., Inc.*, No. 7:09-cv-0557-RDP, (N.D. Ala.); and *Melo v. Drummond Co., Inc.*, No. 2:13-cv-0393-RDP (N.D. Ala. filed Feb. 26, 2012).  See Exh. B, Collingsworth Supp. Decl. ¶ 11.

222.   He also currently represents clients in major cases against Exxon Mobil, Chiquita Brands International, Dole Food Company, Occidental Petroleum, Nestle USA, Inc., Archer Daniels Midland Company, Cargill Incorporated, Doe Run and DynCorp. See Exh. B, Collingsworth Decl. ¶ 11.

223.    The *Drummond* cases are complex cases dealing with allegations that Drummond, collaborated with paramilitary terrorists in Colombia to murder and torture trade union leaders and other advocates for working people.  See Exh. B, Collingsworth Supp. Decl. ¶ 12.

224.    These cases are particularly complicated because they are deal with the laws of a foreign country and witnesses subject to threats from paramilitary terrorists. See Exh. B, Collingsworth Supp. Decl. ¶ 13.

225.    Although these cases concern matters in Colombia, Mr. Collingsworth does not speak Spanish. Mr. Collingsworth works through employees that speak Spanish or third party translators when he deals with witnesses and attorneys in Spanish speaking countries. See Exh. B, Collingsworth Decl. ¶ 14-15.

226.    Mr. Collingsworth is before the court on Drummond Inc.'s Renewed Motion for Sanctions and Request for Evidentiary Hearing filed on February 2, 2015. See Doc. 180.

227.    This Court warned Defendants on multiple occasions of the seriousness of the situation and its concern regarding Defendants' witness payments.  See Doc. 63 (Oct. 10, 2013 Hrg. Tr.) at 45:23-46:12, 84:4-85:16; Doc. 105 (Apr. 3, 2014 Text Order); Doc. 123 (Apr. 21, 2014 Hrg. Tr.) at 19:6-16, 37:3-4.

228.    Mr. Collingsworth made statements to the Court on April 21, 2014 regarding security payments that were inaccurate and wrong. Doc. 189-21, Collingsworth Aff., ¶ 10.

229.    Specifically, Mr. Collingsworth's response, "That's correct," to the Court's question whether the three witnesses he identified were the only ones who had received security payments, was not accurate. Doc. 189-21, Collingsworth Aff., ¶ 12.

230.    Mr. Collingsworth has apologized and promised to be very careful not to let it happen again. Doc. 189-21, Collingsworth Aff., ¶ 7.

231.     Mr. Collingsworth represented that he was not expecting to make any statements at the hearing and responded with the names of Libardo Duarte, Jose Gelvez Albarracin, and Jairo Jesus Charris Castro as families who received security payments because he was familiar with the facts of security for these witnesses given he had personally been involved in setting it up. Doc. 189-21, Collingsworth Aff., ¶¶ 9, 11.

232.     Mr. Collingsworth acknowledges that when he stood up and volunteered the answers in response to a question to his counsel, Bradley Smith, Collingsworth had not reviewed the factual record of the case, including all discovery requests and objections and did not recall the security issues for Otero, El Tigre, and Samario. Doc. 189-21, Collingsworth Aff., ¶¶ 9, 13.

233.     Mr. Collingsworth's inaccurate statements have had serious repercussions for himself, his cases, his firm, and his family. See Exh. B, Collingsworth Decl. ¶ 22.

234.     As a human rights defender for most of his career, Mr. Collingsworth has always worked for relatively little income. He currently receives a small salary that allows him to maintain his family. His wife is an artist who brings home little income. He has two kids in college and cannot withstand a significant financial penalty. See Exh. B, Collingsworth Supp. Decl. ¶ 23.

235.     Mr. Collingsworth's incorrect statements have also caused problems in other human rights cases he is involved in, particularly the Dole and Chiquita cases where the defendants and their counsel are closely coordinating their tactics with Drummond. See Exh. B, Collingsworth Decl. ¶ 24.

236.     Human rights plaintiffs in multiple cases could be prejudiced if Mr. Collingsworth is sanctioned before trial on the merits in this case. Sanctions would have an impact on Mr.

Collingsworth's ability to effectively and vigorously prosecute these other cases. See Exh. B, Collingsworth Decl. ¶ 25.

237.    Mr. Collingsworth accepted many of the human rights cases that he currently has because most other lawyers would not take on these large, risky cases and the victims needed effective representation. If he is not able to represent them effectively, he does not think the victims could find other counsel to step in. See Exh. B, Collingsworth Decl. ¶ 25.

238.    This is not the first time an opponent has sought sanctions against Mr. Collingsworth, but to date, no sanctions against him have been upheld on appeal. See Exh. B, Collingsworth Decl. ¶ 26.

239.    Mr. Collingsworth did not intentionally seek to misrepresent the scope and extent of witness assistance payments to witnesses in his pleadings, interrogatory responses, sworn declarations, correspondence with the opposing party, and in open court.

240.    There was no litigation benefit in failing to disclose witness assistance payments because it was obvious the Court would eventually require disclosure.

241.    Mr. Collingsworth's inaccurate representations caused minimal delay and have not significantly increased the burden on this Court and Drummond, except for litigation related to Drummond's sanctions motion.

**E.  The Court's extremely broad and clear October 15, 2014 was the order that set out what was required to be produced or put on a privilege log**

242.    The Court's second chance October 15, 2014 order was the first time Drummond's definitions of "payments to witnesses" and "Columbian witnesses" became the operative definitions in this case. *See* Doc. 151, ¶ 9, n.2.

243.    The definition of "payments to witnesses" thus became:

> "Payments to witnesses" is meant to encompass – in the broadest sense possible – any documents or communications that relate to witness payments or any form of assistance to witnesses. This includes all documents relating to requests for payment, offers of payment, refusals to pay, actual payments, contemplated payments, suggestions of payment, proposals of payment, the logistics of effectuating payments, problems (legal, logistical, or otherwise) with payments, amounts of payments and rejections of offers of payments. "Payments to witnesses" is not in any way limited to "security" payments; rather it encompasses any payment or benefit (monetary or non-monetary) whatsoever to any witness, whether contemplated or completed, regardless of what any party contends was the purpose of the payment. Additionally, "payments to witnesses" is not limited to direct payments to witnesses, but also includes any benefit or things of value offered or provided to, or requested by, witnesses' lawyers, family members, "contacts", intermediaries, friends, girlfriends, paramours, associates or agents, or payments actually made to a security firm or some other person or entity providing security.

*See* Doc. 151, ¶ 9, n.2.

244.    The definition of "Colombian witnesses" became "any person claiming to have knowledge of Drummond's alleged collaboration with paramilitaries and includes people of any nationality. 'Columbian witnesses are <u>not</u> meant and should not be limited to witnesses who are citizens or residents of Columbia." Doc. 151, ¶ 9, n.1.

245.    No previous orders set forth these extremely definitions. Doc. 64 at 3-4.

246.    Drummond first served discovery requests seeking documents about witness payments related to witness protection in February 11, 2014. Doc. 187-17 (Pl.'s 3rd Reqs. for Produc.); Doc. 187-18 (Pl.'s 3rd Interrogs.) (together, "3rd Requests").

247.    Prior to the 3rd Requests in February 2014, there were no specific requests directly and clearly seeking all documents relating to witness assistance payments, Doc. 187-16 (Pl's 1st & 2nd Reqs. for Produc. & Interrogs.).

248.    Nevertheless, on July 1, 2013, Drummond filed a motion to compel discovery responses. Doc. 43.

249. Drummond's motion to compel sought to compel discovery "relevant to payments to . . . witnesses." Doc. 43 at 14; Doc. 187-16 (Pl's 1st & 2nd Reqs. for Produc. & Interrogs.).

