FILED
2015 Dec-07  PM 03:42
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **DRUMMOND, INC.,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:11-cv-3695-RDP** |
| | } | |
| **TERRENCE P. COLLINGSWORTH, et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION AND ORDER

In the late 1970s, Steve Martin burst on the national scene with his trademark humor. Long before he starred in movies, he entertained audiences with his stand-up routines.  During one of those, he gave this advice to those who wish to evade their legal obligations:

> Now . . . you say, "Steve . . . what do I say to the tax man when he comes to my door and says, 'You have never paid taxes'?"  Two simple words.  Two simple words in the English language: 'I forgot!'  How many times do we let ourselves get into terrible situations because we don't say 'I forgot'?  Let's say you're on trial for armed robbery.  You say to the judge, 'I forgot armed robbery was illegal.'

http://snltranscripts.jt.org/77/77imono.phtml (accessed on November 9, 2015).

Defendant Terrence Collingsworth ("Collingsworth") apparently has taken Steve Martin's advice to heart.  In the face of what is now indisputable evidence, it is clear, and Collingsworth admits, that he made "security" payments to multiple (at least six) witnesses in South America as part of his prosecution of lawsuits against Drummond Coal Company.  (*See, e.g.*, Case Nos. 2:09cv1041-RDP; 7:09cv557-RDP; 2:13cv393-RDP).  But there's a problem – and it's a big problem.  Collingsworth only disclosed three such payments to the court and

Drummond.  In fact, on multiple occasions he has given sworn testimony that there were only three witnesses paid.  And there's another problem.  When he finally was forced to admit that there were more than three witnesses paid, he (again under oath) claimed that the reason he didn't disclose the other payments was: "I forgot."  Quite simply, this almost comedic response is an uncreditable and insufficient rebuttal designed to prevent the application of the crime-fraud exception to certain categories of discovery sought in this case.  It fails.  This case not only illustrates the comedic effect of Steve Martin's advice, but provides the makings for John Grisham's next novel.

## I.     Introduction

This case is before the court on Plaintiff's previously filed Renewed Motion for Sanctions (Doc. #174) and Motion for Spoliation Sanctions (Docs. #283, 287).  The court held an evidentiary hearing on September 1, 2, and 3, 2015 for two primary purposes.  The first was to meet head-on the question of the applicability of the crime-fraud exception to the work product and attorney client privileges.  Assertion of privilege claims had become a roadblock to the parties' discovery, as evidenced by the Report and Recommendation of Special Master Regarding Certain Issues Relating to the Court's Hearing on Plaintiff's Motion for Sanctions (Doc. #299) and Drummond Company, Inc.'s Motion to Compel Answers to Deposition Questions (Docs. #311, 329).  The second purpose was to address Drummond Company, Inc.'s Renewed Motion for Sanctions and Request for Evidentiary Hearing (Doc. #174) and Drummond Company, Inc.'s Motion for Spoliation Sanctions (Docs. #283, 287).[1]

---

[1] On September 21, 2015 the court administratively terminated, without prejudice, the Renewed Motion for Sanctions (Docs. #174) and the Motion for Spoliation Sanctions (Docs. #283, 287).  By operation of this Memorandum Opinion and Order, as well as the text order of September 21, 2015, those Motions (Docs. #174, 283, 287) may be refiled, if necessary, following the second round of discovery which this Memorandum Opinion contemplates.

The court has carefully, systematically, and thoroughly considered all of the briefing, argument and testimony advanced in this case.  The court finds that the crime-fraud exception applies here, and that it operates to pierce the work product and attorney client privileges to the extent explained in this opinion, thus allowing Drummond Company, Inc. ("Drummond" or "Plaintiffs") to furrow deeper into the hole of matters otherwise covered by the veil of privacy.[2]  Moreover, because the crime-fraud exception applies here, Drummond is entitled to a second round of discovery.  Thus, the time is still not ripe for the court to rule on the Motion for Sanctions (Doc. #174) and Motion for Spoliation Sanctions (Docs. #283, 287).

## II.     Privileges and the Crime-Fraud Exception

The attorney work product privilege was recognized by the Supreme Court in *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947).  *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1422 (11th Cir. 1994).  Because a lawyer must work with a certain degree of privacy, the doctrine is intended to preserve a zone of confidentiality in which the lawyer can prepare and develop legal theories and strategy with an eye towards litigation.  The doctrine is codified at Rule 26(b) of the Federal Rules of Civil Procedure.  "Not even the most liberal of discovery theories can justify *unwarranted* inquiries into the files and mental impressions of an attorney." *Hickman*, 329 U.S. at 510 (emphasis added).  The work product protection belongs to both the client and the attorney.  *Cox*, 17 F.3d at 1422-23.

The attorney client privilege is widely recognized as being even more sacrosanct.  It is one of the oldest confidential communication privileges known in the common law, tracing its

---

[2] On many levels this case calls to mind a literary piece considerably older than a Grisham tale – the beloved children's classic by Lewis Carroll, *Alice in Wonderland* (1865) ("down, down, down," … "Never come to an end.").  *Id*. at 4.  From the first tumble into the rabbit hole, the facts take the parties "down, down, down," seemingly to "NEVER come to an end." *Id*.  Much like Alice who needs to get "SOMEWHERE" by "walk[ing] long enough," the parties on both sides need to get to the truth. ("Somewhere" … "walking …") *Id*. at 89-90.  And the only way to do that is to pierce the work product and attorney client privileges with the application of the crime-fraud exception.

roots back to the reign of Elizabeth I.  8 J. Wigmore, Evidence in Trials at Common Law § 2290, at 542 (McNaughton rev. ed. 1961); *Gutter v. E.I. Dupont De Nemours*, 124 F.Supp. 2d 1291, 1298 (S.D. Fla. 2000).  Its purpose is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice."  *Id.* (*quoting Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)).  The privilege is held by the client and may be asserted by the attorney only on the client's behalf.  178 A.L.R. Fed. 87 (2002).  *Cox*, 17 F.3d at 1417.

But even these stalwart doctrines of evidence can be overcome by the proper invocation of the crime-fraud exception.  *Cox*, 17 F.3d at 1422.  This exception requires the disclosure of otherwise privileged communications or materials obtained in the course of the attorney's duties on the client's behalf if made or performed in furtherance of a crime, fraud, or other misconduct fundamentally inconsistent with the basic premises of the adversary system.  *Id.*  "A privilege surviv[es] until the relation is abused and vanish[es] when the abuse is shown to the satisfaction of the judge . . .".  *Id.*, *quoting Clark v. United States*, 289 U.S. 1, 16 (1933); *see also United States v. Zolin*, 491 U.S. 554 (the purpose of the exception is to ensure that the otherwise protected secrecy of attorney-client discussions does not extend to communications which are made for the purpose of continuing or contemplating criminal or fraudulent activity).

To determine whether the crime-fraud exception applies to otherwise privileged information, the Eleventh Circuit employs a two-part test which was discussed in *In re Grand Jury Investigation (Schroeder)*, 842 F.2d 1223 (11th Cir. 1987):[3]

---

[3] Defendants argue that a six-step process must be employed by the court for determining whether the crime-fraud exception applies.  (Doc. #367 at 24).  Of that six step process, Defendants argue that steps 1, 2, and 3 must be met to establish a *prima facie* case.  (Doc. #367 at 25-38).  Because there is no case law to support this assertion, and because clear Eleventh Circuit case law supports the *Schroeder* two part test, the court declines to adopt the Defendants' six step test.

4

First, there must be a prima facie showing that the client was engaged in criminal or fraudulent conduct when he sought the advice of counsel, that he was planning such conduct when he sought the advice of counsel, or that he committed a crime or fraud subsequent to receiving the benefit of counsel's advice.  Second, there must be a showing that the attorney's assistance was obtained in furtherance of the criminal or fraudulent activity or was closely related to it.

*Id*. at 1226.

"The first prong is satisfied by a showing of evidence that, if believed by a trier of fact, would establish the elements of some violation that was ongoing or about to be committed."[4]  *Id.* Although such a showing must have foundation in fact, and cannot rest upon mere allegation (*id.*), this prong is often understood to require "probable cause" to suspect the perpetration or attempted perpetration of a crime or fraud.  *See In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1039 (2d. Cir. 1984) (explaining the requirement to be that a prudent person have a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud; the fraudulent nature of the objective need not be established definitively; rather, there need only be a reasonable basis for believing that the objective was fraudulent).  And when determining the second prong, the requirement that the legal advice be in furtherance or related to fraudulent conduct "should not be interpreted restrictively."  *Schroeder*, 842 F.2d at 1227. The crime need not have actually occurred for the exception to be applicable; it need only have

---

[4] Defendants have argued that any fraud, witness bribery, or subornation of perjury "is not continuing." (Doc. #391 at 767; Doc. #395 at 31-32).  But that argument is a non-starter.  Not only does the timeline of events show that false misrepresentations were made to the court in the past contemporaneously with other wrongdoings, but "it's continuing right now.  [Mr. Collingsworth] is misrepresenting to [the court] in this hearing the basis for non-disclosing in the first place. … Why isn't that continuing all the way to trial?  And now we have to step behind the curtain and see is that really what occurred here.  Is he using counsel or using the work product doctrine to carry out a fraud that has been going on for a while and still is ongoing in at least some form and fashion now." (Doc. #391 at 767-77).

been the objective of the communication. *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d at 1039.

The test for application of the crime-fraud exception, which is typically used in the attorney client context, applies neatly in this case to the category of discovery related to Defendants' communications with their attorneys at Hare Smith.[5]  It must be modified slightly, however, to deal with more voluminous questions related to work product.[6]  (Doc. #341 at 38:13-19).  The applicable test is further complicated by the fact that the *clients* of Collingsworth and Conrad & Scherer are accused of no wrongdoing.  But like the Third Circuit in *In re Impounded Case (Law Firm)*, 879 F.2d 1211 (3d. Cir. 1989), this court rejects any argument that the exception is applicable only where a client is accused of wrongdoing.  First, no meaningful client interest would be served by the application of the work product doctrine here.  Second, the spirit of the rule remains the same for both work product and attorney client objections.  Finally, applying the crime-fraud exception to communications related to (or in furtherance of) alleged attorney wrongdoing is consistent with the notion that there are cases in which attorneys may try to hide behind a privilege in order to camouflage their nefarious schemes.

The parties agree that the crime-fraud exception is triggered by statutory crimes and offenses, including witness bribery under 18 U.S.C. § 201(c) and *Ala. Code* § 13A-10-121, and suborning perjury. Under both Alabama and federal law, it is a crime to offer, promise, or give

---

[5] *See* discussion *infra* Section II.B.2.

[6] The interplay of work product privilege and the crime-fraud exception is an inquiry that the court explores at length below.  However, even if there were no allegation in this case that Defendants committed any crime or fraud, many (if not all) of the categories of documents withheld under work product would nevertheless be discoverable.  Information "that would otherwise be protected must be produced if the knowledge, mental impressions, opinions, and advice of a lawyer or law firm are at issue in a litigation to which the lawyer or law firm is a party."  Wright & Miller, Fed. Prac. and Proc. § 2026 (Supp. 1994).  The central issue in this case is "who knew what and when did they know it, to borrow the old Watergate question."  (Doc. #311-2 at 351).  As such the mental impressions of the lawyers are uniquely intertwined with the allegations of misconduct in this case.

anything of value to a person testifying in a legal proceeding with the intent of influencing the testimony of that person.  *Id.*  Subornation of perjury is a separate crime which consists "in procuring or instigating another to commit the crime of perjury.  *United States v. Bradberry*, 466 F.3d 1249, 1254 (11th Cir. 2006)("[b]y knowingly facilitating the presentation of false testimony before the court, a defendant does more than just allow a witness to give perjured testimony; rather, he acts in a manner that obstructs the administration of justice.").  Fraud on the court also triggers the crime-fraud exception, despite Defendants' averment that this is "uncharted territory."  (Doc. #353, Exh. 1 at 5).  *See In re Sealed Case*, 676 F.2d 793, 815-16 and n. 92 (D.C. Cir. 1982) (holding that "[t]he possibility that Company's chairman lied to or attempted to mislead the IRS with his affidavit is enough" to create a *prima facie* showing and invoke the exception.  Although it may "not be sufficient to convict Company's chairman or anyone else of any crimes, . . . [a]ll that is required is that the likelihood of a violation be sufficient as a prima facie matter to warrant abridging any work product privilege that would normally attach to documents relating to the possible violation."); *Gutter*, F. Supp. 2d at 1313 (finding that the crime-fraud exception applied where DuPont, through its attorneys, misrepresented the existence of certain documents in prior litigation); *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d at 1039 ("If the advice was sought in furtherance of a fraud that is not necessarily a violation of the criminal code, the communication is nonetheless unprivileged.").

For each of these alleged wrongdoings -- fraud on the court, witness bribery, suborning perjury -- the court examines specifically whether a *prima facie* case has been established, such that a presumption of guilt attaches and a reasonable person would have a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud.  *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d at 1039.

