

FILED

2024 Feb-15  PM 01:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| DRUMMOND COMPANY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:11-cv-3695-RDP-TMP |
| | ) | |
| TERRENCE P. COLLINGSWORTH, | ) | **Oral Argument Requested** |
| individually and as agent of Conrad & Scherer, | ) | |
| LLP; and CONRAD & SCHERER, LLP, | ) | **Contains Information Designated** |
| | ) | **"Confidential" Pursuant to Protective** |
| Defendants. | ) | **Order** |

## DRUMMOND COMPANY, INC.'S RENEWED MOTION FOR SANCTIONS[1]

William Anthony Davis, III (ASB-5657-D65W)     Sara E. Kropf
H. Thomas Wells, III (ASB-4318-H62W)          Kropf Moseley PLLC
Benjamin T. Presley (ASB-0136-I71P)           1100 H Street NW, Suite 1220
STARNES DAVIS FLORIE LLP                       Washington, DC 20005
100 Brookwood Place, 7th Floor                 (202) 627-6900
Birmingham, AL  35209
(205) 868-6000
fax: (205) 868-6099

*Attorneys for Drummond Company, Inc.*

---

[1] This motion is focused on the misconduct of the Defendant parties.  No relief is being requested at this time as it relates to Defendants' outside counsel.

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

ARGUMENT ..........................................................................................................4

I. COLLINGSWORTH KNOWINGLY LIED TO THE COURT. ........................................5

    A. Collingsworth's "I forgot" excuse was a lie. ............................................5

        *Lead Up to January 2013* .........................................................5

        *July-September 2013* ...............................................................8

        *September-October 2013* ..........................................................9

        *Lead up to the "shortest way to the truth" lie* ......................................11

        *Collingsworth's claim that September 2014 was the first time he "remembered" that El Tigre and Samario were paid is provably false* .........................................13

    B. Collingsworth's excuse for failing to disclose the Blanco payments was also a lie....15

II. C&S AND BILL SCHERER KNOWINGLY LIED TO THE COURT. ........................................22

    A. Bill Scherer was fully aware that Blanco was paid........................................23

    B. Other C&S lawyers and firm administrators were aware Blanco was paid.................25

    C. Bill Scherer and C&S were fully aware that El Tigre and Samario were paid...........26

        i. Numerous key individuals received the "deps in the can" email....................26

        ii. C&S' communications in June and July 2014 leave no doubt on this issue....28

III. DEFENDANTS ALTERED DOCUMENTS AND PULLED DOCUMENTS OFF PRIVILEGE LOGS TO CONCEAL THE PAYMENTS TO EL TIGRE, SAMARIO, AND BLANCO. ..........................30

    A. Defendants pulled documents off draft privilege logs.................................30

    B. Defendants instructed their counsel to redact documents to conceal their payments to El Tigre and Samario. ...............................................................36

IV. THE RECORD IS LITTERED WITH ADDITIONAL FALSE REPRESENTATIONS BY BOTH DEFENDANTS. ..................................................................................37

i

V.     THERE IS EVIDENCE THAT DEFENDANTS MADE OTHER, ADDITIONAL WITNESS PAYMENTS AND INDUCEMENTS THAT HAVE NEVER BEEN DISCLOSED. ......................40

    A.  There is overwhelming evidence that Yuca and Peinado were paid. .........................40

    B.  Defendants offered contingency fees and cash in exchange for testimony. ...............45

    C.  Collingsworth communicated in code regarding witness payments many of which, to this day, have never been disclosed. ...........................................................................46

    D.  Defendants made payments to Colombian prison officials to secure access to witnesses and letters rogatory testimony........................................................................................50

VI.   THE LOSS OF MR. COLLINGSWORTH'S EMAILS CAUSES DRUMMOND IRREPARABLE HARM. ...................................................................................................................................51

LEGAL AUTHORITY ......................................................................................................... 52

   I.     SANCTIONS ARE WARRANTED UNDER RULE 37. ..........................................................52

   II.    SANCTIONS ARE WARRANTED UNDER RULE 26(G). ......................................................56

   III.   SANCTIONS ARE WARRANTED UNDER THE COURT'S INHERENT POWER. ....................56

   IV.   DEFENDANTS SHOULD BE HELD IN CONTEMPT ...........................................................59

CONCLUSION....................................................................................................................60

# TABLE OF AUTHORITIES

**Cases**                                                                                   **Page(s)**

*ABBOTT LABORATORIES, et al., Plaintiffs, v. ADELPHIA SUPPLY USA, et al.*,
   15-CV-05826 (CBA) (LB), 2020 WL 1429472 (E.D.N.Y. Mar. 24, 2020) ....................23 n.14

*Access Innovators, LLC v. Usha Martin, LLC*,
   No. 1:09-cv-2893, 2010 WL 11508119 (N.D. Ga. Apr. 28, 2010)....................................55, 58

*Adolph Coors Co. v. Movement Against Racism & the Klan*,
   777 F.2d 1538 (11th Cir. 1985) ....................................................................................59

*Bridge v. Phoenix Bond & Indem. Co.*,
   553 U.S. 639, 128 S. Ct. 2131 (2008)....................................................................................57

*Byrne v. Nezhat*,
   261 F.3d 1075 (11th Cir. 2001) ............................................................................... 57

*Carlucci v. Piper Aircraft Corp., Inc.*,
   775 F.2d 1440 (11th Cir. 1985) ....................................................................................52, 53

*Chambers v. NASCO, Inc.*,
   501 U.S. 32, 111 S. Ct. 2123 (1991)........................................................................56, 57, 58

*Chilcutt v. U.S.*,
   4 F.3d 1313 (5th Cir. 1993) ....................................................................................54

*Cox v. American Cast Iron Pipe Co.*,
   784 F.2d 1546 (11th Cir.), *cert. denied*, 479 U.S. 883, 107 S. Ct. 274 (1986)......................53

*Diamond Trust u/a/d 10/28/2005 v. Diamond*,
   No. 21-11985, 2022 WL 4493035 (11th Cir. Sept. 28, 2022) ..................................................53

*Dotson v. Bravo*,
   202 F.R.D. 559 (N.D. Ill. 2001), *aff'd*, 321 F.3d 663 (7th Cir. 2003) ....................................52

*Estate of Hill by and through Grube v. NaphCare, Inc.*,
   No. 2:20-cv-00410-MKD, 2022 WL 1464830 (E.D. Wash. May 9, 2022)............................52

*Fair Housing of Marin v. Combs*,
   285 F.3d 899 (9th Cir. 2002) ....................................................................................54

*Franklin Livestock, Inc. v. Boehringer Ingelheim Vetmedica, Inc.*,
   251 F. Supp. 3d 962 (E.D.N.C. 2017) *aff'd*, 721 F. App'x 263 (4th Cir. 2018)......................55

2790391.3

*Freeman v. Giuliani,*
  Civil Action No. 21-3354 (BAH), 2023 WL 5600316 (D.D.C. Aug. 30, 2023) ...................55

*Gratton v. Great Amer. Comm.,*
  178 F.3d 1373 (11th Cir. 1999) .......................................................................................53

*Hornady v. Outokumpu Stainless USA,*
  572 F. Supp. 3d 1162 (S.D. Ala. 2021)..........................................................................56, 57

*In re $39,422 in U.S. Currency,*
  574 F. Supp. 3d 1117 (M.D. Fla. 2021).................................................................................57

*In re Grand Jury Proceedings,*
  117 F. Supp. 2d 6 (D.D.C. 2000) ...........................................................................................60

*In re Sealed Case,*
  754 F.2d 395 (D.C. Cir. 1985)................................................................................................58

*In re Terrorist Attacks on Sept. 11, 2001,*
  No. 03MD01570GBDSN, 2022 WL 4642478 (S.D.N.Y. Sept. 21, 2022) .....................23 n.14

*In re Terry,*
  128 U.S. 289, 9 S. Ct. 77 (1888).............................................................................................59

*Jackson v. Murphy,*
  468 F. App'x 616 (7th Cir. 2012) ...........................................................................................54

*Link v. Wabash R. Co.,*
  370 U.S. 626, 82 S. Ct. 1386 (1962).......................................................................................57

*Littler v. Martinez,*
  No. 2:16-cv-00472-JMS-DLP, 2020 WL 42776 (S.D. Ind. Jan. 3, 2020).............................52

*Malautea v. Suzuki Motor Co., Ltd.,*
  987 F.2d 1536 (11th Cir. 1993) ..............................................................................53, 54, 56

*Martin v. Automobili Lamborghini Exclusive, Inc.,*
  307 F.3d 1332 (11th Cir. 2002) .......................................................................................58 n.26

*McMunn v. Mem'l Sloan-Kettering Cancer Ctr.,*
  191 F. Supp. 2d 440 (S.D.N.Y. 2002).....................................................................................52

*Purchasing Power, LLC v. Bluestem Brands, Inc.,*
  851 F.3d 1218 (11th Cir. 2017) ..............................................................................................57

iv

*Qantum Commc'ns Corp. v. Star Broad., Inc.*,
    473 F. Supp. 2d 1249 (S.D. Fla. 2007) ...................................................................58

*Roche Diagnostics Corp. v. Priority Healthcare Corp.*,
    2:18-cv-01479-KOB, 2020 WL 2308319 (N.D. Ala. May 8, 2020) ...............................55, 58

*Tesco Corp. v. Weatherford Int'l, Inc.*,
    No. CIV.A. H-08-2531, 2014 WL 4244215 (S.D. Tex. Aug. 25, 2014) ................................58

*Trump v. Clinton*,
    No. 22-14102-CV, 2023 WL 333699 (S.D. Fla. Jan. 19, 2023) .............................................57

*Videojet Sys. Int'l, Inc. v. Eagle Inks, Inc.*,
    251 F.3d 170 (Fed. Cir. 2000)...............................................................................59

*Webb v. District of Columbia*,
    1476 F.3d 964 (D.C. Cir. 1998) ............................................................................56

*Zocaras v. Castro*,
    465 F.3d 479 (11th Cir. 2006) .................................................................58 n.26, 59

**Statutes and Rules**                                                    **Page(s)**

18 U.S.C. § 401(1) .................................................................................................59

Fed. R. Civ. P. 26(b) .............................................................................................56

v

## INTRODUCTION

In December 2015, this Court recognized that the crime-fraud exception would allow Drummond and the Court to "get to the truth" about the false statements made by the Defendants regarding the scope, nature, and extent of their witness payments. Doc. 417 (Crime-Fraud Op.) at 47. The crime-fraud discovery has indeed revealed the truth. Defendants' fraud on the court was not a by-product of memory loss or lack of knowledge—it was an intentional effort to conceal facts. A default judgment sanction is not only warranted, it is necessary.

This Court rightly rejected Collingsworth's excuses for repeatedly lying. In Conrad & Scherer, LLP's ("C&S") own words, "Collingsworth will say whatever he needs to say to get through the crisis at the moment," Ex. 1 (CSWRS-001065), and "can't be trusted." Ex. 2 (CSWRS-00359). The crime-fraud discovery proves that Collingsworth never "forgot" about witness payments, and that the purported "distinction" he drew to justify Defendants' fraudulent concealment of the payments to Jaime Blanco—Defendants' most important witness—was a complete fabrication. In other words, after being caught lying about his payments to El Tigre, Samario, and Blanco, Collingsworth's excuses to this Court were themselves utter lies.

The crime-fraud discovery has also revealed the level of intentionality involved in Collingsworth's attempts to hide his misconduct. In September 2013, this Court ordered Defendants to produce their "privilege log to the court and [Drummond] on or before October 2, 2013." Doc. 58. Defendants gathered the documents for this log, which included numerous documents showing El Tigre, Samario, and Blanco were paid, and included them on a September 25, 2013 draft privilege log, with a column on the right summarizing the pertinent portions of the emails. Ex. 3 (CS_TC165475). That log summarized emails with Ivan Otero in which

- Otero is asked for bank account information where the "money for his, ET and Sam's security should be deposited." *Id.* at CS_TC165502.

1

- Otero states "to S and T 1800 each was given." *Id.* at CS_TC165503.

- Otero complains that, "Today, September 12, has not reached the protection of T and S." *Id.* at CS_TC165522.

There were also numerous emails included on the log reflecting the payments to Jaime Blanco that were laundered through Albert van Bilderbeek. *Id.* at CS_TC165494 & CS_TC165510. Yet, before that log was produced to Drummond **and the Court**, all these documents were deleted from the log. After concerns were raised over whether Defendants' privilege log was complete, this Court gave the Defendants one more chance to log everything, but admonished: "But please understand this. If there's a fiber, if there is a molecule out there that you say is privileged, it better be on the Privilege Log or else it will be waived . . . when you supplement." Doc. 63 at 46:4-9. This supplemental log was provided both to Drummond **and the Court** in December 2013, and yet again did not include any of the documents Defendants listed on their internal draft logs showing that El Tigre, Samario, and Blanco were paid.

Furthermore, and contrary to its representations to this Court, C&S was fully aware of the scope, nature, and extent of Defendants' witness payments. C&S Managing Partner Bill Scherer, its Chief Financial Officer Richard Drath, and numerous C&S attorneys—several of whom were admitted *pro hac vice* in this Court and were counsel of record in cases against Drummond—all repeatedly received memos, emails, and other documents showing exactly what witnesses were paid. In a May 2012 memo recommending that the firm "terminate all involvement with TC's cases and with TC and his group," former C&S Partner Jim Carroll unequivocally told Bill Scherer and Richard Drath that "TC has made payments directly or indirectly to one or more witnesses, e.g., Jaime Blanco. … It appears TC has paid money to at least get access to witnesses, including $100,000 to get Jaime Blanco to testify." Ex. 4 (Carroll Depo Exhibit 3). C&S has nonetheless maintained—*even to this day*—that it was unaware Blanco had been paid when it misrepresented

2

the existence of those payments in discovery responses, sworn testimony, and open court.  Like Collingsworth's "I forgot" excuse, this Court should see C&S's claim of ignorance for what it is: an after-the-fact, "uncreditable" attempt to avoid the consequences of perpetrating a fraud on the court.  Doc. 417 (Crime-Fraud Op.) at 2.  C&S is equally culpable with Collingsworth for the fraud on this Court.

Incredibly, the crime-fraud discovery shows that the Defendants' entire defense at the crime-fraud hearing was simply a continuation of their fraud on the Court.  Collingsworth and Bill Scherer's sworn testimony at the crime-fraud hearing about why they failed to disclose witness payments was demonstrably false, as were the factual assertions by Defendants in their briefs both leading up to and in the wake of the crime-fraud hearing.  Put more simply, Defendants' excuses to this Court for repeatedly lying about witness payments were themselves lies.

 Faced with overwhelming evidence of their fraud and intentional misrepresentations, Defendants have now developed selective amnesia.  Bill Scherer claimed he "███████████████████ ████████████████████████. Ex. 5 (B. Scherer Dep.).  After he slipped up in his deposition and admitted that ████████████████████████████████████, he submitted a fraudulent errata sheet with a 180 degree change in his testimony.  Ex. 6 (B. Scherer Erata Sheet).  Christian Levesque, who like Bill Scherer was counsel of record in *Balcero* and was intimately involved in drafting the Defendants' discovery responses and searching for documents *in this case*, similarly testified in her deposition that she "didn't recall" more than 100 times, notwithstanding the fact that she appeared on numerous documents and emails relating to witness payments and other critical events.  Ex. 7 (Levesque Dep.).

This Court already found that Collingsworth "made knowingly false representations in pleadings, affidavits, correspondence, and open court," and that "it would be incredulous to believe

3

that no one at Conrad & Scherer other than Collingsworth knew of the payments made to witnesses

in this case." Doc. 417 (Crime-Fraud Op.) at 17, 20 n.15.  Those findings are more than sufficient

to justify entry of default judgment against both Defendants.  When those findings are coupled

with the evidence that has since come to light through the crime-fraud discovery, it is clear that no

sanction short of default will suffice.  The facts of this case warrant—and the integrity of the

judicial system demands—severe sanctions.  Consistent with this Court's prior orders, Drummond

files this renewed motion for sanctions against Collingsworth and C&S.[2]

## ARGUMENT

At the September 2015 crime-fraud hearing (and continuing to this day), Defendants

represented to this Court over and over that they had "fixed" their misrepresentations, Doc. 390

(Crime-Fraud Hrg. Tr.) at 480:5-9, and they offered the following excuses for why they had

repeatedly lied about the scope, nature, and extent of their payments to El Tigre, Samario, and

Blanco:

1. Collingsworth represented in pleadings and testified under oath that he did not disclose the
   El Tigre and Samario payments until November 2014 because he "forgot" about them until
   "sometime around September 2014, [when] Collingsworth claims he finally took the time
   to 'study the situation.'"  Doc. 417 (Crime-Fraud Op.) at 40-41.

