FILED

2024 Feb-15  PM 01:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 2

FILED
2015 Aug-31  AM 11:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

DRUMMOND COMPANY, INC.,     )
                             )
       Plaintiff ,         )
                             )
vs.                          )
                             )     Case No. 2:11-cv-3695-RDP
TERRENCE P. COLLINGSWORTH,   )
individually and as agent of Conrad & Scherer,  )
LLP; and CONRAD & SCHERER, LLP,  )
                             )
       Defendants .      )

**DRUMMOND COMPANY INC.'S REPLY
IN SUPPORT OF ITS MOTION FOR SPOLIATION SANCTIONS**

William Anthony Davis, III (ASB-5657-D65W)
H. Thomas Wells, III (ASB-4318-H62W)
Benjamin T. Presley (ASB-0136-I71P)
STARNES DAVIS FLORIE LLP
P.O. Box 59812
Birmingham, AL  35259
(205) 868-6000
fax: (205) 868-6099

Sara E. Kropf
LAW OFFICE OF SARA KROPF PLLC
1001 G St. NW, Suite 800
Washington, DC 20001
(202) 627-6900

*Attorneys for Drummond Company, Inc.*

{B2039481}

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION ............................................................................................................ 1

EVIDENCE ..................................................................................................................... 1

    I. THERE IS SUBSTANTIAL EVIDENCE OF INTENTIONAL SPOLIATION BY DEFENDANTS ......... 1

        A.    The Email Gaps Are Not "Small" and the Number of Missing Emails Cannot Be Determined Because of Spoliation ............................................... 5

        B.    Defendants Cannot Sidestep Responsibility for Their Spoliation of Evidence .................................................................................................. 7

              1.    Mr. Williams' Conclusion that CTSS Made an Auto-Archiving Error Is Contradicted by the Evidence ............................................. 7

              2.    Defendants Knew Mr. Collingsworth's Emails Were Not Being Stored On The Server .................................................................... 8

        C.    The Missing Devices Matter ...................................................................... 10

        D.    Defendants' Document Preservation System Was Inadequate ................. 11

Legal Argument ............................................................................................................. 12

    I. DEFENDANTS WILLFULLY VIOLATED THE DUTY TO PRESERVE EVIDENCE .................... 12

    II. THERE IS SUBSTANTIAL EVIDENCE OF BAD FAITH ..................................................... 14

    III. THERE IS SUFFICIENT EVIDENCE OF PREJUDICE TO WARRANT A DEFAULT SANCTION ..................................................................................................... 17

    IV. FORENSIC EXAMINATION ....................................................................................... 20

CONCLUSION ................................................................................................................ 20

CERTIFICATE OF SERVICE ............................................................................................. 21

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*Bank of Mongolia v. M&P Financial Services, Inc.*,
    258 F.R.D. 514 (S.D. Fla. 2009) ......................................................................20

*Britton v. Wal-Mart Stores East L.P.*,
    No. 4:11-cv-32, 2011 WL 3236189 (N.D. Fla. June 8, 2011) ..........................14

*Brown v. Chertoff*,
    563 F. Supp. 2d 1372 (S.D. Ga. 2008) ............................................................17

*Eli Lilly & Co. v. Air Exp. Intern., USA, Inc.*,
    615 F.3d 1305 (11th Cir. 2010) .......................................................................18

*Evans v. Mobile County Health Dept.*,
    No. CA 10-0600-WS-C, 2012 WL 206141 (S.D. Ala. Jan. 24, 2012) .......15, 16

*Flury v. Daimler-Chrysler Corp.*,
    427 F.3d 939 (11th Cir. 2005) ............................................................16, 19, 20

*Global NAPs, Inc. v. Verizon New England Inc.*,
    603 F.3d 71 (1st Cir. 2010) ..............................................................................17

*Graff v. Baja Marine Corp.*,
    310 F. App'x 298 (11th Cir. 2009) ...................................................................19

*Managed Care Solutions, Inc. v. Essent Healthcare, Inc.*,
    736 F. Supp. 2d 1317 (S.D. Fla. 2010) ...........................................................12

*Merrell v. Joe Bullard Oldsmobile, Inc.*,
    529 So. 2d 943 (Ala. 1988) ..............................................................................10

*Orbit One Commc'ns, Inc. v. Numerex Corp.*,
    271 F.R.D. 429 (S.D.N.Y. 2010) ....................................................................13

*Pinkney v. Winn-Dixie Stores, Inc.*,
    No. CV214-075, 2015 WL 858093 (S.D. Ga. Feb. 27, 2015) ........................17

*Point Blank Solutions, Inc. v. Toyobo Am., Inc.*,
    No. 09-61166-CIV, 2011 WL 1456029 (S.D. Fla. Apr. 5, 2011).................13, 14

*S. New England Tel. Co. v. Global NAPs Inc.*,
    624 F.3d 123 (2d Cir. 2010).............................................................................19

*Selectica, Inc. v. Novatus, Inc.*,
    No. 6:13-CV-1708-ORL-40, 2015 WL 1125051 (M.D. Fla. Mar. 12, 2015)...................13

*Swofford v. Eslinger*,
    671 F. Supp. 2d 1274 (M.D. Fla. 2009) ...........................................................................15

*Victor Stanley, Inc. v. Creative Pipe, Inc.*,
    269 F.R.D. 497 (D. Md. 2010)...........................................................................12, 13, 17

Large portions of Mr. Collingsworth's emails are gone, as well as several of his computers. Defendants waited nearly three years after being sued to issue any litigation hold or preserve emails or documents in any form. Perhaps most damning, eight months *after* the Court issued its preservation orders, an external hard drive that likely contained thousands of Mr. Collingsworth's most "sensitive" emails disappeared after being plugged into Mr. Collingsworth's work computer, and someone deleted email files from his computer.

Defendants' response is to claim that a third-party is incompetent. That excuse is contrary to the objective evidence. It also ignores the inescapable fact that everyone has to trust that Mr. Collingsworth is telling the truth about his MacBook and external hard drive in order for Defendants' story to add up. Even Defendants' own expert admits that in formulating his theories about the loss of this evidence, he "relied on Mr. Collingsworth to tell [him] the truth." Doc. 283-10 (Williams Dep.) at 158:10-12. Simply put, what Mr. Collingsworth has to say about how his emails went missing is neither forensic evidence nor credible.[1]

History proves that Defendants will lie, and lie, and lie again until they are confronted with a document. In light of Defendants' proven history of misrepresenting the facts, Drummond cannot fairly be expected to litigate this case without this critical evidence. Defendants' intentional spoliation of critical evidence, coupled with their complete failure to timely preserve evidence, warrants the sanction of default.

## EVIDENCE

### I. THERE IS SUBSTANTIAL EVIDENCE OF INTENTIONAL SPOLIATION BY DEFENDANTS

Defendants' forensic computer expert, Dennis Williams, offers the conclusion that "there is no indication that emails or computers were intentionally disposed of or deleted to destroy

---

[1] Defendants have already admitted the Mr. Collingsworth has no credibility. Doc. 187 at 20 (misrepresentations regarding witness payments have "clearly hurt Mr. Collingsworth's credibility before the Court").

evidence." Doc. 283-14 at ¶ 21. This conclusion cannot be squared with the record.

*First*, there is overwhelming evidence that Defendants have selectively deleted and destroyed critical emails during the pendency of this litigation. For example, one of the most critical documents produced by the Defendants in this entire case is an email chain from July 2012 which evidences a $35,000 payment to Jaime Blanco. *See* Doc. 174-20 at 2827-2828. One of the unredacted emails in that chain is a July 19, 2012 email sent at 11:59:54 a.m. EST from Albert van Bilderbeek to Terry Collingsworth's Gmail account (terrypc56@gmail.com) providing confirmation of that payment. On August 14, 2015, three days before Mr. Collingsworth's first deposition on the sanctions issues, Drummond requested that the native copy of this email be produced. Ex. 1. Defendants did not respond.

Two days ago, Conrad & Scherer's IT Director testified that, as part of his work with Mr. Williams, he exported all of Mr. Collingsworth's emails in his Gmail account to PST files, that those emails are saved on the system at Conrad & Scherer's Ft. Lauderdale office, and that he could locate this email in "[a]n hour, at the most." Ex. 2 (Rodriguez Dep.) at 147:3-4. Drummond again requested on the record a native file copy of this email. *Id.* at 158:13-160:8, Defendants then took a 40 minute recess from the deposition to search for the email. When the parties reconvened, Defendants agreed to get Drummond an answer but represented that "[w]e have work that we, as the attorney team, need to do in response to this request and we need to be -- need time to get back with you about it." *Id.* at 159:17-20. This morning, Defendants finally admitted that the email cannot be found in "Mr. Collingsworth's gmail account or the PST files collected from that account." Ex. 3.

***Defendants' admission that this email no longer exists in Mr. Collingsworth's Gmail mailbox is unequivocal proof that Mr. Collingsworth deliberately and selectively deleted***

***emails during this litigation***.[2]  This conclusion is reinforced by the fact that Defendants *did* (1) produce other communications with Mr. van Bilderbeek from Mr. Collingsworth's Gmail account from the same time period, *see, e.g.,* Ex. 4 (Aug. 5, 2012 email) (CS 1083), and (2) log other contemporaneous emails from Mr. Collingsworth's Gmail account that are contemporaneous with this email.  *See* Ex. 5 (Defs' Jan. 9, 2015 Priv. Log Excerpts) at Entry Nos. 5438 (Aug. 2, 2012 email); at 5434 (July 18, 2012 email); at 5433 (July 13, 2012 email). There is no logical explanation for the disappearance of this email, which reflects a $35,000 payment to Mr. Collingsworth's "breakthrough witness" in *Balcero*, other than intentional spoliation of evidence.  Indeed, Defendants' own expert admitted as much:  "Generally, when someone is intentionally deleting material, they typically select individual messages to delete." Ex. 6 (Mar. 12, 2015 Williams Report) at ¶ 30.

Drummond and this Court will never know with certainty what other emails Mr. Collingsworth selectively deleted.  One example could be an email between Collingsworth and van Bilderbeek wherein Mr. Collingsworth states that Blanco has no knowledge of Drummond collaborating with the AUC, but that he will testify that he does if van Bilderbeek will pay him $100,000.  Mr. Collingsworth had every incentive and opportunity to destroy emails such as this, and there is clear evidence that strongly suggests he did.  Drummond cannot fathom a more prejudicial loss of evidence.

*Second*, Mr. Williams admits that there were "some emails in a deleted folder on a hard drive connected to a server in the Conrad & Scherer DC Office."  Doc. 283-14 (Williams April Dec.) at ¶ 18.  He apparently did not conduct any forensic analysis of these files.  Drummond's forensic computer expert, Spencer Lynch, explains that "the identification of a deleted folder on

---

[2] The only reason this email exists anywhere is because it was later forwarded to another member of his litigation team, Christian Levesque.  *See* Ex. 5 (Defs' Jan. 9, 2015 Privilege Log Excerpt) at Entry No. 5436.

a server should, in and of itself, give cause for further analysis given that the question of purposeful user deletion is a key substantive issue in this matter." Ex. 7 (Lynch Dec.) at ¶ 26. A folder containing a user's email will generally not be deleted without "some action by a user." *Id.*

*Third*, Mr. Williams discovered several email folders on Mr. Collingsworth's computer that had been intentionally deleted, yet he downplays and essentially ignores this fact in his report. Mr. Lynch explains that Mr. Williams sent an email stating that he had "highlighted four possible files" on Mr. Collingsworth's computer and stated that "they have recent activity in 12/2014 which is not good." Ex. 8 (CS_TC 009737). Two of those files "are PST files that were contained in the Recycle Bin." Lynch Dec. at ¶ 21. (PST files are email storage files containing multiple emails). "[F]iles in the Recycle Bin are there as the result of a specific user action to delete files." *Id.* Mr. Lynch opines that this evidence "suggests that there was in fact an intentional deletion of some amount of email in or around December 2014 on one of the Collingsworth computers." *Id.* ¶ 24.

*Fourth*, it is undisputed that Mr. Collingsworth deliberately disposed of his MacBook after this lawsuit was filed. The evidence described below, *infra* § I-B-2, shows that he did so knowing that his MacBook contained the only complete copy of his email and that the email file on the MacBook would not be transferred to his replacement computer. Moreover, Collingsworth's story is simply not credible. He claims he gave it to his niece in Brazil, where it was subsequently stolen. Virtually every firm procedure regarding retaining and disposing of computers was violated in the process. Despite the fact that Defendants have a policy of removing the hard drives from its attorneys' old computers and preserving them, Conrad & Scherer failed to follow this protocol. Ex. 2 (Rodriguez Dep.) at 27:4-17 ("we pull the old hard drive, we connect it into the new computer and copy the data from the old hard drive to the new

computer, then we preserve the hard drive."). Moreover, Mr. Collingsworth did not tell anyone at Conrad & Scherer his story about his MacBook being stolen until its loss was being investigated by Defendants' computer expert. *Id.* at 131:5-10 ("Q. The first time you heard this story about the computer being stolen in Brazil was when the Dennis Williams work was being done, is that right? . . . THE WITNESS: Yes."). Indeed, there is not a shred of objective evidence that this MacBook was ever stolen: no police report, no insurance claim, not even an email discussing the theft.

*Fifth*, the circumstances surrounding the "missing" external hard drive are so suspicious as to be evidence of intentional spoliation. This hard drive, which likely contained some portion of Mr. Collingsworth's emails, disappeared sometime after February 25, 2015, Ex. 7 (Lynch Dec.) ¶ 56, nearly a year after this Court expressly ordered Defendants to preserve all hard drives and other data. Doc. 119. In fact, it disappeared just five days before Defendants retained their computer forensic expert. Defendants have not even tried to explain its sudden disappearance, instead relying on their expert's "surmise" that it was lost during an office move.

*Sixth*, Defendants have admitted that an Acer computer used by Mr. Collingsworth was reformatted within the last year, which is an affirmative act that resulted in the complete destruction of all electronic data, including emails, on that computer. Ex. 7 (Lynch Decl.) ¶¶ 71-73. Mr. Collingsworth utilized this computer prior to his MacBook, and Conrad & Scherer could offer no explanation of who wiped this computer, or why. Ex. 2 (Rodriguez Dep.) at 157:25-158:12.

### A. The Email Gaps Are Not "Small" and the Number of Missing Emails Cannot Be Determined Because of Spoliation

Defendants spent considerable effort trying to convince the Court that the gaps are "very small" (Opp. at 1), a "very small subset of Mr. Collingsworth's email" (*id.* at 3), "very limited"

(*id.*), "small and random" (*id.* at 4) and "*de minimis*" (*id.* at 5). In his most recent declaration, Mr. Williams claims that he has slightly narrowed the gaps in missing email. Doc. 293-1 (Williams August Dec.) at ¶¶ 15-16. Based on Exhibit 2 to Mr. Lynch's report, the gaps include:

| Account | Type of email | Time Frame | Length of period |
|---|---|---|---|
| Conrad & Scherer<br>tc@conradscherer.com | Incoming | March 17, 2011 to March 22, 2013 | 24 months |
| IRAdvocates<br>tc@iradvocates.org | Incoming | June 21, 2007 to May 19, 2008;<br>June 3, 2008 to February 25, 2010;<br>October 27, 2011 to March 23, 2013; | 23 months<br>21 months<br>17 months<br>Total: 61 months |
| IRAdvocates<br>tc@iradvocates.org | Outgoing | June 21, 2007 to January 6, 2008<br>May 17, 2011 to February 3, 2012<br>February 22, 2012 to March 22, 2013 | 5 months<br>8 months<br>12 months<br>Total: 25 months |

Those gaps are not "small" or *de minimis*." Significantly, Mr. Williams cannot quantify the number of missing emails resulting from these gaps, because the evidence is gone. It may be thousands or tens of thousands or hundreds of thousands. Although no one can state with certainty exactly how many emails are missing, there is considerable evidence that Mr. Collingsworth was an avid user (and saver) of emails:

- 3/3/2010 email from V. Ryan to T. Collingsworth: "you had a huge amount of old email in your inbox" (Ex. 9);
- 12/22/10 email from V. Ryan to J. Robison: "the biggest issue was [Mr. Collingsworth's] immense amount of email files" (Ex. 10); and
- 10/7/2011 CTSS work ticket. Noting that CTSS "[a]rchived over 15,000 emails from April, 2011 to October, 2011." (Ex. 11).

Defendants contend that beyond the gaps that Mr. Williams identified, "all" of the other emails were retained by Defendants and thus have been searched. *See, e.g.*, Doc. 293-1 at ¶ 16 ("the forensic evidence indicates that all of Collingsworth's outgoing IRAdvocates emails after October 27, 2011 were retained"); Ex. 12 (Steptoe March 12 Ltr.) at 6 ("All of the outgoing emails sent from the Collingsworth Account were preserved on the Conrad & Scherer E-mail Server"). But Mr. Williams admitted during his deposition that he cannot determine whether

"all" emails have been recovered from these time periods and that "there may have been a few emails deleted." Doc. 283-10 (Williams Dep.) at 71:18-19. That admission is reinforced by the fact that Mr. Collingsworth engaged in intentional, selective deletion of critical emails. *See* pages 2-3, *supra*.[3]

## B. Defendants Cannot Sidestep Responsibility for Their Spoliation of Evidence

Defendants blame Conrad & Scherer's third-party IT vendor, CTSS, for "inadvertent, unfortunate errors that Conrad & Scherer were not aware of until 2015." Opp. at 6. These errors included supposedly setting up an "auto-archive" rule on Mr. Collingsworth's computer. For the reasons set forth below, Defendants' conclusions with respect to CTSS are wrong.

### 1. Mr. Williams' Conclusion that CTSS Made an Auto-Archiving Error Is Contradicted by the Evidence

Defendants contend that "CTSS (or the Apple Genius Bar) enabled an auto-archive setting in an effort to preserve Collingsworth's emails and solve recurrent email problems on his MacBook Pro," Opp. at 6, which resulted in emails being saved automatically to an archive on the Collingsworth's MacBook and not on the server. This conclusion is wholly unsupported by the evidence and by Mr. Williams' own report. Mr. Williams admits that "[b]ecause Mr. Collingsworth no longer has access to the MacBook Pro, and because there are no work tickets from CTSS close in time to May 17, 2011 [when IRAdvocates emails go missing], I cannot conclusively determine that CTSS enabled any such [auto-archive] setting." Doc. 293-1 (Williams August Dec.) at ¶ 5. *See also* Ex. 7 (Lynch Dec.) ¶ 51 (Mr. Williams "does not

---

[3] Defendants' position also lacks sufficient forensic support because Mr. Williams did not compare the email files he was able to locate against multiple sources to ensure that they were complete. Lynch Dec. at ¶¶ 30-32. When email in the same account is stored in multiple locations, it is possible to compare those sources to determine whether they have the same emails, or if one or more of those sources contains emails that are not in another source. *Id.* at ¶ 31. To truly support Defendants' conclusion that all emails for a given time period can be found in a single source, "the analysis would have to show that no other data source has an email in that time period that is not found in that source." *Id.* Without this type of multiple-source analysis, it is impossible for Defendants to claim that what exists on the Conrad & Scherer server is "all" of Mr. Collingsworth's emails.

7

actually provide any evidence that the [auto-archive] rule existed or who enabled it."). Conrad & Scherer's IT Director also confirmed that he never saw any evidence of an auto-archive rule on Mr. Collingsworth's MacBook. Ex. 2 (Rodriguez Dep.) at 149:23-150:19. And the only evidence that Mr. Collingsworth was unaware of an auto-archive rule (if one even existed) is Mr. Collingsworth's declaration.

In fact, there is substantial evidence that Mr. Collingsworth's emails were *manually* archived, not *automatically* archived. Ex. 7 (Lynch Dec.) ¶¶ 52-53. Mr. Lynch's declaration documents numerous instances where Mr. Collingsworth was informed that his email would be archived to an external hard drive. *Id.* at ¶¶ 52-53. If this were the case, then Conrad & Scherer directed exactly which emails would be archived; it was not the result of some mysterious rule on Mr. Collingsworth's MacBook.[4] Consistent with this objective evidence, Conrad & Scherer's IT Director admitted that Mr. Collingsworth had a historical practice of archiving emails onto an external hard drive, Ex. 2 (Rodriguez Dep.) at 154:5-155:21 ("Q. So we know that, at least for these [emails dated 2006, 2007 and 2008], someone was using the external hard drive to back up Mr. Collingsworth's IRAdvocates e-mails, right? . . . A. Yes."), and Maggie Crosby – Mr. Collingsworth's former assistant – stated that Conrad & Scherer personnel manually archived Mr. Collingsworth's emails onto an external hard drive between 2011 and 2013. Doc. 283-22. Even Defendants' expert had an understanding Mr. Collingsworth's emails were archived onto at least one external hard drive. Doc. 283-10 (Williams Dep.) at 150:9-24.

## 2. Defendants Knew Mr. Collingsworth's Emails Were Not Being Stored On The Server

Conrad & Scherer had a centralized server to archive email. The firm's IT director stated

---

[4] For manual archiving, a user "specifically selects which emails will be archived and where they will be archived to, and that operation executes once." *Id.* at n.2. Manual archiving also has the same result as auto-archiving: the emails are saved to the archive location and not to Conrad & Scherer's server. *Id.* at ¶ 53.

that if employees archive emails "on their individual computers and external devices," then those "archives are not part of the Conrad & Scherer backup system." Doc. 293-3 at ¶ 14. On June 15, 2012, Ms. Crosby asked for Mr. Rodriguez's assistance, apparently to search for emails related to Ivan Otero and Jaime Blanco. Ex. 13 (CS_TC 011130 – CS_TC 011132). Ms. Crosby asked Mr. Rodriguez "how to look on [Mr. Collingsworth's] mac also," meaning she knew that the email on the MacBook was not saved elsewhere. *Id.* Mr. Rodriguez responded that he "cannot get anything" from the MacBook. *Id.* Also during this exchange, Mr. Rodriguez informed Mr. Collingsworth and Ms. Crosby that the "old emails are in the mac." *Id.* Mr. Rodriguez admitted he knew at that time that a search of the Conrad & Scherer server would only return *some* of Mr. Collingsworth's emails, and that there were emails that were only stored on the MacBook. Ex. 2 (Rodriguez Dep.) at 50:3-14.

This evidence shows Mr. Collingsworth *and* Conrad & Scherer were both aware that his emails were stored on his MacBook and not on the Conrad & Scherer server. In fact, a few hours after Mr. Rodriguez told Mr. Collingsworth that his "old emails are in the mac," Mr. Collingsworth forwarded Ms. Crosby an email from September 2011 between Mr. Collingsworth and Mr. Otero, Ex. 14, proving that he was aware that his "old emails" were on his MacBook.

In addition, on January 18, 2011, Mr. Collingsworth's assistant copied Mr. Rodriguez on an email where she stated that "Terry could use a short tutorial on archiving emails" and that they needed to "work out a system for backing up information on the [MacBook] laptop." Ex. 15 (CS_TC 007533). Conrad & Scherer therefore knew that Mr. Collingsworth was archiving his own emails manually (not automatically through the firm server) and that there was no system to back up the MacBook in place. Yet there is no evidence that Mr. Rodriguez addressed these problems with CTSS, Mr. Collingsworth or anyone else. The firm was aware of, and

acquiesced to, Mr. Collingsworth's practice of saving his emails only on a computer/external hard drive and not on the Conrad & Scherer server – all well before 2015.[5]

### C. The Missing Devices Matter

Defendants contend that "but for the vendor errors, the loss of three pieces of hardware would not have made any difference." Opp. at 20. This is not true. On November 22, 2011 (just a month after the lawsuit was filed), Mr. Collingsworth emailed Ms. Crosby in response to her email about CTSS's work to archive his email. He said:

> Well please confirm that they know how to put it on an external hard drive that I can access. They keep wanting to do some cloud thing and I keep saying no, first let's clean it out because the stuff I have is ***too sensitive*** and ***I don't want it out there. I'd like to be able to save really sensitive stuff [on] an external hard drive*** and then the routine stuff I don't care—they can cloud it.

Ex. 16 (CS_TC 007540) (emphasis added). Ms. Crosby forwards Mr. Collingsworth's email to Ms. Ryan and suggests that "I could take a couple hours and pull sensitive emails onto an external hard drive myself." *Id.* Because the hard drive is missing, it is impossible to determine if Mr. Collingsworth's instruction was followed by Ms. Crosby.

What is known is that the external hard drive was connected to several Conrad & Scherer computers on key dates after this lawsuit was filed. The pattern of connections indicates that the hard drive contained some (or all) of Mr. Collingsworth's emails and that Defendants used it to search for responsive emails. Ex. 7 (Lynch Dec.) ¶ 56. For example:

- It was connected to a Dell OptiPlex on September 8, 2013. In September 2013, Defendants printed emails that were later produced in October 2013.
- It was connected to an HP laptop on March 29, 2014, and April 4, 2014. April 4 is the date when the Court entered its express order to preserve hard drives.
- It was connected to other computers on December 5 and December 8, 2014. In

---

[5] Defendants concede that CTSS "operated under a written agreement through which they were paid substantial amounts to support the technical needs of Conrad & Scherer's Washington, DC office." Opp. at 6. Basic agency principles support the conclusion that any purported errors or omissions by CTSS should be attributed to the Defendants. "A principal is liable for the torts of his agent if the agent commits the tort while acting within the scope of his employment." *Merrell v. Joe Bullard Oldsmobile, Inc.*, 529 So. 2d 943, 945 (Ala. 1988).

December 2014, Defendants were conducting searches of their emails.

Mr. Williams' initially claimed that this hard drive was lost in December 2014, during an "office move." Doc. 283-14 at ¶ 78. During his deposition, however, Mr. Williams admitted that explanation was his own "surmise" and not based on anyone's explanation or from any independent evidence. Doc. 238-10 at 241:14-17. Moreover, the hard drive was used on February 26, 2015—just 5 days before Mr. Williams was retained. Ex. 7 (Lynch Dec.) ¶ 56.

Finally, there is also evidence that the emails during these "gaps" were accessible to Defendants during the litigation, because Defendants produced emails from the time period when Mr. Williams opined that there was a "gap."[6] Id. at ¶ 60. This suggests that the emails were saved somewhere—likely on the missing external hard drive or one of the missing computers.

**D. Defendants' Document Preservation System Was Inadequate**

Defendants contend that that they had a "reasonable documents and email preservation system." Opp. at 24. They describe it as "effective and redundant." Id. at 22. This also is not true.

*First*, Conrad & Scherer was aware that Mr. Collingsworth's emails were not being backed up to the Conrad & Scherer server and that at least some of his emails were solely accessible on Mr. Collingsworth's MacBook. *See supra* § II-B-2. Therefore, even if the firm had a *policy* that emails should be backed up to the firm server, there was a *practice* of ignoring that policy when it came to Mr. Collingsworth. Mr. Lynch concludes that Defendants' "efforts to backup email do not appear reasonable and were clearly not effective." Ex. 7 (Lynch Dec.) at 15.

*Second*, Defendants incorrectly equate the firm's routine document preservation system

---

[6] For example, Defendants produced an August 16, 2010 email sent only to Mr. Collingsworth's IRAdvocates account. Given that incoming emails to Mr. Collingsworth were supposed to be "missing" during this period, then it is "not clear how Defendants were able to produce this email in October 2013." Ex. 7 (Lynch Dec.) ¶ 60. One explanation is that Defendants were able to locate emails on the now-missing hard drive. Id.

11

with Defendants' document preservation efforts in this litigation. These are two completely different processes. A party to litigation has very different obligations to preserve than someone who is not a party to litigation. Defendants' conclusion also ignores the undisputed evidence that reasonable preservation efforts were not taken after the lawsuit was filed, including:

- Waiting nearly three years to institute any litigation hold at all
- Waiting nearly three years to preserve a backup copy of the firm's email server
- Not preserving the contents of Mr. Collingsworth's MacBook before it was disposed of in April 2013
- Not preserving the contents of the missing external hard drive in any form
- Not preserving the contents of Mr. Collingsworth's critical Gmail account until sometime after April 2015, even though the account was used for firm business
- Not preserving the contents of Lorraine Leete's computer or emails
- Not preserving the Acer Notebook that Mr. Collingsworth used from 2008 to 2011[7]

## LEGAL ARGUMENT

### I. DEFENDANTS WILLFULLY VIOLATED THE DUTY TO PRESERVE EVIDENCE

Defendants do not dispute that they had "an obligation to retain relevant documents, including emails, where litigation is reasonably anticipated," *Managed Care Solutions, Inc. v. Essent Healthcare, Inc.*, 736 F. Supp. 2d 1317, 1324 (S.D. Fla. 2010), or that the duty arose by October 21, 2011, when the lawsuit was filed. In the primary preservation case relied on by Defendants, *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 522 (D. Md. 2010), the court made clear that the duty to preserve "includes an obligation to identify, locate, and maintain, information that is relevant to specific, predictable, and identifiable litigation" and that the duty applies to all "relevant documents." The *Victor Stanley* court also held that "when a

---

[7] The Acer Netbook that Mr. Collingsworth used during 2008-2011 when he traveled—presumably to Colombia—was reformatted sometime after mid-2014, and all data was overwritten. Ex. 7 (Lynch Dec.) ¶¶ 71-73. This overwriting process led to the deletion of all emails and files. Doc. 283-10 (Williams Dep.) at 10:2-22. As to the home computers, Mr. Collingsworth, with the knowledge and support of Conrad & Scherer, frequently worked from his home office. *Id.* at 122:24-123:7; Ex. 17 (CS_TC 007512-13) (email from T. Collingsworth stating that "my firm supports my home office because I do a lot of work there."). Between 2008 and the present, he used at least two computers in his home office. Lynch Rep. at ¶¶ 68-69. Mr. Collingsworth's email accounts were saved on those computers. In November 2011, for example, Defendants restored 8.5 gigabytes of email onto one of his home computers. Doc. 283-10 (Williams Dep.) at 140. According to Defendants' expert, those computers "do not exist" any more. *Id.* at 136:19-137:4.

company or organization has a document retention or destruction policy, it 'is obligated to suspend' that policy and 'implement a "litigation hold" to ensure the preservation of relevant documents' once the preservation duty has been triggered." *Id.* at 524 (citations omitted).

The duty to preserve requires affirmative action. *Selectica, Inc. v. Novatus, Inc.*, No. 6:13-CV-1708-ORL-40, 2015 WL 1125051, at *4 (M.D. Fla. Mar. 12, 2015). Thus, a "party breaches its duty to preserve relevant evidence if it fails to act reasonably by taking 'positive action to preserve material evidence.'" *Victor Stanley*, 269 F.R.D. at 524 (requiring that "the action 'be reasonably calculated to ensure that relevant materials will be preserved,' such as giving out specific criteria on what should or should not be saved for litigation.") (citation omitted).[8] Defendants here did not take any "positive action to preserve material evidence" once the duty to preserve arose, such as collecting relevant hardware or imaging computers.

Defendants offer several arguments as to why they did not violate the duty to preserve. Each lacks merit. *First*, Defendants contend that the missing email gaps were "attributable to third-party vendor errors" and "do not constitute bad faith by defendants." Opp. at 35. In addition to the deficiencies discussed above, this argument confuses the role of CTSS to assist in regular IT duties and the role of a third-party who is engaged to comply with the duty to preserve. CTSS provided "day to day responsibility for user support" in Conrad & Scherer's Washington DC office. Doc. 293-3 ¶ 7. CTSS was never engaged to preserve evidence. Defendants cannot contend that they "reasonably relied" on CTSS to comply with the duty to preserve.

*Second*, Defendants argue that there is no requirement that they implement a litigation hold. Opp. at 36. First, the lack of any litigation hold is "surely relevant" to the Court's

---

[8] The obligation to preserve continues throughout the litigation. *Point Blank Solutions, Inc. v. Toyobo Am., Inc.*, No. 09-61166-CIV, 2011 WL 1456029, at *12 (S.D. Fla. Apr. 5, 2011) (quoting *Orbit One Commc'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429 (S.D.N.Y. 2010)).

evaluation of spoliation. *Point Blank*, 2011 WL 1456029 at *29. Indeed, Defendants' own expert testified that the very "first step" in any case is to put a litigation hold in place "to preserve your data." Doc. 283-10 (Williams Dep.) 85:17-24. Even beyond the 32-month delay in instituting a litigation hold, Defendants waited a full *seven weeks* after the Court's April 3, 2014 order (Doc. 105) to institute any litigation hold at all, and then failed to enforce it with respect to their external hard drives and computers.

**Third**, Defendants contend that there is no "requirement . . . [to] preserve hardware when the information is believed to be backed up or available from other sources." Opp. at 37. The duty to preserve requires that a party preserve relevant electronic information. Although parties do not need to preserve every computer of a departing employee, they do need to preserve the **information contained on that computer**. Defendants failed to do so.

**Fourth**, Defendants argue that they cannot be sanctioned for failing to preserve evidence not in their possession custody or control. Opp. at 38-39. In this category, they place (1) Mr. Collingsworth's Gmail account and (2) Lorraine Leete's email account and personal computer. Mr. Collingsworth is a party to this case; his personal email is certainly within his possession, custody and control. As for Lorraine Leete's "personal" email and computer, Drummond requested only those emails related to her work on Defendants' litigation team. As a member of Defendants' litigation team, her work-related emails were in the possession, custody and control of Defendants. Indeed, Mr. Collingsworth admits as much. Doc. 101-5 at ¶ 12.

## II. THERE IS SUBSTANTIAL EVIDENCE OF BAD FAITH

To prove bad faith, Drummond is not required to present direct "evidence of intentional destruction of evidence" because "proof of malicious destruction would rarely be available where one party has full control of the evidence." *Britton v. Wal-Mart Stores East L.P.*, No. 4:11-cv-32, 2011 WL 3236189, *13 (N.D. Fla. June 8, 2011). Defendants contend that a "clear

{B2039481}           14

and convincing" standard applies, Opp. at 34, but the Eleventh Circuit has never held that a party

seeking spoliation sanctions must meet a "clear and convincing" standard, and this Court should

not adopt this novel standard here. But regardless of what standard applies, Drummond meets it.

The evidence of intentional deletion discussed *supra* on pages 1-5 is overwhelming

evidence of bad faith, but it is not the only evidence. For example, the complete failure to

preserve evidence, standing alone, is sufficient for a finding of bad faith. In *Swofford v.

Eslinger*, 671 F. Supp. 2d 1274, 1282 (M.D. Fla. 2009), the court held that "bad faith is clear"

and imposed sanctions for the "knowing and willful disregard for the clear obligation to preserve

evidence that was solely within the possession and control of the Defendants." *Id.* (defendant's

sheriff's office returned the gun evidence to a manufacturer rather than preserving it).

Defendants also argue that bad faith may be found only where a party "wiped" a device.

Opp. at 29. That argument fails for two reasons. First, there is evidence that Defendants wiped

Mr. Collingsworth's Acer notebook computer within the last year, resulting in the complete loss

its electronic data. Doc. 283-10 (Williams Dep.) at 10:4-19. Defendants have also disposed of

computers and hard drives – which accomplishes the same result. *Evans v. Mobile County

Health Dept.*, No. CA 10-0600-WS-C, 2012 WL 206141, at *12 (S.D. Ala. Jan. 24, 2012) (bad

faith found where party destroyed a computer that contained key evidence). Defendants'

conduct is far worse than "wiping" a device, as it destroys the ability to conduct any tests at all.[9]

In its opening brief, Drummond set forth the cases in this Circuit that support a finding of

bad faith. Doc 283 at 14-23. Defendants were "the only party in a position to preserve the

---

[9] Defendants also contend that the fact that they have produced "many emails that include information that Drummond argued would be in the missing emails" negates any inference of bad faith. Opp. at 29. This argument misses the point. Defendants have spoliated relevant evidence so that it cannot be searched at all. Moreover, there is overwhelming evidence of selective deletion. *See* pages 2-3, *supra*. If Defendants' proposed standard were adopted, a party would be free to destroy the truly damaging documents, produce thousands of non-damaging documents, and avoid sanctions entirely.

[evidence] and failed to do so," meaning that "culpability rested solely upon" them. *Flury v. Daimler-Chrysler Corp.*, 427 F.3d 939, 946 (11th Cir. 2005). For example, in *Evans*, the court found bad faith because the plaintiff destroyed her computer after a duty to preserve attached, the plaintiff knew the computer had relevant information on it and the plaintiff did not disclose the destruction of the computer to the defendant. 2012 WL 206141 at *12. The evidence of Defendants' failure to preserve evidence, coupled with their deliberate disposal of key evidence, proves bad faith here:

- Someone tried to delete email files on a hard drive connected to a server in Conrad & Scherer's DC office. Ex. 7 (Lynch Dec.) ¶¶ 25-28.

- In December 2014, someone tried to delete four email storage files on Mr. Collingsworth's computer by deliberately placing them in the computer's Recycle Bin. *Id.* at ¶¶ 19-24.

- Sometime after December 8, 2014, Defendants disposed of the external hard drive that likely contained many of Mr. Collingsworth's most "sensitive" emails and have not offered any explanation for its disposal. *Id.* at ¶¶ 54-59.

- The disposal of the external hard drive and deletions of files on Mr. Collingsworth's computer were after the Court's April 2014 preservation order.

- In April 2013, Mr. Collingsworth disposed of his MacBook laptop even though he was aware that there were emails on it that could not be located by Conrad & Scherer and that he had instructed his assistant not to transfer the emails from his MacBook to the replacement computer. *See supra* § II-B-2.

- In April 2013, Conrad & Scherer permitted Mr. Collingsworth to dispose of his MacBook laptop even though it was aware that he stored emails on the computer that were not otherwise accessible to the firm. *Id.*

- From October 2011 to June 2014, Defendants undertook no preservation efforts. They did not institute a litigation hold, they did not preserve a copy of any computers, they did not preserve a copy of the firm's email server, they did not preserve a copy of the firm's documents, and they did not take any steps to ensure that hardware containing relevant documents would not be destroyed. Doc. 293-3 (Rodriguez Dec.) at ¶¶ 18-19.

- Defendants repeatedly represented that they had searched all of their files, including Mr. Collingsworth's emails, while simultaneously and falsely representing that no emails or documents had been deleted, and that they had in their possession all of the documents Drummond had subpoenaed from third parties. Doc. 283 at 20-23. Defendants'

opposition brief did not even acknowledge or explain those misrepresentations.

Finally, at key points, Defendants' argument against bad faith relies solely on the statements of Mr. Collingsworth. For example, Mr. Collingsworth testified that he thought the email on his MacBook was being backed up to the Conrad & Scherer server. Doc. 293-4 (Collingsworth Dec.) at ¶ 15. There is no contemporaneous evidence to support this statement, and the objective evidence contradicts it. Given Mr. Collingsworth's pattern of misrepresentations in this case, the Court should not credit this explanation. *See Global NAPs, Inc. v. Verizon New England Inc.*, 603 F.3d 71, 93-94 (1st Cir. 2010) (rejecting as "wholly incredible" the defendants' "suspiciously timed" excuses that they "dropped" one computer down a flight of stairs and accidentally deleted information off another computer, and concluding that the defendants "willfully concealed and destroyed evidence").

## III. THERE IS SUFFICIENT EVIDENCE OF PREJUDICE TO WARRANT A DEFAULT SANCTION

Defendants are incorrect that Drummond must meet a higher "clear and convincing" standard of proof for prejudice. Opp. at 34. This Circuit had made clear that "[i]n spoliation cases, courts must not hold the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed evidence because doing so allows the spoliators to profit from the destruction of evidence." *Southeastern Mechanical Servs., Inc. v. Brody,* 657 F. Supp. 2d 1293, 1300 (M.D. Fla. 2009).[10] Drummond also need not prove the "likely contents" of the missing evidence to prevail. *Id.* In the end, Defendants are the ones who spoliated evidence here; they should not be permitted "to profit from the destruction of evidence." *Id.* But regardless of what standard applies, Drummond meets it.

---

[10] *See also Pinkney v. Winn-Dixie Stores, Inc.*, No. CV214-075, 2015 WL 858093, at *5 (S.D. Ga. Feb. 27, 2015) ("[a]llowing Defendant to avoid spoliation sanctions through the testimony of its witness that the destroyed evidence would not have benefited Plaintiff would 'turn "spoliation law" on its head.'") (quoting *Brown v. Chertoff*, 563 F. Supp. 2d 1372, 1381 (S.D. Ga.2008)); *see also Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. at 502 n.7 (noting the "Catch 22" in evaluating spoliation sanctions because "after evidence no longer exists, it often is difficult to evaluate its relevance and the prejudice associated with it.").

"A party moving for sanctions must show, among other things, that the destroyed evidence was relevant to a claim or defense such that the destruction of evidence of that evidence resulted in prejudice." *Eli Lilly & Co. v. Air Exp. Intern., USA, Inc.*, 615 F.3d 1305, 1318 (11th Cir. 2010). Defendants cannot legitimately argue that Mr. Collingsworth's emails are not critical evidence. His emails have revealed—contrary to Defendants' representations to this Court—that every key paramilitary witness has been paid money to testify, not just three of them. His emails totally contradict Defendants' story about "security," and instead reflect that Defendants made these payments to get "the deps in the can." Doc. 174-6. His emails revealed Llanos Oil's payments to Jaime Blanco in exchange for his testimony against Drummond, Doc. 174-20, contrary to his representation to this Court that Llanos Oil had "no relationship" to Drummond or the *Balcero* case. Doc. 174-23 at 8:23-9:7.

Defendants nevertheless argue that Drummond can "litigate the *prima facie* aspects of the case" as the record now stands. Opp. at 33. Defendants' bad faith spoliation should not go unsanctioned simply because Drummond has been able to uncover evidence of wrongdoing by Defendants. This would serve only to punish Drummond for successfully investigating and developing its case, even in the face of rampant discovery fraud. Defendants' spoliation of evidence also must be viewed through the lens of this particular case: history shows that Defendants will lie until they are confronted with a document. For example, in January 2015, after swearing less than two months earlier that there were merely *discussions* about paying Blanco, Doc. 174-7 at 11-12, Defendants revealed the payments to Blanco. Doc. 174-2; 174-20. In those responses, Mr. Collingsworth testified that he was aware that the Van Bilderbeeks "planned" to send a payment to Otero in September 2011 and December 2011, but swore he "did not recall" if Blanco actually received anything. *Id*. Within the last two weeks, Defendants have

amended this interrogatory response an *eighth* and *ninth* time due to additional documents that were uncovered which show that Jaime Blanco was, in fact, paid $60,000 in September 2011 and another $25,000 in December 2011. Ex. 18 (Defs. 8th and 9th Am. Resp. to Pls. 3d Irogs); Ex. 19.[11]

In addition to allowing Defendants to benefit from their own bad acts, Defendants' argument totally ignores the prejudicial effect on Drummond. In *Flury*, the Eleventh Circuit reversed the lower court and directed it to enter a terminating sanction against plaintiff because he had destroyed a key piece of evidence. 427 F.3d at 946. Importantly, the Court reached this result even though the defendant had other, "less reliable means" to prove its case. *Id.* Although Drummond could certainly prevail on the current record, it is forced to rely on "less reliable means" to prove its case—that is, a less-than-complete record of Mr. Collingsworth's communications concerning witness payments and his subjective belief in the truth of these witnesses' testimony. Like the defendant in *Flury*, Defendants' "spoliation of critical evidence in this case deprived the opposing party of an opportunity to put on a complete [case]." *Id.* at 947. *See also Graff v. Baja Marine Corp.*, 310 F. App'x 298, 302 (11th Cir. 2009) (explaining that defendants "suffered severe prejudice due to plaintiff's [spoliation] conduct because the [destroyed evidence] was *the* critical piece of evidence in this case"). That prejudice is magnified by the Defendants' willingness to lie until they are confronted with a document.

---

[11] Defendants' Eighth and Ninth Amended Interrogatory Responses simply disclose the fact of two payments to a witness: Jaime Blanco. Drummond has twice asked what basis Defendants have for designating these discovery responses "Confidential", and Defendants have refused to respond. Ex. 20. This Court made clear in July that the fact of witness payments is not "Confidential." Doc. 268 (July 6, 2015 Order). For Defendants to continually and willfully violate that July 6, 2015 Order is nothing less than contempt of court. It is also additional and overwhelming evidence that no sanction short of default will suffice in this case. *See S. New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 148 (2d Cir. 2010) ("a pattern of 'prolonged and vexatious obstruction'" warranted entry of a default judgment). Indeed, Defendants are still perfectly willing to intentionally disobey this Court's orders, even when staring down an evidentiary hearing regarding whether a default judgment should be entered against them. If this case does not warrant a default judgment sanction, no case does.

**IV. FORENSIC EXAMINATION**

To the extent this Court has any doubt as to the sufficiency of evidence of bad faith spoliation by the Defendants, Drummond requests that the Court allow Drummond's forensic expert – Mr. Spencer Lynch – to conduct a forensic examination of Defendants' computers, hard drives and email accounts and submit a supplemental report to the Court with his findings. Significantly, the California state court presiding over the *Dole* case has already ordered that Mr. Lynch perform an analysis of Defendants' computers in light of Mr. Collingsworth's missing emails (Mr. Lynch is Dole Foods' forensic expert, as well). Like other issues in this case, Defendants' version of the events and one-sided forensic analysis of their computers should not be the only evidence. To the extent this Court believes additional evidence of bad faith is needed, Drummond should be afforded the opportunity to develop it.[12]

## CONCLUSION

Defendants' explanations for all of the missing and destroyed evidence are simply not credible. Perhaps if there were one gap of missing email for one account or if one piece of hardware were missing, the spoliation may be a result of negligence. But that is not the case here. All of the missing evidence relates to *one person*: Mr. Collingsworth. The missing evidence relates to the key *type of evidence*: email correspondence. And nearly all of the missing evidence is during the *crucial time period*: 2011 to 2013, when Mr. Collingsworth was negotiating and paying witnesses for their testimony. This is not a "tragic irony" or "inadvertent error." Opp. at 11. It is deliberate and intentional destruction of evidence. Drummond "cannot imagine a case in which the evidence destroyed would prove more critical. The resulting prejudice . . . is incurable by any sanction other than [default]." *Flury*, 427 F.3d at 947.

---

[12] *Bank of Mongolia v. M&P Financial Services, Inc.*, 258 F.R.D. 514, 520-21 (S.D. Fla. 2009) (ordering forensic expert to image and search computers).

Respectfully submitted,

_____
William Anthony Davis, III (ASB-5657-D65W)
H. Thomas Wells, III (ASB-4318-H62W)
Benjamin T. Presley (ASB-0136-I71P)
STARNES DAVIS FLORIE LLP
P.O. Box 59812
Birmingham, AL 35259
(205) 868-6000
fax: (205) 868-6099

/s/ Sara E. Kropf
_____
Sara E. Kropf
LAW OFFICE OF SARA KROPF PLLC
1001 G St. NW, Suite 800
Washington, DC 20001
(202) 627-6900

*Attorneys for Drummond Company, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on **August 31, 2015**, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Bradley J. Smith, Esq.
Eric D. Bonner, Esq.
Clark, Hair & Smith, P.C.
1000 Urban Center Drive
Suite 125
Birmingham, Alabama 35242

Christopher S. Niewoehner
Kendall Enyard
Savannah E. Marion
STEPTOE & JOHNSON, LLP
115 S. LaSalle Street
Suite 3100
Chicago, IL 60603
Tel: (312) 577-1240

Special Master T. Michael Brown, Esq.
Ms. Carly Miller, Esq.
Bradley Arant Boult Cummings, LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama 35203
mbrown@babc.com

{B2039481}

21

camiller@babc.com

Kenneth McNeil
SUSMAN GODFREY
1000 Louisiana, Suite 5100
Houston, Texas 77002-5096
kmcneil@SusmanGodfrey.com

Robert Spotswood
William K. Paulk
SPOTSWOOD SANSOM & SANSBURY, LLC
One Federal Place
1819 Fifth Avenue North, Suite 1050
Birmingham, Alabama 35203
rks@spotswoodllc.com
wpaulk@spotswoodllc.com

H. Thomas Wells, III (ASB-4318-H62W)

FILED
2015 Aug-31 AM 11:28
U.S. DISTRICT COURT
N.D. OF ALABAMA



# Exhibit 1

*Filed under seal pursuant to Stipulated Protective Order*

| **From:** | Trey Wells |
| **To:** | "Brown, T. Michael"; "Bob Spotswood"; "William Paulk"; "Ken McNeil"; "Niewoehner, Christopher" |
| **Cc:** | Tony Davis; Ben Presley; "Sara Kropf" |
| **Subject:** | Emergency Request |
| **Date:** | Friday, August 14, 2015 11:03:47 AM |
| **Attachments:** | A9R29F (A9R29F.tmp;1).pdf |

Mike and Defendants' counsel:

In light of the issues currently being investigated concerning Mr. Collingsworth's emails, we request that Defendants be ordered to produce to us by the end of today the native form of the attached email (outlined in red) from Mr. Collingsworth's Gmail account.  As Defendants' expert just recently copied that Gmail account, this should not be difficult to accomplish.

Regards,

Trey

# Privileged

Begin forwarded message:

**From:** Terry C <terrypc56@gmail.com>
**Date:** July 19, 2012 12:24:48 PM EDT
**To:** Lorraine Leete <lorrainemleete@gmail.com>
**Subject: Here is confirmation**

Please let Ivan know and have him
confirm when he gets it  Privileged

### Privileged

Terry Collingsworth
202-543-5811
202-255-2198 (cell)

Begin forwarded message:

**From:** "Albert van Bilderbeek" <albert@vanbilderbeek.com>
**Date:** July 19, 2012 11:59:54 AM EDT
**To:** "'Terry C'" <terrypc56@gmail.com>
**Subject: swift**

CREDIT SUISSE AG

CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER

CS_TC002827

| | | | | | |
|---|---|---|---|---|---|
| Account 742 | **Confidential** | | Balance | | |
| IBAN ⓘ | CH65 ( **Confidential** | | BIC / SWIFT ⓘ CRESCHZZ80A | | |

Booking Details 3F00-120719-80-00221

| Booking Date | Text | Debit | Credit | Value Date | Balance |
|---|---|---|---|---|---|
| **17.07.2012** | Payment order | 35,000.00 | | | - |
| | ABOGADO IVAN OTERO MENDOZA . | | | | |
| | 93 Confidential | | | | |
| | ABOGADO IVAN OTERO MENDOZA | | | | |
| | | | | | |
| | Banco Bilbao Vizcaya Argentaria | | | | |
| | Colombia S.A. | | | | |
| | Carrera 9 72-21 P.O. Box 53859 | | | | |
| | Colombia | | | | |

# Privileged

CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER

CS_TC002828

EX19-008

FILED

2015 Aug-31  AM 11:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 2

*Filed under seal pursuant to Stipulated Protective Order*

1 | IN THE UNITED STATES DISTRICT COURT
  | FOR THE NORTHERN DISTRICT OF ALABAMA
2 | SOUTHERN DIVISION

3 | CASE NO. 2:11-cv-3695-RDP

4 |

5 |

  | DRUMMOND COMPANY, INC.,
6 |
  |              Plaintiff ,
7 |
  | Vs.
8 |
  | TERRENCE P. COLLINGSWORTH,
9 | individually and as agent of Conrad &
  | Scherer, LLP; and CONRAD & SCHERER,
10 | LLP,
  |              Defendants.
11 | _____/

12 |

13 |

  |                          Conrad & Scherer, LLP
14 |                          633 South Federal Highway
  |                          2nd Floor
15 |                          Fort Lauderdale, Florida 33301
  |                          Tuesday, August 25, 2015
16 |                          9:11 a.m. - 3:45 p.m.

17 |

18 |      VIDEOTAPED DEPOSITION OF JUAN CARLOS RODRIGUEZ

19 |                  as 30(b)(6) witness

20 |         Taken before Beverly Bourlier James,

21 |  Registered Professional Reporter, Certified Realtime

22 |  Reporter and Notary Public in and for the State of

23 |  Florida at Large, pursuant to Notice of Taking

24 |  Deposition filed in the above-mentioned cause.

25 |

```
 1    APPEARANCES:

 2
                      H. THOMAS WELLS, III, ESQUIRE
 3                    twells@starneslaw.com
                      WILLIAM ANTHONY DAVIS, III, ESQUIRE
 4                    tdavis@starneslaw.com
                      BENJAMIN T. PRESLEY, ESQUIRE
 5                    bpresley@starneslaw.com
                      Starnes Davis Florie, LLP
 6                    P.O. Box 59812
                      Birmingham, Alabama 35259
 7                    on behalf of the Plaintiff

 8
                      ROBERT SPOTSWOOD, ESQUIRE
 9                    rks@spotswoodllc.com
                      Spotswood Sansom & Sansbury, LLC
10                    One Federal Place
                      1819 Fifth Avenue North, Suite 1050
11                    Birmingham, Alabama 35203

12                    -and-

13                    KENDALL ENYARD, ESQUIRE
                      kenyard@steptoe.com
14                    Steptoe & Johnson, LLP
                      115 S. LaSalle Street
15                    Suite 3100
                      Chicago, Illinois 60603
16                    on behalf of the Defendants

17
      ALSO PRESENT:
18
                      Al Frevola, Esquire
19                    Conrad & Scherer, LLP

20                    Justin Routt, videographer

21

22

23

24

25
```

CONFIDENTIAL                                          3

```
 1              E X A M I N A T I O N

 2                                              Page

 3   DIRECT EXAMINATION.............................. 5
     BY MR. WELLS
 4   CROSS EXAMINATION  ............................. 162
     BY MR. SPOTSWOOD
 5   REDIRECT EXAMINATION ........................... 166
     BY MR. WELLS

 6

 7              E X H I B I T S

 8   Plaintiff's Exhibit 1....notice...................   8
     Plaintiff's Exhibit 2....spreadsheet.............  33
 9   Plaintiff's Exhibit 3....e-mails.................  42
     Plaintiff's Exhibit 4....e-mails.................  47
10   Plaintiff's Exhibit 5....brief...................  72
     Plaintiff's Exhibit 6....brief...................  78
11   Plaintiff's Exhibit 7....brief...................  79
     Plaintiff's Exhibit 8....document................  86
12   Plaintiff's Exhibit 9....e-mails................. 105
     Plaintiff's Exhibit 10...e-mail................. 107
13   Plaintiff's Exhibit 11...e-mail................. 111
     Plaintiff's Exhibit 12...e-mail................. 112
14   Plaintiff's Exhibit 12...e-mails................ 114
     Plaintiff's Exhibit 14...e-mails................ 117
15   Plaintiff's Exhibit 15...e-mails................ 119
     Plaintiff's Exhibit 16...e-mails................ 122
16   Plaintiff's Exhibit 17...e-mail................. 123
     Plaintiff's Exhibit 18...e-mails................ 125
17   Plaintiff's Exhibit 19...e-mails................ 131
     Plaintiff's Exhibit 20...e-mail................. 132
18   Plaintiff's Exhibit 21...e-mail................. 136
     Plaintiff's Exhibit 22...e-mails................ 137
19   Plaintiff's Exhibit 23...e-mails................ 140
     Plaintiff's Exhibit 24...e-mail................. 141
20   Plaintiff's Exhibit 25...e-mails................ 142
     Plaintiff's Exhibit 26...e-mails................ 146
21   Plaintiff's Exhibit 27...e-mails................ 147
     Plaintiff's Exhibit 28...e-mail................. 149
22   Plaintiff's Exhibit 29...e-mail................. 151
     Plaintiff's Exhibit 30...e-mail................. 153

23

24

25
```

1          THE VIDEOGRAPHER:  We are now on the

2     videotaped deposition in the United States

3     District Court for the Northern District of

4     Alabama, Southern Division, case 2:11-CV-3695-RDP

5     in the matter of Drummond Company, Inc.,

6     Plaintiff, versus Terrence P. Collingsworth,

7     individually as an agent of Conrad & Scherer, LLP,

8     and Conrad & Scherer, LLP, Defendants.

9          Our witness today is Juan Carlos

10    Rodriguez.  Today's date is August 25, 2015.  Time

11    is exactly 9:11 a.m.  We are located at 633 South

12    Federal Highway, Fort Lauderdale, Florida, 33301.

13         Will all attorneys please introduce

14    themselves for the record and state who they

15    represent?

16         MR. WELLS:  Trey Wells for Plaintiff

17    Drummond Company, Inc.

18         MR. PRESLEY:  Ben Presley for the

19    Plaintiff Drummond Company.

20         MR. DAVIS:  Tommy Davis for the Plaintiff.

21         MR. SPOTSWOOD:  Robert Spotswood for

22    Terrence Collingsworth and Conrad & Scherer, LLP.

23         MR. ENYARD:  Kendall Enyard for Defendants

24    Terrence Collingsworth and Conrad & Scherer, LLP.

25

```
 1    THEREUPON:
 2                    JUAN CARLOS RODRIGUEZ
 3    called as a witness on behalf of the Plaintiff
 4    herein, duly sworn and responding "Yes," was examined
 5    and testified as follows:
 6                    DIRECT EXAMINATION
 7    BY MR. WELLS:
 8        Q.     Can you please state your name for the
 9    record?
10        A.     Juan Carlos Rodriguez.
11        Q.     Mr. Rodriguez, have you ever given a
12    deposition before?
13        A.     No.
14        Q.     Okay.  I'm sure you've been explained the
15    process, but I'll be asking you a series of questions
16    today.  Your duty here is to answer them truthfully
17    and to the best of your ability.  Do you understand
18    that?
19        A.     Yes, I do.
20        Q.     If I ask you a question that is unclear or
21    you're not entirely sure what I'm asking, I'll ask
22    you please let me know that so I can get you a
23    question you understand.  Will you please do that for
24    me?
25        A.     Absolutely.
```

```
 1        Q.      Where do you currently work?
 2        A.      I work at Conrad & Scherer.
 3        Q.      In what --
 4        A.      In Fort Lauderdale.
 5        Q.      Okay.  In what capacity?
 6        A.      I am the IT director.
 7        Q.      How long have you held that position?
 8        A.      Since December 2010 with a brief
 9  interruption on October 2014.
10        Q.      Okay.  What was the brief interruption?
11        A.      I was offered a position on a different
12  company.  I went for the position, but I didn't like
13  the position, so I came back here.
14        Q.      Before you were IT director, did you work
15  in another capacity at Conrad & Scherer?
16        A.      No.
17        Q.      So your first employment with the firm was
18  in October of 2010?
19        A.      No.
20        Q.      Okay.  When was your first employment with
21  the firm?
22        A.      It was on December 2010.
23        Q.      December 2010.  I apologize.
24                What job functions do you perform as an IT
25  director?
```

1    A.    I make sure that the systems are operating
2  normally for the employees of the firm.
3    Q.    Do you have responsibilities relating to
4  upkeep of the e-mail server?
5    A.    Yes.
6    Q.    Do you have responsibilities concerning
7  preservation of firm computers?
8    A.    I wouldn't say it like that.  My
9  responsibilities were to maintain the system so the
10 users can access their functions normally.
11   Q.    Okay.  Mr. Scherer told us yesterday there
12 was some sort of process in place when a firm
13 computer was changed out, that you or someone else in
14 IT would pull the hard drive out of that and maintain
15 the hard drive.  Is that correct?
16   A.    That is correct.
17   Q.    How long has that system been in place?
18   A.    For a long time.  We have done -- we have
19 preserved the hard drives for certain people.  Since
20 I got here, we changed computers and we preserved the
21 hard drives for certain attorneys.  And
22 after -- yeah, that's my answer.
23   Q.    When you say "certain attorneys," are there
24 certain attorneys their hard drives are not
25 preserved?

```
 1        A.      I wouldn't say like that.  There were a
 2   couple of cases where an attorney will stay here for
 3   like a month and the hard drive was not preserved.
 4        Q.      Okay.  Would it be fair to say that for
 5   attorneys that work here for some reasonable period
 6   of time, the process is to preserve their hard drive
 7   when they switch out from one computer to the other?
 8        A.      Yes.
 9        Q.      And you understand, do you not, that you
10   are here today both in your personal capacity as well
11   as a 30(b)(6) representative for the firm?
12        A.      Yes.
13                (Plaintiff's Exhibit 1, notice, was marked
14   for Identification.)
15   BY MR. WELLS:
16        Q.      I'm going to show you what has been marked
17   as Exhibit 1 to your deposition, which is a copy of
18   the 30(b)(6) notice.  Have you seen this document
19   before?
20        A.      Yes, I have.
21        Q.      Okay.  Could you -- and you don't have to
22   actually read them out, but if you could just tell me
23   the numbers of the topics that you have done some
24   work to prepare to testify for?
25        A.      I'm sorry, can you ask me the question
```

1    again?

2         Q.    Could you go through this notice and tell

3    me the numbers of the topics that you are prepared to

4    testify to today as 30(b)(6) representative?

5         A.    Well, I don't recall exactly the numbers.

6    I know the generalities of what -- of what I have

7    been prepared for this declaration.

8         Q.    Okay.  What are those generalities?

9              MR. SPOTSWOOD:  Trey, I mean, I have --

10             we've designated to you in writing what he would

11             be responsive to either in whole or in part.  I

12             think he's always in part.  So, I mean, do you

13             want him to go through every paragraph of this

14             notice and then tell you what I've already told

15             you or something -- because I'm not going to

16             designate him, for example, on some topics.

17             MR. WELLS:  Right.  And there was a little

18             bit of shifting yesterday as to who was testifying

19             to what.  There are a couple of things that Mr.

20             Scherer was designated and he said, well, Juan

21             Carlos would know more about that than me.  I

22             think there was one where you specifically added

23             Juan Carlos to, so I really just want to know from

24             Juan Carlos in general what is he prepared to

25             testify about today.  I think he said he does not

```
 1          remember the precise topics.
 2                  MR. SPOTSWOOD:  Well, I think the only
 3          thing I -- where I added him yesterday, if I'm not
 4          mistaken, was the topics 11 and 12, which were
 5          searches for documents, which is 11, and then 12
 6          was the knowledge and position regarding the
 7          computers and hard drives identified as missing in
 8          the April Williams report.  So, I mean, you could
 9          do whatever you want with the time we have here,
10          but I just -- you know, he's not designated for
11          all these topics.
12                  MR. WELLS:  I understand that.
13  BY MR. WELLS:
14          Q.     Could you tell me in your own words what
15  you feel you have prepared to testify for?
16                  MR. SPOTSWOOD:  Just go topic by topic.
17          If you have knowledge on the topics, tell him.
18                  THE WITNESS:  Okay.
19                  MR. SPOTSWOOD:  Don't tell him the
20          topic -- don't tell him what you know, identify
21          what topics you're prepared to address in whole or
22          in part.
23                  THE WITNESS:  I am prepared on topic
24          number 1, "Conrad & Scherer's effort to preserve
25          evidence for the libel case."
```

1          I'm prepared in part on number 2, "Conrad

2     & Scherer's policies and procedures regarding

3     security and confidentiality of case-related

4     information for the libel case."

5          I'm prepared for topic number 3, "Conrad &

6     Scherer's policies and procedures regarding

7     transfer and preservation of electronic data and

8     files when employee, partners or officers

9     transition from using an old computer to a new

10    computer since October 2009."

11         Topic number 4, "Conrad & Scherer's

12    policies and procedures regarding

13    retention/disposal of computers and hard drives

14    since October 2011."

15         Topic number 5, "Conrad & Scherer's

16    policies and procedures regarding the

17    retention/disposal of e-mails since October 2011."

18         MR. SPOTSWOOD:  So, just to be clear,

19    these are topics that, you know, that he's saying

20    he is, in part, responsive to.  Okay.

21         THE WITNESS:  Nothing on topic 6.

22         MR. SPOTSWOOD:  He's not designated for 7.

23         THE WITNESS:  Yes, and I don't think so as

24    well.

25         Not 8.

1              Nothing on 9.

2              Nothing on 10.

3              I'm prepared on number 11, "Conrad &

4      Scherer's searches for documents in response to

5      Drummond's written discovery request in this case

6      from October 2011 through October 15, 2014."

7              I'm in part responsible for "Conrad &

8      Scherer's knowledge and/or position regarding the

9      computers and hard drives identified as missing in

10     the April 14, 2015 Williams report."

11             Nothing on 13 -- well, partially on 13.

12     It's very limited, my position on this.

13             Don't recall exactly on number 14.

14     "Conrad & Scherer's knowledge and/or position

15     regarding Mr. Collingsworth's missing e-mails."  I

16     don't think I'm responsible on that one, not fully

17     responsible on this.

18             Number 15, "Conrad & Scherer's knowledge

19     and/or position regarding whether any employee,

20     agent, partner or executive other than Mr.

21     Collingsworth who performed any work Defendants'

22     litigation against Drummond has disposed of any

23     computers or hard drives during the pendency of

24     this case since October 2011."  I think I am

25     responsible on that.

```
 1              Number 16, "Conrad & Scherer's knowledge
 2       and position regarding whether any employee,
 3       agent, partner or executive other than Mr.
 4       Collingsworth who worked on litigation against
 5       Drummond has been unable to locate any of his or
 6       her e-mails since October 2011."
 7              I'm not responsible on number 17.
 8  BY MR. WELLS:
 9       Q.     Okay.
10       A.     I -- and let me correct something for the
11  record.
12              I think I am partially responsible on
13  number 8, "Conrad & Scherer's knowledge and position
14  regarding the truth or falsity of representations
15  regarding the scope, extent and nature of the
16  Defendants' searches for documents that are being
17  challenged in the sanctions hearing and which are
18  listed in Drummond's proposed findings of fact."
19       Q.     Thank you.
20              What have you done to prepare to testify
21  as to those topics you listed?
22       A.     I had a meeting yesterday with counsel.
23       Q.     And I don't want to know anything you
24  discussed with counsel.  Did you interview anyone
25  within the firm?
```

```
 1         A.      No.
 2         Q.      Is the extent of your preparation your
 3    meeting with counsel yesterday?
 4         A.      Yes.
 5         Q.      What type of e-mail server does Conrad &
 6    Scherer use?
 7         A.      Conrad & Scherer has an Exchange 2010
 8    server.
 9         Q.      Has that been in place your entire time
10    with the firm?
11         A.      No.
12         Q.      What was used prior to Exchange 2010?
13         A.      Exchange 2007.
14         Q.      And how long was that in place?
15         A.      I don't recall the exact date, but we did
16    a migration from Exchange 2007 to Exchange 2010
17    around April 2011.  Don't recall the exact date, I'm
18    sorry.
19         Q.      So, at least during the times that you have
20    been employed at the firm, the firm has used some
21    version of Microsoft Exchange?
22         A.      That is correct.
23         Q.      How is that system backed up?
24         A.      That system is backed up using Microsoft
25    Data Protection Manager.
```

1     Q.     And if you could explain for me how does
2     that backup work?
3     A.     Well, the backup takes a copy of the
4     Exchange database and it stores it into local hard
5     drives on the Data Protection Manager, DPM, server
6     and retains a copy of those backups for 90 days.
7     Q.     And then after 90 days, what happens?
8     A.     They get overwritten.  I mean, that --
9     when I set up this -- that happened when I set up the
10    system.
11    Q.     Okay.  How often are the backups of the
12    server made?
13    A.     Daily.
14    Q.     Daily, okay.
15           So, every day, essentially a picture is
16    taken of what the server looks like on that day and
17    it's saved to this DPM backup?
18    A.     That is correct.
19    Q.     And that picture, so to speak, of what was
20    on the server at that day is retained for a period of
21    90 days after which, it's overwritten, is that
22    correct?
23           MR. SPOTSWOOD:  I object to the form.  You
24       have to be very precise here about what time frame
25       you're talking about because the situation did

```
 1        change over time.
 2               MR. WELLS:  Okay.  I'm just trying to get
 3        a general picture right now.
 4               MR. SPOTSWOOD:  Okay.
 5               THE WITNESS:  Well, prior to the legal
 6        hold that it was in place, the server -- the
 7        snapshots were -- yeah, they leave snapshots and
 8        they were kept for 90 days.
 9   BY MR. WELLS:
10        Q.     Okay.  And you mention a legal hold.  When
11   was that put in place?
12        A.     On -- around late or early July 2014.
13        Q.     '14?
14        A.     Yes.
15        Q.     So, in 2011, 2012 and 2013, the server was
16   being backed up daily, correct?
17        A.     That's correct.
18        Q.     But those daily backups were only retained
19   for 90 days, is that right?
20        A.     That is correct.
21        Q.     Okay.  And there was no legal hold put on
22   the server prior to June or July of 2014, is that
23   right?
24               MR. SPOTSWOOD:  Object to the form.
25               You may answer.
```

```
 1              THE WITNESS:  We are pack rats.  We tell
 2         our users to keep everything in the servers.  They
 3         don't delete anything.  They don't -- they are
 4         instructed to save everything onto the servers.
 5         That's our system.  That's the way that we keep
 6         our system.  We have everything stored into our
 7         servers, we tell the users to save case-related
 8         e-mails into our document management system, which
 9         is write protected every night so nobody can
10         delete anything from the server -- from the
11         document management system.  And there -- and the
12         system does not delete anything, so we keep
13         everything.
14    BY MR. WELLS:
15         Q.    But if a user for some reason did not save
16    case-related e-mails to the document management
17    system, the backup of those e-mails on the server
18    would only be retained for 90 days, is that correct?
19         A.    But the e-mails -- I wouldn't say that.
20    The e-mails will stay on the server.  The e-mails
21    will be stored on the server and they will be backed
22    up on the database server as well.
23         Q.    So if a user deletes an e-mail in 2011, for
24    example --
25         A.    Uh-huh.
```

1      Q.      -- that deleted e-mail will no longer exist

2  on their computer, right?

3      A.      No.  The e-mail will be deleted -- will be

4  moved onto a deleted items folder on Outlook and

5  then -- I mean, that's the first step for when a user

6  deletes an e-mail.

7      Q.      And then if they empty out the deleted

8  items folder, that deleted e-mail is off their

9  Outlook, right?

10     A.      Yes.

11     Q.      Now, that deleted item would still exist on

12  the server at least for a period of time, correct?

13     A.      That is correct.

14     Q.      But as of 2011, that period of time was

15  90 days, is that true?

16     A.      They were backed up onto the -- onto the

17  database server, onto the DPM server.

18     Q.      Which, after 90 days, would be overwritten,

19  correct?

20     A.      That's correct.

21          MR. SPOTSWOOD:  I think we are having a

22      miscommunication here.

23  BY MR. WELLS:

24     Q.      Did you misunderstand my question?

25          MR. SPOTSWOOD:  So -- what he's asking you

```
 1          is if their -- if something goes into a deleted
 2          folder and it's not deleted from the deleted
 3          folder, do you still have a backup in your system
 4          of the deleted e-mail?
 5                   THE WITNESS:  Yes.
 6     BY MR. WELLS:
 7          Q.      That's not what I asked.
 8          A.      Can you -- can you repeat the question
 9     again?
10          Q.      All right.  Someone is working on their
11     computer, deletes an e-mail out of their Outlook and
12     then empties their deleted items folder.  You with me
13     so far?
14          A.      Yes.
15          Q.      That e-mail at that point is no longer in
16     that user's Outlook, correct?
17          A.      That is correct.
18          Q.      That deleted e-mail still exists on the
19     backup server, correct?
20          A.      It exists on Exchange.  There are
21     retention policies for Exchange that will keep the
22     dumpster for a period of time and that dumpster is
23     being backed up for 90 days.
24          Q.      Okay, but in 2011 after that 90-day period,
25     that deleted item that was backed up to the backup
```

```
 1    server is overwritten, correct?
 2               MR. ENYARD:  Objection to form.
 3               MR. SPOTSWOOD:  Yes, sorry, my bad.
 4               Objection to form.
 5               THE WITNESS:  Can you ask the question
 6         again?
 7    BY MR. WELLS:
 8         Q.     Someone deletes something off their
 9    Outlook, it is still maintained on the backup server
10    that takes a picture of the server every day,
11    correct?
12         A.     Correct.
13         Q.     But it is only maintained on that backup
14    server for 90 days, correct?
15         A.     On October 2011, yes.
16         Q.     After which time, after the 90 days, it is
17    overwritten, correct?
18         A.     That is correct.
19         Q.     That deleted e-mail is no longer
20    recoverable at that point, correct?
21         A.     I mean, if a user -- there are multiple
22    ways to see this, and one of the ways is if there is
23    an e-mail that a user receives and it doesn't forward
24    it, he doesn't send to anybody on his team or he
25    doesn't get a reply, well, the e-mail wouldn't be
```

```
 1    preserved.  It's just like an advertisement, you
 2    delete an advertisement, you don't forward it, you
 3    just delete it.
 4              But if there is an e-mail that you get and
 5    you have to do something with it, you either forward
 6    it or you copy it to somebody or it was copied to
 7    somebody else within the e-mail system, yes, we will
 8    have a copy of that e-mail.
 9        Q.    All right.  I'm just trying to get an
10    understanding of how your system and the backup
11    works.  The advertisement you gave me an example of,
12    it's not forwarded to anybody, it just comes from an
13    outside source to someone's e-mail, they delete it
14    off their Outlook, it is saved in backup for 90 days
15    after which time it's overwritten, correct?
16        A.    That is correct.
17        Q.    And same -- even if it wasn't an
18    advertisement, if it was an e-mail from a client
19    outside the firm that was not forwarded to someone
20    else in the firm, once that is deleted and after the
21    90-day period, it's gone, correct?
22              MR. SPOTSWOOD:  Objection to form.
23              MR. ENYARD:  Objection.
24              THE WITNESS:  Can I --
25              MR. SPOTSWOOD:  No, you can go ahead and
```

```
 1        answer.
 2                THE WITNESS:  Can you ask the question
 3        again?
 4                MR. WELLS:  Can you read it back?
 5                (The Reporter read back the requested
 6        portion.)
 7                THE WITNESS:  On October 2011, yes.
 8    BY MR. WELLS:
 9        Q.      Okay.  Now, sometimes people using Outlook
10    will utilize Outlook folders.  Do you know what I'm
11    talking about?
12        A.      Yes, sir.
13        Q.      Some people organize it, say if it's a
14    lawyer, they may organize it by case name and drag
15    from their inbox into a folder.
16        A.      That's correct.
17        Q.      In that case, someone drags a case-related
18    e-mail into a folder on their Outlook, what impact
19    does that have on that e-mail on the server, does it
20    pull it off of the server at that point?
21        A.      No.
22        Q.      Okay.  So even the folders are still
23    maintained on the server?
24        A.      Correct.
25        Q.      Just in the 90-day backup form or on the
```

```
1   active server?

2       A.      On the active server.

3       Q.      Okay.  And if someone were to drag from

4   their inbox e-mails onto an external device, would

5   those be removed from the active server?

6       A.      First, how are you going to drag something

7   to an external device?  I don't see that as a

8   possibility.

9       Q.      If someone plugs in, say, an external hard

10  drive.

11      A.      Correct.

12      Q.      You can select any number of e-mails,

13  highlight them, you understand that?

14      A.      Uh-huh, yes.

15      Q.      And you can drag those e-mails onto that

16  external device, correct?

17      A.      I don't think you can do that.

18      Q.      You don't think it makes a copy of those

19  e-mails onto the external device?

20      A.      No, I don't think you can do what you are

21  describing.

22      Q.      Okay.  All right.  We have identified one

23  possibility of an e-mail being removed from the

24  server and that is deleting it, right?

25              MR. ENYARD:  Objection.
```

**CONFIDENTIAL**                                            24

```
1                    THE WITNESS:  I'm sorry, can you -- can
2          you -- so what are you saying?  I'm sorry.
3     BY MR. WELLS:
4          Q.     One possibility that we've discussed today
5     of removing an e-mail from the Conrad & Scherer
6     server is deleting it, right?
7                    MR. SPOTSWOOD:  Objection to form.
8                    You may answer.
9                    THE WITNESS:  In order to delete an
10         e-mail, you have to do a double delete.  You have
11         to delete the e-mail and then go into the deleted
12         folders and purge delete and then wait 90 days
13         and -- no, actually more than 90 days because it's
14         going to be backed up on the transport dumpster
15         for a certain period of time and wait 90 days
16         until that e-mail disappears.
17    BY MR. WELLS:
18         Q.     Okay.  So that's one way an e-mail can be
19    removed from the server, right?
20         A.     That is correct.
21         Q.     What other ways can e-mails be removed from
22    the Conrad & Scherer server?
23         A.     That's -- to my knowledge, that's the only
24    way.
25         Q.     We spoke a little while ago about transfer
```

1    of computers, a user has one computer for a period of
2    time and they get a new computer.  I'd like to ask
3    you a little bit about what goes on in that transfer.
4    One thing I think Mr. Scherer said is the hard drive
5    from the old computer is removed and then is it
6    maintained in your department?
7              MR. SPOTSWOOD:  Object to the form.
8              You may answer.
9              THE WITNESS:  On which period of time?
10   BY MR. WELLS:
11        Q.    October 2011 through December 2013.
12        A.    They were preserved for certain cases.
13   And let me -- yeah, basically, they were -- they
14   were -- the hard drives were removed for certain
15   cases, yes.
16        Q.    Certain legal cases?
17        A.    No.  How do I say this?  I'm sorry.  As my
18   attorney told you before, my -- I have to translate
19   the question in my mind.  English is not my native
20   language.
21              It's not for certain -- I'm sorry.
22        Q.    Let me see if I ask you this way:  You gave
23   us an example earlier of somebody that may work here
24   for a month.
25        A.    Yes.

```
 1        Q.      You would not necessarily remove that
 2   person's hard drive.  Is that what you're referring
 3   to as far as in certain cases?
 4        A.      No, no, no, no.  What I am referring to is
 5   if there is a secretary that leaves, I mean, during
 6   that -- during that period of time, we wouldn't
 7   necessarily preserve the hard drive for that person.
 8        Q.      How about attorneys?
 9        A.      Usually we will preserve the hard drives.
10        Q.      Before preserving the hard drive, is there
11   any effort to transfer the data from the old computer
12   to the new computer?
13        A.      The way that the process works --
14                MR. SPOTSWOOD:  I'm going to -- I'm going
15          to object to the form because you've now
16          transitioned, I think, from current employee, old,
17          new computer as opposed to somebody leaving.  So
18          just -- I want clarity about what you're asking.
19   BY MR. WELLS:
20        Q.      Okay.  Well, let me ask you this way:  If
21   you have an attorney that's not leaving the firm --
22        A.      Uh-huh.
23        Q.      -- he's just transferring from one computer
24   to another --
25        A.      Correct.
```

1      Q.      -- is the hard drive from the old computer

2   preserved?

3      A.      In most of the cases, yes.

4      Q.      Okay.  All right.  Same circumstances,

5   attorney's staying at the firm but just switching

6   from an old computer to a new computer.  Before the

7   hard drive is preserved, is there an effort made to

8   transfer the data from the old computer to the new

9   computer?

10     A.      The easiest way -- I wouldn't say it like

11  that.  What we do is a simple process.  It is let's

12  say an attorney is changing computers, so it's

13  quicker instead of transferring the data from one

14  computer to the other, we pull the old hard drive, we

15  connect it into the new computer and copy the data

16  from the old hard drive to the new computer, then we

17  preserve the hard drive.

18     Q.      Okay.  When you're doing that, do you copy

19  the entire hard drive or just selected data?

20     A.      I'll copy only the user profile which

21  stores the user data.  I don't copy the entire hard

22  drive, which will be programs and operating system

23  files.

24     Q.      Okay, but the user profile that's copied,

25  that would include any e-mails?

```
 1        A.      We rely on a system -- Exchange is a
 2    system that relies on the server.  We sync the
 3    e-mails from the server.  We rely on a system that
 4    preserves everything on the server.  So when we copy
 5    the user's profile from one computer to another, yes,
 6    we copy all the data, but the e-mails will start
 7    syncing from the server, will be syncing whatever
 8    content is on the server.
 9        Q.      Okay, but the e-mails that are on that
10    person's old computer that are not stored solely on
11    the computer -- on the server, they are on the
12    computer, are those transferred over to the new
13    computer?
14              MR. SPOTSWOOD:  Object to the form.
15              You may answer.
16              THE WITNESS:  The users will have
17          everything synced on the server before the
18          computer is even moved, so the primary repository
19          of the data, it's on the server.
20    BY MR. WELLS:
21        Q.      I understand that, but, for example, if
22    someone has a laptop, takes it on an airplane, it's
23    not connected to the server at that point if they
24    have no internet connection, would that be accurate?
25        A.      That is correct.
```

```
 1        Q.      They could open up their Outlook and see
 2   whatever e-mails were already in their Outlook at
 3   that point, couldn't they -- could they not?
 4        A.      That is correct.
 5        Q.      Okay.  So those e-mails that exist on the
 6   computer and can be viewed without actually having to
 7   sync to the server --
 8        A.      Uh-huh.
 9        Q.      -- do those get transferred when you're
10   transferring data from the old computer to new
11   computer?
12              MR. SPOTSWOOD:  Object to the form.
13              You may answer.
14              THE WITNESS:  When a user gets on a plane,
15        the data is on the server.  What works on the
16        computer is just a copy of whatever is on the
17        server, but the primary repository is on the
18        server.
19   BY MR. WELLS:
20        Q.      I understand that, but there is a copy on
21   the computer, right?
22        A.      That is correct.
23        Q.      Does that copy, is that part of the data
24   that is transferred from the old computer to the new
25   computer?
```

```
 1                    MR. SPOTSWOOD:  Object to the form.
 2                    You may answer.
 3                    THE WITNESS:  The information -- I mean,
 4            the -- if you are referring to the local storage,
 5            that -- it wouldn't matter.  I mean, it will be
 6            copied, but it will be resynced the moment that it
 7            connects to the server.
 8      BY MR. WELLS:
 9            Q.    Okay.  Well, there may be duplication, but
10      there -- the copies on the computer will be
11      transferred over?
12                    MR. SPOTSWOOD:  Object to the form.
13      BY MR. WELLS:
14            Q.    Correct?
15                    MR. SPOTSWOOD:  Object to the form.
16                    THE WITNESS:  I think I already answered
17            the question.
18      BY MR. WELLS:
19            Q.    Well, if you would, please, answer that
20      question again.
21            A.    It is -- everything is synced from the
22      server.  The primary copy of the e-mails, the primary
23      repository of the e-mails is on the server.  The
24      computer syncs with the server and grabs whatever is
25      on the server.  So if the e-mail file has been
```

```
 1   copied, it will be, but it will be resynced with
 2   whatever is on the server.
 3        Q.    Okay.  When in this case were the e-mails
 4   of Bill Scherer searched?
 5        A.    Excuse me?
 6        Q.    When in this case were the e-mails of Bill
 7   Scherer first searched?
 8             MR. SPOTSWOOD:  Object to the form.
 9             You may answer.
10             THE WITNESS:  E-mails from Bill Scherer on
11        this case?
12   BY MR. WELLS:
13        Q.    Yes.
14        A.    I don't recall -- I don't -- I don't know
15   the details on that.
16        Q.    All right.  We've been provided some
17   documentation showing certain Exchange Server
18   searches, if you're familiar with those.
19        A.    Yes, I'm familiar with those.
20        Q.    Outside of those Exchange Server searches,
21   do you have knowledge of any other searches that were
22   performed on the e-mails in this case?
23             MR. SPOTSWOOD:  Object to the form.  I
24        actually request that you show the witness what
25        you're talking about with respect to the Exchange
```

1       Server documents in question.

2                MR. WELLS:  We are going to get there.

3                THE WITNESS:  So can you rephrase again?

4       I'm sorry.  I'm not following the train of thought

5       that you have right now.

6    BY MR. WELLS:

7       Q.    Were there searches performed of Conrad &

8    Scherer individual's e-mails other than Exchange

9    Server searches?

10      A.    On what --

11               MR. SPOTSWOOD:  Object to the form.

12               You may answer.

13               THE WITNESS:  On what period of time?

14   BY MR. WELLS:

15      Q.    From October 2011 to the end of 2013.

16      A.    There were some searches on Conrad &

17   Scherer's e-mail servers and there were some searches

18   on the IRAdvocates servers.

19               THE REPORTER:  On the what servers?

20               THE WITNESS:  IRAdvocates.

21   BY MR. WELLS:

22      Q.    When were those searches performed?

23      A.    I don't recall the exact dates.  I know

24   there were some searches on June 2012 and some others

25   on September 2013, but I wouldn't say -- I know there

```
1    were more searches.

2         Q.     Okay.

3         A.     And those searches were preserved and

4    stored and we still have copies of those searches.

5         Q.     And those searches you just identified for

6    me were done on the Exchange Server, is that right?

7         A.     Yes.

8                I'm sorry, can I take a break?

9                MR. WELLS:  Sure.

10               THE VIDEOGRAPHER:  Okay.  We are off the

11        record.  It's 9:51 p.m. -- a.m.

12               (Brief recess was taken.)

13               THE VIDEOGRAPHER:  We are back on record.

14        It is 10:01 a.m.

15               MR. WELLS:  Mr. Rodriguez, before we

16        broke, we were discussing a little bit about

17        Exchange Server searches.  I'm going to show you

18        what's been marked as Exhibit 2.

19               (Plaintiff's Exhibit 2, spreadsheet, was

20   marked for Identification.)

21   BY MR. WELLS:

22        Q.     Is that a spreadsheet that reflects

23   Exchange Server searches performed in this case?

24        A.     Give me a minute.

25        Q.     Take your time.
```

1       A.      This is going to take some time.  It's a

2  large spreadsheet as you may have noticed.

3               Yes.

4       Q.      Okay.  As we go through this document, just

5  so we are both on the same page, you can see on the

6  left-hand side, there's a column that has numbers in

7  it.

8       A.      Yes.

9       Q.      And then on the top, there's a row that has

10  letters.

11      A.      Yes.

12      Q.      Okay.  When I try to direct you to a

13  particular box, I'll refer you to the number and

14  letter.

15      A.      Correct.

16      Q.      Okay.  Now, first of all, before we get

17  into this, is Conrad & Scherer aware of other

18  searches for Conrad & Scherer e-mails other than what

19  is reflected on this Exchange Server search

20  spreadsheet?

21              MR. SPOTSWOOD:  Object to the form.

22              You may answer.

23              THE WITNESS:  These Excel spreadsheet only

24       refers, from what I am seeing, the searches done

25       only on Conrad & Scherer's e-mail server.

```
 1    BY MR. WELLS:
 2         Q.      Okay.  So is the answer that you're aware
 3    of other searches that were done for e-mails?
 4         A.      Yes, there were other searches done.
 5         Q.      What were those searches?
 6                 MR. SPOTSWOOD:  Object to the form.
 7                 You may answer if you know.
 8                 THE WITNESS:  There were searches on the
 9         IRAdvocates e-mail server which are not reflected
10         on this spreadsheet.
11    BY MR. WELLS:
12         Q.      Okay.  When were those performed?
13         A.      There were many searches.  I don't recall
14    the dates.
15         Q.      Can you give me a year?
16         A.      2014.  I don't recall the dates.  Not the
17    year.  I don't remember in detail that information.
18    I may have to check.
19                 MR. SPOTSWOOD:  And just so you know, the
20         time frame that we're talking about here for
21         purposes of this deposition is not after, in my
22         understanding, October 15th of 2014.  That's not
23         what we are talking about here.
24                 THE WITNESS:  We are talking about
25         after --
```

```
 1              MR. SPOTSWOOD:  Pre-October --
 2              THE WITNESS:  2011?
 3              MR. SPOTSWOOD:  Pre-October 2014.
 4              THE WITNESS:  2014.
 5              MR. SPOTSWOOD:  Before that.
 6              THE WITNESS:  There were searches done on
 7      that server.
 8              MR. SPOTSWOOD:  Okay.
 9   BY MR. WELLS:
10      Q.    Where is the documentation reflecting those
11   searches?
12      A.    It's on the IRAdvocates server.
13      Q.    All right.  Was there a spreadsheet created
14   similar to this one to show those searches?
15      A.    I don't recall.
16      Q.    Were the searches that were performed on
17   the IRAdvocates server, whether in documentary form
18   or otherwise, provided to Dennis Williams for review?
19      A.    Excuse me, can you -- what is the question
20   again?
21      Q.    Were the searches that were performed on
22   the IRAdvocates server --
23      A.    Uh-huh.
24      Q.    -- provided to Dennis Williams for review?
25              MR. SPOTSWOOD:  Object to the form.
```

```
 1                You may answer.
 2                THE WITNESS:  I don't recall, but,
 3         actually, let me -- I think they were given to
 4         Dennis Williams, but I am not a hundred percent
 5         sure on that.
 6    BY MR. WELLS:
 7         Q.     When were these searches performed?
 8         A.     Again, I think I already answered that
 9    question.  The searches were done before
10    October 2014.
11         Q.     Were they done before January of 2014?
12         A.     As I stated to you before, I don't recall
13    the exact date.
14         Q.     Are you aware of any searches that were
15    done in the year 2013 on the IRAdvocates server?
16                MR. SPOTSWOOD:  Object to the form.
17                You may answer.
18                THE WITNESS:  I don't recall.  I will have
19         to see that information.
20    BY MR. WELLS:
21         Q.     So this spreadsheet that we are looking at
22    here which is Exhibit 2 would reflect all of the
23    Exchange Server searches for the Conrad & Scherer
24    e-mails, is that right?
25         A.     That is correct.
```

```
 1        Q.      Okay.  And the only person in Conrad &

 2   Scherer that runs e-mails through the IRAdvocates

 3   server is Terry Collingsworth?

 4               MR. SPOTSWOOD:  Object to the form.

 5               You may answer.

 6   BY MR. WELLS:

 7        Q.      Is that correct or incorrect?

 8               MR. SPOTSWOOD:  Object to the form.

 9               THE WITNESS:  I'm sorry, I think I did not

10        understand your question.

11   BY MR. WELLS:

12        Q.      Who utilizes the IRAdvocates server for

13   e-mail purposes?

14        A.      Terry Collingsworth and the IRAdvocates

15   people.

16        Q.      Who other than Terry Collingsworth that is

17   also an employee of Conrad & Scherer?

18        A.      I don't -- I don't recall.  I don't recall

19   the users, I'm sorry.

20        Q.      Okay.  One thing I meant to ask you

21   earlier, for paralegals -- when we were talking about

22   changing computers and the process of removing and

23   preserving the hard drive, you said it is not done

24   for secretaries, it is done for attorneys, is that

25   correct?
```

 1        A.        It is done for attorneys.

 2        Q.        And it's not done for any secretaries?

 3                  MR. SPOTSWOOD:  Object to the form.  Time,

 4        time frame.

 5                  THE WITNESS:  Well, you're talking about

 6        which period of time?

 7   BY MR. WELLS:

 8        Q.        2011 through the end of 2013.

 9        A.        It depends.  There were some paralegals

10   where their computers -- their hard drives were

11   preserved.

12        Q.        Who?

13        A.        Danielle Kisslan, for example.

14        Q.        How about Susana Tellez?

15                  MR. SPOTSWOOD:  Object to the form.

16                  You may answer.

17                  THE WITNESS:  I think we do have her hard

18        drive.

19   BY MR. WELLS:

20        Q.        How about Victoria Ryan?

21        A.        We have the computer that she used.

22        Q.        Maggie Crosby?

23        A.        She used the same computer as Victoria

24   Ryan, so the computer was preserved.

25        Q.        Back to Exhibit 2, if you flip to the

```
 1    second page of this exhibit, row 3, looking at
 2    box 3E --
 3         A.     Uh-huh.
 4         Q.     -- does that show you whose e-mails were
 5    searched?
 6         A.     No.  It says which mailbox was searched.
 7         Q.     Okay.  So which mailbox was searched in
 8    that search?
 9         A.     Terry Collingsworth.
10         Q.     All right.  That search would not have been
11    firm wide, correct?
12         A.     No.
13         Q.     So this search would only recover e-mails
14    in Terry Collingsworth's mailbox, right?
15         A.     That is correct.
16         Q.     And as far as page numbering, do you see at
17    the bottom right-hand corner, there's the CSTC
18    number?
19         A.     Yes.
20         Q.     I will just refer you to the last three
21    numbers of those as we go along, if that's okay.
22         A.     That is correct.
23         Q.     All right.  Let's flip over to 020.
24         A.     020?
25         Q.     Yeah, just the last three numbers of that
```

```
1    long --
2        A.    I'm sorry, let me go back again.   So
3    CSTC020, okay.
4        Q.    I'll give you the whole number.
5    CSTC012020.
6        A.    Okay.  Oh, sorry.  Yes.
7        Q.    And in box 3I --
8        A.    Uh-huh.
9        Q.    -- it shows that this search was performed
10   for e-mails in Mr. Collingsworth's mailbox where the
11   senders were either oteromivan@hotmail.com or
12   jblanco1999@yahoo.com, right?
13       A.    That is correct.
14       Q.    And then you flip on the next page at 3J,
15   the search was also for e-mails that would have come
16   from either of those two e-mail addresses, right?
17       A.    That is correct.
18       Q.    And if we flip to CSTC012023, in box 3X,
19   does that show you when the search was performed?
20       A.    That is correct.
21       Q.    And that was June 15, 2012?
22       A.    Yes.
23       Q.    And then in 3W, does that tell you who ran
24   the search?
25       A.    Yes.
```

```
 1        Q.      And this says, "Admin."
 2        A.      Yes.
 3        Q.      Would that be you?
 4        A.      Usually I use the admin account, yes.
 5        Q.      Okay.  Is anyone else in Conrad & Scherer
 6   able to search using this admin account other than
 7   you?
 8        A.      Yes.
 9        Q.      Who?
10        A.      Natasha, Natasha Klaverweide.  She's my
11   assistant.
12        Q.      Okay.  She works here in the Fort
13   Lauderdale office?
14        A.      Yes.
15        Q.      Okay.  Anyone other than Natasha?
16        A.      Nobody else.
17        Q.      Okay.  You can just keep that in front of
18   you because we'll probably be talking about it some
19   more, but I wanted to show you --
20        A.      Let me put it together.
21                Do I need this?
22        Q.      You can put that to the side.
23        A.      Okay.
24                (Plaintiff's Exhibit 3, e-mails, was marked
25   for Identification.)
```

CONFIDENTIAL                                    43

```
1    BY MR. WELLS:
2         Q.     I'm going to show you what's been marked --
3                MR. SPOTSWOOD:  Trey, this --
4    BY MR. WELLS:
5         Q.     -- Exhibit 3.
6                MR. SPOTSWOOD:  I want to be clear about
7         what we are doing here in terms of, you know, are
8         we -- are we on 30(b)(6) issues, are you talking
9         to him individually?  I frankly assume that you've
10        been talking to him in his capacity as a 30(b)(6)
11        representative and that's what I'm going to assume
12        unless you tell me otherwise.
13               MR. WELLS:  Well, if he needs to
14        distinguish, that's fine.  I think pretty much
15        everything I'll be asking him will -- although a
16        lot of it will be in his personal knowledge, would
17        also be encompassed in these topics.
18               MR. SPOTSWOOD:  Okay.
19   BY MR. WELLS:
20        Q.     All right.  This is an e-mail from -- or an
21   e-mail chain, I guess, from June 15, 2012, is that
22   right?
23        A.     That is correct.
24        Q.     On the second page, there's an e-mail from
25   Maggie Crosby to you on June 15, 2012, is that right?
```

```
 1        A.       That is correct.

 2        Q.       Okay.   And it looks like she's asking you

 3   to perform that search we just looked at for these

 4   two e-mail addresses, oteromivan@hotmail and

 5   jblanco99@yahoo?

 6        A.       That is correct.

 7        Q.       And we just saw you did perform that search

 8   on that day, right?

 9        A.       Uh-huh.

10        Q.       After Maggie's e-mail, you respond to her

11   and say, "Maggie, the search is done.   The PST file

12   is located on the I drive under Drummond lawsuit.

13   The file is called TC Drummond search."   Do you see

14   that?

15        A.       Sorry.

16        Q.       At the very bottom.

17        A.       Yes.

18        Q.       So you performed that search, created a PST

19   of the results and then put them on the I drive?

20        A.       That is correct.

21        Q.       What is the I drive?

22        A.       That's the drive that the Washington

23   office uses to store the documents.

24        Q.       Is it accessible from the Fort Lauderdale

25   office?
```

1          A.      Yes, it is.

2          Q.      Just above your e-mail, Ms. Crosby responds

3    to you and says, "Thank you, Juan.  Can you tell me

4    how to look on his Mac also?"  Do you see that?

5          A.      Yes.

6          Q.      And this time in mid 2012 was a period of

7    time that Mr. Collingsworth was using a MacBook

8    laptop, is that your understanding?

9              MR. SPOTSWOOD:  Object to the form.

10             You may answer.

11             THE WITNESS:  He was using a MacBook Pro,

12      yes.

13   BY MR. WELLS:

14         Q.      Then above that, it appears you give her

15   some instructions how to do that.  And then above

16   that, she asks you again essentially referring to the

17   instructions you gave her, "For the e-mails that you

18   pulled to his Mac?"  Do you see that?

19         A.      Yes.

20         Q.      And you respond, "No, those are the

21   e-mails" on the e-mail -- "from the e-mail system.  I

22   don't have his Mac, so I cannot get anything from

23   there."  Did I read that correctly?

24         A.      Yes.

25         Q.      So you're telling her there that the

```
 1    e-mails that you pulled from this search that are in
 2    that PST are from the e-mail system, the server,
 3    right?
 4                 MR. SPOTSWOOD:  Object to the form.
 5                 You may answer.
 6                 THE WITNESS:  Yes.
 7    BY MR. WELLS:
 8         Q.    But there are also e-mails on his Mac that
 9    are not on the server, right?
10                 MR. SPOTSWOOD:  Object to the form.
11                 You may answer.
12                 THE WITNESS:  Again, what is the question
13        again?  I'm sorry.
14    BY MR. WELLS:
15         Q.    At the time of this e-mail, you're aware
16    there were e-mails on his Mac that were not also on
17    the server, weren't you?
18                 MR. SPOTSWOOD:  Object to the form.
19                 You may answer.
20                 MR. ENYARD:  I'm sorry, could you restate
21        the question?
22                 THE REPORTER:  You want me to read it
23        back?
24                 MR. ENYARD:  Yeah.
25                 (The Reporter read back the requested
```

```
 1    portion.)
 2              MR. SPOTSWOOD:  Object to the form of
 3         that.
 4              You may answer.
 5              THE WITNESS:  No, that's what it -- that's
 6         what the e-mail says.
 7    BY MR. WELLS:
 8         Q.    That there are e-mails on his Mac that you
 9    can't access because they are not on the server?
10         A.    I mean, this is -- first, there's a
11    problem with the context of these e-mail, not all the
12    information is on this e-mail.
13              Yeah, that's what it says.
14              (Plaintiff's Exhibit 4, e-mails, was marked
15    for Identification.)
16    BY MR. WELLS:
17         Q.    Let me show you what's been marked as
18    Exhibit 4, which is another series of e-mails from
19    the day before.
20         A.    Uh-huh.
21         Q.    And this is the day before the e-mails we
22    were just talking about, right?
23         A.    Correct.
24         Q.    Ms. Crosby, in the first e-mail, says to
25    you, "Hi, Juan.  I need to run searches through
```

1    Terry's old e-mails to produce for Defendants in a

2    case," right?

3         A.      That is correct.

4         Q.      She says, "I know that you had had to pull

5    them off and save them somewhere when his computer

6    got switched over."  Was that the switch to the

7    MacBook?

8         A.      I don't know what she meant by that.

9         Q.      Okay.  Did you pull old e-mails off

10   somewhere?

11        A.      I did not pull any e-mails from anywhere

12   and I don't know what she meant by "pull off."

13        Q.      Okay.  She concludes by asking you, "What's

14   the best way for me to run searches through all his

15   old e-mails," right?

16        A.      Yes, that's her question.

17        Q.      And then you respond to her by saying,

18   "Maggie, his old e-mails are in the Mac," right?

19        A.      Yes.

20        Q.      What e-mails were you referring to there?

21        A.      But also I'm asking her what -- I need

22   more information.

23        Q.      Right.  What old e-mails were in the Mac?

24        A.      I'm going to give you a little background

25   of what happened.  I got to the firm in December 2010

CONFIDENTIAL                                          49

```
 1    and on October, late October 2011, I was able to
 2    control -- to grab control from the IRAdvocates
 3    e-mail server.
 4             So, in an effort to be able to run the
 5    searches, I don't have anymore -- so I transferred
 6    what -- Terry Collingsworth, he had a series of web
 7    e-mail servers during that period of time.  So I
 8    copied the e-mail that was on one of the web mail
 9    servers into my Conrad & Scherer e-mail server so we
10    can do those searches and we can have a historic
11    record of what's going on besides other reasons.  So
12    that's what it is.  I'm guessing that anything that
13    he had prior to that, probably they are on his Mac,
14    but that's -- that's that.
15        Q.    Okay.  So, June 14, 2012, you're telling
16    Ms. Crosby Mr. Collingsworth's old e-mails are on the
17    Mac, right?
18        A.    But I need a time frame.  I mean, old
19    e-mails, I don't remember which old e-mails is she
20    referring to.
21        Q.    Mr. Rodriguez, you wrote this e-mail,
22    correct?
23        A.    That is correct.
24        Q.    All right.  You say to Maggie Crosby on
25    June 14, 2012, "His old e-mails are in the Mac."  Is
```

1    that right?

2         A.      That is correct.

3         Q.      On June 15, 2012, you inform Ms. Crosby

4    that you have done a search on the Exchange Server,

5    correct?

6         A.      Uh-huh.

7         Q.      I need a verbal answer.

8         A.      Yes.

9         Q.      And she asks you about those e-mails and

10   you say those are only the e-mails from the server,

11   they are not the e-mails on his Mac because you can't

12   get the e-mails from his Mac.  Isn't that what you

13   tell her?

14        A.      That's what I say, yes.

15        Q.      Okay.  On the June 14th e-mail -- what

16   exhibit number is that?

17        A.      4.

18        Q.      I notice you copied Mr. Collingsworth on

19   your response, is that right?

20        A.      That is correct.

21        Q.      Why did you copy him if he wasn't included

22   in Ms. Crosby's first e-mail?

23        A.      I wouldn't recall that.  E-mail was from

24   three years ago.

25        Q.      So you don't recall?

```
1          A.      No.

2          Q.      Let's go back to Exhibit 2, which is the

3     large spreadsheet.

4               MR. DAVIS:  Let's just say -- let me just

5          say this:  If you're assuming this is a 30(b)(6)

6          deponent, then "I don't recall," that really is

7          not a good answer because he needs to -- it's not

8          his personal knowledge, it's the firm's knowledge

9          that he's being asked, but anyway --

10              MR. SPOTSWOOD:  He's the most

11         knowledgeable person that we have with respect to

12         the e-mail traffic that he's being questioned

13         about and that's -- that's, I think, fully

14         responsive to our obligations.

15              MR. DAVIS:  Okay.  Well, I don't.  And he

16         was -- he's charged with the responsibility to

17         have refreshed his recollection prior to today and

18         this is not -- for the record, it does not appear

19         to be a good faith refreshing of his recollection.

20              MR. ENYARD:  Could you identify for me

21         which topic that e-mail goes to?

22              MR. WELLS:  Searches for e-mails as well

23         as Mr. Collingsworth's missing e-mails.

24              MR. ENYARD:  Which number?  In Exhibit 1,

25         which number?
```

```
 1              MR. WELLS:  All right.  We are going to
 2         stop right here.  Bob, I'm kind of getting now
 3         three lawyers and I understand if Kendall needs to
 4         jump in on some sort of technical issue, which is
 5         what was represented at the beginning of the
 6         deposition, but now we are getting a
 7         non-technical --
 8              MR. SPOTSWOOD:  I think of the three
 9         lawyers you're talking about might be Tony here,
10         but --
11              MR. DAVIS:  So we are all even, but going
12         forward, let's be you and Trey, okay?
13              MR. SPOTSWOOD:  The best of -- I may need
14         a little help, I respect the rules, but I hear
15         you.  Let's go.
16              MR. WELLS:  All right.  For you, number
17         11.  Number 12.
18    BY MR. WELLS:
19         Q.    All right.  Back to Exhibit 2.
20         A.    Uh-huh.
21         Q.    This is the spreadsheet of the Exchange
22    Server --
23         A.    Yes.
24         Q.    -- searches?
25              We've already talked about row 3, which
```

```
 1    was that June of 2012 search just of Mr.
 2    Collingsworth's e-mails and just with those two
 3    e-mail addresses we mentioned.
 4         A.     That is correct.
 5         Q.     The next two searches on this first page
 6    are in rows 6 and 7, is that right?
 7         A.     Yes.
 8         Q.     All right.  Look at the second page of the
 9    exhibit.
10         A.     One second.
11                Yes.
12         Q.     6E and 7E show you whose mailboxes were
13    searched, right?
14         A.     That is correct.
15         Q.     And every one of these people works in the
16    Fort Lauderdale Conrad & Scherer office, true?
17         A.     That is correct.
18         Q.     Okay.  This search did not search Mr.
19    Collingsworth's e-mails, right?
20         A.     That is correct.
21         Q.     Or anyone else in the Conrad & Scherer
22    Washington, D.C. office's e-mails, correct?
23         A.     That is correct.
24         Q.     Let's look at page CSTC012023.
25         A.     Uh-huh.
```

1      Q.      Shows that both these searches were run on

2    September 18, 2013.

3      A.      That is correct.

4      Q.      And run by admin, so that would have been

5    either you or Natasha?

6      A.      That is correct.

7      Q.      Do you know whether it was you or Natasha

8    that ran these particular searches?

9      A.      I don't remember who did it, but -- I

10    don't remember who.

11     Q.      Who requested that these two searches be

12    performed?

13     A.      I don't -- I mean, I know you said that I

14    don't recall exactly who -- who requested these

15    searches.  I mean, you will have to -- I don't recall

16    exactly, sorry.

17     Q.      All right.  Let's look at CSTC012019.

18     A.      Yes.

19     Q.      And in row 6 and 7, does this show the

20    search terms that were run for these two searches we

21    are discussing?

22     A.      Yes.

23     Q.      Row 6 includes the name Fernando Rubio,

24    right?

25     A.      Yes.

```
 1        Q.      Also includes a search for Ivan Otero and
 2   Mejia?
 3        A.      Uh-huh, yes.
 4        Q.      Do you know who Mejia is?
 5        A.      No idea.
 6        Q.      Also included as search terms are Joe
 7   Carrera and the name Mark Carlson.  Do you know who
 8   either of those two individuals are?
 9        A.      No idea.
10        Q.      All right.  And in number 7, the other
11   search that was run only in the Fort Lauderdale
12   office in September of 2013 includes work -- words
13   such as Mike Hugo?
14        A.      Yes.
15        Q.      Mejia?
16        A.      Yes.
17        Q.      Ivan Otero?
18        A.      Uh-huh, yes.
19        Q.      Fernando?
20        A.      Yes.
21        Q.      Payment?
22        A.      Yes.
23        Q.      Or nonpayment?
24        A.      Yes.
25        Q.      And you don't have any knowledge as to who
```

```
 1    requested these searches be performed?

 2              MR. SPOTSWOOD:  Object to the form.

 3              You may answer.

 4              THE WITNESS:  I don't recall.  I will have

 5       to go and check records in order to give this

 6       information for you.

 7    BY MR. WELLS:

 8       Q.    Okay.  You think you can do that today at a

 9    break?

10       A.    I don't think so.  Maybe, I don't know.

11    It would require some effort to look for who

12    requested these searches.  I don't have the -- yeah,

13    requires some effort.  I don't recall.

14       Q.    Who gave you the search terms?

15       A.    I wish I recall.

16       Q.    Who were the results provided to?

17       A.    I'm sorry, but I don't recall to whom I

18    gave these results.

19       Q.    Were the results of these searches saved

20    somewhere?

21       A.    Oh, yes.

22       Q.    Where?

23       A.    In the e-mail server, they are saved.

24    They are there.

25       Q.    Okay, but here in September of 2013,
```

```
 1    searches were not performed with these search terms
 2    on the D.C. office mailboxes, is that right?
 3         A.      That's right.
 4         Q.      So we have identified one search performed
 5    on Mr. Collingsworth's e-mails in June of 2012 just
 6    with Ivan Otero and Jaime Blanco, right?
 7         A.      That is correct.
 8         Q.      And then two searches performed in
 9    September of 2013 just of certain people in the
10    Florida office and just for these -- these search
11    terms that we've just discussed?
12         A.      That is correct.
13         Q.      Okay.  Now, there is a lot on this
14    spreadsheet that is redacted as privileged.  Do you
15    see that?
16         A.      Yes.
17         Q.      And is it your understanding that anything
18    that's redacted does not relate to this case?
19         A.      I don't know.  I'm not an attorney.
20         Q.      Okay.  Well, I'm just trying to figure out
21    do you have any knowledge -- well, let me do it this
22    way:  After these September 2013 searches, everything
23    in the spreadsheet is redacted until you get to
24    CSTC012068.
25         A.      Yes.
```

```
1          Q.      And we see some searches, looks like these
2    searches were performed in November of 2014, page
3    number CSTC012075.
4          A.      That is correct.
5          Q.      Between September of 2013 and November of
6    2014, are you aware of any other searches on the
7    Exchange Server for this case?
8          A.      Again, between what dates?  I'm sorry.
9          Q.      September of 2013 where they -- we had
10   those Rubio Mejia search terms.
11         A.      Yes.
12         Q.      And then here in November where we start
13   seeing terms such as Samario, El Tigre.  Are you
14   aware of any search terms between -- any searches on
15   the Exchange Server between September of 2013 and
16   November of 2014?
17         A.      Related to the case?
18         Q.      Yes.
19         A.      I mean, my job is to run the searches.  I
20   am not aware of which cases they are.  I mean, I know
21   there were a lot of searches run during that period
22   of time; however, I wouldn't know if it's related to
23   Drummond or any other case or -- I mean, there are
24   many cases with Drummond, but I don't know if this is
25   related to the libel case.
```

```
1              MR. WELLS:  All right.  Bob, I mean, he
2         has been designated as the person knowledgeable
3         about searches for this case and that question
4         goes directly to that issue.
5              MR. FREVOLA:  Can I have the question
6         back, please?
7              (The Reporter read back the requested
8    portion.)
9              MR. SPOTSWOOD:  Okay.  Let me have about
10        two minutes.
11             MR. WELLS:  Go off the record.
12             THE VIDEOGRAPHER:  We are off the record.
13        Time is 10:39 a.m.
14             (Brief recess was taken.)
15             THE VIDEOGRAPHER:  We are back on record.
16        It is 10:50 a.m.
17             MR. SPOTSWOOD:  Okay.  Couple of things.
18        One is I can represent to you that the information
19        that's been deleted or marked -- rather, marked
20        privileged from Exhibit 2 is our searches that are
21        unrelated to this case.
22             With respect to searches that are
23        reflected here, these are the searches for which
24        JC and his staff were responsible, okay?  So to
25        the extent that were -- there were additional
```

```
 1        searches done by Terry individually or people
 2        reporting to Terry individually -- did you hear
 3        me?
 4               THE VIDEOGRAPHER:  Yeah, I heard you.
 5               MR. SPOTSWOOD:  Okay.
 6               THE VIDEOGRAPHER:  Clear and --
 7               MR. SPOTSWOOD:  Okay, good.
 8               To the extent that others did searches
 9        individually on their own systems, JC would not be
10        knowledgeable of those.
11               MR. WELLS:  Well, who is going to be the
12        30(b)(6) for that?
13               MR. SPOTSWOOD:  The person who would be
14        knowledgeable about the searches that were
15        conducted in the D.C. office would be Terry
16        Collingsworth and presumably he could -- he would
17        know or we could get him ready to know what the
18        searches were done by the people that he was
19        working with in that office.
20               MR. WELLS:  Well, the problem is he did
21        not know, we've already asked him, which was the
22        purpose for this 30(b)(6) is to get an
23        understanding of who did know, he said he didn't
24        do the searches, so he wouldn't know what was
25        done.
```

```
 1              MR. SPOTSWOOD:  Okay.
 2              MR. WELLS:  So this witness has been put
 3        up as the firm's representative on the firm's
 4        document searches, which would include the D.C.
 5        office of the firm, but y'all are saying he does
 6        not have any knowledge as to any searches that may
 7        have been done in the D.C. firm?
 8              MR. SPOTSWOOD:  I believe that's correct.
 9        I'll let him confirm that.
10              That's correct?
11              THE WITNESS:  Yeah, that's correct.  I
12        mean, I am responsible for these searches.  If a
13        user goes on his mailbox and searches for
14        something, I don't have any record of what he has
15        searched on his computer.
16   BY MR. WELLS:
17        Q.    All right.  Let me ask you a couple
18   questions.
19              MR. SPOTSWOOD:  Are you also -- just to
20        clarify, you also asked, I think, for what the
21        instructions were for these searches and we are,
22        as we sit here right now, trying to undertake
23        that -- to find that out so he can respond to
24        that.
25
```

```
 1   BY MR. WELLS:
 2       Q.     All right.  One of the topics you were
 3   identified for and presume prepared for is topic 11,
 4   "Conrad & Scherer's searches for documents in
 5   response to Drummond's written discovery requests in
 6   this case from October 2011 through October 15,
 7   2014."  Now, in order to prepare as a 30(b)(6)
 8   representative for that topic, you had a meeting with
 9   counsel yesterday, is that correct?
10       A.     That is correct.
11       Q.     Did you interview anyone in the Washington,
12   D.C. office?
13       A.     No, I did not.
14       Q.     Did you interview anyone in the Fort
15   Lauderdale office?
16       A.     No, I did not.
17       Q.     And you have not gained any knowledge as to
18   what searches may have been performed by Conrad &
19   Scherer's Washington, D.C. office?
20       A.     The only searches that I am responsible is
21   what is on the Excel spreadsheet here and the ones on
22   the IRAdvocates.
23       Q.     In order to prepare for Conrad & Scherer's
24   searches, you did not do any investigation of what
25   may have been done in the D.C. office, is that true?
```

```
 1        A.       That's true.
 2                 MR. WELLS:  All right.  We need to take a
 3        break.
 4                 THE VIDEOGRAPHER:  We are off the record.
 5        It is 10:55 a.m.
 6                 (Brief recess was taken.)
 7                 THE VIDEOGRAPHER:  We are back on record.
 8        It's 11:11 a.m.
 9                 THE WITNESS:  Ready?
10                 MR. SPOTSWOOD:  Go ahead.
11                 THE WITNESS:  Just to clarify the record,
12        on line 6 and 7, I just educated myself on what is
13        this about.  This is an unrelated Drummond search.
14        This is for another case that -- I mean, they
15        request me to do the searches.  This is not
16        related to the Drummond libel case on Exhibit
17        Number 2.
18   BY MR. WELLS:
19        Q.       What case is it -- well, let me ask you
20   this:  Here on page CSTC012016 --
21        A.       Yes, Drummond search 2 and Drummond.
22        Q.       Right.  Both of them are identified as
23   Drummond searches, right?
24        A.       They are identified on this document as
25   Drummond searches; however, I just learned a few
```

1   minutes ago that these searches were not related with

2   this Drummond case.

3       Q.     What were they related to?

4       A.     To the Securepoint case.

5       Q.     Okay.  So if we take those two searches

6   out, we've got a June of 2012 search of just Mr.

7   Collingsworth's e-mail box and just to and from Ivan

8   Otero and Jaime Blanco, right?

9       A.     That's correct.

10      Q.     And then we skip on to November of 2014,

11  where we start seeing terms such as "Samario" and "El

12  Tigre."  I'm not going to read all of them, but --

13      A.     That is correct.

14      Q.     That's the next searches relating to this

15  case?

16      A.     Yes.

17      Q.     Okay.  So, between June of 2012 and

18  November of 2014, there were no Exchange Server

19  searches for any e-mails relating to this case?

20      A.     I wouldn't --

21          MR. SPOTSWOOD:  Object to the form.

22          You may answer.

23          THE WITNESS:  I may -- I wouldn't say

24      that.  There were no searches done by me or my IT

25      staff on this -- during that period of time, that

```
 1          doesn't mean that if a user searches his own

 2          mailbox, the documents will not come up.

 3    BY MR. WELLS:

 4          Q.      Okay.   What all users searched their

 5    mailboxes in that time period?

 6                  MR. SPOTSWOOD:   And let me tell you, at

 7          this point, we have got more work to do on that.

 8          This witness today is not ready to respond to what

 9          happened with the folks up in D.C. on that, but we

10          are working on it very hard right now.

11    BY MR. WELLS:

12          Q.      How about the folks in Florida; what users

13    in Florida searched their e-mail boxes between 2012

14    and 2014?

15          A.      I wouldn't know that.   I don't keep a

16    record of who searches their own mailbox during that

17    period of time.

18          Q.      So Conrad & Scherer has no knowledge of any

19    individual user in the Florida office searching their

20    individual e-mail box for e-mails responsive to this

21    case?

22                  MR. SPOTSWOOD:   Object to the form.

23                  You may answer.

24                  THE WITNESS:   Yeah, there's no way to know

25          that.
```

```
 1            MR. WELLS:  All right.  We are going to
 2     object to more work being done on a topic this
 3     person has been designated as the 30(b)(6)
 4     representative for.  We contend and believe that
 5     if he does not have knowledge of it today on a
 6     topic he's been designated for, the firm does not
 7     have knowledge of it and we will object to the
 8     firm attempting to backfill.
 9            MR. SPOTSWOOD:  The deposition notice says
10     that this will happen on dates and times to
11     agree -- be agreed by the parties or as ordered by
12     the Court.  We finally reached agreement on these
13     topics, these narrow topics, just a couple of days
14     ago.  We have been working very, very hard to
15     respond to these.  We obviously have some gaps
16     here with respect to these searches that are
17     outside of this individual's knowledge, scope, and
18     our effort is going to be to learn what that
19     information is which is missing and provide it to
20     you through an appropriate supplemental
21     designation.  If you don't want to listen to it,
22     that's your call.
23            MR. WELLS:  Well, we are here to hear
24     about it today.
25            MR. DAVIS:  Yes.
```

```
1              MR. WELLS:  And yesterday.
2              MR. SPOTSWOOD:  And you had 365-page
3         deposition yesterday.
4              MR. WELLS:  All right.  We asked Mr.
5         Scherer the first time his e-mails were searched
6         for this case and he said you'll have to ask the
7         IT department, which we are doing today.
8    BY MR. WELLS:
9         Q.     Are you aware of the first time Mr.
10   Scherer's e-mails were searched for this case?
11        A.     No.
12        Q.     Okay.  Your only knowledge is what's
13   reflected on this spreadsheet, is that right?
14        A.     That is correct.
15        Q.     So, to the best of your knowledge as
16   30(b)(6) here today, the first time Mr. Scherer's
17   e-mails were searched for this case was in November
18   of 2014?
19             MR. SPOTSWOOD:  Object to the form.
20             You may answer.
21             THE WITNESS:  From what it's saying --
22        what it says here, yes.
23   BY MR. WELLS:
24        Q.     Same for Billy Scherer, first time his were
25   searched would have been November of 2014 or later?
```

```
 1        A.      That is correct.

 2        Q.      Same for Richard Drath?

 3        A.      That is correct.

 4        Q.      Same for any other member of the Florida

 5   office?

 6                MR. SPOTSWOOD:  Object to the form.

 7                You may answer.

 8                THE WITNESS:  Yes.

 9   BY MR. WELLS:

10        Q.      All right.  And it appears the first time

11   the words "El Tigre" or "Samario" was searched in

12   this case was November of 2014.

13        A.      What page are you, I'm sorry?

14        Q.      Oh, CSTC012068.

15                MR. SPOTSWOOD:  Object to the form.

16                You may answer.

17                THE WITNESS:  Let me go to the page first,

18        then --

19                MR. SPOTSWOOD:  What was the page number

20        again?

21                MR. WELLS:  CSTC012068.

22                THE WITNESS:  I don't have 68.

23                MR. SPOTSWOOD:  I don't either.

24   BY MR. WELLS:

25        Q.      (Indicating).
```

```
 1        A.      Oh, you're right, sorry.
 2                Line 85?
 3                MR. ENYARD:  Hold on, JC.
 4                MR. SPOTSWOOD:  Hang on a second, I'm --
 5        got it, sorry.
 6                THE WITNESS:  Yes.
 7   BY MR. WELLS:
 8        Q.      Yes, line 85, looks like a search for
 9   Samario or El Tigre, first time those two search
10   terms were searched in this case was November of
11   2014, is that right?
12                MR. SPOTSWOOD:  Object to the form of
13        that.  We've already told you that he is not
14        knowledgeable about the individual searches that
15        were done, if any.
16   BY MR. WELLS:
17        Q.      You can answer the question.
18        A.      That I have knowledge, yes, that's the
19   first time that I, as Juan Rodriguez, an individual,
20   have knowledge about it.
21        Q.      Well, then based on all the preparation
22   you've done for today, that's the best of your
23   knowledge, right?
24                MR. SPOTSWOOD:  Object to the form.
25                You may answer.
```

```
 1              THE WITNESS:  That is correct.
 2   BY MR. WELLS:
 3        Q.    Look down at line 92.  Looks like a search
 4   for the Spanish word "pagos."  Is that right?
 5        A.    That is correct.
 6        Q.    That is Spanish for payments, true?
 7        A.    Yes.
 8        Q.    First term that -- first time that term was
 9   searched for in this case was November of 2014,
10   right?
11              MR. SPOTSWOOD:  Object to the form.
12              You may answer as to your personal
13         knowledge based upon what you've told your
14         limitations of knowledge are.
15              THE WITNESS:  Give me a minute, I'm going
16         to put the spreadsheet so I can see the whole
17         spreadsheet.
18              So we are talking about line 92, right?
19   BY MR. WELLS:
20        Q.    Yes.
21        A.    That is correct.
22        Q.    All right.  So, based on both your personal
23   knowledge and everything you've done to prepare for
24   this deposition today, the first time the Spanish
25   word for payments was searched for in this case was
```

1    November of 2014?

2            MR. SPOTSWOOD:  Object to the form of the

3        question and simply assumes that this individual,

4        and I've corrected this designation, he is not

5        knowledgeable of what -- about what happened in

6        the individual searches.

7            THE WITNESS:  Should I answer?

8    BY MR. WELLS:

9        Q.     Yes.

10           MR. DAVIS:  Just object to the form, not

11       speaking objections.

12           THE WITNESS:  Again, should I answer?

13   BY MR. WELLS:

14       Q.     Yes.

15       A.     Okay.  To my knowledge, these searches

16   were run -- the search that you -- the word

17   "payments" in Spanish, pagos, it was run on November

18   of 2014.

19       Q.     And to your knowledge and based on what

20   you've done to prepare for today, you're not aware of

21   it being searched prior to November of 2014, correct?

22           MR. SPOTSWOOD:  Object to the form.

23           You may answer.

24           THE WITNESS:  Not to -- yeah, to my

25       knowledge, I don't -- I don't know.

CONFIDENTIAL                                    72

```
1    BY MR. WELLS:
2         Q.    So first time Samario or El Tigre was
3    searched was in November of 2014, true?
4              MR. SPOTSWOOD:  Object to the form.
5              You may answer.
6              THE WITNESS:  Again, I wouldn't say that.
7         It was searched by me on the server.
8    BY MR. WELLS:
9         Q.    And that's all you have knowledge of?
10        A.    That's all I have knowledge.  I don't know
11   in -- I don't know if the users run those searches on
12   their individual mailboxes; I don't have a record of
13   that.
14        Q.    And the first time this Spanish word for
15   payments was run was November of 2014?
16        A.    That is correct.
17             MR. SPOTSWOOD:  Object to the form.
18             You may answer.  Sorry.
19             THE WITNESS:  Okay.
20             MR. WELLS:  He's answered.
21             (Plaintiff's Exhibit 5, brief, was marked
22   for Identification.)
23   BY MR. WELLS:
24        Q.    All right.  I'll show you what's been
25   marked as Exhibit 5.
```

```
1          A.      Give me a minute.

2          Q.      Okay.

3          A.      Do I need the spreadsheet?

4          Q.      You can put it away for right now.

5          A.      Okay.

6                  Okay.

7          Q.      This is a brief filed by the Defendants as

8    well as IRAdvocates.  And if you could just -- turn

9    to page 1 for me, please, the first numbered page.

10         A.      Okay.

11         Q.      Do you see the indented quotation there at

12   the bottom?  It's single spaced.

13         A.      Yes.

14         Q.      It says, "As we've previously discussed,

15   since 2008, Conrad & Scherer and IRAdvocates files

16   have overlapped for the purpose of the Drummond

17   litigation."  Do you know if that's a true statement?

18         A.      (Shaking head.)

19                 MR. SPOTSWOOD:  Object to the form.

20                 You may answer.

21                 THE WITNESS:  Let me read the whole

22         document.  I don't know the context.  I don't know

23         anything about this.  This is the first time that

24         I've seen this document.

25
```

**CONFIDENTIAL**                                    74

```
 1    BY MR. WELLS:
 2        Q.    Okay.  Well, you can just not look at the
 3    document.  Did Conrad & Scherer and IRAdvocates'
 4    files overlap to your knowledge for purposes of the
 5    Drummond litigation?
 6              MR. SPOTSWOOD:  Object to the form.
 7              You may answer.
 8              THE WITNESS:  That's a question for the
 9        attorneys.  I don't know if the files have been
10        overlap and I don't know which files are you
11        referring to, electronic files, documents.  I
12        don't know.
13    BY MR. WELLS:
14        Q.    Let's focus on electronic files.  Did the
15    electronic files overlap for purposes of the Drummond
16    litigation?
17              MR. SPOTSWOOD:  Object to the form.
18              You may answer.
19              THE WITNESS:  What I know is that the
20        Washington office uses a single file server and
21        they have the files in that server.  So I wouldn't
22        say overlapped, I would say they were stored in
23        the same server.
24    BY MR. WELLS:
25        Q.    At Conrad & Scherer's server?
```

1      A.      On Conrad & Scherer's Washington server,

2  yes.

3              MR. SPOTSWOOD:  Object to the form and

4      time frames are important here.

5              THE WITNESS:  Yeah.

6  BY MR. WELLS:

7      Q.      All right.  The next sentence says, "The

8  files for both entities were searched," both entities

9  being Conrad & Scherer and IRAdvocates, you

10  understand that?

11      A.      Correct.

12      Q.      Files for both of those entities were

13  searched and responsive documents were produced.

14              MR. SPOTSWOOD:  Object to the form.

15              You may answer.

16              THE WITNESS:  Question:  This is -- I

17      mean, the time frame for this, I mean, this is

18      prior -- I see that the document is filed on --

19  BY MR. WELLS:

20      Q.      October 24, 2013.

21      A.      Yes, so I don't know.

22      Q.      Okay.  We do know and you do know that, as

23  of October 24, 2013, that no searches had been run on

24  the Conrad & Scherer server for the terms -- we'll

25  start with the term "El Tigre," right?

1      A.      Let --

2              MR. SPOTSWOOD:  Object to the form.

3              You may answer.

4              THE WITNESS:  Let me correct that

5      statement.  What the spreadsheet shows are the

6      searches done on the e-mail server, not on the

7      file server.  So the searches done on the file

8      server, I mean, I don't have a record of those

9      searches.

10   BY MR. WELLS:

11     Q.      Do you have knowledge of them sitting here

12   today?

13     A.      Sorry?

14     Q.      Do you have knowledge of them so that you

15   can testify about them today, the searches on the

16   file server?

17     A.      Of the logs?  I don't have the logs.  I

18   don't know -- prior to October 24, 2013, I don't -- I

19   don't know that information.

20     Q.      Okay.  So, sitting here today based on your

21   personal knowledge as well as any knowledge you

22   gained in preparing for this deposition, it is your

23   understanding that no searches had been performed to

24   your knowledge as of October 2013 containing the word

25   "El Tigre," right?

**CONFIDENTIAL**                                                          77

```
 1                    MR. SPOTSWOOD:  Object to the form.
 2                    You may answer.
 3                    THE WITNESS:  I didn't -- I wouldn't say
 4           that the searches were not run, I just said that I
 5           don't know if the searches were run.
 6      BY MR. WELLS:
 7           Q.    And you don't know of any searches being
 8      run in -- as of October 2013 containing the word
 9      "Samario," do you?
10                    MR. SPOTSWOOD:  Object to the form.
11                    You may answer.
12                    THE WITNESS:  Again, as I stated before, I
13           don't have a record of what the user searched on
14           their local mailboxes nor the searches that the
15           users could have done on the file servers.
16      BY MR. WELLS:
17           Q.    And I'm asking you based on what you can
18      testify to here today based on all the work you've
19      done to prepare for this deposition --
20                    MR. SPOTSWOOD:  Object to the form --
21      BY MR. WELLS:
22           Q.    -- what searches do you have knowledge of
23      prior to October of 2013 that contain the word
24      "Samario"?
25                    MR. SPOTSWOOD:  Object to the form.
```

1          You may answer.

2          THE WITNESS:  I don't know any -- I don't

3      know anything about any searches performed for the

4      word "Samario" or "El Tigre."

5          MR. WELLS:  Okay.

6          (Plaintiff's Exhibit 6, brief, was marked

7      for Identification.)

8  BY MR. WELLS:

9      Q.     I'm going to show you what's been marked as

10  Exhibit 6, this is a brief filed by the Defendants on

11  October 31, 2013, and if you could just turn for me

12  to page 3.  Toward the bottom of the page, about

13  seven lines up, do you see the sentence beginning,

14  "Defendants disclosed the fact of security payments"?

15     A.     Yes, I -- I see the phrase.

16     Q.     All right.  It says, "Defendants disclosed

17  the fact of security payments in Balcero producing

18  all responsive non-privileged documents regarding

19  funds provided to Drummond witnesses through

20  June 2012, nearly a year after the letters at issue

21  were sent.  And Defendants recently supplemented this

22  with over 400 additional pages netted by the broader

23  requests in the libel case for all communications

24  regarding security payments."

25          What searches were done to respond to the

```
1    request in the libel case for all communications
2    regarding security payments?
3                MR. SPOTSWOOD:  Object to the form.
4                You may answer.
5                THE WITNESS:  Which time?
6    BY MR. WELLS:
7        Q.    As of October 31, 2013.
8        A.    I'll stay with the fact that me, Juan
9    Carlos Rodriguez, I did not know any searches that I
10   have run for these terms prior to October 2013.
11       Q.    And based on what you've done to prepare
12   for this deposition, you also don't know of any
13   searches done prior to October of 2013 responsive to
14   a request like that?
15               MR. SPOTSWOOD:  Object to the form.
16               You may answer.
17               THE WITNESS:  I do not know who -- or any
18       searches.  I mean, I don't know.  I don't know if
19       the searches were performed.
20               (Plaintiff's Exhibit 7, brief, was marked
21       for Identification.)
22   BY MR. WELLS:
23       Q.    I'm going to show you Exhibit 7, which is a
24   brief filed by the Defendants on April 14, 2014 in
25   opposition to Drummond's motion for sanctions.  If
```

```
 1     you'll turn with me to page 1.
 2          A.     Uh-huh.
 3          Q.     The bottom paragraph in the second sentence
 4     begins, "There's absolutely."  Do you see that?
 5          A.     Where, excuse me?
 6          Q.     The final paragraph.
 7          A.     Uh-huh.
 8          Q.     Second sentence.
 9          A.     Okay.
10          Q.     It says, "There's absolutely no issue of
11     the propriety of Defendants' searches or the
12     completeness of their production."  Well, as of April
13     2014, you are not aware of any searches being
14     performed for e-mails containing the search term "El
15     Tigre," are you?
16               MR. SPOTSWOOD:  Object to the form.
17               You may answer.
18               THE VIDEOGRAPHER:  10 minutes to tape
19          change.
20               THE WITNESS:  I don't know.
21     BY MR. WELLS:
22          Q.     You're not aware of any searches having
23     been performed as of April 2014 for e-mails
24     containing the term "Samario," are you?
25               MR. SPOTSWOOD:  Object to the form.
```

```
 1                    You may answer.
 2                    THE WITNESS:  I don't know.
 3    BY MR. WELLS:
 4         Q.    You are not aware of any searches as of
 5    April 2014 of Bill Scherer's mailbox, are you?
 6                    MR. SPOTSWOOD:  Object to the form.
 7                    You may answer.
 8                    THE WITNESS:  There were searches on Bill
 9         Scherer's mailbox for many other -- for many other
10         things.  I mean, there were searches on Bill
11         Scherer's mailbox.
12    BY MR. WELLS:
13         Q.    Before April of 2014?
14         A.    Yes.
15         Q.    Okay.  Tell me about those.
16                    MR. SPOTSWOOD:  I think you guys have lost
17         communication.  He thinks you're talking about
18         anything.
19    BY MR. WELLS:
20         Q.    Have you searched Bill Scherer's mailbox
21    for this case prior to April of 2014?
22         A.    Not that I'm aware of.
23         Q.    Okay.  And has anyone, to your knowledge?
24                    MR. SPOTSWOOD:  Object to the form.
25                    You may answer.
```

```
 1                 THE WITNESS:  I don't know.
 2    BY MR. WELLS:
 3        Q.      Okay.  Same question for Billy Scherer, Mr.
 4    Scherer's son.  As of April of 2014, you're not aware
 5    of anyone having searched his mailbox for e-mails
 6    responsive to this case, are you?
 7        A.      I don't know.
 8        Q.      And with respect to Richard Drath, as of
 9    April 2014, you're not aware of any search done by
10    this firm for e-mails responsive to this case, are
11    you?
12                MR. SPOTSWOOD:  Object to the form.
13                You may answer.
14                THE WITNESS:  I don't know.
15    BY MR. WELLS:
16        Q.      Do you offer IT support to the people in
17    the D.C. office?
18                MR. SPOTSWOOD:  Object to the form.
19                You may answer.
20                THE WITNESS:  Yes, I do.
21    BY MR. WELLS:
22        Q.      At times, you go up to the D.C. office to
23    assist with IT issues, right?
24        A.      Sometimes.
25                MR. SPOTSWOOD:  Object to the form.
```

```
 1                You may answer.
 2   BY MR. WELLS:
 3        Q.      Other times, you are able to remotely log
 4   in to someone's workstation to assist them with some
 5   issue they're having, right?
 6        A.      Yes, but we rely primarily on CTSS to do
 7   the work for the Washington office.
 8        Q.      I'm just asking have you had occasion to
 9   log in remotely to D.C. office computers to assist
10   with IT issues?
11        A.      Yes, I do.
12        Q.      And you had that capability, obviously,
13   right?
14        A.      Yes.
15        Q.      Have you also assisted Mr. Collingsworth
16   with computers he uses in his home office?
17        A.      I have not or not that I recall.  I'm
18   sorry, not that I recall.
19        Q.      Has he ever sent old home office computers
20   back to you --
21                MR. SPOTSWOOD:  Object to the form.
22   BY MR. WELLS:
23        Q.      -- for preservation or deletion?
24                MR. SPOTSWOOD:  Object to the form.
25                You may answer.
```

```
1                    THE WITNESS:  No.
2    BY MR. WELLS:
3         Q.    He's never done that?
4         A.    No.
5         Q.    Are you aware that certain of Mr.
6    Collingsworth's work computers were transferred from
7    his work office for use at his home?
8                    MR. SPOTSWOOD:  Object to the form.
9                    You may answer.
10                    THE WITNESS:  Can you give me a time frame
11        on that, please?
12    BY MR. WELLS:
13        Q.    There was an HP Compaq desktop in his home
14    from, say, 2010 to possibly into 2012.
15        A.    I was made aware of that during the
16    process of the litigation, but at the time, I did not
17    know about it.
18        Q.    Okay.  So if he had a home computer --
19    excuse me, if he had a work computer that was moved
20    into his home office for use in his work, there was
21    no pulling of the hard drive out of that computer,
22    for example?
23        A.    I mean, you are asking -- you're -- I
24    don't know --
25        Q.    Yeah.
```

```
 1        A.      You are -- that's a hypothetical.
 2        Q.      Do you have any knowledge of that?
 3              MR. SPOTSWOOD:  Object to the form.
 4              You may answer.
 5              THE WITNESS:  Can you ask -- can you ask
 6        the question again?  I'm don't sure -- I'm not
 7        sure if I got it.
 8   BY MR. WELLS:
 9        Q.      Do you have any knowledge of any computer
10   being transferred from Mr. Collingsworth's office in
11   D.C. to his home office?
12        A.      No.
13        Q.      Based on that answer, I assume you also
14   have no knowledge of any hard drive being pulled out
15   of that office computer prior to being sent to his
16   home?
17        A.      Yes, I don't have any knowledge about it.
18        Q.      And no knowledge regarding any transfer of
19   data off of that computer prior to it going to his
20   home?
21              MR. SPOTSWOOD:  Object to the form.
22              You may answer.
23              THE VIDEOGRAPHER:  Four minutes to tape
24        change.
25
```

BY MR. WELLS:

Q.      You can answer.

A.      Let me think about it.

        Again, as I told you before, I did not
know about his home computer.  I did not know
anything, I just learned it through the litigation.

        I'm sorry, I'm hungry and kind of tired.

        (Plaintiff's Exhibit 8, document, was
marked for Identification.)

BY MR. WELLS:

Q.      Let me show you Exhibit 8.  And if you
could flip to page 2 of this document.

A.      That is correct.

Q.      The top right-hand box -- well, really just
the top row is talking about the Mac laptop, do you
see that?

A.      Top right corner?

Q.      Yeah, that whole top of the page.

A.      Yes.

Q.      In the top right-hand corner, it's
discussing the Mac laptop being given to Mr.
Collingsworth's niece in Brazil and then it says,
"Mr. Collingsworth told JC about this since it was a
laptop purchased by Conrad & Scherer."  Is that a
true statement?

**CONFIDENTIAL**                                              87

```
1                    MR. SPOTSWOOD:   Object to the form.
2                    You may answer.
3     BY MR. WELLS:
4         Q.     Was the Mac laptop purchased by Conrad &
5     Scherer?
6         A.     I don't know.
7         Q.     You do know he was utilizing it as his work
8     computer at the time, don't you?
9         A.     I do know that he was using that computer
10    at the time, but I do know -- I do not know if that
11    was a Conrad & Scherer computer.
12        Q.     Well, the policy of Conrad & Scherer with
13    respect to computers and using them for work is that
14    only Conrad & Scherer computers be used for Conrad &
15    Scherer work, isn't that right?
16                   MR. SPOTSWOOD:   Object to the form.
17                   You may answer.
18                   THE WITNESS:   That's the standard
19        procedure.
20                   THE VIDEOGRAPHER:   Two minutes.
21    BY MR. WELLS:
22        Q.     So if Mr. Collingsworth was using a
23    non-Conrad & Scherer computer for Conrad & Scherer
24    work, that would be a violation of the policy?
25                   MR. SPOTSWOOD:   Object to the form.
```

```
1              You may answer.
2              THE WITNESS:  We have a standard way of
3         doing things.  We have -- we purchase our own
4         computers and that's the way that we run this
5         business -- we run this partnership.  So, I mean,
6         I don't know if the Mac computer was purchased by
7         Conrad & Scherer or not.  I mean, it was -- from
8         my understanding during the litigation, I think
9         that laptop was purchased around when I got here.
10        So I wouldn't have a handle on if it was purchased
11        by Conrad & Scherer or by him.
12  BY MR. WELLS:
13        Q.     You just don't know one way or another?
14        A.     Yeah.
15             THE VIDEOGRAPHER:  Okay.  We are off the
16        record.  This is the end of media unit number 1.
17        11:43 a.m.
18             (Luncheon recess was taken from 11:43 a.m.
19   to 12:20 p.m.)
20             THE VIDEOGRAPHER:  We are back on the
21        record.  This begins media 2.  The time is
22        12:20 p.m.
23  BY MR. WELLS:
24        Q.     Mr. Rodriguez, before we broke for lunch,
25   we were discussing exhibit -- what number is that?
```

```
 1        A.      8.
 2        Q.      8.
 3              Before we go back to that document, you
 4   worked, I guess, alongside or assisted Dennis
 5   Williams in his review of this matter, right?
 6        A.      Yes.
 7        Q.      And you are aware of an issue where Mr.
 8   Collingsworth's e-mails from his IRAdvocates e-mail
 9   account were missing prior to March of 2013?
10              MR. SPOTSWOOD:  Object to the form.
11              You may answer.
12              THE WITNESS:  That is correct.
13   BY MR. WELLS:
14        Q.      Okay.  If you will look at page 3 of
15   Exhibit 8, there's that date March 22, 2013.  Do you
16   see that?
17        A.      Yes.
18        Q.      And the last sentence in that box says,
19   "There are no IRA e-mails on Terry Collingsworth's
20   work desktop prior to this date."  Was that an
21   observation you made; did you look at his work
22   desktop to see what e-mails were in it?
23        A.      I did look on his work desktop, but this
24   is not -- I mean, I didn't wrote this, so I don't
25   know if --
```

CONFIDENTIAL

```
1         Q.      Right.  And I'm not asking if you wrote
2    that sentence, but I'm asking did you actually
3    witness that fact; did you look in his work desktop
4    and see that there were no e-mails prior to March 22,
5    2013?
6         A.      That is correct.
7         Q.      Okay.  And is that what was also on the
8    Conrad & Scherer server?
9              MR. SPOTSWOOD:  Object to the form.
10             You may answer.
11   BY MR. WELLS:
12        Q.      Only Terry Collingsworth e-mails postdating
13   March 22, 2013.
14        A.      Let me correct this statement.  This is
15   incorrect.  What we couldn't find is that there were
16   no e-mails -- there were no e-mails on his inbox
17   prior to March 22, 2013.  All the sent items since
18   2008 have been on his inbox -- on his mailbox on the
19   Conrad & Scherer e-mail server.
20        Q.      But that's only for his Conrad & Scherer
21   e-mail account, right?
22        A.      Yes.
23        Q.      The inbox and the outbox for --
24             MR. SPOTSWOOD:  Hang on a second.  He was
25        in the middle of explaining an answer, I thought.
```

```
 1                   THE WITNESS:  Yes.
 2                   So let me go back again.  Can you read
 3           what I have said, I'm sorry?
 4                   (The Reporter read back the requested
 5           portion.)
 6                   THE WITNESS:  Yes.  Also we found -- well,
 7           please scratch that.
 8                   Also, there were on his computer the sent
 9           e-mails on the Office 365 account from very late
10           February 2012 to the present on that computer, all
11           the same items on the IRAdvocates account.
12    BY MR. WELLS:
13           Q.     Okay.  So when -- and I'm talking about
14    before Dennis Williams or you goes and tries to find
15    other sources of e-mails, when you look in Terry
16    Collingsworth's e-mail account just on the
17    IRAdvocates, there's nothing -- there's no e-mails in
18    the inbox prior to March 22, 2013?
19           A.     Uh-huh.
20           Q.     Yes?
21           A.     Yes.
22           Q.     And there are no e-mails in his IRAdvocates
23    sent items prior to February of 2012?
24           A.     Yes, but there is another condition on
25    that.  Terry's mailbox was merged -- Terry's
```

**CONFIDENTIAL**                                    92

1    IRAdvocates mailbox was merged onto Conrad &

2    Scherer's on October of 2011.  So we would -- he

3    would lose the ability to send e-mails as

4    IRAdvocates.  So his only outgoing e-mail from

5    October 2011 to February late February 2012 is going

6    from Conrad & Scherer e-mails -- from the Conrad &

7    Scherer e-mail server.

8         Q.     So, between October of '11 and February of

9    2012, the only way he could send e-mails would be

10   from his Conrad & Scherer account?

11        A.     That is correct.

12        Q.     So, in that time period, there should not

13   be any e-mails that we have that show from

14   TC@iradvocates.org, is that right?

15        A.     There could be -- I think there's a test

16   or something when I was trying to find out how to

17   make him send out as IRAdvocates, but the primary

18   mailbox was on Conrad & Scherer and he was only able

19   to send out as TC@conradscherer.com --

20   conradscherer.com.

21        Q.     So e-mails during that October 2011 through

22   February 2012 time period to the extent they have

23   been produced in this case, should all say from

24   TC@conradscherer.com?

25        A.     That is correct.

1      Q.     So you mentioned earlier when someone gets

2  a new computer and connects it to the Conrad &

3  Scherer system or the server, it syncs with whatever

4  e-mails are on the server, right?

5      A.     That is correct.

6      Q.     Is that the same with the IRA server,

7  IRAdvocates?

8      A.     It depends on the time frame.

9      Q.     2013?

10     A.     That is correct.

11     Q.     So if someone were to open up Mr.

12 Collingsworth's new computer in June of 2013 and look

13 at his inbox, there would be no IRAdvocates e-mails

14 earlier than March of 2013, is that right?

15             MR. SPOTSWOOD:  Object to the form.

16             You may answer.

17             THE WITNESS:  They would be able to see

18     whatever was on the server at that time.

19 BY MR. WELLS:

20     Q.     Which only went back to March of 2013,

21 right?

22             MR. SPOTSWOOD:  Object to the form.

23             You may answer.

24             THE WITNESS:  If you want to

25     know -- yes -- I'm sorry, can you ask me the

1        question again?  I'm not sure if I got it

2        correctly.

3   BY MR. WELLS:

4        Q.      There were no IRAdvocates' e-mails in Mr.

5   Collingsworth's inbox on the server prior to March of

6   2013?

7                MR. SPOTSWOOD:  Object to the form.

8                You may answer, go ahead.

9                THE WITNESS:  On the e-mails.

10  BY MR. WELLS:

11       Q.      On the inbox.

12               So if someone opened up his computer, say,

13  in May of 2013, they would see only inbox e-mails

14  going back to March, right?

15       A.      I wouldn't know that.  I mean --

16       Q.      Can you explain to me how it could be

17  anything other than that; they are not on the server

18  now, are they?

19       A.      They are not in the server right now.

20       Q.      Have they been deleted off the server after

21  March of 2013?

22       A.      Yes, but the problem is I don't know when

23  they were removed from the server within that time

24  frame.

25       Q.      Have e-mails been -- have Mr.

1    Collingsworth's e-mails been deleted off the server

2    since he started using whatever laptop it was that he

3    got after the MacBook -- let me back up.

4            Do you understand Mr. Williams has offered

5    the opinion that the reason these e-mails are not on

6    the server prior to March of 2013 is because there

7    was some sort of auto archive feature enabled on the

8    MacBook?

9        A.    That's what Williams says.

10       Q.    Okay.  You understand the MacBook was given

11   away?

12       A.    Yes.

13       Q.    Are you aware of any of Mr. Collingsworth's

14   e-mails being deleted off the server after that

15   MacBook was given away?

16       A.    I was made aware of those deletions during

17   the litigation when we were doing the searches.

18       Q.    Okay.  I'm not asking when you became aware

19   but are you aware of whether any e-mails have been

20   deleted from the server after Mr. Collingsworth gave

21   the computer away or was it just the MacBook having

22   this auto archive that caused the e-mails to get

23   pulled off the server?

24            MR. SPOTSWOOD:  Object to the form.

25            You may answer.

**CONFIDENTIAL**                                          96

```
 1                    THE WITNESS:  Can you read the question
 2        again, please?
 3                    (The Reporter read back the requested
 4        portion.)
 5                    THE WITNESS:  I am not aware.
 6        BY MR. WELLS:
 7            Q.      Did you have any occasion to look in Mr.
 8        Collingsworth's e-mail account between March of 2013
 9        and November of 2014?
10            A.      Most likely close to November 2014, to the
11        end of November 2014.
12            Q.      Okay.  So you don't have any recollection
13        of anytime in 2013 you would have looked into his
14        inbox?
15            A.      That is correct.
16            Q.      When you did ultimately look at his e-mail
17        account, you discovered there were no incoming
18        e-mails in the IRAdvocates account prior to March 22,
19        2013?
20                    MR. SPOTSWOOD:  Object to the form.
21        BY MR. WELLS:
22            Q.      Right?
23                    MR. SPOTSWOOD:  You may answer.
24                    THE WITNESS:  Can you read the question?
25                    (The Reporter read back the requested
```

**CONFIDENTIAL**                                    97

```
 1    portion.)

 2              THE WITNESS:  That's when I did the

 3        searches on 2014, yes, so the answer is yes.

 4    BY MR. WELLS:

 5        Q.    Okay.  How did that come to your attention

 6    that there were these gaps?

 7        A.    Outside counsel request -- made a request

 8    to get the PSTs for each user in Washington.  So I

 9    ran a script and Terry's mailbox was unusually small

10    in the number of kilobytes for the inbox, so I

11    thought it was an error from the server.

12              When I went on the server and I see what I

13    have, I basically raised my hand and say I don't see

14    any Terry's e-mails prior to March 22, 2013.  While

15    doing these searches, because it was a really tough

16    month, we were working under the clock to get the

17    searches, I also went and see his IRAdvocates and we

18    saw the same behavior.  The sent e-mails were in the

19    server and in the computer, but the inbox, all the

20    e-mails -- all the content in the e-mails was gone

21    prior to March 22, 2013.

22        Q.    Okay.  So you were pulling PSTs from

23    various users to give to counsel or to whoever the

24    e-discovery vendor was and you saw that Terry's was

25    much smaller than everyone else's?
```

```
1        A.      That is correct.

2                MR. SPOTSWOOD:  Object to the form.

3                Sorry.

4                THE WITNESS:  I'm sorry.

5                MR. SPOTSWOOD:  Go ahead.

6                THE WITNESS:  That is correct.

7    BY MR. WELLS:

8        Q.      All right.  Flip to page 1 of this exhibit.

9    In the second box from top, you've got a date range

10   between June 2008 and March of 2011 and it says,

11   "Terry's incoming e-mails located by JC/computer

12   consultant."  Do you know if that's referring to

13   Conrad & Scherer e-mails or IRAdvocates e-mails?

14       A.      I'm going to make a clarification here.

15   I -- no, I'm sorry.  I don't know.  I don't know to

16   which e-mails is he referring to.

17       Q.      Okay.  Well, what -- when did you locate

18   e-mails in this time frame?

19       A.      On which server?

20       Q.      Well, either one.  From the incoming.

21       A.      On the incoming.

22               Well, question, can I say anything about

23   my conversations with Dennis Williams?

24               MR. SPOTSWOOD:  Yes, you can talk about

25       your conversation with Dennis Williams, but I
```

```
 1        don't want you talking about your conversations
 2        with the lawyers.
 3               THE WITNESS:  Okay.
 4               I have, during the first when they
 5        out -- someone, I don't know who, retained
 6        Mr. Williams, he was asking me multiple questions
 7        trying to get a grasp of how our system works and
 8        everything, and I was telling him the history of
 9        my e-mail server.
10               When I told him that we did the migration
11        from Exchange 2007 to Exchange 2010, he asked me
12        don't you have a backup of that migration and it
13        triggered in my mind that, yes, I do have that
14        backup.  So I went to that backup and I recover
15        those e-mails on the Conrad & Scherer server.
16   BY MR. WELLS:
17        Q.     Okay.  And that's really what I'm asking.
18   So that chunk of time of e-mails that's referred to
19   here, that was located during the course of the work
20   with Mr. Williams?
21        A.     Yes, sir.
22        Q.     And the next box down talks about, "Sent
23   e-mails from the SiteGround server."  Now that would
24   have been IRAdvocates, right?
25        A.     That is correct.
```

1      Q.      These are sent e-mails between November of

2   2010 and October of 2011.  Were those also located

3   from the SiteGround server during the course of the

4   work with Mr. Williams?

5      A.      No, that was prior.

6      Q.      When were those located?

7      A.      On November/December 2014.

8      Q.      After you had discovered there was this

9   issue with the small inbox?

10     A.      Yes.  We were trying to locate the e-mails

11  in our best way, so we did a great effort to look for

12  those e-mails.

13     Q.      Okay.  And this is referring to IRAdvocates

14  sent e-mails between November 2010 and October 2011,

15  and it says there's only a handful.  Is that

16  accurate?

17             MR. SPOTSWOOD:  Object to the form.

18             You may answer.

19             THE WITNESS:  I don't recall.  I mean,

20      they say it's a handful, it's a handful.  I don't

21      know, I didn't wrote this.

22  BY MR. WELLS:

23     Q.      Okay.  How were these e-mails recovered

24  from the SiteGround server; did you all have to go

25  out to the SiteGround company and see if they had

```
1    e-mails?

2              MR. SPOTSWOOD:  Object to the form.

3              You may answer.

4    BY MR. WELLS:

5        Q.    How was that recovered?

6              MR. SPOTSWOOD:  Same objection.

7              And, again, if he only knows that from

8        attorney information -- let me -- go ahead, but

9        don't reveal any attorney-client communications.

10             THE WITNESS:  Okay.  Can you ask me the

11       question again?

12   BY MR. WELLS:

13       Q.    Yeah.  It looks like here in this second

14   box and the third box they are talking about we've

15   gotten e-mails from the SiteGround server.

16       A.    Uh-huh.

17       Q.    How were those obtained; did you have to go

18   to the SiteGround company and ask for their copies of

19   the e-mails or where were they located?

20       A.    I was going to -- I knew for a fact that I

21   did the migration from IRAdvocates on October 22,

22   2011 to the Conrad & Scherer e-mail server.  So when

23   I did the migration, I pulled the e-mails -- sorry,

24   not pulled, I copied the e-mails from the SiteGround

25   server into the Conrad & Scherer so Terry can see a
```

**CONFIDENTIAL** 102

```
1    unified mailbox.
2             So, in the effort of trying to locate
3    these e-mails, I remembered that the e-mails were
4    still in the SiteGround server.  So we -- I asked
5    Terry about the password of the server and we tried
6    to get the password and I was able to log into that
7    server and grab those e-mails again.
8        Q.    Okay, but before you did that, those
9    e-mails were not in Mr. Collingsworth's inbox or
10   outbox?
11            MR. SPOTSWOOD:  Object to the form.
12            You may answer.
13            THE WITNESS:  Before when?
14   BY MR. WELLS:
15       Q.    Before you went and found that migration
16   backup.
17       A.    No, no, no, no.  The migration -- let's go
18   back -- let's check the timeline.  That was not
19   before that -- that was before the restore of the
20   migration.  Yes, that was before.
21       Q.    All right.  When you found these e-mails
22   from the SiteGround server, I think you mentioned
23   that was because you knew that you had done a
24   migration on October 27, 2011 and you created a
25   backup of those e-mails?
```

```
 1        A.      No, no, that's what -- that's not what I
 2   said.
 3        Q.      Okay.  I'm just trying to understand.  What
 4   did you say?
 5        A.      What I said was on October 27th when I
 6   move -- there are processes on an e-mail migration.
 7   The first process is the mail flow.  So there's
 8   something called a change of an MX record.  So I
 9   changed the MX record from SiteGround to Conrad &
10   Scherer.
11              The next step is, okay, now you have
12   everything in Conrad & Scherer, now you have your
13   mail coming into Conrad & Scherer, now we need to
14   copy the e-mail that it was prior, whatever you have
15   on the server, and put it onto a new server.  That's
16   the logical step.  So I copied everything that was in
17   the SiteGround server onto the Conrad & Scherer
18   e-mail server so he can see his IRAdvocates and his
19   Conrad & Scherer e-mails on the same mailbox, one
20   single mailbox.
21        Q.      Okay.
22        A.      Okay.
23        Q.      So when you pulled the PST of Terry's
24   inbox --
25        A.      Uh-huh.
```

```
 1        Q.      -- and noticed it was smaller than everyone
 2   else's --
 3        A.      Yes.
 4        Q.      -- were these e-mails that were referring
 5   to the SiteGround server, were they in that PST?
 6        A.      No.
 7        Q.      It was nothing prior to March of 2013?
 8        A.      That is correct.
 9        Q.      These SiteGround issues were able --
10   they -- never mind.
11              Do you have any judgment as to how many
12   e-mails were in this handful of e-mails, these sent
13   e-mails from the SiteGround server?
14        A.      I'm sorry, I don't understand the
15   question.
16        Q.      Do you have any judgment as to how many of
17   these sent e-mails referred to here from the
18   SiteGround server as being only a handful, do you
19   have any judgment as to how many e-mails that would
20   be?  And you can give me a range if you have any
21   judgment.
22        A.      No, I don't have any.
23        Q.      Okay.
24        A.      I don't know.
25
```

```
 1              (Plaintiff's Exhibit 9, e-mails, was marked

 2       for Identification.)

 3       BY MR. WELLS:

 4           Q.     Let me show you what's been marked as

 5       Exhibit 9.  These are a few e-mails from January 18,

 6       2011.  I want to direct your attention to the one at

 7       the bottom of this first page, looks like you're cc'd

 8       on it, right?

 9           A.     Uh-huh.

10           Q.     Is that a yes?

11           A.     Yes.

12                  Let me read the e-mail, please.

13                  MR. SPOTSWOOD:  Yeah, me, too.

14                  THE WITNESS:  Okay.

15       BY MR. WELLS:

16           Q.     In general, this e-mail is discussing the

17       fact that Mr. Collingsworth now has a new MacBook?

18           A.     Yes.

19           Q.     And it says that he's planning for that

20       MacBook to take the place of his current PC here in

21       the office (Windows 7) as well as his Acer notebook

22       that he normally uses during travel.  Do you see

23       that?

24           A.     Yes.

25           Q.     The current PC that he had in the office at
```

1    that time was what, the Dell Optiplex?

2         A.      I don't know.

3         Q.      Well, one of these is actually named -- is

4    also taking the place of the Acer notebook that he

5    would use during travel?

6         A.      Yes.

7         Q.      Were both of those computers Conrad &

8    Scherer computers, the PC in his office as well as

9    the Acer notebook?

10        A.      Well, January 18, 2011, I just saw it

11   here.  I don't know, I have no idea.

12        Q.      Further on that paragraph, he -- or

13   Victoria Ryan is saying, "However, he does plan to

14   keep his home computer in use."

15        A.      Uh-huh.

16        Q.      Do you know what home computer that is

17   referring to?

18        A.      Ung-ugh, I don't know.

19        Q.      All right.  Here on January 18th, one of

20   the things Ms. Ryan is also saying about setting up

21   this new MacBook is -- this is the second to last

22   paragraph, I think, "We will also need to work out a

23   system for backing up information on that laptop."

24   Do you see that?

25        A.      Okay.  Yes, I see it.

```
1        Q.      And three days after this e-mail, an
2   external hard drive was purchased to back up Mr.
3   Collingsworth's files, right?
4                MR. SPOTSWOOD:  Object to the form.
5                THE WITNESS:  I don't know.
6                MR. SPOTSWOOD:  You may answer.
7                (Plaintiff's Exhibit 10, e-mail, was marked
8   for Identification.)
9   BY MR. WELLS:
10       Q.      Let me show you Exhibit 10.  This is an
11  e-mail from you to Mr. Dennis Williams?
12       A.      Yes, that is correct.
13       Q.      And you were sending him a receipt for a
14  USB drive, right?
15       A.      That is correct.
16       Q.      This is something he had asked you to
17  provide to him?
18       A.      I've got a question.  Can I -- can I have
19  a break for a moment, please?  No, sorry, let me
20  answer this.
21               Can you repeat the question again?  Sorry.
22       Q.      Just asking did Dennis Williams ask you to
23  provide this receipt that you are providing in this
24  e-mail?
25       A.      It's --
```

```
 1              MR. SPOTSWOOD:  I don't want you to reveal
 2        any communications with counsel.  Can you answer
 3        that question without doing that?
 4              THE WITNESS:  Give me a minute to think.
 5              Okay.  Unfortunately, I cannot answer;
 6        that was a discussion that we had --
 7              MR. SPOTSWOOD:  Okay.
 8              THE WITNESS:  -- with counsel.
 9    BY MR. WELLS:
10        Q.    In any event, the receipt that's attached
11    is a Staples receipt?
12        A.    Yes.
13        Q.    For a GoFlex 500 gigabyte hard drive?
14        A.    Yes.
15        Q.    The date of the receipt is January 21,
16    2011?
17        A.    Yes.
18        Q.    Whose handwriting is this on this receipt?
19        A.    I have no idea.
20        Q.    It's not yours, is it?
21        A.    No.
22        Q.    This isn't something you wrote on the
23    receipt prior to giving it to Mr. Williams, is it?
24        A.    No, I didn't.
25        Q.    Is this how the receipt was maintained in
```

**CONFIDENTIAL**                                    109

1    the files when you found it, with this handwriting

2    already on it?

3         A.    I -- I will have to consult with my

4    counsel on -- on how I obtained this.

5              MR. SPOTSWOOD:  That's not what he's

6         asking you.

7              THE WITNESS:  Sorry.

8    BY MR. WELLS:

9         Q.    I'm just asking, you scanned this receipt

10   as a PDF to Dennis Williams.

11        A.    I did not scan this receipt.

12        Q.    It's attached to an e-mail you sent to him.

13   Can we agree on that?

14        A.    Yes.  It's agreed on that, but if you

15   notice, it was sent from the second floor scanner to

16   me and I forward the e-mail to Dennis Williams.

17        Q.    Okay.  In any event, the handwriting on

18   this receipt says, "External hard drive for TC

19   files"?

20        A.    That is correct.

21        Q.    Do you know that that external hard drive

22   is missing today?

23        A.    I learned -- I learned that during the

24   course of this litigation, yes.

25        Q.    Okay.  Does Conrad & Scherer have any

1    knowledge as to the last time that hard drive was
2    used?
3         A.     No.
4         Q.     Does Conrad & Scherer have any knowledge as
5    to who was the last person to use that hard drive?
6         A.     No.
7         Q.     Does Conrad & Scherer have any knowledge as
8    to when it was lost?
9         A.     No.
10        Q.     Does Conrad & Scherer have any knowledge as
11   to what was on that hard drive?
12        A.     No.
13        Q.     Does Conrad & Scherer have any knowledge as
14   to how many times that hard drive was plugged into
15   and used with Mr. Collingsworth's MacBook?
16        A.     All that information that you are asking
17   me is provided on Dennis Williams' report, but I
18   don't -- I don't know that information firsthand.
19        Q.     And based on all the work you've done to
20   get prepared today, you don't have any information as
21   to whether or how many times that external hard drive
22   was plugged into the MacBook?
23        A.     Yeah.
24               MR. SPOTSWOOD:  And just for the record, I
25        think we previously advised in yesterday's

1          deposition that this information would have to
2          come from Mr. Williams and that you already had
3          it.
4                    MR. WELLS:  I think he didn't know,
5          either.
6                    (Plaintiff's Exhibit 11, e-mail, was marked
7      for Identification.)
8      BY MR. WELLS:
9          Q.       Handing you Exhibit 11, which is a
10     March 31, 2011 e-mail from Victoria Ryan to you and
11     subject line is "D.C. office machines."  Do you see
12     that?
13         A.       Yes.
14         Q.       She's providing you here the work computers
15     for the D.C. office?
16         A.       Yes.
17         Q.       Is this something that you keep sort of an
18     inventory of, what computers are in use in both the
19     Florida and D.C. offices?
20         A.       Yes.
21         Q.       Okay.  And the one she lists for Terry
22     Collingsworth is the Mac laptop, right?
23         A.       Yes.
24         Q.       Down on the bottom, there's a few machines
25     listed under -- as "other machines," I guess maybe

1    not work --

2         A.      Uh-huh.

3         Q.      -- in the office machines.  One of them is

4    TC home office and they discuss a previous desktop PC

5    that was shipped up from Conrad & Scherer last year.

6         A.      Yes.

7         Q.      Would that have been shipped up by you?

8              MR. SPOTSWOOD:  Object to the form of

9         that.

10             You may answer.

11             THE WITNESS:  I don't think so.

12   BY MR. WELLS:

13        Q.      Okay.  Do you know what desktop PC Ms. Ryan

14   is referring to in this e-mail to you?

15        A.      She writes that it's TC home office, but I

16   don't --

17        Q.      As far as what type of computer it was,

18   where it is today, do you know that?

19        A.      I think -- I don't know.

20             (Plaintiff's Exhibit 12, e-mail, was marked

21        for Identification.)

22   BY MR. WELLS:

23        Q.      Showing you what's been marked as

24   Plaintiff's 12, it's a January 25, 2012 e-mail from

25   Victoria Ryan to you and here she's discussing the

```
1    subject of rerouting Terry's e-mails, is that right?
2        A.     Uh-huh.
3        Q.     Is that a yes?
4        A.     That's -- that's a yes.
5        Q.     And I'm not going to read the whole thing,
6    but in general, what she's discussing is a process
7    where they could route his IRAdvocates e-mail through
8    Gmail?
9        A.     Let me read the e-mail first.
10       Q.     Okay.
11       A.     Okay.  I have read it.
12       Q.     The question is was this proposal ever done
13   routing his IRAdvocates e-mail through Gmail?
14       A.     No.
15       Q.     So something, I guess, was considered but
16   not done, it was left on the SiteGround server at
17   this point?
18       A.     On January 25, 2012, it was on the Conrad
19   & Scherer server.  This -- the second paragraph on
20   this e-mail where she says, "Terry still has problems
21   with his IRAdvocates e-mail which is hosted by
22   SiteGround," that statement is incorrect.  On
23   January 25, 2012, Terry's mailbox was -- Terry's
24   IRAdvocates mailbox was merged on the Conrad &
25   Scherer e-mail server.
```

```
 1        Q.      Okay.  So this proposal of moving it to
 2   Gmail was not done, so it stayed on the Conrad &
 3   Scherer server at that point?
 4        A.      Yes, yes.
 5        Q.      Until at some point the IRAdvocates was
 6   moved off and onto an Office 365 server?
 7        A.      That is correct, and it was --
 8        Q.      It was --
 9        A.      -- February 2nd or 3rd of 2012 when I -- I
10   think it's further down when -- I'll be there on the
11   2nd of February, so it was during my visit to
12   Washington.
13        Q.      Okay.  So the Gmail option was proposed but
14   the ultimate resolution was we'll go with Office 365
15   instead?
16        A.      That is correct.
17                Sorry, just can I grab a bottle of water?
18        Q.      Absolutely.
19                MR. SPOTSWOOD:  Would you get one for me,
20        too?
21                THE WITNESS:  Thank you.
22                (Plaintiff's Exhibit 12, e-mails, was
23   marked for Identification.)
24   BY MR. WELLS:
25        Q.      I'm going to show you Exhibit 13.  This is
```

```
 1    a series of e-mails from May 2012.  Go ahead and read
 2    them and I'll ask you a couple of questions.
 3         A.     May 21, 2012.
 4                Okay.
 5         Q.     The string begins with Mr. Collingsworth
 6    asking you to remote into his laptop to help him with
 7    some issue he's having?
 8         A.     That is correct.
 9         Q.     And that was at that time the Mac laptop,
10    correct?
11         A.     Yes.
12         Q.     So you had the capability, while Mr.
13    Collingsworth was using the Mac laptop, to remote
14    into his computer to assist with it?
15                MR. SPOTSWOOD:  Object to the form.
16                You may answer.
17                THE WITNESS:  I may answer?
18                MR. SPOTSWOOD:  Yes.
19                THE WITNESS:  Yes, I have the ability to
20        remote in.
21    BY MR. WELLS:
22         Q.     And that Mac laptop was connected directly
23    to the Conrad & Scherer server, wasn't it?
24         A.     It was connected to the e-mails, to the
25    e-mail server on Conrad & Scherer.
```

CONFIDENTIAL                                    116

1      Q.     In other words, Mr. Collingsworth was not

2   using that Mac laptop and going online to a web

3   hosted e-mail access point; he had Outlook on his

4   computer that was connected to the server, so all he

5   had to do was open Outlook and his e-mails would be

6   there?

7      A.     That is correct.

8      Q.     Are you aware of any non-Conrad & Scherer

9   computers on which that is the case, that they are

10   connected directly to the server?

11            MR. SPOTSWOOD:  Object to the form.

12            You may answer.  Go ahead.

13            THE WITNESS:  I'm sorry, I'm having

14      trouble double negations.  Can you repeat the

15      question again?

16   BY MR. WELLS:

17      Q.     Are you aware of any non-Conrad & Scherer

18   computer, non-firm computer --

19      A.     Uh-huh.

20      Q.     -- that is directly connected to the Conrad

21   & Scherer e-mail server?

22            MR. SPOTSWOOD:  Object to the form.

23            You may answer.

24            THE WITNESS:  No, I'm not aware.

25

Bain & Associates Court Reporting Services, Inc.
1-888-326-0594  depos@bainandassociates.com

```
 1   BY MR. WELLS:
 2        Q.     That's firm policy?
 3        A.     Yes.
 4        Q.     That only firm computers be connected to
 5   the firm server, right?
 6        A.     That is the policy, that is the general --
 7   let me correct that.  That is the standard -- our
 8   standard way of doing things.
 9        Q.     Okay.
10               (Plaintiff's Exhibit 14, e-mails, was
11   marked for Identification.)
12   BY MR. WELLS:
13        Q.     I'm going to show you Exhibit 14 which are
14   some e-mails in June of 2012 and appears there's some
15   discussion about Mr. Collingsworth's new computer
16   being set up and transitioning from his old computer,
17   is that right?
18        A.     Yes.
19        Q.     What was the new computer?
20        A.     I think -- I cannot exactly pinpoint to
21   which computer is she referring to.
22        Q.     Can you say that it was the -- whatever
23   brand it was, it was the computer that he utilized in
24   the office?
25        A.     Could be.
```

```
 1        Q.      I mean, this isn't referring to replacing
 2    his MacBook, is it?
 3        A.      No.
 4                MR. SPOTSWOOD:  Object to the form.
 5                You may answer.  Go ahead.
 6                THE WITNESS:  This is not referring to the
 7        MacBook -- to a MacBook.
 8    BY MR. WELLS:
 9        Q.      Can you identify what the old computer
10    she's referring to is?
11        A.      If you give me some document, I may.  I
12    don't -- I don't know at this moment in time.
13        Q.      Was there any transfer of data from the
14    MacBook to either of these computers referred to in
15    this e-mail?
16                MR. SPOTSWOOD:  Object to the form.
17                You may answer.
18                THE WITNESS:  Give me a minute to think.
19                Yes, I don't know what she's referring to.
20    BY MR. WELLS:
21        Q.      Okay, but are you aware of -- whatever
22    these computers are, are you aware of any transfer of
23    data from the MacBook to any of Mr. Collingsworth's
24    office computers?
25        A.      Not from the MacBook, not from the
```

1    MacBook.  At the time, Terry was also using a desktop

2    computer and I -- no, I don't recall exactly the

3    date, but I remember that there was an issue with a

4    Dell computer.  He had a desktop computer and that

5    desktop computer failed, so we have to transfer the

6    data from one computer to the other.  So that's what

7    I think she's referring to.

8         Q.    But was there any transfer from the MacBook

9    to that new computer to ensure that both the

10   MacBook --

11        A.    I don't think so.

12        Q.    -- had the same thing on it?

13        A.    I don't know.

14              MR. SPOTSWOOD:  Object to the form.

15              You may answer.  Go ahead.

16              THE WITNESS:  I don't think so.

17              (Plaintiff's Exhibit 15, e-mails, was

18   marked for Identification.)

19   BY MR. WELLS:

20        Q.    Showing you Exhibit 15, this is a series of

21   July 2012 e-mails, appear to be discussing the same

22   subject of transferring from one computer to another.

23        A.    Uh-huh.

24              Oh.  So this confirms what I just told you

25   before.

CONFIDENTIAL                                                  120

1      Q.      Which was what, this is the Dell that had

2  an issue?

3      A.      The Dell that had an issue.

4      Q.      And it was replaced with a Dell Vostro that

5  Conrad & Scherer still maintains?

6      A.      Yes.

7      Q.      Okay.  And, again, you're not aware of any

8  transfer of data from the MacBook to the Dell Vostro?

9      A.      No.

10            MR. SPOTSWOOD:  Object to the form.

11            You may answer.

12  BY MR. WELLS:

13      Q.      In any event, when he was going from one

14  Dell to the next Dell, the data from the previous

15  Dell was transferred to the new Dell, right?

16      A.      That is correct.

17      Q.      And that was handled by Conrad & Scherer IT

18  personnel?

19      A.      Yes.

20      Q.      Was that the regular procedure at this

21  period in time for Conrad & Scherer IT to handle

22  transfer of data from one work computer to the next?

23            MR. SPOTSWOOD:  Object to the form.

24            You may answer.

25            THE WITNESS:  Yeah, it's routine

**CONFIDENTIAL**                                        121

```
 1        procedure.

 2                Can I have a quick break?

 3                MR. WELLS:  Sure.

 4                THE VIDEOGRAPHER:  We are off the record

 5        at 1:08 p.m.

 6                (Brief recess was taken.)

 7                THE VIDEOGRAPHER:  We are back on the

 8        record.  It's 2:16 -- 1:16 p.m.

 9                THE WITNESS:  I want to clarify something

10        for the record.  The last question, can you read

11        me his last question, please?

12                (The Reporter read back the requested

13   portion.)

14                THE WITNESS:  I want to correct my answer.

15                On this case, we transferred the data from

16        an old computer to a new computer because there

17        was a warranty issue on the computer, but it's not

18        a routine procedure to change -- to transfer data

19        from one computer to another.

20   BY MR. WELLS:

21        Q.     Did you discuss your response to that

22   question with counsel during the break?

23                MR. SPOTSWOOD:  You can answer that.

24                THE WITNESS:  Yes.

25                MR. SPOTSWOOD:  You can also ask if that's
```

```
 1         your answer or the lawyer's answer.
 2              MR. WELLS:  Well, you can follow up and
 3         get your questions answered at the end of the day,
 4         Bob.
 5              (Plaintiff's Exhibit 16, e-mails, was
 6    marked for Identification.)
 7    BY MR. WELLS:
 8         Q.    I'm going to show you Exhibit 16, which is
 9    a series of e-mails from February 15th, 2013 between
10    you and Mr. Collingsworth, right?
11              MR. SPOTSWOOD:  Hang on a second, let me
12         catch up with you.
13              MR. WELLS:  Okay.
14              THE WITNESS:  That is correct.
15    BY MR. WELLS:
16         Q.    Looks like Mr. Collingsworth is complaining
17    about his e-mail being slow when he's trying to type
18    an e-mail in Outlook, right?
19         A.    Yes.
20         Q.    He asked if you can remote in and you say
21    yes, you can, correct?
22         A.    Yes.
23         Q.    Do you recall what you did on this occasion
24    to assist?
25         A.    No, I don't recall.
```

1      Q.      What was the issue causing the Outlook to

2   be moving slowly?

3      A.      I don't recall.

4              (Plaintiff's Exhibit 17, e-mail, was marked

5   for Identification.)

6   BY MR. WELLS:

7      Q.      Showing you Exhibit 17, this is an April 3,

8   2013 e-mail from Maggie Crosby to you talking about

9   the fact that Mr. Collingsworth has traded out his

10  MacBook, correct?

11     A.      Yes.

12     Q.      And the new computer he obtained was an HP

13  laptop?

14     A.      Yes.

15     Q.      Ms. Crosby is telling you, "Hi, Juan.

16  Terry has traded out his Mac.  Is there a time that

17  you or someone from your team can transfer everything

18  from his Mac to his new computer."  Did I read that

19  correctly?

20     A.      Yes.

21     Q.      So, at least as of early April 2013, there

22  are discussions going on with you about transferring

23  data from Mr. Collingsworth's MacBook to his new

24  computer?

25     A.      That is correct.

```
 1        Q.      Did that transfer ever take place?

 2        A.      No.

 3        Q.      And what was the reason for that transfer

 4   not taking place?

 5                MR. SPOTSWOOD:  Object to the form.

 6                You may answer.

 7                THE WITNESS:  Let me correct my answer

 8        before, my prior answer.  I personally do not know

 9        if the transfer was done from his computer.  All I

10        got was a response saying that it's

11        already -- it's already been taken care of.

12   BY MR. WELLS:

13        Q.      Who did that response come from?

14        A.      If I am not mistaken, from Maggie.

15        Q.      Was this in an e-mail?

16        A.      Yes.

17        Q.      Did you review that e-mail yesterday in

18   preparing for today?

19        A.      No.

20        Q.      Are you aware of whether it's been produced

21   in this case?

22        A.      I don't know if it was produced in this

23   case.

24        Q.      When was this e-mail?

25        A.      I don't remember exactly when, but I know
```

```
 1    we were busy at that time and we couldn't get to it
 2    when they requested it.  So we asked later or I don't
 3    exactly recall -- I don't recall the details.  I'm
 4    sorry.
 5               (Plaintiff's Exhibit 18, e-mails, was
 6    marked for Identification.)
 7    BY MR. WELLS:
 8        Q.    Let me show you Exhibit 18.  This is some
 9    e-mail correspondence between Ms. Crosby and Mr.
10    Collingsworth on April 23, 2013, approximately
11    20 days after this last e-mail we just looked at,
12    where Mr. Collingsworth says that he won't worry
13    about transferring old e-mails, music, et cetera.
14    Have you seen that e-mail in your preparation for
15    today's testimony?
16               MR. SPOTSWOOD:  Object to the form.
17               You may answer.
18               THE WITNESS:  I'm reading.
19               Yes, I have seen the e-mail.
20    BY MR. WELLS:
21        Q.    And Mr. Collingsworth is telling Ms.
22    Crosby," Don't worry about transferring my old
23    e-mails over to my new computer."
24               MR. SPOTSWOOD:  Object to the form.
25
```

```
 1    BY MR. WELLS:
 2         Q.      Right?
 3                 MR. SPOTSWOOD:  You may answer.
 4                 Same objection.
 5                 THE WITNESS:  That's what is written on
 6         the e-mail.
 7    BY MR. WELLS:
 8         Q.      And you think it was -- well, let me go up
 9    to Ms. Crosby's e-mail above and she says, "Sounds
10    good.  Those computer tasks should be easy enough.
11    I'll work with Juan to get that all worked out."  Do
12    you see that?
13         A.      That is correct.
14         Q.      All right.  Was it after this date,
15    April 23, 2013, that you received some communication
16    from Maggie Crosby about the transfer from Mr.
17    Collingsworth's MacBook has already been taken care
18    of?
19                 MR. SPOTSWOOD:  Object to the form.
20                 You may answer.  Go ahead.
21                 THE WITNESS:  I don't recall the date of
22         that e-mail.  I don't know if it was prior or
23         after.
24                 MR. WELLS:  Bob, do you know what e-mail
25         he's talking about or whether it's been produced?
```

1          MR. SPOTSWOOD:  I would have to check.  I
2      don't know as I sit here.
3          MR. WELLS:  All right.  We would request
4      that it be produced if there is such an e-mail.
5      It was not in anything we've seen.  I don't know
6      if it's in something that was taken out of the
7      Dennis Williams file or what this e-mail is he's
8      referring to, but we want to see it.
9  BY MR. WELLS:
10     Q.    All right.  This e-mail or verbal
11 communication, however it was relayed to you from Ms.
12 Crosby that the transfer from the Mac to a new
13 computer had been --
14     A.    I'm sorry, can you slow down?
15     Q.    Yes.
16          You said you were told by Maggie Crosby
17 that the transfer of data from the Mac to Mr.
18 Collingsworth's new computer had been taken care of.
19     A.    Yes.
20     Q.    Did she advise you who took care of it?
21     A.    No, not that I recall.
22     Q.    Now -- well, ask it this way:  We do know
23 that Mr. Collingsworth's e-mails that were stored
24 only on the MacBook were not transferred to his new
25 computer, don't we?

1              MR. SPOTSWOOD:  Object to the form.

2              You may answer.

3              THE WITNESS:  Excuse me, I don't -- what

4      is the question again?  I'm not sure if I got it

5      correctly.

6   BY MR. WELLS:

7      Q.     Well, Mr. Williams has opined that because

8   of some auto archive feature on the MacBook, it was

9   archiving all of his inbox e-mails only to the

10  MacBook and that's the reason there's a gap in this

11  pre-2013 period.  Do you understand that?

12     A.     Yes.

13     Q.     Okay.  Mr. Collingsworth's new computer

14  after the MacBook was an HP laptop?  I think we

15  already established that.

16     A.     Yes.

17     Q.     We know those e-mails are not on the HP

18  laptop, don't we?

19     A.     Yes.

20     Q.     So, to the best of Conrad & Scherer's

21  knowledge, isn't it true that there was no transfer

22  of e-mails from the MacBook to the HP laptop?

23     A.     I wouldn't say it that way.  We had a

24  system where the e-mails sync from the e-mail server

25  to a computer.  The main repository is the server,

1    not the computer.  So it wouldn't matter if the

2    computer was stolen, destroyed, the main repository

3    of the data was on the server, not on the

4    local -- not on the device that was -- that was being

5    used at the time.

6         Q.    Well, in this case, the pre-March 2013

7    e-mails were not on the server, they were only on Mr.

8    Collingsworth's MacBook, right?

9         A.    Pre-March -- can you say it again?  I'm

10   sorry.  Can you read it again?

11              (The Reporter read back the requested

12   portion.)

13              THE WITNESS:  I don't know if they were on

14        his MacBook.  I don't know where they are.

15   BY MR. WELLS:

16        Q.    Well, they weren't on the server; can we

17   agree on that?

18        A.    Yes.

19        Q.    So when the HP laptop was plugged in and it

20   synced, it would not sync up any incoming e-mails

21   prior to March of 2013, right?

22        A.    Right.

23        Q.    So when Mr. Collingsworth opened up his HP

24   laptop for the first time and it synced with the

25   server, he would not see any incoming e-mails

1    predating March 2013, right?

2         A.    Correct.

3         Q.    Let me ask you this:  The hard drive of the

4    MacBook was not removed and preserved, was it?

5         A.    Not to my knowledge.

6         Q.    Did anybody request that that be done?

7         A.    Nobody did that request.

8         Q.    Did anyone advise Conrad & Scherer that Mr.

9    Collingsworth's MacBook, which was his primary work

10   computer, was being given away to a relative?

11        A.    Not to my knowledge.

12        Q.    Well, to anyone in Conrad & Scherer's

13   knowledge?

14        A.    I don't know.

15        Q.    Based on everything you've done to get

16   prepared for this deposition, you have no knowledge

17   of that occurring?

18        A.    I have no knowledge.

19        Q.    Now, Mr. Collingsworth has testified that

20   after that MacBook was purportedly stolen in Brazil,

21   he told you.  Is that true?

22             MR. SPOTSWOOD:  Object to the form.

23             You may answer.

24             THE WITNESS:  When he told me that?

25

```
 1   BY MR. WELLS:

 2        Q.     I'm asking did he tell you that.

 3        A.     During the course of the litigation, he

 4   told us that.

 5        Q.     The first time you heard this story about

 6   the computer being stolen in Brazil was when the

 7   Dennis Williams work was being done, is that right?

 8               MR. SPOTSWOOD:  Object to the form.

 9               You may answer.

10               THE WITNESS:  Yes.

11               (Plaintiff's Exhibit 19, e-mails, was

12   marked for Identification.)

13   BY MR. WELLS:

14        Q.     Showing you Exhibit 19.  These are some

15   e-mails between you and Mr. Collingsworth in June of

16   2013 and it looks like, at this point, he has got his

17   new HP laptop up and running, is that right?

18        A.     Yes.

19        Q.     In the bottom e-mail, he is writing to you

20   as well as Maggie Crosby and says, "Thanks to both of

21   you for getting this set up.  It is working very

22   well.  I have just one question.  I'm working from

23   home and have a good internet connection.  How can I

24   access my files on Dropbox?"  Do you see that?

25        A.     Yes.
```

1      Q.      Now, Mr. Collingsworth testified that he

2    was certain he did not have any e-mails stored on

3    Dropbox.  You know that is not true, right?

4              MR. SPOTSWOOD:  Object to the form.

5              You may answer.

6              THE WITNESS:  Sorry, I don't -- I don't

7       get the question, so e-mails on Dropbox?

8    BY MR. WELLS:

9      Q.      Is it a true statement that Mr.

10   Collingsworth never stored any e-mails on Dropbox?

11             MR. SPOTSWOOD:  Object to the form.

12             You may answer.

13             THE WITNESS:  I don't know.

14             (Plaintiff's Exhibit 20, e-mail, was marked

15   for Identification.)

16   BY MR. WELLS:

17     Q.      Going to show you Exhibit 20.  This is an

18   e-mail exchange from this year between you and Dennis

19   Williams, and see down at the bottom a reference to

20   Dropbox?

21     A.      (Nodding head.)

22             Yes.

23     Q.      It says -- this is Dennis Williams

24   speaking, "I saw mention of a Dropbox.  Did Terry

25   Collingsworth keep data in a Dropbox, any e-mails in

```
 1   a Dropbox?  What kind of data kept in Terry

 2   Collingsworth's Dropbox."  And your response was

 3   what?

 4       A.     That, "He has some data, however only some

 5   PSTs already examined.  If I am not mistaken, only

 6   2010 e-mails."

 7       Q.     And PSTs are basically a file that contains

 8   multiple e-mails, right?

 9       A.     That is correct.

10       Q.     So you are aware that Mr. Collingsworth did

11   have e-mails in his Dropbox?

12       A.     He has the database for those e-mails in

13   his Dropbox.

14       Q.     Did you access Mr. Collingsworth's Dropbox

15   here in June of 2013 when he's asking for help

16   accessing it?

17            MR. SPOTSWOOD:  That's going back to

18       Exhibit 19?

19            MR. WELLS:  Right.

20            MR. SPOTSWOOD:  Okay.

21            THE WITNESS:  I don't recall.

22   BY MR. WELLS:

23       Q.     After June of 2013 when Mr. Collingsworth

24   has got his HP laptop set up, did he ever contact

25   Conrad & Scherer IT support for assistance in
```

1    locating his incoming e-mails prior to 2013?

2        A.      No.

3        Q.      Did anyone in the D.C. office contact

4    Conrad & Scherer IT for assistance in locating Mr.

5    Collingsworth's incoming e-mails prior to 2013?

6        A.      No.

7        Q.      Did anyone express any concern about not

8    being able to find Mr. Collingsworth's e-mails prior

9    to March of 2013?

10           MR. SPOTSWOOD:  Object to the form.

11           You may answer.

12           THE WITNESS:  Again, Terry sent e-mails

13       were -- anything that Terry sent prior to

14       March 22, 2013 was on the e-mail server.

15   BY MR. WELLS:

16       Q.      I'm talking about the inbox.  Did anybody

17   say, hey, we can't find Mr. Collingsworth's e-mails

18   prior to 2013 in the inbox?

19       A.      That is correct.

20       Q.      Nobody said that?

21       A.      Nobody said that.

22       Q.      Let me just ask you this:  We discussed

23   earlier in the deposition this backup of the server

24   that would be maintained for 90 days and then it was

25   overwritten.  Do you recall that?

```
 1        A.      Yes.

 2        Q.      Is there any backup of that backup?

 3        A.      Backup of the DPM server?

 4        Q.      Yes.

 5        A.      No.

 6        Q.      During the time y'all have been using this

 7   90-day DPM server backup, y'all have not also been

 8   utilizing backup tapes or disks attached to a server

 9   that maintain the documents for longer than 90 days?

10        A.      I'm sorry, can you read the question

11   again?

12        Q.      I'll ask it a different way.

13                Other than the 90-day DPM server backup,

14   is there any other backup of the e-mail server that

15   stays around longer than 90 days?

16        A.      Stays around longer than 90 days, a

17   backup?

18        Q.      Yes.

19                MR. SPOTSWOOD:  I'll object to the form of

20        this because I think the time frame is important.

21   BY MR. WELLS:

22        Q.      October 2011 to December 2013.

23        A.      There is a replica for disaster recovery

24   purposes --

25                THE REPORTER:  For what purposes?  I
```

```
 1            didn't hear you.
 2                    THE WITNESS:  Disaster recovery purposes.
 3                    THE REPORTER:  Thank you.
 4                    THE WITNESS:  In an Orlando data center
 5            which keeps the last 24 hours a replica of the
 6            server, a daily replica of the server.  So, in
 7            case something fails, we can go back to Orlando
 8            and get -- and be able to operate normally.  As
 9            far as backup, backup goes, we only have the DPM
10            server.
11      BY MR. WELLS:
12            Q.      Okay.  So the disaster recovery, if there
13      was some hurricane or something that knocked out
14      server here, you have something over in Orlando that
15      was backed up within the last 24 hours?
16            A.      Yes.
17            Q.      But that daily backup is not maintained
18      beyond, I guess, that 24-hour period, is that right?
19            A.      That is correct.
20            Q.      Okay.
21                    (Plaintiff's Exhibit 21, e-mail, was marked
22      for Identification.)
23      BY MR. WELLS:
24            Q.      Let me show you Exhibit 21, which is an
25      e-mail from one of Dennis Williams' associates to you
```

1    asking, "Juan, can you check your e-mail around the

2    June 23, 2013 range or slightly after for any e-mails

3    regarding Terry Collingsworth's e-mail?"

4          A.     Yes.

5          Q.     Did you comply with this request and search

6    for e-mails discussing Mr. Collingsworth's e-mails?

7          A.     Yes.

8          Q.     Did you find any?

9          A.     No.

10         Q.     No e-mails saying, hey, we can't find

11   e-mails prior to March 2013?

12         A.     Yes.

13         Q.     So, as far as you are aware, Mr.

14   Collingsworth did not notify anyone at Conrad &

15   Scherer that the MacBook was allegedly stolen until

16   Mr. Williams started asking for a copy of it, is that

17   right?

18         A.     I wouldn't say it that way.

19         Q.     All right.  Well, give me --

20                (Plaintiff's Exhibit 22, e-mails, was

21   marked for Identification.)

22   BY MR. WELLS:

23         Q.     Showing you Exhibit 22, which is an e-mail

24   string involving you and Mr. Williams where it

25   appears -- Mr. Williams says, "We also need to image

```
1    the Mac laptop that Terry Collingsworth used and then
2    gave to a relative.  Please try to have Terry provide
3    the Mac laptop."
4         A.    Let me read the e-mail first.
5         Q.    Okay.
6         A.    Yes.
7         Q.    All right.  You would agree that
8    Mr. Williams would not be asking for a copy of the
9    Mac laptop if he knew at that time it had been
10   stolen, right?
11             MR. SPOTSWOOD:  Object to the form.
12             You may answer.
13             THE WITNESS:  Sorry, can you read the
14        question slowly?
15             (The Reporter read back the requested
16   portion.)
17             MR. SPOTSWOOD:  Object to the form.
18             You may answer.
19             THE WITNESS:  Yes.
20   BY MR. WELLS:
21        Q.    And you respond to Mr. Williams and inform
22   him that Mr. Collingsworth gave the laptop to his
23   niece and apparently it was stolen in Brazil, right?
24        A.    Yes.
25        Q.    When did you learn that information?
```

```
 1        A.      During the litigation.
 2        Q.      During the Dennis Williams' involvement in
 3   the litigation?
 4        A.      It was during discussions during November
 5   and December 2014.
 6        Q.      Who told you that?
 7             MR. SPOTSWOOD:  If that requires you to
 8        talk about communication with counsel, then I
 9        would ask that you not answer that question.
10             THE WITNESS:  I cannot answer that
11        question.
12   BY MR. WELLS:
13        Q.      Have you discussed it with Mr.
14   Collingsworth?
15        A.      Not that I recall.
16                Can I have a quick break?
17        Q.      If I could --
18        A.      Just need one minute; I need to go to the
19   bathroom real quick.
20             MR. WELLS:  Okay.
21             THE VIDEOGRAPHER:  1:46.  We are off the
22        record.
23                (Brief recess was taken.)
24             THE VIDEOGRAPHER:  1:47 p.m.  Back on the
25        record.
```

```
 1              (Plaintiff's Exhibit 23, e-mail, was marked
 2    for Identification.)
 3    BY MR. WELLS:
 4         Q.     I'm going to show you what's been marked as
 5    Exhibit 23.  These are some more e-mails between you
 6    and Mr. Williams and it appears you are providing him
 7    a spreadsheet?
 8              MR. PRESLEY:  I think we are on a
 9         different exhibit than what we just gave him.
10              MR. WELLS:  Strike everything I just said.
11              MR. SPOTSWOOD:  Okay.  Can I get a copy of
12         whatever it is we are looking on?
13              MR. WELLS:  I think you have a correct
14         copy.
15              MR. SPOTSWOOD:  I don't have anything yet.
16         He was trying to get clarity on that one first.
17              MR. WELLS:  Okay.
18              THE WITNESS:  Is this --
19    BY MR. WELLS:
20         Q.     Starting again, what I've handed you is a
21    March 4th e-mail from you to Dennis Williams and
22    others.  Appears like you are responding to some of
23    Mr. Williams' questions, is that what that is?
24         A.     Let me read the e-mail.
25         Q.     Sure.
```

1      A.      Okay.

2      Q.      Would that accurately describe that you

3  were responding some questions from Mr. Williams and

4  his team?

5      A.      For Mr. Graham.

6      Q.      Who is a member of Mr. Williams' team?

7      A.      Yes.

8      Q.      One of those questions down towards the

9  middle of the page is, "Who moved files from the Mac

10 to the HP laptop," right?

11     A.      Correct.

12     Q.      And your response is, "No idea."

13     A.      That's correct.

14     Q.      Is that still true today?

15     A.      I still don't know who moved the files.

16     Q.      Or if anyone moved them at all?

17             MR. SPOTSWOOD:   Object to the form.

18             You may answer.

19             THE WITNESS:  I don't know.

20             (Plaintiff's Exhibit 24, e-mail, was marked

21 for Identification.)

22 BY MR. WELLS:

23     Q.      Now I'm handing you Exhibit 24.  It's

24 another e-mail from you to Dennis Williams and this

25 one appears like you're providing him a spreadsheet

1    called the "CS hard drive inventory list," is that

2    right?

3                MR. SPOTSWOOD:  Give him a chance to take

4        a look at this; this is several pages.

5                THE WITNESS:  That's correct.

6    BY MR. WELLS:

7        Q.    What is this inventory list supposed to

8    reflect?

9        A.    The hard drives that we had in

10   possession -- we have in possession.

11       Q.    That the firm has in possession?

12       A.    Uh-huh.

13       Q.    Is that a yes?

14       A.    Yes.

15       Q.    So we should be able to look at this list

16   and determine all of the hard drives that the firm

17   currently possesses?

18                MR. SPOTSWOOD:  Object to the form.

19                You may answer.

20                THE WITNESS:  Yes.

21                (Plaintiff's Exhibit 25, e-mails, was

22   marked for Identification.)

23   BY MR. WELLS:

24       Q.    Going to show you what has been marked as

25   Exhibit 25.  This is some more correspondence between

CONFIDENTIAL                          143

1    you and Mr. Graham of Dennis Williams' team, is that

2    right?

3         A.    Okay.

4         Q.    Looks like Mr. Graham is asking you if

5    anyone looked in the deleted folder for Mr.

6    Collingsworth's account?

7         A.    Yes.

8         Q.    And you said you had but there was nothing

9    there, is that right?

10        A.    Yes.

11        Q.    You say, "Those PSTs there are from his

12   Gmail."  What are you referring to there?

13        A.    Sorry, but I don't recall.

14        Q.    Did you obtain any PSTs from Mr.

15   Collingsworth's Gmail account?

16        A.    Yes.

17        Q.    Where are those PSTs located today?

18              MR. SPOTSWOOD:  Object to the form.

19              You may answer.

20              THE WITNESS:  In our servers.

21   BY MR. WELLS:

22        Q.    You have a copy of Mr.

23   Collingsworth's -- well, what PSTs did you take from

24   the Gmail account?

25        A.    Can you read my answer, please?

**CONFIDENTIAL**                                    144

1            (The Reporter read back the requested
2       portion.)
3            THE WITNESS:  Can I correct the
4       question -- the answer to the question?
5            At the time that was on December 2014
6       during the litigation, it was requested by counsel
7       to grab some keyword searches on Terry's Gmail
8       account.  So those results were exported into a
9       PST file and Terry was given the chance to review
10      those results.  So those are the PSTs that he was
11      referring to.
12 BY MR. WELLS:
13      Q.    Okay.  Did you run the same search terms on
14 his Gmail account as were being run in the Exchange
15 Server at that time?
16           MR. SPOTSWOOD:  Okay.  If you know, I'll
17      let you answer the question.
18           THE WITNESS:  The problem is it was
19      discussed with you guys, so --
20           MR. SPOTSWOOD:  No, it's okay.  I'm going
21      to let you answer that question.  Without waiving
22      the privilege, we'll let you answer the question
23      about the search terms.
24           THE WITNESS:  Can you ask me the question
25      again?

```
 1              (The Reporter read back the requested
 2      portion.)
 3              THE WITNESS:  At the time, there were
 4          provided me some search terms by counsel, by
 5          external counsel, and I run those terms on Terry's
 6          Gmail account.
 7      BY MR. WELLS:
 8          Q.    And did you run those same terms on both
 9      the Exchange Server and the Gmail account?  The
10      question I'm being asked, were you given a set of
11      search terms and you went out and ran it on the
12      Exchange Server, you also ran it on the Gmail
13      account, and then you may have also run the same
14      terms on the IRA 365 server.  Is that what you did?
15          A.    Yes.
16          Q.    Okay.  And the PSTs resulting from those
17      searches are currently saved on the Conrad & Scherer
18      server?
19          A.    Yes, and it was given to counsel for
20      document review.
21          Q.    Okay.  You would be able to access those
22      PSTs here in the office in this building?
23          A.    Yes.
24          Q.    And go through by date and try to find an
25      e-mail from a particular date?
```

```
 1        A.      If the e-mail fell in the keyword
 2    searches, yes.
 3        Q.      Okay.
 4                (Plaintiff's Exhibit 26, e-mails, was
 5    marked for Identification.)
 6    BY MR. WELLS:
 7        Q.      I'm going to show you what's being marked
 8    as Exhibit 26.  And if you look at that very bottom
 9    e-mail from Albert Van Bilderbeek to Terry
10    Collingsworth's Gmail account, right?
11        A.      Yes.
12        Q.      All right.  Now, if that e-mail was in the
13    PSTs you collected from his Gmail account, how long
14    do you think it would take you to find it?
15        A.      I don't know --
16                MR. SPOTSWOOD:  I object to the form of
17          that, but go ahead and finish your answer.
18                THE WITNESS:  I'm sorry, can you ask --
19          can you read me the question again.
20    BY MR. WELLS:
21        Q.      I'll just ask you a different way.
22                If I want to ask you open up those PSTs
23    and see if you can find this July 19th e-mail from
24    Albert Van Bilderbeek to Terry Collingsworth, how
25    long do you think that would take you to do?
```

1              MR. SPOTSWOOD:  Object to the form.

2          You may answer.

3              THE WITNESS:  I don't know.  An hour at

4      the most.

5              (Plaintiff's Exhibit 27, e-mails, was

6      marked for Identification.)

7      BY MR. WELLS:

8          Q.      Let me show you what's been marked as

9      Exhibit 27, I apologize.  Is this an e-mail where you

10     were provided I'll call them notes from an interview

11     for lack of a better term?

12         A.      Okay.

13         Q.      This is sort of some notes about questions

14     and answers in a conversation with Maggie Crosby?

15         A.      Yes.

16         Q.      Did you participate in this interview?

17         A.      No.

18         Q.      Okay, but you were provided a copy of it?

19         A.      That's what it says in the e-mail.

20         Q.      And you've just taken the time to read the

21     document.  Do you see where she discusses in there

22     the practice of periodically archiving Mr.

23     Collingsworth's e-mails to an external hard drive?

24         A.      That is correct.

25         Q.      And is it Conrad & Scherer's knowledge that

**CONFIDENTIAL**                                          148

```
1     that, in fact, occurred during the time of Ms.
2     Crosby's employment at the firm?
3              MR. SPOTSWOOD:  Object to the form.
4              You may answer.
5              THE WITNESS:  I think that she is not
6         right on some facts on this interview.
7     BY MR. WELLS:
8         Q.    Like what?
9         A.    We did not help Terry Collingsworth to
10    archive any of his e-mails.
11        Q.    How about just the process of archiving
12    e-mails to an external hard drive?
13             MR. SPOTSWOOD:  Object to the form.
14    BY MR. WELLS:
15        Q.    Regardless of who did it.
16             MR. SPOTSWOOD:  Object to the form.
17    BY MR. WELLS:
18        Q.    Does Conrad & Scherer have any knowledge
19    that she's incorrect that his e-mails were archived
20    to an external hard drive?
21             MR. SPOTSWOOD:  Object to the form.  You
22         may answer.
23             THE WITNESS:  I did not teach anybody how
24         to move e-mails onto a PST file.
25
```

```
 1    BY MR. WELLS:
 2         Q.     Onto an external hard drive?
 3         A.     Much less onto an external hard drive.
 4         Q.     But she's saying in here that that
 5    occurred, that someone was archiving onto an external
 6    hard drive.  Do you have reason to dispute that that
 7    actually occurred, that someone archived e-mails onto
 8    an external hard drive?
 9              MR. SPOTSWOOD:  Object to the form.
10              You may answer.
11              THE WITNESS:  I wouldn't know.
12              (Plaintiff's Exhibit 28, e-mail, was marked
13    for Identification.)
14    BY MR. WELLS:
15         Q.     Showing you Exhibit 28, go ahead and read
16    that e-mail and let me know when you're ready.
17         A.     Okay.
18         Q.     This is a March 25, 2015 e-mail from Dennis
19    Williams to you and it appears like he's asking you
20    some questions, one of which is about this auto
21    archive rule, right?
22         A.     Correct.
23         Q.     It says on here, "Juan Carlos was able to
24    look at Terry Collingsworth's e-mail account and saw
25    that it was set to auto archive."  Did you see an
```

1    auto archive rule anywhere?

2         A.     I don't know from where Dennis got this

3    statement, but I don't recall ever seeing a rule for

4    auto archive.

5         Q.     Okay.  Well, he said the same thing and

6    that's why I was confused about this e-mail.  You did

7    not actually see an auto archive enabled on any of

8    Terry Collingsworth's accounts?

9         A.     Yes.

10        Q.     I'm going to ask that in a different way.

11   Sometimes, like you said, the double negatives get

12   us.

13             Did you see an auto archive enabled on any

14   of Terry Collingsworth's accounts?

15             MR. SPOTSWOOD:  Object to the form.

16             You may answer.

17             THE WITNESS:  I do not -- I did not see

18        anything any auto archive function on any of Terry

19        Collingsworth's computer.

20   BY MR. WELLS:

21        Q.     Then he's asking some follow-up questions

22   and one of those is, "Did you take any screenshots,"

23   right?

24             MR. SPOTSWOOD:  Just to be clear, I don't

25        see any answers to these on here.  Am I missing

```
 1        something or --
 2                 MR. WELLS:  I'm getting the answers right
 3        now.
 4                 MR. SPOTSWOOD:  Okay.
 5                 THE WITNESS:  Yeah, I don't recall.  I
 6        don't recall.
 7   BY MR. WELLS:
 8        Q.     This would be a lot easier if there were
 9   answers.
10                 In any event, one of the questions he's
11   asking you here is, "Did you take any screenshots?"
12   Do you see that?
13        A.     Yes.
14                 Okay.  I don't recall.
15                 (Plaintiff's Exhibit 29, e-mail, was marked
16   for Identification.)
17   BY MR. WELLS:
18        Q.     Going to hand you Exhibit 29, which is an
19   e-mail from you to Dennis Williams a couple days
20   later.
21        A.     Oh.
22        Q.     And you appear to be providing him a
23   screenshot of something, right?
24        A.     Yes.
25        Q.     What is this?
```

```
 1        A.      This is a rule that states that any

 2   e-mails -- and if I am not mistaken -- let me read

 3   this back again.

 4               Oh, I remember this.

 5               MR. ENYARD:  I think there are two

 6       separate documents attached.

 7               THE WITNESS:  There's two documents here.

 8               MR. ENYARD:  In this exhibit.

 9               MR. WELLS:  Okay.  Yeah, the last two

10       pages should not be on there.

11               MR. SPOTSWOOD:  We will pull those off and

12       give them back to you.

13   BY MR. WELLS:

14        Q.      I'm just looking at this April 1, 2015

15   e-mail.

16        A.      So again what is the question?

17        Q.      What is this a screenshot of?

18        A.      This is a screenshot of a rule set up on

19   Terry Collingsworth's Conrad & Scherer mailbox.

20        Q.      And what is the rule doing?

21        A.      If there is an e-mail sent to

22   TC@iradvocates.org, move to the IRAdvocates whatever

23   folder and stop processing more rules.

24        Q.      Where is that folder?

25        A.      It's inside of his inbox in a folder in
```

1    the server.

2         Q.      There was a -- Dennis Williams told us

3    about there was some rule enabled where if e-mails

4    went to both Mr. Collingsworth's Conrad & Scherer

5    account and IRAdvocates account at the same time, it

6    would go into some special folder?

7         A.      That's correct.

8         Q.      Is that what this rule is?

9         A.      That is correct.

10        Q.      Okay.  Do you have any idea why that rule

11   was set up?

12        A.      I don't recall the rule.

13               THE VIDEOGRAPHER:  10 minutes to tape

14        change.

15   BY MR. WELLS:

16        Q.      Do you have any idea who asked that it be

17   set up?

18        A.      I don't recall.

19        Q.      Do you have any idea when it was set up?

20        A.      No idea when it was set up.

21               (Plaintiff's Exhibit 30, e-mail, was marked

22        for Identification.)

23   BY MR. WELLS:

24        Q.      Let me show you Exhibit 30, which is

25   another e-mail between you and Dennis Williams around

1    that same time period.

2         A.    Okay.  It has a missing attachment.

3         Q.    That's how it was produced to us.  I'm just

4    reading what it says was attached.  It says, "Juan,

5    attached is a spreadsheet of DBX files in Terry's

6    file path on an external hard drive in Jenny's

7    office."  What are DBX files?

8         A.    Those are Outlook Express e-mail files.

9    It's like a PST version of Outlook Express.

10        Q.    Okay.  So those are e-mail storage files?

11        A.    That is correct.

12        Q.    And these were on an external hard drive in

13   the Washington, D.C. office?

14        A.    That's what it says on the e-mail.

15        Q.    And that external hard drive had a label on

16   it called, "IRAdvocates backup," right?

17        A.    That's what it says in the e-mail.

18        Q.    And these e-mails are just from 2006, 2007

19   and 2008.  Is that what that says?

20        A.    No.  It says that the last written dates

21   are like 2006, 2007 and 2008.

22        Q.    Okay.  If they had a last written date of

23   2008, could they contain any e-mails that postdate

24   2008?

25        A.    No.

```
 1        Q.     So that external hard drive had backups of
 2   e-mails from 2008 and before, true?
 3              MR. SPOTSWOOD:  Object to the form.
 4              You may answer.
 5              THE WITNESS:  True.
 6   BY MR. WELLS:
 7        Q.     So we know that, at least for these files,
 8   someone was using the external hard drive to back up
 9   Mr. Collingsworth's IRAdvocates e-mails, right?
10              MR. SPOTSWOOD:  Object to the form.
11              You may answer.
12              THE WITNESS:  Can you read the question
13       slowly, please?
14              (The Reporter read back the requested
15   portion.)
16              THE WITNESS:  I'm sorry, slowly.
17              (The Reporter read back the requested
18   portion.)
19              MR. SPOTSWOOD:  Object to the form.
20              You may answer.
21              THE WITNESS:  Yes.
22              MR. WELLS:  All right.  Now is a good time
23       for a break.
24              THE VIDEOGRAPHER:  We are off the record
25       at 2:16 p.m.
```

```
 1                    (Brief recess was taken.)
 2                    THE VIDEOGRAPHER:  We are back on record.
 3          It is 2:40 p.m.  This begins media 3.
 4     BY MR. WELLS:
 5          Q.     Mr. Rodriguez, we were discussing a little
 6     while ago an e-mail between you and Dennis Williams
 7     where he had asked the question who transferred data
 8     from the MacBook to the HP and your response was, "No
 9     idea."  Do you recall that?
10          A.     Yes, I do.
11          Q.     Okay.  Am I correct to assume that since
12     you don't know if anyone transferred any data from
13     that MacBook you also do not know if anyone wiped
14     that MacBook before it was given to Mr.
15     Collingsworth's relative, is that right?
16                    MR. SPOTSWOOD:  Object to the form.
17                    You can answer.
18                    THE WITNESS:  I don't know any of that.
19     BY MR. WELLS:
20          Q.     Okay.  So if Mr. Collingsworth testified
21     that Conrad & Scherer wiped that MacBook laptop
22     before he gave it away, Conrad & Scherer does not
23     have knowledge of that?
24                    MR. SPOTSWOOD:  Well, that depends upon
25          whether or not Terry Collingsworth is the only
```

1        knowledgeable person.  If he is, then he is.

2              MR. WELLS:  Well, Terry Collingsworth

3        testified repeatedly he has no idea essentially

4        how to do anything with the computer, which may or

5        may not be true, but he clearly did not wipe the

6        laptop himself.  He said someone at Conrad &

7        Scherer did.  He doesn't know much about it, he

8        was in Spain at the time.

9              MR. SPOTSWOOD:  All right.  That will go

10       on our list that we need to track down.

11             THE WITNESS:  So what is my question

12       again?

13   BY MR. WELLS:

14       Q.     The question is based on your personal

15   knowledge as well as any knowledge you had gained in

16   preparation for this deposition, do you know whether

17   anyone at Conrad & Scherer wiped the MacBook laptop

18   before it was given to Mr. Collingsworth's relative?

19             MR. SPOTSWOOD:  Object to the form.

20             You may answer.

21             THE WITNESS:  What I would say is that

22       nobody from the IT staff at Conrad & Scherer wipe

23       that Mac.

24   BY MR. WELLS:

25       Q.     Okay.  We discussed also during the course

1    of this deposition an Acer notebook that Mr.

2    Collingsworth used to use right before the MacBook?

3         A.    Yes.

4         Q.    Mr. Williams told us that that Acer was

5    still in the firm's possession but had been

6    reformatted or wiped sometime in the last year.  Are

7    you aware of that?

8         A.    I don't have any knowledge on that Acer

9    notebook.

10        Q.    Okay.  So you would not know who it was

11   that reformatted and/or wiped that Acer notebook?

12        A.    No idea.

13        Q.    All right.  Could you get back out

14   Exhibit 26?

15        A.    Yes.

16        Q.    By my account, we've got a little over

17   three hours left of time.  I would like for you to go

18   to those PSTs of Mr. Collingsworth's Gmail account

19   and see if you can locate just this e-mail from

20   Albert Van Bilderbeek to Mr. Collingsworth, not any

21   of the ones above it, just that one.

22             MR. SPOTSWOOD:  What is this, a test?  I

23        don't think that's an appropriate deposition

24        question.

25             MR. WELLS:  This is a request that we made

1      of the Defendants probably 10 days ago.

2      Apparently Mr. Rodriguez is able to do it within

3      an hour.  We'd like him to use some of the

4      remaining three hours that we have to do that for

5      us.

6              MR. SPOTSWOOD:  Well, so what you're

7      asking for here is the PST version of this e-mail?

8              MR. WELLS:  Yes, or whatever the native

9      file is that comes out of Gmail.

10             MR. SPOTSWOOD:  Okay.  Well, let me take a

11     break and see if we can accommodate your request.

12             THE VIDEOGRAPHER:  Off the record,

13     2:45 p.m.

14             (Brief recess was taken.)

15             THE VIDEOGRAPHER:  We are back on record.

16     It's exactly 3:23 p.m.

17             MR. SPOTSWOOD:  We have work that we, as

18     the attorney team, need to do in response to this

19     request and we need to be -- need time to get back

20     with you about it.  We will do so as soon as we

21     can, certainly within 48 hours, but I am not able

22     to offer JC to address your requests for this

23     e-mail in the native format file from that file

24     that we were discussing.

25             MR. WELLS:  Y'all are committing to have

**CONFIDENTIAL**                                      160

1      it to us, or an answer to us, I guess, either the

2      e-mail or an answer otherwise, within 48 hours?

3              MR. SPOTSWOOD:  Yes.

4              MR. WELLS:  Just to be clear, within

5      48 hours, we will either have the e-mail -- native

6      e-mail provided to us or an answer as to its

7      whereabouts?

8              MR. SPOTSWOOD:  Yes.

9              MR. WELLS:  Okay.  Do you have something

10     to say?

11             MR. DAVIS:  Do we have an explanation as

12     to why it takes more?

13             MR. SPOTSWOOD:  I couldn't answer that

14     without, you know, invading the attorney-client

15     privilege.  I'm sorry, I know this is a delay, I

16     know this is frustrating for you guys, but I've

17     got a process I've got to work through here.

18             MR. DAVIS:  Yeah.  Well, we've come a long

19     way for y'all to have to do more work.  You've

20     come a long way.

21             MR. ENYARD:  I have no problem; I have to

22     go back and do the work.

23             MR. DAVIS:  Yeah.

24             MR. WELLS:  Why don't we take a break so

25     we can --

```
 1                    MR. SPOTSWOOD:  Okay.

 2                    MR. WELLS:  -- discuss.

 3                    THE VIDEOGRAPHER:  Okay.  We are off the

 4          record.  It's 3:27 p.m.

 5                    (Off the record.)

 6                    THE VIDEOGRAPHER:  We are back on record.

 7          It's 3:29 p.m.

 8                    MR. WELLS:  Can we get a commitment within

 9          the next 42 hours so that we will have an answer

10          in advance of Mr. Collingsworth's re-deposition?

11                    MR. SPOTSWOOD:  That's a fair request.

12                    MR. WELLS:  Okay.

13                    MR. SPOTSWOOD:  So that would be, just to

14          be specific, we are talking about --

15                    MR. WELLS:  Let's say 9:00 Thursday

16          morning.

17                    MR. SPOTSWOOD:  9:00 a.m. Thursday.

18                    MR. DAVIS:  6:00 Wednesday afternoon is

19          what we will need, don't you think?

20                    All right, whatever; you do whatever.

21                    MR. WELLS:  I won't need much time.

22                    MR. SPOTSWOOD:  And that's when Terry is

23          scheduled to reconvene?

24                    MR. WELLS:  Well, that -- we hadn't set

25          the exact time, but that would be the typical time
```

```
 1          we can start and we can maybe bump it back a
 2          little bit if we need a little bit of time to
 3          digest the answer.
 4                    MR. SPOTSWOOD:  Okay.
 5                    MR. WELLS:  I think we are still waiting
 6          ruling by the Court how much time we will get with
 7          him.
 8                    MR. SPOTSWOOD:  Okay.
 9                    MR. WELLS:  All right?
10                    Thank you, Mr. Rodriguez.
11                    THE WITNESS:  Thank you.
12                    MR. SPOTSWOOD:  I have just a couple of
13          questions.  Just two seconds with Kendall, I'll be
14          right back.
15                    THE VIDEOGRAPHER:  We are off the record.
16          It's 3:31 p.m.
17                    (Off the record.)
18                    THE VIDEOGRAPHER:  We are back on the
19          record at 3:34 p.m.
20                         CROSS EXAMINATION
21     BY MR. SPOTSWOOD:
22          Q.    Mr. Rodriguez, I just have a couple of
23     questions I want to ask you.
24                    The first is on the Conrad & Scherer
25     server system since you arrived at the firm, if a
```

1   person sends an e-mail in to the firm from outside or

2   sends an e-mail or if a person inside the

3   firm -- well, let me go back because I have to break

4   this down.

5           If a person from outside the firm sends an

6   e-mail in to the firm and copies more than one

7   person, if one of the recipients of the multiple

8   recipients inside the firm but not others deletes the

9   e-mail, will the e-mail still remain on your system?

10       A.      Yes.

11       Q.      And if -- now I want to switch topics on

12   you and talk about the deletion features of the

13   e-mail system or the e-mails at the Conrad & Scherer

14   server since you've been here and that is has there

15   ever been an auto delete feature that would delete

16   regular e-mail traffic that comes into and out of the

17   firm at any particular point in time?

18       A.      As I said on my deposition, we do not have

19   any of those auto delete features or mechanisms in

20   our organization.  We prefer to keep everything in

21   our system.

22       Q.      Okay.  And if someone wants to delete a

23   particular e-mail that comes in to them, they have to

24   do it twice in order to get it off of your system;

25   they have to first delete it, if goes into the trash

1    and then you have to empty the trash box?

2         A.     That is correct.

3         Q.     Okay.  And then that trash box would be

4    preserved but no longer than 90 days up until June of

5    2014?

6         A.     Can you repeat the --

7         Q.     Yeah, I just want to make sure I understood

8    your testimony correctly.  During much of the period

9    we've talked about prior to June of 2014, if someone

10   had deleted an e-mail twice, how long would it be on

11   the system after that second deletion, if at all?

12        A.     90 days.

13        Q.     Okay.

14        A.     But let me add something to that.  If a

15   person deletes an e-mail and leaves it in the trash

16   can, it's going to be there forever if he never

17   purges the e-mail.  There are no policies to empty a

18   trash can every certain amount of days, it's just

19   going to stay in the trash can until the user purge

20   the trash can.

21        Q.     Okay.  Is there a write protected feature

22   on the C&S file server?

23        A.     Yes, there is.

24        Q.     Can you tell us what that means?

25        A.     It means that for every document that we

1   store in our file server, in our document management

2   system -- excuse me, I'm sorry.  It means that for

3   every document that we store in our document

4   management system, it's going to be saved and it's

5   going to be write protected so no one can delete the

6   file from the document management system.

7        Q.     Okay.  There was a question on the table

8   earlier this afternoon about routine data transfers

9   and you asked to take a break after that while that

10  question was on the table or it was really after you

11  made an answer to the question.  Do you remember

12  that?

13       A.     Yes, I do remember that.

14       Q.     Could you tell us why you asked to take a

15  break?

16       A.     Well, I felt that I did not answer the

17  question correctly.

18       Q.     Okay.

19       A.     And I wanted to ask counsel how do I fix

20  this mistake.  This is my first deposition, I don't

21  know how this works.

22       Q.     In any event, when you returned to this

23  room, what did you do?

24       A.     I tried to fix my answer.

25       Q.     And was your answer correct as you returned

1   and stated it?

2       A.     When I stated my answer, it was correct.

3             MR. SPOTSWOOD:  I'd like to designate the

4       deposition transcript as confidential in its

5       entirety and we will deal with the issues arising

6       from that in the future.

7             MR. WELLS:  Just a couple of follow-ups.

8             MR. SPOTSWOOD:  Yes, sir.

9                   REDIRECT EXAMINATION

10  BY MR. WELLS:

11      Q.     How many e-mails for Mr. Collingsworth's

12  Conrad & Scherer inbox did you find in the firm's

13  document management system for the year 2012?

14      A.     I don't recall the number of documents.  I

15  don't recall how many documents; a lot of documents.

16      Q.     It's been represented to us there is a gap

17  in Mr. Collingsworth's e-mails from March of 2013

18  back to sometime in 2011 depending on which account

19  you're talking about.  Do you understand that?

20      A.     Yes.

21      Q.     Are there e-mails of Mr. Collingsworth in

22  that time period saved to the firm's document

23  management system concerning Drummond?

24      A.     I don't know.

25      Q.     You cannot testify here today that any

```
 1    e-mails concerning Drummond between 2011 and 2013
 2    were actually saved on the document management system
 3    for Mr. Collingsworth's account?
 4         A.     Can you read the question again?
 5                (The Reporter read back the requested
 6    portion.)
 7                MR. SPOTSWOOD:  You're talking about
 8         during that time frame they were saved, not any
 9         work we've been doing since then when we got
10         involved to try to supplement the record here?
11    BY MR. WELLS:
12         Q.     Yeah, I'm talking about you don't have
13    e-mails between 2011 and 2013.  Are those e-mails
14    saved on the document management system had they been
15    saved during that time period?
16         A.     That's a different question.  You asked me
17    if I can testify if those documents were saved.  You
18    are saying that they were not.  So which question do
19    you want me to answer?
20         Q.     What I'm trying to get at here is there's a
21    gap in e-mails between 2011 and 2013, right?
22         A.     Yes.
23         Q.     You offered some testimony about this write
24    protect feature on the document management system.
25    Do you recall that?
```

1     A.      That is correct.

2     Q.      The only way that write protect has any

3  pertinence to the issue of missing e-mails would be

4  if those missing e-mails were actually saved on the

5  document management system, right?

6     A.      That is correct.

7     Q.      Were any of those e-mails saved on the

8  document management system?

9     A.      I don't know.

10    Q.      Okay.  Is there any way on your system to

11  see from the server side whether someone has double

12  deleted their entire inbox?

13    A.      Not that I know of.

14    Q.      And if they were double deleted, they would

15  disappear from the server, so I guess you would see

16  the absence of e-mails, right?

17    A.      I don't see the absence of e-mails.  I

18  mean --

19    Q.      Okay.

20    A.      I wouldn't know what's in there.

21    Q.      I'll ask it a different way.

22            The only way, or tell me if you know, but

23  do you know if the only way to determine whether

24  someone actually double deleted their entire inbox

25  would be to have the computer they used to do that

```
 1      double deletion?
 2               MR. SPOTSWOOD:  Object to the form of the
 3          question.
 4               You may answer.
 5               THE WITNESS:  I don't know the answer to
 6          that.
 7               MR. WELLS:  Okay.  That's it for us.
 8               MR. SPOTSWOOD:  Okay.  Thank you.
 9               THE WITNESS:  Thank you.
10               THE VIDEOGRAPHER:  Everybody is in
11          agreement to end the video deposition?
12               MR. SPOTSWOOD:  Yes, sir.
13               THE VIDEOGRAPHER:  This is the end of the
14          deposition.  We are off the record at 3:45 p.m.
15               (Thereupon, the deposition was concluded at
16      approximately 3:45 a.m.  Signature and formalities
17      were not waived.)
18
19
20
21
22
23
24
25
```

1          EXCEPT FOR ANY CORRECTIONS MADE ON THE
           ERRATA SHEET BY ME, I CERTIFY THIS IS A
2          TRUE AND ACCURATE TRANSCRIPT.

3

4          JUAN CARLOS RODRIGUEZ

5
           Sworn to and subscribed before me this
6
           day of                  2015.
7
     Personally known      or I.D. _____
8

9

10
           Notary Public in and for the
11         State of Florida at Large

12   My commission expires:

13

14

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2

3    STATE OF FLORIDA:

4    COUNTY OF BROWARD:

5

6             I, the undersigned authority, certify that

7    JUAN CARLOS RODRIGUEZ personally appeared before me

8    on August 25th, 2015 and was duly sworn by me.

9

10            WITNESS my hand and official seal this 26th

11   day of August, 2015.

12

13

14                      BEVERLY BOURLIER JAMES
                        My Commission #EE091768
15                      Expires September 9th, 2015

16

17

18

19

20

21

22

23

24

25

```
 1              C E R T I F I C A T E

 2

 3    STATE OF FLORIDA:

 4    COUNTY OF BROWARD:

 5              I, BEVERLY BOURLIER JAMES, a Notary Public

 6    for the State of Florida at Large, hereby certify

 7    that I reported the deposition of JUAN CARLOS

 8    RODRIGUEZ; and that the foregoing pages constitute a

 9    true and correct transcription of my shorthand report

10    of the deposition by said witness on this date.

11              I further certify that I am not an attorney

12    or counsel of any of the parties, nor a relative or

13    employee of any attorney or counsel connected with

14    the action nor financially interested in the action.

15              WITNESS my hand and official seal in the

16    State of Florida, this 26th day of August, 2015.

17

18

19              BEVERLY BOURLIER JAMES
                Registered Professional Reporter
20              Certified Realtime Reporter
                Certified LiveNote Reporter
21              Florida Professional Reporter
                NCRA Realtime Systems Administrator
22

23

24

25
```

Drummond Company, Inc. vs
Terrence P. Collingsworth, et. al

Juan Carlos Rodriguez
August 25, 2015

## A

**ability (3)**
5:17;92:3;
115:19
**able (15)**
42:6;49:1,4;
83:3;92:18;93:17;
102:6;104:9;134:8;
136:8;142:15;
145:21;149:23;
159:2,21
**above (5)**
45:2,14,15;
126:9;158:21
**absence (2)**
168:16,17
**Absolutely (4)**
5:25;80:4,10;
114:18
**access (6)**
7:10;47:9;116:3;
131:24;133:14;
145:21
**accessible (1)**
44:24
**accessing (1)**
133:16
**accommodate (1)**
159:11
**account (28)**
42:4,6;89:9;
90:21;91:9,11,16;
92:10;96:8,17,18;
143:6,15,24;144:8,
14;145:6,9,13;
146:10,13;149:24;
153:5,5;158:16,18;
166:18;167:3
**accounts (2)**
150:8,14
**accurate (2)**
28:24;100:16
**accurately (1)**
141:2
**Acer (7)**
105:21;106:4,9;
158:1,4,8,11
**active (3)**
23:1,2,5
**actually (12)**
8:22;24:13;29:6;
31:24;37:3;90:2;
106:3;149:7;150:7;
167:2;168:4,24
**add (1)**
164:14
**added (2)**
9:22;10:3
**additional (2)**
59:25;78:22
**address (2)**

10:21;159:22
**addresses (3)**
41:16;44:4;53:3
**Admin (4)**
42:1,4,6;54:4
**advance (1)**
161:10
**advertisement (4)**
21:1,2,11,18
**advise (2)**
127:20;130:8
**advised (1)**
110:25
**afternoon (2)**
161:18;165:8
**again (40)**
9:1;19:9;20:6;
22:3;30:20;32:3;
36:20;37:8;41:2;
45:16;46:12,13;
58:8;68:20;71:12;
72:6;77:12;85:6;
86:4;91:2;94:1;
96:2;101:7,11;
102:7;107:21;
116:15;120:7;
128:4;129:9,10;
134:12;135:11;
140:20;144:25;
146:19;152:3,16;
157:12;167:4
**against (2)**
12:22;13:4
**agent (3)**
4:7;12:20;13:3
**ago (6)**
24:25;50:24;
64:1;66:14;156:6;
159:1
**agree (4)**
66:11;109:13;
129:17;138:7
**agreed (2)**
66:11;109:14
**agreement (2)**
66:12;169:11
**ahead (12)**
21:25;63:10;
94:8;98:5;101:8;
115:1;116:12;
118:5;119:15;
126:20;146:17;
149:15
**airplane (1)**
28:22
**Alabama (1)**
4:4
**Albert (3)**
146:9,24;158:20
**allegedly (1)**
137:15
**along (1)**
40:21

**alongside (1)**
89:4
**although (1)**
43:15
**always (1)**
9:12
**amount (1)**
164:18
**and/or (4)**
12:8,14,19;
158:11
**answered (4)**
30:16;37:8;
72:20;122:3
**anymore (1)**
49:5
**apologize (2)**
6:23;147:9
**apparently (2)**
138:23;159:2
**appear (3)**
51:18;119:21;
151:22
**appears (8)**
45:14;68:10;
117:14;137:25;
140:6,22;141:25;
149:19
**appropriate (2)**
66:20;158:23
**approximately (2)**
125:10;169:16
**April (16)**
10:8;12:10;
14:17;79:24;80:12,
23;81:5,13,21;
82:4,9;123:7,21;
125:10;126:15;
152:14
**archive (11)**
95:7,22;128:8;
148:10;149:21,25;
150:1,4,7,13,18
**archived (2)**
148:19;149:7
**archiving (4)**
128:9;147:22;
148:11;149:5
**arising (1)**
166:5
**around (7)**
14:17;16:12;
88:9;135:15,16;
137:1;153:25
**arrived (1)**
162:25
**assist (5)**
82:23;83:4,9;
115:14;122:24
**assistance (2)**
133:25;134:4
**assistant (1)**
42:11

**assisted (2)**
83:15;89:4
**associates (1)**
136:25
**assume (4)**
43:9;11;85:13;
156:11
**assumes (1)**
71:3
**assuming (1)**
51:5
**attached (6)**
108:10;109:12;
135:8;152:6;154:4,
5
**attachment (1)**
154:2
**attempting (1)**
66:8
**attention (2)**
97:5;105:6
**attorney (7)**
8:2;25:18;26:21;
27:12;57:19;101:8;
159:18
**attorney-client (2)**
101:9;160:14
**attorneys (9)**
4:13;7:21,23,24;
8:5;26:8;38:24;
39:1;74:9
**attorney's (1)**
27:5
**August (1)**
4:10
**auto (12)**
95:7,22;128:8;
149:20,25;150:1,4,
7,13,18;163:15,19
**aware (33)**
34:17;35:2;
37:14;46:15;58:6,
14,20;67:9;71:20;
80:13,22;81:4,22;
82:4,9;84:5,15;
89:7;95:13,16,18,
19;96:5;116:8,17,
24;118:21,22;
120:7;124:20;
133:10;137:13;
158:7
**away (6)**
73:4;95:11,15,
21;130:10;156:22

## B

**back (52)**
6:13;22:4,5;
33:13;39:25;41:2;
46:23,25;51:2;
52:19;59:6,7,15;
63:7;83:20;88:20;

89:3;91:2,4;93:20;
94:14;95:3;96:3,
25;102:18;107:2;
121:7,12;129:11;
133:17;136:7;
138:15;139:24;
144:1;145:1;152:3,
12;155:8,14,17;
156:2;158:13;
159:15,19;160:22;
161:6;162:1,14,18;
163:3;166:18;
167:5
**backed (9)**
14:23,24;16:16;
17:21;18:16;19:23,
25;24:14;136:15
**backfill (1)**
66:8
**background (1)**
48:24
**backing (1)**
106:23
**backup (30)**
15:2,3,17;17:17;
19:3,19,25;20:9,
13;21:10,14;22:25;
99:12,14,14;
102:16,25;134:23;
135:2,2,3,7,8,13,
14,17;136:9,9,17;
154:16
**backups (4)**
15:6,11;16:18;
155:1
**bad (1)**
20:3
**Balcero (1)**
78:17
**based (12)**
69:21;70:13,22;
71:19;76:20;77:17,
18;79:11;85:13;
110:19;130:15;
157:14
**basically (3)**
25:13;97:13;
133:7
**bathroom (1)**
139:19
**became (1)**
95:18
**beginning (2)**
52:5;78:13
**begins (4)**
80:4;88:21;
115:5;156:3
**behalf (1)**
5:3
**behavior (1)**
97:18
**Ben (1)**
4:18

Bain & Associates Court Reporting Services, Inc.
1-888-326-0594   depos@bainandassociates.com

Drummond Company, Inc. vs
Terrence P. Collingsworth, et. al

Juan Carlos Rodriguez
August 25, 2015

**besides (1)**
49:11
**best (7)**
5:17;48:14;
52:13;67:15;69:22;
100:11;128:20
**better (1)**
147:11
**beyond (1)**
136:18
**Bilderbeek (3)**
146:9,24;158:20
**Bill (7)**
31:4,6,10;81:5,8,
10,20
**Billy (2)**
67:24;82:3
**bit (5)**
9:18;25:3;33:16;
162:2,2
**Blanco (2)**
57:6;64:8
**Bob (4)**
52:2;59:1;122:4;
126:24
**both (14)**
8:10;34:5;54:1;
63:22;70:22;75:8,
8,12;106:7;111:18;
119:9;131:20;
145:8;153:4
**bottle (1)**
114:17
**bottom (10)**
40:17;44:16;
73:12;78:12;80:3;
105:7;111:24;
131:19;132:19;
146:8
**box (14)**
34:13;40:2;41:7,
18;64:7;65:20;
86:14;89:18;98:9;
99:22;101:14,14;
164:1,3
**boxes (1)**
65:13
**brand (1)**
117:23
**Brazil (4)**
86:22;130:20;
131:6;138:23
**break (13)**
33:8;56:9;63:3;
107:19;121:2,22;
139:16;155:23;
159:11;160:24;
163:3;165:9,15
**brief (15)**
6:8,10;33:12;
59:14;63:6;72:21;
73:7;78:6,10;
79:20,24;121:6;

139:23;156:1;
159:14
**broader (1)**
78:22
**broke (2)**
33:16;88:24
**building (1)**
145:22
**bump (1)**
162:1
**business (1)**
88:5
**busy (1)**
125:1

---

## C

**C&S (1)**
164:22
**call (2)**
66:22;147:10
**called (5)**
5:3;44:13;103:8;
142:1;154:16
**came (1)**
6:13
**Can (108)**
5:8,22;7:10;
8:25;17:9;19:8,8;
20:5;21:24,25;
22:2,4;23:12,15,17,
20;24:1,1,18,21;
29:6;32:3;33:8;
34:5;35:15;36:19;
42:17,22;45:3;
49:10,10;56:8;
59:5,18;61:23;
69:17;70:16;73:4;
74:2;76:15;77:17;
84:10;85:5,5;86:2;
91:2;93:25;94:16;
96:1,24;98:22,24;
101:10,25;103:18;
104:20;107:18,18,
21;108:2;109:13;
114:17;116:14;
117:22;118:9;
121:2,10,23,25;
122:2,20,21;
123:17;127:14;
129:9,10,16;
131:23;135:10;
136:7;137:1;
138:13;139:16;
140:11;143:25;
144:3,24;146:18,
19,23;155:12;
156:17;158:19;
159:11,21;160:25;
161:8;162:1,1;
164:6,16,18,19,20,
24;165:5;167:4,17
**capability (2)**

83:12;115:12
**capacity (4)**
6:5,15;8:10;
43:10
**care (4)**
124:11;126:17;
127:18,20
**Carlos (8)**
4:9;5:2,10;9:21,
23,24;79:9;149:23
**Carlson (1)**
55:7
**Carrera (1)**
55:7
**case (48)**
4:4;10:25;11:4;
12:5,24;22:14,17;
31:3,6,11,22;
33:23;48:2;57:18;
58:7,17,23,25;59:3,
21;62:6;63:14,16,
19;64:2,4,15,19;
65:21;67:6,10,17;
68:12;69:10;70:9,
25;78:23;79:1;
81:21;82:6,16;
92:23;116:9;
121:15;124:21,23;
129:6;136:7
**case-related (4)**
11:3;17:7,16;
22:17
**cases (8)**
8:2;25:12,15,16;
26:3;27:3;58:20,24
**catch (1)**
122:12
**caused (1)**
95:22
**causing (1)**
123:1
**cc'd (1)**
105:7
**center (1)**
136:4
**certain (15)**
7:19,21,23,24;
24:15;25:12,14,16,
21;26:3;31:17;
57:9;84:5;132:2;
164:18
**certainly (1)**
159:21
**cetera (1)**
125:13
**chain (1)**
43:21
**challenged (1)**
13:17
**chance (2)**
142:3;144:9
**change (6)**
16:1;80:19;

85:24;103:8;
121:18;153:14
**changed (3)**
7:13,20;103:9
**changing (2)**
27:12;38:22
**charged (1)**
51:16
**check (5)**
35:18;56:5;
102:18;127:1;
137:1
**chunk (1)**
99:18
**circumstances (1)**
27:4
**clarification (1)**
98:14
**clarify (3)**
61:20;63:11;
121:9
**clarity (2)**
26:18;140:16
**clear (5)**
11:18;43:6;60:6;
150:24;160:4
**clearly (1)**
157:5
**client (1)**
21:18
**clock (1)**
97:16
**close (1)**
96:10
**collected (1)**
146:13
**Collingsworth (49)**
4:6,22,24;12:21;
13:4;38:3,14,16;
40:9;45:7;49:6;
50:18;60:16;83:15;
86:23;87:22;90:12;
95:20;105:17;
111:22;115:5,13;
116:1;122:10,16;
123:9;125:10,12,
21;129:23;130:19;
131:15;132:1,10,
25;133:10,23;
137:14;138:1,22;
139:14;146:24;
148:9;156:20,25;
157:2;158:2,20;
166:21
**Collingsworth's (58)**
12:15;40:14;
41:10;49:16;51:23;
53:2,19;57:5;64:7;
84:6;85:10;86:22;
89:8,19;91:16;
93:12;94:5;95:1,
13;96:8;102:9;
107:3;110:15;

117:15;118:23;
123:23;126:17;
127:18,23;128:13;
129:8;130:9;133:2,
14;134:5,8,17;
137:3,6;143:6,15,
23;146:10;147:23;
149:24;150:8,14,
19;152:19;153:4;
155:9;156:15;
157:18;158:18;
161:10;166:11,17;
167:3
**column (1)**
34:6
**coming (1)**
103:13
**commitment (1)**
161:8
**committing (1)**
159:25
**communication (4)**
81:17;126:15;
127:11;139:8
**communications (4)**
78:23;79:1;
101:9;108:2
**Company (6)**
4:5,17;19:6;12;
100:25;101:18
**Compaq (1)**
84:13
**complaining (1)**
122:16
**completeness (1)**
80:12
**comply (1)**
137:5
**computer (103)**
7:13;8:7;11:9,
10;18:2;19:11;
25:1,2,5;26:11,12,
17,23;27:1,6,6,8,9,
14,15,16;28:5,10,
11,12,13,18;29:6,
10,11,16,21,24,25;
30:10,24;39:21,23,
24;48:5;61:15;
84:18,19,21;85:9,
15,19;86:5;87:8,9,
11,23;88:6;91:8,
10;93:2,12;94:12;
95:21;97:19;
106:14,16;112:17;
115:14;116:4,18,
18;117:15,16,19,
21,23;118:9;119:2,
4,4,5,6,9,22;
120:22;121:16,16,
17,19;123:12,18,
24;124:9;125:23;
126:10;127:13,18,
25;128:13,25;

**Drummond Company, Inc. vs**
**Terrence P. Collingsworth, et. al**

**Juan Carlos Rodriguez**
**August 25, 2015**

129:1,2;130:10;
131:6;150:19;
157:4;168:25
**computers (26)**
7:7,20;10:7;
11:13;12:9,23;
25:1;27:12;38:22;
39:10;83:9,16,19;
84:6;87:13,14;
88:4;106:7,8;
111:14,18;116:9;
117:4;118:14,22,
24
**concern (1)**
134:7
**concerning (3)**
7:6;166:23;
167:1
**concluded (1)**
169:15
**concludes (1)**
48:13
**condition (1)**
91:24
**conducted (1)**
60:15
**confidential (1)**
166:4
**confidentiality (1)**
11:3
**confirm (1)**
61:9
**confirms (1)**
119:24
**confused (1)**
150:6
**connect (1)**
27:15
**connected (7)**
28:23;115:22,24;
116:4,10,20;117:4
**connection (2)**
28:24;131:23
**connects (2)**
30:7;93:2
**Conrad (105)**
4:7,8,22,24;6:2,
15;10:24;11:1,5,
11,15;12:3,7,14,18;
13:1,13;14:5,7;
24:5,22;32:7,16;
34:17,18,25;37:23;
38:1,17;42:5;49:9;
53:16,21;62:4,18,
23;65:18;73:15;
74:3,25;75:1,9,24;
86:24;87:4,11,12,
14,14,23;88:7,11;
90:8,19,20;92:1,6,
6,10,18;93:2;
98:13;99:15;
101:22,25;103:9,
12,13,17,19;106:7;

129:5;110:4,7,10,
13;112:5;113:18,
24;114:2;115:23,
25;116:20;120:5,
17,21;128:20;
130:8,12;133:25;
134:4;137:14;
145:17;147:25;
148:18;152:19;
153:4;156:21,22;
157:6,17,22;
162:24;163:13;
166:12
**conradscherercom (1)**
92:20
**considered (1)**
113:15
**consult (1)**
109:3
**consultant (1)**
98:12
**contact (2)**
133:24;134:3
**contain (2)**
77:23;154:23
**containing (4)**
76:24;77:8;
80:14,24
**contains (1)**
133:7
**contend (1)**
66:4
**content (2)**
28:8;97:20
**context (2)**
47:11;73:22
**control (2)**
49:2,2
**conversation (2)**
98:25;147:14
**conversations (2)**
98:23;99:1
**copied (8)**
21:6;27:24;30:6;
31:1;49:8;50:18;
101:24;103:16
**copies (4)**
30:10;33:4;
103:18;163:6
**copy (24)**
8:17;15:3,6;21:6,
8;23:18;27:15,18,
20,21;28:4,6;
29:16,20,23;30:22;
50:21;103:14;
137:16;138:8;
140:11,14;143:22;
147:18
**corner (3)**
40:17;86:17,20
**corrected (1)**
71:4
**correctly (6)**

45:23;94:2;
123:19;128:5;
164:8;165:17
**correspondence (2)**
125:9;142:25
**counsel (16)**
13:22,24;14:3;
62:9;97:7,23;
108:2,8;109:4;
121:22;139:8;
144:6;145:4,5,19;
165:19
**couple (10)**
8:2;9:19;59:17;
61:17;66:13;115:2;
151:19;162:12,22;
166:7
**course (5)**
99:19;100:3;
109:24;131:3;
157:25
**Court (3)**
4:3;66:12;162:6
**created (3)**
36:13;44:18;
102:24
**Crosby (16)**
39:22;43:25;
45:2;47:24;49:16,
24;50:3;123:8,15;
125:9,22;126:16;
127:12,16;131:20;
147:14
**Crosby's (3)**
50:22;126:9;
148:2
**CROSS (1)**
162:20
**CS (1)**
142:1
**CSTC (1)**
40:17
**CSTC012016 (1)**
63:20
**CSTC012019 (1)**
54:17
**CSTC012020 (1)**
41:5
**CSTC012023 (2)**
41:18;53:24
**CSTC012068 (3)**
57:24;68:14,21
**CSTC012075 (1)**
58:3
**CSTC020 (1)**
41:3
**CTSS (1)**
83:6
**current (3)**
26:16;105:20,25
**currently (3)**
6:1;142:17;
145:17

**D**

**Daily (6)**
15:13,14;16:16,
18;136:6,17
**Danielle (1)**
39:13
**data (33)**
11:7;14:25;15:5;
26:11;27:8,13,15,
19,21;28:6,19;
29:10,15,23;85:19;
118:13,23;119:6;
120:8,14,22;
121:15,18;123:23;
127:17;129:3;
132:25;133:1,4;
136:4;156:7,12;
165:8
**database (4)**
15:4;17:22;
18:17;133:12
**date (14)**
4:10;14:15,17;
37:13;89:15,20;
98:9;108:15;119:3;
126:14,21;145:24,
25;154:22
**dates (6)**
32:23;35:14,16;
58:8;66:10;154:20
**Davis (11)**
4:20,20;51:4,15;
52:11;66:25;71:10;
160:11,18,23;
161:18
**day (8)**
15:15,16,20;
20:10;44:8;47:19,
21;122:3
**days (27)**
15:6,7,21;16:8,
19;17:18;18:15,18;
19:23;20:14,16;
21:14;24:12,13,15;
66:13;107:1;
125:11;134:24;
135:9,15,16;
151:19;159:1;
164:4,12,18
**DBX (2)**
154:5,7
**DC (18)**
53:22;57:2;
60:15;61:4,7;
62:12,19,25;65:9;
82:17,22;83:9;
85:11;111:11,15,
19;134:3;154:13
**deal (1)**
166:5
**December (8)**

6:8,22,23;25:11;
48:25;135:22;
139:5;144:5
**declaration (1)**
9:7
**Defendants (10)**
4:8,23;48:1;
73:7;78:10,14,16,
21;79:24;159:1
**Defendants' (3)**
12:21;13:16;
80:11
**delay (1)**
160:15
**delete (16)**
17:3,10,12;21:2,
3,13;24:9,10,11,12;
163:15,15,19,22,
25;165:5
**deleted (26)**
18:1,3,4,7,8,11;
19:1,2,2,4,12,18,
25;20:19;21:20;
24:11;59:19;94:20;
95:1,14,20;143:5;
164:10;168:12,14,
24
**deletes (6)**
17:23;18:6;
19:11;20:8;163:8;
164:15
**deleting (2)**
23:24;24:6
**deletion (4)**
83:23;163:12;
164:11;169:1
**deletions (1)**
95:16
**Dell (10)**
106:1;119:4;
120:1,3,4,8,14,14,
15,15
**Dennis (27)**
36:18,24;37:4;
89:4;91:14;98:23,
25;107:11,22;
109:10,16;110:17;
127:7;131:7;
139:2;140:21;
141:24;143:1;
149:18;150:2;
151:19;153:2,25;
156:6
**department (2)**
25:6;67:7
**depending (1)**
166:18
**depends (3)**
39:9;93:8;
156:24
**deponent (1)**
51:6

**deposition (23)**
4:2;5:12;8:17;
35:21;52:6;66:9;
67:3;70:24;76:22;
77:19;79:12;111:1;
130:16;134:23;
157:16;158:1,23;
163:18;165:20;
166:4;169:11,14,
15
**describe (1)**
141:2
**describing (1)**
23:21
**designate (2)**
9:16;166:3
**designated (7)**
9:10,20;10:10;
11:22;59:2;66:3,6
**designation (2)**
66:21;71:4
**desktop (10)**
84:13;89:20,22,
23;90:3;112:4,13;
119:1,4,5
**destroyed (1)**
129:2
**detail (1)**
35:17
**details (2)**
31:15;125:3
**determine (2)**
142:16;168:23
**device (5)**
23:4,7,16,19;
129:4
**different (7)**
6:11;135:12;
140:9;146:21;
150:10;167:16;
168:21
**digest (1)**
162:3
**DIRECT (3)**
5:6;34:12;105:6
**directly (4)**
59:4;115:22;
116:10,20
**director (3)**
6:6,14,25
**disappear (1)**
168:15
**disappears (1)**
24:16
**disaster (3)**
135:23;136:2,12
**disclosed (2)**
78:14,16
**discovered (2)**
96:17;100:8
**discovery (2)**
12:5;62:5
**discuss (3)**

112:4;121:21;
161:2
**discussed (8)**
13:24;24:4;
57:11;73:14;
134:22;139:13;
144:19;157:25
**discusses (1)**
147:21
**discussing (11)**
33:16;54:21;
86:21;88:25;
105:16;112:25;
113:6;119:21;
137:6;156:5;
159:24
**discussion (2)**
108:6;117:15
**discussions (2)**
123:22;139:4
**disks (1)**
135:8
**disposed (1)**
12:22
**dispute (1)**
149:6
**distinguish (1)**
43:14
**District (2)**
4:3,3
**Division (1)**
4:4
**document (29)**
8:18;17:8,11,16;
34:4;61:4;63:24;
73:22,24;74:3;
75:18;86:8,12;
89:3;118:11;
145:20;147:21;
164:25;165:1,3,3,
6;166:13,22;167:2,
14,24;168:5,8
**documentary (1)**
36:17
**documentation (2)**
31:17;36:10
**documents (17)**
10:5;12:4;13:16;
32:1;44:23;62:4;
65:2;74:11;75:13;
78:18;135:9;152:6,
7;166:14,15,15;
167:17
**done (46)**
7:18;8:23;13:20;
33:6;34:24;35:3,4;
36:6;37:9,11,15;
38:23,24;39:1,2;
44:11;50:4;60:1,
18,25;61:7;62:25;
64:24;66:2;69:15,
22;70:23;71:20;
76:6,7;77:15,19;

78:25;79:11,13;
82:9;84:3;102:23;
110:19;113:12,16;
114:2;124:9;130:6,
15;131:7
**double (7)**
24:10;116:14;
150:11;168:11,14,
24;169:1
**down (9)**
70:3;99:22;
111:24;114:10;
127:14;132:19;
141:8;157:10;
163:4
**DPM (7)**
15:5,17;18:17;
135:3,7,13;136:9
**drag (4)**
22:14;23:3,6,15
**drags (1)**
22:17
**Drath (2)**
68:2;82:8
**drive (48)**
7:14,15;8:3,6;
23:10;25:4;26:2,7,
10;27:1,7,14,16,17,
19,22;38:23;39:18;
44:12,19,21,22;
84:21;85:14;107:2,
14;108:13;109:18,
21;110:1,5,11,14,
21;130:3;142:1;
147:23;148:12,20;
149:2,3,6,8;154:6,
12,15;155:1,8
**drives (13)**
7:19,21,24;10:7;
11:13;12:9,23;
15:5;25:14;26:9;
39:10;142:9,16
**Dropbox (12)**
131:24;132:3,7,
10,20,24,25;133:1,
2,11,13,14
**Drummond (22)**
4:5,17,19;12:22;
13:5;44:12,13;
58:23,24;63:13,16,
21,21,23,25;64:2;
73:16;74:5,15;
78:19;166:23;
167:1
**Drummond's (4)**
12:5;13:18;62:5;
79:25
**duly (1)**
5:4
**dumpster (3)**
19:22,22;24:14
**duplication (1)**
30:9

**during (32)**
12:23;14:19;
26:5,6;49:7;58:21;
64:25;65:16;84:15;
88:8;92:21;95:16;
99:4,19;100:3;
105:22;106:5;
109:23;114:11;
121:22;131:3;
135:6;139:1,2,4,4;
144:6;148:1;
157:25;164:8;
167:8,15
**duty (1)**
5:16

**E**

**earlier (6)**
25:23;38:21;
93:1,14;134:23;
165:8
**early (2)**
16:12;123:21
**easier (1)**
151:8
**easiest (1)**
27:10
**easy (1)**
126:10
**e-discovery (1)**
97:24
**educated (1)**
63:12
**effort (9)**
10:24;26:11;
27:7;49:4;56:11,
13;66:18;100:11;
102:2
**either (12)**
9:11;21:5;41:11,
16;54:5;55:8;
68:23;98:20;111:5;
118:14;160:1,5
**EI (9)**
58:13;64:11;
68:11;69:9;72:2;
75:25;76:25;78:4;
80:14
**electronic (4)**
11:7;74:11,14,15
**else (6)**
7:13;21:7,20;
42:5,16;53:21
**else's (2)**
97:25;104:2
**e-mail (174)**
7:4;14:5;17:23;
18:1,3,6,8;19:4,11,
15,18;20:19,23,25;
21:4,7,8,13,18;
22:18,19;23:23;
24:5,10,11,16,18;

30:25;32:17;34:25;
35:9;38:13;41:16;
43:20,21,24;44:4,
10;45:2,21,21;
46:2,15;47:6,11,12,
24;49:3,7,8,9,21;
50:15,22,23;51:12,
21;53:3;56:23;
64:7;65:13,20;
76:6;89:8;90:19,
21;91:16;92:4,7;
96:8,16;99:9;
101:22;103:6,14,
18;105:12,16;
107:1,7,11,24;
109:12,16;111:6,
10;112:14,20,24;
113:7,9,13,20,21,
25;115:25;116:3,
21;118:15;122:17,
18;123:4,8;124:15,
17,24;125:9,11,14,
19;126:6,9,22,24;
127:4,7,10;128:24;
131:19;132:14,18;
134:14;135:14;
136:21,25;137:1,3,
23;138:4;140:1,21,
24;141:20,24;
145:25;146:1,9,12,
23;147:9,19;
149:12,16,18,24;
150:6;151:15,19;
152:15,21;153:21,
25;154:8,10,14,17;
156:6;158:19;
159:7,23;160:2,5,
6;163:1,2,6,9,9,13,
16,23;164:10,15,17
**e-mails (212)**
11:17;12:15;
13:6;17:8,16,17,19,
20,20;23:4,12,15,
19;24:21;27:25;
28:3,6,9;29:2,5;
30:22,23;31:3,6,10,
22;32:8;34:18;
35:3;37:24;38:2;
40:4,13;41:10,15;
42:24;45:17,21;
46:1,8,16;47:8,14,
18,21;48:1,9,11,15,
18,20,23;49:16,19,
19,25;50:9,10,11,
12;51:22,23;53:2,
19,22;57:5;64:19;
65:20;67:5,10,17;
80:14,23;82:5,10;
89:8,19,22;90:4,12,
16,16;91:9,15,17,
22;92:3,6,9,13,21;
93:4,13;94:4,9,13,
25;95:1,5,14,19,22;

96:18;97:14,18,20,
20;98:11,13,13,16,
18;99:15,18,23;
100:1,10,12,14,23;
101:1,15,19,23,24;
102:3,3,7,9,21,25;
103:19;104:4,12,
12,13,17,19;105:1,
5;113:1;114:22;
115:1,24;116:5;
117:10,14;119:17,
21;122:5,9;125:5,
13,23;127:23;
128:9,17,22,24;
129:7,20,25;
131:11,15;132:2,7,
10,25;133:6,8,11,
12;134:1,5,8,12,17;
137:2,6,6,10,11,20;
140:5;142:21;
146:4;147:5,23;
148:10,12,19,24;
149:7;152:2;153:3;
154:18,23;155:2,9;
163:13;166:11,17,
21;167:1,13,13,21;
168:3,4,7,16,17
**employed (1)**
14:20
**employee (5)**
11:8;12:19;13:2;
26:16;38:17
**employees (1)**
7:2
**employment (3)**
6:17,20;148:2
**empties (1)**
19:12
**empty (3)**
18:7;164:1,17
**enabled (4)**
95:7;150:7,13;
153:3
**encompassed (1)**
43:17
**end (7)**
32:15;39:8;
88:16;96:11;122:3;
169:11,13
**English (1)**
25:19
**enough (1)**
126:10
**ensure (1)**
119:9
**entire (5)**
14:9;27:19,21;
168:12,24
**entirely (1)**
5:21
**entirety (1)**
166:5
**entities (3)**

75:8,8,12
**ENYARD (13)**
4:23,23;20:2;
21:23;23:25;46:20,
24;51:20,24;69:3;
152:5,8;160:21
**error (1)**
97:11
**essentially (3)**
15:15;45:16;
157:3
**established (1)**
128:15
**et (1)**
125:13
**even (4)**
21:17;22:22;
28:18;52:11
**event (5)**
108:10;109:17;
120:13;151:10;
165:22
**Everybody (1)**
169:10
**everyone (2)**
97:25;104:1
**evidence (1)**
10:25
**exact (5)**
14:15,17;32:23;
37:13;161:25
**exactly (10)**
4:11;9:5;12:13;
54:14,16;117:20;
119:2;124:25;
125:3;159:16
**EXAMINATION (3)**
5:6;162:20;
166:9
**examined (2)**
5:4;133:5
**example (7)**
9:16;17:24;
21:11;25:23;28:21;
39:13;84:22
**Excel (2)**
34:23;62:21
**Exchange (30)**
14:7,12,13,16,16,
21;15:4;19:20,21;
28:1;31:17,20,25;
32:8;33:6,17,23;
34:19;37:23;50:4;
52:21;58:7,15;
64:18;99:11,11;
132:18;144:14;
145:9,12
**Excuse (6)**
31:5;36:19;80:5;
84:19;128:3;165:2
**executive (2)**
12:20;13:3
**Exhibit (76)**

8:13,17;33:18,
19;37:22;39:25;
40:1;42:24;43:5;
47:14,18;50:16;
51:2,24;52:19;
53:9;59:20;63:16;
72:21,25;78:6,10;
79:20,23;86:8,11;
88:25;89:15;98:8;
105:1,5;107:7,10;
111:6,9;112:20;
114:22,25;117:10,
13;119:17,20;
122:5,8;123:4,7;
125:5,8;131:11,14;
132:14,17;133:18;
136:21,24;137:20,
23;140:1,5,9;
141:20,23;142:21,
25;146:4,8;147:5,
9;149:12,15;
151:15,18;152:8;
153:21,24;158:14
**exist (3)**
18:1,11;29:5
**exists (2)**
19:18,20
**explain (2)**
15:1;94:16
**explained (1)**
5:14
**explaining (1)**
90:25
**explanation (1)**
160:11
**exported (1)**
144:8
**express (5)**
134:7;154:8,9
**extent (5)**
13:15;14:2;
59:25;60:8;92:22
**external (22)**
23:4,7,9,16,19;
107:2;109:18,21;
110:21;145:5;
147:23;148:12,20;
149:2,3,5,8;154:6,
12,15;155:1,8

**F**

**fact (9)**
13:18;78:14,17;
79:8;90:3;101:20;
105:17;123:9;
148:1
**facts (1)**
148:6
**failed (1)**
119:5
**fails (1)**
136:7

**fair (2)**
8:4;161:11
**faith (1)**
51:19
**falsity (1)**
13:14
**familiar (2)**
31:18,19
**far (6)**
19:13;26:3;
40:16;112:17;
136:9;137:13
**feature (5)**
95:7;128:8;
163:15;164:21;
167:24
**features (2)**
163:12,19
**February (9)**
91:10,23;92:5,5,
8,22;114:9,11;
122:9
**Federal (1)**
4:12
**feel (1)**
10:15
**fell (1)**
146:1
**felt (1)**
165:16
**Fernando (2)**
54:23;55:19
**few (3)**
63:25;105:5;
111:24
**figure (1)**
57:20
**file (19)**
30:25;44:11,13;
74:20;76:7,7,16;
77:15;127:7;133:7;
144:9;148:24;
154:6;159:9,23,23;
164:22;165:1,6
**filed (4)**
73:7;75:18;
78:10;79:24
**files (23)**
11:8;27:23;
73:15;74:4,9,10,11,
14,15,21;75:8,12;
107:3;109:1,19;
131:24;141:9,15;
154:5,7,8,10;155:7
**final (1)**
80:6
**finally (1)**
66:12
**find (12)**
61:23;90:15;
91:14;92:16;134:8,
17;137:8,10;
145:24;146:14,23;

166:12
**findings (1)**
13:18
**fine (1)**
43:14
**finish (1)**
146:17
**firm (34)**
6:17,21;7:2,7,12;
8:11;13:25;14:10,
20,20;21:19,20;
26:21;27:5;40:11;
48:25;61:5,7;66:6,
8;82:10;117:2,4,5;
142:11,16;148:2;
162:25;163:1,3,5,6,
8,17
**firm's (6)**
51:8;61:3,3;
158:5;166:12,22
**first (36)**
6:17,20;18:5;
23:6;31:7;34:16;
47:10,24;50:22;
53:5;67:5,9,16,24;
68:10,17;69:9,19;
70:8,8,24;72:2,14;
73:9,23;99:4;
103:7;105:7;113:9;
129:24;131:5;
138:4;140:16;
162:24;163:25;
165:20
**firsthand (1)**
110:18
**fix (2)**
165:19,24
**flip (6)**
39:25;40:23;
41:14,18;86:12;
98:8
**floor (1)**
109:15
**Florida (7)**
4:12;57:10;
65:12,13,19;68:4;
111:19
**flow (1)**
103:7
**focus (1)**
74:14
**folder (12)**
18:4,8;19:2,3,12;
22:15,18;143:5;
152:23,24,25;
153:6
**folders (3)**
22:10,22;24:12
**folks (2)**
65:9,12
**follow (1)**
122:2
**following (1)**

Drummond Company, Inc. vs
Terrence P. Collingsworth, et. al

Juan Carlos Rodriguez
August 25, 2015

32:4
**follows (1)**
5:5
**follow-up (1)**
150:21
**follow-ups (1)**
166:7
**forever (1)**
164:16
**form (123)**
15:23;16:24;
20:2,4;21:22;
22:25;24:7;25:7;
26:15;28:14;29:12;
30:1,12,15;31:8,
23;32:11;34:21;
35:6;36:17,25;
37:16;38:4,8;39:3,
15;45:9;46:4,10,
18;47:2;56:2;
64:21;65:22;67:19;
68:6,15;69:12,24;
70:11;71:2,10,22;
72:4,17;73:19;
74:6,17;75:3,14;
76:2;77:1,10,20,
25;79:3,15;80:16,
25;81:6,24;82:12,
18,25;83:21,24;
84:8;85:3,21;87:1,
16,25;89:10;90:9;
93:15,22;94:7;
95:24;96:20;98:2;
100:17;101:2;
102:11;107:4;
112:8;115:15;
116:11,22;118:4,
16;119:14;120:10,
23;124:5;125:16,
24;126:19;128:1;
130:22;131:8;
132:4,11;134:10;
135:19;138:11,17;
141:17;142:18;
143:18;146:16;
147:1;148:3,13,16,
21;149:9;150:15;
155:3,10,19;
156:16;157:19;
169:2
**formalities (1)**
169:16
**format (1)**
159:23
**Fort (7)**
4:12;6:4;42:12;
44:24;53:16;55:11;
62:14
**forward (5)**
20:23;21:2,5;
52:12;109:16
**forwarded (2)**
21:12,19

**found (4)**
91:6;102:15,21;
109:1
**Four (1)**
85:23
**frame (11)**
15:24;35:20;
39:4;49:18;75:17;
84:10;93:8;94:24;
98:18;135:20;
167:8
**frames (1)**
75:4
**frankly (1)**
43:9
**FREVOLA (1)**
59:5
**front (1)**
42:17
**frustrating (1)**
160:16
**fully (2)**
12:16;51:13
**function (1)**
150:18
**functions (2)**
6:24;7:10
**funds (1)**
78:19
**Further (2)**
106:12;114:10
**future (1)**
166:6

## G

**gained (3)**
62:17;76:22;
157:15
**gap (3)**
128:10;166:16;
167:21
**gaps (2)**
66:15;97:6
**gave (10)**
21:11;25:22;
45:17;56:14,18;
95:20;138:2,22;
140:9;156:22
**general (5)**
9:24;16:3;
105:16;113:6;
117:6
**generalities (2)**
9:6,8
**gets (2)**
29:14;93:1
**gigabyte (1)**
108:13
**given (11)**
5:11;37:3;86:21;
95:10,15;130:10;
144:9;145:10,19;

156:14;157:18
**giving (1)**
108:23
**Gmail (16)**
113:8,13;114:2,
13;143:12,15,24;
144:7,14;145:6,9,
12;146:10,13;
158:18;159:9
**goes (8)**
19:1;25:3;51:21;
59:4;61:13;91:14;
136:9;163:25
**GoFlex (1)**
108:13
**good (6)**
51:7,19;60:7;
126:10;131:23;
155:22
**grab (4)**
49:2;102:7;
114:17;144:7
**grabs (1)**
30:24
**Graham (3)**
141:5;143:1,4
**grasp (1)**
99:7
**great (1)**
100:11
**guess (7)**
43:21;89:4;
111:25;113:15;
136:18;160:1;
168:15
**guessing (1)**
49:12
**guys (3)**
81:16;144:19;
160:16

## H

**hand (2)**
97:13;151:18
**handed (1)**
140:20
**handful (5)**
100:15,20,20;
104:12,18
**Handing (2)**
111:9;141:23
**handle (2)**
88:10;120:21
**handled (1)**
120:17
**handwriting (3)**
108:18;109:1,17
**Hang (3)**
69:4;90:24;
122:11
**happen (1)**
66:10

**happened (4)**
15:9;48:25;65:9;
71:5
**happens (1)**
15:7
**hard (58)**
7:14,15,19,21,
24;8:3,6;10:7;
11:13;12:9,23;
15:4;23:9;25:4,14;
26:2,7,9,10;27:1,7,
14,16,17,19,21;
38:23;39:10,17;
65:10;66:14;84:21;
85:14;107:2;
108:13;109:18,21;
110:1,5,11,14,21;
130:3;142:1,9,16;
147:23;148:12,20;
149:2,3,6,8;154:6,
12,15;155:1,8
**head (2)**
73:18;132:21
**hear (4)**
52:14;60:2;
66:23;136:1
**heard (2)**
60:4;131:5
**hearing (1)**
13:17
**held (1)**
6:7
**help (4)**
52:14;115:6;
133:15;148:9
**herein (1)**
5:4
**hey (2)**
134:17;137:10
**Hi (2)**
47:25;123:15
**highlight (1)**
23:13
**Highway (1)**
4:12
**himself (1)**
157:6
**historic (1)**
49:10
**history (1)**
99:8
**hold (4)**
16:6,10,21;69:3
**home (15)**
83:16,19;84:7,
13,18,20;85:11,16,
20;86:5;106:14,16;
112:4,15;131:23
**hosted (2)**
113:21;116:3
**hour (2)**
147:3;159:3
**hours (8)**

136:5,15;158:17;
159:4,21;160:2,5;
161:9
**HP (11)**
84:13;123:12;
128:14,17,22;
129:19,23;131:17;
133:24;141:10;
156:8
**Hugo (1)**
55:13
**hundred (1)**
37:4
**hungry (1)**
86:7
**hurricane (1)**
136:13
**hypothetical (1)**
85:1

## I

**idea (12)**
55:5,9;106:11;
108:19;141:12;
153:10,16,19,20;
156:9;157:3;
158:12
**Identification (30)**
8:14;33:20;
42:25;47:15;72:22;
78:7;79:21;86:9;
105:2;107:8;111:7;
112:21;114:23;
117:11;119:18;
122:6;123:5;125:6;
131:12;132:15;
136:22;137:21;
140:2;141:21;
142:22;146:5;
147:6;149:13;
151:16;153:22
**identified (8)**
10:7;12:9;23:22;
33:5;57:4;62:3;
63:22,24
**identify (3)**
10:20;51:20;
118:9
**image (1)**
137:25
**impact (1)**
22:18
**important (2)**
75:4;135:20
**inbox (23)**
22:15;23:4;
90:16,18,23;91:18;
93:13;94:5,11,13;
96:14;97:10,19;
100:9;102:9;
103:24;128:9;
134:16,18;152:25;

166:12;168:12,24
**Inc (2)**
4:5,17
**include (2)**
27:25;61:4
**included (2)**
50:21;55:6
**includes (2)**
54:23;55:1,12
**incoming (8)**
96:17;98:11,20,
21;129:20,25;
134:1,5
**incorrect (4)**
38:7;90:15;
113:22;148:19
**indented (1)**
73:11
**Indicating (1)**
68:25
**individual (7)**
65:19,20;69:14,
19;71:3,6;72:12
**individually (5)**
4:7;43:9;60:1,2,9
**individuals (1)**
55:8
**individual's (2)**
32:8;66:17
**inform (2)**
50:3;138:21
**information (17)**
11:4;30:3;35:17;
37:19;47:12;48:22;
56:6;59:18;66:19;
76:19;101:8;
106:23;110:16,18,
20;111:1;138:25
**inside (3)**
152:25;163:2,8
**instead (2)**
27:13;114:15
**instructed (1)**
17:4
**instructions (3)**
45:15,17;61:21
**internet (2)**
28:24;131:23
**interruption (2)**
6:9,10
**interview (6)**
13:24;62:11,14;
147:10,16;148:6
**into (24)**
15:4;17:6,8;
19:1;22:15,18;
24:11;27:15;34:17;
49:9;84:14,20;
96:13;101:25;
102:6;103:13;
110:14,22;115:6,
14;144:8;153:6;
163:16,25

**introduce (1)**
4:13
**invading (1)**
160:14
**inventory (3)**
111:18;142:1,7
**investigation (1)**
62:24
**involved (1)**
167:10
**involvement (1)**
139:2
**involving (1)**
137:24
**IRA (3)**
89:19;93:6;
145:14
**IRAdvocates (40)**
32:18,20;35:9;
36:12,17,22;37:15;
38:2,12,14;49:2;
62:22;73:8,15;
75:9;89:8;91:11,
17,22;92:1,4,17;
93:7,13;96:18;
97:17;98:13;99:24;
100:13;101:21;
103:18;113:7,13,
21,24;114:5;
152:22;153:5;
154:16;155:9
**IRAdvocates' (2)**
74:3;94:4
**issue (14)**
52:4;59:4;78:20;
80:10;83:5;89:7;
100:9;115:7;119:3;
120:2,3;121:17;
123:1;168:3
**issues (5)**
43:8;82:23;
83:10;104:9;166:5
**item (2)**
18:11;19:25
**items (6)**
18:4,8;19:12;
90:17;91:11,23
**Ivan (4)**
55:1,17;57:6;
64:7

**J**

**Jaime (2)**
57:6;64:8
**January (8)**
37:11;105:5;
106:10,19;108:15;
112:24;113:18,23
jblanco1999@yahoocom (1)
41:12
**jblanco99@yahoo (1)**
44:5

**JC (5)**
59:24;60:9;69:3;
86:23;159:22
**JC/computer (1)**
98:11
**Jenny's (1)**
154:6
**job (2)**
6:24;58:19
**Joe (1)**
55:6
**Juan (15)**
4:9;5:2,10;9:20,
23,24;45:3;47:25;
69:19;79:8;123:15;
126:11;137:1;
149:23;154:4
**judgment (4)**
104:11,16,19,21
**July (4)**
16:12,22;119:21;
146:23
**jump (1)**
52:4
**June (23)**
16:22;32:24;
41:21;43:21,25;
49:15,25;50:3,15;
53:1;57:5;64:6,17;
78:20;93:12;98:10;
117:14;131:15;
133:15,23;137:2;
164:4,9

**K**

**keep (10)**
17:2,5,12;19:21;
42:17;65:15;
106:14;111:17;
132:25;163:20
**keeps (1)**
136:5
**Kendall (3)**
4:23;52:3;
162:13
**kept (2)**
16:8;133:1
**keyword (2)**
144:7;146:1
**kilobytes (1)**
97:10
**kind (3)**
52:2;86:7;133:1
**Kisslan (1)**
39:13
**Klaverweide (1)**
42:10
**knew (3)**
101:20;102:23;
138:9
**knocked (1)**
136:13

**knowledge (63)**
10:6,17;12:8,14,
18;13:1,13;24:23;
31:21;43:16;51:8,
8;55:25;57:21;
61:6;62:17;65:18;
66:5,7,17;67:12,
15;69:18,20,23;
70:13,14,23;71:15,
19,25;72:9,10;
74:4;76:11,14,21,
21,24;77:22;81:23;
85:2,9,14,17,18;
110:1,4,7,10,13;
128:21;130:5,11,
13,16,18;147:25;
148:18;156:23;
157:15,15;158:8
**knowledgeable (7)**
51:11;59:2;
60:10,14;69:14;
71:5;157:1
**knows (1)**
101:7

**L**

**label (1)**
154:15
**lack (1)**
147:11
**language (1)**
25:20
**laptop (31)**
28:22;45:8;
86:15,21,24;87:4;
88:9;95:2;106:23;
111:22;115:6,9,13,
22;116:2;123:13;
128:14,18,22;
129:19,24;131:17;
133:24;138:1,3,9,
22;141:10;156:21;
157:6,17
**large (2)**
34:2;51:3
**last (16)**
40:20,25;89:18;
106:21;110:1,5;
112:5;121:10,11;
125:11;136:5,15;
152:9;154:20,22;
158:6
**late (4)**
16:12;49:1;91:9;
92:5
**later (3)**
67:25;125:2;
151:20
**Lauderdale (7)**
4:12;6:4;42:13;
44:24;53:16;55:11;
62:15

**lawsuit (1)**
44:12
**lawyer (1)**
22:14
**lawyers (3)**
52:3,9;99:2
**lawyer's (1)**
122:1
**learn (2)**
66:18;138:25
**learned (4)**
63:25;86:6;
109:23,23
**least (4)**
14:19;18:12;
123:21;155:7
**leave (1)**
16:7
**leaves (2)**
26:5;164:15
**leaving (2)**
26:17,21
**left (2)**
113:16;158:17
**left-hand (1)**
34:6
**legal (4)**
16:5,10,21;25:16
**less (1)**
149:3
**letter (1)**
34:14
**letters (2)**
34:10;78:20
**libel (6)**
10:25;11:4;
58:25;63:16;78:23;
79:1
**likely (1)**
96:10
**limitations (1)**
70:14
**limited (1)**
12:12
**line (6)**
63:12;69:2,8;
70:3,18;111:11
**lines (1)**
78:13
**list (4)**
142:1,7,15;
157:10
**listed (3)**
13:18,21;111:25
**listen (1)**
66:21
**lists (1)**
111:21
**litigation (14)**
12:22;13:4;
73:17;74:5,16;
84:16;86:6;88:8;
95:17;109:24;

131:3;139:1,3;
144:6
**little (10)**
9:17;24:25;25:3;
33:16;48:24;52:14;
156:5;158:16;
162:2,2
**LLP (4)**
4:7,8,22,24
**local (4)**
15:4;30:4;77:14;
129:4
**locate (5)**
13:5;98:17;
100:10;102:2;
158:19
**located (8)**
4:11;44:12;
98:11;99:19;100:2,
6;101:19;143:17
**locating (2)**
134:1,4
**log (3)**
83:3,9;102:6
**logical (1)**
103:16
**logs (2)**
76:17,17
**long (10)**
6:7;7:17,18;
14:14;41:1;146:13,
25;160:18,20;
164:10
**longer (7)**
18:1;19:15;
20:19;135:9,15,16;
164:4
**look (20)**
45:4;53:8,24;
54:17;56:11;70:3;
74:2;89:14,21,23;
90:3;91:15;93:12;
96:7,16;100:11;
142:4,15;146:8;
149:24
**looked (4)**
44:3;96:13;
125:11;143:5
**looking (4)**
37:21;40:1;
140:12;152:14
**looks (10)**
15:16;44:2;58:1;
69:8;70:3;101:13;
105:7;122:16;
131:16;143:4
**lose (1)**
92:3
**lost (2)**
81:16;110:8
**lot (5)**
43:16;57:13;
58:21;151:8;

166:15
**lunch (1)**
88:24
**Luncheon (1)**
88:18

## M

**Mac (31)**
45:4,18,22;46:8,
16;47:8;48:18,23;
49:13,17,25;50:11,
12;86:15,21;87:4;
88:6;111:22;115:9,
13,22;116:2;
123:16,18;127:12,
17;138:1,3,9;
141:9;157:23
**MacBook (43)**
45:7,11;48:7;
95:3,8,10,15,21;
105:17,20;106:21;
110:15,22;118:2,7,
7,14,23,25;119:1,8,
10;120:8;123:10,
23;126:17;127:24;
128:8,10,14,22;
129:8,14;130:4,9,
20;137:15;156:8,
13,14,21;157:17;
158:2
**machines (4)**
111:11,24,25;
112:3
**Maggie (11)**
39:22;43:25;
44:11;48:18;49:24;
123:8;124:14;
126:16;127:16;
131:20;147:14
**Maggie's (1)**
44:10
**mail (3)**
49:8;103:7,13
**mailbox (23)**
40:6,7,14;41:10;
61:13;65:2,16;
81:5,9,11,20;82:5;
90:18;91:25;92:1,
18;97:9;102:1;
103:19,20;113:23,
24;152:19
**mailboxes (5)**
53:12;57:2;65:5;
72:12;77:14
**main (2)**
128:25;129:2
**maintain (3)**
7:9,14;135:9
**maintained (7)**
20:9,13;22:23;
25:6;108:25;
134:24;136:17

**maintains (1)**
120:5
**makes (1)**
23:18
**management (13)**
17:8,11,16;
165:1,4,6;166:13,
23;167:2,14,24;
168:5,8
**Manager (2)**
14:25;15:5
**many (11)**
35:13;58:24;
81:9,9;104:11,16,
19;110:14,21;
166:11,15
**March (27)**
89:9,15;90:4,13,
17;91:18;93:14,20;
94:5,14,21;95:6;
96:8,18;97:14,21;
98:10;104:7;
111:10;129:21;
130:1;134:9,14;
137:11;140:21;
149:18;166:17
**Mark (1)**
55:7
**marked (44)**
8:13,16;33:18,
20;42:24;43:2;
47:14,17;59:19,19;
72:21,25;78:6,9;
79:20;86:9;105:1,
4;107:7;111:6;
112:20,23;114:23;
117:11;119:18;
122:6;123:4;125:6;
131:12;132:14;
136:21;137:21;
140:1,4;141:20;
142:22,24;146:5,7;
147:6,8;149:12;
151:15;153:21
**matter (4)**
4:5;30:5;89:5;
129:1
**may (117)**
16:25;22:14;
24:8;25:8,23;
28:15;29:13;30:2,
9;31:9;32:12;34:2,
22;35:7,18;37:1,
17;38:5;39:16;
45:10;46:5,11,19;
47:4;52:13;56:3;
61:6;62:18,25;
64:22,23;65:23;
67:20;68:7,16;
69:25;70:12;71:23;
72:5,18;73:20;
74:7,18;75:15;
76:3;77:2,11;78:1;

79:4,16;80:17;
81:1,7,25;82:13,
19;83:1,25;84:9;
85:4,22;87:2,17;
88:1;89:11;90:10;
93:16,23;94:8,13;
95:25;96:23;
100:18;101:3;
102:12;107:6;
112:10;115:1,3,16,
17;116:12,23;
118:5,11,17;
119:15;120:11,24;
124:6;125:17;
126:3,20;128:2;
130:23;131:9;
132:5,12;134:11;
138:12,18;141:18;
142:19;143:19;
145:13;147:2;
148:4,22;149:10;
150:16;155:4,11,
20;157:4,5,20;
169:4
**Maybe (3)**
56:10;111:25;
162:1
**mean (33)**
9:9,12;10:8;
15:8;18:5;20:21;
26:5;30:3,5;47:10;
49:18;54:13,15;
58:19,20,23;59:1;
61:12;63:14;65:1;
75:17,17;76:8;
79:18;81:10;84:23;
88:5,7;89:24;
94:15;100:19;
118:1;168:18
**means (3)**
164:24,25;165:2
**meant (3)**
38:20;48:8,12
**mechanisms (1)**
163:19
**media (3)**
88:16,21;156:3
**meeting (3)**
13:22;14:3;62:8
**Mejia (4)**
55:2,4,15;58:10
**member (2)**
68:4;141:6
**mention (2)**
16:10;132:24
**mentioned (3)**
53:3;93:1;
102:22
**merged (3)**
91:25;92:1;
113:24
**Microsoft (2)**
14:21,24

**mid (1)**
45:6
**middle (2)**
90:25;141:9
**might (1)**
52:9
**migration (10)**
14:16;99:10,12;
101:21,23;102:15,
17,20,24;103:6
**Mike (1)**
55:13
**mind (3)**
25:19;99:13;
104:10
**minute (6)**
33:24;70:15;
73:1;108:4;118:18;
139:18
**minutes (6)**
59:10;64:1;
80:18;85:23;87:20;
153:13
**miscommunication (1)**
18:22
**missing (11)**
10:7;12:9,15;
51:23;66:19;89:9;
109:22;150:25;
154:2;168:3,4
**mistake (1)**
165:20
**mistaken (4)**
10:4;124:14;
133:5;152:2
**misunderstand (1)**
18:24
**moment (3)**
30:6;107:19;
118:12
**month (3)**
8:3;25:24;97:16
**more (13)**
9:21;24:13;33:1;
42:19;48:22;65:7;
66:2;140:5;142:25;
152:23;160:12,19;
163:6
**morning (1)**
161:16
**most (4)**
27:3;51:10;
96:10;147:4
**motion (1)**
79:25
**move (3)**
103:6;148:24;
152:22
**moved (7)**
18:4;28:18;
84:19;114:6;141:9,
15,16
**moving (2)**

114:1;123:2
**much (7)**
43:14;97:25;
149:3;157:7;
161:21;162:6;
164:8
**multiple (4)**
20:21;99:6;
133:8;163:7
**music (1)**
125:13
**MX (2)**
103:8,9
**myself (1)**
63:12

**N**

**name (4)**
5:8;22:14;54:23;
55:7
**named (1)**
106:3
**narrow (1)**
66:13
**Natasha (5)**
42:10,10,15;
54:5,7
**native (4)**
25:19;159:8,23;
160:5
**nature (1)**
13:15
**nearly (1)**
78:20
**necessarily (2)**
26:1,7
**need (20)**
42:21;47:25;
48:21;49:18;50:7;
52:13;63:2;73:3;
103:13;106:22;
137:25;139:18,18;
157:10;159:18,19,
19;161:19,21;
162:2
**needs (3)**
43:13;51:7;52:3
**negations (1)**
116:14
**negatives (1)**
150:11
**netted (1)**
78:22
**new (30)**
11:9;25:2;26:12,
17;27:6,8,15,16;
28:12;29:10,24;
93:2,12;103:15;
105:17;106:21;
117:15,19;119:9;
120:15;121:16;
123:12,18,23;

125:23;127:12,18,
24;128:13;131:17
**next (9)**
41:14;53:5;
64:14;75:7;99:22;
103:11;120:14,22;
161:9
**niece (2)**
86:22;138:23
**night (1)**
17:9
**nobody (6)**
17:9;42:16;
130:7;134:20,21;
157:22
**Nodding (1)**
132:21
**non-Conrad (3)**
87:23;116:8,17
**non-firm (1)**
116:18
**nonpayment (1)**
55:23
**non-privileged (1)**
78:18
**non-technical (1)**
52:7
**nor (1)**
77:14
**normally (4)**
7:2,10;105:22;
136:8
**Northern (1)**
4:3
**notebook (6)**
105:21;106:4,9;
158:1,9,11
**notes (2)**
147:10,13
**notice (7)**
8:13,18;9:2,14;
50:18;66:9;109:15
**noticed (2)**
34:2;104:1
**notify (1)**
137:14
**November (22)**
58:2,5,12,16;
64:10,18;67:17,25;
68:12;69:10;70:9;
71:1,17,21;72:3,
15;96:9,10,11;
100:1,14;139:4
**November/December (1)**
100:7
**number (28)**
10:24;11:1,5,11,
15;12:3,13,18;
13:1,7,13;23:12;
34:13;40:18;41:4;
50:16;51:24,25;
52:16,17;55:10;
58:3;63:17;68:19;

88:16,25;97:10;
166:14
**numbered (1)**
73:9
**numbering (1)**
40:16
**numbers (6)**
8:23;9:3,5;34:6;
40:21,25

**O**

**object (119)**
15:23;16:24;
25:7;26:15;28:14;
29:12;30:1,12,15;
31:8,23;32:11;
34:21;35:6;36:25;
37:16;38:4,8;39:3,
15;45:9;46:4,10,
18;47:2;56:2;
64:21;65:22;66:2,
7;67:19;68:6,15;
69:12,24;70:11;
71:2,10,22;72:4,
17;73:19;74:6,17;
75:3,14;76:2;77:1,
10,20,25;79:3,15;
80:16,25;81:6,24;
82:12,18,25;83:21,
24;84:8;85:3,21;
87:1,16,25;89:10;
90:9;93:15,22;
94:7;95:24;96:20;
98:2;100:17;101:2;
102:11;107:4;
112:8;115:15;
116:11,22;118:4,
16;119:14;120:10,
23;124:5;125:16,
24;126:19;128:1;
130:22;131:8;
132:4,11;134:10;
135:19;138:11,17;
141:17;142:18;
143:18;146:16;
147:1;148:3,13,16,
21;149:9;150:15;
155:3,10,19;
156:16;157:19;
169:2
**Objection (8)**
20:2,4;21:22,23;
23:25;24:7;101:6;
126:4
**objections (1)**
71:11
**obligations (1)**
51:14
**observation (1)**
89:21
**obtain (1)**
143:14

**obtained (3)**
101:17;109:4;
123:12
**obviously (2)**
66:15;83:12
**occasion (3)**
83:8;96:7;
122:23
**occurred (3)**
148:1;149:5,7
**occurring (1)**
130:17
**October (39)**
6:9,18;11:10,14,
17;12:6,6,24;13:6;
20:15;22:7;25:11;
32:15;35:22;37:10;
49:1,1;62:6,6;
75:20,23;76:18,24;
77:8,23;78:11;
79:7,10,13;92:2,5,
8,21;100:2,14;
101:21;102:24;
103:5;135:22
**off (29)**
18:8;20:8;21:14;
22:20;33:10;48:5,
9,12;59:11,12;
63:4;85:19;88:15;
94:20;95:1,14,23;
114:6;121:4;
139:21;152:11;
155:24;159:12;
161:3,5;162:15,17;
163:24;169:14
**offer (2)**
82:16;159:22
**offered (3)**
6:11;95:4;
167:23
**office (45)**
42:13;44:23,25;
53:16;55:12;57:2,
10;60:15,19;61:5;
62:12,15,19,25;
65:19;68:5;74:20;
82:17,22;83:7,9,16,
19;84:7,20;85:10,
11,15;91:9;105:21,
25;106:8;111:11,
15;112:3,4,15;
114:6,14;117:24;
118:24;134:3;
145:22;154:7,13
**officers (1)**
11:8
**offices (1)**
111:19
**office's (1)**
53:22
**often (1)**
15:11
**old (27)**

11:9;25:5;26:11,
16;27:1,6,8,14,16;
28:10;29:10,24;
48:1,9,15,18,23;
49:16,18,19,25;
83:19;117:16;
118:9;121:16;
125:13,22
**once (1)**
21:20
**one (47)**
8:7;9:22;12:16;
20:22;23:22;24:4,
18;25:1,4;26:23;
27:13;28:5;36:14;
38:20;49:8;53:10,
15;57:4;59:18;
62:2;88:13;98:20;
103:19;105:6;
106:3,19;111:21;
112:3;114:19;
119:6,22;120:13,
22;121:19;131:22;
136:25;139:18;
140:16;141:8,25;
149:20;150:22;
151:10;158:21;
163:6,7;165:5
**ones (2)**
62:21;158:21
**online (1)**
116:2
**only (36)**
10:2;16:18;
17:18;20:13;24:23;
27:20;34:23,25;
38:1;40:13;50:10;
55:11;62:20;67:12;
87:14;90:12,20;
92:4,9,18;93:20;
94:13;100:15;
101:7;104:18;
117:4;127:24;
128:9;129:7;133:4,
5;136:9;156:25;
168:2,22,23
**onto (17)**
17:4;18:4,16,16,
17;23:4,15,19;
92:1;103:15,17;
114:6;148:24;
149:2,3,5,7
**open (4)**
29:1;93:11;
116:5;146:22
**opened (2)**
94:12;129:23
**operate (1)**
136:8
**operating (2)**
7:1;27:22
**opined (1)**
128:7

**opinion (1)**
95:5
**opposed (1)**
26:17
**opposition (1)**
79:25
**option (1)**
114:13
**Optiplex (1)**
106:1
**order (5)**
24:9;56:5;62:7,
23;163:24
**ordered (1)**
66:11
**organization (1)**
163:20
**organize (2)**
22:13,14
**Orlando (3)**
136:4,7,14
**Otero (4)**
55:1,17;57:6;
64:8
**oteromivan@hotmail (1)**
44:4
**oteromivan@hotmailcom (1)**
41:11
**others (4)**
32:24;60:8;
140:22;163:8
**otherwise (3)**
36:18;43:12;
160:2
**out (26)**
7:13,14;8:7,22;
18:7;19:11;57:20;
61:23;64:6;84:21;
85:14;92:16,17,19;
99:5;100:25;
106:22;123:9,16;
126:11;127:6;
136:13;145:11;
158:13;159:9;
163:16
**outbox (2)**
90:23;102:10
**outgoing (1)**
92:4
**Outlook (17)**
18:4,9;19:11,16;
20:9;21:14;22:9,
10,18;29:1,2;
116:3,5;122:18;
123:1;154:8,9
**outside (7)**
21:13,19;31:20;
66:17;97:7;163:1,5
**over (9)**
16:1;28:12;
30:11;40:23;48:6;
78:22;125:23;
136:14;158:16

**overlap (3)**
74:4,10,15
**overlapped (2)**
73:16;74:22
**overwritten (7)**
15:8,21;18:18;
20:1,17;21:15;
134:25
**own (5)**
10:14;60:9;65:1,
16;88:3

**P**

**pack (1)**
17:1
**page (24)**
34:5;40:1,16;
41:14;43:24;53:5,
8,24;58:2;63:20;
68:13,17,19;73:9,
9;78:12,12;80:1;
86:12,18;89:14;
98:8;105:7;141:9
**pages (3)**
78:22;142:4;
152:10
**pagos (2)**
70:4;71:17
**paragraph (6)**
9:13;80:3,6;
106:12,22;113:19
**paralegals (2)**
38:21;39:9
**part (7)**
9:11,12;10:22;
11:1,20;12:7;29:23
**partially (2)**
12:11;13:12
**participate (1)**
147:16
**particular (5)**
34:13;54:8;
145:25;163:17,23
**parties (1)**
66:11
**partner (2)**
12:20;13:3
**partners (1)**
11:8
**partnership (1)**
88:5
**password (2)**
102:5,6
**path (1)**
154:6
**Payment (1)**
55:21
**payments (8)**
70:6,25;71:17;
72:15;78:14,17,24;
79:2
**PC (5)**

105:20,25;106:8;
112:4,13
**PDF (1)**
109:10
**pendency (1)**
12:23
**people (9)**
7:19;22:9,13;
38:15;53:15;57:9;
60:1,18;82:16
**percent (1)**
37:4
**perform (3)**
6:24;44:3,7
**performed (24)**
12:21;31:22;
32:7,22;33:23;
35:12;36:16,21;
37:7;41:9,19;
44:18;54:12;56:1;
57:1,4,8;58:2;
62:18;76:23;78:3;
79:19;80:14,23
**period (28)**
8:5;15:20;18:12,
14;19:22,24;21:21;
24:15;25:1,9;26:6;
32:13;39:6;45:6;
49:7;58:21;64:25;
65:5,17;92:12,22;
120:21;128:11;
136:18;154:1;
164:8;166:22;
167:15
**periodically (1)**
147:22
**person (13)**
26:7;38:1;51:11;
59:2;60:13;66:3;
110:5;157:1;163:1,
2,5,7;164:15
**personal (7)**
8:10;43:16;51:8;
70:12,22;76:21;
157:14
**personally (1)**
124:8
**personnel (1)**
120:18
**person's (2)**
26:2;28:10
**pertinence (1)**
168:3
**phrase (1)**
78:15
**picture (4)**
15:15,19;16:3;
20:10
**pinpoint (1)**
117:20
**place (10)**
7:12,17;14:9,14;
16:6,11;105:20;

106:4;124:1,4
**Plaintiff (5)**
4:6,16,19,20;5:3
**Plaintiff's (31)**
8:13;33:19;
42:24;47:14;72:21;
78:6;79:20;86:8;
105:1;107:7;111:6;
112:20,24;114:22;
117:10;119:17;
122:5;123:4;125:5;
131:11;132:14;
136:21;137:20;
140:1;141:20;
142:21;146:4;
147:5;149:12;
151:15;153:21
**plan (1)**
106:13
**plane (1)**
29:14
**planning (1)**
105:19
**please (16)**
4:13;5:8,22,23;
30:19;59:6;73:9;
84:11;91:7;96:2;
105:12;107:19;
121:11;138:2;
143:25;155:13
**plugged (3)**
110:14,22;
129:19
**plugs (1)**
23:9
**pm (15)**
33:11;88:19,22;
121:5,8;139:24;
155:25;156:3;
159:13,16;161:4,7;
162:16,19;169:14
**point (12)**
19:15;20:20;
22:20;28:23;29:3;
65:7;113:17;114:3,
5;116:3;131:16;
163:17
**policies (6)**
11:2,6,12,16;
19:21;164:17
**policy (4)**
87:12,24;117:2,6
**portion (14)**
22:6;47:1;59:8;
91:5;96:4;97:1;
121:13;129:12;
138:16;144:2;
145:2;155:15,18;
167:6
**position (11)**
6:7,11,12,13;
10:6;12:8,12,14,
19;13:2,13

**possesses (1)**
142:17
**possession (4)**
142:10,10,11;
158:5
**possibility (3)**
23:8,23;24:4
**possibly (1)**
84:14
**postdate (1)**
154:23
**postdating (1)**
90:12
**practice (1)**
147:22
**pre-2013 (1)**
128:11
**precise (2)**
10:1;15:24
**predating (1)**
130:1
**prefer (1)**
163:20
**pre-March (2)**
129:6,9
**Pre-October (2)**
36:1,3
**preparation (4)**
14:2;69:21;
125:14;157:16
**prepare (8)**
8:24;13:20;62:7,
23;70:23;71:20;
77:19;79:11
**prepared (12)**
9:3,7,24;10:15,
21,23;11:1,5;12:3;
62:3;110:20;
130:16
**preparing (2)**
76:22;124:18
**present (1)**
91:10
**preservation (3)**
7:7;11:7;83:23
**preserve (5)**
8:6;10:24;26:7,
9;27:17
**preserved (13)**
7:19,20,25;8:3;
21:1;25:12;27:2,7;
33:3;39:11,24;
130:4;164:4
**preserves (1)**
28:4
**preserving (2)**
26:10;38:23
**PRESLEY (3)**
4:18,18;140:8
**presumably (1)**
60:16
**presume (1)**
62:3

**pretty (1)**
43:14
**previous (2)**
112:4;120:14
**previously (2)**
73:14;110:25
**primarily (1)**
83:6
**primary (6)**
28:18;29:17;
30:22,22;92:17;
130:9
**prior (39)**
14:12;16:5,22;
49:13;51:17;71:21;
75:18;76:18;77:23;
79:10,13;81:21;
85:15,19;89:9,20;
90:4,17;91:18,23;
94:5;95:6;96:18;
97:14,21;100:5;
103:14;104:7;
108:23;124:8;
126:22;129:21;
134:1,5,8,13,18;
137:11;164:9
**privilege (2)**
144:22;160:15
**privileged (2)**
57:14;59:20
**Pro (1)**
45:11
**probably (3)**
42:18;49:13;
159:1
**problem (5)**
47:11;60:20;
94:22;144:18;
160:21
**problems (1)**
113:20
**procedure (4)**
87:19;120:20;
121:1,18
**procedures (4)**
11:2,6,12,16
**process (11)**
5:15;7:12;8:6;
26:13;27:11;38:22;
84:16;103:7;113:6;
148:11;160:17
**processes (1)**
103:6
**processing (1)**
152:23
**produce (1)**
48:1
**produced (7)**
75:13;92:23;
124:20,22;126:25;
127:4;154:3
**producing (1)**
78:17

**production (1)**
80:12
**profile (3)**
27:20,24;28:5
**programs (1)**
27:22
**proposal (2)**
113:12;114:1
**proposed (2)**
13:18;114:13
**propriety (1)**
80:11
**protect (2)**
167:24;168:2
**protected (3)**
17:9;164:21;
165:5
**Protection (2)**
14:25;15:5
**provide (4)**
66:19;107:17,23;
138:2
**provided (10)**
31:16;36:18,24;
56:16;78:19;
110:17;145:4;
147:10,18;160:6
**providing (5)**
107:23;111:14;
140:6;141:25;
151:22
**PST (9)**
44:11,18;46:2;
103:23;104:5;
144:9;148:24;
154:9;159:7
**PSTs (14)**
97:8,22;133:5,7;
143:11,14,17,23;
144:10;145:16,22;
146:13,22;158:18
**pull (8)**
7:14;22:20;
27:14;48:4,9,11,
12;152:11
**pulled (7)**
45:18;46:1;
85:14;95:23;
101:23,24;103:23
**pulling (2)**
84:21;97:22
**purchase (1)**
88:3
**purchased (6)**
86:24;87:4;88:6,
9,10;107:2
**purge (2)**
24:12;164:19
**purges (1)**
164:17
**purportedly (1)**
130:20
**purpose (2)**

60:22;73:16
**purposes (7)**
35:21;38:13;
74:4,15;135:24,25;
136:2
**put (9)**
16:11,21;42:20,
22;44:19;61:2;
70:16;73:4;103:15

**Q**

**quick (3)**
121:2;139:16,19
**quicker (1)**
27:13
**quotation (1)**
73:11

**R**

**raised (1)**
97:13
**ran (5)**
41:23;54:8;97:9;
145:11,12
**range (3)**
98:9;104:20;
137:2
**rather (1)**
59:19
**rats (1)**
17:1
**reached (1)**
66:12
**read (42)**
8:22;22:4,5;
45:23;46:22,25;
59:7;64:12;73:21;
91:2,4;96:1,3,24,
25;105:12;113:5,9,
11;115:1;121:10,
12;123:18;129:10,
11;135:10;138:4,
13,15;140:24;
143:25;144:1;
145:1;146:19;
147:20;149:15;
152:2;155:12,14,
17;167:4,5
**reading (2)**
125:18;154:4
**ready (4)**
60:17;63:9;65:8;
149:16
**real (1)**
139:19
**really (6)**
9:23;51:6;86:14;
97:15;99:17;
165:10
**reason (5)**
17:15;95:5;

124:3;128:10;
149:6
**reasonable (1)**
8:5
**reasons (1)**
49:11
**recall (48)**
9:5;12:13;14:15,
17;31:14;32:23;
35:13,16;36:15;
37:2,12,18;38:18,
18;50:23,25;51:6;
54:14,15;56:4,13,
15,17;83:17,18;
100:19;119:2;
122:23,25;123:3;
125:3,3;126:21;
127:21;133:21;
134:25;139:15;
143:13;150:3;
151:5,6,14;153:12,
18;156:9;166:14,
15;167:25
**receipt (11)**
107:13,23;
108:10,11,15,18,
23,25;109:9,11,18
**received (1)**
126:15
**receives (1)**
20:23
**recently (1)**
78:21
**recess (8)**
33:12;59:14;
63:6;88:18;121:6;
139:23;156:1;
159:14
**recipients (2)**
163:7,8
**recollection (3)**
51:17,19;96:12
**reconvene (1)**
161:23
**record (40)**
4:14;5:9;13:11;
33:11,13;49:11;
51:18;59:11,12,15;
61:14;63:4,7,11;
65:16;72:12;76:8;
77:13;88:16,21;
103:8,9;110:24;
121:4,8,10;139:22,
25;155:24;156:2;
159:12,15;161:4,5,
6;162:15,17,19;
167:10;169:14
**records (1)**
56:5
**recover (2)**
40:13;99:14
**recoverable (1)**
20:20

**recovered (2)**
100:23;101:5
**recovery (3)**
135:23;136:2,12
**redacted (3)**
57:14,18,23
**re-deposition (1)**
161:10
**REDIRECT (1)**
166:9
**refer (2)**
34:13;40:20
**reference (1)**
132:19
**referred (3)**
99:18;104:17;
118:14
**referring (22)**
26:2,4;30:4;
45:16;48:20;49:20;
74:11;98:12,16;
100:13;104:4;
106:17;112:14;
117:21;118:1,6,10,
19;119:7;127:8;
143:12;144:11
**refers (1)**
34:24
**reflect (2)**
37:22;142:8
**reflected (4)**
34:19;35:9;
59:23;67:13
**reflecting (1)**
36:10
**reflects (1)**
33:22
**reformatted (2)**
158:6,11
**refreshed (1)**
51:17
**refreshing (1)**
51:19
**regarding (16)**
10:6;11:2,6,12,
16;12:8,15,19;
13:2,14,15;78:18,
24;79:2;85:18;
137:3
**Regardless (1)**
148:15
**regular (2)**
120:20;163:16
**relate (1)**
57:18
**Related (6)**
58:17,22,25;
63:16;64:1,3
**relating (3)**
7:3;64:14,19
**relative (4)**
130:10;138:2;
156:15;157:18

Drummond Company, Inc. vs
Terrence P. Collingsworth, et. al

Juan Carlos Rodriguez
August 25, 2015

**relayed (1)**
127:11
**relies (1)**
28:2
**rely (3)**
28:1,3;83:6
**remain (1)**
163:9
**remaining (1)**
159:4
**remember (10)**
10:1;35:17;
49:19;54:9,10;
119:3;124:25;
152:4;165:11,13
**remembered (1)**
102:3
**remote (4)**
115:6,13,20;
122:20
**remotely (2)**
83:3,9
**remove (1)**
26:1
**removed (8)**
23:5;23;24:19,
21;25:5,14;94:23;
130:4
**removing (2)**
24:5;38:22
**repeat (4)**
19:8;107:21;
116:14;164:6
**repeatedly (1)**
157:3
**rephrase (1)**
32:3
**replaced (1)**
120:4
**replacing (1)**
118:1
**replica (3)**
135:23;136:5,6
**reply (1)**
20:25
**report (3)**
10:8;12:10;
110:17
**Reporter (18)**
22:5;32:19;
46:22,25;59:7;
91:4;96:3,25;
121:12;129:11;
135:25;136:3;
138:15;144:1;
145:1;155:14,17;
167:5
**reporting (1)**
60:2
**repository (5)**
28:18;29:17;
30:23;128:25;
129:2

**represent (2)**
4:15;59:18
**representations (1)**
13:14
**representative (6)**
8:11;9:4;43:11;
61:3;62:8;66:4
**represented (2)**
52:5;166:16
**request (15)**
12:5;31:24;
63:15;79:1,14;
97:7,7;127:3;
130:6,7;137:5;
158:25;159:11,19;
161:11
**requested (20)**
22:5;46:25;
54:11,14;56:1,12;
59:7;91:4;96:3,25;
121:12;125:2;
129:11;138:15;
144:1,6;145:1;
155:14,17;167:5
**requests (3)**
62:5;78:23;
159:22
**require (1)**
56:11
**requires (2)**
56:13;139:7
**rerouting (1)**
113:1
**resolution (1)**
114:14
**respect (7)**
31:25;51:11;
52:14;59:22;66:16;
82:8;87:13
**respond (8)**
44:10;45:20;
48:17;61:23;65:8;
66:15;78:25;
138:21
**responding (3)**
5:4;140:22;
141:3
**responds (1)**
45:2
**response (10)**
12:4;50:19;62:5;
121:21;124:10,13;
133:2;141:12;
156:8;159:18
**responsibilities (3)**
7:3,6,9
**responsibility (1)**
51:16
**responsible (9)**
12:7,16,17,25;
13:7,12;59:24;
61:12;62:20
**responsive (9)**

9:11;11:20;
51:14;65:20;75:13;
78:18;79:13;82:6,
10
**restate (1)**
46:20
**restore (1)**
102:19
**resulting (1)**
145:16
**results (6)**
44:19;56:16,18,
19;144:8,10
**resynced (2)**
30:6;31:1
**retained (4)**
15:20;16:18;
17:18;99:5
**retains (1)**
15:6
**retention (1)**
19:21
**retention/disposal (2)**
11:13,17
**returned (2)**
165:22,25
**reveal (2)**
101:9;108:1
**review (6)**
36:18,24;89:5;
124:17;144:9;
145:20
**Richard (2)**
68:2;82:8
**Right (151)**
9:17;16:3,19,23;
18:2,9;19:10;21:9;
23:22,24;24:6,19;
27:4;29:21;31:16;
32:5;33:6;36:13;
37:24;40:10,14,23;
41:12,16;43:20,22,
25;44:8;46:3,9;
47:22;48:2,15,18,
23;49:17,24;50:1,
19;52:1,2,16,19;
53:6,8,13,19;54:17,
24;55:10;57:2,3,6;
59:1;61:17,22;
62:2;63:2,22,23;
64:8;65:10;66:1;
67:4,13;68:10;
69:1,11,23;70:4,10,
18,22;72:24;73:4;
75:7,25;76:25;
78:16;82:23;83:5,
13;86:17;87:15;
89:5;90:1,21;
92:14;93:4,14,21;
94:14,19;96:22;
98:8;99:24;102:21;
105:8;106:19;
107:3,14;111:22;

113:1;117:5,17;
120:15;122:10,18;
126:2,14;127:3,10;
129:8,21,22;130:1;
131:7,17;132:3;
133:8,19;136:18;
137:17,19;138:7,
10,23;141:10;
142:2;143:2,9;
146:10,12;148:6;
149:21;150:23;
151:2,23;154:16;
155:9,22;156:15;
157:9;158:2,13;
161:20;162:9,14;
167:21;168:5,16
**right-hand (3)**
40:17;86:14,20
**Robert (1)**
4:21
**Rodriguez (13)**
4:10;5:2,10,11;
33:15;49:21;69:19;
79:9;88:24;156:5;
159:2;162:10,22
**room (1)**
165:23
**route (1)**
113:7
**routine (3)**
120:25;121:18;
165:8
**routing (1)**
113:13
**row (6)**
34:9;40:1;52:25;
54:19,23;86:15
**rows (1)**
53:6
**Rubio (2)**
54:23;58:10
**rule (10)**
149:21;150:1,3;
152:1,18,20;153:3,
8,10,12
**rules (2)**
52:14;152:23
**ruling (1)**
162:6
**run (25)**
47:25;48:14;
49:4;54:1,4,20;
55:11;58:19,21;
71:16,17;72:11,15;
75:23;77:4,5,8;
79:10;88:4,5;
144:13,14;145:5,8,
13
**running (1)**
131:17
**runs (1)**
38:2
**Ryan (7)**

39:20,24;106:13,
20;111:10;112:13,
25

---

**S**

**Samario (9)**
58:13;64:11;
68:11;69:9;72:2;
77:9,24;78:4;80:24
**same (23)**
21:17;27:4;34:5;
39:23;67:24;68:2,
4;74:23;82:3;
91:11;93:6;97:18;
101:6;103:19;
119:12,21;126:4;
144:13;145:8,13;
150:5;153:5;154:1
**sanctions (2)**
13:17;79:25
**save (4)**
17:4,7,15;48:5
**saved (14)**
15:17;21:14;
56:19,23;145:17;
165:4;166:22;
167:2,8,14,15,17;
168:4,7
**saw (6)**
44:7;97:18,24;
106:10;132:24;
149:24
**saying (11)**
11:19;24:2;
48:17;61:5;67:21;
106:13,20;124:10;
137:10;149:4;
167:18
**scan (1)**
109:11
**scanned (1)**
109:9
**scanner (1)**
109:15
**scheduled (1)**
161:23
**Scherer (95)**
4:7,8,22,24;6:2,
15;7:11;9:20;14:6,
7;24:5,22;25:4;
31:4,7,10;32:8;
34:17,18;37:23;
38:2,17;42:5;49:9;
53:16,21;65:18;
67:5,24;73:15;
74:3;75:9,24;82:3;
86:24;87:5,11,12,
14,15,23,23;88:7,
11;90:8,19,20;
92:6,7,10,18;93:3;
98:13;99:15;
101:22,25;103:10,

12,13,17,19;106:8;
109:25;110:4,7,10,
13;112:5;113:19,
25;114:3;115:23,
25;116:8,17,21;
120:5,17,21;130:8;
133:25;134:4;
137:15;145:17;
148:18;152:19;
153:4;156:21,22;
157:7,17,22;
162:24;163:13;
166:12
**Scherer's (29)**
10:24;11:2,6,11,
15;12:4,8,14,18;
13:1,13;32:17;
34:25;62:4,19,23;
67:10,16;74:25;
75:1;81:5,9,11,20;
82:4;92:2;128:20;
130:12;147:25
**scope (2)**
13:15;66:17
**scratch (1)**
91:7
**screenshot (3)**
151:23;152:17,
18
**screenshots (2)**
150:22;151:11
**script (1)**
97:9
**search (43)**
34:19;40:8,10,
13;41:9,15,19,24;
42:6;44:3,7,11,13,
18;46:1;50:4;53:1,
18,18;54:20;55:1,
6,11;56:14;57:1,4,
10;58:10,14;63:13,
21;64:6;69:8,9;
70:3;71:16;80:14;
82:9;137:5;144:13,
23;145:4,11
**searched (25)**
31:4,7;40:5,6,7;
53:13;61:15;65:4,
13;67:5,10,17,25;
68:11;69:10;70:9,
25;71:21;72:3,7;
75:8,13;77:13;
81:20;82:5
**searches (121)**
10:5;12:4;13:16;
31:18,20,21;32:7,9,
16,17,22,24;33:1,3,
4,5,17,23;34:18,24;
35:3,4,5,8,13;36:6,
11,14,16,21;37:7,9,
14,23;47:25;48:14;
49:5,10;51:22;
52:24;53:5;54:1,8,

11,15,20;56:1,12,
19;57:1,8,22;58:1,
2,6,14,19,21;59:3,
20,22,23;60:1,8,14,
18,24;61:4,6,12,13,
21;62:4,18,20,24;
63:15,23,25;64:1,5,
14,19,24;65:1,16;
66:16;69:14;71:6,
15;72:11;75:23;
76:6,7,9,15,23;
77:4,5,7,14,22;
78:3,25;79:9,13,18,
19;80:11,13,22;
81:4,8,10;95:17;
97:3,15,17;144:7;
145:17;146:2
**searching (1)**
65:19
**second (15)**
40:1;43:24;53:8,
10;69:4;80:3,8;
90:24;98:9;101:13;
106:21;109:15;
113:19;122:11;
164:11
**seconds (1)**
162:13
**secretaries (2)**
38:24;39:2
**secretary (1)**
26:5
**Securepoint (1)**
64:4
**security (5)**
11:3;78:14,17,
24;79:2
**seeing (4)**
34:24;58:13;
64:11;150:3
**select (1)**
23:12
**selected (1)**
27:19
**send (5)**
20:24;92:3,9,17,
19
**senders (1)**
41:11
**sending (1)**
107:13
**sends (3)**
163:1,2,5
**sent (17)**
78:21;83:19;
85:15;90:17;91:8,
23;97:18;99:22;
100:1,14;104:12,
17;109:12,15;
134:12,13;152:21
**sentence (6)**
75:7;78:13;80:3,
8;89:18;90:2

**separate (1)**
152:6
**September (9)**
32:25;54:2;
55:12;56:25;57:9,
22;58:5,9,15
**series (6)**
5:15;47:18;49:6;
115:1;119:20;
122:9
**server (174)**
7:4;14:5,8;15:5,
12,16,20;16:6,15,
22;17:10,17,20,21,
22;18:12,17,17;
19:19;20:1,9,10,
14;22:19,20,23;
23:1,2,5,24;24:6,
19,22;28:2,3,4,7,8,
11,17,19,23;29:7,
15,17,18;30:7,22,
23,24,25;31:2,17,
20;32:1,9;33:6,17,
23;34:19,25;35:9;
36:7,12,17,22;
37:15,23;38:3,12;
46:2,9,17;47:9;
49:3,9;50:4,10;
52:22;56:23;58:7,
15;64:18;72:7;
74:20,21,23,25;
75:1,24;76:6,7,8,
16;90:8,19;92:7;
93:3,4,6,18;94:5,
17,19,20,23;95:1,6,
14,20,23;97:11,12,
19;98:19;99:9,15,
23;100:3,24;
101:15,22,25;
102:4,5,7,22;
103:15,15,17,18;
104:5,13,18;
113:16,19,25;
114:3,6;115:23,25;
116:4,10,21;117:5;
128:24,25;129:3,7,
16,25;134:14,23;
135:3,7,8,13,14;
136:6,6,10,14;
144:15;145:9,12,
14,18;153:1;
162:25;163:14;
164:22;165:1;
168:11,15
**servers (10)**
17:2,4,7;32:17,
18,19;49:7,7,9;
77:15;143:20
**set (13)**
15:9,9;117:16;
131:21;133:24;
145:10;149:25;
152:18;153:11,17,

19,20;161:24
**setting (1)**
106:20
**seven (1)**
78:13
**several (1)**
142:4
**Shaking (1)**
73:18
**shifting (1)**
9:18
**shipped (2)**
112:5,7
**show (29)**
8:16;31:24;
33:17;36:14;40:4;
41:19;42:19;43:2;
47:17;53:12;54:19;
72:24;78:9;79:23;
86:11;92:13;105:4;
107:10;114:25;
117:13;122:8;
125:8;132:17;
136:24;140:4;
142:24;146:7;
147:8;153:24
**showing (7)**
31:17;112:23;
119:20;123:7;
131:14;137:23;
149:15
**shows (3)**
41:9;54:1;76:5
**side (3)**
34:6;42:22;
168:11
**Signature (1)**
169:16
**similar (1)**
36:14
**simple (1)**
27:11
**simply (1)**
71:3
**single (3)**
73:12;74:20;
103:20
**sit (2)**
61:22;127:2
**SiteGround (17)**
99:23;100:3,24,
25;101:15,18,24;
102:4,22;103:9,17;
104:5,9,13,18;
113:16,22
**sitting (2)**
76:11,20
**situation (1)**
15:25
**skip (1)**
64:10
**slightly (1)**
137:2

**slow (2)**
122:17;127:14
**slowly (4)**
123:2;138:14;
155:13,16
**small (2)**
97:9;100:9
**smaller (2)**
97:25;104:1
**snapshots (2)**
16:7,7
**solely (1)**
28:10
**somebody (4)**
21:6,7;25:23;
26:17
**someone (21)**
7:13;19:10;20:8;
21:19;22:17;23:3,
9;28:22;93:1,11;
94:12;99:5;123:17;
149:5,7;155:8;
157:6;163:22;
164:9;168:11,24
**someone's (2)**
21:13;83:4
**sometime (2)**
158:6;166:18
**sometimes (3)**
22:9;82:24;
150:11
**somewhere (3)**
48:5,10;56:20
**son (1)**
82:4
**soon (1)**
159:20
**sorry (49)**
8:25;14:18;20:3;
24:1,2;25:17,21;
32:4;33:8;38:9,19;
41:2,6;44:15;
46:13,20;54:16;
56:17;58:8;68:13;
69:1,5;72:18;
76:13;83:18;86:7;
91:3;93:25;98:3,4,
15;101:23;104:14;
107:19,21;109:7;
114:17;116:13;
125:4;127:14;
129:10;132:6;
135:10;138:13;
143:13;146:18;
155:16;160:15;
165:2
**sort (5)**
7:12;52:4;95:7;
111:17;147:13
**Sounds (1)**
126:9
**source (1)**
21:13

**sources (1)**
91:15
**South (1)**
4:11
**Southern (1)**
4:4
**spaced (1)**
73:12
**Spain (1)**
157:8
**Spanish (5)**
70:4,6,24;71:17;
72:14
**speak (1)**
15:19
**speaking (2)**
71:11;132:24
**special (1)**
153:6
**specific (1)**
161:14
**specifically (1)**
9:22
**spoke (1)**
24:25
**Spotswood (210)**
4:21,21;9:9;10:2,
16,19;11:18,22;
15:23;16:4,24;
18:21,25;20:3;
21:22,25;24:7;
25:7;26:14;28:14;
29:12;30:1,12,15;
31:8,23;32:11;
34:21;35:6,19;
36:1,3,5,8,25;
37:16;38:4,8;39:3,
15;43:3,6,18;45:9;
46:4,10,18;47:2;
51:10;52:8,13;
56:2;59:9,17;60:5,
7,13;61:1,8,19;
63:10;64:21;65:6,
22;66:9;67:2,19;
68:6,15,19,23;69:4,
12,24;70:11;71:2,
22;72:4,17;73:19;
74:6,17;75:3,14;
76:2;77:1,10,20,
25;79:3,15;80:16,
25;81:6,16,24;
82:12,18,25;83:21,
24;84:8;85:3,21;
87:1,16,25;89:10;
90:9,24;93:15,22;
94:7;95:24;96:20,
23;98:2,5,24;
100:17;101:2,6;
102:11;105:13;
107:4,6;108:1,7;
109:5;110:24;
112:8;114:19;
115:15,18;116:11,

22;118:4,16;
119:14;120:10,23;
121:23,25;122:11;
124:5;125:16,24;
126:3,19;127:1;
128:1;130:22;
131:8;132:4,11;
133:17,20;134:10;
135:19;138:11,17;
139:7;140:11,15;
141:17;142:3,18;
143:18;144:16,20;
146:16;147:1;
148:3,13,16,21;
149:9;150:15,24;
151:4;152:11;
155:3,10,19;
156:16,24;157:9,
19;158:22;159:6,
10,17;160:3,8,13;
161:1,11,13,17,22;
162:4,8,12,21;
166:3,8;167:7;
169:2,8,12
**spreadsheet (21)**
33:19,22;34:2,
20,23;35:10;36:13;
37:21;51:3;52:21;
57:14,23;62:21;
67:13;70:16,17;
73:3;76:5;140:7;
141:25;154:5
**staff (3)**
59:24;64:25;
157:22
**standard (4)**
87:18;88:2;
117:7,8
**Staples (1)**
108:11
**start (5)**
28:6;58:12;
64:11;75:25;162:1
**started (2)**
95:2;137:16
**Starting (1)**
140:20
**state (2)**
4:14;5:8
**stated (4)**
37:12;77:12;
166:1,2
**statement (7)**
73:17;76:5;
86:25;90:14;
113:22;132:9;
150:3
**States (2)**
4:2;152:1
**stay (4)**
8:2;17:20;79:8;
164:19
**stayed (1)**

114:2
**staying (1)**
27:5
**stays (2)**
135:15,16
**step (3)**
18:5;103:11,16
**still (14)**
18:11;19:3,18;
20:9;22:22;33:4;
102:4;113:20;
120:5;141:14,15;
158:5;162:5;163:9
**stolen (6)**
129:2;130:20;
131:6;137:15;
138:10,23
**stop (2)**
52:2;152:23
**storage (2)**
30:4;154:10
**store (3)**
44:23;165:1,3
**stored (8)**
17:6,21;28:10;
33:4;74:22;127:23;
132:2,10
**stores (2)**
15:4;27:21
**story (1)**
131:5
**Strike (1)**
140:10
**string (2)**
115:5;137:24
**subject (3)**
111:11;113:1;
119:22
**supplement (1)**
167:10
**supplemental (1)**
66:20
**supplemented (1)**
78:21
**support (2)**
82:16;133:25
**supposed (1)**
142:7
**sure (12)**
5:14,21;7:1;
33:9;37:5;85:6,7;
94:1;121:3;128:4;
140:25;164:7
**Susana (1)**
39:14
**switch (3)**
8:7;48:6;163:11
**switched (1)**
48:6
**switching (1)**
27:5
**sworn (1)**
5:4

**sync (4)**
28:2;29:7;
128:24;129:20
**synced (4)**
28:17;30:21;
129:20,24
**syncing (2)**
28:7,7
**syncs (2)**
30:24;93:3
**system (41)**
7:9,17;14:23,24;
15:10;17:5,6,8,11,
12,17;19:3;21:7,
10;27:22;28:1,2,3;
45:21;46:2;93:3;
99:7;106:23;
128:24;162:25;
163:9,13,21,24;
164:11;165:2,4,6;
166:13,23;167:2,
14,24;168:5,8,10
**systems (2)**
7:1;60:9

### T

**table (2)**
165:7,10
**talk (3)**
98:24;139:8;
163:12
**talked (2)**
52:25;164:9
**talking (26)**
15:25;22:11;
31:25;35:20,23,24;
38:21;39:5;42:18;
43:8,10;47:22;
52:9;70:18;81:17;
86:15;91:13;99:1;
101:14;123:8;
126:25;134:16;
161:14;166:19;
167:7,12
**talks (1)**
99:22
**tape (3)**
80:18;85:23;
153:13
**tapes (1)**
135:8
**tasks (1)**
126:10
**TC (4)**
44:13;109:18;
112:4,15
**TC@conradscherercom (2)**
92:19,24
**TC@iradvocatesorg (2)**
92:14;152:22
**teach (1)**
148:23

**team (2)**
20:24;123:17;
141:4,6;143:1;
159:18
**technical (1)**
52:4
**Tellez (1)**
39:14
**telling (5)**
45:25;49:15;
99:8;123:15;
125:21
**term (6)**
70:8,8;75:25;
80:14,24;147:11
**terms (20)**
43:7;54:20;55:6;
56:14;57:1,11;
58:10,13,14;64:11;
69:10;75:24;79:10;
144:13,23;145:4,5,
8,11,14
**Terrence (3)**
4:6,22,24
**Terry (37)**
38:3,14,16;40:9,
14;49:6;60:1,2,15;
89:19;90:12;91:15;
101:25;102:5;
111:21;113:20;
119:1;123:16;
132:24;133:1;
134:12,13;137:3;
138:1,2;144:9;
146:9,24;148:9;
149:24;150:8,14,
18;152:19;156:25;
157:2;161:22
**Terry's (14)**
48:1;91:25,25;
97:9,14,24;98:11;
103:23;113:1,23,
23;144:7;145:5;
154:5
**test (2)**
92:15;158:22
**testified (5)**
5:5;130:19;
132:1;156:20;
157:3
**testify (9)**
8:24;9:4,25;
10:15;13:20;76:15;
77:18;166:25;
167:17
**testifying (1)**
9:18
**testimony (3)**
125:15;164:8;
167:23
**Thanks (1)**
131:20
**THEREUPON (2)**

5:1;169:15
**third (1)**
  101:14
**thought (3)**
  32:4;90:25;
  97:11
**three (8)**
  40:20,25;50:24;
  52:3,8;107:1;
  158:17;159:4
**Thursday (2)**
  161:15,17
**Tigre (9)**
  58:13;64:12;
  68:11;69:9;72:2;
  75:25;76:25;78:4;
  80:15
**timeline (1)**
  102:18
**times (6)**
  14:19;66:10;
  82:22;83:3;110:14,
  21
**tired (1)**
  86:7
**today (27)**
  4:9;5:16;8:10;
  9:4,25;24:4;51:17;
  56:8;65:8;66:5,24;
  67:7,16;69:22;
  70:24;71:20;76:12,
  15,20;77:18;
  109:22;110:20;
  112:18;124:18;
  141:14;143:17;
  166:25
**Today's (2)**
  4:10;125:15
**together (1)**
  42:20
**told (16)**
  7:11;9:14;25:18;
  69:13;70:13;86:4,
  23;99:10;119:24;
  127:16;130:21,24;
  131:4;139:6;153:2;
  158:4
**Tommy (1)**
  4:20
**Tony (1)**
  52:9
**took (1)**
  127:20
**top (7)**
  34:9;86:14,15,
  17,18,20;98:9
**topic (13)**
  10:16,16,20,23;
  11:5,11,15,21;
  51:21;62:3,8;66:2,
  6
**topics (15)**
  8:23;9:3,16;10:1,

4,11,17,21;11:19;
13:21;43:17;62:2;
66:13,13;163:11
**tough (1)**
  97:15
**Toward (1)**
  78:12
**towards (1)**
  141:8
**track (1)**
  157:10
**traded (2)**
  123:9,16
**traffic (2)**
  51:12;163:16
**train (1)**
  32:4
**transcript (1)**
  166:4
**transfer (21)**
  11:7;24:25;25:3;
  26:11;27:8;85:18;
  118:13,22;119:5,8;
  120:8,22;121:18;
  123:17;124:1,3,9;
  126:16;127:12,17;
  128:21
**transferred (12)**
  28:12;29:9,24;
  30:11;49:5;84:6;
  85:10;120:15;
  121:15;127:24;
  156:7,12
**transferring (7)**
  26:23;27:13;
  29:10;119:22;
  123:22;125:13,22
**transfers (1)**
  165:8
**transition (1)**
  11:9
**transitioned (1)**
  26:16
**transitioning (1)**
  117:16
**translate (1)**
  25:18
**transport (1)**
  24:14
**trash (7)**
  163:25;164:1,3,
  15,18,19,20
**travel (2)**
  105:22;106:5
**Trey (4)**
  4:16;9:9;43:3;
  52:12
**tried (2)**
  102:5;165:24
**tries (1)**
  91:14
**triggered (1)**
  99:13

**trouble (1)**
  116:14
**true (16)**
  18:15;53:16;
  62:25;63:1;70:6;
  72:3;73:17;86:25;
  128:21;130:21;
  132:3,9;141:14;
  155:2,5;157:5
**truth (1)**
  13:14
**truthfully (1)**
  5:16
**try (4)**
  34:12;138:2;
  145:24;167:10
**trying (12)**
  16:2;21:9;57:20;
  61:22;92:16;99:7;
  100:10;102:2;
  103:3;122:17;
  140:16;167:20
**turn (3)**
  73:8;78:11;80:1
**twice (2)**
  163:24;164:10
**two (16)**
  41:16;44:4;53:2,
  5;54:11,20;55:8;
  57:8;59:10;64:5;
  69:9;87:20;152:5,
  7,9;162:13
**type (3)**
  14:5;112:17;
  122:17
**typical (1)**
  161:25

**U**

**ultimate (1)**
  114:14
**ultimately (1)**
  96:16
**unable (1)**
  13:5
**unclear (1)**
  5:20
**under (3)**
  44:12;97:16;
  111:25
**understood (1)**
  164:7
**undertake (1)**
  61:22
**Unfortunately (1)**
  108:5
**Ung-ugh (1)**
  106:18
**unified (1)**
  102:1
**unit (1)**
  88:16

**United (1)**
  4:2
**unless (1)**
  43:12
**unrelated (2)**
  59:21;63:13
**unusually (1)**
  97:9
**up (42)**
  14:23,24;15:9,9;
  16:16;17:22;18:16;
  19:23,25;24:14;
  29:1;61:3;65:2,9;
  78:13;82:22;93:11;
  94:12;95:3;106:20,
  23;107:2;112:5,7;
  117:16;122:2,12;
  126:8;129:20,23;
  131:17,21;133:24;
  136:15;146:22;
  152:18;153:11,17,
  19,20;155:8;164:4
**upkeep (1)**
  7:4
**upon (2)**
  70:13;156:24
**USB (1)**
  107:14
**use (107)**
  14:6;42:4;84:7,
  20;106:5,14;110:5;
  111:18;158:2;
  159:3
**used (11)**
  14:12,20;39:21,
  23;87:14;110:2,15;
  129:5;138:1;158:2;
  168:25
**user (16)**
  17:15,23;18:5;
  20:21,23;25:1;
  27:20,21,24;29:14;
  61:13;65:1,19;
  77:13;97:8;164:19
**users (10)**
  7:10;17:2,7;
  28:16;38:19;65:4,
  12;72:11;77:15;
  97:23
**user's (2)**
  19:16;28:5
**uses (4)**
  44:23;74:20;
  83:16;105:22
**using (15)**
  11:9;14:24;22:9;
  42:6;45:7,11;87:9,
  13,22;95:2;115:13;
  116:2;119:1;135:6;
  155:8
**Usually (2)**
  26:9;42:4
**utilize (1)**

22:10
**utilized (1)**
  117:23
**utilizes (1)**
  38:12
**utilizing (2)**
  87:7;135:8

**V**

**Van (3)**
  146:9,24;158:20
**various (1)**
  97:23
**vendor (1)**
  97:24
**verbal (2)**
  50:7;127:10
**version (3)**
  14:21;154:9;
  159:7
**versus (1)**
  4:6
**Victoria (5)**
  39:20,23;106:13;
  111:10;112:25
**video (1)**
  169:11
**VIDEOGRAPHER (29)**
  4:1;33:10,13;
  59:12,15;60:4,6;
  63:4,7;80:18;
  85:23;87:20;88:15,
  20;121:4,7;139:21,
  24;153:13;155:24;
  156:2;159:12,15;
  161:3,6;162:15,18;
  169:10,13
**videotaped (1)**
  4:2
**viewed (1)**
  29:6
**violation (1)**
  87:24
**visit (1)**
  114:11
**Vostro (2)**
  120:4,8

**W**

**wait (2)**
  24:12,15
**waiting (1)**
  162:5
**waived (1)**
  169:17
**waiving (1)**
  144:21
**wants (1)**
  163:22
**warranty (1)**
  121:17

**Washington (10)**
44:22;53:22;
62:11,19;74:20;
75:1;83:7;97:8;
114:12;154:13
**water (1)**
114:17
**way (29)**
17:5;24:18,24;
25:22;26:13,20;
27:10;48:14;57:22;
65:24;88:2,4,13;
92:9;100:11;117:8;
127:22;128:23;
135:12;137:18;
146:21;150:10;
160:19,20;168:2,
10,21,22,23
**ways (3)**
20:22;22;24:21
**web (3)**
49:6,8;116:2
**Wednesday (1)**
161:18
**Wells (233)**
4:16,16;5:7;
8:15;9:17;10:12,
13;13:8;16:2,9;
17:14;18:23;19:6;
20:7;22:4,8;24:3,
17;25:10;26:19;
28:20;29:19;30:8,
13,18;31:12;32:2,
6,14,21;33:9,15,21;
35:1,11;36:9;37:6,
20;38:6,11;39:7,
19;43:1,4,13,19;
45:13;46:7,14;
47:7,16;51:22;
52:1,16,18;56:7;
59:1,11;60:11,20;
61:2,16;62:1;63:2,
18;65:3,11;66:1,
23;67:1,4,8,23;
68:9,21,24;69:7,
16;70:2,19;71:8,
13;72:1,8,20,23;
74:1,13,24;75:6,
19;76:10;77:6,16,
21;78:5,8;79:6,22;
80:21;81:3,12,19;
82:2,15,21;83:2,
22;84:2,12;85:8;
86:1,10;87:3,21;
88:12,23;89:13;
90:11;91:12;93:19;
94:3,10;96:6,21;
97:4;98:7;99:16;
100:22;101:4,12;
102:14;105:3,15;
107:9;108:9;109:8;
111:4,8;112:12,22;
114:24;115:21;

116:16;117:1,12;
118:8,20;119:19;
120:12;121:3,20;
122:2,7,13,15;
123:6;124:12;
125:7,20;126:1,7,
24;127:3,9;128:6;
129:15;131:1,13;
132:8,16;133:19,
22;134:15;135:21;
136:11,23;137:22;
138:20;139:12,20;
140:3,10,13,17,19;
141:22;142:6,23;
143:21;144:12;
145:7;146:6,20;
147:7;148:7,14,17;
149:1,14;150:20;
151:2,7,17;152:9,
13;153:15,23;
155:6,22;156:4,19;
157:2,13,24;
158:25;159:8,25;
160:4,9,24;161:2,8,
12,15,21,24;162:5,
9;166:7,10;167:11;
169:7
**weren't (2)**
46:17;129:16
**what's (14)**
33:18;43:2;
47:17;48:13;49:11;
67:12;72:24;78:9;
105:4;112:23;
140:4;146:7;147:8;
168:20
**whereabouts (1)**
160:7
**whole (7)**
9:11;10:21;41:4;
70:16;73:21;86:18;
113:5
**whose (3)**
40:4;53:12;
108:18
**wide (1)**
40:11
**Williams (40)**
10:8;12:10;
36:18,24;37:4;
89:5;91:14;95:4,9;
98:23,25;99:6,20;
100:4;107:11,22;
108:23;109:10,16;
111:2;127:7;128:7;
131:7;132:19,23;
137:16,24,25;
138:8,21;140:6,21;
141:3,24;149:19;
151:19;153:2,25;
156:6;158:4
**Williams' (6)**
110:17;136:25;

139:2;140:23;
141:6;143:1
**Windows (1)**
105:21
**wipe (2)**
157:5,22
**wiped (5)**
156:13,21;
157:17;158:6,11
**wish (1)**
56:15
**within (9)**
13:25;21:7;
94:23;136:15;
159:2,21;160:2,4;
161:8
**without (4)**
29:6;108:3;
144:21;160:14
**witness (162)**
4:9;5:3;10:18,
23;11:21,23;16:5;
17:1;19:5;20:5;
21:24;22:2,7;24:1,
9;25:9;28:16;
29:14;30:3,16;
31:10,24;32:3,13,
20;34:23;35:8,24;
36:2,4,6;37:2,18;
38:9;39:5,17;
45:11;46:6,12;
47:5;56:4;61:2,11;
63:9,11;64:23;
65:8,24;67:21;
68:8,17,22;69:6;
70:1,15;71:7,12,
24;72:6,19;73:21;
74:8,19;75:5,16;
76:4;77:3,12;78:2;
79:5,17;80:20;
81:2,8;82:1,14,20;
84:1,10;85:5;
87:18;88:2;89:12;
90:3;91:1,6;93:17,
24;94:9;96:1,5,24;
97:2;98:4,6;99:3;
100:19;101:10;
102:13;105:14;
107:5;108:4,8;
109:7;112:11;
114:21;115:17,19;
116:13,24;118:6,
18;119:16;120:25;
121:9,14,24;
122:14;124:7;
125:18;126:5,21;
128:3;129:13;
130:24;131:10;
132:6,13;133:21;
134:12;136:2,4;
138:13,19;139:10;
140:18;141:19;
142:5,20;143:20;

144:3,18,24;145:3;
146:18;147:3;
148:5,23;149:11;
150:17;151:5;
152:7;155:5,12,16,
21;156:18;157:11,
21;162:11;169:5,9
**witnesses (1)**
78:19
**word (8)**
70:4,25;71:16;
72:14;76:24;77:8,
23;78:4
**words (4)**
10:14;55:12;
68:11;116:1
**work (40)**
6:1,2,14;8:5,24;
12:21;15:2;25:23;
55:12;65:7;66:2;
77:18;83:7;84:6,7,
19,20;87:7,13,15,
24;89:20,21,23;
90:3;99:19;100:4;
106:22;110:19;
111:14;112:1;
120:22;126:11;
130:9;131:7;
159:17;160:17,19,
22;167:9
**worked (3)**
13:4;89:4;
126:11
**working (7)**
19:10;60:19;
65:10;66:14;97:16;
131:21,22
**works (7)**
21:11;26:13;
29:15;42:12;53:15;
99:7;165:21
**workstation (1)**
83:4
**worry (2)**
125:12,22
**write (5)**
17:9;164:21;
165:5;167:23;
168:2
**writes (1)**
112:15
**writing (2)**
9:10;131:19
**written (5)**
12:5;62:5;126:5;
154:20,22
**wrote (5)**
49:21;89:24;
90:1;100:21;
108:22

**Y**

**y'all (5)**
61:5;135:6,7;
159:25;160:19
**year (8)**
35:15,17;37:15;
78:20;112:5;
132:18;158:6;
166:13
**years (1)**
50:24
**yesterday (9)**
7:11;9:18;10:3;
13:22;14:3;62:9;
67:1,3;124:17
**yesterday's (1)**
110:25

---

**0**

**020 (2)**
40:23,24

---

**1**

**1 (9)**
8:13,17;10:24;
51:24;73:9;80:1;
88:16;98:8;152:14
**1:08 (1)**
121:5
**1:16 (1)**
121:8
**1:46 (1)**
139:21
**1:47 (1)**
139:24
**10 (6)**
12:2;80:18;
107:7,10;153:13;
159:1
**10:01 (1)**
33:14
**10:39 (1)**
59:13
**10:50 (1)**
59:16
**10:55 (1)**
63:5
**11 (8)**
10:4,5;12:3;
52:17;62:3;92:8;
111:6,9
**11:11 (1)**
63:8
**11:43 (2)**
88:17,18
**12 (6)**
10:4,5;52:17;
112:20,24;114:22
**12:20 (2)**
88:19,22
**13 (3)**
12:11,11;114:25

**14 (8)**
  12:10,13;16:13;
  49:15,25;79:24;
  117:10,13
**14th (1)**
  50:15
**15 (9)**
  12:6,18;41:21;
  43:21,25;50:3;
  62:6;119:17,20
**15th (2)**
  35:22;122:9
**16 (3)**
  13:1;122:5,8
**17 (3)**
  13:7;123:4,7
**18 (5)**
  54:2;105:5;
  106:10;125:5,8
**18th (1)**
  106:19
**19 (3)**
  131:11,14;
  133:18
**19th (1)**
  146:23

---

**2**

**2 (12)**
  11:1;33:18,19;
  37:22;39:25;51:2;
  52:19;59:20;63:17,
  21;86:12;88:21
**2:11-CV-3695-RDP (1)**
  4:4
**2:16 (2)**
  121:8;155:25
**2:40 (1)**
  156:3
**2:45 (1)**
  159:13
**20 (3)**
  125:11;132:14,
  17
**2006 (2)**
  154:18,21
**2007 (5)**
  14:13,16;99:11;
  154:18,21
**2008 (8)**
  73:15;90:18;
  98:10;154:19,21,
  23,24;155:2
**2009 (1)**
  11:10
**2010 (13)**
  6:8,18,22,23;
  14:7,12,16;48:25;
  84:14;99:11;100:2,
  14;133:6
**2011 (35)**
  11:14,17;12:6,

24;13:6;14:17;
16:15;17:23;18:14;
19:24;20:15;22:7;
25:11;32:15;36:2;
39:8;49:1;62:6;
92:2,5,21;98:10;
100:2,14;101:22;
102:24;105:6;
106:10;108:16;
111:10;135:22;
166:18;167:1,13,
21
**2012 (30)**
  16:15;32:24;
  41:21;43:21,25;
  45:6;49:15,25;
  50:3;53:1;57:5;
  64:6,17;65:13;
  78:20;84:14;91:10,
  23;92:5,9,22;
  112:24;113:18,23;
  114:9;115:1,3;
  117:14;119:21;
  166:13
**2013 (67)**
  16:15;25:11;
  32:15,25;37:15;
  39:8;54:2;55:12;
  56:25;57:9,22;
  58:5,9,15;75:20,
  23;76:18,24;77:8,
  23;78:11;79:7,10,
  13;89:9,15;90:5,
  13,17;91:18;93:9,
  12,14,20;94:6,13,
  21;95:6;96:8,13,
  19;97:14,21;104:7;
  122:9;123:8,21;
  125:10;126:15;
  129:6,21;130:1;
  131:16;133:15,23;
  134:1,5,9,14,18;
  135:22;137:2,11;
  166:17;167:1,13,
  21
**2014 (44)**
  6:9;12:6;16:12,
  22;35:16,22;36:3,
  4;37:10,11;58:2,6,
  16;62:7;64:10,18;
  65:14;67:18,25;
  68:12;69:11;70:9;
  71:1,18,21;72:3,
  15;79:24;80:13,23;
  81:5,13,21;82:4,9;
  96:9,10,11;97:3;
  100:7;139:5;144:5;
  164:5,9
**2015 (4)**
  4:10;12:10;
  149:18;152:14
**21 (4)**
  108:15;115:3;

136:21,24
**22 (12)**
  89:15;90:4,13,
  17;91:18;96:18;
  97:14,21;101:21;
  134:14;137:20,23
**23 (5)**
  125:10;126:15;
  137:2;140:1,5
**24 (7)**
  75:20,23;76:18;
  136:5,15;141:20,
  23
**24-hour (1)**
  136:18
**25 (7)**
  4:10;112:24;
  113:18,23;142:21,
  25;149:18
**26 (3)**
  146:4,8;158:14
**27 (3)**
  102:24;147:5,9
**27th (1)**
  103:5
**28 (2)**
  149:12,15
**29 (2)**
  151:15,18
**2nd (2)**
  114:9,11

---

**3**

**3 (9)**
  11:5;40:1;42:24;
  43:5;52:25;78:12;
  89:14;123:7;156:3
**3:23 (1)**
  159:16
**3:27 (1)**
  161:4
**3:29 (1)**
  161:7
**3:31 (1)**
  162:16
**3:34 (1)**
  162:19
**3:45 (2)**
  169:14,16
**30 (2)**
  153:21,24
**30b6 (11)**
  8:11,18;9:4;43:8,
  10;51:5;60:12,22;
  62:7;66:3;67:16
**31 (3)**
  78:11;79:7;
  111:10
**33301 (1)**
  4:12
**365 (4)**
  91:9;114:6,14;

145:14
**365-page (1)**
  67:2
**3E (1)**
  40:2
**3I (1)**
  41:7
**3J (1)**
  41:14
**3rd (1)**
  114:9
**3W (1)**
  41:23
**3X (1)**
  41:18

---

**4**

**4 (4)**
  11:11;47:14,18;
  50:17
**400 (1)**
  78:22
**42 (1)**
  161:9
**48 (3)**
  159:21;160:2,5
**4th (1)**
  140:21

---

**5**

**5 (3)**
  11:15;72:21,25
**500 (1)**
  108:13

---

**6**

**6 (7)**
  11:21;53:6;
  54:19,23;63:12;
  78:6,10
**6:00 (1)**
  161:18
**633 (1)**
  4:11
**68 (1)**
  68:22
**6E (1)**
  53:12

---

**7**

**7 (8)**
  11:22;53:6;
  54:19;55:10;63:12;
  79:20,23;105:21
**7E (1)**
  53:12

---

**8**

**8 (7)**
  11:25;13:13;
  86:8,11;89:1,2,15
**85 (2)**
  69:2,8

---

**9**

**9 (3)**
  12:1;105:1,5
**9:00 (2)**
  161:15,17
**9:11 (1)**
  4:11
**9:51 (1)**
  33:11
**90 (21)**
  15:6,7,21;16:8,
  19;17:18;18:15,18;
  19:23;20:14,16;
  21:14;24:12,13,15;
  134:24;135:9,15,
  16;164:4,12
**90-day (5)**
  19:24;21:21;
  22:25;135:7,13
**92 (2)**
  70:3,18

---

FILED

2015 Aug-31 AM 11:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 3

*Filed under seal pursuant to Stipulated Protective Order*

| | |
|---|---|
| **From:** | Bob Spotswood |
| **To:** | Trey Wells; William Paulk; Tony Davis; Ben Presley |
| **Cc:** | "kmcneil@SusmanGodfrey.com"; "Niewoehner, Christopher" |
| **Subject:** | RE: Drummond v. Collingsworth |
| **Date:** | Thursday, August 27, 2015 9:38:15 AM |

Trey:

My letter states that Defendants located copies of the e-mail from the files of the others, namely Lorraine Leete and Christian Levesque. We did not locate the native file from Mr. Collingsworth's gmail account or the PST files collected from that account.

Bob

---

**From:** Trey Wells [mailto:TWells@starneslaw.com]
**Sent:** Thursday, August 27, 2015 9:29 AM
**To:** William Paulk <wpaulk@spotswoodllc.com>; Tony Davis <TDavis@starneslaw.com>; Ben Presley <bpresley@starneslaw.com>
**Cc:** 'kmcneil@SusmanGodfrey.com' <kmcneil@SusmanGodfrey.com>; 'Niewoehner, Christopher' <cniewoehner@steptoe.com>; Bob Spotswood <rks@spotswoodllc.com>
**Subject:** RE: Drummond v. Collingsworth

The email in question was solely between Albert van Bilderbeek and Terry Collingsworth, and was sent to Mr. Collingsworth's Gmail account. We did not ask about forwarded copies or otherwise. We asked for, and Defendants agreed to provide, a production of the native file from Mr. Collingsworth's Gmail account, or an explanation of its whereabouts if it was not there. This letter does not provide what was agreed to be provided on the record during Mr. Rodriguez's deposition. Please confirm that the requested email is not in Mr. Collingsworth's Gmail account, or any of the PSTs of that account which were collected by Defendants. If we do not have a clear answer to this, we will begin Mr. Collingsworth's deposition with a call to Judge Proctor.

---

**From:** William Paulk [mailto:wpaulk@spotswoodllc.com]
**Sent:** Thursday, August 27, 2015 9:17 AM
**To:** Tony Davis; Trey Wells; Ben Presley
**Cc:** 'kmcneil@SusmanGodfrey.com'; Niewoehner, Christopher; Bob Spotswood
**Subject:** Drummond v. Collingsworth

Counsel for Drummond:

Please see the attached correspondence from Bob Spotswood.

William


William T. Paulk
Spotswood Sansom & Sansbury LLC
1819 5th Ave. North

Suite 1050

Birmingham, AL 35203

Direct:  (205) 986-3624

Main:  (205) 986-3620

Fax: (205) 986-3639

Email: wpaulk@spotswoodllc.com

www.spotswoodllc.com

Confidentiality Notice: This e-mail is from a law firm and may be protected by the attorney-client or work product privileges. If you have received this message in error, please notify the sender by replying to this e-mail and then delete it from your computer.



H. Thomas Wells, III - Attorney

100 Brookwood Place, 7th Floor, Birmingham, AL 35209

P.O. Box 598512, Birmingham, AL 35259-8512

(205) 868-6083 - Fax: (205) 868-6099 - www.starneslaw.com

NOTICE: This e-mail message and all attachments transmitted with it may contain legally privileged and confidential information and/or protected health information (PHI) intended solely for the use of the recipients named above. If you are the intended recipient, please be aware that forwarding this message to others may result in a waiver of these privileges. If the reader of this message is not the intended recipient, you are hereby notified that any reading, dissemination, distribution, copying, or other use of this message or its attachments is strictly prohibited. If you have received this transmission in error, please notify the sender immediately by telephone at (205) 868-6000 and permanently delete this email and any attachments, including all copies and backups thereof. Thank you.



One Federal Place
1819 Fifth Avenue North, Suite 1050
Birmingham, Alabama 35203
Phone: 205.986.3620 Fax: 205.986.3639
www.spotswoodllc.com

Robert K. Spotswood
Direct Dial: 205.986.3621
E-mail: rks@spotswoodllc.com

August 27, 2015

*Via Electronic Mail Only*

H. Thomas Wells, III
STARNES DAVIS FLORIE LLP
P.O. Box 598512
Birmingham, AL 35259-8512
TWells@starneslaw.com

      Re:    *Drummond Company, Inc. v. Terrence P. Collingsworth and Conrad & Scherer, LLP*, 2:11-cv-3695-RDP

Dear Trey:

      I write in response to your letter dated August 14, 2015, and your request during the August 25, 2015 deposition of Juan Carlos Rodriguez, that Defendants produce a native file of a July 19, 2012 email from Mr. Collingsworth's Gmail account or provide an explanation as to the whereabouts of the file within 42 hours.

      As you are aware, Defendants previously produced this e-mail to Plaintiff at CS_TC002827-28 and Defendants disclosed the wire transfer that is reflected in this e-mail in January 2015. The production copy of the e-mail was produced from the files of Christian Levesque, an employee of Conrad & Scherer, LLP, who received a forwarded copy of the e-mail from Defendant Collingsworth on the same date, July 19, 2012. As you know, it is the law firm's policy that all emails related to firm business should not be deleted from the Conrad & Scherer server and this email remained on the server.

      The collection and production of this e-mail shows that Mr. Collingsworth's e-mail was preserved. Further, Mr. Collingsworth's decision to forward the e-mail to other Conrad & Scherer employees further demonstrates that there were not intentional efforts to delete the e-mail from the Conrad & Scherer server or his Gmail account. Mr. Collingsworth's decision to forward the e-mail resulted in at least two copies of the e-mail being saved and preserved.

      By today's previously agreed-upon deadline, Defendants have located copies of the e-mail from the files of the others, namely Lorraine Leete and Christian Levesque.

H. Thomas Wells, III
August 27, 2015
Page **2** of **2**

Sincerely,

Robert K. Spotswood

Cc:    Tony Davis, Esq.
        Ben Presley, Esq.

FILED

2015 Aug-31  AM 11:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 5

*Filed under seal pursuant to Stipulated Protective Order*

Defendants Collingsworth and Conrad Scherer, LLP's Privilege Log**
Submitted for *In Camera* Review modified Jan. 9, 2015

Case 1:11-cv-00969-RDP Document 77-52 Filed 02/05/14 Page 228 of 232

Designated as Confidential-Attorneys' Eyes Only

| No. | Privilege Document Number | Related to Document Number | Bates Number - if Produced in Redacted Form | Drummond RFP Number | Date | From | To | CC | Privilege Basis | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 5432 | CSPRIV441863 | CSPRIV441863 | | 4-4; | 05/25/2012 | Perillo, Bob<bob.perillo@gmail.com> | Hager, Eric;<EHager@conradscherer.com>; Collingsworth, Terrence; <TC@conradscherer.com>; | | AWP, CI | Email chain from Bob Perillo to Terrence Collingsworth, Esq. and Eric Hager, Esq. regarding legal strategy and mental impressions. |
| 5433 | CSPRIV441869 | CSPRIV441869 | | 4-4; 2-8; | 07/13/2012 | Collingsworth, Terry<terrypc56@gmail.com> | Cuellar, Francisco<framirez_cuellar@hotmail.com> | | AWP, CI | Email chain from Terrence Collingsworth, Esq. to Francisco Cuellar regarding pending litigation and strategy and communications with Otero. |
| 5434 | CSPRIV441873 | CSPRIV441873 | | 4-5; | 07/18/2012 | Collingsworth, Terrence<terrypc56@gmail.com> | Carrera, <Josephjoseph.carrera@sppi-llc.com> | | AWP, CI | Email from Terrence Collingsworth, Esq. to Joseph Carrera regarding investigation activities and security strategy. |
| 5435 | CSPRIV441874 | CSPRIV441874 | | 4-4; | 07/24/2012 | Collingsworth, Terrence<terrypc56@gmail.com> | Levesque, Christian;<CLevesque@conradscherer.com> Sheridan, Rachel; Hager, Eric; Tellez, Susana Stam, Cristina; Crosby, Maggie | Dahl, Henry | AWP, CI | Email from Terrence Collingsworth, Esq. To Christian Levesque, Rachel Sheridan, Eric Hager, Susana Tellez, Christina Stam and Maggie Crosby regarding mental impressions. |
| 5436 | CSPRIV441876 | CSPRIV441876 | | 4-4; | 07/26/2012 | Collingsworth, Terrence<terrypc56@gmail.com> | Levesque, Christian<CLevesque@conradscherer.com> | | AWP, CI | Email chain from Terrence Collingsworth to Christian Levesque regarding legal strategy related to Drummond litigation and witness testimony. |
| 5437 | CSPRIV441878 | CSPRIV441878 | | 4-5; | 08/02/2012 | Collingsworth, Terrence | Carrera, Joseph | | AWP, CI | Email from Terrence Collingsworth, Esq. to Joseph Carrera regarding investigation activities and security strategy. |
| 5438 | CSPRIV441879 | CSPRIV441879 | | 1-63; | 08/02/2012 | Collingsworth, Terrence<terrypc56@gmail.com> | Van Bilderbeek, Albert<albert@vanbilderbeek.com> | | AWP, CI | Email from Terrence Collingsworth, Esq. to Albert van Bilderbeek regarding legal strategy and mental impressions. |
| 5439 | CSPRIV441881 | CSPRIV441881 | | 4-5; | 08/06/2012 | Collingsworth, Terrence<terrypc56@gmail.com> | Carrera, <Josephjoseph.carrera@sppi-llc.com> | | AWP, CI | Email from Terrence Collingsworth, Esq. to Joseph Carrera regarding investigation activities and security strategy. |
| 5440 | CSPRIV441882 | CSPRIV441882 | | 4-5; | 08/05/2012 | Collingsworth, Terrence<terrypc56@gmail.com> | Carrera, <Josephjoseph.carrera@sppi-llc.com> | | AWP, CI | Email from Terrence Collingsworth, Esq. to Joseph Carrera regarding investigation activities and security strategy. |
| 5441 | CSPRIV441883 | CSPRIV441883 | | 4-5; | 06/06/2012 | Carlson, Mark<mark.carlson@sppi-llc.com> | Collingsworth, Terrence<terrypc56@gmail.com> | | AWP, CI | Email from Mark Carlson to Terrence Collingsworth, Esq. chain regarding payments to Secure Pointe. |
| 5442 | CSPRIV441886 | CSPRIV441886 | | 4-5; | 06/21/2012 | Carrera, J. | Collingsworth, T. | | AWP, CI | Email from Joseph Carrera to Terrence Collingsworth, Esq. regarding investigative work on behalf of Conrad and Scherer. |
| 5443 | CSPRIV441889 | CSPRIV441889 | | 4-5; | 06/21/2012 | Joseph Carrera <joseph.carrera@sppi-llc.com> | Terrence Collingsworth, Esq. <tc@iradvocates.org> | Mark Carlson <mark.carlson@sppi-llc.com> | AWP, CI | Email chain from Joseph Carrera to Terrence Collingsworth regarding payments to Secure Pointe. |
| 5444 | CSPRIV441893 | CSPRIV441893 | | 4-5; | 06/22/2012 | Joseph Carrera <joseph.carrera@sppi-llc.com> | Terrence Collingsworth <tc@iradvocates.org> | | AWP, CI | Email from Joseph Carrera to Terrence Collingsworth, Esq. regarding investigative work on behalf of Conrad and Scherer. |

FILED
2015 Aug-31 AM 11:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 6

***Filed under seal pursuant to Stipulated Protective Order***

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

DRUMMOND COMPANY, INC.                          )
                                                )
        Plaintiffs,                             )
                                                )
v.                                              )   Case No. 2:11-CV-3695-RDP
                                                )
TERRENCE P. COLLINGSWORTH, individually         )
and as an agent of Conrad & Scherer, LLP; and   )
CONRAD & SCHERER, LLP,                          )
                                                )
        Defendants.                             )
                                                )
                                                )

## DECLARATION OF DENNIS WILLIAMS

THE STATE OF TEXAS      )
                        )
COUNTY OF HARRIS        )

I, Dennis Williams, declare as follows:

1. My name is Dennis Williams. I am personally acquainted with and competent to testify

to the facts herein stated. I provide this declaration based on my personal knowledge and can

testify under oath to all of the facts herein.

2. I am a retired Federal Bureau of Investigation (FBI) agent with more than 32 years of law

enforcement experience. In addition to my law enforcement experience at the FBI, I also

became an FBI certified computer forensics examiner responsible for conducting computer

forensics exams, searches, and peer reviews of forensic examinations. I have attended the FBI

Computer Forensic Examiner Boot Camp and participated in other programs and trainings

including, but not limited to, the National White Collar Crime Center for Basic Data Recovery

1

and Analysis, the National White Collar Crime Center for Advanced Data Recovery and Analysis, and the Microsoft Advanced Forensics training.

3. During my time at the FBI, I worked for 9 years in the FBI Washington D.C. headquarters. I served as Supervisory Special Agent providing computer support for field operations and investigations. In this role, I worked with investigators and prosecutors on major cases and provided computer support tailored to the needs of the specific investigation.

4. I then came to Houston (in approximately 1990) and worked on a variety investigations related to White Collar crime, drug cases, and terrorism.

5. In 2000, I became a certified computer forensic examiner for the FBI. One of my tasks was responsibility for collection of electronic information in the Enron investigation.

6. Subsequently in 2005, I became the Director of the Greater Houston Regional Computer Forensics Laboratory (RCFL), which is a multi-agency task force and full service forensics laboratory and training center focused on examining digital evidence in criminal investigations and various types of fraud.

7. I am currently a Partner at Pathway Forensics, LLC ("Pathway"). I joined Pathway in 2008 after my retirement from 32 years of service in the FBI.

8. As a Partner at Pathway, I have extensive experience in e-Discovery, digital forensics acquisitions and analysis. Pathway is licensed as a private investigator. I have provided expert computer forensic services for business and employment disputes, compliance with discovery requests in litigation, investigations of intellectual property theft, family law matters, fraud, and criminal cases.

9. I am currently an EnCase certified examiner (EnCE), which is an internationally recognized computer forensics certification. My resume is attached to this affidavit as Exhibit A.

2

10. Pathway provides digital forensics, computer investigations, electronic discovery and forensics lab consulting services, including the acquisition, authentication and analysis of electronic evidence.

11. Some areas of the work in which I provide these services include:

    a. On-site staffing for e-discovery and/or forensics, including for Fortune 500 companies

    b. Civil litigation support

    c. Foreign Corrupt Practices Act

    d. Intellectual property

**Scope of Engagement**

12. Pathway was engaged in this litigation on behalf of defendants Terry Collingsworth and Conrad & Scherer to do the following:

    a. to attempt to locate certain specific additional electronic data that Conrad & Scherer was unable to find in connection with its recent document search in the above-referenced litigation;

    b. to also review the sufficiency and thoroughness of Defendants initial e-discovery collection efforts; and

    c. to determine after finding any additional information whether any of the information still not located appears to have been intentionally deleted or not.

**Summary of Analysis**

13. Pathway was engaged in February 2015 by attorneys on behalf of Conrad & Scherer and Terry Collingsworth to make this review on a confidential basis.

3

14. At the beginning, we were provided with a description of certain email categories related to Terry Collingsworth that Conrad & Scherer had been unable to locate in a recently conducted search.

15. Despite Conrad & Scherer's large-scale document collection effort and thorough search for documents, it is my understanding that they came to learn that certain electronic data was missing from their document collection.

16. The missing electronic data included:

    a.  Incoming e-mails **only** (not ones that were replied to, forwarded to, or copied to other people, and also not ones that were sent by or copied to other Conrad & Scherer employees) that were sent to Mr. Collingsworth's Conrad & Scherer e-mail account between June 2008 and March 22, 2013, which for some reason did not appear to have been saved on the Conrad & Scherer E-mail Server (despite other emails being saved); and

    b.  Certain e-mails from Mr. Collingsworth's International Rights Advocates e-mail account.

17. We began discussions with IT personnel at Conrad & Scherer to discuss these matters. We did this on-site, by phone, and by remote access. We did this work in connection with servers and laptops in both Conrad & Scherer's Ft. Lauderdale office and Washington D.C. office. We also brought some information back to our Houston office.

18. Our conclusions are preliminary and our investigation is on-going.

19. In the process of our work, we were able to assist Conrad & Scherer personnel in recovering some additional information, not readily available, they had inadvertently missed.

4

Our discussions with Conrad & Scherer also triggered the discovery of an additional back-up file on a decommissioned computer that contained additional information.

20. We were given un-restricted access to system files and infrastructure set up. We did not look at actual content or re-do searches, although we were provided search terms used by Conrad & Scherer and summaries of the number of hits on the initial search terms.

21. There was one specific restriction on our review of actual content governed by a highly restrictive confidentiality order from an unrelated case. We therefore relied upon Juan Carlos Rodriguez, a Conrad & Scherer IT professional, to determine the content and dates of a limited number of those PST files.

22. The Conrad & Scherer computer system had various components where information was stored, including an email server and back-ups. Conrad & Scherer also utilized a third-party-owned cloud-based ShareFile server and maintained email containers on specific individual computers in other offices.

23. The searches that were done across the computer system were redundant. Therefore, that insured the likelihood of not missing any responsive information.

24. However, the initial computer system itself was limited in its ability to do any proximity searches, so the searches had to be done in stages. We only looked at the initial broad search conducted on the exchange server—not later funneling after the initial search results were transferred to other data review systems. We have no opinion on whether the search terms were adequate, but they appeared to be broad and extensive.

25. We were able as a result of our discussion and analysis, to identify some data that had previously not been searched:

5

    a.   Terry Collingsworth's e-mail inbox from the Conrad & Scherer E-mail Server from June 2008 through March 2011. These files were located on a back-up of an old Conrad & Scherer E-mail server that was de-commissioned when the firm migrated from one version of Microsoft Exchange Server to another in 2011. The back-up was not previously searched during Defendants' initial document collection because the IT department reasonably believed that the backup files were duplicative of the files that were later placed on the replacement server during the E-mail migration.

    b.   Terry Collingsworth's e-mail inbox and sent mail from his International Rights Advocates account that covered periods of time between 2008 and 2011. Portions of this from 2010 and 2011 previously had been recovered and searched by Conrad & Scherer as part of their earlier document search. These files were located in a subfolder on the hard drive of a computer used by Mr. Collingsworth's assistant who recently left the firm and whose computer was returned to the Conrad & Scherer IT department. It is my understanding that Mr. Collingsworth initially used the computer for a period of time, but it was later used by his administrative assistant. The IT department discovered the archived e-mail files in February when the returned computer was inspected and a backup copy of the hard drive was created.

    c.   Our discussions triggered the memory of a Conrad & Scherer IT professional regarding an archived e-mail file that contained a very small number of e-mails, which were the results of a specific search of Terry Collingsworth's Conrad &

6

Scherer e-mail files in 2012. The archived file was collected and given to legal counsel for review.

d. Backup e-mail archive files for the exchange server. These files were located on a back-up of an old Conrad & Scherer E-mail server that was de-commissioned when the firm migrated from one version of Microsoft Exchange Server to another in 2011. The awareness of these back-ups came from our conversations with the Conrad & Scherer IT professionals. These types of back-up files are not normally searched during e-discovery collection efforts.

26. While looking for what was not located, we had to review the thoroughness of what had been initially searched. In connection with that effort, we interviewed various IT personnel at Conrad & Scherer to get an understanding of how those earlier searches had been done.

27. After interviewing these people, and after our independent review of the architecture and our review of the actual searches, we were able to reach the conclusion that a thorough and reasonable search had been done in light of the normal standards for electronic discovery.

28. Indeed, our firm does a lot of electronic discovery work and we are familiar with best practices.

29. We understand that this search involved multiple broad searches over several years' worth of data. The additional information we found could easily have been missed despite a thorough search. The additional information was in backups and hard drives that could have easily been overlooked.

30. There is still some data we are continuing to look for. To this point, we have found no evidence of any intentional deletion. For example, some emails to Terry Collingsworth have yet to be located for a specified time period. Generally, when someone is intentionally deleting

7

material, they typically select individual messages to delete. In contrast, the missing data appears to be for all incoming only email in a certain time range in an email inbox. Our understanding is that there was nothing in the Deleted Items folder. That suggests some sort of automatic mechanism in the computer, a manual archiving of email onto a hard drive which is lost, or a problem with migrating the emails from a Mac computer onto the Conrad & Scherer email server or other back-up drive, but so far we are still investigating.

31. We are now reviewing some work tickets from a computer service company in Arlington, Virginia which relate to Terry Collingsworth email.

32. Some of these work tickets show that work was done to archive Collingsworth incoming emails at various times including October 2011. Furthermore, the motivation for the archiving appears to be his email was too full. This appears to indicate an effort to archive the incoming email, which is not consistent with any intent to delete the email. Furthermore, there are indications that the email was archived. Our investigation is continuing on that issue. This may well have been a situation where everyone involved thought it was preserved.

**Preliminary Conclusions**

33. In response to our first task on finding additional information we were successful in locating some additional decommissioned devices that contained potentially responsive data, as explained above. In my opinion, it is reasonable and understandable that these were not initially found despite a thorough search.

34. In response to our second task of reviewing the thoroughness of the initial search, we were able to reach the conclusion that a thorough and reasonable search had been done in light of the standards for electronic discovery.

8

3613940v1/014368

35. As to our third task, our preliminary conclusion is that we have not yet found any evidence of an intentional deletion of missing data. However our investigation is ongoing, and we have not yet reached a final conclusion.

36. Pathway is continuing its investigation to determine if any of the electronic data referenced above can be located and restored.

I declare under the penalty of perjury that the foregoing is true and correct.

FURTHER, AFFIANT SAITH NOT.

DENNIS WILLIAMS

SUBSCRIBED AND SWORN TO BEFORE ME, a Notary Public, by DENNIS WILLIAMS, on this 11th day of March, 2015, to certify which witness my hand and seal of office.

Notary Public in and for the State of Texas

MICHAEL A. LEONE
Notary Public, State of Texas
Commission Expires 09-24-2018

My Commission Expires:_____

9

3613940v1/014368

FILED

2015 Aug-31  AM 11:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 7

*Filed under seal pursuant to Stipulated Protective Order*



# STROZ FRIEDBERG

Prepared for
Drummond Company

Prepared by
Spencer Lynch

August 18, 2015

## DECLARATION OF SPENCER LYNCH

## DRUMMOND COMPANY
## V.
## TERRENCE P. COLLINGSWORTH, ET AL.

# TABLE OF CONTENTS

I.   Scope of Declaration ......................................................................................................... 5

II.   Materials Reviewed ........................................................................................................... 6

III.  Executive Summary .......................................................................................................... 7

IV.  Analysis ............................................................................................................................ 8

   A.    The analysis performed by Mr. Williams appears to contradict his claim that there were no intentional deletions ........................................................................................................................... 9

      1.    Mr. Williams identified, but did not investigate, multiple deletions of email ................................. 10

         I.    Mr. Williams analysis identified email files in the Recycle Bin that he does not further investigate or discuss in his declarations ........................................................................................................... 10

         II.   Mr. Williams identified and discussed a deletion in the Williams April Declaration but does not address whether the deletion was intentional ................................................................................ 12

      2.    A comparison of data across different sources to determine each sources relative completeness does not appear to have been performed ............................................................................................. 13

      3.    Mr. Williams identifies email backups but does not describe any analysis of them .................... 14

      4.    Mr. Williams' conclusion ignores multiple pieces of evidence that are contradictory to his analysis 15

   B.    The efforts to backup email do not appear reasonable and were clearly not effective .................. 15

      1.    The Evidence Mr. Williams provides in the Williams April Declaration does not support, and appears to contradict, his conclusion that the efforts were reasonable ................................................. 16

      2.    Mr. Williams' characterization of Mr. Collingsworth's beliefs is inconsistent with his beliefs about the reliability of witnesses ............................................................................................................. 17

      3.    Contemporaneous information shows that Defendants were aware that emails were not stored on the server ............................................................................................................................. 18

      4.    Defendants appear at least partly responsible for the email archiving setup that Mr. Williams states is the cause of the email loss ...................................................................................... 19

      5.    Mr. Williams' conclusion that an Auto-Archive Rule resulted in the loss of email is contrary to the evidence ..................................................................................................................... 20

      6.    The external hard drive that likely contained emails "too sensitive" was available to Defendants on multiple key dates, but is now purportedly lost ............................................................... 22

DECLARATION OF SPENCER LYNCH

7.    Emails produced by Defendants in October 2013 contradict Mr. Williams narrative and suggest defendants had emails on the external hard drive and on the server after they were purportedly lost 24

C.    The Williams declarations have multiple statements that are unclear, unsupported, or contradicted by his own analysis ........................................................................................................ 26

   1.    Mr. Williams' discussion of the deleted folder contains at least two substantial issues ............. 26

   2.    Mr. Williams does not provide any clarity and may mislead the reader about how many devices were used by Mr. Collingsworth ...................................................................................... 27

   3.    Mr. Williams mischaracterizes the remaining gaps of email and does not analyze other potentially relevant accounts. ................................................................................................ 29

      I.    Mr. Williams mischaracterizes the email gaps ...................................................... 30

      II.    The use of the Verizon account may mean that neither the Conrad & Scherer server nor the IRAdvocates server ever contained all of the email ...................................................... 31

      III.    Mr. Williams does not discuss any analysis of the Gmail account or Dropbox account ......... 32

      IV.    Mr. Williams describes no analysis of the International Labor Rights Forum email address .. 33

V.    Conclusion ................................................................................................. 33

DECLARATION OF SPENCER LYNCH

1.      Stroz Friedberg, LLC ("Stroz Friedberg") was retained by Starnes Davis Florie LLP

("Counsel"), counsel for Drummond Company, Inc. ("Drummond") in connection with a litigation

captioned *Drummond Company v. Terrence P. Collingsworth, et al.*, Case No 2:11-CV-03695-RDP-

TMP in the United States District Court for the Northern District of Alabama.  Stroz Friedberg was

retained to assist in the analysis and attempted recovery of potentially relevant data (including emails)

associated with the Defendants, Terrence Collingsworth and Conrad & Scherer, which has been

disclosed as missing or otherwise lost.  Stroz Friedberg understands that the deletion and recovery of

this data is at issue in another litigation involving Mr. Collingsworth (Juana Perez 1A, et al v Dole Food

Company et al, Case No BC412620 in the Superior Court of the State of California for the Country of

Los Angeles).  I, Spencer Lynch, have filed a declaration in that other case.

2.      Established in 2000, Stroz Friedberg is an international firm specializing in digital

forensics, electronic discovery, data breach and cybercrime response, security science, and business

intelligence services and investigations. Stroz Friedberg's management includes former federal and

state prosecutors and former law enforcement officers with both government and private-sector

experience in traditional and cyber-based investigations, digital forensics, data preservation and

analysis, infrastructure protection, and electronic discovery. Many of its staff of digital forensic

examiners, electronic security professionals, electronic discovery specialists, and private investigators

joined Stroz Friedberg following careers in law enforcement, the intelligence community, and consulting.

3.      I, Spencer Lynch, am a Director of Digital Forensics for Stroz Friedberg and work out of

the firm's London office. In this role, some of my responsibilities include co-managing the company's

digital forensic practice, developing policies and procedures for the forensic team, managing the

development of the company's capabilities through the acquisition of tools and both internal and

external training programs for its employees, and directly managing the forensic staff in the company's

international forensic departments in London, Hong Kong, and Switzerland.

4.      In my role at Stroz Friedberg, I maintain an active case load of digital forensic

engagements in internal investigations and civil, criminal, and regulatory matters relating to (but not

limited to) document authentication, database analytics, the theft or misappropriation of data, and

4

investigations into computer intrusions or hacking. I am frequently involved in large electronic discovery matters, including the preservation, analysis, and processing of data from laptop computers, desktop computers, servers, removable media, and mobile computing devices such as cellphones, smartphones, and tablets. I have testified as an expert in digital forensics in United States District Courts for the Northern, Eastern, and Southern Districts of New York, the Royal Courts of Justice in the United Kingdom, and in an international arbitration under the UNCITRAL rules.

5.      Prior to joining Stroz Friedberg, I worked for Ernst & Young performing forensic analysis and database analytics within a fraud investigations group. I obtained a B.A from Duke University in Computer Science and Public Policy and a minor in Psychology. My CV setting forth my qualifications in more detail is set forth as Exhibit 1.

## I.    SCOPE OF DECLARATION

6.      As described above, Stroz Friedberg was retained by Counsel to assist in the analysis and attempted recovery of data associated with Mr. Collingsworth and Conrad & Scherer. For this declaration, I have been asked to review documents (described below) produced to Drummond by Defendants and their counsel, documents produced by Mr. Dennis Williams, a computer forensics expert hired by Defendants to assist in the recovery and analysis of their emails, and the transcript and exhibits of a deposition of Mr. Williams.  I have been asked to determine whether the opinions offered by Mr. Williams were supported by his analysis and whether his analysis was complete.

7.      I have not been provided access to any electronic evidence underlying the claims in the documents produced by Mr. Williams. I understand from Counsel and the documents produced by Defendants' counsel that counsel for Mr. Collingsworth and other defendants in the case undertook a review in an effort to identify whether any of the missing emails could be recovered. I further understand that, a Mr. Williams, was engaged by Defendants and their counsel to assist in that effort and to offer opinions that may shed light on whether the emails were missing as a result of reasonable or routine computer maintenance and whether or not there is evidence of intentional deletion of any emails or other electronic data.

5

8.    As part of my review of these documents, I have been asked, by Counsel, to review the documents and offer an opinion regarding the extent to which the evidence supports Mr. Williams' contention that all missing emails are the result of reasonable and routine computer maintenance. Further, I have been asked to identify whether or not Mr. Williams' work appears complete, follows generally accepted best practices, and whether his opinions are supported by the analysis he offers. This declaration sets forth my opinions on those topics. I reserve the right to supplement this declaration if new information becomes available to me or if I am asked to address different topics.

## II.    MATERIALS REVIEWED

9.    In producing this declaration, I reviewed and relied on the following materials:

a.  A letter from Steptoe & Johnson dated March 12, 2015 (the "March 12 Letter");

b.  Exhibit A to the March 12 Letter, a declaration by Dennis Williams dated March 11, 2015 (the "Williams March Declaration");

c.  A letter from Steptoe & Johnson dated April 14, 2015 (the "April 14 Letter");

d.  A declaration by Dennis Williams dated April 14, 2015 (the "Williams April Declaration") that attaches 28 exhibits labelled A to BB;

e.  Drummond's Motion for Spoliation Sanctions and corresponding exhibits (the "Motion for Sanctions");

f.  Defendant's response to the above motion, and corresponding exhibits (the "Response to Motion for Sanctions"), including a declaration of Dennis Williams dated August 13, 2015 (the "Williams August Declaration");

g.  The transcript from a June 30, 2015 deposition of Mr. Williams, and corresponding exhibits (the "Williams Deposition");

h.  A declaration of Christopher Niewoehner dated July 15, 2015;

i.  A bundle of documents produced by Mr. Williams bearing bates numbers CS TC009354 to CS TC012296 (the "Williams Document Production");

j.  A selection of documents produced by counsel for Defendants in October 2013 bearing bates numbers CS000715 to CS1245;

k.  An Order dated April 4, 2014 signed by Judge R David Proctor (the "April 4, 2014 Order");

l.  An email dated June 14, 2012 forwarding an email dated September 13, 2011 bearing bates number CS002673; and

m.  Documents reflecting the dates of certain events in the litigation.

6

10.     I have not been provided access to any of the devices that Mr. Williams purports to have analyzed.

## III.    EXECUTIVE SUMMARY

11.     My review of the Williams March Declaration, Williams April Declaration, Williams August Declaration, Williams Document Production, and Williams Deposition identified that the work described by Mr. Williams appears incomplete and at times contradictory. Most significantly, Mr. Williams does not offer sufficient evidence to support his conclusion that "there is no indication that emails or computers were intentionally disposed of or deleted to destroy evidence" (Williams April Declaration at 21). Instead, the analysis he performed but did not describe in his declarations identified evidence contradictory to his opinion regarding likely intentional deletions and disposal of emails.  In one instance, Mr. Williams' analysis identified deleted emails he described as having "recent activity in 12/2014 which is not good." (CS TC009737).  Significantly, these emails appear to be located on Mr. Collingsworth current desktop computer. Some of the emails he was referencing in this sentence were located in the Recycle Bin of the computer, a location commonly associated with intentional deletions by a user.

12.     Moreover, I disagree with Mr. Williams that "there is overwhelming evidence reflecting Collingsworth's email problems and the reasonable efforts that were taken… to save or back-up his electronic information…" (Williams April Declaration at 22). While Mr. Williams does describe some of the evidence of email problems, the very facts he presents suggest that the efforts to back-up information were not reasonable and clearly not effective at preserving that electronic information. Moreover, he stated in his deposition that the first thing he would tell a client to do when facing a newly filed lawsuit "would be putting in place a litigation hold." (Williams Deposition @ 85:17-24).  Given his view as to the importance of litigation holds, the fact that he was aware of no such process calls into question his stated opinion.  Additionally, he ignored evidence contradictory to his opinions about the loss of the MacBook laptop and an external hard drive. When that evidence is considered, the handling

7

of those devices does not reflect reasonable efforts to preserve data and, as it relates to his first conclusion, may be evidence of the intentional disposal of data.

13.     Finally, Mr. Williams' narrative appears to be based largely on unsubstantiated claims that are not cited, described vaguely, and at times appear to confuse the subject of discussion, making it difficult to determine what has actually happened. His declarations do not contain the type of technical details I would expect in a computer forensics report, such as identifying information about the computers or email accounts he examined, the methodology he employed, and the names and versions of software in scope for his analysis. In setting forth this declaration, I have attempted to make clear what can be determined from the facts and narratives that Mr. Williams provides and those found in the letters from Steptoe and Johnson.

14.     In my opinion, the analysis described by Mr. Williams is incomplete. Nonetheless, based on a review of what was done, I believe that the conclusions offered by Mr. Williams are contradicted by the evidence he reviewed.

## IV.    ANALYSIS

15.     Mr. Williams' analysis resulted in three primary findings that he sets forth in the Williams April Declaration. First, he found that "Conrad & Scherer did in fact possess emails for certain time periods that were identified as missing in [his] March 11, 2015 Preliminary Report" (Williams April Declaration at 17) but that "some narrow gaps of missing emails remain." (Williams April Declaration at 19). Second, he concluded that "there is no indication that emails or computers were intentionally disposed of or deleted to destroy evidence." (Williams April Declaration at 21). Third, he concluded that "there is overwhelming evidence reflecting Collingsworth's email problems and the reasonable efforts that were taken by Collingsworth and his assistants to save or back-up his electronic information." (Williams April Declaration at 22).

16.     While Mr. Williams' analysis appears to have located additional emails, as set forth herein, I disagree with the opinions he offers. However, beyond allowing me to identify inconsistencies and issues with his analysis, the incomplete analysis and extremely limited amount of technical detail

8

he provides in his declarations makes it impossible for me to state with certainty what did in fact occur with Mr. Collingsworth's emails and whether or not any more emails are recoverable. The Williams Document Production includes more technical information than the declarations, but that information is also extremely limited. Set forth herein are examples of the problems with Mr. Williams' analysis highlighting where his work appears incomplete, unsupported, or contradicted by the very evidence he cites or possessed.

17.     In considering the dates and facts herein, it is important to consider the timing of events in this litigation, as some of the events described herein related to the loss of email are in close temporal proximity to events in the litigation. I understand that this litigation was filed in 2011 (Motion for Sanctions at page 7), the First Request for Production of Documents was served on February 28, 2013 (Motion for Sanctions at page 10), and a subsequent request for production was served on May 1, 2013 (a Request for Production dated May 1, 2013). I understand from Counsel that the first document production from Defendants counsel was received on October 3, 2013, and included documents reflecting that they had been printed in September 2013 (e.g. CS000806, CS000831, and CS001100). I further understand that on April 3, 2014, April 4, 2014, and April 21, 2014, the Court ordered Defendants to preserve all electronic data, emails, computers, and hard drives in their present form (Motion For Sanctions at page 29, April 4, 2014 Order).

## A. THE ANALYSIS PERFORMED BY MR. WILLIAMS APPEARS TO CONTRADICT HIS CLAIM THAT THERE WERE NO INTENTIONAL DELETIONS

18.     Mr. Williams claims that there are no indications of intentional deletions. (Williams April Declaration at 21). Much of the support for his view originates from emails and service tickets. It is not made clear in his declaration whether he reviewed all emails and service tickets available, or if instead he was just provided those that support the narrative adopted in his declarations. He does not offer any forensic evidence to corroborate the majority of information in those documents. By his own admission, three of the four earliest known computers are not available to him (Williams April Declaration at 36).

9

1. MR. WILLIAMS IDENTIFIED, BUT DID NOT INVESTIGATE, MULTIPLE DELETIONS OF EMAIL

   I. MR. WILLIAMS ANALYSIS IDENTIFIED EMAIL FILES IN THE RECYCLE BIN THAT HE DOES NOT FURTHER INVESTIGATE OR DISCUSS IN HIS DECLARATIONS

19. Contrary to his opinion, the Williams Document Production highlights that Mr. Williams identified deletions of email but did not discuss them in his first two declarations. Specifically, one of the documents produced in the Williams Document Production was an email dated April 2, 2015 he sent discussing deleted emails, which describes that he "highlighted four possible files" and "they have recent activity in 12/2014 which is not good."(CS TC009737). That email attaches a chart with 451 lines, one of which is a header row (CS TC009739 - CS TC009969). Many of those rows reference deleted email files with activity in December 2014. He does not describe in the email why he says the date is "not good", but presumably it is because the recent activity means that the files must have been recently deleted.

20. In his deposition and in the Williams August Declaration, Mr. Williams described that it was possible for a file to be in the chart as deleted when an active copy of that file still exists because of the way the "Recover Folders" process he used operates. (Williams Deposition at 216:9 – 217:5, Williams August Declaration at 36). The way Recover Folders operates, it is possible for the process to misidentify a file as deleted when it, in fact, it has not been deleted. In order to determine whether that is the case, it is necessary to identify an active copy of that file through forensic analysis. Mr. Williams asserts that "most of [the 450 email files in the chart] were still active" but he provides no support for his statement. (Williams August Declaration at 36g). He also admits that of those 450 email files, four PST files "do not have corresponding active files." (Williams August Declaration at 36g). That admission provides evidence that is contradictory to his opinion.

21. Two of the four PST or OST files he highlighted in the chart attached to his email are PST files that were contained in the Recycle Bin. (CS TC009739 - CS TC009969, Lines 3 and 5). The Recycle Bin is a special folder on a Windows computer that holds files that have been selected to be deleted, but which have not yet been marked as deleted on the hard drive. Generally, in my experience,

10

files in the Recycle Bin are there as the result of a specific user action to delete files. The fact that these files are in the Recycle Bin would not be impacted by the Recover Folders process that Mr. Williams describes.

22.     It does not appear that Mr. Williams or his associates performed any further analysis of the circumstances of these deletions. In a reply to Mr. Williams' email, one of Mr. Williams' colleagues, Mr. Chris Graham, stated that "the only one worth going after is maybe the IRA ost which is most likely just duplicative data from the active OST." (CS TC010011). In that sentence, Mr. Williams' colleague appears to discount any further analysis of these deleted files and of whether or not the deletions were intentional. The one file he suggests "maybe" worth pursuing he also appears to discount on the assertion that it is "most likely duplicative."  The declarations and Williams Document Production do not provide any analysis to support these assertions, and as described herein, an analysis comparing sources of email to determine if different sources are fully duplicative would be a worthwhile exercise to have conducted.

23.     Mr. Williams states in the Williams August Declaration that "all four of these [deleted] PST files were provided to Defendants' e-discovery vendor for processing in this matter." (Williams August Declaration at 36h). However, it is not clear how that would have been possible given the circumstances. In order for the files to be successfully processed, Mr. Williams and his colleagues would have had to successfully recover the files in full. In Mr. Graham's email, he states that one of the deleted PST files "will export but the [other] will not" (CS TC010011). As such, it does not appear that Mr. Williams or his colleagues could recover the files such that they could be processed by the e-discovery vendor.

24.     Regardless of whether they could be recovered, Mr. Williams' explanation does not discuss whether the deletions were intentional. As set forth herein, I do not have access to the forensic evidence analyzed by Mr. Williams and cannot perform an analysis of the circumstances surrounding the deletions. However, based on the information I do have, the evidence (which was highlighted by Mr. Williams in his spreadsheet) suggests that there was in fact an intentional deletion of some amount of email in or around December 2014 on one of the Collingsworth computers.

11

II.    MR. WILLIAMS IDENTIFIED AND DISCUSSED A DELETION IN THE WILLIAMS APRIL DECLARATION BUT DOES NOT ADDRESS WHETHER THE DELETION WAS INTENTIONAL

25.    In another instance, where Mr. Williams does discuss the deletion of email in the Williams April Declaration, his analysis leaves open more questions than it answers. Specifically, Mr. Williams states that he identified "some emails in a deleted folder on a hard drive connected to a server in the Conrad & Scherer DC Office" (Williams April Declaration at 18). Mr. Williams speculates that those emails may have been stored on the server as part of an email migration (Williams April Declaration at 48). Because Mr. Williams doesn't provide any metadata for the emails, it is not possible for me to assess whether there is any merit to that theory. However, as described later, the email migration was for different email accounts than were found in this deleted folder, so, on its face, it seems unlikely that the email migration in 2008 is linked to the emails he found. More importantly, despite the fact he identified a deleted folder containing email, he offers no analysis about the circumstances of its deletion.

26.    The identification of a deleted folder on a server should, in and of itself, give cause for further analysis given that the question of purposeful user deletions is a key substantive issue in this matter. Generally speaking, I would not expect a folder containing a user's email and its contents to be deleted without some action by a user. Therefore the initial observation of the deletion merits additional analysis.

27.    The fact that Mr. Williams actually identified relevant email material from this deleted folder compounds the need for deeper analysis, to determine, if possible, how and why this email material came to be deleted. The results of such further analysis could potentially impact Mr. Williams's conclusion that "[t]here is no indication that emails…were intentionally...deleted to destroy evidence." (Williams April Declaration at 21). If Mr. Williams reached this conclusion having performed the kind of forensic analysis described below, I would expect that this work would be detailed in his declaration. If this work was not performed, however, then the analysis set forth in the Williams April Declaration

would not support his conclusion, and would leave open questions. I am not aware of any evidence in the Williams Document Production that such analysis was performed.

28.     It is often possible, through forensic analysis, to determine when files and folders were deleted, how they were deleted, and by what user they were deleted. For files deleted through being sent to the Recycle Bin on a Windows computer, like those described above, that information is tracked and recorded by the operating system. For files deleted in other ways, or where that information has been overwritten, it is sometimes possible, using other information, to strongly infer those details. For instance, if files were accessed on a certain date, one can generally infer that the files must have been deleted after that date, and if files were deleted during a time period that only one user had access to the computer, one can generally infer that they must have been deleted by that user.

29.     Mr. Williams provides neither his own such analysis nor the information necessary for me to perform the analysis. As a result, it is not possible to determine, based on the information provided, when these files were deleted, by whom, or how. He also does not describe when they were created on the server. His speculation that they were created as part of an email migration may be the reason he chose not to investigate this deletion, but as described herein, that speculation regarding the migration appears unfounded and unlikely to be correct.

## 2.   A COMPARISON OF DATA ACROSS DIFFERENT SOURCES TO DETERMINE EACH SOURCES RELATIVE COMPLETENESS DOES NOT APPEAR TO HAVE BEEN PERFORMED

30.     In addition to not investigating or disclosing the deletion of emails, there are other analyses that Mr. Williams did not appear to perform (or did not disclose) that I would expect him to perform, and that I believe are necessary to support his opinions. One such analysis is a comparison of the emails that have been located from different sources to one another in an effort to determine the relative completeness of each source. This analysis would be informative in assessing the claim in the March 12 Letter that "[a]ll of the *outgoing* emails sent from the Collingsworth Account were preserved on the Conrad & Scherer E-mail Server". (March 12 Letter, page 6, emphasis in original).

13

DECLARATION OF SPENCER LYNCH

31.     When email for the same account is located in multiple sources, it is possible to compare those sources to determine whether they have the same emails, or if one or more of the sources contains emails that are not in another source.  If one source has emails that are not in any other source, that is evidence that the other sources are not complete.  In order to fully support Steptoe & Johnson's claim that all of the email from a given time period was found in a given source, the analysis would have to show that no other data source has an email in that time period that is not found in that source. There is no discussion of that comparison, and it is thus not possible to know whether or not the claim that all outgoing email was stored "on the Conrad & Scherer E-mail Server", or any other similar claim, is supported.

32.     Mr. Williams, in fact, admits that it is not possible from his analysis to know whether "all" emails have been recovered from the time periods that he says they were. In his deposition, he stated in reference to one time period for which he alleges that all emails have been received that "there may have been a few emails deleted." (Williams Deposition at 71: 18-19). When questioned whether he could testify that Defendants had all of Mr. Collingsworth's emails from a given day, he admitted that he admitted that he did not "know whether [he had] every email from that day." (Williams Deposition at 69:1-3).

3.  MR. WILLIAMS IDENTIFIES EMAIL BACKUPS BUT DOES NOT DESCRIBE ANY ANALYSIS OF THEM

33.     The letters and declarations provide very little information about or analysis of the email backups that may exist. While Mr. Williams and Steptoe & Johnson are correct that backups can be very expensive if all backups are reviewed (March 12 Letter at Page 4), the assertion downplays the value such backups can have in conducting the type of analysis he was asked to perform. Similar to the analysis described above, comparing information in backups to the emails that have been recovered to date could prove to be valuable in quantifying how much email has been recovered and in helping assess whether there is value in restoring other backups.

14

34.     Depending on the type and number of backups, it may be possible to perform that comparison on a very targeted basis such that it is not unduly burdensome. To offer opinions as to a worthwhile strategy to investigate the backups, I would need additional information about what backups exist. While I would generally expect an exercise such as the one conducted by Mr. Williams to include interviews and information gathering about how frequently backups are made, how long they have been retained, whether any routine destruction of backups has ceased as part of a litigation hold, and the technology necessary to restore data from those backups, Mr. Williams does not provide any such information in his declaration.  In addition, Mr. Williams provides no information regarding whether a targeted search of the backups was considered and, if so, why it was rejected. Instead, Mr. Williams only identifies that backups exist and that they had not been searched (Williams March Declaration at 25b).

### 4.  MR. WILLIAMS' CONCLUSION IGNORES MULTIPLE PIECES OF EVIDENCE THAT ARE CONTRADICTORY TO HIS ANALYSIS

35.     In addition to the evidence set forth above, there is evidence, described fully below, that Mr. Collingsworth should have been aware that disposing of his MacBook would result in the loss of emails. Therefore, the loss of that MacBook may well have been an intentional disposal of data. Similarly, the loss of an external hard drive, also described below, occurred extremely recently and no corroborated explanation for its loss has been provided. With the questions left unanswered by Mr. Williams' analysis, it is not possible to know how much email can be recovered, how email was lost, and how much email was lost through intentional destruction or disposal. Nonetheless, the evidence that has been provided shows it is possible that there were multiple instances of intentional destruction or disposal of email data.

### B.  THE EFFORTS TO BACKUP EMAIL DO NOT APPEAR REASONABLE AND WERE CLEARLY NOT EFFECTIVE

36.     In the Williams April Declaration, Mr. Williams offers the opinion that "Collingsworth's efforts to save and/or transfer his electronic information, including emails, from old computers to replacement computers were reasonable." (Williams April Declaration at 126). Instead of any fault for the missing emails resting on Mr. Collingsworth or Conrad & Scherer, Mr. Williams assigns the fault to third-party IT support personnel and states that "[i]t appears that third-party IT support personnel failed to properly transfer some of Collingsworth's emails from one computer to a replacement computer…" (Williams April Declaration at 127). I do not agree with Mr. Williams' assessment that Mr. Collingsworth's efforts were reasonable based on the information provided.

1.  THE EVIDENCE MR. WILLIAMS PROVIDES IN THE WILLIAMS APRIL DECLARATION DOES NOT SUPPORT, AND APPEARS TO CONTRADICT, HIS CONCLUSION THAT THE EFFORTS WERE REASONABLE

37.     Based on the narrative Mr. Williams provides, there were multiple instances where Mr. Collingsworth and others at Conrad & Scherer held and expressed concerns about the third party IT support personnel or had identified failings in their ability to preserve his emails, yet Mr. Collingsworth did not appear to take any action and allowed emails to continue to be lost. In my opinion, that is not consistent with reasonable efforts to save electronic information. Particularly given those concerns and past failings, a reasonable step would have been for Defendants to check that emails had been properly transferred to a new computer and preserved before giving away or destroying the old computer. Moreover, the instruction to not transfer emails from the MacBook resulted in the loss of a substantial amount of information, and apparently was a decision made by Mr. Collingsworth himself.

38.     As of December 22, 2010, it was apparent that there were problems with the third-party IT support CTSS not archiving email properly, yet Defendants appeared to continue with the same arrangement. (Williams April Declaration at 65). Again almost a year later, on November 22, 2011, Mr. Collingsworth himself appeared to express some concern that CSC/CTSS was not in a position to assist as he required (Williams April Declaration Exhibit W).

16

39. Furthermore, an email dated January 20, 2012, shows that Mr. Collingsworth knew that he could not access an external hard drive on which he believed email had been archived (Williams April Declaration at 98d and Exhibit X).

40. Despite these concerns, Mr. Collingsworth apparently made no effort to validate that he could access historical email after changing computers. Checking that e-mail had been transferred would merely require Mr. Collingsworth to see if he could still access his historical emails on his new computers. This apparent failure to validate that email had been transferred shows that these actions were not reasonable particularly given that on March 30, 2010, Mr. Collingsworth received an email that stated "it is possible that something did not get copied over. This is a common occurrence…." (Williams April Declaration at Exhibit G). That email shows that Mr. Collingsworth was aware that it was common for email transfers to fail or be incomplete, and he should have been checking that they were performed properly.

41. Moreover, Mr. Collingsworth's instruction not to transfer email from the MacBook was reckless given his past experiences. (Williams April Declaration Exhibit BB). According to Mr. Williams, that decision resulted in the loss of a substantial amount of email.

## 2. MR. WILLIAMS' CHARACTERIZATION OF MR. COLLINGSWORTH'S BELIEFS IS INCONSISTENT WITH HIS BELIEFS ABOUT THE RELIABILITY OF WITNESSES

42. Mr. Williams' characterization of Mr. Collingsworth's instruction is also misleading about the evidence he cites. In no place in the document Mr. Williams cites does Mr. Collingsworth provide any justification for his decision, yet Mr. Williams adopts the justification that Mr. Collingsworth thought his emails were stored on the server. (Williams April Declaration at 115). None of the documents relied upon by Mr. Williams indicate where Mr. Collingsworth believed the emails were stored when he made the decision. Mr. Collingsworth simply says not to transfer his documents.

43. In his deposition, Mr. Williams states that his opinion that Mr. Collingsworth believed that the emails were stored on the server came from talking to Mr. Collingsworth "on a limited extent." (Williams Deposition at 161:16-19). Mr. Williams did not have any other evidence to corroborate Mr.

Collingsworth's statements. (Williams Deposition at 162:20 – 163:4). This appears at odds with Mr. Williams experience "during [his] years as an investigator." (Williams Deposition 153:18-22). In his deposition, Mr. Williams stated that "contemporaneous information… can be more reliable than information provided years later." (Williams Deposition 153:18-22). In this instance, however, it appears that instead of relying on contemporaneous information he relied on statements made years later. In fact, the contemporaneous evidence shows that Mr. Collingsworth was told that archiving emails "removes emails from your Inbox & off the server, and stores them locally on your computer." (Williams April Declaration at Exhibit N).

### 3. CONTEMPORANEOUS INFORMATION SHOWS THAT DEFENDANTS WERE AWARE THAT EMAILS WERE NOT STORED ON THE SERVER

44. Contrary to his statement, Mr. Collingsworth and his firm were, in fact, aware that some email was stored only on the MacBook, and that these emails were not being backed up or archived in a separate location. Documents provided as part of the Williams Document Production set out several email communications that evidence this.

45. Emails sent between two Conrad & Scherer employees in June 2012 demonstrate a shared understanding that emails stored on Mr. Collingsworth's MacBook were only stored on and accessible from the MacBook itself. On June 15, 2012, in the course of searching for emails between Mr. Collingsworth and two specific individuals,[1] Mr. Collingsworth's assistant, Maggie Crosby, requested the assistance of the Director of IT at Conrad & Scherer, Juan Carlos Rodriguez. (CS TC011131 – CS TC011132). Once Mr. Rodriguez had assisted by providing the results of his searches, Ms. Crosby then asked whether he could tell her "how to look on [Mr. Collingsworth's] mac also," implying that she knew that email on the MacBook was not also stored on the server, and thus would not have been included in the original search. (CS TC011131 – CS TC011132). Mr. Rodriguez subsequently told Ms. Crosby that he "cannot get anything from [Mr. Collingsworth's MacBook],"

---

[1] I understand from Counsel that these two individuals were Jaime Blanco and Ivan Otero.

because he did not have the device. (CS TC011131 – CS TC011132). This exchange makes clear that Defendants knew and understood that for at least some of Mr. Collingsworth's email it was not stored on and could not be accessed from the Conrad & Scherer server.

46.    Moreover, a similar email exchange on the same subject, one day earlier on June 14, 2012, establishes that Mr. Collingsworth himself knew that some email was stored exclusively on his MacBook. Following Ms. Crosby's request about "the best way" to search through "ALL [Mr. Collingsworth's] old emails," Mr. Rodriguez copied in Mr. Collingsworth to his response. Mr. Rodriguez explained in his response to both Mr. Collingsworth and Ms. Crosby that the "old emails are in the mac." (CS TC011130). These contemporaneous email exchanges make clear that Defendants would have been aware that emails on his MacBook laptop were not stored anywhere else.  In fact, the evidence shows that Mr. Collingsworth himself likely acted on this information from Conrad & Scherer's IT Director. At 1:26PM on June 14, 2012, less than three hours after Conrad & Scherer's IT Director told him that his "old emails in the mac", Mr. Collingsworth forwarded to Ms. Crosby an older email from September 2011 that was between Mr. Collingsworth and oteromivan@hotmail.com, one of the email addresses for which Ms. Crosby was searching for emails. (CS 002673).

### 4.    DEFENDANTS APPEAR AT LEAST PARTLY RESPONSIBLE FOR THE EMAIL ARCHIVING SETUP THAT MR. WILLIAMS STATES IS THE CAUSE OF THE EMAIL LOSS

47.    Mr. Williams places the fault for many missing emails on an auto-archive rule that, in his opinion, "was put in place by CTSS." (Williams August Declaration at 33). But for this rule, Mr. Williams says that incoming emails from both IRAdvocates and Conrad & Scherer "for the period between March 2011 and March 2013 would still be on the servers." (Williams August Declaration at 34). Mr. Williams' assignment of fault to CTSS ignores the issue as to whether or not CTSS were acting at Mr. Collingsworth's direction in setting up the rule, if such a rule existed. If the rule existed (as discussed later, Mr. Williams' opinions on this issue are not supported by the evidence), the evidence does show that Mr. Collingsworth was involved in the decision about archiving. Specifically, service tickets

demonstrate that Mr. Collingsworth, and not CTSS, was the cause of delays and inaction in setting up a robust email backup solution on the MacBook.

48.     First, a service ticket initiated on March 29, 2011 describes that a quote for a third party provider named AppRiver had been sent to Conrad & Scherer. As described in the ticket, AppRiver was being recommended to provide "email backup as a more reliable option." According to the remarks, two follow up emails were subsequently sent by CTSS on May 4, 2011, and May 26, 2011. No response was received. The ticket was closed on May 31, 2011, 'until the client [was] ready to proceed'. (CS TC009462).

49.     Another service ticket regarding email archiving and backup indicates that Mr. Collingsworth himself spoke with Vickie Shores at CTSS on December 1, 2011, and had agreed to call back once he had decided how he wanted to proceed. There is no evidence in this service ticket to suggest that a subsequent conversation occurred, and the ticket was closed. (CS TC009468). These two service tickets demonstrate both that Mr. Collingsworth was aware of the need for, and availability of, alternatives for archiving email on his MacBook, and that he delayed solutions that would have safeguarded the email from this period.

50.     Finally, in another instance, on November 22, 2011, Mr. Collingsworth rejected a proposal to back up his email to a "cloud" based backup service, insisting instead that email be placed on an external hard drive. His stated justification for this was because his email was "too sensitive." (Williams April Declaration Exhibit W) If that is indeed true, I would expect that the hard drive would be stored safely to protect its contents. As described herein, it appears the external hard drive used by Mr. Williams was recently lost.

5.  MR. WILLIAMS' CONCLUSION THAT AN AUTO-ARCHIVE RULE RESULTED IN THE LOSS OF EMAIL IS CONTRARY TO THE EVIDENCE

51.     Mr. Williams, in discussing the "Auto-Archive Rule" on the MacBook, states "Collingsworth outgoing IRAdvocates emails between May 17, 2011 and October 17, 2011 likely would not be missing if this sort of setting had not been enabled." (Williams August Declaration at 23).

However, he does not actually provide any evidence that the rule existed or who enabled it.  He acknowledges this in saying that "if this kind of setting for Mr. Collingsworth's outgoing IRAdvocates emails were enabled, it is likely that CTSS performed that function." (Williams August Declaration at 22.).

52.     Contrary to Mr. Williams' assertions, there is evidence that archiving during that time period was performed manually, not automatically.[2]  The evidence also suggests that Mr. Collingsworth was aware of and involved in the archiving that was happening.  On April 6, 2011, one of Mr. Collingsworth's assistants sent Mr. Collingsworth an email stating "did you have a chance to search for those emails you wanted to grab before archiving? Because I could at least start archiving your emails on your laptop…" (CS TC011065).  On October 7, 2011, Mr. Collingsworth sent an email stating "Do need [CTSS] to empty the inbox of iradvoates account on Outlook and archive it." (CS TC011091).  Those emails suggest that the archiving from April 6, 2011 to October 7, 2011 was not automatic, but in fact manual and performed under Mr. Collingsworth's instructions.  On October 11, 2011, a service ticket confirms this and states that CTSS archived over 15,000 emails from April 2011 to October 2011. (Williams April Declaration at 91 and Exhibit T).

53.     Mr. Williams also states that the archives were being saved to the MacBook and not an external hard drive. For example, he states "it appears this archive was saved to the MacBook and not to any offsite backup." (Williams April Declaration at 92). Mr. Williams' analysis appears to ignore the possibility that the archives could have saved to an external hard drive.  Significantly, the Williams March Declaration identified a manual archiving of emails onto an external hard drive as one of the three scenarios that would explain why Mr. Collingsworth's emails are missing. (Williams March Declaration at 30).  In addition, in his interview with the owner of CTSS, the owner stated that "[he] believed that the emails were archived to either Collingsworth's Mac laptop or to an **external hard drive**." (Williams April Declaration at 93, emphasis added). Finally, an email sent to Mr. Williams

---

[2] Manual archiving is different than automatic archiving. In manual archiving, a user specifically selects which emails will be archived and where they will be archived to, and that operation executes once. In automatic archiving, the user configures a process to automatically select emails and run an ongoing process that archives emails whenever they match the archive criteria.

21

summarizing an interview with one of Mr. Collingsworth's assistants who worked for Conrad & Scherer from August 2011 to July 2013 states that Mr. Collingsworth had "archived emails that were saved to an external hard drive," that CTSS "did not come in and do the archiving," that the "archiving was actually done by C&S," and that the "archiving was done periodically and not every day." (CS TC01261). Manually archiving to an external hard drive would have the same result as an auto-archive rule in that under either scenario the emails would be removed from the Conrad & Scherer server and stored locally to wherever they were being archived.

6. THE EXTERNAL HARD DRIVE THAT LIKELY CONTAINED EMAILS "TOO SENSITIVE" WAS AVAILABLE TO DEFENDANTS ON MULTIPLE KEY DATES, BUT IS NOW PURPORTEDLY LOST

54. It is clear from documents produced by Mr. Williams that a hard drive used with the MacBook laptop is the same hard drive that was in in Conrad & Scherer's possession on December 8, 2014. Mr. Williams states that this hard drive was subsequently lost during an office move. (Williams April Declaration at 78). On January 21, 2011, Victoria Ryan sent an email stating that she was "popping out to staples to pick up a portable external hard drive for Terry's files" and that someone else was "looking into his computer info-transfer." (CS TC009597). A receipt from Staples dated the same day shows that a 500GB GoFlex hard drive was purchased (CS TC010084).[3] A billing report from CTSS references that slightly later in the day, CTSS configured an external hard drive "for use with both Mac and PC". (Williams April Declaration Exhibit M). A Seagate GoFlex hard drive with serial number 'na02nq70' was connected to one of Mr. Collingsworth computers on January 21, 2011. (CS TC010160). A document produced by Mr. Williams also makes this clear, stating "On 1/21/2011, VR purchased external HD from staples", he provides a "possible SN na02nq70," and references that it was "last used on 12/8/2014 on Dell Vostro." (CS TC011185).

---

[3] A 500GB hard drive is large enough to store hundreds of thousands of emails and other files, such as Microsoft Word documents or PDF documents. It is likely that every single email that is now purportedly missing could be stored on a 500GB hard drive.

55.     From the above evidence, it seems most likely that this hard drive purchased days after the MacBook and configured to be used by both Mac and PC was the one to which Mr. Collingsworth's email was archived. While the MacBook laptop is not available for analysis, a chart produced by Mr. Williams show that this Seagate GoFlex hard drive was connected to one of Mr. Collingsworth's computers as well as computers of others at Conrad & Scherer multiple times. (CS TC010160 - CS TC010166). Generally, a computer does not record every time an external hard drive is connected. Instead, if a hard drive is connected multiple times, computer forensics may only be able to identify the first time it was connected, the last time it was connected, and potentially a handful of times in between. It is also possible that the types of dates referenced by Mr. Williams are updated by different processes, not a connection of an external hard drive. In order to confirm the accuracy of Mr. Williams' chart, I would need to perform further analysis of the Collingsworth computers.

56.     Accepting the chart as it was produced by Mr. Williams, it appears that the Seagate GoFlex hard drive was connected to a different computer, the Dell Vostro, on September 18, 2012, connected to the Dell OptiPlex on September 5, 2013, connected to an HP Laptop on March 29, 2014 and April 4, 2014, and connected to other computers on December 5, 2014, December 8, 2014, and February 26, 2015. Many of those dates are significant, and all are after the date the litigation was filed:

   a.  September 2013 is when emails were printed that were produced by Defendants in October 2013.

   b.  April 4, 2014, is the same day the Court entered its second order directing Defendants to preserve data (April 4, 2014 Order).

   c.  December 2014 is when Defendants were conducting multiple searches of their email server for emails in this case. (CS TC012016 - CS TC012158).

   d.  February 26, 2015 is only 5 days before Mr. Williams received a signed engagement letter for his work in this matter. (CS TC011263).

57.     Beyond observing that the external hard drive was in Defendants' possession in December 2014, Mr. Williams does not appear to investigate any of those dates. In his deposition, Mr. Williams acknowledges that it is possible to do an analysis to determine how external devices were

23

used and that it can be possible to tell what files were accessed from external devices. (Williams Deposition at 26:1 – 37:24).   There is no explanation in his declarations as to why he did not conduct an analysis of activity around this external hard drive to figure out what it was used for given the apparent extensive use of this drive.

58.     The evidence is clear that this hard drive was in the possession of Defendants on multiple dates after the litigation began and the Court ordered Defendants to preserve all electronic data and all hard drives. In offering his opinions about the "reasonable efforts" that Defendants undertook to save electronic information and his opinion about the disposal of emails, Mr. Williams provides no reasonable explanation for the loss of this drive, perhaps as recently five days before he was engaged. The Williams April Declaration offers that it was lost in an office move (Williams April Declaration at 78), but in his deposition, Mr. Williams made clear that was a theory he developed on his own, not one based on any evidence or statement by those involved in the office move (Williams Deposition at 241:6–242:1). There is evidence, set forth above, that this hard drive was used on multiple dates before and after existing gaps and that email archives were saved to external hard drives. It is possible that this hard drive contained the email data that was archived in October 2011 and would cover at least one of the gaps in Mr. Collingsworth's email data.

59.     Additionally, Williams testified in his Deposition that this external hard drive was used not only to store Mr. Collingsworth's emails, but his "emails and files." (Williams Deposition at 170:5-8). Accordingly, that external hard drive likely contained electronic files and documents that were not emails. Examples of such files could include Microsoft Word documents, audio recordings, PDF files, pictures, and videos. None of these files would be affected by the purported auto-archive rule in Microsoft Outlook, and would all now be lost.

7.   EMAILS PRODUCED BY DEFENDANTS IN OCTOBER 2013 CONTRADICT MR. WILLIAMS NARRATIVE AND SUGGEST DEFENDANTS HAD EMAILS ON THE EXTERNAL HARD DRIVE AND ON THE SERVER AFTER THEY WERE PURPORTEDLY LOST

      60.    The emails produced by Defendants in October 2013 are particularly noteworthy.  Some of the emails in that production fall into periods Mr. Williams believed were gaps prior to his work. For example, an email sent solely to Mr. Collingsworth IRAdvocates account on August 16, 2010 (CS000975) falls into the period from February 26, 2010 through January 27, 2011 which Mr. Williams stated he located and had been "identified as missing" prior to his work. (Williams April Report at 17). Had emails from this period been missing, it is not clear how Defendants were able to produce this email in October 2013. Given the Seagate GoFlex hard drive, purchased "for Terry's files," was connected to one of Mr. Collingsworth's computers in the same month that other emails in this production were being printed, it is possible that those emails were found on this hard drive.

      61.    Another email in the production is even more noteworthy and potentially contradicts the narrative offered by Mr. Williams. This email was sent on December 21, 2012 and was only addressed to accounts for Mr. Collingsworth. The page in the production reflects that it was printed September 17, 2013 from the Conrad & Scherer email server. (CS000879).  The date of that email falls into a period where incoming emails addressed to Mr. Collingsworth's IRAdvocates email address are purportedly missing and emails addressed to his Conrad & Scherer email account also are purportedly missing and were lost when Mr. Collingsworth gave the MacBook to his niece in June 2013. (Williams April Declaration at 120 and 123).

      62.    This email appears to have been addressed to both Mr. Collingsworth's Conrad & Scherer and his IRAdvocates email addresses. Mr. Williams stated in his deposition that there was a rule for emails "addressed to both Terry Collingsworth at IRAdvocates and Terrence Collingsworth at Conrad & Scherer to move it into a separate folder." (Williams Deposition at 54:11-16).  Mr. Williams suggests that the auto-archive process would not act on these e-mails. I am not aware of any evidence of such a rule. Mr. Williams asked Conrad & Scherer for the rules on Mr. Collingsworth's outlook account and there was no such rule in the screenshot he was provided. (CS TC009734).  As a result, I have no reason to believe that emails addressed to both accounts simultaneously would be treated any differently than an email addressed to just one of his accounts.

25

63.     If that email was on the server in September 2013, it's possible that Mr. Williams'

narrative is incorrect as this email may be evidence that emails in a time period that is now purportedly

missing were in fact on the email server in September 2013, after Mr. Williams believes they would

have been archived.

## C.  THE WILLIAMS DECLARATIONS HAVE MULTIPLE STATEMENTS THAT ARE UNCLEAR, UNSUPPORTED, OR CONTRADICTED BY HIS OWN ANALYSIS

64.     In addition to the weaknesses in the analysis offered by Mr. Williams to support his

opinions described above, there are, more generally, repeated instances of discussions that are

unclear, unsupported by evidence, or contradicted by the evidence Mr. Williams offers. As a result,

among other things, it is not clear in Mr. Williams' declarations how many computers or email addresses

were used by Mr. Collingsworth.  The total extent of what email gaps exist is also not clear. Using the

information provided, I have attempted to bring clarity those issues.

### 1.  MR. WILLIAMS' DISCUSSION OF THE DELETED FOLDER CONTAINS AT LEAST TWO SUBSTANTIAL ISSUES

65.     One example of unclear, unsupported, or contradictory analysis is found in Mr. Williams'

discussion of the deleted folder that contained email. As set forth above, Mr. Williams identified a

deleted folder contained on a hard drive connected to a Conrad & Scherer server.  He attributed the

possible source of that folder to an email migration. (Williams April Declaration at 48).  He further states

that "one of the remaining gaps in Collingsworth's IRAdvocates incoming emails is from June 3, 2008

(which is shortly after the migration from GroupWise to Outlook) through February 25, 2010." (Williams

April declaration at 55).  Based on Mr. Williams' own report and the evidence he provides, that is not

correct. June 3, 2008 is not "shortly after the migration." Mr. Williams identified and quoted in his report

that the migration occurred on June 6, 2008.  (Williams April Declaration at 45).  If Mr. Williams does not

believe the information he relied on is correct and the migration in fact occurred on another date, he has

not provided that information.

66.     There is an additional issue with Mr. Williams' statements on this subject.  Mr. Williams describes that the email in the deleted folder was from "Collingsworth's IRAdvocates and International Labor Rights Forum email accounts." (Williams April Declaration at 48).  However, the migration that Mr. Williams mentions was a migration performed by Conrad & Scherer staff, not IRAdvocates staff. (Williams April declaration at 45).  The migration of IRAdvocates email did not occur until substantially later, on October 27, 2011, a fact that Mr. Williams provides in a different discussion. (Williams April Declaration at 99). The email cited by Mr. Williams in reference to the 2008 migration even states that Conrad & Scherer had "no access or knowledge of anything with the email before Terry came aboard with us at the IRAdvocates domain." (Williams April Declaration Exhibit B).  Given the facts set forth by Mr. Williams, it appears unlikely that the email found on the Conrad & Scherer server related to the 2008 migration as he suggests.

## 2.  MR. WILLIAMS DOES NOT PROVIDE ANY CLARITY AND MAY MISLEAD THE READER ABOUT HOW MANY DEVICES WERE USED BY MR. COLLINGSWORTH

67.     Mr. Williams sets forth a table of the "five primary computers used by Collingsworth from 2008 through 2014" (Williams April Declaration at 36).  In addition to those computers, he states that Mr. Collingsworth used a Dell Vostro Desktop[4], an Acer netbook, and a Dell Inspiron laptop. Mr. Williams does not provide serial numbers or any other identifying information about any of these devices. Finally, Mr. Williams references that Mr. Collingsworth also used an iPhone and iPad. (Williams April Declaration at 37).

68.     In addition to those devices, Mr. Williams, and the supporting documentation he provides, make reference to a home computer that does not appear to be accounted for in his description. Specifically, Exhibit V to the Williams April Declaration identified that on November 10, 2011, a technical support person visited Mr. Collingsworth's residence to work on "Terry's home PC

---

[4] In Paragraph 37 of the Williams April Declaration, Mr. Williams describes that Mr. Collingsworth used a Dell Vostro desktop sometime between 2008 to 2014 and that he currently has a Dell Vostro desktop in his office.  It is not clear whether the two references to a Vostro desktop refer to the same device or a different device. For the purposes of counting the number of computers, I assume they refer to the same device.

with Outlook" and that part of the work included backing up data to a "PST file" and restoring a "PST file over 8.5GB".

69.     Mr. Williams' chart sets forth that the primary computer used by Mr. Collingsworth at that time was a MacBook laptop (Williams April Declaration at 36), and Mr. Williams also describes that the Outlook software on the MacBook used the OLM format, not the PST format. (Williams April Declaration at 93c). Thus, the home computer appears to be a different computer. Mr. Williams' narrative about the MacBook could mislead a reader to believe mistakenly that the work described related to the MacBook.

70.     In summary, it appears as though Mr. Collingsworth has used at least 9 computers since 2008.  Mr. Williams describes that two of those computers were disposed of (Williams April Declaration at 36c) but provides no indication in his declarations as to why he believes that or whether there is any evidence of that. Significantly, he stated at this deposition that this disposal occurred during the course of this litigation. (Williams Deposition 125 – 129).  A third computer, the Apple MacBook, is purported to have been given to Mr. Collingsworth's niece in June 2013 and subsequently stolen (Williams April Declaration 120). Again, Mr. Williams provides no indication as to where this information came from. Mr. Williams does not describe what analysis has been performed on the other computers beyond stating that he has conducted an examination of some of them, including the Dell Optiplex (Williams April Declaration at 62), the Vostro Desktop (Williams April Declaration at 37), and Inspiron Laptop (Williams April Declaration at 37).  He does not state whether he has performed an analysis of the HP laptop used from June 2013 to May 2014.

71.     Finally, in the Williams August Declaration, Mr. Williams describes that the "Acer Netbook laptop was transferred to Conrad & Scherer employee [sic] before the lawsuit was filed and has since been returned and analyzed." (Williams August Declaration at 42b). As Mr. Williams stated in the Williams April Declaration, the Acer netbook had previously been used by Mr. Williams when he travelled, and was replaced by the MacBook. (Williams April Declaration at 73). It is not clear when it was first used from the information available to me.  A document produced by Mr. Williams references that the Acer netbook was serviced on March 30, 2010, so it must have been first used by Mr. Collingsworth on or before that date. (CS TC011183) As such it is possible, if not likely, that the Acer

netbook had historical email on it, including email prior to February 26, 2010, that Mr. Williams states was lost by CTSS failure to transfer data properly between computers. (Williams April Declaration at 68).

72.     Mr. Williams does not describe his analysis or any findings from the Acer netbook. Though he was aware of these facts from an email dated April 14, 2015 sent to him, Mr. Williams does not describe that Windows had been re-installed on the netbook on January 13, 2014, during the litigation, and that while there was evidence of a PST file from September 2010 on the computer, the content of the file was lost and had been entirely "overwritten, all zeros." (CS TC010608 & CS TC010609). The re-installation of Windows generally serves to delete all of the data on the computer. In my experience, the re-installation of Windows is sometimes done to intentionally delete and make data unrecoverable. Had the Acer netbook been preserved before Windows was re-installed, that PST may still be recoverable.

73.     However, it is possible that a more targeted deletion of this PST occurred in addition to the re-installation of Windows, as I would not generally expect the re-installation of Windows to overwrite a PST with "all zeros." It is therefore possible that a user of the computer undertook a prior exercise to wipe or destroy data on that computer before re-installing Windows. Since the PST is overwritten, it is not possible to know what was lost through the handling of the Acer netbook and the re-installation of Windows in 2014.

### 3.   MR. WILLIAMS MISCHARACTERIZES THE REMAINING GAPS OF EMAIL AND DOES NOT ANALYZE OTHER POTENTIALLY RELEVANT ACCOUNTS.

74.     Throughout his declarations, Mr. Williams refers primarily to two email accounts for Mr. Collingsworth, one held at IRAdvocates and one held at Conrad & Scherer. Mr. Williams does not identify the email addresses or account names of the accounts he focused on, but from the March 12 Letter written by Steptoe & Johnson, it appears as though the two accounts were tc@conradscherer.com and tc@iradvocates.com. Based on the summary and discussion in the Williams April Declaration, it appears that most, if not all, of his analysis was focused on those two

29

accounts. It is, however, also clear that those were not the only accounts used by Mr. Collingsworth. The April 14 Letter makes reference to a Gmail account, and the April Williams Declaration makes reference to a Verizon account and an International Labor Rights Forum account. The Williams August Declaration also makes reference to a Dropbox account, which could have stored email data. Beyond a few references to the other accounts, Mr. Williams and Steptoe & Johnson provide very little information about those other accounts. Thus, it is not possible to know whether there are additional missing emails or other documents from those accounts.

I.     MR. WILLIAMS MISCHARACTERIZES THE EMAIL GAPS

75.     For the two accounts that Mr. Williams does identify, he sets out a timeline of what emails remain missing, and describes that "some narrow gaps of missing emails remain." (Williams April Declaration at 19). I disagree with Mr. Williams' characterization of the gaps as narrow. As Mr. Williams sets forth, some of the gaps are over a year long. Attached as Exhibit 2 is a chart prepared by Stroz Friedberg using the information in the Williams April Declaration and the April 14 Letter that shows the gaps of email that still exist, the "primary computers" used by Mr. Collingsworth, and some of the discrete events described in the Williams April Declaration and exhibits.

76.     The chart prepared by Stroz Friedberg does not match a chart presented to Mr. Williams in his deposition that he testified accurately represented additional gaps. (Williams Deposition at Exhibit 5). For example, that chart included a gap in outgoing email from the IRAdvocates account from June 2, 2008 to May 3, 2011. While Mr. Williams disagreed with some of the gaps represented in that chart, he did not dispute this gap and accepted the chart to be accurate in that respect (Williams Deposition at 64:17). This serves to highlight that Mr. Williams' declarations are not clear as to what the gaps are. As further evidence of this, both of these charts differ from a chart produced by counsel for Defendants. (Response to Motion for Sanctions at page 3).

77.     In the Williams August Declaration, Mr. Williams attempts to revise one of the gaps he had previously identified. (Williams August Declaration at 15 and 16) That revision, if accurate, would serve to change the end date of a period of missing outgoing email from the IRAdvocates account from

30

February 22, 2012 to October 27, 2011.  Mr. Williams, in the conclusion of this discussion, states "the forensic evidence indicates that all of Collingsworth outgoing IRAdvocates email after October 26, 2011 were retained." (Williams August Declaration 17). Mr. Williams does not cite any evidence in the discussion of his revision.

78.    Mr. Williams' revision also does not discuss a gap in outgoing IRAdvocates emails he previously stated existed from February 22, 2012 to March 22, 2013. (Williams April Declaration at 19d). At his deposition, Mr. Williams was presented with a chart that identified, among other gaps, this gap from February 22, 2012 to March 22, 2013. While he disagreed with some of the gaps represented in that chart, he did not dispute this gap and accepted the chart to be accurate in that respect (Williams Deposition at 64:17). Thus, Mr. Williams' statement that "all of Collingsworth outgoing IRAdvocates email after October 26, 2011 were retained" is contradictory to his other descriptions of the email gaps.

II.    THE USE OF THE VERIZON ACCOUNT MAY MEAN THAT NEITHER THE CONRAD & SCHERER SERVER NOR THE IRADVOCATES SERVER EVER CONTAINED ALL OF THE EMAIL

79.    The Verizon account is of particular importance, as it is possible that the account was used to send email from either the IRAdvocates or Conrad & Scherer account.  An invoice from the third-party IT support provider attached to the Williams April Declaration describes that, in an effort to help resolve Mr. Collingsworth's email problems, at least some of his devices were configured to send email using "Verizon's SMTP server" in April 2010. (Williams April Declaration Exhibit H).  An "SMTP server" provides an email user with the ability to send email – any outgoing email will travel through that server on its way to the addressees.  It is therefore possible, depending on the configuration, that outgoing emails sent by Mr. Collingsworth on devices configured to use the Verizon server would never be transmitted to either the Conrad & Scherer or IRAdvocates email servers.

80.    Another invoice, this time referencing work done in November 2011, references the Verizon account. (Williams April Declaration Exhibit V).  Depending on the configuration put in place then, it is again possible that Mr. Collingsworth's emails were being sent or received through Verizon,

not through either Conrad & Scherer or IRAdvocates. There is no analysis of these issues in any of the documents I have been provided. If emails did not travel through the Conrad & Scherer servers, that fact would call into question Steptoe & Johnson's statements that all outgoing emails were stored on those servers. (March 12 Letter, page 6).

### III.   MR. WILLIAMS DOES NOT DISCUSS ANY ANALYSIS OF THE GMAIL ACCOUNT OR DROPBOX ACCOUNT

81.     In addition to the Verizon account, there are at least two other accounts that do not appear to have been analyzed by Mr. Williams. The first is a Gmail account that Steptoe & Johnson references in the April 14 Letter but is not discussed in the Williams April Declaration.  Steptoe & Johnson stated that the "Collingsworth G-Mail account (terrype56@gmail.com) has been searched" but do not describe who performed the search or how it was searched. (April 14 Letter at page 3). In the Williams August Declaration, Mr. Williams states that he preserved a copy of the Gmail account. (Williams August Declaration at 24). He does not describe whether he performed any analysis of that account or if he searched any of the other evidence for emails from the Gmail account.

82.     Regardless of whether Mr. Williams has now preserved the Gmail account, it is particularly notable that it was not preserved or analyzed earlier, as it may have contained emails to fill some of the gaps.  On January 25, 2012, Victoria Ryan sent an email stating that "we want to use a Gmail account to route [Mr. Collingsworth's] emails." (CS TC011104).  Mr. Williams described in the Williams April Declaration that both incoming and outgoing emails for the IRAdvocates accounts were missing for almost all of 2012 and into 2013. (Williams April Declaration at 19). Mr. Williams should have investigated whether the Gmail account had any of those emails.

83.     Similar to the Gmail Account, Mr. Williams states that he preserved a copy of a Dropbox account.[5] (Williams August Declaration at 27). He does not describe when he performed that preservation. He further describes that "Mr. Collingsworth's Dropbox account is mirrored on the hard

---

[5] Dropbox is service that allows a user to, among other things, backup files, including documents or emails, to a cloud-based storage service and synchronize those files across computers

drive of his work computer." As a result, he concluded that his analysis of that computer would encompass an analysis of the Dropbox account.  However, there is information stored on Dropbox that is not "mirrored" to the computer. For instance, it is possible to recover files deleted from a Dropbox account using the web interface that would not be accessible on a computer.[6]  Mr. Williams does not describe when he performed the preservation, whether he preserved any deleted content, or when the Dropbox account was "mirrored" to the work computer.

IV.    MR. WILLIAMS DESCRIBES NO ANALYSIS OF THE INTERNATIONAL LABOR RIGHTS FORUM EMAIL ADDRESS

84.    The other account referenced but apparently not investigated by Mr. Williams is the International Labor Rights Forum email account.  As described earlier, Mr. Williams found a folder of deleted email on a Conrad & Scherer server. That email included email from Mr. Collingsworth's account at International Labor Rights Forum from November 2, 2005 through June 20, 2007.  (Williams April Declaration at 48).  Mr. Williams does not purport to have investigated this account any further. It is not clear whether or not Mr. Collingsworth stopped using the account on June 20, 2007 or later, and from the currently available information, it is possible that other emails exist in this account that have not been searched for or located.

## V.    CONCLUSION

85.    My review of the Williams March Declaration, Williams April Declaration, Williams August Declaration, Williams Document Production, and Williams Deposition identified that the work described by Mr. Williams appears incomplete and at times contradictory. Most significantly, Mr. Williams does not offer sufficient evidence to support his conclusion that "there is no indication that emails or computers were intentionally disposed of or deleted to destroy evidence" (Williams April Declaration at 21). Instead, the analysis he performed but did not describe in his declarations identified

---

[6] Dropbox's allows a user to see an event history that includes the deletion of files from a Dropbox account and allows a user to restore those deleted files.  See https://www.dropbox.com/en/help/296

33

evidence contradictory to his opinion regarding likely intentional deletions and disposal of emails. In one instance, Mr. Williams' analysis identified deleted emails he described as having "recent activity in 12/2014 which is not good." (CS TC009737). Significantly, these emails appear to be located on Mr. Collingsworth current desktop computer. Some of the emails he was referencing in this sentence were located in the Recycle Bin of the computer, a location commonly associated with intentional deletions by a user.

86.     Moreover, I disagree with Mr. Williams that "there is overwhelming evidence reflecting Collingsworth's email problems and the reasonable efforts that were taken… to save or back-up his electronic information…" (Williams April Declaration at 22). While Mr. Williams does describe some of the evidence of email problems, the very facts he presents suggest that the efforts to back-up information were not reasonable and clearly not effective at preserving that electronic information. Moreover, he stated in his deposition that the first thing he would tell a client to do when facing a newly filed lawsuit "would be putting in place a litigation hold." (Williams Deposition @ 85:17-24). Given his view as to the importance of litigation holds, the fact that he was aware of no such process calls into question his stated opinion. Additionally, he ignored evidence contradictory to his opinions about the loss of the MacBook laptop and an external hard drive. When that evidence is considered, the handling of those devices does not reflect reasonable efforts to preserve data and, as it relates to his first conclusion, may be evidence of the intentional disposal of data.

87.     Finally, Mr. Williams' narrative appears to be based largely on unsubstantiated claims that are not cited, described vaguely, and at times appear to confuse the subject of discussion, making it difficult to determine what has actually happened. His declarations do not contain the type of technical details I would expect in a computer forensics report, such as identifying information about the computers or email accounts he examined, the methodology he employed, and the names and versions of software in scope for his analysis. In setting forth this declaration, I have attempted to make clear what can be determined from the facts and narratives that Mr. Williams provides and those found in the letters from Steptoe and Johnson.

DECLARATION OF SPENCER LYNCH

88.     In my opinion, the analysis described by Mr. Williams is incomplete. Nonetheless, based on a review of what was done, I believe that the conclusions offered by Mr. Williams are contradicted by the evidence he reviewed.


I declare under penalty of perjury under the laws of the United States of America that the above and foregoing is true and correct.  Executed on August 18, 2015.

_____

Spencer C. Lynch

DECLARATION OF SPENCER LYNCH

BOSTON

CHICAGO

DALLAS

HONG KONG

LONDON

LOS ANGELES

MINNEAPOLIS

NEW YORK

SAN FRANCISCO

SEATTLE

WASHINGTON, DC

ZURICH

# STROZ FRIEDBERG

www.strozfriedberg.com

 @strozfriedberg

**EXHIBIT 1**



STROZ FRIEDBERG
CV

# Spencer C. Lynch
## DIRECTOR, DIGITAL FORENSICS

<u>PROFESSIONAL EXPERIENCE</u>

**STROZ FRIEDBERG LTD**
**Director, Digital Forensics, London, UK, January 2012 - Present**
**Assistant Director, Digital Forensics, London, UK,** July 2011 to December 2011
**Digital Forensic Examiner, New York, NY, USA,** August 2007 to June 2011

Responsible for co-managing the firm's digital forensics practice. Conduct digital forensic acquisitions and analyses of laptop computers, desktop computers, mobile devices, and servers in civil litigations, criminal and regulatory matters, and internal investigations. Supervise and take part in the development of customised utilities for use in the analysis and processing of electronic data. Carry out complex, large-scale digital forensic and eDisclosure projects involving the preservation, processing, and production of electronic data from a variety of digital sources. Advise clients on issues of incident response, data breaches, and computer and network security. Supervise Digital Forensic Examiners and manage the operations of the firm's digital forensic practice outside of the United States of America. Significant casework includes:

- Performed and directed the analysis of data collected as part of an inspection ordered by the United States International Trade Commission in an investigation into claims of misappropriation of trade secrets and patent infringement brought by the Dow Chemical Company against Organik Kimya San. ve Ticaret AS. Identified multiple attempts of data destruction and authored multiple reports and affidavits setting forth the analysis.

- Performed and directed an investigation into alleged hacking by the claimant in a litigation of the defendant's email accounts. Authored expert reports relating to the fabrication and destruction of evidence and testified as an expert witness in a contempt application made by one of the defendants.

- Performed and directed the analysis of data collected in the United States and Ecuador in an investigation into a conspiracy to defraud the Chevron Corporation of billions of US dollars. Found key digital forensic evidence supporting Chevron's arguments that the judgment was a product of fraudulent conduct, including bribery of Ecuadorian Judges and the ghost writing of supposedly independent expert reports and orders and judgments issued by the Ecuadorian court system. Testified as an expert witness at trial in the United States District Court for the Southern District of New York, and in an arbitration under the UNCITRAL rules.

- Performed a digital forensic analysis and source code review of data collected during a criminal prosecution for the theft of trade secrets. Testified as an expert witness at trial for the United States Attorney's Office for the Southern District of New York.

- Led the analysis of databases and web servers seized during a criminal investigation of online pharmacies. Testified as an expert witness at trial for the United States Attorney's Office for the Eastern District of New York.

- Performed a digital forensic investigation to determine if former employees of a company stole proprietary information. Filed two affidavits and testified as an expert witness in a preliminary injunction hearing in the United States District Court for the Northern District of New York.



STROZ FRIEDBERG
CV

# Spencer C. Lynch
## DIRECTOR, DIGITAL FORENSICS

- Coordinated the execution of a Civil Search Order across multiple office and warehouse locations in an investigation into the manufacture and distribution of counterfeit goods. Supervised the recovery and analysis of a sales database seized during the Search Order to identify customers and manufacturers of counterfeit products and the volume of goods traded illegally.

- Supervised the collection and analysis of data from a leading UK law firm in a response to the identification of previously unknown malware on the law firm's file server. Analysed data collected from the network and infected computers to determine the likelihood that client information had been exposed through the security incident.

- Decoded the enciphered storage format of an obsolete email client to recover deleted messages from a computer in a civil litigation case. Recovered hundreds of deleted and previously unproduced messages.

- Participated in and led efforts to collect and process terabytes of data from multiple global locations in response to both regulatory and US Congressional inquiries into issues related to the global credit crisis.

- Participated in an anti-money laundering effort for a global bank. Performed data analysis and recommended thresholds and triggers to be implemented in an automated transaction monitoring system.

**ERNST & YOUNG**
**Legal Technology Services – Fraud Investigative and Dispute Services Staff**
August 2005 to August 2007
New York, NY

- Supervised teams to acquire electronic evidence. Searched and reviewed electronic evidence, recovered deleted information from storage media, and produced native files from electronic evidence. Built custom digital forensic tools for recovering files. Worked with a variety of digital forensic tools, including EnCase, FTK, dcfldd and ImageMASSter Solo devices. Managed outside vendors in performing bulk tape restores.

- Worked on investigations involving the destruction of data, the viewing of inappropriate material, compromised machines, and the backdating of documents.

- Interviewed IT professionals to collect information regarding databases, data sources, and backup strategies. Used information obtained from the interviews to develop a collection strategy and to request extracts from relevant data sources. Normalised data and imported it into a SQL environment. Supervised the implementation of backup strategies to comply with data retention policies. Developed custom SQL queries to analyse and report on client data.



STROZ FRIEDBERG
CV

# Spencer C. Lynch
## DIRECTOR, DIGITAL FORENSICS

<u>TESTIMONY</u>

April 2015: Testified as a digital forensics expert in *Chevron Corporation and Texaco Petroleum Corporation v. The Republic of Ecuador,* UNCITRAL, PCA Case No 2009-23 (Permanent Court of Arbitration)

September 2014: Testified as a digital forensic expert in a contempt application as part of *Daar Al Arkan Real Estate Development Corporation , et al, v. Majid Al-Refai, Kroll Associates UK Limited,  Alexander Richardson, FTI Consulting Group Limited*, 2012 Folio 834 (Royal Courts of Justice, UK)

October 2013: Testified as a digital forensic expert in *Chevron Corporation* v. *Steven Donziger et al.,* 11-CV-0691 (S.D.N.Y. USA)

October 2011: Testified as a digital forensic expert in *Bassam Alghanim v. Steven McIntyre, Verify Limited, Cerule Limited, Timothy Zimmer*, HC09 CO 3426 (Royal Courts of Justice, UK)

December 2010: Testified as a digital forensic expert in *United States v. Aleynikov*, 10-CR-96 (S.D.N.Y. USA)

June 2009: Testified in an arbitration regarding a digital forensic investigation in *Quixtar v. Woodward, et al.*, JAMS File No. 1100052219 (Linda Singer) (USA).

October 2008: Testified as a digital forensic expert in *United States v. Quinones, et al.*, 06-CR-845 (E.D.N.Y. USA).

January 2008: Testified as a digital forensic expert in *Von Roll v. Craig, et al.*, 07-CV-1336 (N.D.N.Y. USA).

<u>EDUCATION</u>

**DUKE UNIVERSITY, North Carolina, USA**
B.A. in Computer Science and Public Policy, minor in Psychology, 2005

<u>PUBLICATIONS</u>

May 2014: *Information Age,* "No one-size-fits-all approach to APTs"
November 2013: *CNN Money,* "Chevron alleges still another fraud by Ecuadorians"
May 2013: *Network Security,* "Security at the data level"
January 2013: *Computer Fraud & Security*: "Spear-phishing: how to spot and mitigate the menace"
October 2012: *Network Security*, "Seek and destroy"
September 2012: *SC Magazine*, "BYOD requires clear strategy and enforcement"



# Spencer C. Lynch
## DIRECTOR, DIGITAL FORENSICS

### CERTIFICATIONS

EnCase Certified Examiner (EnCE), 2006 – Present

### TRAINING

**STROZ FRIEDBERG, LLC**
**Internal Training Program**
Develop and Attend weekly in-house training presentations on digital forensics, cyber-crime response, computer security, desktop, mobile device, and network digital forensic tools, and relevant legal topics.

**GUIDANCE SOFTWARE, INC.**
**EnCase Intermediate Computer Forensics, 2005**
Attended training course in digital forensic practices and the use of EnCase forensic software.

**SANS INSTITUTE**
**Hacker Techniques, Exploits and Incident Handling, 2008**
Attended training course on common hacking and exploitation techniques and computer incident response strategies.

07/2015

Capital House, 85 King William Street, London, EC4N 7BL

| slynch@strozfriedberg.com | T: +44 20.7061.2304 | strozfriedberg.com |

**EXHIBIT 2**



Exhibit 2

2007
2008
2009
2010
2011
2012
2013
2014
1 2 3 4 5 6 7 8 9 10 11 12
Email Account
Gmail
Verizon
International Labour Rights Forum
C&S incoming
C&S outgoing
IRA incoming
IRA outgoing
March 17, 2011 - March 22, 2013
June 21, 2007 - May 19, 2008
June 3, 2008 - February 25, 2010
October 27, 2011 - March 22, 2013
June 21, 2007 - January 6, 2008
May 17, 2011 - February 3, 2012
February 22, 2012 - March 22, 2013
Computer in use
1. Dell Latitude laptop
2. HP Compaq desktop
3. Dell Optiplex desktop
4. MacBook laptop
5. HP laptop
Events
June 2008 C&S migration from GroupWise to Outlook. (Exhibit B)
April 30, 2010 Collingsworth's iPhone configured to send email from Verizon server. (Exhbiti H)
December 22, 2010 Ryan notices that Collingsworth's Outlook archive folder is empty. (Exhibit J)
January 21, 2011 CSC/CTSS assists with configuration of MacBook, stores electronic data on a 'remote attach drive'.
November 10, 2011 CSC/CTSS works on Collingsworth's home PC, technician calls Verizon to obtain password required for POP setup. (Exhibit V)
November 22, 2011 Collingsworth expresses concern about CSC/CTSS, and rejects cloud backup proposal, insisting instead on a hard drive for storage of sensitive material. (Exhibit W)
January 20, 2012 Draft email showing that Collingsworth could not access emails archived on his MacBook. (Exhibit X)
April 23. 2013 Collingsworth instructs not to transfer email from the MacBook (Exhibit BB)
June 2013 Collingsworth gives away MacBook, which is later stolen in Brazil. (Williams April Declaration at 78 and 120)
December 8, 2014 A hard drive used in 2011 to transfer Collingsworth email is attached to a C&S computer (Williams April Declaration
Week of December 14, 2014 A hard drive is lost in C&S DC office move (Williams April
Periods for which all email has been purportedly recovered.
No claims as to whether email is missing or complete.
Periods for which there is purportedly missing email.

FILED
2015 Aug-31  AM 11:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 8

*Filed under seal pursuant to Stipulated Protective Order*

**Dennis Williams**

| | |
|---|---|
| From: | Dennis Williams |
| Sent: | Thu 4/02/2015 10:56 PM (GMT-00:00) |
| To: | Chris Graham |
| Cc: | |
| Bcc: | |
| Subject: | 10871 Steptoe |
| Attachments: | Terry Desktop - Recovered Email Listing.xlsx |

Chris,

I have highlighted four possible files. Looks like they are not overwritten and do not have invalid clusters. They have recent activity in 12/2014 which is not good. But have created date in 7/2012 which is good. Do you think it will be worthwhile to export the email?

PS: The hard drive I tried to preview had a clicking sound and could not access in EnCase, FTK or Windows. They all hung.

Regards,

Dennis Williams

Partner

Pathway Forensics LLC

14405 Walters Road, Suite 630, Houston, TX 77014

T: (713) 401-3380 x5909 | F: (713) 513-5050

dwilliams@pathwayforensics.com

www.pathwayforensics.com

Licensed TX Private Investigators (A-15251)



CONFIDENTIAL

PF00000740

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER CS TC009737

CONFIDENTIALITY NOTICE: This email message and/or its attachments may contain information that is confidential or restricted. It is intended only for the individuals named as recipients in the message. If you are not an authorized recipient, you are prohibited from using, delivering, distributing, printing, copying, or disclosing the message or contents to others. If you have received this message in error, please notify the sender by return email and delete the email and its attachments immediately. Thank you.

CONFIDENTIAL

PF00000741

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER    CS_TC009738

FILED
2015 Aug-31  AM 11:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 9

*Filed under seal pursuant to Stipulated Protective Order*

**From:** Victoria D. Ryan
**Sent:** Tuesday, March 30, 2010 12:58 PM
**To:** Terry Collingsworth
**Subject:** computer stuff & Josh at your house 9:30 Friday


Terry, here's the status of your computer issues (these notes are just as much for me as they are for you):

1. Josh will be at your house at 9:30am on Friday to set up your laptop there and help you with other issues. He will also bring that new monitor screen to see if you want that set up there (sorry, I forget what you said you wanted to do with it if we didn't use it in the office). If you don't want it there, we can use it here at the office for Piper.

2. New Desktop is set up in your office (with larger, older monitor screen)-- it should have everything on it that your laptop did, however, it is possible that something did not get copied over. This is a common occurrence, and we will find out if anything is missing once you start using your new desktop. We have back-ups -- see note #4.

3. IMPORTANT NOTE: Your email-- Steve realized that you had a huge amount of old email in your inbox that is slowing your mail down and puts you at danger of crashing (your inbox should have a max of 2 gigs-- yours had 6 gigs). SO-- we have created a separate folder for you in Outlook, called "Archive" where emails prior to Feb. 26, 2010 are now stored. They are easily accessible and searchable. I will show you when you come in; it'll make more sense explained in person.

4. Your laptop has not been "cleared" yet--it still has all the same old files. When Josh goes to your house on Friday, he can delete everything except for your main programs. Steve also currently has a "back-up" copy of all your files saved on his own harddrive, which he will wait to delete (again, we are waiting to delete b/c we want to make sure all is good with the New Desktop).

Please let me know if you have any questions for now.


Victoria Ryan
Legal Assistant
Conrad & Scherer, LLP
1156 15th Street NW, Suite 502
Washington, D.C. 20005
Phone: 202-543-4001
Fax: 1-866-803-1125

1

CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER

FILED

2015 Aug-31 AM 11:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 10

*Filed under seal pursuant to Stipulated Protective Order*

**From:** Victoria D. Ryan
**Sent:** Wednesday, December 22, 2010 12:35 PM
**To:** Dispatch
**Subject:** RE: retrieving old emails

# Non-responsive

Victoria Ryan
Legal Assistant
Conrad & Scherer, LLP
1156 15th Street NW, Suite 502
Washington, D.C. 20005
Phone: 202-543-4001
Fax: 1-866-803-1125

---

From: Dispatch [Dispatch@ctssinc.com]
Sent: Wednesday, December 22, 2010 12:37 PM
To: Victoria D. Ryan
Subject: RE: retrieving old emails

Hello Victoria,

# Non-responsive

Terrye Nissley
Customer Service

CTSS, Inc.
8309 Richmond Highway
Alexandria, VA 22309

703-360-5552
dispatch@ctssinc.com

1

CS_TC007530

From: Victoria D. Ryan [mailto:VRyan@conradscherer.com]
Sent: Wednesday, December 22, 2010 11:42 AM
To: Joshua Robison
Cc: Tech Support
Subject: retrieving old emails


Hi Josh (and all), I wanted to check into retrieving old emails of Terry's. I'm specifically trying to retrieve items from early February, but the archive folder in his Outlook, that I believe Steve set up (titled it ArchiveQ1), is empty. There are a couple things to take into account as we investigate this:


1. Terry got a new PC a few months ago and we switched his files over to that, but the biggest issue was his immense amount of email files. I know you guys had backups saved for him during this process but I'm not sure if you still have the backup. His last sent emails I can access date back to 5/11/10. His inbox dates back to 2/26/10, but I'm looking for emails predating that.

2. We switched webhosting services for the IRAdvocates email and beforehand wanted to make sure we weren't going to lose emails in the process. I'm pretty sure we did that correctly with your help. (no emails remain in his sent-box in the IRAdvocate webmail, b/c he never really sends email from that-- he always uses outlook or some other method.)


I'll be available this afternoon to talk, but if you don't have time, can someone be in contact with me next week (Mon-Wed?).


Thanks so much,


Victoria Ryan

Legal Assistant

Conrad & Scherer, LLP

1156 15th Street NW, Suite 502

Washington, D.C. 20005

Phone: 202-543-4001

Fax: 1-866-803-1125

2

CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER

CS_TC007531

FILED

2015 Aug-31 AM 11:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 11

*Filed under seal pursuant to Stipulated Protective Order*

## Call Information

| | | | |
|---|---|---|---|
| Call number: | SC79407 | Invoice number: | IN98353 |
| Call type: | COMPUTER | Call description: | Terry Collinsworth's Outlook needs a new Archive folder set up and move all emails from 4-1-11 through 10-1-11 to help clean up his Inbox. (Make sure this archive is selected in offsite data backup too.) |

| | |
|---|---|
| Call received: | 10/07/11 02:56 pm |
| Call released: | |
| Call dispatched: | 10/11/11 11:00 am |
| Call arrived: | 10/11/11 11:00 am |
| Call finished: | 10/11/11 12:30 pm |
| Response hours: | 19.07 |
| Repair hours: | 1.50 |
| Down hours: | 20.57 |

Technician:   Paul  Do

Repair remarks:   10/11/2011- On site, worked on Terrence's MAC book. Archived over 15000 emails from April, 2011 to Oct, 2011.

## Labor

| Technician | Date/Time | | | Hours | | Rates | Mileage | Total |
|---|---|---|---|---|---|---|---|---|
| Paul  Do | Dispatch: | 10/11/11 | 11:00 am | Travel: | 0.00 | | 0.00 | $0.00 |
| | Arrival: | 10/11/11 | 11:00 am | Labor: | 1.50 | $100.00 | | |
| | Departure | 10/11/11 | 12:30 pm | Overtime: | 0.00 | $0.00 | | |

## Preventive Maintenance Schedule

| | | |
|---|---|---|
| Next PM date: | | Next PM meter: |

## Equipment Information

| | | | |
|---|---|---|---|
| Number: | C&S-Misc. | Contract Number: | 1424-01 |
| Item Number: | MISC | Contact: | Conrad & Sherer |
| Make/Model: | Equipment / Misc | Territory: | DISTRICT NE,NW |
| Serial number: | Misc | Bill code: | CSC Deposit |
| Customer: | Conrad & Scherer, LLP | Remarks: | |
| Location Cust: | Conrad & Scherer, LLP | | |
| | 1156 15th Street, NW Washington, DC 20005 | Suite 502 | |

CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER

CS_TC007538


FILED

2015 Aug-31  AM 11:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 12

*Filed under seal pursuant to Stipulated Protective Order*

Christopher S. Niewoehner
312 577 1240 direct
312 577 1370 fax
cniewoehner@steptoe.com



115 S. LaSalle Street
Suite 3100
Chicago, IL 60603
312 577 1300 main
www.steptoe.com

March 12, 2015

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

<u>**Via E-mail**</u>

T. Michael Brown                          H. Thomas Wells, III
Bradley Arant                             Starnes Davis Florie LLP
One Federal Place                         P.O. Box 598512
1819 Fifth Avenue North                   Birmingham, AL 35259 – 8512
Birmingham, AL 35203 - 2119               twells@starneslaw.com
mbrown@babc.com

      RE:    *Drummond Company, Inc. v. Terrence P. Collingsworth, et al.*
                2:11-cv-03695-RDP-TMP

Dear Mike and Trey:

     The massive data review that counsel for Defendants Conrad & Scherer, LLP ("Conrad & Scherer") and Terrence Collingsworth conducted in compliance with the Court's very broad October 15, 2014 Order involved searches of multiple servers and computers going back – as you know – for several years.

     Defendants' data collection and review in compliance with the Court's October 15, 2014 Order was massive. It cost over $1 million. It generated a privilege log of over 12,800 documents. It involved multiple and somewhat redundant searches over several servers, as well as certain individual computers. Conrad & Scherer offices in several cities were involved in the data collection efforts.

     This is even more impressive because Conrad & Scherer is approximately a 30-person law firm. Its computer system is not built for massive and complex searches, but rather to run a business.

     But precisely because of our exhaustive search, we found two gaps in e-mail that we want to report to you – along with our efforts to figure out what happened, and the success of some of

T. Michael Brown
H. Thomas Wells, III
March 12, 2015
Page 2



the remedial efforts. Both gaps only came to light through a redundant and very thorough effort to make sure all available sources of potentially responsive documents were searched:

- The first was a weird situation with Terry Collingsworth's Conrad & Scherer email account between June 2008 and March 22, 2013.[1] The *outgoing* e-emails were there – and so were any incoming emails that had been forwarded or replied to or sent to other Conrad & Scherer employees. But the "incoming only" emails that were not otherwise forwarded or replied to or sent to other Conrad & Scherer employees appeared missing. We luckily spotted this. It appeared that the loss of those emails was the product of some kind of Murphy's Law fluke involving storage of the e-mails.

- The second was that certain e-mails from Mr. Collingsworth's IRAdvocates e-mail account were missing. The emails that were missing were haphazard – for some periods, incoming e-mails were missing. For others, outgoing e-mails were missing. There was no pattern of cherry-picking, again suggesting some kind of accident or mistake involving the storage of the e-mails.

It is not surprising that an exhaustive search using broad search terms of multiple servers over many years at multiple offices would find some anomalies like this.

But we have been determined to get to the bottom of these anomalies and report to the court what we are finding.

After we submitted our privilege logs and document production, we therefore spent several weeks conducting an extensive internal investigation to search for the missing e-mails and to determine why we could not find this electronic data.

Although we were confident that our document collection methodology and searches captured nearly all of the responsive documents, we have been determined to turn over every stone to find what we believe is a small amount of e-mail that was not collected previously. We are still investigating, but wanted to provide a report to you before next week's scheduled status hearing.

To supplement the internal efforts to deal with the complexity of the server systems, we have now retained Dennis Williams of Pathway Forensics ("Pathway").

Mr. Williams is a top national forensic expert with 32 years' experience with the FBI. He led a team of FBI computer experts that worked the Enron investigation. He has worked in key

---

[1] As discussed below, we have now located Mr. Collingsworth's incoming e-mails for this e-mail account from June 2008 through March 2011.

T. Michael Brown
H. Thomas Wells, III
March 12, 2015
Page 3



positions both at the FBI's Washington D. C. headquarters and in leading the FBI's Houston computer forensics laboratory supplying forensic expertise to government investigators and prosecutors in a variety of cases around the United States. (*See* Affidavit of Dennis Williams ¶¶ 2-6, attached hereto as Exhibit A.)

Mr. Williams has also worked for Fortune 500 companies in conducting e-discovery searches. (*Id.* ¶ 27.) He knows how complex e-discovery is done.

We asked Pathway to 1) attempt to locate the electronic data that we were not able to find in our document collection efforts; 2) review the sufficiency and thoroughness of our initial e-discovery collection efforts; and 3) determine after finding any additional information whether any of the information still not located appeared to have been intentionally deleted. As part of its examination, Pathway interviewed Defendants' IT support staff involved in the document collection efforts to understand how Defendants maintained documents in the ordinary course and how we identified and collected electronic data from those custodians, computers, servers, and databases. Pathway has determined that the document collection efforts were thorough and reasonable in light of the normal standards for discovery. (*Id.* ¶ 27.)

Pathway has proved its worth by identifying a way to locate some of the data we were missing. That data was found on a previously decommissioned server and in several archived files that had not been searched previously. (*Id.* ¶ 25.)

The files included:

- An archived e-mail file containing Mr. Collingsworth's Conrad & Scherer inbox from June 2008 through March 2011.

- An archived e-mail file that contained 26 e-mails from a previous search for communications between Mr. Collingsworth and Ivan Otero or Mr. Collingsworth and Jaime Blanco.

- Three archived electronic files that contain e-mails from Mr. Collingsworth's International Rights Advocates e-mail account.

- Archived e-mail files for every custodian for whom we previously collected.

We have processed and reviewed the e-mails in Mr. Collingsworth's Conrad & Scherer inbox from June 2008 through March 2011.

This process revealed only a *de minimis* number of responsive documents that had not been found and searched in our earlier review. For example, our review found that out of the approximately 13,000 e-mails that were in this file, we had already collected and reviewed



T. Michael Brown
H. Thomas Wells, III
March 12, 2015
Page 4

approximately 12,900 (99%) of them because we had previously collected a copy of the same e-mail – either through another custodian, or through Mr. Collingsworth's own response to the e-mail or as part of an e-mail chain.

Today, we are producing 22 responsive, non-privileged documents in this set that were not previously collected. That is truly a few needles in a haystack already produced.

Also, we are submitting a supplemental privilege log that contains 41 entries for documents in this set that were not previously logged. That is a couple new pages in a privilege log that already runs over 2,400 pages. The Special Master can review those 41 entries and documents to determine that they have no material effect in adding new evidence to the huge existing privilege log.

That in itself shows the exhaustive nature of our previous search.

Similarly, we processed and reviewed the 26 documents sent between Mr. Collingsworth and Ivan Otero or between Mr. Collingsworth and Jaime Blanco. Our review determined that only 10 documents in this set were not previously collected and reviewed in our initial collection. Today, we are producing those 10 documents.

We are in the process of reviewing the additional archived electronic files that contain Mr. Collingsworth's International Rights Advocates e-mails, but our cursory review shows that many of these files are duplicative of e-mails in our prior collections. We expect to produce any responsive, non-privileged documents and any additional privilege log next week.

We also processed and de-duplicated a sampling of the archived backup of e-mails for the custodians. Similar to the results above, nearly all of the e-mails are duplicative of our prior collections.

Before continuing this extremely expensive process of reviewing archived backups – which expert Dennis Williams states is not typically done in e-discovery work - because it typically produces so little additional information when balanced with the high costs, we are seeking guidance from the Court on how to continue and whether this is worth it.

We hope to address this at our next status conference.

Again, the review of these recently located archived e-mail files has resulted in us finding that nearly all of the "new" e-mails are duplicative of e-mails that were collected and reviewed previously. This finding supports our conclusion that the redundancy of our initial search methodology accounted for and eliminated nearly all of the potential problems and therefore, any concern about the loss of responsive electronic data is greatly reduced.

T. Michael Brown
H. Thomas Wells, III
March 12, 2015
Page 5



Nevertheless, we are still working with Pathway to identify some of the additional electronic files that we have not located to date, including:

- Mr. Collingsworth's Conrad & Scherer's weird "incoming-only" emails (not those forwarded, replied to, or with copies to other Conrad & Scherer employees) from about March 17, 2011 through about March 22, 2013.[2]

- Collingsworth's IRAdvocates e-mail for the following periods:

  o All his e-mails from late 2007 through about June 2008;
  o All his incoming e-mails from about June 2008 through about December 2010 (except incoming e-mails between about February 26, 2010 and May 7, 2010, we have found);
  o All his outgoing e-mails from about May 4, 2010 through about December 2010;
  o Many of his outgoing e-emails from about December 2010 through October 26, 2011;
  o All his outgoing e-emails from about October 27, 2011 through about February 3, 2012; and
  o All his incoming emails from about October 27, 2011 through about March 22, 2013.

Defendants no longer have every computer or hard drive used by Mr. Collingsworth in this time frame – certain of those devices were disposed of prior to Defendants recognizing that any of Mr. Collingsworth's e-mails were missing. Defendants are continuing to investigate whether those e-mails are stored elsewhere.

Here is a more detailed – and somewhat duplicative – breakdown and analysis of our findings summarized above:

I.     Mr. Collingsworth's Conrad & Scherer E-mail Account

Defendants have determined that a limited, identifiable set of e-mails associated with the Conrad & Scherer e-mail account used by Mr. Collingsworth (tc@conradscherer.com) (the "Collingsworth Account") were not saved.

Conrad & Scherer typically saves e-mails sent from and received to firm e-mail accounts on a particular server (the "Conrad & Scherer E-mail Server"). Conrad & Scherer followed this practice after Mr. Collingsworth began using the Collingsworth Account in 2008. However, the

---

[2] Note that pursuant to the Court's October 15, 2014 Order, Defendants have no obligation to log documents after January 1, 2013.

T. Michael Brown
H. Thomas Wells, III
March 12, 2015
Page 6



*incoming* e-mails on the Collingsworth Account between March 17, 2011 and March 22, 2013 were not saved on the Conrad & Scherer E-mail Server.

We are still investigating whether the e-mails can be located. However, the loss of those incoming-only e-mails is mitigated greatly in several important ways:

A. All of the *outgoing* e-mails sent from the Collingsworth Account were preserved on the Conrad & Scherer E-mail Server.

B. Because the outgoing e-mails on the Collingsworth Account were saved, any incoming message that Mr. Collingsworth either replied to or forwarded to anyone else was preserved (as part of the reply or forwarded e-mail chain).

C. The Conrad & Scherer E-mail Server still has both incoming and outgoing accounts for current and former Conrad & Scherer employees who worked with Mr. Collingsworth on litigation involving Drummond (*e.g.*, Susana Tellez). As a result, there is a copy on the Conrad & Scherer E-mail Server of all the e-mails that were sent to the Collingsworth Account by Mr. Collingsworth's co-workers using their Conrad & Scherer e-mail accounts.

D. Further, because incoming and outgoing e-mails were saved for the other Conrad & Scherer e-mail accounts, a copy of any e-mails that were sent to both the Collingsworth Account *and* another Conrad & Scherer account (*e.g.*, in the to, cc or bcc fields) was also saved on the Conrad & Scherer E-mail Server.

Thus, the only e-mails that were not retained on the Conrad & Scherer E-mail Server were *incoming* e-mails sent to the Collingsworth Account between March 17, 2011 and March 22, 2013 that:

1. were not replied to or forwarded to any other e-mail account; *and*

2. were sent by someone who was not using a Conrad & Scherer e-mail account; *and*

3. were *not* sent to any other Conrad & Scherer e-mail account (e.g., in the to, cc, or bcc fields).

In conducting the document review to comply with the October 15, 2014 Order, counsel for Defendants searched the entire Conrad & Scherer E-mail Server for responsive documents. Many of these searches were done in redundant ways. Multiple and comprehensive search terms were made on every major category of documents required under the Court's October 15, 2014 order. Both Spanish and English terms were used. All this creates a whole series of "nets" that would catch any relevant email.

T. Michael Brown
H. Thomas Wells, III
March 12, 2015
Page 7



As is evident both by the documents produced in this case and the information contained on Defendants' privilege log, there were many e-mails sent to the Collingsworth Account that were saved. Thus, the ultimate loss of electronic data here appears minimal.

II.     Mr. Collingsworth's International Rights Advocates ("IRAdvocates") E-mail Account

Defendants have also determined that not all e-mails associated with an International Rights Advocates e-mail account used by Mr. Collingsworth (tc@iradvocates.com) (the "Collingsworth IRA Account") were saved.

IRAdvocates used a number of different servers over the years to store e-mail, including e-mail sent to or from the Collingsworth IRA Account. As Defendants previously informed Drummond, in late 2007, IRAdvocates changed the companies that had provided a server and IT support to IRAdvocates. Both of those companies went out of business, and Defendants no longer have access to any information, including any e-mails associated with the Collingsworth IRA Account, stored on that server.

By at least November or December 2010, IRAdvocates had begun to save its e-mails with a web-based server company. E-mails associated with the Collingsworth IRA Account were saved with the web-based server company until about October 27, 2011, when IRAdvocates began to save its e-mails on the Conrad & Scherer E-mail Server. Upon review, the web-based server retained incoming e-mails for the Collingsworth IRA Account from about December 2010 through about October 26, 2011, but retained only a small number of outgoing e-mails from that period. The emails saved with the web-based server company were reviewed and searched in our prior efforts.

From about October 27, 2011 through about February 5, 2012, the Collingsworth IRA e-mail account was treated as an alias of the Collingsworth Account – e-mails for both e-mail accounts were saved on the Conrad & Scherer E-mail Server.

On about February 5, 2012, e-mails for IRAdvocates e-mail addresses, including the Collingsworth IRA Account, were saved on a different server (the "IRA E-mail Server").

Based on our review, outgoing e-mails sent from the Collingsworth IRA Account beginning on about February 3, 2012 remain on the IRA E-mail Server. Those emails have been searched previously. However, incoming e-mails received on the Collingsworth IRA Account prior to about March 22, 2013 were not saved on the IRA E-mail Server.

Again, the loss of any e-mails is mitigated in significant ways for many of the reasons discussed above:

T. Michael Brown
H. Thomas Wells, III
March 12, 2015
Page 8



- As before, to the degree that Defendants have outgoing e-mails from the Collingsworth IRA Account, those e-mail chains will include incoming e-mails that were forwarded or replied to by Mr. Collingsworth.

- Similarly, to the degree that Defendants retain incoming e-mails on the Collingsworth IRA Account, those e-mail chains also include replies that others sent to e-mails that Mr. Collingsworth sent.

Further, Defendants also searched e-mails between the Collingsworth IRA Account and other e-mail accounts used by Conrad & Scherer personnel (including Mr. Collingsworth himself using the Collingsworth Account) as well as the following individuals who used IRAdvocates email accounts for the following time periods:

| Lorraine Leete | 9/18/2012-1/1/2013 |
| Cassie Webster | 9/18/2012-1/1/2013 |
| Charity Ryerson | 9/5/2012-1/1/2013. |

In conclusion, we are continuing our efforts to locate the missing e-mails and we are still investigating the reasons why the e-mails were not saved. This letter is primarily focused on efforts to find some email gaps that literally came to light because of our exhaustive search following the October 15, 2014 Order, which greatly broadened the scope of what Defendants needed to review. Those gaps were not immediately obvious without such work.

This letter does not provide detail to the Court on the massive and exhaustive effort instituted by new defense counsel that produced so much information.

But we urge the Court to rely on our post-October 15, 2014 search – rather than the searches made by Defendants prior to that point – because of that massive and exhaustive effort.

For example, a letter sent by Brad Smith to Drummond counsel in April 2014 about electronic searches should not be relied upon without clarification. That summary was done before the October 15, 2014 Order, so the searches done before the letter was sent were not as broad as new counsel's later searches. Further, the summary did not make clear that one technique used to search for an individual's e-mails was to search other custodian's accounts for e-mails to or from that person (*e.g.*, that was the only way in which e-mails to or from Rebecca Pendleton's IRAdvocates e-mail account were searched) or relied on a kind of self-reporting of potentially responsive e-mails by some respondents. [3]

---

[3] Defendants did not have access after the October 15, 2014 Order to two sources of data addressed in the April 2014 letter – the personal laptop of Lorraine Leete and the personal e-mail account of Lorraine Leete (lorrainemleete@gmail.com). Those personal items are in the sole possession of Ms. Leete, who no longer works with Defendants.



T. Michael Brown
H. Thomas Wells, III
March 12, 2015
Page 9

      New defense counsel made the decision following the October 15, 2014 Order to begin searching from scratch.  This approach was redundant and expensive, but was done to make sure the job was done right.

      Please contact me with any questions or concerns.

                      Regards,

                      Christopher S. Niewoehner

cc:    Tony Davis
       Ben Presley

FILED

2015 Aug-31  AM 11:28
U.S. DISTRICT COURT
N.D. OF ALABAMA



# Exhibit 13

*Filed under seal pursuant to Stipulated Protective Order*

| From: | Juan C. Rodriguez |
|---|---|
| To: | Maggie C. Crosby; Terrence Collingsworth |
| Sent: | 6/14/2012 10:33:37 AM |
| Subject: | RE: TC's old emails |

Maggie, his old emails are in the mac.. can you provide me more information so I can help you?

Juan Carlos Rodriguez
Director of IT
**Conrad & Scherer, LLP**
633 South Federal Highway
Fort Lauderdale, Florida 33301
Office: (954)-847.3304
Fax: (954)-667-7961
Email: Jcrodriguez@conradscherer.com

**From:** Maggie C. Crosby
**Sent:** Thursday, June 14, 2012 10:33 AM
**To:** Juan C. Rodriguez
**Subject:** TC's old emails

Hi Juan,
I need to run searches through Terry's old emails to produce for defendants in a case. I know that you had had to pull them off and save them somewhere when his computer got switched over. What's the best way for me to run searches through ALL his old emails?
Maggie

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER    CS_TC011130

| From: | Juan C. Rodriguez |
|---|---|
| To: | Maggie C. Crosby |
| Sent: | 6/15/2012 5:03:07 PM |
| Subject: | RE: TC emails |

No., those are the emails from the email system., I don't have his mac., so I cannot get anything from there!

Juan Carlos Rodriguez
Director of IT
**Conrad & Scherer, LLP**
633 South Federal Highway
Fort Lauderdale, Florida 33301
Office: (954)-847.3304
Fax: (954)-867-7961
Email: Jcrodriguez@conradscherer.com

**From:** Maggie C. Crosby
**Sent:** Friday, June 15, 2012 5:03 PM
**To:** Juan C. Rodriguez
**Subject:** RE: TC emails

For the emails that you pulled to his mac?

**From:** Juan C. Rodriguez
**Sent:** Friday, June 15, 2012 5:01 PM
**To:** Maggie C. Crosby
**Subject:** RE: TC emails

On outlook .go to file, then open, and look for the file.

And that's it.

jc

Juan Carlos Rodriguez
Director of IT
**Conrad & Scherer, LLP**
633 South Federal Highway
Fort Lauderdale, Florida 33301
Office: (954)-847.3304
Fax: (954)-867-7961
Email: Jcrodriguez@conradscherer.com

**From:** Maggie C. Crosby
**Sent:** Friday, June 15, 2012 5:01 PM
**To:** Juan C. Rodriguez
**Subject:** RE: TC emails

Thank you Juan! Can you tell me how to look on his mac also?

**From:** Juan C. Rodriguez
**Sent:** Friday, June 15, 2012 4:49 PM
**To:** Maggie C. Crosby
**Subject:** RE: TC emails

Maggie, the search is done, the pst file is located on the I drive under Drummond lawsuit, the file is called tc Drummond search



CONFIDENTIAL

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER   CS_TC011131



Thanks

juan

Juan Carlos Rodriguez
Director of IT
**Conrad & Scherer, LLP**
633 South Federal Highway
Fort Lauderdale, Florida 33301
Office: (954)-847-3304
Fax: (954)-987-7061
Email: Jcrodriguez2@conradscherer.com

_____

**From:** Maggie C. Crosby
**Sent:** Friday, June 15, 2012 3:23 PM
**To:** Juan C. Rodriguez
**Subject:** TC emails

Hi Juan,
As we discussed, will you please pull the following and send it to me? We'll need it by Wednesday morning. Thank you!

- All his communication with Ivan Otero (oteroivan@hotmail.com)
- All his communication with Jaime (jblance1999@yahoo.com) and any attached or linked documents

Maggie

CONFIDENTIAL

PF00002373

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER    CS_TC011132

FILED

2015 Aug-31 AM 11:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 15

*Filed under seal pursuant to Stipulated Protective Order*

| | |
|---|---|
| **From:** | Victoria D. Ryan |
| **To:** | 'Vickie Shores' |
| **Sent:** | 5/6/2011 3:12:55 PM |
| **Subject:** | RE: follow-up for Hosted Exchange email for IRAadvocates |

Hi Vickie, let me speak with Terry. I think this sounds like a good option, but I'll need to get Terry's feedback. If we do want to select that hosting option, can you give me an idea of the timing & steps for the switch-over process, from Siteground to the Hosted Exchange you mention? I.e., how far in advance do we need to plan this? Are we absolutely positive that it will not affect the associated website that is hosted through Siteground at the moment?

I'm aware that it can take 2 to 48 hours to switch everything over.

Right now I do believe all of Terry's emails are still on the Siteground server—I was not able to archive his emails in his Outlook on his Mac Laptop in the office, though I was able to organize them better in his Inbox.

Before doing any kind of hosting switch, we should to schedule an appointment to have a technician archive Terry's email on a non-Mac. Right now I'm not sure what his Outlook shows when he opens it on his PC at home--- but that might be where we take the emails and archive them (with a copy to an external portable harddrive).

Terry's supposed to let me know some times that would work for him to do this next week.

Thanks,
Victoria Ryan
Legal Assistant
Conrad & Scherer, LLP
1156 15th Street NW, Suite 502
Washington, D.C. 20005
Main Line: 202-543-4001
Direct Phone: 202-527-7982
Fax: 1-866-803-1125

---

**From:** Vickie Shores [mailto:vshores@ctssinc.com]
**Sent:** Wednesday, May 04, 2011 4:15 PM
**To:** Victoria D. Ryan
**Subject:** follow-up for Hosted Exchange email for IRAadvocates

Hello Victoria,
I wanted to follow-up on the Hosted Exchange option that I sent to you for Terry. Do you or Terry want to discuss this?


Vickie Shores
CTSS, Inc.
8309 Richmond Highway
Alexandria, VA 22309
703-360-5552
703-780-9543 fax
vshores@ctssinc.com

---

**From:** Vickie Shores
**Sent:** Wednesday, April 20, 2011 6:29 PM
**To:** 'Victoria D. Ryan'
**Cc:** Dispatch
**Subject:** RE: appointment for Monday April 25

CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER

Hello Victoria,

I spoke with Josh about the hosted email for IRAadvocates and recommend a Hosted Exchange solution that allows up to 3 emails, calendar and full email backup offsite for $45/per month.  I am available to discuss this option anytime.

Vickie Shores
CTSS, Inc.
8309 Richmond Highway
Alexandria, VA  22309
703-360-5552
703-780-9543 fax
vshores@ctssinc.com

---

**From:** Victoria D. Ryan [mailto:VRyan@conradscherer.com]
**Sent:** Tuesday, April 19, 2011 4:47 PM
**To:** Tech Support
**Subject:** appointment for Monday April 25

Hi Terrye, can we schedule for someone to come in to our office on Monday, April 25th? Pretty much any time after 9:15 is good. A new laptop will have arrived for our attorney Christian, and in case we have any set-up problems with it in this office I'd like to have a technician scheduled to come in.

I also need some assistance in archiving the emails on Terry's Mac laptop. It's not quite the same as with  PC—you can save the files locally on the computer but it doesn't look like you can view/search for them within Outlook as you could on a PC. Would it be possible in the next few days for someone to do remote work with me on the other end? I'm not sure yet of the time but wanted to give a heads-up.

Additionally, could you check in to see if there's been progress with looking at a new mail host for Terry (aka for IRAdvocates)?

If it turns out we don't need the Monday appointment I'll let you know to cancel.

Thanks,
Victoria Ryan
Legal Assistant
Conrad & Scherer, LLP
1156 15th Street NW, Suite 502
Washington, D.C. 20005
Main Line: 202-543-4001
Direct Phone: 202-527-7982
Fax: 1-866-803-1125

CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER

FILED

2015 Aug-31 AM 11:28
U.S. DISTRICT COURT
N.D. OF ALABAMA



# Exhibit 16

*Filed under seal pursuant to Stipulated Protective Order*



Victoria Ryan <victoriadryan@gmail.com>

# FW: Tech will be down late this morning to help Terry archive

**Maggie C. Crosby** <MCrosby@conradscherer.com>
To: "victoriadryan@gmail.com" <victoriadryan@gmail.com>

Tue, Nov 22, 2011 at 10:17 AM

As you can see...we're still working on the email archiving situation.  Have we done any of this in the past?  Or are we just now trying to get it all resolved?  If we do this the way that TC describes below, it sounds like something that I could take a couple hours and pull sensitive emails onto an external hard drive myself.  What is your understanding?

**From:** Terrence Collingsworth
**Sent:** Tuesday, November 22, 2011 10:13 AM
**To:** Maggie C. Crosby
**Subject:** Re: Tech will be down late this morning to help Terry archive

Well please confirm that they know how to put it on an external hard drive that I can access. They keep wanting to do some cloud thing and I keep saying no, first let's clean out because the stuff I have is too sensitive and I don't want it out there. I'd like to be able to save really sensitive stuff om an external hard drive and then the routine stuff I don't care — they can cloud it. BUT if they aren't ready to do what I actually need, then tell them to figure it out

**From:** "Maggie C. Crosby" <MCrosby@conradscherer.com>
**Date:** Tue, 22 Nov 2011 10:06:08 -0500
**To:** Terrence Collingsworth <tc@conradscherer.com>
**Subject:** FW: Tech will be down late this morning to help Terry archive

Hey Terry,

Do you want for me to confirm this so we can get your email situation squared away?  Or would you rather postpone?

Maggie

**From:** dispatch ctssinc.com [dispatch@ctssinc.com]
**Sent:** Tuesday, November 22, 2011 8:51 AM
**To:** Maggie C. Crosby
**Subject:** Tech will be down late this morning to help Terry archive

Hello Maggie,

The tech will be down later this morning to help Terry archive his email.

CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER

Terrye Nissley
Customer Service

CTSS, Inc.
8309 Richmond Highway
Alexandria, VA 22309

703-360-5552
dispatch@ctssinc.com

CS_TC007541

FILED
2015 Aug-31 AM 11:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 17

*Filed under seal pursuant to Stipulated Protective Order*

| From: | Terry Collingsworth |
|---|---|
| To: | Victoria D. Ryan |
| CC: | Non-responsive |
| Sent: | 3/29/2010 10:12:44 AM |
| Subject: | Re: tech guys will be coming today RE: computer stuff and my house |

Well having not heard from you we made other plans. They can come next time they are at office. Please do have them wipe the laptop as requested and leave it in my office

Terry Collingsworth
202-543-5811
202-255-2198 (cell)

On Mar 29, 2010, at 9:31 AM, "Victoria D. Ryan" <VRyan@conradscherer.com> wrote:

Hi Terry (and Sufie)--yes, sorry I did not email you, I wasn't checking email over the weekend. We are confirmed to have the tech people come in today (new equipment is also in) and they will be able to stop by your house after coming here.

They are scheduled to be here from 11:30am-2:30pm, but I think they may not need that much time. I can give Sufie a call to give her a better idea of their timing if we get an idea.

Concerning your current laptop-- once files are transferred to the new desktop (which may take awhile), we have 2 choices for a "wipe" of the current laptop:

1. Delete all your old files, etc., but keep the main programs you use (could be done today) - probably would not have too much of an effect on speed, maybe a bit.
2. Completely wipe everything and restore the computer to original set-up (most likely will take a few hours; would need original discs, which I am searching for, and it might be cheaper to ship it to Florida to have them do it--Joe now on vacation thru April 6th, but I'm going to call someone else there to discuss). Steve said this would make it run faster.

If you have a preference, let me know--I will let you know what Florida says in the meantime.


Victoria Ryan
Legal Assistant
Conrad & Scherer, LLP
1156 15th Street NW, Suite 502
Washington, D.C. 20005
Phone: 202-543-4001
Fax: 1-866-803-1125

---

**From:** Terry Collingsworth [tc@iradvocates.org]
**Sent:** Wednesday, March 24, 2010 10:27 AM
**To:** Victoria D. Ryan
**Cc:** Non-responsive
**Subject:** computer stuff and my house

FIRST, FORGET ABOUT SWITCHING THE KEYBOARD – let's keep the same setup


Please forward to CSC folks


As to my home office

CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER

# Non-responsive

Here is what we need

1. My home desktop – please check for virus – it has been popping up a screen that says I have a virus and then its trying to sell me software to fight it

2. Printer attached to home desktop – I have a new printer cartridge but I can't get it to fit.

3. After you install the new PC in my office and transfer files, wipe the laptop I'm currently using [by this I mean get rid of all files but I want it set up with the programs I currently have on it – I'm hoping this makes it faster and going forward I will work on my docs using a flash drive] and set it up in my back office at home (Sufie will show you where). I will use this for travel and will leave it set up and home when I'm not.

4. Can you set up our wireless with a new password and give it to Sufie

5. Please also check the PC in basement for viruses etc

Steven and Josh – everything can be billed as work on Terry's home office – my firm supports my home office because I do a lot of work there.

VICTORIA, please confirm with me and Sufie by email above if this date changes, Thanks, Terry

CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER

CS_TC007513

FILED

2015 Aug-31 AM 11:28
U.S. DISTRICT COURT
N.D. OF ALABAMA



# Exhibit 18

*Filed under seal pursuant to Stipulated Protective Order*

FOR THE NORTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| DRUMMOND COMPANY, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:11-CV-3695-RDP |
| | ) | |
| TERRENCE P. COLLINGSWORTH, individually | ) | |
| and as an agent of Conrad & Scherer, LLP; and | ) | |
| CONRAD & SCHERER, LLP, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## DEFENDANTS' EIGHTH AMENDED AND SUPPLEMENTAL OBJECTIONS AND RESPONSES TO PLAINTIFF DRUMMOND COMPANY, INC.'S THIRD SET OF INTERROGATORIES NUMBER 2

Defendants TERRENCE P. COLLINGSWORTH and CONRAD & SCHERER, LLP (collectively, "Defendants") hereby submit their Eighth Amended and Supplemental Objections and Responses to Plaintiff Drummond Company, Inc.'s ("Drummond's") Third Interrogatories, dated February 11, 2014.

## GENERAL OBJECTIONS

Defendants' responses to Drummond's Third Interrogatories ("Interrogatories") are subject to the following General Objections, as applicable. The General Objections are set forth here to avoid the duplication and repetition of restating them for each Interrogatory. Defendants are amending and supplementing the General Objections set forth in Defendants' prior responses to all Interrogatories. The General Objections set forth here supersede and govern Defendants' responses to the extent that there are any inconsistencies between these General Objections and prior General Objections. The failure to list any General Objection applicable within a specific response should not be construed as a waiver of that General Objection.

Defendants reserve the right to revise, correct, add to, supplement, modify or clarify any of the responses or objections set forth herein.

1. Defendants object to these Interrogatories to the extent they seek information or materials that were generated, received or obtained by Defendants in anticipation of litigation, or that are protected from discovery by the attorney-client privilege, the work product doctrine or any other applicable privilege of discovery immunity. Such privileged or otherwise protected information or materials includes the advice of counsel with respect to particular claims. Any

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

inadvertent disclosure of such information or materials shall not be deemed a waiver of the attorney-client privilege, the attorney work-product doctrine or any other applicable privilege or doctrine.

2.    Defendants object to the Interrogatories to the extent they seek information or documents not relevant to the subject matter of this lawsuit and not reasonably calculated to lead to the discovery of admissible evidence.  To the extent that Defendants produce information or materials in response to these Interrogatories, Defendants do not concede that any such information or materials are admissible in evidence or relevant to issues in this action. Defendants reserve any and all objections to the use or admission of any information, materials or documents contained, identified or produced in response to these Interrogatories.

3.    Defendants object to the Interrogatories to the extent they seek information that is already in Drummond's possession, custody or control or that is obtainable from another source that is more convenient or less expensive.

4.    Defendants object to the Interrogatories to the extent they seek information or documents that do not already exist, or information or documents that are not within Defendants' possession, custody or control.

5.    Defendants object to these Interrogatories, including the "Definitions" and "Instructions" contained in them, to the extent they purport to impose obligations in addition to, or different from, those imposed by the Federal Rules of Civil Procedure and/or the Local Rules of this Court.

6.    Defendants object to these Interrogatories to the extent they seek information containing confidential, proprietary or sensitive business information.

7.    Defendants' responses and objections to the Interrogatories are based on information now known to Defendants. Defendants have not yet completed their search for relevant documents, their discovery of the facts in this lawsuit or their preparation for trial, and therefore, reserves the right to amend, modify or supplement its responses and objections if Defendants learn of new information.

8.    Defendants object to the Interrogatories to the extent they seek information after December 31, 2012.  Unless otherwise noted, the responses to these Interrogatories will relate to information before December 31, 2012.

## **ANSWER**

## **INTERROGATORY NO. 2**

Identify every instance in which Defendants (or any member of their litigation team)

have offered to provide assistance (regardless of whether such assistance was actually provided)

to any witness, any relative or friend of any witness, any Colombian paramilitary, or any relative

2

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

of any Colombian paramilitary. For purposes of this interrogatory, "assistance" is meant to include, but not be limited to, solicitation of business proposals, legal advice, payment of attorneys' fees, provision of any attorney, prison transfers, negotiations or other communications with Colombian prosecutors, offers to communicate with contacts in Washington, D.C., offers to assist in requests for extradition, offers to communicate with the FBI, and assistance with sentencing.

**AMENDED AND SUPPLEMENTAL OBJECTIONS AND RESPONSE:**

Defendants incorporate the General Objections above and the Objections set forth in their response dated November 24, 2014, as if fully stated herein. Defendants object to the Interrogatory to the extent that it seeks information that is protected by the attorney-client or attorney work product doctrine or any other applicable privilege. Defendants object to the phrase "to any witness, any relative or friend of any witness" as vague, ambiguous, and overly broad. For example, there have been allegations of payments to witnesses with fact testimony when in fact the individuals were not witnesses with fact testimony. Further, the identification of non-fact witnesses in unrelated matters is privileged work product and in this case, could impact the safety of the individuals involved. Defendants object to the term "witness" as applied to plaintiffs or potential plaintiffs in *Romero, Balcero, Baloco* or *Melo,* as those individuals typically did not have information about Drummond. Subject to that objection, in this response, when Defendants use the term plaintiff or potential plaintiff they are referring only to individuals who could serve in that role in the cases of *Romero, Balcero, Baloco* or *Melo.* Moreover, much of the information sought by this Interrogatory is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

3
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Although the term "offer of assistance" is extremely vague and Defendants are not required to provide anything other than concrete offers, out of an abundance of caution, Defendants are hereby providing information beyond the scope of the interrogatory posed.

Subject to and without waiving the foregoing general and specific objections, Defendants respond as follows.

**1.     Jaime Blanco Maya**

      A.     <u>Defendant Collingsworth</u>

After reviewing additional documents, I see that Mr. Van Bilderbeek sent $60,000 to Mr. Otero in about September 2011, which I understand to have been, at least in part, for Mr. Blanco.

      B.     <u>Defendant Conrad & Scherer, LLP</u>

Defendant Conrad & Scherer, LLP does not have any independent knowledge as to the payments made by Mr. Van Bilderbeek to Mr. Blanco via Mr. Otero.  William Scherer, managing partner of Conrad & Scherer, LLP, did not know of the information detailed above in Defendant Collingsworth's response.  Mr. Scherer only just learned about this in the course of preparing this supplementary response.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

I declare under penalty of perjury that the foregoing Interrogatory Response 1A is true and correct to the best of my knowledge.

_____
Terrence P. Collingsworth

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

On behalf of Conrad & Scherer, LLP I hereby declare under penalty of perjury that the foregoing Interrogatory Response 1B is true and correct to the best of its knowledge.

William Scherer

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

As to objections,

*/s/Christopher S. Niewoehner*
Christopher S. Niewoehner
Admitted *pro hac vice*
Steptoe & Johnson LLP
115 South LaSalle Street, Suite 3100
Chicago, IL 60604
Tel: 312-577-1240
Fax: 312-577-1370
cniewoehner@steptoe.com

Kendall R. Enyard
Savannah E. Marion
Admitted *pro hac vice*
Steptoe & Johnson LLP
1330 Connecticut Avenue NW
Washington, DC 20036
Tel: 202-429-6405

Kenneth E. McNeil, Esq.
Stuart V. Kusin, Esq.
Adam Carlis, Esq.
Susman Godfrey, LLP
Admitted *pro hac vice*
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Tel: 713-651-9366
kmcneil@susmangodfrey.com
skusin@susmangodfrey.com
acarlis@susmangodfrey.com

Robert K. Spotswood, Esq. (Alabama Bar No. SPO 001)
William Paulk, Esq.
Michael Sansbury, Esq.
Spotswood Sansom & Sansbury LLC
One Federal Place
1819 Fifth Avenue North, Suite 1050
Birmingham, Alabama 35203
Tel: 205-986-3620
rks@spotswoodllc.com
wpaulk@spotswoodllc.com
msansbury@spotswoodllc.com

7

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## CERTIFICATE OF SERVICE

I hereby certify that on this <u>19th</u> day of August 2015, I caused a true and correct copy of the foregoing DEFENDANTS' EIGHTH AMENDED AND SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFF'S THIRD SET OF INTERROGATORIES NUMBER 2 to be served on the following parties electronically:

William Anthony Davis, III, Esq.
H. Thomas Wells, III, Esq.
Benjamin T. Presley
STARNES DAVIS FLORIE, LLP
P.O. Box 59812
Birmingham, Alabama 35259
tdavis@starneslaw.com
htw@starneslaw.com
btp@starneslaw.com

Sara E Kropf
LAW OFFICE OF SARA KROPF PLLC
1001 G Street NW, Suite 800
Washington, D.C. 20001
sara@kropf-law.com

*Counsel for Plaintiff*

*s/ Christopher S. Niewoehner*
Christopher S. Niewoehner

FOR THE NORTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| DRUMMOND COMPANY, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:11-CV-3695-RDP |
| | ) | |
| TERRENCE P. COLLINGSWORTH, individually | ) | |
| and as an agent of Conrad & Scherer, LLP; and | ) | |
| CONRAD & SCHERER, LLP, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## DEFENDANTS' NINTH AMENDED AND SUPPLEMENTAL OBJECTIONS AND RESPONSES TO PLAINTIFF DRUMMOND COMPANY, INC.'S THIRD SET OF INTERROGATORIES NUMBER 2

Defendants TERRENCE P. COLLINGSWORTH and CONRAD & SCHERER, LLP (collectively, "Defendants") hereby submit their Ninth Amended and Supplemental Objections and Responses to Plaintiff Drummond Company, Inc.'s ("Drummond's") Third Interrogatories, dated February 11, 2014.

## GENERAL OBJECTIONS

Defendants' responses to Drummond's Third Interrogatories ("Interrogatories") are subject to the following General Objections, as applicable. The General Objections are set forth here to avoid the duplication and repetition of restating them for each Interrogatory. Defendants are amending and supplementing the General Objections set forth in Defendants' prior responses to all Interrogatories. The General Objections set forth here supersede and govern Defendants' responses to the extent that there are any inconsistencies between these General Objections and prior General Objections. The failure to list any General Objection applicable within a specific response should not be construed as a waiver of that General Objection.

Defendants reserve the right to revise, correct, add to, supplement, modify or clarify any of the responses or objections set forth herein.

1. Defendants object to these Interrogatories to the extent they seek information or materials that were generated, received or obtained by Defendants in anticipation of litigation, or that are protected from discovery by the attorney-client privilege, the work product doctrine or any other applicable privilege of discovery immunity. Such privileged or otherwise protected information or materials includes the advice of counsel with respect to particular claims. Any

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

inadvertent disclosure of such information or materials shall not be deemed a waiver of the attorney-client privilege, the attorney work-product doctrine or any other applicable privilege or doctrine.

2.    Defendants object to the Interrogatories to the extent they seek information or documents not relevant to the subject matter of this lawsuit and not reasonably calculated to lead to the discovery of admissible evidence.  To the extent that Defendants produce information or materials in response to these Interrogatories, Defendants do not concede that any such information or materials are admissible in evidence or relevant to issues in this action. Defendants reserve any and all objections to the use or admission of any information, materials or documents contained, identified or produced in response to these Interrogatories.

3.    Defendants object to the Interrogatories to the extent they seek information that is already in Drummond's possession, custody or control or that is obtainable from another source that is more convenient or less expensive.

4.    Defendants object to the Interrogatories to the extent they seek information or documents that do not already exist, or information or documents that are not within Defendants' possession, custody or control.

5.    Defendants object to these Interrogatories, including the "Definitions" and "Instructions" contained in them, to the extent they purport to impose obligations in addition to, or different from, those imposed by the Federal Rules of Civil Procedure and/or the Local Rules of this Court.

6.    Defendants object to these Interrogatories to the extent they seek information containing confidential, proprietary or sensitive business information.

7.    Defendants' responses and objections to the Interrogatories are based on information now known to Defendants. Defendants have not yet completed their search for relevant documents, their discovery of the facts in this lawsuit or their preparation for trial, and therefore, reserves the right to amend, modify or supplement its responses and objections if Defendants learn of new information.

8.    Defendants object to the Interrogatories to the extent they seek information after December 31, 2012.  Unless otherwise noted, the responses to these Interrogatories will relate to information before December 31, 2012.

## ANSWER

## INTERROGATORY NO. 2

Identify every instance in which Defendants (or any member of their litigation team)

have offered to provide assistance (regardless of whether such assistance was actually provided)

to any witness, any relative or friend of any witness, any Colombian paramilitary, or any relative

2

of any Colombian paramilitary.  For purposes of this interrogatory, "assistance" is meant to include, but not be limited to, solicitation of business proposals, legal advice, payment of attorneys' fees, provision of any attorney, prison transfers, negotiations or other communications with Colombian prosecutors, offers to communicate with contacts in Washington, D.C., offers to assist in requests for extradition, offers to communicate with the FBI, and assistance with sentencing.

**AMENDED AND SUPPLEMENTAL OBJECTIONS AND RESPONSE:**

Defendants incorporate the General Objections above and the Objections set forth in their response dated November 24, 2014, as if fully stated herein.  Defendants object to the Interrogatory to the extent that it seeks information that is protected by the attorney-client or attorney work product doctrine or any other applicable privilege.  Defendants object to the phrase "to any witness, any relative or friend of any witness" as vague, ambiguous, and overly broad.  For example, there have been allegations of payments to witnesses with fact testimony when in fact the individuals were not witnesses with fact testimony.  Further, the identification of non-fact witnesses in unrelated matters is privileged work product and in this case, could impact the safety of the individuals involved.  Defendants object to the term "witness" as applied to plaintiffs or potential plaintiffs in *Romero, Balcero, Baloco* or *Melo,* as those individuals typically did not have information about Drummond.  Subject to that objection, in this response, when Defendants use the term plaintiff or potential plaintiff they are referring only to individuals who could serve in that role in the cases of *Romero, Balcero, Baloco* or *Melo*. Moreover, much of the information sought by this Interrogatory is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Although the term "offer of assistance" is extremely vague and Defendants are not required to provide anything other than concrete offers, out of an abundance of caution, Defendants are hereby providing information beyond the scope of the interrogatory posed.

Subject to and without waiving the foregoing general and specific objections, Defendants respond as follows.

**1.      Jaime Blanco Maya**

      A.      <u>Defendant Collingsworth</u>

After reviewing additional documents, Mr. Collingsworth sees that Mr. Van Bilderbeek sent $25,000 to Mr. Otero in about December 2011, which Mr. Collingsworth understands to have been, at least in part, for Mr. Blanco.

      B.      <u>Defendant Conrad & Scherer, LLP</u>

Defendant Conrad & Scherer, LLP does not have any independent knowledge as to the payments made by Mr. Van Bilderbeek to Mr. Blanco via Mr. Otero.  William Scherer, managing partner of Conrad & Scherer, LLP, did not know of the information detailed above in Defendant Collingsworth's response.  Mr. Scherer only just learned about this in the course of preparing this supplementary response.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

I declare under penalty of perjury that the foregoing Interrogatory Response 1A is true and correct to the best of my knowledge.

_____

Terrence P. Collingsworth

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

On behalf of Conrad & Scherer, LLP I hereby declare under penalty of perjury that the foregoing Interrogatory Response 1B is true and correct to the best of its knowledge.

William Scherer

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

As to objections,

*/s/Christopher S. Niewoehner*
Christopher S. Niewoehner
Admitted *pro hac vice*
Steptoe & Johnson LLP
115 South LaSalle Street, Suite 3100
Chicago, IL 60604
Tel: 312-577-1240
Fax: 312-577-1370
cniewoehner@steptoe.com

Kendall R. Enyard
Savannah E. Marion
Admitted *pro hac vice*
Steptoe & Johnson LLP
1330 Connecticut Avenue NW
Washington, DC 20036
Tel: 202-429-6405

Kenneth E. McNeil, Esq.
Stuart V. Kusin, Esq.
Adam Carlis, Esq.
Susman Godfrey, LLP
Admitted *pro hac vice*
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Tel: 713-651-9366
kmcneil@susmangodfrey.com
skusin@susmangodfrey.com
acarlis@susmangodfrey.com

Robert K. Spotswood, Esq. (Alabama Bar No. SPO 001)
William Paulk, Esq.
Michael Sansbury, Esq.
Spotswood Sansom & Sansbury LLC
One Federal Place
1819 Fifth Avenue North, Suite 1050
Birmingham, Alabama 35203
Tel: 205-986-3620
rks@spotswoodllc.com
wpaulk@spotswoodllc.com
msansbury@spotswoodllc.com

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of August, 2015, I caused a true and correct copy of

the foregoing DEFENDANTS' NINTH AMENDED AND SUPPLEMENTAL RESPONSES

AND OBJECTIONS TO PLAINTIFF'S THIRD SET OF INTERROGATORIES NUMBER 2 to

be served on the following parties electronically:

William Anthony Davis, III, Esq.
H. Thomas Wells, III, Esq.
Benjamin T. Presley
STARNES DAVIS FLORIE, LLP
P.O. Box 59812
Birmingham, Alabama 35259
tdavis@starneslaw.com
htw@starneslaw.com
btp@starneslaw.com

Sara E Kropf
LAW OFFICE OF SARA KROPF PLLC
1001 G Street NW, Suite 800
Washington, D.C. 20001
sara@kropf-law.com

*Counsel for Plaintiff*

*s/ Christopher S. Niewoehner*
Christopher S. Niewoehner