# Exhibit 1

**In The Matter Of:**

**Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.**

---

Terrence P. Collingsworth - Volume I

*February 20, 2024*

---

Bain & Associates Court Reporting Services, Inc.
505 20th Street North
Suite 1250
Birmingham, AL 35203
Toll Free 1.888.326.0594

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

**Terrence P. Collingsworth - Volume I**
**2/20/2024**

```
1        IN THE UNITED STATES DISTRICT COURT
2       FOR THE NORTHERN DISTRICT OF ALABAMA
3              SOUTHERN DIVISION
4
5 DRUMMOND COMPANY, INC.,   )
6      Plaintiff,           )
7 VS.                       )  CASE NO:
8 TERRENCE P. COLLINGSWORTH,)2:11-CV-3695-RDP
9 et al.,                   )DEPOSITION OF:
10      Defendants.         ) TERRENCE P.
11                          )COLLINGSWORTH
12              VOLUME I
13
14      S T I P U L A T I O N S
15
16       IT IS STIPULATED AND AGREED, by and
17 between the parties through their respective
18 counsel, that the deposition of:
19         TERRENCE P. COLLINGSWORTH,
20 may be taken before Merit Gilley, Commissioner
21 and Notary Public, State at Large, at the Hugo
22 L. Black United States Courthouse, 8th Floor
23 Judicial conference Room, 1729 5th Avenue North,
24 Birmingham, Alabama 35203, on the 20th day of
25 February, 2024, commencing at approximately
                                          Page 1
```

```
1 9:01 a.m.
2
3        IT IS FURTHER STIPULATED AND AGREED
4 that the signature to and reading of the
5 deposition by the witness is not waived, the
6 deposition to have the same force and effect as
7 if full compliance had been had with all laws
8 and rules of Court relating to the taking of
9 depositions.
10
11       IT IS FURTHER STIPULATED AND AGREED
12 that it shall not be necessary for any
13 objections to be made by counsel to any
14 questions, except as to form or leading
15 questions, and that counsel for the parties may
16 make objections and assign grounds at the time
17 of the trial, or at the time said deposition is
18 offered in evidence, or prior thereto.
19              ***
20
21
22
23
24
25
                                          Page 2
```

```
1
2            A P P E A R A N C E S
3
4 FOR THE PLAINTIFF:
5      H. THOMAS WELLS, III
6      BENJAMIN T. PRESLEY
7      WILLIAM ANTHONY DAVIS, III
8      ANNA KATHERINE SHERMAN     (Via Zoom)
9      Attorneys at Law
10     Starnes Davis Florie,LLP
11     100 Brookwood Place, 7th Floor
12     Birmingham, Alabama  35209
13     (205) 868-6000
14     twells@starneslaw.com
15     bpresley@starneslaw.com
16     tdavis@starneslaw.com
17     asherman@starneslaw.com
18
19     SARA E. KROPF     (Via Zoom)
20     Attorney at Law
21     Law Office of Sara Kropf, PLLC
22     1001 G Street NW
23     Suite 800
24     Washington, D.C.  20001
25     Sara@kropf-law.com
                                          Page 3
```

```
1 FOR THE DEFENDANT:
2      WILLIAM T. PAULK
3      ROBERT K. SPOTSWOOD
4      ALEX SPANOS    (Via Zoom)
5      Attorneys at Law
6      Spotswood Sansom & Sansbury, LLC
7      Financial Center, 505 20th Street North
8      Birmingham, Alabama  35203
9      (205) 986-3620
10     wpaulk@spotswoodllc.com
11     rks@spotswoodllc.com
12     aspanos@spotswood.com
13
14
15 ALSO PRESENT:
16     Blake Andrews, Drummond Company
17     Eric Hager, Conrad & Scherer  (Via Zoom)
18     Paige Byrd, Videographer
19
20
21
22
23
24
25
                                          Page 4
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 1 (1 - 4)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

**Terrence P. Collingsworth - Volume I**
**2/20/2024**

```
 1              EXAMINATION INDEX
 2
 3 Terrence P. Collingsworth
 4 BY MR. WELLS . . . . . . . . . . . . . . 11
 5
 6
 7              EXHIBIT INDEX
 8
 9 Plaintiff's Exhibit                      MAR
10  1    Tab 187 - 8-18-09 Email Chain       15
11         Regarding Finance issues
12  2    Tab 253 - 9-2-11 Email Chain        22
13         Regarding Drummond Deps
14  3    Tab 257 - 6-21-12 Email Chain       31
15         Regarding Usual
16  4    Tab 258 - 7-19-12 Email Chain       42
17         Regarding Here is Confirmation
18  5    Tab 260 - 1-13-11 Email Chain       50
19         Regarding Status
20  6    Tab 261 - 1-19-11 Email Regarding tc 52
21         to colombia
22  7    Tab 262 - 3-5-13 Email Regarding    58
23         Questions Privileged and
           Confidential
24  8    Tab 263 - Text Message Summary      62
25         Spreadsheet
                                         Page 5
```

```
 1  9    Tab 2 - 4-7-15 Email Regarding      71
 2         Drummond Theme
 3 10    Tab 5 - 3-17-11 Email Chain         72
 4         Regarding Approval and conditions of
           further work
 5 11    Tab 6 - 8-29-13 Email Chain         76
 6         Regarding Privilege.7z
 7 12    Tab 7 - 8-29-13 Email Chain         80
 8         Regarding Privilege.7z
 9 13    Tab 9 - Memo                        81
10 14    Tab 10 - Project Drummond - Selected 84
11         Document Metadata Summary
12 15    Tab 11 - 9-23-13 Email Regarding    89
13         Agenda of Meeting with Brad and
           Agreement Attached
14 16    Tab 12 - 9-25-13 Email Regarding    91
15         Privilege Log
16 17    Tab 15 -September 2013 Email        92
17 18    Tab 16 - 9-27-13 Email Regarding    93
18         A-team home stretch
19 19    Tab 21 - 10-2-13 Letter Regarding   96
20         Privilege Log
21 20    Tab 265 - 9-25-13 Email Regarding   97
22         Privilege Log
23 21    Tab 20 - 9-30-13 Email Chain       114
24         Regarding log and documents
25
                                         Page 6
```

```
 1 22    Tab 22 - 10-2-13 Email Regarding   121
 2         resend of letter
 3 23    Tab 23 - Summary spreadsheet of    122
 4         10-3-13 Text Message
 5 24    Tab 24 - 11-8-13 Email Regarding   125
 6         Drummond Libel
 7 25    Tab 25 - Order on Motion to Compel 128
 8 26    Tab 26 - 12-20-13 Letter Regarding 129
 9         Supplemental Privilege Log
10 27    Tab 27 - 3-31-14 Email Regarding   134
11         Misc.
12 28    Tab 28 - 4-2-14 Email Chain        136
13         Regarding Drummond/Collingsworth
14 29    Tab 176 - 3-14-14 Email Chain      152
15         Regarding Privileges
16 30    Tab 29 - 4-7-14 Email Chain        155
17         Regarding Secure Pointe Partners
           Int'l Vs. Conrad & Scherer, LLP,
18         Case No. 70-194-176-13: C&S document
           production
19 31    Tab 30 - 4-7-14 Email Chain        160
20         Regarding Secure Pointe Partners
           Int'l Vs. Conrad & Scherer, LLP,
21         Case No. 70-194-176-13: C&S document
           production
22 32    Tab 32 - 4-7-14 Email Chain        165
23         Regarding Secure Pointe Partners
           Int'l Vs. Conrad & Scherer, LLP,
24         Case No. 70-194-176-13: C&S document
           production
25
                                         Page 7
```

```
 1 33    Tab 33 - 2-7-11 Email Regarding    165
 2         Revised Workplan
 3 34    Tab 35 - 3-28-11 Email Regarding TC 170
 4         Schedule
 5 35    Tab 36 - 5-22-11 Email Regarding   171
 6         Confidential Trip Report
 7 36    Tab 37 - 5-28-11 Email Regarding   177
 8         Memo - Paying Witnesses
 9 37    Tab 297 - 4-13-11 Email Chain      182
10         Regarding Meeting, etc. RE:
           immediate follow up
11 38    Tab 39 - 7-1-11 Email Chain        198
12         Regarding Col. deps
13 39    Tab 41 - 7-6-11 Email Regarding    201
14         Bocanegra pressuring witnesses
15 40    Tab 43 - 7-22-11 Email Chain       205
16         Regarding Ethics issue and C&S
           PROPOSAL
17 41    Tab 45 - 8-25-11 Email Chain       209
18         Regarding Authorization de pago
19 42    Tab 46 - 9-2-11 Email Chain        213
20         Regarding Drummond deps
21 43    Tab 48 - 9-8-11 Email Regarding    216
22         Discovery responses for your review
23 44    Tab 49 - 9-2-11 Email Regarding I  222
24         will get 25 from PWA
25
                                         Page 8
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 2 (5 - 8)

Case 2:11-cv-03695-RDP   Document 783-1   Filed 03/06/24   Page 5 of 259

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

| 1 | 45 | Tab 50 - 9-8-11 Email Regarding IO Funds | 227 |
| 3 | 46 | Tab 51 - 9-9-11 Email Regarding col plans | 229 |
| 5 | 47 | Tab 52 - 9-9-11 Loan Agreement with Nicox BV | 241 |
| 7 | 48 | Tab 53 - 9-9-11 Loan Agreement with Albert Van Bilderbeek | 249 |
| 9 | 49 | Tab 54 - 9-9-11 Cooperation Agreement with Albert Van Bilderbeek | 252 |
| 11 | 50 | Tab 55 - 9-9-11 Co-operation Agreement | 259 |
| 13 | 51 | Tab 56 - 9-8-11 Co-operation Agreement | 265 |
| 15 | 52 | Tab 58 - 9-11-11 Email Chain Regarding Signed Agreements, Loan Agreement | 269 |
| 17 | 53 | Tab 149 - Email | 271 |
| 18 | 54 | Tab 298 - Excerpts from Balcero trial testimony of Jaime Blanco | 281 |
| 20 | 55 | Tab 61 - 10-24-11 Email Regarding Claudia B. Giraldo, et al., vs. Drummond Company, Inc., et al | 294 |
| 22 | 56 | Tab 62 - 10-1-11 Email Regarding JBM and Adkins | 295 |
| 24 | 57 | Tab 63 - 10-15-11 Email Chain Regarding Blanco decl | 298 |

1  whom they represent.

2          MR. WELLS:  Trey Wells for the

3  plaintiffs, Drummond.

4          MR. PRESLEY:  Ben Presley also for

5  the plaintiffs.

6          MR. DAVIS:  Tony Davis, plaintiff.

7          MR. ANDREWS:  Blake Andrews with

8  Drummond Company.

9          MR. SPOTSWOOD:  Robert Spotswood for

10 William Scherer and Conrad & Scherer.

11         MR. PAULK:  William Paulk for

12 William Scherer and Conrad & Scherer.  And Eric

13 Hager, in-house lawyer Conrad & Scherer, should

14 be on the Zoom feed.

15         TERRENCE P. COLLINGSWORTH

16 being first duly sworn, was examined and

17 testified as follows:

18         THE COURT REPORTER:  All right.

19 Usual stipulations?

20         MR. WELLS:  Yes.

21         EXAMINATION

22 BY MR. WELLS:

23 Q        All right.  Mr. Collingsworth, just

24 for formality purposes, will you state your name

25 for the record.

1   I, Merit Gilley, a Court Reporter of

2  Birmingham, Alabama, and a Notary Public for the

3  State of Alabama at Large, acting as

4  Commissioner, certify that on this date, as

5  provided by the Federal Rules of Civil Procedure

6  and the foregoing stipulation of counsel, there

7  came before me on the 20th day of February,

8  2024, at the Hugo L. Black United States

9  Courthouse, 8th Floor Judicial conference Room,

10 1729 5th Avenue North, Birmingham, Alabama

11 35203, commencing at approximately 9:01 a.m.,

12 TERRENCE P. COLLINGSWORTH, witness in the above

13 cause, for oral examination, whereupon the

14 following proceedings were had:

15         THE VIDEOGRAPHER:  We now commence

16 the videotaped deposition in the United States

17 District Court for the Northern District of

18 Alabama, Southern Division in the matter of

19 Drummond Company, Incorporated versus Terrence

20 P. Collingsworth, et al.  Case Number

21 2:11-CV-3695-RDP.

22         Today's date is February 20th, 2024.

23 The time is 9:01 a.m. Central time.  Our witness

24 today is Mr. Terrence Collingsworth.  Will all

25 attorneys present please state their names and

1  A        My name is Terrence Collingsworth.

2  Q        Mr. Collingsworth, have you read the

3  sanctions brief we filed last week?

4  A        No.

5  Q        So you were weighing in on how long

6  it would take you to respond without having read

7  it?

8  A        I was doing things to get ready to

9  come here, and I was not preparing yet for

10 responding to your motion.

11 Q        Okay.

12 A        It takes quite a while to get my

13 office in shape for me to leave it for four

14 days.

15 Q        Are you aware of the time line we've

16 put together of documents being pulled off the

17 privilege log that related to payments to El

18 Tigre, Samario, and Jaime Blanco?

19 A        No.

20 Q        Okay.  We'll get into that.  Before

21 we start running through the documents, I'm

22 going to try to get some help from you

23 translating some of the language used in here.

24         At -- at times when you were

25 emailing about the Drummond case and maybe other

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 3 (9 - 12)

**Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.**

**Terrence P. Collingsworth - Volume I**
**2/20/2024**

---

1 cases, did you speak in code?
2 A          We're in an odd situation since I
3 also represent myself.  So if I object to your
4 question, I'm going to object first.  And I
5 object to the form of that question.  It -- it
6 is vague.
7 Q          Okay.  What's your answer?
8 A          What was the question?
9 Q          When you were communicating via
10 email about the Drummond case, did you sometimes
11 speak in code?
12 A          I would say abbreviations, not code.
13 Q          Did you ever refer to Albert Van
14 Bilderbeek as your uncle?
15 A          I don't recall that.  I recall
16 sometimes calling him and his brother the
17 brothers.  I don't recall that.  Did I call him
18 my uncle?  If you show me something that said I
19 did, then I would say, Okay, now I remember.
20 Q          How about the use of the word
21 "books" to refer to money?
22 A          I would have to see the context for
23 any such reference, but that does ring a bell.
24 Yes.
25 Q          Any reason you can't just say
                                                    Page 13

1 "money" and you've got to say "books"?
2 A          I think I was following Albert's
3 lead on any of those communications, the words
4 that he used.
5 Q          Do you have any idea why he would
6 use the word "books" as opposed to "money" or
7 "funds"?
8 A          No.  You'd have to ask him.
9 Q          And often times, and we'll see
10 several emails about this, you would vaguely
11 reference Ivan Otero and his, quote, unquote,
12 friends.
13          What does friends mean?
14 A          I object to the form.
15          I -- I -- you'd have to show me
16 something for me to be clear on what I was
17 referring to.
18 Q          Okay.  Do you recall referring to
19 Ivan Otero's, quote, unquote, friends?
20 A          Not as I sit here.  No.
21 Q          And you don't have any explanation
22 as you sit here right now as to what that could
23 mean?
24          Is that true?
25 A          Well, if I don't recall it, then I
                                                    Page 14

1 can't explain it.
2          MR. WELLS:  All right.  Let's get
3 Tab 187.
4          (Plaintiff's Exhibit 1 was
5          marked for identification.)
6 Q          I'm going to show you what has been
7 marked as Plaintiff's Exhibit 1.
8          MR. WELLS:  And, Paige, did you get
9 that tab 187 for the electronic?
10 Q          All right.  So this is focusing on
11 the middle email from you on July 30th, 2009.
12          Do you see that one?
13 A          Yes.
14 Q          And you were writing to Richard
15 Drath, who was the CFO of Conrad & Scherer at
16 the time; correct?
17 A          I think he was.  Yeah.
18 Q          And you tell Mr. Drath, "I wanted to
19 make sure we are clear on the immediate needs
20 for the cases and how we are going to handle
21 these.  For Chiquita/Dole, but ok to charge to
22 Chiquita case with Girardi and Lack.  We need to
23 make the second payment to Juan Carlos Tovar of"
24 10,000.  "I want to minimize our paper trail on
25 wiring funds to Tovar in Colombia.  Bob Perilla
                                                    Page 15

1 will carry this down in cash."
2          Why are you wanting to minimize your
3 paper trail in sending this money?
4 A          I -- first, let me recall who Tovar
5 is.  I'm going to read the rest of this.
6          I don't recall specifically.  I
7 certainly agree that that's what it says.  Tovar
8 was somebody who was working with us in Colombia
9 to get information.  There was nothing improper
10 or illegal about our payments to him.  He was
11 working for us as a contractor, so I cannot
12 recall specifically why we were concerned about
13 a paper trail.
14 Q          So your testimony is it's
15 legitimate; but you were reducing your paper
16 trail, and you don't know why?
17 A          I said I do not recall why we were
18 concerned about a paper trail to Tovar.
19 Q          Can you think of any reason it may
20 be --
21 A          No.
22 Q          -- given your experience in
23 Colombia?
24 A          Not as I sit here.  No.
25 Q          In the next paragraph you say, "I am
                                                    Page 16

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 4 (13 - 16)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

1 meeting the AUC's treasure in Medellin August*
2 15th. "I need to bring our first good faith
3 payment of" $10,000.
4         What is going on there with a good
5 faith payment relating to the AUC's treasurer?
6 A       I believe -- no.  I'm certain that
7 at that time I was meeting with a lawyer who was
8 facilitating several meetings for us in
9 Chiquita.  And by the way, this was for
10 Chiquita.  I think his name was Harley Maya
11 Sanchez.  And I was bringing funds to give to
12 him.
13 Q       Harley Maya Sanchez was a lawyer for
14 Raul Hasbun?
15 A       I don't know if he actually
16 represented him at any proceedings, but he was a
17 person who was facilitating meetings for me with
18 several of the paramilitaries who were in
19 prison.
20 Q       And negotiating payment terms for
21 Hasbun to give you certain testimony; correct?
22 A       He did attempt to do that, but he
23 never succeeded.
24         JUDGE PROCTOR:  May I just interject
25 for a moment?  I'm next door if you need me.

Page 17

1         MR. PRESLEY:  Thank you, Judge.
2         JUDGE PROCTOR:  Okay.  Don't let me
3 break your stride otherwise.
4         (Discussion off the record.)
5         MR. WELLS:  Are we back on the
6 record?
7         THE VIDEOGRAPHER:  9:12.
8 Q       (By Mr. Wells)  So,
9 Mr. Collingsworth, why do you need to make a
10 payment of $10,000 to this Harley Maya Sanchez
11 in order to meet with Raul Hasbun?
12 A       As I said, I was paying Harley
13 Sanchez for his services.
14 Q       Which were what?
15 A       Facilitating meetings, doing
16 research for me.  He didn't work for free.
17 Q       And the cost to facilitate a meeting
18 with an imprisoned AUC treasurer is $10,000?
19 A       No.
20 Q       Okay.  What was the $10,000 for?
21 A       I said earlier he facilitated
22 several meetings for us.
23 Q       All right.
24 A       And since it is, I think,
25 responsive; at some point, there is a record

Page 19

1 Good morning, everyone.  Welcome to our humble
2 chambers.  So next door if you need me.  I don't
3 plan -- I may be popping in and out; we'll see.
4 But I've got plenty of work to do next door.
5         MR. WELLS:  Okay.
6         JUDGE PROCTOR:  So here if you need
7 me; okay?
8         MR. WELLS:  We've got a chair for
9 you if you need it.
10        JUDGE PROCTOR:  All right.  And so
11 just to keep things running, you know, I -- I
12 know we have a lot of things riding on this
13 deposition.  Let's just -- and I like what I'm
14 hearing so far when I walked in, just kind of
15 popped in.  Let's just keep things on a
16 professional level as you're doing.  And
17 let's -- you know there's no refusal to answer
18 at this point.  If -- if you have a -- if you
19 think there's something that's asked that
20 shouldn't have to be answered, come get me;
21 okay?  I can't imagine what that would be.  So
22 that's my kind of adjournment for both sides;
23 okay?  Fair enough?
24        MR. WELLS:  Fair enough.
25        THE WITNESS:  Sounds good.

Page 18

1 that he refunded a good chunk of that $10,000
2 because he did not, in fact, facilitate the
3 meetings that we had agreed he would.
4 Q       When you were negotiating with
5 Harley Maya Sanchez, was he negotiating with you
6 regarding payments that could be made to Raul
7 Hasbun in regards to his testimony.
8 A       There are documents that I'm aware
9 of in this case that have the details of that.
10 I think we were exploring the possibility of
11 having Hasbun testify as an expert witness.
12 That did not materialize, so no agreement was
13 every made.
14 Q       And -- and that concept would be
15 Raul Hasbun, who at the time was in prison;
16 correct?
17 A       At which time?
18 Q       2009, 2010.
19 A       Yes.  He was in prison then.
20 Q       He was a leader of the AUC, which is
21 a terrorist organization; correct?
22 A       Not at that time.
23 Q       Wasn't the AUC designated a
24 terrorist organization in 2001?
25 A       He wasn't the leader of it when he

Page 20

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 5 (17 - 20)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

1  was in prison.
2  Q        Fair.
3          And what expert testimony could he
4  possibly offer?
5  A        I object to the form.
6          His testimony was to be the
7  financial structure of the AUC.
8  Q        And did he have knowledge of that,
9  given that he was the treasurer?
10 A        He certainly did.  Yes.
11 Q        So the testimony you were seeking
12 was his personal knowledge regarding the facts
13 of the AUC's financial structure?
14 A        That was a part of it.
15 Q        And you were looking for a way to
16 come to an arrangement with him to pay him for
17 that testimony; correct?
18 A        Well, this is irrelevant since we
19 did not make such an agreement.  So what I
20 thought or what I tried to do, I think, is
21 irrelevant.
22 Q        Well, the question is:  Did you
23 negotiate with him in an attempt to come to a
24 deal to pay him for that testimony you just
25 described?
Page 21

1  A        Did I negotiate?  I don't think I
2  negotiated with him.  No.
3  Q        Through Harley Maya Sanchez and any
4  other intermediary --
5  A        I --
6          -- were you attempting to negotiate
7  a deal such that you could pay Raul Hasbun to
8  testify as you just described?
9  A        I did have a negotiation with
10 Harley, and we did not conclude that
11 negotiation.
12 Q        All right.  Let's go to tab 253,
13 which will be Exhibit 2.
14          (Plaintiff's Exhibit 2 was
15          marked for identification.)
16 Q        This is an email chain involving you
17 and Lorraine Leete and some others in September
18 of 2011.  And the middle email is discussing
19 Jaime Blanco and Ivan Otero being worried that
20 "if the brothers don't come through," Blanco "is
21 going to make a deal with Bernal."
22          What is the reference to the
23 brothers there?
24 A        Where are you -- where do you see
25 the word?
Page 22

1  Q        Lorraine Leete's email just above
2  the redaction, the very first sentence.
3  A        What's your question?
4  Q        What is the reference to the
5  brothers there?
6  A        Well, given the context -- I didn't
7  write this.  But given the context, I think, as
8  I mentioned earlier, that is probably referring
9  to the Van Bilderbeek brothers.
10 Q        And, in fact, in your response
11 above; you say that "we are 100% sure.  The
12 funds have to come from Amsterdam" that you're
13 speaking to Albert?
14 A        Well, I did say that I thought it
15 was the Van Bilderbeek brothers.
16 Q        Any reason not to just refer to them
17 by name and use the -- the code "the brothers"
18 for the Van Bilderbeeks?
19 A        In my response, I did.  I said
20 Albert.  I didn't write the email that says
21 brothers, so I cannot tell you why.
22 Q        I'm just talking generally.  There
23 are several that we will see today.
24          Is there some reason that the term
25 "the brothers" was used as opposed to naming who
Page 23

1  you're talking about?
2  A        If you show me an email where I used
3  the word "brothers," I can try to remember why I
4  did that.
5  Q        And this is a discussion between you
6  and people on your legal team; correct?
7  A        Well, some of them are lawyers; some
8  of them aren't.  They're on my staff you could
9  say.
10 Q        Do you have any explanation for why
11 members of your legal team would use the term
12 "brothers" in references to the Van Bilderbeeks
13 as opposed to just telling them the Van
14 Bilderbeeks or Albert?
15 A        Unless I told them, which I did not,
16 I cannot speculate as to why someone would use
17 the word "brothers."
18 Q        So in your mind, you didn't have any
19 particular concern that was raised for you to
20 not want to name people in certain emails?
21          Is that fair?
22 A        Clearly not since when I replied, I
23 used "Albert" instead of "the brothers."
24 Q        And --
25 A        I'm not saying I never used the word
Page 24

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 6 (21 - 24)

**Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.**

1 "brothers."  I'm saying I would be surprised.
2 And if you show me an email where I did, I would
3 try to recall why I did.
4 Q        And this discussion here is talking
5 about a payment to be made to Jaime Blanco sent
6 from Albert Van Bilderbeek; correct?
7        MR. PAULK:  Object to the form.
8 A        I'm also going to object to the
9 form.
10        There was -- I guess I would say no.
11 Q        (By Mr. Wells)  So the reference to
12 Ivan being extremely worried that "if the
13 brothers don't come through," Blanco "is going
14 to make a deal with Bernal"; what does that
15 mean?
16 A        It means that, as Jaime testified in
17 his deposition in December, we learned that
18 Jaime Bernal Cuellar; who was the lawyer for
19 Drummond, probably still is; was attempting to
20 bribe Jaime Blanco.  And that caused us some
21 concern.
22 Q        My question is relating to "if the
23 brothers," meaning the Van Bilderbeeks, "don't
24 come through."
25        What do they need to come through

Page 25

1 on?
2 A        They were organizing funds to
3 provide for Jaime Blanco's lawyers.
4 Q        And that's what this email was in
5 reference to; correct?
6 A        That's correct.
7 Q        Who were the lawyers that these
8 funds were supposedly going to pay?
9 A        I -- I don't know.  I think there
10 was a guy named Bocanegra.  But I believe that
11 he is the guy who stopped representing Jaime
12 Blanco and that he was bringing in some other
13 lawyers.  I never met him.  I never -- I don't
14 recall their names as I sit here.  I don't think
15 I ever knew their names.
16 Q        So you never met the lawyers as -- I
17 assume you also never spoke to them.
18        Is that correct?
19 A        I certainly never spoke to them.
20 Q        Never saw any legal invoices from
21 them?
22 A        No.
23 Q        And Jaime Blanco, as I understand
24 your prior testimony, originally asked you for
25 $150,000; correct?

Page 26

1 A        I -- as I sit here, I don't know if
2 it was 150, 125.  It was somewhere in that
3 range.
4 Q        And --
5 A        And there's documents that I know
6 you have that verify whatever that number was.
7 Q        What, if anything, did you do to
8 verify that Mr. Blanco actually needed that kind
9 of money, whether for lawyers or any other
10 purpose?
11 A        I had spoken to Ivan Otero about it
12 many times.  And it was Ivan who had the
13 discussions.  And I trusted Ivan, and he
14 informed me of the situation.
15 Q        So you sitting here today can't say
16 what lawyers in Colombia cost, whether $150,000
17 is a reasonable or excessive amount?
18        That's just something outside of
19 your knowledge; is that correct?
20 A        Well, I do know that I asked
21 Drummond to give me the amounts that they paid
22 to Jaime Bernal Cuellar while he was trying to
23 bribe Jaime Blanco, and I bet you he charged
24 Drummond a whole lot more than $150,000.
25        MR. WELLS:  Move to strike, and

Page 27

1 please read my question back.
2 Q        And, Mr. Collingsworth, we'll try
3 not to bother the judge too much today; but
4 you're well aware that was not at all responsive
5 to the question.
6 A        I think it was responsive.
7        You asked me do I know how much
8 lawyers cost.  And I said one way I could know
9 is if Drummond reveals how much money they have
10 spent on Jaime Bernal Cuellar.
11 Q        So your answer is you don't know?
12 A        Oh, I know, generally speaking, that
13 that's not a lot of money for lawyers in
14 Colombia for a major representation.  It did not
15 strike me as unreasonable at the time.
16 Q        And these lawyers were going to be
17 representing Jaime Blanco in what?
18 A        My recollection is that Jaime was
19 about -- Jaime's defense originally was that he
20 had nothing to do with the murders of the trade
21 union leaders.  And upon reflection, he realized
22 -- this is just my -- I'm -- I'm -- you've --
23 maybe you better restate your question.
24 Q        What were these lawyers that you
25 were sending upwards of $100,000 to going to be

Page 28

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 7 (25 - 28)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

1 representing Jaime Blanco for?
2                MR. PAULK:  Object to the form.
3 A        Object to the form.
4        I wasn't sending anything to
5 anybody.
6 Q        (By Mr. Wells)  Okay.  What are they
7 representing him for, the lawyers?
8 A        He was changing his plea in his
9 criminal case, and he needed legal
10 representation to do that.  And I had gathered;
11 although, I'm not -- I -- I believe it's true;
12 that his original lawyer, who I think was
13 Bocanegra, was not helping him to do that
14 because he had a conflict of interest with
15 Drummond.  And Drummond wanted him to be
16 convicted of his initial denial of being
17 involved in the murders.  So Jaime wanted to,
18 instead, try to say that he was an accomplice
19 but that he was an accomplice with Drummond; so
20 he needed new lawyers to get that done.
21 Q        And why is that your problem?
22        Why is he asking you money -- for
23 money for lawyers for his criminal case?
24 A        So that he would be then able to
25 tell the whole story of what happened in the
Page 29

1 allowed him, with proper representation, to be
2 in a position to tell the truth in any form,
3 including in our civil case.  He was not going
4 to contradict himself.
5 Q        So we've seen the documents where
6 the money passes from an account related to
7 Albert Van Bilderbeek to Ivan Otero.
8        Do you understand how the money
9 flowed from that point?
10 A        No.
11 Q        But your understanding is that money
12 was either given to Blanco to give to his
13 lawyers or given directly to his lawyers, or do
14 you know?
15 A        I don't know.  Ivan Otero knows.
16 Q        But as it was represented to you at
17 least, these payments were for Jaime Blanco's
18 criminal lawyers?
19 A        Absolutely.
20        MR. WELLS:  Let's go to tab 257.
21 This will be Exhibit 3.
22        (Plaintiff's Exhibit 3 was
23        marked for identification.)
24 Q        So this is a June 2012 email between
25 you and Lorraine Leete with copies to Susana
Page 31

1 murders of the union leaders and what was
2 Drummond's role in those murders.
3 Q        Was it explained to you that if you
4 did not provide that money for these lawyers,
5 that he would not say that Drummond was
6 involved?
7 A        That was not my understanding.
8 Q        Why did you make the payment or
9 arrange the payment, however you want to
10 characterize it?
11 A        So that Jaime Blanco would feel free
12 and have proper legal representation to tell the
13 truth about what happened, which he has now
14 done.  And he has now been recognized by the
15 government of Colombia for having done so; and
16 he's now free.
17 Q        So the payment that was being
18 discussed was not for his representation in,
19 say, appearing for a deposition in the civil
20 cases; correct?
21 A        Correct.
22 Q        It was for his criminal lawyers in
23 his separate criminal situation in Colombia;
24 correct?
25 A        That then -- yes.  And that then
Page 30

1 Tellez and Christian Levesque.
2        And all the people I just mentioned
3 are on your legal team; correct?
4        Take your time.
5 A        I'm sorry.  I was reading this.
6 What did you say?
7 Q        The people on this email are part of
8 your legal team, correct, at the time of this
9 email?
10 A        Yes.
11 Q        And you say, "Just spoke to my uncle
12 al."
13        What does that mean, "uncle al"?
14 A        I spoke to Albert.
15 Q        Why do you refer to him as uncle?
16        Is he your uncle?
17 A        I was being sarcastic I think.
18 Q        Do you have an uncle that was in any
19 way involved in any of your litigated cases?
20 A        Of course not.
21 Q        And the reason I ask is there's
22 going to be a handful of that we're going to
23 look at today that have this same reference to
24 "uncle."  And I just want to make sure that
25 we're not talking about some uncle of yours that
Page 32

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 8 (29 - 32)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

1 we're not aware of.
2 A           I said I don't have any uncles
3 involved.
4 Q           Okay.  The last sentence says,
5 "Lorraine please tell the friends there is
6 imminent" and -- oh, excuse me.  -- "please tell
7 the friends there this is imminent.  Please also
8 tell" them -- "tell me in general way what New
9 funds does our friend need now and what can I
10 bring when I come."
11           What -- who are the friends?
12 A           As I sit here, I really don't know.
13 I would have to -- I -- I can only imagine that
14 it is Ivan Otero, but I don't know.
15 Q           So you -- the first time you're
16 talking about the friends plural, and the next
17 time you say "what New funds does our friend
18 need."
19           Do you know what that second friend
20 reference is referring to?
21 A           I don't know that they're different.
22 But I would say that if I'm referring to
23 someone, I'm referring to Ivan.
24 Q           Any reason why you're referring to,
25 quote, "the friends" as opposed to naming who
Page 33

1 you're talking about?
2 A           Yeah.  I think by this time we are
3 getting very concerned.  We had been warned that
4 our communications were being intercepted.
5 Albert, in particular, was very concerned about
6 the security of our communications.  And we were
7 warned that Drummond had people who were
8 actually wiretapping him down in -- in Colombia
9 and that security forces were selling his
10 communications to Drummond in Colombia, so we
11 were kind of freaking out.  And we didn't have
12 the money to do anything very fancy with
13 security.  But I think that's probably why we
14 started being concerned about our
15 communications.
16 Q           And what would be the reason not to
17 name these, quote, unquote, friends?
18 A           I just explained that, I thought.
19 Q           Yeah.  I get that.
20 A           We were concerning about security.
21 Q           But why does it matter if somebody
22 sees who you're talking about in the email?
23 A           Because Drummond was paying
24 paramilitaries down there to kill people, and so
25 my people in Colombia were very concerned about
Page 34

1 their lives.
2 Q           Well, Terry, to be fair; you don't
3 know that from your personal knowledge, do you?
4 A           I think I do.  Yes.
5 Q           Tell me a single payment that you
6 witnessed Drummond make to any paramilitary.
7 A           Oh, I didn't witness them; I was
8 told of them --
9 Q           Right.
10 A           -- by credible people.
11 A           And --
12 A           And by the way, your two guys,
13 Jimenez and what was his -- Linares; they're
14 about to go to prison for 38 years because other
15 people think that this happened too.
16 Q           We're only here to talk about what
17 you think and know, Mr. Collingsworth.
18 A           Well, I know that.  I know that for
19 a fact.
20 Q           Mr. Collingsworth, please behave
21 yourself.
22 A           Well, if you don't like my answers,
23 then ask different questions.
24 Q           Tell me:  What evidence do you have
25 that Drummond paid paramilitaries ever?
Page 35

1 A           How much time do you have?
2 Q           Let's talk about it categorically.
3           You have testimony declarations from
4 imprisoned paramilitaries.  That would be one
5 category; correct?
6 A           Plus the number --
7 Q           Is that one category?
8 A           That's one category, in addition to
9 the numerous interviews that I did with those
10 paramilitaries prior to their signing
11 declarations.  Yes.
12 Q           And do you have any documentary
13 evidence of a single payment flowing from
14 Drummond to any paramilitary?
15 A           Well, among others, I think Jaime
16 Blanco just handed you a bunch of documentary
17 evidence in December in his deposition in
18 Colombia -- well, actually, I handed them to
19 you -- that showed that with forensic proof
20 backing up his story that he testified, and the
21 Colombian prosecutors apparently agree, that he
22 had an arrangement with Drummond where he
23 overcharged his invoices.  And the difference
24 between what was the legitimate charge and the
25 overcharge was sent on to the AUC per agreement
Page 36

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 9 (33 - 36)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

1 with Drummond.

2 Q        Jaime Blanco handed over something
3 that was prepared in 2019.

4        I'm talking about when you're
5 actively litigating the cases against Drummond,
6 2015 and prior; did you have any documentary
7 evidence of a single payment flowing from
8 Drummond to a paramilitary?

9 A        Jaime Blanco told me that same
10 story.

11 Q        Did you was the question.  Did you?

12 A        Yes.

13 Q        You had documentary evidence --

14 A        Well, I had Jaime Blanco's testimony
15 and his invoices at that time.

16 Q        Okay.  And I think you've alleged
17 that Jim Adkins would take out $10,000 in cash
18 in the U.S. and fly it down to Colombia.

19        Do you remember that allegation?

20 A        Yeah.

21 Q        Do you have any bank records showing
22 a withdrawal of $10,000 in cash by Mr. Adkins at
23 any point in time?

24 A        No.  Because Drummond has
25 stonewalled us on our discovery requests to

Page 37

1 all that time, you have not found a single bank
2 record supporting your allegations; is that
3 true?

4 A        Other than the written evidence
5 submitted by Jaime Blanco, we do not have any
6 written bank records from Drummond.  I -- I
7 presume Drummond was a little bit more clever
8 than simply writing down a withdrawal to Jim
9 Adkins to take to Colombia to murder people.

10 Q        You don't even have bank records
11 showing Jim Adkins taking out money for any
12 purpose close in time to him traveling to
13 Colombia, do you?

14 A        Jim Adkins was a CIA agent --

15 Q        Do you have a bank record reflecting
16 that --

17 A        That --

18 Q        -- Mr. Collingsworth?

19 A        No, I do not.

20 Q        Thank you.

21        So outside of what you are hearing
22 from these imprisoned, can we call them,
23 murders,

24 A        Oh, yeah.  You hired them.  I mean,
25 Drummond hired them.  They know they're murders.

Page 39

1 them.  So you have yet to really get any fair
2 responses to our discovery requests from
3 Drummond.  But I think we're going to tee up a
4 motion to compel pretty soon.

5 Q        So the answer is, No, you have no
6 bank records reflecting a payment --

7 A        For the reasons stated.

8 Q        -- from Drummond?

9 A        For the reasons stated.  Yes.

10 Q        And you've been in active litigation
11 with Drummond since 2002 almost continuously;
12 right?

13 A        Yeah.  I think that first case was
14 2002.

15 Q        All of those cases have been in
16 federal court; correct?

17 A        That's correct.

18 Q        Such that you have the subpoena
19 power of the federal court to subpoena third
20 parties for evidence; correct?

21 A        Yes.

22 Q        That would include banks that would
23 hold records of financial transactions; correct?

24 A        Yes.

25 Q        And with all that subpoena power and

Page 38

1 Q        Outside of what these murders are
2 telling you, do you have any documentary
3 evidence; while you were actively litigating
4 with Drummond, 2015 and before; that supports
5 your claim that Drummond paid the AUC?

6 A        We certainly, as I mentioned, have
7 Jaime Blanco's records.  But I must state given
8 the tone of your question that, as you know I
9 think, that people can be convicted based on
10 testimony.  They don't need bank records to show
11 that a certain event occurred.  And the
12 Colombian authorities clearly now believe that
13 Drummond paid the paramilitaries to murder
14 people.  And two of your presidents, Mr. Linares
15 and Jimenez, are going to go to prison for that.
16 That will give me the satisfaction of saying to
17 you and everyone that we were right about this,
18 weren't we.

19 Q        So parsing that out; your answer is,
20 No, you don't have documentary evidence.  You
21 have testimony.

22        Is that a fair summary?

23 A        No.

24 Q        Tell me the documentary evidence
25 you've got?

Page 40

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 10 (37 - 40)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

1  A          I mentioned the Jaime Blanco
2  evidence that is now -- was facilitated through
3  the Colombian prosecutors and a forensic expert
4  selected by the Colombian prosecutor.  So I
5  think that's pretty good evidence.
6  Q          Okay.  And you had none of that when
7  you wrote the letters to the Dutch government in
8  2011 and '12, correct, or 2010 and '11?
9  A          No.  I only had the testimony of 20
10 people or so who told me the same thing.
11 Q          Okay.  And focusing on that 2011,
12 2012 time period when you're resisting summary
13 judgment in the Balcero case, you had no
14 evidence supporting your allegation that
15 Drummond was complicit with paramilitaries other
16 than these paramilitaries' statements; true?
17 A          No.
18 Q          What else have you got?
19 A          I've got Jaime Blanco's testimony
20 and --
21 Q          Testimony is out of the question.
22 I'm talking about anything other than these
23 imprisoned murders.
24 A          And -- and we also had lots of
25 Colombian journalists, human rights activists,

Page 41

1  people who had been observing Drummond in
2  Colombia for years also told me that they also
3  believed that this was true.
4  Q          Anything else?
5  A          Nope.
6              MR. WELLS:  Let's go to tab 258.
7  This will be Exhibit 4.
8              (Plaintiff's Exhibit 4 was
9              marked for identification.)
10 Q          This is a July 2012 email chain.
11 And at the beginning, looks like Albert Van
12 Bilderbeek is sending you a confirmation of a
13 $35,000 wire to Ivan Otero.
14             That was one of the payments you
15 understood to be for Jaime Blanco; correct?
16             MR. PAULK:  Object to the form.
17 A          Well, 35,000 seems like an odd
18 number.  But I can't think of any other reason
19 why Albert would have sent money to Ivan.  So I
20 think it's a fair assumption, but I can't say
21 with 100 percent certainty.
22 Q          (By Mr. Wells)  Are you aware of
23 Mr. Van Bilderbeek sending money to Mr. Otero
24 for any purpose other than this arrangement with
25 Jaime Blanco?

Page 42

1  A          I have a vague recollection that he
2  once sent some funds for security when someone
3  had tried to kill Ivan because of the work he
4  was doing to gather evidence about Drummond, but
5  I don't recall if it actually happened.  I think
6  we had a discussion at a minimum.
7  Q          And if we read up above the wire
8  confirmation; we've got an email from you that
9  says, "Please let Ivan know and have him confirm
10 when he gets it and that all is well with his
11 friends."
12 A          Uh-huh.
13 Q          And who are the friends?
14 A          Maybe the lawyers that he is working
15 with there.  If it's concerning Jaime Blanco's
16 payment, that makes sense that we're talking
17 about the lawyers.  But that's what this was
18 for.
19 Q          And what reason would you have not
20 to just say what you mean and use the word
21 "friends"?
22 A          Well, other than what I mentioned
23 earlier about Ivan's concerns about security; I
24 can't think of any other reason.
25 Q          Well, this payment to Blanco didn't

Page 43

1  have anything to do with security, did it?
2  A          Ivan was concerned that his
3  communications were being intercepted and that
4  Drummond was learning about everything that he
5  was doing, and I was respecting that any time
6  that I was speaking generally.
7  Q          And you at times would instruct
8  people to speak generally to basically vaguely
9  refer to what you're talking about so only you
10 would understand it; correct?
11 A          Well, you showed me one email where
12 I did make that direction.  I don't have any
13 reason to doubt that I did it.  And I also think
14 that everyone was sensitive to the security
15 situation.  Yes.
16 Q          And what security issue would arise
17 from y'all paying over $100,000 for the benefit
18 of Jaime Blanco?
19 A          Drummond tried to bribe Jaime Blanco
20 to turn again on -- to -- to recant his story.
21 Drummond was paying paramilitaries to murder
22 people in Colombia.  Ivan had heard of several
23 attempts on his life and had heard of several
24 others.  He was concerned that anything that he
25 did that might anger Drummond was dangerous for

Page 44

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 11 (41 - 44)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

**Terrence P. Collingsworth - Volume I**
**2/20/2024**

---

1 him.
2 Q        To be clear:  Everything you just
3 said is something somebody else told you.
4         You didn't witness any of that;
5 correct?
6 A        Yeah.  When Ivan looked me in the
7 eyes and expressed his terror that people were
8 trying to kill him, I believed him.
9 Q        Speaking of Mr. Otero, what sort of
10 due diligence did you do before getting involved
11 with him?
12 A        Well, I certainly Googled him.  But
13 I spoke to a couple of people.
14 Q        Who?
15 A        Ivan -- not -- not Ivan.  Francisco
16 Rameriz, who was working with me for -- since
17 the inception of these cases.  I spoke to him.
18 Q        You mentioned a couple of people.
19        Who else?
20 A        There were a couple of other lawyers
21 in that union human rights circle at that time,
22 2001-ish, 2002 -- no.  It was after that.  But I
23 spoke to some other lawyers.  I can't remember
24 any names as I sit here.  I believe I asked Dan
25 Kovalik to check him out with some of the people

Page 45

1 that he knew there in Colombia.  Dan Kovalik,
2 and -- but certainly Francisco.  I think they
3 even went to school together.
4 Q        And you mentioned Google.
5        Did you -- did you try to see if
6 there was any articles written about him or
7 anything you could find on the internet?
8 A        I -- I don't think I found anything.
9 I'm not a very high-tech person.  But I --
10 somehow I -- I did do some kind of search.  I'm
11 not sure even what engine I used or that existed
12 at the time.
13 Q        Did anyone object to Ivan Otero
14 becoming involved as a part of your legal team?
15 A        I object to the form.
16        When?  At the start -- at the start?
17 Q        We can start there.
18 A        No.
19 Q        Did anyone object at any time to
20 Mr. Otero being a part of your legal team?
21 A        Yes.
22 Q        And who was that?
23 A        At some point our paralegal in
24 Colombia, Yina -- I forget her last name -- she
25 didn't object in that she couldn't really

Page 46

1 object.  She expressed a concern that some of
2 the human rights people were not happy with us
3 working with Ivan because of his prior work on
4 behalf of paramilitaries that he had
5 represented.
6 Q        Did anyone else raise that concern
7 with you?
8 A        Not that I recall.
9 Q        And when you were talking to people
10 about Ivan Otero, why are you talking about Ivan
11 Otero?
12        How did you sort of get on the scent
13 of him, so to speak?
14 A        I don't understand the question.
15 Q        How do you know to even be looking
16 out for Ivan Otero or looking into Ivan Otero or
17 asking people about Ivan Otero?
18        Where did Ivan Otero come from in
19 terms of your involvement with him?
20 A        I believe I was introduced to him by
21 Francisco Rameriz.
22 Q        In Colombia?
23 A        Yes.
24 Q        So, presumably, you would have had
25 some discussions prior to the introduction

Page 47

1 about, Hey, who is this person; why are you
2 meeting with him; why am I going to make the
3 trek down to Colombia to talk to him?
4 A        No.  I don't think that's how it
5 happened.
6 Q        How did it happen?
7 A        I think I was already there, and he
8 -- Francisco invited Ivan to meet with me at
9 some -- maybe a dinner in -- I'm not sure if it
10 was Bogota or Valledupar.
11 Q        And how was Ivan described to you?
12        What was the purpose of this
13 meeting?
14 A        I think initially he was described
15 to me as a friend of Francisco's that maybe he
16 even went to school with.
17 Q        This was just a social meeting, or
18 was this for purposes of your case?
19 A        No.  It eventually became for the
20 purpose of working -- excuse me -- working with
21 Ivan to -- similar to the role that we had for
22 Harley Sanchez, to facilitate us to meet with
23 some paramilitaries that he knew.  Excuse me.
24 Q        So he -- the reason you were meeting
25 with him is he was represented to you as someone

Page 48

---

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 12 (45 - 48)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

**Terrence P. Collingsworth - Volume I**
**2/20/2024**

---

1 who could get you in touch with certain
2 paramilitaries; true?
3 A          No.
4 Q          Well, correct me.  Because I think I
5 just repeated what you just said.
6 A          **Well, you -- you seem to be assuming**
7 **that there was a -- an introduction with a**
8 **purpose stated, and then we met and -- and then**
9 **the purpose was explored.  It -- that -- as I**
10 **said, that's now how it happened.  We initially**
11 **had a dinner together.**
12 Q          And so how did you come to the
13 understanding that Otero could act in a similar
14 role to Harley Maya Sanchez and facilitate
15 meetings between you and paramilitaries?
16 A          **I'm -- to the best of my**
17 **recollection, that did not come up until after**
18 **the dinner.**
19 Q          How did you come to that
20 understanding?
21 A          **I -- I believe; although, again,**
22 **it's to the best of my recollection; that Ivan**
23 **-- sorry -- Francisco reported back to me that**
24 **Ivan would be interested in having a discussion**
25 **with me, and we had that discussion.**
Page 49

---

1 Q          And so it was Ivan who told you he
2 could introduce you to paramilitaries?
3 A          **Yes.**
4 Q          Are you aware that Mr. Otero's
5 currently facing criminal charges in Colombia?
6 A          **No.**
7 Q          Didn't know that?
8 A          **No.**
9 Q          Are you aware of whether he's ever
10 been subject to criminal charges in Colombia in
11 relation to bribery?
12 A          **I have some vague recollection that**
13 **there was a case -- a retaliatory case brought**
14 **against him by Drummond where Jaime Bernal**
15 **Cuellar was responsible for it, that it has no**
16 **merit, that it's not going anywhere.  But that's**
17 **the extent of my knowledge.**
18 Q          You're not aware of any other
19 bribery charges he has that have nothing to do
20 with Drummond?
21 A          **No.**
22          MR. WELLS:  Let's go to tab 260.
23 This is Exhibit 5.
24          (Plaintiff's Exhibit 5 was
25          marked for identification.)
Page 50

---

1 Q          So this is a January 2011 email
2 chain between you and Albert Van Bilderbeek .
3 And you start by saying, "I'm waiting to get
4 people moving until I have the funds.  Any news
5 from the library?"
6          What's that about?
7 A          **I -- I -- I would just be**
8 **speculating that I'm -- since Albert refers to**
9 **funds as books that I'm referring to funds or**
10 **the source of funds as a library.  But this was**
11 **like 13 years ago.  I think that's a fair**
12 **speculation, but I cannot say for sure.**
13 Q          So you can't decipher your own code
14 here?
15 A          **I said I don't recall.**
16 Q          Then Mr. Van Bilderbeek responds "I
17 met at the bookshop with our provider and the
18 books are available for shipment on the 1st.
19 The known courier will forward the books right
20 away to you and you will have it within 24
21 hours."
22          So your best speculation is that's
23 referring to money?
24 A          **I object to the form.  I should not**
25 **speculate.**
Page 51

---

1          Doesn't that refer to money?
2 A          **I said in my prior response that I**
3 **thought it must but that I'm not 100 percent**
4 **sure.  To the best of my recollection, all of**
5 **these bookish terms are referring to funds.**
6          And why not just say funds?
7 A          **As I said, I was following Albert's**
8 **leads from long ago.**
9 Q          Do you have any idea why he didn't
10 want to explicitly reference money?
11 A          **You should ask him.**
12 Q          I hope to.
13          I'm asking you:  Do you have any
14 idea why he was using these code words instead
15 of saying money?
16 A          **As I said, Albert was extremely**
17 **paranoid and security conscious.  And so**
18 **whatever he did was related to his own concerns**
19 **that I don't have personal knowledge of.**
20          MR. WELLS:  Let's go to tab 261, and
21 this will be Exhibit 6.
22          (Plaintiff's Exhibit 6 was
23          marked for identification.)
24 Q          You're telling Mr. Van Bilderbeek
25 here "Albert, I need to get to Colombia to meet
Page 52

---

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 13 (49 - 52)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

1 the new contacts who have reached out to us.  I
2 am going to go on" January 26th "and" refer --
3 "return" on February 3rd.  I will then return
4 around" February "15 to distribute some of the
5 books I will be getting on" February 1st "and to
6 begin taking depositions.  We are really going
7 to be rolling now and I will only be able to do
8 this with a steady stream of books."
9          So interpret for us,
10 Mr. Collingsworth.  What does all that mean?
11 A          I object to the form.
12          Ask me a specific question.
13 Q          The three sentences I just read,
14 what does that mean?
15          Are you -- are you sending actual
16 books to people and distributing reading
17 material?
18 A          Well, I think we've -- we've
19 clarified that when we're -- Albert is speaking
20 of books and I'm speaking of books to Albert,
21 we're talking about money.  But as to the rest
22 of this, I have no reason to think that anything
23 was ever sent that is being referred to in a
24 general way here.
25          Other than the payments in relation

Page 53

1 to Jaime Blanco, what other funds did Albert Van
2 Bilderbeek provide for your cases in Colombia?
3 A          As I said I -- I have some
4 recollection, although I'm not certain, that he
5 did at some point do something to help Ivan with
6 his security concerns.  I don't think that I
7 recall any other Drummond-specific funds that
8 Albert sent other than the funds for Jaime
9 Blanco.
10 Q          Did he ever send funds to you for
11 any of your other cases against other companies
12 in Colombia?
13 A          I don't think so.
14 Q          Did he ever send any funds for you
15 for any purpose in relation to Colombia other
16 than the Blanco payments and this vague
17 recollection you have this maybe one time on a
18 security issue for Otero?
19 A          My recollection is that I asked him
20 a whole lot of times for additional funds.  As I
21 sit here today, I do not recall that he ever
22 sent any others except for the purposes that you
23 listed.  If there is a transaction in -- in your
24 document somewhere where it shows that he did
25 send something else, I would not be shocked.

Page 54

1 But I don't recall as I sit here.
2 Q          But your general recollection is
3 that if he did send funds for whatever purpose,
4 it was related in some way to the Drummond case?
5          Is that fair?
6 A          Related in some way?
7          If Ivan's security is -- yeah.  I
8 guess so.
9 Q          And Mr. Van Bilderbeek was
10 antagonistic to Drummond in your conversations
11 with him; correct?
12 A          I object to the form.
13          I don't know what you mean by that.
14 Q          He didn't like Drummond, did he,
15 based on your conversations?
16 A          Object to the form.
17          Nobody liked Drummond who dealt with
18 them in Colombia.  But I don't think he had any
19 love for Drummond.  That is true.
20 Q          He had made claims that his brother
21 was imprisoned by the Colombian government due
22 to some conspiracy with Drummond; right?
23 A          He told me, yes, that not only was
24 -- there was some conspiracy that Drummond
25 orchestrated a conspiracy to steal his rights

Page 55

1 from Llanos Oil and that ended up putting his
2 brother in prison.  Yes.
3 Q          And as far as you are aware, did he
4 have any other motivation for helping you with
5 your cases other than his own lack of good
6 feelings toward Drummond?
7 A          I can't tell you what his
8 motivations were.  He never explained it to me.
9 Q          Why did you think he was somebody
10 you could reach out to for money for your
11 Drummond cases?
12 A          I don't think I did.
13 Q          Well, how do we get to by 2011
14 you're using "books" for "money" with him,
15 asking him repeatedly, as you just said, for
16 money relating to your Drummond case.
17          How -- how did you two get in touch
18 such that you felt he would be a good source for
19 potential funding?
20 A          I had been speaking to Albert for a
21 number of years before any discussion of money
22 ever occurred.
23 Q          And how did you two get in touch?
24 A          I believe to the best of my
25 recollection that I was introduced to Albert by

Page 56

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 14 (53 - 56)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

1 Dan Kovalik, who was my cocounsel in the
2 original Drummond cases.
3 Q        And he was affiliated with the
4 United Steelworkers union?
5 A        He was.
6 Q        And to the best of your
7 recollection, how -- how did he describe why he
8 was introducing you to this person, Albert Van
9 Bilderbeek?
10 A        I have no recollection of that.  I
11 don't even -- I can't even tell you til he
12 introduced me or Albert reached out because Dan
13 talked about me.  I don't recall.  The first
14 time that I met Albert what I did say with some
15 certainty is that I spoke to Albert for years
16 before the topic of money ever came up.
17 Q        By the time you first got in touch
18 with him, was his brother already in prison?
19 A        I don't recall.
20 Q        Had Llanos Oil already lost its oil
21 rights?
22 A        I believe so.  Yes.
23        MR. WELLS:  All right.  Let's go to
24 tab 262.
25 Q        And Albert Van Bilderbeek is Dutch;

1 correct?
2 A        Depends what you mean by "Dutch" or
3 "by."
4        Are you asking me whose passport
5 does he have, or where was he born?
6 Q        I mean, we've seen already a couple
7 of emails, we'll see a whole lot more, talking
8 about the Netherlands and Amsterdam.
9        He was located in the Netherlands;
10 correct?
11 A        He lives in the Netherlands.  Yes.
12 Q        All right.
13 A        He has a very unusual and
14 hard-to-understand past heritage.  And I really
15 have no idea where he was born.
16 Q        Do you have any Dutch family?
17 A        No.
18        (Plaintiff's Exhibit 7 was
19        marked for identification.)
20 Q        Let me show you what has been marked
21 as Plaintiff's Exhibit 7, which is tab 262 for
22 our exhibit coordinator.
23        So this is an exchange in 2013
24 between you and Mr. Van Bilderbeek relating to
25 Rafael Garcia.  And if you look at the bottom of

1 the first page, Mr. Van Bilderbeek is sending
2 you a Google translate of a message from
3 Mr. Garcia.
4        Do you see that?
5 A        I'm sorry.  What would you like me
6 to look at?
7 Q        The bottom of the page that says
8 "Google Translate."
9 A        Okay.
10 Q        And above that in your email, you're
11 referencing the letters RG.
12        Is that Rafael Garcia?
13 A        Well, you're going to have to give
14 me a second to read this, and then I'll be happy
15 to answer that.
16        Okay.
17 Q        Is RG Rafael Garcia?
18 A        Yes.
19 Q        And he is saying, "Hi Albert, sorry
20 but I have always been clear that as far as it
21 has no guarantees or help from Terry (which so
22 far has not happened) is impossible for me to
23 help."  And then in the last sentence he says,
24 "Unlike you, the thing I've always told thank
25 you very much, Terry only interested what

1 matters to him regardless what happens to my
2 family or me."
3        Do you know what Mr. Garcia is
4 referring to in that translated message?
5 A        No.
6 Q        You respond that you had chartered a
7 plane and taken him out of Colombia; correct?
8 A        That's what it says.
9 Q        And then Mr. Van Bilderbeek responds
10 saying, "I know what you did for him and memory
11 loss always seem to go hand in hand with books."
12        So it would be your understanding
13 that Mr. Van Bilderbeek is actually saying
14 memory loss seems to go hand in hand with money?
15 A        The -- the email speaks for itself.
16 I have told you that usually when we're talking
17 about books, it is funds.
18 Q        And how many funds or how -- what
19 amount of funds to your knowledge have you spent
20 on Mr. Garcia for any purpose?
21        We've got a chartered plane, so I'm
22 lumping that in there.  But if there were
23 others, I would include that.
24 A        I -- I don't recall the amounts of
25 that plane or whether there was also some funds

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 15 (57 - 60)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

1 included for him to land safely in Uruguay.  I
2 do recall that he was summarily put out on the
3 street by President Uribe and that everyone
4 agreed he was about to be killed.  And we did
5 step in and help him get out of the country.
6 Q        Who is we?
7 A        Whoever was working with me at the
8 time -- this time.  Yeah.  I think certainly I
9 would have -- the funding would not have come
10 from me personally.  I think at least part of it
11 would have come from Conrad & Scherer.
12 Q        And do you know how much money
13 Albert Van Bilderbeek has provided for the
14 benefit of Rafael Garcia?
15 A        No.
16 Q        You do know he has provided
17 Mr. Garcia some funding, don't you?
18 A        No -- not in the sense that you
19 seem to be implying.  I'm -- I'm not aware that
20 he handed him any cash.  No.  I think that he
21 paid for him to attend meetings.  I think he
22 paid for costs for him to travel.  I'm not aware
23 of anything beyond those sorts of things.
24 Q        Did you send money to Rafael
25 Garcia's wife?
Page 61

1 A        Did I?
2 A        Uh-huh.  You or your firm?
3 A        Well, as I said in -- when I
4 answered your original question, I think that
5 there was a -- besides paying for a plane to
6 save his life and get him out of the country,
7 there was some initial support provided.  I have
8 no idea if we sent it to his wife or to somebody
9 else or how much it was or anything of that
10 sort.  I think, conceptually though, that must
11 -- I'm not -- I would not be surprised if that
12 were included in that initial assistance.
13        MR. WELLS:  All right.  Let's go to
14 tab 263.
15 Q        And if you need a break at any time,
16 Mr. Collingsworth; just let us know.
17 A        All right.
18        (Plaintiff's Exhibit 8 was
19          marked for identification.)
20 Q        And this is Exhibit 8.  This is a
21 series of text messages produced to us between
22 you and Mr. Van Bilderbeek.  And you can just
23 read over the messages on the right-hand column.
24        But a number of references to books;
25 right?
Page 62

1 A        I'm sorry.  Was there a question?
2 Q        A number of these messages reference
3 books; correct?
4 A        Yeah.
5 Q        For example, the top one from July
6 of 2013, you're asking him to "send 100 today,"
7 or at least ten, and saying it's urgent; right?
8 A        That's what it says.
9 Q        And what -- I'm assuming that is
10 100,000 or 10,000?
11        Is that correct?
12 A        Must be.
13 Q        And what did you need $100,000 for
14 in July of 2013?
15 A        I don't recall.  We always needed
16 money.
17        Well, your Balcero and Baloco cases
18 had, I believe, both been dismissed by that
19 time.
20        So can you think of other reasons
21 you would need that kind of money in Colombia in
22 July of 2013?
23 A        As I said, no.
24 Q        And then these messages continue on
25 to 2014.  For example, if you look at the April
Page 63

1 21st, 2014, at 7:08; you say, "In Alabama.  Just
2 won the" Drummond "motion for court to seize my
3 computers etc.  now just need books to make
4 things happen."
5        And you recall Drummond filed a
6 motion in this case asking for the Court to
7 forensically analyze your computers; correct?
8 A        Are you asking me if I recall that
9 motion?
10 Q        Yes.
11 A        Yes.
12 Q        Why did you need books at that time
13 after Drummond had already filed a sanctions
14 motion seeking your computers?
15 A        I don't recall specifically.  As I
16 said, we always needed money.  But I don't know
17 that there was any particular event there that I
18 can point you to.
19 Q        And at the bottom, this leads all
20 the way up to September of 2015.  Again, asking
21 Mr. Van Bilderbeek for books; and you're
22 referencing the ten that did not arrive.
23        What did you need thousands of
24 dollars for in Colombia in late 2015, which
25 would have been years after your Drummond cases
Page 64

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 16 (61 - 64)

**Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.**

**Terrence P. Collingsworth - Volume I**
**2/20/2024**

---

1 had been dismissed?
2 A       I -- I don't necessarily agree that
3 that was referring to money just for Colombia.
4 But I cannot tell you exactly in 2015 why there
5 would have been a need in Colombia.
6 Q       Well, you say, "That's my reality
7 until I receive books."  Colombia "will be won
8 or lost in short time depending on resources";
9 right?
10 A       Yeah.  But prior to that it says my
11 checks are "bouncing.  No funds on debit card."
12 It sounds like I was I was a personal financial
13 issue.
14 Q       And you can't give us any insight as
15 to why you would need $10,000 from Albert Van
16 Bilderbeek in late 2015?
17 A       Sounds like I needed money.
18 Q       Are the payments that you either
19 made or arranged for witnesses in Colombia still
20 ongoing?
21 A       I object to the form, and I object
22 to the time frame.
23 Q       What's the answer?
24 A       I'm not going to tell you unless you
25 ask a specific question that is within the time

Page 65

---

1 of witnesses were terminated by Conrad & Scherer
2 shortly after my departure.
3 Q       And what, if anything, have you done
4 to check on the safety of these people who you
5 say you were gravely concerned about their
6 security since those payments have stopped?
7 A       I regularly checked in on them.
8 Q       Anything ever happen?
9         Is everybody still alive?
10 A       No one has been killed.  That is
11 true.
12 Q       When the payments stopped, did you
13 get communications from either the witnesses or
14 their family members asking why the payments had
15 stopped, asking for them to resume?
16 A       I'm pretty sure.  Yes.
17 Q       And what did you tell them?
18 A       I told them what happened.
19 Q       Which was what?
20 A       That the institute -- institution
21 that was providing those payments was no longer
22 able to do so and that they should take all
23 precautions they can to remain safe.
24 Q       And so that would have been close to
25 nine years ago.  We'll call it eight and change.

Page 67

---

1 frame of the discovery parameters in this case.
2 Q       The monthly payments that were being
3 sent to Ivan Otero for the benefit of El Tigre
4 and Samario and their families, is that
5 continuing presently?
6 A       I'm going to restate my objection.
7         And I will say, though, that with
8 that particular question as far as I know,
9 Conrad & Scherer stopped those payments; and I
10 certainly did not resume them.
11 Q       As far as you know, those payments
12 stopped in late 2015 when you were fired from
13 Conrad & Scherer?
14         MR. PAULK:  Object to the form.
15 A       I object to the form.
16         And when Conrad & Scherer stopped
17 those payments is a matter of records.  I don't
18 have specific recall.  It was not me who did
19 that.
20 Q       (By Mr. Wells)  The monthly payments
21 that were going to the wife of Charris, did
22 those continue to your knowledge after your
23 departure from Conrad & Scherer?
24 A       As far as I know, all of the
25 payments that were for security for the families

Page 66

---

1         To your knowledge, no harm has come
2 to any of those people in that time?
3 A       Oh, I wouldn't say that's true.
4 None -- as I say, none of them have been killed.
5 Q       What harm has come to any of them
6 that you can testify about today?
7 A       Nothing specific.
8 Q       And how were these communications
9 from either the witnesses or the family members
10 relayed to you?
11 A       Either by -- either in-person
12 discussions or by Zoom or telephone of some
13 sort.
14 Q       You do not speak Spanish; correct?
15 A       Correct.
16 Q       So are you personally talking with
17 these people with a translator, or is someone
18 relaying messages back and forth?
19 A       Object to the form.
20         For the most part, there was a --
21 another person who had the direct relationship
22 with the family members; and I was speaking to
23 that person.
24 Q       And who would that person be?
25 A       Depends.

Page 68

---

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 17 (65 - 68)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

| | |
|---|---|
| 1 Q        El Tigre? | 1 Q        And you have objected during |
| 2 A        **I think El Tigre would have been** | 2 depositions; tried to argue about it in briefs |
| 3 **Ivan Otero.** | 3 that, you know, the payments aren't really |
| 4 Q        Samario? | 4 payments; they were security costs. |
| 5 A        **Same:  Ivan Otero.** | 5         That's your position; right? |
| 6 Q        Charris? | 6 A        **Which payments?** |
| 7 A        **For most of the time, it was the** | 7         MR. WELLS:  Well, let's look at |
| 8 **paralegal we had in Colombia, Yina.** | 8 Plaintiff's Exhibit 9, which is tab 2. |
| 9 Q        Well, it's my understanding that | 9         (Plaintiff's Exhibit 9 was |
| 10 Conrad & Scherer shut down the Colombia office | 10          marked for identification.) |
| 11 in connection with shutting down your | 11 Q        This is you talking to Eric Hager, |
| 12 Washington, D.C. offices. | 12 who was a Conrad & Scherer lawyer at the time of |
| 13         Do I have that incorrect? | 13 this email; right? |
| 14 A        **At some point, I'm sure they did.** | 14 A        **I'm sorry?  What was the question?** |
| 15 Q        So when after December of 2015, | 15 Q        Was Eric Hager a Conrad & Scherer |
| 16 which it's been told to us is when your | 16 lawyer at the time of this email? |
| 17 departure from the firm was; when after that | 17 A        **I think so.  Yeah.  Yeah.** |
| 18 would you have been getting messages from Yina | 18 Q        And you're telling him "We have |
| 19 about these witnesses wondering where their -- | 19 fully explained to the Drummond Court that the |
| 20 or Charris or his family wondering where their | 20 'payments' at issue were security and relocation |
| 21 payments were? | 21 costs."  And then in the next paragraph, second |
| 22 A        **And what's your question?** | 22 sentence, you say, "Drummond has every 'witness |
| 23 Q        When after 2015 was Yina relaying | 23 payment' document, and they were all for |
| 24 messages to you from Charris and/or his family? | 24 security." |
| 25 A        **For several more years.** | 25         And you're putting that in quotes |
| Page 69 | Page 71 |
| 1 Q        Are you aware of anyone else that | 1 there because you don't believe what Drummond is |
| 2 has provided monetary support to them since | 2 calling them is accurate; true? |
| 3 December of 2015? | 3 A        **I'm sorry?** |
| 4 A        **I'm not aware.  No.** | 4 Q        Why are you using quotes around the |
| 5 Q        All right.  Let's take our first | 5 word "payments" and "witness payments" and no |
| 6 break. | 6 other words in this email? |
| 7         THE VIDEOGRAPHER:  The time is | 7 A        **I -- nine years later I guess I** |
| 8 10:21 a.m.  We are off the record. | 8 **would say that I was flagging that I don't** |
| 9         (Short recess.) | 9 **believe that calling them witness payments is** |
| 10         THE VIDEOGRAPHER:  The time | 10 **accurate.  Yes.** |
| 11 10:35 a.m.  We are back on the record. | 11         MR. WELLS:  Let's go to tab 5, which |
| 12 Q        (By Mr. Wells)  Mr. Collingsworth, | 12 is Exhibit 10. |
| 13 you do not agree with Drummond's contention that | 13         (Plaintiff's Exhibit 10 was |
| 14 you paid witnesses for their testimony. | 14          marked for identification.) |
| 15         Fair statement? | 15 Q        This is an email in March of 2011 |
| 16 A        **I do not agree with that.  Yes.** | 16 from Mike Hugo to Mark Carlson and Joseph |
| 17 Q        And you don't really think much of | 17 Carrera with several people, including you, |
| 18 this case, do you? | 18 copied. |
| 19 A        **Which case?** | 19         Are Mark Carlson and Joseph Carrera |
| 20 Q        Either the defamation case against | 20 associated with Secure Pointe? |
| 21 you or the RICO case against you? | 21 A        **Yeah.  They changed the name of** |
| 22 A        **They're both legally frivolous, and** | 22 **their firm at some point.  But when we started** |
| 23 **they are simply slap suits to retaliate against** | 23 **working with them, it was Secure Pointe.** |
| 24 **us for our human rights efforts to hold Drummond** | 24 Q        What did it become; Princeton |
| 25 **accountable for its crimes in Colombia.** | 25 something? |
| Page 70 | Page 72 |

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 18 (69 - 72)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Page 73

1 A         Maybe it was the opposite.  Maybe it
2 was Princeton and they became Secure Pointe.
3 But --
4 Q         In any event, Mr. Hugo is sending to
5 Secure Pointe a scope of work that is attached;
6 correct?
7 A         I don't know what it -- where it
8 says scope of work, but he sent them something.
9 Q         Well, at the top it says, "PWA
10 Response to Scope of Work"; right?
11 A        Yes.
12 Q        And PWA would be Parker Waichman
13 Alonso?
14 A        Yes.
15 Q        And he's -- did you have any
16 participation in preparing this document or
17 input?
18 A        I don't think so.
19 Q        And Secure Pointe was an
20 investigation firm y'all were using in Colombia
21 to help try to get with witnesses?
22 A        I don't think that's a fair
23 characterization.
24 Q        Characterize it for me.
25 A        Ask me a question.

Page 74

1 Q         How would you characterize what
2 Secure Pointe was doing for you in Colombia?
3 A         They were conducting investigations
4 for factual leads.
5 Q         Looking for witnesses?
6 A         Among other things.
7 Q         And the first sentence, at least
8 that's not redacted in this document, says, "One
9 point that M-U-S-T be adhered to religiously, is
10 that while it is clear that you must resort to
11 whatever cash outlays you deem necessary to gain
12 access to the target subjects, you may not pay
13 any witness for his testimony.  You also may not
14 pay anyone else for any witness' testimony."
15 Do you agree that that was
16 prohibited in Secure Pointe's scope of work?
17 A        I agree that that's what it says.
18 Q        Do you agree it would be
19 inappropriate for Secure Pointe to pay any
20 witness for his testimony?
21 A        If that's what it was, yes.
22 Q        Do you agree that it would be
23 inappropriate for Secure Pointe to pay anyone
24 else for any witness' testimony?
25 A        I don't understand how that would

Page 75

1 work.  If -- if the witness was going to benefit
2 from someone else being paid directly just for
3 the testimony, then -- then yes.
4 Q         In other words as a general matter,
5 you're not allowed to pay fact witnesses or
6 people affiliated with them for their testimony;
7 right?
8 A         As a general matter, yes.
9 Q         You left Susana Tellez's deposition
10 early on Friday.
11 Did you log back on to the Zoom to
12 see the remainder?
13 A        No.  I was in distress.
14 Q        Okay.
15 A        From the dental appointment, not
16 from the deposition.
17 Q        So you didn't view any of her
18 testimony or the questions relating to documents
19 being pulled off of the defendant's privilege
20 log in this case?
21 Is that true?
22 A        On Friday?
23 Q        Uh-huh.
24 A        No, I didn't.
25 Q        And your explanation for

Page 76

1 misrepresenting the number of witnesses who had
2 been paid and the identities of those that had
3 been paid in the crime-fraud hearing was for El
4 Tigre and Samario, you had just forgotten that
5 there were security payments sent for their
6 benefit; right?
7 A         I said that because -- yes.  I sent
8 -- I said that because we were paying Ivan,
9 there were lots of things going on.  And I did
10 not specifically recall the security payments
11 made to the families of Samario and El Tigre.
12 MR. WELLS:  Let's go to tab 6, which
13 is Exhibit 11.
14 (Plaintiff's Exhibit 11 was
15 marked for identification.)
16 Q         This is an email from Charity
17 Ryerson to you with a copy to Christian Levesque
18 in -- or Levesque in August of 2013; correct?
19 A        I'm sorry?
20 Q        Who is Charity Ryerson?
21 A        At the time of this, she was either
22 a paralegal or a lawyer working with us.
23 Q        And she is sending an email with an
24 attachment called "Privilege"; right?
25 A        Yes.

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

1 Q        And she's telling you "Here are the
2 privileged" documents.  "I just looked through
3 my notes on these to highlight a few you may
4 want to look at, and there are a few that could
5 be problematic."  Number two, she flags a May
6 22nd, 2011, "Confidential Trip Report" that she
7 says "outlines some payments, etc"; correct?
8 A        Yes.
9 Q        And she said, "If anything in the
10 world is privileged, this is"; right?
11 A        That's what she says.
12 Q        And in litigation if you have a
13 document that has been requested but you contend
14 it is privileged, that would go on what is
15 called a privilege log; correct?
16 A        If it was responsive.  Yes.
17 Q        And let's flip to the last three
18 Bates numbers.  It is 689.
19 A        (Witness complies.)
20 Q        It's just a few pages back from the
21 beginning, the last three numbers is 689.  And
22 this is an email entitled "Confidential Trip
23 Report" dated May 22nd, 2011; correct?
24 A        Yes.
25 Q        And you recognize this as what has

1 been referred to in this case as the deps in the
2 can email; right?
3 A        Not yet.  I haven't read it.
4 Q        Well, flip to number ten in the
5 numbered paragraphs.
6 A        (Witness complies.)
7 Q        Says, "Gave Ivan $5,400 for security
8 costs for him, ET and Samario.  Need to pay
9 $2,700 per month to maintain until we get" the
10 "deps in the can"; right?
11 A        That's what it says.
12 Q        And, clearly, this document reflects
13 that the $2700 per month for Ivan Otero are for
14 the families of El Tigre and Samario; correct?
15 A        Well, it -- it says for him too; so
16 for Ivan Otero's security as well.
17 Q        In addition to the families of El
18 Tigre and Samario?
19 A        That's what it says.
20 Q        And as it relates to imprisoned
21 Colombian paramilitaries, and probably anybody
22 in prison in Colombia; are you aware of whether
23 their bank accounts are accessible by the
24 prisoners?
25 A        No, I'm not.

1 Q        Are you aware of any way in which
2 you could actually provide money directly to a
3 prisoner in Colombia?
4 A        Am I aware of it?
5 Q        Yes.
6 A        Well, I could think of some.  But
7 I'm not -- never had occasion to -- to do that;
8 so not specifically.
9 Q        So these documents being flagged for
10 you as potentially problematic by Ms. Ryerson in
11 August of 2013, one of which is this deps in the
12 can email; is it your testimony that as of
13 August 2013, you had forgotten that El Tigre and
14 Samario were receiving payments?
15 A        Why August -- why August of 2013?
16 Q        Because she is attaching it in an
17 email to you dated August 29th, 2013, flagging
18 the attached deps in the can email as a
19 potentially problematic document.
20 A        I'm looking to see that -- the
21 original email, does she attach these to it?
22 A        Yes.
23 A        And so your question is?
24        MR. WELLS:  Will you read my
25 question back.

1        (Record read.)
2 A        No.  I don't recall that I read this
3 email or that I read any of the documents
4 attached to Charity's submission here.  So I
5 can't say that I did or didn't remember.  I
6 remember that at the 2015 hearing, by then we
7 had disclosed the so-called deps in the can
8 email.  And -- and I discussed then that there
9 had been other indications of this but that I
10 did not flag them or recall them when I
11 testified originally.
12        MR. WELLS:  Let's get tab 7, please.
13 This is Exhibit 12.
14        (Plaintiff's Exhibit 12 was
15        marked for identification.)
16 Q        So this is you responding to the
17 email we just looked at also on August 29th,
18 2013, saying, "thanks.  Will focus on this
19 finally"; correct?
20 A        That's what it says.
21 Q        But you're saying you have no
22 recollection of whether or not you actually did
23 as you said in this email and focused on the
24 document she's attaching to you?
25 A        That's correct.  I do not recall

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 20 (77 - 80)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

1 **whether I did or did not read all of the**
2 **attachments to her email when I said I would**
3 **focus on it.**
4           MR. WELLS:  Let's go to tab 9.  This
5 is Exhibit 13.
6           (Plaintiff's Exhibit 13 was
7               marked for identification.)
8 Q        This is an email or, excuse me, a
9 memo to Brad and Eric.
10          And the names of your former counsel
11 in the defamation case were Brad Smith and Eric
12 Bonner; correct?
13 **A        I recall Brad Smith.  I don't know**
14 **Eric's last name, but I know there probably was**
15 **an Eric in there.**
16 Q        And it's from Christian.
17          That would be Christian Levesque;
18 right?
19 **A        Yes.**
20 Q        And she was your cocounsel in the
21 Drummond cases, correct, the Baloco and Balcero
22 ones at least?
23 **A        She -- she did work on those cases.**
24 Q        Was there anyone else at Conrad &
25 Scherer other than you that was more involved in

Page 81

1 those cases than Christian Levesque?
2 **A        It depends on when -- it depends on**
3 **when.  There were times when Christian did a lot**
4 **of work; there were times when she was working**
5 **on Firestone or other things.  She did work on**
6 **the case.  There's no question of that.**
7 Q        And she is flagging Drummond's
8 second request for production number eight,
9 which asks for all documents reflecting
10 communications between defendants or anyone
11 working on their behalf and Ivan Otero.  And she
12 says that request is problematic because Ivan
13 Otero represents certain AUC ex-paramilitary
14 witnesses; right?
15 **A        Are you asking is that what she**
16 **said?**
17 Q        Yes.
18 **A        Yeah.**
19 Q        As of September of 2013, did Ivan
20 Otero represent certain AUC ex-paramilitary
21 witnesses?
22 **A        I object to the form.**
23          **If I understand the question, if**
24 **you're asking did he on September 8th, 2013,**
25 **represent paramilitaries; I don't know.**

Page 82

1 Q        Is it your testimony that this
2 reference to Ivan Otero in the present tense
3 represents certain AUC ex-paramilitary
4 witnesses.
5          Is it your testimony that is not an
6 accurate statement, or you just don't know?
7 **A        I said I don't recall if at this**
8 **time; September 8th, 2013; he can -- he still**
9 **represented paramilitary witnesses.  He could**
10 **have.  I just don't recall.**
11 Q        Are you aware of whether or not it
12 is unethical to give a contingency fee to a
13 lawyer for fact witnesses in one of your cases?
14 **A        Oh, I don't -- I don't think you**
15 **could categorically say that one way or the**
16 **other.  It depends.  Are there conflicts?  Have**
17 **they been disclosed?  There are all kinds of**
18 **factors that would go into if it was unethical.**
19 Q        When you promised or agreed with
20 Ivan Otero that he would have a contingency fee
21 in the Drummond cases, did you analyze the
22 ethics of that arrangement?
23          MR. PAULK:  Object to the form.
24 **A        Object to the form.**
25          **We certainly discussed it.**

Page 83

1 Q        (By Mr. Wells)  We being who?
2 **A        Me, Ivan, probably some other folks**
3 **in the firm.  I don't recall specifically.  But**
4 **it was an obvious issue that needed to be**
5 **discussed.**
6 Q        And I've not seen any memo or other
7 document undertaking that analysis.
8          Are you aware of one?
9 **A        I'm not aware of a specific**
10 **document.  No.**
11 Q        Did you reach out to any bar
12 association to inquire of bar counsel whether it
13 would be appropriate to offer a contingency fee
14 to the lawyer for imprisoned fact witnesses?
15 **A        At this time, I don't think so.**
16          MR. WELLS:  Let's go to tab 10.
17          (Plaintiff's Exhibit 14 was
18              marked for identification.)
19 Q        So since you haven't read the
20 sanctions motion, I'll just give you some
21 context.  This is a report from our computer
22 expert analyzing the metadata associated with
23 four documents.
24 **A        What's -- okay.**
25 Q        And it is plaintiff's 14 to your

Page 84

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 21 (81 - 84)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

1 deposition.  If you could flip -- let me mark
2 that for you.  Unfortunately, this is not
3 Batesed in the same order.
4          MR. WELLS:  Time out.
5          (Discussion off the record.)
6          THE VIDEOGRAPHER:  The time is
7 10:58 a.m.  We are back on the record.
8 Q        (By Mr. Wells)  All right.  So I've
9 turned to a document that was produced to us by
10 Conrad & Scherer in the case.  And the cover
11 page that we're looking at right now is what's
12 called a metadata slip sheet.  And the expert
13 report basically explains that the file name for
14 this document attached was redact and produce,
15 September 19th, 2013; last modified on September
16 19th, 2013; Author:  Terry Collingsworth.
17          Do you have any reason to dispute
18 that you either created or saved this document
19 on September 19th, 2013?
20 A        I have no reason to recall, nor do I
21 know what document you're referring to.
22          MR. PAULK:  Trey, what page are you
23 on?
24          MR. WELLS:  They're not sequentially
25 numbered.

Page 85

1          MR. PAULK:  What about the ECF
2 number at the top?
3          MR. PRESLEY:  Page 12 of 127.
4          MR. WELLS:  Oh, there you go.
5 That's a better way to do that.
6          MR. PAULK:  All right.
7 Q        (By Mr. Wells)  And if you flip to
8 the next page, the document associated with that
9 sheet is called "To Do for Drummond" February
10 7th, 2012.
11          Do you see that?
12 A        And so you're telling me that this
13 prior page that's dated the 19th of September,
14 2013, is somehow the cover of this document from
15 a year earlier?
16 Q        It is the metadata sheet associated
17 with that document; such that it tells you when
18 it was saved, what its title was on the
19 computer, and whose computer it was on.
20 A        Okay.  If you say so.
21 Q        Now, this document now has -- well,
22 let's use the page -- the ECF page numbers.  Go
23 to page 18 of 127.
24 A        (Witness complies.)
25 Q        Says, "RG is now making a huge

Page 86

1 demand for a 'security payment.'  I told him
2 never mind."
3          Would RG be Rafael Garcia?
4 A        I assume so.
5 Q        And if you flip to page 27 of 127.
6 A        (Witness complies.)
7 Q        We've got a paragraph saying, "We
8 made one payment for security to Ivan for" El
9 Tigre "and Samario's families.  We need to
10 follow up on my next trip to confirm that
11 security measures were taken and what is actual
12 cost and duration."
13          Did I read that correctly?
14 A        Yes.
15 Q        Is it your testimony that as of
16 September of 2013 you no longer recalled that
17 payments had been made for the benefit of El
18 Tigre and Samario's families?
19 A        What -- what date?
20 Q        September of 2013?
21 A        And why is that the date?
22 Q        Because the metadata says this
23 document was either saved or created in
24 September of 2013 on your computer.
25 A        It couldn't have been created in

Page 87

1 2013 if it was dated 2012.  That's a big
2 difference in a year.
3 Q        Okay.  Let's put that aside.
4          You are not a computer expert, are
5 you?
6 A        Certainly not.
7 Q        Question is:  As of September 19th,
8 of 2013; is it your testimony that you no longer
9 recalled that payments were being made for the
10 benefit of El Tigre and Samario's families?
11 A        September -- what's the date?
12 Q        19th of 2013.
13 A        I can't say.  I don't recall what I
14 recalled in 2013.
15 Q        Well, I'll represent to you that in
16 the lead-up to September 2013, starting in July
17 of 2013; you started making repeated
18 representations and declarations and briefs in
19 the defamation case saying that only three
20 witnesses had been paid, and those three did not
21 include El Tigre and Samario.
22 A        Is that a question?
23 Q        Getting there.
24          Does that help you at all as to
25 whether your testimony is you would have

Page 88

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 22 (85 - 88)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

1 recalled in September of 2013 that, in fact, El
2 Tigre and Samario were witnesses that payments
3 were made for the benefit of?
4 A        No witnesses that you've listed were
5 paid for their benefit or otherwise.  Security
6 arrangements were made for their families.  But
7 your assertion does not refresh my recollection
8 from 2013 or '12.
9              MR. WELLS:  Let's go to tab 11,
10 which is Exhibit 15.
11              (Plaintiff's Exhibit 15 was
12              marked for identification.)
13 Q        This is another September of 2013
14 email; this one from Christian Levesque to you.
15 And she says, "Communications about payments -
16 concerning" because "they want internal
17 communications between lawyers concerning
18 communications.  Biggest concerns:  1) payments;
19 2) Ivan Otero communications."
20              What concern did you have, if you
21 had any, about requests for Ivan Otero
22 communications in the defamation case?
23 A        I -- I don't recall.  This was not
24 written by me, so I don't know that I expressed
25 concerns to anyone at this time.
Page 89

1 Q        Did you discuss with Ms. Levesque
2 her apparent concerns as she is listing in this
3 email?
4 A        Not that I recall at this time.
5 Q        One thing we can agree on is that
6 your communications and your team's
7 communications with Ivan Otero would in some
8 instances relate to the subject of making,
9 quote, security payments for the families of El
10 Tigre and Samario; right?
11 A        At this time?
12 Q        You -- your team communicated with
13 Ivan Otero about making security payments to El
14 Tigre and Samario's families; correct?
15 A        Well, you've showed me some emails
16 that would indicate that.
17 Q        And the communications with Ivan
18 Otero also include the subject of this
19 arrangement to pay Jaime Blanco and/or his
20 lawyers; correct?
21          That was another subject discussed
22 with Ivan Otero via email; correct?
23          MR. PAULK:  Object to the form.
24 A        I object to the form.
25          To the best of my recollection, most
Page 90

1 of the emails, which is your word, were my
2 discussions with either Lorraine or sometimes
3 Rebecca about their verbal communications with
4 Ivan.  I don't believe Ivan and I emailed each
5 other about any of this.
6 Q        (By Mr. Wells)  Ivan emailed with
7 members of your team who spoke Spanish fluently;
8 correct?
9 A        Correct.
10 Q        And then they would either relay
11 messages to you or directly translate them for
12 you; right?
13 A        Usually.  Yes.
14          MR. WELLS:  Let's go to tab 12,
15 which is Exhibit 16.
16              (Plaintiff's Exhibit 16 was
17              marked for identification.)
18 Q        Actually, let's go back to that
19 prior exhibit real quick, 15.
20 A        (Witness complies.)
21 Q        The attachment to this email from
22 Christian Levesque to you in September of 2013
23 is a copy of an attorney cooperation agreement
24 between you and Ivan Otero; correct?
25 A        It appears to be the -- the Spanish
Page 91

1 version I can't read, but it looks like it is.
2 The next page --
3 Q        Exhibit 1 with your signature on it
4 is in English; correct?
5 A        Yes.
6          MR. WELLS:  Let's go to tab 15.
7 Q        You can put that one away, but keep
8 this 16 in front of you.
9 A        (Witness complies.)
10              (Plaintiff's Exhibit 17 was
11              marked for identification.)
12 Q        This is another email to you in
13 September of 2013.  And Susana Tellez is telling
14 you that she had found a signed agreement with
15 Albert.  And then at the bottom where it says,
16 "Ivan"; she's also found a signed agreement with
17 Ivan.  And if you flip back, she's attached
18 those two agreements.
19          MR. PAULK:  Did you mark this as an
20 exhibit?
21          MR. PRESLEY:  Yes.  That is 17.
22 Q        (By Mr. Wells)  And the question is
23 just:  Does that email to you in September 2013
24 attach the attorney cooperation agreement with
25 Ivan Otero and a cooperation agreement between
Page 92

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

1 you and Albert Van Bilderbeek?
2 A        I cannot say for certain as I sit
3 here whether these ultimately ended up being
4 valid or were not voided, but there are two
5 agreements attached.  One is with Ivan, and one
6 is with Albert.
7              MR. WELLS:  Give me tab 16, which is
8 Exhibit 18.
9              (Plaintiff's Exhibit 18 was
10                marked for identification.)
11 Q        This is an email from you the next
12 day.  And if you look at the second sentence it
13 says, "On the home stretch here.  I'm going to
14 meet with Susana starting tomorrow to review all
15 of the documents and make final determinations
16 as to responsiveness, and then privilege and
17 relevance.  I have to be the one to do this
18 because I am the only person with personal
19 knowledge and participation in all aspects of
20 these cases."
21              Did I read that correctly?
22 A        Yes.
23 Q        And were you the one at Conrad &
24 Scherer to, as you say here, make the final
25 calls as to privilege and responsiveness as it
Page 93

1 related to the privilege log that was originally
2 produced in this -- the defamation case?
3 A        Well, it says so here.  And I -- as
4 just a general matter, those decisions would
5 have been mine.
6 Q        So you can put those two away.
7 A        (Witness complies.)
8 Q        Exhibit 16 is a September 25th,
9 2013, draft privilege log.  And if you look
10 through it, do you see there's -- on the log
11 itself, you see there's a column on the right
12 with summaries of quotations from the documents.
13 And there appears to be some color coding.  Some
14 are flagged as red, and some of them are just in
15 black.
16              Do you know what the color coding
17 means?
18 A        Well, I have to look at it.
19              Your question is do I know what the
20 color coding in the right-hand column is?
21 Q        Yes.
22 A        Well, I --
23 Q        Why are some things in red?
24 A        Generally speaking, it looks like
25 someone is providing more details about a
Page 94

1 document for us to decide -- for me to
2 decide whether -- how we are going to treat that
3 document.  That's my guess.
4 Q        And Ms. Tellez told us in her
5 deposition that her process in these types of
6 privilege log projects would be to create a
7 document like this that sort of summarizes the
8 various documents.  But then she would also pull
9 together hard copies of the actual documents.
10 And she would go through those with you when
11 making calls on what should be claimed as
12 privileged on the log, what should be removed
13 from the log and produced to the other side.
14              Does that sound familiar to you?
15 A        No.  No, it doesn't.
16 Q        Well, what was your process for
17 going through privilege logs to determine what
18 should be left on the log and claimed as
19 privileged and what should be removed and
20 produced to the other side?
21 A        Well, I think it would be called
22 typical that I would get something like this
23 Exhibit 16 that had some notes.  And then
24 Susana, or someone working at Susana's
25 direction, would give me the documents in a
Page 95

1 folder; and I would -- I would review them.  No
2 one was sitting there with me.
3 Q        Okay.  So what I described is
4 accurate except for the reference to Susana
5 actually being physically with you at the time?
6 A        I don't remember exactly what you
7 described.  But I just told you what the typical
8 process was.
9              MR. WELLS:  All right.  Give me tab
10 21 and tab 265.
11              (Plaintiff's Exhibit 19 was
12                marked for identification.)
13 Q        So tab 21 will be Plaintiff's
14 Exhibit 19.  And that is a letter from Brad
15 Smith dated October 2nd, 2013, to Drummond's
16 counsel attaching the defendant's privilege log
17 in the defamation case.
18 A        Okay.
19 Q        And there are a number of documents
20 that were included on the draft privilege log
21 that had the little summaries by them that were
22 not included on the final privilege log produced
23 to Drummond and the Court and were not produced
24 to Drummond at the time.
25              Are you aware of that?
Page 96

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 24 (93 - 96)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

1 A          Well, I'd have to do quite a bit of
2 review between these two to say I'm aware of it.
3              Is there a question other than that?
4 Q          Are you aware that that occurred,
5 that y'all produced a privilege log that did not
6 list certain documents that were responsive and
7 did not produce them to Drummond either?
8 A          As I sit here, no.  I wouldn't be at
9 all surprised that in my review of the draft
10 privilege log I -- I decided that certain
11 documents were either not responsive or that
12 were privileged or not privileged.
13 Q          What I'm showing you as Plaintiff's
14 Exhibit 20, which tab 265 for our exhibit
15 coordinator, is another copy of the draft
16 privilege log.  But this is one where we have
17 gone through and highlighted the entries that
18 were removed from the draft privilege log before
19 the final was produced to Drummond and the
20 document was not produced to Drummond.
21                (Plaintiff's Exhibit 20 was
22                marked for identification.)
23 Q          Let's go to the first page of the
24 privilege log.
25 A          (Witness complies.)

Page 97

1 here ten years later.  But I know there is, and
2 I'm going to be able to figure that out.
3 Q          And I believe you said your
4 testimony here today is you have not yet
5 reviewed Drummond's sanctions motion against
6 you?
7 A          That's correct.
8 Q          Turn to the Bates number page with
9 the last --
10 A          Just -- just to be -- to be clear:
11 I looked at the table of contents.  I did not
12 have time to read the 60-some pages or whatever
13 it is.  But --
14 Q          Turn to the Bates numbered page with
15 the last three numbers 486.
16 A          (Witness complies.)
17 Q          And this section of log is all
18 communications with Albert Van Bilderbeek.  And
19 the top one on this page is summarized and
20 quoting the email as saying "I believe your
21 client has a lot to thank you for, however
22 refresh his memory" so that he has a lot to --
23 or refresh his memory "that he has a lot to
24 thank us for!  So I believe with all what you
25 have done you can assert some pressure on him to

Page 99

1 the heading "All documents evidencing any
2 the heading "All documents evidencing any
3 communications between the Defendants and Daniel
4 Kovalik."  There is an email where the read
5 summary says, Chain includes email from Rebecca
6 Pendleton to Terrence Collingsworth discussing
7 declaration and attorney cooperation agreement.
8 And it quotes "He understands that he won't get
9 paid as soon as the" declarations "are turned
10 in, he just wants a time line because he is
11 being asked."
12              Do you have any explanation for why
13 that document was pulled off of the privilege
14 log and not produced to Drummond?
15 A          I recall generally that there was an
16 issue.  We were having a discovery dispute with
17 Drummond at the time of this and that there was
18 a substantive issue as to whether we were
19 producing a category of documents; I think it
20 was payments versus funds or something like
21 that; and that we removed -- I removed certain
22 documents based on that.  Now, I've been trying
23 to, and I hope to, provide details of that at
24 some point in this case.  But I know there is an
25 explanation.  And I don't recall it as I sit

Page 98

1 cooperate.  From TC, 'I'm trying my best and I
2 do think RG knows he has TWO good friends'."
3              RG would be Rafael Garcia?
4 A          I assume so.
5 Q          Any explanation for why this
6 document was pulled off of the privilege log
7 that was produced to the Drummond and the Court
8 and not produced to Drummond or the Court?
9 A          Well, I would give the same answer
10 that there was some larger categorical reason
11 for the documents that we did not produce; and I
12 believe it had to do with a dispute with
13 Drummond over what they were producing and how
14 we were interpreting terms.  But I cannot
15 specifically speak to this document as I sit
16 here.
17 Q          Go to the last three Bates numbers
18 492.
19 A          (Witness complies.)
20 Q          Item number 67 was also pulled off
21 the log and not produced to Drummond.  And it is
22 quoted as saying, "I hope it is possible to get
23 me" 150,000 "books by then so I will have the
24 resources to move.  Let me know when the library
25 will be open and I will adjust my plans."  And

Page 100

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 25 (97 - 100)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

1 another quote says, "RG says this guy is
2 particularly dirty."
3           Is your testimony also you don't
4 have any explanation for why this document was
5 pulled off the log and not produced to Drummond
6 or otherwise indicated that it even existed?
7 A        That was not my explanation for any
8 of my prior answers.  I said there is an
9 explanation for probably all of the documents
10 that were removed, and it had to do with a
11 categorical decision that we made and that I
12 think was justified.  I cannot recall
13 specifically what it is as I sit here, but I am
14 looking into it.
15 Q        You don't have an explanation
16 sitting here today; is that correct?
17 A        That is correct.
18 Q        Go to 494.
19 A        (Witness complies.)
20 Q        Number 82, which is summarized as a
21 wire confirmation of payment from Albert to Ivan
22 Otero for $35,000.  And I think we actually just
23 looked at that email where you said you believe
24 that 35 would have been related to the Jaime
25 Blanco arrangement; right?

Page 101

1 A        I said it seemed like an odd number,
2 but it must have been.
3 Q        And number 83 is another email and
4 wire confirmation of payment from Albert to Ivan
5 Otero for $60,000.
6           And you're aware that there was a
7 $60,000 payment that to your understanding was
8 for Jaime Blanco and/or his lawyers?
9 A        I'm not specifically aware, but that
10 seems also to be consistent with that
11 arrangement.
12 Q        Do you have any explanation for why
13 these documents were pulled off of the privilege
14 log and not produced to Drummond?
15 A        The same answer that I gave to the
16 other specific questions, and it will be the
17 same answer to all of the other ones that there
18 is an explanation.  And it was -- it had
19 something to do with a decision we made based on
20 interpretations of the scope of the request and
21 a dispute we were having with Drummond over what
22 they were -- how they were interpreting similar
23 language and that that explains probably all of
24 the documents that were removed.
25 Q        And I think you told us just a

Page 102

1 second ago it was you that had the final say on
2 what made it on the privilege log and what
3 didn't; right?
4 A        Absolutely.
5 Q        And you would have reviewed these
6 summaries in making those determinations;
7 correct?
8 A        I don't --
9 Q        Or the document itself?
10 A        Yeah.  Or the document itself.
11 Q        Let's go to 502.
12 A        (Witness complies.)
13 Q        Number 45, which is summarized as --
14 well, it's an email between Lorraine Leete and
15 Ivan Otero.  And it's summarized as "In order to
16 send money to your bank account we need the
17 following info:" and then it asks for banking
18 details.  And this is a quote, "which is where
19 he said the money for his, ET and Sam's security
20 should be deposited."
21           And that's a reference to El Tigre
22 and Samario; correct?
23 A        Probably.
24 Q        And you would have either reviewed
25 this summary of it or the document itself to

Page 103

1 make the determination of whether it should be
2 on or off the log; right?
3 A        Well, if -- if I had decided that we
4 were going to remove all documents that related
5 to X because of a reason that I'm -- I have not
6 yet been able to recall as I sit here in this
7 line of questioning, it's possible that I would
8 have said to someone remove all documents
9 related to X and that I wouldn't have one by one
10 removed them myself.
11 Q        Well, this log, and this page in
12 particular, has just a number of emails with
13 Ivan Otero on it?
14 A        Yeah.
15 Q        And on this page, only two of them
16 were removed.  And you can't --
17 A        If you say so.  Yeah.
18 Q        -- give us any idea what this X
19 category would have been that you were trying to
20 remove from within the larger group of Ivan
21 Otero communications?
22 A        Not based on this.  No.
23 Q        And for the one that says clearly
24 that money is being sent for El Tigre and
25 Samario's security, you don't have an

Page 104

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 26 (101 - 104)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

1 explanation for why that was removed for the --
2 from the log and not produced to Drummond?
3 A        I think I've answered your question.
4 Q        And the answer is, No, I don't have
5 an explanation; right?
6 A        I do have an explanation.  I do not
7 recall as I sit here, but we will be looking
8 into it.
9 Q        Who is we?
10 A        I will be working with my
11 cocounsel -- not my cocounsel, the counsel for
12 defendants to help me find documents in this
13 time frame that might help me to explain this
14 situation.
15 Q        You mean William Paulk and Bob
16 Spotswood?
17 A        Yeah.
18 Q        Okay.  Well, we asked --
19 A        They're not --
20 Q        -- them for an explanation, and they
21 told us we just have to depose the people that
22 were involved.  And we now have, and no one has
23 had an explanation.
24 A        I have an explanation.  And I've
25 said that with some help getting documents in
Page 105

1 the time frame, I believe I'll be able to
2 provide an explanation.  Because I don't have
3 the capacity that they do to search for these
4 kinds of documents from the past.  So they don't
5 need to know.  They need to now -- know that I'm
6 going to ask for some documents, and we'll
7 figure it out.
8 Q        Let's flip to the next page, last
9 three Bates numbered 503.
10 A        (Witness complies.)
11 Q        Item number 52 at the top, which is
12 another Ivan Otero email summarized as "To S and
13 T 1800 each was given.  From this 800 was for
14 the transfer of their nuclear families and 1000
15 to sustain them for one month."
16          And S and T would be Samario and El
17 Tigre?
18 A        Probably.  I -- I -- I -- certainly,
19 I don't recall.  I didn't write this, but that's
20 probably right.
21 Q        Well, you are the one making the
22 final calls as to which documents land on this
23 log and which don't; right?
24 A        That has nothing to do with what the
25 document says, but yes.
Page 106

1 Q        How can you make a call on whether a
2 document should be or should not be logged if
3 you have no idea what it's saying or what it's
4 referencing?
5 A        Well, as I said; if I made a
6 categorical decision that remove all documents
7 that related to X and this was one of those
8 documents, I did not need to specifically review
9 it in order to reach that -- to -- for that to
10 happen.
11 Q        What category would the documents
12 that we've just referenced fall into other than
13 they disclose that Jaime Blanco and El Tigre and
14 Samario received payments contrary to what you
15 had been representing up to this point?
16          MR. PAULK:  Object to the form.
17 A        As I said -- I object to the form.
18          You're just asking me the same
19 question over and over.  I've told you that I --
20 there is an explanation.  I don't know what it
21 is as we sit here, and we will be looking into
22 it.
23 Q        (By Mr. Wells)  Let's go to 510.
24 A        (Witness complies.)
25 Q        Numbers 19 and 29 are more Ivan
Page 107

1 Otero communications referencing a package from
2 the brothers.
3          And would that relate to this
4 arrangement to pay Jaime Blanco and/or his
5 criminal lawyers?
6 A        We never paid Jaime Blanco.  So if
7 there's funds being discussed here concerning
8 Jaime Blanco, that would have been for his
9 lawyers.
10 Q        But those two documents would be
11 referencing that subject?
12 A        Referencing it?
13 Q        The package from the brothers?
14 A        Payment?  Apparently, yes.
15 Q        And 93 talks about a $60,000 deposit
16 into Ivan's account.  I think you told me your
17 general recollection there was a $60,000 payment
18 in this Jaime Blanco arrangement?
19 A        I didn't say that I recalled the
20 number 60,000.  I said that if there was a
21 payment in that arrangement, that it would have
22 been for lawyers for Jaime Blanco.
23 Q        Let's go to 522.
24 A        (Witness complies.)
25 Q        Number 182 was pulled off the log
Page 108

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 27 (105 - 108)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

**Terrence P. Collingsworth - Volume I**
**2/20/2024**

1 and not produced to Drummond.  And it is quoted
2 as saying from Ivan Otero "Today, September 12,
3 has not reached the protection of T and S.  More
4 worrying is on what respect with the last two"
5 there "are three months of delay.  That leads
6 me" to "serious problems which I request you to
7 help me solve."
8          T and S would be El Tigre and
9 Samario.
10 A       As I said, probably so.
11 Q       Do you have any explanation for why
12 this document was pulled off the log and not
13 produced to Drummond?
14 A       The same answer that I previously
15 provided for the other questions on this that
16 you have asked.
17 Q       As a general matter, you would agree
18 that if a document is requested and it's neither
19 logged nor produced; the other side has no way
20 to know that it even exists?
21 A       Is that a question?
22 Q       Yes.  Do you agree with that?
23 A       Well, that does not answer the
24 question of whether it should have been produced
25 or logged.  It depends upon whether it was
Page 109

1 responsive.  And I think that is the issue that
2 we're going to look into, whether it was
3 responsive.
4 Q       The question is:  If a document is
5 responsive and it is neither produced nor
6 logged, your opponent has no way to know that
7 that document even exists?
8          MR. PAULK:  Object to the form.
9 A       Until it is ultimately produced,
10 which it was in this case.
11 Q       (By Mr. Wells)  So your testimony is
12 in producing this log, you were not trying to
13 hide the existence of certain documents
14 reflecting payments --
15 A       Oh, I'm certain of that.
16 Q       -- relating to El Tigre, Samario,
17 and Jaime Blanco?
18 A       I'm certain of that.  I believe
19 there is an issue of responsiveness, and that is
20 the key to the mystery.
21 Q       And when Otero in this email, at
22 least as it's quoted, he first references El
23 Tigre and Samario; and then he says he's more
24 worried about the last two.
25          Who are the last two?
Page 110

1 A       I don't know.
2 Q       Well, what all witnesses were you
3 making monthly payments for either they or their
4 families' security through Ivan Otero?
5          MR. PAULK:  Object to the form.
6 A       I also object to the form.
7          I -- I -- I don't think there were
8 any.  There's more to the email.  He's talking
9 about other cases.  I -- I can't speculate now
10 what I -- what he says he was more worried
11 about.
12 Q       (By Mr. Wells)  I'm not concerned
13 about what he's worried about.  I'm trying to
14 figure out who the other two other than Tigre
15 and Samario were getting monthly security
16 payments through Ivan Otero?
17          MR. PAULK:  Object to the form.
18 A       I -- I -- you're reading something
19 into that that I don't see.
20 Q       (By Mr. Wells)  Go to 525.
21 A       (Witness complies.)
22 Q       193 and 194 were both pulled off the
23 log and not produced to Drummond or otherwise
24 disclosed to the Court.  And both are an
25 exchange between Lorraine Leete and Ivan Otero
Page 111

1 talking about certain amounts for payments for
2 the, quote, new ones and old ones.
3          Do you see that?
4 A       I do.
5 Q       And Lorraine Leete's email, which is
6 194, says, "With respect to the protection
7 assistance we have:  according to the email I
8 sent you" September 27th, 2012, "for the month
9 of october we were behind four months for the
10 new ones and two for the old.  This would be 4
11 times 2400 = 9600 for the new," and it's cut
12 off.  We can't see what she breaks down for the
13 old.
14          Who are the old ones, and who are
15 the new ones?
16 A       The only two that I'm aware of, as
17 I've said, are El Tigre and Samario.  Ivan was
18 working on the Chiquita cases with us.  There
19 were a lot of other things going on.  I -- I --
20 I cannot speculate as to any distinction being
21 made here by Lorraine.
22 Q       So the -- the 2700 per month
23 payments to Ivan Otero that we now know were
24 security relating to El Tigre and Samario, that
25 amount was increased by $2200 a month in about
Page 112

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 28 (109 - 112)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

---

1 July of 2012?
2 A        If you say so.
3 Q        And the documents will bear it out.
4          But my question is:  Who are these
5 "new ones" that are getting $2200 per month?
6 A        I just answered your question.  I
7 don't know what that refers to.  It could be a
8 lot of things.
9 Q        Well, you'd agree that this -- this
10 email here is talking about, quote, protection
11 assistance?
12 A        It says what it says.  I -- I -- I
13 cannot speculate as to what somebody else meant
14 when they wrote a document.
15 Q        Well, this is a document you're
16 making a call on as to whether it gets logged or
17 not.
18 A        Yeah.
19 Q        Is this -- is there anything else
20 this could be talking about than witnesses?
21 A        As I said, he was working on other
22 cases.  We had other issues going on.  It could
23 be a number of things.  I don't know.  There's
24 nothing specific that comes to mind in
25 referencing "new ones."
Page 113

1 Can you recall anyone else that Ivan
2 Otero was receiving protection assistance for
3 other than El Tigre and Samario?
4 A        And himself.  He received security
5 for himself.  That's what I'm aware of.
6 Q        Anything else?
7 A        Nope.
8 Q        So you don't know why you were
9 sending him $2200 a month over and above what
10 was for him, El Tigre, and Samario?
11 A        As I sit here, I don't recall the
12 details of that.
13 Q        Okay.  Let's take another break.
14          THE VIDEOGRAPHER:  The time is
15 11:42 a.m.  We are off the record.
16          (Short recess.)
17          THE VIDEOGRAPHER:  The time is
18 11:52 a.m.  We are back on the record.
19          (Plaintiff's Exhibit 21 was
20          marked for identification.)
21          MR. WELLS:  For our exhibit
22 coordinator, this will be tab 20; and it is
23 marked Plaintiff's Exhibit 20.
24 Q        (By Mr. Wells)  This is a September
25 30th, 2013, email from you to Brad Smith, your
Page 114

1 lawyer in the defamation case, attaching a draft
2 privilege log.  And I will represent to you that
3 draft privilege log no longer contains the
4 emails we just went over a moment ago.
5          Did you not involve your lawyer in
6 the decision-making process as to what should be
7 removed from the log or not?
8 A        I'm going to read the email before I
9 -- apparently, it has something to do with the
10 question.
11          Your question is did I involve Brad?
12 Q        Yes.
13 A        Brad, I think as the email -- the
14 cover sheet indicates, I informed him of
15 decisions that we made; and he had the
16 opportunity to agree or disagree or discuss, and
17 he often did not.  But I think the email is
18 pretty typical of our discussions.
19 Q        My question is really more
20 specifically did you tell him that the log you
21 were sending him already had documents that
22 y'all had removed from your internal log?
23          MR. PAULK:  Object to the form.
24 A        Yeah.  I object to the form as well.
25          We did not discuss those initial
Page 115

1 drafts of the log.  So -- so this is about as
2 clear as we could be in terms of what we are
3 producing.
4 Q        (By Mr. Wells)  And you're telling
5 your lawyer in the second paragraph "Please note
6 that all or virtually all of the 'security
7 payment' docs are going to be produced because
8 they are not privileged.  We will have updates
9 of wires to Charris and a huge pile of
10 communications with Halcon's representative, the
11 guy that we aren't even using as a witness.  The
12 other person who we helped with security,
13 Duarte, has nothing more as that was just a one
14 shot arrangement to move his family before he
15 testified."
16 A        That's what it says.
17 Q        And at this time, what you're
18 telling Brad Smith, your lawyer, is consistent
19 with what you had been saying in briefs and
20 under oath to the Court and to Drummond that
21 there were only three witnesses that received
22 security payments or any other sort of payments
23 in your Drummond cases?
24 A        I don't read it that way.
25 Q        Well, you certainly don't tell Brad
Page 116

---

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 29 (113 - 116)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

1 Smith when you're telling him that all or
2 virtually all of the security payment documents
3 are going to be produced that, by the way, we
4 pulled off security payment emails relating to
5 El Tigre and Samario.
6          Do you see that in there?
7 A        It's not in there.
8 Q        And you certainly don't tell Brad
9 Smith that there are documents that y'all have
10 removed from the log prior to providing it to
11 him -- providing it to him that relate to
12 payments for Jaime Blanco's criminal lawyers?
13          MR. PAULK:  Object to the form.
14 Q        (By Mr. Wells)  That's not in there
15 either, is it?
16          MR. PAULK:  Object to the form.
17 A        Object to the form.
18          As I said, there's an explanation
19 for what we removed.  But Brad did not see the
20 original privilege log, so it would have been
21 really a waste of both of our times for me to
22 say the things that I took off of the thing you
23 never saw are.  So we gave him what we decided
24 we had to produce at that time.
25          (By Mr. Wells)  And didn't tell him
Page 117

1 what you had decided not to produce; right?
2 A        I -- without going through every
3 single document here, I -- I think that the --
4 the first sentence of the second paragraph is a
5 bit more general than you are implying.  And I
6 think there were other people besides the two
7 that are mentioned here where we did provide --
8 or three that are mentioned here that we did
9 provide documents on.
10 Q        Let's look at Exhibit 20 again.
11 A        (Witness complies.)
12          MR. WELLS:  No.  Tab 21 is exhibit
13 what?
14          MR. PRESLEY:  21 is Exhibit 19.
15 Q        (By Mr. Wells)  Exhibit 19.  Excuse
16 me.
17          So this, again, is the log as it was
18 produced to Drummond and the Court along with
19 Brad Smith's cover letter to me and Sara Kropf.
20 Let's stick with the cover letter.
21 A        (Witness complies.)
22 Q        And you were a drafter of this
23 letter; correct?
24 A        I don't know that.
25 Q        We'll get there.
Page 118

1          Look at the second page, first full
2 paragraph.
3 A        (Witness complies.)
4 Q        The representation being made here
5 to Drummond's lawyer is "As to Plaintiff's
6 Second Request for Documents No. 8, relating to
7 Ivan Otero, Defendants have searched for and
8 logged internal communications with Ivan Otero
9 as it related to Drummond."
10          Did I read that correctly?
11 A        It seems so.  Yeah.
12 Q        And a moment ago we reviewed several
13 entries that were pulled off the log that
14 related to -- that were with Ivan Otero,
15 correct, emails with Ivan Otero?
16 A        I think there were emails between me
17 and other people discussing Ivan Otero.
18 Q        There were emails between Lorraine
19 Leete and Ivan Otero.  That was the last one we
20 looked at.
21 A        I -- that's not inconsistent with
22 what I said.  There were no emails between me
23 and Ivan Otero.
24 Q        Okay.  And those emails talking
25 about security payments for ET and Sam's family,
Page 119

1 for TNS for El Tigre and Samario.  Those relate
2 to Drummond; correct?
3          Your contention is that those were
4 necessary because Drummond had threatened these
5 people.  Isn't that your position in the case?
6 A        Absolutely.
7          So that representation is clearly
8 untrue, isn't it?
9 A        As I said there, you can ask this as
10 many times as you want.  You've got your hours
11 that you need.  The answer is there is an
12 explanation for what we removed from the
13 privilege log -- the documents we removed.  And
14 I don't recall what it is as we sit here, but
15 there -- there certainly were documents produced
16 that related to Ivan Otero communications.
17 There was a reason why some of them were not
18 included.
19 Q        Well, none of them that were
20 included reflected the payments relating to El
21 Tigre, Samario, and Jaime Blanco.
22          Do you have an explanation for that?
23 A        As I said, there is an explanation.
24 And I don't recall what it was at that time, nor
25 do I necessarily understand -- certainly, not my
Page 120

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 30 (117 - 120)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

| | |
|---|---|
| 1 -- I have no basis to say that what you said is | 1 thorough. |
| 2 true, that all of the documents -- none of the | 2 Q      What would be the consequences if |
| 3 documents were produced.  I don't know that. | 3 she made a mistake and produced the wrong Ivan |
| 4      MR. WELLS:  Let's get tab 22.  And | 4 Otero email? |
| 5 this is Plaintiff's Exhibit 22. | 5 A      I don't read it to say that.  I'm |
| 6           (Plaintiff's Exhibit 22 was | 6 not worried about that. |
| 7           marked for identification.) | 7 Q      You're not worried that if she |
| 8 Q      Just fair warning, | 8 produced the emails reflecting El Tigre, |
| 9 Mr. Collingsworth:  We're going to get a copy of | 9 Samario, and Jaime Blanco had gotten paid that |
| 10 those notes before you leave. | 10 that would reveal that you've been repeatedly |
| 11 A      You're welcome to it.  I guess I'll | 11 lying to the Court? |
| 12 keep my editorial comments aside here. | 12 A      They did not get paid.  And as I |
| 13 Q      Write what you like. | 13 said, I was concerned with her generally having |
| 14      This is an email on October 2nd, | 14 accurate responses to our discovery requests. |
| 15 2013, the same date as the final letter that | 15 That's how I read that text. |
| 16 went out, where you are attaching the draft | 16 Q      You do acknowledge that up to this |
| 17 letter that we just looked at; right? | 17 point, you had been repeatedly lying to the |
| 18 A      Looks like that.  Yes. | 18 Court about whether or not El Tigre, Samario, |
| 19 Q      Do you have any reason to dispute | 19 and Jaime Blanco had been paid; right? |
| 20 that you and your team had a hand in drafting | 20 A      I do not acknowledge that.  It |
| 21 that letter? | 21 depends on what the question was that we were |
| 22 A      Well, I don't -- I don't have a | 22 responding to at any given time. |
| 23 reason to dispute it.  I don't have any | 23 Q      No.  You made representations that |
| 24 recollection that I had anything to do with it. | 24 there were only three witnesses that received |
| 25 I could have, but I just don't recall. | 25 payments of any sort from your team, and you |
| Page 121 | Page 123 |

| | |
|---|---|
| 1      Probably should have asked this at | 1 named them out.  And that list did not include |
| 2 the beginning:  Are you under any -- the | 2 El Tigre, Samario, and Jaime Blanco. |
| 3 influence of any sort of substance or any sort | 3      Is your testimony now that those |
| 4 of medical condition that impacts your memory? | 4 were accurate representations? |
| 5 A      No. | 5 A      No.  No.  I'm saying that at any |
| 6      Are you under the influence of any | 6 given time whether we responded in a particular |
| 7 substance or any medical condition that would | 7 way depended on the question.  And then as you |
| 8 interfere with your ability to testify | 8 well know, I certainly acknowledged to the Court |
| 9 truthfully here today? | 9 that I did not fully disclose those payments; |
| 10 A      No. | 10 and I offered my explanation. |
| 11      MR. WELLS:  Hand me tab 23, please. | 11 Q      And why is it that you're only |
| 12 This is Plaintiff's Exhibit 23. | 12 telling her here to be careful as it relates to |
| 13           (Plaintiff's Exhibit 23 was | 13 the Ivan Otero documents? |
| 14           marked for identification.) | 14 A      I don't remember. |
| 15 Q      This is a text message between you | 15 Q      There are a host of categories of |
| 16 and Susana Tellez on October 3rd, 2013, the day | 16 document requests on that privilege log.  It's |
| 17 after that privilege log was produced to | 17 organized by document request, and the only one |
| 18 Drummond.  And you tell her, "Please of course | 18 you're telling her to be careful about is the |
| 19 take your time on Ivan docs especially the ones | 19 Ivan Otero documents. |
| 20 we are producing too as one mistake and ..." | 20 A      Your statement does not refresh my |
| 21      Why are you instructing Ms. Tellez | 21 recollection as to what I thought at that time. |
| 22 to take care with the Ivan docs because one | 22 Q      So is it possible that you were |
| 23 mistake and dot, dot, dot? | 23 concerned that your lies might have been |
| 24 A      I'm telling her not to make a | 24 uncovered, but you just don't recall it now? |
| 25 mistake, to be careful, to be accurate, to be | 25 A      Object to the form.  I'm not going |
| Page 122 | Page 124 |

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 31 (121 - 124)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

1 to speculate.

2          I told you I don't recall.

3          MR. WELLS:  Let's get out tab 24,
4 which is Exhibit 24.

5          (Plaintiff's Exhibit 24 was
6          marked for identification.)

7 Q        So this is a November 8th email --
8 November 8th, 2013, email from you to Bill
9 Scherer, Billy Scherer, and Richard Drath
10 attaching a brief that the defendants had just
11 filed the day before.  And you're telling them
12 in the second paragraph "I do need to raise that
13 the lawyer provided by our insurer, Brad Smith,
14 is extremely incompetent, which has caused our
15 office to have to do 99.99% of the work in the
16 case."  And the last sentence says, "I wrote
17 100% of this brief because Brad still does not
18 have a clue of what is going on with the facts
19 or the law."

20          Were you telling the truth to your
21 partners when you made those statements?

22 A        About what?  There are several
23 statements there.

24 Q        That up to the time of this email,
25 your office has done 99.99 percent of the work

Page 125

1 in the defamation case?

2 A        I think that's probably true.

3 Q        And that you wrote 100 percent of
4 the brief that you're attaching to this email?

5 A        Yeah.  I have no reason to think
6 that's not true.

7 Q        And the briefs that were filed under
8 Brad Smith's signature, at least while he was on
9 the case, were written by either you or someone
10 in the D.C. office of Conrad & Scherer; is that
11 correct?

12 A        I'm speaking about this brief in
13 particular that is attached to Exhibit 24.  I
14 know that I wrote this brief.  I don't know what
15 other briefs you're referring to.  But there's
16 no question that I wrote this one.

17 Q        I mean, isn't it the fact that y'all
18 were taking the laboring war on drafting this on
19 these issues where Drummond is alleging that
20 you've hidden documents and lied about witness
21 payments because you believed Brad Smith to be
22 incompetent?

23 A        Again, I object -- I object to the
24 form as to what all you're referring to.

25          I'm very clear that I drafted this

Page 126

1 particular brief attached to Exhibit 24.

2 Q        And this brief, similar to all the
3 ones leading up to it, represents that only
4 three witnesses in the Drummond cases were paid
5 and does not disclose that El Tigre, Samario,
6 and Jaime Blanco had also been paid?

7 A        None of the witnesses were paid.
8 And I don't know if this brief mentions any of
9 that.  I have not read it recently.

10 Q        Given that you had just undergone
11 the privilege log in process, had the documents
12 not only in front of you but summarized for you
13 and the ones we looked at reflecting the
14 payments relating to El Tigre, Samario, and
15 Jaime Blanco; can you provide any explanation
16 for why this brief would not disclose payments
17 relating to those three witnesses?

18          MR. PAULK:  Object to the form.

19 A        Also object to the form and the --
20 and I'm not clear on the timing.

21          But the explanation that I had
22 provided that there -- there is a reason why we
23 took those documents off the log.  If there --
24 if -- if they should have been mentioned here
25 and aren't, that would be the same explanation.

Page 127

1 I don't -- I haven't read this brief.  I'm --
2 you know, you're making representations about it
3 that may or may not be true.

4 Q        (By Mr. Wells)  Well, that's -- your
5 explanation is I don't have an explanation now,
6 but I will come up with one?

7 A        Nope.  That's not what I said.

8 Q        Do you have an explanation now?

9 A        I said there is an explanation that
10 we will research and explore and identify.  Your
11 implication being that I was going to create an
12 explanation, which is not what I testified to.

13 Q        Well, we're not going to have to
14 develop some sort of explanation that you cannot
15 tell us right now; correct?

16 A        I'm going to have to review
17 documents to identify the explanation that
18 existed at that time over ten years ago.

19 Q        Let's go to tab 25, which is Exhibit
20 25.

21          (Plaintiff's Exhibit 25 was
22          marked for identification.)

23 Q        This is Judge Proctor's order on
24 motions to compel.  And for purposes of our
25 jury, a motion to compel is when you ask the

Page 128

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 32 (125 - 128)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

1 Court to tell the other side they have to
2 produce documents on a particular subject.
3          Fair?
4 A        Yes.
5 Q        And if we go to page four of that
6 order it says, "Interrogatories and requests for
7 production on communications with Mr. Otero are
8 not overbroad and are properly within the scope
9 of discovery."  Skipping one sentence:  "For any
10 documents withheld on grounds of attorney client
11 privilege or work product, the Magistrate Judge
12 will examine the privilege log and related
13 documents and will make independent findings for
14 each issue remaining in dispute."
15          So do you agree that as of the date
16 of this order, Judge Proctor has ruled that
17 communications with Ivan Otero are within the
18 scope of discovery and need to either be
19 produced or logged if you claim a privilege?
20 A        I object to the form.
21          And that does appear to be what this
22 says.
23          MR. WELLS:  Let's go to tab 26,
24 which is Exhibit 26.
25          (Plaintiff's Exhibit 26 was
                                          Page 129

1          marked for identification.)
2 Q        This is a supplemental privilege log
3 produced by you and Conrad & Scherer to both
4 Drummond and the Court in December of 2013
5 following Judge Proctor's order that we just
6 looked at.  And it says, "These logs list
7 privileged documents, if any, responsive to" --
8 and then skipping a lit bit -- "Plaintiffs'
9 second request for production of documents"
10 numbers "1-13."  And I will tell you the second
11 request number eight was for communications
12 relating to Ivan Otero which Judge Proctor had
13 just ordered produced or logged.
14          Do you have any explanation for why
15 this privilege log does not include any of those
16 emails that we referenced earlier relating to
17 payments concerning El Tigre, Samario, and Jaime
18 Blanco?
19          MR. PAULK:  Object to the form.
20 A        Object to the form.
21          Assuming that that is an accurate
22 representation of what this privilege log now
23 contains, no.  I -- I cannot answer that
24 question as I sit here.  I will say that I did
25 inform the Court that I misrepresented the --
                                          Page 130

1 the issue of whether we had provided security
2 for El Tigre and Samario, and I offered my
3 explanation for why that occurred.  Clearly,
4 that was inappropriate, and we should have done
5 more research to be more accurate on what the
6 scope of those requests required.  But -- but
7 sitting here today, I can't tell you what
8 happened in 2013.  But I know that I did
9 disclose those to the Court ultimately.
10 Q        (By Mr. Wells)  Would you have been
11 the one making the final calls on this
12 supplemental privilege log as to what is
13 included or not?
14 A        Typically, I would have been.  I --
15 I don't recall any -- anything specific about
16 this supplemental privilege log, but I'm -- as I
17 said earlier, that would have typically been the
18 -- the, sort of, order of authority on these
19 cases.
20 Q        I will also represent to you that
21 the Albert Van Bilderbeek cooperation agreement
22 and the Ivan Otero cooperation agreement that
23 were sent to you just days before the original
24 privilege log was produced were also not
25 included on that log or the supplemental
                                          Page 131

1 December 2013 log.
2          Do you have any explanation for why
3 that was?
4 A        I don't have specific recall, but I
5 do recall that probably both of those were
6 ultimately voided or invalidated or superseded
7 by other agreements.  So if they -- the
8 agreement at issue really was not a valid
9 agreement, I think I might -- my -- my
10 recollection is not specific.  But I could see
11 the rationale being that they weren't -- they
12 were not valid agreements, so they were not
13 something that needed to be produced.
14 Q        So your view is if you have a
15 document that is signed and says it's an
16 agreement between you and Ivan Otero and you're
17 asked for a document that is an agreement
18 between you and Ivan Otero, you just make the
19 decision whether it's valid or not as to whether
20 you're going to produce it or not?
21          MR. PAULK:  Object to the form.
22 A        Object to the form.
23          I was very clear I do not have
24 specific recall.  I was simply attempting a
25 rationale as I'm sitting here today, which is
                                          Page 132

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 33 (129 - 132)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

1 **pretty close to speculation; and I -- I**
2 **shouldn't do that.**
3          MR. WELLS:  What exhibit is tab 10?
4          MR. PRESLEY:  Exhibit 14.
5 Q        (By Mr. Wells)  Pull back out
6 Exhibit 14.
7 **A        (Witness complies.)**
8 Q        And flip to page eight on the ECF
9 page number at the top.
10 **A        (Witness complies.)**
11 Q        So similar to the other document
12 like this we looked at, the first page is the
13 metadata slip sheet which gives you the email
14 subject "Confidential Trip Record Report" and
15 the date that it was either saved, created, or
16 modified.  And it shows this one being one of
17 those things on February 14th, 2014, on the
18 computer of Terrence Collingsworth.
19          And the next page is the deps in the
20 can email; correct?
21 **A        The question is:  Is this document**
22 **dated May 27, 2000 and -- 22nd, 2011; is that**
23 **the -- the email that has the reference to deps**
24 **in the can?**
25 Q        Yes.

                                    Page 133

1 **A        It appears so.  Point number ten.**
2 Q        And do you have any explanation for
3 why in February of 2014 you were still
4 misrepresenting to the Court whether there had
5 been payments for El Tigre and Samario?
6 **A        I don't recall looking at this**
7 **document again in 2014.  So, no, I don't have**
8 **any further explanation.**
9          MR. WELLS:  Let's go to tab 27.
10          (Plaintiff's Exhibit 27 was
11          marked for identification.)
12 Q        This is a March 31st, 2014, email
13 from Susana Tellez to you attaching what appear
14 to be various expense spreadsheets related to
15 the Drummond case.
16          Is that what that appears to you?
17 **A        Says it's a cost ledger, whatever**
18 **that is.**
19 Q        Do you know why you were asking
20 Ms. Tellez to send that to you in March of 2014?
21 **A        No.**
22          MR. PAULK:  Object to the form.
23 Q        (By Mr. Wells)  If we can go to the
24 last three Bates numbers 183.  It's towards the
25 back.

                                    Page 134

1 **A        (Witness complies.)**
2 Q        Row 29 has an entry for "Security
3 arrangements," $5,400, May 19th, 2011.  And it
4 says payment -- oh, I'm sorry.  "Payment to Ivan
5 Otero for security arrangements for families of
6 Samario, El Tigre, and for Ivan Otero."
7          Did I read that correctly?
8 **A        Yes.**
9 Q        And did you review this email that
10 Ms. Tellez sent you on or around the time it was
11 sent to you?
12 **A        I can't imagine that I would have**
13 **gone through this massive cost ledger without --**
14 **no.  I don't recall, and I -- that's not the**
15 **sort of thing that I would have taken the time**
16 **to review.**
17 Q        Do you have any explanation for why
18 after March of 2014 you continued
19 misrepresenting to Judge Proctor whether or not
20 El Tigre and Samario had had security payments
21 made for their benefit?
22 **A        Well, since I don't think I reviewed**
23 **this document; it would not have refreshed my**
24 **recollection about that fact.**
25 Q        So your testimony is still you just

                                    Page 135

1 forgot?
2 **A        Well, I said it was a very**
3 **complicated situation and that I did not recall**
4 **the specifics; and I did not disclose them**
5 **because of that.**
6          MR. WELLS:  Let's go to tab 28.
7 Q        Is that Exhibit 28?
8 **A        It says 28.**
9          (Plaintiff's Exhibit 28 was
10          marked for identification.)
11 Q        All right.  This is dated April 2nd,
12 2014.  And you are emailing Susana Tellez
13 attaching a copy of Drummond's first motion for
14 sanctions filed in April of 2014 -- well, filed
15 the same day actually; right?
16 **A        You're asking me did Drummond file**
17 **this motion that's attached to the email on**
18 **February -- on April 2nd, 2014?**
19 Q        I'm asking you:  This is an email
20 where you're sending that motion to Susana
21 Tellez?
22 **A        That's what it says.**
23 Q        And the subject of the motion was
24 Parker Waichman had produced documents that the
25 defendants had previously not listed on their

                                    Page 136

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 34 (133 - 136)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

1 privilege log, nor had they produced, which
2 caused Drummond to believe that documents were
3 being lied about or hidden.  And you say to
4 Susana Tellez "Drummond has filed its motion.
5 I'm not sure what" -- "yet what to do, but I
6 think we need to get the PW stuff logged asap
7 first."
8          And PW would be Parker Waichman
9 stuff?
10 A       Yes.
11 Q       Why wasn't the Parker Waichman stuff
12 on your logs already?
13 A       Well, if it's among the category of
14 documents that we removed from the log for a --
15 a -- a sound legal reason; then that would be
16 the explanation.  I don't know if there's any
17 other documents besides those that are being
18 referred to here.
19 Q       And the Parker Waichman documents
20 were -- included some emails where you were
21 discussing trying to get funding to make a
22 payment for Jaime Blanco's lawyers.  And you
23 were questioned about it by Parker Waichman as
24 to whether that would look like bribery.  And
25 your response was "As opposed to him saying
                                          Page 137

1 Drummond had nothing to do with it?"
2          Do you recall that email?
3 A       No.  And when I say "I don't
4 recall," I don't have a specific recollection.
5 Generally speaking, I think that there were some
6 Jaime-Blanco-related issues in the production
7 from Parker Waichman.
8 Q       And why would Jaime-Blanco-related
9 issues not have been either produced to Drummond
10 or listed on a privilege log?
11 A       Well, as I -- as I said, if they
12 were removed from the privilege log that we were
13 previously discussing; there is an explanation.
14 I also think I have some recollection that I had
15 disclosed in a deposition, or maybe in the court
16 testimony, that I did originally make a
17 distinction between assistance or security
18 assistance or any other kind of witness
19 assistance that came from sources other than us
20 and stuff that did come from us.  I think so,
21 but I -- I have a general recollection of that.
22 Q       And your explanation for not
23 disclosing Jaime Blanco is you had made this
24 distinction in your mind that the money;
25 although, it was arranged by you; came from
                                          Page 138

1 Albert Van Bilderbeek.  And for that reason, you
2 felt like you could not disclose it?
3          Does that sound familiar?
4 A       As I said, I have a general
5 recollection of some rationale of that sort.
6 Q       Did you discuss that rationale with
7 your lawyer, Brad Smith, to help you determine
8 whether that was an appropriate legal
9 distinction to be making?
10 A       I object to the form.
11          I don't recall discussing that with
12 Brad Smith.  No.
13 Q       So that was a decision you were
14 making yourself?
15 A       Well, I don't know about that.  I'm
16 sure we discussed it internally.  I just don't
17 recall who I discussed it with.
18 Q       Well, it's not a very large
19 universe.  It would have been somebody in the
20 D.C. office; right?
21 A       Sure.  But I'm not going to
22 speculate as to which people were in the room
23 when we had a discussion about it.  And as I've
24 said, it was ultimately my decision.  There's no
25 question of that.
                                          Page 139

1 Q       So is it your testimony that others
2 in the D.C. office knew that Jaime Blanco had
3 had these payments made for his benefit and were
4 in on the discussion with you as to why they
5 were not being disclosed?
6 A       No, that's not my testimony.  First
7 of all, they weren't for -- you -- the
8 implication being that they were payments to
9 benefit Jaime Blanco; it was to pay for his
10 lawyers.  And I don't recall who or maybe even
11 whether I had a discussion with anybody in the
12 office.  I probably did, but I can't recall.
13 Q       Well, if you don't pay Jaime
14 Blanco's lawyers, he's got to pay them; right?
15 A       Object to the form.
16          I don't think I can answer that
17 non-question.
18 Q       How is paying for an expense on his
19 behalf for criminal lawyers to represent him in
20 a criminal action against him not a benefit to
21 him?
22 A       Well, as -- as I've said repeatedly,
23 it was necessary to allow him to tell the truth;
24 and I think it was ethical.  Whether you have
25 other questions that you would like to suggest
                                          Page 140

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 35 (137 - 140)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

1 that didn't happen on -- on that transaction,
2 that's -- that's up to you.  But there was
3 nothing untoward about that transaction.
4 Q          And you, I think, told me earlier
5 you made the payments; and he needed these new
6 lawyers so that he could change his position
7 before the fiscal a; right?
8 A          Not change his position; tell the
9 truth; change his plea.
10 Q          Well, prior to you making these
11 payments, he had told the fiscal a he had
12 nothing to do with the murders and didn't know
13 anything about them; correct?
14 A          He was pleading not guilty to the
15 crime of having really orchestrated the murders.
16 So he did certainly did not admit to the
17 fiscal a that he had participated in those
18 murders.  That's correct.
19 Q          And after you arranged these more
20 than $100,000 worth of payments; he changed that
21 story to say, Well, I was involved, but it was
22 really Drummond that was behind it.
23          MR. PAULK:  Object to the form.
24 Q          (By Mr. Wells)  That was his new
25 position; correct?

Page 141

1          MR. PAULK:  Object to the form.
2 A          Object to the form.
3          It wasn't his new position.  He --
4 he was able to tell the truth.  And I believe,
5 as I testified earlier, he was prevented from
6 doing so by Drummond and -- and the lawyers that
7 Drummond had sent in to see him, Bocanegra and
8 Jaime Bernal Cuellar, who he says threatened
9 him.
10 Q          (By Mr. Wells)  You do know that
11 he's testified in your Balcero case?
12          He being Jaime Blanco; right?
13          You actually took the deposition?
14 A          Yeah.  Yes.  I do recall that he
15 gave a deposition.
16 Q          And you asked him if he had been
17 threatened, and he said no.  So you're saying
18 that was a lie?
19 A          I don't recall that question or what
20 the context was for him answering in that way,
21 if he did.
22 Q          If he did, it would be a lie
23 according to what you just told me; right?
24 A          Well, Jaime Blanco is very much in
25 control of what he perceives as threats to him.

Page 142

1 For example, in his testimony in December, he
2 publicly said for the first time that Jaime
3 Bernal Cuellar had tried to bribe him.  I think
4 the figure was over $2 million to keep his mouth
5 shut.  He never testified to that because he was
6 afraid, according to him, that Drummond would
7 retaliate against him for exposing that.  So in
8 any case where Jaime was less than forthcoming
9 about threats to him; at least in terms of what
10 he has told me, he often felt that he would be
11 putting himself in danger to have made such a
12 disclosure.
13 Q          So you think he was justified in
14 perjuring himself on that subject?
15 A          I didn't say that.  But under
16 Colombian law, a witness --
17 Q          I'm not worried -- I'm not worried
18 about Colombian law.  This was a U.S.
19 deposition.
20 A          It took place in Colombia.  And --
21 and he announced his intention of applying his
22 constitutional rights, as did the judge who was
23 overseeing that proceeding in Colombia.
24 Q          And your understanding of those
25 rights is Colombians have a constitutional right

Page 143

1 to lie under oath?
2 A          To prevent self-incrimination.  Yes.
3 Q          So your understanding it's not just
4 remain silent; they can actually open their
5 mouth and tell an outright lie to protect
6 themselves from being incriminated?
7 A          Well, whether it's my understanding
8 or not; that was his understanding of the
9 constitutional law.  I'm --
10 Q          What is your understanding?
11 A          I'm not a constitutional law
12 Colombia expert, so I really don't have much of
13 an understanding.  I think I've seen the
14 constitutional provision at issue.  I did not
15 read any supporting case law to determine its
16 scope.
17 Q          So you do not know whether
18 Colombians have a constitutional right to speak
19 and lie as long as it's to not incriminate
20 themselves?
21 A          No.  I said I think that is the
22 case.  That is a -- a right under Colombian law.
23 Q          Prior to that deposition when you
24 were asking Mr. Blanco whether he had received
25 threats and he was saying no he had not; had he

Page 144

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 36 (141 - 144)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

1 told you that he had, in fact, received threats?
2 A        In -- in what time frame?
3 Q        Any time prior to the deposition,
4 which was in April and May of 2012.
5 A        Yeah.  I think he did tell me that
6 he had been threatened.  Yes.  Yes.  I -- he
7 did.
8 Q        So he responded to one of your
9 questions with something that was totally
10 inconsistent with what he had previously told
11 them -- told you.
12        Did you have any concern that he was
13 perjuring himself?
14 A        As I said, if he thought he was
15 exercising his constitutional right to testify
16 as he did; then whether or not that is perjury
17 on top of -- that would cancel out his
18 constitutional right, I -- I don't know.
19 Q        You are an officer of the Court in
20 the U.S., correct, as a lawyer?
21 A        Yes.
22 Q        And you presented Jaime Blanco's
23 testimony to the Court as under oath, truthful
24 testimony, did you not?
25 A        Yes, I did.

Page 145

1 do know that all of these guys, even -- even El
2 Tigre, who was a pretty aggressive fellow, they
3 were terrified that the Drummond was going to
4 have them killed; and so they were very careful
5 about what they said publicly about threats they
6 received from Drummond.
7 Q        And I think you've testified in this
8 case that you yourself were very concerned about
9 the safety and well-being of these witnesses and
10 their families; correct?
11 A        I don't know if I testified to that.
12 But, yes, I was very concerned that the
13 witnesses were going to be killed.  Ever since
14 that first Drummond trial where Jimmy Rubio, one
15 of our star witnesses; right before he was going
16 to give his deposition, his father-in-law was
17 murdered.  And his tongue was cut out and stuck
18 back in his mouth, which I'm told is the AUC
19 sign for you better shut up.  Ever since that
20 happened, I've been extremely concerned that
21 more of the witnesses that were testifying on
22 behalf of the plaintiffs in my cases were going
23 to be murdered.
24 Q        So when any of these witnesses
25 claimed that they had been threatened, did you

Page 147

1 So given that fact, did you have any
2 concern that you heard Jaime Blanco say
3 something that you didn't think was true?
4 A        If -- if -- if we threw a deposition
5 away every time there was an inconsistency
6 within an entire deposition, then we wouldn't
7 have many depositions.  I did not use that
8 portion of the testimony affirmatively in any
9 way, nor did I refer to it.  So I don't recall
10 having any concerns about the use of Jaime
11 Blanco's testimony.
12 Q        El Tigre also gave you a declaration
13 in which he claimed that Jaime Bernal had
14 threatened him; correct?
15 A        I think that's right.  After he had
16 given his testimony, he was threatened, or after
17 he gave his declaration.
18 Q        And then you asked him that same
19 question in his deposition; and he said, No, he
20 had not.
21        Did that cause you concern that one
22 of the witnesses that you were presenting to the
23 Court had lied?
24 A        Object to the form.
25        I don't recall that exchange.  But I

Page 146

1 file any police reports with any official
2 authorized governmental unit?
3 A        In Colombia?
4 Q        Yes.
5 A        No.
6 Q        Why not?
7 A        Well, until recently, the
8 governments in Colombia have been extremely
9 corrupt and, by all accounts, in the pocket of
10 Drummond and other major multinationals.  So
11 that would have been very much like going to the
12 fox and saying, You're raiding the chicken coop.
13 There is no question that if I had done that; my
14 witnesses, the people that were working on our
15 team, would have been very concerned that we
16 were in -- in essence, poking the bear.
17 Q        So your view is the government of
18 Colombia all the way from the police up to the
19 top was corrupt and would have harmed these
20 witnesses?
21        MR. PAULK:  Object to the form.
22 A        Object to the form.
23        They -- they're -- there -- there
24 was a decent chance that Jaime Bernal Cuellar
25 would have immediately learned of any complaints

Page 148

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 37 (145 - 148)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

1 or any such actions.  He was very much involved
2 in them.  I don't remember the exact details.
3 But until -- until recently in the last five,
4 six years, every attorney general of Colombia
5 had been a law partner of Jaime Bernal's.  One
6 of them was like his Godson.  Drummond very
7 cleverly hired a very connected guy.  And then
8 they also had this guy that I deposed.  I can't
9 remember his name as I sit here.  But he was the
10 chief of staff for President Uribe while also
11 receiving $100,000, was it a month?  A year?  He
12 received a big consulting fee from Drummond.
13 Drummond had purchased the influence of the
14 governments of Colombia until fairly recently.
15 And now finally they're facing some justice down
16 there.
17             MR. WELLS:  Mark that question and
18 answer for me, please.
19 Q         (By Mr. Wells)  The question is
20 simply:  Did you believe the government of
21 Colombia was corrupt at the time you're making
22 these payments for, quote, unquote, security?
23 A         While we were providing security
24 payments to witnesses in Colombia, the
25 government of Colombia was largely in the pocket
Page 149

1 of Drummond and was corrupt.
2 Q         And you say that has now changed in
3 your view?
4 A         Absolutely, it has changed.
5 Q         So the -- the AUC right-wing
6 paramilitary groups, I think you've alleged this
7 in multiple -- multiple of your complaints, were
8 in a basically war with left-wing guerrilla
9 groups; right?
10 A         When?
11 Q         1996 to 2006.
12 A         Yes.  For the most part.
13 Q         And are you aware the current
14 president of Colombia is a former guerrilla?
15 A         He was with one of the groups that
16 surrendered, and he was fully -- I don't know.
17 I don't want to say exonerated.  But he was --
18 he was not found guilty of any crimes.  And I
19 don't even remember the group that he was in.
20 But, yeah, he was an elected president of
21 Colombia.
22 Q         And in his prior life, he was a
23 member of an outlaw group in Colombia?
24 A         I don't know if they were an outlaw
25 group.  He wasn't a member of FARC.  He was a
Page 150

1 member one of those other groups, and they
2 quickly put down their arms and became part of
3 civil society in Colombia.  He -- President
4 Petro was the mayor of Bogota for years.  He was
5 a senator for years.  He is a legitimate civil
6 society participant by all measures.
7 Q         But was a former member of a
8 guerrilla group, which was outlawed?
9 A         I don't know that it was outlawed.
10 I don't know that I would call it a gorilla
11 group.  It was not the FARC.  That's the one we
12 were worried about.
13 Q         When did this change between corrupt
14 government and no-longer-corrupt government
15 occur according to you?
16 A         I, first of all, object to the form.
17             I've never characterized the entire
18 government of Colombia today as not being
19 corrupt.  I was mainly focused, as per my prior
20 testimony, on the office of attorney general,
21 which had been very close to Jaime Bernal
22 Cuellar until probably about six, eight years
23 ago.
24 Q         And you're saying six to eight years
25 ago the attorney general's office stopped being
Page 151

1 corrupt?
2 A         It stopped being controlled by Jaime
3 Bernal Cuellar, Drummond's lawyer in Colombia.
4 Let's say influenced.  I think "controlled" is
5 too strong a word.
6 Q         Let me show you Plaintiff's Exhibit
7 29, which is tab 176.
8             (Plaintiff's Exhibit 29 was
9             marked for identification.)
10 Q         So just for context, this is after
11 Parker Waichman had produced documents that the
12 defendants had neither produced nor logged, one
13 of which being the attorney cooperation
14 agreement with Ivan Otero that we've seen today.
15 And you tell your lawyer "Brad We are 100% sure
16 that" attorney "agreement with Otero was never
17 implemented.  Really don't know how they got it.
18 I must have said to someone in my office to send
19 the whole file and there was a hard copy in the
20 file even though it was not implemented.  We
21 don't have any e copy because this was drafted
22 on someone's computer in Colombia not on our
23 system.  Maybe even a hotel."
24             Did I read that correctly?
25 A         Yes.
Page 152

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 38 (149 - 152)

**Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.**

1  Q        And we have just seen that you were
2  provided a PDF copy attached to an email of that
3  very agreement twice a few months before you
4  wrote this email?
5  A        That's not true.
6  Q        Really?
7  A        Really.
8  Q        The email from Christian Levesque
9  sending you attaching the Otero agreement to it
10 we looked at earlier today.
11          You don't recall that?
12 A        I do recall that.  That's not the
13 agreement we're talking about here in this
14 communication with Brad.
15 Q        And the Susana Tellez email where
16 she's attaching both the Ivan Otero cooperation
17 agreement and the Van Bilderbeek cooperation
18 agreement.
19          Do you remember looking at that
20 earlier today?
21 A        Yes.
22 Q        But your testimony is you were not
23 referring to that agreement in this March 2014
24 email?
25 A        That's correct.
                                    Page 153

1  Q        What other Otero agreement did
2  Parker Waichman produce?
3  A        I don't know what Otero agreement
4  Parker Waichman produced.  But I can tell you
5  that what I am discussing here is an agreement
6  between, as it says, Ivan and Francisco Rameriz
7  and me that never became implemented.  So it
8  must be that that was the agreement that Parker
9  Waichman provided.  I can only deduce that.  But
10 there was a different agreement altogether that
11 never became operational, was never signed by
12 all three parties.  And I think that's what the
13 reference is to.
14 Q        Well, you're also saying that it was
15 all verbal; so there would be no document that
16 Parker Waichman could have possibly produced
17 that you're just describing.
18 A        Well, apparently, there was one hard
19 copy of something.  I -- I don't remember.  But
20 the issue that is discussed here is Francisco
21 and Ivan were unhappy with a proposal; whether
22 it was verbal, I don't recall; that never became
23 operational.
24 Q        So your testimony is you were not
25 intentionally lying to your lawyer here?
                                    Page 154

1  A        Absolutely.
2          MR. WELLS:  Let's get tab 29, which
3  is Exhibit 30.
4          (Plaintiff's Exhibit 30 was
5          marked for identification.)
6  Q        This is an April 7th, 2014, email
7  from Lesley Wharton to Charity Ryerson and you
8  attaching what's called CS production docs for
9  CR.
10          Could you tell me what that means?
11 A        No, I cannot.
12 Q        In any event, Ms. Wharton here is
13 saying whatever these documents are
14 attached.  And if we flip to one of the
15 attachments, last three Bates numbers 995; you
16 say here above the second to last redaction "On
17 the issue of Jaime Blanco, this guy could put
18 the Drummond case away and PWA has likewise
19 never answered whether they are even considering
20 making an arrangement to help with his lawyers
21 (similar to what we did with El Tigre and
22 Samario)."
23          Did I read that correctly?
24 A        Yes.
25          And do you know why Ms. Wharton was
                                    Page 155

1  sending this and other documents attached to
2  this email to you in April of 2014?
3  A        I -- I don't.  At some point we had
4  a dispute with Parker Waichman that resulted in
5  an -- not Parker Waichman -- Secure Pointe that
6  resulted in an arbitration of some sort.  I
7  think that that was probably why there was an
8  interest in some of these issues in 2014.
9  Q        And how is paying for Jaime Blanco's
10 criminal lawyers similar to what you did with El
11 Tigre and Samario?
12 A        I don't think it is.
13 Q        Well, why are you saying it here?
14 A        I must have been shortcutting or
15 summarizing or in some way not thinking that
16 that distinction made a difference in this
17 context.  But, clearly, that's not the case.
18 Q        One thing that is similar is all
19 three of those witnesses said one thing to the
20 Colombian government before the payments and
21 another thing after; right?
22 A        No.
23 Q        Really?
24          Tell me any testimony you're aware
25 of that Jaime Blanco gave to the Colombian
                                    Page 156

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 39 (153 - 156)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

1 government prior to you making a -- excuse me.
2 Strike all that.  I'll start over.
3          Tell me any testimony you're aware
4 of that Jaime Blanco gave to the Colombian
5 government accusing Drummond of complicity with
6 paramilitaries that was given prior to the
7 payments to him.
8 A        Well, it's in the record somewhere
9 in some brief.  But, absolutely, Jaime was
10 talking to prosecutors and -- and offering to
11 tell the truth before I ever met him.  And I
12 think he alluded to that in his own testimony.
13 Do I -- as I sit here, can I tell you the Bates
14 number of that document?  No.  But it exists.
15 Q        And you believe there is some
16 transcript of testimony by Jaime Blanco accusing
17 Drummond of being complicit with paramilitaries
18 before the payments were made to him?
19          MR. PAULK:  Object to the form.
20 A        Object to the form.
21          I didn't say it was a transcript.
22 There might be interview notes or Jaime himself
23 testifying in some way that is in a document.  I
24 don't remember the form of the document, but I'm
25 sure that I saw it.  And I'm sure that I cited
Page 157

1 it in some brief along the way.
2 Q        (By Mr. Wells)  And can you tell us
3 any occasion on which El Tigre or Samario
4 testified to the Colombian authorities that
5 Drummond was complicit with the AUC prior to you
6 making the initial $80,000 payment to Ivan
7 Otero?
8 A        Yes.  Again, I'm not sure as I sit
9 here the Bates number of the documents.  But
10 both of them had been interviewed and -- and
11 said similar statements prior to ever meeting
12 me.  And I know that we put that in a brief that
13 we filed at some point.
14 Q        You keep referring to Bates numbers.
15 So if such testimony exists as you are
16 testifying about today, it would be in the
17 production in this case?
18 A        No.  It might be in a brief, as I've
19 said twice now, that we -- we submitted briefs
20 on -- on issues of -- it was really responding
21 to these false accusations that these guys
22 changed their testimony because I provided
23 security assistance to them.  So -- so what --
24 what form it took, I don't recall as I sit here;
25 but I'm pretty confident in my assertion.
Page 158

1 Q        And if you had testimony from any of
2 these three witnesses where they accused
3 Drummond of being complicit with the AUC prior
4 to receiving any sort of money, you would have
5 produced it in this case; true?
6 A        They never received any money, so I
7 object to that characterization.
8          But as I said; if this exists, and I
9 think it does, it would have been in a brief or
10 some format that we've already provided to
11 Drummond.  Yes.
12 Q        Because, I mean, that would be
13 helpful for you.  You would want to get that
14 out; right?
15 A        I object to the form.
16 Q        What's the answer?
17 A        The answer to the question of
18 whether there is such testimony and whether it
19 would be helpful is, of course, it is, that
20 these guys never changed their testimony.  They
21 all told different versions of it depending on
22 who was threatening them when.  And, ultimately,
23 I think they've all told the truth, as the
24 prosecutor in Colombia apparently agrees in
25 getting pretty close to putting Jimenez and
Page 159

1 Linares in prison for about 38 years.
2          MR. WELLS:  Mark that question and
3 answer too, please.
4          Let's go to tab 30, which is Exhibit
5 31.
6          (Plaintiff's Exhibit 31 was
7           marked for identification.)
8 Q        Focused on the second email from the
9 top; which is an April 7th, 2014, email from
10 Charity Ryerson to you.  She is summarizing a
11 couple of documents that are labeled by Bates
12 number.  And what I'm looking at is the CS612.
13          Do you see that?
14 A        Yes.
15 Q        She says, "This is an email from you
16 explaining what a bunch of idiots and assholes
17 (your words) the folks at PWA are:  No reason
18 not to just turn this over, but for this
19 sentence:  'And on the issue of Jaime Blanco,
20 this guy could put the Drummond case away and
21 PWA has likewise never answered whether they are
22 even considering making an arrangement to help
23 with his lawyers (similar to what we did with El
24 Tigre and Samario).'"
25          Did I read that correctly?
Page 160

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 40 (157 - 160)

**Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.**

**Terrence P. Collingsworth - Volume I**
**2/20/2024**

---

1 A        Yeah.  It appears that that's a copy
2 of or a repeat of something you read to me a few
3 minutes ago.
4 Q        So if I understand your testimony
5 correctly; as of April 2014, you still had no
6 recall that El Tigre and Samario -- that any
7 sort of arrangement or payment of any sort had
8 been made in relation to them?
9        Is that true?
10 A     I think so.  Yes.
11 Q        And when you get this email where
12 you're comparing the situation of Jaime Blanco,
13 who you said you never forgot there was an
14 arrangement to provide funds at his request, and
15 you comparing that as being similar to El Tigre
16 and Samario; did that not jog any memory in your
17 mind that, Oh, yeah, we have been making
18 payments that El Tigre and Samario asked for?
19 A        Apparently not since I did not
20 disclose it at this time.
21 Q        Tell me --
22 A        Nor -- nor do I agree that I read
23 this in detail when I received it.  That's true
24 of almost all of these giant emails.  There was
25 a lot going on, and I really did not put a lot

Page 161

---

1 document.  This is an email that's not very long
2 where she's just describing a few documents.
3 A        Is that --
4 Q        You're saying you don't even review
5 those emails that are sent directly to you?
6 A        On many occasions I do not study
7 emails that are sent to me dealing with a topic
8 that I really did not have a lot of interest in
9 or take very seriously, which was the Secure
10 Pointe dispute.
11 Q        So these emails here, CS501 and
12 CS612 that Ms. Ryerson is describing, were they
13 produced to Secure Pointe at the same time they
14 were not being produced to Drummond?
15 A        I don't know.
16 Q        Do you have any explanation for why
17 she would be emailing you this information if
18 you're not going to look at it?
19 A        Object to the form.
20        No, I don't.  She didn't know I
21 wasn't going to look at it.  She was doing her
22 job of trying to make sure that she had on paper
23 provided me with whatever notice she thinks I
24 should have had regardless of whether I
25 interpreted it.

Page 163

---

1 of effort into Secure Pointe Partners and their
2 arbitration.
3 Q        Well, Ms. Ryerson is emailing you
4 about decisions to make as to what documents to
5 produce or not produce in that Secure Pointe
6 arbitration; correct?
7 A        Your question is?
8 Q        The subject of her email is emails
9 and whether they should be produced or not
10 produced to Secure Pointe in the arbitration.
11 A        Well, it looks to me like she's
12 saying we're going to have to produce these.
13 And I -- I very likely would have just trusted
14 that she was doing what she needed to do.  I
15 don't recall studying this in any way at that
16 time.
17 Q        And you are the one that makes the
18 final call as to what documents are or are not
19 produced in your cases?
20 A        Or categorically, as I've said
21 repeatedly.  If someone said, We're going to
22 produce all of these particular documents
23 dealing with X and I said, Fine; then I wouldn't
24 have reviewed every single document.  No.
25 Q        I'm not saying every single

Page 162

---

1        MR. WELLS:  Let's go to tab 32.
2 Q        Before we get there, just to close
3 the loop on this:  Did you ever make or approve
4 payments for criminal lawyers of El Tigre and
5 Samario?
6 A        No.
7 Q        Because that was the arrangement
8 with Jaime Blanco, according to your testimony;
9 and you're comparing it to being similar to El
10 Tigre and Samario, which is the reason for the
11 question.  So --
12 A        Well, you already asked me that
13 question, and I told you that maybe I was
14 abbreviating, didn't think it was a distinction
15 with a difference in that context.  I don't
16 know.  But, no, we never provided any attorney
17 assistance to El Tigre and Samario.
18 Q        Distinction without a difference?
19        Payments are payments?
20 A        I didn't say that.
21        I object to the form.
22 Q        Let me show you Plaintiff's Exhibit
23 32.  This is another supplemental privilege log
24 which was produced by or on behalf of you and
25 Conrad & Scherer in the defamation case on July

Page 164

---

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 41 (161 - 164)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

**Terrence P. Collingsworth - Volume I**
**2/20/2024**

1 11th, 2014.

2                    (Plaintiff's Exhibit 32 was

3                    marked for identification.)

4 Q        And it also does not include any of

5 those entries that we reviewed earlier

6 reflecting payments relating to El Tigre,

7 Samario, or Jaime Blanco.

8        Do you have any explanation for why

9 that is?

10 A        **Well, I -- assuming your**

11 **representation is correct, I have no explanation**

12 **beyond what I've already provided that there is**

13 **a reason that I will investigate and provide.**

14 Q        All right.  It's approaching 1:10.

15 I need to have a lunch break or I'm going to get

16 weak.

17        THE VIDEOGRAPHER:  The time is

18 1:07 p.m.  We are off the record.

19        (The lunch recess was taken.)

20        THE VIDEOGRAPHER:  The time is

21 1:52 p.m.  We are back on the record.

22        MR. WELLS:  All right.  Let's get

23 tab 33.  This is Exhibit 33.

24        (Plaintiff's Exhibit 33 was

25        marked for identification.)

Page 165

1 the paragraph, there's a parenthetical with the

2 name Alfredo Araujo in it.

3        Do you see that?

4 A        **Yes.**

5 Q        All right.  Just after that it says,

6 "Note that Bam Bam, see below, told us that

7 Jaime Blanco had tried to bribe him while in

8 jail and in doing so said that El Tigre had

9 taken the money."

10        So Bam Bam is the alias for Libardo

11 Duarte; correct?

12 A        **Yes.**

13 Q        And he told you and this group that

14 Jaime Blanco, one of your witnesses, had tried

15 to bribe Libardo Duarte, another of your

16 witnesses, and apparently successfully bribed El

17 Tigre, yet another of your witnesses?

18        MR. PAULK:  Object to the form.

19 A        **I don't read it that way.**

20        **Object to the form too.**

21 Q        (By Mr. Wells)  Did you mean

22 something other than what this sentence says?

23 A        **I meant exactly what this sentence**

24 **said.  When you mischaracterize it and said**

25 **something completely different, I did not agree**

Page 167

1 Q        (By Mr. Wells)  So this is September

2 7th, 2011; and you are emailing your legal team

3 what you say is a revised workplan; right?

4 A        **That's what it says.**

5 Q        All right.  And let's go to the

6 first page of the revised workplan right after

7 the email.

8 A        **(No response.)**

9 Q        Right after the email.

10 A        **That's the second page.**

11 Q        At the top it says, "TC notes."

12        So am I correct to assume that these

13 are your writings here?

14 A        **Looks like it.  Yeah.**

15 Q        At the top under Drummond, you're

16 talking about meetings that were attended by

17 Francisco Rameriz, Lorraine Leete, Ivan Torres,

18 and you.

19        And my question is:  Is Ivan Torres

20 Ivan Otero, or is there a different Ivan?

21 A        **Well, it -- Torres is not part of**

22 **Ivan's name, so I don't think I'm referring to**

23 **him.  But I cannot picture an Ivan Torres**

24 **either.**

25 Q        All right.  Kind of two-thirds down

Page 166

1 with that.

2 Q        All right.  Libardo Duarte was one

3 of the witnesses that you relied on in Balcero;

4 correct?

5 A        **Not correct.  We took his testimony.**

6 **I don't believe we ever relied upon it.**

7 **Certainly, at some point, we decided not to rely**

8 **on it.  I'm not sure of the exact timing of**

9 **that.**

10 Q        And you didn't rely on it why?

11 A        **Because there were a consistent**

12 **series of events where we -- I had no confidence**

13 **in his credibility at some point.**

14 Q        Did you have no confidence as -- in

15 his credibility at this point as to --

16 A        **I don't -- I don't recall when I**

17 **lost confidence in his credibility, but I did.**

18 Q        I'll tell you that -- you can see it

19 on the next page, but at this point he has not

20 yet signed a declaration for you.

21        Would I be correct to assume that

22 you would not get a declaration from a witness

23 you did not believe was telling the truth?

24 A        **I'm simply trying to determine from**

25 **around the redactions if -- who we're talking**

Page 168

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 42 (165 - 168)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

**Terrence P. Collingsworth - Volume I**
**2/20/2024**

1  about with the "He agreed that he would sign a
2  formal declaration."  And the prior paragraph
3  says LD I think, so that would be Duarte.  So if
4  we're still working on his declaration, he would
5  not have given his deposition either.  So at
6  this point, I did not decide that I did not
7  trust him or feel that he had credibility.
8  Q         So at this point when he's telling
9  you that Jaime Blanco had tried to bribe him,
10 him being Libardo Duarte; did that cause you
11 credibility concerns about Blanco?
12 A        I don't recall this event.  I really
13 can't even picture how this could have happened,
14 as they were both in different parts of prisons.
15 I -- I certainly did not -- to answer your
16 question, I have high regard for Jaime Blanco's
17 credibility.  Whatever is going on here, I don't
18 recall.  But it did not take away from my
19 feeling that he had credibility.
20 Q         And he -- Duarte is also telling you
21 that Jaime Blanco tried to bribe El Tigre, and
22 El Tigre had taken the money.
23         So did that cause you credibility
24 concerns with either Blanco or El Tigre?
25 A         At this point, I have no idea
                                        Page 169

1  whether these things had happened.  I'm sure we
2  looked into them.  And I reserved my judgment is
3  my general recollection.
4         MR. WELLS:  All right.  Give me tab
5  35, which is Exhibit 38.
6         MR. PRESLEY:  Let me pull that back
7  and put the correct exhibit on it.  This should
8  be 34.
9             (Plaintiff's Exhibit 34 was
10             marked for identification.)
11        MR. WELLS:  Correction.  Plaintiff's
12 Exhibit 34.
13 Q      (By Mr. Wells)  So this email is
14 from late March 2011, so a little over a month
15 after the previous document we were looking at.
16 And you're telling Lorraine Leete at the bottom
17 "LORRAINE - please let me know asap when you
18 reach Ivan and there is a plan for us to meet"
19 Jaime Blanco.  "I will come in as soon as I need to
20 next week."
21        So my question is:  How do we get
22 from early February 2011 when witnesses are
23 saying Blanco is trying to bribe them to late
24 March 2011 and you're going to meet with Blanco?
25 A         Well, what -- the question is how
                                        Page 170

1  did we get there?
2  Q         Yes.
3         What were the inter -- the
4  intervening factors where in early February
5  you're being told by some of your witnesses that
6  Blanco is trying to bribe them to late March and
7  you're going in to see Jaime Blanco, which I
8  assume is for the purpose of talking to him
9  about being a witness?
10 A         Object to the form.
11         The prior email did not have two
12 people telling us that Jaime Blanco had tried to
13 bribe them; it was only Duarte.  And I don't
14 have specific recall from 13 years ago.  But I
15 imagine that I was going in -- this might have
16 even been my first meeting with Jaime Blanco to
17 assess the situation.
18 Q         All right.  So that's late March
19 2011.
20         MR. WELLS:  Let me get tab 36, and
21 this is Plaintiff's Exhibit 35.
22             (Plaintiff's Exhibit 35 was
23             marked for identification.)
24 Q         And, again, the deps in the can
25 email of May 22nd, 2011.  And it looks like at
                                        Page 171

1  this point Blanco has asked for money.
2         So what can you recall about your
3  meetings with Blanco between late March 2011 and
4  the date of this email we're looking at?
5  A         Not much beyond what is in this
6  email, which is clearly I had met with Jaime;
7  and we are now beginning the process to see, as
8  it says here, if we can help with his legal
9  fees.
10 Q         It says, "Unfortunately, he wants
11 significant help with his legal fees for his
12 defense as a condition.  He says he is not
13 helping anyone if he is going to prison for the
14 rest of his life.  His number is" 150,000.
15 "Likely can move on that."
16         Was that request for 150,000 made in
17 a meeting that you were present for?
18 A         No.
19         Was that a request he made to Ivan
20 Otero, he being Blanco?
21 A         I believe so.  I believe I first
22 heard about these issues from Ivan with somebody
23 else, obviously, translating.
24 Q         Did you ever talk directly with
25 Jaime Blanco about this request for $150,000?
                                        Page 172

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 43 (169 - 172)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

1 A          No, I did not.

2 Q          All of that would have been handled
3 between he and Ivan Otero?

4 A          And/or -- I mean, I -- I -- I -- the
5 only information I have came from Ivan Otero.
6 Whether Ivan got information also from the
7 lawyers that are being mentioned here, I can't
8 say for sure, but I wouldn't be surprised.

9 Q          And you're telling the recipients of
10 these emails that Jaime Blanco wants this money
11 as a condition.

12          A condition to what?

13 A          To going forward, I assume, with his
14 new legal strategy.

15 Q          To now testifying that Drummond was
16 the ones behind the union leader killings?

17 A          To telling the truth about his role
18 and the role of Drummond in the murders of the
19 union leaders and other things that the AUC did
20 for Drummond.

21 Q          And prior to that, he had not taken
22 that position?

23 A          As I previously testified, he did.

24 Q          Well, then why do you need to pay
25 him anything if that's already his position?

1 A          I object to the form.

2          I didn't have to do anything.  But
3 we did ultimately provide him with assistance
4 for his lawyers.

5 Q          And he told you he was not going to
6 sign a declaration for you unless you complied
7 with that and provided that money?

8 A          As I said, I never spoke to him
9 about these issues.

10 Q          But that is your understanding;
11 correct?

12 A          What was my understanding?

13 Q          That Jaime Blanco would not sign a
14 declaration until he received money?

15 A          Jaime Blanco -- again, I did not
16 discuss it with him -- may or may not have
17 signed a declaration without funds for his
18 lawyers.  I don't know that.  It seemed that
19 initially that was his position; and, likewise,
20 it's not possible to say with certainty, but I
21 don't think Jaime Blanco would have decided he
22 was going to go to prison without raising the
23 defense that he ultimately raised successfully
24 to his involvement with Drummond in the murders.
25 But, again, we don't know that for sure.

1 Q          Let me ask you this:  Jaime Blanco
2 is in prison at the time you're writing this
3 email; correct?

4 A          Yes.  I think so.

5 Q          He was still in prison at the time
6 you took his letters rogatory testimony in
7 Balcero; correct?

8 A          He was.  Yes.

9 Q          And he appeared for that letter
10 rogatory testimony via a letter rogatory,  which
11 is effectively an international subpoena; right?

12 A          It was, yes, a letters rogatory
13 deposition.

14 Q          So you had the legal means at your
15 disposal to compel him to appear and testify to
16 whatever he will testify to; correct?

17 A          Yes.  I could have issued -- I did a
18 issue a letters rogatory that brought him there.

19 Q          So why are you advocating for paying
20 money for his criminal legal fees other than so
21 that he testifies in a way that you like?

22 A          So that he is able to testify
23 truthfully to what actually happened between him
24 and Drummond.

25 Q          And what you understand his position

1 was absent that money being provided, he would
2 not testify that way?

3 A          I previously a few questions ago
4 said no one knows.  I can't tell you what he
5 would have done.  But I think that he would have
6 still testified because he wasn't going to
7 voluntarily spend his life in jail while
8 Drummond did -- was -- was able to threaten him
9 and prevent him from doing that.

10 Q          So when he's asking for this money
11 as a condition; a condition to him testifying a
12 certain way?

13 A          Absolutely not.  And I -- as I said,
14 I am here recanting a discussion I had with Ivan
15 Otero.  Jaime Blanco never provided me with any
16 condition or -- nor did we discuss the funds.

17 Q          Well, this is your words,
18 Mr. Collingsworth.  You're saying he needs that
19 money as a condition.

20 A          And I just said that that is my
21 understanding that he wanted these funds for his
22 attorneys so that he would be able to tell the
23 truth.  This does not say that he would never
24 tell the truth or that he would never testify in
25 his own defense.

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 44 (173 - 176)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

1 Q        But in your mind, why are you
2 advocating for paying this money if he's going
3 to tell the same story anyway?
4         You can get his testimony by
5 compulsion.  He does not have to voluntarily
6 show up.  So why are you advocating paying such
7 a handsome sum at his request?
8 A        Object to the form.
9         First of all, I don't think that
10 this is a particularly handsome sum for legal
11 representation in a capital case.  Also, as I
12 said now three times, we did not know whether he
13 would or would not testify.  I definitely wanted
14 to facilitate his ability to tell the truth
15 about what happened by helping provide legal
16 representation to him.
17         MR. WELLS:  Let me get tab 37.
18         (Plaintiff's Exhibit 36 was
19              marked for identification.)
20 Q        Isn't Jaime Blanco under a legal
21 duty to tell the truth in his criminal
22 proceeding with or without money?
23 A        You're asking me, what, for a legal
24 opinion about Colombian law or --
25 Q        Your understanding --
Page 177

1 prepared?
2 A        I don't think so.  I don't recall
3 seeing this.  I recall that we had a memo from
4 somebody in my office.  And I think -- just
5 quickly looking at this, I think it asked the
6 wrong question.  But, no, I don't recall seeing
7 this or taking it into account.
8 Q        Did you ever talk to Billy Scherer,
9 Bill Scherer's son, about the ethics of paying a
10 witness to testify?
11 A        I never discussed with anybody the
12 ethics of paying a witness to testify because
13 under none of the situations that we are
14 involved with were we paying someone to testify.
15 So, no, I did not.
16 Q        Did you have a discussion with Billy
17 Scherer about the ethics of making this payment
18 requested by Jaime Blanco?
19 A        I don't believe so.  I think I had a
20 discussion with his father.  I don't think that
21 I discussed it with Billy, at least I don't
22 recall.
23 Q        And what did you and Bill Scherer
24 discuss about the ethics of meeting Blanco's
25 payment demand?
Page 179

1 A        -- what's in his mind?
2 Q        You told us your understanding
3 multiple times; sometimes much more confidently
4 than today.
5 A        What's your question?
6         MR. WELLS:  Can you read it back,
7 please.
8         (Record read.)
9 A        Well, again, he never got money.
10 The question is with or without proper legal
11 representation.  But as we've previously
12 discussed, he also had a constitutional right to
13 flat out deny everything and lie.  So I don't
14 know what was -- what he viewed as how he was
15 going to balance those interests.
16 Q        Let me show you what's been marked
17 as Plaintiff's Exhibit 36.  This is a May 28th,
18 2011, email; which is six days after the email
19 we just looked about -- looked at where you're
20 advocating for paying up to $150,000 for Jaime
21 Blanco's legal fees.  And there is a legal
22 memorandum drafted by an attorney in the Florida
23 Conrad & Scherer office on whether paying a
24 witness to testify would be ethical.
25         Did you know that this memo had been
Page 178

1 A        I think that there was a general
2 agreement.  Even the Parker Waichman people
3 generally agreed that providing funds for a
4 witness' attorney to allow them to testify was
5 -- was ethical.  I think someone else in Bill's
6 office raised a question of whether it would
7 damage his credibility such that -- the witness'
8 credibility such that it would sort of cancel
9 out what was done, but I think it's actually
10 pretty common.
11         In fact, I recall that former
12 President Uribe recently went on television in
13 Colombia and said Drummond paid for his lawyers
14 to prevent me from taking his deposition when I
15 subpoenaed him several years ago.  So I'm sure
16 that Drummond must have some views about whether
17 that was proper.  I think he mentioned Greg
18 Craig was the lawyer that Drummond paid for him.
19         MR. WELLS:  Mark that one too,
20 please.
21 Q        Mr. Collingsworth, you understand it
22 is common to pay for a lawyer for a witness to
23 attend a deposition in your case; for example,
24 employers paying for employees and former
25 employees' attorneys to be with them at a
Page 180

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 45 (177 - 180)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

```
 1 deposition?
 2 A         The question is is that common?
 3 Q         Yes.
 4 A         I think it is.
 5 Q         And that is not what you were doing
 6 here with Jaime Blanco.
 7            You were not paying for a lawyer to
 8 be present with him at the deposition in your
 9 case, were you?
10 A         I was paying for his legal
11 representation that would allow him to speak
12 fully about what happened.  I don't see an
13 ethical distinction; and I think it's very close
14 to the situation of Uribe, who had legal
15 representation, according to him, paid for by
16 Drummond not to attend his deposition, but to
17 generally give him legal representation, to
18 prevent his testimony actually.
19 Q         And you were seeking Uribe's
20 testimony in the Balcero case; correct?
21 A         It -- it must have been the Balcero
22 case.  Yeah.
23 Q         Uribe did not have some separate
24 criminal proceeding that Drummond was paying for
25 his lawyers in, did he?
```
Page 181

```
 1 A         I don't know the scope of what
 2 Drummond paid his lawyers for.  I know that he
 3 has been -- Uribe has been repeatedly accused of
 4 being a founder of, a funder of, a facilitator
 5 of the AUC.  But I -- this particular instance
 6 that he spoke of on television, he only
 7 mentioned the Greg Craig payments that were made
 8 by Drummond.
 9 Q         You have no knowledge that Drummond
10 has ever paid for criminal legal fees for
11 President Uribe or any other third party, do
12 you?
13 A         Not yet because Drummond has
14 stonewalled in the discovery requests that I
15 issued recently seeking that information.  And
16 we, again, will be hopefully learning more
17 through a motion to compel.
18            MR. WELLS:  Let's go to tab 297.  And
19 this is Exhibit 37.
20            (Plaintiff's Exhibit 37 was
21             marked for identification.)
22 Q         I'm just focused on the first page;
23 which is a couple of April 13th, 2011, emails
24 between you and some lawyers of Parker Waichman;
25 is that correct?
```
Page 182

```
 1 A         I'm not sure what you're focused on.
 2 Q         Are the emails on the first page
 3 between you and Parker Waichman lawyers as well
 4 as Richard Drath and Bill Scherer?
 5 A         Looks like the -- the email is
 6 between me and Gary Falkowitz, who is with
 7 Parker Waichman.
 8 Q         And Mr. Falkowitz is telling you
 9 "Regarding the potential for paying Jaime
10 Blanco's legal fees, please see the following
11 notes/concerns.  For clarification purposes, you
12 have requested that we help pay Jaime Blanco's
13 legal fees relating to his criminal prosecution
14 of murdering union leaders in Colombia.  You've
15 also indicated that the fees could be anywhere
16 from 50 to 100,000 but you think 'closer to'"
17 100,000 "(per your e-mail with Mike)."
18            Have I read that so far accurately?
19 A         Yes.
20 Q         And at the bottom he says, "We are
21 left with the following question:  If paying his
22 legal fees is going to be disclosed at some
23 point in his deposition (which I'm sure we can
24 all agree it will be), would it be of any real
25 value to our case if his credibility as a
```
Page 183

```
 1 witness is significantly damaged as the payment
 2 will likely be viewed as a form of bribery."
 3            Now, you did not disclose that Jaime
 4 Blanco's legal fees had been paid prior to his
 5 deposition, did you, in Balcero?
 6 A         No.
 7 Q         And that fixes the credibility
 8 concern because if the other side doesn't know
 9 about it, he won't be asked about it; right?
10 A         Object to the form.
11            Clearly, we have disclosed it.  So
12 who knows what difference it would have made and
13 when we -- if we dis -- the timing of the
14 disclosure, but it has been disclosed.
15 Q         Well, Jaime Blanco, in his Balcero
16 deposition, lied about whether he had received
17 any sort of benefit.
18            Did that cause you any concern when
19 you heard it?
20 A         I'd have to see the actual question
21 and answer before I expressed a view on whether
22 I had a concern.
23 Q         You don't remember that?
24 A         Not precisely.  No.
25 Q         In any event, after Parker Waichman
```
Page 184

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 46 (181 - 184)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

1 lawyer Gary Falkowitz raises the concern that
2 his credibility could be damaged as the payment
3 will be looked at as possible bribery; your
4 response is what?
5 A         Looks like my response is at the top
6 of the page there.
7 Q         Can you read it out for us.
8 A         "As opposed to him saying Drummond
9 had nothing at all to do with it?"
10 Q        So you're telling your cocounsel in
11 the Balcero case that if these payments are not
12 made, Jaime Blanco is going to say Drummond had
13 nothing at all to do with it?
14 A        That's not what it says.  As I
15 previously have testified, that was certainly a
16 possibility that he would continue to maintain
17 his complete innocence; and, therefore, he would
18 not be talking about Drummond's involvement
19 since he will -- would be saying that he had
20 nothing to do with it.  And I do note that you
21 skipped over, I think, the most important
22 sentence in this exchange is that their ethics
23 counsel found that this would be ethical to pay
24 those legal fees, which is what we also had
25 previously determined.  So my speculations --
Page 185

1 Q         Who's we?
2 A         -- my speculations about what Jaime
3 Blanco would do are -- are irrelevant.  We don't
4 know what he would have done if we did or
5 didn't.  But I do know that we were told on a
6 couple of occasions this would be ethical.
7 Q         You're asking Parker Waichman to
8 provide the funds to meet this request by Jaime
9 Blanco.  They raise resistance, raising
10 credibility issues and it could possible be
11 looked at as bribery.  And your response is "As
12 opposed to him saying Drummond had nothing at
13 all to do with it?"
14         And your testimony here today is you
15 were not telling them if you don't make the
16 payment, he's going to say Drummond had nothing
17 at all to do with it?
18 A         I think I already answered your
19 question, and I'll repeat myself if you'd like
20 that we don't know what Drummond would -- what
21 Jaime Blanco would have done.  That's pure
22 speculation.  Certainly, as I previously said,
23 that one possibility would be that he continued
24 to deny that he had anything to do with this;
25 and, therefore, no one else could have had
Page 186

1 something to do with it with him.  That was a
2 possibility.  And it's speculation.
3 Q         Well, I mean you're putting down in
4 writing that possibility right here, aren't you?
5 A         If it's a possibility, I put it down
6 in writing.  That's fine.
7 Q         And your testimony that as of the
8 time you're writing this email, it was not your
9 belief that if you didn't make the payment, he
10 would not testify the way you wanted him to?
11 A         That's not what I said.  I said I --
12 we had no way to know.  I don't -- didn't have a
13 belief.  I would -- I had clarity of a couple of
14 options, and this was one.
15 Q         When Parker Waichman is raising with
16 you that they're sure we can all agree that this
17 will be disclosed, the payment; did you have any
18 discussions with them about, No, I don't agree,
19 and I'm not going to disclose it?
20 A         No.  I don't think so.
21 Q         That was just your own internal
22 thought?
23 A         I didn't -- no.  I don't -- I'm not
24 agreeing that I had that internal thought.  I'm
25 not agreeing that it would not have been
Page 187

1 disclosed because it eventually was.  There are
2 many other ways it could have been disclosed,
3 including if you had managed to take Albert Van
4 Bilderbeek's deposition.  There are all kinds of
5 things that could have happened.  And it's all
6 speculation.
7 Q         Well, Jaime Blanco gave his trial
8 testimony in Balcero.
9         That was what the letters rogatory
10 testimony was, right, to be played at trial?
11 A         Yes.
12 Q         And at no time prior to that trial
13 testimony, did you inform the Court or Drummond
14 that Jaime Blanco's legal fees had been paid and
15 that that had been arranged by you, did you?
16 A         That I had disclosed?  No, I did
17 not.
18 Q         And no one on your legal team
19 disclosed that to Drummond or the Court prior to
20 Jaime Blanco giving his trial testimony, did
21 they?
22 A         That is correct.
23 Q         And that is the same situation as
24 every paramilitary that gave trial testimony in
25 Balcero.  You did not disclose to Drummond or
Page 188

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 47 (185 - 188)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

**Terrence P. Collingsworth - Volume I**
**2/20/2024**

1 the Court prior to their giving their trial
2 testimony that payments had been made at their
3 requests.
4          MR. PAULK:  Object to the form.
5 A          I don't think I can agree with every
6 one.
7 Q          (By Mr. Wells)  Well, let's go
8 through the list.
9          Libardo Duarte?
10 A          We disclosed that.
11 Q          Before his trial testimony in
12 Balcero?
13 A          I -- I don't -- I don't recall
14 actually, but I know that we did.
15 Q          Well, I'll tell you it wasn't before
16 the trial testimony.
17          Charris, did you disclose anything
18 about the payments being made to his wife every
19 single month before he gave his trial testimony?
20 A          Again, I'm not sure because we
21 certainly did disclose that in an early -- in a
22 fairly early stage.  I don't recall the timing
23 of that versus his testimony.
24 Q          Libardo Duarte, did you disclose the
25 payments made at his request to his wives,

Page 189

1 plural --
2 A          I don't --
3 Q          -- prior to him giving him trial
4 testimony?
5 A          Object to the form.
6          I don't know that he had wives.
7 And, again, as with Charris; I don't recall the
8 timing of that.  We certainly did disclose it.
9 Q          El Tigre, did you disclose any of
10 the payments made for the benefit of his family
11 at his request prior to his trial testimony in
12 Balcero?
13          MR. PAULK:  Object to the form.
14 A          As I've said many times today; no,
15 we did not.
16 Q          (By Mr. Wells)  Same question for
17 Samario?
18 A          Same answer.
19 Q          That's the list.
20          Oh, excuse me.  Jose Gelvez
21 Albarracin, alias El Canoso; did you disclose to
22 Drummond or the Court prior to him giving his
23 trial testimony in Balcero that you had made a
24 payment to his wife at his request?
25 A          The same.  I don't know the timing

Page 190

1 of it, but we certainly disclosed that early.
2 That was one of the ones we were handling.  I
3 don't recall if it was before or after his
4 testimony.
5 Q          Would you agree that it is a pretty
6 important fact whether a fact witness has
7 received any sort of benefit, either to
8 themselves or their family, as it relates to the
9 jury's view of their credibility?
10 A          Well, if that were the question;
11 yes, I agree.  But I don't characterize
12 preventing someone's family from being murdered
13 because they're going to testify against
14 Drummond as a particular benefit in the sense
15 that that's something they really wanted.  I --
16 I recall that our ethics expert long ago, I
17 think it's professor Wolfram, made that point
18 very well that he also did not consider this
19 something that you would call a benefit, not
20 murdering someone's family.
21 Q          He's also the one that said it was
22 okay to lie to a federal judge; right?
23 A          I don't know that he said that.  I
24 think that what he said was that he understood
25 the reluctance to disclose things to the very

Page 191

1 people who we are alleging at the time were
2 responsible for murdering these people.
3 Q          Now, Jaime Blanco was convicted of
4 murdering Valmore Locarno and Victor Orcasita;
5 correct?
6 A          Well, he's --
7 Q          Being the mastermind behind their
8 murders?
9 A          I don't -- I don't know that.  I
10 think he was convicted of being a conspirator.
11 He was convicted of having a role in that -- in
12 those murders.  Yes.
13 Q          And your clients were the widows and
14 children of those men; correct?
15 A          That's correct.
16 Q          Did you tell your clients that you
17 were paying for the criminal defense of the man
18 facing criminal charges for killing their
19 husbands?
20 A          I'm not sure if I did specifically.
21 But I would have been happy to because we were
22 getting justice for them and taking -- making
23 sure that a few of the, sort of, cogs in the
24 wheel were available to testify is -- I don't
25 see any -- any issue with that.

Page 192

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 48 (189 - 192)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

1 Q        El Tigre and Samario were part of
2 the AUC front that you contended were
3 responsible for murdering hundreds of people,
4 including close to 100 of your clients; correct?
5 A        Yes.
6 Q        And did you disclose to any of the
7 surviving relatives of those murdered clients
8 that we are supporting their family on a
9 month-to-month basis?
10 A        Again, I don't recall specifically
11 doing that; but I would have been happy to do
12 that.  I think most people who aren't
13 representing Drummond, accused of murdering
14 thousands of people for -- by paying
15 paramilitaries, might not agree.  But the only
16 way you can get testimony about, for example,
17 the Mafia is eventually to have a few people
18 turn on the Mafia.  And that is the process
19 through which we were able to obtain some
20 testimony.
21 Q        By paying close to half a million
22 dollars is what we've calculated?
23 A        By providing reasonable amounts to
24 prevent Drummond-paid assassins from killing
25 them.

Page 193

1 Q        Now, let's put Jaime Blanco to the
2 side because he was not a paramilitary and,
3 therefore, was not eligible to participate in
4 the Justice and Peace process.
5          Is that your understanding?
6 A        I don't have an understanding of who
7 was eligible to participate in the Justice and
8 Peace process.  Certainly, paramilitaries were;
9 but I don't know that they -- I don't know if
10 they did or did not exclude someone like Jaime
11 Blanco.
12 Q        Well, we'll stick with El Tigre and
13 Samario who were certainly paramilitaries.
14          To your knowledge, they were
15 participating in the Justice and Peace process
16 of Colombia; correct?
17 A        Yes.
18 Q        Which was a process whereby as long
19 as they told the truth about their crimes, they
20 would get a reduced sentence capped at eight
21 years; correct?
22 A        That's right, I think.
23 Q        In other words, they are required to
24 tell the truth or else they're going to sit in
25 prison for probably their life; right?

Page 194

1 A        I don't know what the maximum
2 sentence would be if they didn't tell the truth.
3 But the concept of Justice and Peace was to
4 encourage people to tell the truth by rewarding
5 them with a reduced sentence.  That's all I can
6 say.
7 Q        And it was your belief when you
8 authorized the payments to El Tigre's and
9 Samario's families that they would not tell the
10 truth in the Justice and Peace process without
11 you authorizing those payments?
12 A        Absolutely not.  I had no
13 understanding of what they were going to do in
14 the Justice and Peace process.  And I have no
15 reason to think that the Justice and Peace
16 people would not themselves address any stated
17 security concerns.  I just have no idea what the
18 deal they made with Justice and Peace.
19 Q        Now, you were telling me earlier you
20 thought there was some evidence that El Tigre
21 and Samario had accused Drummond of being
22 complicit with paramilitaries before you started
23 meeting with them.  Putting aside whether that's
24 true, we'll just accept it's true for right now.
25          If that is the case, why in the

Page 195

1 world are they at any more risk of saying the
2 same thing again?
3 A        Object to the form.
4          The -- the -- the qualitative
5 difference is that I'm not aware -- I've never
6 seen the actual testimony that they gave to
7 Justice and Peace that specifically named
8 Drummond.  I -- I know they did, but I didn't
9 see it because it wasn't public.  When we
10 switched to our case and we were going to be
11 public with what they were saying about
12 Drummond, that is what gave them concern.  And
13 these were seasoned paramilitaries who said, I
14 am not going to cross those people.  They'll
15 kill my family.
16 Q        The Justice and Peace process, the
17 testimonies were part of public hearings.
18          You didn't know that?
19 A        I -- I disagree with that.  I think
20 certain people were permitted to attend, and
21 some of that was released.  I spent quite a bit
22 of time trying to obtain the complete
23 transcripts and have yet to be successful.
24          MR. WELLS:  All right.  Give me tab
25 39.

Page 196

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 49 (193 - 196)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

1  Q         While he's getting that, you asked
2  Parker Waichman for the funds to meet Blanco's
3  request for money, and they ultimately refused;
4  is that correct?
5  A         **Well, they didn't pay it.  I do -- I**
6  **think that it was more tied up with our**
7  **inability to continue to work with them.  But,**
8  **yes, they did not pay it.**
9  Q         And you ultimately turned to Albert
10 Van Bilderbeek to see if he would pay; is that
11 correct?
12 A         **I certainly did.  I don't know if**
13 **there were any interim steps that I don't recall**
14 **specifically; but, yes, I did.  Excuse me.**
15 Q         Was that communicated to Jaime
16 Blanco?
17 A         **I don't know.  I've never discussed**
18 **these things with Jaime Blanco, as I've**
19 **previously testified.  It certainly was**
20 **communicated to Ivan.  Yes.**
21 Q         Are you aware of any member of your
22 legal team offering a contingency fee to a
23 witness in your Drummond cases?
24 A         **To a witness?  No.**
25 Q         Or to the witness' representative

Page 197

1  but on behalf of the witness?  They're the one
2  getting the fee?
3  A         **Who's getting the fee?**
4  Q         The witness?
5  A         **No.**
6  Q         Have you got any knowledge of that
7  occurring in any of your cases arising out of
8  Colombia?
9  A         **No.**
10           (Plaintiff's Exhibit 38 was
11           marked for identification.)
12 Q         Let's look at Plaintiff's Exhibit
13 38.  This is in July of 2011.  And Rebecca
14 Pendleton is telling you that "Although" Jaime
15 Blanco "is 'on board,' we still need to be
16 looking for support.  Do you have an update on
17 that to provide to Ivan?"  And then you respond
18 that you understand that, you've "just hung up
19 with Albert" Van Bilderbeek and "He says he
20 hopes by Wednesday of next week to confirm some
21 funding."
22           So tell us what you can about what
23 occurred between April and July of 2011 where
24 you're approaching Albert Van Bilderbeek about
25 this concept of providing money at Jaime

Page 198

1  Blanco's request.
2  A         **I -- I don't recall the specific**
3  **initiation of the discussion.  But as this email**
4  **indicates, it certainly did begin.  And I began**
5  **discussing with Albert the possibility of him**
6  **providing the funding.**
7  Q         And please tell us anything that you
8  can recall about the substance of those
9  discussions.
10 A         **Well, most of it was really Ivan --**
11 **I'm sorry -- Albert agreed that he could help**
12 **and -- and then there began a pretty long**
13 **process of him saying, Don't worry, Don't worry,**
14 **I'm going to do it.  And then it never -- never**
15 **materialized until -- well, I don't know how**
16 **much time passed but quite a bit of time.**
17 Q         Is that the sum and substance of
18 what you can recall of your discussions between
19 Mr. Van Bilderbeek and yourself about meeting
20 Mr. Blanco's payment requests?
21 A         **You mean ever?  I thought you were**
22 **talking about this initial give and take that**
23 **we're talking about here.**
24 Q         At least up until the time the first
25 payment was made?

Page 199

1  A         **Well, at some point Albert said that**
2  **he did have the possibility of obtaining funds,**
3  **and he brought some other people into that**
4  **discussion.  And, ultimately, those funds did**
5  **arrive.**
6  Q         Was Ivan Otero involved in any of
7  these discussions with Albert Van Bilderbeek, or
8  were you the only connection to Albert Van
9  Bilderbeek in this arrangement?
10 A         **Ivan was never involved in any**
11 **discussions with Albert that I'm aware of.**
12 Q         Was there any reason that it was set
13 up that way.
14 A         **No.  Not -- nothing in particular.**
15 **I was dealing with all kinds of things, all**
16 **kinds of people.  And I compartmentalized a lot**
17 **of the work, and I was dealing with Albert.**
18 **That was one of my things.**
19 Q         With respect to Jaime Blanco; did
20 you type any agreement between him, you, and his
21 criminal attorneys relating to this payment
22 arrangement?
23 A         **Who's him?**
24 Q         Jaime Blanco?
25 A         **Not that I'm aware of.**

Page 200

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 50 (197 - 200)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

1 Q        Did you obtain an opinion from bar
2 counsel on the ethics of such an arrangement?
3 A        No.  We already had two opinions.
4 No, I did not.
5 Q        And I think we've already covered
6 you did not tell Drummond that you were thinking
7 of meeting this payment demand prior to him
8 testifying, did you?
9 A        Did I disclose it before he
10 testified?
11 Q        Correct.
12 A        No.
13 Q        And I think you probably already
14 covered this, but you didn't see any of the
15 purported invoices from his criminal legal -- or
16 his criminal lawyers for which this $150,000 was
17 supposed to cover?
18 A        No.
19        MR. WELLS:  Let me get tab 41, which
20 is Plaintiff's Exhibit 39.
21        (Plaintiff's Exhibit 39 was
22        marked for identification.)
23 Q        This is July 6th, of 2011; and
24 Rebecca Pendleton is telling you "To clarify
25 from the other emails," Jaime Blanco "is willing

Page 201

1 to work with us but on the conditions that we
2 have discussed with I."
3        Is "I," I assume, Ivan Otero?
4 A        I would assume so.
5 Q        And Jaime Blanco is willing to work
6 with you but on the condition y'all have
7 discussed.
8        What conditions is he conditioning
9 his working with you on?
10 A        The same condition that you have
11 asked me about several other times that we
12 provide funding to support his legal team.
13 Q        She mentions that y'all are
14 fortunate to have Otero and Mauricio reassuring
15 Blanco.
16        Who is Mauricio?
17 A        I don't recall.  I don't think I
18 ever met anyone named Mauricio.
19 Q        And she says, "but we'll need an
20 answer pretty soon as I see" Jaime Blanco
21 "starting to slide away if we don't get an
22 answer fairly soon."
23        What did you interpret that to mean,
24 that he was sliding away if you don't get an
25 answer to him on this condition he's discussing?

Page 202

1 A        I interpreted that to mean that he
2 had on a number of occasions, including the one
3 that he just testified about, he had been not
4 only getting threats but offers of significant
5 money to sort of take the hit for Drummond.  And
6 I interpreted that to mean that if he was going
7 to go to jail anyways, he would at least get
8 money from Drummond.
9 Q        And you wanted to get money to him
10 first?
11 A        I wanted him to be able to tell the
12 truth with proper legal representation.
13 Q        And you don't know who his criminal
14 lawyers ended up being, do you?
15 A        Object to the form.
16        I've answered that several times.
17 No, I do not.
18 Q        So you have no idea whether they're
19 proper, improper, or totally incompetent, do
20 you?
21 A        Well, I do know because, ultimately,
22 Jaime Blanco is walking around Bogota.  Looks
23 like it worked out for him.
24 Q        And you've not seen any engagement
25 letter with these supposed attorneys; correct?

Page 203

1 A        They're not supposed attorneys.
2 There were attorneys.  Ivan had discussed with
3 me the -- what their strategy was, et cetera.
4 But, no, I didn't meet them; I didn't see any
5 paperwork.
6 Q        And that includes no invoices --
7 A        You've already asked me that.
8 Q        -- no communications back and forth,
9 nothing?
10 A        No paperwork.
11        MR. WELLS:  Let's go to tab 43.
12 Q        I think you were just telling me
13 that you did not solicit ethical advice from bar
14 counsel because you had gotten an ethical
15 opinion from somebody in your office.
16        Is that Piper Hendricks?
17 A        Well, that's part of what I told
18 you.  I also spoke to the Parker Waichman
19 people.  I think I discussed it with other
20 lawyers.  I did not -- other than that memo from
21 Bill Scherer's office that I think was answering
22 the wrong question, I don't think anyone ever
23 said you can't do it.  It was a question of
24 should you, and is there some strategic reason
25 not to, but not that it was unethical.

Page 204

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 51 (201 - 204)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

**Terrence P. Collingsworth - Volume I**
**2/20/2024**

1 Q          Focused on the Parker Waichman; I
2 mean, don't you view -- or didn't you at the
3 time view the Parker Waichman lawyers are
4 morally rutterless?
5 A          **I wasn't getting an ethical opinion**
6 **from them.  I got -- they reported that they**
7 **went to their ethics counsel.**
8 Q          So the people you called morally
9 rutterless were reporting something to you, and
10 you're relying on it?
11            Is that what happened?
12 A          **First of all, I don't recall using**
13 **those exact words.  But they were pretty, let's**
14 **say, money oriented.  That's the only issue that**
15 **I had with them.**
16            (Plaintiff's Exhibit 40 was
17            marked for identification.)
18 Q          All right.  Plaintiff's Exhibit 40
19 is a couple of emails.  At the bottom in July of
20 2011, you were providing to lawyers in the
21 Chiquita case a memo from Piper Hendricks on the
22 ethics of paying costs and fees for a witness.
23            Is that the person in your D.C.
24 office that you got this ethical advice from?
25 A          **I -- I -- I think -- as I sit here,**

Page 205

1 I think those were two different questions:  The
2 Hasbun situation versus the Jaime Blanco
3 situation.  But I do believe that it was Piper
4 Hendricks who did legal research on those
5 questions, the ethical questions.
6 Q          How many years had Piper been a
7 lawyer as of July 2011?
8 A          **I don't know.  She had worked**
9 **somewhere else before I hired her; I don't know**
10 **for how long.  She -- she was not a brand new**
11 **lawyer.**
12 Q          She was an intern, was she not?
13 A          **No.  Somebody said that the other**
14 **day.  That's not true.**
15 Q          And it's your testimony you didn't
16 request that an intern prepare this ethics
17 analysis?
18 A          **I was answering your question of**
19 **whether Piper Hendricks was an intern, and the**
20 **answer to that is no.  Whether she or I or**
21 **someone else got additional research assistance**
22 **from an intern, probably; but Piper was not.**
23 Q          My question more specifically is:
24 When this issue came up and you're for the first
25 time asking for a memo on legal ethics of paying

Page 206

1 a witness' costs and fees, did you ask that to
2 be prepared by an intern?
3 A          **I don't think so.  I think I asked**
4 **Piper to do it.**
5 Q          And you send that memo to the
6 Chiquita lawyers, which these are a group of
7 plaintiffs' lawyers that are suing Chiquita
8 based on similar allegations that they conspired
9 with paramilitaries in Colombia?
10 A          **Yes.**
11 Q          Eric Hager then responds to you
12 telling you, "Terry - I'm not convinced by
13 Piper's memo that we're in the clear.  While I
14 see some arguments we could make, I would
15 recommend we get more sold authority before
16 moving forward with any payments."
17            Did you ever get more solid
18 authority after this email from Eric Hager?
19            MR. PAULK:  Object to the form.
20 A          **Yeah.  I -- I -- first of all, I**
21 **thought the Piper memo was fine.  But I'm not**
22 **sure of the exact timing; but, yeah, we did.  I**
23 **talked to some other folks.  But also it was the**
24 **Parker Waichman ethics counsel that gave us**
25 **additional views on this.  And, again, I never**

Page 207

1 -- I don't recall anyone saying that you can't
2 do this.  It was a question of should you do it
3 and what were the strategic implications.
4 Q          (By Mr. Wells)  Strategic
5 implications being if it was disclosed, it could
6 hurt credibility.
7            That was one; right?
8 A          **That was the one someone expressed.**
9 **Yes.**
10 Q          And did you have that concern?
11 A          **No, I didn't.**
12 Q          But you didn't disclose it anyway?
13 A          **I've explained a different reason**
14 **why we didn't disclose it initially.  But I**
15 **feel, and I think most people -- I -- I -- my**
16 **concern was not that it would damage**
17 **credibility.  I thought people would understand**
18 **the steps one has to take to deal with people**
19 **who are murdering witnesses.**
20 Q          So in your view if Drummond had paid
21 over $100,000 for Jaime Blanco's criminal legal
22 fees, that would have been just fine?
23 A          **Depends what it was for.  Were you**
24 **paying just his criminal legal fees without any**
25 **conditions attached?  Yes, that would be fine.**

Page 208

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 52 (205 - 208)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

1 Q        But your arrangement did have
2 conditions attached; correct?
3 A        **It did not on the substance of his**
4 **testimony.**
5 Q        Well, the condition to him working
6 with you, as we just saw in that email, was this
7 payment?
8 A        **You've asked me that about four**
9 **times now, so I will object to the form.**
10          **But the answer is still the same,**
11 **which is we don't know what Jaime would have**
12 **done if he did not have proper legal**
13 **representation.**
14          MR. WELLS:  Let me get tab 45, which
15 is Exhibit 41.
16          (Plaintiff's Exhibit 41 was
17          marked for identification.)
18 Q        At the bottom there is -- this is
19 August of 2011, by the way.  And at the bottom
20 it says, Jaime Blanco "is getting impatient
21 since he was initially told the brothers would
22 likely make the funding the week of August 8th.
23 He is not working on his declaration until he
24 gets this funding."
25          So you were told that Jaime Blanco
Page 209

1 will not work on a declaration for you until he
2 receives the funding; true?
3 A        **Well, that's what this email says.**
4 Q        And your response is "Look, I can't
5 be any more clear -- I am on the phone with
6 Albert every day hearing new intricacies of his
7 financial situation, including today."  And the
8 second to last sentence says, "If" Jaime Blanco
9 "wants to stop working until we have it in hand,
10 so be it."
11          So when you're trying to get funds
12 from Albert Van Bilderbeek to meet Jaime
13 Blanco's request for payment, you understand
14 that he is not going to work on his declaration
15 until you, quote, have it in hand.
16 A        **I understood that he was taking this**
17 **position that he -- so that we could pay for his**
18 **lawyers that he needed, their participation, to**
19 **complete the declaration.  And I think the last**
20 **sentence there, again, sums up what my view was**
21 **that I don't see that he has any choice other**
22 **than going -- going -- I don't know what that --**
23 **that's a bad sentence.  But as I said, I think**
24 **in my mind he had to do this at some point.  He**
25 **had to tell the truth, or he was going to jail**
Page 210

1 **alone and no one else.**
2 Q        So why make the payment if it's
3 going to happen anyway, why not just go take his
4 testimony through the letters rogatory testimony
5 with no money?
6 A        **Because we were facilitating his**
7 **ability to tell the complete truth about what**
8 **happened.  It was a very complicated situation.**
9 **And I'm not saying here I'm 100 percent sure.**
10 **I'm saying that we don't know what he would do,**
11 **but I was not as concerned as the other people**
12 **were.**
13 Q        Is it your belief that it is okay to
14 pay a witness for their testimony as long as
15 their testimony is what you believed to be true?
16 A        **Object to the form.**
17          **I never said that.  And, no, I --**
18 **that's not my testimony.  I've never testified**
19 **to that.**
20 Q        Do you believe it is permissible to
21 pay a witness for their testimony as long as you
22 believe their testimony is true?
23 A        **Object to the form.**
24          **You're asking me to speculate.  What**
25 **I believe is irrelevant.  And, once again, I**
Page 211

1 **don't think that having any substantive input on**
2 **testimony when you're providing legal assistance**
3 **to the witness' lawyers is proper.  I did not**
4 **have substantive input as to what he was going**
5 **to say.**
6 Q        Well, you worked on drafts of his
7 declaration, did you not?
8 A        **Just like every lawyer does.  I read**
9 **it.  I made a few corrections.  I asked**
10 **questions.  I did not in any way alter those --**
11 **the -- the essence of the testimony.**
12 Q        But this is not a situation where
13 you make this payment, and you just wait and a
14 fully formed declaration shows up on your
15 doorstep.
16          You were involved in the drafting
17 process; correct?
18 A        **I was involved in the reading and**
19 **correcting process.**
20 Q        And making comments about what
21 should be included?
22 A        **Asking reasonable questions about**
23 **what was included.**
24 Q        In the email above the redaction
25 that we were just looking at, looks like you
Page 212

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

1 were providing an email to -- message to be
2 provided to Ivan Otero.  And you say, Please --
3 at the end, "Please tell JBM," Jaime Blanco, "to
4 chill out.  We are on the same team and the only
5 other team just tried to screw him with
6 Tolemaida's declaration.  I will keep the
7 promise, but I can't control the timing."
8          And what promise is that?
9 A        That we would provide the lawyers --
10 the assistance to the lawyers that we had said
11 we would.
12 Q        And that was a promise you were
13 committed to keeping?
14 A        It was a situation where I had
15 agreed to try to provide funding for his
16 lawyers.  I was certainly willing to make all
17 reasonable efforts to do so.
18          MR. WELLS:  Let's go to tab 46, and
19 this is Plaintiff's Exhibit 42.
20          (Plaintiff's Exhibit 42 was
21             marked for identification.)
22 Q        Lorraine Leete is telling you in
23 September of 2011, second to last sentence of
24 that email, "I had a missed call from JBM this
25 morning, but I told Ivan to call him back as I

Page 213

1 think it's better if" Jaime Blanco "doesn't have
2 conversations about the deal with the brothers
3 with us and this seems to be the only thing on
4 his mind."
5          Do you have any knowledge as to why
6 the word "brothers" is used as opposed to just
7 saying what's going on?
8 A        Well, consistent with my prior
9 testimony that I think everyone understood who
10 the brothers were; and I believe that, in fact,
11 this is true in this case.  If you go up to my
12 response, I say Albert.  I have no concerns
13 about saying it's Albert.  What other people
14 thought and how they addressed this situation is
15 in their minds, not mine.
16 Q        Did you think it was better for
17 Jaime Blanco not to have conversations about the
18 deal with Albert Van Bilderbeek with your team?
19 A        I didn't have a view of that one way
20 or the other.  I'm not aware that anybody --
21 this says she was going to call him back.
22 That's news to me.  I -- my understanding was
23 that Ivan was the person speaking to Jaime
24 Blanco about this situation.  So to answer your
25 question; no, I don't know.

Page 214

1 Q        Did you ever tell -- did you ever
2 tell anyone to relay to Jaime Blanco not to send
3 you emails about this arrangement?
4 A        I believe at some point I told Jaime
5 Blanco not to send me emails, period, not just
6 about this.  I -- I -- I -- those would have
7 been nonprivileged communications, and I did not
8 want him to be doing that.
9 Q        Because being nonprivileged, you'd
10 have to produce them, and this arrangement would
11 then be discovered --
12 A        I said --
13 Q        -- correct?
14 A        I said any emails regarding
15 anything, not just this arrangement.
16 Q        And he, in fact, did send emails to
17 you that you did not produce to Drummond in the
18 Balcero case; correct?
19 A        I don't -- I -- I wouldn't be
20 surprised if he sent me some emails that mostly
21 dealt with silly things but that weren't
22 responsive to anything.  But I don't -- I don't
23 recall any situation where I said I'm not going
24 to produce this even though Jaime Blanco sent it
25 to me and it's responsive.

Page 215

1 Q        So do you have an explanation for
2 why none of the emails between you and Jaime
3 Blanco were produced to Drummond before he gave
4 his trial testimony?
5 A        I don't know that there -- I don't
6 know.  I don't know that there were any.  I
7 don't know that they weren't produced or that
8 any of them were responsive.  I -- I don't know.
9          MR. WELLS:  All right.  Let's go to
10 tab 48.  This is Plaintiff's Exhibit 43.
11          (Plaintiff's Exhibit 43 was
12             marked for identification.)
13 Q        And just for your context; this is
14 Christian Levesque in September of 2011, the
15 same time that you're talking about the deal
16 with Jaime Blanco and the brothers, providing
17 discovery responses that y'all were preparing to
18 respond to Drummond's discovery requests in
19 Balcero.
20          And if you can flip to the last
21 three Bates numbered page 927.
22 A        (Witness complies.)  927.
23 Q        The first interrogatory is asking
24 about relationship between you and the Ivan
25 Bilderbeeks and their company, Llanos Oil.  And

Page 216

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 54 (213 - 216)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

**Terrence P. Collingsworth - Volume I**
**2/20/2024**

1 the response, which I understand this is a
2 draft; but I can represent to you the ultimate
3 response was very similar, was basically you had
4 an attorney-client relationship with them that
5 had nothing to do with the Drummond case.
6          Do you acknowledge that as not a
7 truthful response?
8 A     No, I don't.  At this time my
9 relationship with them was based, as it says
10 here, on the Llanos Oil situation, a possible
11 representation.  And my representation of Albert
12 did not extend to -- I wasn't representing him
13 when we were having discussions about his
14 providing funding for Jaime Blanco's lawyers.
15 Q     So in real time as you're exchanging
16 emails with Albert Van Bilderbeek on the subject
17 of paying Jaime Blanco's criminal legal fees,
18 you did not believe those communications were
19 privileged?
20 A     Depends what they said.  But in my
21 mind as -- and certainly as I sit here now, I do
22 make a distinction between the prior -- the
23 legal work that I was retained to perform for
24 him and -- and some of our communications that
25 were not related to that.

Page 217

1 Q     And so why were none of those
2 provided to Drummond --
3          MR. PAULK:  Object to the form.
4 Q     (By Mr. Wells)  -- during Balcero
5 before Jaime Blanco gave his trial testimony?
6 A     Yeah.  I -- I'd have to see the
7 particulars of any communication to be able to
8 hazard a guess as to why it was not considered
9 responsive to a particular discovery request.
10 Q     I mean, the fact is you didn't want
11 Drummond to know about this arrangement with
12 Jaime Blanco, did you?
13 A     Object to the form.
14          We -- we -- we were very concerned
15 and in -- going back to Exhibit 42 just as one
16 example, the one you just gave me; it says in
17 the lower half there, "Jaime Bernal went to
18 visit JBM yesterday, and Ivan is extremely
19 worried," blah -- et cetera, et cetera.  We were
20 very concerned that Drummond was threatening
21 Jaime Bernal -- or excuse me -- Jaime Blanco,
22 offering bribes to him.  He confirmed that that
23 happened.  So, yeah, I was a little concerned
24 that Drummond was going to be able to upend,
25 let's say, or -- or -- or interfere with this

Page 218

1 situation because they were trying to threaten
2 him and bribe him.  So, yeah, I didn't want the
3 people doing that to necessarily have the
4 information that might help them to disturb that
5 situation.
6 Q     Well, the situation I was asking
7 about is meeting Jaime Blanco's payment request.
8 A     The whole situation.
9 Q     What I --
10 A     That's what I was talking about too.
11 Q     How is Drummond finding out about
12 that going to change anything about threats or
13 bribes or anything?
14 A     We were in the process of having
15 Jaime Blanco's lawyers work with him to tell the
16 truth.  And if Drummond had knowledge that that
17 process was -- was happening, then they would
18 have continued and -- and upped their ante of
19 threats and bribes.  That was my opinion at the
20 time, and it remains so today.
21 Q     So you have an opinion about what
22 would have happened in that situation, but you
23 don't have an opinion about what would have
24 happened had you not paid Jaime Blanco?
25 A     Well, the difference is we had a

Page 219

1 track record of what was happening, which was
2 Drummond was threatening and attempting to bribe
3 Jaime Blanco before I ever arrived on the scene.
4 So I don't have to guess that that might have
5 continued should Drummond have a reason to up
6 the ante on their illegal conduct.
7 Q     Do you have a single email, text
8 message, bank transaction, any document that
9 supports your claim that Drummond tried to bribe
10 Jaime Blanco, tried to threaten him, or anything
11 of what you just said?
12 A     Well, we have the testimony of the
13 only other person in the room, which is Jaime
14 Blanco.  So that's -- that's good enough for me.
15 Q     And to be clear:  You don't have
16 anything to substantiate what you just said
17 other than what Jaime Blanco has said?
18 A     Well, I think there's a couple of
19 other things.  I mean, Ivan Otero mentioned
20 several times that he -- other lawyers -- it
21 seemed to be sort of common knowledge that Jaime
22 Bernal Cuellar was very influential with the
23 various attorney generals and was putting great
24 focus on preventing any information about
25 Drummond from coming forward.

Page 220

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 55 (217 - 220)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

1 Q          Well, you're communicating with
2 Jaime Blanco via email while he's in prison.
3          Did you ever ask him, Hey, can you
4 get us some emails that you've had with these
5 Drummond folks you say are bribing or
6 threatening you?  Be great to have some
7 documentary evidence.
8 A          I've never seen any indication that
9 Jaime Bernal Cuellar; who, by all accounts, is a
10 crafty, shrewd, and illegal operator; would have
11 been dumb enough to put a threat or a bribe in
12 an email.  He always visited in person.  So the
13 only evidence of that would be there's two
14 people.  There's Jaime Bernal Cuellar and Jaime
15 Blanco.
16          MR. WELLS:  Let's go to tab 49.
17 Q          And while we're waiting on this;
18 we've seen a couple of them, I could show you
19 probably ten OR 20 others.  But there were
20 multiple reminders coming to you by email where
21 Ivan Otero or Lorraine Leete is saying Jaime
22 Blanco wants to know what's going on with the
23 brothers, basically where -- where is the money?
24 Where is the money?
25          Do you recall there being a period

1 of time at which you had committed to Jaime
2 Blanco, or at least through Ivan Otero y'all had
3 committed to Jaime Blanco, that this payment
4 would be made and the time the payment was
5 actually made?
6 A          Was there a gap of time?
7 Q          Yes.
8 A          Yeah.
9 Q          And you -- we saw somewhere where
10 you say I'm on the phone with Albert all the
11 time.  He keeps giving me these stories about
12 his financial situation.  I mean, there -- there
13 was a series of -- of, I would say, irritated
14 requests about what about this promise that was
15 made to me.
16 A          Well, I didn't get any irritated
17 requests from Jaime Blanco.  I got reports from
18 Ivan often delivered through Lorraine that such
19 requests and/or questions had been raised by
20 Jaime Blanco.
21 Q          Let me show you Plaintiff's Exhibit
22 44.
23          (Plaintiff's Exhibit 44 was
24          marked for identification.)
25 Q          This is you and Lorraine Leete in

1 September of 2011.  And you are telling her that
2 you "just spoke with Albert.  There will be a
3 finance closing on Tuesday and the funds 'should
4 be available' Wednesday of next week.  In the
5 meantime, I'm going to get" Parker Waichman "to
6 wire" 25,000 "as a down payment.  We will get
7 this sent to Ivan and will describe it
8 internally as for services rendered in advising"
9 Jaime Blanco "and in developing the documents
10 with him.  Please tell Ivan and" Jaime Blanco
11 "help is on the way."
12          So as the funding issue with -- with
13 Albert Van Bilderbeek was still in flux; did
14 you, as you say here, have a plan to get $25,000
15 from Parker Waichman to provide for Jaime
16 Blanco's legal fees?
17 A          Well, I did sit in on some -- maybe
18 it was both Christian and Susana's depositions;
19 so I have more -- I have seen more recent
20 documentation about that transaction.  I -- I
21 don't think I saw anything, nor do I recall
22 specifically, that it was going to be for the
23 legal fees, 25,000.  And I know for a fact that
24 -- that Parker Waichman did provide it and that,
25 ultimately, it was not used for the legal fees.

1 It, I think, was put into some kind of general
2 emergency fund.  But that's -- that's the extent
3 of my knowledge.  So if the question is did that
4 go to Jaime Blanco's attorneys, the answer is
5 no.
6 Q          The question is:  As you're writing
7 this email; when you say you're going to get PWA
8 to wire 250,000 as a down payment, a down
9 payment for what?
10 A          Well, I -- I -- I can't say -- I --
11 I don't recall specifically as I sit here.  I
12 think it's reasonable to speculate that it was
13 going to be a down payment for the only thing
14 that was out there, but I do know that it never
15 happened.  So that's it.
16 Q          So the only thing you can think of
17 this being a down payment for is a down payment
18 for the arrangement with Jaime Blanco?
19 A          That's the only issue that was
20 involving money that was pending out there.
21 Q          Did you ever pay Ivan Otero for any
22 legal services on behalf of Jaime Blanco?
23 A          On behalf of Jaime Blanco?
24 Q          You're saying -- you describe it
25 here as for services rendered in advising Jaime

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 56 (221 - 224)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

1 Blanco. So I take that to mean as legal
2 services on behalf of Jaime Blanco.
3 A       No. That's just sloppy writing. I
4 think the --
5 Q       Sloppy, huh?
6 A       I think the second portion of that
7 is the determining language, which is in
8 "developing the documents with him" and that we
9 did -- Ivan did a tremendous amount of work on
10 this particular project and meeting with
11 everybody concerned in the Jaime Blanco
12 situation.
13 Q       Did you tell Parker Waichman when
14 you're trying to get them to wire this $25,000,
15 which you say is going to be a down payment,
16 that Ivan Otero was Jaime Blanco's lawyer?
17 A       I think I saw a document the other
18 day where someone said that was the case. I --
19 I don't -- I -- I don't agree that he was Jaime
20 Blanco's lawyer, at least when I was working
21 with him.
22 Q       So if you said that to Parker
23 Waichman, that would not be a true statement?
24 A       Said what?
25 Q       Ivan Otero is Jaime Blanco's lawyer.

Page 225

1 A       Well, maybe. I -- I did indicate
2 that he was working with him. I don't know
3 specific language I would have used. But that
4 was clearly what I understood that Jai -- Ivan
5 was working with him. He wasn't appearing in
6 court. He wasn't part of the legal team that
7 was going to represent Jaime Blanco in changing
8 his plea. So I think it was an ambiguous
9 situation, but he certainly spent a lot of time
10 working with him for me.
11 Q       And as far as you understand during
12 the entire time you've been affiliated with Ivan
13 Otero, there would never be a time where it
14 would be a true statement to say that Ivan Otero
15 is Jaime Blanco's lawyer?
16 A       I can't say that for sure. No. I
17 told you what I thought at the time, but I don't
18 know that anything different happened or that I
19 wasn't aware of something or that I forgot
20 something.
21 Q       Well, in what circumstance do you
22 understand Ivan Otero served as Jaime Blanco's
23 lawyer?
24 A       I don't. I don't have an
25 understanding as I sit here that he did. I'm

Page 226

1 simply saying that if I forgot or there was some
2 specific instance that I can't recall as I sit
3 here; well, that's a possibility. But I don't
4 recall that.
5       MR. WELLS: Let me get tab 50.
6 Q       Do you need a break?
7 A       No. No. I'm good. Thank you.
8       MR. WELLS: And this is Exhibit 45.
9       (Plaintiff's Exhibit 45 was
10       marked for identification.)
11 Q       This is about six days after the
12 email we just looked at, and you are emailing
13 Lorraine Leete to tell her, "Sorry to add to the
14 pile but can you please draft a quick invoice
15 the documents work" Ivan Otero "did on the
16 declaration including hours and travel time and
17 meeting with us. We need to get" Parker
18 Waichman "an invoice to justify the" 25,000.
19 "Don't take it too seriously but have enough
20 hours to get to" 25,000.
21       This is a fake invoice, isn't it?
22 A       Well, I said don't worry about the
23 hours too much; but Jaime did do all of this
24 work. But I -- I definitely did not take it
25 very seriously, as I said.

Page 227

1 Q       Well, when she sends it to you she
2 says, "If we pay them $150/hour, the way she's
3 done it, it comes out to $25,000. "But if you
4 think" Parker Waichman "wants to pay him a lower
5 rate, let me know and I can just add in more for
6 travel time and meetings with us."
7 A       That's what it says.
8 Q       I mean, that -- that is not an
9 accurate accounting of time, is it, if you -- if
10 you lower the rate and you just add more hours.
11       That's a totally fake document,
12 isn't it?
13 A       It's not totally fake because he did
14 do all of that work. In terms of coming up to
15 25 and the flexibility in terms of getting
16 there, that was not accurate.
17 Q       And the reason you didn't end up
18 paying this $25,000 as a down payment for the
19 Jaime Blanco arrangement is because the Albert
20 Van Bilderbeek funds ultimately came through.
21       Isn't that true?
22 A       I -- I do think that's true. I -- I
23 also had said that I found it odd that 25,000
24 would make any difference in this whatsoever.
25 But, yes, we did not use this to provide funds

Page 228

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 57 (225 - 228)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

**Terrence P. Collingsworth - Volume I**
**2/20/2024**

1 to Jaime Blanco's lawyers.

2 Q        And you did not use it to pay Ivan

3 Otero for his legal time, did you?

4 A          I forget if he got any of it.  I

5 know that we created a fund for him to have

6 access to.  I don't recall any other details.

7 I'm sure you have something that will clarify

8 that.

9 Q        This is tab 51, which is Plaintiff's

10 Exhibit 46.

11               (Plaintiff's Exhibit 46 was

12               marked for identification.)

13 Q        This is September 9th, so the day

14 after this supposed invoice that Lorraine Leete

15 put together.  And you are saying, number one,

16 "Lorraine -- I just signed all kinds of bizarre

17 documents with Albert to confirm a finance plan.

18 He says the" 60,000 "will be wired Monday

19 September 12."  We also -- "I also now expect we

20 will get" 25,000 from Parker Waichman "about

21 that same time.  My plan is that the" 25,000

22 "can be used for Ivan's new security, to buy 3

23 computers for the guys, and then when we see

24 what is left we will hold that for a bizarre

25 things can happen fund.  When we get the

1 declaration from" Jaime Blanco, "Ivan will

2 receive the rest of his fees," $50,000.

3               Did I read that correctly?

4 A          Yes.

5 Q        And I think you told me you've never

6 paid Ivan Otero for legal fees relating to

7 representation of Jaime Blanco; is that correct?

8 A          That's correct.  It still is.

9 Q        Now, some of that 25,000 you're

10 saying is going to be used "to buy 3 computers

11 for the guys."

12               Who are the guys?

13 A          The only thing I can remember back

14 from this time is that Ivan had a young -- his

15 -- one of his nephews and a couple of other

16 folks that were working with him, and they were

17 asking Ivan for computers.  I'm pretty sure we

18 never did this, but that's -- that's my

19 recollection.  Some people who were working with

20 Ivan.

21 Q        Are you saying you never authorized

22 the expenditure of funds to purchase computers

23 for imprisoned paramilitaries?

24 A          I -- I don't -- I don't think those

25 guys ever got computers related to anything I

1 did.  Yes.

2 Q        So if any one of them had testified

3 to that, that would be false?

4 A          Yes.

5 Q        All right.  So the invoice wasn't

6 really based on reality.  You get $25,000 on the

7 representation to Parker Waichman that it is for

8 Ivan Otero's legal fees.  But in reality, you're

9 initially thinking it was going to be a down

10 payment for the Blanco arrangement.  But you

11 later transitioned it to buy computers and

12 create a bizarre things that can happen fund.

13               Is that accurate?

14 A          No, it's not accurate.  It's -- the

15 most important thing on the list was Ivan's

16 security, which probably was most of the funds.

17 I'm sure we didn't buy any computers.  And the

18 bizarre things can happen fund would have been

19 for Ivan as well.  So we never intended that the

20 25K would permanently be part of the payment for

21 Jaime Blanco's attorneys' fees.  If it was a

22 down payment; when we received the actual funds,

23 then we could use those for the purposes here

24 stated.  Ivan at this time had serious security

25 that was expensive.  And so I think it's fair to

1 say that most of the funds, if not virtually all

2 of the funds, were for Ivan.

3 Q        But you're telling Parker Waichman

4 we need $25,000 for the work Ivan Otero did with

5 Jaime Blanco for legal fees; correct?

6 A          That work that he did for me.

7 Q        Well, the email will speak for

8 itself.  But -- and that's not what the 25,000

9 was for, in your mind.

10               That's -- is that not just

11 out-and-out fraud?

12 A          Well, if you ignore what I just said

13 in terms of what the -- the long-term plan was;

14 then you can say that.  But, ultimately, the 25K

15 was and -- was planned for and was used for

16 Ivan.

17 Q        Well, planned for.  The -- the

18 initial plan was to use it as a down payment for

19 this money that Jaime Blanco had requested.

20 A          To -- temporarily while we were

21 waiting for the funds from Albert; this is, in

22 fact, a down payment for that; we were going to

23 use that.  But we never did.  And we were always

24 going to reserve those funds for the issues that

25 are listed here, except for the computers which

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 58 (229 - 232)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

1 we did not do.
2 Q       So why didn't you tell Parker
3 Waichman the truth that, Hey, guys, I need
4 $25,000 as a down payment for this money Jaime
5 Blanco has asked for?
6 A       Because that's not what its purpose
7 was in the -- in the final plan.  And you can
8 ignore what I said and -- and ask me the same
9 question over and over.  But this was never the
10 plan that this fund of 25K was going to be used
11 permanently for Jaime Blanco's lawyers.
12 Q       You were calling it 25,000 a down
13 payment for the Jaime Blanco arrangement
14 seven -- six days -- no, seven days before this
15 email we're looking at right now.
16 A       I don't think I can be any clearer.
17 By now we knew we were going to get the funds
18 from Albert for Jaime Blanco.  Whether we would
19 have needed to use this 25 temporarily to
20 somehow make things go more smoothly; and then
21 when we got the Albert money, we were going to
22 give the 25 back for its original purpose.
23 That's what happened, and that was always the
24 plan.
25 Q       But you didn't tell Parker Waichman
Page 233

1 any of that, the people who gave you the
2 $25,000?
3 A       I told them the funds were for Ivan.
4 And the invoice, as we've clarified, is not
5 particularly accurate.  But at the end of the
6 day, Ivan got these funds.  And he did do a
7 significant amount of work for us on the Jaime
8 Blanco issues.
9 Q       Do you on a regular basis lie in
10 order to obtain funds?
11 A       Object to the form.
12       No.
13 Q       Did you think it was okay to lie
14 this one time to Parker Waichman to get this
15 $25,000?
16 A       Object to the form.
17       No.
18 Q       Why did you feel it necessary to lie
19 to Parker Waichman instead of saying, I need
20 $25,000 as a down payment for the Jaime Blanco
21 arrangement?
22 A       It was not ultimately for the Jaime
23 Blanco arrangement.  And I think the sum and
24 substance of what we said we were going to do
25 with the funds, that was ultimately what
Page 234

1 happened to the funds.
2 Q       Then why didn't you feel it
3 necessary to tell Parker Waichman the truth,
4 that I need $25,000 so I can buy three computers
5 for the guys, Ivan's security, and a bizarre
6 things that can happen fund?
7 A       What Ivan did with the money or what
8 we did with the money that Ivan earned is -- is
9 immaterial to the fact that he did do this
10 substantial amount of work.  And the $25,000 was
11 a pretty small amount to provide for his benefit
12 at this time.
13 Q       Ivan Otero was working on a
14 contingency fee in the case; correct?
15 A       Well, the -- the contingency fee in
16 the Balcero case was negated.  Sorry.  Sorry.  I
17 knew that was going to happen.  I don't -- I
18 don't recall whether that agreement where we
19 provided Ivan with $80,000 included a
20 contingency fee.  It could have.  I -- I don't
21 recall.
22 Q       It did.
23 A       Okay.  Then he was, if it did.
24 Q       And you were working on a
25 contingency fee in the cases as well; correct?
Page 235

1 A       I did have a contingency fee
2 agreement.  Yes.
3 Q       You were not being paid by the hour.
4 Your payment would come as a percentage of the
5 recovery if you were to win the case.
6       That's how a contingency fee works;
7 correct?
8 A       Well, I was being paid.  But on top
9 of that, yes, we had a contingency fee
10 agreement.
11       And the deal with Ivan Otero to work
12 on a contingency fee was you're not going to get
13 paid by the hour?
14 A       Oh, I don't agree with that.  I
15 think situations change all the time.  If
16 you're -- for example, I think when we made the
17 contingency fee agreement or whatever that
18 agreement was with Ivan; Ivan -- or sorry --
19 Jaime Blanco was not part of his scope of work.
20 And he ended up spending a significant amount of
21 time on something that we hadn't anticipated.
22 So I saw no problem giving him some extra money
23 because he was being compensated for something
24 that wasn't within our original understanding.
25 Q       So back to the question before you
Page 236

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 59 (233 - 236)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

**Terrence P. Collingsworth - Volume I**
**2/20/2024**

1 spilled your water:  Why did you not tell Parker
2 Waichman when you're asking for this $25,000
3 This is not really for Ivan Otero's legal work;
4 this is for computers, security, and a fund?
5 A        Object to the form.
6          I think I've said four times now we
7 did not buy computers.  And as far as I was
8 concerned, the money was for the benefit of Ivan
9 Otero.  And whether -- as long as that was
10 accurate, I had no problem with the way that we
11 handled it to get it done quickly.
12 Q        Did you create a bizarre things that
13 can happen fund?
14 A        I believe so.  Yeah.
15 Q        How much --
16 A        I mean, I didn't have it.  I think
17 we left it with Ivan.
18 Q        To do with at his discretion?
19 A        No.  I think if something major
20 occurred, he would have told me.  I think most
21 of the issues that Ivan spent money on were
22 security related, for his personal security.
23 Q        Did you give money to Ivan Otero
24 that you understood he paid prison guards with
25 to help y'all get into prisons?
                                        Page 237

1 The day that Samario was supposed to be brought
2 to a court to be -- do his letters rogatory
3 testimony.  And Ivan came to me in a panic
4 because he said that Drummond had paid the
5 guards to not bring Samario to the prison and
6 that he needed, I think it was, the equivalent
7 of $50 to pay for the transportation of Samario
8 to the prison.  And I do recall giving him that.
9 I don't have specific recall of any other
10 situations.  But this -- this is Colombia, and
11 sometimes service charges are required to have
12 the most basic things performed.  But I think
13 Ivan was also dealing with the countermeasures
14 that Drummond was taking to prevent access or to
15 prevent someone like Samario from being brought
16 to his testimony.
17 Q        Well, I mean, paying a prison guard
18 to get into a prison is bribery, is it not?
19          MR. PAULK:  Object to the form.
20 A        Yeah.  I object to the form.
21          I'm not going to give you a legal
22 opinion of that.  I've told you the facts of
23 what I understood happened on a couple of
24 occasions.
25 Q        (By Mr. Wells)  Was that y'all paid
                                        Page 239

1 A        I gave Ivan funds to facilitate all
2 of our work in prisons, and anywhere really.  I
3 don't know exactly what he did with it at any
4 given time.  But I did give him money.  Yes.
5 Q        As long as he got results;
6 whether he bribed people with that money, made
7 elicit payments to government officials with
8 that money, that was not your concern?
9 A        I didn't say that.  I object to the
10 form.
11 Q        Okay.  Are you aware of Ivan Otero
12 ever providing money to prison officials to get
13 y'all into prison?
14 A        Not specifically.  I do have some
15 general recollection that there were situations
16 where guards would not let anyone in without
17 what they would call a service charge and that
18 Ivan occasionally was required to provide that.
19 Q        And I've seen a number of emails
20 where you're talking about service charges.  So
21 there were certain, quote, unquote, service
22 charges that had to be paid to gain access to
23 certain of these prisons.
24          Is that your testimony?
25 A        Well, I remember one in particular.
                                        Page 238

1 money to prison guards to get access to prisons?
2 A        I didn't pay money to any prison
3 guards.  I told --
4 Q        Ivan did?
5 A        Well, I wasn't there; but I -- he
6 did tell me on this one occasion what happened.
7 Yes.
8 Q        And it's your understanding that the
9 prisons in Colombia, much like the U.S., are
10 staffed by government employees?
11 A        I don't have an understanding of --
12 probably.  I don't know if they were state
13 employees, federal employees.  I don't -- I
14 don't know.
15 Q        All right.  Let's take a quick
16 break.
17          THE VIDEOGRAPHER:  The time is
18 3:36 p.m.  We are off the record.
19               (Short recess.)
20          THE VIDEOGRAPHER:  The time is
21 3:44 p.m.  We are back on the record.
22 Q        (By Mr. Wells)  Mr. Collingsworth,
23 when we broke, we were talking about Exhibit 46
24 in which you tell Lorraine *I just signed all
25 kinds of bizarre documents with Albert to
                                        Page 240

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 60 (237 - 240)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

1 confirm a finance plan." And that was September
2 9th, 2011. Let me show you a couple of
3 documents also dated September 9th, 2011.
4        MR. WELLS: Let's go to tab 52.
5        MR. PRESLEY: Mr. Collingsworth, you
6 need to put your microphone on.
7        THE WITNESS: Right before I say
8 something on the record, I sure will.
9        (Plaintiff's Exhibit 47 was
10               marked for identification.)
11       MR. WELLS: This will be Plaintiff's
12 Exhibit 47.
13 Q        (By Mr. Wells) So this is a
14 document dated September 9th, 2011, entitled
15 "Loan Agreement" between you and a company
16 called Nicox BV.
17        What is going on here?
18 A        Do you have a more specific
19 question?
20 Q        Is this one of the bizarre financing
21 documents that you signed in order to get the
22 money to meet the arrangement with Jaime Blanco?
23 A        At this time I signed a number of --
24 of documents that initially resulted in the
25 funding being sent for the -- Jaime Blanco's
                                          Page 241

1 attorneys among other thing.
2 Q        Okay. And there were a series of
3 documents, and we'll go through them; but this
4 is one of them.
5 A        If you're asking is this a document
6 that I signed? Yes, it is.
7 Q        A document that you signed that
8 resulted in the funding being released so that
9 the arrangement with Jaime Blanco could be met?
10 A        It initially resulted in that
11 funding being released. Yes.
12 Q        All right. So this is a document
13 saying you are being loaned $1.5 million by
14 Nicox BV represented by Herman de Leeuw.
15        Who is Herman de Leeuw?
16 A        Well, I know Herman. Herman is
17 another Dutch businessman who has -- I've met
18 him several times. And he is an associate of
19 Albert Van Bilderbeek's.
20 Q        And tell me what you can recall
21 about the discussions leading up to this
22 arrangement, how it was explained to you what
23 the transaction was going to be.
24 A        Very little was explained to me
25 about this document or any of the related
                                          Page 242

1 documents. Because at the very outset, Albert
2 Van Bilderbeek told me that this was a -- a
3 temporary, sort of, stepping-stone agreement and
4 that it would be almost immediately voided and
5 that him and I would have a new agreement that
6 would govern our -- our funding relationship.
7 So I never paid too much attention to it, and --
8 well, there's my answer.
9 Q        Where is that new agreement?
10 A        There is -- I -- it's a -- we have a
11 verbal agreement.
12 Q        So the only signed documents we have
13 relating to this funding arrangement are these
14 Nicox BV loan documents?
15 A        Well, I actually never saw one that
16 was signed by everybody. But these are the
17 original documents that Albert sent me. And I
18 recall saying that this is bizarre because it
19 was bizarre. And there were many problems and
20 issues I had with these documents. And almost
21 -- well, shortly thereafter, Albert and I
22 reached a different arrangement; and these
23 documents are, as far as I'm concerned, null.
24 They are null and void and never really took
25 effect.
                                          Page 243

1 Q        And that different arrangement, you
2 say, is all verbal.
3        So all we've got is you and Mr. Van
4 Bilderbeek's word?
5 A        That's sufficient for me and Mr. Van
6 Bilderbeek, but that is the case. Yes.
7 Q        And the security in paragraph five
8 of this loan agreement, the $1.5 million loan to
9 you, was secured by your contingency fee
10 interests in the Drummond case and the Chiquita
11 case; correct?
12 A        For a very temporary period before
13 we nullified this agreement, it says there that
14 that is the case.
15 Q        Well, the part -- the counterparty
16 to you in this agreement is Nicox BV, not Albert
17 Van Bilderbeek. So --
18 A        So what?
19 Q        Nicox BV lo -- BV loaned you $1.5
20 million?
21 A        Not really. No.
22 Q        Well, tell me how it happened.
23 A        I did tell you. This was a
24 temporary stepping-stone agreement. And shortly
25 thereafter, Albert and I made a different
                                          Page 244

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 61 (241 - 244)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

1 arrangement that voided all of these agreements.
2 Q        And there's no document with Nicox
3 BV or any of these other people on the ones
4 we're about to see documenting that these
5 agreements that everybody signed is -- are now
6 void?
7 A        Oh, I think there's an agreement
8 between Albert and whoever else needed to be
9 agreed to that voided all of these agreements.
10 I wasn't a party to that.
11 Q        How did the flow of funds work?
12        Where did the $1.5 million go?
13 A        I saw these -- some of these during
14 Christian's deposition, and I was trying to
15 remember. I'm not sure if I received 1.5
16 million and sent 750 back to Albert or if Albert
17 got 750 and I got 750. I don't recall that.
18 But we both ended up with 750.
19 Q        And where did your 750 go?
20 A        To my bank.
21 Q        And from there?
22 A        Are you asking what -- how -- how
23 did I spend it?
24 Q        Yes.
25 A        Well, for -- for several years I --

Page 245

1 I used it for paying bills and other things of
2 that sort.
3 Q        Did Nicox BV not get paid its money
4 back?
5 A        I said this agreement is null and
6 void. I never have to pay Nicox BV back
7 anything.
8 Q        So they just gave you 1.5 million
9 that; you then gave half of it to Albert Van
10 Bilderbeek?
11 A        Object to the form.
12        And that's not what I said.
13 Q        Well, a loan envisions it will be
14 paid back at some point?
15 A        A valid --
16 Q        Nicox B -- let me finish.
17        Nicox BV did actually part with $1.5
18 million; correct?
19 A        As I said, I'm not sure if -- I only
20 got 750, and Albert got 750. That is part of
21 his arrangement with these guys. I -- I don't
22 know that. I know I can say for sure that I
23 received $750,000 that originated from Nicox BV.
24 Q        That you never paid back?
25 A        Never will either. I'm not

Page 246

1 obligated to. This loan agreement is null and
2 void.
3 Q        Have you had any discussions with
4 anybody at Nicox BV about what you just said,
5 that they don't have to get their money back?
6 A        I didn't say they're not going to
7 get their money back; they're going to get
8 it back from me.
9 Q        Well, elaborate on that.
10        What do you mean by that?
11 A        As I said, Albert made some
12 agreement with whoever was in concern here to
13 void this agreement. And he -- he kept his
14 funds, and I kept my funds. And my
15 understanding -- I know it's not -- I'm 100
16 percent sure that I've been relieved of any
17 obligation to repay this loan.
18 Q        What bank account did the 750 go
19 into?
20 A        I -- I don't --
21 Q        Your bank account I mean?
22 A        Probably was the only one that I
23 had. And I know you all have got all those
24 records. I think it went into my -- what was
25 then a SunTrust account.

Page 247

1 Q        Did you report on any of your tax
2 returns that you had received $750,000
3 originally characterized as a loan that was then
4 forgiven?
5 A        No. I think the status of what this
6 is, whether it's a gift or what -- what exactly
7 occurred there is something that I have not yet
8 dealt with. But it certainly was not income.
9 Q        So you were given $750,000 after
10 signing this loan agreement. And you say it was
11 later voided such that you never have to pay
12 that money back?
13 A        Yes.
14 Q        And you have not reported that on
15 any tax return and not paid any taxes on it?
16 A        I don't think so. No.
17        MR. WELLS: Let's get tab 53.
18 Q        What does Nicox BV do?
19 A        I have no idea.
20 Q        What does Herman de Leeuw do?
21 A        Well, what I understand is most of
22 his business is a very high level metals
23 recovery and recycling business.
24 Q        Like scrap metal?
25 A        Scrap metal, but also rare earth,

Page 248

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 62 (245 - 248)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

1  precious metals.  He works all over the world.
2  Q        Have you received funding from Nicox
3  BV and/or Herman de Leeuw on any other occasion
4  in relation to any other case?
5  A        No.
6          Let me show you Plaintiff's Exhibit
7  48.
8          (Plaintiff's Exhibit 48 was
9           marked for identification.)
10  Q       This is a document dated the same
11  day entitled "Loan Agreement," but this one is
12  between you and Albert Van Bilderbeek.
13          And if you look at the last two
14  pages, it is signed by both you and Albert Van
15  Bilderbeek; correct?
16  A        Yes.
17  Q       And in this document, you are
18  agreeing to loan Albert Van Bilderbeek $750,000;
19  correct?
20  A        Well, this agreement, like the
21  other, was voided.
22  Q       I'm talking about this agreement,
23  Mr. Collingsworth.  We've already heard your
24  claim that it was voided.
25  A        Well, then what's your question?

Page 249

1  Q       By the terms of this agreement, you
2  are loaning to Albert Van Bilderbeek $750,000?
3  A        That appears to be what this
4  initially accomplished.
5  Q       And that loan was secured by
6  expected proceeds from the Llanos Oil/Van
7  Bilderbeek claim in paragraph five?
8  A        That's what it says.
9  Q       What is that claim that was securing
10  this loan?
11  A        I'm -- I'm not sure as I did not
12  file any claim for Van Bilderbeek.  But he had
13  some other lawsuits, and I -- I don't know any
14  other claim.  But I know that I did not ever
15  file such a claim on his behalf.
16  Q       And it says at the end the agreement
17  is governed by the Isle of Man Law.
18          Do you have any understanding as to
19  why the Isle of Man is the applicable
20  jurisdiction for this agreement?
21  A        No, I don't.  And like I said, I was
22  told before I even signed anything that this was
23  a very temporary situation.  I did not put a lot
24  of thought into provisions such as the choice of
25  law provision.

Page 250

1  Q       What is the new agreement between
2  you and Albert Van Bilderbeek that you say is
3  all verbal?
4  A        That he kept and does not owe to me
5  $750,000, and I kept and do not owe to him or
6  anyone else $750,000.
7  Q       No other terms?
8  A        Not really.  Pretty simple.
9          Not really is not a no.
10          Are there any other terms?
11  A        Not that I'm aware of.
12  Q       Did Nicox BV to your knowledge get
13  paid back by anyone?
14  A        I don't know if Albert provided
15  something back to them later on.  I don't think
16  so.  I think that they had some very -- they,
17  being Albert and Nicox and some of the other
18  people involved, they had very complicated
19  interlocking business relationships.  Some of
20  them were on the Llanos board.  Albert, I think,
21  was on the Nicox board.  So once this
22  transaction ended for me, I did not care about,
23  pay attention to, or investigate further what
24  arrangements they had.
25          MR. WELLS:  Let's go to tab 54,

Page 251

1  which is Plaintiff's Exhibit 49.
2          (Plaintiff's Exhibit 49 was
3           marked for identification.)
4  Q       Another document of the same date,
5  but this one is titled "Cooperation Agreement
6  between Albert Van Bilderbeek and Terrence
7  Patrick Collingsworth."  And it basically says
8  it's -- it's supplementing the loan agreement
9  between you two.  But if there's a conflict with
10  this agreement and any other agreement, this
11  agreement controls.  Now, there's a reference in
12  that first paragraph that was relating to a
13  James Elwood.
14          Who is that?
15  A        That -- that explains maybe the Isle
16  of Man.  James Elwood is a lawyer, I think he's
17  based in the Isle of Man, who works closely with
18  both Albert and Herman.
19  Q       And what involvement, if any, did
20  James Elwood have in your cases either against
21  Drummond or Chiquita?
22  A        None whatsoever, except that he
23  might be on one of these documents that sent
24  funds my way.  But I -- I don't think we --
25  that's all.

Page 252

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 63 (249 - 252)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

**Terrence P. Collingsworth - Volume I**
**2/20/2024**

1 Q        Did you ever intend for James Elwood
2 to have any involvement in any of your cases?
3 A        No.  He doesn't know anything about
4 these issues.
5 Q        In paragraph three, looks like there
6 was some typed language that was struck out and
7 supplemented by handwritten language.
8        Would that be yours or Mr. Van
9 Bilderbeek's handwriting?
10 A        Well, it's not mine.
11 Q        And it says, "AB will wire on behalf
12 of TC, funded by TC, to Ivan Otero $60,000 to
13 the following" bank "account" and gives Ivan
14 Otero's bank account in Colombia.
15        And is that the first initial
16 $60,000 payment for the arrangement with Jaime
17 Blanco?
18 A        Well the 60,000 is.  I'm not sure
19 that I agree with your translation of that
20 handwriting.  I really can't make it out.  But
21 the 60,000 that came from Albert to Ivan was
22 part of the arrangement for the attorneys' fees
23 for Jaime Blanco.
24 Q        And the document you signed says it
25 will be on behalf of you and funded by you.
Page 253

1 A        I don't -- I don't agree that that's
2 what it says.  But --
3 Q        Well, you signed it
4 Mr. Collingsworth.  You tell us what it says.
5 A        I can't read this writing as I sit
6 here.  But I do know that based on the actual
7 agreements that are -- are -- that supplanted
8 all of these agreements; Albert paid that money,
9 both the 60 and the 50, that I never -- he never
10 paid me back, I never sent him anymore money,
11 and that this money came from Albert.
12 Q        And then it says in paragraph four
13 in approximately 45 days, when the work
14 contemplated for Ivan Otero is completed, AB
15 will wire him $50,000"; correct.
16 A        That's what it says.
17 Q        And we just saw your email a second
18 ago from this very same day saying as soon as
19 the declaration is done, Ivan will get another
20 $50,000.
21        The $50,000 was for payment after
22 the declaration was signed; correct?
23 A        I don't know what -- what email
24 you're referring to.
25 Q        Well, let me ask you this:  Was the
Page 254

1 $50,000 here contemplated to be after Jaime
2 Blanco signed his declaration?
3 A        I don't recall it being that rigidly
4 broke down.  But I do recall that there was a 60
5 and a 50 and that the declaration and the
6 testimony had occurred by the time we were
7 finished.  But I don't -- I don't recall that
8 the 50 was conditioned on anything.
9 Q        And you did agree or at least
10 confirm with Ivan Otero that it would be okay in
11 this arrangement with Jaime Blanco to make an
12 additional down payment and then a series of
13 payments over time.
14        Isn't that true?
15 A        I -- I don't know what you're
16 referring to.
17 Q        You didn't discuss with Ivan Otero
18 or through a translator communicate with Ivan
19 Otero that you wanted to pay Blanco an initial
20 sum first and then a series of payments after
21 that?
22 A        Well, I don't recall that.  And I
23 don't think there were -- was a series of
24 payments.  I think there were two.
25        And this one is signed by both you
Page 255

1 and Albert Van Bilderbeek.  And there's a
2 witness, Harris Schoenbrou?
3        Who is that?  I'm not sure I'm
4 pronouncing that correctly.
5        MR. PRESLEY:  Slendebroek.
6 Q        (By Mr. Wells)  Slendebroek.
7 A        I -- I don't know.  Must be someone
8 in Albert's office or someone in these various
9 individuals' offices.  I wasn't there when
10 Albert signed this.
11 Q        (By Mr. Wells)  So how does this
12 arrangement not come up when we're talking about
13 the Jaime Blanco payments in the crime-fraud
14 hearing in front of Judge Proctor?
15 A        Object to the form.
16        I'm not sure what you mean.
17 Q        You were asked by Judge Proctor:  So
18 Albert Van Bilderbeek had the kind of money that
19 he could give $150,000 to Jaime Blanco?  And you
20 said, Yes, he was able to help him.
21 A        And he did.
22 Q        But why are you not disclosing this,
23 as in your words, bizarre arrangement with this
24 Isle of Man group and a company that you never
25 paid back?
Page 256

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 64 (253 - 256)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

```
 1              How does that not come up?
 2 A         Because it was null and void almost
 3 immediately.  And so whatever these documents
 4 say were not relevant to what actually happened.
 5 Q        When you say "almost immediately,"
 6 how -- how quickly after you signed this series
 7 of documents; which when we get through with
 8 them will be five, six, seven, something like
 9 that; how quickly after that did you enter some
10 verbal agreement where all of these went up in
11 smoke?
12 A         Well, as I previously testified,
13 Ivan -- I'm sorry -- Albert assured me before we
14 saw these various bizarre agreements that that
15 would be the case; which is why, as I've
16 testified, I wasn't too worried about the
17 details of these bizarre agreements.  And I'm
18 not sure if there was a matter of two or three
19 weeks or two months; but almost immediately,
20 Albert confirmed that everybody concerned was
21 satisfied and that I need not concern myself
22 with these original agreements which are null
23 and void.
24 Q        Had you forgotten about these
25 bizarre agreements at the time of the
                                          Page 257
```

```
 1 crime-fraud hearing?
 2 A         I did not forget that I received
 3 $750,000 as part of these arrangements, but that
 4 I -- I certainly did not use that funding --
 5 those funds for anything related to this
 6 transaction.  So I imagine I did not feel that
 7 my role in this was responsive.
 8 Q        You didn't feel like when you were,
 9 as you said multiple times in the crime-fraud
10 hearing, correcting the record, making sure all
11 of the truth was disclosed, that you needed to
12 disclose this bizarre arrangement that resulted
13 in the funds for Jaime Blanco?
14 A         They did not result in the funds
15 from me.  And that was our original rationale,
16 as you'll recall, for not disclosing the Jaime
17 Blanco attorney arrangement.  We ultimately did,
18 even though the funds came from Albert.
19 Q        So, again, how long after you signed
20 these documents was there an agreement that
21 these documents are no longer valid contracts?
22 A         Object to the form.
23              As I said, the agreement actually
24 predated these, and that it was a matter of a
25 couple of weeks; maybe maximum two months, when
                                          Page 258
```

```
 1 it was absolutely clarified that there was no
 2 further validity to any of these documents.
 3 Q        But in the first couple of weeks or
 4 months, however long these documents were the
 5 only thing in place; these were the documents
 6 that resulted in the funds that went down to
 7 Jaime Blanco and/or his lawyers?
 8 A         As I said, you know, Albert assured
 9 me before we ever signed anything that that
10 would not be the case and that these documents
11 were a stepping stone, I think is the word that
12 he used.  As far as I was concerned, these
13 documents were never valid.  But as it worked
14 out, I did receive $750,000 that did not go to
15 any of these payments that were made; and, I
16 think, really anything to do with the Drummond
17 case.
18 Q        And as part of this arrangement,
19 Albert got $750,000.
20              And some of that money went for the
21 Blanco arrangement; correct?
22 A         I believe that is the case.  Yes.
23              MR. WELLS:  Let me get tab 55, which
24 is Plaintiff's Exhibit 50.
25              (Plaintiff's Exhibit 50 was
                                          Page 259
```

```
 1 marked for identification.)
 2 Q        This is a cooperation agreement also
 3 dated September 9th, 2011, between you and James
 4 Elwood in which it says these services
 5 Mr. Elwood will provide are "logistical support,
 6 suitable contacts and information so as to
 7 assist" Terry Collingsworth "in the pursuance of
 8 the" Drummond and Chiquita cases; correct?
 9 A         That's what it says.
10 Q        And I think you just told me
11 Mr. Elwood did nothing in pursuance of either of
12 those cases?
13 A         That's correct.
14 Q        Did you not ask any questions about
15 why you're signing all these documents?
16 A         As I've testified, I think, now
17 three times; I was assured by Albert that this
18 was a necessary stepping stone, not to worry
19 about them, and that he explained that we would
20 have a replacement agreement along the terms
21 that we actually ended up with.  So I was not
22 concerned about any of the details of any of
23 these agreements.
24 Q        Where were you when -- well, first,
25 where were you when you were discussing with
                                          Page 260
```

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

1  Albert Van Bilderbeek this concept before the
2  documents have actually been signed?
3  A        I'm just trying to remember whether
4  I had visited him when we had the initial
5  discussion or it was by Skype or something.  I'm
6  pretty sure it was a Skype conversation.
7  Q        So you were not physically in the
8  same room?
9  A        If we were having a Skype
10 conversation, I would not have been physically
11 in the same room as Albert.
12 Q        Thank you for that snide response.
13          You also promised Mr. Elwood ten
14 percent of any fees you got out of the Drummond
15 case; correct?
16 A        This document has that provision as
17 paragraph BA, as with all other terms of these
18 various agreements that never came to pass; and
19 the agreement was voided.  So Mr. Elwood has no
20 -- has received zero and has no expectation of
21 receiving anything.
22 Q        What was your contingency fee
23 interest in the Drummond case?
24          MR. PAULK:  Object to the form.
25 A        Well, there are a lot of Drummond

Page 261

1  cases.  But I believe that all of them probably
2  had a pretty standard contingency fee agreement
3  where we got 33 percent of the net recovery if
4  we settled and 40 percent if we went to trial.
5  I don't have any of them in front of me, but
6  that's typically the kind of agreement we have.
7  Q        (By Mr. Wells) And that -- whether
8  it be 33 percent or 40 percent, that contingency
9  fee would flow to Conrad & Scherer, not all for
10 you; correct?
11 A        Well, when -- excuse me.
12          Depends on which case and the timing
13 of it.  But I think initially I probably had the
14 contingency agreements through just
15 International Rights advocates.  And then when I
16 joined Conrad & Scherer, they created a pretty
17 complicated formula for what percentage of it
18 they would get.
19 Q        Had you -- let's just stick with 40
20 percent so we don't have multiple numbers.
21          Had you recovered a 40 percent
22 contingency fee in any of the Drummond cases;
23 how was that going to be split between you,
24 Conrad & Scherer, Ivan Otero, and anybody else
25 that had a piece of it?

Page 262

1  A        Object to the form.  Calls for
2  speculation.
3          I -- I would need to see -- it would
4  be determined by the agreements.  So I had my
5  original contingency fee agreement.  If at the
6  time that case settled, any case, if Conrad &
7  Scherer still had a valid agreement with me;
8  then their agreement determined how much of that
9  they would get.  I do not recall the percentage
10 that would go to Ivan based on that agreement in
11 which you say there was a contingency where we
12 gave him $80,000.  I don't recall.  But we would
13 have governed it by whatever agreements were
14 binding at the time.
15 Q        And that agreement said Ivan Otero
16 had a 25 percent contingency fee, but I believe
17 it said 25 percent of the fees.  So I -- I would
18 read that to be 25 percent of Conrad & Scherer's
19 40 percent, or the plaintiff's 40 percent.
20          Is that how you understood the
21 arrangement, or what was the cut for Ivan Otero?
22 A        Well, given that I've said I don't
23 even recall what the percentage was; I cannot
24 testify accurately about what my understanding
25 was how it would be applied.

Page 263

1  Q        And --
2  A        But just to be helpful; I think that
3  whatever it was, your surmise about how his
4  percentage would be calculated, I think that was
5  probably right, that it would be a percentage of
6  the actual fees, not the -- the recovery.
7  Q        And I've seen documents where you
8  have, whether for trying to get funding or other
9  purposes, put values that you were estimating
10 the Drummond cases could be worth.  I think one
11 was up to a billion dollars.
12          Do you have any testimony today as
13 to what you valued the Balcero case at?
14 A        No.  I don't recall.
15 Q        And you expected it was many, many
16 millions of dollars; correct?
17 A        I said I don't recall.
18 Q        You were litigating this case for
19 less than a million dollars?
20 A        I didn't say that.  I object to the
21 form.
22 Q        So give me your best estimate.
23 A        I am not going to simply pull a
24 number out of the air.  I don't -- there are
25 documents where we provided estimates.  They

Page 264

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 66 (261 - 264)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

1 were pretty high.  I don't recall what they
2 were.
3 Q       Okay.  Well, will you just agree
4 that those documents are accurate as to your
5 estimates?
6 A       Well, they turned out to not be
7 accurate estimates.  But at the time, they were
8 accurate estimates.
9 Q       So if the case ended up resulting in
10 a $100 million recovery, that's $40 million
11 total contingency fee; 10 million of that, 25
12 percent, would go to Ivan Otero?
13 A       If that's what the agreement said.
14       MR. WELLS:  Let's go to tab 56;
15 Plaintiff's Exhibit 51.
16       (Plaintiff's Exhibit 51 was
17            marked for identification.)
18 Q       This is a cooperation agreement
19 between James Elwood and Paul Akkermans.
20       Who is Paul Akkermans?
21 A       Paul was some -- another Dutch guy
22 who I believe was for some period of time on the
23 board of Llanos Oil and was someone that Albert
24 knew.  He also was some kind of retired special
25 forces guy from the Netherlands.

Page 265

1 Q       Did you and Mr. Akkermans ever
2 communicate?
3 A       I didn't think -- strike that.
4 Apparently, we did.  I just reviewed some emails
5 from him over the weekend or Friday, whatever
6 day that was, where he was asking me all kinds
7 of questions about when we were going to meet
8 and things of that sort.  So, yes, apparently, I
9 did.
10 Q       One of those emails, he sends you an
11 email.  You then flip it to Albert Van
12 Bilderbeek saying, I will respond; and Van
13 Bilderbeek tells you Don't respond due to the
14 investigations of him.
15       Do you recall reviewing that
16 document?
17 A       I recall the document.  Yes.
18 Q       What investigations were there of
19 Paul Akkermans?
20 A       I have no idea.  I had forgotten
21 completely about Paul Akkermans, who was a
22 pretty minor player in my life, until I saw
23 these emails recently.  But I don't have any
24 recall of what he was being investigated for.
25 Q       And James Elwood, do you know if he

Page 266

1 lost his law license?
2 A       No, I do not.
3       Did he?
4 Q       I'll tell you when I'm getting
5 deposed.
6 A       I can't wait.
7 Q       And in this document it is saying
8 that James Elwood will pay to Paul Akkermans
9 one-third of all gross fees or consideration
10 otherwise received by Elwood in respect to the
11 Drummond and Chiquita cases; correct?
12 A       That's what it says.
13 Q       Did you discuss these documents that
14 you were signing that on their face assigned
15 some of the Drummond contingency fee interests
16 to these individuals with anyone at Conrad &
17 Scherer?
18 A       No.  Because I knew that these
19 documents were not going to be valid and
20 enforced, so this was a -- basically a pro forma
21 transaction that was not going to be valid.
22 A       Well, those --
23 A       This -- this one I -- this one is
24 not even signed by anyone.  I don't even know if
25 it ever was.

Page 267

1 Q       Well, the ones involving you with
2 your signature were witnessed by Christian
3 Levesque, who was a Conrad & Scherer attorney.
4       Did you have any discussions with
5 her about what these documents were that you
6 were signing with her?
7 A       I'm sure we didn't.  She witnessed
8 them simply as documents.
9 Q       And in your view, someone just
10 witnessing a contract is not really taking a
11 material part in that contract?
12 A       Object to the form.
13       It depends on -- on what -- what
14 document it is and what their role is.  Do they
15 have a role beyond just witnessing?  I go to
16 notaries all the time.  They witness my
17 signature.  They don't have a clue what they
18 signed.
19       But someone just being a witness on
20 a document is just confirming I saw this person
21 sign the document.  They're not necessarily
22 involved in the transaction or really have
23 anything -- idea what it's about?
24 A       Object to the form.
25       I would say certainly with respect

Page 268

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 67 (265 - 268)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

1  to the one transaction where someone was
2  witnessing my signature, Christian; that was the
3  case.
4  Q        When's the last time you've
5  communicated with Herman de Leeuw?
6  A        We -- we generally either call each
7  other or send messages for -- for Christmas, or
8  I send him a card.  That's it.  I've not in any
9  business discussions with him in -- since the --
10 these documents.
11 Q        But you're -- you're still in
12 contact with him?
13 A        Well, if you call sending someone a
14 Christmas card being in contact; yes, I am.
15       MR. WELLS:  Let's go to tab 58,
16 which is Exhibit 52.
17           (Plaintiff's Exhibit 52 was
18           marked for identification.)
19 Q        This is basically you emailing the
20 signed agreements back to the parties and asking
21 for the wire.
22       But my question is:  You send your
23 email at the bottom to a man named Frank van
24 Lint, who I did not see listed on the loan
25 agreements that we just went through.

Page 269

1      Who is Frank van Lint?
2  A        Well, at the time of these
3  transactions in September of 2011; he worked for
4  Herman.
5  Q        At Nicox BV?
6  A        I don't know if he worked for that
7  company or they had some other company or
8  arrangement.  But I do know that he was working
9  for Herman.
10 Q        Do you maintain any contact with
11 Mr. van Lint?
12 A        Just -- yes.  Social.
13 Q        Up to present?
14 A        Yeah.
15 Q        He's in the U.S. now; correct?
16 A        Well, I believe you guys subpoenaed
17 him in Philadelphia.  So as far as I know,
18 that's where he lives.
19 Q        Let's get -- actually, let's take a
20 very, very quick break.
21       THE VIDEOGRAPHER:  The time
22 4:27 p.m.  We are off the record.
23           (Short recess.)
24       THE VIDEOGRAPHER:  The time is
25 4:33 p.m.  We are back on the record.

Page 270

1           MR. WELLS:  This will be tab 149 for
2  our exhibit coordinator, and it is Exhibit 53.
3               (Plaintiff's Exhibit 53 was
4               marked for identification.)
5  Q        (By Mr. Wells)  So this is an email
6  between you and Lorraine Leete, but it appears
7  you were passing messages through her to Ivan
8  Otero; is that correct?
9  A        Well, it's -- that's what it says.
10 As I testified earlier, I -- I was surprised to
11 see that there apparently was some direct
12 contact between her and Jaime Blanco.  My
13 understanding was that I was dealing with Ivan
14 exclusively.  And, in fact, let me strike that.
15 It's Ivan reporting to -- to Lorraine.
16 Q        All right.  You tell her to tell
17 Ivan the following:  "I am working hard to raise
18 legal fees for Jaime Blanco.  Our current and
19 soon-to-be former partners Parker Waichman have
20 declined to put up the funds saying it's too
21 risky.  My firm is confident we can do this, but
22 we need to raise funds.  I have a good new lead.
23 One question is whether we can make a down
24 payment to the lawyers and then perhaps a series
25 of payments.  Makes it easier to raise funds and

Page 271

1  also gives us some security that we will get the
2  assistance."  And Lorraine Leete responds with a
3  message from Ivan saying that he said, Yes, it
4  would be possible to make a down payment and a
5  series of payments.
6       And that is, in effect, what
7  occurred.  There was an initial payment to
8  Blanco before his declaration and then payments
9  afterwards?
10 A        Well, that's not what we're talking
11 about here in a series of payments.  But, in
12 fact, the documents now show that there were
13 two.  That's not a series in my mind, but there
14 were two.
15 Q        Well, we'll get there.  That's not
16 accurate either.
17       When you're talking about a down
18 payment and a series of payments you say, That
19 could give you some security that you will get
20 the assistance.
21       What are you talking about there,
22 Mr. Collingsworth?
23 A        I'm talking about the fact that, as
24 I previously testified, I didn't meet these
25 lawyers.  I don't know these lawyers.  To have

Page 272

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 68 (269 - 272)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

1 **provided them with their entire legal fees up**
2 **front to perform this work struck me as not a**
3 **good idea.**
4 Q        What assistance do you need security
5 that you will get?
6 A        **The legal assistance that these**
7 **lawyers are -- are -- we are paying them to**
8 **provide to Jaime Blanco.**
9 Q        So that he will say what you contend
10 to be the truth, that Drummond was complicit
11 with the AUC?
12 A        Object to the form.
13        **I've said repeatedly that we are**
14 **working to get him his legal representation so**
15 **that he could tell the true version of what he**
16 **told us he wanted to say.**
17 Q        All right.  We can get the
18 crime-fraud opinion out if we need to, but let's
19 see if we can do it without.
20        In that opinion, Judge Proctor lays
21 out what the evidence showed and really what the
22 -- the defendants have admitted was the case as
23 to a series of payments and the time line of it
24 to Jaime Blanco, first of which is he refused to
25 sign his declaration before receiving a payment;
Page 273

1 correct?
2 A        (No response.)
3 Q        Is that what happened?
4 A        **Did he refuse?**
5        **He didn't have a declaration to sign**
6 **at the outset, so I don't think he could have**
7 **refused to sign it.**
8 Q        He said he would not work on a
9 declaration until he got the funding?
10 A        **He said he would not work on it.  He**
11 **needed to support his lawyers who were working**
12 **with him on that declaration.**
13 Q        And in September 2011, Jaime Blanco
14 was -- or there was a $60,000 transfer to Ivan
15 Otero, which we just saw came from that
16 cooperation agreement between you and Albert Van
17 Bilderbeek.  And a month later in October he
18 signed his declaration.
19        Are you with me so far?
20        Does that sound accurate to you?
21 A        **Roughly.  Yeah.**
22 Q        And then in December of 2011, there
23 was a $25,000 payment for Jaime Blanco's legal
24 fees.  And after that, he gave the first day of
25 his trial testimony in Balcero in April of 2012.
Page 274

1 And on the same day, you handed Ivan Otero
2 $10,000 in cash.
3        I know you dispute what the purpose
4 of that $10,000 in cash was, but are you still
5 with me on the time line?
6 A        **I don't recall that we gave any**
7 **funds for Jaime Blanco's lawyers at that time.**
8 **I thought we were done when the two wires were**
9 **sent from Albert.**
10 Q        Did you or did you not hand Ivan
11 Otero $10,000 in cash on the day of Jaime
12 Blanco's letters rogatory testimony?
13 A        **I -- I -- I provided Ivan Otero with**
14 **$10,000 somewhere around there.  I don't**
15 **remember if it was the day or the day before or**
16 **the day after.  Yes.**
17 Q        And that was in cash; correct?
18 A        **I don't recall that it was all in**
19 **cash.  But if you're representing to me that**
20 **Judge Proctor found that there was evidence to**
21 **support that, that would not shock me.**
22 Q        You've been transferring funds to
23 Ivan Otero monthly for quite a while at this
24 point.
25        Why are you handing him $10,000 in
Page 275

1 cash as opposed to a check, a wire transfer,
2 something that would run through the normal
3 banking channels?
4 A        **Well, we never gave him a check.  I**
5 **can only think that it must have been more**
6 **urgent; and it was almost certainly related to**
7 **his security issues or his travel issues or a**
8 **combination of those two things.**
9 Q        And you have no documentation as to
10 what he spent that $10,000 on, do you?
11 A        **I -- I don't know if we do or not.**
12 **I wouldn't have been able to obtain it without**
13 **first explaining what it was for.  So I'm pretty**
14 **sure there must be a record of some sort.**
15 Q        And Blanco gave the second day of
16 his trial testimony in May of 2012.  And after
17 that in July of 2012, another $35,000 payment
18 went from Albert Van Bilderbeek's account to
19 Ivan Otero.
20        Any reason to disagree with that?
21 A        **There's no reason for me to confirm**
22 **it either.  I have no recollection of that.**
23 Q        And the documents will bear this
24 out.  But let's put aside the 10,000 in cash on
25 the day he gave his first day of trial
Page 276

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 69 (273 - 276)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

1 testimony. We've got a large payment before he
2 signs his declaration, a large payment after he
3 signs his declaration, and then another large
4 payment after he gives his testimony.
5          Was that not to secure the
6 assistance that his testimony would be as you
7 expected?
8 A      Well, again, I don't recall, nor
9 will I testify, that he received yet another
10 payment for his lawyers. But as I stated in
11 response to your earlier question about a series
12 of payments, that was certainly to ensure the
13 ongoing cooperation of his lawyers.
14 Q      And --
15 A      Any payments that were made were for
16 his lawyers and to make sure that they were
17 actually doing what we had agreed they would do.
18 Q      And you've said in relation to other
19 witnesses in the Drummond cases that if they
20 were not cooperating with them -- with you, you
21 would pull the assistance that you were
22 providing; right?
23 A      Object to the form.
24          If you have an example of that, I'd
25 be happy to look at it.

Page 277

1 Q      I do. I'm asking if you admit that
2 or deny it or just say you don't remember?
3 A      I generally don't remember. I do
4 recall, I think it was, Charris. I think I only
5 recall it because it was a -- an exhibit at
6 Susana's deposition last week, that there was an
7 email that -- that seemed to be that Charris had
8 done something. And we were not happy with him
9 and made clear that we were expecting his
10 cooperation in exchange for the security; that
11 if he wasn't going to provide testimony, then
12 his family probably wasn't in danger.
13 Q      So back to Blanco.
14          As it relates to your explanation
15 for the series of payments being to ensure that
16 the lawyers provided the assistance; how are you
17 ensuring anything if you have not ever met the
18 lawyers, don't know their names, and never seen
19 any documentation whatsoever from them?
20 A      Well, I'm pretty sure they did what
21 they were supposed to do. Because, certainly,
22 Ivan assured me of that. And everything worked
23 as it should have in terms of Jaime being able,
24 with his lawyers' assistance, to explain what
25 really happened.

Page 278

1 Q      So your assurance that all that
2 other work had been done was that Jaime Blanco
3 told the story that you believed to be the
4 truth?
5 A      Object to form.
6          I did not say that. I said it
7 was --
8 Q      What else did you have that gave you
9 the assurance that anything they had done was
10 worth the money that was paid?
11 A      As I said, Ivan occasionally
12 confirmed to me that they were doing the work
13 and that everything was proceeding as was
14 discussed.
15 Q      And you do understand that Jaime
16 Blanco was convicted of the charges he was
17 charged with in the Colombian criminal system;
18 correct?
19 A      As I said previously, I don't know
20 that he was convicted of being the, what they
21 call, intellectual author. He was convicted, I
22 think, of being a conspirator. But he was
23 convicted of something. Yeah.
24 Q      And that -- a conviction was
25 appealed to the Colombian appellate courts and

Page 279

1 was affirmed; correct?
2 A      I'm not -- I -- I assume he
3 appealed. I don't know that. I didn't see any
4 of those documents.
5 Q      And he was in prison for many years
6 as a convicted murderer until the JEP process
7 was created, which was a peace process to
8 basically -- it was basically negotiated with
9 the FARC, I believe.
10          Is that your understanding?
11 A      I don't have an understanding of
12 what the FARC had to do with it. I do have an
13 understanding that Jaime Blanco participated in
14 the JEP process, and he certainly was not a
15 member of FARC.
16 Q      And it was not the Colombian courts
17 that released Blanco from prison; it was the
18 JEP?
19 A      Oh, I think the courts had to --
20 almost positive the courts would have had to
21 sign off on that too.
22 Q      Are you speculating, or do you know?
23 A      I'm making an educated guess.
24          MR. WELLS: Let's get tab 298.
25 Q      If Blanco had not testified in his

Page 280

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 70 (277 - 280)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

**Terrence P. Collingsworth - Volume I**
**2/20/2024**

1 letters rogatory testimony the way that he had
2 testified in the declaration for you, do you
3 think you would have still made payments to him?
4            MR. PAULK:  Object to the form.
5 **A        Object to the form.**
6        **I'm not going to speculate.**
7 Q        All right.  What I'm showing you is
8 Plaintiff's Exhibit 54, which is excerpts from
9 Jaime Blanco's trial testimony in Balcero.
10           (Plaintiff's Exhibit 54 was
11        marked for identification.)
12 Q        So on page 16 starting at line 15,
13 you asked Mr. Blanco, After you produced this
14 declaration, did you receive any threats or
15 promises from anyone relating to the statements
16 that you've made in this declaration?  And he
17 answered, Up to the present time, I have not
18 suffered any type of threats.  We'll stop there.
19        And it's your testimony that as far
20 as you are aware, that's not true?
21 **A        Well, I think you're neglecting the**
22 **-- the -- the statement in the question.  He had**
23 **received threats before I met him, during the**
24 **time I was speaking with him.  The question**
25 **asked was re -- relating to the statements**

1 **you've made in this declaration.  So I'm**
2 **interpreting that to be that immediately as a**
3 **result of the declaration, he had not received**
4 **any threats.**
5 Q        The declaration is the first time he
6 had ever testified publicly accusing Drummond of
7 complicity with the AUC.
8        Do you understand that?
9 **A        Well, as I said, I know that he had**
10 **spoken to the prosecutors.  And I myself told**
11 **you the difference was that he was not spoken**
12 **publicly before.  That is correct.**
13 Q        So how would he get any threats
14 before the declaration if he had never come out
15 publicly saying Drummond is complicit with the
16 AUC?
17 **A        Object to the form.**
18        **I have no way to tell you why**
19 **Drummond or anyone else would have threatened**
20 **him other than that they were afraid of what he**
21 **would say, not what he did say.**
22 Q        And you asked him after that, Have
23 you had any promises or benefits provided to
24 you?  And his answer was, No.  No kind
25 whatsoever.

1        And that is not a true statement
2 under oath, is it?
3 **A        Again, I think that it's more**
4 **nuanced than that, that he likely interpreted**
5 **that to be did he receive promises or benefits**
6 **directly to him for his testimony; and the**
7 **answer to that was no.  But, again, that's his**
8 **testimony, not mine.**
9 Q        Well, your testimony is that the
10 help that you arranged for Jaime Blanco was in
11 relation to his criminal case; correct?
12 **A        That is correct.**
13 Q        So let's flip the page and go to
14 page 189.
15 **A        (Witness complies.)**
16 Q        This is Drummond's counsel, Bill
17 Jeffress asking Mr. Blanco, starting on line 14,
18 Did you discuss anything with Terry about help
19 that Terry or his contacts could provide to you
20 in your case?  His answer was, It is my
21 understanding that just like in Colombia, it is
22 prohibited to receive assistance.  And I believe
23 it is the same way in the United States.  I've
24 never talked about that subject with Mr. Terry.
25 And the statement I'm making today, it's a

1 voluntary statement regarding knowledge that I
2 have regarding the facts that are being
3 investigated.  The written declaration that I
4 have provided to the Alabama court, I have
5 stated there that this is by my own free will
6 and that I have not been subject to any type of
7 pressure nor gifts of any kind.  That's correct.
8 Q        Are you asking me if that's correct?
9 A        No.  I just quoted the testimony.
10 A        Okay.
11 Q        My question is:  Do you acknowledge
12 that that is an untrue response to Mr. Jeffress'
13 question?
14 **A        No.  No, I don't.  Again, I think**
15 **it's more nuanced than that.  He never spoke to**
16 **me about any of this.  So I think he's literally**
17 **interpreting that.  Again, that's his testimony,**
18 **not mine.  And I think going into the next**
19 **paragraph that he is is probably not regarding**
20 **assistance for his legal representation to be a**
21 **direct benefit to him.  It didn't go in his**
22 **pocket.  He was simply telling the truth, as he**
23 **says here.**
24 Q        Well, he's only asked about help
25 that could be provided to him in his case.

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 71 (281 - 284)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

1       And you helped provide funds,
2 according to your testimony, for his criminal
3 legal fees in that case; correct?
4 A       You're asking me for my
5 interpretation of what he said, which is still
6 not a very good question for me to interpret
7 what someone else said.  And now you're offering
8 a counter-interpretation.  I gave you my
9 impression of what I think that he was referring
10 to in answering that question.
11      MR. WELLS:  Mark that one for me,
12 please, too.  Can you read my question back.
13      (Record read.)
14 Q       Did you or did you not provide help
15 by introducing him to the concept of Albert Van
16 Bilderbeek such that he could get lawyers for
17 his criminal case?
18 A       We've been talking about that for
19 quite sometime; and, yes, I did.
20 Q       Did you not also offer to use your
21 contacts in Washington, D.C. to help him in his
22 criminal case?
23 A       I offered to, and I think I did,
24 introduce him to some FBI agents who interviewed
25 him.  I don't know that that was a big help to
Page 285

1 him.  But I certainly did do that.  That was in
2 my interests.
3 Q       To have Drummond criminally
4 investigated by the FBI?
5 A       Absolutely.  For their criminal
6 conduct.
7 Q       Tell us how you know the money that
8 went from Albert Van Bilderbeek to Ivan Otero
9 wasn't just given straight to Jaime Blanco?
10 A       I testified repeatedly that my
11 information about that process and how it worked
12 came from Ivan Otero, who I trust completely.
13 Q       So in order to confirm that with
14 documents, we would need to look at Ivan Otero's
15 bang account to see where that money went?
16 A       I don't know if that would yield any
17 -- any indication of any of that.
18 Q       In any of your other cases did, you
19 have evidence other than just the statements of
20 imprisoned witnesses, like actual documents?
21 A       Well, in Chiquita we had evidence.
22 Because unlike in Drummond, which was a family
23 corporation, a board member of Chiquita was
24 watching this go on and said I can't tolerate
25 this anymore and turned the company in.  We've
Page 286

1 not had that happen in the Drummond case.  So
2 we're dealing with whatever evidence we can
3 gather in whatever form it is available.  But,
4 yeah, in Chiquita we had a whole different
5 situation because somebody turned the company in
6 and provided documentation of the payments.
7 Q       So there is documentation?
8 A       As I said, it was somebody who
9 turned the company in.  Yes.
10 Q       That documentation consists of what?
11      Bank records?  Emails?  What?
12 A       Well, probably both.  But
13 Chiquita -- the reason I'm hesitating is that
14 after a board member turned Chiquita in,
15 Chiquita pled guilty to the crime of financing
16 this same terrorist organization that Drummond
17 was financing, the AUC.  So a lot of their
18 evidence came from their factual proffer and the
19 documents that they themselves had to turn in as
20 part of their, what turned out to be, a
21 sweetheart plea agreement.  So they're --
22 they're not comparable at all here.
23 Q       Well, the documents, at least as it
24 relates to bank records that would show
25 financial transactions, would be held by banks;
Page 287

1 correct?
2 A       I mean --
3 Q       I mean, Chiquita does not have
4 control over whether those banks give up those
5 records or not.
6 A       As I sit here, I'm not aware that
7 any of the evidence that we relied on in
8 Chiquita was from bank record -- records.  It
9 was from testimony of people that documented
10 that the payments had occurred.  And whatever
11 they handed over to the Justice Department,
12 which I have not seen, that constituted the
13 factual basis for a factual proffer that listed
14 all of the payments they made to the agency
15 without reference to banks or any other form of
16 how that payment was made; that became part of
17 the factual proffer that the -- the company
18 signed.
19      So implicit in your woven-in
20 accusations against Drummond when I was asking
21 you about Chiquita, you are accusing Drummond's
22 lawyers of hiding documents from you, is that
23 correct, including me?
24 A       Oh, I'm sure that Drummond's
25 lawyers, including you, have been improperly
Page 288

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 72 (285 - 288)

**Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.**

**Terrence P. Collingsworth - Volume I**
**2/20/2024**

---

1 stonewalling in response to legitimate discovery
2 requests.  And as I've said, we're not finished
3 with that yet; and we'll certainly be exploring
4 at least some of that in a motion to compel.  I
5 don't know what specific knowledge each of you
6 had about Drummond's involvement in the payments
7 to the AUC to murder people.  I don't know that
8 yet.  But I do think it's a fair question to ask
9 of what did Drummond know and when did they know
10 it and what did their lawyers know and when did
11 they know it when your two presidents are about
12 to be convicted for financing terrorism and
13 crimes against humanity in Colombia.  I think
14 the government in Colombia is not relying on
15 pure speculation.  They have a lot of evidence,
16 and they're convinced.  I'm convinced too.
17        MR. WELLS:  Mark that one too,
18 please.
19 Q       Have you even attempted to subpoena
20 Drummond's bank records to see if you could
21 develop a paper trail of money that is
22 unexplained or, say, $10,000 transactions by a
23 man you said was regularly flying down with
24 $10,000?
25 A       Object to the form.

Page 289

---

1        And I -- I have some recollection
2 that some years ago some of our team went to
3 look at bank records.  And Drummond performed
4 the classic fill a room with documents and tell
5 people to find a document.  And after exhausting
6 themselves for several days, I believe that the
7 team decided that it was more fruitful to pursue
8 other avenues to gather that information and/or
9 that it was not likely that Drummond made
10 blatant illegal transactions transparent.  For
11 example --
12 Q       Let's stop you there because you
13 haven't even started to answer my question.
14        My question is:  Have you even tried
15 to subpoena, meaning Drummond's lawyers are not
16 in the middle.  They have no control over what
17 the bank turns over to you.
18        Have you tried to do that to see if
19 you could find any documentation that supports
20 these wild allegations you've been making?
21        MR. PAULK:  Object to the form.
22 A       Object to the form.
23        And I do believe I answered the
24 question.  I don't think that Drummond's
25 transactions involving illegal payments are

Page 290

---

1 going to be transparent; nor were they in
2 Chiquita as far as I know.
3 Q       (By Mr. Wells)  So you haven't tried
4 to send a subpoena; you're just assuming they're
5 not transparent?
6 A       We looked at the bank records that
7 Drummond produced.  I guess they're coming from
8 the same bank.  And we would not have had any
9 less difficult a time trying to identify illegal
10 transactions amidst the room full of documents
11 that the bank would produce or Drummond will
12 produce.  I will say, though, that one of the
13 interesting things about Drummond's choice of a
14 head of security down there, Jim Adkins, the CIA
15 guy --
16 Q       I'm going to stop you right there.
17 A       He -- he was found --
18 Q       That's so -- that's ridiculous.
19 A       Oh, it's not ridiculous.
20 Q       No.  No.  That is --
21 A       Chairman Walsh --
22 Q       The question is --
23 A       -- found him to be lying to Congress
24 about --
25 Q       -- not about that.

Page 291

---

1 A       -- those transactions.  And he was
2 in charge of your security down there.
3        MR. WELLS:  All right.  We're
4 shutting down the deposition.  We're going to
5 have the rest of the conversations with Judge
6 Proctor.
7        Can I get printouts of that question
8 and then the one before the last one?
9 A       I'm not refusing to answer your
10 question.
11 Q       You're not answering the question.
12        If there were a judge here, they
13 would tell you to answer the question and --
14 A       All right.  Try me again.
15 Q       -- stop editorializing.
16 A       Try me again.  I want to finish
17 this.
18 Q       Have you sent a subpoena --
19 A       You've got to put your mic on.
20 Q       -- to any of Drummond's banks to try
21 to see if you could determine -- let me start
22 over.
23        Have you sent a subpoena to any of
24 Drummond's banks to see if you could determine
25 whether any of these allegations you're making

Page 292

---

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 73 (289 - 292)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

1 are supported by actual documentary evidence?
2 A          I'm not aware of any subpoena being
3 sent by us, our team, to a bank seeking
4 Drummond's records.
5 Q          And you're aware we have been
6 subpoenaing many third parties in this case;
7 correct?
8 A          I'm aware of some.  Yeah.
9 Q          And we have multiple $10,000
10 withdrawals by you within days of your trips
11 down to Colombia.  Now, you dispute what was
12 done with it, and the bank records won't reflect
13 that.  But we can at least see that you did take
14 out $10,000 right before you went to Colombia.
15          You haven't tried to do that with
16 Drummond?
17 A          I think I at this time have answered
18 your question.  We have not issued any subpoenas
19 to any banks.
20 Q          Now, before Jaime Blanco signed his
21 declaration; you tried to get him in touch with
22 Jim Adkins, didn't you?
23 A          I know because I saw the email at
24 Susana's deposition that there was a discussion
25 that they were going to, or possibly would, meet

Page 293

1 directly; so I can just generally assume that
2 that's how 99 percent of the discussions went, I
3 -- I learned of that from Ivan Otero.
4 Q          And what did he tell you?
5 A          I don't recall.  I can just assume
6 that he said Jaime Blanco wants to speak to Jim
7 Adkins.
8 Q          That's -- that's the best you can
9 do?
10 A          That's the best I can do now.
11          MR. WELLS:  All right.  Let me see
12 tab 62, which is Exhibit 56.
13          (Plaintiff's Exhibit 56 was
14          marked for identification.)
15 Q          So this is October 1st, 2011.  And
16 you are telling Lorraine Leete "Please tell Ivan
17 to stress to" Jaime Blanco "that to even suggest
18 or hint to Adkins that he received funds from
19 anyone, even Albert, will cause us a world of
20 trouble."
21          Why are you instructing that Blanco
22 should not reveal the fact that he received
23 funds from anyone, including Albert?
24          MR. PAULK:  Object to the form.
25 A          Well, to the best I can recall and

Page 295

1 with each other.  And I -- but I don't recall
2 whether it occurred, as you said, that I was
3 trying to get him or -- to -- to facilitate
4 that.
5          MR. WELLS:  Let me show you Exhibit
6 55, which is tab 61.
7          (Plaintiff's Exhibit 55 was
8          marked for identification.)
9 Q          This is an October 24th, 2011, email
10 from you to Jim Adkins' lawyers attaching the
11 Jaime Blanco declaration; correct?
12 A          Yes.
13 Q          And in the second sentence you say,
14 "As you know, I provided Tom and Laina," who are
15 Jim Adkins' lawyers, "with Mr. Blanco's phone
16 number, as he wanted to speak to Mr. Adkins
17 before releasing the declaration.  Mr. Blanco
18 never heard from Mr. Adkins, so he signed the
19 Declaration on October 14."
20          Did I read that correctly?
21 A          Yes.  That's what it says.
22 Q          How did you find out Mr. Blanco
23 wanted to get in touch with Mr. Adkins before he
24 signed his declaration on October 14th?
25 A          Well, he -- he did not contact me

Page 294

1 consistent with how I previously testified; I --
2 at this point in time, we are very concerned
3 about Drummond learning of our relationship with
4 Jaime Blanco in the sense of working with him on
5 his testimony because we were very concerned
6 that Drummond would return to threaten him or
7 offer him bribes.
8 Q          (By Mr. Wells)  Well, this says
9 "cause us a world of trouble."
10 A          It does.
11 Q          It does not say cause Jaime Blanco a
12 world of trouble.
13 A          It would cause both of us a world of
14 trouble if Jaime Blanco received threats and/or
15 bribes.
16 Q          And you don't say in this email
17 Don't suggest that we paid your attorneys' fees.
18 It says, Don't suggest that he, being Jaime
19 Blanco, received funds.
20          That's what it says; right?
21 A          That's what it says.  And everybody
22 in the transaction understood exactly that the
23 funds were used for attorneys.  I didn't have to
24 spell that out every single time.
25 Q          Everybody on this email understood

Page 296

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 74 (293 - 296)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

1 that?
2 A          Well, it's only two people; but they
3 certainly -- no.  Three.  Yeah.  Everyone
4 understood that.
5 Q          Weren't you concerned that if this
6 all came out that Drummond would accuse you of
7 bribery?
8 A          No.  Because I knew it wasn't
9 bribery.
10 Q          Weren't you concerned that if this
11 came out that Drummond would use this to impeach
12 Jaime Blanco's credibility?
13 A          Object to the form.
14          Well, apparently, their -- that
15 discussion was going on; and that's the very
16 issue that Parker Waichman raised, the
17 credibility issue, and I think other people did.
18 So I -- as you previously asked me and I
19 previously explained, I thought that people
20 would understand the need for the -- the legal
21 advice that Jaime Blanco sought that we assisted
22 him with.
23 Q          And you will agree that you were
24 hiding it from Drummond and instructing Jaime
25 Blanco to hide it from Drummond?
Page 297

1 that the money that Blanco was requesting that
2 you were trying to get the firm and then Parker
3 Waichman to pay ultimately did get paid by
4 Albert Van Bilderbeek?
5 A          I don't recall telling them that.
6 No.
7 Q          Did you not want them to know
8 either?
9 A          I don't think I had any concerns
10 about them knowing.  At this point in time, I'm
11 dealing with things that needed to be dealt
12 with.  And that probably was not one.
13 Q          The next paragraph under the ones --
14 one we were just looking at says, "We now have
15 Blanco's financial documents and will work with
16 him directly to prepare a declaration with the
17 documents showing his payments to the AUC for
18 Drummond."
19          Where is that declaration?
20 A          We never did it.
21 Q          So did you look at his financial
22 documents and determine that it could not prove
23 anything that he was saying?
24 A          Object to the form.
25          No.  That -- that's not what it says
Page 299

1 At this point in time, we had not
2 disclosed it for the reasons that I previously
3 testified to.  And I did not want to Drummond to
4 learn of this at this time.
5          MR. WELLS:  Let's go to tab 63,
6 which is Exhibit 57.
7          (Plaintiff's Exhibit 57 was
8          marked for identification.)
9 Q          So you are providing to Bill Scherer
10 and Billy Scherer the signed declaration, or
11 you're tell -- you're telling them that Blanco
12 has completed a draft of his declaration;
13 correct?
14 A          That's what it says.  Yeah.
15 Q          And you say, "the politics of
16 getting this guy to turn were 100% accomplished
17 by Ivan Otero"; correct?
18 A          It does say that.
19 Q          Did you tell any of the people on
20 this email how it was accomplished?
21 A          I -- other than what's written here,
22 I don't recall that we had a further discussion
23 with these people on this email.
24 Q          You didn't tell your managing
25 partner, his son that was one of your partners,
Page 298

1 there.  It says we -- well, my testimony is we
2 did not do it.
3 Q          And my question is:  Why not?
4          If you've got financial documents
5 that you say can show his payments to the AUC
6 for Drummond, why didn't you put something
7 together with actual documentary evidence?
8 A          We had the documents.  I think we
9 used some of the documents.  Ultimately, the JEP
10 provided a forensic accountant.  I believe we
11 could not find --
12 Q          I don't want to hear about something
13 that happened eight years after this email was
14 written.  I'm talking about 2011.
15          What did you do with Jaime Blanco's
16 financial documents?
17 A          We reviewed them.  And I recall
18 asking him some questions about what they meant,
19 and I think he answered that they were documents
20 that hid payments to the AUC for Drummond.  We
21 did not hire a forensic accountant ourselves at
22 that time.  I don't think we could find someone
23 in the time frame that we were dealing with.
24 Q          Where are those financial documents
25 now?
Page 300

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 75 (297 - 300)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

1  A          I think we did produce those.
2  Certainly, we used some of them at the
3  deposition; but I don't -- I don't have specific
4  recall of where they -- they ended up.
5  Q          As of October 2011, you had them in
6  your possession as you said here; or was that
7  untrue?
8  A          If it says we had them as of that
9  day, we must have had them.
10 Q          And did you ever get rid of them or
11 otherwise destroy them?
12 A          No.
13 Q          Were they provided to Conrad &
14 Scherer and put on Conrad & Scherer's document
15 management system?
16 A          That I don't know.  I -- I was
17 working with them at that time.  I would assume
18 that would have happened, but I did not
19 personally deal with what happened to documents
20 that we received.
21 Q          If I wanted to look at those
22 documents and see if they had provided any
23 documentary support for your allegations and
24 Jaime Blanco's allegations, where would I go to
25 look?
                                        Page 301

1  A          Well, as I sit here, I'm not quite
2  sure.  But I -- I have a recollection that we
3  used them at his deposition.  So maybe they are
4  exhibits to that deposition.  Maybe they are
5  somewhere --
6  Q          I'll tell you they are not.
7  A          Well, I --
8  Q          So where else could we look?
9  A          If my recall is that they were, then
10 I'm not necessarily going to take your
11 representation that they were not.  That is my
12 recall.  I'll have to apparently verify that.
13 Q          Do you want to bet on it?
14 A          Not really.  No.
15 Q          I didn't think so.
16            So when you analyzed them, did you
17 make a determination they were not helpful, not
18 corroborating?
19 A          As I said in response to your prior
20 question, no.  What I decided was that we would
21 ask Jaime Blanco about them, and he would
22 explain it.  And I believe that he did so at his
23 deposition.
24 Q          Outside of the deposition, do you
25 think Conrad & Scherer would have possession of
                                        Page 302

1  these documents somewhere?
2  A          Well, you're asking me to speculate.
3  I think it's reasonable to assume that they
4  would have been part of the -- the firm's
5  documents relating to this case.  I have not
6  seen them since this time frame here 2011.
7            MR. WELLS:  Okay.  Let's go to tab
8  64.  Oh, wait.  Not that one.
9            We probably need to take a break
10 now.  This is going to take longer than 15
11 minutes.
12            MR. PRESLEY:  Let's go off the
13 record.
14            THE VIDEOGRAPHER:  The time is
15 5:15 p.m.  We are off the record.
16 (DAY ONE PROCEEDINGS CONCLUDED AT 5:15 P.M.)
17
18
19
20
21
22
23
24
25
                                        Page 303

1
2            C E R T I F I C A T E
3
4  STATE OF ALABAMA )
5  JEFFERSON COUNTY )
6
7            I hereby certify that the above
8  and foregoing deposition was taken down
9  by me in stenotype, and the questions and
10 answers thereto were reduced to computer
11 print under my supervision, and that the
12 foregoing represents a true and correct
13 transcript of the deposition given by
14 said witness upon said hearing.
15
16            I further certify that I am
17 neither of counsel nor of kin to the
18 parties to the action, nor am I in
19 anywise interested in the result of said
20 cause.
21
22
23
24            /s/Merit Gilley
             Merit Gilley, Commissioner
25            ACCR NO. 67
                                        Page 304

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 76 (301 - 304)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

## WORD INDEX

**< $ >**
**$1.5**    242:13    244:8, 19    245:12    246:17
**$10,000**    17:3    19:10, 18, 20    20:1    37:17, 22    65:15    275:2, 4, 11, 14, 25    276:10    289:22, 24    293:9, 14
**$100**    265:10
**$100,000**    28:25    44:17    63:13    141:20    149:11    208:21
**$150,000**    26:25    27:16, 24    172:25    178:20    201:16    256:19
**$150/hour**    228:2
**$2**    143:4
**$2,700**    78:9
**$2200**    112:25    113:5    114:9
**$25,000**    223:14    225:14    228:3, 18    231:6    232:4    233:4    234:2, 15, 20    235:4, 10    237:2    274:23
**$2700**    78:13
**$35,000**    42:13    101:22    276:17
**$40**    265:10
**$5,400**    78:7    135:3
**$50**    239:7
**$50,000**    230:2    254:15, 20, 21    255:1
**$60,000**    102:5, 7    108:15, 17    253:12, 16    274:14
**$750,000**    246:23    248:2, 9    249:18    250:2

251:5, 6    258:3    259:14, 19
**$80,000**    158:6    235:19    263:12

**< 1 >**
**1**    5:10    15:4, 7    89:18    92:3
**1.5**    245:15    246:8
**1:07**    165:18
**1:10**    165:14
**1:52**    165:21
**10**    6:3, 10    72:12, 13    84:16    133:3    265:11
**10,000**    15:24    63:10    276:24
**10:21**    70:8
**10:35**    70:11
**10:58**    85:7
**100**    3:11    23:11    42:21    52:3    63:6    125:17    126:3    152:15    193:4    211:9    247:15    298:16
**100,000**    63:10    183:16, 17
**1000**    106:14
**1001**    3:22
**10-1-11**    9:22
**10-15-11**    9:24
**10-2-13**    6:19    7:1
**10-24-11**    9:20
**10-3-13**    7:3
**11**    5:4    6:5, 12    41:8    76:13, 14    89:9
**11:42**    114:15
**11:52**    114:18
**1-13**    130:10
**1-13-11**    5:18
**114**    6:23
**11-8-13**    7:5
**1-19-11**    5:20
**11th**    165:1
**12**    6:7, 14    41:8    80:13, 14

86:3    89:8    91:14    109:2    229:19
**121**    7:1
**122**    7:3
**12-20-13**    7:8
**125**    7:5    27:2
**127**    86:3, 23    87:5
**128**    7:7
**129**    7:8
**13**    6:9    51:11    81:5, 6    171:14
**134**    7:10
**136**    7:12
**13th**    182:23
**14**    6:10    84:17, 25    133:4, 6    283:17    294:19
**149**    9:17    271:1
**14th**    133:17    294:24
**15**    5:10    6:12, 16    53:4    89:10, 11    91:19    92:6    281:12    303:10
**150**    27:2
**150,000**    100:23    172:14, 16
**152**    7:14
**155**    7:16
**15th**    17:2
**16**    6:14, 17    91:15, 16    92:8    93:7    94:8    95:23    281:12
**160**    7:19
**165**    7:22    8:1
**17**    6:16    92:10, 21
**170**    8:3
**171**    8:5
**1729**    1:23    10:10
**176**    7:14    152:7
**177**    8:7
**18**    6:17    86:23    93:8, 9
**1800**    106:13
**182**    8:9    108:25
**183**    134:24

**187**    5:10    15:3, 9
**189**    283:14
**19**    6:19    96:11, 14    107:25    118:14, 15
**193**    111:22
**194**    111:22    112:6
**198**    8:11
**1996**    150:11
**19th**    85:15, 16, 19    86:13    88:7, 12    135:3
**1st**    51:18    53:5    295:15

**< 2 >**
**2**    5:12    6:1    22:13, 14    71:8    89:19
**2:11-CV-3695-RDP**    10:21
**20**    6:21, 23    41:9    97:14, 21    114:22    118:10    221:19
**2000**    133:22
**20001**    3:24
**2001**    20:24
**2001-ish**    45:22
**2002**    38:11, 14    45:22
**2006**    150:11
**2009**    15:11    20:18
**201**    8:13
**2010**    20:18    41:8
**2011**    22:18    41:8, 11    51:1    56:13    72:15    77:6, 23    133:22    135:3    166:2    170:14, 22, 24    171:19, 25    172:3    178:18    182:23    198:13, 23    201:23    205:20    206:7    209:19    213:23    216:14

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 1

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

223:1   241:2, 3,
14   260:3
270:3   274:13,
22   294:9
295:15   300:14
301:5   303:6
**2012**   31:24
41:12   42:10
86:10   88:1
112:8   113:1
145:4   274:25
276:16, 17
**2013**   6:16
58:23   63:6, 14,
22   76:18
79:11, 13, 15,
17   80:18
82:19, 24   83:8
85:15, 16, 19
86:14   87:16,
20, 24   88:1, 8,
12, 14, 16, 17
89:1, 8, 13
91:22   92:13,
23   94:9   96:15
114:25   121:15
122:16   125:8
130:4   131:8
132:1
**2014**   63:25
64:1   133:17
134:3, 7, 12, 20
135:18   136:12,
14, 18   153:23
155:6   156:2, 8
160:9   161:5
165:1
**2015**   37:6
40:4   64:20, 24
65:4, 16   66:12
69:15, 23   70:3
80:6
**2019**   37:3
**2024**   1:25
10:8, 22
**205**   3:13   4:9
8:15
**209**   8:17
**20th**   1:24   4:7
10:7, 22
**21**   6:19, 23
96:10, 13

114:19, 23
118:12, 14
**213**   8:19
**216**   8:21
**21st**   64:1
**22**   5:12   7:1
121:4, 5, 6
**222**   8:23
**227**   9:1
**229**   9:3
**22nd**   77:6, 23
133:22   171:25
**23**   7:3   122:11,
12, 13
**24**   7:5   51:20
125:3, 4, 5
126:13   127:1
**2400**   112:11
**241**   9:5
**249**   9:7
**24th**   294:9
**25**   7:7   8:23
128:19, 20, 21
228:15   233:19,
22   263:16, 17,
18   265:11
**25,000**   223:6,
23   227:18, 20
228:23   229:20,
21   230:9
232:8   233:12
**250,000**   224:8
**252**   9:9
**253**   5:12   22:12
**257**   5:14   31:20
**258**   5:16   42:6
**259**   9:11
**25K**   231:20
232:14   233:10
**25th**   94:8
**26**   7:8   129:23,
24, 25
**260**   5:18   50:22
**261**   5:20   52:20
**262**   5:22
57:24   58:21
**263**   5:24   62:14
**265**   6:21   9:13
96:10   97:14
**269**   9:15
**26th**   53:2

**27**   7:10   87:5
133:22   134:9,
10
**2700**   112:22
**271**   9:17
**2-7-11**   8:1
**27th**   112:8
**28**   7:12   136:6,
7, 8, 9
**281**   9:18
**28th**   178:17
**29**   7:14, 16
107:25   135:2
152:7, 8   155:2
**294**   9:20
**295**   9:22
**297**   8:9   182:18
**298**   9:18, 24
280:24
**29th**   79:17
80:17
**2nd**   96:15
121:14   136:11,
18

**< 3 >**
**3**   5:14   31:21,
22   229:22
230:10
**3:36**   240:18
**3:44**   240:21
**30**   7:16, 19
155:3, 4   160:4
**30th**   15:11
114:25
**31**   5:14   7:19
160:5, 6
**3-14-14**   7:14
**3-17-11**   6:3
**31st**   134:12
**32**   7:22   164:1,
23   165:2
**3-28-11**   8:3
**33**   8:1   165:23,
24   262:3, 8
**3-31-14**   7:10
**34**   8:3   170:8,
9, 12
**35**   8:3, 5
101:24   170:5
171:21, 22

**35,000**   42:17
**3-5-13**   5:22
**35203**   1:24
4:8   10:11
**35209**   3:12
**36**   8:5, 7
171:20   177:18
178:17
**37**   8:7, 9
177:17   182:19,
20
**38**   8:11   35:14
160:1   170:5
198:10, 13
**39**   8:11, 13
196:25   201:20,
21
**3rd**   53:3
122:16

**< 4 >**
**4**   5:16   42:7,
8   112:10
**4:27**   270:22
**4:33**   270:25
**40**   8:15
205:16, 18
262:4, 8, 19, 21
263:19
**41**   8:13, 17
201:19   209:15,
16
**4-13-11**   8:9
**42**   5:16   8:19
213:19, 20
218:15
**4-2-14**   7:12
**43**   8:15, 21
204:11   216:10,
11
**44**   8:23
222:22, 23
**45**   8:17   9:1
103:13   209:14
227:8, 9   254:13
**46**   8:19   9:3
213:18   229:10,
11   240:23
**47**   9:5   241:9,
12
**4-7-14**   7:16, 19,

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 2

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

*22*

**4-7-15**   *6:1*

**48**   *8:21   9:7*
*216:10   249:7, 8*
**486**   *99:15*
**49**   *8:23   9:9*
*221:16   252:1, 2*
**492**   *100:18*
**494**   *101:18*

**< 5 >**

**5**   *5:18   6:3*
*50:23, 24   72:11*
**5:15**   *303:15, 16*
**50**   *5:18   9:1,*
*11   183:16*
*227:5   254:9*
*255:5, 8*
*259:24, 25*
**502**   *103:11*
**503**   *106:9*
**505**   *4:7*
**51**   *9:3, 13*
*229:9   265:15,*
*16*
**510**   *107:23*
**52**   *5:20   9:5,*
*15   106:11*
*241:4   269:16,*
*17*
**522**   *108:23*
**5-22-11**   *8:5*
**525**   *111:20*
**5-28-11**   *8:7*
**53**   *9:7, 17*
*248:17   271:2, 3*
**54**   *9:9, 18*
*251:25   281:8,*
*10*
**55**   *9:11, 20*
*259:23   294:6, 7*
**56**   *9:13, 22*
*265:14   295:12,*
*13*
**57**   *9:24   298:6,*
*7*
**58**   *5:22   9:15*
*269:15*
**5th**   *1:23   10:10*

**< 6 >**

**6**   *5:20   6:5*
*52:21, 22   76:12*
**60**   *254:9   255:4*
**60,000**   *108:20*
*229:18   253:18,*
*21*
**60-some**   *99:12*
**61**   *9:20   294:6*
**62**   *5:24   9:22*
*295:12*
**6-21-12**   *5:14*
**63**   *9:24   298:5*
**64**   *303:8*
**67**   *100:20*
*304:25*
**689**   *77:18, 21*
**6th**   *201:23*

**< 7 >**

**7**   *5:22   6:7*
*58:18, 21   80:12*
**7:08**   *64:1*
**70-194-176-13**
*7:17, 20, 23*
**71**   *6:1*
**7-1-11**   *8:11*
**7-19-12**   *5:16*
**72**   *6:3*
**7-22-11**   *8:15*
**750**   *245:16, 17,*
*18, 19   246:20*
*247:18*
**76**   *6:5*
**7-6-11**   *8:13*
**7th**   *3:11*
*86:10   155:6*
*160:9   166:2*

**< 8 >**

**8**   *5:24   62:18,*
*20   119:6*
**80**   *6:7*
**800**   *3:23*
*106:13*
**81**   *6:9*
**8-18-09**   *5:10*
**82**   *101:20*
**8-25-11**   *8:17*
**8-29-13**   *6:5, 7*
**83**   *102:3*
**84**   *6:10*

**868-6000**   *3:13*
**89**   *6:12*
**8th**   *1:22   10:9*
*82:24   83:8*
*125:7, 8   209:22*

**< 9 >**

**9**   *6:1, 9   71:8,*
*9   81:4*
**9:01**   *2:1*
*10:11, 23*
**9:12**   *19:7*
**91**   *6:14*
**9-11-11**   *9:15*
**92**   *6:16*
**9-2-11**   *5:12*
*8:19, 23*
**9-23-13**   *6:12*
**9-25-13**   *6:14, 21*
**927**   *216:21, 22*
**9-27-13**   *6:17*
**93**   *6:17   108:15*
**9-30-13**   *6:23*
**96**   *6:19*
**9600**   *112:11*
**97**   *6:21*
**9-8-11**   *8:21*
*9:1, 13*
**986-3620**   *4:9*
**99**   *295:2*
**99.99**   *125:15, 25*
**9-9-11**   *9:3, 5,*
*7, 9, 11*
**995**   *155:15*
**9th**   *229:13*
*241:2, 3, 14*
*260:3*

**< A >**

**a.m**   *2:1   10:11,*
*23   70:8, 11*
*85:7   114:15, 18*
**AB**   *253:11*
*254:14*
**abbreviating**
*164:14*
**abbreviations**
*13:12*
**ability**   *122:8*
*177:14   211:7*
**able**   *29:24*
*53:7   67:22*

**99:2**   *104:6*
*106:1   142:4*
*175:22   176:8,*
*22   193:19*
*203:11   218:7,*
*24   256:20*
*276:12   278:23*
**absent**   *176:1*
**Absolutely**
*31:19   103:4*
*120:6   150:4*
*155:1   157:9*
*176:13   195:12*
*259:1   286:5*
**accept**   *195:24*
**access**   *74:12*
*229:6   238:22*
*239:14   240:1*
**accessible**   *78:23*
**accomplice**
*29:18, 19*
**accomplished**
*250:4   298:16,*
*20*
**according**   *112:7*
*142:23   143:6*
*151:15   164:8*
*181:15   285:2*
**account**   *31:6*
*103:16   108:16*
*179:7   247:18,*
*21, 25   253:13,*
*14   276:18*
*286:15*
**accountable**
*70:25*
**accountant**
*300:10, 21*
**accounting**   *228:9*
**accounts**   *78:23*
*148:9   221:9*
**ACCR**   *304:25*
**accurate**   *72:2,*
*10   83:6   96:4*
*122:25   123:14*
*124:4   130:21*
*131:5   228:9,*
*16   231:13, 14*
*234:5   237:10*
*265:4, 7, 8*
*272:16   274:20*

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 3

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

**accurately**
183:18    263:24
**accusations**
158:21    288:20
**accuse**    297:6
**accused**    159:2
182:3    193:13
195:21
**accusing**    157:5,
16    282:6
288:21
**acknowledge**
123:16, 20
217:6    284:11
**acknowledged**
124:8
**act**    49:13
**acting**    10:3
**action**    140:20
304:18
**actions**    149:1
**active**    38:10
**actively**    37:5
40:3
**activists**    41:25
**actual**    53:15
87:11    95:9
184:20    196:6
231:22    254:6
264:6    286:20
293:1    300:7
**add**    227:13
228:5, 10
**addition**    36:8
78:17
**additional**
54:20    206:21
207:25    255:12
**address**    195:16
**addressed**    214:14
**adhered**    74:9
**adjournment**
18:22
**adjust**    100:25
**Adkins**    9:22
37:17, 22    39:9,
11, 14    291:14
293:22    294:10,
15, 16, 18, 23
295:7, 18
**admit**    141:16

**278**:1
**admitted**    273:22
**advice**    204:13
205:24    297:21
**advising**    223:8
224:25
**advocates**    262:15
**advocating**
175:19    177:2,
6    178:20
**affiliated**    57:3
75:6    226:12
**affirmatively**
146:8
**affirmed**    280:1
**afraid**    143:6
282:20
**agency**    288:14
**Agenda**    6:12
**agent**    39:14
**agents**    285:24
**aggressive**    147:2
**ago**    51:11
52:8    67:25
103:1    115:4
119:12    128:18
151:23, 25
161:3    171:14
176:3    180:15
191:16    254:18
290:2
**agree**    16:7
36:21    65:2
70:13, 16
74:15, 17, 18,
22    90:5
109:17, 22
113:9    115:16
129:15    161:22
167:25    183:24
187:16, 18
189:5    191:5,
11    193:15
225:19    236:14
253:19    254:1
255:9    265:3
297:23
**AGREED**    1:16
2:3, 11    20:3
61:4    83:19
169:1    180:3

**199**:11    213:15
245:9    277:17
**agreeing**    187:24,
25    249:18
**Agreement**    6:13
9:5, 7, 9, 11,
13, 16    20:12
21:19    36:25
91:23    92:14,
16, 24, 25    98:7
131:21, 22
132:8, 9, 16, 17
152:14, 16
153:3, 9, 13, 17,
18, 23    154:1, 3,
5, 8, 10    180:2
200:20    235:18
236:2, 10, 17,
18    241:15
243:3, 5, 9, 11
244:8, 13, 16,
24    245:7
246:5    247:1,
12, 13    248:10
249:11, 20, 22
250:1, 16, 20
251:1    252:5, 8,
10, 11    257:10
258:20, 23
260:2, 20
261:19    262:2,
6    263:5, 7, 8,
10, 15    265:13,
18    274:16
287:21
**Agreements**    9:15
92:18    93:5
132:7, 12
245:1, 5, 9
254:7, 8
257:14, 17, 22,
25    260:23
261:18    262:14
263:4, 13
269:20, 25
**agrees**    159:24
**air**    264:24
**Akkermans**
265:19, 20
266:1, 19, 21
267:8

**al**    1:9    9:20,
21    10:20
32:12, 13
**ALABAMA**    1:2, 24
3:12    4:8
10:2, 3, 10, 18
64:1    284:4
304:4
**Albarracin**
190:21
**Albert**    9:7, 9
13:13    23:13,
20    24:14, 23
25:6    31:7
32:14    34:5
42:11, 19    51:2,
8    52:16, 25
53:19, 20    54:1,
8    56:20, 25
57:8, 12, 14, 15,
25    59:19
61:13    65:15
92:15    93:1, 6
99:18    101:21
102:4    131:21
139:1    188:3
197:9    198:19,
24    199:5, 11
200:1, 7, 8, 11,
17    210:6, 12
214:12, 13, 18
217:11, 16
222:10    223:2,
13    228:19
229:17    232:21
233:18, 21
240:25    242:19
243:1, 17, 21
244:16, 25
245:8, 16
246:9, 20
247:11    249:12,
14, 18    250:2
251:2, 14, 17,
20    252:6, 18
253:21    254:8,
11    256:1, 10,
18    257:13, 20
258:18    259:8,
19    260:17
261:1, 11
265:23    266:11

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 4

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

274:16    275:9
276:18    285:15
286:8    295:19,
23    299:4
**Albert's**    14:2
52:7    256:8
**ALEX**    4:4
**Alfredo**    167:2
**alias**    167:10
190:21
**alive**    67:9
**allegation**
37:19    41:14
**allegations**
39:2    207:8
290:20    292:25
301:23, 24
**alleged**    37:16
150:6
**alleging**    126:19
192:1
**allow**    140:23
180:4    181:11
**allowed**    31:1
75:5
**alluded**    157:12
**Alonso**    73:13
**alter**    212:10
**altogether**
154:10
**ambiguous**    226:8
**amidst**    291:10
**amount**    27:17
60:19    112:25
225:9    234:7
235:10, 11
236:20
**amounts**    27:21
60:24    112:1
193:23
**Amsterdam**    23:12
58:8
**analysis**    84:7
206:17
**analyze**    64:7
83:21
**analyzed**    302:16
**analyzing**    84:22
**and/or**    69:24
90:19    102:8
108:4    173:4
222:19    249:3

259:7    290:8
296:14
**Andrews**    4:16
11:7
**anger**    44:25
**ANNA**    3:8
**announced**    143:21
**answer**    13:7
18:17    28:11
38:5    40:19
59:15    65:23
100:9    102:15,
17    105:4
109:14, 23
120:11    130:23
140:16    149:18
159:16, 17
160:3    169:15
184:21    190:18
202:20, 22, 25
206:20    209:10
214:24    224:4
243:8    282:24
283:7, 20
290:13    292:9,
13
**answered**    18:20
62:4    105:3
113:6    155:19
160:21    186:18
203:16    281:17
290:23    293:17
300:19
**answering**
142:20    204:21
206:18    285:10
292:11
**answers**    35:22
101:8    304:10
**antagonistic**
55:10
**ante**    219:18
220:6
**ANTHONY**    3:7
**anticipated**
236:21
**anybody**    29:5
78:21    140:11
179:11    214:20
247:4    262:24
**anymore**    254:10
286:25

**anyway**    177:3
208:12    211:3
**anyways**    203:7
**anywise**    304:19
**apparent**    90:2
**apparently**
36:21    108:14
115:9    154:18
159:24    161:19
167:16    266:4,
8    271:11
297:14    302:12
**appealed**    279:25
280:3
**appear**    129:21
134:13    175:15
**appeared**    175:9
**appearing**    30:19
226:5
**appears**    91:25
94:13    134:1,
16    161:1
250:3    271:6
**appellate**    279:25
**applicable**
250:19
**applied**    263:25
**applying**    143:21
**appointment**
75:15
**approaching**
165:14    198:24
**appropriate**
84:13    139:8
**Approval**    6:3
**approve**    164:3
**approximately**
1:25    10:11
254:13
**April**    63:25
136:11, 14, 18
145:4    155:6
156:2    160:9
161:5    182:23
198:23    274:25
**Araujo**    167:2
**arbitration**
156:6    162:2, 6,
10
**argue**    71:2
**arguments**    207:14

**arising**    198:7
**arms**    151:2
**arrange**    30:9
**arranged**    65:19
138:25    141:19
188:15    283:10
**arrangement**
21:16    36:22
42:24    83:22
90:19    101:25
102:11    108:4,
18, 21    116:14
155:20    160:22
161:7, 14
164:7    200:9,
22    201:2
209:1    215:3,
10, 15    218:11
224:18    228:19
231:10    233:13
234:21, 23
241:22    242:9,
22    243:13, 22
244:1    245:1
246:21    253:16,
22    255:11
256:12, 23
258:12, 17
259:18, 21
263:21    270:8
**arrangements**
89:6    135:3, 5
251:24    258:3
**arrive**    64:22
200:5
**arrived**    220:3
**articles**    46:6
**asap**    137:6
170:17
**asherman@starnesla
w.com**    3:17
**aside**    88:3
121:12    195:23
276:24
**asked**    18:19
26:24    27:20
28:7    45:24
54:19    98:11
105:18    109:16
122:1    132:17
142:16    146:18
161:18    164:12

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 5

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

172:1    179:5
184:9    197:1
202:11    204:7
207:3    209:8
212:9    233:5
256:17    281:13,
25    282:22
284:24    297:18
asking    29:22
47:17    52:13
56:15    58:4
63:6    64:6, 8,
20    67:14, 15
82:15, 24
107:18    134:19
136:16, 19
144:24    176:10
177:23    186:7
206:25    211:24
212:22    216:23
219:6    230:17
237:2    242:5
245:22    266:6
269:20    278:1
283:17    284:8
285:4    288:20
300:18    303:2
asks    82:9
103:17
aspanos@spotswood.
com    4:12
aspects    93:19
assassins    193:24
assert    99:25
assertion    89:7
158:25
assess    171:17
assholes    160:16
assign    2:16
assigned    267:14
assist    260:7
assistance
62:12    112:7
113:11    114:2
138:17, 18, 19
158:23    164:17
174:3    206:21
212:2    213:10
272:2, 20
273:4, 6    277:6,
21    278:16, 24

283:22    284:20
assisted    297:21
associate    242:18
associated
72:20    84:22
86:8, 16
association
84:12
assume    26:17
87:4    100:4
166:12    168:21
171:8    173:13
202:3, 4    280:2
295:1, 5
301:17    303:3
assuming    49:6
63:9    130:21
165:10    291:4
assumption    42:20
assurance    279:1,
9
assured    257:13
259:8    260:17
278:22
A-team    6:17
attach    79:21
92:24
Attached    6:13
73:5    79:18
80:4    85:14
92:17    93:5
126:13    127:1
136:17    153:2
155:14    156:1
208:25    209:2
attaching    79:16
80:24    96:16
115:1    121:16
125:10    126:4
134:13    136:13
153:9, 16
155:8    294:10
attachment
76:24    91:21
attachments
81:2    155:15
attempt    17:22
21:23
attempted    289:19
attempting    22:6
25:19    132:24

220:2
attempts    44:23
attend    61:21
180:23    181:16
196:20
attended    166:16
attention    243:7
251:23
Attorney    3:20
91:23    92:24
98:7    129:10
149:4    151:20,
25    152:13, 16
164:16    178:22
180:4    220:23
258:17    268:3
attorney-client
217:4
Attorneys    3:9
4:5    10:25
176:22    180:25
200:21    203:25
204:1, 2    224:4
231:21    242:1
253:22    296:17,
23
AUC    19:18
20:20, 23    21:7
36:25    40:5
82:13, 20    83:3
147:18    150:5
158:5    159:3
173:19    182:5
193:2    273:11
282:7, 16
287:17    289:7
299:17    300:5,
20
AUC's    17:1, 5
21:13
August    17:1
76:18    79:11,
13, 15, 17
80:17    209:19,
22
Author    85:16
279:21
authorities
40:12    158:4
authority
131:18    207:15,
18

Authorizacion
8:17
authorized
148:2    195:8
230:21
authorizing
195:11
available    51:18
192:24    223:4
287:3
Avenue    1:23
10:10
avenues    290:8
aware    12:15
20:8    28:4
33:1    42:22
50:4, 9, 18
56:3    61:19, 22
70:1, 4    78:22
79:1, 4    83:11
84:8, 9    96:25
97:2, 4    102:6,
9    112:16
114:5    150:13
156:24    157:3
196:5    197:21
200:11, 25
214:20    226:19
238:11    251:11
281:20    288:6
293:2, 5, 8

< B >
BA    261:17
back    19:5
28:1    49:23
68:18    70:11
75:11    77:20
79:25    85:7
91:18    92:17
114:18    133:5
134:25    147:18
165:21    170:6
178:6    204:8
213:25    214:21
218:15    230:13
233:22    236:25
240:21    245:16
246:4, 6, 14, 24
247:5, 7, 8
248:12    251:13,
15    254:10

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 6

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

256:25    269:20
270:25    278:13
285:12
**backing**    36:20
**bad**    210:23
**balance**    178:15
**Balcero**    9:18
41:13    63:17
81:21    142:11
168:3    175:7
181:20, 21
184:5, 15
185:11    188:8,
25    189:12
190:12, 23
215:18    216:19
218:4    235:16
264:13    274:25
281:9
**Baloco**    63:17
81:21
**Bam**    167:6, 10
**bang**    286:15
**bank**    37:21
38:6    39:1, 6,
10, 15    40:10
78:23    103:16
220:8    245:20
247:18, 21
253:13, 14
287:11, 24
288:8    289:20
290:3, 17
291:6, 8, 11
293:3, 12
**banking**    103:17
276:3
**banks**    38:22
287:25    288:4,
15    292:20, 24
293:19
**bar**    84:11, 12
201:1    204:13
**based**    40:9
55:15    98:22
102:19    104:22
207:8    217:9
231:6    252:17
254:6    263:10
**basic**    239:12
**basically**    44:8
85:13    150:8

217:3    221:23
252:7    267:20
269:19    280:8
**basis**    121:1
193:9    234:9
288:13
**Bates**    77:18
99:8, 14
100:17    106:9
134:24    155:15
157:13    158:9,
14    160:11
216:21
**Batesed**    85:3
**bear**    113:3
148:16    276:23
**becoming**    46:14
**began**    199:4, 12
**beginning**    42:11
77:21    122:2
172:7
**behalf**    47:4
82:11    140:19
147:22    164:24
198:1    224:22,
23    225:2
250:15    253:11,
25
**behave**    35:20
**belief**    187:9,
13    195:7
211:13
**believe**    17:6
26:10    29:11
40:12    45:24
47:20    49:21
56:24    57:22
63:18    72:1, 9
91:4    99:3, 20,
24    100:12
101:23    106:1
110:18    137:2
142:4    149:20
157:15    168:6,
23    172:21
179:19    206:3
211:20, 22, 25
214:10    215:4
217:18    237:14
259:22    262:1
263:16    265:22
270:16    280:9

283:22    290:6,
23    300:10
302:22
**believed**    42:3
45:8    126:21
211:15    279:3
**bell**    13:23
**Ben**    11:4
**benefit**    44:17
61:14    66:3
75:1    76:6
87:17    88:10
89:3, 5    135:21
140:3, 9, 20
184:17    190:10
191:7, 14, 19
235:11    237:8
284:21
**benefits**    282:23
283:5
**BENJAMIN**    3:6
**Bernal**    22:21
25:14, 18
27:22    28:10
50:14    142:8
143:3    146:13
148:24    151:21
152:3    218:17,
21    220:22
221:9, 14
**Bernal's**    149:5
**best**    49:16, 22
51:22    52:4
56:24    57:6
90:25    100:1
264:22    295:8,
10, 25
**bet**    27:23
302:13
**better**    28:23
86:5    147:19
214:1, 16
**beyond**    61:23
165:12    172:5
268:15
**big**    88:1
149:12    285:25
**Biggest**    89:18
**Bilderbeek**    9:7,
9    13:14    23:9,
15    25:6    31:7
42:12, 23    51:2,

16    52:24    54:2
55:9    57:9, 25
58:24    59:1
60:9, 13    61:13
62:22    64:21
65:16    93:1
99:18    131:21
139:1    153:17
197:10    198:19,
24    199:19
200:7, 9
210:12    214:18
217:16    223:13
228:20    243:2
244:6, 17
246:10    249:12,
15, 18    250:2, 7,
12    251:2
252:6    256:1,
18    261:1
266:12, 13
274:17    285:16
286:8    299:4
**Bilderbeeks**
23:18    24:12,
14    25:23
216:25
**Bilderbeek's**
188:4    242:19
244:4    253:9
276:18
**Bill**    125:8
179:9, 23
183:4    204:21
283:16    298:9
**billion**    264:11
**bills**    246:1
**Bill's**    180:5
**Billy**    125:9
179:8, 16, 21
298:10
**binding**    263:14
**Birmingham**    1:24
3:12    4:8
10:2, 10
**bit**    39:7    97:1
118:5    130:8
196:21    199:16
**bizarre**    229:16,
24    231:12, 18
235:5    237:12
240:25    241:20

1-888-326-0504  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 7

Case 2:11-cv-03695-RDP   Document 783-1   Filed 03/06/24   Page 86 of 259

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

243:18, 19
256:23   257:14,
17, 25   258:12
**Black**   1:22
10:8   94:15
**blah**   218:19
**Blake**   4:16
11:7
**Blanco**   9:18, 24
12:18   22:19,
20   25:5, 13, 20
26:12, 23   27:8,
23   28:17   29:1
30:11   31:12
36:16   37:2, 9
39:5   41:1
42:15, 25
43:25   44:18,
19   54:1, 9, 16
90:19   101:25
102:8   107:13
108:4, 6, 8, 18,
22   110:17
120:21   123:9,
19   124:2
127:6, 15
130:18   138:23
140:2, 9
142:12, 24
144:24   146:2
155:17   156:25
157:4, 16
160:19   161:12
164:8   165:7
167:7, 14
169:9, 11, 21,
24   170:19, 23,
24   171:6, 7, 12,
16   172:1, 3, 20,
25   173:10
174:13, 15, 21
175:1   176:15
177:20   179:18
181:6   184:15
185:12   186:3,
9, 21   188:7, 20
192:3   194:1,
11   197:16, 18
198:15   200:19,
24   201:25
202:5, 15, 20
203:22   206:2

209:20, 25
210:8   213:3
214:1, 17, 24
215:2, 5, 24
216:3, 16
218:5, 12, 21
219:24   220:3,
10, 14, 17
221:2, 15, 22
222:2, 3, 17, 20
223:9, 10
224:18, 22, 23
225:1, 2, 11
226:7   228:19
230:1, 7
231:10   232:5,
19   233:5, 13,
18   234:8, 20,
23   236:19
241:22   242:9
253:17, 23
255:2, 11, 19
256:13, 19
258:13, 17
259:7, 21
271:12, 18
272:8   273:8,
24   274:13
276:15   278:13
279:2, 16
280:13, 17, 25
281:13   283:10,
17   286:9
293:20   294:11,
17, 22   295:6,
17, 21   296:4,
11, 14, 19
297:21, 25
298:11   299:1
302:21
**Blanco's**   26:3
31:17   37:14
40:7   41:19
43:15   117:12
137:22   140:14
145:22   146:11
156:9   169:16
178:21   179:24
183:10, 12
184:4   188:14
197:2   199:1,
20   208:21

210:13   217:14,
17   219:7, 15
223:16   224:4
225:16, 20, 25
226:15, 22
229:1   231:21
233:11   241:25
274:23   275:7,
12   281:9
294:15   297:12
299:15   300:15
301:24
**blatant**   290:10
**board**   198:15
251:20, 21
265:23   286:23
287:14
**Bob**   15:25
105:15
**Bocanegra**   8:13
26:10   29:13
142:7
**Bogota**   48:10
151:4   203:22
**Bonner**   81:12
**bookish**   52:5
**books**   13:21
14:1, 6   51:9,
18, 19   53:5, 8,
16, 20   56:14
60:11, 17
62:24   63:3
64:3, 12, 21
65:7   100:23
**bookshop**   51:17
**born**   58:5, 15
**bother**   28:3
**bottom**   58:25
59:7   64:19
92:15   170:16
183:20   205:19
209:18, 19
269:23
**bouncing**   65:11
**bpresley@starnesla**
**w.com**   3:15
**Brad**   6:12
81:9, 11, 13
96:14   114:25
115:11, 13
116:18, 25
117:8, 19

118:19   125:13,
17   126:8, 21
139:7, 12
152:15   153:14
**brand**   206:10
**break**   19:3
62:15   70:6
114:13   165:15
227:6   240:16
270:20   303:9
**breaks**   112:12
**bribe**   25:20
27:23   44:19
143:3   167:7,
15   169:9, 21
170:23   171:6,
13   219:2
220:2, 9   221:11
**bribed**   167:16
238:6
**bribery**   50:11,
19   137:24
184:2   185:3
186:11   239:18
297:7, 9
**bribes**   218:22
219:13, 19
296:7, 15
**bribing**   221:5
**brief**   12:3
125:10, 17
126:4, 12, 14
127:1, 2, 8, 16
128:1   157:9
158:1, 12, 18
159:9
**briefs**   71:2
88:18   116:19
126:7, 15
158:19
**bring**   17:2
33:10   239:5
**bringing**   17:11
26:12
**broke**   240:23
255:4
**Brookwood**   3:11
**brother**   13:16
55:20   56:2
57:18
**brothers**   13:17
22:20, 23   23:5,

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 8

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

9, 15, 17, 21, 25
24:3, 12, 17, 23
25:1, 13, 23
108:2, 13
209:21   214:2,
6, 10   216:16
221:23
brought   50:13
175:18   200:3
239:1, 15
bunch   36:16
160:16
business   248:22,
23   251:19
269:9
businessman
242:17
buy   229:22
230:10   231:11,
17   235:4   237:7
BV   9:5   241:16
242:14   243:14
244:16, 19
245:3   246:3, 6,
17, 23   247:4
248:18   249:3
251:12   270:5
Byrd   4:18

< C >
C&S   7:17, 20,
23   8:15
calculated
193:22   264:4
call   13:17
39:22   67:25
107:1   113:16
151:10   162:18
191:19   213:24,
25   214:21
238:17   269:6,
13   279:21
called   76:24
77:15   85:12
86:9   95:21
155:8   205:8
241:16
calling   13:16
72:2, 9   233:12
calls   93:25
95:11   106:22
131:11   263:1

cancel   145:17
180:8
Canoso   190:21
capacity   106:3
capital   177:11
capped   194:20
card   65:11
269:8, 14
care   122:22
251:22
careful   122:25
124:12, 18
147:4
Carlos   15:23
Carlson   72:16,
19
Carrera   72:17,
19
carry   16:1
CASE   1:7   7:17,
20, 23   10:20
12:25   13:10
15:22   20:9
29:9, 23   31:3
38:13   41:13
48:18   50:13
55:4   56:16
64:6   66:1
70:18, 19, 20,
21   75:20   78:1
81:11   82:6
85:10   88:19
89:22   94:2
96:17   98:24
110:10   115:1
120:5   125:16
126:1, 9
134:15   142:11
143:8   144:15,
22   147:8
155:18   156:17
158:17   159:5
160:20   164:25
177:11   180:23
181:9, 20, 22
183:25   185:11
195:25   196:10
205:21   214:11
215:18   217:5
225:18   235:14,
16   236:5
244:6, 10, 11,

14   249:4
257:15   259:10,
17, 22   261:15,
23   262:12
263:6   264:13,
18   265:9
269:3   273:22
283:11, 20
284:25   285:3,
17, 22   287:1
293:6   303:5
cases   13:1
15:20   30:20
32:19   37:5
38:15   45:17
54:2, 11   56:5,
11   57:2   63:17
64:25   81:21,
23   82:1   83:13,
21   93:20
111:9   112:18
113:22   116:23
127:4   131:19
147:22   162:19
197:23   198:7
235:25   252:20
253:2   260:8,
12   262:1, 22
264:10   267:11
277:19   286:18
cash   16:1
37:17, 22
61:20   74:11
275:2, 4, 11, 17,
19   276:1, 24
categorical
100:10   101:11
107:6
categorically
36:2   83:15
162:20
categories
124:15
category   36:5,
7, 8   98:19
104:19   107:11
137:13
cause   10:13
146:21   169:10,
23   184:18
295:19   296:9,
11, 13   304:20

caused   25:20
125:14   137:2
Center   4:7
Central   10:23
certain   17:6,
21   24:20
40:11   49:1
54:4   82:13, 20
83:3   93:2
97:6, 10   98:21
110:13, 15, 18
112:1   176:12
196:20   238:21,
23
certainly   16:7
21:10   26:19
40:6   45:12
46:2   61:8
66:10   83:25
88:6   106:18
116:25   117:8
120:15, 25
124:8   141:16
168:7   169:15
185:15   186:22
189:21   190:8
191:1   194:8,
13   197:12, 19
199:4   213:16
217:21   226:9
248:8   258:4
268:25   276:6
277:12   278:21
280:14   286:1
289:3   297:3
301:2
certainty   42:21
57:15   174:20
certify   10:4
304:7, 16
cetera   204:3
218:19
CFO   15:15
Chain   5:10, 12,
14, 16, 18   6:3,
5, 7, 23   7:12,
14, 16, 19, 22
8:9, 11, 15, 17,
19   9:15, 24
22:16   42:10
51:2   98:5

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 9

Case 2:11-cv-03695-RDP   Document 783-1   Filed 03/06/24   Page 88 of 259

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

chair   18:8
Chairman   291:21
chambers   18:2
chance   148:24
change   67:25
141:6, 8, 9
151:13   219:12
236:15
changed   72:21
141:20   150:2,
4   158:22
159:20
changing   29:8
226:7
channels   276:3
characterization
73:23   159:7
characterize
30:10   73:24
74:1   191:11
characterized
151:17   248:3
charge   15:21
36:24   238:17
292:2
charged   27:23
279:17
charges   50:5,
10, 19   192:18
238:20, 22
239:11   279:16
Charity   76:16,
20   155:7
160:10
Charity's   80:4
Charris   66:21
69:6, 20, 24
116:9   189:17
190:7   278:4, 7
chartered   60:6,
21
check   45:25
67:4   276:1, 4
checked   67:7
checks   65:11
chicken   148:12
chief   149:10
children   192:14
chill   213:4
Chiquita   15:22
17:9, 10
112:18   205:21

207:6, 7
244:10   252:21
260:8   267:11
286:21, 23
287:4, 13, 14,
15   288:3, 8, 21
291:2
Chiquita/Dole
15:21
choice   210:21
250:24   291:13
Christian   32:1
76:17   81:16,
17   82:1, 3
89:14   91:22
153:8   216:14
223:18   268:2
269:2
Christian's
245:14
Christmas   269:7,
14
chunk   20:1
CIA   39:14
291:14
circle   45:21
circumstance
226:21
cited   157:25
Civil   10:5
30:19   31:3
151:3, 5
claim   40:5
129:19   220:9
249:24   250:7,
9, 12, 14, 15
claimed   95:11,
18   146:13
147:25
claims   55:20
clarification
183:11
clarified   53:19
234:4   259:1
clarify   201:24
229:7
clarity   187:13
classic   290:4
Claudia   9:20
clear   14:16
15:19   45:2
59:20   74:10

99:10   116:2
126:25   127:20
132:23   207:13
210:5   220:15
278:9
clearer   233:16
Clearly   24:22
40:12   78:12
104:23   120:7
131:3   156:17
172:6   184:11
226:4
clever   39:7
cleverly   149:7
client   99:21
129:10
clients   192:13,
16   193:4, 7
close   39:12
67:24   133:1
151:21   159:25
164:2   181:13
193:4, 21
closely   252:17
closer   183:16
closing   223:3
clue   125:18
268:17
cocounsel   57:1
81:20   105:11
185:10
code   13:1, 11,
12   23:17
51:13   52:14
coding   94:13,
16, 20
cogs   192:23
Col   8:11   9:3
COLLINGSWORTH
1:11, 19   5:3
10:12, 20, 24
11:15, 23   12:1,
2   19:9   28:2
35:17, 20
39:18   53:10
62:16   70:12
85:16   98:6
121:9   133:18
176:18   180:21
240:22   241:5
249:23   252:7

254:4   260:7
272:22
COLLINGSWORTH,)2:1
1-CV-3695-RDP
1:8
colombia   5:20
15:25   16:8, 23
27:16   28:14
30:15, 23   34:8,
10, 25   36:18
37:18   39:9, 13
42:2   44:22
46:1, 24   47:22
48:3   50:5, 10
52:25   54:2, 12,
15   55:18   60:7
63:21   64:24
65:3, 5, 7, 19
69:8, 10   70:25
73:20   74:2
78:22   79:3
143:20, 23
144:12   148:3,
8, 18   149:4, 14,
21, 24, 25
150:14, 21, 23
151:3, 18
152:3, 22
159:24   180:13
183:14   194:16
198:8   207:9
239:10   240:9
253:14   283:21
289:13, 14
293:11, 14
Colombian   36:21
40:12   41:3, 4,
25   55:21
78:21   143:16,
18   144:22
156:20, 25
157:4   158:4
177:24   279:17,
25   280:16
Colombians
143:25   144:18
color   94:13, 16,
20
column   62:23
94:11, 20
combination
276:8

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 10

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

come    12:9
  18:20    21:16,
  23    22:20
  23:12    25:13,
  24, 25    33:10
  47:18    49:12,
  17, 19    61:9, 11
  68:1, 5    128:6
  138:20    170:19
  236:4    256:12
  257:1    282:14
comes    113:24
  228:3
coming    220:25
  221:20    228:14
  291:7
commence    10:15
commencing    1:25
  10:11
comments    121:12
  212:20
Commissioner
  1:20    10:4
  304:24
committed
  213:13    222:1, 3
common    180:10,
  22    181:2
  220:21
communicate
  255:18    266:2
communicated
  90:12    197:15,
  20    269:5
communicating
  13:9    221:1
communication
  153:14    218:7
communications
  14:3    34:4, 6,
  10, 15    44:3
  67:13    68:8
  82:10    89:15,
  17, 18, 19, 22
  90:6, 7, 17
  91:3    98:3
  99:18    104:21
  108:1    116:10
  119:8    120:16
  129:7, 17
  130:11    204:8

215:7    217:18,
  24
companies    54:11
COMPANY    1:5
  4:16    9:21
  10:19    11:8
  216:25    241:15
  256:24    270:7
  286:25    287:5,
  9    288:17
comparable
  287:22
comparing
  161:12, 15
  164:9
compartmentalized
  200:16
Compel    7:7
  38:4    128:24,
  25    175:15
  182:17    289:4
compensated
  236:23
complaints
  148:25    150:7
complete    185:17
  196:22    210:19
  211:7
completed
  254:14    298:12
completely
  167:25    266:21
  286:12
compliance    2:7
complicated
  136:3    211:8
  251:18    262:17
complicit    41:15
  157:17    158:5
  159:3    195:22
  273:10    282:15
complicity
  157:5    282:7
complied    174:6
complies    77:19
  78:6    86:24
  87:6    91:20
  92:9    94:7
  97:25    99:16
  100:19    101:19
  103:12    106:10
  107:24    108:24

111:21    118:11,
  21    119:3
  133:7, 10
  135:1    216:22
  283:15
compulsion    177:5
computer    84:21
  86:19    87:24
  88:4    133:18
  152:22    304:10
computers    64:3,
  7, 14    229:23
  230:10, 17, 22,
  25    231:11, 17
  232:25    235:4
  237:4, 7
concept    20:14
  195:3    198:25
  261:1    285:15
conceptually
  62:10
concern    24:19
  25:21    47:1, 6
  89:20    145:12
  146:2, 21
  184:8, 18, 22
  185:1    196:12
  208:10, 16
  238:8    247:12
  257:21
concerned    16:12,
  18    34:3, 5, 14,
  25    44:2, 24
  67:5    111:12
  123:13    124:23
  147:8, 12, 20
  148:15    211:11
  218:14, 20, 23
  225:11    237:8
  243:23    257:20
  259:12    260:22
  296:2, 5    297:5,
  10
concerning
  34:20    43:15
  89:16, 17
  108:7    130:17
concerns    43:23
  52:18    54:6
  89:18, 25    90:2
  146:10    169:11,

24    195:17
  214:12    299:9
conclude    22:10
CONCLUDED    303:16
condition    122:4,
  7    172:12
  173:11, 12
  176:11, 16, 19
  202:6, 10, 25
  209:5
conditioned
  255:8
conditioning
  202:8
conditions    6:3
  202:1, 8
  208:25    209:2
conduct    220:6
  286:6
conducting    74:3
conference    1:23
  10:9
confidence
  168:12, 14, 17
confident
  158:25    271:21
Confidential
  5:23    8:5
  77:6, 22    133:14
confidently
  178:3
confirm    43:9
  87:10    198:20
  229:17    241:1
  255:10    276:21
  286:13
Confirmation
  5:16    42:12
  43:8    101:21
  102:4
confirmed
  218:22    257:20
  279:12
confirming
  268:20
conflict    29:14
  252:9
conflicts    83:16
Congress    291:23
connected    149:7
connection
  69:11    200:8

1-888-326-0504  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 11

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

Conrad    4:17
7:17, 20, 23
11:10, 12, 13
15:15    61:11
66:9, 13, 16, 23
67:1    69:10
71:12, 15
81:24    85:10
93:23    126:10
130:3    164:25
178:23    262:9,
16, 24    263:6,
18    267:16
268:3    301:13,
14    302:25
conscious    52:17
consequences
123:2
consider    191:18
consideration
267:9
considered    218:8
considering
155:19    160:22
consistent
102:10    116:18
168:11    214:8
296:1
consists    287:10
conspiracy
55:22, 24, 25
conspirator
192:10    279:22
conspired    207:8
constituted
288:12
constitutional
143:22, 25
144:9, 11, 14,
18    145:15, 18
178:12
consulting
149:12
contact    269:12,
14    270:10
271:12    294:25
contacts    53:1
260:6    283:19
285:21
contains    115:3
130:23

contemplated
254:14    255:1
contend    77:13
273:9
contended    193:2
contention
70:13    120:3
contents    99:11
context    13:22
23:6, 7    84:21
142:20    152:10
156:17    164:15
216:13
contingency
83:12, 20
84:13    197:22
235:14, 15, 20,
25    236:1, 6, 9,
12, 17    244:9
261:22    262:2,
8, 14, 22    263:5,
11, 16    265:11
267:15
continue    63:24
66:22    185:16
197:7
continued
135:18    186:23
219:18    220:5
continuing    66:5
continuously
38:11
contract    268:10,
11
contractor    16:11
contracts    258:21
contradict    31:4
contrary    107:14
control    142:25
213:7    288:4
290:16
controlled
152:2, 4
controls    252:11
conversation
261:6, 10
conversations
55:10, 15
214:2, 17    292:5
convicted    29:16
40:9    192:3, 10,
11    279:16, 20,

21, 23    280:6
289:12
conviction
279:24
convinced
207:12    289:16
coop    148:12
cooperate    100:1
cooperating
277:20
Cooperation    9:9
91:23    92:24,
25    98:7
131:21, 22
152:13    153:16,
17    252:5
260:2    265:18
274:16    277:13
278:10
Co-operation
9:11, 13
coordinator
58:22    97:15
114:22    271:2
copied    72:18
copies    31:25
95:9
copy    76:17
91:23    97:15
121:9    136:13
152:19, 21
153:2    154:19
161:1
corporation
286:23
correct    15:16
17:21    20:16,
21    21:17    24:6
25:6    26:5, 6,
18, 25    27:19
30:20, 21, 24
32:3, 8    36:5
38:16, 17, 20,
23    41:8    42:15
44:10    45:5
49:4    55:11
58:1, 10    60:7
63:3, 11    64:7
68:14, 15    73:6
76:18    77:7, 15,
23    78:14
80:19, 25

81:12, 21
90:14, 20, 22
91:8, 9, 24
92:4    99:7
101:16, 17
103:7, 22
118:23    119:15
120:2    126:11
128:15    133:20
141:13, 18, 25
145:20    146:14
147:10    153:25
162:6    165:11
166:12    167:11
168:4, 5, 21
170:7    174:11
175:3, 7, 16
181:20    182:25
188:22    192:5,
14, 15    193:4
194:16, 21
197:4, 11
201:11    203:25
209:2    212:17
215:13, 18
230:7, 8    232:5
235:14, 25
236:7    244:11
246:18    249:15,
19    254:15, 22
259:21    260:8,
13    261:15
262:10    264:16
267:11    270:15
271:8    274:1
275:17    279:18
280:1    282:12
283:11, 12
284:7, 8    285:3
288:1, 23
293:7    294:11
298:13, 17
304:12
correcting
212:19    258:10
Correction
170:11
corrections
212:9
correctly    87:13
93:21    119:10
135:7    152:24

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 12

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

155:23   160:25
161:5   230:3
256:4   294:20
corroborating
302:18
corrupt   148:9,
19   149:21
150:1   151:13,
19   152:1
cost   19:17
27:16   28:8
87:12   134:17
135:13
costs   61:22
71:4, 21   78:8
205:22   207:1
counsel   1:18
2:13, 15   10:6
81:10   84:12
96:16   105:11
185:23   201:2
204:14   205:7
207:24   283:16
304:17
counter-
interpretation
285:8
countermeasures
239:13
counterparty
244:15
country   61:5
62:6
COUNTY   304:5
couple   45:13,
18, 20   58:6
160:11   182:23
186:6   187:13
205:19   220:18
221:18   230:15
239:23   241:2
258:25   259:3
courier   51:19
course   32:20
122:18   159:19
COURT   1:1   2:8
10:1, 17   11:18
38:16, 19   64:2,
6   71:19   96:23
100:7, 8
111:24   116:20
118:18   123:11,

18   124:8
129:1   130:4,
25   131:9
134:4   138:15
145:19, 23
146:23   188:13,
19   189:1
190:22   226:6
239:2   284:4
Courthouse   1:22
10:9
courts   279:25
280:16, 19, 20
cover   85:10
86:14   115:14
118:19, 20
201:17
covered   201:5,
14
CR   155:9
crafty   221:10
Craig   180:18
182:7
create   95:6
128:11   231:12
237:12
created   85:18
87:23, 25
133:15   229:5
262:16   280:7
credibility
168:13, 15, 17
169:7, 11, 17,
19, 23   180:7, 8
183:25   184:7
185:2   186:10
191:9   208:6,
17   297:12, 17
credible   35:10
crime   141:15
287:15
crime-fraud
76:3   256:13
258:1, 9   273:18
crimes   70:25
150:18   194:19
289:13
criminal   29:9,
23   30:22, 23
31:18   50:5, 10
108:5   117:12
140:19, 20

156:10   164:4
175:20   177:21
181:24   182:10
183:13   192:17,
18   200:21
201:15, 16
203:13   208:21,
24   217:17
279:17   283:11
285:2, 17, 22
286:5
criminally   286:3
cross   196:14
CS   155:8
CS501   163:11
CS612   160:12
163:12
Cuellar   25:18
27:22   28:10
50:15   142:8
143:3   148:24
151:22   152:3
220:22   221:9,
14
current   150:13
271:18
currently   50:5
cut   112:11
147:17   263:21

< D >
D.C   3:24
69:12   126:10
139:20   140:2
205:23   285:21
damage   180:7
208:16
damaged   184:1
185:2
Dan   45:24
46:1   57:1, 12
danger   143:11
278:12
dangerous   44:25
Daniel   98:3
date   10:4, 22
87:19, 21
88:11   121:15
129:15   133:15
172:4   252:4
dated   77:23
79:17   86:13

88:1   96:15
133:22   136:11
241:3, 14
249:10   260:3
DAVIS   3:7, 10
11:6
day   1:24   10:7
93:12   122:16
125:11   136:15
206:14   210:6
225:18   229:13
234:6   239:1
249:11   254:18
266:6   274:24
275:1, 11, 15,
16   276:15, 25
301:9   303:16
days   12:14
131:23   178:18
227:11   233:14
254:13   290:6
293:10
de   8:17
242:14, 15
248:20   249:3
269:5
deal   21:24
22:7, 21   25:14
195:18   208:18
214:2, 18
216:15   236:11
301:19
dealing   162:23
163:7   200:15,
17   239:13
271:13   287:2
299:11   300:23
dealt   55:17
215:21   248:8
299:11
debit   65:11
December   25:17
36:17   69:15
70:3   130:4
132:1   143:1
274:22
decent   148:24
decide   95:1, 2
169:6
decided   97:10
104:3   117:23
118:1   168:7

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 13

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

174:21   290:7
302:20
**decipher**   51:13
**decision**   101:11
102:19   107:6
132:19   139:13,
24
**decision-making**
115:6
**decisions**   94:4
115:15   162:4
**decl**   9:24
**declaration**
98:7   146:12,
17   168:20, 22
169:2, 4   174:6,
14, 17   209:23
210:1, 14, 19
212:7, 14
213:6   227:16
230:1   254:19,
22   255:2, 5
272:8   273:25
274:5, 9, 12, 18
277:2, 3   281:2,
14, 16   282:1, 3,
5, 14   284:3
293:21   294:11,
17, 19, 24
298:10, 12
299:16, 19
**declarations**
36:3, 11   88:18
98:9
**declined**   271:20
**deduce**   154:9
**deem**   74:11
**defamation**
70:20   81:11
88:19   89:22
94:2   96:17
115:1   126:1
164:25
**DEFENDANT**   4:1
**Defendants**   1:10
82:10   98:3
105:12   119:7
125:10   136:25
152:12   273:22
**defendant's**
75:19   96:16

**defense**   28:19
172:12   174:23
176:25   192:17
**definitely**
177:13   227:24
**delay**   109:5
**delivered**   222:18
**demand**   87:1
179:25   201:7
**denial**   29:16
**dental**   75:15
**deny**   178:13
186:24   278:2
**Department**
288:11
**departure**   66:23
67:2   69:17
**depended**   124:7
**depending**   65:8
159:21
**Depends**   58:2
68:25   82:2
83:16   109:25
123:21   208:23
217:20   262:12
268:13
**depose**   105:21
**deposed**   149:8
267:5
**deposit**   108:15
**deposited**   103:20
**DEPOSITION**   1:9,
18   2:5, 6, 17
10:16   18:13
25:17   30:19
36:17   75:9, 16
85:1   95:5
138:15   142:13,
15   143:19
144:23   145:3
146:4, 6, 19
147:16   169:5
175:13   180:14,
23   181:1, 8, 16
183:23   184:5,
16   188:4
245:14   278:6
292:4   293:24
301:3   302:3, 4,
23, 24   304:8, 13

**depositions**   2:9
53:6   71:2
146:7   223:18
**Deps**   5:12
8:11, 19   78:1,
10   79:11, 18
80:7   133:19,
23   171:24
**describe**   57:7
223:7   224:24
**described**   21:25
22:8   48:11, 14
96:3, 7
**describing**
154:17   163:2,
12
**designated**   20:23
**destroy**   301:11
**detail**   161:23
**details**   20:9
94:25   98:23
103:18   114:12
149:2   229:6
257:17   260:22
**determination**
104:1   302:17
**determinations**
93:15   103:6
**determine**   95:17
139:7   144:15
168:24   292:21,
24   299:22
**determined**
185:21   263:4, 8
**determining**
225:7
**develop**   128:14
289:21
**developing**
223:9   225:8
**difference**
36:23   88:2
156:16   164:15,
18   184:12
196:5   219:25
228:24   282:11
**different**   33:21
35:23   154:10
159:21   166:20
167:25   169:14
206:1   208:13

226:18   243:22
244:1, 25   287:4
**difficult**   291:9
**diligence**   45:10
**dinner**   48:9
49:11, 18
**direct**   68:21
271:11   284:21
**direction**   44:12
95:25
**directly**   31:13
75:2   79:2
91:11   163:5
172:24   283:6
295:1   299:16
**dirty**   101:2
**dis**   184:13
**disagree**   115:16
196:19   276:20
**disclose**   107:13
124:9   127:5,
16   131:9
136:4   139:2
161:20   184:3
187:19   188:25
189:17, 21, 24
190:8, 9, 21
191:25   193:6
201:9   208:12,
14   258:12
**disclosed**   80:7
83:17   111:24
138:15   140:5
183:22   184:11,
14   187:17
188:1, 2, 16, 19
189:10   191:1
208:5   258:11
298:2
**disclosing**
138:23   256:22
258:16
**disclosure**
143:12   184:14
**discovered**
215:11
**Discovery**   8:21
37:25   38:2
66:1   98:16
123:14   129:9,
18   182:14

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 14

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

216:17, 18
218:9    289:1
**discretion**
237:18
**discuss**    90:1
115:16, 25
139:6    174:16
176:16    179:24
255:17    267:13
283:18
**discussed**    30:18
80:8    83:25
84:5    90:21
108:7    139:16,
17    154:20
178:12    179:11,
21    197:17
202:2, 7    204:2,
19    279:14
**discussing**
22:18    98:6
119:17    137:21
138:13    139:11
154:5    199:5
202:25    260:25
**Discussion**    19:4
24:5    25:4
43:6    49:24, 25
56:21    85:5
139:23    140:4,
11    176:14
179:16, 20
199:3    200:4
261:5    293:24
297:15    298:22
**discussions**
27:13    47:25
68:12    91:2
115:18    187:18
199:9, 18
200:7, 11
217:13    242:21
247:3    268:4
269:9    295:2
**dismissed**    63:18
65:1
**disposal**    175:15
**dispute**    85:17
98:16    100:12
102:21    121:19,
23    129:14

156:4    163:10
275:3    293:11
**distinction**
112:20    138:17,
24    139:9
156:16    164:14,
18    181:13
217:22
**distress**    75:13
**distribute**    53:4
**distributing**
53:16
**DISTRICT**    1:1, 2
10:17
**disturb**    219:4
**DIVISION**    1:3
10:18
**docs**    116:7
122:19, 22
155:8
**Document**    6:10
7:17, 20, 23
54:24    71:23
73:16    74:8
77:13    78:12
79:19    80:24
84:7, 10    85:9,
14, 18, 21    86:8,
14, 17, 21
87:23    95:1, 3,
7    97:20    98:13
100:6, 15
101:4    103:9,
10, 25    106:25
107:2    109:12,
18    110:4, 7
113:14, 15
118:3    124:16,
17    132:15, 17
133:11, 21
134:7    135:23
154:15    157:14,
23, 24    162:24
163:1    170:15
220:8    225:17
228:11    241:14
242:5, 7, 12, 25
245:2    249:10,
17    252:4
253:24    261:16
266:16, 17
267:7    268:14,

20, 21    290:5
301:14
**documentary**
36:12, 16    37:6,
13    40:2, 20, 24
221:7    293:1
300:7    301:23
**documentation**
223:20    276:9
278:19    287:6,
7, 10    290:19
**documented**    288:9
**documenting**
245:4
**documents**    6:23
12:16, 21    20:8
27:5    31:5
75:18    77:2
79:9    80:3
82:9    84:23
93:15    94:12
95:8, 9, 25
96:19    97:6, 11
98:2, 19, 22
100:11    101:9
102:13, 24
104:4, 8
105:12, 25
106:4, 6, 22
107:6, 8, 11
108:10    110:13
113:3    115:21
117:2, 9    118:9
119:6    120:13,
15    121:2, 3
124:13, 19
126:20    127:11,
23    128:17
129:2, 10, 13
130:7, 9
136:24    137:2,
14, 17, 19
152:11    155:13
156:1    158:9
160:11    162:4,
18, 22    163:2
223:9    225:8
227:15    229:17
240:25    241:3,
21, 24    242:3
243:1, 12, 14,
17, 20, 23

252:23    257:3,
7    258:20, 21
259:2, 4, 5, 10,
13    260:15
261:2    264:7,
25    265:4
267:13, 19
268:5, 8
269:10    272:12
276:23    280:4
286:14, 20
287:19, 23
288:22    290:4
291:10    299:15,
17, 22    300:4, 8,
9, 16, 19, 24
301:19, 22
303:1, 5
**doing**    12:8
18:16    19:15
43:4    44:5
74:2    142:6
162:14    163:21
167:8    176:9
181:5    193:11
215:8    219:3
277:17    279:12
**dollars**    64:24
193:22    264:11,
16, 19
**door**    17:25
18:2, 4
**doorstep**    212:15
**dot**    122:23
**doubt**    44:13
**draft**    94:9
96:20    97:9, 15,
18    115:1, 3
121:16    217:2
227:14    298:12
**drafted**    126:25
152:21    178:22
**drafter**    118:22
**drafting**    121:20
126:18    212:16
**drafts**    116:1
212:6
**Drath**    15:15, 18
125:9    183:4
**DRUMMOND**    1:5
4:16    5:12
6:1, 10    7:5

1-888-326-0504  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 15

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

8:19    9:21
10:19    11:3, 8
12:25    13:10
25:19    27:21,
24    28:9    29:15,
19    30:5    34:7,
10, 23    35:6, 25
36:14, 22    37:1,
5, 8, 24    38:3,
8, 11    39:6, 7,
25    40:4, 5, 13
41:15    42:1
43:4    44:4, 19,
21, 25    50:14,
20    55:4, 10, 14,
17, 19, 22, 24
56:6, 11, 16
57:2    64:2, 5,
13, 25    70:24
71:19, 22    72:1
81:21    83:21
86:9    96:23, 24
97:7, 19, 20
98:14, 17
100:7, 8, 13, 21
101:5    102:14,
21    105:2
109:1, 13
111:23    116:20,
23    118:18
119:9    120:2, 4
122:18    126:19
127:4    130:4
134:15    136:16
137:2, 4    138:1,
9    141:22
142:6, 7    143:6
147:3, 6, 14
148:10    149:6,
12, 13    150:1
155:18    157:5,
17    158:5
159:3, 11
160:20    163:14
166:15    173:15,
18, 20    174:24
175:24    176:8
180:13, 16, 18
181:16, 24
182:2, 8, 9, 13
185:8, 12
186:12, 16, 20

188:13, 19, 25
190:22    191:14
193:13    195:21
196:8, 12
197:23    201:6
203:5, 8
208:20    215:17
216:3    217:5
218:2, 11, 20,
24    219:11, 16
220:2, 5, 9, 25
221:5    239:4,
14    244:10
252:21    259:16
260:8    261:14,
23, 25    262:22
264:10    267:11,
15    273:10
277:19    282:6,
15, 19    286:3,
22    287:1, 16
288:20    289:9
290:3, 9    291:7,
11    293:16
296:3, 6    297:6,
11, 24, 25
298:3    299:18
300:6, 20
Drummond/Collingsw
orth    7:12
Drummond-paid
193:24
Drummond's    30:2
70:13    82:7
96:15    99:5
119:5    136:13
152:3    185:18
216:18    283:16
288:21, 24
289:6, 20
290:15, 24
291:13    292:20,
24    293:4
Drummond-specific
54:7
Duarte    116:13
167:11, 15
168:2    169:3,
10, 20    171:13
189:9, 24
due    45:10

55:21    266:13
duly    11:16
dumb    221:11
duration    87:12
Dutch    41:7
57:25    58:2, 16
242:17    265:21
duty    177:21

< E >
earlier    19:21
23:8    43:23
86:15    130:16
131:17    141:4
142:5    153:10,
20    165:5
195:19    271:10
277:11
early    75:10
170:22    171:4
189:21, 22
191:1
earned    235:8
earth    248:25
easier    271:25
ECF    86:1, 22
133:8
editorial    121:12
editorializing
292:15
educated    280:23
effect    2:6
243:25    272:6
effectively
175:11
effort    162:1
efforts    70:24
213:17
eight    67:25
82:8    130:11
133:8    151:22,
24    194:20
300:13
either    31:12
65:18    67:13
68:9, 11    70:20
76:21    85:18
87:23    91:2, 10
97:7, 11
103:24    111:3
117:15    126:9
129:18    133:15

138:9    166:24
169:5, 24
191:7    246:25
252:20    260:11
269:6    272:16
276:22    299:8
El    12:17    66:3
69:1, 2    76:3,
11    78:14, 17
79:13    87:8, 17
88:10, 21    89:1
90:9, 13
103:21    104:24
106:16    107:13
109:8    110:16,
22    112:17, 24
114:3, 10
117:5    120:1,
20    123:8, 18
124:2    127:5,
14    130:17
131:2    134:5
135:6, 20
146:12    147:1
155:21    156:10
158:3    160:23
161:6, 15, 18
164:4, 9, 17
165:6    167:8,
16    169:21, 22,
24    190:9, 21
193:1    194:12
195:8, 20
elaborate    247:9
elected    150:20
electronic    15:9
elicit    238:7
eligible    194:3,
7
Elwood    252:13,
16, 20    253:1
260:4, 5, 11
261:13, 19
265:19    266:25
267:8, 10
Email    5:10, 12,
14, 16, 18, 20,
22    6:1, 3, 5, 7,
12, 14, 16, 17,
21, 23    7:1, 5,
10, 12, 14, 16,
19, 22    8:1, 3,

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 16

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

5, 7, 9, 11, 13,
15, 17, 19, 21,
23   9:1, 3, 15,
17, 20, 22, 24
 13:10   15:11
 22:16, 18   23:1,
20   24:2   25:2
 26:4   31:24
 32:7, 9   34:22
 42:10   43:8
 44:11   51:1
 59:10   60:15
 71:13, 16   72:6,
15   76:16, 23
 77:22   78:2
 79:12, 17, 18,
21   80:3, 8, 17,
23   81:2, 8
 89:14   90:3, 22
 91:21   92:12,
23   93:11   98:4,
5   99:20
 101:23   102:3
 103:14   106:12
 110:21   111:8
 112:5, 7
 113:10   114:25
 115:8, 13, 17
 121:14   123:4
 125:7, 8, 24
 126:4   133:13,
20, 23   134:12
 135:9   136:17,
19   138:2
 153:2, 4, 8, 15,
24   155:6
 156:2   160:8, 9,
15   161:11
 162:8   163:1
 166:7, 9
 170:13   171:11,
25   172:4, 6
 175:3   178:18
 183:5   187:8
 199:3   207:18
 209:6   210:3
 212:24   213:1,
24   220:7
 221:2, 12, 20
 224:7   227:12
 232:7   233:15
 254:17, 23

 266:11   269:23
 271:5   278:7
 293:23   294:9
 296:16, 25
 298:20, 23
 300:13
e-mail   183:17
emailed   91:4, 6
emailing   12:25
 136:12   162:3
 163:17   166:2
 227:12   269:19
emails   14:10
 24:20   58:7
 90:15   91:1
 104:12   115:4
 117:4   119:15,
16, 18, 22, 24
 123:8   130:16
 137:20   161:24
 162:8   163:5, 7,
11   173:10
 182:23   183:2
 201:25   205:19
 215:3, 5, 14, 16,
20   216:2
 217:16   221:4
 238:19   266:4,
10, 23   287:11
emergency   224:2
employees
 180:24, 25
 240:10, 13
employers   180:24
encourage   195:4
ended   56:1
 93:3   203:14
 236:20   245:18
 251:22   260:21
 265:9   301:4
enforced   267:20
engagement
 203:24
engine   46:11
English   92:4
ensure   277:12
 278:15
ensuring   278:17
enter   257:9
entire   146:6
 151:17   226:12
 273:1

entitled   77:22
 241:14   249:11
entries   97:17
 119:13   165:5
entry   135:2
envisions   246:13
equivalent   239:6
Eric   4:17
 11:12   71:11,
15   81:9, 11, 15
 207:11, 18
Eric's   81:14
especially
 122:19
essence   148:16
 212:11
estimate   264:22
estimates
 264:25   265:5,
7, 8
estimating   264:9
et   1:9   9:20,
21   10:20   78:8
 103:19   119:25
 204:3   218:19
ethical   140:24
 178:24   180:5
 181:13   185:23
 186:6   204:13,
14   205:5, 24
 206:5
Ethics   8:15
 83:22   179:9,
12, 17, 24
 185:22   191:16
 201:2   205:7,
22   206:16, 25
 207:24
event   40:11
 64:17   73:4
 155:12   169:12
 184:25
events   168:12
eventually
 48:19   188:1
 193:17
everybody   67:9
 225:11   243:16
 245:5   257:20
 296:21, 25
evidence   2:18
 35:24   36:13,

17   37:7, 13
 38:20   39:4
 40:3, 20, 24
 41:2, 5, 14
 43:4   195:20
 221:7, 13
 273:21   275:20
 286:19, 21
 287:2, 18
 288:7   289:15
 293:1   300:7
evidencing   98:2
exact   149:2
 168:8   205:13
 207:22
exactly   65:4
 96:6   167:23
 238:3   248:6
 296:22
EXAMINATION   5:1
 10:13   11:21
examine   129:12
examined   11:16
example   63:5,
25   143:1
 180:23   193:16
 218:16   236:16
 277:24   290:11
Excerpts   9:18
 281:8
excessive   27:17
exchange   58:23
 111:25   146:25
 185:22   278:10
exchanging
 217:15
exclude   194:10
exclusively
 271:14
excuse   33:6
 48:20, 23   81:8
 118:15   157:1
 190:20   197:14
 218:21   262:11
exercising
 145:15
exhausting   290:5
EXHIBIT   5:7, 9
 15:4, 7   22:13,
14   31:21, 22
 42:7, 8   50:23,
24   52:21, 22

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 17

Case 2:11-cv-03695-RDP   Document 783-1   Filed 03/06/24   Page 96 of 259

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

58:18, 21, 22
62:18, 20   71:8,
9   72:12, 13
76:13, 14
80:13, 14   81:5,
6   84:17   89:10,
11   91:15, 16,
19   92:3, 10, 20
93:8, 9   94:8
95:23   96:11,
14   97:14, 21
114:19, 21, 23
118:10, 12, 14,
15   121:5, 6
122:12, 13
125:4, 5
126:13   127:1
128:19, 21
129:24, 25
133:3, 4, 6
134:10   136:7,
9   152:6, 8
155:3, 4   160:4,
6   164:22
165:2, 23, 24
170:5, 7, 9, 12
171:21, 22
177:18   178:17
182:19, 20
198:10, 12
201:20, 21
205:16, 18
209:15, 16
213:19, 20
216:10, 11
218:15   222:21,
23   227:8, 9
229:10, 11
240:23   241:9,
12   249:6, 8
252:1, 2
259:24, 25
265:15, 16
269:16, 17
271:2, 3   278:5
281:8, 10
294:5, 7
295:12, 13
298:6, 7
**exhibits**   302:4
**existed**   46:11

101:6   128:18
**existence**   110:13
**exists**   109:20
110:7   157:14
158:15   159:8
**exonerated**
150:17
**ex-paramilitary**
82:13, 20   83:3
**expect**   229:19
**expectation**
261:20
**expected**   250:6
264:15   277:7
**expecting**   278:9
**expenditure**
230:22
**expense**   134:14
140:18
**expensive**   231:25
**experience**   16:22
21:3   41:3
84:22   85:12
88:4   144:12
191:16
**explain**   15:1
105:13   278:24
302:22
**explained**   30:3
34:18   56:8
71:19   208:13
242:22, 24
260:19   297:19
**explaining**
160:16   276:13
**explains**   85:13
102:23   252:15
**explanation**
14:21   24:10
75:25   98:12,
25   100:5
101:4, 7, 9, 15
102:12, 18
105:1, 5, 6, 20,
23, 24   106:2
107:20   109:11
117:18   120:12,
22, 23   124:10
127:15, 21, 25
128:5, 8, 9, 12,
14, 17   130:14

131:3   132:2
134:2, 8
135:17   137:16
138:13, 22
163:16   165:8,
11   216:1
278:14
**explicitly**   52:10
**explore**   128:10
**explored**   49:9
**exploring**   20:10
289:3
**exposing**   143:7
**expressed**   45:7
47:1   89:24
184:21   208:8
**extend**   217:12
**extent**   50:17
224:2
**extra**   236:22
**extremely**   25:12
52:16   125:14
147:20   148:8
218:18
**eyes**   45:7

< F >
**face**   267:14
**facilitate**
19:17   20:2
48:22   49:14
177:14   238:1
294:3
**facilitated**
19:21   41:2
**facilitating**
17:8, 17   19:15
211:6
**facilitator**
182:4
**facing**   50:5
149:15   192:18
**fact**   20:2
23:10   35:19
75:5   83:13
84:14   89:1
126:17   135:24
145:1   146:1
180:11   191:6
214:10   215:16
218:10   223:23
232:22   235:9

271:14   272:12,
23   295:22
**factors**   83:18
171:4
**facts**   21:12
125:18   239:22
284:2
**factual**   74:4
287:18   288:13,
17
**Fair**   18:23, 24
21:2   24:21
35:2   38:1
40:22   42:20
51:11   55:5
70:15   73:22
121:8   129:3
231:25   289:8
**fairly**   149:14
189:22   202:22
**faith**   17:2, 5
**fake**   227:21
228:11, 13
**Falkowitz**   183:6,
8   185:1
**fall**   107:12
**false**   158:21
231:3
**familiar**   95:14
139:3
**families**   66:4,
25   76:11
78:14, 17   87:9,
18   88:10   89:6
90:9, 14
106:14   111:4
135:5   147:10
195:9
**family**   58:16
60:2   67:14
68:9, 22   69:20,
24   116:14
119:25   190:10
191:8, 12, 20
193:8   196:15
278:12   286:22
**fancy**   34:12
**far**   18:14
56:3   59:20, 22
66:8, 11, 24
183:18   226:11
237:7   243:23

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 18

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

259:12   270:17
274:19   281:19
291:2
**FARC**   150:25
151:11   280:9,
12, 15
**father**   179:20
**father-in-law**
147:16
**FBI**   285:24
286:4
**February**   1:25
10:7, 22   53:3,
4, 5   86:9
133:17   134:3
136:18   170:22
171:4
**Federal**   10:5
38:16, 19
191:22   240:13
**fee**   83:12, 20
84:13   149:12
197:22   198:2,
3   235:14, 15,
20, 25   236:1, 6,
9, 12, 17   244:9
261:22   262:2,
9, 22   263:5, 16
265:11   267:15
**feed**   11:14
**feel**   30:11
169:7   208:15
234:18   235:2
258:6, 8
**feeling**   169:19
**feelings**   56:6
**fees**   172:9, 11
175:20   178:21
182:10   183:10,
13, 15, 22
184:4   185:24
188:14   205:22
207:1   208:22,
24   217:17
223:16, 23, 25
230:2, 6   231:8,
21   232:5
253:22   261:14
263:17   264:6
267:9   271:18
273:1   274:24

285:3   296:17
**fellow**   147:2
**felt**   56:18
139:2   143:10
**figure**   99:2
106:7   111:14
143:4
**file**   85:13
136:16   148:1
152:19, 20
250:12, 15
**filed**   12:3
64:5, 13
125:11   126:7
136:14   137:4
158:13
**fill**   290:4
**final**   93:15, 24
96:22   97:19
103:1   106:22
121:15   131:11
162:18   233:7
**finally**   80:19
149:15
**Finance**   5:10
223:3   229:17
241:1
**Financial**   4:7
21:7, 13   38:23
65:12   210:7
222:12   287:25
299:15, 21
300:4, 16, 24
**financing**
241:20   287:15,
17   289:12
**find**   46:7
105:12   290:5,
19   294:22
300:11, 22
**finding**   219:11
**findings**   129:13
**Fine**   162:23
187:6   207:21
208:22, 25
**finish**   246:16
292:16
**finished**   255:7
289:2
**fired**   66:12
**Firestone**   82:5

**firm**   62:2
69:17   72:22
73:20   84:3
271:21   299:2
**firm's**   303:4
**first**   11:16
13:4   16:4
17:2   23:2
33:15   38:13
57:13, 17   59:1
70:5   74:7
97:23   110:22
118:4   119:1
133:12   136:13
137:7   140:6
143:2   147:14
151:16   166:6
171:16   172:21
177:9   182:22
183:2   199:24
203:10   205:12
206:24   207:20
216:23   252:12
253:15   255:20
259:3   260:24
273:24   274:24
276:13, 25
282:5
**fiscal**   141:7,
11, 17
**five**   149:3
244:7   250:7
257:8
**fixes**   184:7
**flag**   80:10
**flagged**   79:9
94:14
**flagging**   72:8
79:17   82:7
**flags**   77:5
**flat**   178:13
**flexibility**
228:15
**flip**   77:17
78:4   85:1
86:7   87:5
92:17   106:8
133:8   155:14
216:20   266:11
283:13
**Floor**   1:22

3:11   10:9
**Florida**   178:22
**Florie,LLP**   3:10
**flow**   245:11
262:9
**flowed**   31:9
**flowing**   36:13
37:7
**fluently**   91:7
**flux**   223:13
**fly**   37:18
**flying**   289:23
**focus**   80:18
81:3   220:24
**focused**   80:23
151:19   160:8
182:22   183:1
205:1
**focusing**   15:10
41:11
**folder**   96:1
**folks**   84:2
160:17   207:23
221:5   230:16
**follow**   8:10
87:10
**following**   10:14
14:2   52:7
103:17   130:5
183:10, 21
253:13   271:17
**follows**   11:17
**force**   2:6
**forces**   34:9
265:25
**foregoing**   10:6
304:8, 12
**forensic**   36:19
41:3   300:10, 21
**forensically**
64:7
**forget**   46:24
229:4   258:2
**forgiven**   248:4
**forgot**   136:1
161:13   226:19
227:1
**forgotten**   76:4
79:13   257:24
266:20
**form**   2:14
13:5   14:14

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 19

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

21:5    25:7, 9
29:2, 3    31:2
42:16    46:15
51:24    53:11
55:12, 16
65:21    66:14,
15    68:19
82:22    83:23,
24    90:23, 24
107:16, 17
110:8    111:5, 6,
17    115:23, 24
117:13, 16, 17
124:25    126:24
127:18, 19
129:20    130:19,
20    132:21, 22
134:22    139:10
140:15    141:23
142:1, 2
146:24    148:21,
22    151:16
157:19, 20, 24
158:24    159:15
163:19    164:21
167:18, 20
171:10    174:1
177:8    184:2,
10    189:4
190:5, 13
196:3    203:15
207:19    209:9
211:16, 23
218:3, 13
234:11, 16
237:5    238:10
239:19, 20
246:11    256:15
258:22    261:24
263:1    264:21
268:12, 24
273:12    277:23
279:5    281:4, 5
282:17    287:3
288:15    289:25
290:21, 22
295:24    297:13
299:24
**forma**    267:20
**formal**    169:2
**formality**    11:24

**format**    159:10
**formed**    212:14
**former**    81:10
150:14    151:7
180:11, 24
271:19
**formula**    262:17
**forth**    68:18
204:8
**forthcoming**
143:8
**fortunate**    202:14
**forward**    51:19
173:13    207:16
220:25
**found**    39:1
46:8    92:14, 16
150:18    185:23
228:23    275:20
291:17, 23
**founder**    182:4
**four**    12:13
84:23    112:9
129:5    209:8
237:6    254:12
**fox**    148:12
**frame**    65:22
66:1    105:13
106:1    145:2
300:23    303:6
**Francisco**    45:15
46:2    47:21
48:8    49:23
154:6, 20
166:17
**Francisco's**
48:15
**Frank**    269:23
270:1
**fraud**    232:11
**freaking**    34:11
**free**    19:16
30:11, 16    284:5
**Friday**    75:10,
22    266:5
**friend**    33:9, 17,
19    48:15
**friends**    14:12,
13, 19    33:5, 7,
11, 16, 25
34:17    43:11,

13, 21    100:2
**frivolous**    70:22
**front**    92:8
127:12    193:2
256:14    262:5
273:2
**fruitful**    290:7
**full**    2:7
119:1    291:10
**fully**    71:19
124:9    150:16
181:12    212:14
**fund**    224:2
229:5, 25
231:12, 18
233:10    235:6
237:4, 13
**funded**    253:12,
25
**funder**    182:4
**funding**    56:19
61:9, 17
137:21    198:21
199:6    202:12
209:22, 24
210:2    213:15
217:14    223:12
241:25    242:8,
11    243:6, 13
249:2    258:4
264:8    274:9
**Funds**    9:1
14:7    15:25
17:11    23:12
26:2, 8    33:9,
17    43:2    51:4,
9, 10    52:5, 6
54:1, 7, 8, 10,
14, 20    55:3
60:17, 18, 19,
25    65:11
98:20    108:7
161:14    174:17
176:16, 21
180:3    186:8
197:2, 18
200:2, 4
210:11    223:3
228:20, 25
230:22    231:16,
22    232:1, 2, 21,
24    233:17

234:3, 6, 10, 25
235:1    238:1
245:11    247:14
252:24    258:5,
13, 14, 18
259:6    271:20,
22, 25    275:7,
22    285:1
295:18, 23
296:19, 23
**FURTHER**    2:3, 11
6:4    134:8
251:23    259:2
298:22    304:16

**< G >**
**gain**    74:11
238:22
**gap**    222:6
**Garcia**    58:25
59:3, 12, 17
60:3, 20    61:14,
17    87:3    100:3
**Garcia's**    61:25
**Gary**    183:6
185:1
**gather**    43:4
287:3    290:8
**gathered**    29:10
**Gelvez**    190:20
**general**    33:8
53:24    55:2
75:4, 8    94:4
108:17    109:17
118:5    138:21
139:4    149:4
151:20    170:3
180:1    224:1
238:15
**generally**    23:22
28:12    44:6, 8
94:24    98:15
123:13    138:5
180:3    181:17
269:6    278:3
295:1
**generals**    220:23
**general's**    151:25
**getting**    34:3
45:10    53:5
69:18    88:23
105:25    111:15

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 20

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

113:5    159:25
192:22    197:1
198:2, 3    203:4
205:5    209:20
228:15    267:4
298:16
**giant**    161:24
**gift**    248:6
**gifts**    284:7
**Gilley**    1:20
10:1    304:24
**Giraldo**    9:20
**Girardi**    15:22
**give**    17:11, 21
27:21    31:12
40:16    59:13
65:14    83:12
84:20    93:7
95:25    96:9
100:9    104:18
147:16    170:4
181:17    196:24
199:22    233:22
237:23    238:4
239:21    256:19
264:22    272:19
288:4
**given**    16:22
21:9    23:6, 7
31:12, 13    40:7
106:13    123:22
124:6    127:10
146:1, 16
157:6    169:5
238:4    248:9
263:22    286:9
304:13
**gives**    133:13
253:13    272:1
277:4
**giving**    188:20
189:1    190:3,
22    222:11
236:22    239:8
**go**    22:12
31:20    35:14
40:15    42:6
50:22    52:20
53:2    57:23
60:11, 14
62:13    72:11
76:12    77:14

81:4    83:18
84:16    86:4, 22
89:9    91:14, 18
92:6    95:10
97:23    100:17
101:18    103:11
107:23    108:23
111:20    128:19
129:5, 23
134:9, 23
136:6    160:4
164:1    166:5
174:22    182:18
189:7    203:7
204:11    211:3
213:18    214:11
216:9    221:16
224:4    233:20
241:4    242:3
245:12, 19
247:18    251:25
259:14    263:10
265:12, 14
268:15    269:15
283:13    284:21
286:24    298:5
301:24    303:7,
12
**Godson**    149:6
**going**    12:22
13:4    15:6, 20
16:5    17:4
22:21    25:8, 13
26:8    28:16, 25
31:3    32:22
38:3    40:15
48:2    50:16
53:2, 6    59:13
65:24    66:6, 21
75:1    76:9
93:13    95:2, 17
99:2    104:4
106:6    110:2
112:19    113:22
115:8    116:7
117:3    118:2
121:9    124:25
125:18    128:11,
13, 16    132:20
139:21    147:3,
13, 15, 22
148:11    161:25

162:12, 21
163:18, 21
165:15    169:17
170:24    171:7,
15    172:13
173:13    174:5,
22    176:6
177:2    178:15
183:22    185:12
186:16    187:19
191:13    194:24
195:13    196:10,
14    199:14
203:6    210:14,
22, 25    211:3
212:4    214:7,
21    215:23
218:15, 24
219:12    221:22
223:5, 22
224:7, 13
225:15    226:7
230:10    231:9
232:22, 24
233:10, 17, 21
234:24    235:17
236:12    239:21
241:17    242:23
247:6, 7
262:23    264:23
266:7    267:19,
21    278:11
281:6    284:18
291:1, 16
292:4    293:25
297:15    302:10
303:10
**good**    17:2, 4
18:1, 25    20:1
41:5    56:5, 18
100:2    220:14
227:7    271:22
273:3    285:6
**Google**    46:4
59:2, 8
**Googled**    45:12
**gorilla**    151:10
**gotten**    123:9
204:14
**govern**    243:6
**governed**    250:17
263:13

**government**
30:15    41:7
55:21    148:17
149:20, 25
151:14, 18
156:20    157:1,
5    238:7
240:10    289:14
**governmental**
148:2
**governments**
148:8    149:14
**gravely**    67:5
**great**    220:23
221:6
**Greg**    180:17
182:7
**gross**    267:9
**grounds**    2:16
129:10
**group**    104:20
150:19, 23, 25
151:8, 11
167:13    207:6
256:24
**groups**    150:6, 9,
15    151:1
**guarantees**    59:21
**guard**    239:17
**guards**    237:24
238:16    239:5
240:1, 3
**guerrilla**    150:8,
14    151:8
**guess**    25:10
55:8    72:7
95:3    121:11
218:8    220:4
280:23    291:7
**guilty**    141:14
150:18    287:15
**guy**    26:10, 11
101:1    116:11
149:7, 8
155:17    160:20
265:21, 25
291:15    298:16
**guys**    35:12
147:1    158:21
159:20    229:23
230:11, 12, 25

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 21

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

233:3    235:5
246:21   270:16

< H >
Hager   4:17
  11:13   71:11,
  15   207:11, 18
Halcon's  116:10
half   193:21
  218:17   246:9
hand   60:11, 14
  121:20   122:11
  210:9, 15
  275:10
handed   36:16,
  18   37:2   61:20
  275:1   288:11
handful   32:22
handing   275:25
handle   15:20
handled   173:2
  237:11
handling   191:2
handsome   177:7,
  10
handwriting
  253:9, 20
handwritten
  253:7
happen   48:6
  64:4   67:8
  107:10   141:1
  211:3   229:25
  231:12, 18
  235:6, 17
  237:13   287:1
happened   29:25
  30:13   35:15
  43:5   48:5
  49:10   59:22
  67:18   131:8
  147:20   169:13
  170:1   175:23
  177:15   181:12
  188:5   205:11
  211:8   218:23
  219:22, 24
  224:15   226:18
  233:23   235:1
  239:23   240:6
  244:22   257:4
  274:3   278:25

300:13   301:18,
  19
happening
  219:17   220:1
happens   60:1
happy   47:2
  59:14   192:21
  193:11   277:25
  278:8
hard   95:9
  152:19   154:18
  271:17
hard-to-
understand   58:14
Harley   17:10,
  13   19:10, 12
  20:5   22:3, 10
  48:22   49:14
harm   68:1, 5
harmed   148:19
Harris   256:2
Hasbun   17:14,
  21   19:11   20:7,
  11, 15   22:7
  206:2
hazard   218:8
head   291:14
heading   98:2
hear   300:12
heard   44:23
  146:2   172:22
  184:19   249:23
  294:18
hearing   18:14
  39:21   76:3
  80:6   210:6
  256:14   258:1,
  10   304:14
hearings   196:17
held   287:25
help   12:22
  54:5   59:21, 23
  61:5   73:21
  88:24   105:12,
  13, 25   109:7
  139:7   155:20
  160:22   172:8,
  11   183:12
  199:11   219:4
  223:11   237:25
  256:20   283:10,

18   284:24
  285:14, 21, 25
helped   116:12
  285:1
helpful   159:13,
  19   264:2
  302:17
helping   29:13
  56:4   172:13
  177:15
Hendricks
  204:16   205:21
  206:4, 19
heritage   58:14
Herman   242:14,
  15, 16   248:20
  249:3   252:18
  269:5   270:4, 9
hesitating
  287:13
Hey   48:1
  221:3   233:3
Hi   59:19
hid   300:20
hidden   126:20
  137:3
hide   110:13
  297:25
hiding   288:22
  297:24
high   169:16
  248:22   265:1
highlight   77:3
highlighted
  97:17
high-tech   46:9
hint   295:18
hire   300:21
hired   39:24, 25
  149:7   206:9
hit   203:5
hold   38:23
  70:24   229:24
home   6:17
  93:13
hope   52:12
  98:23   100:22
hopefully   182:16
hopes   198:20
host   124:15
hotel   152:23
hour   236:3, 13

hours   51:21
  120:10   227:16,
  20, 23   228:10
huge   86:25
  116:9
Hugo   1:21
  10:8   72:16
  73:4
huh   225:5
human   41:25
  45:21   47:2
  70:24
humanity   289:13
humble   18:1
hundreds   193:3
hung   198:18
hurt   208:6
husbands   192:19

< I >
idea   14:5
  52:9, 14   58:15
  62:8   104:18
  107:3   169:25
  195:17   203:18
  248:19   266:20
  268:23   273:3
identification
  15:5   22:15
  31:23   42:9
  50:25   52:23
  58:19   62:19
  71:10   72:14
  76:15   80:15
  81:7   84:18
  89:12   91:17
  92:11   93:10
  96:12   97:22
  114:20   121:7
  122:14   125:6
  128:22   130:1
  134:11   136:10
  152:9   155:5
  160:7   165:3,
  25   170:10
  171:23   177:19
  182:21   198:11
  201:22   205:17
  209:17   213:21
  216:12   222:24
  227:10   229:12
  241:10   249:9

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 22

Case 2:11-cv-03695-RDP   Document 783-1   Filed 03/06/24   Page 101 of 259

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

252:3    260:1
265:17   269:18
271:4    281:11
294:8    295:14
298:8
identify    128:10,
17   291:9
identities    76:2
idiots    160:16
ignore    232:12
233:8
III    3:5, 7
illegal    16:10
220:6    221:10
290:10, 25
291:9
imagine    18:21
33:13    135:12
171:15   258:6
immaterial    235:9
immediate    8:10
15:19
immediately
148:25   243:4
257:3, 5, 19
282:2
imminent    33:6, 7
impacts    122:4
impatient    209:20
impeach    297:11
implemented
152:17, 20
154:7
implication
128:11   140:8
implications
208:3, 5
implicit    288:19
implying    61:19
118:5
important
185:21   191:6
231:15
impossible    59:22
impression    285:9
imprisoned
19:18    36:4
39:22    41:23
55:21    78:20
84:14    230:23
286:20

improper    16:9
203:19
improperly
288:25
inability    197:7
inappropriate
74:19, 23    131:4
inception    45:17
include    38:22
60:23    88:21
90:18    124:1
130:15   165:4
included    61:1
62:12    96:20,
22   120:18, 20
131:13, 25
137:20   212:21,
23   235:19
includes    98:5
204:6
including    31:3
72:17    188:3
193:4    203:2
210:7    227:16
288:23, 25
295:23
income    248:8
incompetent
125:14   126:22
203:19
inconsistency
146:5
inconsistent
119:21   145:10
Incorporated
10:19
incorrect    69:13
increased    112:25
incriminate
144:19
incriminated
144:6
independent
129:13
INDEX    5:1, 7
indicate    90:16
226:1
indicated    101:6
183:15
indicates
115:14   199:4

indication
221:8    286:17
indications    80:9
individuals
256:9    267:16
influence    122:3,
6   149:13
influenced    152:4
influential
220:22
info    103:17
inform    130:25
188:13
information
16:9    163:17
173:5, 6
182:15   219:4
220:24   260:6
286:11   290:8
informed    27:14
115:14
in-house    11:13
initial    29:16
62:7, 12
115:25   158:6
199:22   232:18
253:15   255:19
261:4    272:7
initially    48:14
49:10    174:19
208:14   209:21
231:9    241:24
242:10   250:4
262:13
initiation    199:3
innocence    185:17
in-person    68:11
input    73:17
212:1, 4
inquire    84:12
insight    65:14
instance    182:5
227:2
instances    90:8
institute    67:20
institution
67:20
instruct    44:7
instructing
122:21   295:21
297:24
insurer    125:13

intellectual
279:21
intend    253:1
intended    231:19
intention    143:21
intentionally
154:25
inter    171:3
intercepted
34:4    44:3
interest    29:14
156:8    163:8
261:23
interested
49:24    59:25
304:19
interesting
291:13
interests
178:15   244:10
267:15   286:2
interfere    122:8
218:25
interim    197:13
interject    17:24
interlocking
251:19
intermediary
22:4
intern    206:12,
16, 19, 22    207:2
internal    89:16
115:22   119:8
187:21, 24
internally
139:16   223:8
international
175:11   262:15
internet    46:7
interpret    53:9
202:23   285:6
interpretation
285:5
interpretations
102:20
interpreted
163:25   203:1,
6   283:4
interpreting
100:14   102:22
282:2    284:17

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 23

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

Interrogatories
129:6
interrogatory
216:23
intervening
171:4
interview  157:22
interviewed
158:10   285:24
interviews  36:9
Int'l   7:17, 20,
23
intricacies
210:6
introduce   50:2
285:24
introduced
47:20   56:25
57:12
introducing
57:8   285:15
introduction
47:25   49:7
invalidated
132:6
investigate
165:13   251:23
investigated
266:24   284:3
286:4
investigation
73:20
investigations
74:3   266:14, 18
invited   48:8
invoice   227:14,
18, 21   229:14
231:5   234:4
invoices   26:20
36:23   37:15
201:15   204:6
involve   115:5,
11
involved   29:17
30:6   32:19
33:3   45:10
46:14   81:25
105:22   141:21
149:1   179:14
200:6, 10
212:16, 18
251:18   268:22

involvement
47:19   174:24
185:18   252:19
253:2   289:6
involving   22:16
224:20   268:1
290:25
IO   9:1
irrelevant
21:18, 21
186:3   211:25
irritated
222:13, 16
Isle   250:17, 19
252:15, 17
256:24
issue   8:15
44:16   54:18
65:13   71:20
84:4   98:16, 18
110:1, 19
129:14   131:1
132:8   144:14
154:20   155:17
160:19   175:18
192:25   205:14
206:24   223:12
224:19   297:16,
17
issued   175:17
182:15   293:18
issues   5:10
113:22   126:19
138:6, 9   156:8
158:20   172:22
174:9   186:10
232:24   234:8
237:21   243:20
253:4   276:7
Item   98:1
100:20   106:11
its   57:20
70:25   86:18
137:4   144:15
233:6, 22   246:3
Ivan   14:11, 19
22:19   25:12
27:11, 12, 13
31:7, 15   33:14,
23   42:13, 19
43:3, 9   44:2,
22   45:6, 15

46:13   47:3, 10,
16, 17, 18   48:8,
11, 21   49:22,
24   50:1   54:5
66:3   69:3, 5
76:8   78:7, 13,
16   82:11, 12,
19   83:2, 20
84:2   87:8
89:19, 21   90:7,
13, 17, 22   91:4,
6, 24   92:16, 17,
25   93:5
101:21   102:4
103:15   104:13,
20   106:12
107:25   109:2
111:4, 16, 25
112:17, 23
114:1   119:7, 8,
14, 15, 17, 19,
23   120:16
122:19, 22
123:3   124:13,
19   129:17
130:12   131:22
132:16, 18
135:4, 6
152:14   153:16
154:6, 21
158:6   166:17,
19, 20, 23
170:18   172:19,
22   173:3, 5, 6
176:14   197:20
198:17   199:10
200:6, 10
202:3   204:2
213:2, 25
214:23   216:24
218:18   220:19
221:21   222:2,
18   223:7, 10
224:21   225:9,
16, 25   226:4,
12, 14, 22
227:15   229:2
230:1, 6, 14, 17,
20   231:8, 19,
24   232:2, 4, 16
234:3, 6   235:7,
8, 13, 19

236:11, 18
237:3, 8, 17, 21,
23   238:1, 11,
18   239:3, 13
240:4   253:12,
13, 21   254:14,
19   255:10, 17,
18   257:13
262:24   263:10,
15, 21   265:12
271:7, 13, 15,
17   272:3
274:14   275:1,
10, 13, 23
276:19   278:22
279:11   286:8,
12, 14   295:3,
16   298:17
Ivan's   43:23
55:7   108:16
166:22   229:22
231:15   235:5

< J >
Jai   226:4
jail   167:8
176:7   203:7
210:25
Jaime   9:18
12:18   22:19
25:5, 16, 18, 20
26:3, 11, 23
27:22, 23
28:10, 17, 18
29:1, 17   30:11
31:17   36:15
37:2, 9, 14
39:5   40:7
41:1, 19   42:15,
25   43:15
44:18, 19
50:14   54:1, 8
90:19   101:24
102:8   107:13
108:4, 6, 8, 18,
22   110:17
117:12   120:21
123:9, 19
124:2   127:6,
15   130:17
137:22   138:23
140:2, 9, 13

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 24

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

142:8, 12, 24
143:2, 8
145:22   146:2,
10, 13   148:24
149:5   151:21
152:2   155:17
156:9, 25
157:4, 9, 16, 22
160:19   161:12
164:8   165:7
167:7, 14
169:9, 16, 21
170:19   171:7,
12, 16   172:6,
25   173:10
174:13, 15, 21
175:1   176:15
177:20   178:20
179:18   181:6
183:9, 12
184:3, 15
185:12   186:2,
8, 21   188:7, 14,
20   192:3
194:1, 10
197:15, 18
198:14, 25
200:19, 24
201:25   202:5,
20   203:22
206:2   208:21
209:11, 20, 25
210:8, 12
213:3   214:1,
17, 23   215:2, 4,
24   216:2, 16
217:14, 17
218:5, 12, 17,
21   219:7, 15,
24   220:3, 10,
13, 17, 21
221:2, 9, 14, 21
222:1, 3, 17, 20
223:9, 10, 15
224:4, 18, 22,
23, 25   225:2,
11, 16, 19, 25
226:7, 15, 22
227:23   228:19
229:1   230:1, 7
231:21   232:5,
19   233:4, 11,

13, 18   234:7,
20, 22   236:19
241:22, 25
242:9   253:16,
23   255:1, 11
256:13, 19
258:13, 16
259:7   271:12,
18   273:8, 24
274:13, 23
275:7, 11
278:23   279:2,
15   280:13
281:9   283:10
286:9   293:20
294:11   295:6,
17   296:4, 11,
14, 18   297:12,
21, 24   300:15
301:24   302:21
Jaime-Blanco-
related   138:6, 8
Jaime's   28:19
James   252:13,
16, 20   253:1
260:3   265:19
266:25   267:8
January   51:1
53:2
JBM   9:22
213:3, 24
218:18
JEFFERSON   304:5
Jeffress   283:17
284:12
JEP   280:6, 14,
18   300:9
Jim   37:17
39:8, 11, 14
291:14   293:22
294:10, 15
295:6
Jimenez   35:13
40:15   159:25
Jimmy   147:14
job   163:22
jog   161:16
joined   262:16
Jose   190:20
Joseph   72:16, 19
journalists

41:25
Juan   15:23
JUDGE   17:24
18:6, 10   19:1,
2   28:3   128:23
129:11, 16
130:5, 12
135:19   143:22
191:22   256:14,
17   273:20
275:20   292:5,
12
judgment   41:13
170:2
Judicial   1:23
10:9
July   15:11
42:10   63:5, 14,
22   88:16
113:1   164:25
198:13, 23
201:23   205:19
206:7   276:17
June   31:24
jurisdiction
250:20
jury   128:25
jury's   191:9
justice   149:15
192:22   194:4,
7, 15   195:3, 10,
14, 15, 18
196:7, 16
288:11
justified
101:12   143:13
justify   227:18

< K >
KATHERINE   3:8
keep   18:11, 15
92:7   121:12
143:4   158:14
213:6
keeping   213:13
keeps   222:11
kept   247:13, 14
251:4, 5
key   110:20
kill   34:24
43:3   45:8
196:15

killed   61:4
67:10   68:4
147:4, 13
killing   192:18
193:24
killings   173:16
kin   304:17
kind   18:14, 22
27:8   34:11
46:10   63:21
138:18   166:25
224:1   256:18
262:6   265:24
282:24   284:7
kinds   83:17
106:4   188:4
200:15, 16
229:16   240:25
266:6
knew   26:15
46:1   48:23
140:2   233:17
235:17   265:24
267:18   297:8
know   16:16
17:15   18:11,
12, 17   26:9
27:1, 5, 20
28:7, 8, 11, 12
31:14, 15
33:12, 14, 19,
21   35:3, 17, 18
39:25   40:8
43:9   47:15
50:7   55:13
60:3, 10   61:12,
16   62:16
64:16   66:8, 11,
24   71:3   73:7
81:13, 14
82:25   83:6
85:21   89:24
94:16, 19
98:24   99:1
100:24   106:5
107:20   109:20
110:6   111:1
112:23   113:7,
23   114:8
118:24   121:3
124:8   126:14
127:8   128:2

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 25

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

131:8    134:19
137:16    139:15
141:12    142:10
144:17    145:18
147:1, 11
150:16, 24
151:9, 10
152:17    154:3
155:25    158:12
163:15, 20
164:16    170:17
174:18, 25
177:12    178:14,
25    182:1, 2
184:8    186:4, 5,
20    187:12
189:14    190:6,
25    191:23
192:9    194:9
195:1    196:8,
18    197:12, 17
199:15    203:13,
21    206:8, 9
209:11    210:22
211:10    214:25
216:5, 6, 7, 8
218:11    221:22
223:23    224:14
226:2, 18
228:5    229:5
238:3    240:12,
14    242:16
246:22    247:15,
23    250:13, 14
251:14    253:3
254:6, 23
255:15    256:7
259:8    266:25
267:24    270:6,
8, 17    272:25
275:3    276:11
278:18    279:19
280:3, 22
282:9    285:25
286:7, 16
289:5, 7, 9, 10,
11    291:2
293:23    294:14
299:7    301:16
knowing    299:10
knowledge    21:8,
12    27:19    35:3

50:17    52:19
60:19    66:22
68:1    93:19
182:9    194:14
198:6    214:5
219:16    220:21
224:3    251:12
284:1    289:5
known    51:19
knows    31:15
100:2    176:4
184:12
Kovalik    45:25
46:1    57:1
98:4
KROPF    3:19, 21
118:19

< L >
labeled    160:11
laboring    126:18
Lack    15:22
56:5
Laina    294:14
land    61:1
106:22
language    12:23
102:23    225:7
226:3    253:6, 7
Large    1:21
10:3    139:18
277:1, 2, 3
largely    149:25
larger    100:10
104:20
late    64:24
65:16    66:12
170:14, 23
171:6, 18    172:3
Law    3:9, 20, 21
4:5    125:19
143:16, 18
144:9, 11, 15,
22    149:5
177:24    250:17,
25    267:1
laws    2:7
lawsuits    250:13
lawyer    11:13
17:7, 13    25:18
29:12    71:12,
16    76:22

83:13    84:14
115:1, 5    116:5,
18    119:5
125:13    139:7
145:20    152:3,
15    154:25
180:18, 22
181:7    185:1
206:7, 11
212:8    225:16,
20, 25    226:15,
23    252:16
lawyers    24:7
26:3, 7, 13, 16
27:9, 16    28:8,
13, 16, 24    29:7,
20, 23    30:4, 22
31:13, 18
43:14, 17
45:20, 23
89:17    90:20
102:8    108:5, 9,
22    117:12
137:22    140:10,
14, 19    141:6
142:6    155:20
156:10    160:23
164:4    173:7
174:4, 18
180:13    181:25
182:2, 24
183:3    201:16
203:14    204:20
205:3, 20
207:6, 7
210:18    212:3
213:9, 10, 16
217:14    219:15
220:20    229:1
233:11    259:7
271:24    272:25
273:7    274:11
275:7    277:10,
13, 16    278:16,
18, 24    285:16
288:22, 25
289:10    290:15
294:10, 15
lays    273:20
LD    169:3
lead    14:3
271:22

leader    20:20,
25    173:16
leaders    28:21
30:1    173:19
183:14
leading    2:14
127:3    242:21
leads    52:8
64:19    74:4
109:5
lead-up    88:16
learn    298:4
learned    25:17
148:25    295:3
learning    44:4
182:16    296:3
leave    12:13
121:10
ledger    134:17
135:13
Leete    22:17
31:25    103:14
111:25    119:19
166:17    170:16
213:22    221:21
222:25    227:13
229:14    271:6
272:2    295:16
Leete's    23:1
112:5
Leeuw    242:14,
15    248:20
249:3    269:5
left    75:9
95:18    183:21
229:24    237:17
left-wing    150:8
legal    24:6, 11
26:20    29:9
30:12    32:3, 8
46:14, 20
137:15    139:8
166:2    172:8,
11    173:14
175:14, 20
177:10, 15, 20,
23    178:10, 21
181:10, 14, 17
182:10    183:10,
13, 22    184:4
185:24    188:14,
18    197:22

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 26

Case 2:11-cv-03695-RDP   Document 783-1   Filed 03/06/24   Page 105 of 259

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

201:15    202:12
203:12    206:4,
25    208:21, 24
209:12    212:2
217:17, 23
223:16, 23, 25
224:22    225:1
226:6    229:3
230:6    231:8
232:5    237:3
239:21    271:18
273:1, 6, 14
274:23    284:20
285:3    297:20
legally    70:22
legitimate
16:15    36:24
151:5    289:1
Lesley    155:7
Letter    6:19
7:1, 8    96:14
118:19, 20, 23
121:15, 17, 21
175:9, 10
203:25
letters    41:7
59:11    175:6,
12, 18    188:9
211:4    239:2
275:12    281:1
level    18:16
248:22
Levesque    32:1
76:17, 18
81:17    82:1
89:14    90:1
91:22    153:8
216:14    268:3
Libardo    167:10,
15    168:2
169:10    189:9,
24
Libel    7:5
library    51:5,
10    100:24
license    267:1
lie    142:18, 22
144:1, 5, 19
178:13    191:22
234:9, 13, 18

lied    126:20
137:3    146:23
184:16
lies    124:23
life    44:23
62:6    150:22
172:14    176:7
194:25    266:22
liked    55:17
likewise    155:18
160:21    174:19
Linares    35:13
40:14    160:1
line    12:15
98:10    104:7
273:23    275:5
281:12    283:17
Lint    269:24
270:1, 11
list    97:6
124:1    130:6
189:8    190:19
231:15
listed    54:23
89:4    136:25
138:10    232:25
269:24    288:13
listing    90:2
lit    130:8
literally    284:16
litigated    32:19
litigating    37:5
40:3    264:18
litigation
38:10    77:12
little    39:7
96:21    170:14
218:23    242:24
lives    35:1
58:11    270:18
Llanos    56:1
57:20    216:25
217:10    250:6
251:20    265:23
LLC    4:6
LLP    7:17, 20, 23
lo    244:19
Loan    9:5, 7, 15
241:15    243:14
244:8    246:13
247:1, 17
248:3, 10

249:11, 18
250:5, 10
252:8    269:24
loaned    242:13
244:19
loaning    250:2
Locarno    192:4
located    58:9
Log    6:14, 19,
21, 23    7:8
12:17    75:11,
20    77:15    94:1,
9, 10    95:6, 12,
13, 18    96:16,
20, 22    97:5, 10,
16, 18, 24
98:14    99:17
100:6, 21
101:5    102:14
103:2    104:2,
11    105:2
106:23    108:25
109:12    110:12
111:23    115:2,
3, 7, 20, 22
116:1    117:10,
20    118:17
119:13    120:13
122:17    124:16
127:11, 23
129:12    130:2,
15, 22    131:12,
16, 24, 25
132:1    137:1,
14    138:10, 12
164:23
logged    107:2
109:19, 25
110:6    113:16
119:8    129:19
130:13    137:6
152:12
logistical    260:5
logs    95:17
130:6    137:12
long    12:5
52:8    144:19
163:1    191:16
194:18    199:12
206:10    211:14,
21    237:9

238:5    258:19
259:4
longer    67:21
87:16    88:8
115:3    258:21
303:10
long-term    232:13
look    32:23
58:25    59:6
63:25    71:7
77:4    93:12
94:9, 18    110:2
118:10    119:1
137:24    163:18,
21    198:12
210:4    249:13
277:25    286:14
290:3    299:21
301:21, 25
302:8
looked    45:6
77:2    80:17
99:11    101:23
119:20    121:17
127:13    130:6
133:12    153:10
170:2    178:19
185:3    186:11
227:12    291:6
looking    21:15
47:15, 16    74:5
79:20    85:11
101:14    105:7
107:21    134:6
153:19    160:12
170:15    172:4
179:5    198:16
212:25    233:15
299:14
looks    42:11
92:1    94:24
121:18    162:11
166:14    171:25
183:5    185:5
203:22    212:25
253:5
loop    164:3
Lorraine    22:17
23:1    31:25
33:5    91:2
103:14    111:25
112:5, 21

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 27

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

119:18   166:17
170:16, 17
213:22   221:21
222:18, 25
227:13   229:14,
16   240:24
271:6, 15
272:2   295:16
loss   60:11, 14
lost   57:20
65:8   168:17
267:1
lot   18:12
27:24   28:13
54:20   58:7
82:3   99:21, 22,
23   112:19
113:8   161:25
163:8   200:16
226:9   250:23
261:25   287:17
289:15
lots   41:24
76:9
love   55:19
lower   218:17
228:4, 10
lumping   60:22
lunch   165:15, 19
lying   123:11,
17   154:25
291:23

< M >
Mafia   193:17, 18
Magistrate
129:11
maintain   78:9
185:16   270:10
major   28:14
148:10   237:19
making   86:25
88:17   90:8, 13
95:11   103:6
106:21   111:3
113:16   128:2
131:11   139:9,
14   141:10
149:21   155:20
157:1   158:6
160:22   161:17
179:17   192:22

212:20   258:10
280:23   283:25
290:20   292:25
man   192:17
250:17, 19
252:16, 17
256:24   269:23
289:23
managed   188:3
management
301:15
managing   298:24
MAR   5:9
March   72:15
134:12, 20
135:18   153:23
170:14, 24
171:6, 18   172:3
Mark   72:16, 19
85:1   92:19
149:17   160:2
180:19   285:11
289:17
marked   15:5, 7
22:15   31:23
42:9   50:25
52:23   58:19,
20   62:19
71:10   72:14
76:15   80:15
81:7   84:18
89:12   91:17
92:11   93:10
96:12   97:22
114:20, 23
121:7   122:14
125:6   128:22
130:1   134:11
136:10   152:9
155:5   160:7
165:3, 25
170:10   171:23
177:19   178:16
182:21   198:11
201:22   205:17
209:17   213:21
216:12   222:24
227:10   229:12
241:10   249:9
252:3   260:1
265:17   269:18
271:4   281:11

294:8   295:14
298:8
massive   135:13
mastermind   192:7
material   53:17
268:11
materialize
20:12
materialized
199:15
matter   10:18
34:21   66:17
75:4, 8   94:4
109:17   257:18
258:24
matters   60:1
Mauricio   202:14,
16, 18
maximum   195:1
258:25
Maya   17:10, 13
19:10   20:5
22:3   49:14
mayor   151:4
mean   14:13, 23
25:15   32:13
39:24   43:20
53:10, 14
55:13   58:2, 6
105:15   126:17
159:12   167:21
173:4   187:3
199:21   202:23
203:1, 6   205:2
218:10   220:19
222:12   225:1
228:8   237:16
239:17   247:10,
21   256:16
288:2, 3
meaning   25:23
290:15
means   25:16
94:17   155:10
175:14
meant   113:13
167:23   300:18
measures   87:11
151:6
Medellin   17:1
medical   122:4, 7

meet   19:11
48:8, 22   52:25
93:14   170:18,
24   186:8
197:2   204:4
210:12   241:22
266:7   272:24
293:25
Meeting   6:12
8:9   17:1, 7
19:17   48:2, 13,
17, 24   158:11
171:16   172:17
179:24   195:23
199:19   201:7
219:7   225:10
227:17
meetings   17:8,
17   19:15, 22
20:3   49:15
61:21   166:16
172:3   228:6
member   150:23,
25   151:1, 7
197:21   280:15
286:23   287:14
members   24:11
67:14   68:9, 22
91:7
Memo   6:9   8:7
81:9   84:6
178:25   179:3
204:20   205:21
206:25   207:5,
13, 21
memorandum
178:22
memory   60:10,
14   99:22, 23
122:4   161:16
men   192:14
mentioned   23:8
32:2   40:6
41:1   43:22
45:18   46:4
118:7, 8
127:24   173:7
180:17   182:7
220:19
mentions   127:8
202:13

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 28

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

**Merit**   1:20
10:1   50:16
304:24
**Message**   5:24
7:3   59:2
60:4   122:15
213:1   220:8
272:3
**messages**   62:21,
23   63:2, 24
68:18   69:18,
24   91:11
269:7   271:7
**met**   26:13, 16
49:8   51:17
57:14   157:11
172:6   202:18
242:9, 17
278:17   281:23
**Metadata**   6:10
84:22   85:12
86:16   87:22
133:13
**metal**   248:24, 25
**metals**   248:22
249:1
**mic**   292:19
**microphone**   241:6
**middle**   15:11
22:18   290:16
**Mike**   72:16
183:17
**million**   143:4
193:21   242:13
244:8, 20
245:12, 16
246:8, 18
264:19   265:10,
11
**millions**   264:16
**mind**   24:18
87:2   113:24
138:24   161:17
177:1   178:1
210:24   214:4
217:21   232:9
272:13
**minds**   214:15
**mine**   94:5
214:15   253:10
283:8   284:18

**minimize**   15:24
16:2
**minimum**   43:6
**minor**   266:22
**minutes**   161:3
303:11
**Misc**   7:10
**mischaracterize**
167:24
**misrepresented**
130:25
**misrepresenting**
76:1   134:4
135:19
**missed**   213:24
**mistake**   122:20,
23, 25   123:3
**modified**   85:15
133:16
**moment**   17:25
115:4   119:12
**Monday**   229:18
**monetary**   70:2
**money**   13:21
14:1, 6   16:3
27:9   28:9, 13
29:22, 23   30:4
31:6, 8, 11
34:12   39:11
42:19, 23
51:23   52:1, 10,
15   53:21
56:10, 14, 16,
21   57:16
60:14   61:12,
24   63:16, 21
64:16   65:3, 17
79:2   103:16,
19   104:24
138:24   159:4,
6   167:9
169:22   172:1
173:10   174:7,
14   175:20
176:1, 10, 19
177:2, 22
178:9   197:3
198:25   203:5,
8, 9   205:14
211:5   221:23,
24   224:20
232:19   233:4,

21   235:7, 8
236:22   237:8,
21, 23   238:4, 6,
8, 12   240:1, 2
241:22   246:3
247:5, 7
248:12   254:8,
10, 11   256:18
259:20   279:10
286:7, 15
289:21   299:1
**month**   78:9, 13
106:15   112:8,
22, 25   113:5
114:9   149:11
170:14   189:19
274:17
**monthly**   66:2,
20   111:3, 15
275:23
**months**   109:5
112:9   153:3
257:19   258:25
259:4
**month-to-month**
193:9
**morally**   205:4, 8
**morning**   18:1
213:25
**Motion**   7:7
12:10   38:4
64:2, 6, 9, 14
84:20   99:5
128:25   136:13,
17, 20, 23
137:4   182:17
289:4
**motions**   128:24
**motivation**   56:4
**motivations**   56:8
**mouth**   143:4
144:5   147:18
**Move**   27:25
100:24   116:14
172:15
**moving**   51:4
207:16
**multinationals**
148:10
**multiple**   150:7
178:3   221:20

258:9   262:20
293:9
**murder**   39:9
40:13   44:21
289:7
**murdered**   147:17,
23   191:12
193:7
**murderer**   280:6
**murdering**
183:14   191:20
192:2, 4   193:3,
13   208:19
**murders**   28:20
29:17   30:1, 2
39:23, 25   40:1
41:23   141:12,
15, 18   173:18
174:24   192:8,
12
**M-U-S-T**   74:9
**mystery**   110:20

**< N >**
**name**   11:24
12:1   17:10
23:17   24:20
34:17   46:24
72:21   81:14
85:13   149:9
166:22   167:2
**named**   26:10
124:1   196:7
202:18   269:23
**names**   10:25
26:14, 15
45:24   81:10
278:18
**naming**   23:25
33:25
**necessarily**
65:2   120:25
219:3   268:21
302:10
**necessary**   2:12
74:11   120:4
140:23   234:18
235:3   260:18
**need**   15:22
17:2, 25   18:2,
6, 9   19:9
25:25   33:9, 18

1-888-326-0504  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 29

Case 2:11-cv-03695-RDP   Document 783-1   Filed 03/06/24   Page 108 of 259

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

40:10    52:25
62:15    63:13,
21    64:3, 12, 23
65:5, 15    78:8
87:9    103:16
106:5    107:8
120:11    125:12
129:18    137:6
165:15    170:19
173:24    198:15
202:19    227:6,
17    232:4
233:3    234:19
235:4    241:6
257:21    263:3
271:22    273:4,
18    286:14
297:20    303:9
**needed**    27:8
29:9, 20    63:15
64:16    65:17
84:4    132:13
141:5    162:14
210:18    233:19
239:6    245:8
258:11    274:11
299:11
**needs**    15:19
176:18
**negated**    235:16
**neglecting**
281:21
**negotiate**    21:23
22:1, 6
**negotiated**    22:2
280:8
**negotiating**
17:20    20:4, 5
**negotiation**
22:9, 11
**neither**    109:18
110:5    152:12
304:17
**nephews**    230:15
**net**    262:3
**Netherlands**
58:8, 9, 11
265:25
**never**    17:23
24:25    26:13,
16, 17, 19, 20
56:8    79:7

87:2    108:6
117:23    143:5
151:17    152:16
154:7, 11, 22
155:19    159:6,
20    160:21
161:13    164:16
174:8    176:15,
23, 24    178:9
179:11    196:5
197:17    199:14
200:10    207:25
211:17, 18
221:8    224:14
226:13    230:5,
18, 21    231:19
232:23    233:9
243:7, 15, 24
246:6, 24, 25
248:11    254:9,
10    256:24
259:13    261:18
276:4    278:18
282:14    283:24
284:15    294:18
299:20
**new**    29:20
33:8, 17    53:1
112:2, 10, 11,
15    113:5, 25
141:5, 24
142:3    173:14
206:10    210:6
229:22    243:5,
9    251:1    271:22
**news**    51:4
214:22
**Nicox**    9:5
241:16    242:14
243:14    244:16,
19    245:2
246:3, 6, 16, 17,
23    247:4
248:18    249:2
251:12, 17, 21
270:5
**nine**    67:25
72:7
**no-longer-corrupt**
151:14
**nonprivileged**
215:7, 9

**non-question**
140:17
**Nope**    42:5
114:7    128:7
**normal**    276:2
**North**    1:23
4:7    10:10
**NORTHERN**    1:2
10:17
**notaries**    268:16
**Notary**    1:21
10:2
**note**    116:5
167:6    185:20
**notes**    77:3
95:23    121:10
157:22    166:11
**notes/concerns**
183:11
**notice**    163:23
**November**    125:7,
8
**nuanced**    283:4
284:15
**nuclear**    106:14
**null**    243:23, 24
246:5    247:1
257:2, 22
**nullified**    244:13
**Number**    10:20
27:6    36:6
42:18    56:21
62:24    63:2
76:1    77:5
78:4    82:8
86:2    96:19
98:1    99:8
100:20    101:20
102:1, 3
103:13    104:12
106:11    108:20,
25    113:23
130:11    133:9
134:1    157:14
158:9    160:12
172:14    203:2
229:15    238:19
241:23    264:24
294:16
**numbered**    78:5
85:25    99:14
106:9    216:21

**numbers**    77:18,
21    86:22
99:15    100:17
107:25    130:10
134:24    155:15
158:14    262:20
**numerous**    36:9
**NW**    3:22

< O >
**oath**    116:20
144:1    145:23
283:2
**object**    13:3, 4,
5    14:14    21:5
25:7, 8    29:2,
3    42:16    46:13,
15, 19, 25    47:1
51:24    53:11
55:12, 16
65:21    66:14,
15    68:19
82:22    83:23,
24    90:23, 24
107:16, 17
110:8    111:5, 6,
17    115:23, 24
117:13, 16, 17
124:25    126:23
127:18, 19
129:20    130:19,
20    132:21, 22
134:22    139:10
140:15    141:23
142:1, 2
146:24    148:21,
22    151:16
157:19, 20
159:7, 15
163:19    164:21
167:18, 20
171:10    174:1
177:8    184:10
189:4    190:5,
13    196:3
203:15    207:19
209:9    211:16,
23    218:3, 13
234:11, 16
237:5    238:9
239:19, 20
246:11    256:15

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 30

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

258:22    261:24
263:1    264:20
268:12, 24
273:12    277:23
279:5    281:4, 5
282:17    289:25
290:21, 22
295:24    297:13
299:24
objected    71:1
objection    66:6
objections    2:13,
16
obligated    247:1
obligation
247:17
observing    42:1
obtain    193:19
196:22    201:1
234:10    276:12
obtaining    200:2
obvious    84:4
obviously    172:23
occasion    79:7
158:3    240:6
249:3
occasionally
238:18    279:11
occasions    163:6
186:6    203:2
239:24
occur    151:15
occurred    40:11
56:22    97:4
131:3    198:23
237:20    248:7
255:6    272:7
288:10    294:2
occurring    198:7
October    96:15
112:9    121:14
122:16    274:17
294:9, 19, 24
295:15    301:5
odd    13:2
42:17    102:1
228:23
offer    21:4
84:13    285:20
296:7

offered    2:18
124:10    131:2
285:23
offering    157:10
197:22    218:22
285:7
offers    203:4
Office    3:21
12:13    69:10
125:15, 25
126:10    139:20
140:2, 12
151:20, 25
152:18    178:23
179:4    180:6
204:15, 21
205:24    256:8
officer    145:19
offices    69:12
256:9
official    148:1
officials    238:7,
12
Oh    28:12    33:6
35:7    39:24
68:3    83:14
86:4    110:15
135:4    161:17
190:20    236:14
245:7    280:19
288:24    291:19
303:8
Oil    56:1
57:20    216:25
217:10    265:23
Oil/Van    250:6
ok    15:21
Okay    12:11, 20
13:7, 19    14:18
18:5, 7, 21, 23
19:2, 20    29:6
33:4    37:16
41:6, 11    59:9,
16    75:14
84:24    86:20
88:3    96:3, 18
105:18    114:13
119:24    191:22
211:13    234:13
235:23    238:11
242:2    255:10

265:3    284:10
303:7
old    112:2, 10,
13, 14
once    43:2
211:25    251:21
ones    81:22
102:17    112:2,
10, 14, 15
113:5, 25
122:19    127:3,
13    173:16
191:2    245:3
268:1    299:13
one-third    267:9
ongoing    65:20
277:13
open    100:25
144:4
operational
154:11, 23
operator    221:10
opinion    177:24
201:1    204:15
205:5    219:19,
21, 23    239:22
273:18, 20
opinions    201:3
opponent    110:6
opportunity
115:16
opposed    14:6
23:25    24:13
33:25    137:25
185:8    186:12
214:6    276:1
opposite    73:1
options    187:14
oral    10:13
Orcasita    192:4
orchestrated
55:25    141:15
Order    7:7
19:11    85:3
103:15    107:9
128:23    129:6,
16    130:5
131:18    234:10
241:21    286:13
ordered    130:13

organization
20:21, 24
287:16
organized    124:17
organizing    26:2
oriented    205:14
original    29:12
57:2    62:4
79:21    117:20
131:23    233:22
236:24    243:17
257:22    258:15
263:5
originally
26:24    28:19
80:11    94:1
138:16    248:3
originated
246:23
Otero    14:11
22:19    27:11
31:7, 15    33:14
42:13, 23    45:9
46:13, 20
47:10, 11, 16,
17, 18    49:13
54:18    66:3
69:3, 5    78:13
82:11, 13, 20
83:2, 20    89:19,
21    90:7, 13, 18,
22    91:24
92:25    101:22
102:5    103:15
104:13, 21
106:12    108:1
109:2    110:21
111:4, 16, 25
112:23    114:2
119:7, 8, 14, 15,
17, 19, 23
120:16    123:4
124:13, 19
129:7, 17
130:12    131:22
132:16, 18
135:5, 6
152:14, 16
153:9, 16
154:1, 3    158:7
166:20    172:20
173:3, 5

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 31

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

176:15   200:6
202:3, 14
213:2   220:19
221:21   222:2
224:21   225:16,
25   226:13, 14,
22   227:15
229:3   230:6
232:4   235:13
236:11   237:9,
23   238:11
253:12   254:14
255:10, 17, 19
262:24   263:15,
21   265:12
271:8   274:15
275:1, 11, 13,
23   276:19
286:8, 12
295:3   298:17
Otero's   14:19
50:4   78:16
231:8   237:3
253:14   286:14
out-and-out
232:11
outlaw   150:23,
24
outlawed   151:8,
9
outlays   74:11
outlines   77:7
outright   144:5
outset   243:1
274:6
outside   27:18
39:21   40:1
302:24
overbroad   129:8
overcharge   36:25
overcharged
36:23
overseeing
143:23
owe   251:4, 5

< P >
p.m   165:18, 21
240:18, 21
270:22, 25
303:15, 16

package   108:1,
13
page   59:1, 7
85:11, 22   86:3,
8, 13, 22, 23
87:5   92:2
97:23   99:8, 14,
19   104:11, 15
106:8   119:1
129:5   133:8, 9,
12, 19   166:6,
10   168:19
182:22   183:2
185:6   216:21
281:12   283:13,
14
pages   77:20
99:12   249:14
pago   8:17
paid   27:21
35:25   40:5, 13
61:21, 22
70:14   75:2
76:2, 3   88:20
89:5   98:9
108:6   123:9,
12, 19   127:4, 6,
7   180:13, 18
181:15   182:2,
10   184:4
188:14   208:20
219:24   230:6
236:3, 8, 13
237:24   238:22
239:4, 25
243:7   246:3,
14, 24   248:15
251:13   254:8,
10   256:25
279:10   296:17
299:3
Paige   4:18
15:8
panic   239:3
paper   15:24
16:3, 13, 15, 18
163:22   289:21
paperwork   204:5,
10
paragraph   16:25
71:21   87:7
116:5   118:4

119:2   125:12
167:1   169:2
244:7   250:7
252:12   253:5
254:12   261:17
284:19   299:13
paragraphs   78:5
paralegal   46:23
69:8   76:22
parameters   66:1
paramilitaries
17:18   34:24
35:25   36:4, 10
40:13   41:15,
16   44:21   47:4
48:23   49:2, 15
50:2   78:21
82:25   157:6,
17   193:15
194:8, 13
195:22   196:13
207:9   230:23
paramilitary
35:6   36:14
37:8   83:9
150:6   188:24
194:2
paranoid   52:17
parenthetical
167:1
Parker   73:12
136:24   137:8,
11, 19, 23
138:7   152:11
154:2, 4, 8, 16
156:4, 5   180:2
182:24   183:3,
7   184:25
186:7   187:15
197:2   204:18
205:1, 3
207:24   223:5,
15, 24   225:13,
22   227:17
228:4   229:20
231:7   232:3
233:2, 25
234:14, 19
235:3   237:1
271:19   297:16
299:2
parsing   40:19

part   21:14
32:7   46:14, 20
61:10   68:20
150:12   151:2
166:21   193:1
196:17   204:17
226:6   231:20
236:19   244:15
246:17, 20
253:22   258:3
259:18   268:11
287:20   288:16
303:4
participant
151:6
participate
194:3, 7
participated
141:17   280:13
participating
194:15
participation
73:16   93:19
210:18
particular
24:19   34:5
64:17   66:8
104:12   124:6
126:13   127:1
129:2   162:22
182:5   191:14
200:14   218:9
225:10   238:25
particularly
101:2   177:10
234:5
particulars
218:7
parties   1:17
2:15   38:20
154:12   269:20
293:6   304:18
partner   149:5
298:25
Partners   7:16,
19, 22   125:21
162:1   271:19
298:25
parts   169:14
party   182:11
245:10

1-888-326-0504  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 32

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

| | | | |
|---|---|---|---|
| pass 261:18 | 180:24 181:7, | 76:5, 10 77:7 | 75:6 105:21 |
| passed 199:16 | 10, 24 183:9, | 79:14 87:17 | 118:6 119:17 |
| passes 31:6 | 21 192:17 | 88:9 89:2, 15, | 120:5 139:22 |
| passing 271:7 | 193:14, 21 | 18 90:9, 13 | 148:14 171:12 |
| passport 58:4 | 205:22 206:25 | 98:20 107:14 | 180:2 192:1, 2 |
| Patrick 252:7 | 208:24 217:17 | 110:14 111:3, | 193:3, 12, 14, |
| Paul 265:19, 20, | 228:18 239:17 | 16 112:1, 23 | 17 195:4, 16 |
| 21 266:19, 21 | 246:1 273:7 | 116:22 117:12 | 196:14, 20 |
| 267:8 | payment 15:23 | 119:25 120:20 | 200:3, 16 |
| PAULK 4:2 | 17:3, 5, 20 | 123:25 124:9 | 204:19 205:8 |
| 11:11 25:7 | 19:10 25:5 | 126:21 127:14, | 208:15, 17, 18 |
| 29:2 42:16 | 30:8, 9, 17 | 16 130:17 | 211:11 214:13 |
| 66:14 83:23 | 35:5 36:13 | 134:5 135:20 | 219:3 221:14 |
| 85:22 86:1, 6 | 37:7 38:6 | 140:3, 8 141:5, | 230:19 234:1 |
| 90:23 92:19 | 43:16, 25 | 11, 20 149:22, | 238:6 245:3 |
| 105:15 107:16 | 71:23 87:1, 8 | 24 156:20 | 251:18 288:9 |
| 110:8 111:5, | 101:21 102:4, | 157:7, 18 | 289:7 290:5 |
| 17 115:23 | 7 108:14, 17, | 161:18 164:4, | 297:2, 17, 19 |
| 117:13, 16 | 21 116:7 | 19 165:6 | 298:19, 23 |
| 127:18 130:19 | 117:2, 4 135:4 | 182:7 185:11 | perceives 142:25 |
| 132:21 134:22 | 137:22 158:6 | 189:2, 18, 25 | percent 42:21 |
| 141:23 142:1 | 161:7 179:17, | 190:10 195:8, | 52:3 125:25 |
| 148:21 157:19 | 25 184:1 | 11 207:16 | 126:3 211:9 |
| 167:18 189:4 | 185:2 186:16 | 238:7 255:13, | 247:16 261:14 |
| 190:13 207:19 | 187:9, 17 | 20, 24 256:13 | 262:3, 4, 8, 20, |
| 218:3 239:19 | 190:24 199:20, | 259:15 271:25 | 21 263:16, 17, |
| 261:24 281:4 | 25 200:21 | 272:5, 8, 11, 18 | 18, 19 265:12 |
| 290:21 295:24 | 201:7 209:7 | 273:23 277:12, | 295:2 |
| pay 21:16, 24 | 210:13 211:2 | 15 278:15 | percentage |
| 22:7 26:8 | 212:13 219:7 | 281:3 287:6 | 236:4 262:17 |
| 74:12, 14, 19, | 222:3, 4 223:6 | 288:10, 14 | 263:9, 23 |
| 23 75:5 78:8 | 224:8, 9, 13, 17 | 289:6 290:25 | 264:4, 5 |
| 90:19 108:4 | 225:15 228:18 | 299:17 300:5, | perform 217:23 |
| 140:9, 13, 14 | 231:10, 20, 22 | 20 | 273:2 |
| 173:24 180:22 | 232:18, 22 | PDF 153:2 | performed |
| 183:12 185:23 | 233:4, 13 | Peace 194:4, 8, | 239:12 290:3 |
| 197:5, 8, 10 | 234:20 236:4 | 15 195:3, 10, | Perilla 15:25 |
| 210:17 211:14, | 253:16 254:21 | 14, 15, 18 | period 41:12 |
| 21 224:21 | 255:12 271:24 | 196:7, 16 280:7 | 215:5 221:25 |
| 228:2, 4 229:2 | 272:4, 7, 18 | pending 224:20 | 244:12 265:22 |
| 239:7 240:2 | 273:25 274:23 | Pendleton 98:6 | perjuring |
| 246:6 248:11 | 276:17 277:1, | 198:14 201:24 | 143:14 145:13 |
| 251:23 255:19 | 2, 4, 10 288:16 | people 24:6, 20 | perjury 145:16 |
| 267:8 299:3 | payments 12:17 | 32:2, 7 34:7, | permanently |
| Paying 8:7 | 16:10 20:6 | 24, 25 35:10, | 231:20 233:11 |
| 19:12 34:23 | 31:17 42:14 | 15 39:9 40:9, | permissible |
| 44:17, 21 62:5 | 53:25 54:16 | 14 41:10 42:1 | 211:20 |
| 76:8 140:18 | 65:18 66:2, 9, | 44:8, 22 45:7, | permitted 196:20 |
| 156:9 175:19 | 11, 17, 20, 25 | 13, 18, 25 47:2, | person 17:17 |
| 177:2, 6 | 67:6, 12, 14, 21 | 9, 17 51:4 | 46:9 48:1 |
| 178:20, 23 | 69:21 71:3, 4, | 53:16 67:4 | 57:8 68:21, 23, |
| 179:9, 12, 14 | 6, 20 72:5, 9 | 68:2, 17 72:17 | 24 93:18 |

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 33

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

116:12   205:23
214:23   220:13
221:12   268:20
**personal**   21:12
35:3   52:19
65:12   93:18
237:22
**personally**
61:10   68:16
301:19
**Petro**   151:4
**Philadelphia**
270:17
**phone**   210:5
222:10   294:15
**physically**   96:5
261:7, 10
**picture**   166:23
169:13
**piece**   262:25
**pile**   116:9
227:14
**Piper**   204:16
205:21   206:3,
6, 19, 22   207:4,
21
**Piper's**   207:13
**Place**   3:11
143:20   259:5
**Plaintiff**   1:6
3:4   11:6
**plaintiffs**   11:3,
5   130:8
147:22   207:7
**Plaintiff's**   5:9
15:4, 7   22:14
31:22   42:8
50:24   52:22
58:18, 21
62:18   71:8, 9
72:13   76:14
80:14   81:6
84:17, 25
89:11   91:16
92:10   93:9
96:11, 13
97:13, 21
114:19, 23
119:5   121:5, 6
122:12, 13
125:5   128:21
129:25   134:10

136:9   152:6, 8
155:4   160:6
164:22   165:2,
24   170:9, 11
171:21, 22
177:18   178:17
182:20   198:10,
12   201:20, 21
205:16, 18
209:16   213:19,
20   216:10, 11
222:21, 23
227:9   229:9,
11   241:9, 11
249:6, 8   252:1,
2   259:24, 25
263:19   265:15,
16   269:17
271:3   281:8,
10   294:7
295:13   298:7
**plan**   18:3
170:18   223:14
229:17, 21
232:13, 18
233:7, 10, 24
241:1
**plane**   60:7, 21,
25   62:5
**planned**   232:15,
17
**plans**   9:3
100:25
**played**   188:10
**player**   266:22
**plea**   29:8
141:9   226:8
287:21
**pleading**   141:14
**please**   10:25
28:1   33:5, 6,
7   35:20   43:9
80:12   116:5
122:11, 18
149:18   160:3
170:17   178:7
180:20   183:10
199:7   213:2, 3
223:10   227:14
285:12   289:18
295:16

**pled**   287:15
**plenty**   18:4
**PLLC**   3:21
**plural**   33:16
190:1
**Plus**   36:6
**pocket**   148:9
149:25   284:22
**point**   18:18
19:25   31:9
37:23   46:23
54:5   64:18
69:14   72:22
74:9   98:24
107:15   123:17
134:1   156:3
158:13   168:7,
13, 15, 19
169:6, 8, 25
172:1   183:23
191:17   200:1
210:24   215:4
246:14   275:24
296:2   298:1
299:10
**Pointe**   7:16, 19,
22   72:20, 23
73:2, 5, 19
74:2, 19, 23
156:5   162:1, 5,
10   163:10, 13
**Pointe's**   74:16
**poking**   148:16
**police**   148:1, 18
**politics**   298:15
**popped**   18:15
**popping**   18:3
**portion**   146:8
225:6
**position**   31:2
71:5   120:5
141:6, 8, 25
142:3   173:22,
25   174:19
175:25   210:17
**positive**   280:20
**possession**
301:6   302:25
**possibility**
20:10   185:16
186:23   187:2,

4, 5   199:5
200:2   227:3
**possible**   100:22
104:7   124:22
174:20   185:3
186:10   217:10
272:4
**possibly**   21:4
154:16   293:25
**potential**   56:19
183:9
**potentially**
79:10, 19
**power**   38:19, 25
**precautions**
67:23
**precious**   249:1
**precisely**   184:24
**predated**   258:24
**prepare**   206:16
299:16
**prepared**   37:3
179:1   207:2
**preparing**   12:9
73:16   216:17
**PRESENT**   4:15
10:25   83:2
172:17   181:8
270:13   281:17
**presented**   145:22
**presenting**
146:22
**presently**   66:5
**President**   61:3
149:10   150:14,
20   151:3
180:12   182:11
**presidents**
40:14   289:11
**PRESLEY**   3:6
11:4   19:1
86:3   92:21
118:14   133:4
170:6   241:5
256:5   303:12
**pressure**   99:25
284:7
**pressuring**   8:13
**presumably**   47:24
**presume**   39:7
**pretty**   38:4
41:5   67:16

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 34

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

115:18    133:1
147:2    158:25
159:25    180:10
191:5    199:12
202:20    205:13
230:17    235:11
251:8    261:6
262:2, 16
265:1    266:22
276:13    278:20
prevent    144:2
176:9    180:14
181:18    193:24
239:14, 15
prevented    142:5
preventing
191:12    220:24
previous    170:15
previously
109:14    136:25
138:13    145:10
173:23    176:3
178:11    185:15,
25    186:22
197:19    257:12
272:24    279:19
296:1    297:18,
19    298:2
Princeton    72:24
73:2
print    304:11
printouts    292:7
prior    2:18
26:24    36:10
37:6    47:3, 25
52:2    65:10
86:13    91:19
101:8    117:10
141:10    144:23
145:3    150:22
151:19    157:1,
6    158:5, 11
159:3    169:2
171:11    173:21
184:4    188:12,
19    189:1
190:3, 11, 22
201:7    214:8
217:22    302:19
prison    17:19
20:15, 19    21:1
35:14    40:15

56:2    57:18
78:22    160:1
172:13    174:22
175:2, 5
194:25    221:2
237:24    238:12,
13    239:5, 8, 17,
18    240:1, 2
280:5, 17
prisoner    79:3
prisoners    78:24
prisons    169:14
237:25    238:2,
23    240:1, 9
Privilege    6:14,
19, 21    7:8
12:17    75:19
76:24    77:15
93:16, 25    94:1,
9    95:6, 17
96:16, 20, 22
97:5, 10, 16, 18,
24    98:13
100:6    102:13
103:2    115:2, 3
117:20    120:13
122:17    124:16
127:11    129:11,
12, 19    130:2,
15, 22    131:12,
16, 24    137:1
138:10, 12
164:23
Privilege.7z
6:5, 7
Privileged    5:22
77:2, 10, 14
95:12, 19
97:12    116:8
130:7    217:19
Privileges    7:14
pro    267:20
probably    23:8
25:19    34:13
78:21    81:14
84:2    101:9
102:23    103:23
106:18, 20
109:10    122:1
126:2    132:5
140:12    151:22
156:7    194:25

201:13    206:22
221:19    231:16
240:12    247:22
262:1, 13
264:5    278:12
284:19    287:12
299:12    303:9
problem    29:21
236:22    237:10
problematic
77:5    79:10, 19
82:12
problems    109:6
243:19
Procedure    10:5
proceeding
143:23    177:22
181:24    279:13
proceedings
10:14    17:16
303:16
proceeds    250:6
process    95:5,
16    96:8    115:6
127:11    172:7
193:18    194:4,
8, 15, 18
195:10, 14
196:16    199:13
212:17, 19
219:14, 17
280:6, 7, 14
286:11
PROCTOR    17:24
18:6, 10    19:2
129:16    130:12
135:19    256:14,
17    273:20
275:20    292:6
Proctor's
128:23    130:5
produce    85:14
97:7    100:11
117:24    118:1
129:2    132:20
154:2    162:5,
12, 22    215:10,
17, 24    291:11,
12    301:1
produced    62:21
85:9    94:2
95:13, 20

96:22, 23    97:5,
19, 20    98:14
100:7, 8, 21
101:5    102:14
105:2    109:1,
13, 19, 24
110:5, 9
111:23    116:7
117:3    118:18
120:15    121:3
122:17    123:3,
8    129:19
130:3, 13
131:24    132:13
136:24    137:1
138:9    152:11,
12    154:4, 16
159:5    162:9,
10, 19    163:13,
14    164:24
216:3, 7
281:13    291:7
producing    98:19
100:13    110:12
116:3    122:20
product    129:11
production    7:18,
21, 24    82:8
129:7    130:9
138:6    155:8
158:17
professional
18:16
professor    191:17
proffer    287:18
288:13, 17
prohibited
74:16    283:22
Project    6:10
225:10
projects    95:6
promise    213:7,
8, 12    222:14
promised    83:19
261:13
promises    281:15
282:23    283:5
pronouncing
256:4
proof    36:19
proper    30:12
31:1    178:10

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 35

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

180:17   203:12,
19   209:12
212:3
properly   129:8
PROPOSAL   8:16
154:21
prosecution
183:13
prosecutor   41:4
159:24
prosecutors
36:21   41:3
157:10   282:10
protect   144:5
protection
109:3   112:6
113:10   114:2
prove   299:22
provide   26:3
30:4   54:2
79:2   98:23
106:2   118:7, 9
127:15   161:14
165:13   174:3
177:15   186:8
198:17   202:12
213:9, 15
223:15, 24
228:25   235:11
238:18   260:5
273:8   278:11
283:19   285:1,
14
provided   10:5
61:13, 16   62:7
70:2   109:15
125:13   127:22
131:1   153:2
154:9   158:22
159:10   163:23
164:16   165:12
174:7   176:1,
15   213:2
218:2   235:19
251:14   264:25
273:1   275:13
278:16   282:23
284:4, 25
287:6   294:14
300:10   301:13,
22
provider   51:17

providing   67:21
94:25   117:10,
11   149:23
180:3   193:23
198:25   199:6
205:20   212:2
213:1   216:16
217:14   238:12
277:22   298:9
provision
144:14   250:25
261:16
provisions
250:24
Public   1:21
10:2   196:9, 11,
17
publicly   143:2
147:5   282:6,
12, 15
pull   95:8
133:5   170:6
264:23   277:21
pulled   12:16
75:19   98:13
100:6, 20
101:5   102:13
108:25   109:12
111:22   117:4
119:13
purchase   230:22
purchased   149:13
pure   186:21
289:15
purported   201:15
purpose   27:10
39:12   42:24
48:12, 20   49:8,
9   54:15   55:3
60:20   171:8
233:6, 22   275:3
purposes   11:24
48:18   54:22
128:24   183:11
231:23   264:9
pursuance   260:7,
11
pursue   290:7
put   12:16
61:2   88:3
92:7   94:6
151:2   155:17

158:12   160:20
161:25   170:7
187:5   194:1
221:11   224:1
229:15   241:6
250:23   264:9
271:20   276:24
292:19   300:6
301:14
putting   56:1
71:25   143:11
159:25   187:3
195:23   220:23
PW   137:6, 8
PWA   8:23   73:9,
12   155:18
160:17, 21
224:7

< Q >
qualitative
196:4
question   13:4,
5, 8   21:22
23:3   25:22
28:1, 5, 23
37:11   40:8
41:21   47:14
53:12   62:4
63:1   65:25
66:8   69:22
71:14   73:25
79:23, 25   82:6,
23   88:7, 22
92:22   94:19
97:3   105:3
107:19   109:21,
24   110:4
113:4, 6
115:10, 11, 19
123:21   124:7
126:16   130:24
133:21   139:25
142:19   146:19
148:13   149:17,
19   159:17
160:2   162:7
164:11, 13
166:19   169:16
170:21, 25
178:5, 10
179:6   180:6

181:2   183:21
184:20   186:19
190:16   191:10
204:22, 23
206:18, 23
208:2   214:25
224:3, 6   233:9
236:25   241:19
249:25   269:22
271:23   277:11
281:22, 24
284:11, 13
285:6, 10, 12
289:8   290:13,
14, 24   291:22
292:7, 10, 11,
13   293:18
300:3   302:20
questioned
137:23
questioning
104:7
questions   2:14,
15   5:22   35:23
75:18   102:16
109:15   140:25
145:9   176:3
206:1, 5
212:10, 22
222:19   260:14
266:7   300:18
304:9
quick   91:19
227:14   240:15
270:20
quickly   151:2
179:5   237:11
257:6, 9
quite   12:12
97:1   196:21
199:16   275:23
285:19   302:1
quotations   94:12
quote   14:11, 19
33:25   34:17
90:9   101:1
103:18   112:2
113:10   149:22
210:15   238:21
quoted   100:22
109:1   110:22
284:9

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

**quotes**   71:25
72:4   98:8
**quoting**   99:20

**< R >**
**Rafael**   58:25
59:12, 17
61:14, 24   87:3
100:3
**raiding**   148:12
**raise**   47:6
125:12   186:9
271:17, 22, 25
**raised**   24:19
174:23   180:6
222:19   297:16
**raises**   185:1
**raising**   174:22
186:9   187:15
**Rameriz**   45:16
47:21   154:6
166:17
**range**   27:3
**rare**   248:25
**rate**   228:5, 10
**rationale**
132:11, 25
139:5, 6   258:15
**Raul**   17:14
19:11   20:6, 15
22:7
**reach**   56:10
84:11   107:9
170:18
**reached**   53:1
57:12   109:3
243:22
**read**   12:2, 6
16:5   28:1
43:7   53:13
59:14   62:23
78:3   79:24
80:1, 2, 3
81:1   84:19
87:13   92:1
93:21   98:4
99:12   115:8
116:24   119:10
123:5, 15
127:9   128:1
135:7   144:15
152:24   155:23

160:25   161:2,
22   167:19
178:6, 8
183:18   185:7
212:8   230:3
254:5   263:18
285:12, 13
294:20
**reading**   2:4
32:5   53:16
111:18   212:18
**ready**   12:8
**real**   91:19
183:24   217:15
**reality**   65:6
231:6, 8
**realized**   28:21
**really**   33:12
38:1   46:25
53:6   58:14
70:17   71:3
115:19   117:21
132:8   141:15,
22   144:12
152:17   153:6,
7   156:23
158:20   161:25
163:8   169:12
191:15   199:10
231:6   237:3
238:2   243:24
244:21   251:8,
9   253:20
259:16   268:10,
22   273:21
278:25   302:14
**reason**   13:25
16:19   23:16,
24   32:21
33:24   34:16
42:18   43:19,
24   44:13
48:24   53:22
85:17, 20
100:10   104:5
120:17   121:19,
23   126:5
127:22   137:15
139:1   160:17
164:10   165:13
195:15   200:12
204:24   208:13

220:5   228:17
276:20, 21
287:13
**reasonable**
27:17   193:23
212:22   213:17
224:12   303:3
**reasons**   38:7, 9
63:20   298:2
**reassuring**
202:14
**Rebecca**   91:3
98:5   198:13
201:24
**recall**   13:15,
17   14:18, 25
16:4, 6, 12, 17
25:3   26:14
43:5   47:8
51:15   54:7, 21
55:1   57:13, 19
60:24   61:2
63:15   64:5, 8,
15   66:18
76:10   80:2, 10,
25   81:13   83:7,
10   84:3   85:20
88:13   89:23
90:4   98:15, 25
101:12   104:6
105:7   106:19
114:1, 11
120:14, 24
121:25   124:24
125:2   131:15
132:4, 5, 24
134:6   135:14
136:3   138:2, 4
139:11, 17
140:10, 12
142:14, 19
146:9, 25
153:11, 12
154:22   158:24
161:6   162:15
168:16   169:12,
18   171:14
172:2   179:2, 3,
6, 22   180:11
189:13, 22
190:7   191:3,
16   193:10

197:13   199:2,
8, 18   202:17
205:12   208:1
215:23   221:25
223:21   224:11
227:2, 4   229:6
235:18, 21
239:8, 9
242:20   243:18
245:17   255:3,
4, 7, 22   258:16
263:9, 12, 23
264:14, 17
265:1   266:15,
17, 24   275:6,
18   277:8
278:4, 5   294:1
295:5, 25
298:22   299:5
300:17   301:4
302:9, 12
**recalled**   87:16
88:9, 14   89:1
108:19
**recant**   44:20
**recanting**   176:14
**receive**   65:7
230:2   259:14
281:14   283:5,
22
**received**   107:14
114:4   116:21
123:24   144:24
145:1   147:6
149:12   159:6
161:23   174:14
184:16   191:7
231:22   245:15
246:23   248:2
249:2   258:2
261:20   267:10
277:9   281:23
282:3   295:18,
22   296:14, 19
301:20
**receives**   210:2
**receiving**   79:14
114:2   149:11
159:4   261:21
273:25

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 37

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

**recess**    70:9
114:16    165:19
240:19    270:23
**recipients**    173:9
**recognize**    77:25
**recognized**    30:14
**recollection**
28:18    43:1
49:17, 22
50:12    52:4
54:4, 17, 19
55:2    56:25
57:7, 10    80:22
89:7    90:25
108:17    121:24
124:21    132:10
135:24    138:4,
14, 21    139:5
170:3    230:19
238:15    276:22
290:1    302:2
**recommend**    207:15
**record**    11:25
19:4, 6, 25
39:2, 15    70:8,
11    80:1    85:5,
7    114:15, 18
133:14    157:8
165:18, 21
178:8    220:1
240:18, 21
241:8    258:10
270:22, 25
276:14    285:13
288:8    303:13,
15
**records**    37:21
38:6, 23    39:6,
10    40:7, 10
66:17    247:24
287:11, 24
288:5, 8
289:20    290:3
291:6    293:4, 12
**recovered**    262:21
**recovery**    236:5
248:23    262:3
264:6    265:10
**recycling**    248:23
**red**    94:14, 23
**redact**    85:14
**redacted**    74:8

**redaction**    23:2
155:16    212:24
**redactions**
168:25
**reduced**    194:20
195:5    304:10
**reducing**    16:15
**refer**    13:13, 21
23:16    32:15
44:9    52:1
53:2    146:9
**reference**    13:23
14:11    22:22
23:4    25:11
26:5    32:23
33:20    52:10
63:2    83:2
96:4    103:21
133:23    154:13
252:11    288:15
**referenced**
107:12    130:16
**references**
24:12    62:24
110:22
**referencing**
59:11    64:22
107:4    108:1,
11, 12    113:25
**referred**    53:23
78:1    137:18
**referring**    14:17,
18    23:8    33:20,
22, 23, 24    51:9,
23    52:5    60:4
65:3    85:21
126:15, 24
153:23    158:14
166:22    254:24
255:16    285:9
**refers**    51:8
113:7
**reflect**    293:12
**reflected**    120:20
**reflecting**    38:6
39:15    82:9
110:14    123:8
127:13    165:6
**reflection**    28:21
**reflects**    78:12

**refresh**    89:7
99:22, 23
124:20
**refreshed**    135:23
**refunded**    20:1
**refusal**    18:17
**refuse**    274:4
**refused**    197:3
273:24    274:7
**refusing**    292:9
**regard**    169:16
**Regarding**    5:10,
12, 14, 16, 18,
20, 22    6:1, 3,
5, 7, 12, 14, 17,
19, 21, 23    7:1,
5, 8, 10, 12, 14,
16, 19, 22    8:1,
3, 5, 7, 9, 11,
13, 15, 17, 19,
21, 23    9:1, 3,
15, 20, 22, 24
20:6    21:12
183:9    215:14
284:1, 2, 19
**regardless**    60:1
163:24
**regards**    20:7
**regular**    234:9
**regularly**    67:7
289:23
**relate**    90:8
108:3    117:11
120:1
**related**    12:17
31:6    52:18
55:4, 6    94:1
101:24    104:4,
9    107:7    119:9,
14    120:16
129:12    134:14
217:25    230:25
237:22    242:25
258:5    276:6
**relates**    78:20
124:12    191:8
278:14    287:24
**relating**    2:8
17:5    25:22
56:16    58:24
75:18    110:16
112:24    117:4

119:6    120:20
127:14, 17
130:12, 16
165:6    183:13
200:21    230:6
243:13    252:12
281:15, 25
303:5
**relation**    50:11
53:25    54:15
161:8    249:4
277:18    283:11
**relationship**
68:21    216:24
217:4, 9    243:6
296:3
**relationships**
251:19
**relatives**    193:7
**relay**    91:10
215:2
**relayed**    68:10
**relaying**    68:18
69:23
**released**    196:21
242:8, 11
280:17
**releasing**    294:17
**relevance**    93:17
**relevant**    257:4
**relied**    168:3, 6
288:7
**relieved**    247:16
**religiously**    74:9
**relocation**    71:20
**reluctance**
191:25
**rely**    168:7, 10
**relying**    205:10
289:14
**remain**    67:23
144:4
**remainder**    75:12
**remaining**    129:14
**remains**    219:20
**remember**    13:19
24:3    37:19
45:23    80:5, 6
96:6    124:14
149:2, 9
150:19    153:19
154:19    157:24

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 38

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

184:23    230:13
238:25    245:15
261:3    275:15
278:2, 3
**reminders**    221:20
**remove**    104:4, 8,
20    107:6
**removed**    95:12,
19    97:18
98:21    101:10
102:24    104:10,
16    105:1
115:7, 22
117:10, 19
120:12, 13
137:14    138:12
**rendered**    223:8
224:25
**repay**    247:17
**repeat**    161:2
186:19
**repeated**    49:5
88:17
**repeatedly**
56:15    123:10,
17    140:22
162:21    182:3
273:13    286:10
**replacement**
260:20
**replied**    24:22
**Report**    8:5
77:6, 23    84:21
85:13    133:14
248:1
**reported**    49:23
205:6    248:14
**Reporter**    10:1
11:18
**reporting**    205:9
271:15
**reports**    148:1
222:17
**represent**    11:1
13:3    82:20, 25
88:15    115:2
131:20    140:19
217:2    226:7
**representation**
28:14    29:10
30:12, 18    31:1
119:4    120:7

130:22    165:11
177:11, 16
178:11    181:11,
15, 17    203:12
209:13    217:11
230:7    231:7
273:14    284:20
302:11
**representations**
88:18    123:23
124:4    128:2
**representative**
116:10    197:25
**represented**
17:16    31:16
47:5    48:25
83:9    242:14
**representing**
26:11    28:17
29:1, 7    107:15
193:13    217:12
275:19
**represents**
82:13    83:3
127:3    304:12
**request**    82:8,
12    102:20
109:6    119:6
124:17    130:9,
11    161:14
172:16, 19, 25
177:7    186:8
189:25    190:11,
24    197:3
199:1    206:16
210:13    218:9
219:7
**requested**    77:13
109:18    179:18
183:12    232:19
**requesting**    299:1
**requests**    37:25
38:2    89:21
123:14    124:16
129:6    131:6
182:14    189:3
199:20    216:18
222:14, 17, 19
289:2
**required**    131:6
194:23    238:18
239:11

**research**    19:16
128:10    131:5
206:4, 21
**resend**    7:1
**reserve**    232:24
**reserved**    170:2
**resistance**    186:9
**resisting**    41:12
**resort**    74:10
**resources**    65:8
100:24
**respect**    109:4
112:6    200:19
267:10    268:25
**respecting**    44:5
**respective**    1:17
**respond**    12:6
60:6    198:17
216:18    266:12,
13
**responded**    124:6
145:8
**responding**
12:10    80:16
123:22    158:20
**responds**    51:16
60:9    207:11
272:2
**response**    23:10,
19    52:2    73:10
137:25    166:8
185:4, 5
186:11    210:4
214:12    217:1,
3, 7    261:12
274:2    277:11
284:12    289:1
302:19
**responses**    8:21
38:2    123:14
216:17
**responsible**
50:15    192:2
193:3
**responsive**
19:25    28:4, 6
77:16    97:6, 11
110:1, 3, 5
130:7    215:22,
25    216:8
218:9    258:7

**responsiveness**
93:16, 25
110:19
**rest**    16:5
53:21    172:14
230:2    292:5
**restate**    28:23
66:6
**result**    258:14
282:3    304:19
**resulted**    156:4,
6    241:24
242:8, 10
258:12    259:6
**resulting**    265:9
**results**    238:5
**resume**    66:10
67:15
**retained**    217:23
**retaliate**    70:23
143:7
**retaliatory**
50:13
**retired**    265:24
**return**    53:3
248:15    296:6
**returns**    248:2
**reveal**    123:10
295:22
**reveals**    28:9
**review**    8:21
93:14    96:1
97:2, 9    107:8
128:16    135:9,
16    163:4
**reviewed**    99:5
103:5, 24
119:12    135:22
162:24    165:5
266:4    300:17
**reviewing**    266:15
**Revised**    8:1
166:3, 6
**rewarding**    195:4
**RG**    59:11, 17
86:25    87:3
100:2, 3    101:1
**Richard**    15:14
125:9    183:4
**RICO**    70:21
**rid**    301:10

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 39

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

ridiculous
291:18, 19
riding 18:12
right 11:18, 23
14:22 15:2, 10
18:10 19:23
22:12 35:9
38:12 40:17
51:19 55:22
57:23 58:12
62:13, 17, 25
63:7 65:9
70:5 71:5, 13
73:10 75:7
76:6, 24 77:10
78:2, 10 81:18
82:14 85:8, 11
86:6 90:10
91:12 94:11
96:9 101:25
103:3 104:2
105:5 106:20,
23 118:1
121:17 123:19
128:15 136:11,
15 139:20
140:14 141:7
142:12, 23
143:25 144:18,
22 145:15, 18
146:15 147:15
150:9 156:21
159:14 165:14,
22 166:3, 5, 6,
9, 25 167:5
168:2 170:4
171:18 175:11
178:12 184:9
187:4 188:10
191:22 194:22,
25 195:24
196:24 205:18
208:7 216:9
231:5 233:15
240:15 241:7
242:12 264:5
271:16 273:17
277:22 281:7
291:16 292:3,
14 293:14
295:11 296:20

right-hand
62:23 94:20
rights 41:25
45:21 47:2
55:25 57:21
70:24 143:22,
25 262:15
right-wing 150:5
rigidly 255:3
ring 13:23
risk 196:1
risky 271:21
rks@spotswoodllc.c
om 4:11
ROBERT 4:3
11:9
rogatory 175:6,
10, 12, 18
188:9 211:4
239:2 275:12
281:1
role 30:2
48:21 49:14
173:17, 18
192:11 258:7
268:14, 15
rolling 53:7
Room 1:23
10:9 139:22
220:13 261:8,
11 290:4
291:10
Roughly 274:21
Row 135:2
Rubio 147:14
ruled 129:16
rules 2:8 10:5
run 276:2
running 12:21
18:11
rutterless
205:4, 9
Ryerson 76:17,
20 79:10
155:7 160:10
162:3 163:12

< S >
s/Merit 304:24
safe 67:23
safely 61:1

safety 67:4
147:9
Samario 12:18
66:4 69:4
76:4, 11 78:8,
14, 18 79:14
88:21 89:2
90:10 103:22
106:16 107:14
109:9 110:16,
23 111:15
112:17, 24
114:3, 10
117:5 120:1,
21 123:9, 18
124:2 127:5,
14 130:17
131:2 134:5
135:6, 20
155:22 156:11
158:3 160:24
161:6, 16, 18
164:5, 10, 17
165:7 190:17
193:1 194:13
195:21 239:1,
5, 7, 15
Samario's 87:9,
18 88:10
90:14 104:25
195:9
Sam's 103:19
119:25
Sanchez 17:11,
13 19:10, 13
20:5 22:3
48:22 49:14
sanctions 12:3
64:13 84:20
99:5 136:14
Sansbury 4:6
Sansom 4:6
SARA 3:19, 21
118:19
Sara@kropf-
law.com 3:25
sarcastic 32:17
satisfaction
40:16
satisfied 257:21
save 62:6

saved 85:18
86:18 87:23
133:15
saw 26:20
117:23 157:25
209:6 222:9
223:21 225:17
236:22 243:15
245:13 254:17
257:14 266:22
268:20 274:15
293:23
saying 24:25
25:1 40:16
51:3 52:15
59:19 60:10,
13 63:7 80:18,
21 87:7 88:19
99:20 100:22
107:3 109:2
116:19 124:5
137:25 142:17
144:25 148:12
151:24 154:14
155:13 156:13
162:12, 25
163:4 170:23
176:18 185:8,
19 186:12
196:1, 11
199:13 208:1
211:9, 10
214:7, 13
221:21 224:24
227:1 229:15
230:10, 21
234:19 242:13
243:18 254:18
266:12 267:7
271:20 272:3
282:15 299:23
says 16:7
23:20 33:4
43:9 59:7, 23
60:8 63:8
65:10 73:8, 9
74:8, 17 77:7,
11 78:7, 11, 15,
19 80:20
82:12 86:25
87:22 89:15
92:15 93:13

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 40

Case 2:11-cv-03695-RDP   Document 783-1   Filed 03/06/24   Page 119 of 259

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

94:3    98:5
101:1    104:23
106:25    110:23
111:10    112:6
113:12    116:16
125:16    129:6,
22  130:6
132:15    134:17
135:4    136:8,
22  142:8
154:6    160:15
166:4, 11
167:5, 22
169:3    172:8,
10, 12  183:20
185:14    198:19
202:19    209:20
210:3, 8
214:21    217:9
218:16    228:2,
7  229:18
244:13    250:8,
16  252:7
253:11, 24
254:2, 4, 12, 16
260:4, 9
267:12    271:9
284:23    294:21
296:8, 18, 20,
21  298:14
299:14, 25
300:1    301:8
scene  220:3
scent  47:12
Schedule  8:3
Scherer  4:17
7:17, 20, 23
11:10, 12, 13
15:15    61:11
66:9, 13, 16, 23
67:1  69:10
71:12, 15
81:25    85:10
93:24    125:9
126:10    130:3
164:25    178:23
179:8, 17, 23
183:4    262:9,
16, 24  263:7
267:17    268:3
298:9, 10
301:14    302:25

Scherer's  179:9
204:21    263:18
301:14
Schoenbrou  256:2
school  46:3
48:16
scope  73:5, 8,
10  74:16
102:20    129:8,
18  131:6
144:16    182:1
236:19
scrap  248:24, 25
screw  213:5
search  46:10
106:3
searched  119:7
seasoned  196:13
second  15:23
33:19    59:14
71:21    82:8
93:12    103:1
116:5    118:4
119:1, 6
125:12    130:9,
10  155:16
160:8    166:10
210:8    213:23
225:6    254:17
276:15    294:13
section  99:17
Secure  7:16, 19,
22  72:20, 23
73:2, 5, 19
74:2, 16, 19, 23
156:5    162:1, 5,
10  163:9, 13
277:5
secured  244:9
250:5
securing  250:9
security  34:6,
9, 13, 20    43:2,
23  44:1, 14, 16
52:17    54:6, 18
55:7    66:25
67:6    71:4, 20,
24  76:5, 10
78:7, 16    87:1,
8, 11  89:5
90:9, 13
103:19    104:25

111:4, 15
112:24    114:4
116:6, 12, 22
117:2, 4
119:25    131:1
135:2, 5, 20
138:17    149:22,
23  158:23
195:17    229:22
231:16, 24
235:5    237:4,
22  244:7
272:1, 19
273:4    276:7
278:10    291:14
292:2
see  13:22
14:9    15:12
18:3    22:24
23:23    46:5
58:7    59:4
75:12    79:20
86:11    94:10,
11  111:19
112:3, 12
117:6, 19
132:10    142:7
160:13    167:3,
6  168:18
171:7    172:7
181:12    183:10
184:20    192:25
196:9    197:10
201:14    202:20
204:4    207:14
210:21    218:6
229:23    245:4
263:3    269:24
271:11    273:19
280:3    286:15
289:20    290:18
292:21, 24
293:13    295:11
301:22
seeing  179:3, 6
seeking  21:11
64:14    181:19
182:15    293:3
seen  31:5
58:6    84:6
144:13    152:14
153:1    196:6

203:24    221:8,
18  223:19
238:19    264:7
278:18    288:12
303:6
sees  34:22
seize  64:2
Selected  6:10
41:4
self-
incrimination
144:2
selling  34:9
senator  151:5
send  54:10, 14,
25  55:3    61:24
63:6    103:16
134:20    152:18
207:5    215:2, 5,
16  269:7, 8, 22
291:4
sending  16:3
28:25    29:4
42:12, 23
53:15    59:1
73:4    76:23
114:9    115:21
136:20    153:9
156:1    269:13
sends  228:1
266:10
sense  43:16
61:18    191:14
296:4
sensitive  44:14
sent  25:5
36:25    42:19
43:2    53:23
54:8, 22    62:8
66:3    73:8
76:5, 7    104:24
112:8    131:23
135:10, 11
142:7    163:5, 7
215:20, 24
223:7    241:25
243:17    245:16
252:23    254:10
275:9    292:18,
23  293:3
sentence  23:2
33:4    59:23

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 41

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

71:22    74:7
93:12    118:4
125:16   129:9
160:19   167:22,
23   185:22
194:20   195:2,
5   210:8, 20, 23
213:23   294:13
**sentences**   53:13
**separate**   30:23
181:23
**September**   6:16
22:17   64:20
82:19, 24   83:8
85:15, 19
86:13   87:16,
20, 24   88:7, 11,
16   89:1, 13
91:22   92:13,
23   94:8   109:2
112:8   114:24
166:1   213:23
216:14   223:1
229:13, 19
241:1, 3, 14
260:3   270:3
274:13
**sequentially**
85:24
**series**   62:21
168:12   222:13
242:2   255:12,
20, 23   257:6
271:24   272:5,
11, 13, 18
273:23   277:11
278:15
**serious**   109:6
231:24
**seriously**   163:9
227:19, 25
**served**   226:22
**service**   238:17,
20, 21   239:11
**services**   19:13
223:8   224:22,
25   225:2   260:4
**set**   200:12
**settled**   262:4
263:6
**seven**   233:14

257:8
**shape**   12:13
**sheet**   85:12
86:9, 16
115:14   133:13
**SHERMAN**   3:8
**shipment**   51:18
**shock**   275:21
**shocked**   54:25
**short**   65:8
70:9   114:16
240:19   270:23
**shortcutting**
156:14
**shortly**   67:2
243:21   244:24
**shot**   116:14
**show**   13:18
14:15   15:6
24:2   25:2
40:10   58:20
152:6   164:22
177:6   178:16
221:18   222:21
241:2   249:6
272:12   287:24
294:5   300:5
**showed**   36:19
44:11   90:15
273:21
**showing**   37:21
39:11   97:13
281:7   299:17
**shows**   54:24
133:16   212:14
**shrewd**   221:10
**shut**   69:10
143:5   147:19
**shutting**   69:11
292:4
**side**   95:13, 20
109:19   129:1
184:8   194:2
**sides**   18:22
**sign**   147:19
169:1   174:6,
13   268:21
273:25   274:5,
7   280:21
**signature**   2:4
92:3   126:8
268:2, 17   269:2

**Signed**   9:15
92:14, 16
132:15   154:11
168:20   174:17
229:16   240:24
241:21, 23
242:6, 7
243:12, 16
245:5   249:14
250:22   253:24
254:3, 22
255:2, 25
256:10   257:6
258:19   259:9
261:2   267:24
268:18   269:20
274:18   288:18
293:20   294:18,
24   298:10
**significant**
172:11   203:4
234:7   236:20
**significantly**
184:1
**signing**   36:10
248:10   260:15
267:14   268:6
**signs**   277:2, 3
**silent**   144:4
**silly**   215:21
**similar**   48:21
49:13   102:22
127:2   133:11
155:21   156:10,
18   158:11
160:23   161:15
164:9   207:8
217:3
**simple**   251:8
**simply**   39:8
70:23   132:24
149:20   168:24
227:1   264:23
268:8   284:22
**single**   35:5
36:13   37:7
39:1   118:3
162:24, 25
189:19   220:7
296:24
**sit**   14:20, 22
16:24   26:14

27:1    33:12
45:24    54:21
55:1    93:2
97:8    98:25
100:15   101:13
104:6   105:7
107:21   114:11
120:14   130:24
149:9   157:13
158:8, 24
194:24   205:25
217:21   223:17
224:11   226:25
227:2   254:5
288:6   302:1
**sitting**   27:15
96:2   101:16
131:7   132:25
**situation**   13:2
27:14   30:23
44:15   105:14
136:3   161:12
171:17   181:14
188:23   206:2,
3   210:7   211:8
212:12   213:14
214:14, 24
215:23   217:10
219:1, 5, 6, 8,
22   222:12
225:12   226:9
250:23   287:5
**situations**
179:13   236:15
238:15   239:10
**six**   98:1
149:4   151:22,
24   178:18
227:11   233:14
257:8
**skipped**   185:21
**Skipping**   129:9
130:8
**Skype**   261:5, 6,
9
**slap**   70:23
**Slendebroek**
256:5, 6
**slide**   202:21
**sliding**   202:24
**slip**   85:12

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 42

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

133:13

**sloppy**   225:3, 5

**small**   235:11

**Smith**   81:11, 13
96:15   114:25
116:18   117:1,
9   125:13
126:21   139:7,
12

**Smith's**   118:19
126:8

**smoke**   257:11

**smoothly**   233:20

**snide**   261:12

**so-called**   80:7

**social**   48:17
270:12

**society**   151:3, 6

**sold**   207:15

**solicit**   204:13

**solid**   207:17

**solve**   109:7

**somebody**   16:8
34:21   45:3
56:9   62:8
113:13   139:19
172:22   179:4
204:15   206:13
287:5, 8

**someone's**
152:22   191:12,
20

**son**   179:9
298:25

**soon**   38:4
98:9   170:19
202:20, 22
254:18

**soon-to-be**
271:19

**sorry**   32:5
49:23   59:5, 19
63:1   71:14
72:3   76:19
135:4   199:11
227:13   235:16
236:18   257:13

**sort**   45:9
47:12   62:10
68:13   95:7
116:22   122:3
123:25   128:14

131:18   135:15
139:5   156:6
159:4   161:7
180:8   184:17
191:7   192:23
203:5   220:21
243:3   246:2
266:8   276:14

**sorts**   61:23

**sought**   297:21

**sound**   95:14
137:15   139:3
274:20

**Sounds**   18:25
65:12, 17

**source**   51:10
56:18

**sources**   138:19

**SOUTHERN**   1:3
10:18

**Spanish**   68:14
91:7, 25

**SPANOS**   4:4

**speak**   13:1, 11
44:8   47:13
68:14   100:15
144:18   181:11
232:7   294:16
295:6

**speaking**   23:13
28:12   44:6
45:9   53:19, 20
56:20   68:22
94:24   126:12
138:5   214:23
281:24

**speaks**   60:15

**special**   265:24

**specific**   53:12
65:25   66:18
68:7   84:9
102:16   113:24
131:15   132:4,
10, 24   138:4
171:14   199:2
226:3   227:2
239:9   241:18
289:5   301:3

**specifically**
16:6, 12   64:15
76:10   79:8
84:3   100:15

101:13   102:9
107:8   115:20
192:20   193:10
196:7   197:14
206:23   223:22
224:11   238:14

**specifics**   136:4

**speculate**   24:16
51:25   111:9
112:20   113:13
125:1   139:22
211:24   224:12
281:6   303:2

**speculating**
51:8   280:22

**speculation**
51:12, 22
133:1   186:22
187:2   188:6
263:2   289:15

**speculations**
185:25   186:2

**spell**   296:24

**spend**   176:7
245:23

**spending**   236:20

**spent**   28:10
60:19   196:21
226:9   237:21
276:10

**spilled**   237:1

**split**   262:23

**spoke**   26:17, 19
32:11, 14
45:13, 17, 23
57:15   91:7
174:8   182:6
204:18   223:2
284:15

**spoken**   27:11
282:10, 11

**SPOTSWOOD**   4:3,
6   11:9   105:16

**Spreadsheet**
5:24   7:3

**spreadsheets**
134:14

**staff**   24:8
149:10

**staffed**   240:10

**stage**   189:22

**standard**   262:2

**star**   147:15

**Starnes**   3:10

**start**   12:21
46:16, 17   51:3
157:2   292:21

**started**   34:14
72:22   88:17
195:22   290:13

**starting**   88:16
93:14   202:21
281:12   283:17

**State**   1:21
10:3, 25   11:24
40:7   240:12
304:4

**stated**   38:7, 9
49:8   195:16
231:24   277:10
284:5

**statement**   70:15
83:6   124:20
225:23   226:14
281:22   283:1,
25   284:1

**statements**
41:16   125:21,
23   158:11
281:15, 25
286:19

**STATES**   1:1, 22
10:8, 16   283:23

**Status**   5:18
248:5

**steady**   53:8

**steal**   55:25

**Steelworkers**
57:4

**stenotype**   304:9

**step**   61:5

**stepping**   259:11
260:18

**stepping-stone**
243:3   244:24

**steps**   197:13
208:18

**stick**   118:20
194:12   262:19

**STIPULATED**   1:16
2:3, 11

**stipulation**   10:6

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 43

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

stipulations
  11:19
stone   259:11
  260:18
stonewalled
  37:25   182:14
stonewalling
  289:1
stop   210:9
  281:18   290:12
  291:16   292:15
stopped   26:11
  66:9, 12, 16
  67:6, 12, 15
  151:25   152:2
stories   222:11
story   29:25
  36:20   37:10
  44:20   141:21
  177:3   279:3
straight   286:9
strategic
  204:24   208:3, 4
strategy   173:14
  204:3
stream   53:8
Street   3:22
  4:7   61:3
stress   295:17
stretch   6:17
  93:13
stride   19:3
strike   27:25
  28:15   157:2
  266:3   271:14
strong   152:5
struck   253:6
  273:2
structure   21:7,
13
stuck   147:17
study   163:6
studying   162:15
stuff   137:6, 9,
11   138:20
subject   50:10
  90:8, 18, 21
  108:11   129:2
  133:14   136:23
  143:14   162:8
  217:16   283:24

  284:6
subjects   74:12
submission   80:4
submitted   39:5
  158:19
subpoena   38:18,
19, 25   175:11
  289:19   290:15
  291:4   292:18,
23   293:2
subpoenaed
  180:15   270:16
subpoenaing
  293:6
subpoenas   293:18
substance   122:3,
7   199:8, 17
  209:3   234:24
substantial
  235:10
substantiate
  220:16
substantive
  98:18   212:1, 4
succeeded   17:23
successful
  196:23
successfully
  167:16   174:23
suffered   281:18
sufficient   244:5
suggest   140:25
  295:17   296:17,
18
suing   207:7
suitable   260:6
Suite   3:23
suits   70:23
sum   177:7, 10
  199:17   234:23
  255:20
summaries   94:12
  96:21   103:6
summarily   61:2
summarized
  99:19   101:20
  103:13, 15
  106:12   127:12
summarizes   95:7
summarizing
  156:15   160:10

Summary   5:24
  6:10   7:3
  40:22   41:12
  98:5   103:25
sums   210:20
SunTrust   247:25
superseded   132:6
supervision
  304:11
supplanted   254:7
Supplemental
  7:8   130:2
  131:12, 16, 25
  164:23
supplemented
  253:7
supplementing
  252:8
support   62:7
  70:2   198:16
  202:12   260:5
  274:11   275:21
  301:23
supported   293:1
supporting   39:2
  41:14   144:15
  193:8
supports   40:4
  220:9   290:19
supposed   201:17
  203:25   204:1
  229:14   239:1
  278:21
supposedly   26:8
sure   15:19
  23:11   32:24
  46:11   48:9
  51:12   52:4
  67:16   69:14
  137:5   139:16,
21   152:15
  157:25   158:8
  163:22   168:8
  170:1   173:8
  174:25   180:15
  183:1, 23
  187:16   189:20
  192:20, 23
  207:22   211:9
  226:16   229:7
  230:17   231:17
  241:8   245:15

  246:19, 22
  247:16   250:11
  253:18   256:3,
16   257:18
  258:10   261:6
  268:7   276:14
  277:16   278:20
  288:24   302:2
surmise   264:3
surprised   25:1
  62:11   97:9
  173:8   215:20
  271:10
surrendered
  150:16
surviving   193:7
Susana   31:25
  75:9   92:13
  93:14   95:24
  96:4   122:16
  134:13   136:12,
20   137:4
  153:15
Susana's   95:24
  223:18   278:6
  293:24
sustain   106:15
sweetheart
  287:21
switched   196:10
sworn   11:16
system   152:23
  279:17   301:15

< T >
Tab   5:10, 12,
14, 16, 18, 20,
22, 24   6:1, 3,
5, 7, 9, 10, 12,
14, 16, 17, 19,
21, 23   7:1, 3,
5, 7, 8, 10, 12,
14, 16, 19, 22
  8:1, 3, 5, 7, 9,
11, 13, 15, 17,
19, 21, 23   9:1,
3, 5, 7, 9, 11,
13, 15, 17, 18,
20, 22, 24   15:3,
9   22:12   31:20
  42:6   50:22
  52:20   57:24

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 44

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

58:21    62:14
71:8    72:11
76:12    80:12
81:4    84:16
89:9    91:14
92:6    93:7
96:9, 10, 13
97:14    114:22
118:12    121:4
122:11    125:3
128:19    129:23
133:3    134:9
136:6    152:7
155:2    160:4
164:1    165:23
170:4    171:20
177:17    182:18
196:24    201:19
204:11    209:14
213:18    216:10
221:16    227:5
229:9    241:4
248:17    251:25
259:23    265:14
269:15    271:1
280:24    294:6
295:12    298:5
303:7
**table**   99:11
**take**   12:6
32:4    37:17
39:9    67:22
70:5    114:13
122:19, 22
163:9    169:18
188:3    199:22
203:5    208:18
211:3    225:1
227:19, 24
240:15    270:19
293:13    302:10
303:9, 10
**taken**   1:20
60:7    87:11
135:15    165:19
167:9    169:22
173:21    304:8
**takes**   12:12
**talk**   35:16
36:2    48:3
172:24    179:8

**talked**   57:13
207:23    283:24
**talking**   23:22
24:1    25:4
32:25    33:16
34:1, 22    37:4
41:22    43:16
44:9    47:9, 10
53:21    58:7
60:16    68:16
71:11    111:8
112:1    113:10,
20    119:24
153:13    157:10
166:16    168:25
171:8    185:18
199:22, 23
216:15    219:10
238:20    240:23
249:22    256:12
272:10, 17, 21,
23    285:18
300:14
**talks**   108:15
**target**   74:12
**tax**   248:1, 15
**taxes**   248:15
**tc**   5:20    8:3
100:1    166:11
253:12
**tdavis@starneslaw.
com**   3:16
**team**   24:6, 11
32:3, 8    46:14,
20    90:12    91:7
121:20    123:25
148:15    166:2
188:18    197:22
202:12    213:4,
5    214:18
226:6    290:2, 7
293:3
**team's**   90:6
**tee**   38:3
**telephone**   68:12
**television**
180:12    182:6
**tell**   15:18
23:21    29:25
30:12    31:2
33:5, 6, 8
35:5, 24    40:24

56:7    57:11
65:4, 24    67:17
115:20    116:25
117:8, 25
122:18    128:15
129:1    130:10
131:7    140:23
141:8    142:4
144:5    145:5
152:15    154:4
155:10    156:24
157:3, 11, 13
158:2    161:21
168:18    176:4,
22, 24    177:3,
14, 21    189:15
192:16    194:24
195:2, 4, 9
198:22    199:7
201:6    203:11
210:25    211:7
213:3    215:1, 2
219:15    223:10
225:13    227:13
233:2, 25
235:3    237:1
240:6, 24
242:20    244:22,
23    254:4
267:4    271:16
273:15    282:18
286:7    290:4
292:13    295:4,
16    298:11, 19,
24    302:6
**Tellez**   32:1
92:13    95:4
122:16, 21
134:13, 20
135:10    136:12,
21    137:4
153:15
**Tellez's**   75:9
**telling**   24:13
40:2    52:24
71:18    77:1
86:12    92:13
116:4, 18
117:1    122:24
124:12, 18
125:11, 20
168:23    169:8,

20    170:16
171:12    173:9,
17    183:8
185:10    186:15
195:19    198:14
201:24    204:12
207:12    213:22
223:1    232:3
284:22    295:16
298:11    299:5
**tells**   86:17
266:13
**temporarily**
232:20    233:19
**temporary**   243:3
244:12, 24
250:23
**ten**   63:7
64:22    78:4
99:1    128:18
134:1    221:19
261:13
**tense**   83:2
**term**   23:24
24:11
**terminated**   67:1
**terms**   17:20
47:19    52:5
100:14    116:2
143:9    228:14,
15    232:13
250:1    251:7,
10    260:20
261:17    278:23
**TERRENCE**   1:8,
10, 19    5:3
10:12, 19, 24
11:15    12:1
98:6    133:18
252:6
**terrified**   147:3
**terror**   45:7
**terrorism**   289:12
**terrorist**   20:21,
24    287:16
**Terry**   35:2
59:21, 25
85:16    207:12
260:7    283:18,
19, 24
**testified**   11:17
25:16    36:20

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 45

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

80:11   116:15
128:12   142:5,
11   143:5
147:7, 11
158:4   173:23
176:6   185:15
197:19   201:10
203:3   211:18
231:2   257:12,
16   260:16
271:10   272:24
280:25   281:2
282:6   286:10
296:1   298:3
testifies   175:21
testify   20:11
22:8   68:6
122:8   145:15
175:15, 16, 22
176:2, 24
177:13   178:24
179:10, 12, 14
180:4   187:10
191:13   192:24
263:24   277:9
testifying
147:21   157:23
158:16   173:15
176:11   201:8
testimonies
196:17
testimony   9:18
16:14   17:21
20:7   21:3, 6,
11, 17, 24
26:24   36:3
37:14   40:10,
21   41:9, 19, 21
70:14   74:13,
14, 20, 24   75:3,
6, 18   79:12
83:1, 5   87:15
88:8, 25   99:4
101:3   110:11
124:3   135:25
138:16   140:1,
6   143:1
145:23, 24
146:8, 11, 16
151:20   153:22
154:24   156:24
157:3, 12, 16

158:15, 22
159:1, 18, 20
161:4   164:8
168:5   175:6,
10   177:4
181:18, 20
186:14   187:7
188:8, 10, 13,
20, 24   189:2,
11, 16, 19, 23
190:4, 11, 23
191:4   193:16,
20   196:6
206:15   209:4
211:4, 14, 15,
18, 21, 22
212:2, 11
214:9   216:4
218:5   220:12
238:24   239:3,
16   255:6
264:12   274:25
275:12   276:16
277:1, 4, 6
278:11   281:1,
9, 19   283:6, 8,
9   284:9, 17
285:2   288:9
296:5   300:1
Text   5:24   7:3
62:21   122:15
123:15   220:7
Thank   19:1
39:20   59:24
99:21, 24
227:7   261:12
thanks   80:18
Theme   6:1
thereto   2:18
304:10
thing   41:10
59:24   90:5
117:22   135:15
156:18, 19, 21
196:2   214:3
224:13, 16
230:13   231:15
242:1   259:5
things   12:8
18:11, 12, 15
61:23   64:4
74:6   76:9

82:5   94:23
112:19   113:8,
23   117:22
133:17   170:1
173:19   188:5
191:25   200:15,
18   215:21
220:19   229:25
231:12, 18
233:20   235:6
237:12   239:12
246:1   266:8
276:8   291:13
299:11
think   14:2
15:17   16:19
17:10   18:19
19:24   20:10
21:20   22:1
23:7   26:9, 14
28:6   29:12
32:17   34:2, 13
35:4, 15, 17
36:15   37:16
38:3, 13   40:9
41:5   42:18, 20
43:5, 24   44:13
46:2, 8   48:4,
7, 14   49:4
51:11   53:18,
22   54:6, 13
55:18   56:9, 12
61:8, 10, 20, 21
62:4, 10   63:20
69:2   70:17
71:17   73:18,
22   79:6   83:14
84:15   95:21
98:19   100:2
101:12, 22
102:25   105:3
108:16   110:1
111:7   115:13,
17   118:3, 6
119:16   126:2,
5   132:9
135:22   137:6
138:5, 14, 20
140:16, 24
141:4   143:3,
13   144:13, 21
145:5   146:3,

15   147:7
150:6   152:4
154:12   156:7,
12   157:12
159:9, 23
161:10   164:14
166:22   169:3
174:21   175:4
176:5   177:9
179:2, 4, 5, 19,
20   180:1, 5, 9,
17   181:4, 13
183:16   185:21
186:18   187:20
189:5   191:17,
24   192:10
193:12   194:22
195:15   196:19
197:6   201:5,
13   202:17
204:12, 19, 21,
22   205:25
206:1   207:3
208:15   210:19,
23   212:1
214:1, 9, 16
220:18   223:21
224:1, 12, 16
225:4, 6, 17
226:8   228:4,
22   230:5, 24
231:25   233:16
234:13, 23
236:15, 16
237:6, 16, 19,
20   239:6, 12
245:7   247:24
248:5, 16
251:15, 16, 20
252:16, 24
255:23, 24
259:11, 16
260:10, 16
262:13   264:2,
4, 10   266:3
274:6   276:5
278:4   279:22
280:19   281:3,
21   283:3
284:14, 16, 18
285:9, 23
289:8, 13

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 46

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

290:24    293:17
297:17    299:9
300:8, 19, 22
301:1    302:15,
25   303:3
thinking    156:15
201:6    231:9
thinks    163:23
third    38:19
182:11    293:6
THOMAS    3:5
thorough    123:1
thought    21:20
23:14    34:18
52:3    124:21
145:14    187:22,
24   195:20
199:21    207:21
208:17    214:14
226:17    250:24
275:8    297:19
thousands    64:23
193:14
threat    221:11
threaten    176:8
219:1    220:10
296:6
threatened
120:4    142:8,
17   145:6
146:14, 16
147:25    282:19
threatening
159:22    218:20
220:2    221:6
threats    142:25
143:9    144:25
145:1    147:5
203:4    219:12,
19   281:14, 18,
23   282:4, 13
296:14
three    53:13
77:17, 21
88:19, 20
99:15    100:17
106:9    109:5
116:21    118:8
123:24    127:4,
17   134:24
154:12    155:15
156:19    159:2

177:12    216:21
235:4    253:5
257:18    260:17
297:3
threw    146:4
tied    197:6
Tigre    12:18
66:3    69:1, 2
76:4, 11    78:14,
18   79:13    87:9,
18   88:10, 21
89:2    90:10, 14
103:21    104:24
106:17    107:13
109:8    110:16,
23   111:14
112:17, 24
114:3, 10
117:5    120:1,
21   123:8, 18
124:2    127:5,
14   130:17
131:2    134:5
135:6, 20
146:12    147:2
155:21    156:11
158:3    160:24
161:6, 15, 18
164:4, 10, 17
165:6    167:8,
17   169:21, 22,
24   190:9
193:1    194:12
195:20
Tigre's    195:8
time    2:16, 17
10:23    12:15
15:16    17:7
20:15, 17, 22
28:15    32:4, 8
33:15, 17    34:2
36:1    37:15, 23
39:1, 12    41:12
44:5    45:21
46:12, 19
54:17    57:14,
17   61:8    62:15
63:19    64:12
65:8, 22, 25
68:2    69:7
70:7, 10    71:12,
16   76:21    83:8

84:15    85:4, 6
89:25    90:4, 11
96:5, 24    98:10,
17   99:12
105:13    106:1
114:14, 17
116:17    117:24
120:24    122:19
123:22    124:6,
21   125:24
128:18    135:10,
15   143:2
145:2, 3    146:5
149:21    161:20
162:16    163:13
165:17, 20
175:2, 5    187:8
188:12    192:1
196:22    199:16,
24   205:3
206:25    216:15
217:8, 15
219:20    222:1,
4, 6, 11    226:9,
12, 13, 17
227:16    228:6,
9   229:3, 21
230:14    231:24
234:14    235:12
236:15, 21
238:4    240:17,
20   241:23
255:6, 13
257:25    263:6,
14   265:7, 22
268:16    269:4
270:2, 21, 24
273:23    275:5,
7   281:17, 24
282:5    291:9
293:17    296:2,
24   298:1, 4
299:10    300:22,
23   301:17
303:6, 14
times    12:24
14:9    27:12
44:7    54:20
82:3, 4    112:11
117:21    120:10
177:12    178:3
190:14    202:11

203:16    209:9
220:20    237:6
242:18    258:9
260:17
timing    127:20
168:8    184:13
189:22    190:8,
25   207:22
213:7    262:12
title    86:18
titled    252:5
TNS    120:1
today    10:24
23:23    27:15
28:3    32:23
54:21    63:6
68:6    99:4
101:16    109:2
122:9    131:7
132:25    151:18
152:14    153:10,
20   158:16
178:4    186:14
190:14    210:7
219:20    264:12
283:25
Today's    10:22
told    24:15
35:8    37:9
41:10    42:2
45:3    50:1
55:23    59:24
60:16    67:18
86:17    87:1
95:4    96:7
102:25    105:21
107:19    108:16
125:2    141:4,
11   142:23
143:10    145:1,
10, 11    147:18
159:21, 23
164:13    167:6,
13   171:5
174:5    178:2
186:5    194:19
204:17    209:21,
25   213:25
215:4    226:17
230:5    234:3
237:20    239:22
240:3    243:2

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 47

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

250:22    260:10
273:16    279:3
282:10
**Tolemaida's**
213:6
**tolerate**    286:24
**Tom**    294:14
**tomorrow**    93:14
**tone**    40:8
**tongue**    147:17
**Tony**    11:6
**top**    63:5    73:9
86:2    99:19
106:11    133:9
145:17    148:19
160:9    166:11,
15    185:5    236:8
**topic**    57:16
163:7
**Torres**    166:17,
19, 21, 23
**total**    265:11
**totally**    145:9
203:19    228:11,
13
**touch**    49:1
56:17, 23
57:17    293:21
294:23
**Tovar**    15:23, 25
16:4, 7, 18
**track**    220:1
**trade**    28:20
**trail**    15:24
16:3, 13, 16, 18
289:21
**transaction**
54:23    141:1, 3
220:8    223:20
242:23    251:22
258:6    267:21
268:22    269:1
296:22
**transactions**
38:23    270:3
287:25    289:22
290:10, 25
291:10    292:1
**transcript**
157:16, 21
304:13

**transcripts**
196:23
**transfer**    106:14
274:14    276:1
**transferring**
275:22
**transitioned**
231:11
**translate**    59:2,
8    91:11
**translated**    60:4
**translating**
12:23    172:23
**translation**
253:19
**translator**
68:17    255:18
**transparent**
290:10    291:1, 5
**transportation**
239:7
**travel**    61:22
227:16    228:6
276:7
**traveling**    39:12
**treasure**    17:1
**treasurer**    17:5
19:18    21:9
**treat**    95:2
**trek**    48:3
**tremendous**    225:9
**Trey**    11:2
85:22
**trial**    2:17
9:18    147:14
188:7, 10, 12,
20, 24    189:1,
11, 16, 19
190:3, 11, 23
216:4    218:5
262:4    274:25
276:16, 25
281:9
**tried**    21:20
43:3    44:19
71:2    143:3
167:7, 14
169:9, 21
171:12    213:5
220:9, 10
290:14, 18

291:3    293:15,
21
**Trip**    8:5    77:6,
22    87:10
133:14
**trips**    293:10
**trouble**    295:20
296:9, 12, 14
**true**    14:24
29:11    39:3
41:16    42:3
49:2    55:19
67:11    68:3
72:2    75:21
121:2    126:2, 6
128:3    146:3
153:5    159:5
161:9, 23
195:24    206:14
210:2    211:15,
22    214:11
225:23    226:14
228:21, 22
255:14    273:15
281:20    283:1
304:12
**trust**    169:7
286:12
**trusted**    27:13
162:13
**truth**    30:13
31:2    125:20
140:23    141:9
142:4    157:11
159:23    168:23
173:17    176:23,
24    177:14, 21
194:19, 24
195:2, 4, 10
203:12    210:25
211:7    219:16
233:3    235:3
258:11    273:10
279:4    284:22
**truthful**    145:23
217:7
**truthfully**
122:9    175:23
**try**    12:22
24:3    25:3
28:2    29:18
46:5    73:21

213:15    292:14,
16, 20
**trying**    27:22
45:8    98:22
100:1    104:19
110:12    111:13
137:21    163:22
168:24    170:23
171:6    196:22
210:11    219:1
225:14    245:14
261:3    264:8
291:9    294:3
299:2
**Tuesday**    223:3
**turn**    44:20
99:8, 14
160:18    193:18
287:19    298:16
**turned**    85:9
98:9    197:9
265:6    286:25
287:5, 9, 14, 20
**turns**    290:17
**twells@starneslaw.
com**    3:14
**twice**    153:3
158:19
**two**    35:12
40:14    56:17,
23    77:5    92:18
93:4    94:6
97:2    100:2
104:15    108:10
109:4    110:24,
25    111:14
112:10, 16
118:6    171:11
201:3    206:1
221:13    249:13
252:9    255:24
257:18, 19
258:25    272:13,
14    275:8
276:8    289:11
297:2
**two-thirds**
166:25
**type**    200:20
281:18    284:6
**typed**    253:6
**types**    95:5

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 48

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

typical    95:22
96:7    115:18
Typically
131:14, 17
262:6

< U >
U.S    37:18
143:18    145:20
240:9    270:15
Uh-huh    43:12
62:2    75:23
ultimate    217:2
ultimately    93:3
110:9    131:9
132:6    139:24
159:22    174:3,
23    197:3, 9
200:4    203:21
223:25    228:20
232:14    234:22,
25    258:17
299:3    300:9
uncle    13:14, 18
32:11, 13, 15,
16, 18, 24, 25
uncles    33:2
uncovered    124:24
undergone    127:10
understand
26:23    31:8
44:10    47:14
74:25    82:23
120:25    161:4
175:25    180:21
198:18    208:17
210:13    217:1
226:11, 22
248:21    279:15
282:8    297:20
understanding
30:7    31:11
49:13, 20
60:12    69:9
102:7    143:24
144:3, 7, 8, 10,
13    174:10, 12
176:21    177:25
178:2    194:5, 6
195:13    214:22
226:25    236:24
240:8, 11

247:15    250:18
263:24    271:13
280:10, 11, 13
283:21
understands    98:8
understood
42:15    191:24
210:16    214:9
226:4    237:24
239:23    263:20
296:22, 25
297:4
undertaking    84:7
unethical    83:12,
18    204:25
unexplained
289:22
Unfortunately
85:2    172:10
unhappy    154:21
union    28:21
30:1    45:21
57:4    173:16,
19    183:14
unit    148:2
UNITED    1:1, 22
10:8, 16    57:4
283:23
universe    139:19
unquote    14:11,
19    34:17
149:22    238:21
unreasonable
28:15
untoward    141:3
untrue    120:8
284:12    301:7
unusual    58:13
update    198:16
updates    116:8
upend    218:24
upped    219:18
upwards    28:25
urgent    63:7
276:6
Uribe    61:3
149:10    180:12
181:14, 23
182:3, 11
Uribe's    181:19
Uruguay    61:1

use    13:20
14:6    23:17
24:11, 16
43:20    86:22
146:7, 10
228:25    229:2
231:23    232:18,
23    233:19
258:4    285:20
297:11
Usual    5:14
11:19
usually    60:16
91:13

< V >
vague    13:6
43:1    50:12
54:16
vaguely    14:10
44:8
valid    93:4
132:8, 12, 19
246:15    258:21
259:13    263:7
267:19, 21
validity    259:2
Valledupar    48:10
Valmore    192:4
value    183:25
valued    264:13
values    264:9
Van    9:7, 9
13:13    23:9, 15,
18    24:12, 13
25:6, 23    31:7
42:11, 23    51:2,
16    52:24    54:1
55:9    57:8, 25
58:24    59:1
60:9, 13    61:13
62:22    64:21
65:15    93:1
99:18    131:21
139:1    153:17
188:3    197:10
198:19, 24
199:19    200:7,
8    210:12
214:18    217:16
223:13    228:20
242:19    243:2

244:3, 5, 17
246:9    249:12,
14, 18    250:2,
12    251:2
252:6    253:8
256:1, 18
261:1    266:11,
12    269:23
270:1, 11
274:16    276:18
285:15    286:8
299:4
various    95:8
134:14    220:23
256:8    257:14
261:18
verbal    91:3
154:15, 22
243:11    244:2
251:3    257:10
verify    27:6, 8
302:12
version    92:1
273:15
versions    159:21
versus    10:19
98:20    189:23
206:2
Victor    192:4
Videographer
4:18    10:15
19:7    70:7, 10
85:6    114:14,
17    165:17, 20
240:17, 20
270:21, 24
303:14
videotaped    10:16
view    75:17
132:14    148:17
150:3    184:21
191:9    205:2, 3
208:20    210:20
214:19    268:9
viewed    178:14
184:2
views    180:16
207:25
virtually    116:6
117:2    232:1
visit    218:18

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 49

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

visited    221:12
  261:4
void   243:24
  245:6    246:6
  247:2, 13
  257:2, 23
voided   93:4
  132:6    243:4
  245:1, 9
  248:11   249:21,
  24    261:19
VOLUME    1:12
voluntarily
  176:7    177:5
voluntary   284:1
VS    1:7    7:17,
  20, 23    9:20

< W >
Waichman   73:12
  136:24   137:8,
  11, 19, 23
  138:7    152:11
  154:2, 4, 9, 16
  156:4, 5   180:2
  182:24   183:3,
  7    184:25
  186:7    187:15
  197:2    204:18
  205:1, 3
  207:24   223:5,
  15, 24    225:13,
  23   227:18
  228:4    229:20
  231:7    232:3
  233:3, 25
  234:14, 19
  235:3    237:2
  271:19   297:16
  299:3
wait   212:13
  267:6    303:8
waiting    51:3
  221:17   232:21
waived    2:5
walked    18:14
walking   203:22
Walsh   291:21
want    15:24
  24:20    30:9
  32:24    52:10
  77:4    89:16

120:10    150:17
159:13    215:8
218:10    219:2
292:16    298:3
299:7    300:12
302:13
wanted    15:18
  29:15, 17
  176:21   177:13
  187:10   191:15
  203:9, 11
  255:19   273:16
  294:16, 23
  301:21
wanting    16:2
wants    98:10
  172:10   173:10
  210:9    221:22
  228:4    295:6
war    126:18
  150:8
warned    34:3, 7
warning   121:8
Washington    3:24
  69:12    285:21
waste    117:21
watching   286:24
water    237:1
way    17:9
  21:15    28:8
  32:19    33:8
  35:12    53:24
  55:4, 6    64:20
  79:1    83:15
  86:5    109:19
  110:6    116:24
  117:3    124:7
  142:20   146:9
  148:18   156:15
  157:23   158:1
  162:15   167:19
  175:21   176:2,
  12   187:10, 12
  193:16   200:13
  209:19   212:10
  214:19   223:11
  228:2    237:10
  252:24   281:1
  282:18   283:23
ways    188:2
weak    165:16

Wednesday
  198:20    223:4
week    12:3
  170:20    198:20
  209:22    223:4
  278:6
weekend    266:5
weeks    257:19
  258:25    259:3
weighing    12:5
Welcome    18:1
  121:11
Well    14:25
  21:18, 22    23:6,
  14   24:7    27:20
  28:4    35:2, 18,
  22   36:15, 18
  37:14    42:17
  43:10, 22, 25
  44:11    45:12
  49:4, 6   53:18
  56:13    59:13
  62:3    63:17
  65:6    69:9
  71:7    73:9
  78:4, 15, 16
  79:6    86:21
  88:15    90:15
  94:3, 18, 22
  95:16, 21   97:1
  100:9   103:14
  104:3, 11
  105:18   106:21
  107:5   109:23
  111:2   113:9,
  15   115:24
  116:25   120:19
  121:22   124:8
  128:4, 13
  135:22   136:2,
  14   137:13
  138:11   139:15,
  18   140:13, 22
  141:10, 21
  142:24   144:7
  148:7   154:14,
  18   156:13
  157:8   162:3,
  11   164:12
  165:10   166:21
  170:25   173:24
  176:17   178:9

183:3    184:15
187:3    188:7
189:7, 15
191:10, 18
192:6    194:12
197:5    199:10,
15   200:1
203:21    204:17
209:5    210:3
212:6    214:8
219:6, 25
220:12, 18
221:1    222:16
223:17    224:10
226:1, 21
227:3, 22
228:1    231:19
232:7, 12, 17
235:15, 25
236:8    238:25
239:17    240:5
242:16    243:8,
15, 21   244:15,
22   245:25
246:13    247:9
248:21   249:20,
25   253:10, 18
254:3, 25
255:22    257:12
260:24    261:25
262:11    263:22
265:3, 6
267:22    268:1
269:13    270:2,
16   271:9
272:10, 15
276:4    277:8
278:20    281:21
282:9    283:9
284:24    286:21
287:12, 23
294:25    295:25
296:8    297:2,
14   300:1
302:1, 7    303:2
well-being    147:9
WELLS    3:5    5:4
  11:2, 20, 22
  15:2, 8    18:5,
  8, 24    19:5, 8
  25:11    27:25
  29:6    31:20

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 50

Case 2:11-cv-03695-RDP   Document 783-1   Filed 03/06/24   Page 129 of 259

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

42:6, 22   50:22
52:20   57:23
62:13   66:20
70:12   71:7
72:11   76:12
79:24   80:12
81:4   84:1, 16
85:4, 8, 24
86:4, 7   89:9
91:6, 14   92:6,
22   93:7   96:9
107:23   110:11
111:12, 20
114:21, 24
116:4   117:14,
25   118:12, 15
121:4   122:11
125:3   128:4
129:23   131:10
133:3, 5   134:9,
23   136:6
141:24   142:10
149:17, 19
155:2   158:2
160:2   164:1
165:22   166:1
167:21   170:4,
11, 13   171:20
177:17   178:6
180:19   182:18
189:7   190:16
196:24   201:19
204:11   208:4
209:14   213:18
216:9   218:4
221:16   227:5,
8   239:25
240:22   241:4,
11, 13   248:17
251:25   256:6,
11   259:23
262:7   265:14
269:15   271:1,
5   280:24
285:11   289:17
291:3   292:3
294:5   295:11
296:8   298:5
303:7
**went**   46:3
48:16   115:4
121:16   180:12

205:7   218:17
247:24   257:10
259:6, 20
262:4   269:25
276:18   286:8,
15   290:2
293:14   295:2
**We're**   13:2
32:22, 25   33:1
35:16   38:3
43:16   53:19,
21   60:16
85:11   110:2
121:9   153:13
162:12, 21
168:25   169:4
172:4   199:23
207:13   221:17
233:15   245:4
256:12   272:10
287:2   289:2
292:3, 4
**we've**   12:15
18:8   31:5
43:8   53:18
58:6   60:21
87:7   107:12
152:14   159:10
178:11   193:22
201:5   221:18
234:4   244:3
249:23   277:1
285:18   286:25
**Wharton**   155:7,
12, 25
**whatsoever**
228:24   252:22
278:19   282:25
**wheel**   192:24
**When's**   269:4
**widows**   192:13
**wife**   61:25
62:8   66:21
189:18   190:24
**wild**   290:20
**WILLIAM**   3:7
4:2   11:10, 11,
12   105:13
**willing**   201:25
202:5   213:16
**win**   236:5

**wire**   42:13
43:7   101:21
102:4   223:6
224:8   225:14
253:11   254:15
269:21   276:1
**wired**   229:18
**wires**   116:9
275:8
**wiretapping**   34:8
**wiring**   15:25
**withdrawal**
37:22   39:8
**withdrawals**
293:10
**withheld**   129:10
**witness**   2:5
10:12, 23
18:25   20:11
35:7   45:4
71:22   72:5, 9
74:13, 14, 20,
24   75:1   77:19
78:6   86:24
87:6   91:20
92:9   94:7
97:25   99:16
100:19   101:19
103:12   106:10
107:24   108:24
111:21   116:11
118:11, 21
119:3   126:20
133:7, 10
135:1   138:18
143:16   168:22
171:9   178:24
179:10, 12
180:4, 7, 22
184:1   191:6
197:23, 24, 25
198:1, 4
205:22   207:1
211:14, 21
212:3   216:22
241:7   256:2
268:16, 19
283:15   304:14
**witnessed**   35:6
268:2, 7
**Witnesses**   8:7,
13   65:19   67:1,

13   68:9   69:19
70:14   73:21
74:5   75:5
76:1   82:14, 21
83:4, 9, 13
84:14   88:20
89:2, 4   111:2
113:20   116:21
123:24   127:4,
7, 17   146:22
147:9, 13, 15,
21, 24   148:14,
20   149:24
156:19   159:2
167:14, 16, 17
168:3   170:22
171:5   208:19
277:19   286:20
**witnessing**
268:10, 15
269:2
**wives**   189:25
190:6
**Wolfram**   191:17
**won**   64:2   65:7
**wondering**   69:19,
20
**word**   13:20
14:6   22:25
24:3, 17, 25
43:20   72:5
91:1   152:5
214:6   244:4
259:11
**words**   14:3
52:14   72:6
75:4   160:17
176:17   194:23
205:13   256:23
**work**   6:4   18:4
19:16   43:3
47:3   73:5, 8,
10   74:16   75:1
81:23   82:4, 5
125:15, 25
129:11   197:7
200:17   202:1,
5   210:1, 14
217:23   219:15
225:9   227:15,
24   228:14
232:4, 6   234:7

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 51

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume I
2/20/2024

235:10    236:11,
19    237:3
238:2    245:11
254:13    273:2
274:8, 10
279:2, 12
299:15
**worked**    203:23
206:8    212:6
259:13    270:3,
6    278:22
286:11
**working**    16:8,
11    43:14
45:16    47:3
48:20    61:7
72:23    76:22
82:4, 11    95:24
105:10    112:18
113:21    148:14
169:4    202:9
209:5, 23
210:9    225:20
226:2, 5, 10
230:16, 19
235:13, 24
270:8    271:17
273:14    274:11
296:4    301:17
**Workplan**    8:1
166:3, 6
**works**    236:6
249:1    252:17
**world**    77:10
196:1    249:1
295:19    296:9,
12, 13
**worried**    22:19
25:12    110:24
111:10, 13
123:6, 7
143:17    151:12
218:19    257:16
**worry**    199:13
227:22    260:18
**worrying**    109:4
**worth**    141:20
264:10    279:10
**woven-in**    288:19
**wpaulk@spotswoodll
c.com**    4:10

**write**    23:7, 20
106:19    121:13
**writing**    15:14
39:8    175:2
187:4, 6, 8
224:6    225:3
254:5
**writings**    166:13
**written**    39:4, 6
46:6    89:24
126:9    284:3
298:21    300:14
**wrong**    123:3
179:6    204:22
**wrote**    41:7
113:14    125:16
126:3, 14, 16
153:4

**< Y >**
**y'all**    44:17
73:20    97:5
115:22    117:9
126:17    202:6,
13    216:17
222:2    237:25
238:13    239:25
**Yeah**    15:17
34:2, 19    37:20
38:13    39:24
45:6    55:7
61:8    63:4
65:10    71:17
72:21    82:18
103:10    104:14,
17    105:17
113:18    115:24
119:11    126:5
142:14    145:5
150:20    161:1,
17    166:14
181:22    207:20,
22    218:6, 23
219:2    222:8
237:14    239:20
270:14    274:21
279:23    287:4
293:8    297:3
298:14
**year**    86:15
88:2    149:11

**years**    35:14
42:2    51:11
56:21    57:15
64:25    67:25
69:25    72:7
99:1    128:18
149:4    151:4, 5,
22, 24    160:1
171:14    180:15
194:21    206:6
245:25    280:5
290:2    300:13
**yesterday**    218:18
**yield**    286:16
**Yina**    46:24
69:8, 18, 23
**young**    230:14

**< Z >**
**zero**    261:20
**Zoom**    3:8, 19
4:4, 17    11:14
68:12    75:11

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 52

**In The Matter Of:**

**Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.**

---

Terrence P. Collingsworth - Volume II

*February 21, 2024*

---

Bain & Associates Court Reporting Services, Inc.
505 20th Street North
Suite 1250
Birmingham, AL 35203
Toll Free 1.888.326.0594

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

```
1        IN THE UNITED STATES DISTRICT COURT
2      FOR THE NORTHERN DISTRICT OF ALABAMA
3                SOUTHERN DIVISION
4
5 DRUMMOND COMPANY, INC.,   )
6      Plaintiff,           )
7 VS.                       )  CASE NO:
8 TERRENCE P. COLLINGSWORTH,)2:11-CV-3695-RDP
9 et al.,                   )DEPOSITION OF:
10     Defendants.          ) TERRENCE P.
11                          )COLLINGSWORTH
12                             VOLUME II
13
14        S T I P U L A T I O N S
15
16        IT IS STIPULATED AND AGREED, by and
17 between the parties through their respective
18 counsel, that the deposition of:
19        TERRENCE P. COLLINGSWORTH,
20 may be taken before Merit Gilley, Commissioner
21 and Notary Public, State at Large, at the Hugo
22 L. Black United States Courthouse, 8th Floor
23 Judicial conference Room, 1729 5th Avenue North,
24 Birmingham, Alabama 35203, on the 21st day of
25 February, 2024, commencing at approximately
                                           Page 305
```

```
1 9:01 a.m.
2
3        IT IS FURTHER STIPULATED AND AGREED
4 that the signature to and reading of the
5 deposition by the witness is not waived, the
6 deposition to have the same force and effect as
7 if full compliance had been had with all laws
8 and rules of Court relating to the taking of
9 depositions.
10
11        IT IS FURTHER STIPULATED AND AGREED
12 that it shall not be necessary for any
13 objections to be made by counsel to any
14 questions, except as to form or leading
15 questions, and that counsel for the parties may
16 make objections and assign grounds at the time
17 of the trial, or at the time said deposition is
18 offered in evidence, or prior thereto.
19                  ***
20
21
22
23
24
25
                                           Page 306
```

```
1
2            A P P E A R A N C E S
3
4 FOR THE PLAINTIFF:
5    H. THOMAS WELLS, III
6    BENJAMIN T. PRESLEY
7    WILLIAM ANTHONY DAVIS, III
8    ANNA KATHERINE SHERMAN    (Via Zoom)
9    Attorneys at Law
10   Starnes Davis Florie,LLP
11   100 Brookwood Place, 7th Floor
12   Birmingham, Alabama  35209
13   (205) 868-6000
14   twells@starneslaw.com
15   bpresley@starneslaw.com
16   tdavis@starneslaw.com
17   asherman@starneslaw.com
18
19   SARA E. KROPF    (Via Zoom)
20   Attorney at Law
21   Law Office of Sara Kropf, PLLC
22   1001 G Street NW
23   Suite 800
24   Washington, D.C.  20001
25   Sara@kropf-law.com
                                           Page 307
```

```
1 FOR THE DEFENDANT:
2    WILLIAM T. PAULK
3    ALEX SPANOS    (Via Zoom)
4    Attorneys at Law
5    Spotswood Sansom & Sansbury, LLC
6    Financial Center, 505 20th Street North
7    Birmingham, Alabama  35203
8    (205) 986-3620
9    wpaulk@spotswoodllc.com
10   rks@spotswoodllc.com
11   aspanos@spotswood.com
12
13
14 ALSO PRESENT:
15   Blake Andrews, Drummond Company
16   Eric Hager, Conrad & Scherer  (Via Zoom)
17   Paige Byrd, Videographer
18
19
20
21
22
23
24
25
                                           Page 308
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 1 (305 - 308)

Case 2:11-cv-03695-RDP   Document 783-1   Filed 03/06/24   Page 133 of 259

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

EXAMINATION INDEX

Terrence P. Collingsworth - Volume II

BY MR. WELLS . . . . . . . . . . . . . .316

EXHIBIT INDEX

Plaintiff's Exhibit                                    MAR

58    Tab 68 - 7-16-12 Email Chain            321
      Regarding Tio

59    Tab 71 - 7-19-12 Email Chain            324
      Regarding Here is confirmation

60    Tab 72 - 5-23-12 Memorandum Regarding   327
      Drummond

61    Tab 73 - 5-31-12 Email Chain            331
      Regarding Transcript - Jairo Jesus
      Charris Castro

62    Tab 75 - 6-14-12 Email Regarding        334
      Plans etc

63    Tab 113 - 3-27-12 Memo Regarding        337
      Updates/Pending Issues with Ivan

64    Tab 114 - 6-6-12 Email Chain            342
      Regarding Cust Out Wire Advice -
      eMail

65    Tab 116 - Declaration of Jose           344
      Aristides Peinado Martinez
                                         Page 309

66    Tab 117 - Declaration of Oscar David    344
      Perez Bertel

67    Tab 115 - 6-11-12 Email Chain           345
      Regarding pending issues

68    Tab 118 - 6-15-12 Memo Regarding        348
      6/15/2012 Meeting with Ivan Notes

69    Tab 119 - 6-15-12 Memo Regarding        349
      Text Message Summary Spreadsheet

70    Tab 120 - 6-19-12 Email Chain           356
      Regarding Terry please "reply all"
      with your approval of 06.19.12 DC
      admin request

71    Tab 121 - 7-3-12 Email Chain            359
      Regarding Pending $$ matters

72    Tab 123 - 7-18-12 Email Chain           362
      Regarding Updates

73    Tab 124 - 9-12-12 Email Chain           370
      Regarding Saludo

74    Tab 125 - 9-17-12 Email Chain           372
      Regarding DC Unpaid Exp

75    Tab 259 - 11-8-12 Email Chain           374

76    Tab 126 - 5-13-11 Email Regarding       387
      charris wire

77    Tab 127 - 012-3-12 Email Chain          400
      Regarding declaracion de 2007
                                         Page 310

78    Tab 128 - 12-10-12 Email Chain          405
      Regarding declaracion de 2007

79    Tab 129 - 4-11-13 Email Chain           413
      Regarding RESPUESTA

80    Tab 248 - 7-21-10 Email Chain           417
      Regarding TravelFW: Trip plans

81    Tab 130 - 10-18-10 Email Regarding      420
      Colombia deps

82    Tab 131 - 10-21-10 Email Regarding      423
      call Charris

83    Tab 133 - November 2011 Email           432

84    Tab 136 - 5-27-12 Email Regarding       435
      home stretch

85    Tab 137 - 7-4-11 Email Chain            436
      Regarding rogs

86    Tab 138 - 8-31-11 Email Chain           443
      Regarding LD meeting

87    Tab 140 - 4-19-11 Email Chain           448
      Regarding Last update on IUvan

88    Tab 142 - 9-20-11 Email Regarding LD    451
      updates

89    Tab 144 - 4-15-11 Email Chain           456
      Regarding Confidential Attorney Work
      Product

90    Tab 152 - 11-4-11 Email Regarding       457
      November 4, 2011 Jose Gelvez
      Albarracin Interview Notes
                                         Page 311

91    Tab 156 - 6-3-12 Email Regarding        464
      Draft back to you Attached with some
      revisions and a few comments

92    Tab 157 - 6-3-11 Email Chain            466
      Regarding Problem with June 8mtg
      Andre - washington dc

93    Tab 153 - 6-14-11 Email Chain           477
      Regarding No. 2 -- Drummond

94    Tab 159 - 10-21-11 Email Chain          481
      Regarding MCFSA + INVOICE COLOMBIA
      + LIH REGISTER

95    Tab 162 - 11-1-11 Email Chain           486
      Regarding Depositions are going
      forward

96    Tab 164 - 12-9-11 Email Chain           488
      Regarding HELP!

97    Tab 168 - 5-29-13 Email Regarding       494
      Colombian investigation of Drummond
      officers advancing

98    Tab 175 - 3-14-14 Email Chain           497
      Regarding Attached image

99    Tab 177 - 3-17-14 Email Chain           500
      Regarding 3.17.14 DRAFT response to
      Ala. Bar Complaint

100   Tab 76 - 8-12-11 Email Chain            503
      Regarding TC reply

101   Tab 77 - 1-18-11 Email Chain            511
      Regarding Requested Email

102   Tab 78 - Email Chain                    512

103   Tab 79 - 6-21-11 Email Chain            518
      Regarding schedule update and JBM
                                         Page 312

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 2 (309 - 312)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

1 104    Tab 81 - 8-2-11 Email Chain       521
2        Regarding nadiaFW: misc issues

3 105    Tab 95 - 2-7-11 Email Regarding    524
4        revised workplan

5 106    Tab 311 - 12-12-08 Email Regarding 526
6        12.12.08ATTYCOOPIvanOtero

7 107    Tab 313 - Text Message Summary     532
8        Spreadsheet

9 108    Tab 295 - 12-5-08 Email Regarding  544
10       Update

11 109   Tab 296 - 12-11-08 Email Regarding 547
12       get together

13 110   Tab 80 - Signed Attorney Cooperation 548
14       Agreement

15 111   Tab 83 - 1-3-09 Email Regarding    551
16       Attorney contracts and decls

17 112   Tab 84 - 2-17-09 Email Regarding   555
18       drummond

19 113   Tab 87 - 4-11-09 Email Regarding   568
20       Final El Tigre decl

21 114   Tab 88 - 4-15-09 Email Regarding   569
22       Samario's decl

23 115   Tab 89 - 1st United Bank Statement 570
24       Excerpt

25 116   Tab 90 - 3-27-09 Email Regarding   574
         Atty Coop Agreement -  Ivan Otero
                                      Page 313

1 117   Tab 91 - 5-21-09 Email Regarding   582
2       Drummond

3 118   Tab 92 - Translated article from   589
4       VerdadAbierta

5 119   Tab 294 - 12-7-10 Email Regarding  596
6       Big tiger problem

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                                      Page 314

1        I, Merit Gilley, a Court Reporter of
2 Birmingham, Alabama, and a Notary Public for the
3 State of Alabama at Large, acting as
4 Commissioner, certify that on this date, as
5 provided by the Federal Rules of Civil Procedure
6 and the foregoing stipulation of counsel, there
7 came before me on the 21st day of February,
8 2024, at the Hugo L. Black United States
9 Courthouse, 8th Floor Judicial conference Room,
10 1729 5th Avenue North, Birmingham, Alabama
11 35203, commencing at approximately 9:01 a.m.,
12 TERRENCE P. COLLINGSWORTH, witness in the above
13 cause, for oral examination, whereupon the
14 following proceedings were had:
15        THE VIDEOGRAPHER:  This is the
16 continuation of the videotaped deposition of
17 Terrence Collingsworth in the United States
18 District Court for the Northern District of
19 Alabama, Southern Division in the matter of
20 Drummond Company, Incorporated versus Terrence
21 P. Collingsworth, et al.  Case Number
22 2:11-CV-3695-RDP.
23        Today's date is February 21st, 2024.
24 The time is 9:01 a.m. Will all attorneys present
25 please state their names and whom they
                                      Page 315

1 represent.
2        MR. WELLS:  Trey Wells for the
3 plaintiffs, Drummond.
4        MR. PRESLEY:  Ben Presley, Drummond.
5        MR. DAVIS:  Tony Davis, Drummond.
6        MR. ANDREWS:  Blake Andrews,
7 Drummond.
8        MR. PAULK:  William Paulk for
9 defendants, Conrad & Scherer, Bill Scherer.  We
10 may also have Eric Hager, Bob Spotswood, and an
11 associate from our office joining remotely.
12        TERRENCE P. COLLINGSWORTH
13 being first duly sworn, was examined and
14 testified as follows:
15        THE COURT REPORTER:  All right.
16 Usual stipulations?
17        MR. WELLS:  Yes.
18        EXAMINATION CONTINUED
19 BY MR. WELLS:
20 Q        Well, Mr. Collingsworth, toward the
21 end of yesterday; we were discussing the Nicox
22 BV loan documents, which I understand is the
23 original way that the funding for the Jaime
24 Blanco arrangement was secured.
25        Do you recall that testimony?
                                      Page 316

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 3 (313 - 316)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

**Terrence P. Collingsworth - Volume II**
**2/21/2024**

1 A        Yes.
2 Q        And are those various loan documents
3 and cooperation agreements that we looked at,
4 are those the only agreements that you have
5 signed with any of those individuals involved
6 that we talked about since the time of the Nicox
7 loan documents?
8 A        As far as I can recall, yes.
9 Q        And you said the $750,000 that you
10 got went into your bank account.
11        Was that the SunTrust Bank account
12 or some other bank account?
13 A        Well, as far as I know, it would
14 have been the SunTrust account.
15 Q        Did you have any other bank accounts
16 in the 2010 to 2012 time period?
17 A        Not personally.  No.
18 Q        Did you have any other bank accounts
19 that you had access to?
20 A        Well, International Rights Advocates
21 has a bank account.
22 Q        Any others?
23 A        Nope.
24 Q        Is IRA's account at SunTrust as
25 well?

Page 317

1 A        No.
2 Q        And since your departure from Conrad
3 & Scherer, have you continued sending money
4 periodically to Ivan Otero?
5 A        I have occasionally sent money for
6 travel and for security, but very occasionally.
7 Q        How would you define "very
8 occasionally"?
9 A        Once a year maybe.
10 Q        And approximately what range of
11 dollars are you sending once a year?
12 A        Couple of thousand dollars maximum
13 for a trip.
14 Q        And is that coming from your
15 personal account or the IRA account or some
16 other account?
17 A        I don't have any other accounts, and
18 it would have come from the IRAdvocates account.
19 Q        Do you have any other sources of
20 funding for Drummond-related activities since
21 you left Conrad & Scherer?
22 A        Not directly.  No.
23 Q        What do you mean by "not directly"?
24 A        There's nobody that is specifically
25 funding any Drummond litigation.

Page 319

1 A        No.
2 Q        Where is it at?
3 A        Wells Fargo.
4 Q        Was it Wells Fargo at -- back in the
5 2011 time period, 2012?
6 A        Was the name Wells Fargo Wells
7 Fargo, or was the account --
8 Q        Was the IRA account at Wells Fargo
9 at that time?
10 A        Yes.
11 Q        And did you use any of the $750,000
12 for any of your cases?
13 A        Indirectly.  I paid back a lot of
14 money that I owed across the years.  Some of
15 which was used for supporting our work.  But I
16 can't -- I can't give amounts.  But I did not
17 affirmatively then use the funds for anything
18 going forward.
19 Q        In paying back money that you owed;
20 what were you paying back, not the amounts, but
21 give me the nature of the loans that you were
22 paying back.
23 A        Well, it was mostly like credit card
24 debt.
25 Q        Any case-related loans?

Page 318

1 Q        Do you have some sort of general
2 funding that you're using for Drummond
3 litigation?
4 A        No.
5 Q        Just wondering why you're using the
6 word "not directly" and "specifically."
7 A        To be precise.
8 Q        That suggests there is some other
9 source of funds that you have access to that you
10 have used for Drummond.
11        Is that the case?
12 A        As I said, not directly.  If a
13 foundation gives us a grant to do human rights
14 work and I take a trip that somehow relates to
15 Drummond, while I'm in Colombia I do something
16 related to Drummond; then that is an indirect
17 support.  They don't have a specific line item
18 for Drummond or a budget for Drummond.
19 Q        When you get a grant, as you just
20 mentioned, what -- does the grant have any sort
21 of specific purpose; this money should be used
22 for X?
23 A        Usually.  Yes.
24 Q        Do you ever get grants for
25 litigation work?

Page 320

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 4 (317 - 320)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

1  A        Yes.

2  Q        And who are those from?

3  A        I -- I'm going to object to the time

4  frame.

5           At the time -- yeah.  Give me a time

6  frame that's within the discovery parameters of

7  this case.

8  Q        Since your departure from Conrad &

9  Scherer.

10  A        I've not had any grants that were

11  related to Drummond litigation since that time.

12  Q        Have you used any money for grants

13  -- from grants for anything Drummond related

14  since that time?

15  A        As I said, not directly.

16  Q        But there maybe an occasion where

17  you're doing something that may have a dual

18  purpose.  You mentioned going on a trip where

19  you might do something Drummond related on that

20  trip?

21  A        Yes.

22           MR. WELLS:  Well, all right.  Let's

23  get tab 68.  This is Exhibit 58.

24

25           (Plaintiff's Exhibit 58 was

Page 321

1  marked for identification.)

2  Q        This is on July 16th, 2012.  And

3  Lorraine Leete is translating a message from

4  Ivan Otero to you, which in the middle of the

5  page says, "Hello Terry, I hope you had a good

6  trip back home.  I would appreciate if you can

7  send me the confirmation number, so that I can

8  look for the document from my uncle that still

9  has not appeared in Valledupar.  The

10  documentation that you said was sent has not

11  arrived.  The situation has become unbearable."

12           What is he talking about?

13  A        I really don't know what he's

14  talking about.  Nothing specific that comes to

15  mind in 2012.  It almost always was his own

16  security concerns.  But it doesn't say that

17  here, so I cannot say that with confidence.

18  Q        And were you ever providing

19  documents to Otero from his uncle?

20  A        As I've previously testified, some

21  of these folks in this email chain referred to

22  Albert Van Bilderbeek as uncle Albert or

23  something along those lines.  And usually I did

24  not.  In fact, if you go to the top of the page,

25  I say, "I'll get Albert to send the number

Page 322

1  tomorrow."

2  Q        Do you have any explanation for why

3  Mr. Otero and then Christian Levesque above are

4  calling Albert uncle and money a document?

5  A        As I testified --

6           MR. PAULK:  Object to the form.

7  A        As I testified yesterday, I don't

8  know what other people were thinking.  But as

9  you can see from this particular exhibit and

10  almost all of the other ones, I did not do that.

11  So I can't put myself in anyone else's shoes.

12  Q        (By Mr. Wells)  But even though

13  they're not using the name of the person

14  involved or describing the actual transaction,

15  you understand it because your email says Albert

16  and money; correct?

17  A        That's what it says.  Yes.

18  Q        And didn't you tell us yesterday

19  that the only occasions in which Albert Van

20  Bilderbeek had sent any substantial sums of

21  money to Ivan Otero was in relation to the Jaime

22  Blanco arrangement?

23  A        I don't recall answering that

24  question yesterday.  I -- I -- I know for a fact

25  that sometimes Albert helped Ivan with travel or

Page 323

1  with security as needed if I asked him to do

2  that.

3           MR. WELLS:  Well, let's get tab 71,

4  which is Exhibit 59.

5           (Plaintiff's Exhibit 59 was

6           marked for identification.)

7  Q        So this is just three days later.

8  And Albert Van Bilderbeek is sending you a wire

9  confirmation to Ivan Otero in the amount of

10  $35,000.

11           Do you see that?

12  A        Yes.

13  Q        Are you aware of anything that that

14  $35,000 could relate to other than the Jaime

15  Blanco arrangement?

16  A        As -- as I -- I think I just said in

17  2012, I don't have any specific recollection of

18  what this would have been for.  I'm sure that

19  there are records that would indicate that, but

20  I don't recall as I sit here.

21  Q        So it could be the Jaime Blanco

22  arrangement.  You just don't know sitting here

23  today?

24  A        And it could not be as I'm sitting

25  here today.  I don't know, as I said.

Page 324

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 5 (321 - 324)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

1  Q        And in the last email when Otero was
2  asking for this transfer he said, "The situation
3  has become unbearable."
4           What did you understand that to
5  mean?
6  A        As I previously testified about that
7  last exhibit, I -- my first reaction to seeing
8  that kind of language was his own security.
9  That's my best estimate of what he meant as I
10 sit here today.
11 Q        $35,000 for security?
12 A        That was what I said.  Yes.  I said
13 that is my best guess and that I don't know what
14 the $35,000 was for as I sit here today.
15 Q        The account from which this $35,000
16 was sent is the Asian Pacific Energy
17 Corporation.
18          What is that?
19 A        I have no idea.  Some -- some
20 company that Albert had apparently some funds
21 with.
22 Q        You never had any dealings with the
23 Asian Pacific Energy Corporation?
24 A        Not that I am aware of other than
25 some things like this.  I think there was a
                                    Page 325

1  couple of transfers from that organization.
2  Q        Have you ever signed a document on
3  behalf of the Asian Pacific Energy Corporation?
4  A        On behalf of?  I don't recall doing
5  that.  No.
6  Q        Have you ever signed an agreement
7  with the Asian Pacific Energy Corporation?
8  A        Not that I'm aware of as I set here.
9  It's possible that they were involved in those
10 other transactions you showed me yesterday, but
11 I don't think they were.  I don't know.
12 Q        Have you communicated with any
13 Dutch government officials about the Asian
14 Pacific Energy Corporation?
15 A        Not that I recall.
16 Q        Do any of the individuals involved
17 in that Nicox transaction; Herman deLeeuw, Paul
18 Akkermans, James Elwood; have any involvement
19 with the Asian Pacific Energy Corporation to
20 your knowledge?
21 A        I don't know.
22 Q        How about Andre Lasserre?
23 A        I don't know.
24          MR. WELLS:  All right.  Let's get
25 tab 72.
                                    Page 326

1           And this is Exhibit 60.
2           (Plaintiff's Exhibit 60 was
3           marked for identification.)
4  Q        This is a memorandum that was
5  prepared by Jim Carroll for Bill Scherer and
6  Richard Drath.  And if you flip through it, a
7  lot of it's redacted.  But from what you can
8  see, it's discussing the Drummond case.  And on
9  page three of that memorandum it says, "The
10 witnesses generally seem untrustworthy:  The
11 witnesses are criminals, convicts, and poor
12 people vulnerable to bribery and threats.  It
13 appears" Terry Collingsworth "has paid money to
14 at least get access to witnesses, including
15 $100,000 to get Jaime Blanco to testify.  The
16 other side and the court assumedly know about
17 this."
18          Now, Drummond and the Court did not
19 know that Jaime Blanco or his lawyers had
20 received any money, did they?
21          MR. PAULK:  Object to the form.
22 A        Object to the form.
23          At the time of this memo, I had not
24 disclosed my assistance to Jaime Blanco's
25 lawyers.
                                    Page 327

1  Q        (By Mr. Wells)  He also says in here
2  "A number of witnesses have given conflicting
3  stories in affidavit, etc., as" Terry
4  Collingsworth "has pointed out in memos."
5           And that's true, isn't it, these
6  witnesses have testified inconsistently over
7  time?
8  A        Object to the form.
9           I think it depends entirely on who
10 we're talking about.
11 Q        Jaime Blanco, for example?
12 A        As I said, I never saw any
13 indication that he was denying Drummond's role
14 in this.
15 Q        You didn't see his testimony to the
16 Fiscal a when he was arrested in September of
17 2010?
18 A        I probably saw that, and that was a
19 complete denial of his responsibility.  So -- so
20 I don't view that as something inconsistent with
21 the story that he ultimately told when he
22 explained the truth.
23 Q        And El Tigre, for example, has given
24 conflicting accounts in various testimony,
25 hasn't he?
                                    Page 328

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 6 (325 - 328)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

1 A         I do recall at some point he said
2 that he had been threatened and brought --
3 offered bribes to change -- retract his story.
4 And I think he did.  Then he retracted it again.
5 So I think it's true that he has had some
6 conflicting versions depending on the pressures
7 and -- and threats that he was receiving.
8 Q         Well, he told the Colombian
9 authorities that he didn't know anything about
10 Drummond having anything to do with
11 paramilitaries.  And you then got a subsequent
12 declaration from him saying, I was threatened by
13 Jaime Bernal in order to give that testimony.
14         Do you recall that?
15 A         That's what I just referred to I
16 think.
17 Q         And then when you actually took his
18 trial testimony in Balcero and asked him that
19 question; he said, No, I was never threatened.
20         Do you recall that?
21 A         I don't.  I don't recall
22 specifically.  But I do recall that there was
23 some lack of clarity about when he was
24 threatened and when he was willing to talk about
25 being threatened.

Page 329

1 Q         And does it cause you any concern
2 that this man testifies under oath to completely
3 contradictory things over time?
4         MR. PAULK:  Object to the form.
5 A         Object to the form.
6         It causes me some pause to explain
7 how all of this happened, and I think we are
8 able to do that.  Yes.
9 Q         (By Mr. Wells)  Samario has also
10 given conflicting testimony to Colombian
11 government officials and in the Balcero case,
12 hasn't he?
13 A         Not that I'm aware of as I sit here.
14 No.
15 Q         You're not aware that Samario at --
16 at times has denied any knowledge of Drummond
17 having anything to do with the AUC before the
18 Colombian authorities?
19 A         I'm not aware of any evidence to
20 that effect, and I'm not aware that -- I'm
21 positive that Samario never told me that.  I --
22 I've heard that, I think maybe, from the
23 Drummond side; but I'm not aware of it
24 personally.  No.
25         MR. WELLS:  Let me get 73, and this

Page 330

1 is Exhibit 61.
2         (Plaintiff's Exhibit 61 was
3         marked for identification.)
4 Q         This is a May 31, 2012, email from
5 you to Bill Scherer.
6         And he -- you're basically asking
7 him for some time to get together and start
8 getting ready for trial; correct?
9 A         That's what it says.  Yes.
10 Q         And you say you "Especially need
11 some mock jury work on the credibility issue
12 facing our key mass-murdering witnesses."
13 A         Yes.
14 Q         And who all were you referring to
15 there?
16 A         Well, the bottom of the email
17 mentions Charris.  And I'm forwarding something
18 relating to Charris, so certainly him.  But, of
19 course, all of the paramilitary witnesses that
20 we were relying on had been AUC either
21 commanders or participants.  And so like getting
22 ready for a trial against the Mafia where some
23 of your witnesses are now turned state's
24 evidence, if you will; it's something that you
25 have to prepare for, to explain to the jury that

Page 331

1 they -- they had bird's eye information, but
2 they don't have a very good resume.
3 Q         And your allegation in the case was
4 that your clients, the people that had been
5 killed allegedly by paramilitaries; the people
6 responsible for those murders were some of your
7 witnesses like El Tigre and Samario?
8         MR. PAULK:  Are you talking about
9 Balcero?
10         MR. WELLS:  Yes.
11 A         In Balcero; yes, it is true that El
12 Tigre -- his testimony is that he, on behalf of
13 Drummond, did kill people along that rail
14 corridor.  And, yes, that was one of the issues
15 that we had to explain to the jury.
16 Q         (By Mr. Wells)  And Ivan Otero has,
17 at least at some periods of time, been the
18 criminal attorney for El Tigre; correct?
19 A         Well, as I think I said yesterday, I
20 saw a document maybe in Susana's deposition
21 where somebody listed that.  I myself remain
22 confused as to the timing of when and in what
23 capacity Ivan represented any of these people.
24 But it is certainly -- I believe it is true that
25 at some point he did represent El Tigre, I

Page 332

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 7 (329 - 332)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

1 think, in the -- in the -- what -- the --
2 Q        Justice and Peace?
3 A        Yeah.
4 Q        And when Otero was working with you,
5 he was working on behalf of the victims;
6 correct?
7 A        He was part of our team that was
8 prosecuting this case on behalf of the
9 plaintiffs.  Yes.
10 Q        You didn't see any sort of conflict
11 inherent in that that he represents both the
12 murderer and the victim?
13        MR. PAULK:  Object to the form.
14 A        Object to the form.
15        Depends on the time frame.  And as I
16 testified yesterday, we discussed that.  And I
17 clearly decided I was -- I was not prohibited
18 from working with Ivan Otero on these cases.
19 Q        (By Mr. Wells)  You decided, but you
20 didn't get any sort of bar opinion about that.
21        Is that true?
22 A        Oh, I didn't get any bar opinion
23 about Ivan.  No.
24        MR. WELLS:  Let's get tab 75.  And
25 this is Plaintiff's Exhibit 62.

Page 333

1 (Plaintiff's Exhibit 62 was
2        marked for identification.)
3 Q        This is on June 14th, 2012.  And
4 you're informing your legal team that you just
5 "had a very contentious meeting with Bill
6 Scherer, Richard Drath, and Jim Carroll."
7        That's the guy that we just saw on
8 that memo; right?
9 A        Yes.
10 Q        Tell me what you can recall about
11 that meeting.
12 A        Well, I don't recall much more than
13 what is written here.  I had a meeting with
14 Bill, Drath, and Carroll.  And Carroll, who I
15 had at -- maybe this was the first time I met or
16 discussed anything with Carroll.  And -- and he
17 was there to play -- to -- to raise doubts about
18 the financial viability of these cases.
19 Q        And you say he had reviewed the
20 Drummond file?
21        Did you discuss or did he discuss
22 this memo that we just looked at and the
23 thoughts he was putting forth?
24 A        I never saw this Exhibit 60 until
25 this litigation; your litigation against me.

Page 334

1 So, no, I -- his memo was not something that I
2 reviewed or that was discussed at this meeting.
3 He expressed similar views that I -- that are
4 here in the -- in the unredacted portion of the
5 memo.
6 Q        And what do you recall about
7 Mr. Carroll's position as to the financial
8 viability of the Drummond cases?
9 A        I recall nothing beyond what is
10 written here very specifically that,
11 particularly the Kiobel case, was of grave
12 concern and ultimately was, obviously, a serious
13 problem in the case.
14 Q        All right.  When did you say you
15 first saw this memo in the context of this
16 litigation?
17 A        I don't remember exactly, but I -- I
18 feel confident in what I said that at the time
19 that the memo was written, no one shared it with
20 me.  At some point, either in getting ready for
21 a deposition or someone was wanting me to give
22 context for it, someone showed me that memo.
23 But I never received it when -- at that time,
24 2012.  And the only time that I met with Jim
25 Carroll on these issues was reflected in Exhibit

Page 335

1 62.
2 Q        What do you recall either Bill
3 Scherer or Richard Drath saying during that
4 meeting?
5 A        I think, again, the reason I write
6 memos is to remember them, what happened 12
7 years later.  I think that what's written here
8 is what happened.  I can't add any details to
9 it.
10 Q        You've said that a number of times.
11 I mean, we're -- are we pretty much left with
12 what the documents say as to what was happening?
13 A        In this situation, I cannot add any
14 details.  I think this is a particularly
15 detailed memo.
16 Q        All right.  Two of your witnesses in
17 Balcero that you obtained declarations for but
18 did not get letters rogatory for were Yuca and
19 Peinado.
20        Do you recall those two gentlemen?
21 A        I do.
22 Q        How did you get in touch with Yuca
23 and -- we'll just start with Yuca.
24 A        Object to the form.
25        What do you mean by "get in touch"?

Page 336

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 8 (333 - 336)

Drummond Company, Inc., et al., vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

| | |
|---|---|
| 1 Q        How did you first hear about him? | 1 the nature of the need for security funding? |
| 2 A        **Probably through interviews with** | 2 A        **Well, it says here that they were** |
| 3 **Samario or El Tigre, the -- the -- both of those** | 3 **"vulnerable to Drummond targeting."  So that** |
| 4 **names would have come up.** | 4 **means that they felt that their families would** |
| 5 Q        Both Yuca and Peinado? | 5 **have been in danger if they had provided** |
| 6 A        **Uh-huh.** | 6 **testimony.** |
| 7 Q        And then how did you end up getting | 7 Q        Do you know what threats they had |
| 8 in contact with them? | 8 allegedly received? |
| 9 A        **I went and visited them both in** | 9           You just sort of interpreted a |
| 10 **prison.** | 10 document that doesn't provide much information. |
| 11 Q        Who arranged that? | 11 I'm just trying to figure out if you actually |
| 12 A        **On both cases it was Ivan Otero.** | 12 know the nature of the supposed threats these |
| 13 Q        And were there, quote, service | 13 two may have received? |
| 14 charges paid to gain access to the prisons in | 14 A        **Not specifically as I sit here.  I** |
| 15 those instances? | 15 **think -- I'm sure Ivan would have discussed that** |
| 16 A        **Not that I'm aware of.** | 16 **with me.  But I don't recall did -- did someone** |
| 17 Q        But you don't know? | 17 **report that someone showed up at their house,** |
| 18 A        **If I said I'm not aware of it, that** | 18 **which often happened.  With respect to these** |
| 19 **means I don't know one way or the other.** | 19 **two, I don't recall anything that specific.** |
| 20         MR. WELLS:  All right.  Let me see | 20 Q        When you were thinking about getting |
| 21 tab 113, which is Exhibit 63. | 21 testimony from these imprisoned witnesses, would |
| 22         (Plaintiff's Exhibit 63 was | 22 you do dil -- due diligence to see what |
| 23         marked for identification.) | 23 testimony they had offered before? |
| 24 Q        So this is a memo from Lorraine | 24         MR. PAULK:  Object to the form. |
| 25 Leete to you in March of 2012.  And in the | 25 A        **Object to the form.** |

| | |
|---|---|
| 1 unredacted portion has has a section entitled | 1         **If there was a written record of** |
| 2 "Potential New Witnesses." | 2 **some sort that was available; we, of course,** |
| 3         Do you see that? | 3 **looked at it before we talked to them.** |
| 4 A        **Yes.** | 4 Q        (By Mr. Wells)  And do you know that |
| 5 Q        And she says, "Peinado:  Ivan agrees | 5 Yuca and Peinado have taken inconsistent |
| 6 that he is a very valuable witness and | 6 positions in their testimony as it relates to |
| 7 vulnerable to Drummond targeting.  Any idea on | 7 whether or not Drummond had anything to do with |
| 8 when we will be able to secure security funding | 8 the AUC? |
| 9 for him and Yuca?" | 9 A        **I'm not aware of any inconsistent** |
| 10         So prior to this, had they made a | 10 **position that they took.  I interviewed them** |
| 11 request for, quote, security funding? | 11 **both, and I found their stories to be quite** |
| 12 A        **I'm generally aware that Ivan told** | 12 **credible.** |
| 13 **me that they had security concerns.  I never** | 13 Q        Did you provide security funding for |
| 14 **discussed it with either Peinado or Yuca.** | 14 those two? |
| 15 Q        Okay.  And when did you learn and | 15 A        **No.** |
| 16 what did you learn about this request for | 16 Q        Why not? |
| 17 security funding? | 17 A        **This -- this request -- I -- I -- I** |
| 18         I know you're not speaking to them | 18 **don't -- I'm not confident that their requests were** |
| 19 directly; but I'm including in that question any | 19 **legitimate.  This request, though, came at the** |
| 20 way you got the information, whether through | 20 **time that culminated in this meeting that is in** |
| 21 Ivan, Lorraine, anybody else? | 21 **June of that year that we just -- I -- I was** |
| 22 A        **Well, I think it would have been** | 22 **unable to authorize any more of these kinds of** |
| 23 **exactly like this; Lorraine transmitting** | 23 **costs.  So, no, we did not provide it.** |
| 24 **questions or information from Ivan to me.** | 24 Q        Did you try to? |
| 25 Q        And what was to your understanding | 25         Did you ask and were told no? |

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

**Page 341**

```
1  A         I'm pretty sure I did.  Yes.
2  Q         Okay.  So you wanted to provide the
3  funding; you just couldn't get it out of your
4  law firm?
5  A         I thought that their security
6  concerns were legitimate.  And I did inquire
7  probably of Richard Drath, and I told that there
8  would be no more of these kinds of payments
9  available.
10 Q         Do you have any documentation of any
11 threats these people received; whether it be
12 they received anything in writing as a threat, a
13 text message, email, or after the threat some
14 sort of report to the authorities about it?
15 A         No.  The AUC didn't send memos or
16 send emails.  They showed up with guns and
17 threatened people.  That was consistent with
18 what happened to virtually all of the other
19 people who had serious threats.
20 Q         Mr. Collingsworth, they did not show
21 up with a -- with guns into a prison.
22 A         I'm talking about the families.
23 Q         Let's stick to the question.
24           Did you see any written
25 documentation substantiating that either of two
```

**Page 342**

```
1  gentlemen had received a threat?
2  A         No.  There wouldn't have been any.
3  Q         And you did not make any report to
4  any governmental authority seeking governmental
5  help relating to these supposed threats, did
6  you?
7  A         No.  As I testified yesterday, that
8  would have been futile and probably dangerous.
9  Q         Well, did you file any sort of
10 report with any U.S. governmental authority
11 saying these people had been threatened by what
12 you believed to be an American company?
13 A         No, I did not.
14           MR. WELLS:  Let's go to tab 114.
15 This is Plaintiff's Exhibit 64.
16           (Plaintiff's Exhibit 64 was
17            marked for identification.)
18 Q         So this is also in June of 2012.
19 And Lorraine Leete is telling you, "Hey Terry, I
20 don't know how your meeting went yesterday and I
21 hate to bring up more money issues, but I
22 thought Ivan's monthly wire was increased by
23 $2,200.  Below is the regular wire for $2700."
24           And y'all were regularly, on a
25 monthly basis, sending $2700 to Ivan Otero for
```

**Page 343**

```
1  the arrangement with Ivan Otero, El Tigre, and
2  Samario; correct?
3           MR. PAULK:  Object to the form.
4  A         Object to the form.
5           Well, as I've said, that now appears
6  to be the case.  I also for a while was confused
7  and thought that most of it was for Ivan's own
8  security.
9  Q         (By Mr. Wells)  And what was the
10 $2200 increase for?
11 A         My recollection is that Ivan started
12 doing work on the Chiquita cases, and we were
13 providing him with additional funds for that
14 work.
15 Q         $2200 a month?
16 A         Yes.
17           And what documentation do you have
18 to substantiate that he was actually performing
19 work with that money?
20 A         He was working directly with me, so
21 I was aware that he was doing work.
22 Q         Does he have a contingency fee
23 interest in the Chiquita case?
24 A         No, he does not.
25 Q         So you're just paying him a flat
```

**Page 344**

```
1  $2200 a month?
2  A         For a brief period of time.  Yes.
3  Q         And Yuca and Peinado at the time you
4  were dealing with them, or Ivan was dealing with
5  them on your behalf, were both in prison in
6  Valledupar; correct?
7  A         I -- no.  I don't think that's
8  correct.
9  Q         Are you suggesting that they lied in
10 their declarations they provided to you?
11 A         No, I'm not suggesting that either.
12 I'm just recalling that when I visited one of
13 them, he was in a -- a prison in a different
14 town.  I don't even remember which of the two,
15 but one of them was.
16           MR. WELLS:  Let me get 116 and 117.
17 These are Plaintiff's Exhibit 65 --
18           (Plaintiff's Exhibit 65 was
19            marked for identification.)
20           MR. WELLS:  -- and 66.
21           (Plaintiff's Exhibit 66 was
22            marked for identification.)
23 Q         The declarations of Yuca and
24 Peinado.
25           And if you look in paragraph three
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 10 (341 - 344)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

**Terrence P. Collingsworth - Volume II**
**2/21/2024**

1 of both of those declarations, where does it say
2 they're imprisoned?
3 **A          They both say they're in Valledupar.**
4 Q          And do you believe that to be
5 truthful testimony they put in their declaration?
6 **A          I have no reason to question that.**
7 **As I said though, I am positive that I visited**
8 **one of them in a -- in a different prison when I**
9 **did interview him.**
10 Q          Before or after the declarations
11 were signed?
12 **A          Before.**
13          MR. WELLS:  All right.  Let me get
14 115, which is -- I'm sorry -- Plaintiff's 67.
15          (Plaintiff's Exhibit 67 was
16             marked for identification.)
17 Q          So this is an email chain in June of
18 2012.  And on the second page of the chain,
19 there is a Lorraine Leete email to you with a
20 translated message from Ivan Otero.
21          Do you see that; June 10th, at
22 21:27?
23 **A          Yes.**
24 Q          And she's translating Mr. Otero's
25 message as the following:  "The theme of Charris
                                         Page 345

1 that both Yuca and Peinado were both in
2 Valledupar.
3 **A          But I wasn't providing any security**
4 **assistance to them.**
5 Q          Well, that is the question.
6          So you can't provide us any
7 explanation for what "those in Valledupar" mean?
8 **A          Well, I -- my -- my best guess is**
9 **we're referring to Samario and Ivan.  But,**
10 **again, I didn't write that; and I don't know why**
11 **a plural is used there.**
12 Q          Well, you were already sending $2700
13 a month for Samario and Ivan Otero?
14 **A          That's correct.**
15 Q          Okay.  So you think he's talking
16 about the $2700 per month?
17 **A          I don't know what he's talking**
18 **about.**
19 Q          And if Ivan is talking about
20 himself, do you have any idea why he'd be
21 talking about himself in the third person here?
22 **A          Seems unlikely, but I didn't write**
23 **this.**
24          MR. WELLS:  Let's go to 118, which
25 is Exhibit 68.
                                         Page 347

1 is moving slowly, but it can be done.  Finally,
2 the matter of the brothers has caused serious"
3 inconvenience -- "inconveniences and the
4 security for those in Valledupar has not arrived
5 yet."
6          So, first, what theme of Charris was
7 moving in June of 2012?
8 **A          I -- I don't recall that.**
9 Q          You can't provide us any sort of
10 context for what that cryptic statement might
11 mean?
12 **A          No.  Unfortunately, it's too cryptic**
13 **to refresh my recollection.  And I didn't write**
14 **it.**
15 Q          And the security for those in
16 Valledupar, who is that for?
17 **A          Well, the only other person in**
18 **Valledupar that we ultimately, I am now clear,**
19 **were providing security for was Samario and then**
20 **Ivan.**
21 Q          This is "those," plural.
22 **A          I see that.  I didn't write it, and**
23 **I'm confident that what I said is accurate.**
24 Q          And we just -- well, you're -- what
25 you said is not accurate because we just saw
                                         Page 346

1          (Plaintiff's Exhibit 68 was
2             marked for identification.)
3 Q          This is a -- another June 15th --
4 another June 2012 memo from Lorraine Leete
5 recounting her notes from a meeting with Ivan
6 Otero.  And in number five she says, "P&Y," Ivan
7 "should have permission from prison by Monday or
8 Tuesday" June 18th or 19th "to take" the
9 "depositions.  But" Ivan "needs $2700 for
10 logistics from INPEC and for keeping Yuca from
11 being transferred.  Y," which I presume is Yuca,
12 "will not sign declaration until he gets
13 security" money, "which still hasn't arrived
14 (the extra $2200 monthly)."
15          Did I read that correctly?
16 **A          You did read it correctly.**
17 Q          And P and Y, do you have any reason
18 to think that's anybody other than Peinado and
19 Yuca?
20 **A          No.**
21 Q          And what did you do when you were
22 told that Yuca will not sign his declaration
23 until he gets security money, the extra $2200
24 monthly?
25 **A          I don't recall specifically, but I**
                                         Page 348

Drummond Company, Inc., et al., vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

1  -- I know that at some point I made clear to
2  Ivan that we could do this, provide any security
3  for them.
4  Q          All right.  Let's go to 119, which
5  is Plaintiff's 69.
6                  (Plaintiff's Exhibit 69 was
7                  marked for identification.)
8  Q          These are text messages from your
9  phone that have been produced to us.  And on the
10  second page of the texts -- the -- the first
11  page is just an exhibit cover page.  So the
12  third page of the document, second page of the
13  texts.  We've got a series of texts starting on
14  June 18th, 2012, between you and Christian
15  Levesque.  And in that first one she says,
16  "Lorraine has some info from Ivan that is a
17  little time sensitive...tomorrow, Tuesday would
18  be fine.  I can either talk you through it or we
19  can send over skype.  Otherwise, I will send you
20  an update on a few things this evening that just
21  require you to look and agree or disagree, but
22  are not complicated."
23                  Did I read that correctly?
24  A          Yes.
25  Q          And you respond to her, Yes an email

Page 349

1  is good.  Speak general and I'll get it";
2  correct?
3  A          Yes.
4  Q          In other words, don't be very
5  specific.  Kind of vaguely tell me what you're
6  talking about, and I'll figure it out?
7  A          It -- it says what it says.  It
8  says, "Speak general and I'll get it."
9  Q          But, I mean, you're -- you are
10  telling her not to be specific; correct?
11  A          I'm telling her to speak general,
12  which is not specific.
13  Q          Okay.  You follow up with a text
14  basically asking if there's going to be an
15  email.  And then she responds "Sorry, when I saw
16  Lorraine's email, I thought she was going to.  I
17  am on my home and will do it when I get
18  there...involves payments, as I am sure you
19  know."
20                  And your response was what?
21  A          You're asking me what the text says
22  below that?
23  Q          Yes.
24  A          "Well it is what it is."
25  Q          And her next text says that she sent

Page 350

1  you an email.  And regarding number five, Ivan
2  Otero "needs 2700 for logistics in order to make
3  letters" rogatory for Peinado and Yuca "happen
4  and to keep" Yuca "from being transferred."
5  Yuca "still has not received the 22000 and will
6  not sign without it.  Lucho will not sign"
7  without "security money.  Charris needs" $7,000
8  "for his transfer.  Sorry."
9                  Did I read that correctly?
10  A          I think so.  Yeah.
11  Q          What $7,000 did Charris need for
12  what transfer?
13  A          I don't recall exactly what was
14  going on.  But he was going to be transferred
15  and asked us for -- for money, and I did not
16  provide that money.
17  Q          Putting Charris aside, did you spend
18  money to either secure prisoners' transfer in
19  Colombia or prevent their transfers in Colombia?
20  A          Not that I'm aware of.
21  Q          And who's Lucho who's saying he
22  won't sign without security money?
23  A          Lucho was another paramilitary
24  witness that we interviewed.  And he also had
25  requested security assistance, and I also said

Page 351

1  no to him.  Not because I didn't believe he had
2  security concerns, but by June -- these texts
3  are from June 2012.  As I previously testified,
4  I was told there would be no more funds for
5  security no matter what.
6  Q          Could you get funds for other
7  purposes?
8  A          Object to the form.
9                  It certainly depends on what the
10  funds were for.
11  Q          I mean, if you made a request
12  saying, I need X number of dollars per month for
13  this case or that case and it's not for
14  security, it's for other work; could you --
15  could you get funds released that way?
16  A          Object to the form.
17                  It depends on the situation.
18  Everything -- the memo that you showed me
19  regarding that meeting with Carroll and Drath
20  and -- and Bill Scherer, everything was -- the
21  budgets for all the cases were very restricted
22  by this time.
23  Q          Well, after Ms. Levesque tells you
24  about all of these security payment requests;
25  your response is "tell all" concerned "that I

Page 352

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 12 (349 - 352)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

**Terrence P. Collingsworth - Volume II**
**2/21/2024**

1 will get any day" 35,000 "from my uncle and I
2 can't make it go any faster but it will happen."
3          Did I read that correctly?
4 **A       Yes.**
5 Q       And -- and here's you calling Albert
6 Van Bilderbeek your uncle.
7          Why are you doing that?
8 **A       Well, occasionally, I guess I fell**
9 **into the routine that others were using.  But I**
10 **never sought to hide who I was speaking about.**
11 Q       And the $35,000 from Albert Van
12 Bilderbeek, that matches the 35,000 that we saw
13 in that wire transfer in July of 2012.
14          Do you know what that money was
15 spent on?
16 **A       As I said, I don't recall.**
17 Q       Second text from the bottom you say,
18 the "Point" is -- "just is that I can't approve
19 or not approve; funds are coming and I'm doing
20 the best I can but can't do better."
21          Nowhere in your conversation with
22 Ms. Levesque are you saying no, we can't do
23 this.  You're saying it will happen, and I'm
24 doing the best I can; right?
25 **A       I don't agree that these are all**
Page 353

1 **talking about the same thing.  And I don't know**
2 **how -- I don't believe that 35K relates to some**
3 **of the other requests that were made.  But I do**
4 **know, as I said, that I did not and could not**
5 **provide security for Yuca, Lucho, or money for**
6 **Charris to affect his transfer.  I told people I**
7 **couldn't, and I think there are emails where I'm**
8 **telling Ivan we can't do this anymore.**
9 Q       Well, your response to
10 Ms. Levesque's text about these security
11 requests for Lucho, Charris -- or I'll call them
12 money requests because Charris is saying it's
13 for his transfer.  Her text to you requesting
14 money for logistics, Yuca, Lucho, Charris is at
15 2:19; and your response is less than 30 minutes
16 later about the $35,000.
17          What else could you be responding to
18 but that text?
19 **A       I don't know, but I don't see the**
20 **relationship between those numbers that she is**
21 **raising to me and 35,000 from -- from Albert.**
22 Q       Well, 35,000 would cover all those
23 numbers she listed in her email, wouldn't it?
24 **A       If I was having severe money**
25 **problems, I was certainly not going to be able**
Page 354

1 **to -- to get more than anyone asked for.**
2 Q       You've seen a lot of documents in
3 this case I can tell.  You've been sitting
4 through depositions and watching the exhibits
5 pass by.
6          Have you seen a single document in
7 this case where you said, No, we are not paying
8 the $2200 a month for Yuca and Peinado?
9 **A       I don't know if it's in a -- I -- I**
10 **believe there are documents when I said I can't**
11 **pay anything more.  And I do know that I told**
12 **Ivan verbally that I could not provide anymore**
13 **security for Lucho, Yuca, anybody; and we**
14 **didn't.**
15 Q       Well, we have no way to corroborate
16 what you say you discussed with Ivan.
17          I'm trying to figure out:  Is there
18 a document that was created in real time that
19 would substantiate your refusal, as you say, to
20 pay $2200 a month for Yuca and Peinado?
21          MR. PAULK:  Object to the form.
22 **A       I object to the form.**
23          **I cannot lay my hands on such a**
24 **document as I sit here, but I'm confident that I**
25 **told people we could not.  And those documents**
Page 355

1 **you just showed me, I am telling people after**
2 **that meeting in June that we can't do this**
3 **anymore; and we didn't.**
4 Q       (By Mr. Wells)  So Ms. Levesque's
5 text to you about these payments is on June
6 19th, 2012; correct?
7 **A       What page is that on again?**
8 Q       It's the second page of the -- the
9 third page.
10 **A       Yes.**
11 Q       Let me show you Plaintiff's Exhibit
12 70.
13          (Plaintiff's Exhibit 70 was
14               marked for identification.)
15 Q       This is you also on June 9th, 2012,
16 telling the Conrad & Scherer accounting
17 department "Please rush Ivan wire for $2200";
18 right?
19 **A       I don't see the word "rush," but I'm**
20 **asking them to send him $2200.**
21 Q       Why don't you read into the record
22 the all caps email that you sent at the top of
23 the page.
24 **A       Oh, I didn't see that.  Yes.**
25 **"Please rush Ivan wire for $2200."**
Page 356

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

1 Q        So the same day that Christian
2 Levesque tells you Yuca will not sign without
3 the $2200, you authorize a rush wire to Ivan
4 Otero for $2200.  And what was that for other
5 than as what Ms. Levesque was requesting?
6 A        As I said, this $2200 as far as I
7 understood and approved, and I think it goes
8 with these account numbers, was for Ivan to work
9 on the Chiquita cases.
10       Is that a coincidence?  I don't
11 think so.
12 Q        Well, isn't it true that you'd been
13 told by the firm we're not going to approve any
14 more, quote, unquote, security payments; so you
15 just came up with a different way to describe
16 them to accomplish the same purpose?
17 A        No.
18 Q        So this is unlike the situation
19 where you sent a fake invoice to Parker Waichman
20 to get them to part with $25,000 that you were
21 going to use as a down payment for Jaime Blanco?
22 A        As we spent quite a bit of time on
23 yesterday, that ultimately was used for the
24 purpose that I had described.  It was for Ivan.
25 Q        And what exactly was the $2200

Page 357

1 needed for?
2 A        For Ivan's time, as I previously
3 testified.
4 Q        Why is it a rush?
5 A        Because he was complain -- you don't
6 have the Chiqu -- he was complaining about not
7 receiving any of the funds.
8 Q        What were you about to say?
9        I don't have what?
10 A        I don't have the Chiquita documents
11 with me that show that he was doing work on the
12 Chiquita case and that we were paying him $2200
13 a month.
14 Q        Do you have a written agreement with
15 Otero in Chiquita showing that he's being hired
16 to work on that case for $2200 a month?
17 A        I think there's some paperwork on
18 that.  Yes.
19 Q        Really?
20 A        Yes.
21 Q        Has it been produced in this case?
22 A        I don't know.
23 Q        Well, we'll ask you to go look for
24 that because it's responsive to requests served
25 years ago.

Page 358

1 A        Chiquita documents?
2 Q        Yes.  Any agreement with Ivan Otero.
3        And do you have any invoices from
4 Ivan Otero substantiating work done that
5 justifies a $2200 a month payment?
6 A        No.  As I said, I was working
7 directly with him; and I knew the work that he
8 was doing.
9 Q        Are you aware of any document that I
10 could look at that would say on it $2200 a month
11 and the work that Ivan Otero is being -- is
12 doing for that money?
13 A        There's no itemization of the work.
14 I do feel that there is a document where I
15 authorized $2200 for Ivan to work on the
16 Chiquita case.
17        MR. WELLS:  Let's get 121.  And
18 that's Plaintiff's 71.
19        (Plaintiff's Exhibit 71 was
20        marked for identification.)
21 Q        This is in July of 2012; July 3rd,
22 of 2012.
23        And at the bottom Lorraine Leete is
24 telling you "Hey Terry, there are pending wires
25 for 2700 and 2200 that have not arrived";

Page 359

1 correct?
2 A        Yes.
3 Q        And after you seek clarification
4 from her, you ultimately say at the top of the
5 page "Let me know.  I'll bring cash to get Ivan
6 caught up too."
7        Did you bring cash to Ivan Otero in
8 relation to this email?
9 A        I -- I don't recall.  I don't recall
10 if the wires were actually sent that we're
11 asking for or whether I brought cash.
12 Q        How many times did you give cash to
13 Ivan Otero?
14 A        Just one -- one -- on the next page
15 of this email, it's clear that I'm talking about
16 giving cash to Yina for the office costs.  But
17 to answer your question specifically, not -- not
18 many.  Two, three, four times.
19 Q        Yina was in Bogota; right?
20 A        Yina was in Bogota.  Yes.
21 Q        That's where the office costs would
22 be; correct?
23 A        Yes.
24 Q        Ivan Otero is in Valledupar;
25 correct?

Page 360

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 14 (357 - 360)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

---

1  A        His office is in Valledupar, but he
2  often.  I don't -- I'm not sure what the
3  question is.  But Ivan lives in Valledupar.  He
4  often met me in Bogota.
5  Q        The reason for the question is
6  you're offering up that the cash was supposedly
7  for Yina, which it does say that there.  But
8  your email much further up the chain says you're
9  going to bring cash to get Ivan caught up, not
10 Yina; right?
11 A        That's what it says.
12 Q        And how much cash did you give Otero
13 on these three or four occasions?
14 A        Object to the form.
15          There's -- there's no set amount.
16 Depended on what we were doing and what we
17 needed money for.
18 Q        Why would you ever need to give Ivan
19 Otero cash?
20          It's pretty apparent y'all are able
21 to wire money directly into his bank account on
22 a monthly basis.
23 A        Object to the form.
24          It -- it depends on the
25 circumstances.  Maybe we were in a hurry.  I
                                              Page 361

1  don't know in a general way.
2          MR. WELLS:  All right.  Let's go to
3  123, which is Exhibit 72.
4               (Plaintiff's Exhibit 72 was
5               marked for identification.)
6  A        Yeah.
7  Q        So Lorraine Leete is telling you on
8  July 18th, 2012, that she got a message from
9  Ivan and that she translates it says --
10 translates it as follows:  "After more than
11 three months of making the agreement, it still
12 hasn't been met.  I continue to believe in
13 Terry's word, but my friends now don't believe
14 in me.  Jimenez criminally denounced" Jaime
15 Blanco "for defamation, and he" Jaime Blanco
16 "should testify very soon.  He is thinking about
17 what he is going to say."  And I'll stop there.
18          What agreement that was made three
19 months ago had not been met?
20 A        I'm not sure.  I'm very unclear
21 about the timing of -- of Jaime Blanco and the
22 payments to his lawyers.  I believe yesterday we
23 discussed that you -- you -- you -- you implied
24 that the 35,000 that was mentioned over here
25 that you were trying to say was for Yuca was
                                              Page 362

1  actually for Jaime Blanco.  I don't recall who
2  was -- what -- what all of these transactions
3  were doing within a period of months in 2012.
4  So I -- I don't know.
5  Q        Were you still sending money for the
6  Jaime Blanco arrangement after he provided his
7  trial testimony in Balcero?
8  A        After he had provided trial
9  testimony?
10 Q        Yes.
11 A        I don't think so.
12 Q        And I'll represent to you July of
13 2012 is after he's already given both days of
14 his letters rogatory testimony.
15          So do you have any explanation for
16 what agreement as it relates to Jaime Blanco has
17 not been met?
18 A        No.  And I'm confused though because
19 -- and I'm -- I'm not saying this to be -- I'm
20 saying this, and I truly don't know or recall
21 the timing here.  But it says "he" in -- this
22 email says, "he (JBM)" -- I assume that's Jaime
23 Blanco -- "should testify very soon."  I don't
24 know.  Is that his letters rogatory testimony or
25 some other testimony?  I just don't recall.
                                              Page 363

1  Q        It's your email, Mr. Collingsworth.
2  Tell me.
3  A        Well, you asked me if I recalled;
4  and I'm saying no.  That's very confusing to me
5  as to what we're referring to there in 2012.
6  Q        The translated message from Ivan
7  continues:  "Our witnesses keep being offered
8  money so that they say that nothing is true and
9  that they said it because Terry and I gave them
10 money.  The argument they are using is that the
11 gringos don't meet their word.  What was
12 promised to Charris also hasn't been met.  I
13 understand that it is not Terry who decides but
14 he gave his word and I gave mine.  We should
15 understand what class of people we are dealing
16 with, this noncompliance could bring serious
17 problems for everyone."
18          So you gave your word to whom about
19 what?
20 A        Well, the only other person
21 mentioned there is Charris.  And we did have --
22 we were providing security for his family.  I'm
23 not sure if -- I don't recall the details of
24 what Ivan is referring to there other than that
25 this would have been in -- in July of 2012.
                                              Page 364

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 15 (361 - 364)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

1  That was after the June meeting where Conrad &
2  Scherer clamped down on the budget.  So I'm
3  assuming, but I can't speak for anyone besides
4  Charris who's specifically mentioned here, that
5  the security assistance we were providing to
6  their families was being held up, delayed, or
7  not provided and that Ivan was hearing about
8  that.
9  Q        And that's what you believe was what
10 was promised to Charris?
11 A        That's what I think we were talking
12 about.  Yes.
13 Q        And when he says, "We should
14 understand what class of people we are dealing
15 with, this noncompliance could bring serious
16 problems for everyone," what does that mean?
17 A        I think it's pretty obvious that
18 he's saying that we could -- we could ourselves
19 be subject to violent retaliation.
20 Q        By the people you're sending money
21 to?
22 A        They're in prison.  I -- I assume
23 he's talking about some of their friends.
24 Q        So you had concerns that witnesses
25 you were relying on, if money was not sent,
Page 365

1  specifically referring to.
2  Q        Well, Mr. Collingsworth, this is an
3  email to you from Ivan.  You're the one talking
4  to Ivan.  I was not there, so I'm trying to get
5  your context.  The jury would like to hear your
6  context for what can you tell us about what Ivan
7  is telling you here; and whether that is I heard
8  some more context in a conversation and I can
9  really explain what this message means or
10 anything.
11        So do you have any other context for
12 his statement about the class of people we are
13 dealing with and "noncompliance could bring
14 serious problems" other than what you've told us
15 that it's possible they could have had their
16 friends on the outside come after us?
17        MR. PAULK:  Object to the form.
18 A        Object to the form.
19        And I can't add anything to what
20 I've speculated that Ivan was referring to.
21 Q        (By Mr. Wells)  And Lorraine
22 continues after her translation of Ivan's
23 message.  And she says, "I'll follow up today
24 with Ivan on what is missing for the Valledupar
25 witnesses."
Page 367

1  could bring harm to you?
2  A        I wasn't concerned about that.
3  That's somebody -- that's Ivan writing to
4  Lorraine.  But it's not unreasonable to assume
5  that Ivan was concerned.  He constantly got
6  threats, and he was concerned that somebody
7  was -- perhaps if they're angry with him, this
8  is how they react.  But he's talking about the
9  class of people.  Those are violent people.
10 Q        Your witnesses?
11 A        Not my witnesses necessarily; the
12 people that are around them.
13 Q        Like who?
14 A        I don't know.  I didn't write this.
15 Alls I know is that El Tigre, Charris, and
16 Samario were in prison at the time; so I don't
17 believe they're going to be doing anything.
18 Q        So you're referencing they've got
19 friends on the outside that they may cause to
20 harm you?
21 A        I'm not referencing anything.
22 You're asking me to explain what Ivan meant, and
23 I gave you my best guess, that he was worried
24 about violent retaliation.  I don't know from
25 whom.  I don't know any details of what he was
Page 366

1         Who is she referring to there?
2  A        I don't know.
3  Q        She's emailing you.
4         You don't have any idea?
5  A        Well, as I've previously stated,
6  there was Samario, who was in Valledupar; and
7  then there had been requests that she showed me
8  for a security assistance for Yuca and Peinado,
9  which I was not able to approve.  And so
10 Lorraine is saying "I thought you two squared
11 that up when he was here."  I guess I met with
12 Ivan.  And I told him I could not provide those
13 funds, and I didn't.  And that's all that --
14 that's -- that's all I can say about that.
15 Q        You say you guess you met with Ivan.
16        You -- you don't actually recall
17 that.  You're just surmising, aren't you?
18 A        Well, she says, "I thought you
19 squared that up when he was here."  I don't as I
20 sit here today remember a roughly July 18, 2012,
21 in-person meeting with Ivan.  But based on
22 Lorraine's email, I assume that prior to this
23 email that I had met with Ivan.
24 Q        Wouldn't Lorraine have been with you
25 when you met with Ivan to be the translator?
Page 368

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 16 (365 - 368)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

---

1 A           Not every time.  No.

2 Q           Who else would have acted as
3 translator between you and Ivan?

4 A           Lorraine was my translator about 85
5 percent of the time.  Sometimes Rebecca
6 translated.  Occasionally, rarely, Susana was
7 down there with me.

8 Q           But you don't recall sitting here
9 today any particular meeting with Ivan during
10 which you were discussing what is missing for
11 the Valledupar witnesses?

12 A           I did testify that I told Ivan that
13 I could not provide any security for Yuca,
14 Peinado, Lucho, or the Charris funds or anything
15 else.  I do recall having that meeting with
16 Ivan.

17 Q           When?

18 A           This might have been -- this
19 probably was it.

20 Q           So assuming that testimony to be
21 true, Ivan should understand as of the date of
22 this email he doesn't need to be asking about
23 Valledupar witnesses anymore?

24 A           Object to the form.

25             That doesn't mean that he agreed or

---

1 that he thought that the issue was -- was
2 resolved.

3 Q           Do you know what Ivan was promising
4 to these witnesses?

5             He was meeting with them fairly
6 regularly without you; correct?

7 A           Object to the form.

8             What -- what witnesses are you
9 referring to?

10 Q           Any of the imprisoned witnesses that
11 Ivan was dealing with on your behalf?

12 A           And you're asking me?

13 Q           Do you know what he was promising
14 them in the meetings that you were not present
15 for?

16 A           I don't think that there's any
17 reason to believe that he was promising them
18 anything other than what we had agreed to, but I
19 don't know.  I wasn't in those meetings.  No.

20             MR. WELLS:  Let's go to tab 124,
21 which is Plaintiff's Exhibit 73.

22             (Plaintiff's Exhibit 73 was
23             marked for identification.)

24 Q           This is September of 2012.  And
25 there's a message from Ivan Otero that appears

---

1 to have been translated by Jose Juan Otero
2 Suarez.

3             Is that Otero's son that we met at
4 Jaime Blanco's deposition?

5 A           No.

6 Q           Who was that?

7 A           I think it's a different one of his
8 sons.

9 Q           Okay.  In any event, he's
10 translating Mr. Otero's message to you and says,
11 "First of all, the situation becomes even more
12 worrying.  Today, September 12, has not reached
13 the protection of" El Tigre and Samario.  "More
14 worrying is on what respect with the last two,
15 are three months of delay.  That leads me" to
16 "serious problems, which I request you help me
17 solve."

18             And who are the last two that
19 there's three months' delay for?

20 A           I don't know.  This looks like a
21 pretty odd translation, but he specifically
22 mentions two.  I don't know why he didn't
23 mention others, but I don't know.

24 Q           Well, the rush wire for $2200 we
25 looked at earlier was in June of 2012; right?

---

1 And here we are two months later
2 with Ivan telling you the last two, there's
3 three months' of delay.

4             You can't provide us any context at
5 all as to what he's talking about?

6 A           No, I cannot.

7             MR. WELLS:  Let's go to tab 125,
8 which is Plaintiff's Exhibit 74.

9             (Plaintiff's Exhibit 74 was
10             marked for identification.)

11 Q           So this is the same day, or at least
12 Lorraine Leete's email at the bottom is the same
13 day, as the email from Otero we just looked at.
14 And she is saying she "got a call from Ivan,
15 that the August wire for 2700 did go through.
16 Which means we are just missing the $2700 for
17 September, plus the $2200 for July, August, and
18 September."

19 A           That's what it says.

20 Q           So is that -- is that the three
21 months' delay for the last two?

22 A           I don't -- as I said, the only $2200
23 that I authorized sending to Ivan was for his
24 work on the Chiquita cases.

25 Q           Well, you then forward the exchange

---

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 17 (369 - 372)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

1 to Richard Drath, who was the chief financial
2 officer of Conrad & Scherer.  And you tell him
3 "We are 3 months late for Ivan and as I
4 explained to you most of this is extremely
5 sensitive security-based money and he has been
6 doing a terrific job getting us the evidence we
7 need in all the Colombia cases."
8         So you're not telling him there that
9 the 2700 that's missing and the 2200 that's
10 missing are security related?
11 **A        The 2700 was definitely for**
12 **security.  The 2200 is for Ivan for working on**
13 **the Chiquita cases.  And well before this was**
14 **the email where I specifically authorized that.**
15 **And so if I -- you were implying that I was**
16 **hiding what I was really doing, I would not have**
17 **said this is for security when it wasn't.**
18 Q        The 2200 --
19 **A        The 2200.**
20 Q        -- was not for individuals?
21 **A        No.  It was for Ivan.**
22 Q        You're confident of that?
23 **A        Yes.  That's what I authorized.**
24         MR. WELLS:  Let's go to tab 259.
25 Q        Are you aware of Ivan Otero doing
Page 373

1 anything with all the money you were sending him
2 that was not authorized?
3 **A        You're ask -- object to the form.**
4 **        You're asking me generally that do**
5 **-- do I know if Ivan ever used funds for**
6 **something that he wasn't authorized to do?**
7 Q        Yes.  You just suggested that I
8 authorized it for this purpose.  I'm sure it was
9 used for that purpose.
10        Are you aware of any instance in
11 which Mr. Otero used money for a purpose that
12 was not authorized by you?
13 **A        Not as I sit here.  No.**
14 Q        I'll show you Plaintiff's Exhibit
15 75.
16        (Plaintiff's Exhibit 75 was
17        marked for identification.)
18 MR. PRESLEY:  Tab 259.
19 Q        So this is an email between Lorraine
20 Leete, Ivan Otero, and Susana Tellez.
21        And Susana was your paralegal at the
22 time; correct?
23 **A        At what time?**
24 Q        November 2012, the date of this
25 email?
Page 374

1 **A        Yes.**
2 Q        And we have a translation attached
3 where Ivan originally emails her at the bottom
4 of the page "With respect to the protection
5 assistance payments, we have:  according to the
6 email sent to you on" September 27th, 2012, "by
7 October we had a delay of four months in the
8 payments for the new ones and a two-month delay
9 in the payments for the old ones."  And then he
10 provides a breakdown what he thinks is owed.
11        Who are the new ones, and who are
12 the old ones?
13 **A        As I said, I know now who the new**
14 **one -- or the old ones are.**
15 Q        El Tigre and Samario?
16 **A        Yes.**
17 Q        Who are the new ones?
18 **A        There was no security authorized for**
19 **anybody beyond those people.**
20 Q        And she responds "Regarding the
21 security payments, I agree with your
22 calculations for the past due months, but I
23 believe you've made a mistake in the amounts per
24 month.  We agreed to 2200 a month for the new
25 ones and 2700 for the old ones, for a total of
Page 375

1 4900 a month (with which you seem to agree)."
2        Did I read that correctly?
3 **A        You did read that correctly.**
4 Q        And you did authorize monthly
5 payments of $2200 a month over and above the
6 2700 that was already being sent relating to El
7 Tigre and Samario for Ivan Otero; correct?
8 **A        That's correct.  For his work on the**
9 **Chiquita cases.**
10 Q        So please explain to us why your two
11 cocounsel would be calling those $2200 a month
12 payments security assistance, security payments
13 for the new ones?
14        MR. PAULK:  Object to the form.
15 **A        Object to the form.**
16 **        I didn't write these.  I -- I don't**
17 **know why people were confused, if they were**
18 **confused.  But I can only say what I know that I**
19 **authorized, and it was not for any additional**
20 **security payments.**
21 Q        (By Mr. Wells)  Do you have any
22 documents that we could look at that would
23 substantiate the $2200 a month was not going to
24 these new witnesses, as this email states?
25        MR. PAULK:  Object to the form.
Page 376

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 18 (373 - 376)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

1 A          Object to the form.

2          I -- as I said, I think there were

3 documents that gave cost numbers for the

4 Chiquita cases that I authorized to be paid to

5 Ivan.  What I don't know as I sit here is it

6 looks like, you know, the money is not being

7 paid anyway, whatever it -- maybe it was at some

8 point.  I can only say just absolutely for

9 certain that I did not authorize.  In fact, I

10 said you could not do any more security

11 payments.

12 Q          (By Mr. Wells)  Did you discuss with

13 Lorraine Leete or Ivan Otero the subjects that

14 they are discussing in this email, that the

15 $2200 is for the new ones?

16 A          Well, I'm not copied on, oddly, this

17 particular --

18 Q          Which is why I asked you if you

19 discussed it.  I can see you're not on the

20 email.

21          Did you discuss it with your two

22 team members what they're talking about, the

23 $2200 being for the new ones?

24 A          Other than to tell them that we

25 could not provide additional security, I don't

Page 377

1 have any other recollection of that discussion.

2 Q          But you did after this point

3 continually authorize monthly $2200 payments to

4 Ivan Otero?

5 A          Well, I certainly authorized the

6 $2200 payments for Ivan's work on Chiquita.

7 Whether they were paid or whether they were

8 behind, I don't have any recall of that.

9 Q          And the last record we have of $2200

10 being paid monthly to Ivan Otero is round about

11 the time that you left Conrad & Scherer in 2015.

12          Did he continue getting $2200 a

13 month after you left Conrad & Scherer?

14          MR. PAULK:  Object to the form.

15 A          Object to the form.

16          No.  Conrad & Scherer stopped making

17 all of the payments after our separation.

18 Q          (By Mr. Wells)  So Ivan Otero has

19 been working on Chiquita for free for the last

20 nine years?

21 A          No.

22 Q          Okay.  How is he getting paid?

23 A          You asked me if we continued to make

24 the payments of $2200 for his work on the

25 Chiquita case.  The answer to that is no.

Page 378

1 Q          Okay.

2          MR. WELLS:  Read my question back.

3          (Record read.)

4          MR. WELLS:  The next one.

5          (Record read.)

6 A          And I said --

7 Q          Has he been working on Chiquita over

8 the last nine years as you've been preparing for

9 the trial that's coming up?

10 A          He has.

11 Q          And he's working for free?

12 A          No, he's not.

13 Q          How is he getting paid?

14 A          I pay him on a task-based -- I pay

15 him for doing specific work.

16 Q          I thought you just said you send him

17 money about once a year?

18 A          On the -- on the Drummond case.

19 Q          No.  I asked you if you send money

20 to Ivan Otero, period?

21 A          Okay.  Then we have a clarification.

22 Q          Well, let's clarify it then.

23          How often and how much are you

24 sending Ivan Otero for the last nine years

25 you've been gone from Conrad & Scherer?

Page 379

1 A          For work on the Chiquita case --

2 Q          For any purpose?

3          MR. PAULK:  Let him finish his

4 question -- his answer.

5 A          For any --

6          MR. WELLS:  Are you representing

7 this witness?

8          MR. PAULK:  I'm trying to keep

9 things civil here.

10 A          For the Drummond case, we provided

11 minimal support for travel and security, maybe

12 on three or four occasions, as I've said, which

13 I understood your question to be.  On Chiquita,

14 probably he's done six or seven things for me

15 that I have paid him for his time and his

16 travel.

17 Q          (By Mr. Wells)  So over the last

18 nine years, you've made, what, less than 20

19 transfers to Ivan Otero?

20 A          Well less than 20.  Yes.

21          MR. WELLS:  Let's take a break.

22          THE VIDEOGRAPHER:  Time is

23 10:31 a.m.  We are off the record.

24          (Short recess.)

25          THE VIDEOGRAPHER:  The time is

Page 380

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 19 (377 - 380)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

1 10:40 a.m.  We are back on the record.
2 Q         (By Mr. Wells)  Mr. Collingsworth,
3 who is Halcon?
4 A         Halcon is the nom de guerre of some
5 paramilitary witness that I never met but that
6 for some period of time that we were providing
7 security for him.  I think he was in Panama.
8 Q         So you -- you've never actually met
9 the man?
10 A        Nope.
11 Q        Have you ever spoken to him, whether
12 through an interpreter or directly?
13 A        I don't recall if he was, like, on
14 the phone with me and a translator or whether
15 the communications were he spoke to someone who
16 then told me what he said and I responded.  But
17 I communicated through a translator.  Whether
18 directly or indirectly, I don't recall.
19 Q        Did you have interviews with him, or
20 was that somebody else and then relaying back to
21 you?
22 A        I think at the very end of my
23 dealings with him, I asked him some questions
24 through a translator; and he probably replied to
25 my questions.
Page 381

1 Q         And he received, quote, unquote,
2 security payments for years; correct?
3 A         I don't know for how long.  I
4 inherited him from -- Dan Kovalik and the
5 steelworkers had originally found this witness
6 and had originally moved him to Panama.  And at
7 some point we sort of took over the security
8 assistance for him.
9 Q         And what was this witness supposed
10 to know to be able to testify about that you
11 were interested in?
12 A        I -- I really don't know, and I -- I
13 did not do much to follow up with him.  We were
14 very, very busy.  At some point I finally said,
15 What is this person going to testify to, and did
16 not feel that it was something that put him at
17 risk or that was valuable in any way.  And at
18 some point we stopped our relationship with him.
19 Q        So once he did not testify, you
20 believed it was appropriate to stop making the
21 payments?
22 A        Object to the form.
23          I didn't say that.  I said he did
24 not have any information that was useful or that
25 would put him at risk.  I never did such an
Page 382

1 assessment until the very end, and that was my
2 mistake.
3 Q         So you paid him on a monthly basis
4 for four or more years without knowing whether
5 he was at a security risk?
6 A         As I said, I did not look into the
7 situation.  I inherited a situation from Dan
8 Kovalik, who told me this guy was going to be
9 killed.  And we agreed to continue whatever
10 arrangement Dan had made with the steelworkers.
11 Q        Well, do you trust Dan Kovalik?
12 A        I trust Dan Kovalik completely.
13 Q        And you seem to put a lot of trust
14 in Ivan Otero when he tells you these people
15 claim to be threatened and need security money.
16          Why do you stop the payments to
17 Halcon other than the fact that he's not
18 providing you testimony?
19 A        Object to the form.
20          I can only repeat that he -- when --
21 when I asked him what information he had; not
22 only did he not have any information, but that
23 nothing that he said would have subjected him to
24 threats.  Plus, I think he was still in Panama
25 in any event; so he was not going to be directly
Page 383

1 harmed by people in Colombia.
2 Q         He provided you a draft declaration,
3 didn't he?
4 A         I think so.  I couldn't tell you if
5 my life depended on it what it said.  But I
6 remember I did not feel that it had information
7 that was useful to the case or that put him at
8 risk.
9 Q         Well, one of the things it said that
10 was that Drummond was responsible for the union
11 leader killings.
12          You didn't think that would put him
13 at risk?
14 A        I did not think, if I recall my
15 reaction to that situation, that he had personal
16 knowledge of any of the things that he had said.
17 Q        That's an interesting word,
18 "personal knowledge."
19          Can you tell me any of the witnesses
20 who you say you gave security payments to that
21 have personal knowledge of Drummond cooperating
22 with them in any way?
23          MR. PAULK:  Object to the form.
24 A        Also object to the form.
25          Their statements, their testimony,
Page 384

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 20 (381 - 384)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

1 their declarations speak for themselves.  But I
2 think every single one of them had personal
3 knowledge.
4 Q          (By Mr. Wells)  Well, their
5 statements were based on hearsay:  So and so met
6 with Drummond and told me what the meeting was
7 about.
8 A          I --
9 Q          Do you have any of your security
10 payment witnesses that met directly with
11 Drummond and had an alleged conversation with
12 Drummond?
13 A          Object to the form.
14          I am not, you know, prepared as I
15 sit here to recall the details of every single
16 one of their declarations or their testimony.
17 Q          Can you give me one?
18 A          Well, Charris.  Charris was working
19 directly with Jim Adkins and said that Jim
20 Adkins was coordinating with Charris what the
21 AUC was doing.  That's one.
22 Q          Okay.  And another would be Jaime
23 Blanco, who says Charris is lying about that
24 subject.
25          So who's right?
                                        Page 385

1 A          I don't agree with that.  I think
2 that Charris could have been in meetings that
3 Jaime Blanco was not in, for example.  There's
4 all kinds of ways that they both could have
5 different impressions of what happened.
6 Q          Did you ever express concern to your
7 team about the, quote, different impressions
8 your witnesses seemed to have about key events?
9          MR. PAULK:  Object to the form.
10 A          Object to the form.
11          That's a very general question.  I
12 think there's an email in there somewhere where
13 I said I did have some concerns about
14 conflicting testimony that we would have to work
15 to explain.
16 Q          (By Mr. Wells)  Can you outline for
17 us some of the largest conflicts in testimony
18 that caused you the most concern?
19 A          As I sit here today not having
20 recently reviewed their testimony or their
21 declarations, I -- I really can't.
22          MR. WELLS:  All right.  Let me get
23 tab 126, which is Plaintiff's 76.
24
25          (Plaintiff's Exhibit 76 was
                                        Page 387

1 A          Object to the form.
2          And I disagree with your
3 characterization.
4 Q          You do acknowledge those two
5 statements cannot both be true, that Charris was
6 in meetings to plan the murders or he was not?
7 A          Object to the form.
8          And I don't -- I don't think I can
9 answer that.  I -- you're assuming that -- I'm
10 not clear what you're -- you're asking me.
11 Q          If Charris says, I was in meetings
12 to plan the murders of the union leaders, and
13 Jaime Blanco says, Charris was not in meetings
14 to plan the union leaders; do you recognize that
15 both of those statements cannot be true --
16 A          Well --
17 Q          -- at the same time?
18 A          Object to the form.
19          I'm not aware that there's these
20 direct contrary assertions that you've just --
21 Q          I'm just asking you --
22 A          -- stated.
23          -- whether you recognize those two
24 statements cannot possibly be true at the same
25 time?
                                        Page 386

1          marked for identification.)
2 Q          This is in May of 2011, at which
3 time you would have been making monthly payments
4 to Halcon for how long approximately?
5 A          I don't know.  I don't know when we
6 took it over for Dan.  I -- I just don't know.
7 Q          Before or after you joined Conrad &
8 Scherer?
9 A          Before or after what?
10 Q          Before or after you joined Conrad &
11 Scherer was it that you adopted the payments to
12 Halcon?
13 A          You know, I don't -- I don't really
14 know that either.  I -- probably after.  But if
15 I -- someone showed me a document that showed
16 that we had done it before I joined Conrad &
17 Scherer, I wouldn't be surprised.
18 Q          So Victoria Ryan -- who was in your
19 D.C. office; correct?
20 A          Yes, she was.
21 Q          -- is telling you here "In the last
22 few months Charris has complained he's receiving
23 a lower amount in pesos for his monthly payment
24 than the agreed-upon rate."
25          So it's been reported to you that
                                        Page 388

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 21 (385 - 388)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

1 Charris is the one complaining; correct?
2 A        Well, that's what this says.  But I
3 know for a fact that Charris is not able to
4 communicate to anybody in my office or in --
5 in -- working on our case.  He was in a maximum
6 security prison.
7 Q        Well, y'all were able to communicate
8 with him quite a bit.  You interviewed him.  You
9 got a declaration from him.  Ivan Otero is
10 passing you messages from him and other
11 witnesses.
12        Y'all are able to communicate with
13 these people; correct?
14 A        Because I physically visited him in
15 a maximum security prison.
16 Q        And Victoria Ryan, does she speak
17 Spanish?
18 A        She does.
19 Q        So she could have at least had the
20 ability to communicate with Charris in their --
21 in that language?
22 A        They both speak Spanish.  But she
23 did not visit him in a maximum security prison
24 in Colombia.  I'm sure of that.
25 Q        Which witnesses are you aware of had
Page 389

1 email in prison?
2 A        The only witness that I'm aware in
3 the Drummond case that had email in prison was
4 Jaime Blanco.
5 Q        Because he was emailing you
6 directly?
7 A        Because I know that he had a
8 computer.  He was in a -- the political wing of
9 the prison.
10 Q        All right.  So what she's telling
11 you here is that Charris is complaining that he
12 is receiving a lower amount for his monthly
13 payment.
14        But your testimony is that -- that
15 is not what was happening?
16 A        Absolutely.  That is not happening.
17 His family was receiving support.  That's
18 documented in many other documents, as you all
19 know.
20 Q        Once the wire for the monthly amount
21 for Charris leaves Conrad & Scherer, walk me
22 through where the funds go from there as it
23 relates to Charris.
24 A        I -- I really don't know.  I was not
25 involved in the mechanics of these wires.  I
Page 390

1 think for a period of time, Yina received the
2 wires and then delivered them to Charris'
3 family.  I don't know.
4 Q        Did you witness that happen?
5 A        No.  I trust that when she told me
6 that that it was happening.
7 Q        So you don't -- once the money goes
8 to Colombia, you don't actually -- you've never
9 witnessed where it goes to be able to say under
10 oath 100 percent it did not ultimately end up
11 with the witness themselves?
12        MR. PAULK:  Object to the form.
13 A        Object to the form.
14        That -- there are a number of ways
15 that I knew that the witnesses were getting the
16 security payments.  And I don't believe that
17 anyone has ever, in fact, raised a question or
18 doubted that.  There is -- there is no doubt in
19 my mind that they received it.
20 Q        (By Mr. Wells)  All right.  How did
21 you come up with this amount for Charris that
22 he's complaining is -- is lower because of the
23 exchange rate between the dollar and the peso?
24 A        As with all of the families that we
25 were providing security assistance to, I -- I
Page 391

1 consulted with my colleagues in Colombia as
2 to -- not only did I consult with my colleagues
3 in Colombia, but I first asked them for their
4 suggestions on what would be a reasonable amount
5 to support a family in whatever area they were
6 in.
7 Q        Who were these colleagues?
8 A        Well, Yina was one; Francisco
9 Ramirez; Ivan; Rebecca; that's mostly it.  All
10 people who lived in Colombia.
11 Q        And they told you an amount, and you
12 went with that?
13 A        I'm not saying I never pushed back
14 or asked questions, but we ultimately always
15 agreed on an amount.
16 Q        Do you have any documents that would
17 reflect an analysis of living costs in any
18 particular area and analyzing any of these
19 payments as to whether they are reasonable or
20 not?
21 A        I do recall a long time ago looking
22 at, like, some World Bank studies and looking at
23 cost of living analysis in different parts of
24 Colombia.  And it was consistent with what we
25 were -- the amounts we were providing.
Page 392

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 22 (389 - 392)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

1 Q        I'm not talking about what you say
2 you looked at.  I'm talking about a document
3 that's actually analyzing Charris, for example.
4 He's got so and so number of children, wife,
5 they're living in X location, and here's what a
6 reasonable amount would be.
7        Are there any documents like that
8 that we could look at?
9 A        I -- I doubt it.  I think we all --
10 we had those discussions together, and they were
11 verbal discussions.
12 Q        At the bottom of her email she says,
13 "Halcon has not said anything so far so we're
14 not asking to make this adjustment for him."
15        What does that mean?
16 A        I can't add anything to what seems
17 like a clear assertion by her that Halcon had
18 not complained, apparently, about the difference
19 in the exchange rates.
20 Q        Well, if this analysis has been done
21 to make sure that you're only paying the bare
22 minimum to adequately secure these people and
23 due to the exchange rate Halcon is no longer
24 getting that amount; you're not concerned that
25 he's at a security risk?

Page 393

1 A        Object to the form.
2        I know so little about Halcon,
3 especially for -- until I finally paid attention
4 to him at the end there.  As I said, my
5 recollection is that he was in -- in Panama,
6 which would have been a different security
7 situation altogether.  But I did not have any
8 concern about the difference in the exchange
9 rate impacting his security, or I might have
10 indicated it here.
11 Q        So you were talking to a number of
12 paramilitaries claiming to have knowledge
13 relevant to your case.
14        Did any of them mention Halcon?
15 A        Not that I recall.  But, again, Dan
16 Kovalik was the person who identified this
17 person as a witness.  And I have no recollection
18 of, or I don't think I ever saw, any written
19 analysis of why Dan thought that or who led Dan
20 to him.
21 Q        Well, right here we're up to May of
22 2011.  You've already gotten declarations from
23 Charris, El Tigre, Samario.  I may be leaving
24 somebody out; probably Duarte at this point.
25        Any of the paramilitaries you've

Page 394

1 been talking to or your team has been talking
2 to; have they said, Yeah, no, there was this
3 guy, Halcon, who was also involved?
4 A        Object to the form.
5        And as -- as I've said a few times
6 now, Halcon was so far removed from my
7 consideration during this period of time; I'm
8 pretty sure I never asked any of these people
9 about him.  I was only tangentially aware of why
10 he was a witness.  It was because Dan said that
11 he was.  But I don't believe any of the other
12 witnesses that I personally interviewed
13 mentioned Halcon.
14 Q        Why didn't you stop paying him years
15 earlier than you did --
16 A        General --
17 Q        -- when you said you weren't even
18 paying attention to him?
19 A        Object to the form.
20        And it was because I wasn't paying
21 attention to him.  I didn't have time.  I didn't
22 get around to thinking about him until when I
23 finally did, and then I finally ended the
24 relationship.
25 Q        You respond to Victoria Ryan's email

Page 395

1 in May of 2011; and you say, "I need to see
2 Halcon soon as he seems to be getting a free
3 ride."
4        How is he going to pay for his ride?
5 A        Object to the form.
6        I -- I don't understand your
7 question.
8 Q        Okay.  What do you mean when you
9 he's "getting a free ride"?
10 A        That we -- I -- at this time and --
11 and continuing after this, I had no idea who he
12 was, what he was doing.  And -- and we were
13 supporting him or providing security support for
14 him, so I'm pointing out.  What I ultimately did
15 was check and see what Dan had given us and
16 whether this was something that we wanted to
17 continue doing.
18 Q        He had not provided you any
19 testimony as of the date of this email; correct?
20 A        I don't know that that's correct.  I
21 think there was a draft declaration that had
22 been sitting around for a very long time and
23 that's what I finally asked for follow up
24 on.
25 Q        Well, if he's given you a draft

Page 396

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 23 (393 - 396)

Drummond Company, Inc., et al., vs Terrence P. Collingsworth, et al.

**Terrence P. Collingsworth - Volume II**
**2/21/2024**

1 declaration; then why is he getting a free ride?
2 A          Object to the form.
3          He didn't give me a draft
4 declaration.  I believe there was one in the
5 file from Dan.  I never got around to even
6 looking at it.  I was -- as I said, he was far
7 removed from my consideration.
8 Q          Why is he getting a free ride, given
9 he has already provided a draft of the testimony
10 that he could provide?
11 A          Object to the form.
12          And I think I answered the question
13 that we -- I had no idea what his purpose was.
14 So the fact that he had no purpose or maybe had
15 no purpose and yet we were providing security
16 assistance for him when he may not have needed
17 it was, for me, a question that we had to
18 investigate.
19 Q          And when is the first time you saw
20 his draft declaration?
21 A          I don't recall as I sit here.  I do
22 recall that in Susana's deposition on Friday, I
23 -- there were some documents you showed her that
24 indicated those dates and that I had finally
25 engaged with Halcon.

1          So he's getting paid monthly,
2 supposedly for security.
3          Are you saying he's getting a free
4 ride because he's not really at risk?
5          MR. PAULK:  Object to the form.
6 A          Object to the form.
7          I think I've explained that I
8 believe that he was in Panama.  I have no idea
9 if he had additional information or that he was
10 at risk.  I inherited this situation from Dan
11 Kovalik.  I didn't make that initial
12 determination.
13 Q          (By Mr. Wells)  I understand that.
14 But I'm asking you why in May of 2011 are you
15 telling your team that Halcon is getting a free
16 ride?
17 A          Object to the form.
18          I think I've said repeatedly now
19 that I had no basis for thinking that he had
20 information that was putting him at risk.  And I
21 was wondering why we were continuing to provide
22 security to someone who may or may not have
23 demonstrated the need.
24 Q          Do you think if his information is
25 not useful to you, that does not put him at a

1 security risk?
2 A          Absolutely not.
3 Q          Does someone have to provide you
4 useful information before you will agree to make
5 security payments for them?
6 A          Object to the form.
7          I can only speak generally since
8 you're asking a general question that if someone
9 put themselves at risk in an effort to work with
10 us, regardless of whether that netted useful
11 information; we would have felt responsibility
12 for their security.
13 Q          So after you say that Halcon is
14 getting a free ride here in May of 2011, what
15 did you do to investigate whether these payments
16 should continue?
17 A          Well, as I -- as I just said, I know
18 there are emails and documents that you showed
19 to Susana that at some point, I don't know if it
20 was months or a year after this particular
21 email, I did engage with Halcon.
22 Q          What do you mean you engaged with
23 Halcon?
24 A          As I explained, I asked some
25 follow-up questions and assessed what his

1 testimony was and whether it was putting him at
2 risk.
3 Q          Asked questions to who?  You said
4 you've never spoken to the man.
5 A          I think you're trying to play games
6 with me.  I'm objecting to the form.
7          I testified that I don't recall
8 whether I spoke to him with a translator on the
9 call or I went through a translator to ask him
10 some follow-up questions.
11 Q          When was that?
12 A          Wherever -- whenever those documents
13 that you showed Susana say.  I just said I don't
14 know if it was months or a year after this
15 exchange.
16          MR. WELLS:  Well, let's go to tab
17 127.
18 Q          This is over a year and a half --
19 excuse me.
20          What's the exhibit number there?
21          (Plaintiff's Exhibit 77 was
22          marked for identification.)
23 A          77.
24 Q          Exhibit 77 is more than a year and a
25 half after the email we just looked at saying

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

1 that Halcon was getting a free ride.  And it
2 appears here that Ms. Tellez is telling you a
3 message from Halcon that reads "I'm a little
4 preoccupied because they told" me -- "my family
5 and I to figure out where to go, since you won't
6 be able to help anymore.  I plead that you don't
7 drop me just like that."
8          What is this talking about?
9 A          Well, excuse me.  It -- it a -- it
10 says what it says, that apparently we had
11 informed Halcon that we are no longer in a
12 position to provide security assistance to him;
13 and he's asking Susana what he's supposed to do
14 or something to that effect.
15 Q          And your response that you're
16 telling her to relay to him is "I'm sorry but I
17 have no power in this situation.  The people
18 giving me funds have been clear to me that I
19 must demonstrate what we have been paying for
20 all this time."
21          And who are you referring to there
22 being "the people giving me the funds"?
23 A          Well, at this time I'm at Conrad &
24 Scherer; so I must be referring to Richard Drath
25 and the people that were now asking me to
Page 401

1 justify all of my costs.
2 Q          And how are you going to demonstrate
3 what you have been paying for all of this time
4 to Conrad & Scherer?
5 A          Well, I think if you read the next
6 sentence; that is exactly what I have repeated
7 to you several times now, that "We need to be
8 clear what testimony" -- it says have have.
9 That's some kind of error.  "We need to be clear
10 what testimony," perhaps we have, "and how this
11 puts you at a security risk."  That was my
12 criteria.
13 Q          Well, didn't you believe that anyone
14 testifying about Drummond and the AUC being
15 complicit with each other was at a security
16 risk?
17 A          Object to the form.
18          As I've said repeatedly, I have no
19 idea whether that was something that Halcon
20 could even testify about.  And the fact that he
21 was in Panama, I think, was another factor.
22 Q          Are the payments still going on as
23 of December 2012, the date of this email?
24 A          I don't know.  The records will
25 reflect when the payments stopped.
Page 402

1 Q          Have you seen any documents where
2 you are trying to demonstrate to Conrad &
3 Scherer what you are paying for all of this time
4 as it relates to Halcon?
5 A          I don't recall seeing any documents
6 like that.
7 Q          Have you seen any documents or are
8 you aware of any documents reflecting you
9 explaining to Conrad & Scherer why these monthly
10 payments that have been made out of the firm's
11 account for years are now just going to stop?
12 A          Have I seen any documents?  No.
13 Q          Why at this point -- let me ask it
14 more open ended.
15          At this point, had you lost trust in
16 Dan Kovalik's assessment that Halcon was at a
17 security risk?
18 A          I don't recall that being part of my
19 thought process as I sit here.  I -- I think
20 there was probably a factor of all the time that
21 had gone by that would have affected the
22 security situation as well.  But I don't -- I
23 trust Dan Kovalik as I sit here today.
24 Q          Tell me:  How did Halcon get to
25 Panama?
Page 403

1          Was he from Colombia?
2 A          As I think I've made clear; I have
3 no idea how that arrangement began, how anything
4 happened.  Until I inherited the situation from
5 Dan Kovalik, I was not involved.
6 Q          But was it your understanding that
7 he was not from Colombia, I mean, Panama; he was
8 moved from Colombia to Panama?
9 A          I don't know if he was originally
10 from Panama, if he had lived there before.  I --
11 I -- my recollection is that when I was dealing
12 with him, he was in Panama.  That's about all I
13 can say about Halcon.
14 Q          And he's relaying to you at this
15 point that he and his family have been told
16 where -- they have to figure out where to go.
17          Is he saying they're basically being
18 kicked out of their home?
19 A          I don't know.  I don't know anything
20 more than what is written here.  I never had
21 that discussion with Halcon.
22 Q          And you did not feel any sort of
23 moral obligation to continue supporting these
24 people that you've supported for years?
25 A          Object to the form.
Page 404

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 25 (401 - 404)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

```
 1          I think I'm clear here that my
 2 obligation was to discern whether he had
 3 testimony that was putting him at risk, and I
 4 apparently concluded that he didn't -- wasn't.
 5 Q        Well, he had testimony.  Everybody's
 6 got testimony.
 7          What about the testimony did you
 8 conclude did not put him at a security risk?
 9          MR. PAULK:  Object to the form.
10 A        Object to the form.  I -- as I said,
11 I don't recall the specifics of what he said.
12 Q        (By Mr. Wells)  Or why you thought
13 what he said didn't put him at risk?
14 A        Well, I concluded it; but I don't
15 recall the details of why.
16          MR. WELLS:  Let's go to tab 128,
17 which is Exhibit 78.
18              (Plaintiff's Exhibit 78 was
19                marked for identification.)
20 Q        This is in December of 2012.  And
21 Susana Tellez emails you, middle of the page, a
22 message from Halcon.  And she says, "Same as
23 always, acts like he understands, then sends
24 passive aggressive email saying he wants
25 $2,000."
```
                                              Page 405

```
 1          What did you do at this point to
 2 determine that $2,000 being requested was not
 3 reasonable and necessary for his safety as he
 4 relays in this email?
 5 A        Well, I -- I can only say that I --
 6 I believe that this follows the -- this follows
 7 Exhibit 77 where I said I need to see the -- his
 8 testimony has put him at risk.  Apparently, I
 9 hadn't seen any testimony that's putting him at
10 risk; and so I did not feel that we were in any
11 way going to have a security risk situation with
12 him.
13 Q        And you are denying that request for
14 $2,000.  And your words are "I can only tell him
15 again - we need to understand what he is able to
16 tell us after all of this time."
17          Did I read that correctly?
18 A        That is what it says.
19 Q        And Susana then responds to you
20 saying, "I think I will call him over skype with
21 Lorraine to have someone else on the line, and
22 repeat it again that we don't have the funds to
23 cover even these $2,000, that unfortunately the
24 funding" people "did not give 2" months "notice
25 and that we are waiting for a detailed statement
```
                                              Page 406

```
 1 discussing the other points we sent him."
 2          So I -- I thought about a year and a
 3 half earlier you'd already concluded that he was
 4 getting a free ride, and he wasn't at risk?
 5          MR. PAULK:  Object to the form.
 6 A        Object to the form.
 7 Q        (By Mr. Wells)  Is that not what
 8 happened?
 9 A        Object to the form.
10          I previously testified that when I
11 did use that let's see if he's, you know,
12 getting a free ride language; I don't -- I
13 didn't know, didn't recall whether it was months
14 or a year before I was able to focus on this.
15 And, apparently, I did.
16 Q        And what points did y'all send him
17 to provide in a detailed statement?
18 A        I don't recall.
19 Q        Points relating to Drummond, I
20 assume.
21          He was a Drummond-related witness;
22 correct?
23 A        Well, you can assume that; but I
24 don't know that for a fact.  I said I don't
25 recall.
```
                                              Page 407

```
 1 Q        Well, we could only assume because
 2 you're not testifying to it.
 3          Can you provide us anything that
 4 conflicts with my assumption?
 5 A        That doesn't mean that your
 6 assumption is correct.  But I did agree that it
 7 must have been that we were looking for
 8 testimony about Drummond and, as I previously
 9 stated at least twice in the prior exhibits, and
10 that such testimony would put him at risk.
11 Q        So at this point, had you determined
12 he was no longer at risk?
13 A        I -- I believe that must be the case
14 since I've said we can't provide him with any
15 further funding.  And my conditions for
16 providing funding were he had useful testimony
17 that was also going to put him at risk.
18 Q        And you mentioned the documents will
19 reflect when the payments stopped.
20          Would it be fair to conclude that
21 once the payments have stopped, you have
22 concluded he is no longer at risk?
23 A        The only reason the payments would
24 have stopped is that I made the determination
25 that his testimony was not useful and that it
```
                                              Page 408

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 26 (405 - 408)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

**Terrence P. Collingsworth - Volume II**
**2/21/2024**

1 did not put him at risk.  Yes.
2 Q          Who from your team was on the ground
3 in Panama assessing Halcon's security risk?
4 A          There was nobody in Panama as far as
5 I know.
6 Q          So nobody from your team was
7 actually physically seeing where these people
8 were, what their surroundings were, anything
9 like that?
10 A          As I said, Dan Kovalik set it up.  I
11 certainly never went to Panama, and I'm not
12 aware of anybody on my immediate staff who did.
13 Q          So whether his surroundings, in
14 fact, created a security risk, you don't know?
15 A          Object to the form.
16          He was in Panama, so I -- I think we
17 all agreed and discussed that that was a
18 different situation altogether and that the only
19 way that he would be at risk is if he said
20 something that was directly going to cause
21 Drummond to send some assassins down to Panama
22 to kill him.  And we didn't think that was the
23 case based on what he said.
24 Q          And what he said was what?
25 A          As I said, I don't recall specifics.
Page 409

1 the case.
2 Q          Is there any other witness that you
3 were making security payments to other than
4 Halcon that did not sign a declaration for you?
5 A          I don't think so because generally
6 speaking -- and, again, you're speaking
7 generally -- that the risk comes from signing a
8 statement.  So I think anyone who signed a
9 statement suddenly became at risk.
10 Q          Did you witness any attempted
11 attacks on any of these people or their
12 families?
13 A          Object to the form.
14          No.  I'm not policing the activities
15 of people trying to attack my witnesses in
16 Colombia.  Just from a lack of capacity
17 standpoint, I have to rely on honest reports
18 from people that I trust.
19 Q          And those people are Ivan Otero?
20          Anybody else that's assessing the
21 security situation of these witnesses or their
22 families?  And I'm talking about eyes on the
23 ground.
24 A          We didn't have those kind of eyes on
25 the ground.  We didn't have the funds to have a
Page 411

1 But I -- obviously, I concluded that it was not
2 of that caliber of -- of testimony or risk.
3 Q          We've discussed a draft declaration
4 of Halcon.
5          Did he ever sign any declaration for
6 you at all?
7 A          I don't recall.
8 Q          It would have been produced in this
9 case had he done so; correct?
10 A          I would assume so.
11 Q          Who else were you making security
12 payments to for -- well, on a monthly basis for
13 an extended period of time that you later
14 concluded were no longer at risk and, therefore,
15 stopped the payments?
16 A          The only one in this unique
17 situation was Halcon.  And that was because I
18 did not make the initial determinations; Dan
19 Kovalik did.  So I was not on top of any of the
20 details, and it was a very odd situation.  And I
21 certainly have no trouble stating that it was a
22 mistake for me to not have paid attention to it
23 sooner.  I was extremely busy, and I assumed
24 that Dan's -- that a witness that Dan thought
25 was important and that was also at risk would be
Page 410

1 roving security force or an observation force.
2 Most of the, if not all of the, reports of
3 security issues were reported to us by the
4 people who were threatened.  And then I received
5 that information; whether it was from Ivan or
6 from Lorraine or from Francisco, who's the
7 person who received the details of the threats.
8 Q          Colombia has a witness protection
9 program similar to the U.S.; correct?
10          MR. PAULK:  Object to the form.
11 A          Object to the form.
12          They have had various iterations of
13 a witness protection program.  But during the
14 period of time -- let me stop there.  Yes, they
15 had.
16 Q          (By Mr. Wells)  I think Jaime Blanco
17 just told us a couple of months ago that he's
18 receiving security from the Colombian
19 government?
20 A          He is.
21 Q          How come you didn't make any, quote,
22 security payments for Jaime Blanco?
23 A          How come?  Well, Jaime was in a
24 whole different situation than these other
25 witnesses who were at risk.  Jaime had the
Page 412

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 27 (409 - 412)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

1 **ability and the resources to ensure the safety**
2 **and security of his own family.**
3 Q        But he didn't have the ability or
4 the resources to pay for his own criminal
5 lawyers?
6 A        **Apparently not.**
7        MR. WELLS:  Let's go to 129, which
8 is Exhibit 79.
9        (Plaintiff's Exhibit 79 was
10        marked for identification.)
11 Q        Now we're up to April of 2013.
12        And it appears Halcon is still
13 requesting help for his family and himself;
14 correct?
15        Is that a fair summary?
16 A        **Through a new person here.  Yes.**
17 Q        And you respond "As we told you
18 repeatedly, we understand the situation; but
19 apparently no one on your side is understanding
20 our situation.  We supported Halcon and his
21 family for YEARS and this was without him ever
22 providing a public statement for our case or
23 ever taking any risk for our case.  When he have
24 finally after all this time asked him to tell us
25 what he knows in detail, he has given us nothing
Page 413

1 useful."  And then you conclude that paragraph
2 with "Halcon has given us nothing and I simply
3 do not have the funds to support that any
4 further."
5        So is it your view that the only way
6 he could have any legitimate security risk is if
7 he provides testimony to you?
8 A        Object to the form.
9        I think all of my messages are
10 **consistent that the two factors that we**
11 **considered were whether the testimony was,**
12 **first, useful enough to take a risk and then,**
13 **second, whether it would put him at risk.  And**
14 **we concluded that neither of those had occurred.**
15 Q        Did you meet with witnesses that
16 requested security, claimed to have been
17 threatened and at risk; but you determined they
18 did not have useful testimony and, therefore,
19 did not make any payments?
20 A        Object to the form.
21        Yes, we did.  Certainly.  I can't --
22 **I know that we did interview people; and I**
23 **basically said, Let's not take a risk.  Let's**
24 **not put this person in the line of fire by**
25 **having them come public with a statement.  It's**
Page 414

1 just not that helpful or it's duplicative or
2 it's de minimus.
3 Q        Did you ever assess the security
4 risks to the witnesses themselves that were in
5 prison?
6 A        **Object to the form.**
7        **I am aware of the fact that both,**
8 **certainly, El Tigre, Charris, and Samario had**
9 **had attempts on their lives while they were in**
10 **prison.**
11 Q        Aware how?
12 A        Excuse me?
13 Q        You were aware of that how?
14 A        **They reported the attacks to Ivan**
15 **Otero.  And in the case of Charris, it probably**
16 **was Francisco Ramirez who told me.**
17 Q        And what would you do after receipt
18 of that information, if anything?
19 A        **There was nothing that I could think**
20 **of to do.  I believe Ivan, at least in one**
21 **instance, did speak to prison authorities.**
22        MR. WELLS:  Let's go to --
23 A        **Just -- just excuse me.  For the**
24 **sake of accuracy, there also was a -- I think he**
25 **was actually stabbed, that Bam Bam person, so**
Page 415

1 that he would -- that was reported.  I think it
2 was even reported in the newspaper, but I don't
3 know that it was related to our case.
4 Q        (By Mr. Wells)  Well, he's the guy
5 that you said you determined was not credible --
6 A        That's right.
7 Q        -- and you had to stop relying on
8 him?
9 A        You asked me -- I thought the
10 question was was I aware of anyone who had
11 received threats that was one of the witnesses,
12 and so he would be one.
13 Q        But given that he doesn't have any
14 credible information, you did not associate the
15 threats with Drummond?
16 A        I couldn't say one way or the other.
17 So I didn't -- I -- I'm not concluding anything
18 other than that he was stabbed in prison.
19 Q        Do you know when that was?
20 A        I don't.  No.
21 Q        Before or after you came in contact
22 with him?
23 A        Oh, it was definitely after.
24        MR. WELLS:  Let's go to tab 248.
25 This is Plaintiff's Exhibit 80.
Page 416

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 28 (413 - 416)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

**Terrence P. Collingsworth - Volume II**
**2/21/2024**

---

1              (Plaintiff's Exhibit 80 was
2              marked for identification.)
3  Q        If you go to the Bates numbered page
4  48880.
5  A        (Witness complies.)
6  Q        So this is an email exchange between
7  you and Rebecca Pendleton in July of 2010.
8              Was she married to Francisco Ramirez
9  at this time?
10  A        I don't know.  They got married, but
11  I don't remember the date.
12  Q        And it appears she's sort of
13  relaying between you and Francisco.  She says,
14  "Francisco will make this clear to Charris on
15  Monday."
16  A        Yes.  As I've previously stated; for
17  a good period of time, Francisco was the primary
18  Charris contact.
19  Q        And what Francisco is going to make
20  clear to Charris is your email below stating "I
21  would just add that we are supporting Charris's
22  family so if he is not cooperating we will pull
23  the plug."
24              Did I read that correctly?
25  A        Yes.

1  Q        And what does that mean?
2  A        I think it means exactly what it
3  says, that the two parameters for us providing
4  security support are that you are providing
5  useful information that puts you at risk and
6  that you then are at risk, and we will support
7  your family or provide security as needed.
8  Q        Well, at this point he's already
9  signed a declaration for you, and you've been
10  supporting him for approximately a year at this
11  point.
12              How did you make an assessment that
13  continued cooperation was the only thing that
14  would put him at risk?
15  A        I don't recall the timing, but I
16  don't think he'd given him his -- his -- his
17  letters rogatory testimony by this point.  There
18  were a lot of things --
19  Q        But he had signed a declaration that
20  you had provided to Drummond; correct?
21  A        I know he signed a declaration.  I
22  don't remember the date of it.
23  Q        And if he stopped cooperating with
24  you, you were going to pull the plug.  And "pull
25  the plug" means stop making the payments;

1  correct?
2  A        Well, I think that this is clear
3  evidence of -- of a fluid situation, sort of a
4  bargaining situation that he -- he had more to
5  do, he had more to cooperate, and his family was
6  at risk.  We didn't pull the plug.  I -- I don't
7  know that we would have, but it was worth trying
8  to emphasize to him that we were still involved.
9  Q        Well, what you are relying here for
10  Francisco to make clear to Charris when he
11  visits him in prison is that if he's not
12  cooperating, we are going to pull the plug;
13  correct?
14  A        That's what it says.  And as I said,
15  that was probably a -- more of a bargaining or
16  negotiating tactic.  we didn't pull the plug,
17  and I don't know that we would have.
18  Q        And just to be clear:  Pull the plug
19  refers to no more payments?
20  A        No more support for his family's
21  security.
22          MR. WELLS:  Let's go to tab 131 --
23  I'm sorry -- tab 130.  You can go ahead and mark
24  both of them, and I'll get them.  And this is
25  Plaintiff's Exhibit 81.

1              (Plaintiff's Exhibit 81 was
2              marked for identification.)
3  Q        So this is in October of 2010.
4              You are emailing Eric Hager and
5  David Garces, who are both Conrad & Scherer
6  attorneys; is that correct?
7  A        No.
8  Q        Correct me then.
9  A        David Garces is at this time a
10  paralegal in the Conrad & Scherer office.  He is
11  a licensed attorney in Ecuador.
12  Q        And Eric Hager was a licensed
13  attorney for Conrad & Scherer?
14  A        Yes.
15  Q        And you're telling them in point one
16  "Samario, El Tigre and Charris are ready to
17  testify."  Francisco Ramirez "says we should
18  work with their lawyer, Ivan."
19              Ivan Otero?
20  A        Well, I don't think Ivan was their
21  lawyer at this time, so -- Ivan Otero.  So I'm
22  not sure what Francisco is referring to there.
23  Q        These are your words,
24  Mr. Collingsworth.
25              What did you mean when you said work

---

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 29 (417 - 420)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

**Terrence P. Collingsworth - Volume II**
**2/21/2024**

1 with Samario, El Tigre, and Charris' lawyer, who
2 you identify as Ivan?
3 **A        I am saying there that "Francisco**
4 **says," so I'm reporting back what Francisco said**
5 **to me.  Now, I'm not disputing, debating whether**
6 **or not at this time Ivan had some attorney**
7 **relationship with them.  I don't know.  But this**
8 **seems odd to me is what I've said.**
9 Q        Did it seem odd to you when you were
10 writing it?
11 **A        I can't say what I thought when I**
12 **was writing it.  I'm telling you that as I sit**
13 **here today, it strikes me that Ivan wasn't their**
14 **lawyer, in quotes, at that time.**
15 Q        Can you list all of the other Ivan's
16 you know of that were representing any of your
17 paramilitaries witnesses?
18 **A        There was an Ivan Torres who had**
19 **some representation, maybe of Bam Bam.  But he**
20 **didn't have anything to do with El Tigre and**
21 **Charris.  No.**
22 Q        Bam Bam's lawyer, at least according
23 to your sworn interrogatory responses, was
24 Carlos Toro.  And he was the one that was
25 physically present with Bam Bam during his

1 letters rogatory.  We do know that.
2 **A        Okay.  My mistake.**
3 Q        Okay.  So any Ivan other than Ivan
4 Otero that you're aware of that represented any
5 of your paramilitary witnesses?
6 **A        I know two other Ivan's; but I'm**
7 **certain they did not have a relationship with**
8 **Samario, El Tigre, and Charris.**
9        MR. WELLS:  All right.  Let's do tab
10 131.
11        THE WITNESS:  Can we take a
12 two-minute restroom break?
13        MR. WELLS:  Yes.  Do y'all want to
14 go ahead and break for lunch?
15        THE WITNESS:  No, I don't.
16        THE VIDEOGRAPHER:  The time is
17 11:40 a.m.  We are off the record.
18        (Short recess.)
19        THE VIDEOGRAPHER:  The time is
20 11:45 a.m.  We are back on the record.
21 Q        (By Mr. Wells)  All right.
22 Mr. Collingsworth, let me show you Plaintiff's
23 Exhibit 82.
24        MR. WELLS:  This is tab 131 for our
25 exhibit coordinator.

1        (Plaintiff's Exhibit 82 was
2        marked for identification.)
3 Q        Here you are writing to Susana
4 Tellez and Eric Hager and saying, "Charris needs
5 to be bucked up and also reminded that he will
6 look like a fool and will be a lying perjurer if
7 he backs down from his statement."
8        So what's happening here in October
9 to cause you to make that statement?
10 **A        I generally recall that Charris**
11 **really freaked out like he'd been threatened**
12 **again.  And he was terrified, and he basically**
13 **said that he was not going to say anything more**
14 **about Drummond.  And the fact that he had**
15 **already told us a full story and he was going to**
16 **back down from it; I was making clear that that**
17 **would be, essentially, perjury since he had**
18 **issued a sworn statement.**
19 Q        So if somebody says something under
20 oath and then says something different, that is
21 perjury in your view?
22 **A        Depends on whether they did it**
23 **intentionally.**
24 Q        Because you have said things under
25 oath and then later said something different;

1 correct?
2 **A        Object to the form.**
3 **        And in any case where I gave**
4 **inaccurate statements, it was in error.**
5 Q        Not perjury?
6 **A        Not perjury.**
7 Q        And you said Charris was terrified.
8        Who is the person physically meeting
9 with Charris in making that assessment?
10 **A        I think it was that same lawyer for**
11 **Drummond.**
12 Q        No.  No.  No.  Who on your team is
13 assessing Charris' state of mind such that he is
14 terrified?
15 **A        Doesn't say here.  But as per the**
16 **prior emails, I'm almost certain it would have**
17 **been Francisco Ramirez.**
18 Q        I mean, it also doesn't say here
19 that he's terrified, does it?
20 **A        It does not.  No.  But that was what**
21 **was going on here when he was suddenly freaking**
22 **out and was not going to say anything further**
23 **about Drummond.**
24 Q        And you say, "We have moved his
25 family etc due to the threats and he also needs

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 30 (421 - 424)

Drummond Company, Inc., et al., vs Terrence P. Collingsworth, et al.

**Terrence P. Collingsworth - Volume II**
**2/21/2024**

1 to be assured we will continue to help keep his
2 family safe (unless he screws us now)."
3          What do you mean there?
4 A          Same thing I've testified to
5 repeatedly today, that the two dimensions of
6 receiving security assistance are you have to
7 provide useful information that also puts you at
8 risk.  If he's not providing useful information,
9 then I would assume that he's no longer at risk.
10 Q          Now, at this point he's already
11 provided what you determined to be useful
12 information because you started making the
13 payments; correct?
14 A          You have said, I don't dispute, that
15 he had provided his statement by this date.  I
16 don't know that for a fact.  But my assumption
17 in making the statement that I made, and
18 probably in writing this email, is that if he
19 came out and said, Never mind, Drummond didn't
20 do anything, I made that all up; I would assume
21 that his threat would be eviscerated.
22 Q          And that was an assessment you made
23 based on what information?
24 A          Which part of that statement are you
25 referring to?
Page 425

1          That if he stops cooperating with
2 you and backs down from his statement that he is
3 no longer at any risk?
4 A          Well, if the reason the Charris is
5 at risk is because he has provided information
6 implicating Drummond in the union murders; I
7 just think it's common sense.  I don't know what
8 else I could be referring to.  But it seems
9 convincing to me that if he gave Drummond what
10 they wanted and retracted his statement and said
11 he made it all up that the threat would be gone.
12 Q          Are you aware of testimony that
13 Charris provided before he signed a declaration
14 for you that implicated Drummond with the AUC?
15 A          I'm not aware of any written
16 testimony that he provided, any sworn testimony
17 that he provided.
18 Q          So in your view, his need for
19 security payments is solely related to the
20 testimony he was providing to you?
21 A          Object to the form.
22          I -- I think that during the time we
23 were dealing with Charris, the only time he
24 suddenly had a threat was after he began
25 providing information about Drummond's
Page 426

1 relationship to the AUC.  So that's my
2 conclusion based on that fact.
3 Q          And the first time you're aware of
4 him making that claim is when he provided that
5 information to you?
6 A          No.
7 Q          Is that correct?
8 A          That's not correct.
9 Q          Then tell me when he made that claim
10 before.
11 A          Well, I have a vague recollection of
12 an email that he and Jaime Blanco put together,
13 it's that they sent to Augusto Jimenez basically
14 saying, Help us or we're going to tell what
15 happened.  And I think there were prior
16 indications from Charris that he did have
17 information about Drummond.  I don't recall the
18 details; but, no, I don't agree that this is the
19 first time that he implicated Drummond.
20 Q          Well, let's focus on that email for
21 a second and putting aside the fact that it has
22 been established it was not written by Charris,
23 but Jaime Blanco.  But let's just go with it was
24 written by Charris for purposes of these
25 questions.
Page 427

1          So you've seen an email from Charris
2 demanding money from Drummond.  And if he gets
3 it, he will alter his testimony?
4 A          Object to the form.
5          And I -- just to be clear:  I, in
6 answering your prior question, said that this
7 email came from Jaime Blanco and Charris.  I'm
8 not sure who was sitting at the computer,
9 probably Jaime because Charris is that literal.
10 But I think they did it together.  That's at
11 least my recollection.  And I don't know that
12 there was a demand for money.  I think that
13 Charris in that email, which I vaguely recall as
14 I sit here, was wanting help to allow him to
15 just disappear.  And he -- they were asking, I
16 think, Jimenez for that assistance.
17 Q          And in exchange, he would say
18 something different than what he told you?
19          MR. PAULK:  Object to the form.
20 A          When -- object to the form.
21          When that email was drafted, I had
22 never met Charris.
23 Q          (By Mr. Wells)  The point is you
24 have seen evidence that this man was asking to
25 be bribed in order to testify in a way that you
Page 428

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 31 (425 - 428)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

```
 1 believed to be untrue; correct?
 2 A            Object to the form.
 3              No.  I don't agree with that.
 4 Q            So tell us what the purpose of that
 5 Charris email you just threw into the record
 6 was.
 7 A            The email that I told you I -- I
 8 vaguely recall, my recollection of it, as vague
 9 as it is, is that he wanted help from Drummond
10 to disappear, to not testify at all.  He wanted
11 to disappear because he knew that he was
12 implicated in whatever crimes he was doing on
13 behalf of Drummond.  That's my understanding of
14 that email.
15 Q            And is it also your understanding
16 that Drummond turned that email over to the
17 authorities, which ultimately helped them locate
18 and capture Charris?
19 A            I don't know that.
20 Q            When you received information that
21 any witness had been offered a bribe or had
22 requested a bribe, did you ever report that to
23 the Colombian authorities?
24 A            Object to the form.
25              The only -- the only sort of
```
Page 429

```
 1 detailed documented situation was the El Tigre
 2 situation.  And my recollection is that the
 3 authorities were involved in that, that Jaime
 4 Bernal Cuellar took a friend of his along, who
 5 was the prosecutor; and they together elicited
 6 the retraction from El Tigre.  So I didn't feel
 7 like I could go to the authorities with that
 8 problem.
 9 Q            Tell me what you're referring to as
10 to that situation being, quote, documented?
11 A            That he had a declaration, and then
12 he had another declaration that explained that
13 -- that -- that he had been threatened by Jaime
14 Bernal Cuellar and some official from the
15 Fiscal a's office.
16 Q            And then after he gave a declaration
17 saying he'd been threatened, he gave that to you
18 after he told the Colombian authorities
19 something totally different; correct?
20              MR. PAULK:  Object to the form.
21 A            Yeah.  Object to the form.
22              He didn't give anything to me, but I
23 -- I've seen these two declarations.
24 Q            (By Mr. Wells)  The declaration that
25 you're referring to where El Tigre is claiming
```
Page 430

```
 1 to have been threatened was provided to your
 2 team, not the Colombian authorities; correct?
 3 A            I don't have real specific recall.
 4 I -- I wouldn't dispute that he probably
 5 provided it to Ivan and that it named a specific
 6 government official with the Fiscal a as being
 7 there with Jaime Bernal Cuellar.
 8 Q            And then after that you took his
 9 trial testimony in Balcero, asked him if he had
10 been threatened by Jaime Bernal Cuellar, and he
11 said no.
12              Isn't that true?
13 A            I would have to see his testimony,
14 but I have a recollection that he did not
15 confirm that threat in his dep -- his testimony.
16 Q            So either he lied in his declaration
17 to you, or he lied in his trial testimony that
18 you were taking?
19 A            Object to the form.
20              There are probably other
21 explanations that are in the grasp of Mr. El
22 Tigre.  I don't know what he was thinking.
23 Q            I'm not asking you what he was
24 thinking.  He said he was threatened in one
25 sworn statement; he said he was not threatened
```
Page 431

```
 1 in another sworn statement.  One of those
 2 statements is not true.
 3              You understand that; right?
 4 A            Object to the form.
 5              He could have been exercising his
 6 constitutional right not to publicly look at
 7 Drummond and accuse them of anything.
 8 Q            The constitutional right to lie?
 9 A            That's correct.
10 Q            And are you aware that Jaime Blanco
11 has testified under oath that he viewed Charris
12 as an extortionist?
13 A            I'm not aware of that specific
14 allegation.  I know that they -- they ended up
15 being quite antagonistic towards each other.
16 Q            Do you know whether that testimony
17 is true or not?
18 A            I don't.
19              MR. WELLS:  Let's go to tab 133,
20 which is Plaintiff's Exhibit 83.
21              (Plaintiff's Exhibit 83 was
22              marked for identification.)
23 Q            This is in November of 2011, and
24 Lorraine Leete is providing update from Pedro
25 regarding Charris.
```
Page 432

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 32 (429 - 432)

Drummond Company, Inc., et al., vs Terrence P. Collingsworth, et al.

**Terrence P. Collingsworth - Volume II**
**2/21/2024**

1           Who is the Pedro that's referenced
2 there?
3 A           Excuse me.  Francisco Ramirez was
4 part of some sort of legal cooperative where
5 there were several lawyers that worked on, I
6 guess you could say, human rights and labor
7 rights issues.  And Pedro was another attorney
8 within that cooperative.
9 Q           What's his last name?
10 A           I don't recall.
11 Q           Pedro Mahecha?
12           Did you ever meet him?
13 A           Oh, I met him many times.
14 Q           Is he the guy with the ponytail?
15 A           I don't recall him ever having a
16 ponytail.  No.  He was kind of shaggy looking,
17 but he didn't have a ponytail when I met him.
18 Q           In any event, Pedro is saying
19 Charris is solid and ready to testify but is
20 being held in what sounds like solitary
21 confinement where he's only let out of his cell
22 maybe once a week if he's lucky.  Pedro's
23 thinking of helping him with a pro se petition
24 to get better treatment to be filed after the
25 testimony is taken.
                                        Page 433

1           What is that about?
2 A           I can't add anything other than
3 what's here.  Pedro's reporting this, and I
4 don't know if he filed such a petition.  But
5 this report to me is the extent of my knowledge.
6 Q           Did you ever provide any either
7 monetary or nonmonetary help to move Charris
8 while in prison?
9 A           I recall that there was an email in
10 that stack there where he asked for $7,000 to
11 move him.  I know we didn't do that.  Whether
12 Pedro helped with a petition or some other
13 person did a legal maneuver to help him in some
14 way is possible, but I -- I did not have any
15 direct involvement, or nor did I provide any
16 funding for it that I can recall.
17 Q           Was Pedro somebody you considered to
18 be part of your Colombia legal team?
19 A           Pedro helped Francisco when
20 Francisco could not do what he was supposed to
21 be doing on the case.  He very sporadically
22 helped with the case.  He never sat in on our
23 internal discussions.  So not really.  He was
24 sort of an ad hoc member of the team, if you
25 will.
                                        Page 434

1 Q           Did you consider communications with
2 him privileged?
3 A           Yes.  If they were related to the
4 work that he was being directed to do on my
5 case.  Yes.  That was work product.
6           MR. WELLS:  Let's go to tab 136.
7 This is Plaintiff's Exhibit 84.
8           (Plaintiff's Exhibit 84 was
9           marked for identification.)
10 Q           This is a May 27th, 2012, email from
11 you to members of your legal team.  And you say
12 in point six, Lorraine Leete "please follow up
13 on what" Ivan Otero "needs to get Charris
14 moved."
15           What does that mean?
16 A           Well, I don't -- I don't recall the
17 specifics now.  I -- I gather that there was
18 some issue of whether Charris could be moved.
19 And Ivan had asked a question, and we were with
20 trying to get him to follow up.
21 Q           Moved being, what, improving his
22 prison conditions?
23 A           I don't know.  It could be that --
24 to get him somewhere where he could testify; it
25 could be getting him somewhere closer to where
                                        Page 435

1 we could see him easily.  He was in a high
2 security prison that was very difficult to get
3 to, and I recall some discussion about trying to
4 get him moved to a prison that was closer to
5 Bogota where we could have easier access to him.
6 Q           And how is that a legitimate expense
7 to move a prisoner so that they're more
8 convenient for you to access them?
9 A           Object to the form.
10           But if it saves us time and money to
11 have easier access to a witness to interview,
12 that benefits the team.  And I -- I'm sure I
13 would have approved such a thing if I could make
14 it happen.  Based on this email, I don't know
15 that it did.  Maybe it did.
16 Q           You anticipated my follow up.
17           You don't know that it didn't
18 either, do you?
19 A           I don't know what happened.
20           MR. WELLS:  Let's go to tab 137.
21 This is Plaintiff's Exhibit 85.
22           (Plaintiff's Exhibit 85 was
23           marked for identification.)
24 Q           This is an email exchange between
25 you and Christian Levesque in July of 2011.  And
                                        Page 436

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 33 (433 - 436)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

**Page 437**

1 if we turn to the original email in the chain --
2 so we've got to read bottom up -- you're
3 providing her draft responses to
4 interrogatories.  And if you look at her email
5 above, y'all are discussing the interrogatories
6 asking for anything of value provided to any
7 witness.
8          Are you with me so far?
9 A        Yeah.
10 Q       And it looks like y'all are having a
11 debate as to, all right, are these payments
12 we're making actually something of value that we
13 have to disclose, or can we not disclose it;
14 right?
15 A        Object to the form.
16          I need to read this before I can
17 answer your question.
18 Q       Sure.
19 A        Okay.  I've read what you said.
20          Now, what was your question?
21 Q       Are y'all discussing whether the
22 payments that have been made can be
23 characterized as a thing of value, such that you
24 have to disclose it, or not, such that you don't
25 disclose it?

**Page 438**

1 A        Object to the form.
2          I -- I think that that is certainly
3 part of this discussion.  Yes.
4 Q       And you tell her toward the top of
5 the page -- you reference "Garcia is not going
6 to testify.  Halcon, we don't know if he will."
7 So those are two people that have received
8 payments.
9          But you're -- why are you making the
10 reference that either they're not going to
11 testify or you don't know if they will?
12 A        Well, having just read Christian's
13 position, she said that if someone is not a
14 witness, they're not going to testify; that they
15 -- they're not going to be responsive to
16 whatever discovery requests she's referring to.
17 So I'm telling her, Well, these two are not
18 going to be witnesses.  Or one we -- we don't
19 know; the other one no.
20 Q       So if you have a witness that you
21 don't know if they will testify, how does that
22 impact the analysis here as to whether it should
23 be disclosed or not?
24 A        Object to the form.
25          I would need to do case research, et

**Page 439**

1 cetera.  I'm simply responding to your question
2 about what did Christian and I discuss.  I don't
3 know what the law is as I sit here.
4 Q        Well, no.  I mean your view.  Y'all
5 are discussing whether we disclose this or not.
6          And I'm wondering what impact to you
7 the fact that you say Halcon, you don't know if
8 he will testify, has on whether it will be
9 disclosed in your view, not under the law?
10 A        My view would be determined by the
11 law, so I cannot separate out -- I don't have a
12 view that's not rooted in the law.  Christian
13 doesn't cite me any cases here; but she is
14 representing that if they're a potential
15 witness, that there's no relevance, and we get
16 into work product.  I assume that Christian is
17 giving me good advice there, but I'm merely
18 asking -- answering her factual question.  I
19 don't recall what we did with that.
20 Q        And then you talk about Duarte, who
21 wasn't a potential witness; he was a witness;
22 right?
23 A        At this point we were planning on
24 him being a witness.  Yes.
25          And you say, "just thought it would

**Page 440**

1 be funny to disclose the burgers.  Maybe we just
2 disclose the burgers?"
3          Did I read that correctly?
4 A        You did.
5 Q        And this is after you had already
6 paid thousands of dollars to his family members?
7 A        To -- we did pay to relocate his
8 family members.  But I think the record will
9 reflect that at this time Drummond had not asked
10 us for anything that we provided to family
11 members, so we probably didn't disclose any of
12 that until it was clear that that was now
13 required.
14 Q        Why would it be funny to you to just
15 disclose burgers provided to Duarte during
16 meetings?
17 A        Well, that's all we provided to him
18 directly; so that would have been responsive.  I
19 thought it was funny because he is a very big
20 guy, and I think he probably had a -- an
21 enormous amount of burgers.
22 Q        You're saying it's not funny because
23 you've actually paid a lot of money at his
24 request, but you're not going to disclose it to
25 Drummond and just say you gave him burgers?

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 34 (437 - 440)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

Page 441

```
 1 A          Object to the form.
 2            I have said at this point we had --
 3 we had not been asked, and I think it was only
 4 after we asked Drummond for anything of value
 5 given to family members.  So at this point that
 6 was not a question that we were responding to,
 7 whether we gave something to family members.
 8 So, no, that had nothing to do with the
 9 funniness of it.
10 Q          You paid money to his family members
11 at his request; correct?
12 A          Object to the form.
13            I -- I don't know that.  We
14 certainly provided funds to his family to
15 relocate them on a one-time basis.  I remember
16 that.  I don't know if the -- his wife was
17 actually a very professional person.  I think
18 she was an accountant.  I don't know if my team
19 was dealing with her.  Probably, but I don't
20 know whether he was in that transaction.  He
21 would have probably introduced us to his wife
22 maybe, but I don't know.  I wasn't involved.
23 Q          So Duarte never claimed to you or
24 your team to your knowledge that his family was
25 at risk?
```

Page 442

```
 1 A          Oh, I'm pretty sure that he would
 2 have said something that -- like that.  Yes.  I
 3 think he even told us that people were following
 4 his kids home from school.
 5 Q          So whose idea was it to pay the
 6 money?
 7 A          Object to the form.
 8            I approved the funds to relocate
 9 them after somebody on my team had -- must have
10 spoken to Duarte's wife to learn some details
11 about what was going on.
12 Q          What's his wife's name?
13 A          I don't remember.  It's in the
14 transfers I think.
15 Q          There are a couple of different
16 ladies those transfers went to.
17            Do you know any of their names?
18 A          No.
19 Q          Do you know which one is his wife,
20 or both?
21 A          I think one was his daughter, one
22 was his wife; or maybe two were his daughters.
23 But that is the extent of my recollection.
24            MR. WELLS:  Let's go to 138.
25 Q          What kind of watch are you wearing,
```

Page 443

```
 1 Mr. Collingsworth?
 2 A          Object to the form.
 3            It's a Shinola; made in the U.S.A.
 4 Q          Has that been kind of your brand, or
 5 have you had different watches over the years?
 6 A          Object to the form.
 7            I -- I think it's a relatively new
 8 brand, so I've certainly had other brands.
 9 Q          Do you recall what watch you were
10 wearing back in the '10, '11, '12 time period?
11 A          No.  I assure you it was not an
12 expensive watch.  I'm more of a Timex kind of
13 person.
14 Q          Let me show you Plaintiff's Exhibit
15 86.
16            (Plaintiff's Exhibit 86 was
17            marked for identification.)
18 Q          Which is an email chain the next
19 month after the one we just looked at where
20 Lorraine Leete is telling you about a Libardo
21 Duarte meeting; right?
22 A          Looks like it.  Yeah.
23            And she says, LD "says that he is
24 prepared to accept the money now, after refusing
25 three offers in the past (two offers of 350
```

Page 444

```
 1 million" Colombian pesos "and 500 million"
 2 Colombian pesos from Jaime Blanco, "and one
 3 offer of 250 million from Bocanegra), because
 4 now the only thing keeping him in prison is his
 5 inability to pay off debts and fees that he
 6 owes, since he has served all his time.  He says
 7 that if he gets 15 million" Colombian pesos, "he
 8 will be able to pay a judge to whom he owes 8
 9 million" Colombian pesos "and cover his other
10 fees (he is also counting among these 15
11 million" Colombian pesos "the 2 million"
12 Colombian pesos "we gave his friend to use to
13 get us the photos, which" Duarte "says he will
14 pay back since it seems his friend stole the
15 money and fled to Venezuela).
16            Did Libardo Duarte pay back this
17 money referenced here?
18 A          Well, there's a lot of different
19 monies referenced there.  Are you referring to
20 the --
21 Q          There's only one money referenced
22 that he's going to pay back, the two million
23 Colombian pesos; so stick with me,
24 Mr. Collingsworth.
25            Was that paid back?
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 35 (441 - 444)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

**Terrence P. Collingsworth - Volume II**
**2/21/2024**

1 A        I'm trying to think whether we ever
2 thought he should pay that back.  Because we
3 paid some guy to go to, I think, Venezuela to
4 get some photos and bring them back; that that
5 was something that we wanted to happen.  His
6 friend stole the money, so we never got the
7 photos.  And he was, I believe, like, saying,
8 Don't worry, I'll pay you back.  We certainly
9 never received it.  But that was money that we
10 had authorized for a service to be performed.
11 Q        Photos of what in Venezuela?
12 A        Of other paramilitaries that he was
13 associating with.
14 Q        That were in Venezuela?
15 A        I -- I think that the situation was
16 it was near the border of Venezuela, which is a
17 very -- at that time -- well, it always was a --
18 a very AUC-dominated area.  And then his friend
19 took the money and went to Venezuela.  I don't
20 think that the photos were of people in
21 Venezuela.
22 Q        And the photos were just of
23 paramilitaries or of paramilitaries doing some
24 particular thing?
25 Q        What -- why were you interested in
Page 445

1 requests; correct?
2 A        2011?  Probably.
3 Q        At this point, had you determined
4 that Duarte was no longer credible?
5 A        I don't recall if it was by this
6 point.  This was probably another straw in the
7 camel's back pile that contributed to me
8 ultimately making that determination.
9 Q        And you respond to that email
10 saying, "Wow, well tell him I want my watch
11 back."
12        Did you give Duarte your watch?
13 A        You know, I don't have specific
14 recall of doing that.  If it says that here, I
15 have no reason to doubt that I -- I did.  But I
16 -- I don't remember.
17 Q        Well, you remembered it in August of
18 2011; so I assume you also remembered it the
19 preceding month when you were saying it would be
20 funny just to disclose we gave him hamburgers
21 and nothing directly of value.
22 A        Object to the form.
23        Is that true?
24 A        Is what true?  That I gave him my
25 watch?  I said I don't recall.
Page 447

1 these photos?
2 A        I don't remember the details.
3 Whether there -- they involved people that were
4 associating with the paramilitaries, I don't
5 recall; but I sort of think that's true.
6 Q        And here he's asking for money not
7 for security but to pay off debts; correct?
8 A        It appears so from what's written.
9 Yes.
10 Q        Did you report that to any
11 governmental authorities?
12 A        No.
13 Q        He's also telling your team that he
14 has received two offers of money from Jaime
15 Blanco.
16        Did you report that to any Colombian
17 authorities?
18 A        No.  I didn't believe that.
19 Q        At this time, you did not believe
20 what he was saying?
21 A        I didn't believe that particular
22 thing that he was saying.
23 Q        And at this time, you were already
24 in -- in contact with Jaime Blanco and have --
25 are working on getting funds to meet his
Page 446

1 Q        Why didn't you disclose it when
2 you're being asked to disclose anything of value
3 you gave to any of these paramilitary witnesses,
4 and you're saying here you gave him a watch?
5 A        I'm not saying -- this email --
6 there -- I don't think it could refer to
7 anything else.  If I had given him my watch, I
8 should have disclosed it.  It probably had a
9 very small value, but it was not an intentional
10 nondisclosure.
11 Q        More or less value than hamburgers?
12 A        Probably pretty close.
13 Q        And why didn't you disclose when
14 you're humorously disclosing hamburgers that
15 you'd also given him a watch?
16        MR. PAULK:  Object to the form.
17 A        Object to the form.  I can only
18 speculate that I didn't really remember that I'd
19 given him a watch.  I certainly don't remember
20 it now.
21        MR. WELLS:  Let's go to tab 140,
22 which is Exhibit 87.
23        (Plaintiff's Exhibit 87 was
24        marked for identification.)
25 Q        (By Mr. Wells)  So this is an email
Page 448

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 36 (445 - 448)

Drummond Company, Inc., et al., vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

Page 449

1 exchange in September of 2011 in which Lorraine
2 Leete is telling you and Christian Levesque
3 Duarte "called last night and says he wants to
4 meet with you, Terry.  I told him he can tell me
5 anything he would tell you, but he says he wants
6 to meet with you directly.  He also asked if we
7 were going to take his testimony on" September
8 22nd "and I said not if he had accepted a bribe
9 from Drummond.  On the phone he said that he had
10 not accepted money from them, and had borrowed
11 money from a friend to pay his fees/debts.  I
12 don't trust that this is true."
13            Can you explain for us what this
14 means.
15 A         I don't think I can add anything to
16 what is a report to me of something I did not
17 have personal knowledge of it.  It appears that
18 Lorraine got a call from Ivan, and he said the
19 things that she says he said here.
20 Q         And at least according to Lorraine,
21 she's reporting to you that she does not trust
22 that he's telling the truth; correct?
23 A         About receiving a bribe from
24 Drummond.  That's correct.
25 Q         And Christian Levesque responds

Page 450

1 "God," Duarte "turned out crazier than crazy.
2 Wonder if he was ever approached by Drummond or
3 if it was all a ploy to get us to pay in the
4 first place."  So --
5 A         "Or Maybe Drummond screwed him," to
6 continue the sentence.
7 Q         And you don't know what the truth
8 is; true?
9 A         The truth of whether Drummond gave
10 him a bribe?
11 Q         Or he was lying to get y'all to pay
12 him?
13 A         We didn't pay him; we moved his
14 family.  So I never thought that -- I -- I
15 didn't doubt that based on the reports that we
16 had that his family had received threats.  But
17 whether he was bribed by Drummond, I don't know.
18 Q         So at this point, had you come to
19 the conclusion that Duarte was no longer
20 credible?
21 A         I don't believe so.  I was concerned
22 about this Drummond bribe.  And I don't recall
23 if I personally then met with him to explore
24 that.  But I don't -- I don't think we had a
25 definitive position yet.

Page 451

1 Q         And we were mentioning just a second
2 ago, Duarte at least in his letters rogatory
3 testimony, represented by an attorney named
4 Carlos Toro; correct?
5 A         I think Carlos Toro was there.  I
6 don't know -- the word "represent" pauses me
7 because I don't know that he in any way
8 performed any lawyer services at that time.  But
9 he was there.
10 Q         Why was he there if not representing
11 the witness?
12 A         Object to the form.
13            And I don't know.  I didn't discuss
14 it with him.
15            MR. WELLS:  Let's go to tab 142,
16 which is Plaintiff's 88.
17            (Plaintiff's Exhibit 88 was
18            marked for identification.)
19 Q         This is in September 2011; and,
20 again, Lorraine Leete to you saying, "Carlos
21 thinks that" Duarte "invented the stories about
22 offers of money from Drummond in order to try to
23 get money from us.  Now that his attempt to
24 bribe us has backfired, he is ready to go
25 forward with the deposition.  Carlos warned

Page 452

1 that" Duarte "is a pathological liar and it
2 might be more trouble than" it's "worth to use
3 him as a witness.
4            For example, Carlos said he learned
5 through" Duarte "that we paid to move his family
6 after they were threatened.  Carlos" thinks --
7 "says he thinks the story of" Duarte's "family
8 being threatened was likely invented as well,
9 because" Duarte "has three times in the past
10 told Carlos that his wife was killed, and she
11 always turns out to still be alive."
12            So Carlos Toro is telling your team
13 that Libardo Duarte is a pathological liar.  At
14 this point, did you come to the conclusion he
15 was no longer credible?
16 A         Well, I think I probably felt that
17 he was not credible.  But I know that I also
18 then decided that we might as well take his
19 deposition, and we could use it or not depending
20 on how credible he was in the deposition and
21 whether he provided any useful information.  If
22 I'm not wrong; right after that deposition, we
23 decided not to use it, and we didn't.  And I
24 that was the end of my relation or my
25 interactions with Li -- Duarte.

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 37 (449 - 452)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

**Terrence P. Collingsworth - Volume II**
**2/21/2024**

1 Q        So was it what you heard him say
2 during his deposition that caused you to
3 conclude he was no longer credible?
4 A        Object to the form.
5         I -- as I said earlier, I think it
6 was a -- a building series of things, including
7 this information from Carlos that I ultimately
8 concluded that Duarte was not credible.
9 Q        Right.  But you said it was
10 building.  At this point, you're probably
11 thinking it's -- he's -- he may not be credible;
12 but let's go ahead and take his deposition, see
13 what he says there.
14         You took his deposition, and at that
15 point you determined he's not credible?
16 A        That's what I said.
17 Q        Okay.
18         MR. WELLS:  We're going to go to tab
19 143 for the exhibit coordinator.
20         Well, strike that.  Let's go ahead
21 and break for lunch.  We're about to shift
22 gears.
23         THE VIDEOGRAPHER:  The time is
24 12:30 p.m.  We're off the record.
25         (The lunch recess was taken.)
                                          Page 453

1 A        No.
2 Q        He told us in his deposition that he
3 had concerns that you were effectively
4 embezzling funds from the firm.
5         Did he ever confront you about that
6 subject?
7 A        No.
8 Q        Did he ever confront you about the
9 money that you were using of the firm's in any
10 of your cases?
11 A        Well, "confront" is a strong word.
12 But Billy was off and on concerned about the
13 budgets and would raise it from time to time.
14 Yes.
15 Q        One of the things he raised concerns
16 about were the payment to Ivan Otero; correct?
17 A        I don't think he singled out Ivan
18 Otero.  He was concerned about all of the
19 payments to Colombia.
20 Q        Were there any payments to Colombia
21 in the budget that exceeded the payments to Ivan
22 Otero?
23 A        Object to the form.
24         If you're speaking on a monthly
25 basis --
                                          Page 455

1         THE VIDEOGRAPHER:  The time is
2 1:17 p.m.  We are back on the record.
3 Q        (By Mr. Wells)  Mr. Collingsworth,
4 we have referenced the name Jose Gelvez
5 Albarracin before in this deposition.
6         That was the one of the witnesses in
7 Balcero; correct?
8 A        Yes.
9 Q        He went by the alias El Conoso?
10 A        I believe so.
11 Q        Actually, before we get into him --
12 now that you've had a night to think about the
13 issue of pulling documents off the privilege
14 log, do you have any further thoughts you can
15 provide to us as to why that happened?
16 A        I have not had the opportunity to do
17 anything in way of looking at, searching for
18 other documents to give me that explanation; so
19 no.
20 Q        So you don't have any explanation
21 whatsoever that you can provide without looking
22 at documents?
23 A        That's correct.
24 Q        And Billy Scherer, have you read his
25 deposition?
                                          Page 454

1 Q        Over the course of a year?
2 A        Ivan was probably the largest
3 expense.
4 Q        All right.  Back to Mr. Gelvez.
5         MR. WELLS:  Let's go to tab 144.
6 This is Exhibit 89.
7         (Plaintiff's Exhibit 89 was
8         marked for identification.)
9 Q        So this is April 15th, 2011; you to
10 Richard Drath with a copy to Bill Scherer.  And
11 you are saying, "The guy who we helped today by
12 agreeing to move his family (Richard has" the
13 "details; don't want" the "name here), has
14 become an inside advocate and is going around to
15 former colleagues and getting them to talk.  He
16 delivered to me the biggest fish we've ever
17 had."
18         What fish did this guy deliver to
19 you?
20 A        Unfortunately, I've -- 13 years
21 later, this -- this is just too vague for me to
22 provide any details.  I don't recall.
23 Q        So you can't identify for us "the
24 guy who you helped today" that is referenced
25 here?
                                          Page 456

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

1  A       No.
2  Q       Nor can you identify "the big fish"
3  that this other guy supposedly delivered to you?
4  A       No.
5  Q       Would it be fair to say that you are
6  discussing witnesses here at least?
7  A       The potential for witnesses.  Yeah.
8  Q       Did you move the families of any
9  nonwitnesses?
10  A       (No response.)
11  Q       And by nonwitnesses, I mean people
12  that you didn't either get testimony from or
13  were trying to get testimony from?
14  A       No.
15  MR. WELLS:  Let's go to tab 152,
16  which is Exhibit 90.
17            (Plaintiff's Exhibit 90 was
18            marked for identification.)
19  Q       This is a November 11, 2011, memo
20  from Lorraine Leete to you.  And she's talking
21  about JGA.
22            Any reason for you to believe that
23  is anyone other than Jose Gelvez Albarracin?
24  A       No.  It's --
25  Q       Oh, excuse me.  His name is actually
Page 457

1  in the Re line -- in the reference line.
2  A       So, no, I'm sure that's him.
3  Q       And it says that Gelvez is still
4  "hesitant to sign before we come to an agreement
5  with him."
6            And what knowledge do you have about
7  what he was requesting in order to sign?
8  A       I'm --
9  Q       And I'm asking if you have knowledge
10  other than what is on this page?
11  A       Well, I have to read the page first.
12  I -- I think this is -- that this Exhibit 90 is
13  pretty detailed, and it's from Lorraine to me.
14  I can't add any details to it.
15  Q       Okay.  After she talks about an
16  agreement with him she says, "He said his family
17  is safe, as he moved them from" redacted "in
18  April, but" they -- "that they don't have money
19  for school."  Gelvez "said that" Francisco
20  Ramirez "had told him we could provide economic
21  assistance to his family while he is still in
22  prison (he hopes to get out in December), "
23  however, I told him that this is not the case."
24            So you're being told here that
25  Francisco Ramirez has offered to this witness
Page 458

1  that they can provide economic assistance to the
2  witness' family while he remains in prison;
3  correct?
4  A       That's what Lorraine reports that
5  Francisco told him.  Yes.
6  Q       Did you get any other reports
7  similar to this that Francisco Ramirez was
8  making offers to imprisoned witnesses to support
9  their families while they were in prison?
10  A       Object to the form.
11            Well, I do remember the one
12  situation I believe we've already discussed
13  where Francisco had sort of promoted a business
14  idea for Charris' family instead of monthly
15  payments, which I did not approve or could not
16  approve.  Those are the only two that come to
17  mind.
18  Q       Why couldn't you approve it?
19  A       Because I thought that that would be
20  moving from security assistance to a -- a -- a
21  benefit that went beyond that.
22  Q       She says at the end of this
23  paragraph "It is somewhat worrisome (given
24  Tolemaida's declaration), that" Gelvez's
25  "impression of what" Francisco "presented was
Page 459

1  that we are willing to make monthly payments to
2  the families of those who are witnesses."
3            Did you share that concern Ms. Leete
4  is reporting?
5  A       I testified to the two instances
6  where I was aware that Francisco had,
7  apparently, made a -- an offer that went beyond
8  what I considered to be legitimate security
9  assistance.  I almost certainly would have told
10  him that we aren't going to be doing any of
11  that, and I don't believe any further incidents
12  happened.
13  Q       She references "given Tolemaida's
14  declaration."  Tolemaida provided a declaration
15  in the Balcero case in which he said that
16  Francisco Ramirez had made just such an offer to
17  them that y'all would support his family while
18  he remained in prison.
19            Do you recall that?
20  A       I don't recall that.  I know that I
21  personally never met Tolemaida.  And I -- my
22  understanding then and now was that he was very
23  hostile to us and that he was cooperating with
24  Drummond providing him with assistance.
25  Q       Your understanding of that comes
Page 460

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 39 (457 - 460)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

1 from where?

2 A        From a couple of the witnesses.  I
3 think Jaime Blanco told me that.  Ivan Otero
4 told me that.  I think Francisco told me that.

5 Q        And to your knowledge, did any of
6 them actually witness anything supporting that
7 accusation?

8 A        No.  They weren't in the room when
9 Jaime Bernal Cuellar bribed Tolemaida.

10 Q        Are you aware of anyone that has
11 witnessed this supposed bribe you just
12 referenced?

13 A        Jaime Bernal Cuellar and Tolemaida,
14 as far as I know.

15 Q        Okay.  And have either of them told
16 you or testified that such an event actually
17 occurred?

18 A        No, they haven't yet.

19 Q        Okay.  Did you ever receive any
20 reports from your team raising concerns that
21 Ivan Otero was making offers to witnesses that
22 you felt were inappropriate?

23 A        I -- regarding Ivan Otero, I just
24 recall that there were a couple of situations
25 where he got ahead of himself and told people --

1 told witnesses that we could provide security
2 when we couldn't.  And then I had to be the --
3 the bad guy and say, It's not possible.

4 Q        All right.  Let's go to the very end
5 of the memo, at least the end of the stuff that
6 we can see, second page.

7 A        (Witness complies.)

8 Q        Ms. Leete continues "this was the
9 first meeting we'd held in several months, and"
10 Gelvez "mentioned that he's also been talking
11 with and collaborating with the Colectivo de
12 Abogados, so it may be the case that if we build
13 up a relationship he'd be willing to sign
14 without us making any sort of a payment, or with
15 an understanding that if he or his family starts
16 to feel threatened, we can help them out."

17         And I'll just stop there.

18         The Colectivo de Abogados, is that
19 that group that you were referencing that Pedro
20 and Francisco were part of?

21 A        No.  That's a different group.

22 Q        What was the group that they were a
23 part of?

24 A        Francisco and -- and --

25 Q        Pedro?

1 A        I don't remember the name of it.  It
2 might not have had an initial name.  It was like
3 a small legal cooperative, like I said; but I
4 don't think it had a fancy name.

5 Q        She continues "I didn't want to push
6 to hard today, but when I kept stressing that we
7 will do everything necessary to protect the
8 family's of our witnesses he kept responding
9 that his family was perfectly safe, so I think
10 it would be difficult to justify sending a
11 payment to his family under these
12 circumstances."

13         Did I read that correctly?

14 A        Yeah.

15 Q        And you did, in fact, make the
16 payment after receipt of this memo; correct?

17 A        I -- as I sit here, I'm -- I recall
18 that we did make a relocation payment to the
19 family.  I don't remember if circumstances
20 changed or what the particulars were of that.
21 But I -- we did make one I'm pretty sure.  Yeah.

22 Q        Can you explain why you made that
23 payment after being told by the person
24 interviewing him that Gelvez has said his family
25 is perfectly safe?

1 A        Object to the form.

2         I -- I think that there were -- must
3 have been a change of -- of details of some sort
4 that I don't recall as I sit here.

5         MR. WELLS:  Let's go to 156.

6 Plaintiff's Exhibit 91.

7         (Plaintiff's Exhibit 91 was
8         marked for identification.)

9 Q        This is in June of 2012; email
10 exchange between Lorraine Leete and Christian
11 Levesque.  And I'm looking at Ms. Levesque's
12 email at the bottom of the page.  She's staying
13 that in Gelvez's "typed response he gave to us
14 after we asked him written questions, he says:
15 'Through this document, I hope you all can see
16 that I have fulfilled my commitment to you; I
17 tried to be as faithful as possible to the
18 questionnaire that you sent me, and I therefore
19 also hope to benefit from what you offered my
20 family and me."

21         What was offered to Mr. Gelvez and
22 his family?

23 A        I don't know.

24 Q        And what benefit would whatever that
25 offer provide to him?

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 40 (461 - 464)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

**Terrence P. Collingsworth - Volume II**
**2/21/2024**

1 A        Again, I don't know.

2 Q        Did you ever discuss with Gelvez

3 whether he viewed the payments y'all made as a

4 benefit to him?

5 A        No, I did not.

6 Q        Do you have any written statements

7 as are being quoted here from Ms. Gelvez where

8 he says, contrary to what he said in this

9 written statement, I did not view what was

10 offered to me as a benefit?

11 A        Object to the form.

12        I -- I didn't see any such

13 discussions from Gelvez regarding any --

14 anything other than these communications I'm

15 copied on or that I somehow observed from

16 Lorraine.

17 Q        And did you review Mr. Gelvez's

18 questionnaire responses in which he made the

19 statement that he hoped to benefit from what you

20 had offered to his family and him?

21 A        I don't believe so.  No.

22 Q        He was also asked in his trial

23 testimony in Balcero whether he had received any

24 benefits, and he denied having done so.

25        Do you contend that was truthful

Page 465

1 testimony?

2 A        I don't recall as I sit here what we

3 ultimately did, if anything, for his family.  I

4 -- I think there was one relocation payment.

5 And I think that we did make some inquires as to

6 whether the -- someone at the Justice Department

7 was interested in talking to him because of the

8 kinds of information that he had.  That's all

9 that I can recall.

10        MR. WELLS:  Let's go to tab 157, and

11 it is Plaintiff's Exhibit 92.

12        (Plaintiff's Exhibit 92 was

13        marked for identification.)

14 Q        And this is an email chain in which

15 you're discussing a man named Andre Lasserre.

16        And I believe I understand from what

17 you've testified previously, Andre Lasserre was

18 some sort of lawyer that you paid $100,000 of

19 your own money to help with the Balcero

20 letters rogatory depositions; is that correct?

21 A        Well, excuse me, I did pay him.  I

22 think his scope of work was probably much

23 broader than that.  But he is a French lawyer

24 who was doing a lot of work in Colombia.  And --

25 and we -- we -- he did a few things for us

Page 466

1 there.  That's correct.

2 Q        Well, what was his full scope of

3 work?

4 A        I don't have it here in front of me.

5 I guess this is 2011.  He was -- as one of these

6 emails says, he had a good relationship with the

7 president at that time.  He was working on

8 Albert's case and that he thought that he could

9 help us to try to get someone in the government

10 to take seriously what we were alleging about

11 Drummond in light of the fact that Jaime Bernal

12 Cuellar had the attorney general's office under

13 his control or influence.

14 Q        You say here in this email "This

15 guy, Andre, is attempting to broker a settlement

16 in the Drummond case by using his (very high)

17 contacts with the new Colombian President,

18 Santos.  He is also working on Albert's case

19 (Llanos Oil)."

20        What was he doing for Albert's case?

21 A        I don't remember specifically.  But

22 I think he must have been trying to talk to the

23 government about getting Albert's -- Llanos

24 Oil's exploration rights restored that Albert

25 says had been improperly appropriated by

Page 467

1 Drummond.

2 Q        And that was the case that you took

3 a security interest in in exchange for loaning

4 Albert Van Bilderbeek $750,000 in those

5 documents we looked at yesterday?

6 A        For the brief period of time that

7 that was a -- a valid agreement, it -- it did

8 say that his -- his loan was secured by Llanos

9 Oil's interest.

10 Q        Back to that point, did you -- I

11 think you told me you only talked to Albert

12 about this, what you say, voiding of these loan

13 documents; is that true?

14 A        Object to the form.

15        The sole person that I modified or

16 created a new agreement with that superseded the

17 prior agreements was Albert.

18 Q        And you said it was a matter of

19 couple of weeks to a couple of months --

20 A        Yeah.

21 Q        -- after the documents were signed

22 that you had this discussion with Albert where

23 the agreements were voided?

24 A        It was a very short period of time.

25 Yes.

Page 468

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 41 (465 - 468)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

1 Q        Did you have any discussions with
2 the people that, according to the documents, you
3 owed money to about the voiding of the
4 agreements?
5 A        As I said, I only had the
6 discussions with Albert who organized the
7 discussions that he had with all the other
8 concerned individuals.
9 Q        And did you get any follow up from
10 the individuals that were listed on those
11 documents that was inconsistent with what Albert
12 had told you?
13 A        (No response.)
14 Q        In other words, Hey, where's my
15 money, or what about these agreements, anything
16 like that?
17 A        I think that -- that at some point
18 in there, Frank asked about the agreement.  And
19 I explained to him what Albert had arranged and
20 that Frank probably had a discussion with Albert
21 after that.
22 Q        When would that have been?
23 A        Shortly after the agreements were --
24 after -- after the transaction started.
25 Q        So in the same period of time;

Page 469

1 couple of weeks, couple of months; where Albert
2 has already told you --
3 A        Yeah.
4 Q        -- the agreements don't have to be
5 complied with?
6 A        It would have been after that.
7 Q        How long?
8 A        I don't recall.
9 Q        All right.  So this -- back to this
10 document.  Says, Andre "is attempting to broker
11 a settlement in the Drummond case by using his
12 contacts with the Colombian President, Santos."
13         How was he going to use his contacts
14 with the president to broker a settlement with
15 Drummond?
16 A        Well, as I said, I think that we
17 briefed Andre on the situation, the evidence,
18 the allegations that were -- that we had,
19 certainly, by June of 2011.  And I think that he
20 was to point out to the president that Drummond
21 was engaged in illegal activity and that it was
22 illegal under Colombian law for the government
23 to do business with an entity engaged in illegal
24 conduct and to try to get some understanding to
25 either sever that business relationship with

Page 470

1 Drummond or to come to some agreement where
2 Drummond would, let's -- make reparations for
3 their illegal conduct to the government.
4 Q        When you say "sever," he was trying
5 to convince the president to remove Drummond's
6 coal concession in Colombia?
7 A        It is illegal under Colombian law
8 for the government to do business with a person
9 or company that is violating the law.  So I
10 think one of his points to the -- to the
11 president, if he -- I don't even know that he
12 had the meeting with the president.  But what we
13 were discussing is that he was going to raise
14 that issue with the president.
15         To tell the president of Colombia
16 that Drummond is engaged in illegal activities;
17 and, therefore, the government can no longer do
18 business with Drummond?
19 A        Something to that effect.  Yes.
20 Q        And you felt that pressure point
21 would broker a settlement?
22 A        Or would result in Drummond losing
23 its license in Colombia.
24 Q        Well, you say here he's attempting
25 to broker a settlement?

Page 471

1 A        That's what it says.  Yes.
2 Q        So you were hoping to use the threat
3 of Drummond losing its oil, I mean, its coal
4 concession in Colombia as leverage for a
5 settlement; correct?
6 A        That's what this says, so I imagine
7 that was my thought process.
8 Q        And you told us yesterday that in
9 your view the Colombian government stopped being
10 corrupt sometime 2015 or later.
11         Did you believe the Colombian
12 government was corrupt at this time when you
13 were trying to make an approach to the president
14 of the country?
15 A        I -- I believe -- I'm confident that
16 I -- I clarified that, that I -- no one could
17 say and I didn't say that the entire government
18 was corrupt.  Our main concern was that the
19 attorney general's office was under the control
20 and influence of Jaime Bernal Cuellar, who was
21 working for Drummond.  Clearly, based on this
22 email and -- and the -- as history will reflect;
23 we had a new president come in.  And we were
24 hopeful that, unlike Uribe, who most people
25 understood to be himself associated with the

Page 472

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

1  AUC; we might get a fresh start.
2  Q          Did you come to the conclusion that
3  Santos was also corrupt?
4  A          I did not come to a conclusion about
5  Santos personally.
6  Q          And how long before 2011 had Jaime
7  Bernal left his position as attorney general?
8  A          How long before?
9  Q          Uh-huh.
10 A          I -- I don't know.  That wasn't my
11 allegation.  My allegation was that the next two
12 attorney generals were people that he was very
13 personally close to.  And based on the
14 government's -- or the attorney general's
15 failure to act on any of these corporate crime
16 cases that it was clear that Jaime's -- Bernal
17 Cuellar continued to have great influence in
18 that office.
19 Q          And it's your view that Jaime
20 Bernal, a former attorney general and I think
21 you said there have been a couple after him,
22 have more influence over that office than the
23 president of the country?
24 A          I didn't say that.  Object to the
25 form.

Page 473

1          I don't think the president of the
2  company -- of the country was doing a very
3  micromanagement of the attorney general's
4  office.  I think the attorney general is
5  appointed or elected on a separate cycle and is
6  quite independent under the structure of
7  Colombia, as it should be.
8  Q          And back to this discussion with
9  Andre Lasserre about approaching the Colombian
10 president saying that Drummond is engaged in
11 criminal conduct.
12          Did you provide him any evidence of
13 alleged criminal conduct to bring to the
14 president?
15 A          No.  Not to bring to the president.
16 I briefed him, as I previously testified, on
17 what we thought was the key evidence of
18 Drummond's relationship with the AUC.
19 Q          And that key evidence is the
20 testimony of these imprisoned people we've been
21 talking about; correct?
22 A          For the most part, yes.
23 Q          And did you provide Mr. Lasserre a
24 breakdown of all the payments that you had been
25 making at the request of these imprisoned

Page 474

1  persons?
2  A          Object to the form.
3          I am pretty confident that I did
4  discuss that these witnesses had been threatened
5  by Drummond and that they were -- families were
6  being kept safe.
7  Q          Did you tell Andre Lasserre that
8  Jaime Blanco had had over $100,000 paid at his
9  request by you and your team?
10 A          To his lawyers?  I probably did.
11 Q          Have you seen any emails where that
12 is evidenced?
13 A          I don't think we have seen any
14 emails, or very few emails, between me and Andre
15 period.  I met him and briefed him face to face.
16 Q          Where?
17 A          Well, we met several times.  I think
18 we met in Paris a couple of times where he
19 lived.  And we certainly met in Bogota a few
20 times.
21 Q          When you're briefing Mr. Lasserre
22 about the evidence you have; did you tell him
23 that El Tigre and Samario were receiving, quote,
24 security payments?
25 A          Object to the form.

Page 475

1          Probably not.  If it -- at this time
2  in 2011?  I -- I can't say for sure, but
3  probably not.  I do recall discussing Jaime
4  Blanco.
5  Q          Why wouldn't you have told him about
6  El Tigre and Samario?
7  A          Well, I'm trying to recall what I
8  did recall and what I thought in 2011.  And I --
9  I cannot, so I don't know.
10 Q          You think you may have forgotten
11 about El Tigre and Samario as of June 2011?
12 A          That it wasn't in the front of my
13 mind.  Yes.
14 Q          Did you tell Andre Lasserre that El
15 Tigre and Samario was part of the evidence that
16 you had of alleged criminal activity by
17 Drummond.
18 A          Probably.  I don't know if I had
19 their statements by this date, but I probably
20 had interviewed them by then.
21 Q          You had their statements in 2009?
22 A          Okay.  Then I probably did.
23          MR. WELLS:  Let's go to 158.  This
24 is Plaintiff's Exhibit 93.
25          (Plaintiff's Exhibit 93 was

Page 476

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 43 (473 - 476)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

**Terrence P. Collingsworth - Volume II**
**2/21/2024**

---

1                    marked for identification.)
2 Q        This is an email chain in June of
3 2011.  Looks like the first email is between you
4 and Bill Scherer.  And then you've got you, Bill
5 Scherer, Richard Drath, and Lee Bialostok on the
6 next page.
7             Who's Lee Bialostok there?
8 A        Lee -- Lee is a lawyer based in New
9 York who was personal friends with either Bill
10 Scherer or Richard Drath; I don't remember.  But
11 at some point they brought him into some of
12 these discussions.
13 Q        Did he have any interest in the
14 case?
15 A        I think Bill Scherer did give him a
16 very small interest in a couple of cases.  I'm
17 not sure if Drummond was one of them.
18 Q        All right.  Point one on the first
19 page you're writing about Jaime Blanco, and you
20 call him "the king pin of the Drummond-AUC
21 relationship"; right?
22 A        That's what it says.
23 Q        And you say, "He can put Drummond's
24 two key guys, James Adkins and Alfredo Araujo in
25 the room in many meetings that he, Jaime,
                                        Page 477

1 arranged with leaders of the AUC."
2             And is that what Blanco told you?
3 A        Yes.
4 Q        And when he ultimately signed a
5 declaration and ultimately testified for his
6 trial testimony in Balcero; he did not testify
7 that Alfredo had any meetings with the AUC, did
8 he?
9 A        No, he didn't.
10 Q        And you knew that was not the truth,
11 according to you, at the time you obtained that
12 testimony from him?
13 A        I can say that he had previously
14 told me that Alfredo Araujo was in that room.  I
15 don't know why he did not state that in his
16 testimony.  I think he -- he -- did a --
17 generally, a very sloppy job in his testimony.
18 Q        You continue that "He can deliver
19 the case.  We will" -- he will "give us
20 everything if we can provide some support for
21 his lawyers.  He says" 150,000, "but I think we
22 can get it to about 80-100.  We can work without
23 him, but I think he could put them away."
24             Did you engage in any negotiations
25 with Jaime Blanco to try to get his requested
                                        Page 478

1 number lowered?
2 A        As I'm sure I testified yesterday,
3 no.  I never had myself direct discussions with
4 Jaime Blanco about these fees.  It would have
5 been Ivan who had those discussions.
6 Q        Did you coordinate through Ivan to
7 have those discussions about seeing if we can
8 get the 150,000 reduced?
9 A        I don't have specific recall of that
10 conversation with Ivan.  But I'm pretty certain
11 that it happened because we were trying to
12 reduce -- reduce the costs of this.  And,
13 ultimately, I think he did reduce those costs.
14 Q        To what?
15 A        I -- I -- I think I testified
16 yesterday, I don't know what the total was.  I
17 think the documents reflect the wires that were
18 attributable to the Jaime Blanco lawyers.
19 Q        And those are the wires from the
20 Asian Pacific Energy Corporation?
21 A        Those are the wires that Albert Van
22 Bilderbeek sent.  I don't know if they all came
23 from that company.
24 Q        All right.  Flipping to the next
25 page, which is the email you're sending to Bill
                                        Page 479

1 Scherer, Richard Drath, and Lee Bialostok; in
2 the middle of those redactions it says, "Andre
3 has met with Colombians and told them they will
4 have to kick something in for us and put
5 pressure on Drummond.  They agreed."
6             What does that mean?
7 A        I don't recall what that means.
8 Q        What Colombians did Andre meet with?
9 A        Well, the only specific name that
10 was in one of my emails was President Santos.
11 But I don't know that, as I think I previously
12 testified, whether he actually met with Santos
13 or did he meet with some people on his staff.
14 Q        And what could the Colombians kick
15 in for you to put pressure on Drummond?
16 A        As I said, I don't recall what that
17 refers to.
18 Q        Do you think it's most likely a
19 reference to the prior email we were looking
20 about -- looking at in convincing the Colombian
21 government to sever ties with Drummond?
22 A        I don't see how that would relate to
23 "kick in something."  I -- I can only say that I
24 don't recall what that refers to.
25 Q        And it says, "they agreed."
                                        Page 480

---

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 44 (477 - 480)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

1        Are you aware of Colombians,
2 governmental or otherwise, kicking in anything
3 for you to put pressure on Drummond?
4 **A**     **No.**
5     MR. WELLS: Let's go to tab 159,
6 which is Plaintiff's Exhibit 94.
7        (Plaintiff's Exhibit 94 was
8        marked for identification.)
9 Q     And I am focused on the email on the
10 second page.
11 **A**     **Second page?**
12 Q     And you say here in October of 2011
13 "We have a huge problem in Colombia in that
14 Drummond got to the INPEC people and they will
15 block our efforts to depose prisoners. We
16 needed a heavyweight to go over their heads to
17 the Ministry of Interior. We have the right
18 people, but they are expensive." 100,000 "to
19 start," 100,000 "when we get everything we need
20 and the depos are done."
21     And I'm assuming the heavyweight
22 you're referring to is Andre Lasserre.
23 **A**     **That would appear to be -- the**
24 **logical conclusion. Yes.**
25 Q     And why is it structured this way

Page 481

1 where it's 100,000 up front and then 100,000
2 after the depositions are done?
3 **A**     **I -- I don't recall. But I'm pretty**
4 **sure, virtually certain, that there was not a**
5 **second hundred thousand paid.**
6 Q     Well, you are the one that brokered
7 this deal with Mr. Lasserre; correct?
8 **A**     **I'm the one who spoke to Andre**
9 **Lasserre. Yes.**
10 Q     And you don't have any input you can
11 provide to us as to why it was broken out with
12 100,000 before the depositions and then 100,000
13 after?
14 **A**     **I don't other than that, generally**
15 **speaking, I don't recall specifically; with my**
16 **discussions with Andre that if someone is going**
17 **to perform a task that is expensive, it's a good**
18 **idea to not provide all the money up front.**
19 Q     So provide some money up front. And
20 then when the task is completed, provide the
21 rest?
22 **A**     **As a general matter, yes. And I**
23 **don't recall that -- why that would have been an**
24 **issue in this particular situation.**
25 Q     And why was there not the second

Page 482

1 $100,000 payment made?
2 **A**     **I -- I have a general recall that;**
3 **as I said in the first sentence of this Exhibit**
4 **94, the page that you've referred me to, 8774;**
5 **in that first sentence, we learned that Drummond**
6 **got to the INPEC people, as it says, and that we**
7 **were trying to get the Euro prisons to take the**
8 **depositions of these people live and**
9 **that Andre was to speak to people in the**
10 **Ministry of Interior to overrule that problem.**
11     **And then I don't recall exactly what**
12 **happened, but we then switched to a process**
13 **where we used the letters rogatory instead of**
14 **trying to take the depositions directly in**
15 **prison. So we didn't -- we didn't continue this**
16 **project.**
17 Q     That's a lot to unpack there. So
18 you first say, "we learned that Drummond had
19 gotten to the INPEC people."
20     How did you learn that?
21 **A**     **I believe Francisco Ramirez had had**
22 **some meetings with people in the ministry and**
23 **that they suddenly told him that they were no**
24 **longer interested in talking to us and that one**
25 **of the people that he knew there, the reason he**

Page 483

1 was able to get access, told him that Drummond
2 had got to the Minister, and they weren't going
3 to cooperate with us.
4 Q     But you weren't present for any of
5 the conversations you just described?
6 **A**     **No. I was relying on people on my**
7 **team.**
8 Q     Now, how was Mr. Lasserre going to
9 go over the INPEC people's heads to the Ministry
10 of Interior?
11 **A**     **Well, my general understanding with**
12 **very distant recall now is that he knew somebody**
13 **there as well. So Drummond, I think it was**
14 **Jaime Bernal Cuellar, spoke to somebody in that**
15 **Ministry; and they agreed to not cooperate with**
16 **us. And I believe Andre was going to try to**
17 **talk to them and point out that alls we were**
18 **trying to do is take depositions and get the**
19 **truth, and they ought to cooperate with us.**
20     MR. WELLS: Move to strike.
21 Q     Mr. Collingsworth, I am only asking
22 about what Andre Lasserre was supposed to do
23 with the Ministry of Interior.
24     How was he going to go about
25 convincing them to cooperate with you?

Page 484

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 45 (481 - 484)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

1 A        I believe I answered that, but I'll
2 certainly try again.  That he was going to meet
3 with somebody that he had a contact with and try
4 to convince them that what we were doing was
5 simply taking depositions and that they ought to
6 cooperate with us.  That's all.
7 Q        He was just going to have a talk
8 with them?
9 A        Yeah.
10 Q       How does that cost $100,000?
11 A        That wasn't for the government.
12 That was for Andre.
13 Q       I didn't say that.
14          How does it cost $100,000 for Andre
15 to just have a talk with the Ministry of
16 Interior?
17 A        Andre did a number of other things
18 for us in Colombia, as I previously testified.
19 I don't remember all of the details, but there
20 -- I think there was a scope of work.  But that
21 was one of several things that he was doing,
22 including meeting with President Santos.  He was
23 going to meet with some other folks in other
24 ministries.  He -- he was acting as our
25 consultant on a number of issues.
Page 485

1 Q        And you've identified two things:
2 That he was going to meet with the president and
3 tell him Drummond was engaged in criminal
4 activity, and the government should sever ties
5 with Drummond; and, number two, he was going to
6 have a talk with the Ministry of Interior to
7 convince them to cooperate with you.
8          Can you list any other things he did
9 for you for that $100,000?
10 A        Not as I sit here at this time, but
11 there were other things.
12          MR. WELLS:  Let's go to tab 162,
13 which is Exhibit 95.
14          (Plaintiff's Exhibit 95 was
15          marked for identification.)
16 Q        And you say in the middle of the
17 page here "Andre and his team came through as he
18 promised, and will now work with us to make sure
19 there is no revocation at the last minute.  They
20 will also help us take the next group of
21 secondary AUC people in January."
22          So you're saying here Andre was
23 successful in his job?
24 A        That's what it says.
25 Q        So did that change?
Page 486

1 A        As I previously testified, I don't
2 recall exactly how or why it changed.  But it
3 did change in that we switched over to the
4 letters rogatory process.
5 Q        And who are the witnesses that you
6 refer to here as "secondary AUC people"?
7 A        I'm -- excuse me.  I -- I don't know
8 as I'm testifying today why I used the word
9 "secondary."  I think we had the same list that
10 we always had, and we were trying to depose them
11 all.
12 Q        Did you have any sort of ranking,
13 for lack of a better term, of the witnesses you
14 viewed as primary and others that you viewed as
15 secondary?
16 A        Well, as I just said, I -- I'm
17 surprised to see the word "secondary" here
18 because I did not -- I -- I do not recall that I
19 had, like, categories of them.  There was a
20 pretty short list, and we were going to depose
21 them all.  The only ranking that I certainly had
22 in my mind was that Jaime Blanco was the most
23 important witness.
24          MR. WELLS:  Let's go to 164, which
25 is Exhibit 96.
Page 487

1          (Plaintiff's Exhibit 96 was
2          marked for identification.)
3 Q        This is December 2011 between you
4 and several folks.  But the two on the first
5 page that are exchanging emails are you and
6 Peter Cambs.
7          Is he a Parker Waichman lawyer?
8 A        Yes.
9          And Mr. Cambs is saying, "Regarding
10 the Colombia cases, in particular Drummond, I
11 have not been provided by your office a detailed
12 description of exactly what 'Andre' (the
13 gentleman who Terry paid" 100,000 "to, and which
14 Terry requested" Parker Waichman "pay" 200,000
15 "to) is being hired for.  Other than to say he
16 is a lobbyist of some" kind.  "I made it clear
17 to all who were in attendance in the meeting
18 that I was very concerned about the ethics of
19 employing Andre and the requested payment.  This
20 is why I wanted detailed information about what
21 he specifically" -- what he specifically "was
22 undertaking."
23          What ethical concerns did Mr. Cambs
24 raise to you about this arrangement with Andre
25 Lasserre?
Page 488

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 46 (485 - 488)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

1 A        I don't recall him using the word
2 "ethical" in our discussion.  I think that he
3 was primarily concerned about justifying the --
4 the -- the cost.
5 Q        Well, he's --
6 A        He --
7 Q        -- using the word "ethics" in this
8 written email to you.
9          You don't recall any concerns about
10 ethics of hiring Andre Lasserre raised by either
11 Mr. Cambs or anyone else?
12 A        As I said, no.  in prior situations
13 where there was an ethics issue, they brought in
14 their ethics counsel; we discussed the ethical
15 issues.  In this case, I do not recall that
16 happening.
17 Q        Who is Parker Waichman's, quote,
18 ethics counsel?
19 A        I don't know.
20 Q        So when you say brought in that --
21 you never talked to the person?
22 A        Parker Waichman would report to us
23 what their ethics counsel had said about a
24 particular issue.
25 Q        Did Conrad & Scherer have an ethics
Page 489

1 counsel?
2 A        I imagine Bill Scherer had a -- has
3 a regular ethics counsel.  I never met the
4 person.
5 Q        You certainly never talked to that
6 person, if such a person exists?
7 A        I just said I did not.  No.
8 Q        You respond, basically explaining --
9 well, trying to say that you already explained
10 what he was doing.  But at the end you say,
11 "These cases aren't for the feint of heart and
12 some required steps are certainly unorthodox,
13 but when we win a billion dollar verdict in
14 Drummond, you can be sure" Parker Waichman "will
15 be" the "first in line for fees."
16        So did you think that there was a
17 chance of a billion-dollar verdict in Drummond?
18 A        Yes.
19 Q        And you say, "some required steps"
20 to get to that "are certainly unorthodox."
21        What did you mean there?
22 A        Well, as I sit here today trying to
23 recall what I was thinking back in 2011; I would
24 say that I was certainly re -- referring to the
25 fact that this case had presented several
Page 490

1 challenges that I personally had never dealt
2 with before, including what do you do when the
3 company that you've sued is trying to murder the
4 witnesses.  All of this security stuff and the
5 threats against the witnesses and so forth, I
6 had never dealt with that before.  So that was
7 certainly an unorthodox problem.  I think that
8 was the main one.
9 Q        Okay.  Show me where in Mr. Cambs'
10 email that you're responding to there is any
11 mention of that subject you just raised.
12 A        It's the -- he's not talking about
13 that.  I'm coming back to him and saying, "These
14 cases aren't for the feint of heart."  These are
15 difficult situations we're facing here.
16 Q        Well, he's -- he's complaining about
17 Andre and the potential ethics of employing him;
18 and your response is some of our "steps are
19 certainly unorthodox."
20        Are you telling us you are not
21 calling the arrangement with Andre Lasserre
22 unorthodox?
23 A        Oh, I see.  Yeah.  I would include
24 dealing with a lobbyist of Andre's caliber along
25 with the unique security issues that we faced
Page 491

1 and the issue of providing lawyers, all of those
2 were unorthodox issues that we faced in this
3 case.
4 Q        And how did you get directed to
5 Andre Lasserre?
6 A        How did I meet Andre Lasserre?
7 Q        If you want to put it that way.  I'm
8 just trying to figure out how you came to hear
9 about him and then, ultimately, meet him.
10 A        He was somebody that worked with
11 Albert Van Bilderbeek.  I'm not sure in what
12 capacity, but I met him through Albert.  And I
13 think some of the prior emails indicate that he
14 was doing work for Albert on the Llanos Oil
15 issues, and I met him in that capacity.
16 Q        Was he also lobbying the Colombian
17 government on behalf of Albert Van Bilderbeek
18 and Llanos Oil?
19 A        Well, I don't know that for a fact.
20 But I think in one of the earlier exhibits you
21 showed me, the two things that were mentioned
22 were the Drummond case and the Llanos case that
23 he was concerned with.
24 Q        Do you know what Mr. Lasserre's
25 relationship is, if any, with Nicox BV?
Page 492

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 47 (489 - 492)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

1 A          No.  I don't think he had one, but I
2 don't know.
3 Q          And the same question for Herman de
4 Leeuw?
5 A          The question of does he have a
6 relationship with Herman?
7 Q          Yes.
8 A          Not that I'm aware of.  No.  I'm
9 sure they know each other.
10 Q          And you made this payment of
11 $100,000 to Andre Lasserre through a Latin
12 American holding company; is that right?
13 A          I -- I don't recall how we made the
14 payment.  I recall that somewhere in here was an
15 email mentioning that, but I don't have specific
16 recall of that.
17 Q          Why would you need to make a payment
18 to him through some Latin American holding
19 company?
20 A          Since I don't recall that I did it,
21 I -- I really can't tell you why or what the
22 issues were.
23 Q          I think you said he's French, Andre
24 Lasserre?
25 A          He's French but he does a lot of

1 work in Colombia and South America generally.
2          MR. WELLS:  Let's go to tab 168, and
3 this is Plaintiff's Exhibit 97.
4               (Plaintiff's Exhibit 97 was
5               marked for identification.)
6 Q          Lorraine Leete is reporting to you
7 in May of 2013 that Ivan had "heard through El
8 Tigre that Mecanico's testimony had been taken
9 by the 118th Human Rights Division of the
10 Fiscal a (in charge of the Drummond union murder
11 investigation), and that Mecanico had stated he
12 was pressured by Ivan and Terry to provide his
13 latest declaration against Drummond."
14          Did you obtain a declaration from
15 someone named Mecanico?
16 A          My -- my recollection is that this
17 guy named Mecanico was in prison with Albert's
18 -- Van Bilderbeek's brother, Hank, and that he
19 had produced a handwritten declaration of some
20 sort.  And I -- I'm pretty sure that I did at
21 some point review that declaration.
22 Q          Did you ever obtain a declaration
23 from Mecanico that looked like your other
24 declarations, typed out with a signature at the
25 end?

1 A          I -- I don't recall whether there
2 ever was a signed declaration.  I believe that
3 someone, not me, took the handwritten
4 declaration that Mecanico had prepared on his
5 own and converted it to a formal format, but I
6 -- I don't think that he ever signed it.  I'm
7 not aware that he signed it.
8 Q          And Mecanico, didn't he tell the
9 Colombian press that the handwritten declaration
10 he gave to Albert Van Bilderbeek's brother while
11 they were both in prison together was the result
12 of a bribe?
13 A          I'm not aware of that.  No.
14 Q          Did you ever send Ivan Otero to go
15 see Mecanico?
16 A          I don't recall doing that.  No.
17 Q          Do you believe Mecanico is lying
18 here by claiming that he was pressured by Ivan
19 and you to provide a declaration?
20 A          I -- I never met him, so I know that
21 I didn't pressure him; and I -- I don't know
22 that even Ivan ever met him.  So, yeah, I think
23 he's lying here.  He's -- he's a person that we
24 decided was like Duarte, insane and a
25 pathological liar; and we did not pursue his

1 testimony or use it.
2 Q          Do you know when you came to that
3 conclusion?
4 A          No, I do not.
5 Q          In our next paragraph she says,
6 "Yesterday, the same unit of the Fiscal a spoke
7 with Samario in Valledupar, and they asked him
8 what he knew about the participation of US
9 Drummond management in the murders.  He told the
10 fiscal that Charris, Peinado, and Jaime Blanco
11 were the ones who knew about that."
12          Now, that is not consistent with
13 what he testified to in the declaration you
14 obtained from him, is it?
15 A          No, it's not.  And I don't know
16 anything about that or whether it even happened.
17 Q          And when you received that, did
18 you -- this email, did you believe Samario was
19 lying when he said only Charris, Peinado, and
20 Jaime Blanco were the ones that knew about
21 Drummond participating in the murders?
22          MR. PAULK:  Object to the form.
23 A          No.  Given all that had gone on in
24 Colombia that I was aware of, my first reaction
25 to receiving this news -- I don't remember

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 48 (493 - 496)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

**Terrence P. Collingsworth - Volume II**
**2/21/2024**

1 receiving this email. I don't doubt that I did.
2 But my reaction to the concept that Samario had
3 disavowed his prior statement was that he had
4 been threatened, not that he was lying.
5 Q       (By Mr. Wells)  Samario had been
6 threatened when and by whom?
7 A       I didn't say I had knowledge of the
8 details. I said -- you asked me what was my
9 reaction or some -- something to that effect.
10 And I said, well, my reaction on hearing that
11 news was he must have been threatened.
12 Q       But you didn't have that same
13 reaction when you're receiving the same email
14 information that Mecanico has said something to
15 the Colombian government different than what he
16 said to you?
17 A       No, I did not. I'd never met
18 Mecanico. There was already a pretty good track
19 record of him flipping back and forth and trying
20 to use people. I did not have that experience
21 with Samario at all.
22       MR. WELLS: Let's go to tab 175,
23 which is Exhibit 98.
24
25       (Plaintiff's Exhibit 98 was
Page 497

1 documents mean, and respond to any questions the
2 Court may have.
3       Did you discuss with Brad Smith, I
4 know you -- we told you that we didn't make the
5 payment; but let me just let you know, somebody
6 did make the payment, and let's discuss how we
7 handle that?
8       Did y'all have any kind of
9 discussion like that?
10 A       I don't recall.
11 Q       Brad Smith represented to Judge
12 Proctor that no payment was made to Jaime
13 Blanco. He didn't couch it as who made a
14 payment. He just said there were discussions of
15 a payment, but no payment was made.
16       Do you have any recollection of
17 having a discussion with him where you told him
18 Jaime Blanco was paid but it went through this
19 bizarre arrangement that you went through
20 yesterday, such that his represent --
21 representation to Judge Proctor would be
22 knowingly false?
23 A       No.
24 Q       So best of your knowledge you didn't
25 disclose the -- the bizarre Nicox BV arrangement
Page 499

1       marked for identification.)
2 Q       And this is March of 2014. This is,
3 for your context, after Parker Waichman had
4 produced documents that the defendants had not
5 produced and shortly before Drummond filed a
6 motion of sanctions on that issue. And one of
7 the main issues was the discussions with Parker
8 Waichman about Jaime Blanco's request for
9 $150,000. And you were telling Brad Smith, "I
10 think there are docs in which we discussed
11 WHETHER WE COULD assist Jaime" Blanco's
12 "lawyers, and I wanted to, but ultimately we did
13 not."
14       Now, why are you lying to your
15 lawyer here?
16 A       Object to the form.
17       As I've previously testified on a
18 number of occasions, we initially categorized
19 the assistance to Jaime Blanco's lawyers as it
20 did not come from us; so it was not something
21 that we needed to disclose.
22 Q       Well, Brad Smith is representing you
23 and Conrad & Scherer at this time. He is the
24 one having to deal with Drummond's lawyers,
25 respond to their questions about what these
Page 498

1 to Brad Smith?
2 A       I don't recall doing that. No.
3 Q       Why not?
4 A       As I said, at that time we were
5 considering that to be not something that
6 originated with us and need not be disclosed.
7 Since, obviously corrected that or reconsidered
8 that. But at that time that was our position.
9 Q       Well, it's one thing to be not
10 disclosing it to Drummond, but you're not even
11 disclosing it to your lawyer in a privileged
12 conversation; is that right?
13 A       Object to the form.
14       I said I don't recall whether I told
15 him or not.
16       MR. WELLS: Let's go to tab 177,
17 which is Plaintiff's Exhibit 99.
18       (Plaintiff's Exhibit 99 was
19       marked for identification.)
20 Q       And this is also in March of 2014.
21 And the original email is you sending to Brad
22 Smith your draft response to the Alabama Bar
23 Association; correct?
24 A       Yes.
25 Q       And a Bar complaint was filed
Page 500

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 49 (497 - 500)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

**Terrence P. Collingsworth - Volume II**
**2/21/2024**

1 alleging that you had committed unethical acts,
2 and this is your draft response; correct?
3 A          Well, I have to look at it.
4 Q          Take your time.
5 A          It says at the top "my comments to"
6 the "Bar response." So sounds to me like I was
7 commenting on a Bar response. Nope. Maybe it's
8 Brad commenting on the draft that I sent him. I
9 don't recall this all specifically, but it is
10 definitely an email attaching a draft Bar
11 response.
12 Q          If you flip to page five of that
13 draft response.
14 A          (Witness complies.)
15 Q          The last full paragraph on that page
16 begins "The record is clear that of the 11 or so
17 key Colombian witnesses who did testify or
18 provide a sworn declaration in the human rights
19 litigation, we provided security assistance and
20 relocated family members of three former AUC
21 witnesses, Charris, Duarte and" Gelvez.
22          Now, that is not a true statement,
23 is it?
24 A          As the record now reflects, that is
25 not an accurate statement. At the time I must
Page 501

1 have thought it was.
2 Q          And have you ever followed up with
3 the Alabama Bar to advise them that you had
4 misrepresented the scope of the witness payments
5 that were the subject of your response here?
6 A          I don't -- I -- I did not in -- in
7 any way respond to the Alabama Bar when they put
8 this matter on hold or stayed it. I assume that
9 when this matter is resolved, we will have a
10 supplemental response that will provide any
11 additional details.
12 Q          This is about ten years ago at this
13 point.
14          You've made no effort to reach out
15 to the Alabama Bar and apologize to them for
16 making a misrepresentation to them about a
17 serious ethical matter?
18 A          As I said, they stayed this matter;
19 so I did not feel that was necessary until the
20 stay is lifted. I believe that was conditioned
21 on these cases being resolved.
22 Q          Mr. Collingsworth, isn't the truth
23 that you haven't even thought about correcting
24 any representation to the Alabama Bar until I
25 just showed this to you right now?
Page 502

1 A          Object to the form.
2          No. I -- I do consciously recall
3 saying, This case is stayed. And I don't think
4 it's -- we need to supplement the record until
5 the case isn't stayed.
6 Q          All right. Let's take a break.
7          THE VIDEOGRAPHER: The time is
8 2:30 p.m. We are off the record.
9          (Short recess.)
10          THE VIDEOGRAPHER: The time is
11 2:42 p.m. We are back on the record.
12 Q          (By Mr. Wells) Let me show you --
13          MR. WELLS: Ben, can I get tab 76,
14 which is Plaintiff's Exhibit 100.
15          (Plaintiff's Exhibit 100 was
16          marked for identification.)
17 Q          This is an August 2011 email
18 exchange between you and a man named Peter
19 Smolders.
20          Who is that?
21 A          I'm going to review the exhibit to
22 refresh my recollection.
23          Yeah. This guy, Peter Smolders, was
24 a journalist of some sort. I think he was
25 writing a book about Llanos Oil.
Page 503

1 Q          Did you ever read that book?
2 A          No.
3 Q          And it appears he's asking you
4 questions about your cases against Drummond.
5          Was that something he was
6 incorporating into what he was writing about
7 Llanos Oil?
8 A          I assume so. I -- as I said, I
9 didn't read his book.
10 Q          If we can go to Bates numbered page
11 15079.
12 A          (Witness complies.)
13 Q          I believe it's the first email in
14 the chain. You were telling him that you're
15 providing responses to his questions. And the
16 first question listed is: "How did you get in
17 contact with Samario and El Tigre? Did Charris
18 'direct' you to them?" And your answer was "No,
19 we knew how important they were, so we
20 investigated and found out who was their lawyer.
21 Ivan Otero represents both of them. Francisco
22 met Ivan, and it turns out they went to school
23 together etc. Ivan then agreed to set up a
24 meeting."
25          And is that an accurate statement of
Page 504

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 50 (501 - 504)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

1 how you got in contact with Samario and El
2 Tigre?
3 A        I believe that's essentially what I
4 testified to yesterday, the -- it's ambiguous
5 here as to when Ivan was the lawyer, but
6 Francisco is the person who introduced me.
7 Q        And before you met with Ivan Otero,
8 this says you "investigated and found out" that
9 he was the lawyer for Samario and El Tigre;
10 correct?
11 A        That's what it says.
12 Q        And his next question, he's asking
13 about other AUC members.  And you're saying
14 you're providing him from some other
15 declarations.  But at the very end of the page
16 and bleeding over into the next you say, "Each
17 of the guys is bringing us other guys."
18        What does that mean?
19 A        Well, I can only assume that it
20 means that each witness might bring us some
21 other witnesses.
22 Q        So of the witnesses you ultimately
23 got testimony from, who brought who to you?
24 A        Well, as I think I testified,
25 Samario and El Tigre; it was Ivan.  Gelvez, I

Page 505

1 Q        How did you go about doing that?
2 A        I didn't do it.  I don't recall
3 exactly what was done.  I imagine that Francisco
4 Ramirez spoke to some people at Justice and
5 Peace, and they weren't interested.
6 Q        Did Charris provide Mr. Ramirez any
7 compensation for that help?
8 A        No.  Not that I'm aware of.
9 Q        At the bottom of the page he asks
10 "Did Drummond ever respond to the allegations
11 made by Charris, Samario and El Tigre?  And how?
12 My main question is, I think:  Why would these
13 men want to implicate Drummond if nothing
14 happened?"  And you proceed to tell him you
15 believe they're credible.  The only reason they
16 would say it is it's the truth.
17        Is that effectively your response?
18 A        I'm going to have to read it.
19 Q        And if you prefer, you can just read
20 it into the record.
21 A        I'm not sure.  I'm trying to figure
22 out where my response begins.  I think my actual
23 response begins with "Drummond has" yet -- "not
24 yet had to really respond yet.  We are trying to
25 get all the permissions needed to go to Colombia

Page 507

1 think, that was Francisco Ramirez.  Charris, I
2 think that was Francisco Ramirez who contacted
3 him.
4        Anybody else?
5 Q        Well, what you just told me is this
6 reference you're making here to "Each of the
7 guys is bringing us other guys" is witnesses
8 were bringing other witnesses.
9        So my question was really which
10 witnesses brought you which other witnesses?
11 A        I don't know that any of them ended
12 up bringing us anyone that we later considered
13 to be a witness or that we used.
14 Q        The next question is:  "Charris and
15 Tolemaida were sentenced to 30 years in jail.
16 Would that really be 30 years?"  And you
17 respond, Didn't they par -- excuse me.  That's
18 another part of the question.  "Didn't they
19 participate in the Justice and Peace process?"
20 And you respond "Charris had bad legal
21 representation and never got himself in the
22 process.  We are trying to help him now."
23        How were you trying to help Charris?
24 A        We were trying to get him into the
25 Justice and Peace process, but we -- we did not.

Page 506

1 with a court reporter and Drummond's lawyers to
2 take their depositions.  I agree that these guys
3 are credible, and it would be foolish to
4 implicate such powerful people absent it
5 actually being the truth."
6 Q        And when Mr. Smolders is asking you
7 what could have motivated these people to
8 implicate Drummond; you do not disclose to him
9 that you have made payments to all three of
10 these people's family members at their request,
11 do you?
12 A        No.  Of course not.
13 Q        You didn't think that was something
14 a journalist should know when he's seeking out
15 the motivations behind these prison witnesses'
16 testimony?
17 A        Object to the form.
18        And I was confident and remain
19 confident that their motivation did not come
20 from us rescuing their family from death
21 threats.  The death threats resulted from their
22 deciding to come forward and talk.
23 Q        So was it your testimony that all
24 the payments that you made post dated the
25 testimony these witnesses provided to you that

Page 508

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 51 (505 - 508)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

**Terrence P. Collingsworth - Volume II**
**2/21/2024**

1 you then provided to Drummond?
2 A       No.  I don't think that's the case.
3 I think we were prepared for what was an
4 expected reaction of threats while we were
5 initially dealing with the witnesses.
6 Q       Like, for example, Halcon; you never
7 disclosed any testimony by him to Drummond, yet
8 paid for his and his family's support for years.
9       How is Drummond possibly going to
10 threaten these people?
11 A       Once again, as I testified at length
12 earlier, I did not initiate the Halcon
13 situation; I inherited it.  And then I
14 mistakenly ignored it for a long time before I
15 dealt with it and ultimately concluded that he
16 was not under a threat.
17 Q       Because he had no useful testimony?
18 A       That put him at risk.  Yes.
19 Q       Go to Bates numbered page 5 --
20 15078.
21 A       (Witness complies.)
22 Q       In the middle of the page
23 Mr. Smolders is asking you "One quick question.
24 The judge more or less said that he was going to
25 throw the case out, in his opinion in November
Page 509

1 2009.  But you had one more chance, which you
2 took, and by April 2010 the motion to dismiss
3 was rejected.  Question:  What did you do, or
4 add, after the November 2009 opinion, that led
5 to the eventual success?"
6       And your answer to that question was
7 what?
8 A       I don't think I answered it.  I
9 don't see an answer.
10 Q       Well, if we look at the top of the
11 page, the very next email from you, and the
12 only --
13 A       Which one?
14 Q       -- text in it above the from Peter
15 Smolders meeting --
16 A       Got you.
17 Q       -- and email and response.
18       Your response to the question about
19 what you added to survive a motion to dismiss
20 was "All the details from Samario and El Tigre
21 that showed the 'joint purpose' Drummond shared
22 with the AUC"; correct?
23 A       That's what it says.  Yeah.
24 Q       And that is the only thing you told
25 him was added that allowed you to survive the
Page 510

1 motion to dismiss; correct?
2 A       That's the only thing that I told
3 Peter Smolders.  Yeah.
4       MR. WELLS:  Let's go to tab 77,
5 which is Exhibit 101.
6       (Plaintiff's Exhibit 101 was
7       marked for identification.)
8 Q       So this is you in January of 2011 to
9 Bhavani Raveendran?
10       Can you help me with that
11 pronunciation?
12 A       That's close enough.
13 Q       Who is that?
14 A       Trying to recall back in 2011.  But
15 my educated guess is that she was an intern
16 working -- a summer legal intern -- nope.  That
17 cannot be true because this was January, so I
18 don't know.
19 Q       In any event, you're laying out some
20 issues.  And number two says "In Drummond, we
21 need to explore the 'work product' privilege
22 under the discovery rules.  The precise question
23 is if an attorney personally visits a key
24 witness and there are difficult logistical
25 issues as to how he was able to do that, does he
Page 511

1 have to disclose to the opposition in response
2 to an interrogatory?  The concrete issue is that
3 I managed to interview and get a great
4 declaration from a demobilized AUC paramilitary,
5 El Tigre.  To get to him, I used a series of
6 contacts, three different people, one knew ET's
7 lawyer, then ET's lawyer, and then a guy ET
8 lawyer's introduced me to, who got me in to see
9 ET.  I don't want Drummond to know the names of
10 these people."
11       What are the names of those people?
12       The one who knew ET's lawyer, who is
13 that?
14 A       As I've previously testified, that
15 would be Francisco Ramirez and then Ivan Otero;
16 and then the third person, I don't know who that
17 is.
18 Q       Okay.  So the one who knew El
19 Tigre's lawyer was Francisco Ramirez.
20       And El Tigre's lawyer is Ivan Otero;
21 correct?
22 A       That's what I said.  Yes.
23       MR. WELLS:  Let's go to tab 78,
24 which is Exhibit 102.
25       (Plaintiff's Exhibit 102 was
Page 512

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 52 (509 - 512)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

**Terrence P. Collingsworth - Volume II**
**2/21/2024**

1                   marked for identification.)
2 Q          This is an email exchange between
3 you and Mike Hugo, who was another Parker
4 Waichman lawyer; correct?
5 A          Very briefly.  Yes.
6 Q          And he says, "I have a major concern
7 about Ivan which I will not communicate in an
8 unsecure email manner, but it has to do with
9 information we got in Colombia and a breach of
10 confidence involving him.  I am not sure you
11 fully understand who/what he is, and we can
12 discuss under different circumstances, but I
13 will only say that there was an event that
14 shocked me that we need to discuss in a totally
15 secure manner, not international and" not "by
16 email."  And you respond saying, "I look forward
17 to hearing what you have."
18          What was that major concern that
19 Mr. Hugo was raising here?
20 A          I don't know that we ever had that
21 discussion.  Mike Hugo was a very short time at
22 -- at this firm.  He was let go -- he was fired
23 while he was working on these cases.  I found
24 him to be a very bad lawyer, very unreliable
25 person.  I would have listened to what he said

1 had to say, but I don't recall that we had that
2 meeting.
3 Q          So despite him raising a serious
4 concern about the lawyer that connected you with
5 his clients, El Tigre and Samario; you did not
6 follow up and learn what that concern was?
7 A          Object to the form.
8          I didn't say I -- I said I'd be
9 willing -- I was willing to hear what he had to
10 say.  I think he was fired in the interim.  I
11 didn't have the opportunity.
12 Q          Do you have any explanation for why
13 you are forwarding this exchange to Richard
14 Drath and Bill Scherer in January of 2011 over
15 -- well, about a month later?
16 A          I -- I don't have a recollection.  I
17 probably was just trying to be transparent.  And
18 there had been issues with Mike Hugo.  We were
19 all unhappy with Mike Hugo.  And I probably
20 forwarded this with sort of a -- this is the
21 kind of stuff that I don't -- that I -- that I
22 don't understand about Mike Hugo.
23 Q          Did either Mr. Drath or Mr. Scherer
24 ask you what this concern was that Mr. Hugo was
25 raising that he says shocked him about Ivan

1 Otero?
2 A          Not that I can recall.  And Richard
3 and Bill were both very hands off.  I would not
4 have expected them to reply.  This was more me
5 being transparent.
6 Q          And that's you in a nutshell;
7 transparent, isn't it?
8 A          Object to the form.
9          Is that a real question?
10 Q          Are you instructing yourself not to
11 answer?
12 A          Is that a real question?
13 Q          It is.
14 A          Object to the form.
15          I think I'm as transparent as
16 anybody else.  Depends on the situation.
17 Q          And you believe that you don't hide
18 anything from your opponents; right?
19 A          I never said that.
20 Q          So you do hide things from your
21 opponents?
22 A          I very specifically admitted that I
23 was intentionally hiding the Jaime Blanco
24 materials because I was making a distinction as
25 to who provided the money for the lawyers.  And

1 the other incidents that you've asked me about,
2 I don't believe I know that I did not
3 intentionally not disclose that information.
4 Q          Do you want the jury in this case to
5 believe that you operate in the sunshine?
6 A          Object to the form.
7          I look forward to telling the jury
8 everything that I can about what happened in
9 this case.
10 Q          And your characterization of how you
11 operate and whether you hide payments is that
12 you operate in the sunshine, and you don't hide
13 anything; right?
14 A          Object to the form.
15          And I, just like all lawyers, I use
16 the -- the discovery process and raise all
17 legitimate objections and try to have the rules
18 guide what I am and am not disclosing.
19 Q          I think you told us yesterday that
20 the only written legal analysis that you
21 received analyzing whether it would be ethically
22 permissible to pay the criminal legal fees of a
23 witness was the memo drafted by Piper Hendricks.
24          Is that correct?
25 A          That's the only written opinion that

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 53 (513 - 516)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

1 I reviewed.  I -- I know that we looked at
2 emails yesterday that Parker Waichman's ethics
3 lawyer also agreed with that position.  I did
4 not see his written opinion.
5 Q         And you just mentioned you let the
6 rules guide you in how you operate.
7         And is it your testimony that Piper
8 Hendricks' analysis sets forth the rules for the
9 situation of paying the criminal legal fees of a
10 witness?
11         MR. PAULK:  Object to the form.
12 A         Object to the form.
13         At the time I thought that Piper's
14 analysis was -- was solid, and I did consider it
15 and the opinion of the Parker Waichman lawyers
16 and several of the other lawyers that we talked
17 to in make making that decision.
18 Q         (By Mr. Wells)  And did you believe
19 you needed to follow the rules laid out in Piper
20 Hendricks' memo?
21 A         I don't remember specifically what
22 Piper Hendricks' menu -- memo said.  I do recall
23 reading it.
24 Q         And do you recall following the
25 advice or deciding this is not the rules, I'm
Page 517

1 going to do something different?
2         MR. PAULK:  Object to the form.
3 A         I don't recall.
4         MR. WELLS:  Let's go to tab 79,
5 which is Exhibit 103.
6         (Plaintiff's Exhibit 103 was
7         marked for identification.)
8 Q         And I'm focused on your email on the
9 second page, which is Bates number 39577.  And
10 you are emailing your legal team and telling
11 them "Folks, I have been less than happy lately
12 as my efforts to promote human rights through
13 the rule of law have ironically now got me
14 dealing with some extremely sleazy people.  On
15 the one side we have Ivan and his friends, and
16 on the other side the equally greedy and morally
17 rudderless lawyers at" Parker Waichman, "most
18 particularly Mike Hugo."
19         What about Ivan Otero did you find
20 to be equally greedy and morally rudderless?
21 A         I don't have any feelings about Ivan
22 that he's greedy or morally rudderless.  I think
23 I was referring to his friends.
24 Q         Okay.  That's my next question:  Who
25 are his friends?
Page 518

1 A         I think that's a general way of
2 discussing some of the witnesses that we had
3 been dealing with.
4 Q         And you felt that the witnesses you
5 were dealing with were greedy and morally
6 rudderless?
7 A         I mainly thought that the witnesses
8 were morally rudderless.  I think that the
9 greedy part is particularly aimed at Parker
10 Waichman.
11 Q         Well, you were equating Ivan and his
12 friends with Parker Waichman.
13 A         For different reasons, but yeah.
14 Q         And you're saying both are equally
15 greedy and morally rudderless?
16         So what about the witnesses you're
17 relying on did you believe was greedy?
18 A         I don't have any specific instances
19 where some -- one of these people was greedy.
20 As I just said, this is an email.  It was not a
21 carefully drafted document.  I think the greedy
22 part was Parker Waichman, and the morally
23 rudderless part was the witnesses.
24 Q         And as it relates to Ivan, what
25 about him was equal to the greed and lack of
Page 519

1 morals of Parker Waichman?
2 A         As I said a couple of sentences ago,
3 there's nothing about Ivan that I found greedy
4 or morally rudderless.
5 Q         Okay.  Well, you say you're "dealing
6 with some extremely sleazy people."  And the
7 first people you reference are Ivan and his
8 friends.
9         So what about Ivan and his friends
10 cause you to call them extremely sleazy people?
11 A         I can only speculate that at that
12 time I was irritated about something.  But I
13 have absolutely no hesitation saying there's
14 nothing about Ivan that I find greedy or morally
15 rudderless.
16 Q         Okay.  I --
17 A         He's -- he's a good man.
18 Q         I'm back to the "extremely sleazy"
19 when you're introducing Ivan and his friends.
20         What about Ivan caused you to call
21 him an "extremely sleazy person"?
22 A         I think we all talked some about how
23 Ivan was, like many Colombian men of his age, a
24 real womanizer.  I didn't like that.
25 Q         And that's all you can give us as to
Page 520

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 54 (517 - 520)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

**Terrence P. Collingsworth - Volume II**
**2/21/2024**

1 why you're calling him "extremely sleazy" here?
2 **A          Absolutely.**
3 Q          Was Mike Hugo a womanizer?
4 **A          He was sleazy in other ways.**
5          MR. WELLS:  Let's go to tab 81,
6 which is Plaintiff's Exhibit 104.
7               (Plaintiff's Exhibit 104 was
8               marked for identification.)
9 Q          And I'm really focused on your email
10 that leads off this email chain, so it will be
11 on the second page.  And this is emailing -- you
12 emailing your legal team in August of 2011.
13          And point number six that you're
14 raising, which you say is important in all
15 capital letters and bolded; right?
16 **A          Yeah.**
17 Q          You say, "folks, no harm was done
18 yet.  But, Nadia the journalist had some
19 derogatory things to say about Ivan that were
20 based on facts that only our team would know.
21 Whoever is talking to her socially needs to be
22 absolutely clear that you are not to be
23 revealing inside information, this is a waiver
24 of attorney client and work product privilege
25 and to waive it to a journalist is about as bad
Page 521

1 as it gets.  Further, like it or not, Ivan is an
2 important partner of ours in this process and we
3 need to be protective and supportive of his
4 interests as they largely overlap with ours."
5          And what derogatory things was
6 Nadia, the journalist, reporting to you to cause
7 you to write this email?
8 **A          Lorraine and Susana in particular, I**
9 **-- I don't know if Christian was ever involved**
10 **in these discussions -- they really did not like**
11 **that Ivan was a very open womanizer.  And that**
12 **is the -- about the only thing that I can think**
13 **of that they're referring to here.  They call**
14 **him sleazy all the time and complain to me sort**
15 **of like they have to deal with this guy.**
16 Q          How in the world is the fact that
17 Ivan Otero is a womanizer attorney-client or
18 work product information?
19 **A          Object to the form.**
20 **          In my view, anything that we are**
21 **discussing as a group involving the people**
22 **working on our cases should be treated as**
23 **privileged material.**
24 Q          And in your view, Ivan Otero was a
25 member of the plaintiff's team in Balcero
Page 522

1 representing the Balcero plaintiffs just like
2 the rest of you were?
3 **A          Yes.**
4 Q          So you're telling your team here
5 that basically y'all need to get on board with
6 Ivan.  "Like it or not," he's "an important
7 partner of ours."
8          Did you ever tell any of the female
9 members of your team that were complaining about
10 having to deal with him that you would address
11 the situation with Mr. Otero?
12 **A          Object to the form.**
13 **          And, yes, I did.  In fact, I did it**
14 **in front of them at one point.**
15 Q          And what did you say?
16 **A          I don't recall exactly.  But I**
17 **basically said that in America this kind of**
18 **behavior is -- is offensive, and these people**
19 **that I work with are not happy with what you're**
20 **doing here.  And I think after that he stopped**
21 **in terms of bringing people around us.**
22 Q          So he would bring mistresses to
23 legal meetings with y'all?
24 **A          Object to the form.**
25 **          No.  Not to legal meetings.  Like if**
Page 523

1 **we had a dinner after we had had a work meeting,**
2 **he sometimes brought his friends along.  Yeah.**
3 **He used to.**
4 Q          And you're using friends there to
5 refer to --
6 **A          Girlfriends.**
7 Q          Okay.  You've also talked about his
8 friends being paramilitary witnesses, so I just
9 want to make clear --
10 **A          I did clarify that, didn't I?**
11          MR. WELLS:  Let's go to tab 95,
12 which is Exhibit 105.
13               (Plaintiff's Exhibit 105 was
14               marked for identification.)
15 Q          And I think we probably marked this
16 before, so we've got a lot of exhibits, but
17 we'll go through it again.  I have not asked you
18 about the portion I'm about to ask you about
19 though.
20          This is you emailing to your team in
21 February 2011 your notes from a January 26th
22 through February 3rd trip to Colombia; correct?
23 **A          Yes.**
24 Q          And you are telling your team that
25 you and others "met with El Tigre in
Page 524

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

1 Barranquilla jail.  He claimed repeatedly that
2 he was being threatened and told to stop talking
3 about Drummond and that he would not give us the
4 final deposition until his family was moved,
5 temporarily, to a" safe "location."  And you put
6 in all bold and underlined it, "We need to do
7 this"; correct?
8 **A        I'm sorry.  I don't see where you're**
9 **reading.  What page?**
10 Q        It's the first sentence of the memo.
11 **A        Yes.**
12 Q        And you reference in the next
13 paragraph that Samario is also saying that he
14 will not testify until you first move his family
15 to a safe place; correct?
16 **A        That's what it says.  Yeah.**
17 Q        And flipping over two pages for you
18 to the point number six.
19 **A        (Witness complies.)**
20 Q        You say, "We have to clarify terms
21 and get funds for security to Ivan for" El Tigre
22 "and Samario's families.  Ivan has followed up
23 and wants to know when."
24        So had you not relocated either of
25 those men's families prior to this memo?

1 **A        Based on the memo, I don't -- I**
2 **don't know.  But I -- it seems like it hadn't**
3 **happened yet.**
4 Q        And prior to this memo, had you
5 expended any funds for security for these two
6 witnesses, El Tigre and Samario?
7 **A        Not that I'm aware of.**
8        MR. WELLS:  All right.  Let's go to
9 tab 311, which is Plaintiff's Exhibit 106.
10        (Plaintiff's Exhibit 106 was
11        marked for identification.)
12 Q        So this is you writing to Rebecca
13 Pendleton in December 2008 asking her to
14 translate a message to Ivan Otero.  And the
15 second paragraph of your message says, "attached
16 is the draft agreement.  I think it is better if
17 we leave it quiet about your current clients,
18 and I trust we will all know exactly what is needed
19 to be done.  If you have any questions at all,
20 please let me know through Rebecca.  I expect to
21 return to Colombia after the holidays and will
22 coordinate with you to set up a meeting.  Let me
23 know when your investigation of the facts has
24 obtained some concrete results.  I can transfer
25 the funds as soon as the two declaration we

1 discussed are ready.  If there is anything I can
2 help with in the interim, please let me know."
3        And his current clients you're
4 referencing there would be El Tigre and Samario?
5 **A        Most likely, yes.**
6 Q        And you say, "we all know exactly
7 what is needed to be done."
8        What does that mean?
9 **A        Means Ivan, as per the agreement**
10 **that's attached, is going to -- very**
11 **specifically says in the agreement that's**
12 **attached he's going to do the investigation,**
13 **he's going to interview people, and he's going**
14 **to help draft these declarations.  Says, "The**
15 **funds will be used for travel expenses,**
16 **consultants, providing necessary security," et**
17 **cetera.  That's my understanding of what those**
18 **funds were for.**
19 Q        And the draft agreement says, "Upon
20 execution of this agreement," Conrad & Scherer
21 "will transfer $80,000 to" Otero's "bank
22 account"; correct?
23 **A        Yep.**
24 Q        The agreement does not say Upon Ivan
25 Otero's delivery of signed declarations from El

1 Tigre and Samario, Conrad & Scherer will deliver
2 $80,000 to Otero's bank account, does it?
3 **A        No.**
4 Q        That would be problematic to put in
5 a contract, wouldn't it?
6 **A        Object to the form.**
7        **If you read on in that same**
8 **paragraph, it explains that he needs these fund**
9 **to conduct the work.  So that's why we provided**
10 **it to him.**
11 Q        But when you're sending him the
12 agreement, you don't say you'll transfer the
13 funds as soon as he signs the agreement, as the
14 agreement says.
15        You say you're only going to send
16 the funds as soon as the two declarations of El
17 Tigre and Samario are ready; correct?
18 **A        Well, that's what it says; but the**
19 **agreement controlled what we did.  And we sent**
20 **him the 80,000.  I know that we did.**
21 Q        You sent him the 80,000 when he
22 signed it, as the agreement said?
23 **A        I believe so.**
24 Q        Why would you tell him in this email
25 that you're only going to send him $80,000 until

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 56 (525 - 528)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

1 his clients signed declarations?
2 A        I don't know why there's an
3 inconsistency between these two, but I'm
4 confident that the agreement itself controlled
5 what we did.
6 Q        The agreement itself -- and let's
7 look at it, Mr. Collingsworth.
8 A        (Witness complies.)
9 Q        In paragraph one after talking about
10 the $80,000 payment and that with those funds
11 Mr. Otero will be using them "for travel
12 expenses, hiring consultants, and providing
13 necessary security during the investigation" and
14 assisting "key witnesses with any security
15 measures they need." It says, "This payment
16 will be the sole payment made for these
17 services," doesn't it?
18 A        Yeah.
19 Q        And I think we can all agree $80,000
20 was not the only money you and Conrad & Scherer
21 sent to Ivan Otero, which you have since told us
22 were for the very services listed in this
23 document?
24 A        Object to the form.
25          There certainly were additional
                                        Page 529

1 security funds that we sent to Ivan Otero after
2 this initial agreement.  Yes.
3 Q        Were there additional travel
4 expenses you sent to Ivan Otero after this
5 agreement?
6 A        Yes.
7 Q        Did Ivan Otero ever hire any
8 consultants?
9 A        He did have people work with him.
10 Q        Who?
11 A        I don't recall names, but he
12 introduced me to other lawyers that were doing
13 running around for him.  One of them was his
14 nephew.
15 Q        And providing security -- "necessary
16 security during the investigation," is that to
17 include security for Mr. Otero himself?
18 A        Yes.
19 Q        And that $80,000 was not the sole
20 payment, according to you, for that topic
21 either, was it?
22 A        As I said, no.
23 Q        And the second paragraph of this
24 agreement that you are sending to Mr. Otero at
25 the time you are telling him El Tigre and
                                        Page 530

1 Samario are his current clients, you promise him
2 a 25 percent contingency fee in the Drummond
3 cases; correct?
4 A        No.  That's not correct.
5 Q        Correct me, please.
6 A        Well, I can only read the sentence
7 itself.  It says, "IO and his firm will also
8 receive 25% of the net recovery of attorneys
9 fees for any new cases developed and filed," et
10 cetera, et cetera.  So Balcero had already been
11 filed.  Although, I really don't know what we
12 intended there as I sit here today.  But that
13 language is -- certainly includes the word
14 "new."
15 Q        Well, Mr. Collingsworth, Balcero was
16 filed in May of 2009; and Baloco was filed in
17 March or 2009.
18          Do you need to correct that last
19 testimony you gave?
20 A        Yes.  I didn't realize that this was
21 not signed -- that this was signed in 2008.  I
22 have testified consistently that Ivan Otero had
23 a contingency interest in the Drummond cases.  I
24 have been questioned a lot about that and
25 whether there was a conflict of interest.  So I
                                        Page 531

1 have no doubt that he had such an interest in
2 those cases.
3 Q        And at the time you promised him a
4 contingency interest in those cases, it was your
5 understanding that he was the lawyer for El
6 Tigre and Samario?
7 A        I've said a number of times I'm not
8 at all clear on the timing of when he was a
9 lawyer.  But there certainly are emails that
10 initially, at least when I first went to him, I
11 thought that he was their lawyer.  Yes.
12 Q        Including this email where you're
13 attaching the agreement.  You called them his
14 current clients?
15 A        That's correct.  Yes.
16          MR. WELLS:  All right.  Let's get --
17 okay.
18          MR. PRESLEY:  Tab 313.
19 Q        (By Mr. Wells)  Let me show you
20 what's been marked as Plaintiff's Exhibit 107.
21          (Plaintiff's Exhibit 107 was
22          marked for identification.)
23 Q        These are some text messages
24 captured from your phone and produced by Conrad
25 & Scherer between you and Susana Tellez on
                                        Page 532

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

1 October 23rd, 2008.  And what Ms. Tellez is
2 telling you is "rebecca had the" meeting with
3 the "drummond guys, the proposal for 10% and
4 15,000 upfront" with "signed" declaration "was
5 accepted, however instead of one person there's
6 2.  the guy who knows about union workers also
7 knows about railways, this would give us a
8 larger timeframe ie. 1997-2002.  now the
9 question is how much we would pay for the
10 second" declaration, please "advise how much we
11 would negotiate financially, and it's understood
12 no money will be passed until" the declarations
13 "are received."
14          The two Drummond guys are El Tigre
15 and Samario, aren't they, Mr. Collingsworth?
16 A          No.  We might be referring to who
17 Ivan's clients are.  But the only agreement that
18 was made to provide money relating to that work
19 is the agreement we just looked at, and that
20 funding was for Ivan Otero.
21 Q          That is not the question,
22 Mr. Collingsworth.
23 A          Okay.
24 Q          I'm asking about this text and the
25 Drummond guys that Rebecca had the meeting with
Page 533

1 and proposed 10 percent and $15,000 up front
2 with signed declarations?
3 A          And the question is?
4 Q          Who are the Drummond guys?  It looks
5 like she was initially thinking there was one
6 person, but now there's two, and asking the
7 question of how much we're going to pay for the
8 second declaration.
9 A          I --
10 Q          Who are the two people being
11 referenced in this text message?
12 A          I don't know.  The only person that
13 Rebecca met with was Ivan Otero.  She never met
14 with those witnesses.  And I think that the
15 issue here is that Ivan was asking for
16 additional money for himself, which we provided
17 in that agreement.  But Rebecca never met those
18 guys, so I don't know what else she was
19 referring to there.
20 Q          And the question she's asking is:
21 How much would y'all pay for the second
22 declaration.
23          So who was the first declaration
24 that was worth 10 percent and 15,000 up front?
25          That's the first question.
Page 534

1 A          Again, going back to the prior
2 Exhibit 106, the only -- there -- there were two
3 witnesses that Ivan produced.  And the funding
4 is very clearly described in there that was
5 provided, and it was for Ivan.
6 Q          Who -- who is the first witness
7 referenced in this text that's going to provide
8 a signed declaration for a deal involving 10
9 percent and $15,000?
10 A          Again, based -- based on Exhibit
11 106, the only two people at issue were El Tigre
12 and Samario.  But the financing, the
13 percentages, are reflected in the agreement that
14 we signed with Ivan Otero.
15 Q          Right.  But this is a month and a
16 half earlier than the agreement that you sent to
17 Mr. Otero.  And what is being told to you here
18 is we first thought there was one witness, but
19 now there's two.  So what are we going to pay
20 for the second one?
21 A          To Ivan.  That's my understanding of
22 that transaction.
23 Q          So the two witnesses involved in
24 this transaction -- whoever got the money, I'm
25 just focused on the identity of the witnesses --
Page 535

1 would be El Tigre and Samario?
2 A          Yes.
3 Q          And when she asks how much would we
4 pay for the second declaration, is that how we
5 got to the proposed contract to Ivan Otero
6 promising him, instead of 10 percent, a 25
7 percent contingency fee, and instead of 15,000
8 up front, 80,000 up front?
9 A          Well, there were other reasons why
10 the number got kicked up to 80,000.  But, yes,
11 this was a discussion we were having with Ivan
12 to produce -- to work on and produce those two
13 declarations, and the final agreement is
14 reflected there in Exhibit 106.
15 Q          And you were paying Ivan for those
16 declarations?
17 A          For his services.  Yes.
18 Q          Well, the text that you are a party
19 to is trying to figure out how much you're going
20 to pay for the second declaration; correct?
21 A          Pay Ivan was my exclusive
22 understanding of that transaction.  And, of
23 course, I didn't write that.  What I do know is
24 that when I was directly involved, I drafted
25 this agreement, Exhibit 106; and that reflects
Page 536

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 58 (533 - 536)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

---

**Page 537**

1 our entire agreement.
2 Q        Well, what is not reflected in the
3 agreement you drafted is that the payment won't
4 be made until the declarations are provided.
5 A        Well --
6 Q        But you do say that in your cover
7 email; right?
8 A        Well, I -- you've asked me about
9 that already.  The inconsistency between that
10 timing, I can't explain.  I don't recall.  But I
11 am confident that the sole money that was
12 exchanged in -- as a result of this transaction
13 was the 80,000.
14 Q        And Ms. Tellez is telling you here,
15 similar to what you told Ivan Otero, it's
16 understood no money will be passed until the
17 declarations are received; correct?
18 A        This text that I didn't write says
19 that.  This agreement that I did write doesn't
20 say that, and that was the operating agreement.
21 Q        The email that you wrote when you
22 sent him the agreement says, and I quote, "I can
23 transfer the funds as soon as the two
24 declarations we discussed are ready."
25          That was the deal, wasn't it,

---

**Page 538**

1 Mr. Collingsworth?
2 A        No, it was not.  And you've asked me
3 about that.  I said I can't explain that
4 inconsistency.  But the sole transfer that was
5 made to Ivan Otero concerning these declarations
6 was the 80,000 of that agreement.
7 Q        And you waited to transfer any money
8 to him until after those declarations had been
9 signed, didn't you?
10 A        That I don't know.  We promised to
11 do it right away because he needed the money in
12 order to perform the work.  I don't know as I
13 sit here whether we sent it when we signed the
14 agreement or later on.  I don't know.
15 Q        Well, you will agree, I think we've
16 already confirmed, that the terms of the
17 agreement that you said you followed was that as
18 soon as he signs the agreement, he gets the
19 money immediately?
20 A        I just said that, yes, that was what
21 I understood the transaction involved.
22 Q        Which is not what you're telling him
23 in your cover email and is not what you and
24 Susana Tellez are discussing in these text
25 messages, is it?

---

**Page 539**

1 A        I'm not discussing anything in those
2 text messages.  I didn't write a single one of
3 them.  So I can only speculate as to what my
4 understanding of the actual transaction is, and
5 that is reflected in that agreement.
6 Q        So if it turns out that you did not
7 send 80,000 to Ivan Otero until after the
8 declarations had been signed by El Tigre and
9 Samario, that's just a coincidence?
10          MR. PAULK:  Object to the form.
11 A        Object to the form.
12          Not at all.  I -- I -- there is an
13 inconsistency in the cover note saying we won't
14 give you the money, Ivan, until this is done;
15 and the agreement says we'll give it to you up
16 front.  Whether or not we paid the whole thing
17 up front or after the declarations were signed,
18 the only purpose of that money was to pay Ivan
19 for the services that he was performing that are
20 specified in this agreement.  I don't know, and
21 I think I've said several times, when the
22 payment was made, whether Conrad & Scherer
23 delayed it.  I'm pretty sure it was made, and it
24 was for this agreement.
25 Q        (By Mr. Wells)  And your testimony

---

**Page 540**

1 is despite what you wrote in the email attaching
2 the agreement and despite what Susana Tellez
3 wrote to you before you had drafted the
4 agreement; the deal was not, in your mind, that
5 you're not paying the money until the
6 declarations were signed?
7 A        Object to form.
8          I've answered that.  I don't know
9 when we paid.  One of them says before; one of
10 them says after.  I don't know how that actually
11 worked out.  I have -- the one thing I have no
12 doubt about is that the $80,000 was for Ivan
13 Otero.
14 Q        And that does not answer the
15 question.  I don't care what the document says.
16          You have in your mind what you
17 intend to do at the time; correct?
18 A        Yes.
19 Q        You're a human being with
20 intentions; correct?
21 A        Absolutely.
22 Q        And your intention; as stated in
23 your email, which is consistent with what Susana
24 Tellez says before you wrote that email; is that
25 no money will pass until the declarations are

---

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 59 (537 - 540)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

1 received.
2           Was that, in fact, your intention
3 regardless of what you put in that document you
4 sent to Ivan Otero?
5 A          I don't think so.  I think I
6 understood that Ivan needed funds to accomplish
7 the tasks that we had given him to do.
8 Q          Are you so hesitant to agree to that
9 because you know it would be inappropriate and,
10 perhaps, illegal to pay contingent on the
11 receipt of signed declarations?
12          MR. PAULK:  Object to the form.
13 A          Object to the form.
14           I don't have any view about whether
15 that would be legal or not legal.  I do have a
16 view that we provided Ivan with this money to
17 accomplish the work that needed to be done.
18 Q          (By Mr. Wells)  The Piper Hendricks
19 memo; which you said was the only written
20 analysis that you received as it related to
21 paying, really, anything for witnesses; was
22 three years after what we're looking at now.
23           Did you solicit any ethical or legal
24 advice as to the propriety of proposing to the
25 criminal lawyer of two witnesses that you will
                                        Page 541

1 pay him $80,000 once he secures the declarations
2 of his witnesses?
3 A          I don't believe that's how it
4 happened.  But I did not see any prohibitive
5 conflict in having Ivan wear two hats in this
6 transaction.
7 Q          And that is not what I asked you.
8           Did you solicit ethical advice or
9 legal advice from anyone other than Terry
10 Collingsworth as to whether this arrangement was
11 permissible?
12 A          Oh, I'm pretty sure I discussed it
13 with the other folks working on the team.  And I
14 don't recall that anyone had any objection to
15 what we were doing.
16 Q          And who were those folks in December
17 of 2008?
18 A          Well, I think the Conrad & Scherer
19 people would have had to look at this agreement
20 and approve it.  And this agreement is the
21 operative agreement under which we paid Ivan
22 Otero; the second page, not my cover email.
23 Ivan didn't sign this cover email; we both
24 signed this agreement.
25 Q          Again, that's not my question.
                                        Page 542

1 A          Okay.
2 Q          Did you solicit any legal or ethical
3 advice as to whether it would be permissible for
4 you to pay $80,000 but only as soon as the
5 declarations are ready?
6 A          I did not because that is not what I
7 did or intended to do.  I did not.
8 Q          So why did you write exactly that in
9 your email to Ivan?
10 A          I can only assume that that was
11 carelessness, and I knew that I was attaching an
12 agreement that I had put a lot of thought into
13 and that reflected what we were going to do.
14 Q          Well, you also thought your emails
15 would never see the light of day, didn't you?
16 A          Object to the form.
17           That has nothing to do with what I
18 just said though.
19 Q          That does not answer the question.
20           You never thought your internal
21 emails that you viewed as privileged would ever
22 be seen by Drummond or anyone else outside of
23 your legal team, did you?
24 A          Object to the form.
25           And no.  No, I didn't.
                                        Page 543

1 Q          Did you ever tell Bill Scherer or
2 anyone else at Conrad & Scherer that the $80,000
3 was conditioned on receipt of the declarations
4 of El Tigre and Samario?
5 A          No.  Because that was never what I
6 intended to happen.
7           MR. WELLS:  Let's get 295 and 296.
8 This is Plaintiff's Exhibit 108.
9           (Plaintiff's Exhibit 108 was
10           marked for identification.)
11 Q          It's a December 5th, 2008, email
12 from you to Bill Scherer with copies to Susan
13 Valentini and Richard Drath.
14           Who is Susan Valentini?
15 A          I don't know.
16 Q          Fair to assume she was somebody in
17 Conrad & Scherer?
18 A          She doesn't have an email address
19 there, but seems like a fair assumption.
20 Q          And, really, she's in copy and Drath
21 is in copy.
22           You're really sending this directly
23 to Bill Scherer; correct?
24 A          Well, I copied it to other people
25 for some reason.
                                        Page 544

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 60 (541 - 544)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

**Terrence P. Collingsworth - Volume II**
**2/21/2024**

1 Q        And you're telling him "After a few
2 tense discussions with reps of the bad guys
3 things are now on track.  Will go to prison
4 tomorrow to try to finalize" the "deal with" the
5 "coal company witnesses."
6        So I'm assuming, correct me if that
7 -- if I'm wrong, that that is a reference to the
8 bad guys being El Tigre and Samario and the reps
9 of the bad guys being Ivan Otero?
10 A        No.  I -- I don't think I can make
11 that assumption because of the dates.  This --
12 this is before this agreement with Ivan.  And
13 let me -- let me look at Exhibit 106 again.
14 Q        Well, while you're getting your
15 bearings, it's after the texts you said related
16 to El Tigre and Samario and negotiating
17 financial terms.
18 A        Well, I'm trying my best looking at
19 all the documents; but I cannot say for certain
20 who I'm referring to in this email to Bill.
21 Q        What deal were you re -- finalizing
22 with coal company witnesses in December of 2008
23 other than El Tigre and Samario?
24 A        Well, as I sit here, I don't recall
25 anybody else at that time.

Page 545

1 Q        And as we saw in the text message,
2 the original proposal was 10 percent contingency
3 fee and 15,000 up front when it was understood
4 it was going to be only one witness.  And the
5 question posed was:  How much do we pay and what
6 will we negotiate for the second declaration?
7 And we end up with your draft contract of 80,000
8 up front and a 25 percent contingency fee.
9        What negotiations back and forth,
10 whether tense or not, led to that ultimate
11 financial deal?
12 A        Well, the ultimate financial deal is
13 reflected in that agreement.
14 Q        I know that.
15        How did we get there from 10,000 --
16 A        I --
17 Q        -- ten percent and 15,000 up front?
18 A        I assume Ivan convinced me that
19 there was a lot more work for him to do on this
20 and he would the incur a lot more expenses, and
21 I agreed to do that.
22 Q        You say you "guess."
23        Are you just speculating, or do you
24 know?
25 A        Well, I'm not -- I don't have

Page 546

1 specific recall.  No.  I'm looking at the same
2 documents you are trying to remember.
3        MR. WELLS:  Let's go to tab 296,
4 which is Plaintiff's Exhibit 109.
5        (Plaintiff's Exhibit 109 was
6        marked for identification.)
7 Q        This is a December -- well, the
8 original email from you is a December 10th,
9 2008, email to Bill Scherer and Richard Drath.
10 And December 10th is two days before your email
11 to Ivan Otero attaching the draft agreement and
12 telling him "I can transfer the funds as soon as
13 the two declarations we discussed are ready."
14 And you are telling Bill and Richard "I
15 mentioned the new Drummond case last meeting
16 because we need to raise some serious up front
17 cash to get all the players lined up with
18 security, investigation costs etc.  Pretty close
19 to" 100,000 "will be about right.  That's a lot,
20 but we'll be getting airtight evidence on
21 hundreds of deaths."
22        So as of the time of this email, had
23 you landed on the $80,000 figure with Ivan
24 Otero, or is that still a negotiation at that
25 point?

Page 547

1 A        I don't recall.  It says, "pretty
2 close to 100K," so I probably was assuming that
3 we would be under 100K.  But I don't know if we
4 had agreed on 80 at this point.
5 Q        Do you think you would be vague with
6 -- do you think you would be vague with Bill
7 Scherer and Richard Drath, who are going to be
8 providing this money, as to how much money is
9 needed if you, in fact, on the date you wrote
10 this email knew it was $80,000?
11 A        I don't know.  I don't recall what I
12 was thinking when I wrote this email.
13        MR. WELLS:  Let's get tab 80, which
14 is -- and this is Exhibit 110.
15        (Plaintiff's Exhibit 110 was
16        marked for identification.)
17 Q        And this is the signed agreement
18 between you and Ivan Otero, is it not?
19 A        Well, I don't read Spanish; but --
20 and it's not -- doesn't have the same
21 paragraphs.  But I'm -- it must be that this is
22 the decision -- the same -- this is the
23 agreement.
24 Q        And you signed both the English and
25 the Spanish versions; correct?

Page 548

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 61 (545 - 548)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

1 A          Yes.
2 Q          You, as a lawyer I imagine, would
3 not sign a contract that at least you were not
4 comfortable you knew what you were signing,
5 would you?
6 A          Object to the form.
7           Generally, no.  When I said that I
8 didn't read Spanish, therefore, I couldn't tell
9 you what this first two pages were; I did not
10 realize that the English version was attached.
11 Q          And on the signed version different
12 from the date that you had typed in originally
13 of December 2008, it is written in that this
14 agreement was accepted and agreed on December --
15 excuse me -- January 27th, 2009; correct?
16 A          That's what it says.  Yeah.
17 Q          So according to the terms of this
18 agreement that says, "Upon execution of this
19 agreement," Conrad & Scherer "will transfer
20 $80,000 to" Ivan Otero's "bank account," that
21 transfer should have been made on or shortly
22 after January 27th, 2009; correct?
23 A          According to this agreement, yes.
24 But I never had control, as many other emails
25 have demonstrated, over when Conrad & Scherer
Page 549

1 responded to my funding requests.  I don't know
2 when they sent it.
3 Q          Have you seen any emails where you
4 are pestering Conrad & Scherer about making this
5 $80,000 payment at any time in the month of
6 January?
7 A          I don't recall as I sit here.  No.
8 Q          Have you seen any emails, text
9 message, or any documentary evidence that you
10 are asking Conrad & Scherer to make this payment
11 in the month of February 2009?
12 A          As I said, I don't recall any
13 discussion or when the payment was actually
14 made.
15          MR. WELLS:  Let's go to tab 83,
16 which is --
17 Q          And is it still your testimony that
18 it was never the deal in your mind that you were
19 only going to pay Ivan Otero once he delivered
20 El Tigre and Samario's declarations to you?
21 A          My testimony is that the actual
22 agreement says that the payment would be made
23 upon execution of the agreement, so that is my
24 only barometer for what I thought was going to
25 happen at that time.
Page 550

1 Q          We don't have to go back through it.
2 But you wrote an email when you attached that
3 agreement that said what I assume you were
4 thinking at the time, which is you were not
5 going to pay until the declarations were
6 provided?
7 A          As I've answered, I think, three
8 times now; if there was an inconsistency between
9 my email and the actual agreement, the actual
10 agreement controlled is what we signed.
11 Q          So that's different than what you
12 signed with Albert Van Bilderbeek and Nicox BV,
13 which were just sort of fake agreements?
14 A          Object to the form.
15          The agreement between Ivan Otero and
16 I is determined by that exhibit as far as I
17 know.
18 Q          And that agreement, which is Exhibit
19 110, is the agreement that you reached with Ivan
20 Otero, a legally binding contract?
21 A          I don't -- I -- there might have
22 been a -- modification to it.  I don't
23 remember.  But I think that was the essence of
24 what we agreed to.  Yes.
25          (Plaintiff's Exhibit 111 was
Page 551

1          marked for identification.)
2 Q          Let me show you Plaintiff's Exhibit
3 111.
4          So this is Susana -- or excuse me --
5 Rebecca Pendleton emailing you on December 26th,
6 2008, with the subject attorney contracts and
7 declarations.  And she tells you, "I" revert --
8 "reviewed the attorney contracts and all looks
9 good.  He signed it, but didn't date it - he
10 asked that you date it and sign it" -- I'm
11 assuming that's supposed to say and "return copy
12 to him of the Spanish version.  I attach the
13 contract in English and Spanish.  He understands
14 that he" will not "get paid as soon as the"
15 declarations "are turned in, he just wants a
16 time line because he is being asked."
17          The "he" there is Ivan Otero;
18 correct?
19 A          It must be.  Yeah.
20 Q          And she's telling you that Otero
21 "understands he won't get paid as soon as the"
22 declarations "are turned in, he just wants a
23 time line because he is being asked."
24          Who is he being asked when he's
25 going to get paid?
Page 552

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 62 (549 - 552)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

1  A          I don't know.
2  Q          At this point in time, are you aware
3  of anyone affiliated with Ivan Otero that knows
4  about his agreement with you other than El Tigre
5  and Samario?
6              MR. PAULK:  Object to the form.
7  A          Object to the form.
8              Francisco Ramirez, Rebecca.  There
9  were other people that were aware of it.
10 Q          (By Mr. Wells)  You think -- well,
11 clearly, Rebecca isn't asking him because she's
12 telling you he's being asked by someone else;
13 right?
14 A          Is that from Rebecca?  Yes.
15 Q          And why in the world would Francisco
16 Ramirez be asking when Ivan Otero is going to
17 get paid?
18 A          Object to the form.
19             I don't know.
20 Q          I mean, what you know about
21 Francisco Ramirez and his relationship with Ivan
22 Otero, do you really think he's really happy
23 about Ivan Otero getting paid anything?
24 A          Object to the form.
25             I'm -- I don't think that Francisco
                                            Page 553

1  cared one way or the other.
2  Q          So outside of Francisco, Rebecca, El
3  Tigre, and Samario; can you name anybody else
4  that would have known at this time  that you had
5  negotiated an agreement with Ivan Otero?
6              MR. PAULK:  Object to the form.
7  A          Object to the form.
8              There are other people that Ivan was
9  working with and that were contemplated in the
10 agreement.  We called them, I think,
11 consultants.  But there certainly could have
12 been some other people involved.
13 Q          (By Mr. Wells)  Name me one.
14 A          As I said, I don't know the names as
15 I sit here.  I don't recall.
16 Q          And she then provides you with the
17 wire information for Ivan Otero's bank account;
18 correct?
19 A          Yes.
20 Q          So this email says that as of
21 December 26th, 2008, Ivan Otero had already
22 signed the agreement; correct?
23 A          Yes.
24 Q          So according to the terms of the
25 agreement, he should have gotten his $80,000 on
                                            Page 554

1  or about December 26th; correct?
2              MR. PAULK:  Object to the form.
3  A          Yes.
4  Q          (By Mr. Wells)  And by January 3rd,
5  you had the bank information in order to make
6  that transfer; correct?
7  A          I had it.  I wasn't going to make
8  the transfer, but yes.
9  Q          So was there anything preventing you
10 from making that $80,000 transfer at least on
11 January 3rd, 2009?
12 A          According to the agreement, no.
13             MR. WELLS:  Let's go to tab 84,
14 which is --
15 Q          Do you need a break?
16 A          Just five minutes for a run to the
17 restroom.  Thank you.
18             THE VIDEOGRAPHER:  The time is
19 4:01 p.m.  We are off the record.
20             (Short recess.)
21             THE VIDEOGRAPHER:  The time is
22 4:06 p.m.  We are back on the record.
23 Q          (By Mr. Wells)  Mr. Collingsworth,
24 I'm going to show you Plaintiff's Exhibit 112.
25             (Plaintiff's Exhibit 112 was
                                            Page 555

1              marked for identification.)
2              MR. PRESLEY:  Tab 84.
3  Q          This is a February 17th, 2009, email
4  from you to Bill Scherer and Richard Drath;
5  correct?
6  A          Yeah.
7  Q          And Bill Scherer and Richard Drath
8  are the ones that would have to release the
9  funds for you to provide the $80,000 to Ivan
10 Otero; correct?
11             MR. PAULK:  Object to the form.
12 A          Object to the form.
13             Yes.  Under normal conditions.
14 Q          (By Mr. Wells)  And this is almost a
15 month after the January 27th date that you
16 signed the agreement and close to two months
17 after the December 16th date that Otero
18 apparently signed the agreement; correct?
19 A          Correct.
20 Q          And you're telling Bill Scherer and
21 Richard Drath -- well, first, you're attaching
22 El Tigre's draft declaration, are you not?
23 A          Yes.
24 Q          And you're telling Bill Scherer and
25 Richard Drath "as soon as these are final, we
                                            Page 556

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 63 (553 - 556)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

1 need to have the security and relocation funds."
2          What security and relocation funds
3 were you going to need as soon as those
4 declarations were final?
5 **A          I don't recall the -- the back and**
6 **forth, if any, that went on with me and Bill**
7 **Scherer and Richard Drath.  Excuse me.  But I**
8 **can only -- the only funds at issue were the**
9 **funds that we owed Ivan under the agreement.**
10 Q          So you're selling telling Bill
11 Scherer and Richard Drath that as soon as the
12 declarations are final, that is when the $80,000
13 will be needed?
14 **A          That's what it says here, even**
15 **though it's inconsistent with the agreement that**
16 **I signed.**
17 Q          But consistent with what you told
18 Otero in your email; correct?
19 **A          It is.**
20 Q          So what security and/or relocation
21 were those funds used for?
22 **A          I don't know specifically.  But I do**
23 **know that the agreement that I did sign, the**
24 **agreement that is Exhibit 110, has, among other**
25 **things, language saying these funds are for**

Page 557

1 security, relocation, et cetera, et cetera.
2 That was -- those are two of the things that are
3 listed in that agreement.
4 Q          Well, I thought you just told us
5 maybe an hour ago that it wasn't until February
6 of 2011 that you first requested funds to
7 relocate the families of El Tigre and Samario.
8          Do we need to amend that testimony?
9 **A          No.  It's not inconsistent with what**
10 **I said.  We began, by the other documents, a**
11 **regular security payment to Ivan.  But this**
12 **initial security, relocation, et cetera;**
13 **whatever Ivan determined needed to be done was**
14 **covered by the agreement -- the attorney**
15 **agreement that I had with him.**
16 Q          And you were not going to provide
17 the, quote, security and relocation funds until
18 the declarations are final; is that correct?
19 **A          Object to the form.**
20          **No.  I've repeatedly stated that my**
21 **intention was to provide the funds immediately.**
22 Q          You also say that "This should get
23 them begging to talk and should get the feds on
24 their ass."
25          And I assume you're referring to

Page 558

1 Drummond, that the feds would get on Drummond's
2 ass?
3 **A          Probably, yeah.**
4 Q          And did you, in fact, provide the
5 declarations of El Tigre and Samario to federal
6 investigators in the U.S.?
7 **A          I don't specifically recall, but I**
8 **do recall meeting them.  And I have no reason to**
9 **think I would not have done it.**
10 Q          With the intention to encourage the
11 federal government to investigate Drummond
12 criminally; correct?
13 **A          Yes.  Based on the model of**
14 **Chiquita, we thought that it would be**
15 **appropriate for the feds to look into other**
16 **companies that were paying the paramilitaries in**
17 **Colombia.**
18 Q          In Chiquita, did you promise a
19 contingency fee and an up-front payment to the
20 lawyer of any paramilitaries in exchange for
21 their clients' declarations?
22 **A          No.**
23          In Chiquita, did you offer to pay an
24 up-front payment and a contingency fee to the
25 lawyer of any witness in exchange for

Page 559

1 information from that witness?
2 **A          Well, I think we previously**
3 **discussed and -- and you are aware of the**
4 **documents surrounding the Hasbun situation where**
5 **we attempted to do that with Raul Hasbun and his**
6 **-- his advisor, Harley.  But we did not end up**
7 **doing that.**
8 Q          Because Raul Hasbun kept hiking the
9 price on you; correct?
10 **A          Oh, there were a number of reasons.**
11 **I don't recall exactly how it fell through, but**
12 **he never discussed price with me.  I was relying**
13 **on this Harley Sanchez to provide me with**
14 **information about how this transaction was**
15 **shaping up.**
16 Q          Well, one of the reasons you never
17 reached a deal with Harley Maya Sanchez and Raul
18 Hasbun is because Raul Hasbun kept hiking the
19 price after you thought you had a deal; correct?
20 **A          I don't recall that.  If it's**
21 **reflected in the documents, then that's what**
22 **happened.  But I don't recall that.**
23 Q          Well, let's go to El Tigre's
24 declaration that you're providing here, and go
25 to paragraph nine.

Page 560

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

```
 1          And without going through it, do you
 2 recall that El Tigre's original declaration
 3 provided to you under oath was effectively that
 4 he and some other paramilitaries bombed
 5 Drummond's railroad, made it look like it was
 6 the guerrilla so that it would, essentially,
 7 convince Drummond that they needed the AUC's
 8 protection?
 9          MR. PAULK:  Object to the form.
10 A          Object to the form.
11          I -- I -- I have a vague
12 recollection of some allegation like that.  But
13 I don't have personal recall of that as I'm
14 sitting here now.
15 Q          (By Mr. Wells)  In any event, this
16 draft declaration; which the intent was once
17 it's finalized, it will be signed under oath;
18 correct?
19 A          Yes.  Once it was finalized, it
20 would be signed under oath.
21 Q          In paragraph nine -- before we get
22 there; this draft declaration, is this something
23 you came up with?
24 A          Absolutely not.  Ivan came up with
25 the draft declaration.  And I recall looking at
                                           Page 561
```

```
 1 it and asking some questions.
 2 Q          Who typed it in English, given that
 3 Ivan does not speak English?
 4 A          I don't know.  It would have
 5 certainly been someone working with me who spoke
 6 Spanish and English, but I don't know who did
 7 it.
 8 Q          And I assume your testimony is that
 9 the statements made in this draft declaration
10 are based on information El Tigre is providing,
11 not that y'all are providing to El Tigre?
12          MR. PAULK:  Object to the form.
13 A          Object to the form.
14          Whether we provided news articles or
15 some factual details that were publicly
16 available that he didn't have access to, I don't
17 recall.  I did not do that.  But the declaration
18 was reflected -- is a reflection of Ivan's
19 interviews with El Tigre.
20 Q          (By Mr. Wells)  In paragraph nine of
21 this draft declaration in the third sentence
22 starting with "however" --
23 A          Uh-huh.
24 Q          -- El Tigre is supposedly saying
25 since the first payment to Drummond of which I
                                           Page 562
```

```
 1 have no knowledge in 2000 until the date of my
 2 capture numerous operations were carried out
 3 under my command, et cetera, and so forth.  In
 4 the final declaration, El Tigre said something
 5 similar that he signed under oath that the first
 6 payment of which he had knowledge from Drummond
 7 to the AUC was in the year 2000.
 8          Is that consistent with your
 9 recollection?
10 A          I don't have a recollection of that
11 kind of detail.
12 Q          Do you have any reason to dispute
13 it?
14 A          Well, if I don't recall it, I can't
15 dispute it.  No.
16 Q          Now, at the time you're working on
17 this declaration with El Tigre; Jaime Blanco is
18 free on the streets, right, he has not yet been
19 arrested?
20 A          I don't know that.
21 Q          Well, he was arrested in September
22 of 2010; and this is in January 2009 -- February
23 of 2009.
24 A          Well, if you're -- if you're
25 accurately reflecting when Jaime Blanco was
                                           Page 563
```

```
 1 arrested, then that would be the case.  Yes.
 2 Q          And you were not in contact with
 3 Jaime Blanco at the time of this draft
 4 declaration in February of 2009, were you?
 5 A          Not me personally.  No.
 6 Q          Was anybody on your team in contact
 7 with him prior to him entering prison?
 8 A          I think maybe Francisco Ramirez
 9 might have had one chat with him before he went
10 to prison.  I don't recall what was said, but I
11 think that's the case.
12 Q          Well, Jaime Blanco signed a
13 declaration for you in October of 2011, which is
14 more than two years after the initial
15 declaration of El Tigre, in which he testified
16 under oath that in the mid to late 1990's, at
17 the latest 1997, he, being Jaime Blanco, had
18 brokered a deal with El Tigre where Drummond
19 would make extra payments through his food
20 company so that Jaime Blanco could funnel them
21 to El Tigre.
22          Is that a general summary of Jaime
23 Blanco's allegations?
24 A          Except for the dates, I think
25 generally that was the concept that Jaime Blanco
                                           Page 564
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 65 (561 - 564)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

1 described.  Yes.
2 Q          And if that were true, El Tigre,
3 obviously, would know about a payment Drummond
4 made, supposedly, to the AUC prior to the year
5 2000; correct?
6 A          Object to the form.  I don't know
7 what El Tigre knew.
8 Q          Do you have any explanation for why,
9 when you were talking to El Tigre and getting a
10 declaration from him but you did not yet have
11 the story from Jaime Blanco, that El Tigre's
12 version of the events was that there were no
13 payments made until the year 2000?
14 A          Object to the form.
15          I was not the person dealing with El
16 Tigre and interviewing him.  But, no, I -- I
17 don't.  There must be an explanation, but I --
18 as I sit here, I don't know what it is.
19 Q          Do you have any explanation for why
20 El Tigre, either in this draft declaration or
21 his signed declaration, never mentions anything
22 about some arrangement where money is flowing
23 through Jaime Blanco's food company?
24 A          I don't know what El Tigre was
25 thinking or what he knew.  No, I don't.

Page 565

1 discuss it with them to your knowledge?
2 A          Not that I'm -- excuse me -- not
3 that I'm aware of.  I do recall discussing with
4 Jaime Blanco whether he thought his testimony
5 was consistent with El Tigre, without having El
6 Tigre's testimony there.  And he said yes.  I
7 just remembered that.
8 Q          Did you discuss with your team the
9 fact when Jaime Blanco signed his declaration,
10 this does not match with El Tigre's declaration?
11 A          No.  No.  We did not have that
12 discussion that I can recall.
13 Q          That was not a concern of yours?
14          Many of these guys had dates messed
15 up; they had places messed up.  El Tigre was a
16 very uneducated person.  I assumed that we would
17 get an explanation when we actually had the two
18 of them testifying in conjunction, but that
19 never happened.
20 Q          Did you read any news reports about
21 the atrocities that El Tigre and the men under
22 his command had committed while in the AUC?
23 A          I think I read state department
24 reports.  And, yes, he did some horrible things.
25 Q          Did you read about the reported

Page 567

1 Q          Did you have discussions with El
2 Tigre after you got Jaime Blanco's declaration
3 about him changing his testimony to conform to
4 that of Jaime Blanco?
5 A          No.
6 Q          Well, when he gave his trial
7 testimony in Balcero; he, in fact, did change
8 his testimony to conform to Jaime Blanco, didn't
9 he?
10 A          I don't know what dates he testified
11 to.  But I was answering your question that I
12 did not have any such discussions with El Tigre.
13 Q          Did anyone on your team to your
14 knowledge?
15 A          Not to my knowledge.  No.
16 Q          As of October 2011, you have a
17 declaration from Jaime Blanco saying that by at
18 least 1997 money was being funneled through his
19 company to El Tigre.  But you have a preceding
20 declaration from El Tigre saying nothing about
21 that subject and saying the first payment he
22 knew about was in 2000 after he faked a bombing
23 by the FARC on Drummond's railroad.
24          Did you discuss that with either of
25 those two witnesses or did anyone on your team

Page 566

1 massacre in which his men cut people's heads off
2 and played soccer with them?
3 A          No.  I don't recall that specific
4 story.  But I agree that El Tigre's men did some
5 horrible things.  They were the AUC.
6          MR. WELLS:  Give me tabs 87 and 88.
7 Q          All right I'm going to show you
8 Plaintiff's Exhibit 113.
9          (Plaintiff's Exhibit 113 was
10          marked for identification.)
11 Q          This is an email from you to Bill
12 Scherer and Richard Drath and Billy Scherer in
13 April of 2009 attaching the final signed
14 declaration of El Tigre.  And you tell them
15 "Here is the final El Tigre Declaration.  The
16 other guy, Samario, has a final in Spanish and
17 we are perfecting" the "translation."
18          Had you just received the signed
19 declaration shortly before you provided it to
20 Bill Scherer, Richard Drath, and Billy Scherer?
21 A          I don't recall the time gap between
22 when I received it and when I forwarded it.
23 This is on a Saturday.  So I -- that doesn't
24 really help me, but I don't recall.
25 Q          If we flip to Bates page on the

Page 568

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 66 (565 - 568)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

1 bottom right, because we've got a couple, 39080.
2 A        Yes.  (Witness complies.)
3 Q        And it reflects that El Tigre signed
4 his declaration on March 3rd, 2009; correct?
5 A        That's what it says in the English
6 version.
7 Q        And if you flip to 39086, we've got
8 the actual signature on the signed version.
9 A        Yes.
10 Q        Which in Spanish -- I know you're
11 not fluent in Spanish.  I imagine you can at
12 least get the dates.
13        That matches March 3rd, 2009;
14 correct?
15 A        Yes.
16 Q        And let me show you Plaintiff's
17 Exhibit 114.
18        (Plaintiff's Exhibit 114 was
19        marked for identification.)
20 Q        This is you providing Bill Scherer,
21 Richard Drath, and Billy Scherer the final
22 signed version of Samario's declaration.
23        And if we go to 039057 for his
24 signature page of the original Spanish, also
25 signed on March 3rd, 2009; correct?
Page 569

1 A        Yes.
2 Q        Do you have any reason to believe
3 that you had these declarations for more than a
4 month before you provided them to Bill Scherer,
5 Billy Scherer, and Richard Drath?
6 A        No.
7 Q        Based on how you understand, you
8 operated -- and your involvement in this, would
9 you expect that you were providing these signed
10 declarations to these men close in time to when
11 you actually received them?
12 A        Object to the form.
13        Yes.  I -- I could see no reason why
14 I wouldn't get them over there promptly.
15 Q        Do you have any explanation for why
16 the declarations are signed on March 3rd, but
17 you don't receive them for possibly a month
18 after?
19 A        I don't.  And I don't know that I
20 didn't.  As I said, I would have normally
21 forwarded them quite promptly.  But I don't
22 know.
23        MR. WELLS:  Let's go to tab 89,
24 which is Plaintiff's Exhibit 115.
25        (Plaintiff's Exhibit 115 was
Page 570

1        marked for identification.)
2 Q        And this is kind of a composite of
3 documents, but this was just the way it was
4 produced to us.
5        But my first question is about the
6 email at Bates number 37492.  On March 20th,
7 2009; which would be after El Tigre and Samario
8 have signed their declarations; you send wire
9 information for Ivan Otero's bank account to
10 Richard Drath, Bill Scherer, and Mindy Drath.
11        We've identified Richard Drath.
12        Who is Mindy Drath?
13 A        Mindy was, at the time, Richard's
14 wife but also was, like, the controller of the
15 firm.
16 Q        So it would make sense for you to be
17 sending a request for a monetary transfer to her
18 and Richard?
19 A        Yes.
20 Q        And you tell them This $80,000
21 payment for Ivan Otero "is for new Drummond
22 cases as we agreed and he has met all the
23 conditions.  Cheers, Terry."
24 A        That's what it says.  Yeah.
25 Q        What conditions were placed on the
Page 571

1 release of that $80,000 to Ivan Otero?
2 A        Well, as we discussed at length, my
3 -- the agreement places some conditions that
4 he's going to perform this work.  It appears
5 that, for reasons that I would disagree with and
6 cannot recall, he was not provided the funds
7 until the declarations were completed.
8 Q        And, in fact, I'm glad you're
9 looking at the agreement.
10        The only condition placed on his
11 receipt of that $80,000 is his signature on that
12 agreement; correct?
13 A        That's correct.  And that was my
14 understanding of how this would work.
15 Q        But what actually happened is you
16 did not make the request to Conrad & Scherer to
17 fund the $80,000 until the declarations had been
18 signed; correct?
19 A        I don't know that that's accurate in
20 the sense that there probably were lots of
21 discussions that happened beforehand that
22 clarified to me what the arrangement was
23 actually going to be.
24 Q        Tell me about those discussions.
25 A        Well, I think I -- there were early
Page 572

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 67 (569 - 572)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

1 notices.  There were discussions back in
2 December with Conrad & Scherer about this
3 process and this -- this -- these declarations
4 coming, and I sent them the original agreement.
5 So I can only imagine that between then and when
6 this payment was made in March that I must have
7 been told that we were going to wait until this
8 process was completed.
9 Q       Told by whom?
10 A       I don't recall.
11 Q       Someone at Conrad & Scherer?
12 A       Well, they didn't send the money
13 until this was all done; so I can only imagine
14 that that was the case.
15 Q       And they're telling you despite what
16 the contract that you signed on behalf of Conrad
17 & Scherer says, we are not going to release this
18 $80,000 until the declarations are signed?
19 A       I didn't say that.  I said that the
20 fact that there was this delay and I know that I
21 had discussions, we must have discussed delaying
22 the payment.
23 Q       Keep that exhibit handy, please.
24       MR. WELLS:  And let's pull out tab
25 90, which is Exhibit 116.
Page 573

1       (Plaintiff's Exhibit 116 was
2             marked for identification.)
3 Q       This is an email from you on March
4 27th, 2009; so a week after the last email we
5 looked at.  And you're telling -- well, you're
6 emailing Susana Tellez, Richard Drath, and Shari
7 G. Levy.
8       Who is Shari G. Levy?
9 A       Excuse me.  Shari was like -- Shari
10 was the next person below Mindy Drath in the
11 controller's office.  She was actually, like,
12 the administrative person who did the things.
13 Q       And you're telling them "FOLKS - I
14 just returned from camping and see that" the --
15 "this is still being discussed.  Ivan needs to
16 be paid - as I said at the end of last week, he
17 has met all of the conditions and we have the
18 declarations in hand."
19       So was one of the conditions to him
20 getting $80,000 that you have the declarations
21 in hand?
22 A       Well, at some point after the
23 agreement was signed; that, apparently, did
24 become one of the conditions.  And then I -- the
25 next sentence I think I'm complaining that I
Page 574

1 thought this was preapproved, prebudgeted, et
2 cetera.  And I know that I thought it was
3 inconsistent with my understanding of how the
4 process was to work.
5 Q       Why are you telling him he needs to
6 be paid and explaining as a reason "we have the
7 declarations in hand" if the deal was not we are
8 not going to pay until we have the declarations
9 in hand?
10       MR. PAULK:  Object to the form.
11 A       Well, as I said; at some point,
12 clearly, the -- the -- the -- this became a
13 condition.  I don't know who put that condition
14 on.  I don't think I put that condition on
15 because I signed the agreement that didn't have
16 it.  But I'm not disputing what I wrote there.
17 It became a condition, and then it was
18 satisfied.
19 Q       (By Mr. Wells) And that condition
20 you say was not placed on by you would have had
21 to have been placed by someone at Conrad &
22 Scherer?
23       MR. PAULK:  Object to the form.
24 A       Object to the form.
25       It's someone who had authority in
Page 575

1 the -- the payment cycle would have been the
2 only person who could have done that.  Yes.
3 Q       (By Mr. Wells) So someone within
4 Conrad & Scherer with authority over payments?
5 A       Well, since I can't identify that
6 person and I don't recall who I discussed this
7 with in terms of that being a condition and how
8 the agreement was modified; I'm certainly not
9 going to simply leave it at that.  I don't know
10 how that condition was placed in there.
11 Q       And from your many years at Conrad &
12 Scherer, who do you understand has the final say
13 in that firm as to any major cash outlay?
14       MR. PAULK:  Object to the form.
15 A       Object to the form.
16       That depends entirely on what we're
17 talking about, if you're -- who -- who cares
18 about the issue.  There are a lot of factors.
19 You -- I can't say that there is a person who
20 always had the final decision.
21 Q       (By Mr. Wells) Well, in the earlier
22 email we were looking at, one of the people you
23 sent it to was Bill Scherer.
24       He had authority over cash outlays;
25 correct?
Page 576

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 68 (573 - 576)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

```
 1              He was one of the people?
 2 A         Object to the form.
 3              Richard Drath was the finance
 4 person.  I think Bill was more the substance
 5 person.  He made decisions about strategic
 6 issues and so on.  But since I don't recall who
 7 it was in the discussion and who placed a
 8 condition on it, I can't say because I don't
 9 recall.
10 Q         Well, Bill Scherer told us in his
11 deposition that at one point in time, and I
12 think it was -- I'm not going to put the date on
13 it because I don't want to misquote it.  But at
14 a point in time; his son, Billy Scherer, had put
15 a stop to the monthly payments going down to
16 Colombia and that after a time and a discussion
17 with you, Bill Scherer overruled him, such that
18 they resumed.
19              Do you recall that happening?
20 A         It was not related to this, but I do
21 recall that happening.  Yes.
22 Q         Are you aware of a single instance
23 in your entire time at Conrad & Scherer when
24 Bill Scherer said no to a financial outlay but
25 it was made anyway?
                                       Page 577
```

```
 1 A         No.
 2 Q         And if we go back to Exhibit --
 3              MR. PRESLEY:  89.
 4              MR. WELLS:  89?
 5              MR. PRESLEY:  Yeah.
 6              MR. WELLS:  What is the exhibit?
 7              MR. PRESLEY:  Exhibit 89.  Oh, I'm
 8 sorry.  Exhibit 115, tab 89.
 9 Q         (By Mr. Wells)  If we go back to
10 Exhibit 115, the first page is March 31st, 2009,
11 an $80,000 transfer to Ivan Otero; correct?
12 A         Correct.
13 Q         So after you tell the finance people
14 at Conrad & Scherer that Ivan Otero has met all
15 the conditions and you have the declarations in
16 hand; a few days later, the $80,000 is sent to
17 him.
18              Do I have that correct?
19 A         That seems to be the impression
20 there.  Yes.
21 Q         Now, in both of these emails where
22 you're telling Conrad & Scherer people that Ivan
23 Otero has met the conditions, one of which being
24 we had the declarations in hand; you don't
25 attach the declarations to those emails, do you?
                                       Page 578
```

```
 1              MR. PAULK:  Object to the form.
 2 A         Object to the form.
 3              All -- I recall an email where we
 4 sent the actual declarations later.  So I don't
 5 know that I provided them before.
 6 Q         (By Mr. Wells)  And if you actually
 7 had the declarations physically in your hands
 8 and you're trying to get this $80,000 released
 9 and someone has put a condition on it that you
10 actually have to have them, don't you think you
11 would have sent them to the people putting that
12 condition on saying, Here's the declaration;
13 send the 80,000?
14 A         Object to the form.
15              As I said, I don't recall why there
16 was a delay in sending the actual declarations.
17 Q         Well, here's what it looks like,
18 Mr. Collingsworth.  It looks like Ivan Otero got
19 his two clients to sign the declarations on
20 March 3rd.  He tells you he has the signed
21 declarations but doesn't send them to you and
22 asks to be paid.
23 A         Object to the form.
24              I -- I -- whatever these documents
25 have in the way of the timing speaks for
                                       Page 579
```

```
 1 themselves.  I don't recall why I sent it later,
 2 when I received it.  I've already said that.
 3 Q         But what ultimately happened was
 4 almost a month after they signed the
 5 declaration, Otero was not paid until March
 6 31st; and only after that point do we see these
 7 April emails to Bill Scherer attaching the
 8 signed declarations.
 9              Is that time line correct?
10 A         Object to the form.
11              It appears I -- as I said
12 previously, I don't know if I sent earlier
13 drafts or any other versions of the
14 declarations.  But it is true that I also sent
15 them in April.
16 Q         Did Ivan Otero change the deal on
17 you?
18 A         Object to the form.
19              No.  Not that I'm aware of.
20 Q         Did he get the signed declarations,
21 yet refuse to send them to you until he had
22 gotten his money?
23 A         No.  Not that I'm aware of.  I --
24 that's not what Ivan would do.
25 Q         Where are all the emails from Ivan
                                       Page 580
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 69 (577 - 580)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

1 Otero between December 26th, 2008, when he
2 signed the agreement saying he gets 80,000 on
3 the date he signs the agreement, and March 31st,
4 2009, when he actually gets the $80,000?
5 A        Object to the form.
6          I have no idea what Ivan did or
7 didn't email in that period as I sit here.  I
8 know that he was working hard on getting the
9 declarations finished and the other work that he
10 was supposed to be doing under the contract.  He
11 never would have emailed me directly, and I'm
12 not aware that anyone else emailed asking me
13 what was going on.
14 Q        Have you seen any emails through
15 your interpreters, because that appears to be
16 the way you and Ivan Otero would communicate,
17 have you seen any emails like that in which he
18 is saying, Wait a minute.  Why haven't I gotten
19 my $80,000?  I signed the agreement?
20 A        As I said, I -- I object to the
21 form.  And, no, I don't recall seeing any such
22 emails.
23 Q        And Conrad & Scherer paying the
24 $80,000 to Ivan Otero after his clients had
25 signed the declarations was consistent with your
Page 581

1 A        Yes.
2 Q        And then you forward that to Kevin
3 Boyd also attaching the to-be-filed Balcero
4 complaint; correct?
5 A        I -- I will make a correction that
6 it doesn't appear that there was an attachment
7 to Bob.  It simply says I'm going to file
8 tomorrow.  And then with Kevin Boyd, there is an
9 attachment referencing that complaint.
10 Q        Well, the way we could confirm that
11 is if we had the original email between just you
12 and Bob Johnson; right?
13 A        Object to the form.
14          I -- I'm not sure this isn't the
15 original email.
16 Q        Well, you just said this is a
17 forwarded email.
18 A        No.
19 Q        The email that is printed is
20 actually your email to Kevin Boyd, which you
21 copied others in Conrad & Scherer on.
22          The email you sent to Bob Johnson is
23 just between you and Bob Johnson, isn't it?
24 A        Yes.
25 Q        And you lost, quote, unquote, your
Page 583

1 original email to Ivan Otero saying we will
2 transfer the funds as soon as the declarations
3 are ready, isn't it?
4 A        It is, in fact, how things worked
5 out; although, that was not my original
6 intention.
7          MR. WELLS:  Let's go to tab 91.
8 Q        And as we saw in those text
9 messages, El Tigre and Samario were the first
10 witnesses you had to testify about this
11 protection of Drummond's railroad allegation;
12 correct?
13 A        The first witnesses.  Yes.
14 Q        And that theory was the foundation
15 of the Balcero case; correct?
16 A        Yes.
17 Q        Let me show you Plaintiff's Exhibit
18 117.
19          (Plaintiff's Exhibit 117 was
20           marked for identification.)
21 Q        This is May 21st, 2009.  And the
22 original email in the chain is from you to Bob
23 Johnson at the Associated Press in Alabama.
24          And you are providing him the
25 to-be-filed Balcero complaint; correct?
Page 582

1 emails just between people outside of -- well,
2 between you and anyone outside of Conrad &
3 Scherer; correct?
4          MR. PAULK:  Object to the form.
5 A        Object to the form.
6          I have no idea what emails were
7 lost, if any.
8 Q        (By Mr. Wells)  The result of your
9 emails being lost is emails like this one with
10 Bob Johnson where it's just you and him talking
11 and not someone else at Conrad & Scherer copied
12 are no longer available; right?
13 A        Object to the form.
14          And, no, I don't know that's the
15 case at all.
16 Q        Do you know why the original email
17 between you and Bob Johnson has not been
18 produced?
19 A        No, I do not.
20 Q        Do you have any reason to dispute
21 that it is one of the emails of many that have
22 been lost of yours?
23 A        Object to the form.
24          And I have no idea, as I said, how
25 many emails, if any, were lost.
Page 584

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 70 (581 - 584)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

1 Q        And Kevin Boyd was a public
2 relations consultant for Conrad & Scherer;
3 correct?
4 A        Based on the context of the message,
5 I would say that's probably right.  I don't
6 recall dealing with Kevin Boyd except maybe on
7 this occasion.  So I don't know for a fact, but
8 it looks like it is.  Yeah.
9 Q        And would you defer to Bill Scherer
10 in his testimony about who Kevin Boyd is and his
11 relationship to Conrad & Scherer?
12 A        Absolutely.
13 Q        And you're telling Kevin Boyd after
14 you provide him the Balcero complaint that "We
15 should, as with Dole, get something ready to
16 blast email to announce this once I have a green
17 light from our local counsel in Alabama, Garve
18 Ivey?
19 A        That's correct.
20 Q        And was that something you did as
21 part of your strategy in your cases was to
22 announce them to the world to garner media
23 attention?
24 A        Depending on the case.  This is not
25 inconsistent with what we have done in other

Page 585

1 cases.  It says we did it in Dole, so I assume
2 that we did it there too.
3 Q        And what you wanted to do was create
4 public pressure on the defendants in addition to
5 the legal pressure; correct?
6 A        That's part of it.  And another --
7 that's part of it.  Yes.
8 Q        And the reason you wanted to create
9 public pressure in addition to the lawsuit
10 itself is to create additional leverage to
11 convince the defendants to settle the case;
12 correct?
13 A        There are a -- not necessarily.
14 Part of our mission at -- at -- in the work that
15 I was doing was simply to be educating the
16 public about the horrific nature of the global
17 economy.  That was another important reason to
18 use the press.
19 Q        Okay.  Another reason.
20            Is one of the reasons you wanted
21 public pressure on the defendants in these cases
22 to create a different -- additional settlement
23 leverage?
24 A        We had just filed the case, so I
25 can't imagine that I was already thinking that I

Page 586

1 needed settlement leverage.  I think we were
2 beginning a process of public exposure of what
3 Drummond was doing.
4 Q        I'm talking about not just this
5 email; overall strategy.
6            You attempted to create pressure
7 outside the confines of litigation on Drummond
8 through means of media and at least criminal
9 authorities; correct?
10 A        These were diff -- yes.  These are
11 different ways to hold the company accountable.
12 Q        And you also attempted to create
13 pressure on Drummond through conversations by
14 your consultant with the president of the
15 country; correct?
16 A        As I said, yes.  I don't know if
17 that conversation ever occurred, but we did --
18 Q        That was your intent?
19 A        That was my intent.  Yes.
20 Q        And the purpose of that pressure,
21 which actually was stated in the email, was for
22 settlement purposes; correct?
23 A        To resolve the dispute.  Yep.
24            MR. WELLS:  All right.  It's 4:52.
25 Where do you have us, Ben?

Page 587

1            MR. PRESLEY:  I have us at 13 hours
2 and 23 minutes on the record.  I don't know what
3 the official court reporter time is.
4            THE VIDEOGRAPHER:  I have about the
5 -- about the same.  I have it at 13 and 30
6 minutes.
7            MR. PRESLEY:  13, 30.
8            MR. WELLS:  So, obviously, we're not
9 going to get through our 16 hours before the
10 courthouse closes at 5:30.  The Court has
11 informed us that this room is available
12 tomorrow.
13 Q        (By Mr. Wells)  Can we come back
14 tomorrow to finish the deposition?
15 A        I can't.  I scheduled this for two
16 days.
17 Q        Okay.
18 A        I have important conflicts that I
19 must address starting tomorrow.
20 Q        Well, we will go until 5:15 and find
21 another date to get the remainder of our time.
22            MR. PAULK:  What time do we have to
23 be out today?
24            MR. WELLS:  Again, they say they
25 lock the front doors at 5:30.

Page 588

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 71 (585 - 588)

**Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.**

**Terrence P. Collingsworth - Volume II**
**2/21/2024**

---

1 A          Well, we have no choice then to go
2 until 5:15 and stop.  I just want to be clear
3 that I reserve my right to argue that we're done
4 because you chose to put us in a place where the
5 building closes at 5:15.  I've been -- I have
6 nothing else to do here.  I would have stayed
7 until midnight yesterday; I would have stayed
8 until midnight today to finish this.  Just to be
9 clear.
10 Q          (By Mr. Wells)  And to be clear:  I
11 did not choose anything.  This was ordered by
12 the judge.
13 A          You requested it.
14 Q          Well, the documents will reflect
15 what was -- what request was made.
16 A          And that it was scheduled for two
17 days.
18          MR. WELLS:  Let's go to tab 92.
19 Q          Are you familiar with the
20 publication in Colombia VerdadAbierta?
21 A          Not off the top.  No.
22 Q          Let me show you Plaintiff's Exhibit
23 118.
24
25          (Plaintiff's Exhibit 118 was

Page 589

---

1 2000, in Cesar.
2          According to the victims'
3 representatives, during the hearing, a strong
4 Altercation arose, with 'JJ' and 'Mecanico'
5 facing off against Ivan Otero, the attorney for
6 'El Tigre' and 'Samario'.  At the beginning of
7 the proceeding 'JJ' and 'Mecanico' said that
8 Ivan Otero had pressured them to make their
9 confessions about the disappearance of the seven
10 CTI officials agree with those of 'El Tigre' and
11 'Samario'."
12          Were you aware of this report?
13 A          No.
14 Q          Did you ever discuss with Otero
15 whether he had ever pressured other
16 paramilitaries to conform their testimony to
17 that of El Tigre and Samario?
18 A          No.
19 Q          Does this concern you in any way
20 about your involvement with Ivan Otero?
21 A          Object to the form.
22          I just heard this.  I don't know if
23 it's true.  I don't know what the details were.
24 So, no, I -- I -- I've known Ivan for a long
25 time, and this does not seem consistent with

Page 591

---

1          marked for identification.)
2 Q          This is an article from September
3 25th, 2009.  And it says, "Several of the
4 victims of the paramilitaries have been
5 threatened in the capital of Cesar because they
6 have demanded justice and truth."
7          And I imagine you would agree with
8 that statement, right, victims have been
9 threatened for demanding justice and truth?
10 A          Object to the form.
11          I don't know what victims we're
12 talking about.  I think you could say generally
13 plenty of victims have been threatened for
14 demanding justice and truth, but I can't speak
15 to any specifics of this article.
16 Q          Starting with the second paragraph
17 it says, "The latest episode of intimidation
18 goes back to" the "beginning of September 2009
19 when Jhon Jairo Esquivel, alias 'El Tigre';
20 Alcide Manuel Mattos, alias 'Samario'; Jader
21 Luis Morales, alias 'JJ'; and Javier Ernesto
22 Ochoa, alias 'Mecanico,' members of the North
23 Block of the AUC, were rendering a joint
24 voluntary declaration regarding the
25 disappearance of seven CTI members on March 9th,

Page 590

---

1 him.  And to see someone saying that Ivan
2 intimidated or threatened a paramilitary strikes
3 me as almost ridiculous.
4 Q          Ivan Otero carries a gun around with
5 him, doesn't he?
6 A          Because people are trying to kill
7 him.
8 Q          The answer is what?  Yes or no?
9 A          Yes.  Yes, he does.  To protect
10 himself.
11 Q          Did he carry a gun in meetings with
12 you?
13 A          Not that I'm aware of.
14 Q          Was it concealed?
15 A          It --
16 Q          Not necessary at the meetings that
17 you're not aware of; but when you saw the gun
18 and were aware of it, was it concealed?
19 A          The only time I saw a gun and Ivan
20 Otero together were that it was in his glove --
21 his -- the glove compartment of his armor-plated
22 vehicle.
23 Q          And when was that?
24 A          Many times throughout the process;
25 whenever I visited him in Valledupar in 2009,

Page 592

---

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 72 (589 - 592)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

**Terrence P. Collingsworth - Volume II**
**2/21/2024**

1 '10, '11, whenever it was.

2 Q        What kind of gun was this?

3 A        I don't know guns.  I'm from

4 Washington, D.C.

5 Q        I assume it's a handgun of some sort

6 if it can fit in the glove box?

7 A        Yes.

8 Q        Has he ever had occasion to pull it

9 out in any of the times you've been around him?

10 A       No.  Absolutely not.

11 Q       So you were never in a situation

12 with him that was dangerous enough to require

13 brandishing a firearm?

14 A       Object to the form.

15         But the answer is, No, I was never

16 in a situation that required the use of

17 firearms.

18 Q       And just to close the loop on this

19 article saying that the victims felt threatened

20 and identifying the victims as the relatives of

21 these seven CTI members that disappeared, one of

22 the relatives of those seven CTI members was

23 Claudia Balcero, the lead plaintiff in Balcero;

24 correct?

25 A       I know that one of the plaintiffs in

Page 593

1 the case, at least one, was a relative -- or the

2 wife of one of these CTI guys; but I really

3 don't recall as I sit here that it was Claudia

4 Balcero.  It could have been.  But, certainly,

5 one of my clients was threatened.  Yes.

6 Q       And the disappearance of those seven

7 CTI members -- and before we get there; the CTI

8 was kind of an investigatory arm of the

9 Colombian, I don't know if it's police force,

10 but some sort of governmental group; correct?

11 A       I don't know exactly.  I think they

12 were an investigation arm, like not police or

13 anything like that.

14 Q       And the disappearance of those seven

15 CTI members was a big news story in Colombia;

16 correct?

17 A       I don't know.

18 Q       Well, you're representing multiple

19 of the family members of them.

20         You never learned that that was a

21 big deal in Colombia?

22 A       I don't pay attention to the media

23 in Colombia.  No.

24 Q       Do you know what -- strike that.

25         Do you know that one of the major

Page 594

1 issues as it related to those seven CTI members

2 was that their bodies were never found?

3 A       No, I don't know that.

4 Q       So in representing the relatives of

5 some of those seven people, you didn't learn

6 that their bodies had never been found?

7 A       Object to the -- object to the form.

8         I was not the person interviewing

9 the plaintiffs and creating their final reports

10 because I don't speak Spanish, and that's a very

11 time-consuming task.  I don't know the details

12 of hardly any of the -- of the details of what

13 happened to each individual decedent.

14 Q       And Christian Levesque told us in

15 her deposition she was one of the people focused

16 on the plaintiffs and getting discovery from

17 them; whereas, your role was more dealing with

18 the witnesses.

19         Is that consistent with your

20 recollection?

21 A       Well, I think I had a much bigger

22 role than that.  I was sort of in charge of the

23 legal issues and the legal team.

24 Q       In what you just described, were you

25 the lead person in the U.S. charged with dealing

Page 595

1 with witnesses in the Balcero case?

2 A       Yes.

3         MR. WELLS:  Let me see tab 294.

4         And let's stop at 5:10 just to make

5 sure the people that really need to break down

6 can get out of here in time.

7         (Plaintiff's Exhibit 119 was

8         marked for identification.)

9 Q       Let me show you what's been marked

10 as Plaintiff's Exhibit 119.

11         This is a December 7th, 2010, email

12 from you to Francisco Ramirez and Lorraine Leete

13 entitled "Big Tiger problem."  And the

14 attachment has a D-R-U-M Bates range and

15 attaches the declaration of the name that I'll

16 butcher, but it's El Tigre; correct?

17 A       Correct.

18 Q       And DRUM 52 through 61 is the

19 Drummond Bates numbering system in the Balcero

20 case; correct?

21 A       I don't know that.

22 Q       Do you have any reason to dispute

23 that you learned of the El Tigre declaration

24 you're attaching to this email because it was

25 produced to you by Drummond?

Page 596

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

1 A        Do I have a reason to dispute that?
2 I don't recall how I received it.  No.
3 Q        And you say, "Francisco - see
4 attached.  This is a" -- and then there's a
5 bunch of --
6 A        Substitutes.
7 Q        -- signs, which I assume is in place
8 of an expletive?
9 A        Correct.
10 Q        So "This is a" expletive "statement
11 that ET apparently gave a prosecutor with
12 Jimenez's and Araujo's lawyer present and he
13 says things that directly contradict what he
14 said to us.  We need to discuss with Ivan as the
15 highest priority."
16        And the declaration that El Tigre
17 provided to the Colombian authorities in
18 February of 2010 that you're attaching to this
19 email, El Tigre testified under oath that he had
20 no knowledge of Drummond collaborating with
21 paramilitaries.
22        Isn't that right?
23 A        I'd have to see the declaration.
24 But I believe this is the situation that I
25 previously described where a prosecutor showed
Page 597

1 up with Jaime Bernal Cuellar and threatened El
2 Tigre.  And he signed a declaration that they
3 had presented to him, and he later retracted
4 that.
5 Q        He later retracted it after you
6 agreed with Ivan Otero to start sending monthly
7 payments for El Tigre and Samario; isn't that
8 true?
9 A        I don't know the timing of this
10 declaration or the retraction in relation to
11 when we started providing security for the
12 families.  But it was after this that he
13 retracted it.
14 Q        Well, we saw the trip report from, I
15 think it was, January 29th to February 7th, of
16 2011; which would have been just a few months
17 after this email.
18        Did you go to Colombia at any time
19 prior to January 29th after you sent this email?
20 A        I'm -- I am -- I'm sorry.  I'm
21 confused on your dates now.  Because this
22 occurred after El -- El Tigre gave us his
23 declaration.  Then he re -- then he issued this
24 retraction when he said he was threatened.
25        What -- what's the next thing that
Page 598

1 you want me to identify?
2        MR. WELLS:  Do you have any idea
3 what that trip report is?  It's tab 95, so
4 whatever exhibit that is.
5        MR. PRESLEY:  It is 105.
6 Q        (By Mr. Wells)  All right.  Exhibit
7 105.
8        So correction:  Your notes from your
9 trip to Colombia say that trip was from January
10 26th to February 3rd, in 2011.
11 A        Correct.
12 Q        So my question is:  At any time
13 between October 7th, of 2010, and January 26th,
14 of 2011; did you make a trip to Colombia?
15 A        Yes.
16 Q        When?
17 A        Well, according to Exhibit 105; it
18 was from January 26th to February 3rd.
19 Q        Yeah.  The question is:  Between
20 December 7th and, I'll call it, January 25th --
21 really the question is:  Is this the first time
22 you went to Colombia after you sent that email
23 with the inconsistent El Tigre declaration?
24 A        As far as I can recall, that's
25 probably true.  Yes.
Page 599

1 Q        And on your very first trip to meet
2 with El Tigre after he had told the Colombian
3 authorities that he has no knowledge of Drummond
4 collaborating with paramilitaries, you tell your
5 team we have to get security funds for Ivan --
6 or to Ivan for El Tigre and Samario's families;
7 correct?
8 A        That's what it says.
9 Q        And after you made that request for
10 security funds is when El Tigre issued you a
11 second declaration saying, I lied to the
12 Colombian authorities because I was threatened;
13 correct?
14 A        I think that -- that is correct.
15 And I think that it's very consistent that he
16 needed security because even he was being
17 threatened.
18 Q        And then when he testified in front
19 of a Colombian judge in response to your
20 questions in his trial testimony for Balcero, he
21 testified under oath that he had not been
22 threatened; correct?
23 A        I believe that's the case.  Yeah.
24 Q        So that is three totally
25 inconsistent under-oath statements by El Tigre?
Page 600

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 74 (597 - 600)

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

**Terrence P. Collingsworth - Volume II**
**2/21/2024**

```
1              MR. PAULK:  Object to the form.
2 A          Also object to the form.
3 Q          (By Mr. Wells)  How are you
4 reasonably relying on the truth of anything this
5 man is saying?
6 A          Object to the form.
7            As you've asked me that question
8 already; I -- I think that El Tigre was
9 extremely intimidated by Drummond, and
10 particularly Jaime Bernal Cuellar, and that any
11 time that they were -- that a Drummond person
12 was present, he was intimidated, and he used his
13 constitutional right to not tell the truth.  He
14 was afraid.
15 Q          So you believe he lied during his
16 trial testimony in Balcero?
17 A          I believe he exercised his
18 constitutional right to not tell the truth on
19 that question.
20 Q          Did you, as an office of -- officer
21 of the Court when presenting his testimony to
22 the Court, advise the Court, I am presenting
23 testimony to you that has at least one lie in it
24 that I'm aware of?
25 A          No, I did not.  I did not rely on
                                          Page 601
```

```
1 that portion of his testimony.
2            MR. WELLS:  All right.  It's 5:12,
3 so we will shut it down and reconvene at a
4 mutually agreeable date, subject to whatever
5 position Mr. Collingsworth wants to put forth as
6 to why we should not complete our court-ordered
7 time.
8            THE VIDEOGRAPHER:  The time is
9 5:13 p.m.  We are off the record.
10   (THE DEPOSITION WAS CONCLUDED AT 5:13 P.M.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                          Page 602
```

```
1
2            C E R T I F I C A T E
3
4 STATE OF ALABAMA )
5 JEFFERSON COUNTY )
6
7            I hereby certify that the above
8 and foregoing deposition was taken down
9 by me in stenotype, and the questions and
10 answers thereto were reduced to computer
11 print under my supervision, and that the
12 foregoing represents a true and correct
13 transcript of the deposition given by
14 said witness upon said hearing.
15
16            I further certify that I am
17 neither of counsel nor of kin to the
18 parties to the action, nor am I in
19 anywise interested in the result of said
20 cause.
21
22
23
24      /s/Merit Gilley
        Merit Gilley, Commissioner
25      ACCR NO. 67
                                          Page 603
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 75 (601 - 603)

Case 2:11-cv-03695-RDP   Document 783-1   Filed 03/06/24   Page 207 of 259

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

### WORD INDEX

**< $ >**
**$100,000** 327:15
 466:18  475:8
 483:1  485:10,
14  486:9
 493:11
**$15,000** 534:1
 535:9
**$150,000** 498:9
**$2,000** 405:25
 406:2, 14, 23
**$2,200** 342:23
**$2200** 343:10,
15  344:1
 348:14, 23
 355:8, 20
 356:17, 20, 25
 357:3, 4, 6, 25
 358:12, 16
 359:5, 10, 15
 371:24  372:17,
22  376:5, 11,
23  377:15, 23
 378:3, 6, 9, 12,
24
**$25,000** 357:20
**$2700** 342:23,
25  347:12, 16
 348:9  372:16
**$35,000** 324:10,
14  325:11, 14,
15  353:11
 354:16
**$7,000** 351:7,
11  434:10
**$750,000** 317:9
 318:11  468:4
**$80,000** 527:21
 528:2, 25
 529:10, 19
 530:19  540:12
 542:1  543:4
 544:2  547:23
 548:10  549:20
 550:5  554:25
 555:10  556:9
 557:12  571:20
 572:1, 11, 17
 573:18  574:20
 578:11, 16

 579:8  581:4,
19, 24

**< 0 >**
**012-3-12** 310:23
**039057** 569:23
**06.19.12** 310:10

**< 1 >**
**1:17** 454:2
**10** 443:10
 533:3  534:1,
24  535:8
 536:6  546:2
 593:1
**10,000** 546:15
**10:31** 380:23
**10:40** 381:1
**100** 307:11
 312:19  391:10
 503:14, 15
**100,000** 481:18,
19  482:1, 12
 488:13  547:19
**1001** 307:22
**100K** 548:2, 3
**101** 312:21
 511:5, 6
**10-18-10** 311:7
**102** 312:23
 512:24, 25
**10-21-10** 311:9
**10-21-11** 312:7
**103** 312:24
 518:5, 6
**104** 313:1
 521:6, 7
**105** 313:3
 524:12, 13
 599:5, 7, 17
**106** 313:5
 526:9, 10
 535:2, 11
 536:14, 25
 545:13
**107** 313:7
 532:20, 21
**108** 313:9
 544:8, 9
**109** 313:11
 547:4, 5

**10th** 345:21
 547:8, 10
**11** 443:10
 457:19  501:16
 593:1
**11:40** 422:17
**11:45** 422:20
**110** 313:13
 548:14, 15
 551:19  557:24
**111** 313:15
 551:25  552:3
**11-1-11** 312:9
**112** 313:17
 555:24, 25
**113** 309:20
 313:19  337:21
 568:8, 9
**114** 309:22
 313:21  342:14
 569:17, 18
**11-4-11** 311:24
**115** 310:3
 313:23  345:14
 570:24, 25
 578:8, 10
**116** 309:24
 313:25  344:16
 573:25  574:1
**117** 310:1
 314:1  344:16
 582:18, 19
**118** 310:5
 314:3  347:24
 589:23, 25
**1-18-11** 312:21
**11-8-12** 310:20
**118th** 494:9
**119** 310:7
 314:5  349:4
 596:7, 10
**12** 336:6
 371:12  443:10
**12.12.08ATTYCOOPIv
anOtero** 313:5
**12:30** 453:24
**120** 310:9
**121** 310:12
 359:17
**12-10-12** 311:1
**12-11-08** 313:11
**12-12-08** 313:5

**123** 310:14
 362:3
**124** 310:16
 370:20
**125** 310:18
 372:7
**12-5-08** 313:9
**126** 310:21
 387:23
**127** 310:23
 400:17
**12-7-10** 314:5
**128** 311:1
 405:16
**129** 311:3
 413:7
**12-9-11** 312:11
**13** 456:20
 588:1, 5, 7
**130** 311:7
 419:23
**1-3-09** 313:15
**131** 311:9
 419:22  422:10,
24
**133** 311:11
 432:19
**136** 311:12
 435:6
**137** 311:14
 436:20
**138** 311:16
 442:24
**140** 311:18
 448:21
**142** 311:20
 451:15
**143** 453:19
**144** 311:22
 456:5
**14th** 334:3
**15** 444:7, 10
**15,000** 533:4
 534:24  536:7
 546:3, 17
**150,000** 478:21
 479:8
**15078** 509:20
**15079** 504:11
**152** 311:24
 457:15
**153** 312:5

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 1

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

| | | | |
|---|---|---|---|
| **156** 312:1 | **2007** 310:23 | 349:14 352:3 | **27th** 375:6 |
| 464:5 | 311:1 | 353:13 356:6, | 435:10 549:15, |
| **157** 312:3 | **2008** 526:13 | 15 359:21, 22 | 22 556:15 |
| 466:10 | 531:21 533:1 | 362:8 363:3, | 574:4 |
| **158** 476:23 | 542:17 544:11 | 13 364:5, 25 | **294** 314:5 |
| **159** 312:7 | 545:22 547:9 | 368:20 370:24 | 596:3 |
| 481:5 | 549:13 552:6 | 371:25 374:24 | **295** 313:9 |
| **15th** 348:3 | 554:21 581:1 | 375:6 402:23 | 544:7 |
| 456:9 | **2009** 476:21 | 405:20 435:10 | **296** 313:11 |
| **16** 588:9 | 510:1, 4 | 464:9 | 544:7 547:3 |
| **162** 312:9 | 531:16, 17 | **2013** 413:11 | **29th** 598:15, 19 |
| 486:12 | 549:15, 22 | 494:7 | |
| **164** 312:11 | 550:11 555:11 | **2014** 498:2 | **< 3 >** |
| 487:24 | 556:3 563:22, | 500:20 | **3** 373:3 |
| **168** 312:13 | 23 564:4 | **2015** 378:11 | **3.17.14** 312:17 |
| 494:2 | 568:13 569:4, | 472:10 | **30** 354:15 |
| **16th** 322:2 | 13, 25 571:7 | **2024** 305:25 | 506:15, 16 |
| 556:17 | 574:4 578:10 | 315:8, 23 | 588:5, 7 |
| **1729** 305:23 | 581:4 582:21 | **205** 307:13 | **31** 331:4 |
| 315:10 | 590:3, 18 | 308:8 | **311** 313:5 |
| **175** 312:15 | 592:25 | **20th** 308:6 | 526:9 |
| 497:22 | **2010** 317:16 | 571:6 | **313** 313:7 |
| **177** 312:17 | 328:17 417:7 | **21:27** 345:22 | 532:18 |
| 500:16 | 420:3 510:2 | **2-17-09** 313:17 | **3-14-14** 312:15 |
| **17th** 556:3 | 563:22 596:11 | **21st** 305:24 | **316** 304:4 |
| **18** 368:20 | 597:18 599:13 | 315:7, 23 | **3-17-14** 312:17 |
| **18th** 348:8 | **2011** 311:11, 24 | 582:21 | **31st** 578:10 |
| 349:14 362:8 | 318:5 388:2 | **2200** 359:25 | 580:6 581:3 |
| **1990's** 564:16 | 394:22 396:1 | 373:9, 12, 18, | **321** 309:10 |
| **1997** 564:17 | 398:14 399:14 | 19 375:24 | **324** 309:12 |
| 566:18 | 432:23 436:25 | **22000** 351:5 | **3-27-09** 313:25 |
| **1997-2002** 533:8 | 447:2, 18 | **22nd** 449:8 | **3-27-12** 309:20 |
| **19th** 348:8 | 449:1 451:19 | **23** 588:2 | **331** 309:16 |
| 356:6 | 456:9 457:19 | **23rd** 533:1 | **334** 309:18 |
| **1st** 313:23 | 467:5 470:19 | **248** 311:5 | **337** 309:20 |
| | 473:6 476:2, 8, | 416:24 | **342** 309:22 |
| **< 2 >** | 11 477:3 | **25** 531:2, 8 | **344** 309:24 |
| **2** 312:5 | 481:12 488:3 | 536:6 546:8 | 310:1 |
| 406:24 444:11 | 490:23 503:17 | **250** 444:3 | **345** 310:3 |
| 533:6 | 511:8, 14 | **259** 310:20 | **348** 310:5 |
| **2:11-CV-3695-RDP** | 514:14 521:12 | 373:24 374:18 | **349** 310:7 |
| 315:22 | 524:21 558:6 | **25th** 590:3 | **35,000** 353:1, |
| **2:19** 354:15 | 564:13 566:16 | 599:20 | 12 354:21, 22 |
| **2:30** 503:8 | 598:16 599:10, | **26th** 524:21 | 362:24 |
| **2:42** 503:11 | 14 | 552:5 554:21 | **350** 443:25 |
| **20** 380:18, 20 | **2012** 317:16 | 555:1 581:1 | **35203** 305:24 |
| **200,000** 488:14 | 318:5 322:2, | 599:10, 13, 18 | 308:7 315:11 |
| **2000** 563:1, 7 | 15 324:17 | **2700** 351:2 | **35209** 307:12 |
| 565:5, 13 | 331:4 334:3 | 359:25 372:15 | **356** 310:9 |
| 566:22 591:1 | 335:24 337:25 | 373:9, 11 | **359** 310:12 |
| **20001** 307:24 | 342:18 345:18 | 375:25 376:6 | **35K** 354:2 |
| | 346:7 348:4 | **2-7-11** 313:3 | |

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 2

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

| | | | |
|---|---|---|---|
| **362** 310:*14* | **5** 509:*19* | **6-14-11** 312:*5* | **76** 310:*21* |
| **370** 310:*16* | **5:10** 596:*4* | **6-14-12** 309:*18* | 312:*19* 387:*23,* |
| **372** 310:*18* | **5:12** 602:*2* | **6-15-12** 310:*5, 7* | *25* 503:*13* |
| **374** 310:*20* | **5:13** 602:*9, 10* | **6-19-12** 310:*9* | **77** 310:*23* |
| **37492** 571:*6* | **5:15** 588:*20* | **62** 309:*18* | 312:*21* 400:*21,* |
| **387** 310:*21* | 589:*2, 5* | 333:*25* 334:*1* | *23, 24* 406:*7* |
| **39080** 569:*1* | **5:30** 588:*10, 25* | 336:*1* | 511:*4* |
| **39086** 569:*7* | **500** 312:*17* | **6-21-11** 312:*24* | **78** 311:*1* |
| **39577** 518:*9* | 444:*1* | **63** 309:*20* | 312:*23* 405:*17,* |
| **3rd** 359:*21* | **503** 312:*19* | 337:*21, 22* | *18* 512:*23* |
| 524:*22* 555:*4,* | **505** 308:*6* | **6-3-11** 312:*3* | **79** 311:*3* |
| *11* 569:*4, 13,* | **511** 312:*21* | **6-3-12** 312:*1* | 312:*24* 413:*8,* |
| *25* 570:*16* | **512** 312:*23* | **64** 309:*22* | *9* 518:*4* |
| 579:*20* 599:*10,* | **5-13-11** 310:*21* | 342:*15, 16* | **7th** 307:*11* |
| *18* | **518** 312:*24* | **65** 309:*24* | 596:*11* 598:*15* |
| | **52** 596:*18* | 344:*17, 18* | 599:*13, 20* |
| **< 4 >** | **521** 313:*1* | **66** 310:*1* | |
| **4** 311:*24* | **5-21-09** 314:*1* | 344:*20, 21* | **< 8 >** |
| **4:01** 555:*19* | **5-23-12** 309:*14* | **6-6-12** 309:*22* | **8** 444:*8* |
| **4:06** 555:*22* | **524** 313:*3* | **67** 310:*3* | **80** 311:*5* |
| **4:52** 587:*24* | **526** 313:*5* | 345:*14, 15* | 313:*13* 416:*25* |
| **400** 310:*23* | **5-27-12** 311:*12* | 603:*25* | 417:*1* 548:*4, 13* |
| **405** 311:*1* | **5-29-13** 312:*13* | **68** 309:*10* | **80,000** 528:*20,* |
| **4-11-09** 313:*19* | **5-31-12** 309:*16* | 310:*5* 321:*23* | *21* 536:*8, 10* |
| **4-11-13** 311:*3* | **532** 313:*7* | 347:*25* 348:*1* | 537:*13* 538:*6* |
| **413** 311:*3* | **544** 313:*9* | **69** 310:*7* | 539:*7* 546:*7* |
| **4-15-09** 313:*21* | **547** 313:*11* | 349:*5, 6* | 579:*13* 581:*2* |
| **4-15-11** 311:*22* | **548** 313:*13* | | **800** 307:*23* |
| **417** 311:*5* | **551** 313:*15* | **< 7 >** | **80-100** 478:*22* |
| **420** 311:*7* | **555** 313:*17* | **70** 310:*9* | **81** 311:*7* |
| **423** 311:*9* | **568** 313:*19* | 356:*12, 13* | 313:*1* 419:*25* |
| **432** 311:*11* | **569** 313:*21* | **71** 309:*12* | 420:*1* 521:*5* |
| **435** 311:*12* | **570** 313:*23* | 310:*12* 324:*3* | **8-12-11** 312:*19* |
| **436** 311:*14* | **574** 313:*25* | 359:*18, 19* | **82** 311:*9* |
| **443** 311:*16* | **58** 309:*10* | **7-16-12** 309:*10* | 422:*23* 423:*1* |
| **448** 311:*18* | 321:*23, 25* | **7-18-12** 310:*14* | **8-2-11** 313:*1* |
| **451** 311:*20* | **582** 314:*1* | **7-19-12** 309:*12* | **83** 311:*11* |
| **456** 311:*22* | **589** 314:*3* | **72** 309:*14* | 313:*15* 432:*20,* |
| **457** 311:*24* | **59** 309:*12* | 310:*14* 326:*25* | *21* 550:*15* |
| **464** 312:*1* | 324:*4, 5* | 362:*3, 4* | **8-31-11** 311:*16* |
| **466** 312:*3* | **596** 314:*5* | **7-21-10** 311:*5* | **84** 311:*12* |
| **477** 312:*5* | **5th** 305:*23* | **73** 309:*16* | 313:*17* 435:*7,* |
| **481** 312:*7* | 315:*10* 544:*11* | 310:*16* 330:*25* | *8* 555:*13* 556:*2* |
| **486** 312:*9* | | 370:*21, 22* | **85** 311:*14* |
| **488** 312:*11* | **< 6 >** | **7-3-12** 310:*12* | 369:*4* 436:*21,* |
| **48880** 417:*4* | **6/15/2012** 310:*5* | **74** 310:*18* | *22* |
| **4900** 376:*1* | **60** 309:*14* | 372:*8, 9* | **86** 311:*16* |
| **494** 312:*13* | 327:*1, 2* 334:*24* | **7-4-11** 311:*14* | 443:*15, 16* |
| **497** 312:*15* | **61** 309:*16* | **75** 309:*18* | **868-6000** 307:*13* |
| | 331:*1, 2* 596:*18* | 310:*20* 333:*24* | **87** 311:*18* |
| **< 5 >** | **6-11-12** 310:*3* | 374:*15, 16* | 313:*19* 448:*22,* |

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 3

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

*23*   568:6
**8774**   483:4
**88**   311:20
 313:21   451:16,
*17*   568:6
**89**   311:22
 313:23   456:6,
*7*   570:23
*578:3, 4, 7, 8*
**8mtg**   312:3
**8th**   305:22
 315:9

**< 9 >**
**9:01**   306:1
 315:11, 24
**90**   311:24
 313:25   457:16,
*17*   458:12
 573:25
**91**   312:1
 314:1   464:6, 7
 582:7
**9-11-11**   311:18
**9-12-12**   310:16
**9-17-12**   310:18
**92**   312:3
 314:3   466:11,
*12*   589:18
**9-20-11**   311:20
**93**   312:5
 476:24, 25
**94**   312:7
 481:6, 7   483:4
**95**   312:9
 313:3   486:13,
*14*   524:11
 599:3
**96**   312:11
 487:25   488:1
**97**   312:13
 494:3, 4
**98**   312:15
 497:23, 25
**986-3620**   308:8
**99**   312:17
 500:17, 18
**9th**   356:15
 590:25


**< A >**

**a.m**   306:1
 315:11, 24
 380:23   381:1
 422:17, 20
**ability**   389:20
 413:1, 3
**able**   330:8
 338:8   354:25
 361:20   368:9
 382:10   389:3,
*7, 12*   391:9
 401:6   406:15
 407:14   444:8
 484:1   511:25
**Abogados**   462:12,
*18*
**absent**   508:4
**absolutely**
 377:8   390:16
 399:2   520:13
 521:2, 22
 540:21   561:24
 585:12   593:10
**accept**   443:24
**accepted**   449:8,
*10*   533:5
 549:14
**access**   317:19
 320:9   327:14
 337:14   436:5,
*8, 11*   484:1
 562:16
**accomplish**
 357:16   541:6,
*17*
**according**   375:5
 421:22   449:20
 469:2   478:11
 530:20   549:17,
*23*   554:24
 555:12   591:2
 599:17
**account**   317:10,
*11, 12, 14, 21,
24*   318:7, 8
 319:15, 16, 18
 325:15   357:8
 361:21   403:11
 527:22   528:2
 549:20   554:17
 571:9

**accountable**
 587:11
**accountant**
 441:18
**accounting**
 356:16
**accounts**   317:15,
*18*   319:17
 328:24
**ACCR**   603:25
**accuracy**   415:24
**accurate**   346:23,
*25*   501:25
 504:25   572:19
**accurately**
 563:25
**accusation**   461:7
**accuse**   432:7
**acknowledge**
 386:4
**act**   473:15
**acted**   369:2
**acting**   315:3
 485:24
**action**   603:18
**activities**
 319:20   411:14
 471:16
**activity**   470:21
 476:16   486:4
**acts**   405:23
 501:1
**actual**   323:14
 507:22   539:4
 550:21   551:9
 569:8   579:4, 16
**ad**   434:24
**add**   336:8, 13
 367:19   393:16
 417:21   434:2
 449:15   458:14
 510:4
**added**   510:19, 25
**addition**   586:4,
*9*
**additional**
 343:13   376:19
 377:25   398:9
 502:11   529:25
 530:3   534:16
 586:10, 22

**address**   523:10
 544:18   588:19
**adequately**
 393:22
**adjustment**
 393:14
**Adkins**   385:19,
*20*   477:24
**admin**   310:10
**administrative**
 574:12
**admitted**   515:22
**adopted**   388:11
**advancing**   312:14
**Advice**   309:22
 439:17   517:25
 541:24   542:8,
*9*   543:3
**advise**   502:3
 533:10   601:22
**advisor**   560:6
**advocate**   456:14
**Advocates**   317:20
**affect**   354:6
**affidavit**   328:3
**affiliated**   553:3
**affirmatively**
 318:17
**afraid**   601:14
**age**   520:23
**aggressive**
 405:24
**ago**   358:25
 362:19   392:21
 412:17   451:2
 502:12   520:2
 558:5
**agree**   349:21
 353:25   375:21
 376:1   387:1
 399:4   408:6
 427:18   429:3
 508:2   529:19
 538:15   541:8
 568:4   590:7
 591:10
**agreeable**   602:4
**AGREED**   305:16
 306:3, 11
 369:25   370:18
 375:24   383:9
 392:15   409:17

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 4

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

480:5, 25
484:15    504:23
517:3    546:21
548:4    549:14
551:24    571:22
598:6
**agreed-upon**
388:24
**agreeing**    456:12
**Agreement**
313:13, 25
326:6    358:14
359:2    362:11,
18    363:16
458:4, 16
468:7, 16
469:18    471:1
526:16    527:9,
11, 19, 20, 24
528:12, 13, 14,
19, 22    529:4, 6
530:2, 5, 24
532:13    533:17,
19    534:17
535:13, 16
536:13, 25
537:1, 3, 19, 20,
22    538:6, 14,
17, 18    539:5,
15, 20, 24
540:2, 4
542:19, 20, 21,
24    543:12
545:12    546:13
547:11    548:17,
23    549:14, 18,
19, 23    550:22,
23    551:3, 9, 10,
15, 18, 19
553:4    554:5,
10, 22, 25
555:12    556:16,
18    557:9, 15,
23, 24    558:3,
14, 15    572:3, 9,
12    573:4
574:23    575:15
576:8    581:2, 3,
19
**agreements**
317:3, 4
468:17, 23

469:4, 15, 23
470:4    551:13
**agrees**    338:5
**ahead**    419:23
422:14    453:12,
20    461:25
**aimed**    519:9
**airtight**    547:20
**Akkermans**    326:18
**al**    305:9
315:21
**Ala**    312:18
**ALABAMA**    305:2,
24    307:12
308:7    315:2, 3,
10, 19    500:22
502:3, 7, 15, 24
582:23    585:17
603:4
**Albarracin**
311:25    454:5
457:23
**Albert**    322:22,
25    323:4, 15,
19, 25    324:8
325:20    353:5,
11    354:21
467:24    468:4,
11, 17, 22
469:6, 11, 19,
20    470:1
479:21    492:11,
12, 14, 17
495:10    551:12
**Albert's**    467:8,
18, 20, 23
494:17
**Alcide**    590:20
**ALEX**    308:3
**Alfredo**    477:24
478:7, 14
**alias**    454:9
590:19, 20, 21,
22
**alive**    452:11
**allegation**
332:3    432:14
473:11    561:12
582:11
**allegations**
470:18    507:10
564:23

**alleged**    385:11
474:13    476:16
**allegedly**    332:5
339:8
**alleging**    467:10
501:1
**allow**    428:14
**allowed**    510:25
**Alls**    366:15
484:17
**alter**    428:3
**Altercation**
591:4
**altogether**
394:7    409:18
**ambiguous**    505:4
**amend**    558:8
**America**    494:1
523:17
**American**    342:12
493:12, 18
**amount**    324:9
361:15    388:23
390:12, 20
391:21    392:4,
11, 15    393:6,
24    440:21
**amounts**    318:16,
20    375:23
392:25
**analysis**    392:17,
23    393:20
394:19    438:22
516:20    517:8,
14    541:20
**analyzing**
392:18    393:3
516:21
**and/or**    557:20
**Andre**    312:4
326:22    466:15,
17    467:15
470:10, 17
474:9    475:7,
14    476:14
480:2, 8
481:22    482:8,
16    483:9
484:16, 22
485:12, 14, 17
486:17, 22
488:12, 19, 24

489:10    491:17,
21    492:5, 6
493:11, 23
**Andre's**    491:24
**Andrews**    308:15
316:6
**angry**    366:7
**ANNA**    307:8
**announce**    585:16,
22
**answer**    360:17
378:25    380:4
386:9    437:17
504:18    510:6,
9    515:11
540:14    543:19
592:8    593:15
**answered**    397:12
485:1    510:8
540:8    551:7
**answering**
323:5    428:6
439:18    566:11
**answers**    603:10
**antagonistic**
432:15
**ANTHONY**    307:7
**anticipated**
436:16
**anybody**    338:21
348:18    355:13
375:19    389:4
409:12    411:20
506:4    515:16
545:25    554:3
564:6
**anymore**    354:8
355:12    356:3
369:23    401:6
**anyway**    377:7
577:25
**anywise**    603:19
**apologize**    502:15
**apparent**    361:20
**apparently**
325:20    393:18
401:10    405:4
406:8    407:15
413:6, 19
460:7    556:18
574:23    597:11

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 5

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

appear    481:23
583:6
appeared    322:9
appears    327:13
343:5    370:25
401:2    413:12
417:12    446:8
449:17    504:3
572:4    580:11
581:15
appointed    474:5
appreciate    322:6
approach    472:13
approached    450:2
approaching
474:9
appropriate
382:20    559:15
appropriated
467:25
approval    310:10
approve    353:18,
19    357:13
368:9    459:15,
16, 18    542:20
approved    357:7
436:13    442:8
approximately
305:25    315:11
319:10    388:4
418:10
April    413:11
456:9    458:18
510:2    568:13
580:7, 15
Araujo    477:24
478:14
Araujo's    597:12
area    392:5, 18
445:18
argue    589:3
argument    364:10
Aristides    309:24
arm    594:8, 12
armor-plated
592:21
arose    591:4
arranged    337:11
469:19    478:1
arrangement
316:24    323:22
324:15, 22

343:1    363:6
383:10    404:3
488:24    491:21
499:19, 25
542:10    565:22
572:22
arrested    328:16
563:19, 21
564:1
arrived    322:11
346:4    348:13
359:25
article    314:3
590:2, 15
593:19
articles    562:14
a's    430:15
asherman@starnesla
w.com    307:17
Asian    325:16,
23    326:3, 7, 13,
19    479:20
aside    351:17
427:21
asked    324:1
329:18    351:15
355:1    364:3
377:18    378:23
379:19    381:23
383:21    392:3,
14    395:8
396:23    399:24
400:3    413:24
416:9    431:9
434:10    435:19
440:9    441:3, 4
448:2    449:6
464:14    465:22
469:18    496:7
497:8    516:1
524:17    537:8
538:2    542:7
552:10, 16, 23,
24    553:12
601:7
asking    325:2
331:6    350:14,
21    356:20
360:11    366:22
369:22    370:12
374:4    386:10,
21    393:14

398:14    399:8
401:13, 25
428:15, 24
431:23    437:6
439:18    446:6
458:9    484:21
504:3    505:12
508:6    509:23
526:13    533:24
534:6, 15, 20
550:10    553:11,
16    562:1
581:12
asks    507:9
536:3    579:22
aspanos@spotswood.
com    308:11
ass    558:24
559:2
assassins    409:21
assertion    393:17
assertions
386:20
assess    415:3
assessed    399:25
assessing    409:3
411:20    424:13
assessment
383:1    403:16
418:12    424:9
425:22
assign    306:16
assist    498:11
assistance
327:24    347:4
351:25    365:5
368:8    375:5
376:12    382:8
391:25    397:16
401:12    425:6
428:16    458:21
459:1, 20
460:9, 24
498:19    501:19
assisting    529:14
associate
316:11    416:14
associated
472:25    582:23
associating
445:13    446:4

Association
500:23
assume    363:22
365:22    366:4
368:22    407:20,
23    408:1
410:10    425:9,
20    439:16
447:18    502:8
504:8    505:19
543:10    544:16
546:18    551:3
558:25    562:8
586:1    593:5
597:7
assumed    410:23
567:16
assumedly    327:16
assuming    365:3
369:20    386:9
481:21    545:6
548:2    552:11
assumption
408:4, 6
425:16    544:19
545:11
assure    443:11
assured    425:1
atrocities
567:21
attach    552:12
578:25
Attached    312:1,
15    375:2
526:15    527:10,
12    549:10
551:2    597:4
attaches    596:15
attaching
501:10    532:13
540:1    543:11
547:11    556:21
568:13    580:7
583:3    596:24
597:18
attachment
583:6, 9    596:14
attack    411:15
attacks    411:11
415:14
attempt    451:23

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 6

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

**attempted**
411:10   560:5
587:6, 12
**attempting**
467:15   470:10
471:24
**attempts**   415:9
**attendance**
488:17
**attention**   394:3
395:18, 21
410:22   585:23
594:22
**Attorney**   307:20
311:22   313:13,
15   332:13
420:11, 13
421:6   433:7
451:3   467:12
472:19   473:7,
12, 14, 20
474:3, 4
511:23   521:24
552:6, 8
558:14   591:5
**attorney-client**
522:17
**Attorneys**   307:9
308:4   315:24
420:6   531:8
**attributable**
479:18
**Atty**   313:25
**AUC**   330:17
331:20   340:8
341:15   385:21
402:14   426:14
427:1   473:1
474:18   478:1,
7   486:21
487:6   501:20
505:13   510:22
512:4   563:7
565:4   567:22
568:5   590:23
**AUC-dominated**
445:18
**AUC's**   561:7
**August**   372:15,
17   447:17
503:17   521:12
**Augusto**   427:13

**authorities**
329:9   330:18
341:14   415:21
429:17, 23
430:3, 7, 18
431:2   446:11,
17   587:9
597:17   600:3,
12
**authority**   342:4,
10   575:25
576:4, 24
**authorize**
340:22   357:3
376:4   377:9
378:3
**authorized**
359:15   372:23
373:14, 23
374:2, 6, 8, 12
375:18   376:19
377:4   378:5
445:10
**available**   340:2
341:9   562:16
584:12   588:11
**Avenue**   305:23
315:10
**aware**   324:13
325:24   326:8
330:13, 15, 19,
20, 23   337:16,
18   338:12
340:9   343:21
351:20   359:9
373:25   374:10
386:19   389:25
390:2   395:9
403:8   409:12
415:7, 11, 13
416:10   422:4
426:12, 15
427:3   432:10,
13   460:6
461:10   481:1
493:8   495:7,
13   496:24
507:8   526:7
553:2, 9   560:3
567:3   577:22
580:19, 23
581:12   591:12

592:13, 17, 18
601:24

**< B >**
**back**   312:1
318:4, 13, 19,
20, 22   322:6
379:2   381:1,
20   392:13
421:4   422:20
423:16   443:10
444:14, 16, 22,
25   445:2, 4, 8
447:7, 11
454:2   456:4
468:10   470:9
474:8   490:23
491:13   497:19
503:11   511:14
520:18   535:1
546:9   551:1
555:22   557:5
573:1   578:2, 9
588:13   590:18
**backfired**   451:24
**backs**   423:7
426:2
**bad**   462:3
506:20   513:24
521:25   545:2,
8, 9
**Balcero**   329:18
330:11   332:9,
11   336:17
363:7   431:9
454:7   460:15
465:23   466:19
478:6   522:25
523:1   531:10,
15   566:7
582:15, 25
583:3   585:14
593:23   594:4
596:1, 19
600:20   601:16
**Baloco**   531:16
**Bam**   415:25
421:19, 22, 25
**Bam's**   421:22
**Bank**   313:23
317:10, 11, 12,
15, 18, 21

361:21   392:22
527:21   528:2
549:20   554:17
555:5   571:9
**Bar**   312:18
333:20, 22
500:22, 25
501:6, 7, 10
502:3, 7, 15, 24
**bare**   393:21
**bargaining**
419:4, 15
**barometer**   550:24
**Barranquilla**
525:1
**based**   368:21
385:5   409:23
425:23   427:2
436:14   450:15
472:21   473:13
477:8   521:20
526:1   535:10
559:13   562:10
570:7   585:4
**basically**   331:6
350:14   404:17
414:23   423:12
427:13   490:8
523:5, 17
**basis**   342:25
361:22   383:3
398:19   410:12
441:15   455:25
**Bates**   417:3
504:10   509:19
518:9   568:25
571:6   596:14,
19
**bearings**   545:15
**began**   404:3
426:24   558:10
**begging**   558:23
**beginning**   587:2
590:18   591:6
**begins**   501:16
507:22, 23
**behalf**   326:3, 4
332:12   333:5,
8   344:5
370:11   429:13
492:17   573:16
**behavior**   523:18

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 7

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

**believe**   332:24
345:4   352:1
354:2   355:10
362:12, 13, 22
365:9   366:17
370:17   375:23
391:16   395:11
397:4   398:8
402:13   406:6
408:13   415:20
445:7   446:18,
19, 21   450:21
454:10   457:22
459:12   460:11
465:21   466:16
472:11, 15
483:21   484:16
485:1   495:2,
17   496:18
502:20   504:13
505:3   507:15
515:17   516:2,
5   517:18
519:17   528:23
542:3   570:2
597:24   600:23
601:15, 17
**believed**   342:12
382:20   429:1
**Ben**   316:4
503:13   587:25
**benefit**   459:21
464:19, 24
465:4, 10, 19
**benefits**   436:12
465:24
**BENJAMIN**   307:6
**Bernal**   329:13
430:4, 14
431:7, 10
461:9, 13
467:11   472:20
473:7, 16, 20
484:14   598:1
601:10
**Bertel**   310:1
**best**   325:9, 13
347:8   353:20,
24   366:23
499:24   545:18

**better**   353:20
433:24   487:13
526:16
**beyond**   335:9
375:19   459:21
460:7
**Bhavani**   511:9
**Bialostok**   477:5,
7   480:1
**Big**   314:5
440:19   457:2
594:15, 21
596:13
**bigger**   595:21
**biggest**   456:16
**Bilderbeek**
322:22   323:20
324:8   353:6,
12   468:4
479:22   492:11,
17   551:12
**Bilderbeek's**
494:18   495:10
**Bill**   316:9
327:5   331:5
334:5, 14
336:2   352:20
456:10   477:4,
9, 15   479:25
490:2   514:14
515:3   544:1,
12, 23   545:20
547:9, 14
548:6   556:4, 7,
20, 24   557:6,
10   568:11, 20
569:20   570:4
571:10   576:23
577:4, 10, 17,
24   580:7   585:9
**billion**   490:13
**billion-dollar**
490:17
**Billy**   454:24
455:12   568:12,
20   569:21
570:5   577:14
**binding**   551:20
**bird's**   332:1
**Birmingham**
305:24   307:12
308:7   315:2, 10

**bit**   357:22
389:8
**bizarre**   499:19,
25
**Black**   305:22
315:8
**Blake**   308:15
316:6
**Blanco**   316:24
323:22   324:15,
21   327:15, 19
328:11   357:21
362:15, 21
363:1, 6, 16, 23
385:23   386:13
387:3   390:4
412:16, 22
427:12, 23
428:7   432:10
444:2   446:15,
24   461:3
475:8   476:4
477:19   478:2,
25   479:4, 18
487:22   496:10,
20   499:13, 18
515:23   563:17,
25   564:3, 12,
17, 20, 25
565:11   566:4,
8, 17   567:4, 9
**Blanco's**   327:24
371:4   498:8,
11, 19   564:23
565:23   566:2
**blast**   585:16
**bleeding**   505:16
**block**   481:15
590:23
**board**   523:5
**Bob**   316:10
582:22   583:7,
12, 22, 23
584:10, 17
**Bocanegra**   444:3
**bodies**   595:2, 6
**Bogota**   360:19,
20   361:4
436:5   475:19
**bold**   525:6
**bolded**   521:15

**bombed**   561:4
**bombing**   566:22
**book**   503:25
504:1, 9
**border**   445:16
**borrowed**   449:10
**bottom**   331:16
353:17   359:23
372:12   375:3
393:12   437:2
464:12   507:9
569:1
**box**   593:6
**Boyd**   583:3, 8,
20   585:1, 6, 10,
13
**bpresley@starnesla
w.com**   307:15
**Brad**   498:9, 22
499:3, 11
500:1, 21   501:8
**brand**   443:4, 8
**brandishing**
593:13
**brands**   443:8
**break**   380:21
422:12, 14
453:21   503:6
555:15   596:5
**breakdown**
375:10   474:24
**breech**   513:9
**bribe**   429:21,
22   449:8, 23
450:10, 22
451:24   461:11
495:12
**bribed**   428:25
450:17   461:9
**bribery**   327:12
**bribes**   329:3
**brief**   344:2
468:6
**briefed**   470:17
474:16   475:15
**briefing**   475:21
**briefly**   513:5
**bring**   342:21
360:5, 7   361:9
364:16   365:15
366:1   367:13
445:4   474:13,

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 8

Case 2:11-cv-03695-RDP   Document 783-1   Filed 03/06/24   Page 215 of 259

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

15    505:20
523:22
bringing    505:17
506:7, 8, 12
523:21
broader    466:23
broken    482:11
broker    467:15
470:10, 14
471:21, 25
brokered    482:6
564:18
Brookwood    307:11
brother    494:18
495:10
brothers    346:2
brought    329:2
360:11    477:11
489:13, 20
505:23    506:10
524:2
bucked    423:5
budget    320:18
365:2    455:21
budgets    352:21
455:13
build    462:12
building    453:6,
10    589:5
bunch    597:5
burgers    440:1,
2, 15, 21, 25
business    459:13
470:23, 25
471:8, 18
busy    382:14
410:23
butcher    596:16
BV    316:22
492:25    499:25
551:12
Byrd    308:17

< C >
calculations
375:22
caliber    410:2
491:24
call    311:9
354:11    372:14
400:9    406:20
449:18    477:20

520:10, 20
522:13    599:20
called    449:3
532:13    554:10
calling    323:4
353:5    376:11
491:21    521:1
Cambs    488:6, 9,
23    489:11
491:9
camel's    447:7
camping    574:14
capacity    332:23
411:16    492:12,
15
capital    521:15
590:5
caps    356:22
capture    429:18
563:2
captured    532:24
card    318:23
care    540:15
cared    554:1
carefully    519:21
carelessness
543:11
cares    576:17
Carlos    421:24
451:4, 5, 20, 25
452:4, 6, 10, 12
453:7
carried    563:2
carries    592:4
Carroll    327:5
334:6, 14, 16
335:25    352:19
Carroll's    335:7
carry    592:11
CASE    305:7
315:21    320:11
321:7    327:8
330:11    332:3
333:8    335:11,
13    343:6, 23
352:13    355:3,
7    358:12, 16,
21    359:16
378:25    379:18
380:1, 10
384:7    389:5
390:3    394:13

408:13    409:23
410:9    411:1
413:22, 23
415:15    416:3
424:3    434:21,
22    435:5
438:25    458:23
460:15    462:12
467:8, 16, 18,
20    468:2
470:11    477:14
478:19    489:15
490:25    492:3,
22    503:3, 5
509:2, 25
516:4, 9
547:15    564:1,
11    573:14
582:15    584:15
585:24    586:11,
24    594:1
596:1, 20
600:23
case-related
318:25
cases    318:12
333:18    334:18
335:8    337:12
343:12    352:21
357:9    372:24
373:7, 13
376:9    377:4
439:13    455:10
473:16    477:16
488:10    490:11
491:14    502:21
504:4    513:23
522:22    531:3,
9, 23    532:2, 4
571:22    585:21
586:1, 21
cash    360:5, 7,
11, 12, 16
361:6, 9, 12, 19
547:17    576:13,
24
Castro    309:17
categories
487:19
categorized
498:18

caught    360:6
361:9
cause    315:13
330:1    366:19
409:20    423:9
520:10    522:6
603:20
caused    346:2
387:18    453:2
520:20
causes    330:6
cell    433:21
Center    308:6
certain    377:9
422:7    424:16
479:10    482:4
545:19
certainly
331:18    332:24
352:9    354:25
378:5    409:11
410:21    414:21
415:8    438:2
441:14    443:8
445:8    448:19
460:9    470:19
475:19    485:2
487:21    490:5,
12, 20, 24
491:7, 19
529:25    531:13
532:9    554:11
562:5    576:8
594:4
certify    315:4
603:7, 16
Cesar    590:5
591:1
cetera    439:1
527:17    531:10
558:1, 12
563:3    575:2
Chain    309:10,
12, 16, 22
310:3, 9, 12, 14,
16, 18, 20, 23
311:1, 3, 5, 14,
16, 18, 22
312:3, 5, 7, 9,
11, 15, 17, 19,
21, 23, 24
313:1    322:21

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 9

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

345:17, 18
361:8    437:1
443:18    466:14
477:2    504:14
521:10    582:22
**challenges**   491:1
**chance**   490:17
510:1
**change**   329:3
464:3    486:25
487:3    566:7
580:16
**changed**   463:20
487:2
**changing**   566:3
**characterization**
386:3    516:10
**characterized**
437:23
**charge**   494:10
595:22
**charged**   595:25
**charges**   337:14
**Charris**   309:17
310:21    311:9
331:17, 18
345:25    346:6
351:7, 11, 17
354:6, 11, 12,
14    364:12, 21
365:4, 10
366:15    369:14
385:18, 20, 23
386:5, 11, 13
387:2    388:22
389:1, 3, 20
390:11, 21, 23
391:2, 21
393:3    394:23
415:8, 15
417:14, 18, 20
419:10    420:16
421:1, 21
422:8    423:4,
10    424:7, 9, 13
426:4, 13, 23
427:16, 22, 24
428:1, 7, 9, 13,
22    429:5, 18
432:11, 25
433:19    434:7
435:13, 18

459:14    496:10,
19    501:21
504:17    506:1,
14, 20, 23
507:6, 11
**Charris's**   417:21
**chat**   564:9
**check**   396:15
**Cheers**   571:23
**chief**   373:1
**children**   393:4
**Chiqu**   358:6
**Chiquita**   343:12,
23    357:9
358:10, 12, 15
359:1, 16
372:24    373:13
376:9    377:4
378:6, 19, 25
379:7    380:1,
13    559:14, 18,
23
**choice**   589:1
**choose**   589:11
**chose**   589:4
**Christian**   323:3
349:14    357:1
436:25    439:2,
12, 16    449:2,
25    464:10
522:9    595:14
**Christian's**
438:12
**circumstances**
361:25    463:12,
19    513:12
**cite**   439:13
**Civil**   315:5
380:9
**claim**   383:15
427:4, 9
**claimed**   414:16
441:23    525:1
**claiming**   394:12
430:25    495:18
**clamped**   365:2
**clarification**
360:3    379:21
**clarified**
472:16    572:22
**clarify**   379:22

524:10    525:20
**clarity**   329:23
**class**   364:15
365:14    366:9
367:12
**Claudia**   593:23
594:3
**clear**   346:18
349:1    360:15
386:10    393:17
401:18    402:8,
9    404:2    405:1
417:14, 20
419:2, 10, 18
423:16    428:5
440:12    473:16
488:16    501:16
521:22    524:9
532:8    589:2, 9,
10
**clearly**   333:17
472:21    535:4
553:11    575:12
**client**   521:24
**clients**   332:4
514:5    526:17
527:3    529:1
531:1    532:14
533:17    559:21
579:19    581:24
594:5
**close**   448:12
473:13    511:12
547:18    548:2
556:16    570:10
593:18
**closer**   435:25
436:4
**closes**   588:10
589:5
**coal**   471:6
472:3    545:5, 22
**cocounsel**   376:11
**coincidence**
357:10    539:9
**Colectivo**
462:11, 18
**collaborating**
462:11    597:20
600:4

**colleagues**
392:1, 2, 7
456:15
**COLLINGSWORTH**
305:11, 19
309:3    315:12,
17, 21    316:12,
20    327:13
328:4    341:20
364:1    367:2
381:2    420:24
422:22    443:1
444:24    454:3
484:21    502:22
529:7    531:15
533:15, 22
538:1    542:10
555:23    579:18
602:5
**COLLINGSWORTH,)2:1**
**1-CV-3695-RDP**
305:8
**Colombia**   311:7
312:7    320:15
351:19    373:7
384:1    389:24
391:8    392:1, 3,
10, 24    404:1, 7,
8    411:16
412:8    434:18
455:19, 20
466:24    471:6,
15, 23    472:4
474:7    481:13
485:18    488:10
494:1    496:24
507:25    513:9
524:22    526:21
559:17    577:16
589:20    594:15,
21, 23    598:18
599:9, 14, 22
**Colombian**
312:13    329:8
330:10, 18
412:18    429:23
430:18    431:2
444:1, 2, 7, 9,
11, 12, 23
446:16    467:17
470:12, 22
471:7    472:9,

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 10

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

| | | | |
|---|---|---|---|
| *11*   474:*9* | 465:14 | **concern**   330:*1* | 574:*17, 19, 24* |
| 480:*20*   492:*16* | **companies**   559:*16* | 335:*12*   387:*6,* | 578:*15, 23* |
| 495:*9*   497:*15* | **COMPANY**   305:*5* | *18*   394:*8* | **conduct**   470:*24* |
| 501:*17*   520:*23* | 308:*15*   315:*20* | 460:*3*   472:*18* | 471:*1*   474:*11,* |
| 594:*9*   597:*17* | 325:*20*   342:*12* | 513:*6, 18* | *13*   528:*9* |
| 600:*2, 12, 19* | 471:*9*   474:*2* | 514:*4, 6, 24* | **conference** |
| **Colombians** | 479:*23*   491:*3* | 567:*13*   591:*19* | 305:*23*   315:*9* |
| 480:*3, 8, 14* | 493:*12, 19* | **concerned** | **confessions** |
| 481:*1* | 545:*5, 22* | 352:*25*   366:*2,* | 591:*9* |
| **come**   319:*18* | 564:*20*   565:*23* | *5, 6*   393:*24* | **confidence** |
| 337:*4*   367:*16* | 566:*19*   587:*11* | 450:*21*   455:*12,* | 322:*17*   513:*10* |
| 391:*21*   412:*21,* | **compartment** | *18*   469:*8* | **confident** |
| *23*   414:*25* | 592:*21* | 488:*18*   489:*3* | 335:*18*   340:*18* |
| 450:*18*   452:*14* | **compensation** | 492:*23* | 346:*23*   355:*24* |
| 458:*4*   459:*16* | 507:*7* | **concerning**   538:*5* | 373:*22*   472:*15* |
| 471:*1*   472:*23* | **complain**   358:*5* | **concerns**   322:*16* | 475:*3*   508:*18,* |
| 473:*2, 4* | 522:*14* | 338:*13*   341:*6* | *19*   529:*4* |
| 498:*20*   508:*19,* | **complained** | 352:*2*   365:*24* | 537:*11* |
| *22*   588:*13* | 388:*22*   393:*18* | 387:*13*   455:*3,* | **Confidential** |
| **comes**   322:*14* | **complaining** | *15*   461:*20* | 311:*22* |
| 411:*7*   460:*25* | 358:*6*   389:*1* | 488:*23*   489:*9* | **confinement** |
| **comfortable** | 390:*11*   391:*22* | **concession** | 433:*21* |
| 549:*4* | 491:*16*   523:*9* | 471:*6*   472:*4* | **confines**   587:*7* |
| **coming**   319:*14* | 574:*25* | **conclude**   405:*8* | **confirm**   431:*15* |
| 353:*19*   379:*9* | **Complaint** | 408:*20*   414:*1* | 583:*10* |
| 491:*13*   573:*4* | 312:*18*   500:*25* | 453:*3* | **confirmation** |
| **command**   563:*3* | 582:*25*   583:*4,* | **concluded**   405:*4,* | 309:*12*   322:*7* |
| 567:*22* | *9*   585:*14* | *14*   407:*3* | 324:*9* |
| **commanders** | **complete**   328:*19* | 408:*22*   410:*1,* | **confirmed**   538:*16* |
| 331:*21* | 602:*6* | *14*   414:*14* | **conflict**   333:*10* |
| **commencing** | **completed** | 453:*8*   509:*15* | 531:*25*   542:*5* |
| 305:*25*   315:*11* | 482:*20*   572:*7* | 602:*10* | **conflicting** |
| **commenting** | 573:*8* | **concluding** | 328:*2, 24* |
| 501:*7, 8* | **completely** | 416:*17* | 329:*6*   330:*10* |
| **comments**   312:*2* | 330:*2*   383:*12* | **conclusion** | 387:*14* |
| 501:*5* | **compliance**   306:*7* | 427:*2*   450:*19* | **conflicts** |
| **Commissioner** | **complicated** | 452:*14*   473:*2,* | 387:*17*   408:*4* |
| 305:*20*   315:*4* | 349:*22* | *4*   481:*24*   496:*3* | 588:*18* |
| 603:*24* | **complicit**   402:*15* | **concrete**   512:*2* | **conform**   566:*3,* |
| **commitment** | **complied**   470:*5* | 526:*24* | *8*   591:*16* |
| 464:*16* | **complies**   417:*5* | **condition** | **confront**   455:*5,* |
| **committed**   501:*1* | 462:*7*   501:*14* | 572:*10*   575:*13,* | *8, 11* |
| 567:*22* | 504:*12*   509:*21* | *14, 17, 19* | **confused**   332:*22* |
| **common**   426:*7* | 525:*19*   529:*8* | 576:*7, 10* | 343:*6*   363:*18* |
| **communicate** | 569:*2* | 577:*8*   579:*9, 12* | 376:*17, 18* |
| 389:*4, 7, 12, 20* | **composite**   571:*2* | **conditioned** | 598:*21* |
| 513:*7*   581:*16* | **computer**   390:*8* | 502:*20*   544:*3* | **confusing**   364:*4* |
| **communicated** | 428:*8*   603:*10* | **conditions** | **conjunction** |
| 326:*12*   381:*17* | **concealed** | 408:*15*   435:*22* | 567:*18* |
| **communications** | 592:*14, 18* | 556:*13*   571:*23,* | **connected**   514:*4* |
| 381:*15*   435:*1* | **concept**   497:*2* | *25*   572:*3* | **Conoso**   454:*9* |
| | 564:*25* | | |

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 11

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

Conrad     308:16
316:9     319:2,
21     321:8
356:16     365:1
373:2     378:11,
13, 16     379:25
388:7, 10, 16
390:21     401:23
402:4     403:2, 9
420:5, 10, 13
489:25     498:23
527:20     528:1
529:20     532:24
539:22     542:18
544:2, 17
549:19, 25
550:4, 10
572:16     573:2,
11, 16     575:21
576:4, 11
577:23     578:14,
22     581:23
583:21     584:2,
11     585:2, 11
consciously
503:2
consider     435:1
517:14
consideration
395:7     397:7
considered
414:11     434:17
460:8     506:12
considering
500:5
consistent
341:17     392:24
414:10     496:12
540:23     557:17
563:8     567:5
581:25     591:25
595:19     600:15
consistently
531:22
constantly     366:5
constitutional
432:6, 8
601:13, 18
consult     392:2
consultant
485:25     585:2
587:14

consultants
527:16     529:12
530:8     554:11
consulted     392:1
contact     337:8
416:21     417:18
446:24     485:3
504:17     505:1
564:2, 6
contacted     506:2
contacts     467:17
470:12, 13
512:6
contemplated
554:9
contend     465:25
contentious
334:5
context     335:15,
22     346:10
367:5, 6, 8, 11
372:4     498:3
585:4
contingency
343:22     531:2,
23     532:4
536:7     546:2, 8
559:19, 24
contingent
541:10
continually
378:3
continuation
315:16
continue     362:12
378:12     383:9
396:17     399:16
404:23     425:1
450:6     478:18
483:15
CONTINUED
316:18     319:3
378:23     418:13
473:17
continues     364:7
367:22     462:8
463:5
continuing
396:11     398:21
contract     528:5
536:5     546:7
549:3     551:20

552:13     573:16
581:10
contracts
313:15     552:6, 8
contradict
597:13
contradictory
330:3
contrary     386:20
465:8
contributed
447:7
control     467:13
472:19     549:24
controlled
528:19     529:4
551:10
controller
571:14
controller's
574:11
convenient     436:8
conversation
353:21     367:8
385:11     479:10
500:12     587:17
conversations
484:5     587:13
converted     495:5
convicts     327:11
convince     471:5
485:4     486:7
561:7     586:11
convinced     546:18
convincing
426:9     480:20
484:25
Coop     313:25
cooperate     419:5
484:3, 15, 19,
25     485:6     486:7
cooperating
384:21     417:22
418:23     419:12
426:1     460:23
Cooperation
313:13     317:3
418:13
cooperative
433:4, 8     463:3
coordinate
479:6     526:22

coordinating
385:20
coordinator
422:25     453:19
copied     377:16
465:15     544:24
583:21     584:11
copies     544:12
copy     456:10
544:20, 21
552:11
corporate     473:15
Corporation
325:17, 23
326:3, 7, 14, 19
479:20
correct     323:16
331:8     332:18
333:6     343:2
344:6, 8
347:14     350:2,
10     356:6
360:1, 22, 25
370:6     374:22
376:7, 8     382:2
388:19     389:1,
13     396:19, 20
407:22     408:6
410:9     412:9
413:14     418:20
419:1, 13
420:6, 8     424:1
425:13     427:7,
8     429:1
430:19     431:2
432:9     441:11
446:7     447:1
449:22, 24
451:4     454:7,
23     455:16
459:3     463:16
466:20     467:1
472:5     474:21
482:7     500:23
501:2     505:10
510:22     511:1
512:21     513:4
516:24     524:22
525:7, 15
527:22     528:17
531:3, 4, 5, 18
532:15     536:20

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 12

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

537:17    540:17,
20    544:23
545:6    548:25
549:15, 22
552:18    554:18,
22    555:1, 6
556:5, 10, 18,
19    557:18
558:18    559:12
560:9, 19
561:18    565:5
569:4, 14, 25
572:12, 13, 18
576:25    578:11,
12, 18    580:9
582:12, 15, 25
583:4    584:3
585:3, 19
586:5, 12
587:9, 15, 22
593:24    594:10,
16    596:16, 17,
20    597:9
599:11    600:7,
13, 14, 22
603:12
**corrected**    500:7
**correcting**
502:23
**correction**
583:5    599:8
**correctly**
348:15, 16
349:23    351:9
353:3    376:2, 3
406:17    417:24
440:3    463:13
**corridor**    332:14
**corroborate**
355:15
**corrupt**    472:10,
12, 18    473:3
**cost**    377:3
392:23    485:10,
14    489:4
**costs**    340:23
360:16, 21
392:17    402:1
479:12, 13
547:18
**couch**    499:13

**counsel**    305:18
306:13, 15
315:6    489:14,
18, 23    490:1, 3
585:17    603:17
**counting**    444:10
**country**    472:14
473:23    474:2
587:15
**COUNTY**    603:5
**Couple**    319:12
326:1    412:17
442:15    461:2,
24    468:19
470:1    473:21
475:18    477:16
520:2    569:1
**course**    331:19
340:2    456:1
508:12    536:23
**COURT**    305:1
306:8    315:1,
18    316:15
327:16, 18
499:2    508:1
588:3, 10
601:21, 22
**Courthouse**
305:22    315:9
588:10
**court-ordered**
602:6
**cover**    349:11
354:22    406:23
444:9    537:6
538:23    539:13
542:22, 23
**covered**    558:14
**crazier**    450:1
**crazy**    450:1
**create**    586:3, 8,
10, 22    587:6, 12
**created**    355:18
409:14    468:16
**creating**    595:9
**credibility**
331:11
**credible**    340:12
416:5, 14
447:4    450:20
452:15, 17, 20

453:3, 8, 11, 15
507:15    508:3
**credit**    318:23
**crime**    473:15
**crimes**    429:12
**criminal**    332:18
413:4    474:11,
13    476:16
486:3    516:22
517:9    541:25
587:8
**criminally**
362:14    559:12
**criminals**    327:11
**criteria**    402:12
**cryptic**    346:10,
12
**CTI**    590:25
591:10    593:21,
22    594:2, 7, 15
595:1
**Cuellar**    430:4,
14    431:7, 10
461:9, 13
467:12    472:20
473:17    484:14
598:1    601:10
**culminated**
340:20
**current**    526:17
527:3    531:1
532:14
**Cust**    309:22
**cut**    568:1
**cycle**    474:5
576:1

**< D >**
**D.C**    307:24
388:19    593:4
**Dan**    382:4
383:7, 10, 11,
12    388:6
394:15, 19
395:10    396:15
397:5    398:10
403:16, 23
404:5    409:10
410:18, 24
**danger**    339:5
**dangerous**    342:8

593:12
**Dan's**    410:24
**date**    315:4, 23
369:21    374:24
396:19    402:23
417:11    418:22
425:15    476:19
548:9    549:12
552:9, 10
556:15, 17
563:1    577:12
581:3    588:21
602:4
**dated**    508:24
**dates**    397:24
545:11    564:24
566:10    567:14
569:12    598:21
**daughter**    442:21
**daughters**    442:22
**David**    310:1
420:5, 9
**DAVIS**    307:7, 10
316:5
**day**    305:24
315:7    353:1
357:1    372:11,
13    543:15
**days**    324:7
363:13    547:10
578:16    588:16
589:17
**DC**    310:10, 18
312:4
**de**    310:23
311:1    381:4
415:2    462:11,
18    493:3
**deal**    482:7
498:24    522:15
523:10    535:8
537:25    540:4
545:4, 21
546:11, 12
550:18    560:17,
19    564:18
575:7    580:16
594:21
**dealing**    344:4
364:15    365:14
367:13    370:11
404:11    426:23

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 13

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

441:19    491:24
509:5    518:14
519:3, 5    520:5
565:15    585:6
595:17, 25
**dealings**   325:22
381:23
**dealt**   491:1, 6
509:15
**death**   508:20, 21
**deaths**   547:21
**debate**   437:11
**debating**   421:5
**debt**   318:24
**debts**   444:5
446:7
**decedent**   595:13
**December**   402:23
405:20    458:22
488:3    526:13
542:16    544:11
545:22    547:7,
8, 10    549:13,
14    552:5
554:21    555:1
556:17    573:2
581:1    596:11
599:20
**decided**   333:17,
19    452:18, 23
495:24
**decides**   364:13
**deciding**   508:22
517:26
**decision**   517:17
548:22    576:20
**decisions**   577:5
**decl**   313:19, 21
**declaracion**
310:23    311:1
**Declaration**
309:24    310:1
329:12    345:5
348:12, 22
384:2    389:9
396:21    397:1,
4, 20    410:3, 5
411:4    418:9,
19, 21    426:13
430:11, 12, 16,
24    431:16
459:24    460:14

478:5    494:13,
14, 19, 21, 22
495:2, 4, 9, 19
496:13    501:18
512:4    526:25
533:4, 10
534:8, 22, 23
535:8    536:4,
20    546:6
556:22    560:24
561:2, 16, 22,
25    562:9, 17,
21    563:4, 17
564:4, 13, 15
565:10, 20, 21
566:2, 17, 20
567:9, 10
568:14, 15, 19
569:4, 22
579:12    580:5
590:24    596:15,
23    597:16, 23
598:2, 10, 23
599:23    600:11
**declarations**
336:17    344:10,
23    345:1, 10
385:1, 16
387:21    394:22
430:23    494:24
505:15    527:14,
25    528:16
529:1    533:12
534:2    536:13,
16    537:4, 17,
24    538:5, 8
539:8, 17
540:6, 25
541:11    542:1
543:5    544:3
547:13    550:20
551:5    552:7,
15, 22    557:4,
12    558:18
559:5, 21
570:3, 10, 16
571:8    572:7,
17    573:3, 18
574:18, 20
575:7, 8
578:15, 24, 25
579:4, 7, 16, 19,

21    580:8, 14,
20    581:9, 25
582:2
**decls**   313:15
**defamation**
362:15
**DEFENDANT**   308:1
**Defendants**
305:10    316:9
498:4    586:4,
11, 21
**defer**   585:9
**define**   319:7
**definitely**
373:11    416:23
501:10
**definitive**
450:25
**delay**   371:15,
19    372:3, 21
375:7, 8
573:20    579:16
**delayed**   365:6
539:23
**delaying**   573:21
**deLeeuw**   326:17
**deliver**   456:18
478:18    528:1
**delivered**   391:2
456:16    457:3
550:19
**delivery**   527:25
**demand**   428:12
**demanded**   590:6
**demanding**   428:2
590:9, 14
**demobilized**
512:4
**demonstrate**
401:19    402:2
403:2
**demonstrated**
398:23    549:25
**denial**   328:19
**denied**   330:16
465:24
**denounced**   362:14
**denying**   328:13
406:13
**dep**   431:15

**department**
356:17    466:6
567:23
**departure**   319:2
321:8
**Depended**   361:16
384:5
**depending**   329:6
452:19    585:24
**depends**   328:9
333:15    352:9,
17    361:24
423:22    515:16
576:16
**depos**   481:20
**depose**   481:15
487:10, 20
**DEPOSITION**
305:9, 18
306:5, 6, 17
315:16    332:20
335:21    371:4
397:22    451:25
452:19, 20, 22
453:2, 12, 14
454:5, 25
455:2    525:4
577:11    588:14
595:15    602:10
603:8, 13
**depositions**
306:9    312:9
348:9    355:4
466:20    482:2,
12    483:8, 14
484:18    485:5
508:2
**deps**   311:7
**derogatory**
521:19    522:5
**describe**   357:15
**described**
357:24    484:5
535:4    565:1
595:24    597:25
**describing**
323:14
**description**
488:12
**despite**   514:3
540:1, 2    573:15

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 14

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

detail    413:25
563:11
detailed    336:15
406:25    407:17
430:1    458:13
488:11, 20
details    336:8,
14    364:23
366:25    385:15
405:15    410:20
412:7    427:18
442:10    446:2
456:13, 22
458:14    464:3
485:19    497:8
502:11    510:20
562:15    591:23
595:11, 12
determination
398:12    408:24
447:8
determinations
410:18
determine    406:2
determined
408:11    414:17
416:5    425:11
439:10    447:3
453:15    551:16
558:13
developed    531:9
diff    587:10
difference
393:18    394:8
different
344:13    345:8
357:15    371:7
387:5, 7
392:23    394:6
409:18    412:24
423:20, 25
428:18    430:19
442:15    443:5
444:18    462:21
497:15    512:6
513:12    518:1
519:13    549:11
587:11
difficult    436:2
463:10    491:15

511:24
dil    339:22
diligence    339:22
dimensions    425:5
dinner    524:1
direct    386:20
434:15    479:3
504:18
directed    435:4
492:4
directly    319:22,
23    320:6, 12
321:15    338:19
343:20    359:7
361:21    381:12,
18    383:25
385:10, 19
390:6    409:20
440:18    447:21
449:6    483:14
536:24    544:22
581:11    597:13
disagree    349:21
386:2    572:5
disappear
428:15    429:10,
11
disappearance
590:25    591:9
594:6, 14
disappeared
593:21
disavowed    497:3
discern    405:2
disclose    437:13,
24, 25    439:5
440:1, 2, 11, 15,
24    447:20
448:1, 2, 13
498:21    499:25
508:8    512:1
516:3
disclosed
327:24    438:23
439:9    448:8
500:6    509:7
disclosing
448:14    500:10,
11    516:18
discovery    321:6
438:16    511:22
516:16    595:16

discuss    334:21
377:12, 21
439:2    451:13
465:2    475:4
499:3, 6
513:12, 14
566:24    567:1,
8    591:14
597:14
discussed
333:16    334:16
335:2    338:14
339:15    355:16
362:23    377:19
409:17    410:3
459:12    489:14
498:10    527:1
537:24    542:12
547:13    560:3,
12    572:2
573:21    574:15
576:6
discussing
316:21    327:8
369:10    377:14
407:1    437:5,
21    439:5
457:6    466:15
471:13    476:3
519:2    522:21
538:24    539:1
567:3
discussion
378:1    404:21
436:3    438:3
468:22    469:20
474:8    489:2
499:9, 17
513:21    536:11
550:13    567:12
577:7, 16
discussions
393:10, 11
434:23    465:13
469:1, 6, 7
477:12    479:3,
5, 7    482:16
498:7    499:14
522:10    545:2
566:1, 12
572:21, 24
573:1, 21

dismiss    510:2,
19    511:1
dispute    425:14
431:4    563:12,
15    584:20
587:23    596:22
597:1
disputing    421:5
575:16
distant    484:12
distinction
515:24
DISTRICT    305:1,
2    315:18
DIVISION    305:3
315:19    494:9
docs    498:10
document    322:8
323:4    326:2
332:20    339:10
349:12    355:6,
18, 24    359:9,
14    388:15
393:2    464:15
470:10    519:21
529:23    540:15
541:3
documentary
550:9
documentation
322:10    341:10,
25    343:17
documented
390:18    430:1,
10
documents
316:22    317:2,
7    322:19
336:12    355:2,
10, 25    358:10
359:1    376:22
377:3    390:18
392:16    393:7
397:23    399:18
400:12    403:1,
5, 7, 8, 12
408:18    454:13,
18, 22    468:5,
13, 21    469:2,
11    479:17
498:4    499:1
545:19    547:2

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 15

Case 2:11-cv-03695-RDP   Document 783-1   Filed 03/06/24   Page 222 of 259

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

558:10    560:4,
21    571:3
579:24    589:14
**doing**    321:17
326:4    343:12,
21    353:7, 19,
24    358:11
359:8, 12
361:16    363:3
366:17    373:6,
16, 25    379:15
385:21    396:12,
17    429:12
434:21    445:23
447:14    460:10
466:24    467:20
474:2    485:4,
21    490:10
492:14    495:16
500:2    507:1
523:20    530:12
542:15    560:7
581:10    586:15
587:3
**Dole**    585:15
586:1
**dollar**    391:23
490:13
**dollars**    319:11,
12    352:12
440:6
**doors**    588:25
**doubt**    391:18
393:9    447:15
450:15    497:1
532:1    540:12
**doubted**    391:18
**doubts**    334:17
**Draft**    312:1, 17
384:2    396:21,
25    397:3, 9, 20
410:3    437:3
500:22    501:2,
8, 10, 13
526:16    527:14,
19    546:7
547:11    556:22
561:16, 22, 25
562:9, 21
564:3    565:20
**drafted**    428:21
516:23    519:21

536:24    537:3
540:3
**drafts**    580:13
**Drath**    327:6
334:6, 14
336:3    341:7
352:19    373:1
401:24    456:10
477:5, 10
480:1    514:14,
23    544:13, 20
547:9    548:7
556:4, 7, 21, 25
557:7, 11
568:12, 20
569:21    570:5
571:10, 11, 12
574:6, 10    577:3
**drop**    401:7
**DRUM**    596:18
**D-R-U-M**    596:14
**DRUMMOND**    596:5
308:15    309:14
312:5, 13
313:17    314:1
315:20    316:3,
4, 5, 7    319:25
320:2, 10, 15,
16, 18    321:11,
13, 19    327:8,
18    329:10
330:16, 23
332:13    334:20
335:8    338:7
339:3    340:7
379:18    380:10
384:10, 21
385:6, 11, 12
390:3    402:14
407:19    408:8
409:21    416:15
418:20    423:14
424:11, 23
425:19    426:6,
9, 14    427:17,
19    428:2
429:9, 13, 16
432:7    440:9,
25    441:4
449:9, 24
450:2, 5, 9, 17,
22    451:22

460:24    467:11,
16    468:1
470:11, 15, 20
471:1, 2, 16, 18,
22    472:3, 21
474:10    475:5
476:17    477:17
480:5, 15, 21
481:3, 14
483:5, 18
484:1, 13
486:3, 5
488:10    490:14,
17    492:22
494:10, 13
496:9, 21
498:5    500:10
504:4    507:10,
13, 23    508:8
509:1, 7, 9
510:21    511:20
512:9    525:3
531:2, 23
533:3, 14, 25
534:4    543:22
547:15    559:1,
11    561:7
562:25    563:6
564:18    565:3
571:21    587:3,
7, 13    596:19,
25    597:20
600:3    601:9, 11
**Drummond-AUC**
477:20
**Drummond-related**
319:20    407:21
**Drummond's**
328:13    426:25
471:5    474:18
477:23    498:24
508:1    559:1
561:5    566:23
582:11
**dual**    321:17
**Duarte**    394:24
439:20    440:15
441:23    443:21
444:13, 16
447:4, 12
449:3    450:1,
19    451:2, 21

452:1, 5, 9, 13,
25    453:8
495:24    501:21
**Duarte's**    442:10
452:7
**due**    339:22
375:22    393:23
424:25
**duly**    316:13
**duplicative**
415:1
**Dutch**    326:13

**< E >**
**earlier**    371:25
395:15    407:3
453:5    492:20
509:12    535:16
576:21    580:12
**early**    572:25
**easier**    436:5, 11
**easily**    436:1
**economic**    458:20
459:1
**economy**    586:17
**Ecuador**    420:11
**educated**    511:15
**educating**    586:15
**effect**    306:6
330:20    401:14
471:19    497:9
**effectively**
455:3    507:17
561:3
**effort**    399:9
502:14
**efforts**    481:15
518:12
**either**    331:20
335:20    336:2
338:14    341:25
344:11    349:18
351:18    388:14
431:16    434:6
436:18    438:10
457:12    461:15
470:25    477:9
489:10    514:23
525:24    530:21
565:20    566:24
**El**    313:19
328:23    332:7,

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 16

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

11, 18, 25
337:3   343:1
366:15   371:13
375:15   376:6
394:23   415:8
420:16   421:1,
20   422:8
430:1, 6, 25
431:21   454:9
475:23   476:6,
11, 14   494:7
504:17   505:1,
9, 25   507:11
510:20   512:5,
18, 20   514:5
524:25   525:21
526:6   527:4,
25   528:16
530:25   532:5
533:14   535:11
536:1   539:8
544:4   545:8,
16, 23   550:20
553:4   554:2
556:22   558:7
559:5   560:23
561:2   562:10,
11, 19, 24
563:4, 17
564:15, 18, 21
565:2, 7, 9, 11,
15, 20, 24
566:1, 12, 19,
20   567:5, 10,
15, 21   568:4,
14, 15   569:3
571:7   582:9
590:19   591:6,
10, 17   596:16,
23   597:16, 19
598:1, 7, 22
599:23   600:2,
6, 10, 25   601:8
elected   474:5
elicited   430:5
else's   323:11
Elwood   326:18
Email   309:10,
12, 16, 18, 22,
23   310:3, 9, 12,
14, 16, 18, 20,
21, 23   311:1, 3,

5, 7, 9, 11, 12,
14, 16, 18, 20,
22, 24   312:1, 3,
5, 7, 9, 11, 13,
15, 17, 19, 21,
23, 24   313:1, 3,
5, 9, 11, 15, 17,
19, 21, 25
314:1, 5
322:21   323:15
325:1   331:4,
16   341:13
345:17, 19
349:25   350:15,
16   351:1
354:23   356:22
360:8, 15
361:8   363:22
364:1   367:3
368:22, 23
369:22   372:12,
13   373:14
374:19, 25
375:6   376:24
377:14, 20
387:12   390:1,
3   393:12
395:25   396:19
399:21   400:25
402:23   405:24
406:4   417:6,
20   425:18
427:12, 20
428:1, 7, 13, 21
429:5, 7, 14, 16
434:9   435:10
436:14, 24
437:1, 4
443:18   447:9
448:5, 25
464:9, 12
466:14   467:14
472:22   477:2,
3   479:25
480:19   481:9
489:8   491:10
493:15   496:18
497:1, 13
500:21   501:10
503:17   504:13
510:11, 17
513:2, 8, 16

518:8   519:20
521:9, 10
522:7   528:24
532:12   537:7,
21   538:23
540:1, 23, 24
542:22, 23
543:9   544:11,
18   545:20
547:8, 9, 10, 22
548:10, 12
551:2, 9
554:20   556:3
557:18   568:11
571:6   574:3, 4
576:22   579:3
581:7   582:1,
22   583:11, 15,
17, 19, 20, 22
584:16   585:16
587:5, 21
596:11, 24
597:19   598:17,
19   599:22
emailed   581:11,
12
emailing   368:3
390:5   420:4
518:10   521:11,
12   524:20
552:5   574:6
emails   341:16
354:7   375:3
399:18   405:21
424:16   467:6
475:11, 14
480:10   488:5
492:13   517:2
532:9   543:14,
21   549:24
550:3, 8
578:21, 25
580:7, 25
581:14, 17, 22
584:1, 6, 9, 21,
25
embezzling   455:4
emphasize   419:8
employing
488:19   491:17
encourage   559:10

ended   395:23
403:14   432:14
506:11
Energy   325:16,
23   326:3, 7, 14,
19   479:20
engage   399:21
478:24
engaged   397:25
399:22   470:21,
23   471:16
474:10   486:3
English   548:24
549:10   552:13
562:2, 3, 6
569:5
enormous   440:21
ensure   413:1
entering   564:7
entire   472:17
537:1   577:23
entirely   328:9
576:16
entitled   338:1
596:13
entity   470:23
episode   590:17
equal   519:25
equally   518:16,
20   519:14
equating   519:11
Eric   308:16
316:10   420:4,
12   423:4
Ernesto   590:21
error   402:9
424:4
Especially
331:10   394:3
Esquivel   590:19
essence   551:23
essentially
423:17   505:3
561:6
established
427:22
estimate   325:9
et   305:9
315:21   438:25
512:7, 9
527:16   531:9,
10   558:1, 12

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 17

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

563:3    575:1
597:11
ethical    488:23
489:2, 14
502:17    541:23
542:8    543:2
ethically    516:21
ethics    488:18
489:7, 10, 13,
14, 18, 23, 25
490:3    491:17
517:2
ET's    512:6, 7,
12
Euro    483:7
evening    349:20
event    371:9
383:25    433:18
461:16    511:19
513:13    561:15
events    387:8
565:12
eventual    510:5
Everybody's
405:5
evidence    306:18
330:19    331:24
373:6    419:3
428:24    470:17
474:12, 17, 19
475:22    476:15
547:20    550:9
evidenced    475:12
eviscerated
425:21
exactly    335:17
338:23    351:13
357:25    402:6
418:2    483:11
487:2    488:12
507:3    523:16
526:18    527:6
543:8    560:11
594:11
EXAMINATION
309:1    315:13
316:18
examined    316:13
example    328:11,
23    387:3
393:3    452:4

509:6
exceeded    455:21
Excerpt    313:23
exchange    372:25
391:23    393:19,
23    394:8
400:15    417:6
428:17    436:24
449:1    464:10
468:3    503:18
513:2    514:13
559:20, 25
exchanged    537:12
exchanging    488:5
exclusive    536:21
excuse    400:19
401:9    415:12,
23    433:3
457:25    466:21
487:7    506:17
549:15    552:4
557:7    567:2
574:9
execution
527:20    549:18
550:23
exercised    601:17
exercising    432:5
EXHIBIT    309:7,
9    321:23, 25
323:9    324:4, 5
325:7    327:1, 2
331:1, 2
333:25    334:1,
24    335:25
337:21, 22
342:15, 16
344:17, 18, 21
345:15    347:25
348:1    349:6,
11    356:11, 13
359:19    362:3,
4    370:21, 22
372:8, 9
374:14, 16
387:25    400:20,
21, 24    405:17,
18    406:7
413:8, 9
416:25    417:1
419:25    420:1
422:23, 25

423:1    432:20,
21    435:7, 8
436:21, 22
443:14, 16
448:22, 23
451:17    453:19
456:6, 7
457:16, 17
458:12    464:6,
7    466:11, 12
476:24, 25
481:6, 7    483:3
486:13, 14
487:25    488:1
494:3, 4
497:23, 25
500:17, 18
503:14, 15, 21
511:5, 6
512:24, 25
518:5, 6    521:6,
7    524:12, 13
526:9, 10
532:20, 21
535:2, 10
536:14, 25
544:8, 9
545:13    547:4,
5    548:14, 15
551:16, 18, 25
552:2    555:24,
25    557:24
568:8, 9
569:17, 18
570:24, 25
573:23, 25
574:1    578:2, 6,
7, 8, 10    582:17,
19    589:22, 25
596:7, 10
599:4, 6, 17
exhibits    355:4
408:9    492:20
524:16
exists    490:6
Exp    310:18
expect    526:20
570:9
expected    509:4
515:4
expended    526:5

expense    436:6
456:3
expenses    527:15
529:12    530:4
546:20
expensive
443:12    481:18
482:17
experience
497:20
explain    330:6
331:25    332:15
366:22    367:9
376:10    387:15
449:13    463:22
537:10    538:3
explained
328:22    373:4
398:7    399:24
430:12    469:19
490:9
explaining
403:9    490:8
575:6
explains    528:8
explanation
323:2    347:7
363:15    454:18,
20    514:12
565:8, 17, 19
567:17    570:15
explanations
431:21
expletive    597:8,
10
exploration
467:24
explore    450:23
511:21
exposure    587:2
express    387:6
expressed    335:3
extended    410:13
extent    434:5
442:23
extortionist
432:12
extra    348:14,
23    564:19
extremely    373:4
410:23    518:14

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 18

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

520:*6, 10, 18,*
*21*  521:*1*  601:*9*
**eye**  332:*1*
**eyes**  411:*22, 24*

**< F >**
**face**  475:*15*
**faced**  491:*25*
492:*2*
**facing**  331:*12*
491:*15*  591:*5*
**fact**  322:*24*
323:*24*  377:*9*
383:*17*  389:*3*
391:*17*  397:*14*
402:*20*  407:*24*
409:*14*  415:*7*
423:*14*  425:*16*
427:*2, 21*
439:*7*  463:*15*
467:*11*  490:*25*
492:*19*  522:*16*
523:*13*  541:*2*
548:*9*  559:*4*
566:*7*  567:*9*
572:*8*  573:*20*
582:*4*  585:*7*
**factor**  402:*21*
403:*20*
**factors**  414:*10*
576:*18*
**facts**  521:*20*
526:*23*
**factual**  439:*18*
562:*15*
**failure**  473:*15*
**fair**  408:*20*
413:*15*  457:*5*
544:*16, 19*
**fairly**  370:*5*
**faithful**  464:*17*
**fake**  357:*19*
551:*13*
**faked**  566:*22*
**false**  499:*22*
**familiar**  589:*19*
**families**  339:*4*
341:*22*  365:*6*
391:*24*  411:*12,
22*  457:*8*
459:*9*  460:*2*
475:*5*  525:*22,*

*25*  558:*7*
598:*12*  600:*6*
**family**  364:*22*
390:*17*  391:*3*
392:*5*  401:*4*
404:*15*  413:*2,
13, 21*  417:*22*
418:*7*  419:*5*
424:*25*  425:*2*
440:*6, 8, 10*
441:*5, 7, 10, 14,
24*  450:*14, 16*
452:*5, 7*
456:*12*  458:*16,
21*  459:*2, 14*
460:*17*  462:*15*
463:*9, 11, 19,
24*  464:*20, 22*
465:*20*  466:*3*
501:*20*  508:*10,
20*  525:*4, 14*
594:*19*
**family's**  419:*20*
463:*8*  509:*8*
**fancy**  463:*4*
**far**  317:*8, 13*
357:*6*  393:*13*
395:*6*  397:*6*
409:*4*  437:*8*
461:*14*  551:*16*
599:*24*
**FARC**  566:*23*
**Fargo**  318:*3, 4,
6, 7, 8*
**faster**  353:*2*
**February**  305:*25*
315:*7, 23*
524:*21, 22*
550:*11*  556:*3*
558:*5*  563:*22*
564:*4*  597:*18*
598:*15*  599:*10,
18*
**Federal**  315:*5*
559:*5, 11*
**feds**  558:*23*
559:*1, 15*
**fee**  343:*22*
531:*2*  536:*7*
546:*3, 8*
559:*19, 24*

**feel**  335:*18*
359:*14*  382:*16*
384:*6*  404:*22*
406:*10*  430:*6*
462:*16*  502:*19*
**feelings**  518:*21*
**fees**  444:*5, 10*
479:*4*  490:*15*
516:*22*  517:*9*
531:*9*
**fees/debts**
449:*11*
**feint**  490:*11*
491:*14*
**fell**  353:*8*
560:*11*
**felt**  339:*4*
399:*11*  452:*16*
461:*22*  471:*20*
519:*4*  593:*19*
**female**  523:*8*
**figure**  339:*11*
350:*6*  355:*17*
401:*5*  404:*16*
492:*8*  507:*21*
536:*19*  547:*23*
**file**  334:*20*
342:*9*  397:*5*
583:*7*
**filed**  433:*24*
434:*4*  498:*5*
500:*25*  531:*9,
11, 16*  586:*24*
**Final**  313:*19*
525:*4*  536:*13*
556:*25*  557:*4,
12*  558:*18*
563:*4*  568:*13,
15, 16*  569:*21*
576:*12, 20*
595:*9*
**finalize**  545:*4*
**finalized**
561:*17, 19*
**finalizing**
545:*21*
**Finally**  346:*1*
382:*14*  394:*3*
395:*23*  396:*23*
397:*24*  413:*24*
**finance**  577:*3*
578:*13*

**Financial**  308:*6*
334:*18*  335:*7*
373:*1*  545:*17*
546:*11, 12*
577:*24*
**financially**
533:*11*
**financing**  535:*12*
**find**  518:*19*
520:*14*  588:*20*
**fine**  349:*18*
**finish**  380:*3*
588:*14*  589:*8*
**finished**  581:*9*
**fire**  414:*24*
**firearm**  593:*13*
**firearms**  593:*17*
**fired**  513:*22*
514:*10*
**firm**  341:*4*
357:*13*  455:*4*
513:*22*  531:*7*
571:*15*  576:*13*
**firm's**  403:*10*
455:*9*
**first**  316:*13*
325:*7*  334:*15*
335:*15*  337:*1*
346:*6*  349:*10,
15*  371:*11*
392:*3*  397:*19*
414:*12*  427:*3,
19*  450:*4*
458:*11*  462:*9*
477:*3, 18*
483:*3, 5, 18*
488:*4*  490:*15*
496:*24*  504:*13,
16*  520:*7*
525:*10, 14*
532:*10*  534:*23,
25*  535:*6, 18*
549:*9*  556:*21*
558:*6*  562:*25*
563:*5*  566:*21*
571:*5*  578:*10*
582:*9, 13*
599:*21*  600:*1*
**Fiscal**  328:*16*
430:*15*  431:*6*
494:*10*  496:*6,
10*

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 19

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

fish   456:16, 18
457:2
fit   593:6
five   348:6
351:1   501:12
555:16
flat   343:25
fled   444:15
flip   327:6
501:12   568:25
569:7
Flipping   479:24
497:19   525:17
Floor   305:22
307:11   315:9
Florie,LLP
307:10
flowing   565:22
fluent   569:11
fluid   419:3
focus   407:14
427:20
focused   481:9
518:8   521:9
535:25   595:15
folks   322:21
485:23   488:4
518:11   521:17
542:13, 16
574:13
follow   350:13
367:23   382:13
396:23   435:12,
20   436:16
469:9   514:6
517:19
followed   502:2
525:22   538:17
following
315:14   345:25
442:3   517:24
follows   316:14
362:10   406:6
follow-up
399:25   400:10
food   564:19
565:23
fool   423:6
foolish   508:3
force   306:6
412:1   594:9

foregoing   315:6
603:8, 12
forgotten   476:10
form   306:14
323:6   327:21,
22   328:8
330:4, 5
333:13, 14
336:24   339:24,
25   343:3, 4
352:8, 16
355:21, 22
361:14, 23
367:17, 18
369:24   370:7
374:3   376:14,
15, 25   377:1
378:14, 15
382:22   383:19
384:23, 24
385:13   386:1,
7, 18   387:9, 10
391:12, 13
394:1   395:4,
19   396:5
397:2, 11
398:5, 6, 17
399:6   400:6
402:17   404:25
405:9, 10
407:5, 6, 9
409:15   411:13
412:10, 11
414:8, 20
415:6   424:2
426:21   428:4,
19, 20   429:2,
24   430:20, 21
431:19   432:4
436:9   437:15
438:1, 24
441:1, 12
442:7   443:2, 6
447:22   448:16,
17   451:12
453:4   455:23
459:10   464:1
465:11   468:14
473:25   475:2,
25   496:22
498:16   500:13
503:1   508:17

514:7   515:8,
14   516:6, 14
517:11, 12
518:2   522:19
523:12, 24
528:6   529:24
539:10, 11
540:7   541:12,
13   543:16, 24
549:6   551:14
553:6, 7, 18, 24
554:6, 7   555:2
556:11, 12
558:19   561:9,
10   562:12, 13
565:6, 14
570:12   575:10,
23, 24   576:14,
15   577:2
579:1, 2, 14, 23
580:10, 18
581:5, 21
583:13   584:4,
5, 13, 23
590:10   591:21
593:14   595:7
601:1, 2, 6
formal   495:5
format   495:5
former   456:15
473:20   501:20
forth   334:23
491:5   497:19
517:8   546:9
557:6   563:3
602:5
forward   312:10
318:18   372:25
451:25   508:22
513:16   516:7
583:2
forwarded
514:20   568:22
570:21   583:17
forwarding
331:17   514:13
found   340:11
382:5   504:20
505:8   513:23
520:3   595:2, 6
foundation
320:13   582:14

four   360:18
361:13   375:7
380:12   383:4
frame   321:4, 6
333:15
Francisco   392:8
412:6   415:16
417:8, 13, 14,
17, 19   419:10
420:17, 22
421:3, 4
424:17   433:3
434:19, 20
458:19, 25
459:5, 7, 13, 25
460:6, 16
461:4   462:20,
24   483:21
504:21   505:6
506:1, 2   507:3
512:15, 19
553:8, 15, 21,
25   554:2
564:8   596:12
597:3
Frank   469:18, 20
freaked   423:11
freaking   424:21
free   378:19
379:11   396:2,
9   397:1, 8
398:3, 15
399:14   401:1
407:4, 12
563:18
French   466:23
493:23, 25
fresh   473:1
Friday   397:22
friend   430:4
444:12, 14
445:6, 18
449:11
friends   362:13
365:23   366:19
367:16   477:9
518:15, 23, 25
519:12   520:8,
9, 19   524:2, 4,
8
front   467:4
476:12   482:1,

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 20

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

**Terrence P. Collingsworth - Volume II**
**2/21/2024**

18, 19    523:14
534:1, 24
536:8    539:16,
17    546:3, 8, 17
547:16    588:25
600:18
fulfilled    464:16
full    306:7
423:15    467:2
501:15
fully    513:11
fund    528:8
572:17
funding    316:23
319:20, 25
320:2    338:8,
11, 17    339:1
340:13    341:3
406:24    408:15,
16    434:16
533:20    535:3
550:1
funds    318:17
320:9    325:20
343:13    352:4,
6, 10, 15
353:19    358:7
368:13    369:14
374:5    390:22
401:18, 22
406:22    411:25
414:3    441:14
442:8    446:25
455:4    525:21
526:5, 25
527:15, 18
528:13, 16
529:10    530:1
537:23    541:6
547:12    556:9
557:1, 2, 8, 9,
21, 25    558:6,
17, 21    572:6
582:2    600:5, 10
funnel    564:20
funneled    566:18
funniness    441:9
funny    440:1, 14,
19, 22    447:20
FURTHER    306:3,
11    361:8
408:15    414:4

424:22    454:14
460:11    522:1
603:16
futile    342:8

< G >
gain    337:14
games    400:5
gap    568:21
Garces    420:5, 9
Garcia    438:5
garner    585:22
Garve    585:17
gather    435:17
gears    453:22
Gelvez    311:24
454:4    456:4
457:23    458:3,
19    462:10
463:24    464:21
465:2, 7, 13
501:21    505:25
Gelvez's    459:24
464:13    465:17
general    320:1
350:1, 8, 11
362:1    387:11
395:16    399:8
473:7, 20
474:4    482:22
483:2    484:11
519:1    564:22
generally
327:10    338:12
374:4    399:7
411:5, 7
423:10    478:17
482:14    494:1
549:7    564:25
590:12
generals    473:12
general's
467:12    472:19
473:14    474:3
gentleman    488:13
gentlemen
336:20    342:1
getting    331:8,
21    335:20
337:7    339:20
373:6    378:12,
22    379:13

391:15    393:24
396:2, 9    397:1,
8    398:1, 3, 15
399:14    401:1
407:4, 12
435:25    446:25
456:15    467:23
545:14    547:20
553:23    565:9
574:20    581:8
595:16
Gilley    305:20
315:1    603:24
Girlfriends
524:6
give    318:16, 21
321:5    329:13
335:21    360:12
361:12, 18
385:17    397:3
406:24    430:22
447:12    454:18
477:15    478:19
520:25    525:3
533:7    539:14,
15    568:6
given    328:2, 23
330:10    363:13
396:15, 25
397:8    413:25
414:2    416:13
418:16    441:5
448:7, 15, 19
459:23    460:13
496:23    541:7
562:2    603:13
gives    320:13
giving    360:16
401:18, 22
439:17
glad    572:8
global    586:16
glove    592:20,
21    593:6
go    322:24
342:14    347:24
349:4    353:2
358:23    362:2
370:20    372:7,
15    373:24
390:22    400:16
401:5    404:16

405:16    413:7
415:22    416:24
417:3    419:22,
23    422:14
427:23    430:7
432:19    435:6
436:20    442:24
445:3    448:21
451:15, 24
453:12, 18, 20
456:5    457:15
462:4    464:5
466:10    476:23
481:5, 16
484:9, 24
486:12    487:24
494:2    495:14
497:22    500:16
504:10    507:1,
25    509:19
511:4    512:23
513:22    518:4
521:5    524:11,
17    526:8
545:3    547:3
550:15    551:1
555:13    560:23,
24    569:23
570:23    578:2,
9    582:7
588:20    589:1,
18    598:18
God    450:1
goes    357:7
391:7, 9    590:18
going    312:9
318:18    321:3,
18    350:14, 16
351:14    354:25
357:13, 21
361:9    362:17
366:17    376:23
382:15    383:8,
25    396:4
402:2, 22
403:11    406:11
408:17    409:20
417:19    418:24
419:12    423:13,
15    424:21, 22
427:14    438:5,
10, 14, 15, 18

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 21

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

440:24    442:11
444:22    449:7
453:18    456:14
460:10    470:13
471:13    482:16
484:2, 8, 16, 24
485:2, 7, 23
486:2, 5
487:20    503:21
507:18    509:9,
24    518:1
527:10, 12, 13
528:15, 25
534:7    535:1, 7,
19    536:19
543:13    546:4
548:7    550:19,
24    551:5
552:25    553:16
555:7, 24
557:3    558:16
561:1    568:7
572:4, 23
573:7, 17
575:8    576:9
577:12, 15
581:13    583:7
588:9
good    322:5
332:2    350:1
417:17    439:17
467:6    482:17
497:18    520:17
552:9
gotten    394:22
483:19    554:25
580:22    581:18
government
326:13    330:11
412:19    431:6
467:9, 23
470:22    471:3,
8, 17    472:9, 12,
17    480:21
485:11    486:4
492:17    497:15
559:11
governmental
342:4, 10
446:11    481:2
594:10

government's
473:14
grant    320:13,
19, 20
grants    320:24
321:10, 12, 13
grasp    431:21
grave    335:11
great    473:17
512:3
greed    519:25
greedy    518:16,
20, 22    519:5, 9,
15, 17, 19, 21
520:3, 14
green    585:16
gringos    364:11
ground    409:2
411:23, 25
grounds    306:16
group    462:19,
21, 22    486:20
522:21    594:10
guerre    381:4
guerrilla    561:6
guess    325:13
347:8    353:8
366:23    368:11,
15    433:6
467:5    511:15
546:22
guide    516:18
517:6
gun    592:4, 11,
17, 19    593:2
guns    341:16, 21
593:3
guy    334:7
383:8    395:3
416:4    433:14
440:20    445:3
456:11, 18, 24
457:3    462:3
467:15    494:17
503:23    512:7
522:15    533:6
568:16
guys    477:24
505:17    506:7
508:2    533:3,
14, 25    534:4,

18    545:2, 8, 9
567:14    594:2

< H >
Hager    308:16
316:10    420:4,
12    423:4
Halcon    381:3, 4
383:17    388:4,
12    393:13, 17,
23    394:2, 14
395:3, 6, 13
396:2    397:25
398:15    399:13,
21, 23    401:1, 3,
11    402:19
403:4, 16, 24
404:13, 21
405:22    410:4,
17    411:4
413:12, 20
414:2    438:6
439:7    509:6, 12
Halcon's    409:3
half    400:18, 25
407:3    535:16
hamburgers
447:20    448:11,
14
hand    574:18, 21
575:7, 9
578:16, 24
handgun    593:5
handle    499:7
hands    355:23
515:3    579:7
handwritten
494:19    495:3, 9
handy    573:23
Hank    494:18
happen    351:3
353:2, 23
391:4    436:14
445:5    544:6
550:25
happened    330:7
336:6, 8
339:18    341:18
387:5    404:4
407:8    427:15
436:19    454:15
460:12    479:11

483:12    496:16
507:14    516:8
526:3    542:4
560:22    567:19
572:15, 21
580:3    595:13
happening
336:12    390:15,
16    391:6
423:8    489:16
577:19, 21
happy    518:11
523:19    553:22
hard    463:6
581:8
Harley    560:6,
13, 17
harm    366:1, 20
521:17
harmed    384:1
Hasbun    560:4, 5,
8, 18
hate    342:21
hats    542:5
heads    481:16
484:9    568:1
hear    337:1
367:5    492:8
514:9
heard    330:22
367:7    453:1
494:7    591:22
hearing    365:7
497:10    513:17
591:3    603:14
hearsay    385:5
heart    490:11
491:14
heavyweight
481:16, 21
he'd    347:20
418:16    423:11
430:17    462:13
held    365:6
433:20    462:9
Hello    322:5
HELP    312:11
342:5    371:16
401:6    413:13
425:1    427:14
428:14    429:9
434:7, 13

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 22

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

**462**:16   **466**:19
**467**:9   **486**:20
**506**:22, 23
**507**:7   **511**:10
**527**:2, 14
**568**:24
**helped**   323:25
**429**:17   **434**:12,
**19, 22**   **456**:11,
**24**
**helpful**   415:1
**helping**   433:23
**Hendricks**
**516**:23   **517**:8,
**20, 22**   **541**:18
**Herman**   326:17
**493**:3, 6
**hesitant**   458:4
**541**:8
**hesitation**
**520**:13
**Hey**   342:19
**359**:24   **469**:14
**hide**   353:10
**515**:17, 20
**516**:11, 12
**hiding**   373:16
**515**:23
**high**   436:1
**467**:16
**highest**   597:15
**hiking**   560:8, 18
**hire**   530:7
**hired**   358:15
**488**:15
**hiring**   489:10
**529**:12
**history**   472:22
**hoc**   434:24
**hold**   502:8
**587**:11
**holding**   493:12,
**18**
**holidays**   526:21
**home**   311:12
**322**:6   **350**:17
**404**:18   **442**:4
**honest**   411:17
**hope**   322:5
**464**:15, 19
**hoped**   465:19

**hopeful**   472:24
**hopes**   458:22
**hoping**   472:2
**horrible**   567:24
**568**:5
**horrific**   586:16
**hostile**   460:23
**hour**   558:5
**hours**   588:1, 9
**house**   339:17
**huge**   481:13
**Hugo**   305:21
**315**:8   **513**:3,
**19, 21**   **514**:18,
**19, 22, 24**
**518**:18   **521**:3
**human**   320:13
**433**:6   **494**:9
**501**:18   **518**:12
**540**:19
**humorously**
**448**:14
**hundred**   482:5
**hundreds**   547:21
**hurry**   361:25

**< I >**
**idea**   325:19
**338**:7   **347**:20
**368**:4   **396**:11
**397**:13   **398**:8
**402**:19   **404**:3
**442**:5   **459**:14
**482**:18   **581**:6
**584**:6, 24   **599**:2
**identification**
**322**:1   **324**:6
**327**:3   **331**:3
**334**:2   **337**:23
**342**:17   **344**:19,
**22**   **345**:16
**348**:2   **349**:7
**356**:14   **359**:20
**362**:5   **370**:23
**372**:10   **374**:17
**388**:1   **400**:22
**405**:19   **413**:10
**417**:2   **420**:2
**423**:2   **432**:22
**435**:9   **436**:23
**443**:17   **448**:24
**451**:18   **456**:8

**457**:18   **464**:8
**466**:13   **477**:1
**481**:8   **486**:15
**488**:2   **494**:5
**498**:1   **500**:19
**503**:16   **511**:7
**513**:1   **518**:7
**521**:8   **524**:14
**526**:11   **532**:22
**544**:10   **547**:6
**548**:16   **552**:1
**556**:1   **568**:10
**569**:19   **571**:1
**574**:2   **582**:20
**590**:1   **596**:8
**identified**
**394**:16   **486**:1
**571**:11
**identify**   421:2
**456**:23   **457**:2
**576**:5   **599**:1
**identifying**
**593**:20
**identity**   535:25
**ignored**   509:14
**II**   305:12
**309**:3
**III**   307:5, 7
**illegal**   470:21,
**22, 23**   **471**:3, 7,
**16**   **541**:10
**image**   312:15
**imagine**   472:6
**490**:2   **507**:3
**549**:2   **569**:11
**573**:5, 13
**586**:25   **590**:7
**immediate**   409:12
**immediately**
**538**:19   **558**:21
**impact**   438:22
**439**:1
**impacting**   394:9
**implicate**
**507**:13   **508**:4, 8
**implicated**
**426**:14   **427**:19
**429**:12
**implicating**
**426**:6
**implied**   362:23
**implying**   373:15

**important**
**410**:25   **487**:23
**504**:19   **521**:14
**522**:2   **523**:6
**586**:17   **588**:18
**impression**
**459**:25   **578**:19
**impressions**
**387**:5, 7
**imprisoned**
**339**:21   **345**:2
**370**:10   **459**:8
**474**:20, 25
**improperly**
**467**:25
**improving**   435:21
**inability**   444:5
**inaccurate**   424:4
**inappropriate**
**461**:22   **541**:9
**incidents**
**460**:11   **516**:1
**include**   491:23
**530**:17
**includes**   531:13
**including**
**327**:14   **338**:19
**453**:6   **485**:22
**491**:2   **532**:12
**inconsistency**
**529**:3   **537**:9
**538**:4   **539**:13
**551**:8
**inconsistent**
**328**:20   **340**:5,
**9**   **469**:11
**557**:15   **558**:9
**575**:3   **585**:25
**599**:23   **600**:25
**inconsistently**
**328**:6
**inconvenience**
**346**:3
**inconveniences**
**346**:3
**Incorporated**
**315**:20
**incorporating**
**504**:6
**increase**   343:10
**increased**   342:22
**incur**   546:20

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 23

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

independent
474:6
INDEX    309:1, 7
indicate    324:19
492:13
indicated
394:10    397:24
indication
328:13
indications
427:16
indirect    320:16
Indirectly
318:13    381:18
individual
595:13
individuals
317:5    326:16
373:20    469:8,
10
influence
467:13    472:20
473:17, 22
info    349:16
information
332:1    338:20,
24    339:10
382:24    383:21,
22    384:6
398:9, 20, 24
399:4, 11
412:5    415:18
416:14    418:5
425:7, 8, 12, 23
426:5, 25
427:5, 17
429:20    452:21
453:7    466:8
488:20    497:14
513:9    516:3
521:23    522:18
554:17    555:5
560:1, 14
562:10    571:9
informed    401:11
588:11
informing    334:4
inherent    333:11
inherited    382:4
383:7    398:10
404:4    509:13

initial    398:11
410:18    463:2
530:2    558:12
564:14
initially
498:18    509:5
532:10    534:5
initiate    509:12
INPEC    348:10
481:14    483:6,
19    484:9
in-person    368:21
input    482:10
inquire    341:6
inquires    466:5
insane    495:24
inside    456:14
521:23
instance    374:10
415:21    577:22
instances
337:15    460:5
519:18
instructing
515:10
intend    540:17
intended    531:12
543:7    544:6
intent    561:16
587:18, 19
intention
540:22    541:2
558:21    559:10
582:6
intentional
448:9
intentionally
423:23    515:23
516:3
intentions
540:20
interactions
452:25
interest    343:23
468:3, 9
477:13, 16
531:23, 25
532:1, 4
interested
382:11    445:25
466:7    483:24
507:5    603:19

interesting
384:17
interests    522:4
interim    514:10
527:2
Interior    481:17
483:10    484:10,
23    485:16
486:6
intern    511:15,
16
internal    434:23
543:20
International
317:20    513:15
interpreted
339:9
interpreter
381:12
interpreters
581:15
interrogatories
437:4, 5
interrogatory
421:23    512:2
Interview
311:25    345:9
414:22    436:11
512:3    527:13
interviewed
340:10    351:24
389:8    395:12
476:20
interviewing
463:24    565:16
595:8
interviews
337:2    381:19
562:19
intimidated
592:2    601:9, 12
intimidation
590:17
introduced
441:21    505:6
512:8    530:12
introducing
520:19
invented    451:21
452:8

investigate
397:18    399:15
559:11
investigated
504:20    505:8
investigation
312:13    494:11
526:23    527:12
529:13    530:16
547:18    594:12
investigators
559:6
investigatory
594:8
INVOICE    312:7
357:19
invoices    359:3
involved    317:5
323:14    326:9,
16    390:25
395:3    404:5
419:8    430:3
441:22    446:3
522:9    535:23
536:24    538:21
554:12
involvement
326:18    434:15
570:8    591:20
involving
513:10    522:21
535:8
IO    531:7
IRA    318:8
319:15
IRAdvocates
319:18
IRA's    317:24
ironically
518:13
irritated    520:12
issue    331:11
370:1    435:18
454:13    471:14
482:24    489:13,
24    492:1
498:6    512:2
534:15    535:11
557:8    576:18
issued    423:18
598:23    600:10

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 24

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

Issues   309:20
310:3   313:1
332:14   335:25
342:21   412:3
433:7   485:25
489:15   491:25
492:2, 15
493:22   498:7
511:20, 25
514:18   577:6
595:1, 23
item   320:17
itemization
359:13
iterations
412:12
its   471:23
472:3
IUvan   311:18
Ivan   309:20
310:5   313:25
319:4   322:4
323:21, 25
324:9   332:16,
23   333:18, 23
337:12   338:5,
12, 21, 24
339:15   342:25
343:1, 11
344:4   345:20
346:20   347:9,
13, 19   348:5, 6,
9   349:2, 16
351:1   354:8
355:12, 16
356:17, 25
357:3, 8, 24
359:2, 4, 11, 15
360:5, 7, 13, 24
361:3, 9, 18
362:9   364:6,
24   365:7
366:3, 5, 22
367:3, 4, 6, 20,
24   368:12, 15,
21, 23, 25
369:3, 9, 12, 16,
21   370:3, 11,
25   372:2, 14,
23   373:3, 12,
21, 25   374:5,
20   375:3

376:7   377:5,
13   378:4, 10,
18   379:20, 24
380:19   383:14
389:9   392:9
411:19   412:5
415:14, 20
420:18, 19, 20,
21   421:2, 6, 13,
18   422:3
431:5   435:13,
19   449:18
455:16, 17, 21
456:2   461:3,
21, 23   479:5, 6,
10   494:7, 12
495:14, 18, 22
504:21, 22, 23
505:5, 7, 25
512:15, 20
513:7   514:25
518:15, 19, 21
519:11, 24
520:3, 7, 9, 14,
19, 20, 23
521:19   522:1,
11, 17, 24
523:6   525:21,
22   526:14
527:9, 24
529:21   530:1,
4, 7   531:22
533:20   534:13,
15   535:3, 5, 14,
21   536:5, 11,
15, 21   537:15
538:5   539:7,
14, 18   540:12
541:4, 6, 16
542:5, 21, 23
543:9   545:9,
12   546:18
547:11, 23
548:18   549:20
550:19   551:15,
19   552:17
553:3, 16, 21,
23   554:5, 8, 17,
21   556:9
557:9   558:11,
13   561:24
562:3   571:9,

21   572:1
574:15   578:11,
14, 22   579:18
580:16, 24, 25
581:6, 16, 24
582:1   591:5, 8,
20, 24   592:1, 4,
19   597:14
598:6   600:5, 6
Ivan's   342:22
343:7   358:2
367:22   378:6
421:15   422:6
533:17   562:18
Ivey   585:18

< J >
Jader   590:20
jail   506:15
525:1
Jaime   316:23
323:21   324:14,
21   327:15, 19,
24   328:11
329:13   357:21
362:14, 15, 21
363:1, 6, 16, 22
371:4   385:22
386:13   387:3
390:4   412:16,
22, 23, 25
427:12, 23
428:7, 9   430:3,
13   431:7, 10
432:10   444:2
446:14, 24
461:3, 9, 13
467:11   472:20
473:6, 19
475:8   476:3
477:19, 25
478:25   479:4,
18   484:14
487:22   496:10,
20   498:8, 11,
19   499:12, 18
515:23   563:17,
25   564:3, 12,
17, 20, 22, 25
565:11, 23
566:2, 4, 8, 17

567:4, 9   598:1
601:10
Jaime's   473:16
Jairo   309:16
590:19
James   326:18
477:24
January   486:21
511:8, 17
514:14   524:21
549:15, 22
550:6   555:4,
11   556:15
563:22   598:15,
19   599:9, 13,
18, 20
Javier   590:21
JBM   312:24
363:22
JEFFERSON   603:5
Jesus   309:16
JGA   457:21
Jhon   590:19
Jim   327:5
334:6   335:24
385:19
Jimenez   362:14
427:13   428:16
Jimenez's   597:12
JJ   590:21
591:4, 7
job   373:6
478:17   486:23
Johnson   582:23
583:12, 22, 23
584:10, 17
joined   388:7,
10, 16
joining   316:11
joint   510:21
590:23
Jose   309:24
311:24   371:1
454:4   457:23
journalist
503:24   508:14
521:18, 25
522:6
Juan   371:1
judge   444:8
499:11, 21

1-888-326-0504  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 25

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

509:24    589:12
600:19
**Judicial**    305:23
315:9
**July**    322:2
353:13    359:21
362:8    363:12
364:25    368:20
372:17    417:7
436:25
**June**    312:3
334:3    340:21
342:18    345:17,
21    346:7
348:3, 4, 8
349:14    352:2,
3    356:2, 5, 15
365:1    371:25
464:9    470:19
476:11    477:2
**jury**    331:11, 25
332:15    367:5
516:4, 7
**Justice**    333:2
466:6    506:19,
25    507:4
590:6, 9, 14
**justifies**    359:5
**justify**    402:1
463:10
**justifying**    489:3

< K >
**KATHERINE**    307:8
**keep**    351:4
364:7    380:8
425:1    573:23
**keeping**    348:10
444:4
**kept**    463:6, 8
475:6    560:8, 18
**Kevin**    583:2, 8,
20    585:1, 6, 10,
13
**key**    331:12
387:8    474:17,
19    477:24
501:17    511:23
529:14
**kick**    480:4, 14,
23

**kicked**    404:18
536:10
**kicking**    481:2
**kids**    442:4
**kill**    332:13
409:22    592:6
**killed**    332:5
383:9    452:10
**killings**    384:11
**kin**    603:17
**kind**    325:8
350:5    402:9
411:24    433:16
442:25    443:4,
12    488:16
499:8    514:21
523:17    563:11
571:2    593:2
594:8
**kinds**    340:22
341:8    387:4
466:8
**king**    477:20
**Kiobel**    335:11
**knew**    359:7
391:15    429:11
478:10    483:25
484:12    496:8,
11, 20    504:19
512:6, 12, 18
543:11    548:10
549:4    565:7,
25    566:22
**know**    317:13
322:13    323:8,
24    324:22, 25
325:13    326:11,
21, 23    327:16,
19    329:9
337:17, 19
338:18    339:7,
12    340:4
342:20    347:10,
17    349:1
350:19    353:14
354:1, 4, 19
355:9, 11
358:22    360:5
362:1    363:4,
20, 24    366:14,
15, 24, 25
368:2    370:3,

13, 19    371:20,
22, 23    374:5
375:13    376:17,
18    377:5, 6
382:3, 10, 12
385:14    388:5,
6, 13, 14    389:3
390:7, 19, 24
391:3    394:2
396:20    399:17,
19    400:14
402:24    404:9,
19    407:11, 13,
24    409:5, 14
414:22    416:3,
19    417:10
418:21    419:7,
17    421:7, 16
422:1, 6
425:16    426:7
428:11    429:19
431:22    432:14,
16    434:4, 11
435:23    436:14,
17, 19    438:6,
11, 19, 21
439:3, 7
441:13, 16, 18,
20, 22    442:17,
19    447:13
450:7, 17
451:6, 7, 13
452:17    460:20
461:14    464:23
465:1    471:11
473:10    476:9,
18    478:15
479:16, 22
480:11    487:7
489:19    492:19,
24    493:2, 9
495:20, 21
496:2, 15
499:4, 5
506:11    508:14
511:18    512:9,
16    513:20
516:2    517:1
521:20    522:9
525:23    526:2,
18, 20, 23
527:2, 6

528:20    529:2
531:11    534:12,
18    536:23
538:10, 12, 14
539:20    540:8,
10    541:9
544:15    546:14,
24    548:3, 11
550:1    551:17
553:1, 19, 20
554:14    557:22,
23    562:4, 6
563:20    565:3,
6, 18, 24
566:10    569:10
570:19, 22
572:19    573:20
575:2, 13
576:9    579:5
580:12    581:8
584:14, 16
585:7    587:16
588:2    590:11
591:22, 23
593:3, 25
594:9, 11, 17,
24, 25    595:3,
11    596:21
598:9
**knowing**    383:4
**knowingly**    499:22
**knowledge**
326:20    330:16
384:16, 18, 21
385:3    394:12
434:5    441:24
449:17    458:6,
9    461:5    497:7
499:24    563:1,
6    566:14, 15
567:1    597:20
600:3
**known**    554:4
591:24
**knows**    413:25
533:6, 7    553:3
**Kovalik**    382:4
383:8, 11, 12
394:16    398:11
403:23    404:5
409:10    410:19

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 26

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

Kovalik's    403:16
KROPF    307:19, 21

< L >
labor    433:6
lack    329:23
  411:16    487:13
  519:25
ladies    442:16
laid    517:19
landed    547:23
language    325:8
  389:21    407:12
  531:13    557:25
Large    305:21
  315:3
largely    522:4
larger    533:8
largest    387:17
  456:2
Lasserre    326:22
  466:15, 17
  474:9, 23
  475:7, 21
  476:14    481:22
  482:7, 9    484:8,
  22    488:25
  489:10    491:21
  492:5, 6
  493:11, 24
Lasserre's
  492:24
late    373:3
  564:16
lately    518:11
latest    494:13
  564:17    590:17
Latin    493:11, 18
Law    307:9, 20,
  21    308:4
  341:4    439:3, 9,
  11, 12    470:22
  471:7, 9    518:13
laws    306:7
lawsuit    586:9
lawyer    420:18,
  21    421:1, 14,
  22    424:10
  451:8    466:18,
  23    477:8
  488:7    498:15
  500:11    504:20

505:5, 9    512:7,
  12, 19, 20
  513:4, 24
  514:4    517:3
  532:5, 9, 11
  541:25    549:2
  559:20, 25
  597:12
lawyers    327:19,
  25    362:22
  413:5    433:5
  475:10    478:21
  479:18    492:1
  498:12, 19, 24
  508:1    515:25
  516:15    517:15,
  16    518:17
  530:12
lawyer's    512:8
lay    355:23
laying    511:19
LD    311:16, 20
  443:23
lead    593:23
  595:25
leader    384:11
leaders    386:12,
  14    478:1
leading    306:14
leads    371:15
  521:10
learn    338:15,
  16    442:10
  483:20    514:6
  595:5
learned    452:4
  483:5, 18
  594:20    596:23
leave    526:17
  576:9
leaves    390:21
leaving    394:23
led    394:19
  510:4    546:10
Lee    477:5, 7, 8
  480:1
Leete    322:3
  337:25    342:19
  345:19    348:4
  359:23    362:7
  374:20    377:13
  432:24    435:12

443:20    449:2
  451:20    457:20
  460:3    462:8
  464:10    494:6
  596:12
Leete's    372:12
Leeuw    493:4
left    319:21
  336:11    378:11,
  13    473:7
legal    334:4
  433:4    434:13,
  18    435:11
  463:3    506:20
  511:16    516:20,
  22    517:9
  518:10    521:12
  523:23, 25
  541:15, 23
  542:9    543:2,
  23    586:5
  595:23
legally    551:20
legitimate
  340:19    341:6
  414:6    436:6
  460:8    516:17
length    509:11
  572:2
letters    336:18
  351:3    363:14,
  24    418:17
  422:1    451:2
  466:20    483:13
  487:4    521:15
leverage    472:4
  586:10, 23
  587:1
Levesque    323:3
  349:15    352:23
  353:22    357:2,
  5    436:25
  449:2, 25
  464:11    595:14
Levesque's
  354:10    356:4
  464:11
Levy    574:7, 8
Li    452:25
liar    452:1, 13
  495:25

Libardo    443:20
  444:16    452:13
license    471:23
licensed    420:11,
  12
lie    432:8
  601:23
lied    344:9
  431:16, 17
  600:11    601:15
life    384:5
lifted    502:20
light    467:11
  543:15    585:17
LIH    312:8
line    320:17
  406:21    414:24
  458:1    490:15
  552:16, 23
  580:9
lined    547:17
lines    322:23
list    421:15
  486:8    487:9, 20
listed    332:21
  354:23    469:10
  504:16    529:22
  558:3
listened    513:25
literal    428:9
litigation
  319:25    320:3,
  25    321:11
  334:25    335:16
  501:19    587:7
little    349:17
  394:2    401:3
live    483:8
lived    392:10
  404:10    475:19
lives    361:3
  415:9
living    392:17,
  23    393:5
Llanos    467:19,
  23    468:8
  492:14, 18, 22
  503:25    504:7
LLC    308:5
loan    316:22
  317:2, 7    468:8,

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 27

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

*12*
**loaning**   468:3
**loans**   318:21, 25
**lobbying**   492:16
**lobbyist**   488:16
 491:24
**local**   585:17
**locate**   429:17
**location**   393:5
 525:5
**lock**   588:25
**log**   454:14
**logical**   481:24
**logistical**
 511:24
**logistics**
 348:10   351:2
 354:14
**long**   382:3
 388:4   392:21
 396:22   470:7
 473:6, 8
 509:14   591:24
**longer**   393:23
 401:11   408:12,
*22*   410:14
 425:9   426:3
 447:4   450:19
 452:15   453:3
 471:17   483:24
 584:12
**look**   322:8
 344:25   349:21
 358:23   359:10
 376:22   383:6
 393:8   423:6
 432:6   437:4
 501:3   510:10
 513:16   516:7
 529:7   542:19
 545:13   559:15
 561:5
**looked**   317:3
 334:22   340:3
 371:25   372:13
 393:2   400:25
 443:19   468:5
 494:23   517:1
 533:19   574:5
**looking**   392:21,
*22*   397:6
 408:7   433:16

 454:17, 21
 464:11   480:19,
*20*   541:22
 545:18   547:1
 561:25   572:9
 576:22
**looks**   371:20
 377:6   437:10
 443:22   477:3
 534:4   552:8
 579:17, 18
 585:8
**loop**   593:18
**Lorraine**   322:3
 337:24   338:21,
*23*   342:19
 345:19   348:4
 349:16   359:23
 362:7   366:4
 367:21   368:10,
*24*   369:4
 372:12   374:19
 377:13   406:21
 412:6   432:24
 435:12   443:20
 449:1, 18, 20
 451:20   457:20
 458:13   459:4
 464:10   465:16
 494:6   522:8
 596:12
**Lorraine's**
 350:16   368:22
**losing**   471:22
 472:3
**lost**   403:15
 583:25   584:7,
*9, 22, 25*
**lot**   318:13
 327:7   355:2
 383:13   418:18
 440:23   444:18
 466:24   483:17
 493:25   524:16
 531:24   543:12
 546:19, 20
 547:19   576:18
**lots**   572:20
**lower**   388:23
 390:12   391:22
**lowered**   479:1

**Lucho**   351:6, 21,
*23*   354:5, 11,
*14*   355:13
 369:14
**lucky**   433:22
**Luis**   590:21
**lunch**   422:14
 453:21, 25
**lying**   385:23
 423:6   450:11
 495:17, 23
 496:19   497:4
 498:14

< M >
**Mafia**   331:22
**Mahecha**   433:11
**main**   472:17
 491:8   498:7
 507:12
**major**   513:6, 18
 576:13   594:25
**making**   362:11
 378:16   382:20
 388:3   410:11
 411:3   418:25
 423:16   424:9
 425:12, 17
 427:4   437:12
 438:9   447:8
 459:8   461:21
 462:14   474:25
 502:16   506:6
 515:24   517:17
 550:4   555:10
**man**   330:2
 381:9   400:4
 428:24   466:15
 503:18   520:17
 601:5
**managed**   512:3
**management**   496:9
**maneuver**   434:13
**manner**   513:8, 15
**Manuel**   590:20
**MAR**   309:9
**March**   337:25
 498:2   500:20
 531:17   569:4,
*13, 25*   570:16
 571:6   573:6
 574:3   578:10

 579:20   580:5
 581:3   590:25
**mark**   419:23
**marked**   322:1
 324:6   327:3
 331:3   334:2
 337:23   342:17
 344:19, 22
 345:16   348:2
 349:7   356:14
 359:20   362:5
 370:23   372:10
 374:17   388:1
 400:22   405:19
 413:10   417:2
 420:2   423:2
 432:22   435:9
 436:23   443:17
 448:24   451:18
 456:8   457:18
 464:8   466:13
 477:1   481:8
 486:15   488:2
 494:5   498:1
 500:19   503:16
 511:7   513:1
 518:7   521:8
 524:14, 15
 526:11   532:20,
*22*   544:10
 547:6   548:16
 552:1   556:1
 568:10   569:19
 571:1   574:2
 582:20   590:1
 596:8, 9
**married**   417:8,
*10*
**Martinez**   309:24
**massacre**   568:1
**mass-murdering**
 331:12
**match**   567:10
**matches**   353:12
 569:13
**material**   522:23
**materials**   515:24
**matter**   315:19
 346:2   352:5
 468:18   482:22
 502:8, 9, 17, 18

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 28

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

matters   310:12
Mattos   590:20
maximum   319:12
  389:5, 15, 23
Maya   560:17
MCFSA   312:7
mean   319:23
  325:5   336:11,
  25   346:11
  347:7   350:9
  352:11   365:16
  369:25   393:15
  396:8   399:22
  404:7   408:5
  418:1   420:25
  424:18   425:3
  435:15   439:4
  457:11   472:3
  480:6   490:21
  499:1   505:18
  527:8   553:20
means   337:19
  339:4   367:9
  372:16   418:2,
  25   449:14
  480:7   505:20
  527:9   587:8
meant   325:9
  366:22
measures   529:15
Mecanico   494:11,
  15, 17, 23
  495:4, 8, 15, 17
  497:14, 18
  590:22   591:4, 7
Mecanico's   494:8
mechanics   390:25
media   585:22
  587:8   594:22
meet   364:11
  414:15   433:12
  446:25   449:4,
  6   480:8, 13
  485:2, 23
  486:2   492:6, 9
  600:1
Meeting   310:5
  311:16   334:5,
  11, 13   335:2
  336:4   340:20
  342:20   348:5
  352:19   356:2

365:1   368:21
369:9, 15
370:5   385:6
424:8   443:21
462:9   471:12
485:22   488:17
504:24   510:15
514:2   524:1
526:22   533:2,
25   547:15
559:8
meetings   370:14,
19   386:6, 11,
13   387:2
440:16   477:25
478:7   483:22
523:23, 25
592:11, 16
member   434:24
522:25
members   377:22
435:11   440:6,
8, 11   441:5, 7,
10   501:20
505:13   508:10
523:9   590:22,
25   593:21, 22
594:7, 15, 19
595:1
Memo   309:20
310:5, 7
327:23   334:8,
22   335:1, 5, 15,
19, 22   336:15
337:24   348:4
352:18   457:19
462:5   463:16
516:23   517:20,
22   525:10, 25
526:1, 4   541:19
Memorandum
309:14   327:4, 9
memos   328:4
336:6   341:15
men   507:13
520:23   567:21
568:1, 4   570:10
men's   525:25
mention   371:23
394:14   491:11
mentioned
320:20   321:18

362:24   364:21
365:4   395:13
408:18   462:10
492:21   517:5
547:15
mentioning
451:1   493:15
mentions   331:17
371:22   565:21
menu   517:22
merely   439:17
Merit   305:20
315:1   603:24
Message   310:7
313:7   322:3
341:13   345:20,
25   362:8
364:6   367:9,
23   370:25
371:10   401:3
405:22   526:14,
15   534:11
546:1   550:9
585:4
messages   349:8
389:10   414:9
532:23   538:25
539:2   582:9
messed   567:14,
15
met   334:15
335:24   361:4
362:12, 19
363:17   364:12
368:11, 15, 23,
25   371:3
381:5, 8   385:5,
10   428:22
433:13, 17
450:23   460:21
475:15, 17, 18,
19   480:3, 12
490:3   492:12,
15   495:20, 22
497:17   504:22
505:7   524:25
534:13, 17
571:22   574:17
578:14, 23
micromanagement
474:3
mid   564:16

middle   322:4
405:21   480:2
486:16   509:22
midnight   589:7,
8
Mike   513:3, 21
514:18, 19, 22
518:18   521:3
million   444:1,
3, 7, 9, 11, 22
mind   322:15
391:19   424:13
425:19   459:17
476:13   487:22
540:4, 16
550:18
Mindy   571:10,
12, 13   574:10
mine   364:14
minimal   380:11
minimum   393:22
minimus   415:2
Minister   484:2
ministries
485:24
Ministry   481:17
483:10, 22
484:9, 15, 23
485:15   486:6
minute   486:19
581:18
minutes   354:15
555:16   588:2, 6
misc   313:1
misquote   577:13
misrepresentation
502:16
misrepresented
502:4
missing   367:24
369:10   372:16
373:9, 10
mission   586:14
mistake   375:23
383:2   410:22
422:2
mistakenly
509:14
mistresses
523:22
mock   331:11
model   559:13

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 29

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

modification
  551:22
modified   468:15
  576:8
Monday   348:7
  417:15
monetary   434:7
  571:17
money   318:14,
19   319:3, 5
  320:21   321:12
  323:4, 16, 21
  327:13, 20
  342:21   343:19
  348:13, 23
  351:7, 15, 16,
  18, 22   353:14
  354:5, 12, 14,
  24   359:12
  361:17, 21
  363:5   364:8,
  10   365:20, 25
  373:5   374:1,
  11   377:6
  379:17, 19
  383:15   391:7
  428:2, 12
  436:10   440:23
  441:10   442:6
  443:24   444:15,
  17, 21   445:6, 9,
  19   446:6, 14
  449:10, 11
  451:22, 23
  455:9   458:18
  466:19   469:3,
  15   482:18, 19
  515:25   529:20
  533:12, 18
  534:16   535:24
  537:11, 16
  538:7, 11, 19
  539:14, 18
  540:5, 25
  541:16   548:8
  565:22   566:18
  573:12   580:22
monies   444:19
month   343:15
  344:1   347:13,
  16   352:12
  355:8, 20

  358:13, 16
  359:5, 10
  375:24   376:1,
  5, 11, 23
  378:13   443:19
  447:19   514:15
  535:15   550:5,
  11   556:15
  570:4, 17   580:4
monthly   342:22,
25   348:14, 24
  361:22   376:4
  378:3, 10
  383:3   388:3,
  23   390:12, 20
  398:1   403:9
  410:12   455:24
  459:14   460:1
  577:15   598:6
months   362:11,
19   363:3
  371:15, 19
  372:1, 3, 21
  373:3   375:7,
  22   388:22
  399:20   400:14
  406:24   407:13
  412:17   462:9
  468:19   470:1
  556:16   598:16
moral   404:23
Morales   590:21
morally   518:16,
20, 22   519:5, 8,
15, 22   520:4, 14
morals   520:1
motion   498:6
  510:2, 19   511:1
motivated   508:7
motivation
  508:19
motivations
  508:15
move   434:7, 11
  436:7   452:5
  456:12   457:8
  484:20   525:14
moved   382:6
  404:8   424:24
  435:14, 18, 21
  436:4   450:13
  458:17   525:4

moving   346:1, 7
  459:20
multiple   594:18
murder   491:3
  494:10
murderer   333:12
murders   332:6
  386:6, 12
  426:6   496:9, 21
mutually   602:4

< N >
Nadia   521:18
  522:6
nadiaFW   313:1
name   318:6
  323:13   433:9
  442:12   454:4
  456:13   457:25
  463:1, 2, 4
  480:9   554:3,
  13   596:15
named   431:5
  451:3   466:15
  494:15, 17
  503:18
names   315:25
  337:4   442:17
  512:9, 11
  530:11   554:14
nature   318:21
  339:1, 12
  586:16
near   445:16
necessarily
  366:11   586:13
necessary
  306:12   406:3
  463:7   502:19
  527:16   529:13
  530:15   592:16
need   331:10
  339:1   351:11
  352:12   361:18
  369:22   373:7
  383:15   396:1
  398:23   402:7,
  9   406:7, 15
  426:18   437:16
  438:25   481:19
  493:17   500:6
  503:4   511:21

  513:14   522:3
  523:5   525:6
  529:15   531:18
  547:16   555:15
  557:1, 3   558:8
  596:5   597:14
needed   324:1
  358:1   361:17
  397:16   418:7
  481:16   498:21
  507:25   517:19
  526:18   527:7
  538:11   541:6,
  17   548:9
  557:13   558:13
  561:7   587:1
  600:16
needs   348:9
  351:2, 7   423:4
  424:25   435:13
  521:21   528:8
  574:15   575:5
negotiate
  533:11   546:6
negotiated   554:5
negotiating
  419:16   545:16
negotiation
  547:24
negotiations
  478:24   546:9
neither   414:14
  603:17
nephew   530:14
net   531:8
netted   399:10
never   325:22
  328:12   329:19
  330:21   334:24
  335:23   338:13
  353:10   381:5,
  8   382:25
  391:8   392:13
  395:8   397:5
  400:4   404:20
  409:11   425:19
  428:22   434:22
  441:23   445:6,
  9   450:14
  460:21   479:3
  489:21   490:3,
  5   491:1, 6

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 30

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

495:20    497:17
506:21    509:6
515:19    534:13,
17    543:15, 20
544:5    549:24
550:18    560:12,
16    565:21
567:19    581:11
593:11, 15
594:20    595:2, 6
New    338:2
375:8, 11, 13,
17, 24    376:13,
24    377:15, 23
413:16    443:7
467:17    468:16
472:23    477:8
531:9, 14
547:15    571:21
news    496:25
497:11    562:14
567:20    594:15
newspaper    416:2
Nicox    316:21
317:6    326:17
492:25    499:25
551:12
night    449:3
454:12
nine    378:20
379:8, 24
380:18    560:25
561:21    562:20
nom    381:4
noncompliance
364:16    365:15
367:13
nondisclosure
448:10
nonmonetary
434:7
nonwitnesses
457:9, 11
Nope    317:23
381:10    501:7
511:16
normal    556:13
normally    570:20
North    305:23
308:6    315:10
590:22

NORTHERN    305:2
315:18
Notary    305:21
315:2
note    539:13
Notes    310:5
311:25    348:5
524:21    599:8
notice    406:24
notices    573:1
November    311:11,
24    374:24
432:23    457:19
509:25    510:4
Number    315:21
322:7, 25
328:2    336:10
348:6    351:1
352:12    391:14
393:4    394:11
400:20    479:1
485:17, 25
486:5    498:18
511:20    518:9
521:13    525:18
532:7    536:10
560:10    571:6
numbered    417:3
504:10    509:19
numbering    596:19
numbers    354:20,
23    357:8    377:3
numerous    563:2
nutshell    515:6
NW    307:22

< O >
oath    330:2
391:10    423:20,
25    432:11
561:3, 17, 20
563:5    564:16
597:19    600:21
object    321:3
323:6    327:21,
22    328:8
330:4, 5
333:13, 14
336:24    339:24,
25    343:3, 4
352:8, 16
355:21, 22

361:14, 23
367:17, 18
369:24    370:7
374:3    376:14,
15, 25    377:1
378:14, 15
382:22    383:19
384:23, 24
385:13    386:1,
7, 18    387:9, 10
391:12, 13
394:1    395:4,
19    396:5
397:2, 11
398:5, 6, 17
399:6    402:17
404:25    405:9,
10    407:5, 6, 9
409:15    411:13
412:10, 11
414:8, 20
415:6    424:2
426:21    428:4,
19, 20    429:2,
24    430:20, 21
431:19    432:4
436:9    437:15
438:1, 24
441:1, 12
442:7    443:2, 6
447:22    448:16,
17    451:12
453:4    455:23
459:10    464:1
465:11    468:14
473:24    475:2,
25    496:22
498:16    500:13
503:1    508:17
514:7    515:8,
14    516:6, 14
517:11, 12
518:2    522:19
523:12, 24
528:6    529:24
539:10, 11
540:7    541:12,
13    543:16, 24
549:6    551:14
553:6, 7, 18, 24
554:6, 7    555:2
556:11, 12

558:19    561:9,
10    562:12, 13
565:6, 14
570:12    575:10,
23, 24    576:14,
15    577:2
579:1, 2, 14, 23
580:10, 18
581:5, 20
583:13    584:4,
5, 13, 23
590:10    591:21
593:14    595:7
601:1, 2, 6
objecting    400:6
objection    542:14
objections
306:13, 16
516:17
obligation
404:23    405:2
observation
412:1
observed    465:15
obtain    494:14,
22
obtained    336:17
478:11    496:14
526:24
obvious    365:17
obviously
335:12    410:1
500:7    565:3
588:8
occasion    321:16
585:7    593:8
occasionally
319:5, 6, 8
353:8    369:6
occasions
323:19    361:13
380:12    498:18
occurred    414:14
461:17    587:17
598:22
Ochoa    590:22
October    375:7
420:3    423:8
481:12    533:1
564:13    566:16
599:13

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 31

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

odd    371:21
410:20    421:8, 9
oddly    377:16
offensive    523:18
offer    444:3
460:7, 16
464:25    559:23
offered    306:18
329:3    339:23
364:7    429:21
458:25    464:19,
21    465:10, 20
offering    361:6
offers    443:25
446:14    451:22
459:8    461:21
Office    307:21
316:11    360:16,
21    361:1
388:19    389:4
420:10    430:15
467:12    472:19
473:18, 22
474:4    488:11
574:11    601:20
officer    373:2
601:20
officers    312:14
official    430:14
431:6    588:3
officials
326:13    330:11
591:10
Oh    333:22
356:24    416:23
433:13    442:1
457:25    491:23
542:12    560:10
578:7
Oil    467:19
472:3    492:14,
18    503:25
504:7
Oil's    467:24
468:9
Okay    338:15
341:2    347:15
350:13    371:9
378:22    379:1,
21    385:22
396:8    422:2, 3
437:19    453:17

458:15    461:15,
19    476:22
491:9    512:18
518:24    520:5,
16    524:7
532:17    533:23
543:1    586:19
588:17
old    375:9, 12,
14, 25
Once    319:9, 11
379:17    382:19
390:20    391:7
408:21    433:22
509:11    542:1
550:19    561:16,
19    585:16
ones    323:10
375:8, 9, 11, 12,
14, 17, 25
376:13    377:15,
23    496:11, 20
556:8
one-time    441:15
open    403:14
522:11
operate    516:5,
11, 12    517:6
operated    570:8
operating    537:20
operations    563:2
operative    542:21
opinion    333:20,
22    509:25
510:4    516:25
517:4, 15
opponents
515:18, 21
opportunity
454:16    514:11
opposition    512:1
oral    315:13
order    329:13
351:2    428:25
451:22    458:7
538:12    555:5
ordered    589:11
organization
326:1
organized    469:6
original    316:23
437:1    500:21

546:2    547:8
561:2    569:24
573:4    582:1, 5,
22    583:11, 15
584:16
originally
375:3    382:5, 6
404:9    549:12
originated    500:6
Oscar    310:1
Otero    313:25
319:4    322:4,
19    323:3, 21
324:9    325:1
332:16    333:4,
18    337:12
342:25    343:1
345:20    347:13
348:6    351:2
357:4    358:15
359:2, 4, 11
360:7, 13, 24
361:12, 19
370:25    371:1
372:13    373:25
374:11, 20
376:7    377:13
378:4, 10, 18
379:20, 24
380:19    383:14
389:9    411:19
415:15    420:19,
21    422:4
435:13    455:16,
18, 22    461:3,
21, 23    495:14
504:21    505:7
512:15, 20
515:1    518:19
522:17, 24
523:11    526:14
529:11, 21
530:1, 4, 7, 17,
24    531:22
533:20    534:13
535:14, 17
536:5    537:15
538:5    539:7
540:13    541:4
542:22    545:9
547:11, 24
548:18    550:19

551:15, 20
552:17, 20
553:3, 16, 22,
23    554:5, 21
556:10, 17
557:18    571:21
572:1    578:11,
14, 23    579:18
580:5, 16
581:1, 16, 24
582:1    591:5, 8,
14, 20    592:4,
20    598:6
Otero's    345:24
371:3, 10
527:21, 25
528:2    549:20
554:17    571:9
ought    484:19
485:5
outlay    576:13
577:24
outlays    576:24
outline    387:16
outside    366:19
367:16    543:22
554:2    584:1, 2
587:7
overall    587:5
overlap    522:4
overrule    483:10
overruled    577:17
owed    318:14, 19
375:10    469:3
557:9
owes    444:6, 8

< P >
P&Y    348:6
p.m    453:24
454:2    503:8,
11    555:19, 22
602:9, 10
Pacific    325:16,
23    326:3, 7, 14,
19    479:20
page    322:5, 24
327:3    345:18
349:10, 11, 12
356:7, 8, 9, 23
360:5, 14
375:4    405:21

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 32

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

417:3    438:5
458:10, 11
462:6    464:12
477:6, 19
479:25    481:10,
11    483:4
486:17    488:5
501:12, 15
504:10    505:15
507:9    509:19,
22    510:11
518:9    521:11
525:9    542:22
568:25    569:24
578:10
**pages**    525:17
549:9
**paid**    318:13
327:13    337:14
377:4, 7    378:7,
10, 22    379:13
380:15    383:3
394:3    398:1
410:22    440:6,
23    441:10
444:25    445:3
452:5    466:18
475:8    482:5
488:13    499:18
509:8    539:16
540:9    542:21
552:14, 21, 25
553:17, 23
574:16    575:6
579:22    580:5
**Paige**    308:17
**Panama**    381:7
382:6    383:24
394:5    398:8
402:21    403:25
404:7, 8, 10, 12
409:3, 4, 11, 16,
21
**paperwork**    358:17
**par**    506:17
**paragraph**
344:25    414:1
459:23    496:5
501:15    525:13
526:15    528:8
529:9    530:23

560:25    561:21
562:20    590:16
**paragraphs**
548:21
**paralegal**
374:21    420:10
**parameters**
321:6    418:3
**paramilitaries**
329:11    332:5
394:12, 25
421:17    445:12,
23    446:4
559:16, 20
561:4    590:4
591:16    597:21
600:4
**paramilitary**
331:19    351:23
381:5    422:5
448:3    512:4
524:8    592:2
**Paris**    475:18
**Parker**    357:19
488:7, 14
489:17, 22
490:14    498:3,
7    513:3    517:2,
15    518:17
519:9, 12, 22
520:1
**part**    333:7
357:20    403:18
425:24    433:4
434:18    438:3
462:20, 23
474:22    476:15
506:18    519:9,
22, 23    585:21
586:6, 7, 14
**participants**
331:21
**participate**
506:19
**participating**
496:21
**participation**
496:8
**particular**
323:9    369:9
377:17    392:18
399:20    445:24

446:21    482:24
488:10    489:24
522:8
**particularly**
335:11    336:14
518:18    519:9
601:10
**particulars**
463:20
**parties**    305:17
306:15    603:18
**partner**    522:2
523:7
**parts**    392:23
**party**    536:18
**pass**    355:5
540:25
**passed**    533:12
537:16
**passing**    389:10
**passive**    405:24
**pathological**
452:1, 13
495:25
**Paul**    326:17
**PAULK**    308:2
316:8    323:6
327:21    330:4
332:8    333:13
339:24    343:3
355:21    367:17
376:14, 25
378:14    380:3,
8    384:23
387:9    391:12
398:5    405:9
407:5    412:10
428:19    430:20
448:16    496:22
517:11    518:2
539:10    541:12
553:6    554:6
555:2    556:11
561:9    562:12
575:10, 23
576:14    579:1
584:4    588:22
601:1
**pause**    330:6
**pauses**    451:6
**pay**    355:11, 20
379:14    396:4

413:4    440:7
442:5    444:5, 8,
14, 16, 22
445:2, 8    446:7
449:11    450:3,
11, 13    466:21
488:14    516:22
533:9    534:7,
21    535:19
536:4, 20, 21
539:18    541:10
542:1    543:4
546:5    550:19
551:5    559:23
575:8    594:22
**paying**    318:19,
20, 22    343:25
355:7    358:12
393:21    395:14,
18, 20    401:19
402:3    403:3
517:9    536:15
540:5    541:21
559:16    581:23
**payment**    352:24
357:21    359:5
385:10    388:23
390:13    455:16
462:14    463:11,
16, 18, 23
466:4    483:1
488:19    493:10,
14, 17    499:5, 6,
12, 14, 15
529:10, 15, 16
530:20    537:3
539:22    550:5,
10, 13, 22
558:11    559:19,
24    562:25
563:6    565:3
566:21    571:21
573:6, 22    576:1
**payments**    341:8
350:18    356:5
357:14    362:22
375:5, 8, 9, 21
376:5, 12, 20
377:11    378:3,
6, 17, 24    382:2,
21    383:16
384:20    388:3,

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 33

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

11    391:16
392:19    399:5,
15    402:22, 25
403:10    408:19,
21, 23    410:12,
15    411:3
412:22    414:19
418:25    419:19
425:13    426:19
437:11, 22
438:8    455:19,
20, 21    459:15
460:1    465:3
474:24    475:24
502:4    508:9,
24    516:11
564:19    565:13
576:4    577:15
598:7
**Peace** 333:2
506:19, 25
507:5
**Pedro** 432:24
433:1, 7, 11, 18
434:12, 17, 19
462:19, 25
**Pedro's** 433:22
434:3
**Peinado** 309:24
336:19    337:5
338:5, 14
340:5    344:3,
24    347:1
348:18    351:3
355:8, 20
368:8    369:14
496:10, 19
**pending** 310:3,
12    359:24
**Pendleton** 417:7
526:13    552:5
**people** 323:8
327:12    332:4,
5, 13, 23
341:11, 17, 19
342:11    354:6
355:25    356:1
364:15    365:14,
20    366:9, 12
367:12    375:19
376:17    383:14
384:1    389:13

392:10    393:22
395:8    401:17,
22, 25    404:24
406:24    409:7
411:11, 15, 18,
19    412:4
414:22    438:7
442:3    445:20
446:3    457:11
461:25    469:2
472:24    473:12
474:20    480:13
481:14, 18
483:6, 8, 9, 19,
22, 25    484:6
486:21    487:6
497:20    507:4
508:4, 7
509:10    512:6,
10, 11    518:14
519:19    520:6,
7, 10    522:21
523:18, 21
527:13    530:9
534:10    535:11
542:19    544:24
553:9    554:8,
12    576:22
577:1    578:13,
22    579:11
584:1    592:6
595:5, 15    596:5
**people's** 484:9
508:10    568:1
**percent** 369:5
391:10    531:2
534:1, 24
535:9    536:6, 7
546:2, 8, 17
**percentages**
535:13
**Perez** 310:1
**perfecting**
568:17
**perfectly** 463:9,
25
**perform** 482:17
538:12    572:4
**performed**
445:10    451:8
**performing**
343:18    539:19

**period** 317:16
318:5    344:2
363:3    379:20
381:6    391:1
395:7    410:13
412:14    417:17
443:10    468:6,
24    469:25
475:15    581:7
**periodically**
319:4
**periods** 332:17
**perjurer** 423:6
**perjury** 423:17,
21    424:5, 6
**permissible**
516:22    542:11
543:3
**permission** 348:7
**permissions**
507:25
**person** 323:13
346:17    347:21
364:20    382:15
394:16, 17
412:7    413:16
414:24    415:25
424:8    434:13
441:17    443:13
463:23    468:15
471:8    489:21
490:4, 6
495:23    505:6
512:16    513:25
520:21    533:5
534:6, 12
565:15    567:16
574:10, 12
576:2, 6, 19
577:4, 5    595:8,
25    601:11
**personal** 319:15
384:15, 18, 21
385:2    449:17
477:9    561:13
**personally**
317:17    330:24
395:12    450:23
460:21    473:5,
13    491:1
511:23    564:5

**persons** 475:1
**peso** 391:23
**pesos** 388:23
444:1, 2, 7, 9,
11, 12, 23
**pestering** 550:4
**Peter** 488:6
503:18, 23
510:14    511:3
**petition** 433:23
434:4, 12
**phone** 349:9
381:14    449:9
532:24
**photos** 444:13
445:4, 7, 11, 20,
22    446:1
**physically**
389:14    409:7
421:25    424:8
579:7
**pile** 447:7
**pin** 477:20
**Piper** 516:23
517:7, 19, 22
541:18
**Piper's** 517:13
**Place** 307:11
450:4    525:15
589:4    597:7
**placed** 571:25
572:10    575:20,
21    576:10
577:7
**places** 567:15
572:3
**Plaintiff** 305:6
307:4    593:23
**plaintiffs**
316:3    333:9
523:1    593:25
595:9, 16
**Plaintiff's**
309:9    321:25
324:5    327:2
331:2    333:25
334:1    337:22
342:15, 16
344:17, 18, 21
345:14, 15
348:1    349:5, 6
356:11, 13

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 34

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

359:18, 19
362:4    370:21,
22    372:8, 9
374:14, 16
387:23, 25
400:21    405:18
413:9    416:25
417:1    419:25
420:1    422:22
423:1    432:20,
21    435:7, 8
436:21, 22
443:14, 16
448:23    451:16,
17    456:7
457:17    464:6,
7    466:11, 12
476:24, 25
481:6, 7
486:14    488:1
494:3, 4
497:25    500:17,
18    503:14, 15
511:6    512:25
518:6    521:6, 7
522:25    524:13
526:9, 10
532:20, 21
544:8, 9    547:4,
5    548:15
551:25    552:2
555:24, 25
568:8, 9
569:16, 18
570:24, 25
574:1    582:17,
19    589:22, 25
596:7, 10
plan    386:6, 12,
14
planning    439:23
Plans    309:18
311:5
play    334:17
400:5
played    568:2
players    547:17
plead    401:6
please    310:9
315:23    356:17,
25    376:10
435:12    526:20

527:2    531:5
533:10    573:23
plenty    590:13
PLLC    307:21
ploy    450:3
plug    417:23
418:24, 25
419:6, 12, 16, 18
plural    346:21
347:11
plus    372:17
383:24
point    329:1
332:25    335:20
349:1    353:18
377:8    378:2
382:7, 14, 18
394:24    399:19
403:13, 15
404:15    406:1
408:11    418:8,
11, 17    420:15
425:10    428:23
435:12    439:23
441:2, 5    447:3,
6    450:18
452:14    453:10,
15    468:10
469:17    470:20
471:20    477:11,
18    484:17
494:21    502:13
521:13    523:14
525:18    547:25
548:4    553:2
574:22    575:11
577:11, 14
580:6
pointed    328:4
pointing    396:14
points    407:1,
16, 19    471:10
police    594:9, 12
policing    411:14
political    390:8
ponytail    433:14,
16, 17
poor    327:11
portion    335:4
338:1    524:18
602:1
posed    546:5

position    335:7
340:10    401:12
438:13    450:25
473:7    500:8
517:3    602:5
positions    340:6
positive    330:21
345:7
possible    326:9
367:15    434:14
462:3    464:17
possibly    386:24
509:9    570:17
post    508:24
Potential    338:2
439:14, 21
457:7    491:17
power    401:17
powerful    508:4
preapproved
575:1
prebudgeted
575:1
preceding
447:19    566:19
precise    320:7
511:22
prefer    507:19
preoccupied
401:4
prepare    331:25
prepared    327:5
385:14    443:24
495:4    509:3
preparing    379:8
PRESENT    308:14
315:24    370:14
421:25    484:4
597:12    601:12
presented
459:25    490:25
598:3
presenting
601:21, 22
president    467:7,
17    470:12, 14,
20    471:5, 11,
12, 14, 15
472:13, 23
473:23    474:1,
10, 14, 15

480:10    485:22
486:2    587:14
PRESLEY    307:6
316:4    374:18
532:18    556:2
578:3, 5, 7
588:1, 7    599:5
press    495:9
582:23    586:18
pressure    471:20
480:5, 15
481:3    495:21
586:4, 5, 9, 21
587:6, 13, 20
pressured
494:12    495:18
591:8, 15
pressures    329:6
presume    348:11
pretty    336:11
341:1    361:20
365:17    371:21
395:8    442:1
448:12    458:13
463:21    475:3
479:10    482:3
487:20    494:20
497:18    539:23
542:12    547:18
548:1
prevent    351:19
preventing    555:9
previously
322:20    325:6
352:3    358:2
368:5    407:10
408:8    417:16
466:17    474:16
478:13    480:11
485:18    487:1
498:17    512:14
560:2    580:12
597:25
price    560:9, 12,
19
primarily    489:3
primary    417:17
487:14
print    603:11
printed    583:19
prior    306:18
338:10    368:22

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 35

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

408:9    424:16
427:15    428:6
468:17    480:19
489:12    492:13
497:3    525:25
526:4    535:1
564:7    565:4
598:19
priority    597:15
prison    337:10
341:21    344:5,
13    345:8
348:7    365:22
366:16    389:6,
15, 23    390:1, 3,
9    415:5, 10, 21
416:18    419:11
434:8    435:22
436:2, 4    444:4
458:22    459:2,
9    460:18
483:8, 15
494:17    495:11
508:15    545:3
564:7, 10
prisoner    436:7
prisoners
351:18    481:15
prisons    337:14
483:7
privilege
454:13    511:21
521:24
privileged
435:2    500:11
522:23    543:21
pro    433:23
probably    328:18
337:2    341:7
342:8    369:19
380:14    381:24
388:14    394:24
403:20    415:15
419:15    425:18
428:9    431:4,
20    440:11, 20
441:19, 21
447:2, 6    448:8,
12    452:16
453:10    456:2
466:22    469:20
475:10    476:1,

3, 18, 19, 22
514:17, 19
524:15    548:2
559:3    572:20
585:5    599:25
Problem    312:3
314:5    335:13
430:8    481:13
483:10    491:7
596:13
problematic
528:4
problems    354:25
364:17    365:16
367:14    371:16
Procedure    315:5
proceed    507:14
proceeding    591:7
proceedings
315:14
process    403:19
472:7    483:12
487:4    506:19,
22, 25    516:16
522:2    573:3, 8
575:4    587:2
592:24
Proctor    499:12,
21
produce    536:12
produced    349:9
358:21    410:8
494:19    498:4,
5    532:24
535:3    571:4
584:18    596:25
Product    311:23
435:5    439:16
511:21    521:24
522:18
professional
441:17
program    412:9,
13
prohibited
333:17
prohibitive
542:4
project    483:16
promise    531:1
559:18

promised    364:12
365:10    486:18
532:3    538:10
promising    370:3,
13, 17    536:6
promote    518:12
promoted    459:13
promptly    570:14,
21
pronunciation
511:11
proposal    533:3
546:2
proposed    534:1
536:5
proposing    541:24
propriety    541:24
prosecuting
333:8
prosecutor
430:5    597:11,
25
protect    463:7
592:9
protection
371:13    375:4
412:8, 13
561:8    582:11
protective    522:3
provide    339:10
340:13, 23
341:2    346:9
347:6    349:2
351:16    354:5
355:12    368:12
369:13    372:4
377:25    397:10
398:21    399:3
401:12    407:17
408:3, 14
418:7    425:7
434:6, 15
454:15, 21
456:22    458:20
459:1    462:1
464:25    474:12,
23    478:20
482:11, 18, 19,
20    494:12
495:19    501:18
502:10    507:6
533:18    535:7

556:9    558:16,
21    559:4
560:13    585:14
provided    315:5
339:5    344:10
363:6, 8    365:7
380:10    384:2
396:18    397:9
418:20    425:11,
15    426:5, 13,
16, 17    427:4
431:1, 5    437:6
440:10, 15, 17
441:14    452:21
460:14    488:11
501:19    508:25
509:1    515:25
528:9    534:16
535:5    537:4
541:16    551:6
561:3    562:14
568:19    570:4
572:6    579:5
597:17
provides    375:10
414:7    554:16
providing
322:18    343:13
346:19    347:3
364:22    365:5
381:6    383:18
391:25    392:25
396:13    397:15
408:16    413:22
418:3, 4    425:8
426:20, 25
432:24    437:3
460:24    492:1
504:15    505:14
527:16    529:12
530:15    548:8
560:24    562:10,
11    569:20
570:9    582:24
598:11
Public    305:21
315:2    413:22
414:25    585:1
586:4, 9, 16, 21
587:2
publication
589:20

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 36

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

publicly   432:6
562:15
pull   417:22
418:24   419:6,
12, 16, 18
573:24   593:8
pulling   454:13
purpose   320:21
321:18   357:16,
24   374:8, 9, 11
380:2   397:13,
14, 15   429:4
510:21   539:18
587:20
purposes   352:7
427:24   587:22
pursue   495:25
push   463:5
pushed   392:13
put   323:11
345:5   382:16,
25   383:13
384:7, 12
398:25   399:9
405:8, 13
406:8   408:10,
17   409:1
414:13, 24
418:14   427:12
477:23   478:23
480:4, 15
481:3   492:7
502:7   509:18
525:5   528:4
541:3   543:12
575:13, 14
577:12, 14
579:9   589:4
602:5
puts   402:11
418:5   425:7
putting   334:23
351:17   398:20
400:1   405:3
406:9   427:21
579:11

< Q >
question   323:24
329:19   338:19
341:23   345:6
347:5   360:17

361:3, 5   379:2
380:4, 13
387:11   391:17
396:7   397:12,
17   399:8
416:10   428:6
435:19   437:17,
20   439:1, 18
441:6   493:3, 5
504:16   505:12
506:9, 14, 18
507:12   509:23
510:3, 6, 18
511:22   515:9,
12   518:24
533:9, 21
534:3, 7, 20, 25
540:15   542:25
543:19   546:5
566:11   571:5
599:12, 19, 21
601:7, 19
questioned
531:24
questionnaire
464:18   465:18
questions
306:14, 15
338:24   381:23,
25   392:14
399:25   400:3,
10   427:25
464:14   498:25
499:1   504:4,
15   526:19
562:1   600:20
603:9
quick   509:23
quiet   526:17
quite   340:11
357:22   389:8
432:15   474:6
570:21
quote   337:13
338:11   357:14
382:1   387:7
412:21   430:10
475:23   489:17
537:22   558:17
583:25
quoted   465:7

quotes   421:14

< R >
rail   332:13
railroad   561:5
566:23   582:11
railways   533:7
raise   334:17
455:13   471:13
488:24   516:16
547:16
raised   391:17
455:15   489:10
491:11
raising   354:21
461:20   513:19
514:3, 25
521:14
Ramirez   392:9
415:16   417:8
420:17   424:17
433:3   458:20,
25   459:7
460:16   483:21
506:1, 2   507:4,
6   512:15, 19
553:8, 16, 21
564:8   596:12
range   319:10
596:14
ranking   487:12,
21
rarely   369:6
rate   388:24
391:23   393:23
394:9
rates   393:19
Raul   560:5, 8,
17, 18
Raveendran   511:9
reach   502:14
reached   371:12
551:19   560:17
react   366:8
reaction   325:7
384:15   496:24
497:2, 9, 10, 13
509:4
read   348:15, 16
349:23   351:9
353:3   356:21
376:2, 3   379:2,

3, 5   402:5
406:17   417:24
437:2, 16, 19
438:12   440:3
454:24   458:11
463:13   504:1,
9   507:18, 19
528:7   531:6
548:19   549:8
567:20, 23, 25
reading   306:4
517:23   525:9
reads   401:3
ready   331:8, 22
335:20   420:16
433:19   451:24
527:1   528:17
537:24   543:5
547:13   582:3
585:15
real   355:18
431:3   515:9,
12   520:24
realize   531:20
549:10
really   322:13
358:19   367:9
373:16   382:12
387:21   388:13
390:24   398:4
423:11   434:23
448:18   493:21
506:9, 16
507:24   521:9
522:10   531:11
541:21   544:20,
22   553:22
568:24   594:2
596:5   599:21
reason   336:5
345:6   348:17
361:5   370:17
408:23   426:4
447:15   457:22
483:25   507:15
544:25   559:8
563:12   570:2,
13   575:6
584:20   586:8,
17, 19   596:22
597:1

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 37

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

reasonable
392:4, 19
393:6    406:3
reasonably    601:4
reasons    519:13
536:9    560:10,
16    572:5
586:20
Rebecca    369:5
392:9    417:7
526:12, 20
533:2, 25
534:13, 17
552:5    553:8,
11, 14    554:2
recall    316:25
317:8    323:23
324:20    326:4,
15    329:1, 14,
20, 21, 22
334:10, 12
335:6, 9    336:2,
20    339:16, 19
346:8    348:25
351:13    353:16
360:9    363:1,
20, 25    364:23
368:16    369:8,
15    378:8
381:13, 18
384:14    385:15
392:21    394:15
397:21, 22
400:7    403:5,
18    405:11, 15
407:13, 18, 25
409:25    410:7
418:15    423:10
427:17    428:13
429:8    431:3
433:10, 15
434:9, 16
435:16    436:3
439:19    443:9
446:5    447:5,
14, 25    450:22
456:22    460:19,
20    461:24
463:17    464:4
466:2, 9    470:8
476:3, 7, 8
479:9    480:7,

16, 24    482:3,
15, 23    483:2,
11    484:12
487:2, 18
489:1, 9, 15
490:23    493:13,
14, 16, 20
495:1, 16
499:10    500:2,
14    501:9
503:2    507:2
511:14    514:1
515:2    517:22,
24    518:3
523:16    530:11
537:10    542:14
545:24    547:1
548:1, 11
550:7, 12
554:15    557:5
559:7, 8
560:11, 20, 22
561:2, 13, 25
562:17    563:14
564:10    567:3,
12    568:3, 21,
24    572:6
573:10    576:6
577:6, 9, 19, 21
579:3, 15
580:1    581:21
585:6    594:3
597:2    599:24
recalled    364:3
recalling    344:12
receipt    415:17
463:16    541:11
544:3    572:11
receive    461:19
531:8    570:17
received    327:20
335:23    339:8,
13    341:11, 12
342:1    351:5
382:1    391:1,
19    412:4, 7
416:11    429:20
438:7    445:9
446:14    450:16
465:23    496:17
516:21    533:13
537:17    541:1,

20    568:18, 22
570:11    580:2
597:2
receiving    329:7
358:7    388:22
390:12, 17
412:18    425:6
449:23    475:23
496:25    497:1,
13
recess    380:24
422:18    453:25
503:9    555:20
recognize
386:14, 23
recollection
324:17    343:11
346:13    378:1
394:5, 17
404:11    427:11
428:11    429:8
430:2    431:14
442:23    494:16
499:16    503:22
514:16    561:12
563:9, 10
595:20
reconsidered
500:7
reconvene    602:3
record    340:1
356:21    378:9
379:3, 5
380:23    381:1
422:17, 20
429:5    440:8
453:24    454:2
497:19    501:16,
24    503:4, 8, 11
507:20    555:19,
22    588:2    602:9
records    324:19
402:24
recounting    348:5
recovery    531:8
redacted    327:7
458:17
redactions    480:2
reduce    479:12,
13
reduced    479:8
603:10

refer    448:6
487:6    524:5
reference    438:5,
10    458:1
480:19    506:6
520:7    525:12
545:7
referenced
433:1    444:17,
19, 21    454:4
456:24    461:12
534:11    535:7
references
460:13
referencing
366:18, 21
462:19    527:4
583:9
referred    322:21
329:15    483:4
referring
331:14    347:9
364:5, 24
367:1, 20
368:1    370:9
401:21, 24
420:22    425:25
426:8    430:9,
25    438:16
444:19    481:22
490:24    518:23
522:13    533:16
534:19    545:20
558:25
refers    419:19
480:17, 24
reflect    392:17
402:25    408:19
440:9    472:22
479:17    589:14
reflected
335:25    535:13
536:14    537:2
539:5    543:13
546:13    560:21
562:18
reflecting
403:8    563:25
reflection
562:18
reflects    501:24
536:25    569:3

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 38

**Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.**

**Terrence P. Collingsworth - Volume II**
**2/21/2024**

refresh   346:13
503:22
refusal   355:19
refuse   580:21
refusing   443:24
Regarding
309:10, 12, 16,
18, 20, 22
310:3, 5, 7, 9,
12, 14, 16, 18,
21, 23   311:1, 3,
5, 7, 9, 12, 14,
16, 18, 20, 22,
24   312:1, 3, 5,
7, 9, 11, 13, 15,
17, 19, 21, 24
313:1, 3, 5, 9,
11, 15, 17, 19,
21, 25   314:1, 5
351:1   352:19
375:20   432:25
461:23   465:13
488:9   590:24
Regarding327
309:14
regardless
399:10   541:3
REGISTER   312:8
regular   342:23
490:3   558:11
regularly
342:24   370:6
rejected   510:3
relate   324:14
480:22
related   320:16
321:11, 13, 19
373:10   416:3
426:19   435:3
541:20   545:15
577:20   595:1
relates   320:14
340:6   354:2
363:16   390:23
403:4   519:24
relating   306:8
331:18   342:5
376:6   407:19
533:18
relation   323:21
360:8   452:24

598:10
relations   585:2
relationship
354:20   382:18
395:24   421:7
422:7   427:1
462:13   467:6
470:25   474:18
477:21   492:25
493:6   553:21
585:11
relative   594:1
relatively   443:7
relatives
593:20, 22
595:4
relay   401:16
relaying   381:20
404:14   417:13
relays   406:4
release   556:8
572:1   573:17
released   352:15
579:8
relevance   439:15
relevant   394:13
relocate   440:7
441:15   442:8
558:7
relocated
501:20   525:24
relocation
463:18   466:4
557:1, 2, 20
558:1, 12, 17
rely   411:17
601:25
relying   331:20
365:25   416:7
419:9   484:6
519:17   560:12
601:4
remain   332:21
508:18
remainder   588:21
remained   460:18
remains   459:2
remember   335:17
336:6   344:14
368:20   384:6
417:11   418:22
441:15   442:13

446:2   447:16
448:18, 19
459:11   463:1,
19   467:21
477:10   485:19
496:25   517:21
547:2   551:23
remembered
447:17, 18
567:7
reminded   423:5
remotely   316:11
remove   471:5
removed   395:6
397:7
rendering   590:23
reparations
471:2
repeat   383:20
406:22
repeated   402:6
repeatedly
398:18   402:18
413:18   425:5
525:1   558:20
replied   381:24
reply   310:9
312:19   515:4
report   339:17
341:14   342:3,
10   429:22
434:5   446:10,
16   449:16
489:22   591:12
598:14   599:3
reported   388:25
412:3   415:14
416:1, 2   567:25
Reporter   315:1
316:15   508:1
588:3
reporting   421:4
434:3   449:21
460:4   494:6
522:6
reports   411:17
412:2   450:15
459:4, 6
461:20   567:20,
24   595:9

represent   316:1
332:25   363:12
451:6   499:20
representation
421:19   499:21
502:24   506:21
representatives
591:3
represented
332:23   422:4
451:3   499:11
representing
380:6   421:16
439:14   451:10
498:22   523:1
594:18   595:4
represents
333:11   504:21
603:12
reps   545:2, 8
request   310:10
338:11, 16
340:17, 19
352:11   371:16
406:13   440:24
441:11   474:25
475:9   498:8
508:10   571:17
572:16   589:15
600:9
Requested
312:21   351:25
406:2   414:16
429:22   478:25
488:14, 19
558:6   589:13
requesting
354:13   357:5
413:13   458:7
requests   340:18
352:24   354:3,
11, 12   358:24
368:7   438:16
447:1   550:1
require   349:21
593:12
required   440:13
490:12, 19
593:16
rescuing   508:20
research   438:25

1-888-326-0504  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 39

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

reserve     589:3
resolve     587:23
resolved    370:2
 502:9, 21
resources   413:1,
 4
respect     339:18
 371:14    375:4
respective
 305:17
respond     349:25
 395:25    413:17
 447:9     490:8
 498:25    499:1
 502:7     506:17,
 20    507:10, 24
 513:16
responded
 381:16    550:1
responding
 354:17    439:1
 441:6     463:8
 491:10
responds    350:15
 375:20    406:19
 449:25
response    312:17
 350:20    352:25
 354:9, 15
 401:15    457:10
 464:13    469:13
 491:18    500:22
 501:2, 6, 7, 11,
 13    502:5, 10
 507:17, 22, 23
 510:17, 18
 512:1     600:19
responses
 421:23    437:3
 465:18    504:15
responsibility
 328:19    399:11
responsible
 332:6     384:10
responsive
 358:24    438:15
 440:18
RESPUESTA    311:3
rest     482:21
 523:2
restored    467:24

restricted
 352:21
restroom    422:12
 555:17
result     471:22
 495:11    537:12
 584:8     603:19
resulted    508:21
results     526:24
resume     332:2
resumed    577:18
retaliation
 365:19    366:24
retract    329:3
retracted   329:4
 426:10    598:3,
 5, 13
retraction
 430:6    598:10,
 24
return     526:21
 552:11
returned    574:14
revealing   521:23
revert     552:7
review     465:17
 494:21    503:21
reviewed    334:19
 335:2     387:20
 517:1     552:8
revised    313:3
revisions   312:2
revocation
 486:19
Richard    327:6
 334:6     336:3
 341:7     373:1
 401:24    456:10,
 12    477:5, 10
 480:1     514:13
 515:2     544:13
 547:9, 14
 548:7     556:4, 7,
 21, 25    557:7,
 11    568:12, 20
 569:21    570:5
 571:10, 11, 18
 574:6     577:3
Richard's    571:13
ride     396:3, 4,
 9    397:1, 8
 398:4, 16

399:14    401:1
 407:4, 12
ridiculous    592:3
right    316:15
 321:22    326:24
 334:8     335:14
 336:16    337:20
 345:13    349:4
 353:24    356:18
 360:19    361:10
 362:2     371:25
 385:25    387:22
 390:10    391:20
 394:21    416:6
 422:9, 21
 432:3, 6, 8
 437:11, 14
 439:22    443:21
 452:22    453:9
 456:4     462:4
 470:9     477:18,
 21    479:24
 481:17    493:12
 500:12    502:25
 503:6     515:18
 516:13    521:15
 526:8     532:16
 535:15    537:7
 538:11    547:19
 553:13    563:18
 568:7     569:1
 583:12    584:12
 585:5     587:24
 589:3     590:8
 597:22    599:6
 601:13, 18
 602:2
Rights    317:20
 320:13    433:6,
 7    467:24
 494:9     501:18
 518:12
risk     382:17, 25
 383:5     384:8,
 13    393:25
 398:4, 10, 20
 399:1, 9    400:2
 402:11, 16
 403:17    405:3,
 8, 13    406:8, 10,
 11    407:4
 408:10, 12, 17,

22    409:1, 3, 14,
 19    410:2, 14,
 25    411:7, 9
 412:25    413:23
 414:6, 12, 13,
 17, 23    418:5, 6,
 14    419:6
 425:8, 9    426:3,
 5    441:25
 509:18
risks    415:4
rks@spotswoodllc.c
om    308:10
rogatory    336:18
 351:3    363:14,
 24    418:17
 422:1    451:2
 466:20    483:13
 487:4
rogs    311:14
role    328:13
 595:17, 22
Room    305:23
 315:9    461:8
 477:25    478:14
 588:11
rooted    439:12
roughly    368:20
round    378:10
routine    353:9
roving    412:1
rudderless
 518:17, 20, 22
 519:6, 8, 15, 23
 520:4, 15
rule    518:13
rules    306:8
 315:5    511:22
 516:17    517:6,
 8, 19, 25
run    555:16
running    530:13
rush    356:17, 19,
 25    357:3
 358:4    371:24
Ryan    388:18
 389:16
Ryan's    395:25

< S >
s/Merit    603:24

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 40

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

safe  425:2
458:17  463:9,
25  475:6
525:5, 15
safety  406:3
413:1
sake  415:24
Saludo  310:16
Samario  330:9,
15, 21  332:7
337:3  343:2
346:19  347:9,
13  366:16
368:6  371:13
375:15  376:7
394:23  415:8
420:16  421:1
422:8  475:23
476:6, 11, 15
496:7, 18
497:2, 5, 21
504:17  505:1,
9, 25  507:11
510:20  514:5
525:13  526:6
527:4  528:1,
17  531:1
532:6  533:15
535:12  536:1
539:9  544:4
545:8, 16, 23
553:5  554:3
558:7  559:5
568:16  571:7
582:9  590:20
591:6, 11, 17
598:7
Samario's
313:21  525:22
550:20  569:22
600:6
Sanchez  560:13,
17
sanctions  498:6
Sansbury  308:5
Sansom  308:5
Santos  467:18
470:12  473:3,
5  480:10, 12
485:22
SARA  307:19, 21

Sara@kropf-
law.com  307:25
sat  434:22
satisfied  575:18
Saturday  568:23
saves  436:10
saw  328:12, 18
332:20  334:7,
24  335:15
346:25  350:15
353:12  394:18
397:19  546:1
582:8  592:17,
19  598:14
saying  329:12
336:3  342:11
351:21  352:12
353:22, 23
354:12  363:19,
20  364:4
365:18  368:10
372:14  392:13
398:3  400:25
404:17  405:24
406:20  421:3
423:4  427:14
430:17  433:18
440:22  445:7
446:20, 22
447:10, 19
448:4, 5
451:20  456:11
474:10  486:22
488:9  491:13
503:3  505:13
513:16  519:14
520:13  525:13
539:13  557:25
562:24  566:17,
20, 21  579:12
581:2, 18
582:1  592:1
593:19  600:11
601:5
says  322:5
323:15, 17
327:9  328:1
331:9  338:5
339:2  348:6
349:15  350:7,
8, 21, 25  361:8,
11  362:9

363:21, 22
365:13  367:23
368:18  371:10
372:19  385:23
386:11, 13
389:2  393:12
401:10  402:8
405:22  406:18
417:13  418:3
419:14  420:17
421:4  423:19,
20  443:23
444:6, 13
447:14  449:3,
5, 19  452:7
453:13  458:3,
16  459:22
464:14  465:8
467:6, 25
470:10  472:1,
6  477:22
478:21  480:2,
25  483:6
486:24  496:5
501:5  505:8,
11  510:23
511:20  513:6
514:25  525:16
526:15  527:11,
14, 19  528:14,
18  529:15
531:7  537:18,
22  539:15
540:9, 10, 15,
24  548:1
549:16, 18
550:22  554:20
557:14  569:5
571:24  573:17
583:7  586:1
590:3, 17
597:13  600:8
schedule  312:24
scheduled
588:15  589:16
Scherer  308:16
316:9  319:3,
21  321:9
327:5  331:5
334:6  336:3
352:20  356:16
365:2  373:2

378:11, 13, 16
379:25  388:8,
11, 17  390:21
401:24  402:4
403:3, 9  420:5,
10, 13  454:24
456:10  477:4,
5, 10, 15  480:1
489:25  490:2
498:23  514:14,
23  527:20
528:1  529:20
532:25  539:22
542:18  544:1,
2, 12, 17, 23
547:9  548:7
549:19, 25
550:4, 10
556:4, 7, 20, 24
557:7, 11
568:12, 20
569:20, 21
570:4, 5
571:10  572:16
573:2, 11, 17
575:22  576:4,
12, 23  577:10,
14, 17, 23, 24
578:14, 22
580:7  581:23
583:21  584:3,
11  585:2, 9, 11
school  442:4
458:19  504:22
scope  466:22
467:2  485:20
502:4
screwed  450:5
screws  425:2
se  433:23
searching  454:17
second  345:18
349:10, 12
353:17  356:8
414:13  427:21
451:1  462:6
481:10, 11
482:5, 25
518:9  521:11
526:15  530:23
533:10  534:8,
21  535:20

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 41

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

536:4, 20
542:22    546:6
590:16    600:11
**secondary**
486:21    487:6,
9, 15, 17
**section**   338:1
**secure**   338:8
351:18    393:22
513:15
**secured**   316:24
468:8
**secures**   542:1
**security**   319:6
322:16    324:1
325:8, 11
338:8, 11, 13,
17    339:1
340:13    341:5
343:8    346:4,
15, 19    347:3
348:13, 23
349:2    351:7,
22, 25    352:2, 5,
14, 24    354:5,
10    355:13
357:14    364:22
365:5    368:8
369:13    373:10,
12, 17    375:18,
21    376:12, 20
377:10, 25
380:11    381:7
382:2, 7    383:5,
15    384:20
385:9    389:6,
15, 23    391:16,
25    393:25
394:6, 9
396:13    397:15
398:2, 22
399:1, 5, 12
401:12    402:11,
15    403:17, 22
405:8    406:11
409:3, 14
410:11    411:3,
21    412:1, 3, 18,
22    413:2
414:6, 16
415:3    418:4, 7
419:21    425:6

426:19    436:2
446:7    459:20
460:8    462:1
468:3    475:24
491:4, 25
501:19    525:21
526:5    527:16
529:13, 14
530:1, 15, 16,
17    547:18
557:1, 2, 20
558:1, 11, 12,
17    598:11
600:5, 10, 16
**security-based**
373:5
**see**    323:9
324:11    327:8
328:15    333:10
337:20    338:3
339:22    341:24
345:21    346:22
354:19    356:19,
24    377:19
396:1, 15
406:7    407:11
431:13    436:1
453:12    462:6
464:15    465:12
480:22    487:17
491:23    495:15
510:9    512:8
517:4    525:8
542:4    543:15
570:13    574:14
580:6    592:1
596:3    597:3, 23
**seeing**    325:7
403:5    409:7
479:7    581:21
**seek**    360:3
**seeking**    342:4
508:14
**seen**    355:2, 6
403:1, 7, 12
406:9    428:1,
24    430:23
475:11, 13
543:22    550:3,
8    581:14, 17
**selling**    557:10

**send**    322:7, 25
341:15, 16
349:19    356:20
379:16, 19
407:16    409:21
495:14    528:15,
25    539:7
571:8    573:12
579:13, 21
580:21
**sending**    319:3,
11    324:8
342:25    347:12
363:5    365:20
372:23    374:1
379:24    463:10
479:25    500:21
528:11    530:24
544:22    571:17
579:16    598:6
**sends**    405:23
**sense**    426:7
571:16    572:20
**sensitive**    373:5
**sensitive...tomorr
ow**    349:17
**sent**    319:5
322:10    323:20
325:16    350:25
356:22    357:19
360:10    365:25
375:6    376:6
407:1    427:13
464:18    479:22
501:8    528:19,
21    529:21
530:1, 4
535:16    537:22
538:13    541:4
550:2    573:4
576:23    578:16
579:4, 11
580:1, 12, 14
583:22    598:19
599:22
**sentence**    402:6
450:6    483:3, 5
525:10    531:6
562:21    574:25
**sentenced**    506:15
**sentences**    520:2

**separate**    439:11
474:5
**separation**
378:17
**September**
328:16    370:24
371:12    372:17,
18    375:6
449:1, 7
451:19    563:21
590:2, 18
**series**    349:13
453:6    512:5
**serious**    335:12
341:19    346:2
364:16    365:15
367:14    371:16
502:17    514:3
547:16
**seriously**    467:10
**served**    358:24
444:6
**service**    337:13
445:10
**services**    451:8
529:17, 22
536:17    539:19
**set**    326:8
361:15    409:10
504:23    526:22
**sets**    517:8
**settle**    586:11
**settlement**
467:15    470:11,
14    471:21, 25
472:5    586:22
587:1, 22
**seven**    380:14
590:25    591:9
593:21, 22
594:6, 14
595:1, 5
**sever**    470:25
471:4    480:21
486:4
**severe**    354:24
**shaggy**    433:16
**shaping**    560:15
**share**    460:3
**shared**    335:19
510:21

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 42

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

**Shari**   574:6, 8, 9

**SHERMAN**   307:8

**shift**   453:21

**Shinola**   443:3

**shocked**   513:14   514:25

**shoes**   323:11

**Short**   380:24   422:18   468:24   487:20   503:9   513:21   555:20

**Shortly**   469:23   498:5   549:21   568:19

**show**   341:20   356:11   358:11   374:14   422:22   443:14   491:9   503:12   532:19   552:2   555:24   568:7   569:16   582:17   589:22   596:9

**showed**   326:10   335:22   339:17   341:16   352:18   356:1   368:7   388:15   397:23   399:18   400:13   492:21   502:25   510:21   597:25

**showing**   358:15

**shut**   602:3

**side**   327:16   330:23   413:19   518:15, 16

**sign**   348:12, 22   351:6, 22   357:2   410:5   411:4   458:4, 7   462:13   542:23   549:3   552:10   557:23   579:19

**signature**   306:4   494:24   569:8, 24   572:11

**Signed**   313:13   317:5   326:2, 6   345:11   411:8   418:9, 19, 21   426:13   468:21

**478:4   495:2, 6, 7   527:25

**528:22   529:1   531:21   533:4   534:2   535:8, 14   538:9, 13   539:8, 17   540:6   541:11   542:24   548:17, 24   549:11   551:10, 12   552:9   554:22   556:16, 18   557:16   561:17, 20   563:5   564:12   565:21   567:9   568:13, 18   569:3, 8, 22, 25   570:9, 16   571:8   572:18   573:16, 18   574:23   575:15   579:20   580:4, 8, 20   581:2, 19, 25   598:2

**signing**   411:7   549:4

**signs**   528:13   538:18   581:3   597:7

**similar**   335:3   412:9   459:7   537:15   563:5

**simply**   414:2   439:1   485:5   576:9   583:7   586:15

**single**   355:6   385:2, 15   539:2   577:22

**singled**   455:17

**sit**   324:20   325:10, 14   330:13   339:14   355:24   368:20   374:13   377:5   385:15   387:19   397:21   403:19, 23   421:12   428:14   439:3   463:17   464:4   466:2   486:10

**490:22   531:12   538:13   545:24   550:7   554:15   565:18   581:7   594:3

**sitting**   324:22, 24   355:3   369:8   396:22   428:8   561:14

**situation**   322:11   325:2   336:13   352:17   357:18   371:11   383:7   384:15   394:7   398:10   401:17   403:22   404:4   406:11   409:18   410:17, 20   411:21   412:24   413:18, 20   419:3, 4   430:1, 2, 10   445:15   459:12   470:17   482:24   509:13   515:16   517:9   523:11   560:4   593:11, 16   597:24

**situations**   461:24   489:12   491:15

**six**   380:14   435:12   521:13   525:18

**skype**   349:19   406:20

**sleazy**   518:14   520:6, 10, 18, 21   521:1, 4   522:14

**sloppy**   478:17

**slowly**   346:1

**small**   448:9   463:3   477:16

**Smith**   498:9, 22   499:3, 11   500:1, 22

**Smolders**   503:19, 23   508:6   509:23   510:15   511:3

**soccer**   568:2

**socially**   521:21

**sole**   468:15   529:16   530:19   537:11   538:4

**solely**   426:19

**solicit**   541:23   542:8   543:2

**solid**   433:19   517:14

**solitary**   433:20

**solve**   371:17

**somebody**   332:21   366:3, 6   381:20   394:24   423:19   434:17   442:9   484:12, 14   485:3   492:10   499:5   544:16

**somewhat**   459:23

**son**   371:3   577:14

**sons**   371:8

**soon**   362:16   363:23   396:2   526:25   528:13, 16   537:23   538:18   543:4   547:12   552:14, 21   556:25   557:3, 11   582:2

**sooner**   410:23

**sorry**   345:14   350:15   351:8   401:16   419:23   525:8   578:8   598:20

**sort**   320:1, 20   333:10, 20   339:9   340:2   341:14   342:9   346:9   382:7   404:22   417:12   419:3   429:25   433:4   434:24   446:5   459:13   462:14   464:3   466:18   487:12   494:20   503:24   514:20   522:14

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 43

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

551:13    593:5
594:10    595:22
sought    353:10
sounds    433:20
501:6
source    320:9
sources    319:19
South    494:1
SOUTHERN    305:3
315:19
Spanish    389:17,
22    548:19, 25
549:8    552:12,
13    562:6
568:16    569:10,
11, 24    595:10
SPANOS    308:3
Speak    350:1, 8,
11    365:3
385:1    389:16,
22    399:7
415:21    483:9
562:3    590:14
595:10
speaking    338:18
353:10    411:6
455:24    482:15
speaks    579:25
specific    320:17,
21    322:14
324:17    339:19
350:5, 10, 12
379:15    431:3,
5    432:13
447:13    479:9
480:9    493:15
519:18    547:1
568:3
specifically
319:24    320:6
329:22    335:10
339:14    348:25
360:17    365:4
367:1    371:21
373:14    467:21
482:15    488:21
501:9    515:22
517:21    527:11
557:22    559:7
specifics
405:11    409:25

435:17    590:15
specified    539:20
speculate
448:18    520:11
539:3
speculated
367:20
speculating
546:23
spend    351:17
spent    353:15
357:22
spoke    381:15
400:8    482:8
484:14    496:6
507:4    562:5
spoken    381:11
400:4    442:10
sporadically
434:21
Spotswood    308:5
316:10
Spreadsheet
310:7    313:7
squared    368:10,
19
stabbed    415:25
416:18
stack    434:10
staff    409:12
480:13
standpoint
411:17
Starnes    307:10
start    331:7
336:23    473:1
481:19    598:6
started    343:11
425:12    469:24
598:11
starting    349:13
562:22    588:19
590:16
starts    462:15
State    305:21
315:3, 25
424:13    478:15
567:23    603:4
stated    368:5
386:22    408:9
417:16    494:11

540:22    558:20
587:21
Statement
313:23    346:10
367:12    406:25
407:17    411:8,
9    413:22
414:25    423:7,
9, 18    425:15,
17, 24    426:2,
10    431:25
432:1    465:9,
19    497:3
501:22, 25
504:25    590:8
597:10
statements
384:25    385:5
386:5, 15, 24
424:4    432:2
465:6    476:19,
21    562:9
600:25
STATES    305:1,
22    315:8, 17
376:24
state's    331:23
stating    410:21
417:20
stay    502:20
stayed    502:8,
18    503:3, 5
589:6, 7
staying    464:12
steelworkers
382:5    383:10
stenotype    603:9
steps    490:12,
19    491:18
stick    341:23
444:23
STIPULATED
305:16    306:3,
11
stipulation
315:6
stipulations
316:16
stole    444:14
445:6
stop    362:17
382:20    383:16

395:14    403:11
412:14    416:7
418:25    462:17
525:2    577:15
589:2    596:4
stopped    378:16
382:18    402:25
408:19, 21, 24
410:15    418:23
472:9    523:20
stops    426:1
stories    328:3
340:11    451:21
story    328:21
329:3    423:15
452:7    565:11
568:4    594:15
strategic    577:5
strategy    585:21
587:5
straw    447:6
Street    307:22
308:6
streets    563:18
stressing    463:6
stretch    311:12
strike    453:20
484:20    594:24
strikes    421:13
592:2
strong    455:11
591:3
structure    474:6
structured
481:25
studies    392:22
stuff    462:5
491:4    514:21
Suarez    371:2
subject    365:19
385:24    455:6
491:11    502:5
552:6    566:21
602:4
subjected    383:23
subjects    377:13
subsequent
329:11
substance    577:4
substantial
323:20

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 44

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

substantiate
343:18   355:19
376:23
substantiating
341:25   359:4
Substitutes
597:6
success   510:5
successful
486:23
suddenly   411:9
424:21   426:24
483:23
sued   491:3
suggested   374:7
suggesting
344:9, 11
suggestions
392:4
suggests   320:8
Suite   307:23
Summary   310:7
313:7   413:15
564:22
summer   511:16
sums   323:20
sunshine   516:5,
12
SunTrust   317:11,
14, 24
superseded
468:16
supervision
603:11
supplement   503:4
supplemental
502:10
support   320:17
380:11   390:17
392:5   396:13
414:3   418:4, 6
419:20   459:8
460:17   478:20
509:8
supported
404:24   413:20
supporting
318:15   396:13
404:23   417:21
418:10   461:6
supportive   522:3

supposed   339:12
342:5   382:9
401:13   434:20
461:11   484:22
552:11   581:10
supposedly
361:6   398:2
457:3   562:24
565:4
sure   324:18
339:15   341:1
350:18   361:2
362:20   364:23
374:8   389:24
393:21   395:8
420:22   428:8
436:12   437:18
442:1   458:2
463:21   476:2
477:17   479:2
482:4   486:18
490:14   492:11
493:9   494:20
507:21   513:10
539:23   542:12
583:14   596:5
surmising   368:17
surprised
388:17   487:17
surrounding
560:4
surroundings
409:8, 13
survive   510:19,
25
Susan   544:12, 14
Susana   369:6
374:20, 21
399:19   400:13
401:13   405:21
406:19   423:3
522:8   532:25
538:24   540:2,
23   552:4   574:6
Susana's   332:20
397:22
switched   483:12
487:3
sworn   316:13
421:23   423:18
426:16   431:25

432:1   501:18
system   596:19

< T >
Tab   309:10, 12,
14, 16, 18, 20,
22, 24   310:1, 3,
5, 7, 9, 12, 14,
16, 18, 20, 21,
23   311:1, 3, 5,
7, 9, 11, 12, 14,
16, 18, 20, 22,
24   312:1, 3, 5,
7, 9, 11, 13, 15,
17, 19, 21, 23,
24   313:1, 3, 5,
7, 9, 11, 13, 15,
17, 19, 21, 23,
25   314:1, 3, 5
321:23   324:3
326:25   333:24
337:21   342:14
370:20   372:7
373:24   374:18
387:23   400:16
405:16   416:24
419:22, 23
422:9, 24
432:19   435:6
436:20   448:21
451:15   453:18
456:5   457:15
466:10   481:5
486:12   494:2
497:22   500:16
503:13   511:4
512:23   518:4
521:5   524:11
526:9   532:18
547:3   548:13
550:15   555:13
556:2   570:23
573:24   578:8
582:7   589:18
596:3   599:3
tabs   568:6
tactic   419:16
take   320:14
348:8   380:21
414:12, 23
422:11   449:7
452:18   453:12

467:10   483:7,
14   484:18
486:20   501:4
503:6   508:2
taken   305:20
340:5   433:25
453:25   494:8
603:8
talk   329:24
349:18   439:20
456:15   467:22
484:17   485:7,
15   486:6
508:22   558:23
talked   317:6
340:3   468:11
489:21   490:5
517:16   520:22
524:7
talking   322:12,
14   328:10
332:8   341:22
347:15, 17, 19,
21   350:6
354:1   360:15
365:11, 23
366:8   367:3
372:5   377:22
393:1, 2
394:11   395:1
401:8   411:22
457:20   462:10
466:7   474:21
483:24   491:12
521:21   525:2
529:9   565:9
576:17   584:10
587:4   590:12
talks   458:15
tangentially
395:9
targeting   338:7
339:3
task   482:17, 20
595:11
task-based
379:14
tasks   541:7
TC   312:19
tdavis@starneslaw.
com   307:16

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 45

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

team    333:7
  334:4    377:22
  387:7    395:1
  398:15    409:2,
  6    424:12
  431:2    434:18,
  24    435:11
  436:12    441:18,
  24    442:9
  446:13    452:12
  461:20    475:9
  484:7    486:17
  518:10    521:12,
  20    522:25
  523:4, 9
  524:20, 24
  542:13    543:23
  564:6    566:13,
  25    567:8
  595:23    600:5
tell    323:18
  334:10    350:5
  352:25    355:3
  364:2    367:6
  373:2    377:24
  384:4, 19
  403:24    406:14,
  16    413:24
  427:9, 14
  429:4    430:9
  438:4    447:10
  449:4, 5
  471:15    475:7,
  22    476:14
  486:3    493:21
  495:8    507:14
  523:8    528:24
  544:1    549:8
  568:14    571:20
  572:24    578:13
  600:4    601:13,
  18
Tellez    374:20
  401:2    405:21
  423:4    532:25
  533:1    537:14
  538:24    540:2,
  24    574:6
telling    342:19
  350:10, 11
  354:8    356:1,
  16    359:24

362:7    367:7
  372:1    373:8
  388:21    390:10
  398:15    401:2,
  16    420:15
  421:12    438:17
  443:20    446:13
  449:2, 22
  452:12    491:20
  498:9    504:14
  516:7    518:10
  523:4    524:24
  530:25    533:2
  537:14    538:22
  545:1    547:12,
  14    552:20
  553:12    556:20,
  24    557:10
  573:15    574:5,
  13    575:5
  578:22    585:13
tells    352:23
  357:2    383:14
  552:7    579:20
temporarily
  525:5
ten    502:12
  546:17
tense    545:2
  546:10
term    487:13
terms    523:21
  525:20    538:16
  545:17    549:17
  554:24    576:7
TERRENCE    305:8,
  10, 19    309:3
  315:12, 17, 20
  316:12
terrific    373:6
terrified
  423:12    424:7,
  14, 19
Terry    310:9
  322:5    327:13
  328:3    342:19
  359:24    364:9,
  13    449:4
  488:13, 14
  494:12    542:9
  571:23
Terry's    362:13

testified
  316:14    322:20
  323:5, 7    325:6
  328:6    333:16
  342:7    352:3
  358:3    400:7
  407:10    425:4
  432:11    460:5
  461:16    466:17
  474:16    478:5
  479:2, 15
  480:12    485:18
  487:1    496:13
  498:17    505:4,
  24    509:11
  512:14    531:22
  564:15    566:10
  597:19    600:18,
  21
testifies    330:2
testify    327:15
  362:16    363:23
  369:12    382:10,
  15, 19    402:20
  420:17    428:25
  429:10    433:19
  435:24    438:6,
  11, 14, 21
  439:8    478:6
  501:17    525:14
  582:10
testifying
  402:14    408:2
  487:8    567:18
testimony
  316:25    328:15,
  24    329:13, 18
  330:10    332:12
  339:6, 21, 23
  340:6    345:5
  363:7, 9, 14, 24,
  25    369:20
  383:18    384:25
  385:16    387:14,
  17, 20    390:14
  396:19    397:9
  400:1    402:8,
  10    405:3, 5, 6,
  7    406:8, 9
  408:8, 10, 16,
  25    410:2
  414:7, 11, 18

418:17    426:12,
  16, 20    428:3
  431:9, 13, 15,
  17    432:16
  433:25    449:7
  451:3    457:12,
  13    465:23
  466:1    474:20
  478:6, 12, 16,
  17    494:8
  496:1    505:23
  508:16, 23, 25
  509:7, 17
  517:7    531:19
  539:25    550:17,
  21    558:8
  562:8    566:3, 7,
  8    567:4, 6
  585:10    591:16
  600:20    601:16,
  21, 23    602:1
Text    310:7
  313:7    341:13
  349:8    350:13,
  21, 25    353:17
  354:10, 13, 18
  356:5    510:14
  532:23    533:24
  534:11    535:7
  536:18    537:18
  538:24    539:2
  546:1    550:8
  582:8
texts    349:10,
  13    352:2
  545:15
Thank    555:17
theme    345:25
  346:6
theory    582:14
there...involves
  350:18
thereto    306:18
  603:10
thing    354:1
  418:13    425:4
  436:13    437:23
  444:4    445:24
  446:22    500:9
  510:24    511:2
  522:12    539:16
  540:11    598:25

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 46

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

things        325:25
330:3    349:20
380:9, 14
384:9, 16
418:18    423:24
449:19    453:6
455:15    466:25
485:17, 21
486:1, 8, 11
492:21    515:20
521:19    522:5
545:3    557:25
558:2    567:24
568:5    574:12
582:4    597:13
think    324:16
325:25    326:11
328:9    329:4, 5,
16    330:7, 22
332:19    333:1
336:5, 7, 14
338:22    339:15
344:7    347:15
348:18    351:10
354:7    357:7,
11    358:17
363:11    365:11,
17    370:16
371:7    377:2
381:7, 22
383:24    384:4,
12, 14    385:2
386:8    387:1,
12    391:1
393:9    394:18
396:21    397:12
398:7, 18, 24
400:5    402:5,
21    403:19
404:2    405:1
406:20    409:16,
22    411:5, 8
412:16    414:9
415:19, 24
416:1    418:2,
16    419:2
420:20    424:10
426:7, 22
427:15    428:10,
12, 16    438:2
440:8, 20
441:3, 17

442:3, 14, 21
443:7    445:1, 3,
15, 20    446:5
448:6    449:15
450:24    451:5
452:16    453:5
454:12    455:17
458:12    461:3,
4    463:4, 9
464:2    466:4, 5,
22    467:22
468:11    469:17
470:16, 19
471:10    473:20
474:1, 4
475:13, 17
476:10    477:15
478:16, 21, 23
479:13, 15, 17
480:11, 18
484:13    485:20
487:9    489:2
490:16    491:7
492:13, 20
493:1, 23
495:6, 22
498:10    503:3,
24    505:24
506:1, 2
507:12, 22
508:13    509:2,
3    510:8
514:10    515:15
516:19    518:22
519:1, 8, 21
520:22    522:12
523:20    524:15
526:16    529:19
534:14    538:15
539:21    541:5
542:18    545:10
548:5, 6    551:7,
23    553:10, 22,
25    554:10
559:9    560:2
564:8, 11, 24
567:23    572:25
574:25    575:14
577:4, 12
579:10    587:1
590:12    594:11
595:21    598:15

600:14, 15
601:8
thinking    323:8
339:20    362:16
395:22    398:19
431:22, 24
433:23    453:11
490:23    534:5
548:12    551:4
565:25    586:25
thinks    375:10
451:21    452:6, 7
third    347:21
349:12    356:9
512:16    562:21
THOMAS    307:5
thought    341:5
342:22    343:7
350:16    368:10,
18    370:1
379:16    394:19
403:19    405:12
407:2    410:24
416:9    421:11
439:25    440:19
445:2    450:14
459:19    467:8
472:7    474:17
476:8    502:1,
23    517:13
519:7    532:11
535:18    543:12,
14, 20    550:24
558:4    559:14
560:19    567:4
575:1, 2
thoughts    334:23
454:14
thousand    319:12
482:5
thousands    440:6
threat    341:12,
13    342:1
425:21    426:11,
24    431:15
472:2    509:16
threaten    509:10
threatened
329:2, 12, 19,
24, 25    341:17
342:11    383:15
412:4    414:17

423:11    430:13,
17    431:1, 10,
24, 25    452:6, 8
462:16    475:4
497:4, 6, 11
525:2    590:5, 9,
13    592:2
593:19    594:5
598:1, 24
600:12, 17, 22
threats    327:12
329:7    339:7,
12    341:11, 19
342:5    366:6
383:24    412:7
416:11, 15
424:25    450:16
491:5    508:21
509:4
three    324:7
327:9    344:25
360:18    361:13
362:11, 18
371:15, 19
372:3, 20
380:12    443:25
452:9    501:20
508:9    512:6
541:22    551:7
600:24
threw    429:5
throw    509:25
ties    480:21
486:4
tiger    314:5
596:13
Tigre    313:19
328:23    332:7,
12, 18, 25
337:3    343:1
366:15    371:13
375:15    376:7
394:23    415:8
420:16    421:1,
20    422:8
430:1, 6, 25
431:22    475:23
476:6, 11, 15
494:8    504:17
505:2, 9, 25
507:11    510:20
512:5    514:5

1-888-326-0504  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 47

Case 2:11-cv-03695-RDP   Document 783-1   Filed 03/06/24   Page 254 of 259

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

524:25   525:21
526:6   527:4
528:1, 17
530:25   532:6
533:14   535:11
536:1   539:8
544:4   545:8,
16, 23   550:20
553:4   554:3
558:7   559:5
562:10, 11, 19,
24   563:4, 17
564:15, 18, 21
565:2, 7, 9, 16,
20, 24   566:2,
12, 19, 20
567:5, 15, 21
568:14, 15
569:3   571:7
582:9   590:19
591:6, 10, 17
596:16, 23
597:16, 19
598:2, 7, 22
599:23   600:2,
6, 10, 25   601:8
Tigre's   512:19,
20   556:22
560:23   561:2
565:11   567:6,
10   568:4
time   306:16, 17
315:24   317:6,
16   318:5, 9
321:3, 5, 11, 14
327:23   328:7
330:3   331:7
332:17   333:15
334:15   335:18,
23, 24   340:20
344:2, 3
349:17   352:22
355:18   357:22
358:2   366:16
369:1, 5
374:22, 23
378:11   380:15,
22, 25   381:6
386:17, 25
388:3   391:1
392:21   395:7,
21   396:10, 22

397:19   401:20,
23   402:3
403:3, 20
406:16   410:13
412:14   413:24
417:9, 17
420:9, 21
421:6, 14
422:16, 19
426:22, 23
427:3, 19
436:10   440:9
443:10   444:6
445:17   446:19,
23   451:8
453:23   454:1
455:13   467:7
468:6, 24
469:25   472:12
476:1   478:11
486:10   498:23
500:4, 8   501:4,
25   503:7, 10
509:14   513:21
517:13   520:12
522:14   530:25
532:3   540:17
545:25   547:22
550:5, 25
551:4   552:16,
23   553:2
554:4   555:18,
21   563:16
564:3   568:21
570:10   571:13
577:11, 14, 16,
23   580:9
588:3, 21, 22
591:25   592:19
596:6   598:18
599:12, 21
601:11   602:7, 8
time-consuming
595:11
timeframe   533:8
times   330:16
336:10   360:12,
18   395:5
402:7   433:13
452:9   475:17,
18, 20   532:7

539:21   551:8
592:24   593:9
Timex   443:12
timing   332:22
362:21   363:21
418:15   532:8
537:10   579:25
598:9
Tio   309:10
to-be-filed
582:25   583:3
today   324:23,
25   325:10, 14
367:23   368:20
369:9   371:12
387:19   403:23
421:13   425:5
456:11, 24
463:6   487:8
490:22   531:12
588:23   589:8
Today's   315:23
told   328:21
329:8   330:21
338:12   340:25
341:7   348:22
352:4   354:6
355:11, 25
357:13   367:14
368:12   369:12
381:16   383:8
385:6   391:5
392:11   401:4
404:15   412:17
413:17   415:16
423:15   428:18
429:7   430:18
442:3   449:4
452:10   455:2
458:20, 23, 24
459:5   460:9
461:3, 4, 15, 25
462:1   463:23
468:11   469:12
470:2   472:8
476:5   478:2,
14   480:3
483:23   484:1
496:9   499:4,
17   500:14
506:5   510:24
511:2   516:19

525:2   529:21
535:17   537:15
557:17   558:4
573:7, 9
577:10   595:14
600:2
Tolemaida
460:14, 21
461:9, 13
506:15
Tolemaida's
459:24   460:13
tomorrow   323:1
545:4   583:8
588:12, 14, 19
Tony   316:5
top   322:24
356:22   360:4
410:19   438:4
501:5   510:10
589:21
topic   530:20
Toro   421:24
451:4, 5   452:12
Torres   421:18
total   375:25
479:16
totally   430:19
513:14   600:24
touch   336:22, 25
town   344:14
track   497:18
545:3
transaction
323:14   326:17
441:20   469:24
535:22, 24
536:22   537:12
538:21   539:4
542:6   560:14
transactions
326:10   363:2
Transcript
309:16   603:13
transfer   325:2
351:8, 12, 18
353:13   354:6,
13   526:24
527:21   528:12
537:23   538:4,
7   547:12
549:19, 21

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 48

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

**555**:6, 8, 10
**571**:17   **578**:11
**582**:2
**transferred**
**348**:11   **351**:4,
14
**transfers**   **326**:1
**351**:19   **380**:19
**442**:14, 16
**translate**   **526**:14
**Translated**
**314**:3   **345**:20
**364**:6   **369**:6
**371**:1
**translates**
**362**:9, 10
**translating**
**322**:3   **345**:24
**371**:10
**translation**
**367**:22   **371**:21
**375**:2   **568**:17
**translator**
**368**:25   **369**:3,
4   **381**:14, 17,
24   **400**:8, 9
**transmitting**
**338**:23
**transparent**
**514**:17   **515**:5,
7, 15
**travel**   **319**:6
**323**:25   **380**:11,
16   **527**:15
**529**:11   **530**:3
**TravelFW**   **311**:5
**treated**   **522**:22
**treatment**   **433**:24
**Trey**   **316**:2
**trial**   **306**:17
**329**:18   **331**:8,
22   **363**:7, 8
**379**:9   **431**:9,
17   **465**:22
**478**:6   **566**:6
**600**:20   **601**:16
**tried**   **464**:17
**Trip**   **311**:5
**319**:13   **320**:14
**321**:18, 20
**322**:6   **524**:22

**598**:14   **599**:3,
9, 14   **600**:1
**trouble**   **410**:21
**452**:2
**true**   **328**:5
**329**:5   **332**:11,
24   **333**:21
**357**:12   **364**:8
**369**:21   **386**:5,
15, 24   **431**:12
**432**:2, 17
**446**:5   **447**:23,
24   **449**:12
**450**:8   **468**:13
**501**:22   **511**:17
**565**:2   **580**:14
**591**:23   **598**:8
**599**:25   **603**:12
**truly**   **363**:20
**trust**   **383**:11,
12, 13   **391**:5
**403**:15, 23
**411**:18   **449**:12,
21   **526**:18
**truth**   **328**:22
**449**:22   **450**:7,
9   **478**:10
**484**:19   **502**:22
**507**:16   **508**:5
**590**:6, 9, 14
**601**:4, 13, 18
**truthful**   **345**:5
**465**:25
**try**   **340**:24
**451**:22   **467**:9
**470**:24   **478**:25
**484**:16   **485**:2,
3   **516**:17   **545**:4
**trying**   **339**:11
**355**:17   **362**:25
**367**:4   **380**:8
**400**:5   **403**:2
**411**:15   **419**:7
**435**:20   **436**:3
**445**:1   **457**:13
**467**:22   **471**:4
**472**:13   **476**:7
**479**:11   **483**:7,
14   **484**:18
**487**:10   **490**:9,
22   **491**:3
**492**:8   **497**:19

**506**:22, 23, 24
**507**:21, 24
**511**:14   **514**:17
**536**:19   **545**:18
**547**:2   **579**:8
**592**:6
**Tuesday**   **348**:8
**349**:17
**turn**   **437**:1
**turned**   **331**:23
**429**:16   **450**:1
**552**:15, 22
**turns**   **452**:11
**504**:22   **539**:6
**twells@starneslaw.**
**com**   **307**:14
**twice**   **408**:9
**Two**   **336**:16, 20
**339**:13, 19
**340**:14   **341**:25
**344**:14   **360**:18
**368**:10   **371**:14,
18, 22   **372**:1, 2,
21   **376**:10
**377**:21   **386**:4,
23   **414**:10
**418**:3   **422**:6
**425**:5   **430**:23
**438**:7, 17
**442**:22   **443**:25
**444**:22   **446**:14
**459**:16   **460**:5
**473**:11   **477**:24
**486**:1, 5   **488**:4
**492**:21   **511**:20
**525**:17   **526**:5,
25   **528**:16
**529**:3   **533**:14
**534**:6, 10
**535**:2, 11, 19,
23   **536**:12
**537**:23   **541**:25
**542**:5   **547**:10,
13   **549**:9
**556**:16   **558**:2
**564**:14   **566**:25
**567**:17   **579**:19
**588**:15   **589**:16
**two-minute**
**422**:12
**two-month**   **375**:8

**typed**   **464**:13
**494**:24   **549**:12
**562**:2

**< U >**
**U.S**   **342**:10
**412**:9   **559**:6
**595**:25
**U.S.A**   **443**:3
**Uh-huh**   **337**:6
**473**:9   **562**:23
**ultimate**   **546**:10,
12
**ultimately**
**328**:21   **335**:12
**346**:18   **357**:23
**360**:4   **391**:10
**392**:14   **396**:14
**429**:17   **447**:8
**453**:7   **466**:3
**478**:4, 5
**479**:13   **492**:9
**498**:12   **505**:22
**509**:15   **580**:3
**unable**   **340**:22
**unbearable**
**322**:11   **325**:3
**uncle**   **322**:8, 19,
22   **323**:4
**353**:1, 6
**unclear**   **362**:20
**underlined**   **525**:6
**under-oath**
**600**:25
**understand**
**316**:22   **323**:15
**325**:4   **364**:13,
15   **365**:14
**369**:21   **396**:6
**398**:13   **406**:15
**413**:18   **432**:3
**466**:16   **513**:11
**514**:22   **570**:7
**576**:12
**understanding**
**338**:25   **404**:6
**413**:19   **429**:13,
15   **460**:22, 25
**462**:15   **470**:24
**484**:11   **527**:17
**532**:5   **535**:21

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 49

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

understands
  405:23    552:13,
21
understood
  357:7    380:13
  472:25    533:11
  537:16    538:21
  541:6    546:3
undertaking
  488:22
uneducated
  567:16
unethical    501:1
Unfortunately
  346:12    406:23
  456:20
unhappy    514:19
union    384:10
  386:12, 14
  426:6    494:10
  533:6
unique    410:16
  491:25
unit    496:6
UNITED    305:1,
22    313:23
  315:8, 17
unorthodox
  490:12, 20
  491:7, 19, 22
  492:2
unpack    483:17
Unpaid    310:18
unquote    357:14
  382:1    583:25
unreasonable
  366:4
unredacted
  335:4    338:1
unreliable
  513:24
unsecure    513:8
untrue    429:1
untrustworthy
  327:10
update    311:18
  312:24    313:9
  349:20    432:24
Updates    310:14
  311:20

Updates/Pending
  309:20
upfront    533:4
up-front    559:19,
24
Uribe    472:24
use    318:11, 17
  357:21    407:11
  444:12    452:2,
19, 23    470:13
  472:2    496:1
  497:20    516:15
  586:18    593:16
useful    382:24
  384:7    398:25
  399:4, 10
  408:16, 25
  414:1, 12, 18
  418:5    425:7, 8,
11    452:21
  509:17
Usual    316:16
Usually    320:23
  322:23

< V >
vague    427:11
  429:8    456:21
  548:5, 6    561:11
vaguely    350:5
  428:13    429:8
Valentini
  544:13, 14
valid    468:7
Valledupar
  322:9    344:6
  345:3    346:4,
16, 18    347:2, 7
  360:24    361:1,
3    367:24
  368:6    369:11,
23    496:7
  592:25
valuable    338:6
  382:17
value    437:6, 12,
23    441:4
  447:21    448:2,
9, 11
Van    322:22
  323:19    324:8
  353:6, 11

468:4    479:21
  492:11, 17
  494:18    495:10
  551:12
various    317:2
  328:24    412:12
vehicle    592:22
Venezuela
  444:15    445:3,
11, 14, 16, 19, 21
verbal    393:11
verbally    355:12
VerdadAbierta
  314:3    589:20
verdict    490:13,
17
version    549:10,
11    552:12
  565:12    569:6,
8, 22
versions    329:6
  548:25    580:13
versus    315:20
viability
  334:18    335:8
victim    333:12
victims    333:5
  590:4, 8, 11, 13
  591:2    593:19,
20
Victoria    388:18
  389:16    395:25
Videographer
  308:17    315:15
  380:22, 25
  422:16, 19
  453:23    454:1
  503:7, 10
  555:18, 21
  588:4    602:8
videotaped
  315:16
view    328:20
  414:5    423:21
  426:18    439:4,
9, 10, 12    465:9
  472:9    473:19
  522:20, 24
  541:14, 16
viewed    432:11
  465:3    487:14

543:21
views    335:3
violating    471:9
violent    365:19
  366:9, 24
virtually
  341:18    482:4
visit    389:23
visited    337:9
  344:12    345:7
  389:14    592:25
visits    419:11
  511:23
voided    468:23
voiding    468:12
  469:3
VOLUME    305:12
  309:3
voluntary    590:24
VS    305:7
vulnerable
  327:12    338:7
  339:3

< W >
Waichman    357:19
  488:7, 14
  489:22    490:14
  498:3, 8    513:4
  517:15    518:17
  519:10, 12, 22
  520:1
Waichman's
  489:17    517:2
wait    573:7
  581:18
waited    538:7
waiting    406:25
waive    521:25
waived    306:5
waiver    521:23
walk    390:21
want    422:13
  447:10    456:13
  463:5    492:7
  507:13    512:9
  516:4    524:9
  577:13    589:2
  599:1
wanted    341:2
  396:16    426:10
  429:9, 10

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 50

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

Terrence P. Collingsworth - Volume II
2/21/2024

445:5    488:20
498:12    586:3,
8, 20
**wanting**    335:21
428:14
**wants**    405:24
449:3, 5
525:23    552:15,
22    602:5
**warned**    451:25
**Washington**
307:24    312:4
593:4
**watch**    442:25
443:9, 12
447:10, 12, 25
448:4, 7, 15, 19
**watches**    443:5
**watching**    355:4
**way**    316:23
337:19    338:20
352:15    355:15
357:15    362:1
382:17    384:22
406:11    409:19
414:5    416:16
428:25    434:14
451:7    454:17
481:25    492:7
502:7    519:1
554:1    571:3
579:25    581:16
583:10    591:19
**ways**    387:4
391:14    521:4
587:11
**wear**    542:5
**wearing**    442:25
443:10
**week**    433:22
574:4, 16
**weeks**    468:19
470:1
**Well**    316:20
317:13, 20, 25
318:23    321:22
324:3    329:8
331:16    332:19
334:12    338:22
339:2    342:9
343:5    346:17,
24    347:5, 8, 12

350:24    352:23
353:8    354:9,
22    355:15
357:12    358:23
364:3, 20
367:2    368:5,
18    371:24
372:25    373:13
377:16    378:5
379:22    380:20
383:11    384:9
385:4, 18
386:16    389:2,
7    392:8
393:20    394:21
396:25    399:17
400:16    401:9,
23    402:5, 13
403:22    405:5,
14    406:5
407:23    408:1
410:12    412:23
416:4    418:8
419:2, 9
420:20    426:4
427:11, 20
435:16    438:12,
17    439:4
440:17    444:18
445:17    447:10,
17    452:8, 16,
18    453:20
455:11    458:11
459:11    466:21
467:2    470:16
471:24    475:17
476:7    480:9
482:6    484:11,
13    487:16
489:5    490:9,
22    491:16
492:19    497:10
498:22    500:9
501:3    505:19,
24    506:5
510:10    514:15
519:11    520:5
528:18    531:6,
15    536:9, 18
537:2, 5, 8
538:15    542:18
543:14    544:24

545:14, 18, 24
546:12, 25
547:7    548:19
553:10    556:21
558:4    560:2,
16, 23    563:14,
21, 24    564:12
566:6    572:2,
25    573:12
574:5, 22
575:11    576:5,
21    577:10
579:17    583:10,
16    584:1
588:20    589:1,
14    594:18
595:21    598:14
599:17
**WELLS**    307:5
309:4    316:2,
17, 19    318:3, 4,
6, 8    321:22
323:12    324:3
326:24    328:1
330:9, 25
332:10, 16
333:19, 24
337:20    340:4
342:14    343:9
344:16, 20
345:13    347:24
356:4    359:17
362:2    367:21
370:20    372:7
373:24    376:21
377:12    378:18
379:2, 4    380:6,
17, 21    381:2
385:4    387:16,
22    391:20
398:13    400:16
405:12, 16
407:7    412:16
413:7    415:22
416:4, 24
419:22    422:9,
13, 21, 24
428:23    430:24
432:19    435:6
436:20    442:24
448:21, 25
451:15    453:18

454:3    456:5
457:15    464:5
466:10    476:23
481:5    484:20
486:12    487:24
494:2    497:5,
22    500:16
503:12, 13
511:4    512:23
517:18    518:4
521:5    524:11
526:8    532:16,
19    539:25
541:18    544:7
547:3    548:13
550:15    553:10
554:13    555:4,
13, 23    556:14
561:15    562:20
568:6    570:23
573:24    575:19
576:3, 21
578:4, 6, 9
579:6    582:7
584:8    587:24
588:8, 13, 24
589:10, 18
596:3    599:2, 6
601:3    602:2
**went**    317:10
337:9    342:20
392:12    400:9
409:11    442:16
445:19    454:9
459:21    460:7
499:18, 19
504:22    532:10
557:6    564:9
599:22
**we're**    328:10
336:11    347:9
357:13    360:10
364:5    393:13
394:21    413:11
427:14    437:12
453:18, 21, 24
491:15    534:7
541:22    576:16
588:8    589:3
590:11
**We've**    349:13
410:3    437:2

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 51

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

456:16    459:12
474:20    524:16
538:15    569:1,
7    571:11
**whatsoever**
454:21
**who/what**    513:11
**wife**    393:4
441:16, 21
442:10, 19, 22
452:10    571:14
594:2
**wife's**    442:12
**WILLIAM**    307:7
308:2    316:8
**willing**    329:24
460:1    462:13
514:9
**win**    478:22
490:13
**wing**    390:8
**Wire**    309:22
310:21    324:8
342:22, 23
353:13    356:17,
25    357:3
361:21    371:24
372:15    390:20
554:17    571:8
**wires**    359:24
360:10    390:25
391:2    479:17,
19, 21
**witness**    306:5
315:12    338:6
351:24    380:7
381:5    382:5, 9
390:2    391:4,
11    394:17
395:10    407:21
410:24    411:2,
10    412:8, 13
417:5    422:11,
15    429:21
436:11    437:7
438:14, 20
439:15, 21, 24
451:11    452:3
458:25    459:2
461:6    462:7
487:23    501:14
502:4    504:12

505:20    506:13
509:21    511:24
516:23    517:10
525:19    529:8
535:6, 18
546:4    559:25
560:1    569:2
603:14
**witnessed**    391:9
461:11
**witnesses**
327:10, 11, 14
328:2, 6
331:12, 19, 23
332:7    336:16
338:2    339:21
364:7    365:24
366:10, 11
367:25    369:11,
23    370:4, 8, 10
376:24    384:19
385:10    387:8
389:11, 25
391:15    395:12
411:15, 21
412:25    414:15
415:4    416:11
421:17    422:5
438:18    448:3
454:6    457:6, 7
459:8    460:2
461:2, 21
462:1    463:8
475:4    487:5,
13    491:4, 5
501:17, 21
505:21, 22
506:7, 8, 10
508:15, 25
509:5    519:2, 4,
7, 16, 23    524:8
526:6    529:14
534:14    535:3,
23, 25    541:21,
25    542:2
545:5, 22
566:25    582:10,
13    595:18
596:1
**womanizer**
520:24    521:3

522:11, 17
**Wonder**    450:2
**wondering**    320:5
398:21    439:6
**word**    320:6
356:19    362:13
364:11, 14, 18
384:17    451:6
455:11    487:8,
17    489:1, 7
531:13
**words**    350:4
406:14    420:23
469:14
**Work**    311:22
318:15    320:14,
25    331:11
343:12, 14, 19,
21    352:14
357:8    358:11,
16    359:4, 7, 11,
13, 15    372:24
376:8    378:6,
24    379:15
380:1    387:14
399:9    420:18,
25    435:4, 5
439:16    466:22,
24    467:3
485:20    486:18
492:14    494:1
511:21    521:24
522:18    523:19
524:1    528:9
530:9    533:18
536:12    538:12
541:17    546:19
572:4, 14
575:4    581:9
586:14
**worked**    433:5
492:10    540:11
582:4
**workers**    533:6
**working**    333:4,
5, 18    343:20
359:6    373:12
378:19    379:7,
11    385:18
389:5    446:25
467:7, 18
472:21    511:16

513:23    522:22
542:13    554:9
562:5    563:16
581:8
**workplan**    313:3
**World**    392:22
522:16    553:15
585:22
**worried**    366:23
**worrisome**    459:23
**worry**    445:8
**worrying**    371:12,
14
**worth**    419:7
452:2    534:24
**Wow**    447:10
**wpaulk@spotswoodll**
**c.com**    308:9
**write**    336:5
346:13, 22
347:10, 22
366:14    376:16
522:7    536:23
537:18, 19
539:2    543:8
**writing**    341:12
366:3    421:10,
12    423:3
425:18    477:19
503:25    504:6
526:12
**written**    334:13
335:10, 19
336:7    340:1
341:24    358:14
394:18    404:20
426:15    427:22,
24    446:8
464:14    465:6,
9    489:8
516:20, 25
517:4    541:19
549:13
**wrong**    452:22
545:7
**wrote**    537:21
540:1, 3, 24
548:9, 12
551:2    575:16

**< Y >**

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 52

Drummond Company, Inc., et al. vs Terrence P. Collingsworth, et al.

**Terrence P. Collingsworth - Volume II**
**2/21/2024**

**y'all**   342:*24*
 361:*20*   389:*7,*
*12*   407:*16*
 422:*13*   437:*5,*
*10, 21*   439:*4*
 450:*11*   460:*17*
 465:*3*   499:*8*
 523:*5, 23*
 534:*21*   562:*11*
**yeah**   321:*5*
 333:*3*   351:*10*
 362:*6*   395:*2*
 430:*21*   437:*9*
 443:*22*   457:*7*
 463:*14, 21*
 468:*20*   470:*3*
 485:*9*   491:*23*
 495:*22*   503:*23*
 510:*23*   511:*3*
 519:*13*   521:*16*
 524:*2*   525:*16*
 529:*18*   549:*16*
 552:*19*   556:*6*
 559:*3*   571:*24*
 578:*5*   585:*8*
 599:*19*   600:*23*
**year**   319:*9, 11*
 340:*21*   379:*17*
 399:*20*   400:*14,*
*18, 24*   407:*2,*
*14*   418:*10*
 456:*1*   563:*7*
 565:*4, 13*
**years**   318:*14*
 336:*7*   358:*25*
 378:*20*   379:*8,*
*24*   380:*18*
 382:*2*   383:*4*
 395:*14*   403:*11*
 404:*24*   413:*21*
 443:*5*   456:*20*
 502:*12*   506:*15,*
*16*   509:*8*
 541:*22*   564:*14*
 576:*11*
**Yep**   527:*23*
 587:*23*
**yesterday**
 316:*21*   323:*7,*
*18, 24*   326:*10*
 332:*19*   333:*16*
 342:*7, 20*

 357:*23*   362:*22*
 468:*5*   472:*8*
 479:*2, 16*
 496:*6*   499:*20*
 505:*4*   516:*19*
 517:*2*   589:*7*
**Yina**   360:*16, 19,*
*20*   361:*7, 10*
 391:*1*   392:*8*
**York**   477:*9*
**Yuca**   336:*18, 22,*
*23*   337:*5*
 338:*9, 14*
 340:*5*   344:*3,*
*23*   347:*1*
 348:*10, 11, 19,*
*22*   351:*3, 4, 5*
 354:*5, 14*
 355:*8, 13, 20*
 357:*2*   362:*25*
 368:*8*   369:*13*

**< Z >**
**Zoom**   307:*8, 19*
 308:*3, 16*

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 53