FILED

2024 Mar-06  PM 06:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT OF INTERNATIONAL TRADE

## HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| ——————————————— | ) |
| International Rights Advocates, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Case No. 23-00165 |
| | ) |
| Alejandro Mayorkas, *et. al,* | ) |
| | ) |
| Defendants. | ) |
| ——————————————— | ) |

## ORDER

Upon reading defendants' motion to dismiss, plaintiff's response thereto, and upon

consideration of other papers and proceedings had herein; it is hereby

ORDERED that defendants' motion be, and hereby is, DENIED.


———————————————————
CLAIRE R. KELLY, JUDGE


Dated: ———————————, 2024
      New York, New York

# IN THE UNITED STATES DISTRICT COURT OF INTERNATIONAL TRADE

## HONORABLE CLAIRE R. KELLY, JUDGE

_____
)
International Rights Advocates, )
)
Plaintiff, )
)
v. )          Case No. 23-00165
)
Alejandro Mayorkas, *et. al,* )
)
Defendants. )
_____)

## PLAINTIFF INTERNATIONAL RIGHTS ADVOCATES' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Terrence P. Collingsworth
(DC Bar # 471830)
INTERNATIONAL RIGHTS ADVOCATES
621 Maryland Avenue NE
Washington, D.C. 20002
Tel.: (202) 543-5811
tc@iradvocates.org
***Counsel for Plaintiff***

## <u>TABLE OF CONTENTS</u>

I.     Introduction and Summary of Argument ........................................................... 1

II.    Factual Background ........................................................................................... 4

       A.    There Is Absolutely No Doubt that Forced Child Labor is Pervasive in Cocoa
             Harvesting in Côte d'Ivoire. .................................................................... 4

       B.    Since at Least 2001, CBP Has Known About and Failed to Take Action to
             Enforce Section 307 of the Tariff Act to Ban Cocoa from Cote D'Ivoire
             Harvested by Forced Child Labor. ............................................................ 7

III.   IRAdvocates Has Article III Organizational Standing to Bring This Action .................. 9

       A.    IRAdvocates Satisfies the Injury in Fact Requirement ........................................... 9

             1.   CBP's Failure to Act Has Perceptibly Impaired IRAdvocates' Core
                  Mission ..................................................................................... 10

             2.   CBP's Failure to Act Has Directly Resulted in a Diversion of the
                  Organization's Resources ................................................................ 13

       B.    IRAdvocates' Injury Is Fairly Traceable to CBP's Failure to Act and the
             Injury Can Be Redressed by a Favorable Court Decision ................................... 17

       C.    IRAdvocates Satisfies Any Statutory Standing Requirements Because It Is
             Within the Zone of Interests Protected By 19 U.S.C. § 1307 ............................. 18

IV.    The Govt. Defendants Delayed Unreasonably in Acting on the Petition ....................... 24

       A.    CBP's Delay Is Unreasonable Under Section 706(1) of the APA ......................... 24

             1.   IRAdvocates Seeks "Discrete" Agency Action .............................................. 25

             2.   IRAdvocates Seeks "Required" Agency Action ............................................. 27

       B.    CBP's Delay Is Unreasonable Under the *TRAC* Test ........................................... 32

V.     Conclusion ....................................................................................................... 40

# TABLE OF AUTHORITIES

## Cases

*A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142 (Fed. Cir. 2014) ..................................... 10

*Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129 (D.C. Cir. 2006) ........................................................................................................................ 11

*Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615 (D.C. Cir. 2020) ................... 16

*Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150 (1970) ............................... 19

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................................ 27

*Blankenship v. Sec'y of HEW*, 587 F.2d 329 (6th Cir. 1978) ....................................................... 36

*Fair Employment Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268 (D.C. Cir. 1994) ..................................................................................................................... 16

*Florida State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153 (11th Cir. 2008) ............. 15

*Forest Guardians v. Babbitt*, 174 F.3d 1178 (10ᵗʰ Cir. 1999) .................................................... 25

*Gilda Indus. Inc. v. United States*, 446 F.3d 1271 (Fed. Cir. 2006) ........................................... 19

*Hartford Fire Ins. Co. v. United States*, 772 F.3d 1281 (Fed. Cir. 2014) ................................... 10

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ............................................. 9, 13, 15, 17

*Hooker v. Weathers*, 990 F.2d 913 (6th Cir. 1993) .................................................................... 15

*Int'l Labor Rights Fund v. Bush*, 357 F. Supp. 2d 204 (D.D.C. 2004) ..................................... 3, 8

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) ................. 17, 19, 20

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ........................................................... passim

*Martin v. O'Rourke*, 891 F.3d 1338 (Fed. Cir. 2018) ........................................................... 25, 32

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012) .... 20

*MCI Telecommunications Corp. v. F.C.C.*, 627 F.2d 322 (D.C. Cir. 1980) ................................. 34

*McKinney v. United States Dep't of Treasury*, 799 F.2d 1544 (Fed. Cir. 1986) ........ 20, 21, 22, 23

*Military-Veterans Advocacy v. Sec'y of Vet. Affs.*, 7 F.4th 1110 (Fed. Cir. 2021) ................ 12, 15

*Mova Pharm Corp v. Shalala*, 140 F.3d 1060 (D.C. Cir 1998) .................................................. 20

*N.R.D.C., Inc. v. Ross*, 331 F.Supp.3d 1338 (CIT 2018) ...................................................... passim

*Nat'l Credit Union Administration v. First Nat'l Bank & Trust Co.*, 522 U.S. 479 (1998) ......... 20

*Nat'l Treasury Employees Union v. United States*, 101 F.2d 1423 (D.C. Cir. 1996) .................. 11

*Nestle USA, Inc. v. Doe,* 141 S. Ct. 1931 (2021) ......................................................................... 7

*Norton v. Southern Utah Wilderness Alliance*, 524 U.S. 55 (2004) ..................................... 18, 25

*Potomac Elec. Power Co. v. I.C.C,* 702 F.2d 1026, 1034 (D.C. Cir.) ......................................... 33

*Pub. Citizen Health Rsch. Grp. v. Auchter*, 702 F.2d 1150 (D.C. Cir. 1983) ................. 36, 38, 39

*Pub. Citizen Health Rsch. Grp. v. Comm'r, Food & Drug Admin.*, 740 F.2d 21 (D.C. Cir. 1984) ....................................................................................................................... 38

*Telecommunications Research and Action Center v. F.C.C.*, 750 F.2d 70 (D.C. Cir. 1984) passim

*United States v. Monsanto,* 491 U.S. 600 (1989) ............................................................ 2

*Utility Air Regulation Group v. E.P.A.*, 573 U.S. 302 (2014) ................................. 29, 32

*Wanxiang Am. Corp. v. United States*, 12 F.4th 1369 (Fed. Cir. 2021) ....................... 10

*Washingtonian Pub. Co. v. Pearson*, 306 U.S. 30, 41-42 (1939) ................................. 31

## **Statutes**

19 U.S.C. § 1307 ............................................................................................... passim

28 U.S.C. § 1350 ..................................................................................................... 6

28 U.S.C. § 1581(i)(1)(c) ........................................................................................ 3

5 U.S.C. §706 .................................................................................................... passim

Trade Facilitation and Trade Enforcement Act of 2015, Pub. L. No. 114-125 § 910, 130 Stat. 122 (2016) ............................................................................................. passim

## **Other Authorities**

1929 Congressional Record ................................................................................... 37

## **Regulations**

19 C.F.R. § 12.42 ............................................................................................. passim

## IN THE UNITED STATES DISTRICT COURT OF INTERNATIONAL TRADE

## HONORABLE CLAIRE R. KELLY, JUDGE

———————————————————

International Rights Advocates,      )
         )
           Plaintiff,    )
         )
       v.          )     Case No. 23-00165
         )
Alejandro Mayorkas, *et. al,*     )
         )
           Defendants.    )
———————————————————

### PLAINTIFF INTERNATIONAL RIGHTS ADVOCATES' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Plaintiff International Rights Advocates ("IRAdvocates") hereby files its memorandum in opposition to the December 15, 2023 motion to dismiss (ECF 16) ("MTD") filed by Defendants, Alejandro Mayorkas, Secretary, U.S. Department of Homeland Security, and Troy A. Miller, Acting Commissioner, U.S. Customs and Border Protection ("CBP") (collectively "Govt. Defendants") in the above-captioned case.

## I.    Introduction and Summary of Argument

The U.S. Department of Labor, all the major chocolate producers of the world, and numerous investigative journalists all agree on the most salient fact in this case – *i.e.*, that forced child labor is rampant throughout the cocoa industry in Côte d'Ivoire. Section 307 of the Tariff Act of 1930 states that all goods produced or manufactured wholly or in part by forced labor "shall not be entitled to entry at any of the ports of the United States." *See* 19 U.S.C. § 1307. Over four years ago, on February 14, 2020, IRAdvocates and its co-Petitioners filed a Petition with CBP containing overwhelming and undeniable evidence that certain imports of cocoa

products are harvested with forced child labor in Côte d'Ivoire and requesting that, consistent with CBP's obligations under Section 307, the agency issue a withhold release order ("WRO") on such products. *See* IRAdvocates Complaint (Aug. 15, 2023) (ECF 2) ("Compl.") at Exhibit A. CBP's unreasonable delay and refusal to take this discrete action, which is required by statute, caused IRAdvocates to divert significant resources to gather additional evidence of forced child labor and submit supplemental petitions to CBP to prompt the agency to take action. Now, despite all these additional efforts, CBP has cynically asserted that it sat so long on the petitions that the evidence has become too "dated" to act upon. CBP's unreasonable delay and refusal to act required IRAdvocates to file this action with the Court of International Trade.

