

FILED
2024 May-01  PM 07:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| DRUMMOND COMPANY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No 2:11-cv-3695-RDP |
| | ) | |
| v. | ) | Contains Information Designated |
| | ) | Confidential Pursuant to Protective |
| TERRENCE P. COLLINGSWORTH, et al., | ) | Order |
| | ) | |
| Defendants. | ) | |

**Defendant Conrad & Scherer, LLP's Response in Opposition to Drummond Company, Inc.'s Renewed Motion for Sanctions**

Robert K. Spotswood
Michael T. Sansbury
William T. Paulk
SPOTSWOOD SANSOM & SANSBURY LLC
505 20th Street North, Suite 700
Birmingham, AL 35203
Phone (205) 986-3620
Fax (205) 986-3639
rks@spotswoodllc.com
msansbury@spotswoodllc.com
wpaulk@spotswoodllc.com

*Attorneys for Defendant Conrad & Scherer, LLP*

**TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................. ii

TABLE OF AUTHORITIES ........................................................................................... iv

INTRODUCTION ............................................................................................................ 1

PROCEDURAL BACKGROUND OF CRIME-FRAUD DISCOVERY ...................... 6

ARGUMENT .................................................................................................................. 10

I.    Collingsworth either did not lie to the Court or he was untruthful to both the Court and C&S................................................................................................................................ 11

    A.    Collingsworth's contemporaneous emails to C&S's outside counsel only referred to "three witnesses"................................................................................................................ 11

    B.    Collingsworth told C&S's outside counsel that he had forgotten about the payments to the families of El Tigre and Samario because those payments flowed through Otero. ........ 14

    C.    Collingsworth did not disclose to C&S or its outside counsel the payments made to Blanco for his attorney's fees. ............................................................................................ 20

II.    C&S and Bill Scherer did not lie to the Court about Blanco ....................................... 22

    A.    Bill Scherer did not know about the Blanco payments ............................................... 22

    B.    Other C&S lawyers and firm administrators were not aware of the assistance provided for Blanco's attorney's fees. .............................................................................................. 25

    C.    Bill Scherer and C&S were not aware that the families of El Tigre and Samario received assistance...................................................................................................................... 27

III.    C&S did not alter documents or pull them off privilege logs to conceal anything........ 38

    A.    Collingsworth, not C&S, was responsible for the privilege log. ............................... 38

B.      Collingsworth instructed outside counsel to redact expense documents, which included the $2,700 payments to Otero that were described only as being for Otero's security and did not mention El Tigre or Samario. ........................................................................ 39

IV.     Drummond's list of "Additional False Representations" contains allegations addressed above and the remainder are likewise without merit. ............................................................ 40

V.      C&S is not aware of any undisclosed "witness payments," and Drummond's speculation about such payments cannot support a finding of sanctions. .................................................... 42

   A.      C&S has located no evidence confirming Yuca and Peinado were paid.................... 42

   B.      "Defendants" did not offer contingency fees and cash in exchange for testimony.... 43

VI.     Drummond has not proven any "irreparable harm" by the alleged loss of some of Collingsworth's emails. ........................................................................................................... 44

LEGAL AUTHORITY ............................................................................................................... 44

   I.      SANCTIONS ARE NOT WARRANTED UNDER RULE 37 ......................................... 45

   II.      SANCTIONS ARE NOT WARRANTED UNDER RULE 26 .................................... 51

   III.     NO SANCTIONS SHOULD BE ISSUED UNDER THE COURT'S INHERENT POWER ........................................................................................................................................ 52

   IV.     THERE IS NO BASIS FOR A FINDING OF CONTEMPT ........................................ 55

   V.      DRUMMOND HAS NOT DEMONSTRATED THAT IT HAS BEEN PREJUDICED OR THAT THE LEAST PUNITIVE SANCTION WOULD NOT SUFFICE ........................ 56

CONCLUSION ............................................................................................................................ 57

CERTIFICATE OF SERVICE .................................................................................................... 59

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbott Laboratories v. Adelphia Supply USA, Inc.*,
  2020 WL 1429472 (E.D.N.Y. Mar. 24, 2020) ....................................................... 54

*Barnes v. Dalton*,
  158 F.3d 1212 (11th Cir. 1998) ........................................................................ 52

*Bennett v. Ocwen Loan Servicing, LLC*,
  2014 WL 12860644 (N.D. Ga. May 13, 2014) .................................................... 48

*Bonilla v. Volvo Car Corp.*,
  150 F.3d 88 (1st Cir. 1998) ................................................................................ 54

*Casado v. United States*,
  2016 WL 4196659 (S.D. Fla. Aug. 9, 2016) ...................................................... 44

*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991) ............................................................................................ 52

*Chudasama v. Mazda Motor Corp.*,
  123 F.3d 1353 (11th Cir. 1997) ................................................................... 52, 56

*Cont'l Cas. Co. v. Compass Bank*,
  2005 WL 8158659 (S.D. Ala. Dec. 15, 2005) .............................................. 48, 56

*Daval Steel Prods., a Div. of Francosteel Corp. v. M/V Fakredine*,
  951 F.2d 1357 (2d Cir. 1991) ............................................................................ 48

*DeepGulf Inc. v. Moszkowski*,
  333 F.R.D. 249 (N.D. Fla. 2019) ....................................................................... 45

*Dow Chem Pac. Ltd. v. Rascator Maritime S.A.*,
  782 F.2d 329 (2nd Cir. 1986) ............................................................................ 52

*e360 Insight, Inc. v. Spamhaus Project*,
  658 F.3d 637 (7th Cir. 2011) ............................................................................. 48

*FNB Bank v. Park Nat. Corp.*,
  2013 WL 6842778,n.1 (S.D. Ala. Dec. 27, 2013) .............................................. 46

*Halaco Eng'g Co. v. Costle*,
  843 F.2d 376 (9th Cir. 1988) ............................................................................. 57

*Heller v. City of Dallas*,
   303 F.R.D. 466 (N.D. Tex. 2014) ............................................................ 51

*In re Grand Jury*,
   117 F. Supp. 2d 6 (D.D.C. 2000) .............................................................. 56

*In re Mroz*,
   65 F.3d 1567 (11th Cir. 1995) .................................................................. 52

*In re Terrorist Attacks on Sept. 11, 2001*,
   2022 WL 4642478 (S.D.N.Y. Sept. 21, 2022) ......................................... 55

*Jones v. Tauber & Balser, P.C.*,
   503 B.R. 162 (N.D. Ga. 2013) .................................................................. 45

*JTR Enters., LLC v. Colombian Emeralds*,
   697 F. App'x 976 (11th Cir. 2017) .......................................... 49, 52, 54, 55

*Malautea v. Suzuki Motor Co.*,
   987 F.2d 1536 (11th Cir. 1993) .......................................................... 48, 50

*Nat'l Hockey League v. Metro. Hockey Club, Inc.*,
   427 U.S. 639 (1976) ................................................................................. 48

*NPF Franchising, LLC v. SY Dawgs, LLC*,
   37 F.4th 369 (6th Cir. 2022) .................................................................... 45

*Purchasing Power, LLC v. Bluestem Brands, Inc.*,
   851 F.3d 1218 (11th Cir. 2017) .......................................................... 51, 52

*Raulerson v. Warden*,
   928 F.3d 987 (11th Cir. 2019) .................................................................. 49

*Shepard v. Am. Broadcasting Cos., Inc.*,
   62 F.3d 1469 (D.C. Cir. 1995) ................................................................. 56

*Steinberg v. Nationwide Mut. Ins. Co.*,
   224 F.R.D. 67 (E.D.N.Y. 2004) ............................................................... 46

*U.S. v. Certain Real Prop. Located at Route 1, Bryant, Ala.*,
   126 F.3d 1314 (11th Cir. 1997) ............................................................... 45

*Wolters Kluwer Fin. Servs., Inc. v. Scivatange*,
   564 F.3d 110 (2d Cir. 2009) ............................................................... 52, 55

**Statutes**

18 U.S.C. § 401 .................................................................................................................... 55

18 U.S.C. § 1621 .................................................................................................................. 56

## INTRODUCTION

"I am in a recent partnership with Conrad & Scherer, but I operate as an independent lawyer."

This is Mr. Collingsworth's explanation to a third party from whom he was seeking litigation funding in August 2011 about his relationship with Conrad & Scherer ("C&S"). Less than a month later, Collingsworth entered into a series of agreements with Albert van Bilderbeek—a client he signed up without C&S's knowledge and without following C&S's established client-retention protocols—that resulted in payments being made to Ivan Otero for the benefit of Jaime Blanco's criminal lawyer. Like the engagement with Bilderbeek, and as confirmed in writing by Collingsworth, C&S was unaware of these agreements, the fact that Blanco (or his lawyer) received money in connection with his signing a declaration, or that Collingsworth played any role in facilitating those payments.

Drummond's sweeping motion for sanctions is right on one point—"[t]he crime-fraud discovery has indeed revealed the truth." Doc. 779 at 1. But, Drummond's version of the truth drastically misses the mark as to C&S.

Collingsworth operated out of C&S's satellite office in Washington, D.C., which it opened when he joined the firm in 2008. Collingsworth acted as an independent lawyer during his approximately seven-year tenure at the firm. C&S's former outside counsel, Brad Smith, explained it this way during his deposition: "Q During your representation of Terry and Conrad & Scherer, did you develop an opinion about the relationship between the two offices? . . . A I guess I would say Terry was kind of out on his own doing his own thing." Doc. 775-26 (B. Smith Dep.) 197:18-24. But he was not supposed to act that way. Instead, he was hired to be a contract partner subject to the firm's partnership agreement. On multiple occasions, Collingsworth acted without the firm's knowledge and, occasionally, even against its interest.

Collingsworth's relationship with Bilderbeek is a perfect example. In May 2010, just over two years after joining the firm, Collingsworth purported to enter into an attorney-client relationship with Bilderbeek on behalf of C&S. Ex. 1 (CS000891 at 893).[1] But Collingsworth did not advise any partners in the firm of this engagement. He did not use the firm's standard retention agreement or ask the firm to perform its standard conflicts analysis. Ex. 2 (Decl. of Matthew R. Mantro) ¶¶ 4-5, 7. In fact, no matter was ever even opened for this representation. *Id.* ¶¶ 6, 8.

It was Collingsworth's representation of Bilderbeek that resulted in the publication of the allegedly defamatory letters that prompted Drummond to file this case. Apparently in response to a request from Bilderbeek—not anyone from C&S—Collingsworth sent the defamatory letters underlying this one-count defamation case to the Government of the Netherlands and Itochu Corporation. Ex. 3 (CS_TC005390). Collingsworth told Brad Smith that "the firm had no knowledge of the offending statements [in the allegedly defamatory letters] until Drummond's frivolous case was filed." Ex. 4 (CS_BSMITH-0000620). Then C&S partner-William R. Scherer, III ("Bill Scherer, III")—the son of C&S's founder and Managing Partner, William R. Scherer, Jr. ("Bill Scherer" or "Mr. Scherer")—confirmed that was the case: ████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████ Doc. 779-3 (Bill Scherer, III Dep.) 189:18-24; 190:1-4, 10-12.

---

[1] Citations to exhibits with Bates numbers include both the starting Bates number and, if necessary, a pinpoint citation to the last three digits of the specific page being referenced (e.g., Ex. 1 (CS_TC0000010 at 015)). Citations to deposition or hearing testimony will include page and line numbers.

Shortly after Drummond filed this case, Bill Scherer, III began trying to understand the nature of the relationship between Collingsworth and Bilderbeek. Ex. 5 (CS_REPROD_SRLF-0003010) ("The lawsuit says Terry has a 'financial arrangement' with the Llanos company. I don't know what they mean by that. . . . I found references to Albert Van Bilderbeek in one of Terry's to do lists in March 2011 so its [sic] not a question of him having direct contact with Llanos Company. It appears that he is. I'm just trying to understand what they have to do with our case against Drummond."). He, of course, didn't know that Collingsworth had entered into an attorney-client relationship with Bilderbeek because Collingsworth never advised anyone at the firm of it.

These were not isolated events. Collingsworth admitted that he was the only person who spoke to the press about Drummond. Ex. 6 (CS_TC190181 at 182) ("If we supplement, we need to say something like ***the only one of the Defendants who spoke to any press about Drummond was Mr. Collingsworth***." (emphasis added)). He told a third-party litigation funder, "I am in a recent partnership with Conrad & Scherer, but I operate as an independent lawyer. With respect to the human rights cases at issue, all of which I started years before I joined Conrad & Scherer, all of the Colombian client agreements are owned by me." Ex. 7 (CSWRS-010212).[2]

Most importantly, Collingsworth clearly accepted responsibility for key decisions relating to witness security and assistance payments, and the disclosure of them. For example, in September 2013, as Defendants were preparing to produce a privilege log, Collingsworth informed his colleagues in the D.C. office (but not in the Ft. Lauderdale office), that "[o]n the home stretch here, I am going to meet with Susana starting tomorrow to review all of the documents and make final determinations as to responsiveness, and then privilege and relevance. ***I have to be the one to do***

---

[2] This statement was not true for a few reasons. Collingsworth was not supposed to be an independent lawyer. Instead, he was hired to be a contract partner subject to the rights and obligations of the firm's partnership agreement. He also not "own" the Colombian client agreements. Instead, when C&S hired Collingsworth, both parties understood that Collingsworth's existing Colombian clients would become firm clients.

*this because I am the only person with personal knowledge and participation in all aspects of these cases*." Ex. 8 (CSWRS-017384) (emphasis added).

After the privilege log was finished, Collingsworth instructed his paralegal in the D.C. office, "***Please don't send the log to other lawyers in our firm. I want sole responsibility for final review etc***." Ex. 9 (CSWRS-017391) (emphasis added).

Collingsworth also admitted that he alone was responsible for the decision to provide security for some of the witnesses or their families:

> Folks, just wanted to share with you the notes I prepared for Brad for the argument. Briefly, I must embrace the need for security and it shows that I must have thought that Drummond would kill our witnesses or their families. . . . I don't want anyone else, particularly Christian, getting vested in defending the decisions ***that I alone made to provide security for some of the witnesses***.

Ex. 10 (CS_TC207831) (emphasis added). *See also* Ex. 11 (CS_TC196158 at 161) ("***Once I decided that security was needed*** and we discussed with those concerned what was essential, *I told our accounting people* to make the payment in whatever way we agreed, and then it just happened on automatic pilot." (emphasis added))

C&S is one of the most well-respected law firms in South Florida. In the firm's 50-year history, C&S had never been subjected to a serious sanctions motion like the one Drummond filed in this matter. Ex. 12 (Decl. of William R. Scherer, Jr.) ¶ 5. It strains reality to believe that after being a pillar in the South Florida legal community for over fifty years, C&S would knowingly condone, let alone participate in, the type of conduct described in Drummond's motion. At his most recent deposition in 2022, Mr. Scherer testified, ██████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████ Doc. 779-1 (W. Scherer Dep.) at 21:9–19.