250. None of the requests sought information regarding "payments to witnesses." Doc. 187-16 (Pl's 1st & 2nd Reqs. for Produc. & Interrogs.).

251. In its reply brief on the sanctions motion, Drummond argued that four requests listed in the Motion to Compel sought information about witness payments: 1-43, 1-64, 1-71, and 2-8. Doc. 193, at 5-7.

252. Three of the requests, Requests 1-43, 1-64, and 2-8, do not seek information about witness payments, and two of those, Requests Nos, 1-43 and 1-64, were not identified in Drummond's Motion to Compel as seeking witness payments. Doc 43 at 14, 20, Doc. 43-10 at 23, 29, Doc 43-12 at 4.

253. Request No. 1-71 makes no mention of witness payments. Doc. 43-10 at 11.

254. Defendants opposed the motion to compel and expressly argued that Drummond had not served a discovery request seeking witness payments. Doc. 46 at 20; Doc. 114 at 4.

255. The parties' joint report filed with the Court following the August 2013 teleconference with the Court did not reflect an agreement by the defendants to change Request No. 1-71 in the manner proposed by Drummond. Doc. 60 at 3.

256. Defendants noted that several statements in the proposed report were not accurate and failed to account for defendants' objections and limitations. Doc. 210-26.

257. Counsel for Defendants requested that Drummond "remove all references to me being agreeable to limitations or voicing no objections" to Drummond's proposed limitations. Doc. 210-27.

258. Drummond revised its proposed joint report to state that "Drummond agreed" to limit Request No. 71. Doc. 210-28.

259. Counsel for Defendants memorialized his understanding that Request No. 1-71 seeks "all communications regarding the allegation that Drummond collaborated with the AUC or the accusation that Drummond is guilty of human rights violations" and that Drummond has agreed to "limit this request with respect to co-counsel." Doc. 62-4 at 4.

260. The Court's October 15, 2013 Order states "[i]nterrogatories and requests for production on payments to witnesses are not overbroad and are properly within the scope of discovery." Doc. 64 at 3-4.

261. The Court's October 15, 2013 Order states, "For any documents (payments to witnesses or research regarding payments to witnesses) withheld on grounds of attorney client privilege or work product, the Magistrate Judge will examine the privilege log and related documents and will make independent findings for each issue remaining in dispute." Doc. 64 at 4.

262. Drummond's 3rd Requests were the first discovery requests to include a definition of "payments" that was ultimately included in the Court's October 15, 2014 Order. Doc. 187-17, ¶ 18; Doc. 187-18, ¶ 14.

263. Defendants objected to Drummond's definition of "payments." Doc. 187-19, ¶ 2 & pg. 3 (Defs.' Resps. & Objections to Pl's 3rd Reqs. for Produc.); Doc. 187-20, ¶ 2 & pg. 2 (Defs.' Resps. & Objections to Pl's 3rd Interrog.).

264. Drummond did not file a motion to compel responses to Drummond's Third Requests for production. Doc. 104.

265.    Drummond's definitions of "payments to witnesses" and "Colombian witnesses" did not become the operative definitions in this case until the Court issued its October 15, 2014 Order concerning privilege logs. Doc. 151, ¶ 9, n.2.

**F.  Huge efforts have been undertaken after the Court's October 15, 2014 order to disclose witness assistance payments and reasonable steps have been taken to protect the evidence.**

266.    The Court's October 15, 2014 order provided broad new parameters for the documents the parties were required to produce and/or log in the case. The October 15, 2014 Order followed months of negotiations between the parties about the scope of the requirements. The October 15, 2014 Order required that the parties comply with its terms by December 12, 2014. Declaration of Christopher Neiwoehner attached hereto as Exhibit S at ¶ 3.

267.    Conrad & Scherer hired a new legal team to ensure that Conrad & Scherer was in compliance with any discovery order. Doc. 187-4, Scherer Aff., ¶ 14.

268.    New counsel for Defendants entered the case shortly after the October 15, 2014 Order. Lead counsel Kenneth McNeil and other lawyers with Susman Godfrey filed their appearances on November 13, 2014.  The first attorney for the Spotswood, Sansom, and Sansbury, LLC firm, Robert Spotswood, did not file his appearance until November 13, 2014 as well. The first lawyer from Steptoe & Johnson to file an appearance, Christopher Niewoehner, did so on July 30, 2014. Niewoehner' Decl., Exh. S, ¶ 4

269.    To comply with the Court's October 15, 2014 Order, counsel for Defendants undertook a massive review of documents and data kept by Conrad & Scherer, LLP, Terrence Collingsworth, and/or International Rights Advocates.  Niewoehner' Decl., Exh. S, ¶ 5

270.    The review by the new team of lawyers had to be done in a matter of a few weeks and required a series of highly costly steps. Niewoehner' Decl., Exh. S, ¶ 6

271.    Conrad & Scherer devoted substantial resources and efforts to make sure all discovery responses were complete. Doc. 187-3, Frevola Aff. ¶ 13.

272.    In order to conduct an expansive search in response to the Court's October 15, 2014 Order, Conrad & Scherer's data had to be transferred into separate searchable data base system. Doc. 187-3, Frevola Aff., ¶ 6.

273.    Conrad & Scherer's computer system is designed to handle needs of a traditional law practice, including separate programs and systems for firm file case management, emails, back office administration and discovery document management. Doc. 187-3, Frevola Aff., ¶ 5.

274.    Conrad & Scherer cannot "push a button" and quickly respond to vast document requests involving multiple cases over a number of years. Doc. 187-3, Frevola Aff., ¶ 4.

275.    Conrad & Scherer's computer system is not designed to do massive and complex searches across the varied programs and servers that make up the system. Doc. 187-3, Frevola Aff., ¶ 3.

276.    Defendants first searched for and identified sources of documents and files used by personnel at Conrad & Scherer L.L.P. and International Rights Advocates who worked on matters related to Drummond. Exh. S, Niewoehner Decl.  ¶ 7.

277.    Searches were conducted by counsel for paper documents and files at Conrad & Scherer office in the Fort Lauderdale, Florida and Washington D.C., as well as pertinent files in the Quito, Ecuador office.  Exh. S, Niewoehner Decl. ¶ 7(a).

278.    Searches were made of computer servers and computers, as well as backup copies stored on different media and systems, located in the Conrad & Scherer offices in Fort Lauderdale and Washington D.C.  Exh. S, Niewoehner Decl. ¶ 7(b).

279.    The search for documents and electronic sources of data was difficult because of a cascading series of issues.  Exh. S, Niewoehner Decl. ¶ 8.

280.    Conrad & Scherer has a central computer system but the system was built for a small law firm—it is not the type of system that major companies have with sophisticated search capabilities. Exh. S, Niewoehner Decl. ¶ 8(a)i.

281.    Conrad & Scherer's computer system did not permit many types of "smart" searches. For example, the system did not permit searches seeking one search worked with five words of another. The limitations of the capabilities of the computer system meant that the searches conducted on it had to be over-inclusive. Exh. S, Niewoehner Decl. ¶ 8(a)ii.

282.     To resolve this problem, the data on Conrad & Scherer's computers had to be electronically processed and moved onto a different database system, called Relativity, which required significant work by outside vendors and Steptoe and Johnson personnel. Exh. S, Niewoehner Decl. ¶ 8(a)iii.

283.    The breadth of the Court's October 15, 2014 order required a search over the entire set of cases of Conrad & Scherer and all of its many personnel—not just emails of those directly working on the Collingsworth human right cases. Ultimately, Defendants searched the emails of over 100 different people at Conrad & Scherer L.L.P. and International Rights Advocates. Exh. S, Niewoehner Decl. ¶ 8(b).