7

A.      **The Prima Facie Case**

Courts have uniformly held that whether a crime or fraud has *actually* been committed is not the test for piercing the privilege.  *E.g., Gutter*, 124 F. Supp. 2d at 1304.  Instead "all that is required now is the much lower threshold of establishing a *prima facie* case," that is, "evidence, that if believed by the trier of fact, would establish the elements of some violation that was ongoing or about to be committed."  *Id.*; *see also Schroeder*, 842 F.2d at 1226.  The question is whether there is sufficient evidence to call for an inquiry into privileged material.  *Matter of Feldberg*, 862 F.2d 622, 625-26 (7th Cir. 1988).  To engage in such an inquiry, the court must view the evidence relevant to the crimes and frauds alleged – fraud on the court, witness bribery, and suborning perjury.  Those wrongdoings are alleged to have been committed by both Terrence Collingsworth and his firm, Conrad & Scherer.  (Doc. #397 at 1).

1.      **The First Prong of the Prima Facie Case is Established with Respect to that Category of Discovery Related to Allegations of Fraud on the Court**

In preparation for the evidentiary hearing, the court had the parties each submit Proposed Findings of Fact and Conclusions of Law and to respond to the other's submission.  (*See* Doc. #233 and text order of May 22, 2015).  Drummond's submission set forth over 50 specific misrepresentations it contends were made by Defendants to the court relating to the scope, nature, and extent of witness payments.  (*See* Doc. #243, ¶¶ 1-458).  Defendants did not dispute the vast majority of those misrepresentations, either in their responsive Findings of Fact and Conclusions of Law, or during their testimony.  Many of these misrepresentations are outlined below:

- The False Representation:  On July 5, 2011, Collingsworth signed interrogatory responses in *Balcero*.  One of the interrogatories asked for a description of anything of value offered or given by Plaintiffs, or anyone on behalf of Plaintiffs, to any former paramilitary or potential witness.  (Doc. #280, ¶¶78, 80).

8

Collingsworth's response to this interrogatory was: "Plaintiffs have provided Duarte with hamburgers and other food on several occasions, which were served during meetings to discuss the facts in his February 2011 Declaration. Additionally, Plaintiffs are providing reasonable transportation, food, and lodging costs for Plaintiffs who will be deposed in Alabama between July 18-23, 2011. Plaintiffs have paid to relocate Plaintiff Claudia Balcero and her family after she and her family received death threats as a result of participating in this lawsuit." (Doc. #280, ¶ 81).

The Reality:   *This representation to the court was false*.   At the time Collingsworth signed this interrogatory response, Defendants' litigation team had made payments to Halcon, Duarte, El Tigre, Samario, and Charris. (Doc. #280, ¶82). In fact, all of the people who were giving letters rogatory testimony in *Balcero* had been paid; those payments were not revealed to Drummond until after paramilitaries gave their trial testimony. (Doc. #389 at 159-60). Also at this time Collingsworth had discussed with Blanco the possibility of getting Blanco's legal fees paid by Albert van Bilderbeek. (Doc. #280, ¶83).

- The False Representation:   On November 8, 2011 Collingsworth filed an opposition to a motion to compel filed in *Balcero*. (Doc. #280, ¶ 86). In that filing, Collingsworth referenced an interrogatory seeking information related to payments to witnesses and stated: "Plaintiffs provided responsive information relating to all Plaintiffs and witnesses and have not withheld responsive information on the grounds of attorney client privilege as it relates to Plaintiffs or witnesses in this case." (Doc. #280, ¶88).

  The Reality:   *This representation to the court was false.*   At the time Collingsworth filed this opposition, Defendants' litigation team had made payments to no less than six individuals:  Halcon, Duarte, El Tigre, Charris, Samario, and Blanco. (Doc. #280, ¶88). *See* July 5, 2011 bullet point *supra.*

- The False Representation:  On March 8, 2012 the court held a telephonic hearing in the then-active *Balcero* case.  Collingsworth was asked by the court:  "What is your relationship [in the *Balcero* case] with Llanos other than representing officials at Llanos in whatever legal matters you're representing them?"  (Doc. #280, ¶ 95).   Collingsworth responded:   "There is no relationship other than that . . . . I have attorney-client agreements with two individuals who are principals in the company. . . . The two individuals are the two van Bilderbeek brothers." (Doc. #280, ¶ 96; Doc. #174-23).

  The Reality:   *This representation to the court was false*.   At the time Collingsworth represented to the court that Llanos Oil had "no relationship" to the *Balcero* case, Albert van Bilderbeek of Llanos Oil had made two payments to Jaime Blanco, a key witness in the *Balcero* case, totaling in excess of $60,000. (Doc. #280, ¶ 97; Doc. #174-2; Doc. #174-20).   Collingsworth facilitated these payments and himself contacted Albert van Bilderbeek in July 2011 and requested

that van Bilderbeek pay Blanco's legal fees of $150,000.  (Doc. #280, ¶ 38; Doc. #174-2; Doc. #174-20).

- The False Representation:  On April 19, 2012, Jaime Blanco gave the first part of his letters rogatory testimony in *Balcero*.  (Doc. #280, ¶ 101).  Collingsworth asked Blanco "Have you had any promises or benefits provided to you?"  (Doc. #280, ¶ 102).  Blanco responded: "No, no kind whatsoever."  (Doc. #280, ¶ 103).

  The Reality:  *This representation to the court was false*.  As of the date of the testimony, Blanco had already received at least two payments from Albert van Bilderbeek.  (Doc. #280, ¶¶ 104, 106).

- The False Representation:  On May 16, 2012, Collingsworth signed an amended response to the interrogatory in *Balcero* asking him to disclose anything of value offered or given to witnesses.  (Doc. #280, ¶ 109).  Collingsworth's amended response did not disclose the arrangement with Mr. Blanco.  (Doc. #280, ¶ 111).

  The Reality:  *This representation to the court was false*.  At the time Collingsworth signed this May 16, 2012 interrogatory response, he had facilitated several payments to Blanco.  (*See supra*).

- The False Representation:  On July 1, 2013, Drummond filed a motion to compel responses in its First and Second written discovery requests, setting forth documentary evidence of Defendants' payments to three witnesses − Halcon, Charris, and Duarte.  (Doc. #280, ¶ 115).  On July 18, 2013 Defendants filed a response to the motion to compel.  That response states: "First, all of the 'evidence' Drummond has was produced by Plaintiffs in the *Balcero* case, and Plaintiffs produced every responsive document they had."  (Doc. #280, ¶ 117).

  The Reality:  *This representation to the court was false*.  At the time Defendants represented to the court that they had already produced every responsive document they had, they had not disclosed the payments to Blanco, El Tigre, or Samario.  (Doc. #280, ¶¶ 118-124).

- The False Representation:  On July 13, 2013 Collingsworth submitted a declaration testifying that he had produced documents reflecting payments to Duarte, Charris, and Halcon.  (Doc. #280, ¶¶ 125, 126).

  The Reality:  *This representation to the court was false*.  In his declaration Collingsworth did not disclose any payments to Blanco, El Tigre, or Samario.  (Doc. #280, ¶127).  At this time Collingsworth had also facilitated three payments to Blanco from Albert van Bilderbeek.  (Doc. #280, ¶131).

- The False Representation:  On July 22, 2013 Drummond served IRAdvocates with a subpoena seeking any and all documents "related or referring to payments to individuals incarcerated in Colombia, including but not limited to … Jaime

Blanco Maya…Jhon Jairo Esquivel Cuadrado [El Tigre]…[and]…Alcides Manuel Mattos Tabares [Samario]." (Doc. #280, ¶¶ 135, 136). The same subpoena also sought any and all documents "related or referring to payments to any family members of any individuals incarcerated in Colombia, including but not limited to… Jaime Blanco Maya…Jhon Jairo Esquivel Cuadrado [El Tigre]…[and]…Alcides Manuel Mattos Tabares [Samario]." (Doc. #280, ¶137). Finally, the subpoena sought any and all documents related to requests for payment by any of the above-named individuals for payment, as well as documents related to requests for payment by any of the above-named individuals'' family members for payment." (Doc. #280, ¶¶138, 139).

On August 16, 2013 Collingsworth signed a declaration in support of a motion to quash[7] the subpoena to IRAdvocates. (Doc. #280, ¶140). In that declaration, Collingsworth stated that he had provided all responsive documents within the context of the *Balcero* action. (Doc. #280, ¶141).

The Reality: *This representation to the court was false*. At the time Collingsworth submitted his declaration, Defendants had not disclosed the payments to Blanco, El Tigre, or Samario. (Doc. #280, ¶142).

- The False Representation: On October 24, 2013, Collingsworth signed a supplemental brief in support of the motion to quash the subpoena to IRAdvocates. (Doc. #280, ¶164). That brief stated that the files for Conrad & Scherer and IRAdvocates had both been searched and that "responsive documents were produced. On the documents produced, it will be clear from which entity the document originated." (Doc. #280, ¶165).

   The Reality: *This representation to the court was false*. At the time Collingsworth submitted this brief, none of the documents reflecting payments to El Tigre, Samario, or Blanco had been produced or logged. (Doc. #280, ¶167).

- The False Representation: On July 22, 2013 Drummond served Daniel Kovalik with a subpoena seeking any and all documents "related or referring to payments to individuals incarcerated in Colombia, including but not limited to … Jaime Blanco Maya…Jhon Jairo Esquivel Cuadrado [El Tigre]…[and]…Alcides Manuel Mattos Tabares [Samario]." (Doc. #280, ¶¶ 171, 172). The same subpoena also sought any and all documents "related or referring to payments to any family members of any individuals incarcerated in Colombia, including but not limited to… Jaime Blanco Maya…Jhon Jairo Esquivel Cuadrado [El Tigre]…[and]…Alcides Manuel Mattos Tabares [Samario]." (Doc. #280, ¶173). Finally, the subpoena sought any and all documents related to requests for payment by any of the above-named individuals for payment, as well as

---

[7] The motion to quash the subpoena was originally filed in the United States District Court for the District of Colombia. On April 4, 2014, the miscellaneous proceeding arising out of Drummond's subpoena to IRAdvocates was transferred to this court, where it remains pending. (Doc. #280, ¶170).

documents related to requests for payment by any of the above-named individuals'' family members for payment." (Doc. #280, ¶¶174, 175).

On August 19, 2013, Collingsworth signed a declaration in support of a motion to quash the subpoena served on Kovalik.[8]  (Doc. #280, ¶177).  That declaration stated that in connection with the *Balcero* litigation, "I have provided all responsive, non-privileged, and relevant documents in my custody, possession, or control, and I interpreted my obligation to produce documents as including documents in the custody, possession or control of those who work with me on a case.  Thus, the subpoena…to Daniel Kovalik… is duplicative of requests already made to me as a defendant in the libel action and/or duplicative of requests that were made to Plaintiffs in the *Balcero* action." (Doc. #280, ¶178).

The Reality:    *This representation to the court was false*.    At the time Collingsworth submitted his declaration, Defendants had not produced any documents disclosing the payments to Blanco, El Tigre, or Samario.  (Doc. #280, ¶179).

- The False Representation:   On November 5, 2013, Collingsworth signed a declaration in support of Defendants' reply brief on the motion to quash.  (Doc. #280, ¶186).  In that declaration he testified: "the sole promise I made to any witness in *Balcero* was that if they testified and they or a family member received a credible death threat, we would do whatever we could to provide security or to provide a safe haven until such time as the danger had subsided."  (Doc. #280, ¶187).

   The Reality:    *This representation to the court was false*.    At the time Collingsworth submitted his declaration, he had already facilitated at least three payments to Blanco from Albert van Bilderbeek that had nothing to do with "security." (Doc. #280, ¶188).

- The False Representation:  On July 25, 2013 Drummond served a subpoena on Parker Waichmann LLP seeking any and all documents "related or referring to payments to individuals incarcerated in Colombia, including but not limited to … Jaime Blanco Maya…Jhon Jairo Esquivel Cuadrado [El Tigre]…[and]…Alcides Manuel Mattos Tabares [Samario]." (Doc. #280, ¶¶ 193, 194).   The same subpoena also sought any and all documents "related or referring to payments to any family members of any individuals incarcerated in Colombia, including but not limited to… Jaime Blanco Maya…Jhon Jairo Esquivel Cuadrado [El Tigre]…[and]…Alcides Manuel Mattos Tabares [Samario]." (Doc. #280, ¶195).  Finally, the subpoena sought any and all documents related to requests for payment by any of the above-named individuals for payment, as well as

---

[8] On August 22, 2013 Defendants filed a motion to quash this subpoena in the United States District Court for the Western District of Pennsylvania.  On April 14, 2014, the miscellaneous proceeding arising out of the motion to quash was transferred to this court, where it remains pending.  (Doc. #280, ¶191).

documents related to requests for payment by any of the above-named individuals' family members for payment." (Doc. #280, ¶¶196, 197).