2. Collingsworth represented in pleadings and testified under oath that he drew a "distinction"
   with respect to the payments to Jaime Blanco, *i.e.*, that, although he was involved in
   arranging them, the money did not come from Collingsworth or C&S, and that is why
   Defendants failed to disclose them until January 2015.  *Id.*

3. C&S and Bill Scherer represented in pleadings and testified under oath that they never
   knew El Tigre, Samario, and Blanco were paid, and therefore had no reason to know that

---

[2]  Drummond has twice moved for sanctions against the Defendants for their repeated misrepresentations
regarding the scope, nature, and extent of witness payments.  Drummond's first motion for sanctions, which it filed in
early 2014 after the Defendants' former co-counsel in *Balcero* produced documents that Defendants falsely
represented did not exist, *see* Doc. 101 *generally*, was denied without prejudice.  Doc. 123 (Apr. 21, 2014 Hrg. Tr.) at
50:19-25.  Drummond's renewed motion for sanctions, which it filed in 2015 after it was discovered that Defendants
paid every witness who gave letters rogatory testimony in *Balcero*, was administratively terminated with instructions
that Drummond re-file its sanctions motion "following resolution of the crime-fraud issue to be addressed during the
September 1, 2, and 3 evidentiary hearing."  Doc. 383 (Sept. 21, 2015 Text Order).

4

their representations about the scope, nature, and extent of their witness payments were, in fact, false. *Id.* at 19 n.15.

Following that hearing, this Court found (and the Eleventh Circuit affirmed) that the crime-fraud exception applied. The crime-fraud discovery has revealed the truth. Collingsworth never "forgot" anything, and the documents prove it. Collingsworth's purported "distinction" with respect to the Blanco payments was a complete fabrication, and the documents prove it. Bill Scherer's testimony and C&S's representations that they did not know El Tigre, Samario, and Blanco were paid were knowingly false, and the documents prove it.

**I.      COLLINGSWORTH KNOWINGLY LIED TO THE COURT.**

**A.  Collingsworth's "I forgot" excuse was a lie.**

Collingsworth's excuse for lying about whether El Tigre and Samario were paid was that "from at least January 2013 through midway through 2014 Collingsworth 'forgot' that he was paying El Tigre and Samario." Doc. 417 (Crime-Fraud Op.) at 41 n.28. According to Collingsworth, at some point he became confused and started believing the money was for Ivan Otero's personal security. *Id.* at 40. This Court already rejected Collingsworth's "I forgot" excuse as "uncreditable" and "almost comedic." *Id.* at 2. *See also* Doc. 676 (District Court's Invited Response to Collingsworth's Mandamus Petition) at 34 ("Collingsworth secretly paid witnesses and then lied about it."). What was not known in 2015 when this Court rejected this excuse, but is known now, is that Collingsworth repeatedly sent, received, and saved documents which unequivocally showed El Tigre and Samario were paid, including multiple copies of the "deps in the can" email, in the two years prior to the crime-fraud hearing. In other words, documents prove that Collingsworth never "forgot" that El Tigre and Samario were paid.

***Lead Up to January 2013***

As background, Collingsworth knew the nature of these payments in May 2011, when he

authored the "deps in the can" email advising his co-counsel of the $2700 monthly payments to El Tigre and Samario.  Doc. 390 (Crime-Fraud Hrg. Tr.) at 151:19-22.[3]  Ten days later, Collingsworth signed interrogatory responses in *Balcero* failing to disclose these payments, and then attempted at the crime fraud hearing to explain the mental gymnastics behind his decision to withhold this information from Drummond.  Collingsworth claimed he made a distinction based on the mechanism of how the payments were made.  *Id*. at 156:11-157:1 and 157:18-160:9.  Every month thereafter, Collingsworth approved these payments out of C&S's bank account, "using the firm's money, and through the firm's normal approval process as documented in the firm's business records."  Doc. 417 (Crime-Fraud Op.) at 20 n.15.

This Court pointedly questioned Collingsworth on how he could have forgotten the nature of these ongoing monthly payments (more than $30,000 per year) from his law firm:

> THE COURT:  So what you're saying is for an 18-month period, you wouldn't have looked at expenses in the case and noted that, for example, you had a monthly outlay of $2700 for these particular payments?
>
> THE WITNESS: I wouldn't and I didn't.  Occasionally I would hear from Mr. Drath if he had a question about an expense, but it was typically new expenses.

*Id*. at 153:23-154:4.  The crime-fraud discovery has revealed Collingsworth's testimony on this point was yet another lie to the Court.

In June 2012, Collingsworth was asked by C&S's CFO to review the monthly payments the firm was making and reduce them as best he could.  Ex. 8 (CS_TC050426).  Collingsworth told his team that he'd "have to review all the regular expenses in Drummond etc with Drath and make sure they are all essential" and he would therefore "be spending more time and effort on this."  Ex. 9 (CS_TC045543).  Shortly after this, the payments stopped for a few months which

---

[3] The "deps in the can" email refers to the email Collingsworth authored and sent to numerous other lawyers at C&S and Parker Waichman on May 22, 2011, which, in pertinent part, stated that they needed to "pay $2,700 per month" to El Tigre and Samario "until we get the deps [depositions] in the can."  Doc. 417 (Crime-Fraud Op.) at 25.

caused a series of pleading emails from Ivan Otero regarding the delayed payments (making clear that the payments were ***not*** for Ivan Otero's personal security):

| July 9, 2012 | Maggie Crosby emails Collingsworth and says that Otero is "inquiring about the status of wires for the 'safety of the people of Valledupar.' The issues with these payments creates tension." Ex. 10 (CS_TC050552). |
|---|---|
| September 11, 2012 | Otero emails Collingsworth stating: "I wanted to expose you some concerns.  1.  First of all, the situation becomes even more worrying. Today, September 12, has not reached **the protection of T and S**.  More worrying is on what respect with the last two, are three months of delay. That leads me to serious problems, which I request you to help me solve." Ex. 11 (CS_TC045602) (emphasis added). |
| September 26, 2012 | Otero emails Collingsworth stating "The non-compliance regarding the **security for the witnesses** has caused a lot of problems for me, to the point that these people think we have tricked them.  In order to try to solve this inconvenience it is necessary that we pay what is owed.  With the new ones we are behind three months, and with the old ones one. Next week it will be four months and two months, respectively.  Lorraine told me that by next week it would be solved.  We should make sure the fourth month and two month payments are made, and give them a satisfactory explanation."  Ex. 12 (CS_TC053548) (emphasis added).[4] |

Not only did Collingsworth authorize these payments to El Tigre and Samario every month, C&S accounting personnel challenged them, resulting in payments being delayed for several months.  The delay, in turn, caused Otero to repeatedly inquire about the status of the payments. And Otero's communications—albeit in coded language—make clear the payments are for witnesses—***not*** for Otero himself as Collingsworth falsely told this Court.  The Court was therefore imminently justified in finding the "I forgot" excuse to be a continuing fraud on the Court:

> He said the reason I didn't disclose this is I forgot.  Why isn't that a continuing fraud on the Court if I discredit that testimony and say there is no way he forgot. . . . It's continuing right now.  He is misrepresenting to me in this hearing the basis

---

[4] As explained in detail in Section V-A *infra*, the $2700 monthly payments for El Tigre and Samario were increased by $2200 shortly after Yuca and Peinado requested money.  Both Yuca and Peinado were in prison in Valledupar at this time.  The "old ones" clearly refers to the monthly El Tigre and Samario payments, and it appears the references to the "new ones", the "last two", and the "people in Valledupar" are references to Yuca and Peinado.

for nondisclosing in the first place.

Doc. 390 (Crime-Fraud Hrg. Tr.) at 767:8-14.

### *July-September 2013*

> The False Representation:  On July 1, 2013, Drummond filed a motion to compel responses in its First and Second written discovery requests, setting forth documentary evidence of Defendants' payments to three witnesses – Halcon, Charris, and Duarte. (Doc. #280, ¶ 115).  On July 18, 2013 Defendants filed a response to the motion to compel.  That response states: "First, all of the 'evidence' Drummond has was produced by Plaintiffs in the *Balcero* case, and Plaintiffs produced every responsive document they had." (Doc. #280, ¶ 117).
>
> The Reality:  *This representation to the court was false.*  At the time Defendants represented to the court that they had already produced every responsive document they had, they had not disclosed the payments to Blanco, El Tigre, or Samario. (Doc. #280, ¶¶ 118-124).

Doc. 417 (Crime-Fraud Op.) at 10.   Defendants made this and numerous other similar misrepresentations in July through September of 2013.  *Id.* at 10-12.  And Collingsworth clearly knew they were misrepresentations at the time he made them.

In August 2013, the Defendants were gathering documents in response to Drummond's initial requests for production in this case.  On August 29, 2013, Charity Ryerson[5] emailed Collingsworth and Christian Levesque attaching a folder titled "Privilege" which contained numerous documents, including the "deps in the can" email.   Ex. 14 (CS_TC165673 & CS_TC165689 (email and attachment)).  In her email, Ryerson specifically noted that the "deps in the can" email "outlines some payments" and told Collingsworth and Levesque that it was a "problematic" document.  *Id.*  Collingsworth responded that he would "focus on this."  Ex. 15 (CS_TC124111).  Defendants subsequently deep-sixed the "deps in the can" email, which was not logged or produced until over a year later in November 2014, and only *after* Defendants' former

---

[5] According to IRAdvocates' website, Charity Ryerson was a lawyer at both IRAdvocates and C&S.  Ex. 13 (June 24, 2013 IRA website).

co-counsel Parker Waichman LLP provided the documents on its privilege log—which included multiple copies of the "deps in the can" email—to the Special Master for *in camera* review.

On September 19, 2013, Collingsworth saved a PDF titled "Redact and Produce 9.19.13.pdf." Ex. 16 (Lynch Declaration Appendix B (CS_TC240330)).[6] Included in that PDF was a document titled "TO DO FOR DRUMMOND – MARCH 31, 2011" which stated that "We made one payment for security to Ivan for ET and Samario's security." *Id.* at CS_TC240340-240349. Also included was another copy of the "deps in the can" email. *Id.* at CS_TC240350-240351. Defendants did not produce the "deps in the can" email until November 2014, and the "TO DO" list was not produced until years after the crime-fraud hearing.

### September-October 2013

> On October 10, 2013, Collingsworth and his team took this laundry list of written misrepresentations a step further. On that day the court held a hearing on a Drummond motion to compel (Doc. #43). Counsel for Collingsworth represented to the court that all responsive documents had been produced.[10] (Doc. #63 at 25:25-26:16). Collingsworth, who was seated next to his lawyer at the counsel table, made no effort to correct this misrepresentation, knowing full well that all documents related to payments had *not* been produced. (Doc. #280, ¶¶233, 234, 235).

Doc. 417 (Crime-Fraud Op.) at 14. The crime-fraud discovery has proven that Collingsworth well knew what documents were being hidden, and that his counsel Brad Smith's representation to the Court was based on lies Collingsworth told him.

In September 2013, this Court ordered Defendants to produce their "privilege log to the court and [Drummond] on or before October 2, 2013." Doc. 58. In response to this Order, in late

---

[6] As explained in the declaration of Spencer Lynch, the metadata associated with this document reflects that this PDF was authored/created by Collingsworth at 3:36 p.m. on September 19, 2013. Ex. 16 (Lynch Decl.).

September 2013, Collingsworth reviewed draft privilege logs prepared by Christian Levesque, Susana Tellez, and Lorraine Leete.  Documents included on those draft logs—which again were not produced until years after the crime-fraud hearing—expressly stated that El Tigre and Samario had been paid.  Indeed, the log itself contained summaries of the pertinent portions of the documents listed thereon, including the following:

- Email with Otero in which he is being asked for bank account information where the "money for his, ET and Sam's security should be deposited."  Ex. 3 (CS_TC165475) at CS_TC165502.

- Otero email stating "to S and T 1800 each was given." *Id.* at CS_TC165503.

- Otero email stating, "Today, September 12, has not reached the protection of T and S." *Id.* at CS_TC165522.

Defendants pulled those documents off the log that they produced to Drummond (and this Court) on October 2, 2013, and did not produce them to Drummond.  *See* Section III-A *infra* for a more detailed discussion of this issue.  For the few Otero emails Defendants were going to be producing, Collingsworth instructed his paralegal "take your time on Ivan docs especially the ones we are producing too as **one mistake and . . .**" Ex. 17 (Oct. 3, 2013 Collingsworth Text) (emphasis added).

At 2:47 p.m. on the same day Defendants submitted their fraudulent privilege log to Drummond and the Court, Collingsworth emailed Brad Smith a set of "Argument Notes" for the "upcoming October 10 hearing" with this Court, which Collingsworth said was "crucial."  Ex. 18 (CS_TC196158).   In those notes, Collingsworth falsely told his lawyer that "we have now produced all security related documents."  *Id.*  Collingsworth concluded his discussion of witness payments arguments by falsely telling Mr. Smith that "IF DRUMMOND WANTS MORE BACK STORY, THEY HAVE ALL THE DOCUMENTS.  TIME TO DEPOSE ME AND MOVE ON." *Id.*  Also on October 2, Defendants produced a tranche of documents that did not include the "deps

10

in the can" email or the other documents they had repeatedly located in prior weeks which proved El Tigre and Samario were paid.

Therefore, the October 10, 2013 misrepresentation in open court by Brad Smith that all witness payment documents had been produced was known by Collingsworth at the time to be false. As the Court noted in its crime-fraud opinion, it was "not known whether Collingsworth's counsel at this time knew or should have known that his representation to the Court was disingenuous." Doc. 417 (Crime-Fraud Op.) at 14 n.10. It now appears that Mr. Smith did not know, and was simply repeating the lies that Collingsworth fed him leading into that hearing.[7]

### *Lead up to the "shortest way to the truth" lie*

"On April 21, 2014, Defendants kicked the level of falsities up another notch." Doc. 417 (Crime-Fraud Op.) at 15. At a hearing on Drummond's motion for sanctions, this Court directly asked what witnesses had been paid, Collingsworth stood up saying "the shortest way to the truth is to ask me the question," and then proceeded to blatantly lie about the scope of Defendants' witness payments. *Id.* As the above already shows, Collingsworth knew his statements were false at the time he made them. But the below events in the two months leading up to that hearing remove any possible argument to the contrary.

On February 14, 2014, at 9:57 p.m., Collingsworth saved yet another copy of the "deps in the can" email. Ex. 16 (Lynch Declaration Appendix A (CS_TC140226)). A few hours earlier, at 3:07 p.m., Collingsworth sent an email to Billy Scherer, Bill Scherer, and others discussing the monthly payments to Otero and demanding that they be continued. Ex. 19 (CS_TC232295). Although ███████████████████████████████████████████████████

---

[7] At the same time Defendants were repeatedly locating these documents and pulling documents off draft privilege logs, they were also filing motions to quash Drummond's subpoenas to third parties seeking witness payment information and demanding that Drummond be sanctioned for serving them. Doc. 190 at 8-9, 18.

██████████.”  Ex. 20 (Billy Scherer Dep.) 91:2-19.

On March 31, 2014, Susanna Tellez emailed Collingsworth a spreadsheet of costs from the *Balcero* case relating to witness payments.   Included in the attachment was an expense reimbursement request submitted by Collingsworth for $5,400 described as a "payment to Ivan Otero for security arrangements for families of Samario, El Tigre, and for Ivan Otero," as well as a handwritten receipt signed by Otero.   Ex. 21 (CS_TC213118).   Eleven days earlier, Collingsworth signed a sworn interrogatory response falsely stating that Defendants had produced all responsive documents relating to witness payments.  Doc. 417 (Crime-Fraud Op.) at 14.

At 9:58 a.m. on April 2, 2014, Drummond filed its first motion for sanctions and requested that Defendants be sanctioned for failing to disclose witness payment information.  Doc. 101. Defendants' former counsel, Brad Smith, emailed Collingsworth less than an hour later, at 10:54 a.m., telling him that Drummond "filed an emergency motion for sanctions seeking your computer hard drive."  Ex. 22 (CS_TC126385).  At 2:21 p.m. that same afternoon, someone at C&S saved yet another copy of the "deps in the can" email.  Ex. 16 (Lynch Declaration Appendix D (CS_TC124722)).