Seeking to avoid any form of review of CBP's unreasonable delay and refusal to act, the Govt. Defendants claim in their motion to dismiss that CBP has absolute discretion to enforce, or not enforce, a mandatory law of Congress. However, Section 307 plainly states that goods made with forced labor "***shall not be entitled to entry***" into the United States." 19 U.S.C. § 1307 (emphasis added). "The term 'shall' is usually regarded as making a provision mandatory," unless clear evidence and context suggest otherwise. *See United States v. Monsanto,* 491 U.S. 600, 607 (1989). CBP may well have discretion in how to implement the law, but it may not, as it has in this case, ignore serious and widely acknowledged forced child labor violations in cocoa harvesting in Côte d'Ivoire and allow prohibited goods entry into the United States.[1] CBP's failure to comply with its statutory mandate to stop the importation of cocoa harvested with forced child labor is reviewable by this Court under the Administrative Procedure Act, 5 U.S.C.

---

[1] To emphasize a Congressional priority, the Tariff Act was amended in 1997 to specifically and explicitly prohibit the importation of goods produced by forced child labor. 19 U.S.C. § 1307 (2018).

§706.[2] CBP's failure to act upon IRAdvocates' Petition to ban the importation of the illegally produced cocoa is agency action "unlawfully withheld or unreasonably delayed." *Id*. §706(1).

The Govt. Defendants first try to evade review by asserting that Plaintiff IRAdvocates lacks standing to sue. Their argument fails because IRAdvocates has organizational standing under fundamental precedents of the U.S. Supreme Court. IRAdvocates has suffered a concrete injury that was directly caused by the failure of CBP to enforce the Tariff Act, which includes the diversion of substantial resources by the organization to gather and submit additional and updated evidence of forced labor. There is no question that IRAdvocates and its co-Petitioners submitted timely evidence of widespread forced child labor in their original Petition on February 14, 2020. Compl. at Exhibit A. CBP's unreasonable delay caused IRAdvocates to divert resources to twice supplement that evidence, first on June 25, 2021, *id.* at Exhibit E, and again on February 14, 2023, *id.* at Exhibit H.

What CBP did with the timely evidence thrice submitted would make a Soviet bureaucrat blush: CBP waited until December 13, 2022, nearly three years after the initial Petition to inform the Petitioners by letter that their evidence was "dated." *Id.* at Exhibits. F & G. ***In other words, CBP sat on the evidence for nearly three years, delaying any action until it unilaterally declared could no longer take any action based on that evidence***. This is the epitome of unreasonable delay under APA section 706(1). Such conduct, if left uncorrected by this Court, would allow CBP to insulate itself from any obligation to act on timely Section 3017 petitions by

---

[2] The Court of International Trade has exclusive jurisdiction over claims arising out of any laws providing for embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety. 28 U.S.C. § 1581(i)(1)(c). This includes any claims that arise out of Section 307 of the Tariff Act. 19 U.S.C. § 1307; *see also Int'l Labor Rights Fund v. Bush*, 357 F. Supp. 2d 204, 208 (D.D.C. 2004).

merely doing nothing for several years and then declaring the matter closed because the evidence is no longer timely.

The Govt. Defendants also assert – in an argument that is flatly contradicted by the statute – that IRAdvocates' complaint should be dismissed because the only agency action that can be compelled under the APA is discrete agency action that is legally required. Section 307 states that CBP "shall" deny entry to imports of products made with forced child labor. As demonstrated in greater detail below, this creates a mandatory obligation for CBP to take a discrete action within a reasonable amount of time. Finally, contrary to the Govt. Defendants' claims, an analysis of the six factors under *Telecommunications Research and Action Center v. FCC* ("*TRAC*") establishes that CBP's four years of delay is unreasonable under the APA.

## II.     Factual Background

### A.     There Is Absolutely No Doubt that Forced Child Labor is Pervasive in Cocoa Harvesting in Côte d'Ivoire.

The Govt. Defendants, along with most other observers of the cocoa sector, have long been aware of the undisputed fact that the cocoa sector in Côte d'Ivoire is dependent on forced child labor and other child labor performed in violation of ILO Convention No. 182's "Worst Forms of Child Labor." In 2001, the major chocolate companies, including those named in the Petition (*i.e.*, Nestlé, Mars, Hershey, Barry Callebaut, Blommer Chocolate Co., Cargill, Mondelēz, and Olam), to preclude mandatory legislation, signed the Harkin-Engel Protocol ("Protocol") and gave their explicit promise to "phase out" by 2005 their use of the Worst Forms of Child Labor, including forced child labor. Compl. ¶ 29 and Exhibit C. This was a specific admission by the industry that there **is** forced child labor in their cocoa harvesting operations in Côte d'Ivoire, and they pledged that by 2005, they would have in place "industry-wide standards

4

of public certification . . . that cocoa beans and their derivative products have been grown and/or

processed without any of the worst forms of child labor." Protocol at p. 3.

Unfortunately, rather than keep their pledge, the major companies, acting through their

trade association, the World Cocoa Foundation ("WCF"), have merely given themselves a series

of unilateral extensions of time. In 2005, the WCF admitted the Protocol goals would not be

"fully met" by the 2005 deadline, but assured the public and regulators they were "committed to

achieving a certification system … within three years."[3] Then, in 2008, the WCF again

unilaterally extended their self-imposed deadline by two years.[4] In 2010, the industry delayed the

implementation date by a full decade to 2020, and this time the goal was changed to merely

reducing by 70% the use of child labor in the cocoa industry. At the 8th Annual WCF Meeting in

July 2018, the industry effectively abandoned any hard deadline and admitted it was not likely it

would meet its "aspiration for 2020" nor other targets "for the eradication of child labor by

2025."[5] ***Each major extension of time by the industry condemned another group of thousands***

***of children to a life of poverty, malnutrition, and lack of education that might have otherwise***

***allowed them to escape this imposed system of child slavery***.

The WCF's failure to proceed in good faith in keeping the promises made by the major

chocolate companies in the Protocol, and their cynical moves to simply act to extend their own

---

[3]http://www.cacao.gouv.ci/commun/documents/jointstatementSenateurTomHarkin.pdf.

[4]The International Cocoa Initiative, *Joint Statement from U.S. Senator Tom Harkin, Representative Eliot Engel and the Chocolate and Cocoa Industry on the Implementation of the Harkin-Engel Protocol,* 3BL CSR WIRE, June 16, 2008, http://www.csrwire.com/press_releases/14132-Joint-Statement-from-U-S-Senator-Tom-Harkin-Representative-Eliot-Engel-and-the-Chocolate-and-Cocoa-Industry-on-the-Implementation-of-the-Harkin-Engel-Protocol-# (last visited Nov. 27, 2023).

[5]https://www.worldcocoafoundation.org/blog/2018-child-labor-cocoa-coordinating-group-8thannual-meeting-remarks/

deadlines, is so widely known and ridiculed that John Oliver dedicated his October 29, 2023 **Last Week Tonight** show to the topic to great effect.[6] Other major media have consistently exposed the cocoa sector's reliance on the worst forms of child labor, including forced child labor, to harvest cocoa in Côte d'Ivoire. The *Washington Post* published a major exposé on the continued and extensive use of children, many of them trafficked into forced labor, performing hazardous work harvesting cocoa for major U.S. chocolate companies in Côte d'Ivoire.[7] In addition, there are three documentary films by journalist and director Miki Mistrati that reveal in graphic and shocking detail the realities of child slavery in the cocoa sector. The first, *The Dark Side of Chocolate,* is one of the first documentary films exposing the brutal conditions endured by children performing hazardous work harvesting cocoa for the major chocolate multinationals. The second film, *Shady Chocolate,* focuses on the knowing failure of the major cocoa companies to take action to end child labor in their supply chains and their duplicity in misleading the public about their failure to comply with their commitments under the Protocol. The final film, *The Chocolate War*,[8] documents the legal battle following IRAdvocates' filing of a lawsuit under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, against Nestle U.S.A. and Cargill for using forced child labor to harvest their U.S.-bound cocoa. After 16 years of litigation, the U.S. Supreme Court rescued Cargill and Nestle from liability with a non-textual construction of the ATS that required significant conduct in the United States for the ATS to extend extraterritorially to reach

---

[6] *See* https://youtu.be/FwHMDjc7qJ8?si=5-YcFLDTEvH6gUX7.

[7] Peter Whoriskey and Rachel Siegel, *Cocoa's Child Laborers,* The Washington Post, June 5, 2019, https://www.washingtonpost.com/graphics/2019/business/hershey-nestle-mars-chocolate-child-labor-west-africa/?utm_term=.6cb753bcb6f8 (last visited Nov. 27, 2023).

[8] THE CHOCLATE WAR (Made in Copenhagen, 2022) (available on Amazon Prime).

the undisputed child slavery occurring in Côte d'Ivoire. *See Nestle USA, Inc. v. Doe,* 141 S. Ct. 1931 (2021).

Little or nothing has changed in the cocoa sector in Côte d'Ivoire because of a lack of accountability by the industry. A 2020 study funded by the U.S. Department of Labor concluded that 1.56 **million** child laborers were harvesting cocoa in Côte d'Ivoire and Ghana, an increase of 14 percent since their 2015 study, and 1.48 million child laborers engaged in hazardous work during this period.[9] As recent as November 29, 2023, a CBS News crew accompanied IRAdvocates to Ghana and produced a story graphically showing children as young as five years old are harvesting cocoa for the U.S. market and performing the "worst forms of child labor:"[10]

### B. Since at Least 2001, CBP Has Known About and Failed to Take Action to Enforce Section 307 of the Tariff Act to Ban Cocoa from Cote D'Ivoire Harvested by Forced Child Labor.

Since the 1990s, Plaintiff IRAdvocates, and its predecessor organization, the International Labor Rights Fund ("ILRF"), have been fighting to end forced child labor and other worst forms of child labor in cocoa harvesting in West Africa. This is the number one priority of IRAdvocates because generations of West African children have been and continue to be forced into child slavery to harvest cocoa for some of the most wealthy and powerful corporations on the planet. This is a preventable crime that continues only because the major companies have not yet been held accountable, something CBP could remedy by simply doing its job and enforcing the mandatory provisions of Section 307.

---

[9] http://iradvocates.org/sites/iradvocates.org/files/FINAL%202020%20NORC%20CHILD%20LABOR%20Cocoa%20Report.pdf at 10,12.