The Court has previously made findings about Collingsworth's misrepresentations. As Mr. Scherer testified during crime-fraud hearing and in his most recent deposition in 2022, ███ ██████████████████████████████████████████████████████████████ Doc. 779-1 (W. Scherer Dep.) at 19:1–21; 20:17–23. C&S maintains that position here, and will respond to Drummond's renewed motion for sanctions only as it relates to it. But, doing so necessarily requires explaining Collingsworth's role in the firm, and his representations to the firm and its outside counsel, to demonstrate why the Court should deny Drummond's motion for sanctions in full as to C&S.

The majority of C&S's response below is devoted to telling the "other side" of the factual story because in a case like this, facts—***actual facts***, not speculation and innuendo—matter. But the facts are not the only thing on C&S's side. The terminating sanctions Drummond seeks are reserved for the most egregious violations involving knowing bad faith actions. As the facts below show, Drummond has failed to carry this burden.

Collingsworth has apologized to the Court, C&S, and Mr. Scherer for his mistakes:

Q: Mr. Collingsworth, you have admitted to a series of mistakes. Do you have anything further to tell the Court?

A: Yes, I do. I wanted to apologize to the Court. I made a horrible mistake that has cost me my credibility. I have damaged my clients. I have hurt my law firm and Mr. Scherer, and I put my family at risk. And I really regret it. It was a mistake.

Doc. 389 (Sept. 1, 2015 Hr'g Tr.) at 128:17–23.

He has taken responsibility for his actions and any damage done in his separate response brief. The Court should finally put to rest Drummond's years' long effort to seek terminating sanctions against the Defendants in hopes of forever avoiding a trial on the merits of this one-count defamation case.

## PROCEDURAL BACKGROUND OF CRIME-FRAUD DISCOVERY

Near the end of the crime-fraud order, the Court observed, "The discovery related to documents and testimony in response to the crime-fraud finding will be substantial and expensive, and will infringe on asserted privileges if improperly revealed." Doc. 417 at 49. This prediction turned out to be true in multiple respects.

First, the crime-fraud production and related testimony has been substantial. By C&S's best estimate, it has produced more than 27,000 documents and text messages since the parties began the crime-fraud review process following the Eleventh Circuit's resolution of the C&S's interlocutory appeal in 2018. Ex. 13 (Decl. of Roberto Rosado) ¶¶ 5-7. In addition, Drummond has obtained over 60 hours[3] of on-the-record deposition testimony from eleven current and former C&S lawyers, administrators, and outside counsel that was devoted almost exclusively to covering otherwise privileged and work-product protected topics underlying Drummond's renewed sanctions efforts. During this extended questioning, C&S lodged very few privilege objections (perhaps less than a half a dozen), and none of the objections required intervention from the Court or Special Master.

Second, the crime-fraud production was expensive...*very expensive*. Between September 2018, when the Court entered a scheduling order following the Eleventh Circuit's resolution of C&S's interlocutory appeal, and January 2023, when the parties began shifting their focus to merits discovery, C&S estimates that it incurred more than $1.6 million in outside counsel fees and expenses, and over $4 million in internal attorney and administrative support in implementing the crime-fraud order and related orders impacted by it (such as the privilege log recertification order). Ex. 2 (Mantro Decl.) ¶¶ 9-10.

---

[3] This figure was calculated by adding up the total time of each of the eleven depositions and then subtracting all off-the-record time spent in breaks and lunches.

Third, the prospect of C&S's privileges being improperly revealed remained a legitimate concern even after the Eleventh Circuit's decision because the crime-fraud order did not constitute wholesale waiver of C&S's privileges. To account for this, C&S spent an extraordinary amount of time redacting documents to protect privileged and work product information not subject to the crime-fraud order. This had two practical effects. First, redacted documents create an inaccurate representation of what recipients of those documents would have seen real time. For example, this is an image of a redacted copy of the "deps in the can" email, available at Doc. 180-6. Due to the redactions, the reader's eye easily focuses on paragraph 10 regarding El Tigre and Samario:





we got deps in the can, and depending on what happens, we may need to do more for the families. ET and Samario are rattled as Bocanegra also threatened their families.

11. Gave Duarte's family another 2 million Col. Pesos (about $1,000) to complete their relocation following threats.

*Privileged*

From: Terrence Collingsworth <tc@iradvocates.org>
Date: Sat, 21 May 2011 12:10:30 -0400
To: "Parker, Jerrold S." <Jerry@yourlawyer.com>, Andy Alonso <aalonso@yourlawyer.com>, "Hugo, Mike" <mhugo@yourlawyer.com>, "Rosenthal, Fred" <frosenthal@yourlawyer.com>, "Falkowitz, Gary P." <gfalkowitz@yourlawyer.com>, Peter Cambs <pcambs@yourlawyer.com>, "Breakstone, Jay" <jbreakstone@yourlawyer.com>
Cc: Lee Bialostok <lee@plattelaw.com>, Richard Drath <rdrath11@yahoo.com>, Bill Scherer <wrs@conradscherer.com>
Subject: urgent issue

# Privileged

But, recipients of the email in 2011 (and again in 2014) would have seen this:

From: "Pauline Koper" <PKoper@conradscherer.com>
To: "William R. Scherer, III" <wrs3@conradscherer.com>
Cc: "Danielle Kissflan" <DKissflan@conradscherer.com>
Sent: Monday, May 23, 2011 7:59 AM
Subject: FW: Other developments

From: Terrence Collingsworth [mailto:tc@iradvocates.org]
Sent: Sunday, May 22, 2011 6:41 PM
To: Parker, Jerrold S.; Andy Alonso; Hugo, Mike; Rosenthal, Fred; Falkowitz, Gary P.; Peter Cambs; Breakstone, Jay
Cc: Lee Bialostok; Richard Drath; William R. Scherer
Subject: Other developments

Here are a few other developments/leads

1. Met with an intermediary for Maurico Llorente, a former major in military. He was based with Popa battalian troops stationed at Drummond mine in 1999. Knows a lot about the military-AUC coordination for Drummond interests. Is in Picota prison and we will meet him next trip.

2. Got a tip that a lawyer under house arrest for money laundering with para named Arrollave will talk to us and he knows a lot about Drummond. Andres Velez 314-299-6940.

3. Ivan told us about a para named Pajaro who is in prison in Cordoba (which he says is extremely dangerous still and that we should meet Pajaro when they bring him to Barranquilla for a planned J&P session. Pajaro, along with El Tigre, Daniel and Mario were among the first AUC to be sent to Cesar to work with Drummond issues in 1996. This story is based on Ivan's retelling, but he says Pajaro will tell us the whole story with details. In 1997, three Drummond engineers were kidnapped by the ELN, which then demanded of Drummond a ransom of 3 million US$. "Drummmond" [did not know who] instead contacted Carlos Castano for help (in 1997, the AUC was just formed, was not a terrorist organization until 2001, but of course in 1996 Adkins had already written his memo to Mike Tracy saying that these guys were brutal and would violate human rights etc.).(will get name of who did the contact for Drummond; bet anything it was Adkins). Castano responded by kidnapping family members of the ELN guys who had kidnapped the Drummond people and took them to Cordoba. Pajaro, Mancuso and Jorge Enecco carried out the operation. The ELN released the 3 Drummond engineers, and then Drummond paid 1 million to Castano. The money was given to Enecco (dead now but his brother Lucas was a governor of Cesar and is still alive), Mancuso (in Miami federal prison) and Pajaro. Ivan will facilitate a meeting with Pajaro for us. I will try to get in to see Mancuso.

4. Ivan reminded that his clients Pedro and Luco, in prison in Barranquilla know all about Cerrejon and Prodeco, and can get us to Pablo, their commander, who is in Picota prison awaiting extradition. Samario was also involved in Prodeco killings.

5. Hernan Bocanegra as previously advised has visited and tried to bribe ET and Samario recently. He also recently visited Jaime B M. He cleverly says he is Jorge 40's lawyer, but he did tell Jaime that Alfredo Araujo sends his regards and would visit soon. JBM also said that Jorge 40 is pissed that his friend Araujo has claimed to not know him since he became Jorge 40.

6. Our clients, with visas in hand, can come to Alabama mid July. Will work on dates with Drummond

7. We need to confirm dates for first 3 prison deps, ET, Samario, and Bam Bam. Drummond said last week of July works. I will contact US emb re issuing oath.

8. Drummond asked that we suggest some neutral translators

9. Met with Mark Carlson of SP. He thinks he's on track for Col. Mejia. He also met with Raul Hernan Muriel Botero, director general of COSINTE (gerencia@cosinte.com, www.cosinte.com, 310-232-5142; 57-1-610-3337). Cosinte is a very plugged in local investigation firm. Drummond hired him 2 years ago for some work. ASK FOR with document request but DON'T name the company.

10. Gave Ivan $5,400 for security costs for him, ET and Samario. Need to pay $2,700 per month to maintain until

> we get deps in the can, depending on what happens, we may need to do more for the families. ET and Samario are rattled as Bocanegra also threatned their families.
>
> 11. Gave Duarte's family another 2 million Col. Pesos (about $1,000) to complete their relocation following threats.
> 12. Will return when we have a firm plan re Jaime and to prep Plaintiffs for their deps.
>
> From: Terrence Collingsworth <tc@iradvocates.org>
> Date: Sat, 21 May 2011 12:10:30 -0400
> To: "Parker, Jerrold S." <jerry@yourlawyer.com>, Andy Alonso <aalonso@yourlawyer.com>, "Hugo, Mike" <mhugo@yourlawyer.com>, "Rosenthal, Fred" <frosenthal@yourlawyer.com>, "Falkowitz, Gary P." <gfalkowitz@yourlawyer.com>, Peter Cambs <pcambs@yourlawyer.com>, "Breakstone, Jay" <jbreakstone@yourlawyer.com>
> Cc: Lee Bialostok <lee@plattelaw.com>, Richard Drath <rdrath11@yahoo.com>, Bill Scherer <wrs@conradscherer.com>
> Subject: urgent issue
>
> I'm in Bogota and return tomorrow. Many developments.I will have a full update on developments and schedules. Most important issue is that Jaime B M made a proffer to me. He can discuss with documents how Drummond ran money through his food service business. Of every payment Drummond made to JBM, 90% was passed on to AUC (Jorge 40). This system was set up by Adkins. He was present at many meetings with Jorge 40 or Tolemeida and Adkins, Alfredo Araujo, and/or Mike Tracy. Adkins and Araujo were in on decision to murder the union leaders. Adkins had Araujo and JBM arrange for Jorge 40 to work with Drummond. Adkins regularly flew back to Alabama to report directly to Garry Drummond and represented to JBM that Drummond approved. If JBM cooperates with us, Tolemeida won't support Drummond (he said he won't be the only one "continuing the lie" because he will be exposed as liar in J&P process). JBM also said that if he talks, Adkins will run to us to make a deal (maybe). There's more, but no question that JBM could put this away for us.
>
> As previously discussed, he wants significant help with his legal fees for his defense as a condition. He says he is not helping anyone if he is going to prison for the rest of his life. His number is 150k. Likely can move on that. He says his lawyers are about to walk.
>
> Let's discuss asap. I can do a call anytime between 10-6 on Tuesday May 24 and anytime Weds May 25. Let me know. Cheers, Terry

Ex. 14 (CS_TC203423).

One of the key assumptions underlying Drummond's motion for sanctions is that an individual's receipt of an email "proves" that the individual knew and comprehended every piece of information in it. As the example above illustrates, that assumption is seriously flawed and cannot serve as a basis for imposing the serious sanctions Drummond seeks.

Second, producing redacted documents provided Drummond a curated road map to focusing on key events and people that neither C&S nor its outside counsel had. If C&S produced a document reflecting otherwise privileged or protected discussions with or about Otero's work in Colombia or about witness testimony, that information would have been produced only because it was "closely related to" one of the alleged crimes or frauds at issue. What Drummond did not receive, but C&S and its outside counsel had to contend with, are the tens of thousands of other

discussions about these topics that had nothing to do with the narrow issues involved in the crime-fraud order.

Despite the volume of information and other challenges described above, the record reflects that C&S took its responsibilities in implementing the crime-fraud order seriously. In January 2022, the Court observed, "C&S appears to have taken to heart this court's attempt to reduce the number of documents at issue in relation to the court's crime-fraud review. During that process, the Firm has removed certain documents from its privilege logs. The court commends the Firm and its counsel for these efforts." Doc. 693 at 4. The Special Master's subsequent reports and recommendations confirm Defendants' good faith application of the crime-fraud standard and general privilege and relevancy determinations. *See* Doc. 695 (July 21, 2022 R&R) ¶ 19 ("Defendants have appropriately and consistently implemented the Special Master's prior Recommendations and the Court's orders pertaining to the application of the crime-fraud exception."); Doc. 765 (Nov. 22, 2023 R&R) ¶ 9 ("[T]he Special Master finds that the Defendants' claims of relevancy pursuant to the TAR Stipulation and TAR review process are within an acceptable range of reasonableness and accuracy . . . ."); Doc. 771 (Feb. 6, 2024 R&R) ¶¶ 7, 8 ("[T]he Special Master finds that the Defendants' claims of privilege . . . are within an acceptable range of reasonableness and accuracy [and] were appropriate in light of the crime-fraud exception as applied under the law of the case and Eleventh Circuit precedent.").[4]

## ARGUMENT

This section of C&S's response closely tracks the headings in Drummond's motion for sanctions to aid the Court in correlating C&S's responses to Drummond's argument.

---

[4] These findings by the Court and Special Master show the utter falsity of Drummond's claim that "Defendants . . . have done everything within their power for the last decade to obstruct and delay." Doc. 779 at 53.