284.    Defendants' also had to search other databases because Mr. Collingsworth did not join Conrad & Scherer until 2008 and kept emails and electronic files related to work done by International Rights Advocates at times on other servers or systems. Exh. S, Niewoehner Decl. ¶ 8(c).

285.     As some lawyers who worked with Mr. Collingsworth at Conrad & Scherer or International Rights Advocates used their own personal email accounts at times, Defendants also had to arrange to search those email accounts. Exh. S, Niewoehner Decl. ¶ 8(d).

286.     As many of the documents were in Spanish, Spanish-speaking lawyers were necessary to review those documents. Exh. S, Niewoehner Decl. ¶ 8(e).

287.     Adding further to the complication, a special confidentiality order in yet another unrelated case required a pre-screening to make sure certain confidential information from an unrelated third party in the other case was not mixed in with the documents reviewed in the search. Exh. S, Niewoehner Decl. ¶ 8(f).

288.     To solve those issues, Defendants devised a multi-step process for the review that involved processing the data into the Relativity database, running very complex search terms through that Relativity database, using teams of lawyers in Houston, Washington D.C., Birmingham, and Rockville, Maryland to do a first review of the documents for relevance, responsiveness and privilege. We also used an additional core group of reviewers to conduct a second review of the documents after the first screen to ensure consistency Exh. S, Niewoehner Decl. ¶ 9 a-d.

289.     Defendants also repeated the process by running different search terms to respond to all the different requirements of the Court's October 15, 2014 Order. This meant that Defendants conducted over nine different overlapping searches. Exh. S, Niewoehner Decl. ¶ 9(e).

290.     The complexity of the database searches and the number of separate category search terms used created a huge redundancy. But the overlapping searches gave a very high

assurance that all responsive documents were either logged or produced. Exh. S, Niewoehner Decl. ¶ 10.

291.   The search was one of the most complex that Defendants' lawyers had ever seen. The sheer quantity of the documents, combined with the wide breadth of the different search terms, meant that just one of the searches generated thousands of documents to review. Over 250,000 documents were entered into the Relativity database, and over 50,000 documents were reviewed individually by the review teams. Exh. S, Niewoehner Decl. ¶ 11.

292.   As a result of this process, Defendants produced a detailed privilege log of over 1800 pages with over 12,800 entries.  The privilege log and the supporting documents were organized to allow the Special Master and/or the Court review to both search the log itself and the documents. Exh. S, Niewoehner Decl. ¶ 12.

293.   Defendants also produced about 1,200 documents to Drummond through the course of these searches in addition to the documents that were produced before new counsel entered an appearance. To date, Defendants have produced more than 2,000 documents since new counsel appeared in this case. Exh. S, Niewoehner Decl. ¶ 13.

294.   This process was exceptionally expensive. Defendants estimate that they incurred more than $2 million in fees and costs by the time this was done. Exh. S, Niewoehner Decl. ¶ 14.

295.   Defendants continued to make additional efforts to locate and review documents in 2015.  Exh. S, Niewoehner Decl. ¶ 15.

296.   Defendants hired a top computer expert, Dennis Williams, to review the search procedure and to look for any emails or other electronic data that Conrad & Scherer's IT personnel had been unable to find. Exh. S, Niewoehner Decl. ¶ 15 (a).

297.    Dennis Williams is a retired Federal Bureau of Investigation (FBI) agent with more than 32 years of law enforcement experience. *See* April 14, 2015 Declaration of Dennis Williams attached hereto as Exh. T, ("Williams' April Decl."), at ¶ 2.

298.    Mr. Williams was an FBI certified computer forensics examiner responsible for conducting computer forensic exams, searches, and peer reviews of computer forensic examinations. Exh. T, Williams' April Decl., ¶ 2.

299.    One of Mr. Williams' tasks as computer forensics examiner for the FBI was responsibility for the collection of electronic information in the Enron investigation. Exh. T, Williams' April Decl., ¶ 5.

300.    In 2005, Mr. Williams became the Director of the Greater Houston Regional Forensics Laboratory (RCGL), which is a multi-agency task force and full-service forensics laboratory and training center focused on examining digital evidence in criminal investigations and various types of fraud. Exh. T, Williams' April Decl., ¶ 6.

301.    Mr. Williams is currently a Partner at Pathway Forensics, LLC ("Pathway"). As a Partner at Pathway, Mr. Williams has extensive experience in e-discovery, digital forensics acquisition and analysis. Exh. T, Williams' April Decl., ¶ 8.

302.    Mr. Williams is currently an EnCase certified examiner (EnCE), which is an international recognized forensics certification. Exh. T, Williams' Decl., ¶ 9.

303.    Pathway attempted to locate certain electronic data that Conrad & Scherer was unable to find in connection with its recent document search in the above referenced litigation. Exh. T, Williams' April Decl., ¶ 12.

304.    Pathway reviewed the sufficiency and thoroughness of Defendants' initial e-discovery efforts. Exh. T, Williams' April Decl., ¶ 12.

305.   Pathway investigated whether or not any of the information still not located appears to have been intentionally deleted. Exh. T, Williams' April Decl., ¶ 12.

306.   Mr. Williams also reviewed Mr. Collingsworth's computer history, including the retention and replacement of his computers and hard drives and the efforts undertaken to save and transfer electronic information from old computers and hard drives to replacement machines to determine whether discarding or replacing computers has any correlation to the remaining email gaps in Collingsworth's Conrad & Scherer and International Rights Advocates ("IRAADvocates") email accounts. Exh. T, Williams' April Decl., ¶ 13.

307.   Mr. Williams also assessed how the email gaps in Collingsworth's Conrad & Scherer and IRAAdvocates email accounts occurred. Exh. T, Williams' April Decl., ¶ 14.

308.   Mr. Williams interviewed Collingsworth, interviewed current and former employees at Conrad & Scherer, IRAAdvocates, including IT professionals, attorneys, paralegals, and secretaries; Exh. T, Williams' April Decl., ¶ 16.

309.   Pathway was given un-restricted access to system files and infrastructure set up. *See* March 11, 2015 Declaration of Dennis Williams (Williams' March Decl.) attached Exhibit. U, at ¶ 20.

310.   The Conrad & Scherer computer system had various components where information was stored, including an email server and back-ups. Conrad & Scherer also utilized a third-party-owned cloud based ShareFile server and maintained email containers on specific individual computers in other offices. Exh. U, Williams' March Decl., ¶ 22.

311.   The searches that were done across the computer system were redundant. Exh. U, Williams' March Decl., ¶ 23.

312. The redundant searches insured the likelihood of not missing any responsive information. Exh. U, Williams' March Decl., ¶ 23.

313. Williams interviewed various IT personnel at Conrad & Scherer to get an understanding of how earlier searches had been conducted. Exh. U, Williams' March Decl., ¶ 26.

314. A thorough and reasonable search was done in light of the normal standards for electronic discovery. Exh. U, William's March Decl., ¶ 27.

315. The additional information found by Pathway could easily have been missed despite a thorough search. The additional information was in backups and hard drives that could have easily been overlooked. Exh. U, Williams' March Decl., ¶ 29.

316. Mr. Williams did not find any indications that emails or computers were intentionally disposed of or deleted to destroy evidence. Exh. T, Williams' April Decl., ¶ 124.

317. There is substantial evidence reflecting the transition and transfer of electronic information from Collingsworth's old devices to new devices. Exh. T, Williams' April Decl., ¶ 125.

318. Collingsworth's efforts to save and/or transfer his electronic information, including emails, from old computers to replacement computers were reasonable. Exh. T, Williams' April Decl., ¶ 126.

319. Third-party IT support personnel failed to properly transfer some of Collingsworth's emails from one computer to a replacement computer. Exh. T, Williams' April Decl., ¶ 127.

320. Collingsworth was having problems with maintaining his email accounts and archiving his email during the time period of missing emails. Exh. T, Williams' April Decl., ¶ 128.