On August 8, 2013, in objecting to the Parker Waichmann subpoena, Defendants cited Collingsworth's July 31, 2013 declaration which represented that all of the documents requested had already been produced in the *Balcero* case. (Doc. #280, ¶199).

The Reality: *This representation to the court was false*. At the time Defendants served these objections and represented that all responsive documents had already been produced, Defendants had not disclosed the payments to Blanco, El Tigre, or Samario. (Doc. #280, ¶200).

- The False Representation:   On August 19, 2013, Collingsworth submitted a declaration in support of a motion to quash the Parker Waichmann subpoena.[9] (Doc. #280, ¶203).   That declaration stated that in connection with the *Balcero* litigation, "I have provided all responsive, non-privileged, and relevant documents in my custody, possession, or control, and I interpreted my obligation to produce documents as including documents in the custody, possession or control of those who work with me on a case.   Thus, the subpoena…to Parker Waichmann… is duplicative of requests already made to me as a defendant in the libel action and/or duplicative of requests that were made to Plaintiffs in the *Balcero* action." (Doc. #280, ¶204).

  The Reality:   *This representation to the court was false*.   At the time this declaration was submitted, Defendants had not disclosed the payments to Blanco, El Tigre, or Samario. (Doc. #280, ¶205).

- The False Representation:   On October 23, 2013, Collingsworth signed a declaration in support of the reply brief on the motion to quash the Parker Waichmann subpoena. (Doc. #280, ¶222).   In that declaration he testified "the sole promise I made to any witness in *Balcero* was that if they testified and they or a family member received a credible death threat, we would do whatever we could to provide security or to provide a safe haven until such time as the danger had subsided." (Doc. #280, ¶223).

  The Reality:   *This representation to the court was false*.   At the time Collingsworth submitted his declaration, he had already facilitated at least three payments to Blanco from Albert van Bilderbeek that had nothing to do with security. (Doc. #280, ¶224).

---

[9] The motion to quash the subpoena was filed in the United States District Court for the Eastern District of New York. (Doc. #280, ¶212).

On October 10, 2013, Collingsworth and his team took this laundry list of written misrepresentations a step further. On that day the court held a hearing on a Drummond motion to compel (Doc. #43). Counsel for Collingsworth represented to the court that all responsive documents had been produced.[10] (Doc. #63 at 25:25-26:16). Collingsworth, who was seated next to his lawyer at the counsel table, made no effort to correct this misrepresentation, knowing full well that all documents related to payments had *not* been produced. (Doc. #280, ¶¶233, 234, 235). And, as if that were not enough, the written falsities continued:

- The False Representation:  On November 7, 2013, Defendants filed a supplemental brief in further opposition to the motion to compel. (Doc. #68). Collingsworth submitted a declaration in support thereof, stating: "In this first opportunity to respond fully in this court to Drummond's accusations and innuendo, Defendants will show there were credible death threats made against many of the witnesses who were about to give depositions in *Balcero*, and with respect to three of them [Duarte, Gelvez, Charris], Defendants concluded that their family members were in immediate danger." (Doc. #68). The declaration also stated that "the sole promise I made to any witness in *Balcero* was that if they testified and they or a family member received a credible death threat, we would do whatever we could to provide security or to provide a safe haven until such time as the danger had subsided." (Doc. #280, ¶263).

  The Reality:  *These representations to the court were false*. More than three of the witnesses in *Balcero* received payments. (Doc. #280, ¶256). Moreover, at the time Collingsworth submitted his declaration, he had already facilitated at least three payments to Blanco from Albert van Bilderbeek that had nothing to do with security. (Doc. #280, ¶264).

- The False Representation:  On March 20, 2014 Defendants responded to Drummond's Third Interrogatories and Requests for Production. (Doc. #280, ¶300). Those responses were signed by Collingsworth "individually, and on behalf of Conrad & Scherer LLP Defendants." (Doc. #280, ¶301). On the question of "providing assistance" to paramilitaries and/or their families, Collingsworth stated that he had previously produced all non-privileged documents responsive to that request. (Doc. #280, ¶302).

  The Reality:  *This representation to the court was false*. At the time Collingsworth, on his own behalf and on behalf of his firm, represented that he had produced all responsive documents, he had not disclosed or produced

---

[10] To be clear, it is not known whether Collingsworth's counsel at this time knew or should have known that his representation to the court was disingenuous.

documents revealing payments to Samario, El Tigre, or Blanco.  (Doc. #280, ¶303).

- The False Representation:   On April 14, 2014 Collingsworth submitted a declaration in support of an opposition to a motion for sanctions and a cross motion to compel.  (Doc. #114; PX 34).  In that declaration, Collingsworth testifies that "there are no documents produced by PW [Parker Waichmann] or Conrad & Scherer relating to a payment to Blanco or his criminal lawyers because none was made by them."  (Doc. #114-2 at ¶8).

   The Reality:   *This representation to the court was false*.  At the time Collingsworth submitted his declaration, Collingsworth had facilitated no less than three payments to Blanco from Albert van Bilderbeek totaling at least $95,000.  (Doc. #280, ¶¶ 326, 329).

On April 21, 2014, Defendants kicked the level of falsities up another notch.  The court held a hearing for the purpose of organizing the ongoing discovery process.  (Doc. #123). Counsel for Defendants was asked by the court: "Is there a witness that I have received testimony from south of the Equator that didn't receive a security payment?"[11]  (Doc. #123 at 30:1-31:19).  Although the court made clear that it was not an attempt to directly question him, Collingsworth volunteered to answer that question for the Defendants:

   Your Honor, the shortest way to the truth is to ask me the question.  Thank you. Our papers have made it clear and I will say that a lot of the new ambush allegations that they've made, each time they make one if we get a chance to show you the facts, the facts clear up any misunderstanding of what happened. There were exactly in this case three witnesses whose family members were moved because they received death threats, and those were Charris, Gelvez, and Duarte.  Those are the witnesses whose family members were moved.  There was an additional person named Halcon who was participating in Drummond 1 way out there and I had little to do with that.  I never met the guy. … So the three witnesses that I've mentioned, Charris, Gelvez, and Duarte, are the family members of those people who were relocated.

(Doc. #123 at 30:1-31:19).  The court followed up on this statement, asking "Are those the only three besides Halcon who received security payments?"   Collingsworth answered succinctly:

---

[11] Since the time the court asked that question, someone with more knowledge of South American geography has noted that the vast majority of land comprising Columbia is actually north of the Equator. Nevertheless, the court is confident that Collingsworth nevertheless understood the meaning and import of the question.

"That's correct."   (Doc. #123 at 30:1-31:19).   But of course, that was not correct, and Collingsworth knew it.  As of the date Collingsworth made that statement (April 21, 2014), *every* witness who had testified in letters rogatory proceedings in *Balcero* against Drummond had received payments.  (Doc. #280, ¶ 344) (UNDISPUTED by Defendants that the families of the witnesses who provided letters rogatory testimony in *Balcero* implicating Drummond received security assistance); (Doc. #389 at 132).   In fact, as of April 21, 2014, Samario, El Tigre, and Charris were *still* receiving monthly payments in connection with their testimony against Drummond. (Doc. #280, ¶ 345).  As the hearing continued, counsel for Defendants was *directly* asked about any payments made to Jaime Blanco.  (Doc. #123 at 21:3-9).  Counsel represented that "there was no payment made."  (Doc. #123 at 21:3-9).  Collingsworth was seated at the counsel table when this statement was made, and did nothing to correct it.  (Doc. #123). Collingsworth has admitted that his statements (and his attorney's) made in court that day were false.  (Doc. #389 at 112).

After these representations were made in open court, Collingsworth was required to produce documents in this case.  When those various productions were made, information showing that payments were made to Ivan Otero was redacted.  (Doc. #389 at 179).  Some productions that had already been Bates-labeled were not produced at all.  (Doc. #389 at 180-81).

And the written falsities continued:

- The False Representation:   On July 18, 2014 Collingsworth submitted a declaration in connection with a reply brief concerning the scope of the crime-fraud exception to privileged materials.  (Doc. #280, ¶ 407 and Exh. 20).  In that declaration he stated:  "On January 11, 2013, after a series of meet and confers, the *Balcero* plaintiffs produced the documentation of funds provided to relocate the family members of three witness [Duarte, Gelvez, Charris] because they received serious death threats."  (Doc. #280, ¶ 407 and Exh. 20).

  The Reality:  *This representation to the court was false*.  At the time of his testimony under oath, Defendants had been making monthly payments to El Tigre

and Samario for more than three years.  (Doc. #280, ¶409).  In fact, in a July 23, 2014 hearing before the Special Master on this issue, which was attended by Collingsworth, no attempt was made to correct the statement that "exactly three" witnesses in *Balcero* had been paid.  (Doc. #280, ¶¶413, 414).

- The False Representation:  On August 12, 2014, Collingsworth submitted an affidavit testifying: "the sole promise I made to any witness in *Balcero* was that if they testified and they or a family member received a credible death threat, we would do whatever we could to provide security or to provide a safe haven until such time as the danger had subsided."  (Doc. #280, ¶441).  After explaining the payments to Charris, Duarte, Gelvez, and Halcon, the affidavit went on to state that Claudia Balcero was "the final individual who received security measures."  (Doc. #280, ¶446).

  The Reality:  *These representations to the court were false*.  At the time Collingsworth submitted this declaration, he had already facilitated at least three payments to Blanco from Albert van Bilderbeek; none of those payments had anything to do with security.  (Doc. #280, ¶442).

Then, sometime around September 2014, Collingsworth claims he finally took the time to "study the situation."  He reviewed the memorandum that originated the agreement with Mr. Otero for payments to El Tigre and Samario, the "deps in the can" email.  (Doc. #389 at 205).

> MR. COLLINGSWORTH:  I then began a process with my counsel to investigate fully what the scope of the documents that were not produced were, and began a process of amending our responses, and then ultimately we received the October 2014 order from the court that really blew this thing open and began the process of researching all of the databases and every possible nook and cranny to make sure that we got a complete production in time to meet the court's deadline.

(Doc. #389 at 205).

It is hard to imagine a set of facts that could more clearly establish the first prong of the *prima facie* case for piercing the privilege.  Collingsworth repeatedly made knowingly false representations in pleadings, affidavits, correspondence, and open court.  The extent of these misrepresentations rises far above the level of mere discovery violations[12] to evidence that, if

---

[12] Defendants argue that the "standard to apply the crime-fraud exception to discovery or disclosure related issues is so high that even an intentionally false statement to the court is not sufficient to invoke the doctrine in most circumstances."  (Doc. #392 at 7, n. 2).  But the case law cited by Defendants does not support that proposition.  One of the cases cited does not consider the crime-fraud

believed by the trier of fact, would establish some ongoing fraudulent violation.[13] *Gutter*, 124 F. Supp. 2d at 1226, 1304; *see also In re Sealed Case*, 754 F.2d 395, 401 (D.C. Cir. 1985) (finding it was not a close case to decide that the crime-fraud exception applied to egregious discovery misconduct in prior civil litigation, and that the party's "attempt to emasculate the court's ability to ascertain the truth necessarily strikes at the very foundation of the adversary system and the judicial process.").

And because the first prong of the *prima facie* case is met as to Collingsworth related to the claim of fraud on the court, it is also met as to Conrad & Scherer. The unfortunate truth for the law firm is that every brief filed in this court in each of the Drummond cases was filed by Collingsworth acting as an agent of Conrad & Scherer. Every statement made by Collingsworth in this court in each of the Drummond cases was made in Collingsworth's capacity as an agent of Conrad & Scherer for the benefit of Collingsworth, as well as his firm. (Doc. #390 at 423-25; Doc. #348-9 at 62-63, 132). Indeed, as a practical matter, it would be impossible to ferret out work product documents created only by Collingsworth in furtherance of the fraud on the court.[14] Conrad & Scherer has invited the "court [to] make a clear line of demarcation -- for

---

exception at all. *See SEC v. ESM Group, Inc.*, 835 F.2d 270 (11th Cir. 1988). Another deals with the crime-fraud exception, but only in the context of a discovery violation. *Magnetar Techs. Corp. v. Six Flags Theme Park Inc.*, 886 F. Supp.2d 466 (D. Del. 2012). As this court has made clear, this case involves much more than a series of discovery violations. (Doc. #243-2 at 22-23).

[13] This ongoing fraud operated not only at the relevant time in this case, but continued in this court in *Melo*, 2:13cv393-RDP and before both the Eleventh Circuit and the Supreme Court of the United States in *Balcero*, 2:09cv1041-RDP. With respect to *Balcero*, it is undisputed that Defendants did not disclose their payments to Gelvez, Duarte, and Charris until after those witnesses provided their "trial" testimony and after discovery had closed. (Doc. #282, ¶ 93). It is also undisputed that the payments to Blanco, El Tigre, and Samario were never disclosed. (Doc. #282, ¶ 94). But the fact remains that the record presented to these various courts is devoid of evidence of the payments made to witnesses. The *Baloco* petition for certiorari to the Supreme Court was denied on November 2, 2015. (Doc. #109 in 7:09-cv-557-RDP).