At 4:27 p.m. on April 7, 2014, C&S paralegal Lesley Wharton emailed Collingsworth attaching several documents produced in the arbitration proceedings between C&S and Secure Point.  Ex. 23 (CS_TC210980).[8]  Included in the attachments was an email Collingsworth sent to Bill Scherer in June 2011 in which Collingsworth advocated paying Jaime Blanco, describing it as "similar to what we did with El Tigre and Samario."  *Id.* at CS_TC210995.  One hour later, at 5:26 p.m., Collingsworth received an email from Charity Ryerson.  Ex. 24 (CS_TC091715).  In that email, Ryerson quoted from a number of documents, including the email which stated "on the

---

[8] Secure Pointe was a private investigation firm retained by Collingsworth and C&S in *Balcero*.

issue of Jaime Blanco, this guy could put the Drummond case away and PWA [Parker Waichman] has likewise never answered whether they are considering making an arrangement to help with his lawyers (similar to what we did with El Tigre and Samario)." *Id.* Five hours later, at 10:32 p.m., Collingsworth sent Brad Smith a draft response to Drummond's sanctions motion in which he falsely wrote that "Defendants have now completed their document search **and supplemental log** in full compliance with the Court's discovery Order" and that "Drummond's effort to show wrongful withholding of documents has proven to be false." Ex. 25 CS_TC066700) at CS_TC066702 (emphasis added). As stated above, all documents which would've shown that El Tigre, Samario, and Blanco were paid were removed by Defendants from the "supplemental log" before they produced it to Drummond and the Court.

Defendants made the same false representations one week later, on April 14, when they filed their response to Drummond's original sanctions motion and stated that "[t]here is absolutely no issue of the propriety of Defendants' searches or the completeness of their production" and "now represent that their production in response to the Court's October 15 Order [which ordered the production of witness payment information] is complete." Doc. 114 at 1 & 5. And a week after that Collingsworth lied directly to the Court in response to its question about which witnesses had received payments, telling this Court "the shortest way to the truth is to ask me the question." Doc. 417 (Crime-Fraud Op.) at 15.

### Collingsworth's claim that September 2014 was the first time he "remembered" that El Tigre and Samario were paid is provably false

Collingsworth repeatedly received the "deps in the can" email in June and July 2014, but that did not dissuade him from continuing to make knowingly false statements that El Tigre and Samario had not been paid. *See* Section II-C-ii *infra*. Brad Smith, Defendants' counsel, testified that he recalled receiving the "deps in the can" email from Billy Scherer in June 2014, that he

13

"talked to Terry about it," and that he told Collingsworth that it needed to be logged or produced because it reflected payments made to El Tigre and Samario.  Ex. 26 (B. Smith Dep.) at 163:3-167:16.   Collingsworth and C&S nonetheless continued making false representations about witness payments in July and August 2014 in filings in this case, Doc. 417 (Crime-Fraud Op.) at 16-17, and in September 2014 in filings in Florida court.  *Id.* at 47-48.

At the September 2015 evidentiary hearing on the crime-fraud exception, Collingsworth lied again in response to questioning from his own counsel and this Court:

> **Q** So it's fair to say until the time it was back in your mind that, in fact, the payments to Otero reflected security for Samario and El Tigre, which you said didn't happen until perhaps September of 2014, there was no way you could have told the Court or anybody else for that matter about the payments to El Tigre and Samario; is that right?
>
> **A** That's right or I would have. The payments to them were characteristically the same as to the families of the other people, and I wish I would have remembered earlier and that we weren't here talking about it.
>
> **THE COURT: But your best judgment, as you sit here today, is that it was in or around September of 2014 when you recalled this for the first time?**
>
> **THE WITNESS: That's right, Your Honor. When I first saw that deps in the can memo, began a process of getting new lawyers and reinvestigating the situation.**
>
> **THE COURT: And when is the first time you saw that memo?**
>
> …
>
> **THE WITNESS: It was sometime late in September, is my best estimate, Your Honor.**

Doc. 390 (Crime-Fraud Hrg. Tr.) at 267:21-268:25 (emphasis added).  At the time Collingsworth gave this false testimony, he had located, saved, and reviewed numerous documents showing that El Tigre and Samario had been paid.  He had located, sent, or received copies of the "deps in the can" email, numerous times in the previous two years.  As contemporaneous events show, on each

14

of those occasions, Collingsworth's attention was focused on the topic of witness payments.  In fact, the "deps in the can" email was specifically flagged for Collingsworth in an August 2013 email as a "problematic" document concerning "payments," to which Collingsworth responded, "I will focus on this." Ex. 14 (CS_TC165673 & CS_TC165689 (email and attachment)). Collingsworth's "I forgot" excuse is not just "uncreditable," it was a continuation of Defendants' fraud on the court.

### B.  Collingsworth's excuse for failing to disclose the Blanco payments was also a lie.

Collingsworth's story regarding the $120,000 paid to Jaime Blanco wasn't that he "forgot." Rather, Collingsworth testified that he did not disclose these payments because they were made by "someone else."  According to Collingsworth, that "someone else" was Albert Van Bilderbeek.

Recently produced documents prove that this was a complete fabrication and that Collingsworth—not Albert Van Bilderbeek—paid Blanco using a $1,500,000 loan secured by his contingency fee interests in Defendants' cases against Drummond and Chiquita.  In fact, Van Bilderbeek was simply a mechanism to conceal that the Blanco payments were sourced from Collingsworth.  On the same day Collingsworth received his loan proceeds, he immediately turned around and transferred half this money ($750,000) to Van Bilderbeek with the express, written understanding that Van Bilderbeek would "immediately" send money "on behalf of TC" to Ivan Otero.  Otero then gave that money to Blanco in exchange for his declaration.  One month later, Blanco signed his declaration in *Balcero*.  The context of these newly discovered documents is as follows.

In early 2011, Collingsworth unsuccessfully lobbied his former co-counsel at Parker Waichman, LLP to pay Blanco.  *Defamation* Doc. 417 (Crime-Fraud Op.) at 23.  Parker Waichman, LLP ultimately refused, telling Collingsworth paying Blanco would "likely be viewed

as a form of bribery." *Defamation* Doc. 101-15.  Collingsworth responded, "As opposed to him saying Drummond had nothing at all to do with it?" *Id.*

Undeterred by his co-counsel's concern, Collingsworth kept working on a way to pay Blanco.  In late August 2011, Lorraine Leete told Collingsworth that Blanco was "not working on his declaration until he gets this funding." Ex. 27 (CS_TC037828).  Collingsworth responded that he was "on the phone to Albert every day hearing new intricacies [sic] of his finance situation, including today." *Id.*  On September 6, 2011, Collingsworth sent a letter to a man named Herman de Leeuw "c/o Albert Van Bilderbeek" stating as follows:

> I want to personally assure you that, after several tough years of litigation, the Drummond case is now in great condition for our victory either in court or through a settlement.  In my opinion, we are well over 90% probability of winning. **With the funds we are seeking, we will be able to seal the deal with the new evidence we are in the process of developing**.

Ex. 28 (CS_TC180932) (emphasis added).

Three days later, on September 9, 2011, Collingsworth emailed his team telling them that he "just signed all kinds of bizarre documents with Albert to confirm a finance plan."  Ex. 29 (CS_TC201621).  The same day, Collingsworth executed a promissory note and obtained a $1,500,000 loan from an entity called Nicox BV.  Ex. 30 (Collingsworth-Nicox BV Loan Agreement – IRA-033403); Ex. 31 (Collingsworth Promissory Note – IRA-033413).  Herman de Leeuw represented Nicox BV in that loan agreement, and the loan was secured by Collingsworth's contingency fee interests in Defendants' cases against Drummond and Chiquita. *Id.*[9]

Also on September 9, 2011, Collingsworth executed a separate loan agreement with Albert

---

[9] Collingsworth also executed a separate agreement assigning a percentage of his contingency fee interests in cases against Chiquita and Drummond to a man named James Ellwood who purportedly provided "logistical support, suitable contacts and information so as to assist TC." Ex. 32 (Collingsworth-Ellwood Cooperation Agreement - IRA-033414).  Ellwood then apparently entered into other agreements with Nicox BV (Ex. 33 (Ellwood-Nicox BV Agreement – IRA-033420)) and a man named Paul Akkermans (Ex. 34 (Ellwood-Akkermans Agreement – IRA-033417)) giving them each 1/3 of the fees Ellwood received from Collingsworth.

Van Bilderbeek in which Collingsworth transferred to Van Bilderbeek $750,000—half the proceeds from Collingsworth's loan from Nicox BV. Ex. 35 (Collingsworth-Van Bilderbeek Loan Agreement - IRA-033426). Collingsworth and Van Bilderbeek then executed a "Co-Operation Agreement" in which they agreed that Van Bilderbeek would "immediately" pay Ivan Otero $60,000. Ex. 36 (Collingsworth-Van Bilderbeek Cooperation Agreement - CS_TC166643-0001).[10] Notably, **this payment was expressly "on behalf of" and "funded by TC."** *Id.* A few days later, the $60,000 payment was sent to the Ivan Otero bank account specified in Collingsworth and Van Bilderbeek's "Co-operation Agreement." Ex. 37 (CS_TC012447). That money was then provided to Blanco. The same "Co-operation Agreement" also provided that Van Bilderbeek would send Otero another $50,000 "when the work contemplated for Ivan Otero is completed." Ex. 36 (Collingsworth-Van Bilderbeek Cooperation Agreement - CS_TC166643-0001).

Blanco signed his declaration one month later, in October 2011. *Defamation* Doc. 417 (Crime-Fraud Op.) at 23-24. The next month, Leete emailed Collingsworth to tell him that "JBM's second payment of fees is due since he signed the declaration." Ex. 38 (CS_TC043636). This second installment did not come as quickly as Blanco would have liked, prompting Otero to sound alarm bells regarding Blanco potentially reversing course on his testimony:

- December 15, 2011:  email to Collingsworth stating "we are going to have serious problems if the brothers don't come through next week." Ex. 39 (CS_TC045713).

- December 21, 2011: Leete reporting to Collingsworth Otero's statement that "there is nothing on the arrangement and he is very worried that we will lose what we spent so much effort on obtaining." Ex. 40 (CS_TC045954).

- December 27, 2011:  Collingsworth email to Van Bilderbeek stating "Ivan says

---

[10] The agreements signed by Collingsworth were witnessed by Christian Levesque. Ms. Levesque was a C&S lawyer who, in addition to receiving the "deps in the can" email showing payments to El Tigre and Samario and emails relating to Blanco payments, was counsel of record in *Balcero* and *Melo*. When she was asked about these agreements, she claimed to have absolutely no memory of them—rather, she was "busy doing worker bee work for litigation. So I – I just don't recall being involved in that way. I just don't." Ex. 7 (Levesque Dep.) 131:19-21.

17

nothing has arrived and that we are on thin ice." Ex. 41 (CS_TC045716).

Blanco's payment of $25,000 for signing his declaration was ultimately sent to Otero's bank account on December 28, 2011.  Doc. 417 (Crime-Fraud Op.) at 23-24.  Blanco gave his letters rogatory testimony over two days on April 19 and May 25, 2012.  After the first day of Blanco's testimony, Collingsworth handed Ivan Otero $10,000 in cash.  *Id.*  After Blanco's "dep" was fully "in the can," Defendants sent another payment of $35,000 to Blanco in July 2012.  *Id.* at 23-24.[11]

Below is a chart summarizing what is now known about the flow of funds showing the payments from Van Bilderbeek were actually made with Collingsworth's funds:



A few months after Collingsworth signed these agreements, received $1.5 million, and paid Jaime Blanco, Collingsworth falsely represented to this Court that Llanos Oil and the Van Bilderbeek brothers had "no relationship" to the *Balcero* case.  *Defamation* Doc. 417 (Crime-Fraud

---

[11] Paying Blanco in phases to ensure the testimony met with expectations was not a coincidence—it was a deliberate strategy.  Before the first payment was ever made to Blanco, Collingsworth confirmed with Otero a plan to make an initial "downpayment" to Blanco, "and then perhaps a series of payments.  Makes it easier to raise funds and also gives us some security that we will get the assistance".  Ex. 42 (CS_TC061304).

Op.) at 9; *Balcero* Doc. 339 (March 8, 2012 Hrg. Tr.) at 8:8-10:23.  This Court made clear its

concern about Collingsworth's relationship with Van Bilderbeek, stating "Mr. Collingsworth, I'm

going to say one more thing.  I am concerned about this whole business with Llanos.  Can't put

my finger on it, but at a minimum I could say this to you:  I don't know that your clients' best

interests includes that type of an association with a competitor of Drummond because you're going

to open yourself up at a minimum to questions about your approach to this case and what your

interests are."  *Id.* at 68:1-9.[12]  Needless to say, this Court's concern was prescient and the crime-

fraud discovery has confirmed the Court's suspicions.

Collingsworth and C&S continued to lie about these payments up to and during the crime-

fraud hearing, when they falsely represented that they failed to disclose the Blanco payments

because those were "payments other people made."  *Defamation* Doc. 417 (Crime-Fraud Hrg. Tr.)

at 109:5-12.  In his deposition prior to the crime-fraud hearing, Collingsworth falsely testified as

follows:

> Q You do not disclose to the Court or anyone else that payments to Blanco were,
> in fact, made with your knowledge for his attorneys' fees, do you?
>
> MS. ECCLES: Object to the form.
>
> A As I previously testified, at this time, **I was maintaining a distinction between
> a payment made by me and a payment made by someone else. I've since
> reconsidered that distinction and disclosed the Jaime Blanco payment from
> Albert Van Bilderbeek**.
>
> [ … ]
>
> Q And with respect to Jaime Blanco, those documents were not produced because
> why?

---

[12] Christian Levesque, who witnessed the agreements executed by Collingsworth just a few months earlier, was also present at the March 8, 2012 hearing as counsel of record as a C&S lawyer.  Although she now admits Collingsworth's representation to the Court was untrue, Ms. Levesque did nothing to correct Collingsworth's misrepresentation. Ex. 7 (Levesque Dep.) at 161:18-164:3.

A As I've previously testified, I -- I had made a distinction in the responsiveness of those because **they were not from me.**

[ … ]

But **I was aware of the Jaime Blanco arrangement with Mr. Van Bilderbeek, but did not disclose that until I decided to disclose them despite the distinction I had been making that those payments did not come from me**.

*Defamation* Doc. 329-1 (Collingsworth Dep.) at 167:9-19; 258:2-22; 259:11-15 (emphasis added).

Those lies continued at the crime-fraud hearing when Collingsworth lied in response to questions from his own counsel, questions on cross-examination from Drummond's counsel, and in response to direct questions by this Court:

**Q [Mr. Niewoehner]:** Did you or Conrad & Scherer provide attorney's fees to Mr. Blanco?

**A** No, we did not.

**Q** But somebody else provided what you understood to be legal assistance fees; is that correct?

**A** Yes.

**Q** Who was that person?

**A** Albert van Bilderbeek.

*Defamation* Doc. 389 (Crime-Fraud Hrg. Tr.) at 91:9-16.

**Q [Mr. Niewoehner]:** Why didn't you disclose, then, in January of 2013 the information you had about the payments that were intended for Mr. Blanco?

**A** Well, because until the last order from the Court in October of 2014, which significantly broadened the idea of a payment, I had been making a close distinction between payments that I made, which is what I thought the requests were seeking, and payments that other people made.

[ … ]

**Q [Mr. Wells]:** How is that not something of value offered to a witness? Do you recall the interrogatories that we discussed earlier in this hearing back in *Balcero*?

**A** Yes.

**Q** How is that not disclosed?

**A** Well, as I said, **I made what ultimately I determined to be an incorrect judgment about the distinction I was making about something coming from me versus something coming from Mr. van Bilderbeek**.

[ … ]

[Mr. Collingsworth]:  As I previously testified, we were making a distinction at that time and **the statement that defendants or Parker Waichman had not paid the fees is true**.  Ultimately, we decided that it was cutting it too close to not disclose that **the van Bilderbeeks instead for their own reasons paid**, and we did disclose that.

**Q** Are you telling this Court this representation here is not trying to persuade the Court that Jaime Blanco was never paid by anyone for his legal fees?

**A** I think this is carefully worded and technically, as I admitted and apologized for, it cuts it a little close, but **it is not untrue that we did not pay**.

*Id.* at 215:8-16; 217:3-8; 260:19-261:5 (emphasis added).

THE COURT: And Mr. van Bilderbeek had the kind of money than could be used to help Mr. Blanco?

THE WITNESS: Well, he was able to, yes, Your Honor.

THE COURT: So did the conversation go something like this with Blanco: I would like your help, Mr. Collingsworth, with respect to my legal fees. And you said I can't do that, but I know someone who possibly can?

THE WITNESS: It went out across several conversations, where after the first request was made we discussed it internally, considered it, and ultimately I informed Mr. Blanco that we were not able to do it. I think there was then a gap in time where we then met again and he raised it again, and I said there might be someone that I can introduce you to that might be interested in your services.