[10] https://www.cbsnews.com/news/children-harvesting-cocoa-used-by-major-corporations-ghana/

In an early effort to harness the power of the CBP to address child slavery in cocoa harvesting, in 2002, the ILRF filed a petition seeking a WRO on all cocoa imported from Côte d'Ivoire because it was produced "in whole or in part" by forced child labor in violation of section 307 of the Tariff Act.[11] That 2001 Petition was well-documented with extensive evidence that forced child labor was pervasive in cocoa harvesting in Cote D'Ivoire, and certainly put CBP on notice of extent of the problem. In response to the Petition, ***just as in this case***, CBP did nothing but delay, and when no action was taken in over two years and CBP failed to respond to ILRF's inquiries, ILRF filed suit under the APA seeking an order requiring CBP to enforce the law. *See Int'l Labor Rights Fund v. United States*, 391 F. Supp. 2d 1370, 1372-1373 (C.I.T. 2005).

At the time of the ILRF lawsuit, Section 307 of the Tariff Act had a "domestic consumptive demand" exemption, which required that there be sufficient domestic production of cocoa to replace the domestic demand for cocoa that would be needed if CBP issued a WRO banning the importation of cocoa from Côte d'Ivoire. As there was little or no domestic production of cocoa at that time, the Court dismissed the case based on the exemption. *Id*. at 1374-76.

In 2015, the "domestic consumptive demand" exemption was removed from Section 307 of the Tariff Act, leaving CBP free to take action to prevent cocoa harvested with forced child labor from entering any U.S. ports. *See* Trade Facilitation and Trade Enforcement Act of 2015 ("TFTEA"). *See* Pub. L. No. 114-125 § 910, 130 Stat. 122 (2016). When five years passed and

---

[11] IRAdvocates' legal staff was part of the team at ILRF that did the field research and filed the 2002 Petition with CBP. In 2007, the legal department of ILRF formed IRAdvocates to focus exclusively on using the rule of law to address international human rights violations.

CBP still failed to take action, IRAdvocates and its co-Petitioners filed a new Petition on

February 14, 2020 (Exhibit A). As the Petition itself, and the two supplemental filings (Exhibits

E and H), make clear, forced child labor and other worst forms of child labor remain endemic to

cocoa harvesting in Côte d'Ivoire. CBP's steadfast refusal to take any action in response to the

Petition, or on its own initiative as it has always had the power to do, 19 C.F.R. § 12.42(e) and

MTD at 6, leaves tens of thousands of virtual child slaves harvesting cocoa that is exported to

the U.S. in clear violation of the mandatory prohibition of section 307 of the Tariff Act.

### III.      IRAdvocates Has Article III Organizational Standing to Bring This Action

There is no merit to the Govt. Defendants' argument that this action should be dismissed

because "IRAdvocates, as a public interest organization, cannot demonstrate that it has

constitutional standing to maintain this action." MTD at 14. To establish Article III standing, the

plaintiff must have suffered an injury-in-fact, "fairly … traceable to the challenged action of the

defendant," which is "likely" to be "redressed by a favorable decision" from the court. *Lujan v.

Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992). As IRAdvocates demonstrates below, all

three of the *Lujan* requirements are met here, and the Court should deny the Govt. Defendants'

request to dismiss this action for lack of constitutional standing.

### A.  IRAdvocates Satisfies the Injury in Fact Requirement

In *Havens Realty Corp. v. Coleman*, the Supreme Court explained that injury in fact for

an organization, such as IRAdvocates, is established when the defendant's actions or inaction

have "perceptibly impaired" the organization's activities, causing a "concrete and demonstrable

injury" and a "consequent drain on the organization's resources." 455 U.S. 363, 379 (1982). The

allegations in IRAdvocates' complaint and documents referenced therein demonstrate that IRAdvocates satisfies both prongs of the *Havens* test for organizational injury in fact.[12]

1.   CBP's Failure to Act Has Perceptibly Impaired IRAdvocates' Core Mission

As an initial matter, contrary to the Gov't Defendants' claims, IRAdvocates has "demonstrated that its mission has been impaired." *See* MTD at 16. Plaintiff IRAdvocates was founded as an advocacy organization dedicated to achieving just and humane treatment for workers worldwide. Compl. ¶ 117. IRAdvocates advocates for and with working people around the world, including in Côte d'Ivoire, and is committed to overcoming the problems of child labor, forced labor, and other abusive labor practices in the global economy. *Id.* IRAdvocates promotes enforcement of labor rights internationally through public education and mobilization, research, litigation, legislation, and collaboration with labor, government and business groups. *Id.* Moreover, IRAdvocates has for decades made part of its core mission ending the importation into the United States of cocoa products that are made using child labor. *See id.* at ¶¶ 93-104 (describing in detail the efforts of IRAdvocates to address child labor in the cocoa industry in Côte d'Ivoire by working with CBP through the filing of Section 307 petitions and other activities). CBP's failure to take action to stop the importation of such products in response to IRAdvocates' thus creates "a direct conflict between the defendant's conduct and the

---

[12] When considering a motion to dismiss, the Court accepts all well-pleaded factual allegations to be true and draw all reasonable inferences in favor of the nonmoving party. *See Wanxiang Am. Corp. v. United States*, 12 F.4th 1369, 1373 (Fed. Cir. 2021) (citing *Hartford Fire Ins. Co. v. United States*, 772 F.3d 1281, 1284 (Fed. Cir. 2014)). Additionally, the Court presumes that general allegations in the pleadings "embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (internal quotations omitted). The inquiry focuses primarily on the allegations in the complaint, but also includes documents "incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record." *A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1147 (Fed. Cir. 2014) (internal quotations omitted).

10

organization's mission." *Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006) (citing *Nat'l Treasury Employees Union v. United States*, 101 F.2d 1423, 1429-30 (D.C. Cir. 1996)).

The D.C. Circuit's decision in *Abigail Alliance* is instructive in this regard. There, the court found that the first prong of the *Havens* test was met where the organization's activities – providing "counseling, referral, advocacy, and educational services" to assist terminally ill patients in "accessing potentially life-saving drugs" – were impeded by Food and Drug Administration ("FDA") regulations that forced the organization "to divert significant time and resources from these activities towards helping its members and public address the unduly burdensome requirements that the FDA impose{d} on experimental treatments." *Id.* at 132-133. Here, IRAdvocates' grounds for injury are comparable to the circumstances in *Abigail Alliance*. At this point, it has been ***four years*** since IRAdvocates submitted the original petition which contained irrefutable evidence showing that cocoa products harvested with forced child labor are being imported into the United States, in violation of 19 U.S.C. § 1307. *See* Compl. at ¶ 105. CBP's failure to act in response to the evidence in the petition directly conflicts with IRAdvocates' mission of putting an end to forced labor and impeded its activities directed towards achieving this goal. CBP's refusal to act sends a message to all chocolate companies that the highest mountain of evidence regarding forced child labor will not stop their imports of cocoa from entering the United States. This represents far more than a mere setback to IRAdvocates' mission. CBP's failure to take any action on the evidence eviscerates the legal mechanism at the border that prevents imports of goods produced by forced child labor. CBP's refusal to take action renders all of IRAdvocates' activities in this regard futile.

The Court should reject the Govt. Defendants' mischaracterization of IRAdvocates' mission as being limited to acting an "advocacy organization." MTD at 16. According to the Govt. Defendant's, the lack of any enforcement action by CBP does not prevent IRAdvocates from continuing to "promote the enforcement of labor rights." *Id.* As discussed above, IRAdvocates' mission is not narrowly limited to simply "promoting" the enforcement of labor rights through efforts such as education and research. It more broadly encompasses legal efforts in multiple forums that are intended to result in direct enforcement actions. CBP's failure to take such enforcement action thus impairs IRAdvocates' mission by removing an otherwise viable legal tool to end forced child labor in cocoa harvesting.

The Govt. Defendants' reliance on *Military-Veterans Advocacy* is unavailing. *See* MTD at 16 (citing *Military-Veterans Advocacy v. Sec'y of Vet. Affs.*, 7 F.4th 1110, 1129 (Fed. Cir. 2021)). In that case, the relevant organization's mission was to guide veterans through the benefits process. The court concluded that the agency's action "{fell} short of a 'perceptibl{e} impair{ment}'" to the organization's operations and missions when the agency did not "foreclose claimants from obtaining benefits" or "impair or unwind" the organizations' other efforts. *Military-Veterans Advocacy*, 7 F.4th at 1130. In the present case, on the other hand, IRAdvocates' *only* path towards enforcement of the legal prohibition on imports produced by forced child labor is through CBP taking action. As the agency states on its website, under 19 U.S.C. § 1307, "CBP is responsible for preventing the entry of products made with forced labor into the U.S. market by investigating and acting upon allegations of forced labor in supply chains." *Forced Labor*, U.S. CUSTOMS AND BORDER PROT., https://www.cbp.gov/trade/forced-labor (accessed Feb. 2, 2024). Only CBP has the authority to enforce 19 U.S.C. § 1307 and issue WROs to prevent the entry of products made with forced labor into the U.S. market. *Id.* Therefore, unlike the agency

action in *Military-Veterans Advocacy*, CBP's inaction has foreclosed IRAdvocates from

obtaining an end to the importation of cocoa products made with forced labor.

> 2.       *CBP's Failure to Act Has Directly Resulted in a Diversion of the Organization's Resources*

The second prong for injury under the *Havens* test is a "drain on the organization's

resources." *Havens,* 455 U.S. at 379. Here, there is no question that CBP's refusal to take timely

action on IRAdvocates' Section 307 petition resulted in a drain on the organization's resources.

Of course, IRAdvocates devoted significant resources conducting the research and drafting and

filing the original February 14, 2020 Section 307 petition. *See* Compl. at ¶ 105 and Exhibit A.

But the expenditure of those resources does not constitute the injury for IRAdvocates' claim that

it has standing to bring this action. CBP is supposed to issue a WRO on imports whenever

presented with information that "*reasonably but not conclusively* indicates that merchandise"

made with forced labor is being imported in the United States. 19 C.F.R. § 12.42(e).