I.      **Collingsworth either did not lie to the Court or he was untruthful to both the Court and C&S.**

      A.      **Collingsworth's contemporaneous emails to C&S's outside counsel only referred to "three witnesses"**

On June 21, 2013, Drummond served amended responses to Defendants' First Request for Production of Documents. In its response to RFP 1, which asked for documents supporting the claims in the complaint, Drummond "refers Defendants to those documents produced by Mr. Collingsworth reflecting payments to and correspondence with witnesses, including Duarte, Charris, Jaime Blanco, and Jose Pinzon and a person with the email address 'halcon85@yahoo.com.'" Ex. 15 (Pl.'s Am. Resp. to Defs.' 1st Req. for Prod.) at 3. Three days later, Brad Smith—outside counsel for C&S and Collingsworth—asked Collingsworth, "What are the documents Drummond refers to as 'reflecting payments and correspondence to witnesses.'" Ex. 16 (CS_TC064140 at 141). Collingsworth responded, "Susana can you please send to Brad our discovery responses about legitimate security funds provided to the families of *Halcon, Charris and Duarte*?" *Id.* at 140 (emphasis added) Thus, in his first opportunity to educate Mr. Smith about the payment issues, Collingsworth named only three witnesses whose families received assistance. He did not name El Tigre or Samario. This appears to have been the "original sin" of Collingsworth mentioning only three witnesses (although sometimes Collingsworth omitted Halcon because he didn't consider him a "witness"), which he repeated over the next year in various contexts (emphasis added throughout):

- <u>In multiple emails to Mr. Smith</u>: Ex. 17 (CS_TC208227 at 228) ("I think we take credit for disclosing the TWO instances (Charris and Duarte) when we acted to protect family members . . . ."); Ex. 18 (CS_TC190713) ("We can also agree to produce additional documents that supplement what we have already produced - there are documents related to wires to *Charris, Gelves, Durate, and Halcon*."); Ex. 19 (CS_TC190722) ("Brad, let me know if the issue is clear once you start looking at those docs - you will have needed to review them all carefully in any event. *Charris, Duarte (there are just 2) Gelves (just 1) and Halcon* payment docs.").

- <u>In multiple draft filings provided to Mr. Smith</u>: Ex. 20 (CS_TC191102) (July 2013 draft response to motion to compel, and draft Collingsworth declaration, discussing "three witnesses"); Ex. 21 (CS_TC212285) (October 2013 draft Collingsworth declaration discussing payments for Charris, Duarte, and Gelvez); Ex. 22 (CS_TC187798 at 802, 813) (July 2014 draft crime-fraud brief: "Defendants have thoroughly documented that these 'payments' were actually security assistance provided to relocate ***family members of three witnesses*** who received credible death threats attributable to Drummond before the witnesses were to testify against Drummond. . . . The ***three witnesses*** who received security assistance, Libardo Duarte, Jose Gelvez Albarracin, and Jairo Jesus Charris Castro. . . . Defendants have explained repeatedly they found it necessary to provide security and relocation assistance to ***three witnesses*** whose lives were threatened as a result of providing testimony against Drummond.").

- <u>In a July 2013 memorandum prepared by the D.C. office</u>: Ex. 23 (CS_TC237040) (document production memo discussing payments to Charris, Duarte, Gelvez, and Halcon).

- <u>In October 2013 oral arguments notes Collingsworth prepared for Mr. Smith</u>: Ex. 11 (CS_TC196158 at 159) ("Any time the judge or Drummond says something derogatory about improper payments, the record needs to be corrected. . . . ***The funds we have disclosed were paid for Halcon, Charris, and Duarte were for security***.).

- <u>In October 2013 emails with plaintiffs' counsel in the Chiquita MDL</u>: Ex. 24 (CS_TC222577) ("In my Drummond case, Drummond has filed a frivolous defamation action against me. We will ultimately prevail based on the truth of my out of court statements. ***In that case, we had 3 witnesses whose families received serious, credible death threats and we relocated them***. All good.").

- <u>In Collingsworth's March 2014 draft response to the Alabama State Bar</u>: Ex. 25 (CS_TC197050 at 054–055) ("***For the three witnesses in the Drummond case***, ***Jairo Jesus Charris Castro, Libardo Duarte, and Jose Gelvez Albarracin***, my team has always been clear that assistance was provided to their families to relocate them because they were threatened with death once Drummond became aware that the witnesses were going to testify about Drummond's relationship with the AUC. . . . The record is clear that of the 11 or so key Colombian witnesses who did testify or provide a sworn declaration in the human rights litigation, we provided security assistance and relocated family members of ***three former AUC witnesses, Charris, Duarte and Gelvis***. . . .").

- <u>In a July 2014 email with a news reporter</u>: Ex. 26 (CS_TC064730) ("1. How many witnesses have made their payments amounts and why? ***We fully disclosed to Drummond that we provided assistance to relocate family members of three witnesses, Libardo Duarte, Jose Gelvez Albarracin, and Jairo Jesus Charris Castro***. This was necessary because, after these ***three witnesses*** provided written statements, their family members were threatened by men who told them their family members should not testify against Drummond.").

These representations alone would have convinced anyone that only "three witnesses" (or their families) received any type of assistance. But Collingsworth did not stop there (emphasis added throughout):

- In August 2013, Collingsworth told Brad Smith that all documents relating to payments had been disclosed in the *Balcero* case: "***Well we already disclosed every payment in the Balcero case***. That's what is crazy. They know about those because we DID disclose." Ex. 27 (CS_BSMITH-0000650).

- In November 2013, Collingsworth sent Bill Scherer a filed copy of Defendants' "Supplemental Brief in Further Opposition to Drummond's Motion to Compel," Doc. 68, which described payments for the benefits of "three witnesses." In his cover email, Collingsworth called Drummond's accusations "wild and false," described the filing as "our first opportunity to respond factually," and predicted that "the court is not going to be happy with Drummond's misrepresentations and false accusations." Ex. 28 (CS_REPROD_SRLF-0002360).

- In April 2014, in trying to limit Drummond's discovery as to Ivan Otero, Collingsworth told Brad Smith, "If they [Drummond] are not going to produce payments to lawyers we are not either. ***Note Ivan Otero was NOT involved in the security payments to Charris, Gelvis or Duarte so they can't even show relevance***." Ex. 29 (CS_TC196995). Thus, even in connection with discussing Ivan Otero, Collingsworth did not disclose that Otero *was* involved with payments to the families of El Tigre and Samario.

- Finally, on August 11, 2014, Collingsworth told Steptoe & Johnson attorney Chris Niewoehner, who had just entered a *pro hac* appearance (Doc. 139), Bill Scherer, and Susman Godfrey attorney Ken McNeil,[5] "I also wanted to flag that ***we have produced virtually all documents relating to 'payments' for witness*** security due to the court's ruling that the fact of payments was not work product." Ex. 30 (CS_TC198538). A few weeks later, Collingsworth again told Mr. Niewoehner that "***we have produced ALL documents relating to expenditures for witness security*** . . . ." Ex. 31 (CS_TC064650 at 652).

As the above documents demonstrate, and as Mr. Scherer truthfully testified under oath in the crime-fraud hearing and both of his depositions, Collingsworth was telling the C&S (and others) the same thing about the number of witnesses of whose families had received security that he was telling the Court and Drummond.

---

[5] At the time, Mr. McNeil was representing C&S in *Conrad & Scherer, LLP v. William J. Wichmann, et al.*, Case No. 09-11600(05) (Fla. 17th Cir. Ct.). Mr. McNeil entered a *pro hac* appearance in the *Defamation* case on November 13, 2014. Doc. 162.

**B. Collingsworth told C&S's outside counsel that he had forgotten about the payments to the families of El Tigre and Samario because those payments flowed through Otero.**

A central theme of Drummond's motion relates to Collingsworth's claim that he forgot about the payments to the families of El Tigre and Samario. Whether or not that's true is up to the Court to determine. But what is important here is that he also told the firm and its outside counsel that he forgot. And, that appears plausible based not only on the extensive number of times he only said "three witnesses" as outlined above, but also based on the way the payments to the families of El Tigre and Samario were initially set up and made after that.

On February 7, 2011, three months before sending the "deps in the can" email, Collingsworth circulated notes from a trip he had recently taken to Colombia, which included observations about the increasing dangers in Colombia as witness depositions approached:

> We . . . met first with El Tigre in Barranquilla jail. He claimed repeatedly that he was being threatened and told to stop talking about Drummond and that he would not give us the final deposition until his family was moved, temporarily, to a sa[f]e location. We need to do this.
> ….
> We then went to Valledupar and met with Samario in the prison. He said that 45 days ago Alfredo Araujo's cousin, Hernando Molina, visited him and offered him money to stop talking about Drummond and also threatened him. He said he would go on the record and say this. He too insists that he will agree to be deposed, that he will work with us for another day to prep, but that we first needed to move his family to a safe place.
>
> Likewise, Ivan Otero is receiving threats. He will send us copies of written threats that he has received. He wants some security during the period we conduct the depositions.
>
> ***My own assumption is that this is a very dangerous period, that we do need to provide security going into the depositions, and that Drummond et al will do just about anything to prevent the depositions. Once they are taken, I think the risk will be substantially reduced***.

Ex. 32 (CS_TC049189 at 190) (emphasis added).[6]

A few days later, Collingsworth emailed a C&S accounting employee (without copying any C&S lawyers) asking her to "please wire 5,000 to Ivan. This is for security as we begin the process of taking depositions in Colombia." Ex. 34 (CS_TC000180).

About two months later, Ivan Otero emailed Lorraine Leete (a Colombia-based contract attorney who was not a C&S employee) a breakdown of security costs and living expenses for himself and the families of El Tigre and Samario. Ms. Leete forwarded that email to Susana Tellez, a paralegal in the D.C. office. Ex. 35 (CS_TC049445).

About a week later, Victoria Ryan (a legal assistant in the D.C. office), Tellez (a paralegal), and Collingsworth exchanged emails about asking C&S to set up a monthly wire transfer to Ivan Otero in the amount of $2,700. Ryan explicitly asked Collingsworth whether they should provide C&S's accounting office with a breakdown of what the funds were for. Collingsworth's response was "just call it security."

---

[6] This February 2011 email provides additional, clarifying context for Collingsworth's use of the phrase "deps in the can" in the email he sent in May 2011. As Collingsworth better articulated here, he and his team were receiving an increasing number of reports about threats as the letters rogatory depositions approached, but he believed the treats would subside once the depositions were complete. He offered a similar explanation about the increased threats and payments to Ivan Otero in response in an email to Bill Scherer, III in July 2012: "The funds going to Ivan are for security of people we need to protect at least until the heat dies down. . . . The heat is the death threats that preceded the testimony of the AUC guys that Ivan [w]as able to facilitate. The situation is very dangerous right now but should subside[.]" Ex. 33 (CS_TC050524).



Ex. 36 CS_TC039622.

Ryan (a legal assistant) then emailed three *accounting employees* in C&S's Ft. Lauderdale office—Cathy Salomon, Janette Perez, and Lorraine Sarfati—copying only Collingsworth and Tellez (a paralegal) asking C&S to "set up a regular monthly wire in the amount of $2,700 **to be sent to Ivan Otero, for security**." Ex. 37 (CS_TC049447 at 448) (emphasis added). No other lawyer from C&S was copied, including Mr. Scherer, and there was no mention in this email of this payment also being for the benefit of the families of El Tigre and Samario. Indeed, even when Collingsworth had to prompt the accounting department a few months later to make this payment, Collingsworth explained that "[t]his is for security for the 3 key witnesses in Drummond who are going to be deposed next month," but did not identify the witnesses. Ex. 38 (CS_TC173286).[7]

---

[7] In discussing this email chain, Drummond states, "Two weeks after receiving the 'deps in the can' email, Richard Drath received an email in which Collingsworth was discussing the new $2,700 payment to Otero for El Tigre and Samario." Doc. 779 at 27 (citing Ex. 55 (CS_TC053348)). As Drummond's Exhibit 55 and the document cited here reflect, however, nothing in the email chain indicated that the payment was for the families of El Tigre and Samario. This is just one example of why the actual facts—not Drummond's spin on them—matter in this case.

From that point forward, almost without interruption, the $2,700 payments were recorded in C&S's records, and presented to Collingsworth for approval on a monthly basis, as "wire in the amount of $2,7000 to Ivan Alfredo Otero Mendoza" and were described as being for "security."

Terry, please "reply all" with approval of the following requests.

Cathy, Janette, and Lorraine, please see the following for processing.

Next week, as per our usual timing for these monthly wires, we will request wires for Claudia Balcero Giraldo ($575), Halcon ($1,250 sent to Jose Joaquin Pinzon Diaquiz), Charris (approximately $850, sent to Gilma Yineth Baeza Acosta), ▇▇▇▇▇▇▇. As per the timing agreed upon in the past, we would expect these wire to be sent out on Friday, August 5th, along with the **$2,700 Ivan Otero wire** (see #1 below).

WORK PRODUCT

1.  Wire in the amount of $2,700 to Ivan Alfredo Otero Mendoza. This will always be billed to Drummond Rail (090501) for security. Please note that we normally request this on the week-of, but **we need to ensure that the wire will be sent out on Friday, August 5th**, the first Friday of the month, so we're giving advance notice by requesting it this week. When the wire is sent, **please send us the confirmation as soon as possible.** ▇▇▇▇▇▇▇▇▇▇▇▇▇▇

Ex. 39 (compilation exhibit starting at CS_TC213246)

Importantly, unlike the description of the payments to Halcon and Charris, who were identified by name in the above image and in the monthly wire approval emails contained in Exhibit 39, the description of the payments to Otero did not include the names of El Tigre and Samario, or any witness for that matter.

Over the next few years, this process continued uninterrupted with a few exceptions. In the summer of 2012, Bill Scherer, III began reviewing expenses in the Drummond cases and questioned the payments to Otero. In emails and budget projections provided to Bill Scherer, III and CFO Richard Drath, Collingsworth repeatedly explained that the payments to Otero were for security and he did not mention that they included support for the families of El Tigre and Samario:

- "The funds going to Ivan are for security of people we need to protect at least until the heat dies down. . . . . This is a serious issue of security for his people etc. . . . . Bodyguards, leased armor[ed] vehicle, alternative housing[.] The heat is the death threats that preceded the testimony of the AUC guys that Ivan [w]as able to facilitate. The situation is very dangerous right now but should subside[.]" Ex. 33 (CS_TC050524).

- "IVAN OTERO: $2,700 per month for security. Occasional fee payments for extraordinary work; will not be more than $6-8,000 per year. Explanation: . . . . The funds are for Ivan's security, and he also uses them to help others in the process as needed. The funds that Ivan uses could also be characterized as a payment for services if that is easier because he has performed essential work for us." Ex. 40 (CSPRIV488971 at 564).

- "We are 3 months late for Ivan and as I explained to you most of this is extremely sensitive security-based money and he has been doing a terrific job getting us the evidence we need in all the Colombia cases." Ex. 41 (CS_TC050837).

Bill Scherer, III became involved in reviewing case expenses again in early 2014. He

testified, however, ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████. Doc. 779-3 (Bill Scherer, III Dep.) at 66:1-23.