321.    Despite Collingsworth's efforts to preserve his email between March 2011 and March 2013, copies of his email were not retained on the Conrad & Scherer servers. Exh. T, Williams' April Decl., ¶ 128.

322.    Third party personnel did not properly preserve or convert the archived emails on Collingsworth's Mac laptop, which is the likely cause for the gaps in Collingsworth's Conrad & Scherer and IRAadvocates emails between March 2011 and March 2013. Exh. T, Williams' April Decl., ¶ 129.

323.    There is no indication that emails or computers were intentionally disposed of or deleted to destroy evidence. Exh. T, Williams' April Decl., ¶ 21.

324.    There is overwhelming evidence reflecting Collingsworth's email problems and the reasonable efforts that were taken by Collingsworth and his assistants to save or back-up his electronic information, including emails, from old computers to the Conrad & Scherer system or to save and transfer the electronic information from the old computer to a replacement computer before he replaced the old computer. Exh. T, Williams' April Decl., ¶ 22.

325.    In nearly all instances, the emails from the old computer were saved on the Conrad & Scherer system, or properly transferred to a new or replacement computer. Exh. T, Williams' April Decl., ¶ 23.

326.    There were some anomalies that likely explain why gaps still exist. Exh. T, Williams' April Decl., ¶ 23.

327.    In May 2010, a third-party IT support-company failed to properly transfer Collingsworth's archived email files from an old computer to a replacement computer, which likely caused the gap in his IRA Advocates email account from June 2008 to February 26, 2010. Exh. T, Williams' April Decl., ¶ 27, 127.

328.    It also appears that third party IT support personnel failed to configure his email properly on his MacBook. Exh. T, Williams' April Decl., ¶ 28.

329.    Several attempts were made by a third party IT support company to archive his email in April, May, October, and November of 2011, Other attempts also were made to archive his email on his MacBook, including in 2013, when Collingsworth took the MacBook to the Apple Genius Bar to fix his Outlook email. Exh. T, Williams' April Decl., ¶ 29.

330.    The remaining gaps in Collingsworth's email accounts between March 2011 and March 2013 were likely caused by third-party IT support personnel setting a rule to archive his emails on the MacBook and not selecting the option to retain a copy of his emails on the Conrad & Scherer servers. Exh. T, Williams' April Decl., ¶ 35, 129.

331.    Collingsworth was not aware that emails were stored on his MacBook and they were no longer on the Conrad & Scherer servers. Exh. T, Williams' April Decl., ¶ 33.

332.    Defendants located, as a result of the work by Mr. Williams, some backup files containing emails for Mr. Collingsworth, which closed some of the strange missing gaps in Mr. Collingsworth's email records. Exh. S, Niewoehner Decl. ¶ 15(b).

333.    Defendants reviewed the newly-located emails from Mr. Collingsworth using the same multi-step process as before, although this process was even more complicated because it turned out that many of the newly-located emails had been searched before. For example, if Mr. Collingsworth received an email that was also sent to other Conrad & Scherer employees, the prior searches would have found the email in the email accounts of the other employees. As a result, it took extensive efforts to determine which of the newly-located emails had not already been searched. Exh. S, Niewoehner Decl. ¶ 15(c).

334.    The review process of these newly-located emails confirmed that the earlier redundant search efforts had been successful. Exh. S, Niewoehner Decl. ¶ 15(d).

335.    One search of about 11,079 newly-located Collingsworth emails and attachments resulted in the production of about 22 new documents and the logging of approximately 41 privileged documents. Exh. S, Niewoehner Decl. ¶ 15(d)i.

336.    A second search of about 55,971 newly-located Collingsworth emails and attachments resulted in the production of about 132 new documents and the logging of about 63 privileged documents. Exh. S, Niewoehner Decl. ¶ 15(d)ii.

337.    A third search of about 14,329 newly-located Collingsworth emails and attachments resulted in the production of about 129 new documents and the logging of about 66 privileged documents. Exh. S, Niewoehner Decl. ¶ 15(d)iii.

338.    Defendants have also continued to search for any other sources of documents. For example, there was a former employee of International Rights Advocates, Lorraine Leete, who left the organization in late 2014.  Ms. Leete used her own personal computer and personal email at times for her work with International Rights Advocates.  Ms. Leete had searched her computer and personal email for responsive documents before she left, but Defendants got her agreement to give Defendants access to her personal computer and personal email again so they could double check her earlier efforts. That process is ongoing and Defendants will produce or log whatever new documents are identified in that review. Exh. S, Niewoehner Decl. ¶ 16.

339.    Conrad & Scherer personnel have also spent thousands of hours attempting to comply with the Court's October 2014 Order. Doc. 187-3, Frevola Aff., ¶ 13.

340.    Defendants have supplemented their interrogatories and produced additional documents. Doc. 187-3, Frevola Aff., ¶ 16.

341.    Conrad & Scherer's goal is to fully comply with its discovery obligations and make full disclosure to the Court. Doc. 187-3, Frevola Aff., ¶ 15.

**G. Conrad & Scherer acted in good faith in its dealings with the Court and undertook significant cost and effort to comply with the Court's orders**

342.    Conrad & Scherer is based in Ft. Lauderdale, Florida with a satellite office in Washington DC. During relevant time periods, it had 22 lawyers and 34 staff members. Doc. 187-4, Scherer Aff., ¶¶ 3-4.

343.    Conrad & Scherer has been AV Preeminent Peer Rated by Martindale-Hubble since 1987. Doc. 187-4, Scherer Aff., ¶ 3.

344.    As a law firm Conrad & Scherer, L.L.P. has never been sanctioned. Doc. 187-4, Scherer Aff., ¶¶ 6, 13.

345.    William R. Scherer, Jr. is a senior partner of Conrad & Scherer, L.L.P. Doc. 187-4, Scherer Aff., ¶ 2.

346.    Mr. Scherer is well known in Florida and was local counsel for President George W. Bush in the case known as *Bush v. Gore*. Doc. 187-4, Scherer Aff., ¶ 7.

347.    Mr. Scherer is an experienced attorney. From 1988 to 2005, Mr. Scherer was the General Counsel to the North Broward Hospital District, one of the largest public health care providers in the nation. Doc. 187-4, Scherer Aff., ¶ 8.

348.    In 2012, Mr. Scherer was lead counsel for victims of the multi-billion dollar Ponzi scheme orchestrated by Scott Rothstein in South Florida. Doc. 187-4, Scherer Aff., ¶ 9.

349.    In 2014, Mr. Scherer was retained to represent the State of Florida in bringing a major fraud case on its behalf against executives of Digital Domain Media, a movie special effects company founded by director James Cameron. Doc. 187-4, Scherer Aff., ¶ 10.

350.     Conrad & Scherer has been involved in mass tort cases in South America since 2006 against companies such as Coca Cola, Dyncorp International, and Chiquita Brands, among others. Doc. 187-4, Scherer Aff., ¶ 12.

351.     Mr. Scherer has never been sanctioned. Doc. 187-4, Scherer Aff., ¶ 6.

352.     Conrad & Scherer recently hired a new legal team to ensure that Conrad & Scherer was in compliance with any discovery orders. Doc. 187-4, Scherer Aff., ¶ 14.

353.     Since hiring the new legal team Conrad & Scherer has spent $2 million in ensuring compliance with discovery orders. Doc. 187-4, Scherer Aff., ¶ 15.

354.     Conrad & Scherer's goal is to fully comply with its discovery obligations and make full disclosure to the Court. Doc. 187-3, Frevola Aff., ¶ 15.

355.     Since hiring the new legal team, Conrad & Scherer has spent $2 million in ensuring compliance with discovery orders. Doc. 187-4, Scherer Aff., ¶ 15.