[14] For example, is an email from Collingsworth to another Conrad & Scherer employee Collingsworth's privilege, or Conrad & Scherer's privilege? Is an email on which Collingsworth is

purposes of a finding of <u>intentional fraud</u> -- between the conduct of Collingsworth and the conduct of other partners at Conrad & Scherer." (Doc. #400 at 3). But the knowledge and intent of an agent who commits a fraud while acting in the line and scope of his agency are imputed to the principal. *See Gutter*, 124 F. Supp.2d at 1312 (knowledge and intent of agents was fully imputable to their principal, DuPont, in finding the crime-fraud exception applied in DuPont).[15]

---

copied, but does not reply, Collingsworth's privilege, or Conrad & Scherer's privilege? These inquiries necessarily overlap because the litigants are principal and agent.

[15] Because this case presents unique questions, there is scant law to guide the court's analysis on how to treat Conrad & Scherer as opposed to Terrence Collingsworth for the purpose of the application of the crime-fraud exception (as opposed to the sanctions question that may be explored at a later time). The court has been unable to locate any case law which stands for the proposition that agency law should not apply in this situation. Nor has Conrad & Scherer. (*See* generally Docs. #396, 400). While the firm's arguments are many -- Collingsworth did not tell Conrad & Scherer about the assistance payments; Conrad & Scherer did not have actual knowledge of the scheme based upon documents available to it; Conrad & Scherer was not aware that misrepresentations had been made in pleadings filed on its behalf; the purpose of the crime-fraud exception is focused on an individual's intent -- these arguments fail to address the reality of the agency and partnership relationship. (Doc. #396 at 4; Doc. #400 at 4-9). Collingsworth committed the underlying acts while acting in the scope and line of his employment with Conrad & Scherer. This is the "elephant in the room" that Conrad & Scherer simply cannot get around. *See Gutter*, 124 F. Supp.2d at 1309 (internal citations omitted)

> Under basic agency principles, the acts of a corporation's agents are considered to be those of a single legal actor. Generally, a corporation (principal) will be vicariously responsible for the wrongful acts of its employees (agents) when the acts are: (1) related to and committed within the course of employment; (2) committed in furtherance [of the business] of the corporation; and (3) authorized or subsequently acquiesced in by the corporation. Thus, a corporation is charged with constructive knowledge, regardless of its actual knowledge, of all material facts of which its officer or agent receives notice or acquires knowledge while acting within the course of employment and within the scope of his or her authority, even though the officer or agent does not communicate the knowledge to the corporation. The law conclusively presumes that the agent has disclosed the knowledge or information to his or her principal, and charges the principal accordingly.

*Id.* at 1309.

Of course, "because each partner is a general agent of the partnership, a partner's knowledge is treated, in most cases, as knowledge by the partnership. If a partner acts for the partnership with knowledge, that knowledge is imputed to the partnership … knowledge acquired while a partner, even if not then present to his mind, is imputed to the partnership." Partnership Law & Practice § 8:34 (2014); *see also United States v. A&P Trucking Co.*, 358 U.S. 121, 126-27 (1958) (finding the same principles applicable to corporate criminal liability for acts of their agents apply to partnerships). The partnership acts codified in both Florida's and Alabama's statutory law explicitly state that principals of agency apply

Therefore, because the first prong of the *prima facie* case is met as to Collingsworth for purposes of the fraud on the court analysis, it is also met as to Conrad & Scherer.

> ### 2.   The First Prong of the Prima Facie Case is Established for that Category of Discovery Related to Allegations of Witness Bribery and Suborning Perjury

Under Alabama and federal law, bribery, perjury and subornation of perjury are illegal. It is a crime to offer, promise, or give anything of value to a person testifying in a legal proceeding with the intent of influencing the testimony of that person.  18 U.S.C. § 201; Ala. Code § 13A-10-121(a).  Both statutes proscribe any payments to witnesses that exceed actual costs incurred as a result of testifying.  Subornation of perjury occurs when one procures or instigates another to commit the crime of perjury.  *United States v. Bradberry*, 466 F.3d 1249, 1254 (11th Cir. 2006).

> It is essential to subornation of perjury that the suborner should have known or believed or have had good reason to believe that the testimony given would be false; that he should have known or believed that the witness would testify willfully and corruptly, and with knowledge of the falsity; and that he should have knowingly and willfully induced or procured the witness to give such false testimony.

to partnerships.  Fla. Stat. Ann. § 620.8104; Ala. Code § 10A-8-3.01.  Collingsworth was acting for the benefit of the firm by prosecuting claims against Drummond which, if successful, would result in a financial benefit to the firm.  (Doc. #390 at 423-25).  Conrad & Scherer has done nothing to separate itself from responsibility for Collingsworth's actions as an agent, at least for purposes of the crime-fraud exception.  (Doc. #390 at 425).   Under these circumstances, Conrad & Scherer "is charged with constructive knowledge, regardless of its actual knowledge, of all material facts of which its officer or agent receives notice or acquires knowledge while acting within the course of employment and within the scope of his or her authority, even though the officer or agent does not in fact communicate the knowledge to the corporation."  *Gutter*, 124 F. Supp.2d at 1309.

Finally, there is this point:  were it not the case that partnership and agency principles applied to this case, it would be incredulous to believe that no one at Conrad & Scherer other than Collingsworth knew of the payments made to witnesses in this case.  Payments were delivered on a monthly basis by the firm, using the firm's money, and through the firm's normal approval process as documented in the firm's business records.  (Doc. #405 at 1-4).  As of May 23, 2011, at a minimum, Terrence Collingsworth, Bill Scherer, Richard Drath, Billy Scherer, Susana Tellez, Lorraine Leete, Victoria Ryan, Pauline Kroper, and Danielle Kisslan had all received written notice that El Tigre and Samario had been paid.  (*See* Doc. #402 at 1-4).

*Id.*  By allowing a witness to offer perjured testimony, the suborner "acts in a manner that obstructs the administration of justice."  *Id.* at 1255.  And "an attorney who aids false testimony by questioning a witness when perjurious responses can be anticipated risks prosecution for subornation of perjury."  *Nix v. Whiteside*, 475 U.S. 157, 169 (1986).

To pierce otherwise applicable privileges utilizing the crime-fraud exception, Plaintiff's first step is to produce evidence, that if believed by the trier of fact, would establish the elements of witness perjury and/or subornation of perjury that was ongoing or about to be committed.  *Gutter*, 124 F. Supp. 2d at 1304; *see also In re Grand Jury (Schroeder)*, 842 F.2d at 1226.  Here, Plaintiffs have done just that.  The evidence is undisputed that Blanco, El Tigre, Samario, and Charris are "fact" witnesses, all of whom received payments from Defendants' litigation team in a timeline that looks "curiouser and curiouser"[16] upon close examination.  And all of these witnesses provided sworn testimony against Drummond in *Balcero*.  Drummond points to this non-exhaustive list of examples:

- Charris was one of the Defendants' fact witnesses in *Balcero* who accused Drummond of collaborating with the AUC.  Defendants are relying on the Charris testimony in this case to prove the truth of the matter asserted.  (Doc. #280, ¶¶24, 25).

  On July 16 and 17, 2008 Charris testified before the Colombian Fiscalia in the Justice & Peace process.  He denied any knowledge of Drummond's complicity with the AUC.  (Doc. #43-16 at 19, 20, 47).

  Several months before July 2009 (in or around February/March 2009), Collingsworth and his team started meeting with Charris.  (Doc. #69, ¶ 38; Doc. #389 at 135).  Charris did not give any testimony under oath against Drummond prior to February or March 2009.  (Doc. #389 at 135).

  On May 7, 2009 Charris testified to the Colombian authorities that Drummond orchestrated the union leader murders.  (Doc. #69-23).

---

[16] "Curiouser and curiouser!" Carroll, at 15.

On June 23, 2009, Charris again testified before the Colombian authorities. (Doc. #69-22). The same day, Defendants' litigation team provided a $1500 payment to Charris via team member Ricardo Garzon. (Doc. #280, ¶26). On July 30, 2009, Defendants' litigation team provided a 3,000,000 Colombian peso (approximately $1446) payment to Charris's relative, Mery Luz Molina Morales. (Doc. #280, ¶27). Monthly payments to Charris in the amount of $800 have continued to this day. (Doc. #44-6; Doc. # at 73-74). Collingsworth and the defendants have no document or other evidence analyzing the economic expenses of Charris's family. (Doc. #389 at 136-37).

On August 4, 2009, Charris was convicted by the Colombian authorities of the union leader murders. On September 3, 2009, Charris signed a declaration for use in the Defendants' civil cases against Drummond. (Doc. #280, ¶28). Between August 2009 and present day, Defendants' litigation team has made monthly payments to Charris by depositing approximately 1,500,000 Colombian pesos (approximately $840) per month into a bank account held by Charris's wife, Claudia Pinzon Ballesteros. (Doc. #280, ¶29). At present, Defendants' payments made to Charris exceed $40,000. (Doc. #280, ¶30).

On February 1, 2010 Charris testified before the Colombian authorities and denied any knowledge of Alfredo Araujo having any contacts with the AUC. But when he testified in the *Balcero* case, Charris claimed Araujo had close ties with the AUC. (PX 287 at 24; PX 134 at 43-45).

On April 13, 2010 Charris emailed Yineth Baeza, the assistant to Francisco Ramirez, who delivered the monthly payments to Charris. He asked for money to cover his family's move due to his mother in law's illness. There was no mention of security. (Doc. #44-10). The request was denied, but there was an agreement to pay money if Charris was transferred to another prison. (Doc. #44-8).

On May 16, 2012 Charris gave his letters rogatory testimony in *Balcero*. He testified that Ivan Otero was his lawyer and that his legal fees were being paid by Francisco Ramirez. (*Balcero*, Doc. #407-3 at 162-66).[17]

- Blanco was a fact witness in *Balcero* who accused Drummond of collaborating with the AUC. Defendants relied upon Blanco's testimony in this case to prove its affirmative defense of the truth. (Doc. #280, ¶¶31, 32).

---

[17] While on the stand at the evidentiary hearing, Mr. Collingsworth was asked about these payments to Charris. As to the continuing monthly $840 payment, Mr. Collingsworth testified that "local folks came up with this number as a fair representation of what it would take to live in the city without being able to work." (Doc. #389 at 74, 111). Regarding the $1500 payment that went through Garzon, Collingsworth testified "that was the original relocation of the family of Charris from some rural area in Sazar Province to a large city and to get them set up, and it also must have covered Mr. Garzon's own transportation, because we were very directly involved in moving them." (Doc. #389 at 110).

On September 8, 2010 Blanco was arrested and testified before the Colombian Fiscalia that the allegation that Drummond paid the AUC through Blanco's food services company "is absolutely false and accounting-wise impossible." (PX 45 at 6). At the same time he testified that labor unions, NGOs "and a large amount of lawyers are offering money to these demobilized groups that are in precarious financial conditions so that they say what they want to hear or say." (PX 45 at 12).

On February 21, 2011 Collingsworth made email contact with Blanco. (PX 434 at 2). On March 1, 2011, Collingsworth emailed Blanco and told him that Drummond was trying to blame the union murders on Blanco. "In reality, there is no other way for Drummond to defend itself. The assassinations did occur, so they have to say someone else is responsible. That would be you." (PX 75 at 6-7).

In April 2011, Blanco requested that Defendants pay him $150,000 to cover legal fees. (Doc. #280, ¶34; PX 103 at 10). In April or May 2011, Collingsworth exchanged communications with his former *Balcero* co-counsel at Parker Waichmann, LLP asking them to pay Blanco's criminal legal fees. (Doc. #280, ¶35). Parker Waichmann, LLP declined to provide the money needed to make the payments. (Doc. #280, ¶36; Doc #389 at 91).

In July 2011, Collingsworth met with Ivan Otero and Blanco in a prison in Colombia. During that meeting Collingsworth stated to Blanco that he would ask Albert van Bilderbeek to pay Blanco's criminal legal fees. (Doc. #280, ¶37). That same month, Collingsworth contacted van Bilderbeek about paying Blanco's legal fees. (Doc. #280, ¶38). Van Bilderbeek agreed to make these payments and to send the money using Ivan Otero as the intermediary. (Doc. #280, ¶39). "Mr. Blanco helped Mr. van Bilderbeek, using his contacts to investigate Mr. van Bilderbeek's claim in Colombia regarding his oil, the theft of his oil leases, that he alleges was completed by Drummond." (Doc. #389 at 92).

On September 3, 2011 Albert van Bilderbeek made a $60,000 payment to Blanco. (Doc. #342-20). This initial $60,000 payment originated from the "Asian Pacific Energy Corporation," a company that "offers consumers the possibility to invest in possible legal settlements." (PX 303).

On September 12, 2011 Collingsworth emailed his team: "Albert confirmed that he received his funds and would wire today to Ivan – might take a day or so to clear but this is definite now." (PX 19 at 2).