[ … ]

THE COURT: Wait a minute. Explain that one to me, how a $150,000 payment requested would have no value.

THE WITNESS: No, I'm sorry. **I was talking about the van Bilderbeek situation, that merely offering to introduce him to someone was not something**

21

**that I considered to be of value. I later, obviously, revised that distinction that I was making and made the disclosure, but I initially made that distinction in my mind**.

*Id.* at 113:18-114:7; 216:2-15 (emphasis added).  Both Defendants continued to make the same false representations in their post-hearing briefs.  *Defamation* Doc. 392 (Collingsworth Post-Hrg. Br.) at 2 n.1; *Defamation* Doc. 395 (C&S Post-Hrg. Br.) at 6 ("Albert van Bilderbeek was paying Blanco's attorney's fees through Otero").

Incredibly, the documents proving that Collingsworth paid Blanco have been on IRAdvocates' privilege log since April 8, 2016.  And they have been in both Defendants' possession since the inception of this case, because they represented that IRAdvocates' "file is one and the same with Conrad & Scherer's litigation file concerning litigation against Drummond. … In fact, they are the same." Doc. 118-7 at 2.  Yet, Defendants have never—*even to this day*—corrected the record to disclose that Collingsworth actually paid Blanco.  Worse still, the only reason these documents were produced is because Drummond identified them as part of a recertification process for the documents logged by IRAdvocates.[13]  But for the fortuitous fact that Drummond selected these documents from IRAdvocates' log as part of its sampling, they would never have been produced.

## II.    C&S AND BILL SCHERER KNOWINGLY LIED TO THE COURT.

Collingsworth's lies are egregious, and for all the reasons set forth in Drummond's prior sanctions briefing, those misrepresentations are attributable to C&S for purposes of sanctions.

---

[13] With the assistance of the Special Master, Drummond and C&S negotiated an agreement whereby Drummond identified documents on IRAdvocates' log which C&S then reviewed and recertified its privilege claims under the law of this case.  The NICOX loan documents weren't produced by Defendants until **late 2023**, 8 years after Defendants' repeatedly lied to the Court at the crime-fraud hearing regarding their reasons for lying about the Blanco payments.  *See RICO* Doc. 256 at 3-4.

2790391.3

Doc. 180 (Renewed Motion for Sanctions) § II.[14]  This Court, however, does not have to solely rely on Collingsworth's lies to hold C&S responsible for the fraud that both Defendants have perpetrated.  C&S is equally and independently deserving of case terminating sanctions because C&S's testimony and representations to this Court were also knowingly false.

**A.  Bill Scherer was fully aware that Blanco was paid.**

C&S took a different tack than Collingsworth at the crime-fraud hearing when it came to the Blanco payments.  Bill Scherer did not say anything about a "distinction" with respect to these payments.  Rather, he testified that neither he nor C&S knew Blanco was paid:

> **Q [Mr. McNeil]** Let me ask you also the same question about the Blanco payments by the van Bilderbeeks. Without getting into privilege, **when did you first become aware that the attorney fee payments to Blanco by the van Bilderbeeks had not been disclosed to this Court?**
>
> **A [Bill Scherer] At the same time, about November, when we made the disclosures to the Court. I didn't have any knowledge of that prior to that time at all.**
>
> **Q** So your –
>
> **A Nor did the firm.**
>
> **Q So your testimony is that the firm didn't learn about this any sooner?**
>
> **A No, sir. The firm believed that there were three witness assistance payments being made. We were well aware of that, understood that was disclosed as it should have been, and that was our level of knowledge until such time as we learned differently. And as soon as we learned differently, we filed in this court.**

---

[14] Brad Smith, Defendants' former counsel, testified that Billy Scherer instructed him to coordinate the defense of the defamation case with Collingsworth. Ex. 26 (B. Smith Dep.) at 28:1-7; 29:1-12.  As the agent of C&S given the authority to coordinate the defense of the defamation case on its behalf, Collingsworth's acts and omissions are attributable to C&S.  *See In re Terrorist Attacks on Sept. 11, 2001*, 2022 WL 4642478, at *22 (S.D.N.Y. Sept. 21, 2022), *objections overruled,* 2023 WL 4561766 (S.D.N.Y. July 17, 2023) (attorneys' sanctionable conduct properly imputed to their law firm for sanctions purposes); *ABBOTT LABORATORIES, et al., Plaintiffs, v. ADELPHIA SUPPLY USA, et al.*, 2020 WL 1429472, at *8 (E.D.N.Y. Mar. 24, 2020) (entity defendants being sanctioned "cannot absolve themselves by blaming the employees whom they selected as their agents to work with counsel in responding to the discovery requests").

Doc. 390 (Crime-Fraud Hrg. Tr.) at 393:6-23 (emphasis added).  C&S doubled down on that story in its post-hearing briefing, representing to this Court that it "did not have actual knowledge of the payments to Blanco," and that

> **Conrad & Scherer was not aware until approximately the time the Court and Drummond became aware that the additional payments at issue had not been disclosed** and that certain statements and representation made to this Court were not correct. On this record, there is no basis for finding that the crime-fraud exception applies as to Conrad & Scherer. … There is simply no basis for finding that C&S committed a fraud on the court.

Doc. 395 (C&S Post-Hearing Br.) at 6, 8-10 (emphasis added).

The crime-fraud discovery revealed that in May 2012—the same time period during which Defendants' paid witnesses, including Blanco, gave their letters rogatory testimony in *Balcero*— Bill Scherer instructed a C&S partner named James Carroll to prepare a memorandum analyzing the firm's cases against Drummond.  Ex. 43 (Carroll Dep.) 19:15-25.  Mr. Carroll prepared that memo, which he then gave to Bill Scherer and C&S CFO Richard Drath.  In his memo, Carroll wrote that "**TC has made payments directly or indirectly to one or more witnesses, <u>e.g.</u>, Jaime Blanco**.  This is strongly hinted at right in Blanco's declaration (par. 2).  Assumedly all of this will come out." Ex. 4 (Carroll Depo Exhibit 3).  A few paragraphs later, Carroll wrote "**The witnesses generally seem untrustworthy:   The witnesses are criminals, convicts, and poor people vulnerable to bribery and threats.   It appears TC has paid money to at least get access to witnesses, including $100,000 to get Jaime Blanco to testify**." *Id.* (emphasis added).  Carroll concluded his memo by "recommend[ing] a decision at this time to terminate all involvement with TC's cases and with TC and his group." *Id.*  Carroll gave this memo to Bill Scherer, Ex. 43 (Carroll Dep.) 95:12-22, and he met with Bill Scherer, Richard Drath, and Collingsworth to discuss his recommendations.  *Id.* at 63:23-64:3; Ex. 44 (Carroll Dep. Ex. 2 – CS_TC063724).

As this memo reflects, and as Mr. Carroll's testimony confirms, C&S and Bill Scherer were

well aware that Blanco was paid at least as early as May 2012. Notably, Mr. Carroll was able to discover that Blanco was paid after spending less than 30 hours studying the firm's *Balcero* file. *Id.* at 18:16-24. Bill Scherer ████████████████████████████████████████████ ████████████████████████████████████████████, Ex. 5 (B. Scherer Dep.) at 290:12-24, stating "████████████████████████████." *Id.* at 291:17-18.[15] That, of course, is irreconcilable with the C&S's repeated claims prior to the crime-fraud hearing that they had exhaustively searched the firm's files and was unable to discover that Blanco was paid.[16]

### B. Other C&S lawyers and firm administrators were aware Blanco was paid.

In addition to Bill Scherer, former C&S CFO Richard Drath also received Jim Carroll's memo and was aware that Blanco was paid. Ex. 43 (Carroll Dep.) 21:3-22; Ex. 3 (Carroll Dep. Ex. 3 – CS_TC063449); Ex. 45 (Carroll Dep. Ex. 10 – CSWRS-001203). Christian Levesque, who was a C&S lawyer, counsel of record in *Balcero*, and intimately involved in responding to discovery requests in both *Balcero* and in this case, was also fully aware that Blanco was paid, as she was on numerous emails relating to those payments. Ex. 47 (Composite of Levesque emails relating to Blanco payments – CS_TC037811; CS_TC039477; CS_TC038626; CS_TC037803; CS_TC050620). In one of those emails, Collingsworth told Levesque and other members of his team to "tell Ivan [Otero] to stress to JBM that to even suggest or hint to Adkins that he received

---

[15] When questioned about the Carroll memo in his deposition, Bill Scherer ███████████████ █████. Ex. 5 (B. Scherer Dep.) at 288:12-24. He also testified that ████████████████ ████████████████████████████████████████. *Id.* at 292:14-24. Jim Carroll, however, testified that "I know I gave it to him" because "he asked me to do it." Ex. 43 (Carroll Dep.) at 95:12-19. Moreover, the memo's first sentence states "I recommend that CS terminate TC's and CS's involvement in Drummond." Ex. 45 (Carroll Ex. 10 – CSWRS-001203). By May 2012, the firm had invested millions of dollars in attorney time and costs (and hundreds of thousands of dollars in witness payments) in litigation against Drummond. Bill Scherer's claim ████████████████████████████████████████████████████████████ ██████████████████████ is simply not believable.

[16] Defendants located, reviewed, and logged Jim Carroll's memo in late 2014 and early 2015, well before the crime-fraud hearing in September 2015 when Bill Scherer falsely testified that the firm never knew Blanco was paid. Ex. 46 (Defs' Jan. 5, 2015 Privilege Log Excerpt) Entry Nos. 2241-42; Ex. 3 (CS_TC063449).

funds from anyone, even Albert, will cause us a world of trouble." *Id.* at CS_TC039477.[17]  And as explained in Section I-B *supra*, Levesque also witnessed the agreements Collingsworth used to fund those payments.

Other C&S personnel who received written notice that Blanco was paid include C&S lawyer Maxine Streeter, Ex. 48 (Carroll Dep. Ex. 23 – CSWRS-001188), and C&S paralegal Susana Tellez. Ex. 47 at CS_TC039477.  Lorraine Leete, whom Defendants described as a "member[] of Defendants' legal team," Ex. 49 (Aug. 16, 2013 MTQ Leete R45) at 19, was also on numerous documents relating to the Blanco payments. *See, e.g.,* Ex. 38 (CS_TC043636).

**C.  Bill Scherer and C&S were fully aware that El Tigre and Samario were paid.**

**i.     Numerous key individuals received the "deps in the can" email.**

This Court already found that "it would be incredulous to believe that no one at Conrad & Scherer other than Collingsworth knew of the payments made to witnesses in this case":

> Payments were delivered on a monthly basis by the firm, using the firm's money, and through the firm's normal approval process as documented in the firm's business records.  (Doc. #405 at 1-4).  As of May 23, 2011, at a minimum, Terrence Collingsworth, Bill Scherer, Richard Drath, Billy Scherer, Susana Tellez, Lorraine Leete, Victoria Ryan, Pauline Kroper, and Danielle Kisslan had all received written notice that El Tigre and Samario had been paid. (See Doc. #402 at 1-4).

Doc. 417 (Crime-Fraud Op.) at 20 n.15.

The crime-fraud discovery has revealed that, in addition to the C&S lawyers and personnel listed in this Court's crime-fraud opinion, additional C&S lawyers also received the "deps in the can" email.  Those include C&S lawyers Christian Levesque and Eric Hager—both of whom were counsel of record in *Balcero*. Ex. 51 (CS_TC054427).    In addition to Levesque and Hager, C&S

---

[17] Collingsworth attempted to arrange a telephone call between Blanco and Adkins in early October 2011, Ex. 50 (CS_TC023514), which is the reason Collingsworth was warning Blanco not to disclose that he was paid to Adkins.

lawyer David Garces also received the "deps in the can" email.  *Id.*

Nor did Defendants treat these payments as a trivial fact they "forgot" or "never knew."  In February 2011, three months before he sent the "deps in the can" email to Bill Scherer, Collingsworth sent Bill Scherer, Billy Scherer, and Richard Drath an email attaching a report from his recent trip to Colombia.  Ex. 52 (CS_TC049176; CS_TC049184). In that report, Collingsworth wrote that they "have to clarify terms and get funds for security to Ivan for ET and Samario's families."  *Id.*  Collingsworth sent the "deps in the can" email twice on May 22, 2011.  Ex. 51 (CS_TC054427); Ex. 53 (CS_TC051886).   He re-sent himself the "deps in the can" email less than a day later, Ex. 54 (CS_TC014946), and he repeatedly located and saved it during critical time periods.  Section I-A *supra*.  Two weeks after receiving the "deps in the can" email, Richard Drath received an email in which Collingsworth was discussing the new monthly $2,700 payment to Otero for El Tigre and Samario.   C&S accounting personnel told Drath that "Billy [Scherer] does not want this wire to go out until he speaks to you further."  Ex. 55 (CS_TC053348).  A few hours later, Drath gave C&S accounting the green light to send the payment.  *Id.*  On June 15, 2011, Collingsworth emailed Drath, Bill Scherer, and Pauline Koper, stating "on the issue of Jaime Blanco, this guy could put the Drummond case away and PWA likewise never answered whether they are even considering making an arrangement to help with his lawyers (**similar to what we did with El Tigre and Samario**)."  Ex. 56 (CS_TC057371) (emphasis added).  And on November 3, 2011, Lorraine Leete and Christian Levesque once again expressly acknowledged the fact that El Tigre and Samario were being paid when discussing Defendants' discovery responses in *Balcero* relating to witness payments.  In that correspondence, Leete stated "we only disclosed hamburgers given to LD, but not security payments to the families of ET, Sam, Charris, who are witnesses (not potential witnesses)."  Ex. 57 (CS_TC052435).  As all these documents reflect,

27

C&S was clearly aware of the fact that El Tigre and Samario were being paid.

      **ii.      C&S's communications in June and July 2014 leave no doubt on this issue.**

As this Court will recall, one of the issues at the crime-fraud hearing was the "print date" on the "deps in the can" email, which shows that someone printed this email on June 24, 2014. Doc. 417 (Crime-Fraud Op.) at 33-34. This Court held that "[d]iscovery must be allowed into who else saw the email, when they saw it, who showed it to them, and what was done after the email was sent. (See footnote 5, supra). This includes all communications concerning the email and all communications that Defendants and their counsel had which occurred between June 25, 2014 (the date the email was printed) and November 17, 2014 (when the email was first produced to Drummond). This discovery will squarely align with the crimes and frauds alleged in this case – i.e., whether a cover-up of bribery, an ongoing bribery, or an ongoing fraud on the court." *Id.*

The crime-fraud discovery has revealed that C&S and its counsel *repeatedly* located and circulated the "deps in the can" email in June and July 2014. At 2:50 p.m. on June 24, Billy Scherer sent a copy of the "deps in the can" email to both Ken McNeil (who was C&S's counsel in the *Wichmann* case in Florida and would appear in this case a few months later) and to Brad Smith (the Defendants' counsel in this case). Ex. 58 (CS_TC098438; CS_TC098455). *Mr. McNeil forwarded a copy of the "deps in the can" email to Bill Scherer less than two hours later, stating "you and I need to be totally in the loop with Alabama counsel on all this. See below email and attachments.*" *Id.* (emphasis added). Two hours after that, Bill Scherer's assistant sent Scherer and Collingsworth another copy of the "deps in the can" email. Ex. 59 (CS_TC198625).[18] Incredibly, Drummond's counsel was in C&S's Ft. Lauderdale office on this

---

[18] Bill Scherer's story at the crime-fraud hearing was that when he received a copy of the "deps in the can" email in June 2014, it "didn't turn on any light bulb for me." Doc. 390 (Crime-Fraud Hrg. Tr.) 408:15-16.

same day (June 24, 2014) taking the first deposition in this case, which focused entirely on ████████

████████████████████████████████████████████████. Ex. 60 (Gordon

Dep.).[19]

On July 9, 2014, at 2:28 p.m., Brad Smith again forwarded Billy Scherer's June 24th email

attaching the "deps in the can" email to Collingsworth. Ex. 61 (CS_TC229312). Two hours later,

C&S and Collingsworth filed with the Special Master their first brief regarding the crime-fraud

exception, which falsely and repeatedly claimed that only "three witnesses" were paid. Ex. 62

(July 9, 2014 email). Defendants made the same false representations in their reply brief filed on

July 18, 2014. Doc. 417 (Crime-Fraud Op.) at 16. On September 23, 2014, C&S—represented

by Ken McNeil—submitted a filing in Florida court which attached a false declaration from

Collingsworth stating that El Tigre, Samario, and Blanco had not been paid. *Id.* at 47-48.