IRAdvocates' February 14, 2020 Petition met this low evidentiary standard, but CBP refused to

take any action on the initial Petition for over a year. Compl. at ¶ 106. In fact, CBP withheld

action for such an unreasonably long time that it ultimately found, nearly three years later, that

"the information submitted with the petition was dated and did not provide a sufficient basis for

CBP to move forward with enforcement action." *Id.* at Exhibit F.

CBP's refusal to act on the original February 14, 2020 petition caused IRAdvocates to

divert substantial additional resources to convince CBP to take enforcement action:

- IRAdvocates diverted additional resources towards preparing for and participating in a meeting with CBP's Office of Trade on March 23, 2021. Compl. at ¶ 106.

- IRAdvocates diverted additional resources towards collecting additional evidence of trafficking and forced labor in the Ivorian cocoa industry to include in a supplemental petition that was filed on June 25, 2021. *Id.* at ¶ 107 and Exhibit E. The resources included three trips to Western Africa in August, November, and

13

December of 2020 which uncovered evidence that the impact of COVID-19 had worsened the situation of forced and child labor due to a loss of farmer income and the consequent increased in farmer indebtedness, which led to more children being trafficked into Côte d'Ivoire. *Id.* The investigators visited five regions in Côte d'Ivoire – Aboisso, Abengourou, Daloa, Duékoué, and Soubré – and uncovered evidence of forced labor in each of these regions. *Id.* This included numerous interviews and observations of children who discussed their work in the cocoa industry. *Id.*

- IRAdvocates also diverted substantial resources preparing reports, summaries of interviews, affidavits, description of photos, and transcripts of video and audio recording to document the new evidence of forced labor in its June 25, 2021 supplemental petition. *See id.*

- IRAdvocates diverted additional resources towards preparing for and participating in a meeting with CBP representatives on September 10, 2021. *Id.* at ¶ 108.

- IRAdvocates diverted additional resources towards organizing a February 14, 2020 letter that was joined by many important civil society stakeholders and that urged CBP to take action on the Section 307 Petition. *Id.* at ¶ 109 and Exhibit B. IRAdvocates' senior staff spent significant time interacting with the leadership of the 36 major civil society organizations that signed the letter, including the AFL-CIO, the National Consumers League, and the Child Labor Coalition, as well as the 16 ethical cocoa companies and 41 individual signatories. These concerned entities and individuals joined to stress to CBP the key role it had in enforcing Section 307 to protect children from forced labor in cocoa harvesting. *See id.*

- IRAdvocates diverted additional resources towards preparing for and participating in a meeting with CBP representatives on August 15, 2022. *Id.* at ¶ 110.

- IRAdvocates diverted additional resources towards preparing a January 17, 2023 letter responding to a December 13, 2020 letter from CBP in which IRAdvocates once again urged CBP to take action on the Section 307 Petition. *Id.* at ¶ 112 and Exhibit G.

- Finally, IRAdvocates diverted additional resources working with Corporate Accountability Lab to conduct additional research and obtain new evidence to submit on February 14, 2023 yet another supplemental petition regarding ongoing forced child labor in Côte d'Ivoire cocoa harvesting. *Id.* at ¶ 113 and Exhibit H.

Critically, IRAdvocates would not have had to expend any of these additional resources if CBP had not unreasonably withheld and delayed action based on IRAdvocates' original and extremely detailed February 14, 2020 Section 307 Petition.

14

The Court should reject the Govt. Defendants' claim that IRAdvocates has not suffered any drain on its resources because all of its expenditures have been used "for investigation in anticipation of litigation or advocacy." MTD at 2-3. The Federal Circuit has held that "an organization's use of resources for litigation, investigation in anticipation of litigation, or advocacy is … insufficient to give rise to an Article III injury" under the *Havens* test. *Military-Veterans Advocacy*, 7 F.4 at 1129 (citing *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015)); *cf. Hooker v. Weathers*, 990 F.2d 913, 915 (6th Cir. 1993) (holding that that "an organization that works to eliminate discriminatory houses practices" had standing under the two-prong *Havens* test where it "devoted resources to investigating the defendants' practices and allege{d} that it ha{d} confirmed that defendants do discriminate on the basis of familial status"). However, as discussed above, the resources that IRAdvocates expended after the filing of its original February 14, 2020 Section 307 petition were not "for litigation, investigation in anticipation of litigation, or advocacy." Instead, IRAdvocates expended resources to gather and provide additional information to CBP as a result of its unreasonable delay in taking any required action on the original Section 307 Petition.

Nor is there any merit in the Govt. Defendants' contention that the "expenditures by IRAdvocates are voluntary and 'merely part of the ordinary course of [its] operations.'" MTD at 16 (citing *Military-Veterans*, 7 F.4th at 1130). In *Florida State Conference of N.A.A.C.P. v. Browning*, the 11th Circuit found that both the first and second prongs of the *Havens* test were met where the appellants showed that they "reasonably anticipate … hav{ing} to divert personnel and time to educating volunteers and voters on compliance with" a new voter registration law and "resolving the problem" of incorrectly enrolled voters. 522 F.3d 1153, 1166 (11th Cir. 2008). In response to the argument that the organization did not have standing because

15

the diversion of resources was "voluntary," the court stated that "{c}osts unrelated to the legal challenge … qualify as an injury, whether they are voluntarily incurred or not." *Id.* (citing *Fair Employment Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1277 (D.C. Cir. 1994)). Here, IRAdvocates' costs that are unrelated to the preparation of its original Section 307 petition and unrelated to the filing of the instant action at the CIT qualify as injury, whether they are voluntarily incurred or not.

Courts have consistently found injury in similar circumstances where agency inaction has caused an organization to expend additional resources to fill the void left by the agency's failure to act. In *American Anti-Vivisection Society*, the D.C. Circuit Court of Appeals found that an organization's mission – "to protect and raise awareness about the plight of captive birds, and to serve as an educational resource for the humane community, law-makers, and the general public" and to "respond to complaints {of} cruelty of birds" – was impaired by the failure of the U.S. Department of Agriculture ("USDA") to promulgate federal standards for the humane treatment of birds under the Animal Welfare Act. *Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615, 619 (D.C. Cir. 2020). Specifically, the USDA had "repeatedly reiterated its intentional to issue such standards," but its "decision making process … remain{ed} unconsummated" for "many years." *Id.* at 620. In the absence of USDA standards, the organization was "compelled to fill the void" by developing and promoting its own guidance on bird welfare, which was "not part of {the organization's} normal annual expenditure until the efforts became necessary due to USDA's clear inaction" and "caused a consequent drain on the organization's resources." *Id.* at 619 (internal quotation and citation omitted).

Here, similarly, CBP's years of delay in acting on IRAdvocates' evidence of forced child labor in cocoa harvesting, in its own words, left IRAdvocates evidence "dated." IRAdvocates

16

was left with no choice but to "fill the void" of CBP's inaction by diverting further resources to updating its evidence and preparing supplemental petitions as a result of the agency's failure to uphold its statutory duty.

**B.     IRAdvocates' Injury Is Fairly Traceable to CBP's Failure to Act and the Injury Can Be Redressed by a Favorable Court Decision**

As well as the existence of an injury-in-fact, for a party to have standing, this injury must be "fairly traceable" to the defendant's actions and an injury that can be redressed by the court. *Lujan*, 504 U.S. at 560-561; *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118, 134 n.6 (2014) ("Proximate causation is not a requirement of Article III  standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct"). The *Havens* test for organizational standing, discussed above, also contains a causation requirement: whether the defendant's conduct "perceptibly impaired" the plaintiff organization's activities. *Havens*, 455 U.S. at 379. By satisfying the more stringent causation requirement in the *Havens* test, IRAdvocates naturally satisfies this requirement for Article III standing.

The Govt. Defendants argue that "IRAdvocates' injury cannot be traced to CBP because it is the result of IRAdvocates' own choices" as it "voluntarily chose to expend its own resources to provide additional information to CBP {and} to meet with CBP representatives to further the investigation." MTD at 19. However, the fact that IRAdvocates had a "choice" to give up on its core mission of ending the importation of cocoa made with forced labor does not absolve CBP's responsibility for the injury that IRAdvocates has suffered. The need for IRAdvocates to expend additional resources to obtain and present updated evidence is directly traceable to CBP's delay in taking action on the original Section 307 petition – a delay so unreasonable that in CBP's own words it rendered the original evidence too "dated" to act upon.

17

Incredibly, the Govt. Defendants' assert that "it is speculative to assume that IRAdvocates' alleged injury is likely to be redressed by the judicial relief it seeks." *Id.* However, the injury can be redressed by a favorable decision in this action because this Court has the authority to compel agency action to redress the harms of unlawfully withheld or unreasonably delayed agency action. 5 U.S.C. § 706(1); *see also Norton v. Southern Utah Wilderness Alliance*, 524 U.S. 55, 61 (2004) ("The APA provides relief for a failure to act in § 706(1): 'The reviewing court shall ... compel agency action unlawfully withheld or unreasonably delayed'").

CBP claims that because it "lacks the authority to regulate labor practices in another country," no matter what CBP does, it is reasonable to anticipate that IRAdvocates will continue to devote resources to promote enforcement of labor rights in Côte d'Ivoire. MTD at 19. IRAdvocates did not file its Section 307 Petition with the expectation that CBP would begin regulating labor practices in Côte d'Ivoire. The Petition specifically requested that CBP stop the importation of cocoa products from Côte d'Ivoire that are made with forced labor. CBP has the authority under 19 U.S.C. § 1307 to take this action.

C.   **IRAdvocates Satisfies Any Statutory Standing Requirements Because It Is Within the Zone of Interests Protected By 19 U.S.C. § 1307**

As demonstrated above, IRAdvocates has Article III standing to bring this action against the Govt. Defendants for their failure to uphold their legal duty to enforce 19 U.S.C. § 1307 after receiving a petition with information that left little doubt cocoa from Côte d'Ivoire harvested in whole or in part by forced child labor is being, or is likely to be, imported into the United States. Nonetheless, the Govt. Defendants seek dismissal of this action because, in their view, IRAdvocates lacks statutory standing as it does not fall within the "zone of interests" protected or regulated by 19 U.S.C. § 1307. As explained below, they erroneously rely on an outdated

interpretation of the statute that has been superseded by amendments to the law. *See* MTD at 21-22. A proper application of the zone-of-interests test shows that IRAdvocates falls squarely within the zone of interests protected and regulated by the current version of 19 U.S.C. § 1307.