Collingsworth again explained the payments only in terms of Otero and said nothing about

the funds being used for the families of El Tigre and Samario:

> With respect to Ivan, I neglected to mention that about 2,000 per month of his funds are for security. Since he started working on these cases, there have been several assassination attempts directed at him. He filed the attached declaration with the court in our Drummond case to document this. The state would not provide him with security and he said if we wanted him to continue working to develop witnesses with the AUC, we needed to pay for armed security, which we have been doing.

Ex. 42 (CS_TC150277).[8]

The Court entered its October 15, 2014 order expanding the definitions of "payments" and

"witnesses," which prompted a more thorough search of records ultimately leading to the

---

[8] In August 2015, Bill Scherer, III forwarded to C&S's outside counsel the explanation he received from Collingsworth in 2014 about the payments to Otero: "Here is a discussion I had with Terry in 2014 where I directly asked him about the Ivan Otero payments and he did not say anything about these payments being sent on to other people. They were supposedly for him only and I got major pushback when I tried to stop them." Ex. 43 (CS_REPROD_SRLF-0001870). Collingsworth described Bill Scherer, III's inquires in 2014 about the case budgets as follows: "Well, Billy has been literally harassing me on the budgets for the Colombia cases. He says he now has approval authority on all items and is not approving anything until he is completely satisfied it is essential etc. He has parachuted in to a complex situation and has no idea how things work in Colombia. He had his wife call Yina and grill her on who comes to office etc. . . . Things are not good. I've again asked for an audience with Bill anytime this week." Ex. 44 (CSWRS-000563).

realization that payments to Otero included funds for the families of El Tigre and Samario. When confronted with this information, Collingsworth told outside counsel and other C&S lawyers that he had forgotten that and explained why:

> My office and I were involved in great detail with the Charris, Halcon and Durate issues because the threats were reported to us, we discussed in detail, we decided what to do and we did it. Those documents were accessible because they were paid out of our office and I have perfect recall of what happened. I did not have direct involvement in the El Tigre and Samario security issues (and did not want to). I had recall that they had been threatened etc and that I had discussed that we might have to do more for their security. I know that the first we started developing the actual facts on this was when we found the attached memo of 5.23.11, and this caused a more focused search and we found other documents that provided more details that I certainly did not recall (and was in a few cases surprised to see). We DID find all of the invoices to Otero before that, but none of them mentioned Samario or El Tigre and did not cause us to think there was more to the story. At the end of the day, these issues were handled by Otero, and the ones I handled were clear in my mind. There would be no reason why, given my position that it is OK to provide security to threatened witnesses, that I would have withheld that information and risk damaging my position and my credibility.

Ex. 45 (CS_TC069738 at 739) (January 24, 2015 email to outside counsel).

> In reviewing all those docs yesterday, I was struck by how many times I signed off on a document like CSPRIV 495203 (attached) saying to Otero for security. That was pretty seared in my brain and reinforced my initial recall that this was for Otero.

Ex. 46 (CS_TC201634) (Feb. 2, 2015 email to outside counsel)

> Note in the 4.14.14 brief at page 13 we disclosed that the funds we gave to Otero were for security because of his documented death threats. I did not say it was compensation or "hide" its purpose. ***What I did not do was recall at the time that he was sharing those funds for security with Samaria and ET. . . . . 98% of the Otero security documents reference only Otero. Unlike for Charris, Halcon, Gelves or Duarte, I was seeing approval documents for Otero's security***. . . . It was reasonable for me to recall that the Otero security was for Otero . . . . I had no incentive to "hide" the el tigre and samario security. We had no issue disclosing security for those I did specifically participate in and had recall of.

Ex. 47 (CS_TC069642 at 9642) (Feb. 3, 2015 to outside counsel) (emphasis added).

> Drummond has every "witness payment" document, and they were all for security. I did fail to disclose at a hearing in April 2014 that, in addition to the 3 Drummond witnesses for whom we at CS directly provided relocation assistance to their family members (Charris, Gelves and Duarte), Ivan Otero was given funds for security,

and he used part of those funds to relocate the families of Samario and El Tigre. I was asked by the Court if we had supplied any other witnesses besides the three with relocation or other security assistance, and I said no. I did not recall what arrangements we had made with Otero. Once we saw all the documents we produced them and amended my interrogatory responses to reflect this.

Ex. 48 CS_TC068912 (April 7, 2015 email to C&S attorney Eric Hager).

Again, it is for the Court to assess the credibility of Collingsworth's claim that he forgot about the payments to the families of El Tigre and Samario. But that was clearly his explanation to C&S about why the payments had not been disclosed, and the factual record outlined above supported the credibility of Collingsworth's story.

### C. Collingsworth did not disclose to C&S or its outside counsel the payments made to Blanco for his attorney's fees.

In early 2014, after Parker Waichman produced documents reflecting discussions about whether to pay Blanco's attorney's fees, Collingsworth repeatedly told C&S's outside counsel that no payments had been made to Blanco (emphasis added):

- Feb. 28, 2014 – "There was discussion of whether to help with his attorney's fees related to his preparation for and assessment of consequences of his testimony. *The fees were not paid after much discussion*." Ex. 49 (CS_BSMITH-0000925).

- March 14, 2014 - "I think there are docs in which we discussed WHETHER WE COULD assist Jaime's lawyers, and I wanted to, *but ultimately we did not*." Ex. 50 (CS_BSMITH-0000889).

- March 14, 2014 - "Yes, there is a lot of back and forth over whether to pay some fees for JBM, *but we didn't and nothing says we did*." Ex. 51 (CS_TC190277).

- March 14, 2014 - "Well tied to our case not Dole and we discussed *but did not pay JBMs lawyer* so there was no fact of payment and the discussion was clearly WP." Ex. 52 (CS_BSMITH-0000964).

- March 17, 2014 – "While I maintain that there are appropriate conditions that would have allowed us to assist Blanco's criminal lawyers to the extent that testifying for us in the civil case resulted in increased costs and fees to Blanco, Drummond admits it has no evidence of this because there is none." Ex. 25 (CS_TC197050 at 061).

- April 17, 2014 - "*[T]here are no documents produced by PW or Defendants relating to a payment to Blanco because none was made by them.* . . . The sole explanation for

Blanco finally telling the truth about Drummond is that he made some arrangement with the criminal authorities to lift [h]is right against self-incrimination and testify fully about his own role in collaborating with Drummond and the AUC to murder the union leaders. . . . ***PW and Defendants have no documents reflecting their payment to Blanco's criminal lawyers because there was no payment made by them***." Ex. 53 (CS_TC191917 at 929-930).

- April 19, 2014 - "Drummond teases that what, I did not even search for Blanco docs yet. ***Well, no, we didn't yet because we knew that we did not give him any assistance*** . . . ." Ex. 54 (CS_TC190667 at 669).

- June 30, 2014 - "***NOTE – recall the whole problem with emails re: payments to Jamie Blanco's lawyers. They were not made***. . . . [T]he Parker Waichman firm said in the emails that Drummond submitted with the hard drive motion that their ethical counsel said ***we COULD pay Blanco's lawyer but still didn't***." Ex. 55 (CS_TC193299).

Collingsworth also either hid, or at least did not make all efforts to disclose, the various agreements discussed on pages 15-18 of Drummond's motion (for simplicity, the "NICOX Agreements"), which Drummond contends resulted in payments being made to Otero for the benefit of Blanco. For example, in September 2013, Collingsworth's paralegal, Susana Tellez, was searching for documents in response to a request for production seeking agreements with Llanos Oil and/or Albert van Bilderbeek. She found a one-page document that (we now know) was one part of the NICOX Agreements. When she presented it to Collingsworth, he responded, "No that is not it and should be handed to me. I have the real one." Ex. 56 (CSWRS-017389).  He followed up a few minutes later, "Susana, I have the correct Albert agreement and he'll send the one he has executed by both parties asap. ***The other one is a fantasy that was never implemented etc***."   Ex. 57 (CSWRS-017387) (emphasis added).  Just several months later, in January 2014, Collingsworth told Brad Smith, "You can tell Drummond that any responsive documents for agreements with 'Llanos Oil and/or Albert Van Bilderbeek and/or Hendrik Van Bilderbeek" were already produced at CS000891-893." Ex. 58 (CS_BSMITH-0000859). Finally, in March 2105, C&S's new outside counsel asked Collingsworth about an email in which he discussed signing "all kinds of bizarre documents to confirm a finance plan." Counsel noted that no one had been able to locate those

documents and asked Collingsworth, "[C]an you remember anything about them?  Or the finance

plan generally? The critical question is whether you and/or Conrad & Scherer, agreed to pay the

Blanco fee money back to Llanos Oil or the Bilderbeeks, or have any kind of direct or conditional

obligation in that regard?" Collingsworth responded as follows:

> With respect to that transaction, I did sign something when I was in Amsterdam
> that was in Dutch. It was, as Albert assured me, a letter saying I was familiar with
> the issues in the Llanos Oil case and I believed in the strength of his claims. He was
> getting financing from a member of his board. In response to your specific question,
> there are lots of issues between Albert and me, but I can assure with 100%
> specificity that no one, not me or CS, has or had any obligation to pay back those
> funds to Llanos. Albert and Llanos received value for the funds in the way of
> Blanco's assistance in their case.

Ex. 59 (CS_TC154358).[9]

Given this background, it hardly surprising, as Collingsworth confirmed in writing, that

Mr. Scherer and C&S were not aware of Bilderbeek's payments to Blanco. When outside counsel

asked Collingsworth to "confirm again that Bill/Conrad & Scherer weren't aware of any of these

Bilderbeek payments to Blanco," Collingsworth responded, "Yes, that is the case." Ex. 61

(CS_TC065134).

## II.    C&S and Bill Scherer did not lie to the Court about Blanco

### A.  Bill Scherer did not know about the Blanco payments

Despite receiving over 27,000 documents and text messages, and obtaining over 60 hours

of deposition testimony, the only evidence Drummond presents to support its claim that Bill

Scherer knew Blanco was paid is one memo prepared a by Jim Carroll—a C&S attorney who did

no work on the Drummond cases—that contains a cryptic and unsupported reference to a payment

---

[9] Collingsworth also told C&S's new outside counsel in January 2015 that before the Court entered its
October 15, 2014 order broadening the scope of payments, he did not consider assistance provided by Albert to have
been provided by "me": "Based on the rfps posed prior to the recent and extreme broadening of the scope Albert's
assistance to Ivan and/or Blanco was not a benefit provided by me." Ex. 60 (CS_TC196548).

to Blanco, and Carroll's testimony that he "assumes" he gave the memo to Mr. Scherer. These facts hardly support Drummond's claim that Bill Scherer "was fully aware that Blanco was paid," and they certainly would not support a finding of sanctions.

First, as discussed above, Collingsworth confirmed in writing before the crime-fraud hearing that Mr. Scherer and the firm were not aware of the payments to Blanco. In August 2015, C&S's outside counsel asked Collingsworth to "confirm again that Bill/Conrad & Scherer weren't aware of any of these Bilderbeek payments to Blanco." Collingsworth responded, "***Yes, that is the case.***" Ex. 61 (CS_TC065134) (emphasis added).

Second, Drummond omits critical parts of Carroll's testimony. Carroll testified that he "assumed" he gave the memo to Mr. Scherer because he asked Carroll to prepare it and because Mr. Scherer was listed in the "To" line of the memo (along with CFO Richard Drath):

Q.  And Bill Scherer is not copied on this email, is he?

A.  No.

Q.  Do you recall whether you ever emailed this memo to Bill Scherer?

A.  I know I gave it to him somehow.

Q.  Okay. How?

A.  Don't remember.

Q.  Okay. Why do you -- why are you so sure you gave it to him?

A.  Well, he asked me to do it. And he's also listed in the "To" block at the top. So sometimes I gave him memos hard copy. Typically, I would also email them to him or Pauline. So I assume I sent it to him in one of those ways.

Q.  Okay. And is that assumption strictly based on the fact that he is in the "To" line of the memo?

A.  Yes.

Q.  All right. But sitting here today, do you have any recollection of how or when you provided him a copy of the memo, if you did?

A.   Specifically, no.

Q.  Okay. And you haven't been shown an email today where you sent it to him or to Pauline Koper, correct?

MR. WELLS: Object to the form.

THE WITNESS: Not that I recall.

Doc. 775-43 (Carroll Dep. Tr.) at 95:9-96:8.

Third, although Drummond assumes the memo was discussed during a meeting on June 5, 2012, among Mr. Scherer, Collingsworth, Carroll, and Drath, not a single one of these participants recalled the memo being discussed then:

- Bill Scherer: I ███████████████████████████████████████ ███████████████████████████████████████████ ██████████████████████████ Doc. 779-1 (W. Scherer Dep. Tr.) at 288:22-23; 289:10-11; 292:19-20.

- Terry Collingsworth: "[Q]. Did you discuss or did he discuss this memo that we just looked at and the  thoughts he was putting forth? A. I never saw this Exhibit 60 [Carroll memo] until this litigation; your litigation against me. *So, no,* I -- *his memo was not something* that I reviewed or *that was discussed at this meeting*." Doc. 783-1 (T. Collingsworth Dep. Tr.) at 334:21-335:2 (emphasis added).

- Jim Carroll: "Q. And were points from that memo discussed in that meeting? A. Don't remember." Doc. 775-43 (J. Carroll Dep. Tr.) at 20:22-24.

- Richard Drath: "Q. Are you aware of any conversations that you had with anyone about this memo? A. No. Q. Do you know whether Mr. Carroll talked to Bill Scherer about this memo? A. No." Doc. 775-108 (R. Drath Dep. Tr.) at 136:14-19.

Finally, even if Mr. Scherer did see the memo (which he did not), it would have hardly conveyed absolute knowledge that Blanco received assistance with his legal fees. Mr. Scherer would not have been surprised to hear about discussions regarding payments of Blanco's fees because, as he has repeated testified, ██████████████████████████████████. *See, e.g.*, Doc. 779-1 (W. Scherer Dep. Tr.) at 173:1-14. But, when Collingsworth sent Mr. Scherer a copy of Blanco's signed declaration, he said nothing about arrangement for any payments to Blanco (or his lawyer) as a condition to getting Blanco to sign it. Ex. 62 (CS_TC049996). But, critically, he also knew that C&S did not make the payment and, as Collingsworth confirmed in

writing to outside counsel, C&S did not know about any of the arrangements Collingsworth had made.

Nothing in Carroll's memo was unambiguous enough to overcome these beliefs. Drummond's motion states, "In his memo, Carrol wrote that 'TC has made payments directly or indirectly to one or more witnesses, e.g., Jaime Blanco. This is strongly hinted at right in Blanco's declaration (par. 2).'" Doc. 779 at 24. But Carroll actually wrote, "***It appears that*** TC has made payments…." Ex. 63 (CS_TC063349) (emphasis added). And, to further muddy the waters, nothing in paragraph 2 of Blanco's declaration, copied below, suggests he received payments:

> I make this truthful statement voluntarily, despite my knowledge that doing so is against my personal interest. I am confessing to conspiring with others to participate in very serious crimes. Additionally, there is no doubt that through this declaration, I am exposing myself to great risk by linking very powerful people to serious crimes. These people, in the context of Colombia, will not hesitate to use violence and threats against me and my family to silence me, or kill me.