356.     Conrad & Scherer personnel have also spent thousands of hours attempting to comply with the Court's October 2014 Order. Doc. 187-3, Frevola Aff., ¶ 13.

357.     Defendants have supplemented their interrogatories and produced additional documents. Doc. 187-3, Frevola Aff., ¶ 16.

358.     Mr. Scherer, managing partner of Conrad & Scherer, was not directly involved in the actual day to day litigation of the Drummond matters. Doc. 231-11, at 6.

359.     Mr. Scherer receives an estimated thousands of emails every month. He did receive one email report in May 2011 indicating that payments would be made to Mr. Otero for security that included a brief reference to security payments for families of El Tigre and Samario Doc. 231-11, at 6.

360.    Mr. Scherer was not aware of exactly what Mr. Otero was doing with money he was sent. Doc. 231-11, at 6.

361.    Certain lower-level employees of Conrad & Scherer, including employees in the accounting department, were aware of the monthly payments to Mr. Otero for security, but those individuals were not aware of exactly what Mr. Otero did with the money. Doc. 231-11, at 6.

362.    Conrad & Scherer did not make payments to Blanco. Doc. 114-2, ¶ 8.

363.    Conrad & Scherer did not make payments to Blanco's criminal defense lawyer. Doc. 114-2, ¶ 8.

364.    Mr. Scherer did not know about the payments to Blanco by the van Bilderbeeks. Doc. 189-22 at 6-7 (Defs.' 2nd Am. & Supplemental Objections & Resps. To Pl.'s 3rd Set of Interrog. No. 2).

365.    Mr. Scherer also did not about Mr. Blanco's attempt to delay finalizing his declaration in the Drummond case pending Mr. Van Bilderbeek's fulfillment of his arrangement with Mr. Blanco. Doc. 174-20, at 7.

366.    Mr. Scherer has only just learned about it in the course of Defendants' response to discovery requests in this case. No Conrad & Scherer money was used to make those payments. Doc. 174-20, at 7

367.    Conrad & Scherer did not intentionally misrepresent the scope and extent of payments to witnesses in pleadings, interrogatory responses, sworn declarations, correspondence with the opposing party, and in open court.

368.    Conrad & Scherer has gone to extreme lengths to comply with this Court's October 15, 2014 discovery order.

369.     Conrad & Scherer was not aware the representations made by Terry Collingsworth to this Court were not accurate at the time they were made.

370.     Conrad & Scherer was at all times represented in this litigation by counsel, Bradley Smith, of Clark Hair & Smith, P.C., and not by its partner Terry Collingsworth, who is a separate defendant.

371.     At all times Conrad & Scherer relied upon its counsel to provide appropriate and ethical representation to protect the interests of Conrad & Scherer.

372.     Drummond does not accuse counsel for Conrad & Scherer of any ethical misconduct or improper actions, and does not seek sanctions against its counsel.

373.     Conrad & Scherer has acted diligently, responsively, and in good faith at all times with this court.

374.     Conrad & Scherer has corrected any representations made to this Court that were not accurate and have made a good faith and diligent effort to comply with this Court's discovery orders.

375.     Defendants redactions to portions of documents that reflected their witness payments were made in good faith and do not constitute "alteration of evidence."

376.     Defendants' redactions to documents were made with no intent to misrepresent or to obstruct and delay the enforcement of this Court's orders or to disrupt this litigation.

377.     The Court finds Defendants' explanations for their conduct credible.

378.     There is no benefit in failing to disclose witness assistance payments where assistance was necessary to bring out the truth.

379.     There is no benefit in failing to disclose witness assistance payments where the assistance was legal.

380.     There is no benefit in failing to disclose witness assistance payments where part of the assistance has already been disclosed.

381.     There is no benefit in failing to disclose witness assistance payments where it was obvious the Court would eventually require disclosure.

382.     The Court further specifically finds that Mr. Collingsworth's proffered reasons for his representations on April 14, 2014, (Doc. 187-21) are credible and supported by Defendants' actions to search for responsive documents and come forward and voluntarily disclose information in the months following the April 14, 2014 hearing.

383.     Mr. Collingsworth's inaccurate representations caused minimal delay and have not significantly increased the burden on this Court and Drummond, except for litigation related to Drummond's Sanctions motion.

384.     Drummond's decision to file an emergency motion for sanctions in April 2014, rather than meeting and conferring over particular documents first, and its decision to file this motion for sanctions, after nearly all information had been produced, has caused unnecessary delay and greatly increased the burden on this Court.

385.     Mr. Collingsworth's in-accurate representations caused Plaintiff no harm and minimal expense and minimal attorneys' fees and costs.

386.     Drummond's decision to file an emergency motion for sanctions in April 2014, rather than meeting and conferring over particular documents first, and its decision to file this motion for sanctions, until after all information had been produced, has resulted in excessive and unnecessary attorneys' fees and costs.

387.     Defendants did not intentionally destroy or fail to preserve email or computer devices subject to discovery in this case.

388.    Defendants made reasonable efforts to preserve email and computer devices subject to discovery in this case.

389.    Alternate evidence is available from other email and computer devices maintained by Collingsworth and/or Conrad & Scherer.

390.    Drummond has not been prejudiced by any destruction or failure to preserve email or computer devices subject to discovery in this case.

391.    Conrad & Scherer has incurred substantial expense as a result of Mr. Collingsworth's inaccurate statements.

392.    Mr. Collingsworth's inaccurate statements have harmed other Conrad & Scherer cases.

393.    Conrad & Scherer will be prejudiced in other cases if sanctions are issued before a trial on the merits.

**H. The disclosure issue is separate from the merits of the truth of Drummond's assistance to the AUC; the evidence is available for trial, and only Defendants' credibility has been hurt.**

394.    This is a libel case brought by Drummond against Defendants. See Plaintiff's Original Complaint, Doc. 1.

395.    The primary issues to be decided are either the truth of the statements regarding Drummond's assistance to the AUC or the reasonableness of Defendants' belief as to the truth of those statements.

396.    Substantive depositions have not begun in this case and there is no current trial setting in this matter.

397.    The disclosures made concerning payments by Defendants to witnesses or the families of witnesses go to the credibility of the Defendants and their witnesses.

398.    The Court's October 15, 2014 order unequivocally required Drummond to produce all documents related to fact of witness payments. Doc. 64 at 3-4.

399.    The Court's October 15, 2014 order defines Columbian witnesses very broadly and defines "payments to witnesses" broadly. Doc. 64 at 3-4.

400.    Drummond has not produced any documents showing payments to AUC witnesses, yet there is a long list of evidence that Drummond financed and openly interacted with the AUC.

401.    Declaration of Jose Gelvez Albarracin, former AUC member: "At this meeting [with Rafael Peña Ríos, Luis Carlos Rodriguez, and Jim Adkins, among others] we discussed and we all agreed that we would support the AUC with money for arms and supplies. We also agreed that we would give the AUC a monthly payment to cover the salaries, food, and costs of the AUC troops. We also agreed to buy the AUC some vehicles and supply them with fuel. There was no objection to any of these agreements from anyone present. . . . Besides receiving funding and other support from Drummond and Prodeco, the AUC also entered the Drummond mine freely." Doc. 187-10, ¶¶ 16, 19 (Gelvez Decl.).

402.    Declaration of Libardo Duarte, former AUC member: "The AUC, Drummond managers, and the Colombian military all interacted and cooperated. . . . Jaime Blanco's place was our hangout because he got the contract to run the Drummond casino precisely because he was closely aligned with the AUC. Sometime in 1999, I learned from Omega that Drummond had a major agreement with the AUC, and that Drummond paid the AUC about $500,000 (U.S.) per month. This covered our operations – payments for the soldiers, equipment, transport, supplies, food, and drinks. Whatever was left over went up the line to Jorge 40 and Carlos Castaño. . . . The other major way that Drummond provided major funding to the AUC was to

contract with other businesses, and as a requirement of getting Drummond's business, these contractors had to make payments to the AUC." Doc. 187-11, ¶¶ 29-31 (Durante Decl.).