On September 16, 2011 Collingsworth emailed Ivan Otero: "By now you should have received 2 packages. Just to be clear, the one from the brothers you know what that is." (PX 19 at 3).

Blanco refused to sign his declaration against Drummond until he received the $60,000 payment.  (Doc. #280, ¶45) ("Mr. Blanco did not want to finalize his declaration in the Drummond case until Mr. van Bilderbeek satisfied his obligations to Mr. Blanco, apparently expecting that Mr. Collingsworth could intervene in that situation." (Doc. #174-2, at 6)).  The month after receiving the $60,000 payment, in October 2011, Blanco signed a declaration for Defendants to be used in the civil cases against Drummond.  (Doc. #280, ¶46).

On December 28, 2011 Collingsworth sent an email to Albert van Bilderbeek stating: "Ivan says nothing has arrived and that we are on thin ice.  Can you somehow check on this and send a confirmation?  This is truly urgent." (PX 302).  Otero emailed Collingsworth the same day saying: "They tell me that what was pending from the brothers just arrived." (PX 19 at 5).

On March 8, 2012, after two payments were made totaling $85,000 from Albert van Bilderbeek to Blanco, Mr. Collingsworth represented to this court that Llanos Oil has no relationship to this case.  (Doc. #389 at 227).

On April 19, 2012 Collingsworth handed Ivan Otero $10,000 in cash after Blanco had provided (earlier that same day) the first day of his letters rogatory testimony in *Balcero*.  (*Balcero* Doc. #396-15; Doc. #389 at 228).  During that testimony, Collingsworth asked Blanco if he had received any promises or benefits for testifying.  (*Balcero* Doc. #396-15 at 16-17).  Blanco responds: "No, no kind whatsoever." (*Balcero* Doc. #396-15 at 16-17).  But Blanco had already received at least two payments from Albert van Bilderbeek that were facilitated by Collingsworth.

On July 19, 2012 Collingsworth confirmed a third payment to Blanco from Albert van Bilderbeek in the amount of $35,000.  (PX 19 at 7-8).[18]

- Samario and El Tigre were two of Defendants' fact witnesses in *Balcero* who accused Drummond of collaborating with the AUC.  Defendants relied in part upon their testimony in this case to prove their defense of the truth.  (Doc. #280, ¶¶62, 63).

  In 2007, 2008, and 2009, El Tigre testified numerous times in the Justice & Peace process in Colombia.  In that testimony El Tigre did not implicate Drummond with respect to any involvement with the AUC.  (*Balcero* Doc. #361-11 at 86; Doc. #389 at 141-42).

---

[18] On the stand at the evidentiary hearing, Collingsworth was asked about these payments to Blanco.  He testified: Blanco had verbally implicated Drummond with the AUC in February 2011, before any payments were made, and that the comment about being "on thin ice" was because Blanco was upset with him because the separate arrangement with van Bilderbeek had not been completed.  "It caused problems that I didn't need with someone on an unrelated matter." (Doc. #389 at 49, 226-27).

In January 2009, Ivan Otero joined Collingsworth's team in the *Balcero* case. Otero at times represented himself to be El Tigre's criminal lawyer.  In April 2009, Collingsworth paid Otero an $80,000 retainer fee.  (Doc. #389 at 141, 144). There is no documentation regarding how this $80,000 was spent.  (Doc. #389 at 145).

On February 11, 2010 El Tigre testified before the Colombian Fiscalia stating that Drummond did not provide financial support to the AUC.  (Doc. #88-2).

On February 11, 2011, Defendants sent a $5000 payment via international bank wire from Conrad & Scherer's Operating Account to Ivan Otero.  (Doc. #280, ¶64).  Collingsworth authorized this money "to be sent to Mr. Otero's bank account as money for security for Mr. Otero, Samario, and El Tigre."  (Doc. #231-11 at 42).

On April 20, 2011, Defendants set up a regular monthly wire payment for Otero, Samario, and El Tigre in the amount of a $2700 which was to be paid from Conrad & Scherer's Operating Account to Ivan Otero.  (Doc. #280, ¶67).

On May 19, 2011, Collingsworth and Otero signed an agreement that $2700 per month would be paid for security for Otero, Samario, and El Tigre.  (Doc. #389 at 151).  Collingsworth did not require documentation from Otero with respect to these monthly payments because he trusted Otero "and once it was clear that he was using it for security, I was certain that he was."  (Doc. #389 at 154).

On May 22, 2011, Collingsworth emailed Parker Waichmann lawyers, copying Bill Scherer and Richard Drath.  The email stated: "Need to pay $2700 per month to maintain until we get the deps in the can, and depending on what happens, we may need to do more for the families.  ET and Samario are rattled as Bocanegra also threatened their families."  (PX5; Doc. #389 at 151-52).

Between June 2011 and present day, Defendants have sent monthly $2700 payments via international bank wire from Conrad & Scherer's Operating Account to Ivan Otero.  (Doc. #280, ¶71).  While the descriptions of these payments vary, Defendants knew and intended that these monthly payments would be delivered to El Tigre and Samario by Ivan Otero.  (Doc. #280, ¶73; Doc. #389 at 155).

On June 17, 2011 El Tigre signed a declaration for Collingsworth which recanted his February 11, 2010 testimony to the Columbian Fiscalia wherein he denied any knowledge of Drummond's collaboration with the AUC.  "In Colombia, in the wake of the civil conflict and all the powerful people who now want to deny their participation in the crimes of the AUC, such threats are concrete.  I felt I had no choice but to repudiate my prior declaration."  (*Balcero* Doc. #396-11).

25

On March 22, 2012, El Tigre gave his letters rogatory testimony in *Balcero*. When asked about his claim that he was threatened by Jaime Bernal (a Drummond employee), he denied that had occurred. (*Balcero* Doc. #396-11 at 106-08).

Defendants did not disclose to Drummond or the court their payments to El Tigre and Samario until November 17, 2014 when they produced documents reflecting payments to Ivan Otero and a redacted copy of Collingsworth's May 22, 2011 email to Parker Waichmann, Bill Scherer, and Richard Drath. (Doc. #280, ¶74).

Once again, it is hard to imagine a set of facts that could more clearly establish the first prong of the *prima facie* case for applying the crime-fraud exception to allegations of witness bribery and suborning perjury. Here, the court has no hesitation in finding that there is (at least) probable cause to believe that Collingsworth, while prosecuting lawsuits on behalf of his firm, engaged in witness bribery and suborning perjury at the time the work product set forth above was created. *Schroeder*, 842 F.2d at 1226. This alleged witness bribery continues to this day as to some of these former paramilitary witnesses as they continue to receive "security" payments. And once again, because every action taken by Terrence Collingsworth in this court was in Collingsworth's capacity as an agent of Conrad & Scherer, the first prong of *Schroeder* is met as to both Defendants.

**B.    The Second Prong of *Schroeder* – The Categories of Discovery Sought "Relate To" the Crimes or Frauds Alleged in this Case**

The second prong of *Schroeder* is satisfied by "showing that the communication is related to the criminal or fraudulent activity established under the first prong." *In re Grand Jury*, 845 F.2d 896, 898 (11th Cir. 1988). Although different courts use different formulae in determining the degree of relatedness necessary to support this prong, the Eleventh Circuit has said that "the different formulations share a common purpose – identifying communications that should not be privileged because they were used to further a crime or fraud." *Schroeder*, 842 F.2d at 1227. Whether a document or communication is "related to" a crime or fraud should not

26

be interpreted "restrictively" but must "relate to" the crimes or frauds at issue within the meaning of the exception. *Schroeder*, 842 F.2d at 1227 (finding that the determination of relatedness must take into account that the proponent of the exception does not know precisely what the material will reveal or how useful it will be).

On the basis of this guidance, the court must examine each category of discovery sought by Drummond and make an independent finding as to whether each category is individually "related to" the allegations of fraud, witness bribery, and/or suborning perjury. Those categories, as set forth by Drummond, are as follows: information related to Ivan Otero; the redaction and withholding of documents produced by Defendant in May 2014 which, but for the redactions, would have reflected the payments to El Tigre and Samario; drafting of pleadings that included misrepresentations regarding the scope, nature, and extent of witness payments; the "deps in the can" email; information related to an attorney named Paul Wolf; Collingsworth's disclosure of payments to El Tigre, Samario, and Blanco to his counsel; information about the retention and payment of a "consultant"; Collingsworth's communications with Albert van Bilderbeek regarding payments to Jaime Blanco; and Defendants' searches for documents. (*See* Docs. #329, 355). The court addresses each category in turn, and examines each category's relatedness to the crimes and frauds alleged in this case.

### 1.      Information and Communications Related to Ivan Otero[19]

Ivan Otero has been a member of Defendants' Litigation team since 2008.  (Doc. #280),

---

[19] During the course of testimony, counsel for Defendants traveled a very thin line questioning Collingsworth about conversations he had with Otero.  (Doc. # at 59-60).  On several occasions the concern was raised that Defendants were using evidence based on work product communications "when it suits [them] but you're trying to shield [Plaintiffs] from discovering what all was discussed in totality about payments."  (Doc. # at 76).

THE COURT:  The problem is we've got the can open now.  I'm just trying to make sure that we don't get the can open and prejudice your position.  I'm trying to protect Mr. Collingsworth and the Scherer law firm's position here, but what I'm telling you is you can't have it both ways.

You can't say based upon communications that I can't disclose, I understood this was for security only, but I'm not going to tell you what those communications were ….

Well, but I told you I'm not sure you can rely upon Mr. Otero's affidavit as a shield if you're not willing to disclose what was discussed between Otero and Mr. Collingsworth about these payments.  That's the problem you're having right now, is you're trying to use some information and justify your litigation position without letting any other information out of the bag that might inform the other side as to what actually occurred.

And what actually occurred may be completely consistent with your litigation position.  I'm not suggesting it isn't.  But what I'm suggesting is it's really unfair to allow you to assert work product and privilege and not have to disclose communications between Otero and Collingsworth about these areas and at the same time rely upon conclusions from Mr. Collingsworth and Otero, not statements, not evidence, to substitute for evidence.  Does that make sense to you?

I've got that it's banked under the outgoing wire transfer request that was characterized for families' living expenses, but the question we're deciding here, in part, and really what the whole issue here today is: Does the other side get to ask Mr. Collingsworth about Otero's conversation with him about what these payments actually represented and were used for?

That would be piercing the work product privilege and that's what we're litigating.  So I'm not going to allow you – I don't think I can allow you to give me the conclusion of what those statements were when the whole point is you don't want to disclose them and we're litigating about whether the other side gets to discover them. …

But you see what I'm saying?  You're trying to use Otero's testimony to confirm that these were security payments and nothing else but you're not wanting the other side to have the opportunity to question someone who talked to Otero about the payments, and he's not available here for cross examination.

So I'm going to let you put that in, but I'm going to take into account the fact that – I don't know how credible it is.  It's going to be difficult to make credibility judgments on it other than with respect to how it fits with the other facts. …

You're wanting me to infer from this affidavit that there was a legitimate reason for the recommendation to pay these witnesses without going into actually what the recommendation was and the basis for it and the actual recommendation being made.

Let's just be clear what you're doing here.  That's what you're doing.

(Doc. #390 at 79-83, 88-89).

¶¶1, 2).  He was introduced to Collingsworth by Francisco Ramirez, although Collingsworth knew Otero by reputation for several years before he met him in November 2008.  (Doc. #389 at 138-40).  Otero has a contingency fee agreement with Collingsworth in both *Baloco* and *Balcero* entitling him to 16-17% of any recovery against Drummond in those cases.  (Doc. #280, ¶3; Doc. #389 at 140-41).  Defendants provided Otero with an $80,000 lump sum payment in or around April 2009, which Defendants have described as a retainer.  (Doc. #280, ¶8; Doc. #389 at 141).

As a result of this arrangement, Defendants contend that the requested communications are subject to work product privilege.  But there is sufficient information in the record which, if believed by the trier of fact, would establish the elements of ongoing witness bribery, subornation of perjury, and/or fraud on the court.  *Gutter*, 124 F. Supp. 2d at 1304; *see also In re Grand Jury (Schroeder)*, 842 F.2d at 1226.  So the second prong in *Schroeder* instructs the court to determine whether there exists sufficient evidence in the record linking communications to and from Ivan Otero to the crimes alleged.