After being shown documents in his deposition which clearly evidenced his knowledge of

the El Tigre and Samario payments, Bill Scherer testified that ████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████" Ex. 5 (B. Scherer Dep.) 222:20-22; 223:11-13 (emphasis

added). Bill Scherer confirmed that ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

████████████████████████████████████

---

[19] The day after locating and circulating the "deps in the can" email, Billy Scherer ████████████████████
████████████████. Ex. 20 (Billy Scherer Dep.) at 95:18-96:21. ████████████████████. *Id.*

29

███████████████████████████████████        ███████████████

223:18-224:3 (emphasis added).

That testimony is irreconcilable with Bill Scherer's sworn testimony in his first deposition. Ex. 63 (1st B. Scherer Dep.) at 137:7-11 ("Q. … And is it your testimony that you forgot about the payments to Samario and El Tigre after this – you receiving this [deps in the can] email?  A.  No. That's not my testimony.  My testimony is, I never knew it.").  It is also irreconcilable with his testimony at the crime-fraud hearing that the "light didn't come on" for him when he received the "deps in the can" email in June 2014, Doc. 390 (Crime-Fraud Hrg. Tr.) 427:10-13, and that he had "no recollection" of receiving the "deps in the can" email, which "never imparted any kind of information."  *Id.* at 395:9-13.  And it is irreconcilable with C&S's post-hearing brief filed in the wake of the crime-fraud hearing.  Doc. 395 (C&S Post Hrg. Br.) at 20 ("Conrad & Scherer did not know about the assistance payments to El Tigre, Samario, and Blanco until after the October 15, 2014 Order was entered and the new team undertook its investigation.").

After the next break in the deposition, Ex. 5 (B. Scherer Dep.) at 232:12-16, Bill Scherer

███████████████████████████████████████████████████████

██████████████████████████████████████████████."  *Id.* at 258:1-

3.  Following his deposition, Bill Scherer submitted an errata sheet that purported to completely change his testimony on this issue.  Drummond is filing with the Special Master a motion to strike that errata sheet.

### III. DEFENDANTS ALTERED DOCUMENTS AND PULLED DOCUMENTS OFF PRIVILEGE LOGS TO CONCEAL THE PAYMENTS TO EL TIGRE, SAMARIO, AND BLANCO.

#### A. Defendants pulled documents off draft privilege logs.

"**Tell our friend no more &^%#$^& emails**."  Ex. 64 (CS_TC195586).  That is what

30

Collingsworth told Lorraine Leete when they were preparing Defendants' initial privilege log in this case in September 2013.  Leete responded, "**Oh, I did already as soon as I started pulling for this log**."  *Id.*  Defendants' "friend" is Ivan Otero, and draft privilege logs produced by the Defendants pursuant to the crime-fraud exception show that in September 2013 the Defendants located, reviewed, and logged documents that proved El Tigre, Samario, and Blanco had been paid.  Those documents were then removed from the privilege log that Defendants produced to Drummond—and the Court—in October 2013.  At the same time they were locating these documents, logging them, and then pulling them off their log, the Defendants were making false representations to this Court and other federal courts all over the country while simultaneously demanding that Drummond be sanctioned for issuing subpoenas seeking witness payment information.  The timeline of events is as follows.

In early September 2013, Lorraine Leete drafted a memo analyzing documents that had been pulled in response to Drummond's requests for production, including RFP 2-8, which sought "All documents reflecting communications between Defendants or anyone working on their behalf and Ivan Otero."  Ex. 65 (CS_TC242137).[20]  In her memo, Leete quotes a number of documents discussing witness payments to El Tigre, Samario, and Blanco.  *See, e.g., id.* at CS_TC242142 ("To S and T 1800 each was given.").  Each of the documents discussing these payments were quoted and identified in red text, while documents she apparently thought neutral or helpful to Defendants were quoted in black or green text.  *Id.*

On September 25, 2013, Susana Tellez sent a draft privilege log to Christian Levesque. Ex. 3 (CS_TC165475).  The righthand column of that draft privilege log contained "CL Notes"

---

[20] The metadata slipsheet for this document, which reflects the author, file name, created date, and last modified date, is included with this exhibit and reflects that it was saved on September 12, 2013.

(i.e., Christian Levesque), which were excerpted notes and quotations from each document.  As those notes reflect, many of the documents on this draft log reflect witness payments to El Tigre, Samario, and Blanco.

For example, the log included a February 8, 2011 email from Leete to Ivan Otero quoted as saying "In order to send money to your bank account we need the following info (then asks for banking details), 'which is where he said money for his, ET and Sam's security should be deposited."  *Id.* at CS_TC165502.  C&S sent Otero $5,000 within days of this email.  Doc. 417 (Crime-Fraud Op.) at 24.  Another email dated April 15, 2011 is quoted as saying "To S[amario] and [El] T[igre] 1800 each was given."  *Id.* at CS_TC165503.  Yet another email from Otero to Leete is quoted as saying "Today, September 12, has not reached the protection of [El] T[igre] and S[amario]."  *Id.* at CS_TC165522.

This draft log also included entries for documents proving that Jaime Blanco was paid.  For example, the log included September 2011 emails between Defendants and Ivan Otero attaching the wire confirmation of a $60,000 payment to Blanco, through Otero.  *Id.* at CS_TC165494 & CS_TC165510.  It also included emails regarding the $25,000 payment to Blanco in December 2011 from "the brothers," *id.* at CS_TC165514, and the wire confirmation of the $35,000 payment to Blanco in July 2012.  *Id.* at CS_TC165494.  These same documents were exhibits at the crime-fraud hearing and cited by the Court in its crime-fraud opinion.  Doc. 417 at 23-24.

Tellez's billing entry for September 25 reflects that she finished the first draft of the Defendants' privilege log, "prep[ared] hard copies … of all documents pulled for CL [Christian Levesque] and TC [Terry Collingsworth]," and "started reviewing privileged documents and entries with CL."  Ex. 66 (CS_TC218665) at 09/25/13 entry.  The next day, Levesque and Tellez met again to "review responsive/privileged documents and privilege log entries."  *Id.* at 09/26/13

32

entry.  Leete saved another draft privilege log, which again included entries proving that El Tigre, Samario, and Blanco had been paid.  Ex. 67 (CS_TC237461).

On September 27, 2013, Christian Levesque sent another version of the draft log back to Tellez.  Ex. 68 (CS_TC165366).  On this version of the draft log, most of the documents which clearly stated that El Tigre, Samario, and Blanco had been paid were removed.  *Compare* Ex. 3 (CS_TC165475) at CS_TC165502 (2/8/2011 email re Otero's account "where he said money for his, ET and Sam's security should be deposited) *with* Ex. 68 (CS_TC165366) at CS_TC165389 (reflecting the removal of this email).  *Also compare* Ex. 3 (CS_TC165475) at CS_TC165494 (email and wire transfer confirmations for $60,000 and $35,000 Blanco payments) *with* Ex. 68 (CS_TC165366) at CS_TC165373 (reflecting removal of these documents).

On September 28 and 29, 2013, Tellez met with both Levesque and Collingsworth regarding the privilege log and associated documents.  Ex. 66 (CS_TC218665) at 9/28 and 9/29/2013 entries.  Time entries reflect that Collingsworth determined whether communications with Otero were "responsive" and reviewed documents on the Defendants' log.  *Id.*

At 10:39 a.m. on September 29, Christian Levesque sent another draft log back to Susana Tellez.  Ex. 69 (CS_TC165276-0001 & CS_TC165277).  On this version, Defendants removed the remaining documents which clearly reflected that El Tigre, Samario, and Jaime Blanco had been paid.  *Compare* Ex. 68 (CS_TC165366) at CS_TC165408 ("Today, September 12, has not reached the protection of T and S.") *with* Ex. 69 (CS_TC165276-0001) at CS_TC165317 (reflecting removal of this email).  *Also compare* Ex. 68 (CS_TC165366) at CS_TC165397 (9/23/2011 email from Leete to Otero attaching confirmation of a $60,000 payment to Blanco) *with* Ex. 69 (CS_TC165276-0001) at CS_TC165306-307 (reflecting removal of this email).  At 3:37 p.m. on September 29, Collingsworth emailed Leete stating "Tell our friend no more

33

&^%#$^& emails." Ex. 64 (CS_TC195586).  Leete responded, "Oh, I did already as soon as I started pulling for this log."  *Id.*

On October 2, 2013, Collingsworth and C&S produced their initial privilege log to Drummond and to the Court.  It contained 165 entries.  Ex. 70 (Oct. 2, 2013 Ltr. & Log).  On this version of the log, Defendants pulled off the documents that even indirectly referred to witness payments.  For example, 2nd RFP 8, Entries 16-26 on the draft September 29th log correspond with an email chain in which Rebecca Pendleton and Ivan Otero discuss "transferring funds as soon as declarations [of El Tigre and Samario] are ready" and Otero's contingency fee.  Ex. 69 (CS_TC165276-0001) at CS_TC165297-98.  40.  *See also* Ex. 71 (CS_TC160824).  Those emails were removed entirely from Defendants' final log.  *Compare id.* with Ex. 70 (Oct. 2, 2013 Log) at Entry 66.  Defendants also removed documents that even indirectly discussed Blanco payments.  Ex. 69 (CS_TC165276-0001) at CS_TC165302 (5/26/2011 Leete email stating "with JBM, I am virtually certain that I can get a package close to what was asked for") *with* Ex. 70 (Oct. 2, 2013 Log) at Entries 71-72 (reflecting removal of this email).  More than 70 entries, including all the entries for documents that proved El Tigre, Samario, and Blanco had been paid and which appeared on the Defendants' internal privilege logs, were pulled off the log that was produced to Drummond and the Court, and none of those documents were produced by the Defendants.[21]

**"One mistake and" dot…dot…dot**.  Collingsworth was clearly cognizant of the consequences of disclosing the Otero emails Defendants were hiding at this time.  On October 3, 2013, he texted Suzanna Tellez instructing to her to take special care in reviewing the Otero emails: "please of course take your time on Ivan docs especially the ones we are producing too as **one**

---

[21] Attached as Exhibit 72 is a chart reflecting several of the most important (and damning) emails which were initially included on the Defendants' draft logs and ultimately pulled off.  Also included are copies of those emails, which Defendants produced years later as part of the crime-fraud discovery.

**mistake and . . .**   Don't let anyone rush you." Ex. 73 (Oct. 3, 2013 Collingsworth text).

At the October 10, 2013 hearing, Defendants represented to this Court that all responsive documents had been produced.  Doc. 417 (Crime-Fraud Op.) at 14.  "Collingsworth, who was seated next to his lawyer at the counsel table, made no effort to correct this misrepresentation, knowing full well that all documents related to payments had not been produced." *Id.*  It is now known that Defendants had actually pulled witness payment documents off their privilege log less than 2 weeks prior to this hearing resulting in Defendants not only withholding documents, but concealing that they even existed.

When the Defendants produced supplemental privilege logs in December 2013 and in July 2014, they again omitted these documents from those logs.  When producing these logs, Defendants simultaneously and falsely represented to Drummond that the logs contained "privileged documents, if any, responsive to" Drummond's request for Defendants' communications with Ivan Otero. Ex. 74 (Dec. 20, 2013 B. Smith Ltr.).[22]

When Drummond first discovered that Defendants pulled documents off their privilege log, Drummond asked C&S to explain what happened.  C&S was "unable to explain with certainty why various entries were removed from the log before it was served in early October 2013" and told Drummond that "obtaining a definitive explanation will likely require deposing some of the

---

[22] Like their October 2, 2013 letter enclosing their original privilege log, Defendants "ghost-wrote" this letter for Brad Smith.  Ex. 75 (CS_TC0127631); Ex. 76 (CS_TC229830).  One of the questions that the crime-fraud discovery was intended to answer was who responsible for drafting the pleadings and other documents that misrepresented the scope, nature, and extent of witness payments.  Doc. 417 (Crime-Fraud Op.) at 32.  Collingsworth and C&S obviously drafted the misrepresentations this Court catalogued from *Balcero*. *Id.* at 8-10.  The crime-fraud discovery has revealed the Collingsworth and C&S ghostwrote virtually every filing and discovery response in the *Defamation* case.  In Collingsworth's own words, "[r]esponding to the Drummond accusations has been a heavy burden on the DC office [of C&S]" which has done "99.99% of the work in the case." Ex. 77 (CS_REPROD_SRLF-0002360).  *See also* Ex. 78 (CS_TC196396) (Collingsworth drafting discovery responses); Ex. 79 (CS_TC166254) (Collingsworth and Levesque drafting a response to Drummond's motion to compel); Ex. 26 (B. Smith Dep.) at 55:7-65:4 (testifying that Collingsworth and C&S were "heavily involved" in drafting discovery responses and pleadings in the defamation case and that, when pleadings and other filings made representations about witness payments, Mr. Smith was relying on information from Mr. Collingsworth), at 109:1-122:15 (Defendants creating privilege logs).

individuals involved in preparing the log." Ex. 80 (May 31, 2023 W. Paulk Ltr.). On September 18, 2023, Drummond deposed Christian Levesque, who was intimately involved in this process. Ms. Levesque claimed not to remember anything about the draft privilege logs, or the removal of documents reflecting that El Tigre, Samario, and Blanco were paid, and she was unable to offer any explanation whatsoever as to why it occurred. She testified that Terry Collingsworth would be the only one who knows:

> Q. … [S]o just to be clear, if Judge Proctor is looking for an explanation as to why documents that would have revealed the undisclosed witnesses had, in fact, been paid, but pulled off the log and not disclosed to Drummond or the Court because this eventually had to get filed with the court, you don't have an explanation?
>
> A. I – I don't. I don't – I don't know why they weren't on there.
>
> [ … ]
>
> Q So if we are looking to find out who can provide an explanation for why documents were pulled off the log that was provided to Drummond, I think you said you can't provide us an explanation, Terry would be one. Anybody else you think might have an explanation for why that decision was made?
>
> A. Not that I can -- not that I can think of.

Ex. 7 (Levesque Dep.) at 243:10-18; 245:17-23.

## B. Defendants instructed their counsel to redact documents to conceal their payments to El Tigre and Samario.

Another issue at the crime-fraud hearing was the Defendants' production of a tranche of documents in May 2014 which they redacted to hide their payments to El Tigre and Samario. This Court's crime-fraud opinion recognized that "Drummond is entitled to explore who made the decision to redact and withhold all of the documents reflecting payments to El Tigre and Samario, who actually performed the redactions to the documents, what they knew at the time they redacted them, and what they were told about the actual facts of this case, including payments to Otero. These questions go to the heart of the questions raised in this case about fraud, bribery, and

suborning perjury."  Doc. 417 (Crime-Fraud Op.) at 32.

It is now known that Collingsworth is responsible for these redactions.  Brad Smith, Defendants' former counsel, testified that "We were about to produce them, and Terry asked us to redact all that in order to produce them or -- to redact them. And that was the only way we were going to get them produced."  Ex. 26 (B. Smith Dep.) 145:7-11.  *See also id.* at 149:1-6.  As set forth above, and as this Court already found, Collingsworth never "forgot" about paying El Tigre and Samario.  Accordingly, his instruction to his counsel to redact these documents which showed the monthly payments to El Tigre and Samario is further, irrefutable evidence of Defendants' *intentional* fraud on the court.

## IV.   THE RECORD IS LITTERED WITH ADDITIONAL FALSE REPRESENTATIONS BY BOTH DEFENDANTS.

This Court's crime-fraud order catalogued many of the false representations made by the Defendants.  While the above examples of Defendants' additional misrepresentations that have come to light thanks to the crime-fraud discovery may be some of the most egregious, the examples are endless.  Some of the Defendants' additional lies, many of which they told while trying to explain away prior lies, are detailed below:

- The privilege log produced by Parker Waichman in early 2014 included a copy of the "deps in the can" email.  That log, and the documents on the log, were provided to the Special Master in October 2014.  Less than a month later, and in an obvious rush to get out in front of their soon-to-be-discovered fraud, Defendants disclosed that El Tigre and Samario had been paid.  At the crime-fraud hearing, Defendants tried to defuse these facts with the following testimony:

   **Q. [Mr. Niewoehner]** ... So I'm going to focus on your personal knowledge of Parker Waichman's privilege log.  Did you ever see that document?