The Supreme Court's decision in *Lexmark* clarified the analytical framework for determining whether a litigant has statutory standing. There, the Supreme Court explained that the "prudential standing" label used in the past is "misleading" and a "misnomer" because courts "cannot limit a cause of action that Congress has created merely because 'prudence' dictates." *Lexmark*, 572 U.S. at 125, 127-28. The Govt. Defendants thus incorrectly state that "applying the zone of interests test to Section 1307 … determine{s} who has *prudential standing* to bring an enforcement action." MTD at 21 (emphasis added). Instead, the zone-of-interests test is applied "to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Lexmark*, 572 U.S. at 127. Stated differently, the test asks whether the plaintiff has the right to sue under the substantive statute that the plaintiff alleges has been violated. *Id.* The presumption is that a statute provides a cause of action "only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." *Id.* at 129 (internal quotations omitted).

Thus, under the proper zone-of-interests test, a court examines "'whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute … in question." *Gilda Indus. Inc. v. United States*, 446 F.3d 1271, 1279-80 (Fed. Cir. 2006) (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)). The test focuses not just on who or what Congress intended to protect, but also on those who, in practice, can be expected to police the interests that the statute protects. *Mova Pharm Corp v. Shalala*, 140 F.3d 1060, 1075 (D.C. Cir 1998) (citing *Nat'l Credit Union*

*Administration v. First Nat'l Bank & Trust Co.*, 522 U.S. 479 (1998)). The test is "not especially demanding," and the conspicuous inclusion of the word *arguably* in the test makes clear that "the benefit of any doubt goes to the plaintiff." *Lexmark*, 572 U.S. at 130 (discussing *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012)). A plaintiff lacks statutory standing under the zone-of-interests test "only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." *Id.* In this case there can be no doubt that IRAdvocates' interests are "arguably within the zone of interests to be protected or regulated by the statute … in question."

The statute at issue here is 19 U.S.C. § 1307, which prohibits the importation of goods that are produced by forced labor, specifically including forced child labor. In arguing that IRAdvocates lacks statutory standing to maintain this action, the Govt. Defendants rely exclusively on *McKinney v. United States Dep't of Treasury*, 799 F.2d 1544 (Fed. Cir. 1986), a decision issued by the Federal Circuit that construed the statute to discern the interests that Congress intended to protect when it enacted 19 U.S.C. § 1307. In *McKinney*, the Federal Circuit held that certain appellants did not have standing in their personal capacities as consumers (*i.e.*, numerous members of Congress) or as a public interest organization (*i.e.*, Washington Legal Foundation) to pursue an action contesting CBP's denial of their May 1984 petition to bar the importation of goods produced by forced labor in the former Soviet Union. The Federal Circuit reached this conclusion because, at the time, the statute included a consumptive demand exception, which precluded CBP from denying entry when domestic production of the merchandise in question is unable to replace the quantity of imports needed to satisfy domestic demand. *See* 19 U.S.C. § 1307 (1986) ("…but in no case shall such provisions be applicable to

goods, wares, articles, or merchandise so mined, produced, or manufactured which are not mined, produced, or manufactured in such quantities in the United States as to meet the consumptive demand of the United States.").

The following excerpt from *McKinney* makes it abundantly clear that the existence of the consumptive demand exception was the critical consideration in the Federal Circuit's analysis and interpretation of the statute to discern Congress's intent:

> Although § 307 also *regulates* the importation of products produced by forced labor, it does so in a manner that will afford domestic consumers a supply of such products through importation when there is insufficient domestic production to satisfy consumer demand. Thus, § 307 only affords consumers a legal right or interest to have access to such products by relaxation of the import ban when they are in short supply domestically. This legal interest, however, is not implicated or asserted by any of the appellants claiming consumer status.

> The plain language of § 307, accordingly, will not support an interpretation that it was enacted to afford consumers a legal right or interest in preventing, for economic, moral, or ethical reasons, the importation of foreign goods produced by forced labor. Had Congress intended such protection to flow from § 307, it would likely have imposed an absolute bar, i.e., precluding importation of foreign products found to have been produced by forced labor under all conditions, rather than a conditional exclusion to be lifted in the event of unfulfilled domestic demand. The nature and character of the legislation does not support the contention that Congress intended to create a statutory privilege accruing to consumers in the avoidance of purchasing imported goods produced through human rights violations.

799 F.2d at 1552 (internal footnotes and citations omitted). Because the Federal Circuit did not consider the statute to be an absolute bar on imports of foreign goods produced by forced labor, the Federal Circuit reasoned that "Section 307 was enacted by Congress to *protect* domestic producers, production, and workers from the unfair competition which would result from the importation of foreign products produced by forced labor" and to protect consumers from an insufficient supply to meet domestic demand. *Id.* (emphasis in original). Based on this understanding, the Federal Circuit held that the economic, moral, and ethical interests claimed by the members of Congress (consumers) and the Washington Legal Foundation (public interest

21

organization) fell outside the zone of interests protected or regulated by 19 U.S.C. § 1307. *Id.* at 1552-53 and 1557.

Based on the *McKinney* decision alone, the Govt. Defendants assert that IRAdvocates is not within the zone of interests protected or regulated by the statute because standing to bring a claim under 19 U.S.C. § 1307 is "limited to domestic workers and producers who are directly impacted by foreign manufacturers or U.S. importers benefiting from the use of forced labor." MTD at 21 (citing *McKinney*, 799 F.2d at 1557). However, the Govt. Defendants fail to mention that the consumptive demand exception—*i.e.*, the statutory text that guided the Federal Circuit's analysis in *McKinney*—was repealed when Congress passed the TFTEA. *See* Pub. L. No. 114-125 § 910, 130 Stat. 122 (2016). By eliminating the consumptive demand exception, the prohibition on imports of goods produced by forced labor was absolute and no longer conditional. The amendment represented a shift in the object and purpose of 19 U.S.C. § 1307—from a policy of protecting domestic producers and workers against unfair competition from imports of foreign products produced by forced labor to a policy of protecting the consuming public from not only imported goods produced by forced labor but also from facilitating these abhorrent practices and human rights violations. The Federal Circuit reasoned in *McKinney* that Congress would have enacted an absolute bar on imports of goods produced by forced labor if it intended to "create a statutory privilege to consumers in the avoidance of purchasing imported goods produced through human rights violations." 799 F.2d at 1552. That is precisely what Congress did in the TFTEA.

Furthermore, CBP itself has recognized that the passage of TFTEA was an explicit recognition by Congress that Section 307 was intended to protect human rights and was not narrowly focused on protecting the interests of domestic producers and workers. In particular,

22

following the passage of TFTEA in 2016, then-Commissioner Kerlikowske issued an official statement that the amendment to 19 U.S.C. § 1307 was "imperative to human rights protections around the world." *Statement from Commissioner R. Gil Kerlikowske on the Trade Facilitation and Trade Enforcement Act of 2015*, U.S. CUSTOMS AND BORDER PROT. (Feb. 29, 2016), *available at* https://www.cbp.gov/newsroom/speeches-and-statements/statement-commissioner-r-gil-kerlikowske-trade-facilitation-and. As discussed above, the protection of human rights around world, including through the end of global trade in cocoa made with forced labor, is one of the core missions of IRAdvocates.

In light of the TFTEA amendment to the statute, the zone-of-interests analysis in *McKinney* is no longer binding. Now, without exception, Section 307 prohibits the importation of foreign goods produced by, *inter alia*, forced child labor. The law affords the consuming public a legal right or interest in preventing the importation of foreign goods produced by forced labor. As the Govt. Defendants state in the introductory sentence of their motion to dismiss, 19 U.S.C. § 1307 requires CBP "to protect the American marketplace from goods made with forced labor." MTD at 2. IRAdvocates is "an advocacy organization dedicated to achieving just and humane treatment for workers worldwide." Compl. ¶ 117. IRAdvocates has a specialized interest in pursuing all available methods to prevent abusive labor practices in the global economy with a focus on the U.S. market, promoting enforcement of labor rights through public education and mobilization, research, litigation, legislation, and collaboration with labor, government and business groups. *Id.* This places IRAdvocates squarely within the zone of interests to be protected by the statute. Thus, contrary to the Govt. Defendants' position, IRAdvocates has statutory standing to bring a claim against the Govt. Defendants under 19 U.S.C. § 1307 for their

actions (or lack thereof) with respect to imports of cocoa from Côte d'Ivoire harvested in whole or in part by forced child labor. Dismissal of this action is therefore not appropriate.

*    *    *

In sum, IRAdvocates has satisfied all three elements necessary for constitutional standing. The Govt. Defendants' motion to dismiss for lack of standing should be denied.

## IV. The Govt. Defendants Delayed Unreasonably in Acting on the Petition

The Govt. Defendants are in no position to dictate what is a "reasonable" period of time for CBP to act on a petition submitted under section 307 of the Tariff Act and the implementing regulations, since, at a minimum, it must be sooner than the point at which CBP declares the properly-submitted allegation no longer timely. Here, CBP violated APA section 706(1) by failing to act on IRAdvocates' evidence when it *was* timely, waiting nearly three years to inform IRAdvocates that its evidence had become untimely due to CBP's own delay, and then by continuing to delay any action on IRAdvocates' Petition despite its supplementation with timely evidence. *See* Compl. at Exhibit E and H. After more than four years of delay with no end in sight, IRAdvocates asks the Court to compel the action that the law requires and that CBP has chosen to withhold indefinitely.