Ex. 64 (Decl. Jaime Blanco (Oct. 14, 2011) (PLS00002770)).

Based on this flimsy record, the Court should reject Drummond's accusation that Mr. Scherer and C&S of "knowingly lied" to the Court about their knowledge of any payments to Blanco or his lawyers.

### B. Other C&S lawyers and firm administrators were not aware of the assistance provided for Blanco's attorney's fees.

Drummond's efforts to establish "C&S" knowledge about Blanco's payments by referring to what other people allegedly knew falls short.

First, Richard Drath was the firm's chief *financial* officer; he was not an attorney. Given his position, he predictably testified that he did not know what was going on with Blanco at the time Carroll wrote his memo, did not know where Carroll got the information about Blanco, did not know (and would not have known) whether the information had been disclosed to Drummond

or the Court, and that he was not involved in issues about witness trustworthiness. Doc. 775-108 (R. Drath Dep. Tr.) at 136:3-6, 10-13, 20-22; 137:20-25; 139:24-140:1.

Maxine Streeter is a former C&S lawyer who billed a total of only 35 hours in *Balcero* in all of 2012, Ex. 2 (Mantro Decl.) ¶ 11, and appears to have received the memo from Carroll only in connection with internal discussions about whether to try to settle the underlying cases while *Kiobel* was pending before the U.S. Supreme Court. Ex. 65 (CSWRS-001820). Drummond does not a single document or piece of deposition testimony indicating that the reference to Blanco meant anything to her.

The Court can quickly dispose of two of the other individuals. Susana Tellez was an administrative assistant and paralegal in the D.C. office who was living in Colombia from 2011 to 2014 Ex. 66 (S. Tellez Dep. Tr.) at 207:21-23; 212:11-14, and she testified to having no recollection about the Blanco payment. *Id.* 36:14-16 ("Q. Were you aware that Jaime Blanco had been paid? A. I don't believe -- I don't remember."). Lorraine Leete was an attorney based in Colombia and was not even a C&S employee. Doc. 775-107 (E. Hager Dep.) 20:20-21; 43:7-13.

Drummond's last-ditch effort to convey knowledge to C&S hinges on Christian Levesque, who was an associate at the time working in the D.C. office. This effort also falls short. Although Ms. Levesque was copied on some emails reflecting discussions about payment of Blanco's legal fees, she did not recall witnessing any of the documents that set up the payment arrangement, did appreciate what those agreements were for, and, despite being copied on emails, was not involved interfacing with witnesses:

> Q   You don't remember witnessing a number of documents in which Mr. Collingsworth took out a loan in order to get the funds to pay Jamie Blanco?
>
> A   So I don't -- I don't recall witnessing a  number of documents.  I have more recently seen a document that I witnessed.  I don't know what the purpose of that document was.

Doc. 775-7 (C. Levesque Dep.) at 116:10-116:16.

> Q  Did you just not ask any questions when you were getting all these things and signing bizarre Isle of Man documents as to, What is really going on here, Terry?
>
> MR. COLLINGSWORTH: Objection.  Argumentative.  Calls for speculation.
>
> A  Again, I think what's happening is you all have spent years in litigation and have pulled documents, and pieced together your theory of what's happened.  For me, at the time, I was working on the substantive case of Balcero during this -- this time period, and I was not the person, again, liaising or conducting this part of  the litigation that you're showing me these documents  on.  These are also not the only emails I'm getting during that time period. I'm busy doing worker bee work for litigation.  So I -- I just I don't recall being  involved in that way.  I just don't.

*Id.* at 131:5-21.

> Q  Do you recall that Mr. Blanco was making requests for money for his lawyers from your team?
>
> A  I don't recall that independent from what's written here.

*Id.* at 43:25-44:3.

> A  So I mean, Terry is sending this to a lot of people on -- on the team, and there's a lot going at any given time.  And again, I'm not focusing on interfacing with the ex-paramilitaries.  So there could be emails that I had not read and likely were emails that I hadn't read.  I don't have any independent recollection of this particular email and whether I read it at the time or didn't.

*Id.* at 48:6-48:25.

> A  Yes, so I – I'm not sure that that's what is being said here, but at any rate, again, if you're asking in the past did that cause me concern, I just don't recall when I received this email, you know, whether I read it, what I was -- I just was not -- I – I've already said this many times, I just was not -- this was not my -- my focus in this litigation.

*Id.* at 72:22-73:3.

### C.  Bill Scherer and C&S were not aware that the families of El Tigre and Samario received assistance.

#### 1.  The "deps in the can" email did not convey this knowledge.

As explained above, the only individuals in C&S's home office who were involved in

setting up the payments to Otero that included assistance for the benefit of El Tigre and Samario

were accounting personnel. There were no lawyers from the home office involved, and the only lawyer involved at all was Collingsworth.

Drummond's efforts to construct knowledge out of the "deps in the can" email fares no better. First, Christian Levesque testified that she was not working on that aspect of the litigation (interfacing with witnesses) and had no recollection of the "deps in the can" email conveying any knowledge to her about those payments.

> Q   Did you do anything to investigate whether security payments were necessary for El Tigre or Samario?
>
> A   I -- I did not.  I was not working on that part of the litigation in terms of again interfacing with these guys, the para -- ex-paramilitaries, or working on that, so I did not.
>
> Q   So obviously, as of the time of this email, you are being told that money has been provided for the  benefit of El Tigre and Samario, correct?
>
> MR. COLLINGSWORTH: Objection.  Mischaracterizes the testimony.
>
> A   And again, so I'm not being told.  It's a group email, and again, it looks like it's related to security here.   But beyond what we're seeing here, I just don't have anything else I can add.
>
> Q   Do you have any reason to testify under oath today that as of May 2011 when you received this email saying El Tigre and Samario were being paid, that you didn't know it at the time?
>
> A   I'm on this email, so what I'm saying is not denying I'm on this email.  I'm just not having a recollection of how much I am clued into that and understanding what is happening because I'm not dealing with that part of the litigation.

Doc. 775-7 (C. Levesque Dep.) at 44:20-45:1; 50:21-51:13.

Drummond also contends that the "deps in the can" email also conveyed knowledge of the payments to the families of El Tigre and Samario to Eric Hager, a C&S lawyer based in Quito, Ecuador. The record demonstrates otherwise. First, Hager testified that Collingsworth's "long emails" during this time here tough for him to decipher and that he was not familiar with many of the issues in them since he was working on other aspects of the Drummond cases:

He -- you know, oftentimes, with Terry's long -- long emails in this kind of time period, it was a little tough for me to decipher because I wasn't one of the people working closely with witnesses. And so, Terry would oftentimes write using these initials and whatnot. Like, he says 'ET' here. I know that that now is 'El Tigre.' I don't know whether I knew in April of 2011 if that was him. So I'm just not sure how familiar I was with these issues at the time. . . . I don't think [Collingsworth] was, you know, specifically letting me know about it. It wasn't the focus of this email, for sure.

Doc. 775-107 (E. Hager Dep.) at 42:23-43:6; 46:1-3.

Hager's correspondence with Collingsworth several years later confirms that the "deps in the can" and related emails did not convey to him knowledge of the payments to the families of El Tigre and Samario. In April 2014, Collingsworth prepared a draft Rule 11 motion against Paul Wolf, a lawyer involved in the *Chiquita* case who was repeatedly making false statements about witness payment issues arising from the Drummond case. Due to the animosity between himself and Wolf, Collingsworth asked Hager to sign the Rule 11 motion. Hager responded, "I'm fine signing this when the time comes assuming we can confirm the following: 1. ***Neither three witnesses (Samari[o], El Tigre, Jaime Blanco) nor their families received payments from us at any time***." Ex. 67 (CS_TC072619) (emphasis added). Collingsworth responded, "The two points you raise are well documented in the exhibits doc 68 and 69. I'll walk you through that before we are ready to file." *Id.* Of course, Documents 68 and 69 were filings in the *Defamation* case in which Collingsworth described payments to only three witnesses' families. Hager's request for confirmation about payments to these witnesses clearly demonstrates that he did not have knowledge of them.

### 2. C&S's communications in June and July 2014 do not demonstrate knowledge of security payments to the families of El Tigre and Samario.

During the crime-fraud hearing, the Court was rightly skeptical that Mr. Scherer's receipt of the May 2011 email would have conveyed knowledge of the payments to El Tigre and Samario:

> THE COURT: I have an easier time crediting that testimony than Mr. Collingsworth, and here is why. One email, one warning, whenever he opens his emails; it doesn't register; and three years later I've got a house fire because this is being used against me in another litigation.
>
> . . . .
>
> THE COURT: I'm telling you all that I think you have an uphill fight convincing me that stuff before June of 2014 suggests that Scherer himself had the light go on. Based on the full evidence I've heard so far, I don't think one email coming across where these things are mentioned is enough. And I'm not sure -- and I don't know that anything has come up in the evidence that suggests that he should have known five rather than three or even known that only three were being represented in this court continuously up until 2014 when he did know.

Doc. 390 (Sept. 2, 2015 Hr'g Tr.) 461:3-7; 461:20-462:4.

As discussed above, Drummond hasn't offered any new facts that would suggest that Mr. Scherer's receipt of the "deps in the can" email in May 2011 conveyed knowledge of the payments to him.

During the crime-fraud hearing, the Court also expressed concern about developments in the summer and fall of 2014 and the filing of discovery responses, affidavits, and privilege logs in the *Wichmann* case after the email was circulated around that time.

> THE COURT: My biggest concern—I'll just say this. Mr. Scherer was impressive to me. He testified. I've got to size up what he said compared to the whole record, but I was impressed with his testimony. I was impressed with his desire to make this right.
>
> The hiccup, the one hiccup that I've identified is this. It looks to me as if — and maybe the work product issue is kind of clouding things. It's not clear exactly when the light went on other than sometime after January 25, 2014. And I'm using his metaphor there.
>
> MR. McNEIL: It's June.
>
> THE COURT: June 25, 2014. What point was it in which the firm is filing a brief in the Broward County Circuit Court attached a declaration of Mr. Collingsworth saying there were only three payments after that? Wasn't that in October/November?
>
> MR. McNEIL: No, it was in September.
>
> THE COURT: September.

…

THE COURT: But what isn't clear is if the light bulb went on and things started happening and a new legal team was brought in and we're getting to the bottom of this, why at that point they wouldn't have figured out it was five and then be concerned when it's represented to be three in September. You can't answer that question without going into privileged communications, it seems to me. But I'm just telling you that's the hiccup.

Doc. 391 (Sept. 3, 2015 Hr'g Tr.) 680:22-681:14; 682:10-17.

The crime-fraud process has now allowed C&S to fully explain what happened, and that explanation should ally the Court's concerns.

First, a bit of background. In the weeks leading up to the June 2014 circulation of the May 2011 email, William Wichmann, the former C&S attorney who left the firm with client files who the firm had sued in Florida state court, was beginning, for the first time in that case, to raise allegations about "witness bribery" bubbling up in the Drummond case as a defense in his case. C&S was represented in the *Wichman* case by Susman Godfrey L.L.P. ("Susman"), and Ken McNeil from Susman. Susman had no involvement in the Drummond cases at this point. Wichmann served a RFP about payment issues, one of which asked for "documents produced in the [Drummond case] reflecting payments . . . to witnesses . . . ." Ex. 68 (CS_TC192578).

On May 23, 2014 a paralegal at C&S asked Collingsworth (with a copy to the Susman team) if he could "help in responding to this request for production in the Wichmann case?" Ex. 69 (CS_TC184488). Collingsworth responded: "First our collective understanding is that we will respond to request 1 by saying that there are no responsive docs because no payments were made to any witnesses, nor were any such documents produced to Drummond. However, we have tons of docs already provided to Ken and team that we gathered in Drummond for security relocations to the families of 3 witnesses." *Id.*

Several days later, on May 27, Collingsworth emailed the Susman team directly:

Folks, as you know, I'm seeing Ken [McNeil] on Thursday and we will discuss the document issues at length. We need not (and at this point in our small office) cannot reinvent the wheel regarding producing entire universes of documents. I attach again my initial notes on the Wichmann RFP. ***I sent you 100% of our production in the Drummond libel case. You are entitled to rely on that. If I say we don't have documents responsive to a specific request, as I have in the attached, you are entitled to rely on that too***.

Ex. 70 (CS_TC192608 at 2608) (emphasis added).

The "initial notes" Collingsworth circulated contained notes on Wichmann's RFPs, including RFP 1. With respect to RFP 1, Collingsworth stated: "There are no 'payments to witnesses.' We provided security relocation assistance to the ***families of 3 witnesses***. We have THOSE documents Drummond case, but your call as to how to interpret this." *Id.* (CS_TC192610 at 2610) (emphasis added).

Several days later, Collingsworth met with the Susman team in Ft. Lauderdale to discuss the *Wichmann* case. The next day, Collingsworth emailed the Susman team a draft response to Wichmann's RFP 1:

Folks, as per our discussion yesterday, here is [m]y suggested response to RFP No. 1. . . .

Response to No. 1.

> "There are no documents produced in Drummond Company, Inc., v. Terrence P Collingsworth and Conrad & Scherer, LLP, US District Court for the Northern District of Alabama Case No, 2:11-cv-3695-RDP, or any other source, 'reflecting payments by Conrad & Scherer and/or International Rights Advocates to witnesses' because no such payments were made. Conrad and Scherer did produce documents in the Drummond case showing that the firm provided funds for security relocation of family members of ***three witnesses, Jose Gelvez Albarracin, Jairo Jesus Charris Castro, and Libardo Duarte*** in response to death threats those family members received after the witnesses provided statements implicating Drummond in war crimes and before the witnesses were about to testify to this fact under oath. To ensure there is no question at all about payments to anyone at all in Drummond, Conrad & Scherer will produce its entire production of documents from the Drummond case."

Ex. 71 (CS_TC192612) (emphasis added).

Several days later, on May 30, Collingsworth emailed the Susman team declarations from the "3 witnesses whose family members received security assistance from us following death threats," quoted from his declaration filed at Doc. 69 (discussing the "three witnesses"), and concluded, "Hope this is now all clear. I think I've now provided everything you asked for yesterday."