403.     Declaration of Jaime Blanco Maya: "'El Tigre,' was the commander of the AUC in the region and he asked me to be the intermediary between the AUC and Drummond. He was hoping that Drummond would financially support the AUC. . . . After two or three trips [Adkins] told me that he had raised the issue of funding El Tigre's front of the AUC and that Garry Drummond had agreed to the idea. Adkins thought it was impossible for Drummond to pay the AUC directly. As a result, we had to devise a strategy to make payments to the AUC through my company, ISA. . . . The first monthly payment by Drummond of roughly $30 million Colombian pesos to the AUC was made, but during the first month Adkins told me that if in some months he could not bring the required cash, I should charge any funds that were needed to Drummond through ISA, by creating false charge or overcharging for services not provided." Doc 187-12. 12, ¶¶ 16, 18, 21 (Blanco Decl.).

404.     Nevertheless, Drummond witnesses denied even being in contact with the AUC, despite the fact that the AUC operated all around the Drummond mine.

405.     Garry Drummond, CEO, Drummond Company, Inc.: **Q:** "Do you know, as you sit here, whether any Drummond employee, whether Drummond Company, Inc. or Drummond Ltd. ever had even a conversation with a member of the AUC?" **A:** "I do not know of any conversations that a Drummond Company employee had with the AUC." Doc 187-7 at 7:11-17 (Garry Drummond Dep. Tr.).

406.     Alfredo Araujo, Manager of Community Relations for Drummond in Colombia: "**Q:** So as far as you know, no one at Drummond was ever tasked with officially communicating with the AUC? **A:** "I believe that at Drummond, and I'm almost certain—in fact, I am certain

no—nobody had official or inform- -- or informal contact with members of the AUC." **Q:** "Not even informal contact?" **A:** "I'm certain there was no contact, formal or informal." Doc 187-8 at 121:2-11 (Alfredo Araujo Dep. Tr.).

407.   James Michael Tracy, President of Mining for Drummond Inc.: **Q:** "And during that same time period, to your knowledge, did any Drummond employee have communications with the AUC?" **A:** "Not to my knowledge." **Q:** "And have you personally ever had any communications with a member of the AUC?" **A:** "No." Doc 187-9 at 75:13-19 (James Michael Tracy Dep. Tr.).

408.   The evidence stands in stark contrast to Drummond's story that its personnel had never spoken or met with members of the AUC, much less participated in a scheme to finance the AUC.

409.   Alfred Araujo, a former executive with Drummond, has been arrested over the alleged 2001 murders the subject of this litigation. *See* May 26, 2015 Emma Rosser Article attached as Exh. V.

410.   News reports state that Drummond is paying Araujo's attorney fees. *See* Exh. V, Emma Rosser Article

411.   Drummond is paying Mr. Araujo's attorney's fees.

412.   Drummond's president Linares said that Drummond has vowed a "campaign" to show how the plaintiff's lawyers are a criminal venture. See April 7, 2015 El Tiempo article attached as Exh. W.

413.   Given the serious nature of the allegations and the disputed evidence, a trial is necessary to determine the credibility of the witnesses.

414. The interests of justice would not be served by granting Drummond the relief it seeks.

## CONCLUSIONS OF LAW

### I. A DEFAULT JUDGMENT IS NOT WARRANTED UNDER EITHER THIS COURT'S INHERENT POWER OR RULE 37.

The Court finds that a default judgment should not be entered under the Court's inherent authority or Rule 37 because both require a finding of bad faith or willfulness, and the Court finds there is no evidence of either in this case. As explained more fully below, this Court is subject to important constraints on entering a default judgment on liability, whether using the Court's inherent and discretionary powers or Rule 37: (a) the burden of proof of the requisite bad faith is by "clear and convincing evidence", and (b) the default remedy is an extreme punitive sanction that should not be used if lesser sanctions are adequate to protect the administration of justice.

Furthermore, inherent powers should not be used when discovery issues are involved and Rule 37 provides an available statutory remedial scheme.

The Court finds that Drummond has failed to adequately show that a default judgment is appropriate, especially in light of these constraints, under its inherent powers.

Moreover, sanctions are not warranted under the standards set forth in Rule 37.

Even under Rule 37, bad faith must be shown by clear and convincing evidence. It would be error for this Court not to evaluate all less draconian sanctions before imposing default, yet Drummond has refused to submit any evidence on less draconian monetary remedies.

The Court finds that it must take into account the financial ability of the alleged offender to pay a requested sanction, and Drummond has not provided evidence of the amount of any monetary sanction, or established that Collingsworth has the means to pay any such monetary

sanction.  The Court also finds that imputation of any bad faith finding against an individual offender cannot be imputed against his law firm, as explained more fully below.

In addition, Rule 37 sanctions are not available because the Court finds that no discovery order has been violated and that Drummond has not suffered substantial prejudice from the defendants' alleged misconduct.

### A.    Conditions required for a default judgment under the Court's inherent authority.

A court can exercise its inherent authority to issue sanctions only upon a finding of bad faith. *See Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1306 (11th Cir. 2009) ("The key to unlocking a court's inherent power is a finding of bad faith."). Bad faith occurs in extreme situations:

- When "fraud has been practiced on the court," *Chambers v. NASCO, Inc.,* 501 U.S. 32, 46 (1991), or the "very temple of justice has been defiled," *Byrne v. Nezhat*, 261 F.3d 1075, 1106 (11th Cir. 2001), *abrogated on other grounds Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008);

- "[W]here an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent," *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998);

- "[B]y delaying or disrupting the litigation or hampering enforcement of a court order," *id.*; or

- When a party "commits perjury or . . . doctors evidence that relates to the pivotal or linchpin' issue in the case." *In re Brican Am. LLC Equip. Lease Litig.*, 977 F. Supp. 2d 1287, 1292 (S.D. Fla. 2013) (internal quotations omitted).

False or incorrect statements alone do not compel a finding of bad faith. That is, "[w]ithout a 'smoking gun' statement from the plaintiff, *i.e.*, 'I know my claim is frivolous and I am pursuing this claim to harass the defendants,' a district court makes a determination of bad faith by drawing inferences from the conduct before it. Standing alone, a false or inconsistent statement in a deposition does not compel the conclusion of bad faith." *Byrne*, 261 F.3d at 1125.

Although courts can exercise their inherent powers to issue sanctions "even if procedural rules exist which sanction the same conduct," *Chambers*, 501 U.S. at 49, "when there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power," *id.* at 50. Finally, courts must "exercise caution in invoking [their] inherent power." *Thomas v. Tenneco Packaging Co.*, 293 F.3d 1306, 1320 (11th Cir. 2002) (quoting *Chambers,* 501 U.S. at 50).

The party seeking sanctions carries the burden of proving bad faith. *See Wandner v. Am. Airlines, Inc.*, No. 14-cv-22011, 2015 WL 145019, at *10 (S.D. Fla. Jan. 12, 2015). For sanctions such as default judgment, proof of bad faith must be shown by "clear and convincing evidence." *Id.* at *13; *see also In re Brican Am. LLC Equip. Lease Litig.*, 977 F. Supp. 2d at 1293, n.6 (quoting *Compton v. Alpha Kappa Alpha Sorority, Inc.*, 938 F. Supp. 2d 103, 104-05 (D.D.C. 2013)).

"Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers v. NASCO, Inc.*, 501 U.S. at 44. "Restraint is particularly important where . . . the case presents complex factual and legal issues." *In re Orthopedic Bone Screw Prods. Liab. Litig.,* 193 F.3d 781, 796 (3d Cir. 1999).