The evidence of relatedness that Defendants have pointed to is nothing short of staggering.  As set out in Section II.A.1 and 2 *supra*, multiple documents suggest that Otero has served as the conduit for ongoing payments to El Tigre and Samario.  (Doc. #174-5; 174-6; 174-7; 174-8; 174-9).  Multiple documents also suggest that Otero served as the conduit for at least three payments totaling $120,000 to Jaime Blanco.  (Docs. # 174-20; 342-20).  Of course, there is even more.  The story keeps changing as to whether or not Otero represented any witness in the civil case at the time he was paid $80,000 and promised a contingency fee in *Balcero*.  (Doc. #69-29 at 11) (describing Otero as "counsel" for Samario and El Tigre); (Doc. #43-12, No. 8) (representing that "Mr. Otero represents former paramilitaries who are providing testimony against Drummond in this case); (Doc. #243-3 at 110) (testifying under oath that Ivan Otero was

the "Colombian criminal attorney representing Jaime Blanco"); (Doc. #69-39 at ¶¶ 17, 28, 31) (Mr. Otero's affidavit stating: "Even though I withdrew in my representation of [El Tigre] and [Samario] in the Justice & Peace Process, I continue providing them counsel regarding the statements they made before the U.S. court").  While these earlier statements indicate that Otero does in fact represent the former paramilitaries, Defendants now contend that those statements were mistaken.  (Doc. #280, ¶¶ 4, 5, 6, 7).

It is hard to imagine, even in Alice's Wonderland,[20] what more could be required to link Ivan Otero to the crimes and frauds alleged in this case.  Plaintiffs have sufficiently satisfied prong two of *Schroeder* for the information related to Ivan Otero.[21]

---

[20] On August 17, 2015, the court held a conference call and stated its inclination that a litigant must be allowed full discovery into all surrounding facts and circumstances in order to discover the true extent and purpose of the crime or fraud.  Specifically, the court said: "It's almost Alice in Wonderland.  First the verdict, don't worry about the trial.  We don't – we don't want to share any information that may conflict with what our position is. We're just asking you to accept our position."  (Doc. #311-2 at 355:14-356:7).

[21] During the hearing the court asked the following questions and Collingsworth gave the following answers:

THE COURT:  In other words – and, again, I'm not saying that this is going to be a finding, but is it plausible that the only way we can verify security issues with witnesses is to talk to you or Mr. Otero about what these witnesses supposedly told you or him?

MR. COLLINGSWORTH:  No, Your Honor.  I think what we're going to have testimony from a couple of experts about – certainly one in particular in Colombia, but there's –

THE COURT:  I acknowledged that.  I said I understand Colombia is a dangerous place, but as it relates to the context of these payments and these particular individuals, what evidence is there that security threats directed at them other than taking your word for it or your passing along Mr. Otero's word for it?

MR. COLLINGSWORTH:  Other than the context of Colombia, where there's plenty of evidence that this is common and happens all the time, with these specific witnesses I'm not aware of any other source besides me or my conversations or Mr. Otero's conversations.

(Doc. #389 at 240-41).

2.    The Withholding and Redaction of Documents Produced by Defendants in May 2014 which Reflected Payments to El Tigre and Samario

In May 2014, in response to Drummond's written discovery requests, Defendants produced documents that were partially redacted with a black Sharpie and which, absent the redactions, would have reflected that Defendants made payments to El Tigre and Samario.  In that production, some documents were withheld in their entirety.  When questioned about these redactions which perpetuated the non-disclosure and alleged fraud on the court, Collingsworth testified that he was involved only to the extent that he discussed redaction decisions with his counsel Brad Smith; he did not actually perform the redactions.[22]  (Doc. #389 at 115-16, 190).

But not all of the redactions made to documents produced in May 2014 were made with black Sharpie, or for that matter, otherwise indicated to be a redaction.  "[T]here's a redaction of not just blacking something out but eliminating it from the document, which is interesting to me because I don't understand why you would use both methods for redaction unless you wanted someone to not understand there was anything there in the first place."  (Doc. #389 at 118).  While Collingsworth testified that redactions were made because he "characterized them as an expenditure for Mr. Otero, not for any witness," there is no way for Drummond to know, beyond Defendants' "because I say so" assertion, whether the redactions were made in good faith or instead to perpetuate a crime or fraud.  (Doc. #389 at 194).  Of course, both the redactions and the withholding of documents which are related to payments to witnesses are intimately related to the crimes or frauds alleged in this case.  *See* Section II.A. 1 and 2, *supra*.

---

[22] The court warned Collingsworth and his counsel that there were getting on "thin ice" with questions related to Mr. Smith.  "If you're starting to suggest who is responsible for the redactions, why are you not opening the door in terms of what knowledge they had about making the redactions?  In other words, if you're wanting to use this as a shield involving your client, then why couldn't the other side use it as a sword to get the truth?"  (Doc. #389 at 116).

Drummond is entitled to explore who made the decision to redact and withhold all of the documents reflecting payments to El Tigre and Samario, who actually performed the redactions to the documents, what they knew at the time they redacted them, and what they were told about the actual facts of this case, including payments to Otero. These questions go to the heart of the questions raised in this case about fraud, bribery, and suborning perjury. Plaintiffs have sufficiently satisfied prong two of *Schroeder* as to this category of information.[23]

### 3. Drafting of Pleadings and Papers that Include Misrepresentations Regarding the Scope, Nature and Extent of Witness Payments

Defendants have consistently maintained that they did not *intentionally* misrepresent the scope and extent of payments to witnesses in pleadings, interrogatory responses, sworn declarations, correspondence with opposing party, or in open court. (Doc. #280, Defendants' Proposed Findings of Fact, ¶ 367). But because Drummond has come forward with evidence establishing probable cause of ongoing crimes and/or frauds, the drafting of pleadings and papers (and conversations related thereto) are uniquely and intimately related to these purported wrongdoings. Drummond must be permitted to ask questions regarding events and facts surrounding the drafting of filings which misrepresented the scope, nature, and extent of witness payments. Once again, it is difficult to imagine how this issue could be more closely aligned with the evidence of bribery, subornation, and fraud perpetrated on the court. Plaintiffs have sufficiently satisfied prong two of *Schroeder* as to this category of information.

---

[23] Conrad & Scherer argues that, as to the set of documents that relate to communications with Brad Smith and neatly fit into the attorney client context, the co-client privilege applies, thus foreclosing the possibility that Collingsworth's waiver of privilege could be imputed to the law firm. (Doc. #395 at 11-13). This argument fails on at least two grounds. First, the crime-fraud exception is not a waiver of privilege, it is an exception to the privilege. Unlike a co-client waiving a privilege being subject to certain limitations, here nothing was waived. Second, and in any event, because this court has already held that Collingsworth acted at all relevant times on behalf of the law firm, this is not a case where crime-fraud liability was "blindly imputed to an innocent joint privilege-holder." (Doc. #395 at 13-4) (citing a bankruptcy case in which the crime-fraud exception applied to communications between a lawyer and co-clients represented by the lawyer because a prior court had determined that both co-clients were participants in the criminal and fraudulent scheme underlying the crime-fraud analysis).

### 4.    The "Deps in the Can" Email[24]

On May 22, 2011, Collingsworth emailed lawyers at Parker Waichmann and informed them that he had already paid Otero, Samario, and El Tigre $5400 in cash and that Conrad & Scherer would be making monthly $2700 payments to Samario and El Tigre "until we get the deps in the can."  (Doc. #174-6).  Bill Scherer and Richard Draft (then the CEO of Conrad & Scherer) were copied on the email and it was forwarded to Bill Scherer's son, Billy Scherer. (Doc. #174-6; Doc. #311-2 at 232:1-25).  Collingsworth testified that he saw this email again years later, in June or July of 2014, and only then remembered (in other words, "I forgot") that Defendants were paying El Tigre and Samario in addition to the three persons earlier disclosed to the court.  (Doc. #311-2 at 159:16-18).  Bill Scherer testified that while, upon discovery, this email was sent on to Brad Smith, it "didn't turn on any light bulb for me at that time because I didn't know what was going on in the Drummond case."  (Doc. #390 at 147, 157).

Once again, Drummond has come forward with evidence of continuing crimes and fraud and presented evidence which indicates that this email was sent in furtherance of those. Discovery must be allowed into who else saw the email, when they saw it, who showed it to them, and what was done after the email was sent.  (See footnote 5, *supra*).  This includes all communications concerning the email and all communications that Defendants and their counsel had which occurred between June 25, 2014 (the date the email was printed) and November 17, 2014 (when the email was first produced to Drummond).  This discovery will squarely align with the crimes and frauds alleged in this case – *i.e.*, whether a cover-up of bribery, an ongoing

---

[24] The "deps in the can" email specifically, and the subpoena to Parker Waichmann generally, have been the subject of much dispute among the parties. (Doc. #299 at 24-30).  Because the court herein finds that the *Schroeder* test has been satisfied and unrebutted as to this category of information, the court finds that the Report and Recommendation (Doc. #299) of the Special Master on the issue of the Parker Waichmann documents is due to be adopted and approved.  (Doc. #299, ¶¶ 70, 71, 72).

bribery, or an ongoing fraud on the court.  Moreover, such an email evidencing payment to paramilitaries until the "deps are in the can" could itself be in furtherance of the crime or fraud. *In re Grand Jury Subpoena*, 419 F.3d at 347.  Plaintiffs have sufficiently satisfied prong two of *Schroeder* as to this category of information.

### 5.    Paul Wolf[25]

Paul Wolf is a human rights attorney who represents a group of plaintiffs in multi-district litigation against Chiquita Brands International, Inc. currently pending in the United States District Court for the Southern District of Florida.  (Doc. #299, ¶¶73, 75).  Collingsworth and his firm represent a separate group of plaintiffs in the same multi-district litigation.  (Doc. #379 at 6).  During the course of the Chiquita litigation, Wolf came to know Collingsworth; they and other lawyers participated in meetings with the Plaintiffs' Group and shared information through the Google group Listserve.  (Doc. #299, ¶ 76; Doc. #379 at 6).  Wolf was unanimously excluded from the Plaintiffs' Group in September 2011.  (Doc. #379 at 7).  He then began filing ethics charges and complaints against members of the Plaintiffs' Group, including bar complaints against Jack Scarola and Collingsworth, a civil lawsuit against the law firm of Boies, Schiller & Flexner, LLP, and another bar complaint with the Florida Bar against three members of the Boies Schiller law firm.  (Doc. #379 at 7).

In August 2013, Wolf contacted Drummond's counsel via email, stating that he had information regarding payments to witnesses in the Drummond cases.  (Doc. #299, ¶ 79a).  Wolf attached to that email a memorandum from a Conrad & Scherer lawyer regarding paying witnesses' legal fees.  (Doc. #299, ¶ 79b).  After confirming with the Alabama State Bar that

---

[25] The discoverability of the testimony of Paul Wolf has been considered at length by the Special Master. (Doc. #299 at 40-48).  Because the court herein finds that the *Schroeder* test has been satisfied and unrebutted, the court finds that the Report and Recommendation (Doc. #299) of the Special Master on the issue of the Paul Wolf testimony is due to be adopted and approved.

they could speak with him, Drummond obtained a sworn declaration from Wolf which was attached to briefing in this case on October 3, 2013.  (Doc. #299, ¶ 79d).  According to Wolf, he confronted Collingsworth about payments to witnesses in July 2011.  Collingsworth responded by stating that he had an ethics opinion justifying the practice.  (Doc. #62-5).

Defendants seek to "claw back" that declaration, asserting that Wolf and Collingsworth shared a "common interest" privilege and that any information Wolf obtained pursuant to that common interest is work product that Wolf is not authorized to unilaterally waive.  (Doc. #299, ¶¶81, 82).  They instructed Collingsworth not to answer questions about Wolf on the basis of privilege.

The information contained in Wolf's declaration bears directly on the veracity of Collingsworth's contention that he "forgot" about payments to El Tigre and Samario.  The declaration specifically states that Wolf "[has] been a party to at least four conversations where Mr. Collingsworth's payments of witnesses was discussed. … [there] [was] a concern with Mr. Collingsworth's payments to a security company. … Mr. Collingsworth responded that he paid the security company first and then the security company would send the money to the lawyers for the witnesses who were Colombian paramilitaries."  (Doc. #62-5).  Based on these facts, Plaintiffs have sufficiently satisfied prong two of *Schroeder* as to this category of information.

### 6. Collingsworth's Disclosure of Payments to El Tigre, Samario, and Blanco to his counsel

At the October 10, 2013 hearing, Defendants' counsel, Mr. Brad Smith, represented to the court that "all responsive documents" had been produced in connection with any security payments.  (Doc. #63 at 25:25-26:16).  Collingsworth was present at the hearing and, although it is now known the representation was incorrect, he made no effort to correct this representation. And when questioned during his deposition as to whether he had fully disclosed Defendants'

witness payments to his counsel as of the October 10, 2013 date, Collingsworth was instructed not to answer.  (Docs. #311, 329 at 16).

Having established that there is evidence which, if believed, would establish an ongoing crime or fraud, the question of what payments were disclosed to counsel bear directly on the veracity of Collingsworth's claim that he "forgot" about payments to El Tigre and Samario.  If counsel for Collingsworth asked him to disclose to him all of Defendants' witness payments (or specifically asked whether El Tigre, Samario, and Blanco were paid) and Defendants lied to their counsel, this clearly would be relevant to Drummond's contention that Defendants have engaged in fraud on the court, witness payments, and/or suborning perjury.  Based on these facts, Plaintiffs have sufficiently satisfied prong two of *Schroeder* as to this category of information.