   **A. [Mr. Collingsworth]**  No.  To this day, I've never seen the privilege log.

   *This testimony was false.*  On February 28, 2014, Brad Smith emailed Collingsworth asking him "Have you [had] a chance to look at PW's log?" and expressing concern about documents relating to Jaime Blanco.  Collingsworth responded by falsely

claiming "we didn't" pay Blanco, and stating that Parker Waichman's privilege log "gave an unhelpful description but nothing behind it." Ex. 81 (CS_TC127884). Collingsworth's billing records reflect that he reviewed the PWA log again on August 27, 2014, spending two hours comparing PWA's log to the entries on Defendants' log shortly before the documents on PWA's log—including the "deps in the can" email—were provided to the Special Master:

| | | | |
|---|---|---|---|
| 08/27/14 Reviewed PWA documents; Compared our privilege log to PWA's log; Drafted email to team re: meet log to PWA's log; Drafted email to team re: meet and confer letter | NB** | TC | 2.00 |

Ex. 66 (CS_TC218665) at 08/27/14.

- In an attempt to excuse his lie to this Court at the April 21, 2014 hearing, Doc. 417 (Crime-Fraud Op.) at 15, Collingsworth submitted a declaration which stated that at the time he made those false statements, "I had not reviewed the factual record of the case, including all discovery requests and objections, prior to the hearing." Doc. 187-21 (March 5, 2015 Collingsworth Decl.) ¶ 9. In that same declaration, Collingsworth also testified that "I did not recall specifically what the status was of this security issue" with El Tigre and Samario.

  *This testimony was false.* As demonstrated in Section I-A, *supra*, Collingsworth had repeatedly reviewed and saved documents showing that El Tigre and Samario were paid in the months leading up to the crime-fraud hearing, and someone at C&S (most likely Collingsworth) saved a copy of the "deps in the can" email just a few hours after Drummond filed its sanctions motion.

- In opposing Drummond's motion for spoliation sanctions due to the deletion of Mr. Collingsworth's emails, Defendants represented to the Court that they were unaware that vast swaths of Mr. Collingsworth's emails were missing "until 2015, when they were discovered by the top national forensic computer expert hired by the Defendants." Doc. 293 at 1. *See also id.* at 6 ("there is no sinister plot here – just inadvertent, unfortunate errors that Conrad & Scherer and Collingsworth were not aware of until 2015, when they were too late to completely fix."). *See also* Ex. 82 (March 12, 2015 Steptoe Ltr. to Special Master at 1 ███████████████████████████████████████████ ███████████ ).

  *These representations to the Court were false.* Emails produced pursuant to the crime-fraud exception show that, at least as early as July 2014, the Defendants were acutely aware that Collingsworth's emails were missing. On July 11, 2014, C&S employee Charity Ryerson told other C&S personnel that "another exciting twist in this is that there is about an 18 month period in which Terry's emails are lost. Sometime in 2010 and 2011 as I recall … He will probably need to explain this in an affidavit at some point." Ex. 83 (CS_TC139330). The day prior, Ryerson told Collingsworth that "there was a period of a year or two, maybe in 2010, when we lost all your emails for some

reason." Ex. 84 (CS_TC104142).[23]

- Following the crime-fraud hearing, Collingsworth represented to the Court that his "actual explanation [for failing to disclose the El Tigre and Samario payments] is the only one that fits the facts: after Mr. Collingsworth sent around the May 22, 2011 memo, no one, including Mr. Collingsworth, thought about it again until Conrad & Scherer reviewed documents gathered to respond to this Court's broad October, 15, 2104 [sic] Order." Doc. 392 at 8.

   *That representation to the Court was false.* As demonstrated above, Collingsworth, C&S, and their counsel repeatedly located, reviewed, and saved documents that proved El Tigre and Samario were paid between July 2013 and October 2014. *See* §§ I-A and II-C. In addition, Collingsworth, Levesque, Tellez, and Leete pulled documents off a privilege log in September 2013 that unequivocally proved El Tigre and Samario were paid.

- In the same brief, Collingsworth represented that he "did not initially disclose his role in facilitating Jaime Blanco's introduction to Albert van Bilderbeek, who ultimately assisted Blanco with his attorney's fees. Mr. Collingsworth initially believed there was a legitimate distinction to be made based on a third party, not Mr. Collingsworth, had provided the assistance. See id. at 108:16-109:19; 112:13-21. Defendants ultimately did disclose all known information about the van Bilderbeek assistance to Blanco." Doc. 392 at 2 n.1.

   *These representations to the Court were false.* Collingsworth, not Van Bilderbeek, paid Blanco. And at the time Collingsworth represented to this Court that they had "disclose[d] all known information" about the Blanco payments, Defendants were still hiding the documents which prove that Collingsworth made these payments.

- Collingsworth testified at the crime-fraud hearing that the payments to Jaime Blanco were "not something that we were trying to cover up." Doc. 390 (Crime-Fraud Hrg. Tr.) at 259:2-14.

   *This testimony was false.* Collingsworth explicitly told other members of his team to "tell Ivan [Otero] to stress to JBM that to even suggest or hint to Adkins that he received funds from anyone, even Albert, will cause us a world of trouble." Ex. 85 (CS_TC039477).

- Defendants represented to this Court that Ivan Otero did not represent El Tigre or Samario

---

[23] As this Court recognized in its crime-fraud opinion when specifically discussing the spoliation issue, "If Defendants performed a cursory search for documents in August 2013, they would have noticed that emails prior to March 2013 were missing. With the looming evidence of a crime or fraud, an explanation about what search for documents occurred is relevant to the question of whether evidence was being secreted about payments to witnesses. This, in turn, bears directly on the fraud on the court question." Doc. 417 (Crime-Fraud Op.) at 38. As these emails reflect, Defendants knew that an untold number of Collingsworth's emails were missing at the same time they were representing to this Court and to Drummond that they had searched for and produced all responsive documents relating to witness payments.

"as of 2009," when Otero signed his contingency fee agreement with the Defendants.  Doc. 282 (Defs' Corrected Response to Drummond's Proposed Findings of Fact) ¶¶ 3-6.

> *These representations to the Court were false.*  In an email dated September 30, 2013, Collingsworth told Christian Levesque and Susana Tellez a "list of IO's clients" and stated that "officially, in the depositions with Drummond, he asserted that he represented:  Jairo Charris Castro, Jaime Blanco Maya, Jhon Jairo Esquivel Cuadrado, alias El Tigre, [and] Alcides Manuel Mattos Tabares, alias Samario."   Ex. 86 (CS_TC088433).  And in December 2008, Collingsworth sent Rebecca Pendleton an email attaching a draft contingency fee agreement for Otero, while telling him "I think it is better if we leave it quiet about **your current clients**, and I trust we all know exactly what is needed to be done. … I can transfer the funds as soon as the two declarations [of El Tigre and Samario] are ready."  Ex. 87 (CS_TC242653) (emphasis added); Ex. 88 (CS_TC049057).  El Tigre and Samario signed their declarations a few months later, and Defendants sent Otero $80,000 in exchange.

- Bill Scherer testified in his deposition that neither he nor C&S knew that Blanco had been paid until "shortly before" January 2015:  "Q.  Are you aware that Mr. Van Bilderbeek paid at least $95,000 to Jaime Blanco through Ivan Otero? A. Only by virtue of our filings in this case. Q. So when did you find out about the payments to Jaime Blanco? A. At or near the time we filed with the Court and, you know -- when you and the Court learned about it, that's when I learned about it. Q. That filing was in January of 2015. A. Okay. Q. Is it your testimony, as managing partner of Conrad & Scherer, that Conrad & Scherer had no knowledge of these payments prior to January of 2015? A. Yes, sir, or shortly there before. And when I say 'shortly,' I mean in terms of processing the information and getting it as a supplement -- Q. You did know -- A. -- discovery."  Ex. 63 (B. Scherer Dep.) at 182:13-183:5.

> *This testimony was false.*  Numerous C&S personnel were aware that Blanco had been paid, that information was contained in C&S's file for *Balcero*, and Bill Scherer commissioned and received a memo which expressly stated that Blanco was paid, and then had a meeting with the partner who authored the memo and Mr. Collingsworth to discuss the memo's contents and recommendations.  *See* Section II-A *supra*.

## V.    THERE IS EVIDENCE THAT DEFENDANTS MADE OTHER, ADDITIONAL WITNESS PAYMENTS AND INDUCEMENTS THAT HAVE NEVER BEEN DISCLOSED.

The crime-fraud discovery has also revealed documents which reflect that Defendants made other witness payments they have never disclosed.

### A.  There is overwhelming evidence that Yuca and Peinado were paid.

Shortly after this Court issued its crime-fraud opinion, the Defendants produced in the Dole case a June 15, 2012 memo which reflected that Yuca and Peinado were demanding $2,200 per

40

month, and that Yuca would not sign his declaration until he received this money. Drummond then provided this Court with a timeline of events relating to these payments, which it adopts and incorporates herein. Doc 422. To this day, Defendants refuse to admit that Yuca and Peinado were paid. The evidence, however, is overwhelmingly to the contrary:

| Date(s) | Event |
|---|---|
| December 29, 2009<br>January 19, 2010<br>August 26, 2010<br>February 9, 2011 | Yuca testifies several times before the Colombian Fiscalia. He denies any knowledge of Drummond Ltd. executive Alfredo Araujo's complicity in the union leader murders, denies knowing who planned the murders, and denies any knowledge of any agreements between Drummond and the AUC.<br>Doc. 355-1 at 91-92 |
| August 15, 2009<br>June 17, 2011 | Peinado twice testifies before the Colombian Fiscalia. He testifies that he has no personal knowledge regarding the union leader murders and that he did not join the AUC until 2002, well after the murders occurred. On June 17, 2011, Peinado testifies that Samario is lying. Peinado also admits that he was not physically present when the union leaders were killed, and he does not mention any involvement by Alfredo Araujo.<br>Doc. 355-1 at 88-89 |
| October 7, 2011 | Otero emails Lorraine Leete a draft declaration for Peinado. In interrogatory responses submitted in *Balcero*, Collingsworth identified Ivan Otero as Peinado's lawyer, and stated that "Peinado and his counsel, Ivan Otero, typed the first draft of his declaration in Spanish in approximately October 2011."<br>Doc. 69-29 at 14 |
| March 1, 2012 | Peinado signs a declaration against Drummond while in prison in Valledupar.<br>Doc. 69-36 at ¶ 3 |
| March 6, 2012 | Collingsworth emails Otero a copy of Peinado's signed declaration, stating "The 5,000 we are sending is for you to have cash on hand for whatever security or logistical problems occur of the sort we regularly have."<br>Ex. 89 (CS_TC039391) |

41

| Date(s) | Event |
|---|---|
| March 27, 2012 | Lorraine Leete drafts a memo to Collingsworth titled "Re: Updates/Pending Issues with Ivan."   Section II states "Potential New Witnesses. **Peinado: Ivan agrees that he is a very valuable witness and vulnerable to Drummond targeting. Any idea on when we will be able to secure security funding for him and Yuca?**"<br><br>Ex. 90 (CS_TC037622) (emphasis added) |
| June 6, 2012 | Leete forwards Collingsworth confirmation of a $2,700 wire to Otero for El Tigre and Samario, stating "I don't know how your meeting went yesterday and I hate to bring up more money issues, but I thought Ivan's monthly wire was increased by $2,200.  Below is the regular wire for $2700."<br><br>Ex. 91 (CS_TC050434) |
| June 10, 2012 | Otero emails Collingsworth stating that the "security" for those in Valledupar has not arrived.<br><br>Ex. 92 (CS_TC054641)<br><br>Yuca and Peinado are in Valledupar.<br><br>Doc. 69-36 (Peinado Decl.) ¶ 3; *Balcero* Doc. 407-49 (Yuca Decl.) ¶ 3 |
| June 15, 2012 | Lorraine Leete sends Collingsworth a memo regarding her "6/15/2012 Meeting with Ivan Notes." In that memo, Leete discusses payments to Colombian prison officials to block Yuca's transfer and states that Yuca will not testify against Drummond unless he gets paid:<br><br>    "P[einado] & Y[uca], Iv[an Otero] should have permission from prison by Monday or Tuesday, 6/18 or 6/19 to take depos, but Iv[an Otero] needs $2700 USD for logistics from INPEC and for keeping Yuca from being transferred.  **Y[uca] will not sign declaration until he gets security $$, which still hasn't arrived (the extra $2200 monthly)**."<br><br>Ex. 93 (CS_TC061317) (emphasis added). |
| June 18-19, 2012 | Collingsworth and Christian Levesque exchange text messages regarding "time sensitive" information from Otero.  **Levesque tells Collingsworth that it "involves payments, as I am sure you know."  Collingsworth responds "Well it is what it is."**  Levesque again tells Collingsworth that "Y[uca] has still not received the 2200 and will not sign without it."<br><br>Ex. 94 (June 18-19, 2012 Collingsworth Text Messages) (emphasis added) |
| June 19, 2012 | Collingsworth authorizes a "RUSH" wire to Ivan Otero for $2,200.<br><br>Ex. 95 (CS_TC037906) |

42

| Date(s) | Event |
|---|---|
| June 26, 2012 | Leete emails Collingsworth, stating that she would "follow up with Maggie [Crosby] to see that the logistical steps that are necessary in order for him [Yuca] to sign have been put in place. As of yesterday, Iv still had gotten nothing."<br><br>Ex. 96 (CS_TC045673) |
| June 27, 2012 | Yuca signs a declaration against Drummond while in prison in Valledupar.<br><br>*Balcero* Doc. 407-49 (Yuca Decl.) ¶ 3 |
| July 3, 2012 | Leete emails Collingsworth with subject "Pending $$ matters" stating "Hey Terry, there are pending wires for $2700 and $2200 that have not arrived." Collingsworth responds "I'll bring cash to get Ivan caught up"<br><br>Ex. 97 (CS_TC053123) |
| July 6, 2012 | Otero emails Collingsworth with subject "Commitments" stating "The security of the people of Valledupar did not arrive for the month of June or July," and that "These failures are causing discontent among those with whom commitments were made, creating discomfort and a bad environment that can hurt us."<br><br>Ex. 98 (CS_TC050524) |
| July 9, 2012 | Maggie Crosby forwards Lorraine Leete confirmation of a July 9, 2012 wire transfer from C&S to Ivan Otero in the amount of $4,900. In that chain, Crosby states "[h]ere is monthly wire for Ivan Otero:  $2,700 monthly wire $2,200 add'l request".<br><br>Doc. 422-10 |
| July 18, 2012 | Leete emails Collingsworth a translated message from Otero which states that **"[a]fter more than three months of making the agreement, it still hasn't been met.  I continue to believe in Terry's word, but now my friends don't believe me. ... JBM is thinking about what he is going to say.  ... What was promised to Charris also has not been met. ... We should understand what class of people we are dealing with, this noncompliance could bring serious problems for everyone."  Leete also tells Collingsworth that she will "follow up today with Ivan on what is missing for the Valledupar witnesses."**<br><br>Ex. 99 (CS_TC045728) (emphasis added)<br><br>Again, both Yuca and Peinado were in prison in Valledupar.<br><br>Doc. 69-36 (Peinado Decl.) ¶ 3; *Balcero* Doc. 407-49 (Yuca Decl.) ¶ 3 |

| Date(s) | Event |
|---|---|
| August 27, 2012 | Otero emails stating that "The security for the last two has not arrived yet. We are behind one month for them. I'd appreciate if we could solve this issue."<br><br>Ex. 100 (CS_TC050787) |
| September 12, 2012 | Otero emails Collingsworth stating "the situation becomes even more worrying. Today, September 12, has not reached the protection of T[igre] and S[amario]. More worrying is on what respect with the last two, are three months of delay. That leads me serious problems, which I request you to help me solve."<br><br>Ex. 101 (CS_TC045602) |
| September 17, 2012 | Collingsworth emails his team with subject "$$$" and states "I'm speaking with Drath tomorrow to once again try to get the money flowing on a timely and regular basis. If they don't pay Ivan pronto, I'll get my uncle [Albert van Bilderbeek] to help. I realize this is serious."<br><br>Ex. 102 (CS_TC039187)<br><br>Collingsworth forwards an email chain to Drath, the C&S CFO, stating that "we are 3 months late for Ivan and as I explained to you most of this is extremely sensitive security-based money." Below emails reflect that "I just got a call from Ivan, that the August wire for $2700 [El Tigre and Samario] did go through. Which means we are just missing the $2700 for September, plus the $2200 for July, August, and September."<br><br>Ex. 103 (CS_TC039188) |
| September 26, 2012 | Leete forwards Collingsworth a translation of an email from Otero which states "the non-compliance regarding the security for the witnesses has caused a lot of problems for me, to the point that these people think we have tricked them. In order to try to solve this inconvenience it is necessary that we pay what is owed. With the new ones we are behind three months, and with the old ones one. Next week it will be four months and two months, respectively. Lorraine told me that by next week it would be solved. We should make sure the four month and two month payments are made, and give them a satisfactory explanation." Collingsworth responds "OH JEEES," that he has been "yelling" at Richard Drath who "didn't seem to understand that these costs are not normal items and there will be serious consequences if we stop making the payments."<br><br>Ex. 12 (CS_TC053548) |
| September 28, 2012 | Maggie Crosby forwards Tellez and Leete a copy of a $4,400 wire to Ivan Otero from C&S stating "Here is confirmation of wire sent to Ivan."<br><br>Doc. 422-11 |