## A. CBP's Delay Is Unreasonable Under Section 706(1) of the APA

A claim made under § 706(1) of the APA requires a reviewing court to compel agency action that has been unreasonably delayed. *See Telecommunications Research and Action Center v. F.C.C.*, 750 F.2d 70, 79 (D.C. Cir. 1984) ("*TRAC*") ("Congress has instructed statutory review courts to compel agency action that has been unreasonably delayed. 5 U.S.C. § 706(1)"); *Martin v. O'Rourke*, 891 F.3d 1338, 1344 (Fed. Cir. 2018); *N.R.D.C., Inc. v. Ross*, 331 F.Supp.3d 1338,

24

1353 (CIT 2018); *see also Forest Guardians v. Babbitt*, 174 F.3d 1178, 1190 (10th Cir. 1999) ("{O}nce a court deems agency delay unreasonable, it must compel agency action.").

The Supreme Court has held that "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required* to take." *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) ("*SUWA*") (emphasis in original). The limitation to discrete agency action precludes "broad programmatic attack{s}" on agencies, such as claims that "seek wholesale improvement" of an agency program. *Id*. Instead, a § 706(1) plaintiff must "direct its attack against some particular 'agency action' that causes it harm." *Id.* (quoting *Lujan*, 497 U.S. at 891). The limitation to required actions "rules out judicial direction of even discrete agency action that is not demanded by law (which includes, of course, agency regulations that have the force of law.)" *Id.* at 65. IRAdvocates' Petition seeks precisely the kind of discrete and required agency action contemplated by *SUWA*, triggering this Court's responsibility under § 706(1) to compel that action after more than four years of delay.

### 1. *IRAdvocates Seeks "Discrete" Agency Action*

As an initial matter, there can be no dispute that IRAdvocates sought, and continues to seek, "discrete" action from CBP: an investigation that properly considers the evidence of forced child labor violations in the Ivorian cocoa industry, a finding made on the basis of this evidence, and the issuance of a WRO for any cocoa products produced with forced child labor in Côte d'Ivoire. *See* Complaint at ¶ 133. CBP's failure to investigate and rule on the evidence that IRAdvocates has repeatedly raised before it has resulted in the importation of prohibited goods into the United States, in violation of Section 307 of the Tariff Act. The investigation IRAdvocates seeks is specifically provided for in CBP's regulations at 19 C.F.R. § 12.42(d), which states that "upon receipt" of an allegation that prohibited merchandise is being imported into the United States, the CBP Commissioner "will cause such investigation to be made as

25

appears to be warranted by the circumstances of the case{.}" Section 12.42(e) further provides

that if CBP "finds at any time that information available reasonably but not conclusively

indicates that merchandise within the purview of section 307 {of the Tariff Act} is being, or is

likely to be, imported, {it} will promptly advise all port directors accordingly and the port

directors shall thereupon withhold release of any such merchandise{.}" The plain text of § 12.42

refutes Defendants' assertion that the law does not "impose any discrete duty on the agency

concerning how the agency makes the determination whether goods are produced with forced

labor." MTD at 27. It sets out a discrete, multi-step procedure for such a determination, and, to

the best of IRAdvocates' knowledge, CBP has taken *none* of these steps. *See* Complaint at ¶ 133.

　　The administrative process described in § 12.42 consists of discrete agency actions, and it

is these actions that IRAdvocates seeks to compel. IRAdvocates does not make a "broad

programmatic attack" on CBP or seek "wholesale improvement" of a CBP program. *SUWA*, 542

U.S. at 64. IRAdvocates' claim is entirely dissimilar from the kind of claim the Supreme Court

prohibited in *Lujan*, where the plaintiff "allege{d} that violation of the law is rampant within"

BLM's land withdrawal program and requested a laundry list of improvements to the program.

*See Lujan*, 497 U.S. at 891. Rather, IRAdvocates "demand{s} the application of a single

provision to a single factual circumstance{.}" *N.R.D.C.*, 331 F.Supp.3d at 1354-55 (finding that

plaintiff's § 706(1) claim sought discrete agency action rather than "a broad programmatic attack

on the Government's overall implementation of the {statute} or a general challenge to

compliance with a statutory mandate.").

　　In its Complaint, IRAdvocates alleges that Defendants "have unlawfully withheld and/or

unreasonably delayed an investigation into cocoa imports from Cote d'Ivoire, as required by 19

C.F.R. § 12.42 . . . More fundamentally, they have failed to take any action whatsoever,

including issuing a decision regarding the merits of the Petition." Complaint at ¶ 133. Because the investigation and decision that CBP has unreasonably delayed are discrete agency actions, IRAdvocates' § 706(1) claim to compel these actions satisfies the first element of the Supreme Court's test for such claims.

### 2. *IRAdvocates Seeks "Required" Agency Action*

Upon receiving IRAdvocates' Petition, CBP was – and is – *required* to investigate its allegations and make a determination on its merits. In their motion to dismiss, the Govt. Defendants claim that CBP is required to do nothing at all, and enjoys virtually unlimited discretion to act, or not act, on evidence alleging child labor violations:

> Neither the governing statute, 19 U.S.C. § 1307, nor its implementing regulations, 19 C.F.R. § 12.42 *et seq.*, require CBP to take a particular course of action in response to allegations it may receive pertaining to the importation, or likely importation, of goods made with forced labor, much less to take such action by a particular deadline . . .. CBP is not obligated to take enforcement action against a particular product merely because allegations regarding that product have been communicated to it, nor is CBP obligated to issue a "decision" on those allegations.[13]

MTD at 3. If upheld, Defendants' interpretation of the law would effectively repeal it. Congress's command that goods made using forced labor "**shall not** be entitled to entry at any of the ports of the United States" would be rendered utterly meaningless by CBP's self-serving grant of unlimited discretion. 19 U.S.C. § 1307 (emphasis added). So too would the detailed

---

[13] Defendants continue by asserting that "CBP is conducting an investigation that encompasses the allegations submitted by IRAdvocates and that investigation is ongoing." MTD at 3. This assertion is of no moment. On a motion to dismiss, all factual allegations made by the complainant are taken as true. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). IRAdvocates' Complaint states that CBP has failed to conduct an appropriate investigation in response to its Petition and provides detailed factual evidence in support of that statement. *See* Complaint at ¶ 133. Further, CBP acknowledges that, regardless of any Petition, it has the authority to investigate and take action to ban the importation of cocoa harvested by forced child labor, MTD at 6, yet it has failed to take any action whatsoever in the nine years since the "consumptive demand" exemption was repealed in 2015. There is no reason to assume factually that it will act in the future absent an order from this Court.

procedure provided by § 12.42, which requires that CBP "*will cause* such investigation to be made as appears warranted by the circumstances of the case" and that, if "information available reasonably but not conclusively indicates that merchandise within the purview of section 307 is being, or is likely to be, imported, {CBP} *will promptly advise* all port directors accordingly and the port directors *shall thereupon withhold release* of any such merchandise{.}" 19 C.F.R. § 12.42(d)-(e) (emphasis added). Defendants' assertions that these laws do not "require CBP to take a particular course of action in response to allegations it may receive" are incompatible with the plain text of these laws, which require, at minimum, an investigation and determination on the merits of such allegations. *See* MTD at 3. It is precisely this "particular course of action" that Defendants have unreasonably delayed, and which IRAdvocates now seeks to compel after four years of silence with no end in sight.

CBP's regulations grant some discretion to the agency by providing that it shall investigate "as may be warranted by the circumstances of the case." 19 C.F.R. 12.42(d). However, these regulations must be read in the context of Congress's clear command that products using forced labor "**shall** not be entitled to entry." Thus, this clause in CBP's regulations cannot be read to permit CBP to decline to investigate petitions that raise a reasonable inference that imports of such products are occurring. 19 U.S.C. § 1307; *see also* 19 C.F.R. 12.42(e) (requiring a WRO if evidence "reasonably but not conclusively indicates" the same). Importantly, the Govt. Defendants make no attempt to argue that the voluminous evidence IRAdvocates submitted constituted circumstances that did not "warrant" an investigation. Instead, CBP rests entirely on a claim of unfettered discretion to initiate an investigation and make findings. *See* MTD at 27. Whatever discretion the Govt. Defendants have to avoid acting on unassailable evidence of forced child labor cannot be so broad as to convert

28

mandatory statutory language into toothless suggestion. *See TRAC*, 750 F.2d at 79 ("It is obvious that the benefits of agency expertise and creation of a record will not be realized if the agency never takes action . . ."); *see also Utility Air Regulation Group v. E.P.A.*, 573 U.S. 302, 327 (2014) ("The power of executing the laws necessarily includes both authority and responsibility to resolve some questions left open by Congress that arise during the law's administration. But it does not include a power to revise clear statutory terms . . .").

The Govt. Defendants also make much of the absence of a date-certain deadline by which CBP must act in the statute and regulations. *See* MTD at 25-26. Yet both this Court and the Federal Circuit have *not* required the presence of a statutory deadline for agency action in order to find that a § 706(1) claim of unreasonable delay may proceed. In *N.R.D.C., Inc. v. Ross*, the plaintiff asked for a preliminary injunction and brought an APA § 706(1) claim alleging that the Department of Commerce unreasonably delayed an embargo of Mexican fish imports caught with gillnets that threatened the endangered vaquita, in violation of the Marine Mammal Protection Act's prohibition of such imports. *N.R.D.C.*, 331 F.Supp.3d at 1352. The Government challenged subject matter jurisdiction on the grounds that the agency action plaintiffs sought to compel was neither discrete nor mandatory under the *SUWA* test for § 706(1) claims. *Id.* This Court disagreed. It found that the agency action plaintiff sought was both discrete and mandatory, even though the statute and regulations provided no date-certain deadline by which Commerce was required to issue an import ban. Interpreting the language of the statute and regulations, the Court found that:

> {M}ultiple provisions of the MMPA stress that the statute is undergirded and propelled by a sense of urgency that mammals like the vaquita not be killed and brought to extinction, even if unintentionally. For starters, as has been discussed, the Imports Provision itself states that 'in any event *it shall be the immediate goal* that the incidental kill or incidental serious injury of marine mammals . . . be reduced to insignificant levels . . .' As further noted above, the 'moratorium on

the taking and importation of marine mammals and marine mammal products'
commenced 'on the effective date of this chapter.' 16 U.S.C. § 1371(a). The
emergency rulemaking provision, § 1387(g)(1), too speaks to the act's
immediacy. As mentioned, under that provision, the Secretary of Commerce
'shall' undertake emergency rulemaking actions if he or she 'finds that the
incidental mortality and serious injury of marine mammals from commercial
fisheries is having, or is likely to have, an immediate and significant adverse
impact on a stock or species.'