Thus, in his initial communications about payments with C&S's outside counsel in the *Wichmann* case, Collingsworth repeatedly represented that three witnesses' families had received assistance, and he never mention El Tigre or Samario. And, according to Drummond, this was immediately after he "saved another copy of the 'deps in the can' email" on February 14, 2014, and had received a spreadsheet with an expense reimbursement attachment describing a payment to Otero "for security arrangements for the families of Samario, El Tigre, and for Ivan Otero" on March 31. Doc. 779 at 11-12. So, at that point, Collingsworth either did not recall the payments to the families of El Tigre and Samario, or he knowingly withheld that information from C&S's outside counsel in the *Wichmann* case.

A few weeks after being told that only "three witnesses" had received assistance, Bill Scherer, III began circulating numerous documents to the Susman team and Brad Smith. He testified that he did so, not out of concern about what Collingsworth may have disclosed or not, but rather because *Wichmann* had served discovery requests relating to payments:



████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████

Doc. 779-3 (Bill Scherer, III Dep.) at 105:17-106:4.

In circulating this material to Brad Smith and the Susman team, Bill Scherer, III noted that Blanco's request for attorney's fees prompted the firm to conduct legal research on the issue and that "[t]he firm didn't make the payment to my knowledge." Ex. 72 (CS_TC096117 at 6117). He also expressly stated, "***I am hoping that you already know of all of this and have all of this stuff from the prior documents and email searches***. I am copying our Wichmann litigation team so they are in the loop." *Id.* (emphasis added). Thus, far from being a cover up, Bill Scherer, III (who was still employed with C&S at the time) was sending information to the firm's outside counsel in two different cases to ensure they had everything.

Exhibit 72 is a complete copy of the information Bill Scherer, III circulated on June 24, 2014, which is spans nearly forty pages. It would have been nearly impossible for anyone—let alone two sets of outside counsel (none of whom speak Spanish) who have no reason to question Collingsworth's multiple representations about only "three witnesses" having received security assistance—to have discovered the single references to El Tigre and Samario. Mr. Scherer testified that ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████.

Doc. 779-1 (W. Scherer Dep.) at 208:9-209:11; 212:20-213:2. Mr. Scherer did record a .2-time entry in the *Wichmann* case on July 14, 2014, for "Review of e-mail from Ken McNeil re memos regarding ethics of paying witnesses," but he does not recall seeing the "deps in the can" email in

June 2014. Ex. 12 (Decl. of W. Scherer, Jr.) ¶ 6.[10] In fact, it appears that, after receiving the emails,

Mr. Scherer's assistant simply forwarded them to Collingsworth. Ex. 73 (CS_TC198625). Buried

somewhere in this information—which, of course, was not redacted at the time and thus would

have been even more difficult to comprehend—is the one line of the "deps in the can" memo

referencing El Tigre and Samario. THAT is what Drummond hangs its hat on. As Bill Scherer, III

testified, locating that one line of information to realize it was missing from the filings that were

made in the *Wichmann* case would have been ████████████████████



Doc. 779-3 (Bill Scherer, III Dep.) at 112:22-113:1.

After that, the Susman team followed Terry's "three witnesses" lead from several months

ago, and because no one called this memo to anyone else's attention, the "three witnesses"

language remained in the filings. *See, e.g.*, Ex. 74 (CS_TC239895) (Susman associated explaining,

"I borrowed and condensed from Collingsworth's previous affidavits re: the description of the

security/location payment made for the families, Halcon, and Balcero."); Ex. 75

(CS_REPROD_SRLF-0000229) (circulating draft privilege log memo in the *Wichmann* case

borrowing Collingsworth's language about no payments being made to witnesses and explaining

that C&S's document production will include "[d]ocuments reflecting payments made to relocate

the families of three Colombian witnesses").

On July 9, 2014, Brad Smith forwarded Collingsworth the information he had received

from Bill Scherer, III on July 9. Ex. 76 (CS_TC229312). Yet, Collingsworth still signed an

---

[10] As Mr. Scherer recently testified, ████████████████████████████████████
████████████████████████████████████████████████
Doc. 779-1 (W. Scherer Dep.) 165:6-13; 167:2-6; 169:7-15.

affidavit in the *Wichmann* case on August 12, 2014, which only said "three witnesses" and did not discuss the payments for the benefits of the families of El Tigre and Samario. *See* Doc. 243-25 at 152-164.

Two weeks later, Brad Smith emailed Collingsworth a standalone copy of the "deps in the can" email, with the message: "Terry: I would like to get the supplemental privilege log out asap. I do not see where the attached email is listed on the log." Ex. 77 (CS_TC203422). Yet, Collingsworth did nothing at that time to ensure that C&S's outside counsel in the *Wichmann* case, for whom he just signed a declaration, was aware of the implications of the discussion regarding El Tigre and Samario. Thus, C&S's outside counsel filed Collingsworth's August 12 declaration, and a legal brief using the same "three witnesses" language, in the *Wichmann* case on September 23, 2014. Doc. 417 at 47.

Importantly, Drummond has not cited any documents or deposition testimony conclusively establishing that, between June 24, 2014 and September 23, 2014, anyone saw and acknowledged, much less appreciated the significance of, the references to El Tigre and Samario in the "deps in the can" email. Thus, as of September 2014, Collingsworth either still had not recalled the assistance provided to the families of El Tigre and Samario, or he did recall them and willfully failed to call it to the attention of C&S's outside counsel in this case and in the *Wichmann* case.

Against the massive backdrop of evidence demonstrating an absence of understanding or knowledge about payments to the families of El Tigre and Samario, the only hook Drummond can find for tagging Mr. Scherer with knowledge of these payments is a short segment of testimony from his 2022 deposition in which he clearly became confused about which payments he had knowledge of real time versus payments that he learned about over the past 10 years in preparing for multiple depositions and the crime-fraud hearing. As Drummond admits, Mr. Scherer testified

in 2015 at his deposition and crime-fraud hearing that he did not know about the payments for the benefit of the families of El Tigre and Samario until late 2014. Doc. 779 at 330. He said the same thing earlier in the day during his 2022 deposition. Doc. 799-1 (W. Scherer Dep.) at 163:4-168:14.

Later in the day, however, Mr. Scherer became confused. The portions of Mr. Scherer's transcript that Drummond claims reflect his knowledge about the payments occurred after 3:00 p.m. after he had been testifying for over five hours on the record. After the break Drummond mentions, Mr. Scherer made every effort to correct on the record *during his deposition* to avoid any confusion over his earlier testimony:

████████████████████████████████████
████████████████████████████████████
████████████████████████

Doc. 799-1 (W. Scherer Dep.) at 257:12-259:8.

As this exchange reflects, rather than taking advantage of Mr. Scherer's opportunity to make sure the record was clear, Drummond's counsel stated, "Well, the record will reflect what you testified to." Doc. 799-1 (W. Scherer Dep.) at 258:20-21. Because Drummond did not allow Mr. Scherer the opportunity to fully clarify himself on the record, he submitted an errata sheet clarifying his testimony. Doc. 779-2.

**III.    C&S did not alter documents or pull them off privilege logs to conceal anything.**

**A.  Collingsworth, not C&S, was responsible for the privilege log.**

In connection with Defendants' preparation of privilege logs in September 2013, as that process was winding down, Collingsworth informed his colleagues in the D.C. office: "On the home stretch here, I am going to meet with Susana starting tomorrow to review all of the documents and make final determinations as to responsiveness, and then privilege and relevance. *I have to be the one to do this because I am the only person with personal knowledge and participation in all aspects of these cases.*" Ex. 8 (CSWRS-017384) (emphasis added). After the privilege log was finished and served on Drummond, Collingsworth instructed his paralegal in the D.C. office, Susana Tellez, "*Please don't send the log to other lawyers in our firm. I want sole responsibility for final review etc.*" Ex. 9 (CSWRS-017391) (emphasis added). And, as Collingsworth's separate response to Drummond's motion for sanctions indicates, he alone made the categorical decisions about what information to include or remove from the log.

**B. Collingsworth instructed outside counsel to redact expense documents, which included the $2,700 payments to Otero that were described only as being for Otero's security and did not mention El Tigre or Samario.**

Drummond's statement that "Defendants instructed their counsel to redact documents to conceal their payments to El Tigre and Samario" is not true for two reasons. First, as Drummond admits, it was Collingsworth who made the decision about what information to redact, which Brad Smith confirmed during his deposition. Doc. 779 at 37.

Second, there is no evidence in the record that Collingsworth directed Brad Smith to redact the $2,700 payments to Ivan Otero "to conceal their payments to El Tigre and Samario." As Drummond knew in 2015, the information that was redacted only identified Ivan Otero. Below are images of the original and reproduced bank records regarding this payment, which do not mention El Tigre and Samario.





Doc. 755-26 (B. Smith Dep. Ex. 49).

Brad Smith's colleague, Eric Bonner, noticed that "some of the monthly payments made to Ivan Otero" reference security and asked "are we producing those and if so all of the monthly payments or just ones that reference security[?]" Collingsworth responded, "NOTHING on Ivan's

security yet – he is not a witness etc[.]" Ex. 78 (CS_TC196984 at 6984). Collingsworth explained

in an email to C&S's outside counsel that he directed Brad Smith to redact "expense" documents

and that Mr. Smith viewed the $2,700 payment to Otero as an expense and redacted it:

> First was that I decided to redact all expenditure documents because the Court's
> October 15, 2013 Order did not compel their production. We were about to produce
> finance and expenditure documents, and I discussed with Brad that the Court had
> not ordered us to produce the expenditure documents, they were work product, and
> we needed to redact them out. He agreed to do it and did the hand redactions. In
> doing so he viewed the Otero costs called "security" expenditures and redacted
> them.

Ex. 79 (CS_TC199692).

Mr. Smith testified that while he was discussing these redactions with Collingsworth,

Collingsworth never told him that some portion of the $2,700 payments were for the benefit of El

Tigre and Samario's families. Doc. 755-26 (B. Smith Dep.) at 224:13-19. He also testified that he

did not recall discussing with anyone else at C&S the decisions that he and Collingsworth were

making about what information to redact. *Id.* 224:20-225:3.

## IV.    Drummond's list of "Additional False Representations" contains allegations addressed above and the remainder are likewise without merit.

Most of Drummond's argument in this section of its motion repeats and cross-references

earlier discussions in its motion about various allegedly "false representations." There are a few

additional arguments that C&S addresses here.

First, C&S's statements made through its outside counsel about when it learned that some

of Collingsworth's emails were missing hardly constitute a "false representation," and certainly

not a knowingly false one. To begin, other than Collingsworth, the individuals copied on the July

2014 emails that Drummond cites were involved primarily in the *Dole* case, not in defending the

*Defamation* case. (Those individuals included an associate attorney, paralegal, and part-time

document coder.) Drummond has not cited any evidence that the information set forth in the brief

email exchanges that occurred in July 2014 was ever provided to counsel for C&S in the *Defamation* case or to anyone else at C&S for that matter. And, as Exhibit 84 to Drummond's motion reflects, Collingsworth thought at the time that they were able to locate most of the missing emails. Thus, whether or not Collingsworth or others knew that some of Collingsworth's emails were missing is ambiguous at best. And, if they did have such knowledge, it should have been communicated to counsel for C&S in the *Defamation* case.[11]

Second, the dates on which Otero represented paramilitary witnesses who signed declarations against Drummond has been a moving target, at best, and clearly not definitive enough for C&S to have made a knowingly false representation. For example, in the September 2013 email Drummond cites, Collingsworth writes, "***Just FYI, his representations and relationships of these guys is pretty fluid***, but officially, in the depositions with Drummond, he asserted that he represented: Jairo Charris Castro, Jaime Blanco Maya, Jhon Jairo Esquivel Cuadrado, alias El Tigre, [and] Alcides Manuel Mattos Tabares, alias Samario." Doc. 775-86 (emphasis added). Drummond omitted the emphasized language in quoting this email in its motion. Collingsworth did not say in his email that Otero represented these witnesses *at* their depositions. Indeed, Collingsworth expressly told Brad Smith and C&S's new outside counsel that Otero did *not* represent these witnesses at their depositions. Ex. 80 (CS_TC064688) (Brad Smith: "[O]nly issue that continuously concerns me is Otero. What kind of statements were made on record at depos regarding his representation?" Collingsworth: "Only the witnesses saying he was 'their lawyer' but without any reference to time frame or scope. He was NOT counsel of record for any of them

---

[11] Drummond claims that "[e]mails produced pursuant to the crime-fraud exception show that, at least as early as July 2014, Defendants were acutely aware that Collingsworth's emails were missing." Doc. 779 at 38. As C&S explains in its response to Drummond's spoliation motion, however, Drummond was aware of this information at least by February 2016 when it questioned C&S's forensic expert, Dennis Williams, about it during his deposition. Drummond's suggestion that it is only through the crime-fraud process that this information came to light is demonstrably false.

at that time[.]"); Ex. 81 (CS_TC229349) ("It was NOT my understanding based on my knowledge that Otero 'represented' anyone during their depos."). And, Bill Scherer, III ██████████

████████████████████████████████████████████████████████████████

Doc. 779-3 (Bill Scherer, III Dep.) 125:22-126:3.

## V.   C&S is not aware of any undisclosed "witness payments," and Drummond's speculation about such payments cannot support a finding of sanctions.

### A.   C&S has located no evidence confirming Yuca and Peinado were paid

When the additional $2,200 payments to Otero that Drummond contends were actually for Yuca and Peinado began, Collingsworth described the purpose of the increased payments as follows: "Ivan Otero is actually increasing his work for us and is now starting to work on gathering AUC testimony for the banana cases, *which is why I sought to add a payment for him for the banana cases*. I will meet him in Colombia and come up with an overall working budget within the time frame of the cases."  Ex. 82 (CS_TC220762). Collingsworth described the payment in budget projections for the D.C. office as "focusing on getting AUC witnesses," and divided the cost between the *Dole* and *Chiquita* cases. Ex. 83 (CS_TC091780).

When the issue of potential payments to Yuca and Peinado was brought to Collingsworth's attention in late 2015, he told his team in the D.C. office, "[T]his was recently brought to my attention in Drummond. None of those demands/requests were provided by us but I will have to amend any rog responses that legitimately request a request for payment. Under no reading are these 'fact of payment' documents and are work product discussions." Ex. 84 (CS_TC088232).

Several days later C&S and its then-current and former outside counsel exchanged emails reporting that "Terry insisted that the $2200 payments were all for Dole/Chiquita," and forwarded a message from Collingsworth stating, "I spoke to Ivan just now and confirmed that, as I recalled, none of the requests relayed to me by Lorraine in the memo that has everyone excited were acting

upon and the $2200 payment to Ivan was for his work on the banana cases. He is willing to confirm this with you." Ex. 85 (CS_TC096749 at 6754). And, just a few days after that, Collingsworth told C&S and its outside counsel, "There is no issue on the question of payments to any of the folks referenced in Lorraine's memo. My recollection was confirmed with Ivan and Lorraine. . . . [N]one of the demands noted in Lorraine's memo were met." Ex. 86 (CS_TC0101675).