### B.      Conditions for a default judgment under Rule 37.

Four conditions must be present for a default judgment to be entered as a sanction under Rule 37: (1) there must be a discovery order, (2) which the offending party violated willfully or in bad faith, (3) resulting in prejudice to the other party, and (4) a finding by the court that less drastic sanctions would not achieve Rule 37's desired deterrent effect. *See Scipione v. Advance Stores Co.*, 294 F.R.D. 659, 664-65 (M.D. Fla. 2013) (citing *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639 (1976)); *see also United States v. Certain Real Property*

*Located at Route 1, Bryant, Ala.*, 126 F.3d 1314, 1318 (11th Cir. 1997) (holding that "circuit precedent clearly dictates" that a default judgment under Rule 37 "must be preceded by an order of the court compelling discovery, the violation of which might authorize such sanctions"); *Aztec Steel Co. v. Fla. Steel Corp.*, 691 F.2d 480, 482 (11th Cir. 1982) (Rule 37 sanctions designed "to prevent unfair prejudice to the litigants"); *United States v. Real Property Known As 200 Acres of Land Near FM 2686 Rio Grande City, Tex.*, 773 F.3d 654, 660 (5th Cir. 2014) (in order for default judgment to be entered, "the penalized party's discovery violation must be willful," and the "drastic measure is only to be employed where a lesser sanction would not substantially achieve the desired deterrent effect"); *United States v. Varnado*, 447 F. App'x 48, 51 (11th Cir. 2011) (holding "[t]he district court must also determine that lesser sanctions would not serve the interests of justice" before it enters default judgment).

A default judgment, the most severe sanction available under Rule 37, "is a drastic sanction that should be used only in extreme situations because it is preferable for cases to be heard on the merits. . . ." *Varnado*, 447 F. App'x at 51. Because a default judgment precludes a trial on the merits, the Eleventh Circuit has "consistently . . . found Rule 37 sanctions such as dismissal or entry of default judgment to be appropriate . . . only 'where the party's conduct amounts to flagrant disregard and willful disobedience of discovery orders.'" *Certain Real Prop. Located at Route 1, Bryant, Ala.*, 126 F.3d at 1317 (quoting *Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1987)). Such a demanding standard is necessary because sanctions under Rule 37 must be "just," which means the severity of the sanction must bear a close relation to the conduct at issue. *Bonds v. District of Columbia*, 93 F.3d 801, 808 (D.C. Cir. 1996) (citing *Ins. Corp. v. Compagnie des Bauxites de Guinée*, 456 U.S. 694, 707 (1982)).

### C.  The Court finds that the conditions required for entering a default judgment under its inherent authority or Rule 37 are not present here.

1.        **The Court finds that no order in this case has been violated.**

The Court finds that the defendants were never in violation of the October 15, 2013 Order or any subsequent discovery order.

The October 15, 2013 Order determined that "[i]nterrogatories and requests for production on payments to witnesses are not overbroad and are properly within the scope of discovery." Doc. 64 at 3 (emphasis added). But, there were no outstanding discovery requests as of the issuance of that order that directly sought information regarding witness payments.

Nor were defendants in violation of that order after Drummond served its 3rd Requests in February 2014, which were the first requests that expressly sought information about witness payments. The 3rd Requests included an entirely new and, according to defendants, overly broad definition of "payments to witnesses" to which defendants objected and which was not a part of the October 15, 2013 Order.

As a result, prior to this Court's October 15, 2014 Order, wherein it adopted the "payment to witnesses" definition contained in the 3rd Requests, defendants had a good faith basis for objecting on this ground and construing "payments to witnesses" narrowly as only those payments flowing directly from Conrad & Scherer to a witness or a witness's family. In other words, it was not until the Court issued its October 15, 2014 Order that it was clear that the definition of witness payments in Drummond's 3rd Requests would be operative in this case. The Court finds that Defendants complied with its October 15, 2014 Order, and notes that Drummond does not argue that they did not. Accordingly, the Court finds that the defendants have not violated any of its orders and, therefore, no Rule 37 sanctions, including a default judgment, are available. *Certain Real Prop. Located at Route 1, Bryant, Ala.*, 126 F.3d at 1318.

**2.    The Court finds that the incorrect statements made by Mr. Collingsworth to the Court in April 2014 were not made in bad faith.**

A finding of bad faith is necessary to impose sanctions pursuant to the Court's inherent authority. *Eagle Hosp. Physicians*, 561 F.3d at 1306. Mr. Collingsworth has now admitted that statements he made at the April 2014 hearing were inaccurate and should not have been made. Ex. 21, ¶¶ 2-14 (Collingsworth Decl.). Such an admission does not constitute bad faith under applicable case law. Further, the Court finds that Mr. Collingsworth has fixed the issue through additional supplementation in compliance with the October 15, 2014 Order.

A false or incorrect statement to the Court, standing alone, cannot constitute bad faith. *Byrne*, 261 F.3d at 1125. Further, the party seeking sanctions has the burden of proving by clear and convincing evidence that Mr. Collingsworth's statements meet the bad faith standard. *Wandner*, 2015 WL 145019, at *13.  The Court finds that Drummond has not met its burden of proof and that Mr. Collingsworth's statements were not made willfully or in bad faith. As a result, the Court declines to exercise its inherent authority power to sanction Mr. Collingsworth for the statements.

**3.    The Court finds that Drummond has not been prejudiced because defendants complied with the October 15, 2014 Order.**

The Court also finds that sanctions are unwarranted because Drummond has not been prejudiced. The definitions of "witness" and "payments" was not included in any Court order prior to October 15, 2014. After the Court issued its order, the Court finds that the defendants promptly undertook massive and costly efforts to comply with it, as illustrated by the defendants' revised privilege log which is 2,444 pages long, logs over 12,800 documents, and was completed within weeks after this Court's order was issued.  The Court also finds that the defendants served interrogatory responses on four separate occasions between November 2014 and March 2015.

Accordingly, this Court finds that no sanctions are needed to force defendants to properly participate in the discovery process or otherwise protect the administration of justice.

> **4.  The Court finds that a default judgment cannot be entered against Conrad & Scherer because there is no evidence that Conrad & Scherer acted in bad faith.**

Drummond argues that, in addition to Mr. Collingsworth, the law firm Conrad & Scherer should be sanctioned under both Rule 37 and this Court's inherent power. As this Court has previously found, however, the firm has not violated any discovery order triggering Rule 37. Therefore, default cannot be entered against the firm under Rule 37 for that reason alone.

Moreover, in order to impose sanctions on Conrad & Scherer, the Court finds that there must be independent evidence of bad faith on the part of the firm, not merely imputation of alleged bad faith on the part of Mr. Collingsworth, a partner in the firm.  *See Wolters Kluwer Fin. Serv. V. Scivantage*, 564 F.3d 110, 114 (2d Cir. 2009) ("the district court imputed [the firm's partner's] bad faith to [the firm] because [the firm] failed to prevent what she did.  But we have held that '[b]ad faith is personal' and 'may not automatically be visited' on others. . . . Accordingly, absent other specific evidence of [the firm's] bad faith, a sanction under the court's inherent power is unjustified." (citation omitted)).  And this same principle protects a client from automatically bearing the cost of sanctions imposed on its lawyer. See *Byrne v. Nezhat*, 261 F.3d 1075, 1123 (11th Cir. 2001) (abrogation on other grounds recognized by *Douglas Asphalt Co. v. QORE, Inc.,* 657 F.3d 1146, 1151 (11th Cir. 2011)) ("To support its finding of bad faith and otherwise sanctionable conduct [on the part of the client], the court impermissibly relied solely on the actions of counsel . . . . Sanctionable conduct by a party's counsel does not necessarily parlay into sanctionable conduct by a party") (citation omitted).