### 7.    Defendants' Consultant

In the November 24, 2014 interrogatory responses, Defendants disclosed that they paid $100,000 to a consultant in Colombia, describing the consultant as an attorney who was "familiar with the Foreign Ministry, the Ministry of the Interior, and the Letters Rogatory process."  (Doc. #174-7, No. 2).  The consultant was said to have been engaged to "facilitate the Letters Rogatory process and to assist Defendants in obtaining access to prisoners in order to interview and subsequently depose them."  (Doc. #174-7, No. 2).  According to Defendants' SunTrust Privilege Log, the $100,000 lump sum payment to this consultant originated from Collingsworth's personal checking account.  (Doc. #329, Exh. 3 at Entry No. 102).  When asked to identify this consultant, describe the work he performed, and explain why he was paid $100,000 out of Collingsworth's personal checking account, Collingsworth was instructed not to answer.  (Doc. #329 at 20).

Defendants have not explained why information related to this consultant is privileged. But even if it is, this information clearly falls within the category of information connected to the crime or fraud. That $100,000 paid for access to prisoners could mean any number of things, particularly given that, by all indications, virtually every witness who testified against Drummond in *Balcero* was paid in some form or fashion. Discovery of the identity of, work performed by, and payment arrangement with this consultant is necessary for Drummond to investigate whether the consultant also delivered payments to witnesses, and whether Defendants improperly failed to disclose to the court all payments to witnesses. Based on these facts, Plaintiffs have sufficiently satisfied prong two of *Schroeder* as to this category of information.

### 8. Collingsworth's Communications with Albert van Bilderbeek Regarding Payments to Jaime Blanco

On January 9, 2015 Defendants disclosed that Albert van Bilderbeek paid Jaime Blanco sums up to $120,000 for legal representation. (Doc. #174-2). The money was transferred via at least three payments. Blanco cooperated with Collingsworth with respect to a declaration in connection with the lawsuit against Drummond. But Blanco refused to sign his declaration until he received the final one of these payments. (Doc. #174-2). During his deposition, however, Collingsworth was instructed not to answer questions regarding these payments. (Doc. #329, Exh. 1 at 318:4-318:23).

But even if there is a legitimate reason to argue attorney-client privilege for these communications, Plaintiffs have established that there is evidence which, if believed, would evidence an ongoing crime or fraud. The disclosure of payments to Blanco bear directly on the veracity of Collingsworth's claim that he "forgot" about certain payments and/or that witnesses were being bribed for their testimony. Based on these facts, Plaintiffs have sufficiently satisfied prong two of *Schroeder* as to this category of information.

37

9.      **Defendants' Searches for Documents**

There is a spoliation claim made in this case.  According to Defendants, years of Collingsworth's emails prior to March 2013 were lost when he gave his MacBook laptop to his niece in Brazil.  (Doc. #293 at 15).  In July 2013 Drummond served a subpoena on IRAdvocates seeking documents relating to payments to witnesses.  (Doc. #118-3; Doc. #243-10).  Defendants moved to quash that subpoena, but represented in August 2013 that "defendants Collingsworth and his staff have already searched for and produced all responsive non-privileged documents in both this litigation and the *Balcero* case."  (Doc. #46 at 12-13).  Drummond asked Collingsworth what was done to ensure that this representation was accurate and he was instructed not to answer on privilege grounds.  (Doc. #329, Exh. 1 at 133).

The timeframe here is what is interesting.  If Defendants performed a cursory search for documents in August 2013, they would have noticed that emails prior to March 2013 were missing.  With the looming evidence of a crime or fraud, an explanation about what search for documents occurred is relevant to the question of whether evidence was being secreted about payments to witnesses.  This, in turn, bears directly on the fraud on the court question.  Based on these facts, Plaintiffs have sufficiently satisfied prong two of *Schroeder* as to this category of information.

C.      **The Rebuttal**

Because Drummond has established a *prima facie* showing of an ongoing crime or fraud, the burden of persuasion shifts to Defendants to provide a reasonable explanation in order to rebut the prima facie showing.  *Gutter*, 124 F. Supp.2d at 1307.  "If the court accepts the explanation as sufficient to rebut the evidence presented by [Drummond], then the privilege remains.  If the court does not find the evidence is sufficient to rebut the *prima facie* case, then

the *prima facie* case still exists and the privilege is lost.  In order to carry its burden of persuasion [Defendants] have to show by a preponderance of evidence that the *prima facie* showing that the crime-fraud exception applies should not be accepted."  *Id.*  In preparation for the evidentiary hearing, the court addressed this procedural posture to the parties during its August 26, 2015 telephonic conference.  (Doc. #341 at 16-17, 32).

> THE COURT:  All right.  So we let them marshal their information together, prepare for and try to explain to me why on September 1 that prima facie showing has not been made.  When I have the information before me, I make a ruling.  And then [afterwards], if I think you're entitled to take a deposition of Mr. Collingsworth on these issues, then I allow you to do it, and then we resume the hearing next week once that's done and finish up where we are.

> If I don't think you've made the prima facie showing, then we just go [forward] based upon what you can present without piercing the privilege or the work product doctrine.

(Doc. #341 at 32).

> THE COURT:  Well, look, I'm a big believer in due process.  I'm a big believer that we want to do it once; do it right; not do it wrong and do it twice.[26]

> Now, I realize I am dealing with an abuse-of-discretion type standard here, but, quite frankly, that's all the more important reason for me to exercise discretion well about how we're going to handle this.

(Doc. #341 at 33-34).

> THE COURT:  We're going to start off with you [Defendants], and you can do this by proffer or evidence, but I'm going to give you a certain amount of time on Tuesday to rebut their prima facie showing; explain to me why they haven't presented sufficient information, and explain to me why based upon their showing if it was believed by the trier of fact that would not implicate the crime-fraud exception here. ….

> In other words, Collingsworth gets the chance to rebut, but his rebuttal has to disperse any inference.

---

[26] Although the case law is not clear as to whether Defendants are entitled to a rebuttal where the *prima facie* case has been established, the court erred on the side of allowing Defendants full due process.  (*See* Doc. #364 at 3 ("As the court has observed, the Eleventh Circuit has not directly addressed this question."); *see also* Doc. #341 at 39 ("Collingsworth gets the chance to rebut, but his rebuttal has to disperse any inference.").

> And then, it seems to me, that Drummond should have the opportunity to put on evidence that Collingsworth's explanation or evidence is pretext. And then we make a determination about whether or not there has been a prima facie case that has been rebutted or not, and then we will know about whether additional discovery will be needed before we complete a hearing.

(Doc. #341 at 38-39).

Counsel for Defendants assured the court that it would address the specific misrepresentations alleged head-on in its rebuttal. (Doc. #341 at 34-35). So when Collingsworth and other witnesses were on the stand and Defendants had the opportunity to marshal their rebuttal, the court endeavored to hear any testimony or see any evidence that might overcome the presumption. *See Gutter*, 124 F.Supp. 2d at 1307. But, quite frankly, there simply was no rebuttal.

For each of the omissions and misrepresentations about payments to witnesses, Collingsworth testified. And each explanation that emerged ran down one of several rabbit holes:

- "I had been making a close distinction between payments that I made, which is what I thought the requests were seeking, and payments that other people made. … At some point I decided I was playing it too close to the vest and that wasn't an appropriate line to draw." (Doc. #389 at 108-09). "We were maintaining the distinction between payments to a witness, the paramilitary himself, and the family members, which we considered to be very different." (Doc. #389 at 163-64).

- "I did not associate the security payment we were making to Otero to Samario and El Tigre. At some point I assumed that it was just for Otero."[27] (Doc. #389 at 103). "As I said, I recycled the original answer and never looked back. I just

---

[27] This explanation for not revealing the payments to El Tigre and Samario appears to have changed over time. (Doc. #187 at 3, 19-20) ("Mr. Collingsworth was slicing too close to distinguish between the direct payments Conrad & Scherer made to assist witnesses in this dangerous environment and the 'indirect' payments made either through Otero, who had sole discretion on the matter, or the van Bilderbeeks as assisted by Mr. Collingsworth." … "[D]efendants had a good faith basis for objecting on this ground and construing 'payments to witnesses' narrowly as only those payments flowing directly from Conrad & Scherer to a witness or a witness' family."); (Doc. #210 at 9) ("Drummond certainly cannot claim that defendants merit the ultimate sanction of a default judgment because they failed to go back and correct statements that, while accurate at the time they were made, have since become 'false' based on subsequent discovery rulings made by this court.").

continued to assume that I was correct in the first instance and did not do any further investigation on that point, and I should have." (Doc. #389 at 111). "I replicated the mistake by primarily cutting and pasting and going forward, and I just did not think about it again. … I thought I had produced all responsive documents on that issue." (Doc. #389 at 165-66).[28]

- "It was a terrible mistake for me not to [disclose the relationship between myself, Blanco, and the van Bilderbeeks]. I concluded that they were not related. I had them in different boxes, and I, therefore, did not untruthfully answer." (Doc. #389 at 93-94, 97-98). I was "making the legal distinction" between payments by my firm versus payments by the van Bilderbeeks." (Doc. #389 at 112).

During the course of this testimony, the court expressed concern with the efficacy of this rebuttal:

THE COURT: I guess here is what I am struggling with. In my practice, if I made a payment to a witness for any purpose, legitimate, illegitimate, sanctimonious, completely dirty, I think I would remember it. And I'm struggling with the credibility decision of crediting your testimony that when you're at a meet and confer, your discussions about whether we ought to expand disclosures beyond Halcon paramilitary disclosure to subsistence to family members for security reasons, why only remember 60 percent of the people that fall into that category.

MR. COLLINGSWORTH: Well, I wasn't relying on my memory so much as gathering the documents that we had, and I think unfortunately part of the problem was that I was the weakest link in terms of the documents. And when other people looked at the documents, it only said security for Otero, and I don't recall anyone asking me for details because that was just a whole different situation.

THE COURT: Multiple times after that, you said three; there were only three; we now have a complete record; the record is now complete; we now have all the information; there are exactly three.

I can walk you through where you said these things, but I think you understand the scope of my question and its foundation.

And you're saying that in all – for the next several months, when you're making those representations to the court, your opponents in this case, other courts, other individuals, you didn't remember at any point there that there were payments made to Samario and El Tigre as well?

---

[28] That is, from at least January 2013 through midway through 2014 Collingsworth "forgot" that he was paying El Tigre and Samario. (Doc. #389 at 165).

> MR. COLLINGSWORTH:  Unfortunately, Your Honor, I was in over my head.  I believe that what simply happened was the original mistake of the original sin, if you will, and we just recycled that answer over and over again, and it was wrong every single time.
>
> Looking back, sitting here today, trying to explain that, I feel ridiculous.  It was a horrible mistake that was easily fixed.

(Doc. #389 at 104-06).

> With El Tigre and Samario, particularly now that I'm sitting here today looking back and trying to retrace my mistake and my thought process, I not only was not involved, but I didn't know any of the details.  And I guess I came to think of those as Otero.
>
> By the way, Otero had his own very serious security concerns and we were providing him with security.  He had been the subject of assassination attempts and other constant threats, and there was a reason why we were giving Mr. Otero security assistance as a lawyer.

(Doc. #389 at 107).

Essentially what Mr. Collingsworth is saying is this – "I forgot" that I was paying El Tigre and Samario through Mr. Otero.  "I forgot" that the payments were being made through Otero sometime between May 22, 2011 (the date of the "deps in the can" email) and June 3, 2011 (the date of the first misrepresentation made to the court on the scope of payments).  (Doc. #389 at 156-57).  After his first memory lapse a mere ten days after the "deps in the can" email, Collingsworth says he "recycled" his "original sin."  But simply "recycling" an original sin cannot overcome the presumption of the crime or fraud that has been raised by Drummond.  This explanation is as weak as it is incredible at this stage of the case.  *See Gutter*, 124 F. Supp. 2d at 1307.  And "recycling" an original sin is -- in and of itself, putting aside any crime or fraud -- a breach of the professional duty that an attorney owes to the court and opponents.

It is similarly insufficient for Collingsworth to overcome the presumption by claiming that he was "in over his head."  A quick, cursory look at Collingsworth's resume on the Conrad & Scherer website alone discredits the "in over his head" rebuttal.  *See*

http://www.conradscherer.com/attorneys/terry-collingsworth/ (accessed September 30, 2015).

Collingsworth is the Managing Partner of the firm's Washington, D.C. office; he has more than

30 years of experience as a litigator, "with most of his cases involving international human rights

issues;" he "conducts factual research on international issues;" he lectures on international

human rights law at law schools and in other forums around the world; he graduated *Order of the*

*Coif* from Duke University Law School in 1982." *Id.* It defies logic for him to anchor his

rebuttal case on a defense of "I was in over my head."

But the overarching emphasis of Defendants' rebuttal was this – even though we

misrepresented certain facts and failed to disclose others, it doesn't matter because we presented

"highly credible testimony from three top experts that providing security assistance in Columbia

to endangered family members can be necessary, legal, ethical, and morally-required."[29]  (Doc.