44

| Date(s) | Event |
|---|---|
| October 12, 2012 – December 2015 | Conrad & Scherer sends Ivan Otero wires in the amount of $4,900 on a monthly basis.  $2,700 is for El Tigre and Samario (the "old ones") and $2,200 is for Yuca and Peinado (the "new ones")<br><br>Ex. 104 (Redacted 1st United Bank Records) |
| October 21, 2012 | Tellez emails Collingsworth and others the declarations of Yuca, Peinado, Mecanico, and alias 57, stating "Attached are the decls for the **new guys** we didn't depose."<br><br>Ex. 105 (CS_TC166473) (emphasis added) |
| November 7-8, 2012 | Otero emails Leete inquiring about the $2,700 monthly security payments for the "old ones" [El Tigre and Samario] and the $2,200 monthly security payments for the "new ones" [Yuca and Peinado].<br><br>Leete emails Otero stating that they will pay $2,200 a month for the "new ones" and $2,700 a month for the "old ones, for a sum of $4,900 a month"<br><br>Ex. 106 (CS_TC050932) |

Notably, C&S lawyer Eric Hager testified under oath that he was unable to testify that Yuca and Peinado were not paid.  Ex. 107 (Hager Dep.) at 164:13-19.  Christian Levesque, who like Mr. Hager was counsel of record in *Balcero*, responded "I don't know" when asked if Yuca was paid, that she had no explanation for what the $2,200 monthly payments to Otero were for other than what was stated in Lorraine Leete's June 15, 2012 memo, and that she had no basis to dispute that Yuca was paid.  Ex. 7 (Levesque Dep.) at 188:22-24; 189:6-8; 192:10-18.  Richard Drath, C&S's Chief Financial Officer, also did not dispute that this $2,200 monthly payment went to Yuca and Peinado.  Ex. 108 (Drath Dep.) at 159:9-21 ("Q.  But again, this is talking about the $4,900 payment [to Ivan Otero] that precipitated this entire email, right?  A.  Right.  Q.  $2,700 of that was El Tigre and Samario, right?  A.  Yeah.  Q.  $2,200 of that when it increased, Yuca and Peinado, right?  . . . As the memo reflected.  A.  Right.").

### B.  Defendants offered contingency fees and cash in exchange for testimony.

The crime-fraud discovery has also revealed that the Defendants made other improper and

illegal inducements to witnesses that further belie Defendants' story about "security" payments.

For example, in October 2008, Collingsworth received texts from Susana Tellez stating: "Rebecca had the mtg w/ drummond guys, **the proposal for 10% and 15,000 upfront w/ signed DECL was accepted, howevr [sic] instead of one person there's 2 … now the question is how much we would pay for the second decl, pls advise how much we would negotiate financially, and it's understood no money [ ] will be passed until the decls are received**[.]" Ex. 109 (Oct. 23, 2008 Collingsworth text messages) (emphasis added). As contemporaneous documents reflect, Collingsworth and his team are referring to paying money and promising a contingency fee to El Tigre and Samario in exchange for their declarations. Ex. 87 (Dec. 12, 2008 email – CS_TC242653), Ex. 88 (Dec. 26, 2008 - Jan. 3, 2009 email chain – CS_TC049057), Ex. 110 (March 20, 2009 email – CS_TC049085), Ex. 111 (March 27, 2009 email – CS_TC049095). *See also* Ex. 108 (Drath Dep.) at 44:17-59:8 (C&S CFO Richard Drath's testimony regarding the $80,000 payment C&S sent to Ivan Otero after receiving El Tigre and Samario's declarations).

### C. Collingsworth communicated in code regarding witness payments many of which, to this day, have never been disclosed.

Emails produced by the Defendants which relate to their admitted payments to Jaime Blanco reflect that Collingsworth spoke in code about witness payments, referring to them as "books." Ex. 112 (CS_TC012850). Documents produced pursuant to the crime-fraud exception reflect that Collingsworth regularly spoke in code with Albert Van Bilderbeek about witness payments, using the term "books" as a code word for witness payments made in exchange for testimony. Some of those emails and text messages are summarized below:

- December 18, 2010 – Collingsworth emails Van Bilderbeek, telling him that he is going to "meet this guy Duarte" and that "[w]e have so many good things happening now. **I plan [t]o get to Colombia around January 8 and stay about 2 weeks to get all my forces going. I hope it is possible to get me 150k books by then so I will have the resources to move**. If not, let me know when the library will be open and I will adjust my plans."

46

Ex. 113 (CS_TC242655) (emphasis added).

- January 6, 2011 – Collingsworth emails Van Bilderbeek with attachments titled "Blanco.pdf" and "Gloria.pdf," which he says "are for two friends of Rafael's." Collingsworth tells Van Bilderbeek "**I have several new witnesses I need to interview**" and to "**[p]lease let me know when you have made the first transfer to me of 150 books and the pieces will fall into place.**" Ex. 114 (IRA-033482) (emphasis added). The next day, Van Bilderbeek tells Collingsworth that he will "forward the request for 150 books." Ex. 115 (IRA-033480).

- January 10, 2011 - Collingsworth emailed Van Bilderbeek stating "**Any word on the shipment of books? I'm finalizing my plans to take some reading materials to Bogota**. Cheers, Terry." Ex. 116 (IRA-033492) (emphasis added). Van Bilderbeek responds: "Tomorrow I am at the bookstore where you and I went and confirm the order." *Id*.

  o Several of Defendants' witnesses, including Jaime Blanco, was imprisoned in Bogota in 2011.

- January 13, 2011 – Collingsworth emails Van Bilderbeek saying "I'm waiting to get people moving until I have the funds. Any word from the library?" Van Bilderbeek responds "I met at the bookshop with our provider and the books are available for shipment on the 1st. The known courier will forward the books right away to you and you will have it within 24 hours." Ex. 117 (IRA-033494).

- January 19, 2011 - Collingsworth emails van Bilderbeek that he is going to Colombia "on Jan 26 and return Feb 3. **I will then return around Feb 15 to distribute some of the books I will be getting on Feb 1 and to begin taking depositions. We are really going to be rolling now and I will only be able to do this with a steady stream of books**. I know this will go smoothly, but I'm letting you know that we are going to be working full-time on Drummond. **The new discovery cutoff is one year from now, Feb 28, 2012 and we will need one year of hard work and books to get this to victory**." Ex. 118 (IRA-033487) (emphasis added).

- February 8, 2011 – Collingsworth emails Van Bilderbeek stating "**DID NOT RECEIVE BOOKS YET? My little house of cards is shaking!** Sorry to bug you but many people are bugging me and waiting to get resources to do their work." Ex. 119 (CS_TC037769) (emphasis added).

- May 8, 2012 – Collingsworth emails Van Bilderbeek asking "How we doing on the books" and stating "I return May 13 to our favorite country." Van Bilderbeek responds "I signed a contract for the books. I am just waiting receipt, so I can forward it to the same client." Collingsworth then asks "Any progress on larger books?" to which Van Bilderbeek responds "Yes – I am hoping to confirm this before your departure." Ex. 120 (IRA-033463).

- August 14, 2012 – Collingsworth emails Van Bilderbeek asking "any news on dates/books?" Ex. 121 (CS001085).

- August 27, 2012 – Collingsworth asks Van Bilderbeek "Timing of books this week?" Ex. 122 (CS001087).

- November 10, 2012 – Van Bilderbeek tells Collingsworth that "small books have been received by me and forwarded to James for further shipment to you and confirmed." Ex. 123 (IRA-033435).

- March 5, 2013 – Collingsworth emails Van Bilderbeek regarding Rafael Garcia.  Van Bilderbeek responds "I know what you did for him and **memory loss always seem to go hand in hand with books**."  Collingsworth responds "Things are going well here [in Colombia].  Meeting two new people in prison today.  **My guys are great, but need to keep them reading.  Can we expect more books of about the same size in the reasonably near future?**"  Ex. 124 (CS_TC228714) (emphasis added).

- July 26, 2013 – Collingsworth texts Van Bidlerbeek stating "Got home last night.  Have no books and emergency in Our third country.  If you don't clear to send 100 today please send 10 at least.  This is urgent."  Ex. 125 (Text ID # 4322).

  - On the same day, Collingsworth emails his team stating "we have to be very careful about not causing panic in Colombia, especially Ivan. … I want to get there soon and meet key people."  Ex. 126 (CS_TC166115).

- December 20, 2013 – Collingsworth tells Van Bilderbeek "it just arrived.  Thanks.  Now u can move from panic to hope that the large books work soon."  Ex. 125 (Text ID # 3300).

- January 9, 2014 – Collingsworth emails Van Bilderbeek with the subject "More bad news for Drummond in Colombia" and asking Van Bilderbeek to "please advise on where we are."  Van Bilderbeek responds that he will update Collingsworth "this weekend as I expect today or tomorrow information."  Collingsworth states "I really really hope that we are not going to keep chasing a moving date for another several months.  **I need to get to Colombia with books or we have wasted years of work**."  Ex. 127 (CS_TC124219) (emphasis added).

- January 25, 2014 – Collingsworth texts Van Bilderbeek stating "**Please advise on books.  Colombia is crumbling when we should be building**."  Ex. 125 (Text ID # 3194) (emphasis added).

- January 27, 2014 – Van Bilderbeek tells Collingsworth that "I was working yesterday for half of the day I had to attend to our books with James and Herman here in Amsterdam."

Ex. 128 (CS_TC189263).[24]

- February 26, 2014 – Collingsworth texts Van Bilderbeek "Serendipitous moment as **I can strike hard in Colombia soon if I get books**."  Ex. 125 (Text ID # 3078) (emphasis added).

- April 21, 2014 – Collingsworth tells Van Bilderbeek "In Alabama.  **Just won the DR motion for court to seize my computers etc. now just need books to make things happen**." Van Bilderbeek responds "**Very good!  Books will come this week**." Ex. 125 (Text IDs 2877 & 2878) (emphasis added).

- July 8-9, 2014 – Collingsworth asks Van Bilderbeek "How doing on books [to]day." Van Bilderbeek responds "Today!!! Should have release books and will forward.  Pls ck pax report.  Either leak on ur side or my (maybe paul?)" Ex. 125 (Text ID #2605)

- August 29, 2014 – Van Bilderbeek texts Collingsworth stating "50 books shipped.  Next week 50." Ex. 125 (Text ID # 2348).

- October 24, 2014 – Collingsworth texts Van Bilderbeek stating "we are in emergency mode here.  Please let me know when I can count on the promised books." Ex. 125 (Text ID # 2025).

- April 9, 2015 – Van Bilderbeek emails Collingsworth stating "Will stay on until tomorrow making sure books are shipped." Ex. 129 (CS_TC125155).

- June 1, 2015 – Collingsworth texts Van Bilderbeek saying "**I just took a big risk and sent my bank balance to the south.  Please please please arrange a glitch free delivery of books we discussed tomorrow**." Ex. 125 (Text ID #979) (emphasis added).

- August 14, 2015 – Collingsworth texts Van Bilderbeek telling him Drummond "gets to depose me on Monday.  Should be fun.  **Have lots of new potential going in that country.  Just need the books**." Ex. 125 (Text ID #384) (emphasis added).

- September 9, 2015 – Collingsworth emails Van Bilderbeek stating "I do not have the 10 books yet so I'm close to broke.  Really.  I've had to use what I had to keep a bare bones going in South America." Ex. 130 (CS_TC199457).

- September 14, 2015 – Collingsworth texts Van Bilderbeek and states they "**have a huge problem because 10 did not arrive … will need an infusion to get us through this week.  That's my reality until I receive books.  Col[ombia] will be won or lost in short time depending on resources**." Ex. 125 (Text ID #95) (emphasis added).

---

[24] "James" and "Herman" presumably refer to James Ellwood and Herman de Leeuw, who appear on the recently disclosed financing documents relating to the $1,500,000 loan Collingsworth received in September 2011.

**D. Defendants made payments to Colombian prison officials to secure access to witnesses and letters rogatory testimony.**

Other documents reflect that Defendants paid money to secure access to prisoners in Colombia. *See* Ex. 7 (Levesque Dep.) at 194:1-18 (discussing a memo regarding the need for $7,000 to "keep Charris from being transferred"); Ex. 131 (CS_TC052200) (Aug. 25, 2011 Collingsworth email stating Otero "said he can take care of Valledupar and Barranquilla but that the fees will likely be much higher than the 600,000 we paid last time we entered BQA prison"); Ex. 132 (CS_TC049888) (Sept. 6, 2011 Collingsworth email stating "As we are going into prisons for these crucial deps [of El Tigre, Samario, Duarte, and Charris], even with a written authorization, we are going to need lots of 'services charges' and probably some on the spot security. Please wire 5k to the International Rights Advocates that I can then withdraw in cash and bring for this purpose."); Ex. 133 (CS_TC048773) (Oct. 21, 2011 Collingsworth email stating "The 'latin holding company' is a safe payment mechanism. The process is guaranteed. First payment when we get letters [rogatory], second payment when depositions are done. We have top access now. You don't know much about how Colombia works, but this a huge breakthrough for us. We don't have any admissible evidence. I was told the facts by the people who are now going to QUIETLY help us."). When discussing Defendants' discovery responses in *Balcero* that called for disclosure of payments to Colombian prison officials, Collingsworth told Christian Levesque that he "DID provide some cash to guards at Valledupar through IO. MUST we disclose this? I think so unless we can also raise a self-incrimination objection, which would be odd and troubling." Ex. 134 (CS_TC044003). Of course, Defendants didn't disclose those payments either.

## VI.    THE LOSS OF MR. COLLINGSWORTH'S EMAILS CAUSES DRUMMOND IRREPARABLE HARM.

As Drummond explained in its prior motion for spoliation sanctions, it is undisputed that vast swaths of Collingsworth's emails are missing during critical time periods in this case.  Doc. 287 (Drummond's Motion for Spoliation Sanctions; Doc. 352 (Drummond's Reply).  Drummond is contemporaneously refiling its motion for spoliation sanctions pursuant to this Court's order. Doc. 383 (Sept. 21, 2015 Text Order).

The crime-fraud discovery has proven false Defendants' story that they affirmatively disclosed that Collingsworth's emails were missing as soon as they became aware of that fact. Defendants knew that a substantial amount of Collingsworth's emails were missing long before they disclosed that fact to Drummond and the Court.  *See* page 38 *supra*.  Despite that knowledge, Defendants falsely represented that they had fully searched Collingsworth's emails and made a plenary production, which further supports sanctions.  Doc. 417 (Crime-Fraud Op.) at 38 ("If Defendants performed a cursory search for documents in August 2013, they would have noticed that emails prior to March 2013 were missing. With the looming evidence of a crime or fraud, an explanation about what search for documents occurred is relevant to the question of whether evidence was being secreted about payments to witnesses. This, in turn, bears directly on the fraud on the court question.").

The crime-fraud discovery also further confirmed that Collingsworth's emails are critical and unique sources of evidence.  The importance of Collingsworth's missing emails—and the prejudice to Drummond—is amplified by Defendants' litigation strategy and collective amnesia of critical events.  Again, Collingsworth and C&S have consistently claimed not to have any memory of critical events, rendering documents the only source of evidence available to Drummond.  The loss of Collingsworth's emails is therefore highly prejudicial to Drummond,

51

which further supports the sanction of default judgment. *Estate of Hill by and through Grube v. NaphCare, Inc.*, 2022 WL 1464830, at *14-15 (E.D. Wash. May 9, 2022) (entering default judgment against defendants who spoliated a video and holding that "[w]ithout the direct visual evidence of the checks that the spoliated video would have provided, Plaintiffs have only the medical watch log and testimony of the corrections officers, most of whom have little to no memory of the incident.")

## LEGAL AUTHORITY

"[W]hen a party lies to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process, it can fairly be said that he has forfeited his right to have his claim decided on the merits. This is the essence of a fraud upon the court." *McMunn v. Mem'l Sloan-Kettering Cancer Ctr.*, 191 F. Supp. 2d 440, 445 (S.D.N.Y. 2002); *see also Littler v. Martinez*, 2020 WL 42776, at *23 (S.D. Ind. Jan. 3, 2020) (default judgment was the only appropriate sanction because a "party who lies in their declaration or during their deposition and then lies under oath during a hearing about his misconduct does not deserve another opportunity to commit perjury.").

> Litigants should not be permitted to cheat. **"*Our legal system is dependent on the willingness of the litigants to allow an honest and true airing of the real facts.*"** [Collingsworth] seriously violated the "rules of the game", and he can't be permitted to say "oops, you've caught me", and thereafter be allowed to continue to play the game . . . .

*Dotson v. Bravo*, 202 F.R.D. 559, 573 (N.D. Ill. 2001), *aff'd*, 321 F.3d 663 (7th Cir. 2003).

## I. SANCTIONS ARE WARRANTED UNDER RULE 37.

"If this case is not a paradigm of the abuse that sanctions under Rule 37 are to correct, we would have great difficulty hypothesizing one that is." *Carlucci v. Piper Aircraft Corp., Inc.*, 775 F.2d 1440, 1449 (11th Cir. 1985). "Rule 37 sanctions are intended to prevent unfair prejudice to

52

the litigants and insure the integrity of the discovery process." *Gratton v. Great Amer. Comm.*, 178 F.3d 1373, 1375 (11th Cir. 1999). Importantly, "Rule 37 sanctions were designed not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." *Carlucci,* 775 F.2d at 1447 (quotations omitted).

This Court has broad authority under Rule 37 to control discovery. *Cox v. American Cast Iron Pipe Co.,* 784 F.2d 1546 (11th Cir.), *cert. denied*, 479 U.S. 883, 107 S. Ct. 274, 93 L.Ed.2d 250 (1986). A default judgment sanction under Rule 37 "requires a finding of willfulness or bad faith" and is appropriate where lesser sanctions will not suffice. *Diamond Trust u/a/d 10/28/2005 v. Diamond*, 2022 WL 4493035, at *3-4 (11th Cir. Sept. 28, 2022) (affirming default judgment sanction for a defendant's "repeated misrepresentations" and "clear pattern of repeated, willful disobedience of Court orders") (citing *Malautea v. Suzuki Motor Co., Ltd.*, 987 F.2d 1536, 1542 (11th Cir. 1993)).

Drummond adopts and reiterates its prior briefing which demonstrates how the Defendants willfully disregarded this Court's discovery orders. *See* Doc. 180 (Drummond's Renewed Motion for Sanctions) § I. Drummond spent enormous amounts of time and resources pursuing discovery of Defendants' witness payments. This Court has also been forced to devote a huge amount of its resources to complex discovery disputes in this case. Defendants, meanwhile, have done everything within their power for the last decade to obstruct and delay. Moreover, much of the Defendants' misconduct postdates this Court's October 15, 2013 Order, which clearly states that the fact of witness payments must be disclosed and is not subject to work-product objections. As explained above, the discovery Drummond received pursuant to the crime-fraud exception leaves no doubt that Defendants' disregard of this Court's order was willful and in bad faith.

53

While improperly withholding discoverable documents warrants Rule 37 default judgment sanctions, *Malautea*, 987 F.2d at 1539 (upholding a default judgment sanction after "the defendants stubbornly withheld discoverable information by improperly objecting to interrogatories and by providing only partial responses to the interrogatories they answered"), Defendants' conduct here went well beyond that.  Defendants have "not only intentionally withheld documents that [they] knew existed, but [they] also knowingly made blatant misrepresentations to the district court about the existence of those documents." *Chilcutt v. U.S.*, 4 F.3d 1313, 1322-1323 (5th Cir. 1993) (affirming the district court's sanction of deeming "the liability facts of the plaintiff's case established").  Indeed, Defendants made knowingly false representations to Drummond and this Court in discovery responses, sworn declarations, depositions, court filings, and in open court *for years*.  *See* Doc. 417 *generally*; *see also Fair Housing of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002) (upholding a default judgment sanction where "Combs not only failed to produce the documents as ordered, but also misrepresented to both counsel and to the district court that the documents did not exist").  When this Court gave Defendants a chance to explain those misrepresentations at the September 2015 hearing, Defendants lied again, offering excuses that were themselves lies.  *See Malautea*, 987 F.2d at 1542-44 (default judgment sanction pursuant to Rule 37 was "richly deserved" where the defendant violated the district court's discovery orders and "engaged in an unrelenting campaign to obfuscate the truth")[25]; *Jackson v. Murphy*, 468 F. App'x 616, 620 (7th Cir. 2012) (affirming

---

[25] In *Malateau*, the Eleventh Circuit found that "the prime example of the defendants' resistance to discovery was their deliberate cover up of damaging evidence regarding General Motors' refusal to market the Samurai in the United States."  987 F.2d at 1540.  Like Drummond in this case, the *Malateau* plaintiff ultimately discovered the evidence, but only after repeated misrepresentations by the defendants.  *Id.* at 1541.  The court noted that the defendants' responses to discovery requests seeking this information were "if not completely false, at least misleading," and that the defendant "deliberately withheld this information from the plaintiff."  *Id.*

54

dismissal sanction where plaintiff "both perjured himself and forged a document critical to the prosecution of his case," and "his fraud was uncovered only after a costly and contested hearing").

Worse still, Defendants deliberately altered documents that *were* produced to conceal their witness payments, and they pulled documents off privilege logs to prevent Drummond—and this Court—from even knowing that they existed. "'When a party fabricates a document or provides false evidence relating to a key issue in a case, courts have made clear that the appropriate sanction is the ultimate sanction of dismissal.'" *Roche Diagnostics Corp. v. Priority Healthcare Corp.*, 2:18-cv-01479-KOB, 2020 WL 2308319 at *9 (N.D. Ala. May 8, 2020) (quoting *Access Innovators, LLC v. Usha Martin, LLC*, No. 1:09-cv-2893, 2010 WL 11508119, at *3 (N.D. Ga. Apr. 28, 2010)). *See also Franklin Livestock, Inc. v. Boehringer Ingelheim Vetmedica, Inc.*, 251 F. Supp. 3d 962, 970 (E.D.N.C. 2017) *aff'd*, 721 F. App'x 263, 263 (4th Cir. 2018) (entering default judgment even after a defendant, on its own, admitted that it had doctored evidence and subsequently produced the authentic evidence).

Drummond's research is yet to uncover any case with facts as egregious as those presented here, and federal district courts have readily entered default judgments against litigants for far less serious misconduct. For example, in *Freeman v. Giuliani*, the district court entered a default judgment against Rudy Giuliani after it found that he "failed to preserve potentially relevant ESI [and] compounded that failure by failing to produce any meaningful discovery." 2023 WL 5600316, at *20 (D.D.C. Aug. 30, 2023). The court explained that a default judgment sanction is justified where "the errant party's behavior has severely hampered the other party's ability to present his case," where the offending party "has put 'an intolerable burden on a district court by requiring the court to modify its own docket and operations in order to accommodate the delay'" or where there is a "need 'to sanction conduct that is disrespectful to the court and to deter similar

misconduct in the future.'"  *Id*. (quoting *Webb v. District of Columbia*, 1476 F.3d 964, 971 (D.C. Cir. 1998)).  All those justifications exist in this case (in spades), and the underlying facts are far more egregious than those considered by the *Giuliani* court.

## II.     SANCTIONS ARE WARRANTED UNDER RULE 26(G).

Sanctions, including payment of Drummond's attorneys and fees and costs and the Special Master's fees, are also appropriate under Rule 26(g), which provides that a court "shall impose" sanctions against the party who violates this rule "which may include an order to pay the reasonable expenses incurred because of the violation, including a reasonable attorney's fee."  *See Malautea*, 987 F.3d at 1545 (holding that "Rule 26(g) required the judge to sanction the defendants" who signed vexatious discovery responses and objections and affirming a sanction of costs and attorneys' fees against defendants).  Rule 26(g) was "designed to curb discovery abuse by explicitly encouraging the imposition of sanctions."  Fed. R. Civ. P. 26(b) advisory committee's note (1983 amendment).  As set forth above, the evidence clearly shows that Collingsworth and C&S—both as counsel of record in *Balcero* and as parties in this case—signed discovery responses that were knowingly false and designed to hide the truth about their witness payments.  Under the plain language of Rule 26(g), sanctions "must" be imposed for this misconduct.

## III.     SANCTIONS ARE WARRANTED UNDER THE COURT'S INHERENT POWER.

"While Rule 37 governs sanctions for discovery-related misconduct only, a court may exercise its inherent sanctioning power to punish all types of contumacious conduct."  *Hornady v. Outokumpu Stainless USA*, 572 F. Supp. 3d 1162, 1185 (S.D. Ala. 2021).  Thus, "the inherent power of a court [to sanction] can be invoked even if procedural rules exist which sanction the same conduct."  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 49 (1991). "[N]either is a federal court forbidden to sanction bad-faith conduct by means of the inherent power simply because that

conduct could also be sanctioned under the statute or the Rules." *Id.* at 50.

A court's inherent power is appropriately exercised where a "'fraud has been practiced upon it, or that the very temple of justice has been defiled,'" or "when a party 'shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order.'" *Id.* at 46 (citations omitted). "The Court's inherent power to sanction is 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Hornady*, 572 F. Supp. 3d at 1185 (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630-31 (1962)).

The "key to unlocking the court's inherent power" is bad faith. *Byrne v. Nezhat*, 261 F.3d 1075, 1123 (11th Cir. 2001), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 128 S. Ct. 2131 (2008). "The inherent-powers standard is a subjective bad faith standard." *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017). "However, absent direct evidence of subjective bad faith, this standard can also be met if an attorney's conduct is 'tantamount to bad faith,' meaning the 'attorney's conduct is so egregious that it could only be committed in bad faith.'" *Trump v. Clinton*, No. 22-14102-CV, 2023 WL 333699, at *3 (S.D. Fla. Jan. 19, 2023) (quoting *Purchasing Power, LLC*, 851 F.3d at 1224-25)).

"Two common fact patterns reappear in cases involving findings of bad faith: willful misconduct that corrupts the adversary process or repeated failures to obey the court's discovery orders." *Githieya*, 608 F. Supp. 3d at 1297. "A district court may impose case-ending sanctions for litigation misconduct under its inherent power." *Hornady*, 572 F. Supp. 3d at 1185. "This power is appropriately used to sanction '[a]cts which degrade the judicial system, including . . . lying to the Court.'" *In re $39,422 in U.S. Currency*, 574 F. Supp. 3d 1117, 1119 (M.D. Fla. 2021) (quoting

57

*Chambers*, 501 U.S. at 41).[26]

"Any attempt to conceal or misrepresent the truth—such as perjury or the destruction or manipulation of evidence—'emasculate[s] the court's ability to ascertain the truth [and] necessarily strikes at the very foundations of the adversary system and the judicial process.'" *Roche*, 2020 WL 2308319 at *9 (quoting *In re Sealed Case*, 754 F.2d 395, 401 (D.C. Cir. 1985)). "'When a party fabricates a document or provides false evidence relating to a key issue in a case, courts have made clear that the appropriate sanction is the ultimate sanction of dismissal.'" *Id.* at *10 (quoting *Access Innovators*, 2010 WL 11508119, at *3). "[N]ot every lawyer who lies to a court will be caught, so when such deliberate and advantage-seeking untruthful conduct is uncovered, the penalty must be severe enough to act as a deterrent" and "such an affront to this Court, to the other parties, and to judicial integrity can only be answered with dismissal." *Tesco Corp. v. Weatherford Int'l, Inc.*, No. CIV.A. H-08-2531, 2014 WL 4244215, at *7 (S.D. Tex. Aug. 25, 2014). "When considering sanctions, a district court may consider all the circumstances surrounding the alleged violations, including a party's misconduct in related cases." *Qantum Commc'ns Corp. v. Star Broad., Inc.*, 473 F. Supp. 2d 1249, 1274–75 (S.D. Fla. 2007).

As the above authority demonstrates, sanctions are also appropriate in this case under this Court's inherent power. Defendants willfully refused to comply with Court orders to produce witness payment information, and they repeatedly lied in sworn interrogatory responses, depositions, and in open Court. They altered documents to hide witness payment information, and

---

[26] *See also Zocaras v. Castro*, 465 F.3d 479, 492 (11th Cir. 2006) (affirming the dismissal of an action as a sanction pursuant to the court's inherent power and explaining that the party's misrepresentations "raise concerns about the integrity and credibility of the civil justice system that transcend the interests of the parties that appear before this Court, and because this willful and deliberate behavior is without justification and in flagrant contempt of the judicial process, this Court must impose the harsh penalty of dismissal"); *Martin v. Automobili Lamborghini Exclusive, Inc.*, 307 F.3d 1332, 1335-36 (11th Cir. 2002) (affirming dismissal of an action and the award of a defendants' costs and attorneys' fees as sanctions pursuant to the district court's inherent power where the plaintiff misled the court and "engage[ed] in extensive discovery abuse to obstruct revelation of known falsities in the complaint").

they pulled documents off privilege logs. After evidence of those payments came to light, Defendants presented knowingly false testimony and arguments to this Court in an attempt to excuse their misconduct and avoid application of the crime-fraud exception.

In light of Defendants' egregious misconduct, and the fact that they have been given numerous chances (and ample time) to be forthcoming, Drummond respectfully submits that a default judgment is the only appropriate outcome, as history proves any lesser sanction will not have any effect on the Defendants. *Adolph Coors Co. v. Movement Against Racism & the Klan*, 777 F.2d 1538, 1543 (11th Cir. 1985) (upholding sanction of a default judgment, citing defendant's "bad faith noncompliance and no reasonable expectation that lesser sanctions under Rule 37 would have had the necessary effect."). Furthermore, any lesser sanction will not sufficiently deter others from making a mockery of the judicial process as Defendants have done here. *See Zocaras*, 465 F.3d at 484 (the harshest of sanctions are warranted where the grounds are "conduct that 'so violates the judicial process that imposition of a harsh penalty is appropriate not only to reprimand the offender, but also to deter future parties from trampling upon the integrity of the court'"); *Videojet Sys. Int'l, Inc. v. Eagle Inks, Inc.*, 251 F.3d 170 (Fed. Cir. 2000) (upholding default judgment as sanction for discovery misconduct, finding the "integrity of the judicial process is as important to the public interest" as allowing defendants to present allegedly meritorious defenses).

## IV.   DEFENDANTS SHOULD BE HELD IN CONTEMPT.

In addition to being sanctionable, Defendants' knowingly false statements in response to direct questions by this Court are contempt of court. *See* 18 U.S.C. § 401(1) ("[a] court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as . . . [m]isbehavior of any person in its presence or so near thereto as to obstruct the administration of justice"); *In re Terry*, 128 U.S. 289, 303 (1888) (recognizing

the historical and inherent authority of courts to punish for contempt which is "essential to the preservation of order in judicial proceedings," the enforcement of orders, "and consequently to the due administration of justice"). It is well settled that "[m]aking false statements to a court constitutes 'misbehavior' that is punishable as contempt, so long as the other elements of the contempt statute are satisfied." *In re Grand Jury Proceedings*, 117 F. Supp. 2d 6, 27-28 (D.D.C. 2000).

Defendants were ordered by this Court in October 2013 to disclose witness payments without regard to work product objections. Rather than comply with that order, they fraudulently concealed their witness payments. They submitted multiple fraudulent privilege logs to the Court concealing the existence of documents which would have proven the truth. When this Court directly asked which witnesses in *Balcero* had been paid, Defendants' response was knowingly and unequivocally false. And when this Court gave Defendants another chance to explain themselves at the crime-fraud hearing, Defendants lied again regarding their reasons for lying in the first place. A contempt finding is also necessary to preserve the integrity of the judicial process.

## CONCLUSION

Drummond requests that this Court hold Defendants in contempt of court and sanction the Defendants for their egregious behavior by entering a default judgment against them on the issue of liability, allowing Drummond a trial by jury on the issue of damages. Drummond further requests that it be awarded all of its costs and attorneys' fees incurred in this case (or, at the very least, those incurred after entry of this Court's October 15, 2013 Order), along with such other relief the Court deems appropriate.

Respectfully submitted,

/s/ H. Thomas Wells, III
William Anthony Davis, III (ASB-5657-D65W)
H. Thomas Wells, III (ASB-4318-H62W)
Benjamin T. Presley (ASB-0136-I71P)
STARNES DAVIS FLORIE LLP
100 Brookwood Place, 7th Floor
Birmingham, AL 35209
(205) 868-6000
fax: (205) 868-6099

/s/ Sara E. Kropf
Sara E. Kropf
Kropf Moseley PLLC
1100 H. Street NW, Suite 1220
Washington, DC 20005
(202) 627-6900

*Attorneys for Drummond Company, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on **February 15, 2024**, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ H. Thomas Wells, III
H. Thomas Wells, III (ASB-4318-H62W)

61