*Id.* at 1364-65 (emphasis in original). Hence, the Court's method to determine whether the

agency was required to act involved a contextual analysis of statutory language, rather than a

simple box-checking exercise for the presence of a deadline.

The Govt. Defendants attempt to distinguish *N.R.D.C.*, claiming that the statute it

interpreted "dictated a discrete, required, and immediate act," but that "{h}ere, Section 1307

does not include language that reflects a legally required, discrete, and immediate action." MTD

at 26. Their attempt falls flat. In fact, 19 U.S.C. § 1307 and the implementing regulations at 19

C.F.R. § 12.42 are suffused with language requiring short timelines for mandatory action, and

are, like the statute in *N.R.D.C.*, "propelled by a sense of urgency{.}" *Id.* at 1364. Section 307

provides that goods made with forced labor "*shall not be entitled to entry* at any of the ports of

the United States, and the importation thereof *is hereby prohibited*," mirroring *N.R.D.C.*'s

"moratorium on the taking and importation of marine mammals" that "commenced 'on the

effective date of this chapter.'" 19 U.S.C. § 1307 (emphasis added); *N.R.D.C.*, 331 F.Supp.3d at

1365. Likewise, 19 C.F.R. § 12.42 provides for the following:

- *§ 12.42(a)*: If any port director or other principal customs officer has
  reason to believe that any class of merchandise that is being, or is likely to
  be, imported into the United States is being produced . . . with the use of . .
  . forced child labor . . . he *shall communicate his belief* to the
  Commissioner of CBP.

- *§ 12.42(c)*: If any information filed with a port director pursuant to
  paragraph (b) of this section {providing that third party allegations of
  forced child labor must contain a full statement of the party's beliefs, a

detailed description of the merchandise, and all pertinent facts obtainable} does not conform with the requirements of that paragraph, the communication *shall be returned promptly* to the person who submitted it . . . If such information is found to comply with the requirements, it *shall be transmitted by the port director within 10 days* to the Commissioner of CBP{.}

- *§ 12.42(d)*: *Upon receipt* by the Commissioner of CBP of any communication submitted pursuant to paragraph (a) or (b) of this section . . . the Commissioner *will cause such investigation to be made* as appears to be warranted by the circumstances of the case{.}

- *§ 12.42(e)*: If the Commissioner of CBP *finds at any time* that information available reasonably but not conclusively indicates that merchandise within the purview of section 307 is being, or is likely to be, imported, *he will promptly advise all port directors accordingly* and the port directors *shall thereupon withhold release* of any such merchandise{.}[14]

- *§ 12.42(f)*: If it is determined on the basis of the foregoing that the merchandise is subject to the provisions of the said section 307, the Commissioner of CBP . . . *will publish a finding to that effect in a weekly issue* of the Customs Bulletin and in the Federal Register.

19 C.F.R. § 12.42 (emphasis added). Finally, when Congress removed the consumptive demand exception with passage of the TFTEA in 2016, enhancing CBP's ability to take action against imports made with forced labor, Congress expressed its clear intent that CBP act expeditiously to deny entry of such imports by imposing regular reporting requirements on the actions that CBP had taken as a result of the amendment of Section 307. *See* TFTEA, Pub. L. No. 114-125 § 910, 130 Stat. 122 (2016) (requiring that CBP submit within 180 days and annually thereafter a report

---

[14] Defendants apparently believe that the phrase "at any time" means that the finding may arrive whenever CBP deigns to act, or indeed need not arrive at all. *See* MTD at 6. That is not a reasonable interpretation of the text. Because the phrase is surrounded by commands for "prompt" action, "at any time" is best interpreted to emphasize the need for alacrity from CBP by providing that it must act as soon as it reaches a determination that information has reasonably indicated the importation of prohibited goods. *See, e.g.*, *Washingtonian Pub. Co. v. Pearson*, 306 U.S. 30, 41-42 (1939) (interpreting regulatory scheme providing for the deposit of copyrights "at any time after publication of the work" to mean that "Congress intended that prompt deposit when deemed necessary should be enforced{.}"

including, *inter alia*, the number of instances in which imports were denied entry on the basis of being made with forced labor).

Plainly, this statutory scheme, like the one at issue in *N.R.D.C.*, is "propelled by a sense of urgency" and provides for discrete and mandatory action by CBP that cannot be subject to indefinite delay. CBP's interpretation of the regulations would defeat clear statutory requirements for prompt action embodied in both the forced labor statute and the APA itself, unilaterally repealing the will of Congress and rendering its command a dead letter. *See N.R.D.C.*, 331 F.Supp.3d at 1364 (citing *Utility Air Regulation Group*, 573 U.S. at 327 for "the established legal principle that a rule cannot supplant the statute under which it is promulgated").

## B.    CBP's Delay Is Unreasonable Under the *TRAC* Test.

The Federal Circuit has endorsed a six-part test, first outlined in *TRAC*, to determine whether an agency delay is unreasonable for purposes of APA § 706(1). *See Martin*, 891 F.3d at 1344 ("{W}e agree . . . that *TRAC* provides a more appropriate framework for analyzing claims of unreasonable delay."). As an initial matter, this test likewise *does not require* the presence of a date-certain statutory deadline for agency action in order for a reviewing court to compel such action under § 706(1). In addition, contrary to the Govt. Defendants' contentions, an analysis of the *TRAC* factors shows that CBP's delay in action on IRAdvocates' Section 307 petition is unreasonable under the APA. *See* MTD at 29-34.

In *TRAC*, the court decided a case not so different than the matter at hand and which serves as instructive in handling claims under § 706(1). *See* 750 F.2d at 72. In that case, a group of non-profit organizations petitioned the court to compel the Federal Communications Commission ("FCC") to make a decision on various unresolved matters. *Id.* Specifically, the parties argued that the FCC unreasonably delayed in determining whether American Telephone

and Telegraph Company ("AT&T") had to reimburse taxpayers for two separate instances of

allegedly unlawful overcharges and concerns regarding treatment of expenses incurred by

AT&T's manufacturing subsidiary, Western Electric, in its development of "customer premises

equipment." *Id.* To answer this question, the court looked at several cases involving claims of

unreasonable delay and constructed a "hexagonal" test in assessing claims of agency delay. The

six factors of the test are:

(1) The time agencies take to make decisions must be governed by a "rule of reason";

(2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;

(3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;

(4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;

(5) the court should also take into account the nature and extent of the interests prejudiced by delay;

(6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that the agency action is 'unreasonably delayed.'"

*TRAC,* 750 F.2d at 80.

The first *TRAC* factor, which is that the time agencies take to make decisions must be

governed by a "rule of reason," is one of the most compelling. Courts have found that this rule is

violated when "excessive delay saps the public confidence in an agency's ability to discharge its

responsibilities…." *Potomac Elec. Power Co. v. I.C.C.,* 702 F.2d 1026 (D.C. Cir.), *supplemented,*

705 F.2d 1343 (D.C. Cir. 1983). Moreover, as the Govt. Defendants acknowledge, courts have

found agency delays to be unreasonable when the delay spanned years. *See* MTD at 31 (citing

cases); *N.R.D.C.,* 331 F.Supp.3d at 1347 (allowing claim of unreasonable delay to proceed where

the delay amounted to four years); *MCI Telecommunications Corp. v. F.C.C.*, 627 F.2d 322 (D.C. Cir. 1980) (finding agency delay of four years unreasonable).

IRAdvocates filed its original Section 307 petition on February 14, 2020. *See* Compl. at ¶ 1 and Exhibit A. As of the filing of this response brief, it has now been over four years and CBP has yet to take the discrete actions that the statute and its own implementing regulations require it to take – *i.e.*, investigate the allegations in the petition, issue a determination, and issue a WRO covering imports of cocoa products made with forced child labor. CBP attempts to excuse its delay by characterizing the allegations in IRAdvocates' petition as so "complex and wide-ranging" that its investigation "requires extensive time and resources." MTD at 30. As an initial matter, while the petition does contain wide-ranging and conclusive proof of the rampant existence of forced child labor throughout the cocoa industry in Côte d'Ivoire, there is nothing all that "complex" for CBP to decide. In fact, the world's largest chocolate companies have repeatedly admitted that cocoa sourced from Côte d'Ivoire is made with forced child labor. *See* Compl. at ¶¶ 22, 30, 34, 43-46, 53-55, 60, 64-65, 73-75, 82-83, 88. And the U.S. Department of Labor recognizes that there are 1.56 million children in child labor in the cocoa industry in Côte d'Ivoire and Ghana. *Id.* at ¶ 107.

In any event, under CBP's regulations, it does not need to have "conclusive" evidence to take the discrete action of issuing a WRO. It must take action "at any time that information available reasonably but not conclusively" indicates that imported merchandise is being made with forced labor. 19 C.F.R. § 12.42(e). A delay of over four years under these circumstances does not follow a "rule of reason" no matter how complex the allegations contained in IRAdvocates' petition may be. Indeed, a delay of this length "saps the public confidence" that CBP will ever take the action required by Congress – *i.e.*, prohibiting imports of cocoa products

34

that the entire industry acknowledges are tainted with forced child labor. *Potomac Elec.,* 702 F.2d at 1034.

In addition, any "rule of reason" regarding the time it takes for CBP to take action based on information presented in a Section 307 petition logically requires that CBP act before the agency itself claims the information has become so stale that it prevents CBP from ever taking any action. Any finding to the contrary would allow CBP and other similarly situated agencies to shirk their statutorily mandated obligation by simply sitting on information until it is too late to act. But this is exactly what CBP has done in this case. After IRAdvocates filed its initial petition on February 14, 2020, CBP took so long to act that it informed IRAdvocates almost three years later that the information in the petition had become too "dated" and was thus insufficient to merit the issuance of a WRO. Compl. at ¶ 111 and Exhibit F.[15] CBP's course of action unwittingly defined a "rule" for reasonable delays: if CBP has waited so long to act on a petition that the evidence it supplies is no longer timely, then CBP's delay has violated the "rule of reason."

The second *TRAC* factor states that where Congress "has provided a timetable *or other indication of the speed* with which it expects the agency to proceed in the enabling statute, that statutory scheme *may* supply content for this rule of reason." *TRAC*, 750 F.2d at 80 (emphasis added). As highlighted in the language of the factor, the enabling statute may provide a timeline by which the agency should act, but it is *expressly not required* in the analysis of unreasonable delay. Rather, *TRAC* plainly contemplates that a statute may provide some "other indication" of the speed with which the agency should act. Accordingly, in *N.R.D.C.*, four years of delay was found to be unreasonable despite the lack of a statutory timeline, on the basis of statutory

---

[15] IRAdvocates does not agree that the information provided to CBP became untimely, particularly since it twice supplemented the information provided. *See* Exhibits E and H.

language that emphasized the importance of prompt action. *See N.R.D.C.*, 331 F.Supp.3d at 1347, 1365-65. As explained above, the statutory scheme prohibiting the importation of goods made with forced child labor uses similar language to require prompt action, satisfying the second *TRAC* factor. In addition, when passing the TFTEA, Congress imposed annual reporting requirements that indicate its intent that CBP act swiftly to address allegations of forced labor made pursuant to the newly amended Section 307. *See* TFTEA, *See* Pub. L. No. 114-125 § 910, 130 Stat. 122 (2016).

The third *TRAC* factor sets up a clear distinction between matters of economic regulation and matters of human health and welfare. In creating this component of the test, the *TRAC* court considered the findings in *Blankenship v. Sec'y of HEW*, 587 F.2d 329, 334 (6th Cir. 1978) and *Pub. Citizen Health Rsch. Grp. v. Auchter*, 702 F.2d 1150, 1157 (D.C. Cir. 1983). In *Blankenship*, the Sixth Circuit highlighted the fact that the applicants in the case were destitute and sought "benefits for the necessities of life," and accordingly the delays in such a case were less tolerable than in spheres of economic regulation. *Id.* In that matter, applicants were denied basic benefits because the median length between a hearing request and a hearing decision was 220 days. *Id.* In *Pub. Citizen Health*, United States Court of Appeals in the District of Columbia Circuit stated that "three years from announced intent to regulate to final rule is simply too long given the significant risk of grave danger {ethylene oxide} poses to the lives of current workers and the lives and well-being of their offspring." *Pub. Citizen Health*, 702 F.2d at 1157. In both cases, the court encouraged action because human lives and wellbeing were at stake.

Here, without a WRO or other discrete enforcement action, imports of cocoa products made with forced child labor will continue to enter into the United States, providing support to a chocolate industry that has failed to take the promised efforts necessary to remove forced child

36

labor from its supply chain. Ending forced child labor is not a simple matter of economic regulation. It is a matter of human health and welfare of the highest order. Indeed, when Senator Blaine of Wisconsin first introduced Section 307 to the 1930 Tariff Act, he stated that one of the primary goals of the legislation would be seeing that the United States "not give aid or comfort to those employers and planters in foreign countries [who use] forced and indentured labor." *See* 1929 Congressional Record, 4488. By unreasonably delaying any action in response to IRAdvocates' Section 307 petition, CBP is allowing this matter of human health and welfare to continue to fester unabated – with every import of cocoa products from Côte d'Ivoire giving aid to an industry that uses forced child labor.

The Govt. Defendants offer profoundly cynical arguments regarding the human health and welfare interests at stake in this case. They first argue that because "{t}here is no obligation for affected companies to respond to a WRO," there is "no guarantee that a WRO would necessarily address human health and welfare interests in Cote d'Ivoire." MTD at 32. A guarantee of ending forced child labor through agency action is not the standard. A WRO is the mechanism that Congress has chosen to address the problem of imports of products made with forced child labor – regardless of how hopelessly CBP views the matter. In any event, issuing a WRO would clearly be a seismic event that would encourage the major chocolate companies to re-examine their sourcing and make substantially greater efforts to end forced child labor in their supply chains.[16] While CBP may be motivated by a desire to grant more time to the chocolate industry – even though it has promised for many decades to address this problem on its own and

---

[16] Defendants attempt the additional argument that the health and welfare of child workers in Cote d'Ivoire are not the primary concern of the statutory scheme, which instead "was enacted to protect domestic producers and workers." MTD at 3. This argument is plainly refuted by both the legislative history of Section 307 and the removal of the captive consumption provision in TFTEA. *See* 1929 Congressional Record, p. 4488. *See* TFTEA, Pub. L. No. 114-125 § 910, 130 Stat. 122 (2016).

has failed to do so – the statute does not contemplate granting extensions of time. It states clearly and unambiguously that products made with forced child labor "shall not be entitled to entry at any of the ports of the United States." The chocolate industry must first clean up its supply chain, and then it will be entitled to continue importing cocoa products from Cote d'Ivoire. It is not entitled to continue importing while it drags its feet to fix the problem.

The Govt. Defendants next make the shocking argument that enforcing Congress's prohibition on imports of products made with child labor "could adversely impact the U.S. economy by curtailing imports that in turn could affect U.S. businesses and jobs." MTD at 33. CBP's perspective is not only dispiriting; it is legally foreclosed. The law charges CBP with a mandate to eradicate imports made with forced child labor from the U.S. market. It does *not* counterbalance that mandate against the economic harm that may result if the market is deprived of such imports. *See* 19 U.S.C. § 1307, 19 C.F.R. § 12.42. CBP attempts to excuse its own non-enforcement by replacing the law's moral clarity with considerations entirely absent from Congress's statute and CBP's own regulations. That attempt must be rejected.

The fourth *TRAC* factor considers the effect of expediting delayed action on agency activities of a higher or competing priority. As highlighted in *Pub. Citizen Health*, "when the public health may be at stake, the agency must move expeditiously to consider a resolve the issues before it." *Pub. Citizen Health Rsch. Grp. v. Comm'r, Food & Drug Admin.*, 740 F.2d 21, 34 (D.C. Cir. 1984). As illustrated in the discussion in the third factor, public health and wellbeing are at stake, and CBP should move expeditiously.

As part of the fifth *TRAC* factor, the court must take into account the nature and extent of the interests prejudiced by the delay. The Govt. Defendants view this as a throwaway factor that merely restates the third factor. *See* MTD at 33. That is likely because the factor would require

38

weighing the public's interest in ensuring that it does not unwittingly participate in the exploitation of children – an undoubtedly powerful interest, and one that is not counterbalanced by any interest that global chocolate producers may have in continuing to benefit from their use of illegal forced child labor. Because the delay prejudices a significant public interest, this factor provides further support for a finding that CBP's delay is unreasonable.

The sixth *TRAC* factor highlights the notion that the court need not find any impropriety in order to hold that the agency action is unreasonably delayed. This language originated in *Pub. Citizen Health Rsch.* as there were strong indications in that case that industry pressure likely caused the agency to reverse course and issue an advance notice of proposed rulemaking. 740 F.2d 21, 34 (D.C. Cir. 1984). In this matter, IRAdvocates does not currently have specific information suggesting that the chocolate industry has improperly pressured CBP not to take any action, but at this stage of the case, it also cannot rule out this possibility. In any event, as the sixth *TRAC* factor notes, a finding of impropriety is not necessary to hold that the agency action is unreasonably delayed.

In *TRAC*, the court concluded that the FCC's delays of "almost five years … clearly warrant retaining jurisdiction" over the case. *TRAC*, 750 F.2d at 81. The court declined to issue a writ of mandamus compelling agency action only because "the agency has assured us that it is now moving expeditiously to resolve the pending overcharge claims." *Id.* at 72. Accordingly, the court required that "within 30 days from the issuance of this decision the FCC shall inform this court of the dates by which the agency anticipates resolution of both refund disputes. Every 60 days thereafter, the FCC shall advise the court of its progress in these matters." *Id.* at 81. IRAdvocates notes that it has not been so lucky as to receive assurances of "expeditious"

39

movement from CBP, and therefore asks the Court to compel it to abide by the law and conduct the investigation that it has so unreasonably delayed.

*    *    *

In sum, CBP has unreasonably delayed in taking the discrete actions of investigating the allegations in IRAdvocates Section 307 petition, issuing findings based on its investigation, and issuing a WRO for imports of cocoa products made with forced child labor in Côte d'Ivoire.

## V.  Conclusion

For the foregoing reasons, IRAdvocates respectfully requests that the Court deny the Govt. Defendants' motion to dismiss its complaint and proceed to the merits of this case.

Respectfully submitted on this 23rd day of February 2024,

/s/ Terrence P. Collingsworth
Terrence P. Collingsworth
(DC Bar # 471830)
INTERNATIONAL RIGHTS ADVOCATES
621 Maryland Avenue NE
Washington, D.C. 20002
Tel.: (202) 543-5811
tc@iradvocates.org
***Counsel for Plaintiff***

## CERTIFICATE OF COMPLIANCE

I, Terrence P. Collingsworth, hereby certify that the foregoing response brief contains

13,138 words (including text, quotations, footnotes, headings, and attachments) and therefore

complies with the word limitation set forth in this Court's Chamber's Procedures. In preparing

this certificate of compliance, I have relied upon the word count function of the word processing

system used to prepare the brief.


 Date: February 23, 2024                     /s/ Terrence P. Collingsworth
                                             Terrence P. Collingsworth
                                             (D.C. Bar No. 471830)
                                             INTERNATIONAL RIGHTS ADVOCATES
                                             621 Maryland Avenue, NE
                                             Washington, D.C. 20002
                                             Telephone: (202) 543-5811
                                             tc@iradvocates.org

                                             *Counsel for Plaintiff*