Drummond quotes deposition testimony from Eric Hager and Christian Levesque in which they could *not* testify that Yuca and Peinado were *not* paid and twists that into some kind of admission that they were. It also cites a convoluted set of questioning and response (with two form objections omitted) from Drath's testimony, yet fails to include the earlier portion of his testimony in which he testified that he had no idea what the additional $2,200 was for. Doc. 775-108 (R. Drath Dep.) at 145:11-15. C&S clearly cannot be sanctioned for failing to disclose payments that it does not know about and that have been disclaimed as ever occurring by the only person who would know (Collingsworth).

**B.  "Defendants" did not offer contingency fees and cash in exchange for testimony.**

A brief word about this. First, "Defendants" did not offer anyone a contingency fee and cash in exchange for testimony. This section of Drummond's motion recounts a single text message sent to Collingsworth's phone from Rebecca Pendleton in 2008, who, at the time, was a paralegal in the D.C. office. Ex. 66 (S. Tellez Dep.) at 51:5-9. Collingsworth repeatedly testified in his deposition that he understood this discussion related to payments to Ivan for working with El Tigre and Samario and, because he did not write the text message, he could not explain whether Ms. Pendleton meant anything other than that. Doc. 775-108 (T. Collingsworth Dep.) at 532:23-538:6. No other lawyer at C&S was involved in this text exchange, and not a single document

Drummond cites on page 46 of its motion refers to "paying money and promising a contingency fee to El Tigre and Samario in exchange for their declarations."[12]

## VI.    Drummond has not proven any "irreparable harm" by the alleged loss of some of Collingsworth's emails.

C&S will address in its response to Drummond's spoliation motion most of Drummond's arguments relating to missing emails. Drummond's claim in this motion that it has suffered "irreparable harm," however, is inconsistent with its claim that "[t]he crime-fraud discovery has indeed revealed the truth" and "revealed the level of intentionality involved in Collingsworth's attempts to hide his misconduct." Doc. 779 at 1. Also, the staggering number of documents and text messages produced by C&S belies any claim that Drummond has suffered "irreparable harm" due to only several months' worth of email gaps. And, at the end of the day, Drummond does not, and cannot, articulate how it has supposedly been "irreparably harmed."

### LEGAL AUTHORITY

Drummond devotes 52 pages of its 60-page motion to the facts. As the party seeking sanctions, Drummond has the burden of proof. Rather than clearly identifying which order[s] C&S violated or discovery responses it contends were fraudulent or false, Drummond elected instead "to throw as much mud against the wall with the hope that [the] court[] will sift through to see what sticks . . . ." *Casado v. United States*, No. 1:99-CR-00125-KMM, 2016 WL 4196659, at *3 (S.D. Fla. Aug. 9, 2016). Drummond has the burden of proving entitlement to sanctions; it is not the burden of C&S or the Court to wade through fifty-plus pages of facts and triangulate how

---

[12] In this section of its motion, Drummond also accuses Collingsworth of speaking in code to hide witness payments and Defendants of making payments to Colombian prison officials to gain access to prisoners. These allegations are mostly directed to Collingsworth and, in any event, appear have little, if any, connection to any alleged discovery violations.

provide a foundation for the draconian sanctions Drummond seeks. For the reasons that follow, no sanctions should be imposed on C&S.

## I.     SANCTIONS ARE NOT WARRANTED UNDER RULE 37

The Court should not sanction C&S under Rule 37. First, Drummond, which has the burden of proof, does not cite the specific subsection of Rule 37 under which it seeks sanctions. This alone warrants denial of Drummond's motion. Assuming Drummond seeks sanctions under Rule 37(b), which provides for sanctions for "failure to comply with a court order," Drummond's motion should be denied on the merits.

As the party seeking Rule 37 sanctions, Drummond "bears the burden of establishing that an opposing party failed to comply with Rule 26 or a discovery order." *DeepGulf Inc. v. Moszkowski*, 333 F.R.D. 249, 253 (N.D. Fla. 2019). This means that <u>Drummond</u> must "(1) identify a discovery order or directive and (2) show that the order or directive has been violated." *Jones v. Tauber & Balser, P.C.*, 503 B.R. 162, 200 (N.D. Ga. 2013) (citing *U.S. v. Certain Real Prop. Located at Route 1, Bryant, Ala.*, 126 F.3d 1314, 1317 (11th Cir. 1997)). *See also* 7 *Moore's Federal Practice*, § 37.42[1] (Matthew Bender 3d Ed.) ("The absence of a prior order or direction compelling discovery precludes Rule 37(b) sanctions.").

Drummond has failed to carry its burden. First, it does not clearly identify the discovery order that it contends has been violated. Instead, it simply "adopts and reiterates its prior briefing" about how Defendants' allegedly "willfully disregarded the Court's discovery orders." Doc. 779 at 53.[13] There are several problems with this approach. The motion underlying its prior briefing

---

[13] Because Drummond does not identify the order it contends Defendants violated, it is unclear whether Drummond is seeking sanctions for any conduct that occurred in the *Balcero* case. Although Drummond does not reference *Balcero* in its discussion of Rule 37, C&S notes that, at least under Sixth Circuit authority, Rule 37 sanctions would not be available against it for conduct occurring in *Balcero* because it was not a party in that case. *See NPF Franchising, LLC v. SY Dawgs, LLC*, 37 F.4th 369, 373 (6th Cir. 2022) (holding that Rule 37 sanctions may not be imposed on a law firm "where . . . the law firm [is] not a party to the lawsuit.").

was administratively terminated, and Drummond had the obligation to identify <u>here</u> exactly which order it contends Defendants have violated—especially after requesting and receiving permission to file a 60-page brief. Drummond's adoption of prior briefing not only leaves C&S at a loss as to what order it contends Defendants violated, but constitutes an impermissible attempt to exceed the (already drastically increased) page limit. *See, e.g.*, *FNB Bank v. Park Nat. Corp.*, 2013 WL 6842778, at *1 n.1 (S.D. Ala. Dec. 27, 2013) ("When a party incorporates by reference an entire section of another brief, . . . the incorporated section should count against the page limits established by local rule." (cleaned up));  *Steinberg v. Nationwide Mut. Ins. Co.*, 224 F.R.D. 67, 71 (E.D.N.Y. 2004) (striking legal arguments in affidavit that "have the effect of circumventing the Court's page limits").

Applying an extremely generous interpretation of its motion, Drummond arguably contends that Defendants violated the Court's October 15, 2013 Order, Doc. 64. Assuming this is the order Drummond contends was violated, it still has not carried its burden of establishing sanctions are warranted under Rule 37(b). That is because Drummond has failed to demonstrate that C&S violated this order or that it did so willfully and in bad faith.

The Court's October 15, 2013 Order partially resolved competing motions to compel, which contained "broad categories of dispute." Doc. 64 at 1. Consequently, the Court's order reflected its "general rulings on certain of those broad categories." *Id.* With respect to the issue of whether C&S violated the order, Drummond claims that this order "clearly states that the fact of witness payments ***must be disclosed*** and is not subject to work-product objections." Doc. 779 at 53 (emphasis added). But that is not what the order says. Instead, the order says, "Interrogatories and requests for production on payments to witnesses ***are not overbroad and are properly within the scope of discovery***. The fact of payments to witnesses ***are not subject to work product***

46

*objections*." Doc. 64 at 3. This emphasized language in the quotes above reflect subtle but very important distinctions—distinctions that C&S has previously argued preclude an award of sanctions.

In opposing Drummond's motion for sanctions in 2015, Defendants argued that Drummond was not entitled to Rule 37 sanctions because Drummond had not clearly identified discovery requests that Defendants had failed to respond to in violation of a discovery order. *See* Doc. 189 at 10-14. Recognizing this deficiency, Drummond scrambled to cobble together various discovery requests and meet and confer correspondence in an attempt to establish in its reply brief that it had satisfied its burden under Rule 37. Doc. 193. In response to its improper effort to make new arguments in its reply, Defendants sought leave to file a sur-reply, which the Court permitted. Doc. 209.[14] The parties also memorialized their respective positions on the existence of certain discovery requests and the scope of the October 15, 2013 Order in their proposed findings of fact and conclusions of law that preceded the September 2015 hearing. *See* Docs. 280, ¶¶ 242-265 and 297, ¶¶ 242-265.

Drummond's attempt here to establish a violation of Rule 37 fares no better, despite afforded 60 pages for its motion and possessing thousands more documents than it did in 2015. Instead, as noted above, Drummond simply "adopts and reiterates its prior briefing" about how Defendants' allegedly "willfully disregarded the Court's discovery orders," thus forcing C&S (and

---

[14] C&S is cognizant of the Court's skepticism in granting Defendants' leave to file a sur-reply. *See* Doc. 209. C&S is fully aware that Drummond's renewed motion for sanction relates to a discovery dispute, and there is no question that the parties devoted significant time and resources in 2013 meeting and conferring over discovery requests and briefing competing motions to compel, which resulted in entry of the Court's October 15, 2013 Order. C&S's remains concerned, however, that imposition of the drastic sanctions Drummond seeks under Rule 37 must be predicated on a clear request—not Drummond's summary of what it thinks or wishes its discovery requests sought— and a Court order clearly directing compliance with that request. That was the crux of C&S's opposition to Drummond's motion in 2015 and remains its position today.

the Court) to reconstruct exactly which discovery request Drummond contends Defendants failed to respond to in violation of a court order.

Even if C&S violated the October 15, 2013 order (which it did not), Drummond has not established all of the essential predicates for default judgment sanctions, which include a showing of willfulness or bad faith, prejudice, and that lesser sanctions would not suffice. *See Cont'l Cas. Co. v. Compass Bank*, No. CV 04-0766-CB-C, 2005 WL 8158659, at *2 (S.D. Ala. Dec. 15, 2005) ("[I]t is clear that the findings this Court must make before entering the ultimate sanction of the dismissal of all claims, as defendant requests, are as follows: (1) that plaintiff acted willfully or in bad faith; (2) that defendant was prejudiced by plaintiff's conduct; and (3) that lesser sanctions would not serve the punishment and deterrence goals set forth in *National Hockey League* and its progeny."); *see also Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1542 (11th Cir. 1993) ("[T]he severe sanction of a dismissal or default judgment is appropriate only as a last resort, when less drastic sanctions would not ensure compliance with the court's orders.").[15]

Drummond has not proven that C&S acted willfully and in bad faith (even assuming it violated a court order).[16] "[A] showing of willfulness, bad faith, or fault is necessary . . . when . . . [a Rule 37] default is imposed as a discovery sanction." *e360 Insight, Inc. v. Spamhaus Project*, 658 F.3d 637, 642 (7th Cir. 2011). *See also See Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 640 (1976); *Daval Steel Prods., a Div. of Francosteel Corp. v. M/V Fakredine*, 951 F.2d 1357, 1367 (2d Cir. 1991) ("Severe sanctions are justified, however, when the failure to comply with a court order is due to willfulness or bad faith, or is otherwise culpable."); *Bennett v. Ocwen Loan Servicing, LLC*, No. 213CV00243WCOJCF, 2014 WL 12860644, at *15 (N.D. Ga.

---

[15] The prejudice and lesser-available-sanctions factors are discussed in Part V below.

[16] As explained in the section below regarding inherent authority sanctions, a finding of bad faith is personal to the wrongdoer and cannot be attributed to others.

May 13, 2014) ("To impose the harsh sanction of default judgment, the district court must make a finding of willful or bad faith failure to comply."), *report and recommendation adopted*, No. 2:13-CV-243-WCO-JCF, 2014 WL 12861144 (N.D. Ga. Aug. 12, 2014).

Moreover, Drummond must establish by <u>clear and convincing evidence</u> that C&S violated an order willfully and in bad faith. *See JTR Enters., LLC v. Colombian Emeralds*, 697 F. App'x 976, 9887 (11th Cir. 2017) ("[W]e see no error in its finding that Motivation failed to demonstrate Silverstein's bad faith by clear and convincing evidence."). "The clear-and-convincing-evidence standard, although not insatiable, is still demanding . . . [and] calls for proof that a claim is highly probable." *Raulerson v. Warden*, 928 F.3d 987, 1007 (11th Cir. 2019) (cleaned up).

Drummond has not proven by *clear and convincing evidence* that C&S knew about the payments for Blanco's legal fees. Collingsworth has gone on record multiple times unequivocally stating that C&S did not know about them. The flimsy record evidence relating to Jim Carroll's conclusory comment about an assumed payment to Blanco made in a memo that Mr. Scherer never saw and did not discuss with anyone hardly constitutes clear and convincing evidence.

Drummond has not proven by *clear and convincing evidence* that Bill Scherer, or any other senior managerial employees of C&S, knew about the payments to the families of El Tigre and Samario. From the day those payments began, the firm's records reflected that those payments were only for Ivan Otero, and for years Collingsworth represented to C&S and the firm's outside counsel that the families of only "three witnesses"—not including El Tigre or Samario—received security assistance.

Finally, Drummond has not proven by *clear and convincing evidence* that C&S knew that any of these payments were not being disclosed in violation of any Court order. Indeed, Drummond devotes nearly all of its motion to establishing knowledge of the payments without adducing any

evidence about the firm's understanding of what had or had not been disclosed. Rule 37 sanctions are not available because a person has knowledge of a certain fact; they are available only for a willful violation of a Court order. Drummond has not established any violation, much less a willful violation of any Court order by C&S.

One of the key cases Drummond relies upon is *Malautea v. Suzuki Motor Co., Ltd.*, 987 F.2d 1536 (11th Cir. 1993). But that case is distinguishable in important respects:

- The party sanctioned had violated multiple discovery orders or engaged in multiple rounds of discovery misconduct. *Id.* at 1543 ("The defendants received ample notice of the possibility of a default judgment sanction and liberal opportunity to show why the sanction was not deserved. . . .  Still, after three orders, an extension of time allowed for discovery, and two explicit warnings of a default judgment sanction, the defendants did not comply with the court's orders or show an acceptable excuse for their failure to comply.").

- The important documents and information were discovered by the opposing party. *Id.* at 1540-41 ("Ultimately, the plaintiff had to obtain this information from General Motors.").

- The party against whom sanctions were sought had no credible explanation for its misconduct. *Id.* at 1543 ("[T]he defendants did not comply with the court's orders or show an acceptable excuse for their failure to comply.").

- The party seeking sanctions was prejudiced by the discovery misconduct. *Id.* at 1540 ("[D]efendants' delay in producing deposition transcripts, after the Magistrate Judge twice ordered their production, hampered the plaintiff's attorneys' efforts to prepare their case. The delay 'denied the Plaintiff's counsel time for a meaningful review of the earlier depositions before conducting their own depositions.'").

Here, Drummond has identified (at best) one order that Defendants have allegedly violated, not multiple orders; C&S retained new outside counsel to conduct a thorough and extensive search to ensure that responsive documents were produced; as outlined above C&S had multiple credible reasons (supported by contemporaneously created documentation) about why certain payments had not been disclosed by it; and Drummond has had ample time to utilize the information produced in discovery, and in preparing for summary judgment practice and trial.

## II.   SANCTIONS ARE NOT WARRANTED UNDER RULE 26

The Court also should not award any sanctions under Rule 26(g), which applies to "disclosure[s] under Rule 26(a)(1) or (a)(3) and every discovery request, response, or objection." *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1222 n.3 (11th Cir. 2017). "To properly invoke Rule 26(g), the district court must specify which discovery certification was sanctionable." *Heller v. City of Dallas*, 303 F.R.D. 466, 477 (N.D. Tex. 2014).

Drummond's argument for Rule 26(g) sanctions is as deficient as its argument for Rule 37 sanctions because of its failure to identify with specificity "which discovery certification was sanctionable." Instead of identifying in its motion the specific discovery certification it contends is sanctionable, Drummond states "As set forth above, the evidence clearly shows that Collingsworth and C&S—both as counsel of record in *Balcero* and as the parties in this case— signed discover responses that were knowingly false and designed to hide the truth about their witness payments." Doc. 779 at 56. This conclusory allegation begs more questions than it answers:

- Which discovery responses?
- In which case?
- Which person or entity signed?
- When were they signed?
- What about them was false?
- What evidence demonstrates that it was false?
- Did the responses include objections that rendered them not "false"?

This is a particularly poignant example of how Drummond's "throw-it-on-the-wall-and-see-what-sticks" strategy is fundamentally unfair to C&S, and would require both the Court and C&S to either dig through extensive briefing going back almost ten years or to mine Drummond's 50-plus page factual recitation for instances of allegedly false discovery certifications. "[T]he imposition of [a default under Rule 26(g) is] of such sever[ity]" that it "is appropriate only as a

last resort." *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1372 (11th Cir. 1997). A sanction of last resort should not be imposed on this record.

## III.    NO SANCTIONS SHOULD BE ISSUED UNDER THE COURT'S INHERENT POWER

The Court should not issue sanctions through the exercise of its inherent power. "[T]he key to unlocking a court's inherent power is a finding of bad faith." *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998) (citing *In re Mroz*, 65 F.3d 1567, 1575 (11th Cir. 1995)). "The standard is a subjective standard with a narrow exception for conduct tantamount to bad faith. . . . [R]ecklessness alone does not constitute conduct tantamount to bad faith." *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017). A court's inherent "power 'must be exercised with restraint and discretion' and used 'to fashion an appropriate sanction for conduct which abuses the judicial process.'" *Id.* (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991)).

"Bad faith is personal" and "may not automatically be visited" on others. *Wolters Kluwer Fin. Servs., Inc. v. Scivantage*, 564 F.3d 110, 114 (2d Cir. 2009). *See also Dow Chem Pac. Ltd. v. Rascator Maritime S.A.*, 782 F.2d 329, 344 (2nd Cir. 1986) ("A finding that one defendant has acted in bad faith in conducting litigation does not justify an award of fees against a codefendant."); Gregory P. Joseph, *Sanctions: The Federal Law of Litigation Abuse* § 27(A)(1) (6th ed. 2020) ("Bad faith is personal to the offender. One person's bad faith may not be attributed to another by operation of legal fictions or doctrines such as *respondeat superior* or vicarious liability." (citing *JTR Enters., LLC v. Columbian Emeralds*, 697 F. App'x 976, 986-87 (11th Cir. 2017)). "If a court finds that fraud has been practiced upon it, or that the very temple of justice has been defiled," it may sanction "***the responsible party*** . . . ." *Chambers*, 501 U.S. at 46 (citations omitted) (emphasis added).

The record outlined in the factual section above, and summarized here, dispels any notion that C&S acted in bad faith at any point:

- C&S was at all times represented by outside counsel who testified that he never knowingly made a misrepresentation to Drummond or the Court.[17]

- Collingsworth, who acted independently, alone made key decisions and, at times, attempted to hide information from the firm.

- C&S did not know about the payments for Blanco's attorney's fees, as confirmed in writing by Collingsworth.

- C&S and Bill Scherer, the managing partner of C&S, did not know about the payments to the families of El Tigre and Samario, or that any such payments that should have been disclosed had not been disclosed.

- In 2014, Bill Scherer, III search for and sent information to two sets of outside counsel for C&S to ensure they were aware of it.

- After the Court expanded the definition of "payments" and "witnesses" in late 2014, C&S and its counsel undertook massive and expensive efforts to locate all responsive information and have continued to supplement discovery responses since then.

- C&S has spent millions of dollars of its own money trying to correct any misstatements or nondisclosures that occurred and to comply fully with the Court's crime-fraud order.

This is the antithesis of bad faith.

Drummond's effort to hold the firm responsible for Collingsworth's conduct should be rejected. Factually, the only argument Drummond makes for holding the firm responsible is in a footnote in which it cites Brad Smith's testimony that Bill Scherer, III instructed him to coordinate the defense of the *Defamation* case with Collingsworth. Of course, asking its outside counsel to coordinate the defense with the person most knowledgeable of the underlying facts is different

---

[17] Doc. 775-26 (B. Smith Dep.) 211:11-23 ("Q At any point during your representation of Conrad & Scherer, did you knowingly make any misrepresentations to Drummond regarding the scope or number of witness payments? A Absolutely not. Q At any point during your Conrad -- your representation of Conrad & Scherer in the defamation case, did you knowingly make any misrepresentations to the Court or to the special master about the scope or nature of witness payments? A No.").

from the firm granting Collingsworth plenary authority to act on behalf of the firm, as Brad Smith recognized: "Q Okay. And did Billy Scherer tell you that Mr. Collingsworth had been given the authority by the firm to be the point person --  A No. Q -- in the defamation case? A No. There was no -- those direct words were not used. It was probably more along the lines he knows the most about this case." Doc. 775-26 (B. Smith Dep.) 29:13-20.[18] In addition, this conversation occurred "within a couple of days" of Brad Smith being retained in 2011, not contemporaneously with discovery starting in 2013. *Id.* 200:8-16. This distinguishes *Abbott Laboratories v. Adelphia Supply USA, Inc.*, No. 15CV05826CBALB, 2020 WL 1429472, at *8 (E.D.N.Y. Mar. 24, 2020), which held that "Defendants cannot absolve themselves by blaming the employees whom they selected *as their agents to work with counsel in responding to the discovery requests*." Id. at *8 (emphasis added). Moreover, Brad Smith admitted that he was never told that Collingsworth was the only person at C&S whom he should contact about the *Defamation* case. *Id.* 200:17-21.

Legally, Drummond's attempt to impute Collingsworth's conduct to the firm also fails. The bad faith conduct of one defendant does not automatically support sanctions against a co-defendant. Instead, there must be a finding that the co-defendant had knowledge of, acquiesced, or participated in the wrongful conduct. *Bonilla v. Volvo Car Corp.*, 150 F.3d 88, 93-94 (1st Cir. 1998).

Furthermore, the Eleventh Circuit has held that bad faith conduct of a law firm's partner may not be imputed to the law firm without a basis to conclude that the firm was involved in the conduct. *See JTR Enters.*, 697 F. App'x at 986-87 (affirming the district court's denial of sanctions against a firm absent clear and convincing evidence that demonstrate the firm was "otherwise

---

[18] It is not surprising Bill Scherer, III did not tell Brad Smith that Collingsworth had authority to speak on behalf of the firm given Bill Scherer, III's testimony that, ██████████████████████████████ ████████████████████████████████████████████ Doc. 779-3 (Bill Scherer, III Dep.) 26:19-21.

involved in the" bad conduct). The Court in *JTR Enterprises* refused to find that the fact the lawyer was a <u>partner</u> in the firm automatically rendered the firm liable for sanctions: "The fact that Silverstein [attorney] was a partner at YCST [the law firm] is insufficient." *Id.* The Second Circuit reached a similar decision in *Wolters Kluwer*, reversing the award of sanctions against a law firm based on imputation of bad faith conduct committed by a firm lawyer and holding "absent other specific evidence of Dorsey's [law firm] bad faith, a sanction under the court's inherent power is unjustified." 564 F.3d at 114. As Gregory Joseph, a leading sanctions scholar, has explained, "[a]t some point, the involvement and bad faith of multiple partners must be sufficient to constitute evidence of, or permit a strong inference of, bad faith on the part of the firm, given that the firm can only act through its partners." Joseph, *Sanctions: The Federal Law of Litigation Abuse* § 27(A)(4).

Even in the sole case Drummond cites as purporting to impute an attorney's sanctionable conduct to his law firm, the court found that the wrongful conduct warranting sanctions was part of the *law firm's* overall litigation strategy and that the firm was "at best, willfully blind" to the wrongful conduct, which advanced its strategy. *In re Terrorist Attacks on Sept. 11, 2001*, No. 03MD01570GBDSN, 2022 WL 4642478, at *23 (S.D.N.Y. Sept. 21, 2022), *objections overruled*, No. 03MDL1570GBDSN, 2023 WL 4561766 (S.D.N.Y. July 17, 2023).

## IV.  THERE IS NO BASIS FOR A FINDING OF CONTEMPT

The Court should decline to hold Defendants in criminal contempt.

First, although Drummond cites the criminal contempt statute, 18 U.S.C. § 401(1), it ignores the requirements for its invocation. In summary, criminal contempt for making a false statement to a Court is only available where all elements of section 401 are satisfied and there is proof beyond a reasonable doubt that the "relevant statement meets the essential elements of

perjury under the general law." *In re Grand Jury Proc.*, 117 F. Supp. 2d 6, 27–28 (D.D.C. 2000) (cleaned up). The general perjury statute, 18 U.S.C. § 1621, requires proof beyond a reasonable doubt that a defendant "made a false statement to the Court that he did not, at the time, believe to be true, and that the statement is material to the issue to be determined by the Court." *Id.* 28 (cleaned up). "[I]t is firmly established that a statement that is literally true may not form the basis for a perjury prosecution-even if the statement is incomplete, intentionally misleading or misleading by negative implication." *Id.* (cleaned up). Drummond does not address any of these elements.

Second, consistent with its argument for sanctions under Rule 37, 26, and the Court's inherent authority, Drummond does not expressly identify the "false statement" it contends constitutes perjury. Instead, it lodges broad accusations about allegedly fraudulent filings, mischaracterizes the scope of the October 15, 2013 Order, and generally regurgitates a laundry list of supposedly improper behavior, to which C&S has already responded.

## V.     DRUMMOND HAS NOT DEMONSTRATED THAT IT HAS BEEN PREJUDICED OR THAT THE LEAST PUNITIVE SANCTION WOULD NOT SUFFICE

In addition to proving that C&S acted in bad faith, Drummond must also show that it "was prejudiced by [C&S's] conduct" and that "lesser sanctions would not serve the punishment and deterrence goals set forth in *National Hockey League* and its progeny." *Cont'l Cas. Co.*, 2005 WL 8158659, at *2. *See also Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1371 (11th Cir. 1997) ("[A] district court abuses its discretion under Rule 37(b)(2) if it enters a default when less draconian but equally effective sanctions were available."); *Shepard v. Am. Broadcasting Cos., Inc.*, 62 F.3d 1469, 1472 (D.C. Cir. 1995) ("[A] district court may use its inherent power to enter a default judgment only if it finds, first, by clear and convincing evidence—a preponderance is not sufficient—that the abusive behavior occurred; and second, that a lesser sanction would not sufficiently punish and deter

the abusive conduct while allowing a full and fair trial on the merits."); *Halaco Eng'g Co. v. Costle*, 843 F.2d 376, 381 (9th Cir. 1988) ("The district court must, before dismissing an action under its inherent powers, consider less drastic sanctions.).

At this juncture, no sanction is warranted because C&S has been punished enough. It has fully complied with the Court's October 15, 2014 and crime-fraud orders, and Drummond has not been prejudiced. C&S been subjected to a crime-fraud finding which resulted in it spending millions of dollars searching for, reviewing, and producing over 30,000 of otherwise privileged documents and text messages. To the best of its ability, it has fully complied with the Court's October 15, 2014 and crime-fraud orders and has produced responsive documents and served supplemental interrogatory responses whenever it discovered new information. Drummond obtained this information well before discovery closed, was able to question eleven witnesses about it during their depositions, and will be able (subject to evidentiary objections) to use this information on summary judgment and at trial.[19]

## CONCLUSION

From the moment Mr. Scherer began to realize that a lawyer in his firm may have made misrepresentations to the Court and Drummond about the number of witness payments, he and C&S pulled out all the stops to correct the record and ensure whatever information is due to be produced has been. C&S respectfully requests that the Court not issue any further sanctions award against it.

---

[19] Drummond requests reimbursement for ALL of its attorney's fees incurred in this case "or, at the very least, those incurred after entry of this Court's October 15, 2013 Order . . . ." Doc. 779 at 60. Drummond cites no cases in which a party is awarded ALL of the fees it incurred in a case, nor are all of the fees it incurred after October 15, 2013, attributable to alleged discovery violations. As but a few examples, since October 2013, the parties engaged in multiple rounds of briefing on the Special Master's reports and recommendations regarding privileged documents, they have been engaged in several years' worth of merits discovery, and Drummond recently filed five expert reports, the majority of which have nothing to do with alleged discovery violations. Drummond's unsupported and undocumented request for ALL, or even a portion of, its fees should be rejected.

Dated: May 1, 2024

Respectfully submitted,

*s/ William T. Paulk*
Robert K. Spotswood
Michael T. Sansbury
William T. Paulk
SPOTSWOOD SANSOM & SANSBURY LLC
505 20th Street North, Suite 700
Birmingham, AL 35203
Phone (205) 986-3620
Fax (205) 986-3639
rks@spotswoodllc.com
msansbury@spotswoodllc.com
wpaulk@spotswoodllc.com

*Attorneys for Defendant Conrad & Scherer, LLP*

## **CERTIFICATE OF SERVICE**

I certify that on May 1, 2024, I filed the foregoing electronically with the Clerk of Court using the CM/ECF system, which will automatically serve all counsel of record.


s/ *William T. Paulk*
William T. Paulk