Contrary to Drummond's contentions, "[o]ne person's bad faith may not be attributed to another by operation of legal fictions or doctrines such as respondeat superior or vicarious liability." G. P. Joseph, *Sanctions: The Federal Law of Litigation Abuse* § 27(A) at 522 (5th Ed. 2013). And that rule has particular force here where Conrad & Scherer, during the relevant time frame, appeared in this Court solely through its counsel, Bradley Smith. Drummond does not does not accuse Conrad & Scherer's counsel – who was responsible for properly and ethically representing the firm -- of any misconduct whatsoever. And Drummond presents no evidence that Conrad & Scherer itself separately engaged in bad faith conduct in connection with the alleged misstatements of Mr. Collingsworth or the other events in this litigation for which it seeks sanctions.

Drummond suggests that Conrad & Scherer engaged in bad faith by failing to disclose payments to Blanco of which, Drummond alleges, the firm "was clearly aware." *See* Pl.'s Mot. at 18, n.12. But the Court finds that Drummond has not offered substantial evidence to support that assertion or evidence from which the Court could conclude that the firm was directly involved in a misrepresentation to this Court. Bill Scherer, managing partner of the firm, has submitted sworn testimony that he knew nothing about the payments to Blanco by the van Bilderbeeks. See Ex. 22 at 6-7 (Defs.' 2nd Am. & Supplemental Objections & Resps. To Pl.'s 3rd Set of Interrog. No. 2). Based on the record, there is no evidence that Conrad & Scherer failed to comply with a Court's discovery order intentionally or in bad faith, and as noted, the alleged bad-faith actions of others cannot lawfully be attributed to the firm. *See Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1371 (11th Cir. 1997).

Drummond has not argued that there is anything improper about the payments to Blanco, and those payments have been disclosed long before a trial.

Accordingly, the Court declines to sanction Conrad & Scherer under its inherent authority or Rule 37. *See CPR Assocs., Inc. v. Se. Penn. Chapter of Am. Heart Ass'n*, No. CIV. A. 90-3758, 1992 WL 229296, at *11 (E.D. Pa. Sept. 9, 1992) (finding no reason to vicariously sanction law firm when firm did not willfully engage in misconduct or significantly participate in discovery process).

## II.   ALTERNATIVE RULE 37 SANCTIONS SOUGHT BY DRUMMOND ARE NOT WARRANTED.

While Drummond focuses its sanctions request on obtaining a default judgment against the defendants, it also includes a generic request for lesser sanctions. Consistent with its denial of Drummond's requests for default judgment, the Court also declines to award Drummond any of the lesser sanctions it requests.

The Supreme Court has made it very clear that a sanction must be "specifically related to the particular 'claim' which was at issue in the order to provide discovery." *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707 (1982).

This means that "sanctions imposed for failing to comply with a discovery order must be reasonable in light of the circumstances, and a sanction is reasonable only if its character and magnitude are proportionate to the character and magnitude of the violation of the underlying discovery order, and the harmful consequences of that violation." *Vaca v. Rio Props., Inc.*, No. 2:08-CV-00940-RLH, 2011 WL 830519, at *3 (D. Nev. Mar. 3, 2011); *Markham v. Nat'l States Ins. Co.*, No. CIV.02-1606-F, 2004 WL 3019308, at *13 (W.D. Okla. Jan. 8, 2004) (holding that, even in cases where serious sanctions are warranted due to a finding of willfulness or bad faith, "the sanction imposed should still ordinarily be tailored with an eye to remedying the harm resulting from the offender's conduct").

The Court finds that the alternative sanctions Drummond requests do not specifically relate to the alleged misconduct.  Specifically, the Court finds that:

- Drummond's request for an order waiving privilege over protected documents relating to witness payments and credibility determinations is not related to the failure to identify a handful of other witnesses who had received security payments.

- Drummond's request for an award of fees relating to third-party subpoenas that had nothing to do with defendants' alleged misconduct or the Special Master's costs is not related to the alleged misconduct here.

Drummond's claim for monetary sanctions also fails because it does not take into account the ability of the defendants to pay them. The Eleventh Circuit has held "that, when exercising its discretion to sanction under its inherent power, a court must take into consideration the financial circumstances of the party being sanctioned." *Martin v. Automobili Lamborghini Exclusive, Inc.*, 307 F.3d 1332, 1337 (11th Cir. 2002).  That is because "a sanction which a party clearly cannot pay does not vindicate the Court's authority because it neither punishes nor deters." *Id.*  And "[w]hat cannot be done must not be ordered to be done." (*Id.*, citing *Miccosukee Tribe v. South Florida Water Management District*, 280 F.3d 1364, 1370 (11th Cir.2002)).

The Court concludes that Drummond's request for monetary sanctions, which it has failed to quantify, could not be imposed in any substantial amount against Collingsworth because the record shows he does not have the financial resources to pay a substantial amount.

Nor has Drummond established the amount of a monetary sanction that Conrad & Scherer could reasonably expect to pay for any specific, independent misconduct by the firm, which alleged misconduct, as noted, has not been established by Drummond.

The impermissible disconnect between what Drummond actually seeks – a judgment in favor of Drummond on the defamation case and a trial limited to damages – is similarly fatally

flawed as the record shows Collingsworth could not pay any significant amount even if Drummond convinced a jury it suffered actual damages.

For these reasons, Drummond's Renewed Motion for Sanctions is **DENIED**.

Respectfully submitted,

SUSMAN GODFREY L.L.P.

By: /s/ Kenneth E. McNeil
    Kenneth E. McNeil, *Pro Hac Vice*
    Texas State Bar No.: 13830900
    Stuart V. Kusin, *Pro Hac Vice*
    Texas State Bar No.: 11770100
    1000 Louisiana Street, Suite 5100
    Houston, Texas 77002-5096
    Telephone: 713/651-9366
    Facsimile: 713/654-6666

    Lindsey Godfrey Eccles, *Pro Hac Vice*
    WASB No. 33566
    SUSMAN GODFREY LLP
    1201 Third Avenue
    Suite 3800
    Seattle, Washington 98101
    Telephone: 206/516-3880
    Facsimile: 206/516-3883
    leccles@susmangodfrey.com

OF COUNSEL:

Christopher S. Niewoehner
Admitted *pro hac vice*
Steptoe & Johnson LLP
115 South LaSalle Street, Suite 3100
Chicago, IL 60604
Tel: 312-577-1240
Fax: 312-577-1370
cniewoehner@steptoe.com

Kendall R. Enyard
Savannah E. Marion
Admitted *pro hac vice*
Steptoe & Johnson LLP
1330 Connecticut Avenue NW
Washington, DC 20036
Tel: 202-429-6405
Fax: 202-429-3902

Robert K. Spotswood
Michael T. Sansbury
William T. Paulk
SPOTSWOOD SANSOM & SANSBURY LLC
One Federal Place
1819 Fifth Avenue North, Suite 1050
Birmingham, Alabama 35203

Bradley J. Smith
Clark, Hair & Smith, P.C.
1000 Urban Center Drive, Suite 125
Birmingham, Alabama 35242
Tel: 205-397-2900
Fax: 205-397-2901

**CERTIFICATE OF SERVICE**

I hereby certify that on this 15th day of July, 2015, a true and correct copy of the

foregoing document was served upon the following parties via email:

William Anthony Davis, III, Esq.
H. Thomas Wells, III, Esq.
Benjamin T. Presley
STARNES DAVIS FLORIE, LLP
P.O. Box 59812
Birmingham, AL 35259

Sara E. Kropf
LAW OFFICE OF SARA KROPF PLLC
1001 G Street NW, Suite 800
Washington, D.C. 20001
*Attorneys for Plaintiff Drummond Co., Inc.*

s/ William T. Paulk
William T. Paulk