#392 at 3).   Javier F. Pena, a Special Agent for the U.S. Drug Enforcement Administration

("DEA") during the time period that Pablo Escobar and the Medellin Cartel were in full

operation, testified that it is common for witnesses such as confidential informants to refuse to

tell the truth until they and their families are safe and for the DEA to make payments to

witnesses.[30]  (Doc. #392 at 3-4).   Stephen J. T'Kach, who worked at the U.S. Department of

Justice for 22 years as the director of the Witness Security Program, testified that if a witness or

---

[29] Some of the witnesses who received payments submitted declarations attesting to threats made against themselves and their families. Collingsworth and his team made threat assessments to determine whether or not payments would be made, but all information related thereto is "part of the lengthy and careful discussion with my team." (Doc. #389 at 243-44). "I trusted my own judgment. I have some experience with this, and my team, in terms of deciding this was real. In Colombia, you don't need to dig down very deep to determine when someone says they were threatened over an issue like this that it's a real threat and that someone can die." (Doc. #389 at 244). But what is puzzling is that the testimony of these threatened witnesses appeared posted on the IRAdvocates website. (Doc. #389 at 246). And with respect to at least some of that posted information, one can click on links and find the names of family members. (Doc. #389 at 247-48). These facts certainly run counter to any suggestion that these individuals needed to be secreted and moved for safety reasons.

[30] Of course, Mr. Pena testified only as to payments legally authorized by the DEA. Approval of any such payments would be approved through a chain of command. Mr. Pena knows nothing about the actual payments that were made by Defendants to the witnesses in this case.

family was in danger, the Department of Justice would relocate and fully support the family as long as the danger persisted.[31]   (Doc. #392 at 4-5).  Finally Professor Charles W. Wolfram, the Charles Frank Reavis Sr. Professor Emeritus at Cornell Law School specializing in legal ethics, opined that providing security to the family members of witnesses could be ethical based on certain guidelines.  (Doc. #392 at 5; Doc. #390 at 343).[32]

The problem with this line of rebuttal is this:  at this stage of the proceedings, having administratively terminated the motion for sanctions, the court is examining only whether there is evidence such that the establishment of a crime or fraud would be established on the issue of nondisclosure and/or witness bribery.  The court need not decide at this stage of the proceedings whether payments to witnesses were lawful, appropriate, or warranted.  And even were such analysis appropriate at this stage, the opinions offered by Pena, T'Kach, and Wolfram are not relevant to the facts of this case because none of these individuals analyzed the actual payments (and the context of those payments) which are at issue in this case.  Drummond has presented sufficient evidence that, if believed by the trier of fact, would cause a reasonable person to find that Defendants' witness payments were not for security, but rather were intended to operate (or, for that matter, actually operated) as bribes.

Defendants have not negated the crime-fraud presumption with these "innocent explanations" that "may be consistent with the facts alleged."  *Chevron Corp. v. Donziger*, No. 11 Civ. 0691 (LAK), 2013 WL 1087236 at *25 (S.D. N.Y. Mar. 15, 2013) (Kaplan, J.); *see also In re Grand Jury Proceedings*, 492 F.3d 976, 984-85 (8th Cir. 2007) (affirming application of

---

[31] Mr. T'Kach knew nothing about the witness payments made in this case and offered no opinion about the legality of the payments here.  (Doc. #390 at 375).

[32] Professor Wolfram also offered testimony to the effect that there may be times when it is permissible for a party to affirmatively make a misrepresentation to a court and opposing parties about the fact of witness payments.  (Doc. #391 at 343-44).  This opinion is not only troubling but unsupported by any rule of ethics or bar opinion of which the court is aware.

the crime-fraud exception where the rebuttal evidence "appears to consist primarily of statements by the client and others that essentially convey the client's innocent explanations for his conduct.").  It is not appropriate now to simply "send it to the jury, because the whole point is it's a discovery sanction." (Doc. #390 at 457).  There must now be an avenue for Drummond to discover documents and testimony that relate to the crimes and frauds alleged in this case.

### D.    The Effect of the Unrebutted *Schroeder* Test

Having decided that Plaintiff has raised inference of crime-fraud, and that inference has not been dispersed, it is now the obligation of the Special Master to review, *in camera*, documents that fall into the nine categories outlined in Section II.B.  *In re Grand Jury (G.J. No. 87-03-A)*, 845 F.2d 896, 898 (11th Cir. 1988); *see also In re Campbell*, 248 B.R. 435, 440, n.5 (M.D. Fla. 2000) (conducting an *in camera* inspection of requested documents).  Documents falling within the scope of this opinion -- *i.e.*, those documents which cannot be subject to a claim of privilege due to the application of the crime-fraud exception -- shall be carefully scrutinized *in camera* by the Special Master to determine whether they are due to be produced to Plaintiffs because they were in furtherance of, or are closely related to, the unrebutted first prong of the *Schroeder* test.[33]  *See Gutter*, 124 F.Supp.2d at 1317.

For testimony (as opposed to documents) that is sought by Plaintiffs, particularly as set forth in Drummond Company, Inc.'s Motion to Compel Answers to Deposition Questions (Docs. #311, 329), the court finds that *in camera* testimony, *ex parte* when necessary, is an appropriate

---

[33]  The court sought guidance from the parties on the question of the procedure that should be followed should the crime-fraud exception be found to be applicable.  Drummond agrees that *in camera* review is the next step.  (Doc. #397 at 3) ("All allegedly privileged documents and communications in any way related to Defendants' witness payment scheme, and their representations to Drummond, this court, and other courts about such payments, should be reviewed *in camera* to identify documents that "relate to" the crimes and fraud at issue.").  Collingsworth and Conrad & Scherer agree.  (Doc. #392 at 13) ("[T]here cannot be an *in camera* inspection because Drummond has not shown evidence that documents in furtherance of any alleged fraud on the court exist, and none do."); (Doc. #363 at 6) ("Even if the court was inclined to determine that the crime-fraud exception applied, it still must analyze each document or piece of testimony individually in camera to determine if it was made in furtherance of the crime or fraud at issue.").

safeguard to ensure disclosure only as to that information in furtherance of the crime or fraud. *See In re Gen. Motors Corp.*, 153 F.3d 714, 716 (8th Cir. 1998) (directing the district court to have an *ex parte*, *in camera* hearing to determine whether the crime-fraud exception applied to certain documents and testimony, and holding that the party seeking to pierce the privilege had no legal right to insist on being present at the *in camera* review).  In that way, the Special Master will be able to make real-time findings as to whether each aspect of the testimony relates to the fraud on the court, witness bribery, and/or subornation of perjury that have survived the *Schroeder* test in this case.  *See In re BankAmerica Corp. Sec. Litigation*, 270 F.3d 639, 643 (8th Cir. 2001) ("The district court focused only on plaintiffs' threshold showing of fraud.  The court then assumed, without any further showing by plaintiffs, that all contemporaneous attorney-client communications 'could be construed' as in furtherance of the alleged fraud.  This was error.").  This process is consistent with that which the court previously envisioned would occur if this case reached this point.  (Doc. #390 at 474) ("I think the whole point is if you ask a question that does not go to furtherance of the criminal or fraudulent behavior, then they can object to that.  And I might end up supervising that deposition. … That way, I'm available to say no, that's not a legitimate question.").

It is important to note that application of the crime-fraud exception to certain categories of discovery sought in this case is not a sanction as to liability or wrongdoing.  The court has made no finding that any crime or fraud actually occurred.  Instead, the court finds that application of the exception is necessary to get to the truth – not to find evidence of a crime or fraud, but to further explore whether a crime or fraud in fact occurred.  (Doc. #390 at 475).

**E.     The Effect of the Crime-Fraud Exception on Other Litigation Involving the Same Defendants**

The application of the crime-fraud exception in this case is complicated by the fact that witnesses and representations overlap from this case to at least two other cases currently pending in other courts.   Defendants have made the same or similar misrepresentations in relation to allegations of witness payments in those cases.   Therefore the question becomes whether communications with counsel in other cases fall within the crime-fraud exception here under the theory that the misrepresentations made in those other cases was designed to cover-up the fraud occurring in this case.

In *Emperatriz Marina Mendoza Gomez, et al. v. Dole Food Company, Inc. et al.*, Case No. BC412620 (Los Angeles County Superior Court), Collingsworth and Conrad & Scherer allege that Dole Food Company collaborated with Colombian paramilitaries in much the same manner as was alleged in the original Drummond cases.   In May 2014, Defendants represented to the *Gomez* court that the contention that witnesses were paid was "scandalous" and "completely false and malicious."   (Doc. #243-20 at 11-12) (Defendants' May 30, 2014 filing in *Dole*). Defendants stated that they provided security assistance to "family members of three of the many witnesses in the Drummond matter."   *Id.*   In reality, we now know that several (if not all) *Balcero* witnesses who testified against Drummond received payments.   Defendants did not reveal the truth in the *Gomez* case until June 2015, after *this* court learned of the misrepresentation and indicated its intention to call the *Gomez* judge.   (Doc. #372 at 12-13).

In *Conrad & Scherer LLP v. William J. Wichmann et al.*, Case No. 09-011600(5) (Circuit Court of the 17th Judicial Circuit, Broward County, Florida), Conrad & Scherer filed a brief on September 23, 2014 which attached Collingsworth's sworn affidavit.   In that affidavit, Collingsworth described payments made to Charris, Duarte, Gelvez, Halcon, and Claudia

47

Balcero, stating that Balcero was the "final individual who received security measures." (Doc. #397 at 23). But, even as of the date the declaration was signed, Defendants had in fact been making monthly payments to Samario and El Tigre for some three years, and they had offered and facilitated payments from Albert van Bilderbeek to Blanco. (Doc. #397 at 23). On January 27, 2015, Conrad & Scherer disclosed to the *Wichmann* court that additional information had come to light on the payments issue and that responses would be amended. (Doc. #395 at 8).

These representations involve the same witnesses and conduct that is at issue in this case. However, to order the disclosure of otherwise privileged communications, there must be a showing of relatedness to the criminal or fraudulent activity established under the first prong of the exception's test. *In re Grand Jury Investigation*, 842 F.2d at 1227. Efforts to conceal a crime or fraud fit squarely into that "relatedness" prong. *See In re Grand Jury Subpoenas*, 144 F.3d 653, 660 (10th Cir. 1998) (crime-fraud exception "does apply if the assistance was to cover up and perpetuate a crime or fraud."). Here, had Defendants revealed witness payments in either of these other cases, the misrepresentations in this case would have also come to light. Therefore, there is no reasonable basis to draw a distinction between Defendants' communications with counsel in this litigation (which sought to conceal witness payments) with communications with counsel in other litigation (which sought to do the same thing). To that end, the following categories of information are related to the allegations of crimes or frauds in this action, and are due to be reviewed *in camera* by the Special Master for relatedness to: (1) direct or indirect payments to Colombian witnesses; (2) discussions about such payments with counsel for Defendants (or co-counsel) in the *Gomez* and *Wichmann* cases; and/or (3) the disclosure of these witness payments to opposing counsel or to the *Gomez* or *Wichmann* courts.

### III. Conclusion

It may very well be that we are all mad here in *Wonderland*,[34] but we are going to get to the bottom of this rabbit hole.  In accordance with the findings of this Memorandum Opinion: (1) the remaining portions of the Report and Recommendation of Special Master Regarding Certain Issues Relating to the Court's Hearing on Plaintiff's Motion for Sanctions (Doc. #299) are **ADOPTED** and **APPROVED**, to be implemented consistent with this Opinion; and (2) Drummond Company, Inc.'s Motions to Compel Answers to Deposition Questions (Docs. #311, 329) are **GRANTED**, to be implemented consistent with this Opinion.

Invoking 28 U.S.C. § 1292(b), the court finds that this Memorandum Opinion and Order involves a controlling question or controlling questions of law as to which there may be a substantial ground for difference of opinion, and that an immediate appeal with respect to this Memorandum Opinion and Order may materially advance the ultimate termination of this litigation.  The discovery related to documents and testimony in response to the crime-fraud finding will be substantial and expensive, and will infringe on asserted privileges if improperly revealed.

Should either party take an interlocutory appeal of this Memorandum Opinion and Order, this case will be stayed during the pendency of the interlocutory appeal.  And should the parties decline to take an interlocutory appeal of this Memorandum Opinion and Order, the parties shall submit a *joint* report to the court within fifteen (15) days of the date of this order, outlining a process and timeline for continuing and extending discovery consistent with the findings and

---

[34] "But I don't want to go among mad people," Alice remarked.

"Oh, you can't help that," said the Cat: "we're all mad here.  I'm mad.  You're mad."

"How do you know I'm mad?" said Alice.

"You must be," said the Cat, "or you wouldn't have come here."

(*Alice in Wonderland*, Chapter 6).

conclusions of this Memorandum Opinion and Order, and in light of Defendants' request for stay.

      **DONE** and **ORDERED** this December 7, 2015.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE