FILED

2024 Jun-17  PM 02:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

DRUMMOND COMPANY, INC.,       )
                              )
        Plaintiff,            )
                              )
v.                            )   Case No. 2:11-CV-3695-RDP
                              )
TERRENCE P. COLLINGSWORTH, *et al.*,   )
                              )
        Defendants.           )
                              )
                              )

**DEFENDANT TERRENCE P. COLLINGSWORTH'S MOTION FOR
SUMMARY JUDGEMENT IN DEFAMATION CASE**

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................................ 1

II.    STATEMENT OF UNDISPUTED MATERIAL FACTS ("SUMF") ..................................... 3

III.   STANDARD OF REVIEW FOR RULE 56 SUMMARY JUDGEMENT ............................. 8

IV.    ARGUMENT .................................................................................................................... 10

    A.    There Is No "Clear and Convincing Evidence" that the Alleged Defamatory Statements
Were Made with Actual Malice. .......................................................................................... 12

    B.    Drummond Cannot Prove With "Clear and Convincing Evidence" that the Alleged
Defamatory Statements Were False. ..................................................................................... 33

V.     CONCLUSION ................................................................................................................ 37

# TABLE OF AUTHORITIES

## Cases

*Air Wisconsin Airlines Corp. v. Hoeper*, 571 U.S. 237 (2014)   10

*Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306 (11th Cir. 2007)   8

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)   8, 9

*Berisha v. Lawson*, 973 F.3d 1304 (11th Cir. 2020)   29, 30, 31

*Calderone v. United States*, 799 F.2d 254 (6th Cir. 1986)   31

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)   8

*Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 406 F. Supp. 3d 1258 (M.D. Ala. 2019),
   *aff'd*, 6 F.4th 1247 (11th Cir. 2021)   10, 30

*Dunn v. Air Line Pilots Ass'n*, 193 F.3d 1185 (11th Cir. 1999)   10

*Fitzpatrick v. City of Atlanta*, 2 F.3d 1112 (11th Cir. 1993)   8, 9

*Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995 (11th Cir. 1997)   8

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974)   10

*Jones v. Buzzfeed, Inc.*, 591 F. Supp. 3d 1127 (N.D. Ala. 2022)   8

*Klayman v. City Pages*, 650 F. App'x 744 (11th Cir. 2016)   30

*LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366 (S.D. Fla. 1999)   9

*Lovingood v. Discovery Communs., Inc.*, 800 Fed. Appx. 840 (11th Cir. 2020)   30

*McCaig v. Talladega Pub. Co., Inc.*, 544 So. 2d 875 (Ala. 1989)   9

*Michel v. NYP Holdings, Inc.*, 816 F.3d 686 (11th Cir. 2016)   9

*New York Times v. Sullivan*, 376 U.S. 254, 280 (1964)   10

*Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264 (1974)   10

*Rosanova v. Playboy Enters.*, 580 F.2d 859 (5th Cir. 1978)   29, 30

*Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257 (D. Kan. 2003)   8, 9

*Silvester v. Am. Broad. Cos.*, 839 F.2d 1491 (11th Cir. 1988)   10, 30

*Tidwell v. Winn-Dixie Inc.*, 502 So. 2d 747 (Ala. 1987).   9

*U.S. v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991)   9

## Other Authorities

William W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues
   of Material Fact*, 99 F.R.D. 465 (1984)).   33

## I.     INTRODUCTION

I, Defendant Terrence P. Collingsworth, hereby move under Fed. R. Civ. P. 56(a) for summary judgment to dismiss Plaintiff Drummond Company, Inc.'s defamation claim against me, which would also require a dismissal of the derivative defamation claim against co-Defendant Conrad & Scherer, LLP ("C&S"). After **_nearly a decade_** of extremely expensive, invasive, and burdensome discovery following the Court's October 15, 2014 Order, ECF No. 151, and after almost **_nine years_** of crime fraud discovery of my otherwise privileged work product communications with my legal team following this Court's 2015 Crime Fraud Order, ECF No. 417, Drummond has developed **_no evidence_** to establish any material facts in dispute to support its defamation claim.

Rather, Drummond's discovery of my privileged emails strongly confirms that I acted with certainty that Drummond financed the AUC's crimes against humanity. I relied upon over **39** distinct factual sources and at least **64** news articles in making the alleged defamatory statement that Drummond was funding the AUC's crimes against humanity. The great challenge our team faced proving this well-supported fact was Drummond's "bribes or bullets" scheme that prevented third parties from testifying to the Drummond-AUC relationship (until I was able to provide security protection to the families of witnesses). In addition, Drummond's top executives coordinated a stonewall campaign to deny the facts and commit mass perjury to testify to the incredible position that they had never seen or interacted with the AUC. As is discussed in section IV.B _infra_, recently discovered notes of a November 6, 2000 meeting of former

Drummond CEO and President Mike Tracy and his security team (**Exhibit 57**) (ECF No. 63)[1] prove beyond doubt that Drummond was using the Colombian military to coordinate with AUC groups patrolling the Drummond rail line to protect against FARC attacks. Further, Tracy gave the order to identify and cleanse "troublemakers" from Drummond's employees. This chilling and brutal order was given a few months before the Drummond union leaders were executed by the AUC.

Drummond's sole argument to support its frivolous defamation claim is the false accusation that I "bribed" witnesses to give testimony that Drummond was financing the AUC's crimes against humanity. While the evidence actually shows that we provided security assistance to protect the families of some of the key AUC witnesses, even if I bribed every witness in the case, I cannot be liable for defamation if I believed Drummond did in fact finance the AUC's crimes against humanity when I published the statements at issue.

The evidence clearly shows that I knew from early witness interviews and other sources that Drummond had a long-term symbiotic relationship with the AUC and substantially funded the AUC's crimes against humanity, including the 2001 murders of the leaders of Drummond's union at the Colombian mine. There is absolutely no evidence that I ever thought this was not true or that I ever doubted the truth of that statement. Further, the evidence strongly supports that my statements were true. Indeed, as discussed in section IV B, *infra*, Drummond's officials are on their way to prison in Colombia because Colombian prosecutors have amassed substantial evidence of Drummond's funding of the AUC's crimes against humanity.

Stepping back from the extremely contentious events in this case across many years, the simple fact is that even after getting access to Defendants' privileged emails through nine years

---

[1] The ECF numbers are exhibits to my Declaration, ECF No. 814.

of discovery, Drummond has developed no evidence that I acted with the required malice, and Defendants' evidence strongly supports that the statements I made that Drummond financed the AUC were true. Summary judgement must be granted because there are no material facts in dispute on the issues.[2]

## II.     STATEMENT OF UNDISPUTED MATERIAL FACTS ("SUMF")

The following material facts are undisputed and Drummond's lack of evidence to dispute them entitles Defendants to Summary Judgement:

1.    According to Drummond's original Complaint, Defendant Collingsworth sent three letters concerning Drummond's relationship with the AUC. These three letters were the sole basis for Drummond's initial defamation Complaint against Defendants.

2.    The first letter, described in Drummond's Complaint at ¶ 10, is dated January 18, 2011, and was sent by Defendant Collingsworth to the Dutch government.

3.    Drummond identifies six distinct statements from the January 18, 2011 letter it claims were defamatory:

   a.   Hundreds of family members of Colombian nationals were "murdered by paramilitary forces working on behalf of Drummond;"

   b.   Drummond "has an atrocious human rights record;"

   c.   Drummond "made an alliance with the United Self Defense Forces of Colombia (AUC);"

---

[2] As I established in my Opposition to Motion for Sanctions, it would be extremely unjust to award any sanctions to Drummond for my conduct in the defamation case if the case is properly dismissed on summary judgement for lacking merit. *See* ECF No. 789 at 23-35.

d.   The AUC was designated as a terrorist organization by the U.S. government in 2001 "yet Drummond continued its unlawful alliance until 2006" when the AUC demobilized in the Justice & Peace process;

e.   "With Drummond's support," a particular front "went from a small band of 20 thugs to a fighting force of 150 well equipped and well trained soldiers;" and

f.    "Drummond's mandate to the AUC led to the violent slaughter of hundreds of innocent civilians."

4.      Drummond states in ¶ 11 of the Complaint that "Collingsworth knew these statements [from ¶ 10 of the Complaint detailed in the preceding paragraph] were false and/or acted with reckless disregard to whether they were false or not."

5.      There is no credible evidence in the record that Defendant Collingsworth knew that statements in ¶ 10 of the Complaint were false or that he acted with reckless disregard to whether they were false or not.

6.      In fact, the evidence shows that Defendant Collingsworth had a good faith belief that the statements he made were true based on the numerous and varied sources of information he considered prior to making the statements in 2011 and the multiple investigations in Colombia of Drummond's relationship with the AUC that he conducted. *See* TPC Decl. at ¶¶ 2-52, **Exhibits 1-58** (ECF Nos. 1-64), and discussion of the evidence at pages 12-29, *infra*.

7.      The second letter, described in Drummond's Complaint at ¶ 14, is dated February 4, 2011. Defendant Collingsworth sent the letter to the Dutch government.

8.     Drummond identifies a single sentence from the February 4, 2011 letter it claims was defamatory: that Drumond is able to "get away with murder" and that there were "hundreds of Colombian victims of Drummond's human rights violations."

9.     Drummond states in ¶ 15 of the Complaint that "Collingsworth knew these statements [from ¶ 14 of the Complaint detailed in the preceding paragraph] were false and/or acted with reckless disregard to whether they were false or not."

10.    There is no credible evidence in the record that Defendant Collingsworth knew that statements in ¶ 14 of the Complaint were false or that he acted with reckless disregard to whether they were false or not.

11.    In fact, the evidence shows that Defendant Collingsworth had a good faith belief that the statements he made were true based on the numerous and varied sources of information he considered prior to making the statements in 2011 and he had conducted multiple investigations in Colombia of Drummond's relationship with the AUC. *See* TPC Decl. at ¶¶ 2-52, **Exhibits 1-58** (ECF Nos. 1-64), and discussion of the evidence at pages 12-29, *infra*.

12.    The third letter, described in Drummond's Complaint at ¶ 18, is dated September 19, 2011 and was sent by Defendant Collingsworth to the President and CEO of Itochu, an investor in Drummond.

13.    Drummond claims the following three statements from the September 19, 2011 letter were defamatory:

      a.  Drummond "has a record of human rights crimes;"

      b.  That Defendant Collingsworth "had the facts about Drummond's direct involvement in war crimes and other major human rights violations in Colombia;" and

    c.   "Drummond will no doubt continue to deny its crimes but like many companies operating in Colombia during the civil conflict, Drummond joined forces with the AUC, a terrorist organization."

14.    There is no credible evidence in the record that Defendant Collingsworth knew that statements in ¶ 18 of the Complaint were false or that he acted with reckless disregard to whether they were false or not.

15.    In fact, the evidence shows that Defendant Collingsworth had a good faith belief that the statements he made were true based on the numerous and varied sources of information he considered prior to making the statements in 2011 and the multiple investigations in Colombia of Drummond's relationship with the AUC that he conducted. *See* TPC Decl. at ¶¶ 2-52, **Exhibits 1-58** (ECF Nos. 1-64), and discussion of the evidence at pages 12-29, *infra*.

16.    The statements made by Defendant Collingsworth that Drummond cites in its original Complaint at ¶¶ 10, 14, and 18, and ¶ 33 of its Amended Complaint, have proven to be true based on recently developed evidence and events. *See* TPC Decl. at ¶¶ 47-50 and discussion in the text at pages 15-17 (points 8-12) and 32-33, *infra*.

17.    On November 22, 2013, Drummond filed an Amended Complaint, ECF No. 73, and added an additional allegation of defamation at ¶ 33: "On or about August 26, 2013, Collingsworth was interviewed on Alternativa Latina on 88.7 FM Radio at Hofstra University. A recording of this interview was also published on the internet. In the interview, Collingsworth made numerous false and defamatory statements regarding Drummond's complicity in murder and collaboration with a terrorist organization. For example, when discussing an ongoing union strike in Colombia, Collingsworth stated: 'after they killed, after the union leaders were

killed in 2001, eventually obviously new leadership did come forward with much better security. And I think it would be very difficult for Drummond to solve their problems with the union again by having the union leaders assassinated.'"

18.    Drummond states in ¶ 34 of the Amended Complaint that "Collingsworth knew these statements [from ¶ 33 of the Complaint detailed in the preceding paragraph] were false and/or acted with reckless disregard to whether they were false or not."

19.    There is no credible evidence in the record that Defendant Collingsworth knew that statements in ¶ 33 of the Amended Complaint were false or that he acted with reckless disregard to whether they were false or not.

20.    In fact, the evidence shows that Defendant Collingsworth had a good faith belief that the statements he made were true based on the numerous and varied sources of information he considered prior to making the statements in 2013 and the multiple investigations in Colombia of Drummond's relationship with the AUC that he conducted. *See* TPC Decl. at ¶¶ 2-52, **Exhibits 1-56** (ECF Nos. 1-64), and discussion of the evidence at pages 12-29, *infra*.

21.    The statements made by Defendant Collingsworth that Drummond cites in its Amended Complaint at ¶ 33 have proven to be true based on recently developed evidence and events. *See* TPC Decl. at ¶¶ 47-50 and discussion in the text at pages 15-17 (points 8-12) and 32-33, *infra*.

22.    On September 10, 2018 ***a Special Prosecutor indicted nine Drummond officials for financing the AUC's crimes against humanity***. *See* **Exhibit 49A** (ECF No. 54) (9.10.18 Indictment) and **Exhibit 49B** (ECF No. 55) (English translation) and TPC Decl. at ¶ 47. The indictment specifically named nine Drummond executives as responsible for the AUC financing: (1) James Adkins, (2) Delbert Lee Lobb, (3) Jose Miguel Linares Martinez, (4) Augusto Jimenez

Mejia, (5) Luis Carlos Rodriguez Victoria, (6) Jorge Garzon Hernandez, (7) Alfredo Santander

Araujo Castro, (8) Ricardo Linero Gonzalez, and (9) Roberto Guillermo Escobar Londoño.

23.     In response to Drummond's effort to have the indictment dismissed, the Special

Prosecutor specifically rejected Drummond's accusations that I had bribed the key witnesses and

cited her own independent investigation of the witnesses and evidence as the basis for first going

forward with the prosecution. She further decided that the initial trial would be against the

current president, Jose Miguel Linares, and its past president, Augusto Jimenez. *See* **Exhibit 50**

(ECF No. 56) (12.16.20 Decision) and TPC Decl. at ¶ 48.

24.     Drummond appealed the Special Prosecutor's decision to prosecute the

Drummond officers to the Superior Court of the District of Bogotá. On May 29, 2023, the Court

affirmed the Special Prosecutor's decision to proceed to trial against Linares and Jimenez. *See*

**Exhibit 51** (ECF No. 57) and TPC Decl. at ¶ 49.


### III.     STANDARD OF REVIEW FOR RULE 56 SUMMARY JUDGEMENT

In *Jones v. Buzzfeed, Inc.*, 591 F. Supp. 3d 1127, 1139-41 (N.D. Ala. 2022), this Court

articulated in detail the applicable standard for summary judgment:

> Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 . . . (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 . . . (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on his allegations made in the complaint; instead, as the party bearing the burden of proof at trial, he must come forward with at least some evidence to support each element essential to his case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear ... that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

The Eleventh Circuit has interpreted *Celotex* to require that, as to issues on which the nonmovant would bear the burden of proof at trial, a moving party is not required to support its motion with affidavits or other similar material negating the opponent's claim in order to discharge this initial responsibility. Instead, the moving party simply may show —that is, point out to the district court—that there is an absence of evidence to support the non-moving party's case. Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial. *Fitzpatrick*, 2 F.3d at 1115 (quoting *U.S. v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)). And, where the moving party has met this initial burden by showing that there is an absence of evidence supporting the nonmoving party's case, the nonmoving party

must respond in one of two ways. First, he or she may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was "overlooked or ignored" by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence. Second, he or she may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.* (internal citations omitted).

## IV.    ARGUMENT

There are no material questions of fact in dispute on the required elements of defamation Drummond must establish. For purposes of this case, this Court clearly stated the legal standard Drummond must meet to prevail in its defamation claim:

> Under Alabama law, regardless of whether Drummond is a public figure, it must establish that the allegedly defamatory statements were false. To recover on a claim of defamation in Alabama, a plaintiff must prove: "1) a false and defamatory statement concerning the plaintiff; 2) an unprivileged communication of that statement to a third party; 3) fault amounting at least to negligence on the part of the defendant; and 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication of the statement." *McCaig v. Talladega Pub. Co., Inc.*, 544 So. 2d 875, 877 (Ala. 1989). "[F]alsity is a *sine qua non* of a [defamation] claim []." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 695 (11th Cir. 2016) (quotations omitted). Thus, whether or not Drummond is a public figure, "[t]he first element of a cause of action in defamation is a false statement." *Tidwell v. Winn-Dixie Inc.*, 502 So. 2d 747, 748 (Ala. 1987).

ECF No. 767 at 4 (November 30, 2023 Order).

Thus, one clear element that Drummond must prove is that my allegedly defamatory statements were false. The Court confirmed "that 'actual malice . . . requires falsity.' *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 406 F. Supp. 3d 1258, 1278 (M.D. Ala. 2019), *aff'd*, 6 F.4th 1247 (11th Cir. 2021) (citing *Air Wisconsin Airlines Corp. v. Hoeper*, 571 U.S. 237, 247 (2014) (quotation omitted)." ECF No. 767 at 5.

The Court then cited the Eleventh Circuit to define Drummond's burden of proving "actual malice" as follows:

To show "actual malice" a plaintiff must establish *by clear and convincing evidence* that the speaker made the statement "'with knowledge that it was false or with reckless disregard of whether it was false or not.'" [*Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 281 (1974)] (quoting test adopted by analogy from *New York Times v. Sullivan*, 376 U.S. 254, 280 [] (1964) (setting out standard for First Amendment restrictions on state defamation law and stating that plaintiff bears the burden of proving actual malice with "convincing clarity")); *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 [] (1974) (clarifying that [*Sullivan*] requires "clear and convincing proof" of actual malice). *Dunn v. Air Line Pilots Ass'n*, 193 F.3d 1185, 1192 (11th Cir. 1999) (emphasis added).

ECF No. 767 at 6. The Court added "Drummond has voluntarily undertaken this burden in this case, and the court has confirmed that is the burden applicable here by ordering that Drummond **MUST** establish *Sullivan* actual malice ***by clear and convincing evidence***." *Id*. at 6 (emphasis added). As the Eleventh Circuit emphasized, "[i]t is a subjective test, which asks whether the publisher '***in fact*** entertained serious doubts as to the truth of his publication.'" *Silvester v. Am. Broad. Cos.*, 839 F.2d 1491, 1498 (11th Cir. 1988) (emphasis added) (citation omitted).

As I do not dispute that I published the statements Drummond alleges are defamatory, *see* SUMF Nos. 2, 7, and 12, the two legal issues in dispute that Drummond must prove with "clear and convincing evidence" are (1) that my statements were false ***and*** (2) that I acted "with knowledge that [the statements were] false or [made] with reckless disregard of whether it was false or not." ECF No. 767 at 6. As it is simpler to address and would be dispositive, I will first show that Drummond has no material evidence to prove by "clear and convincing evidence" that I acted with malice. I will then show that Drummond cannot, as a matter of law, prove by "clear and convincing evidence" that my statements are false, particularly in light of the recently discovered Tracy memo (**Exhibit 57**) (ECF No. 63) acknowledging Drummond coordinated security with the AUC through the Colombian military. Should Drummond offer any evidence to dispute this, a ruling on the truth or falsity of my statement should be delayed until the

Colombian Court's prosecution of Drummond's officials for the very acts I am accused of falsely stating is completed.

**A.  There Is No "Clear and Convincing Evidence" that the Alleged Defamatory Statements Were Made with Actual Malice.**

After nearly a decade of expensive, burdensome, intrusive discovery, including nine years of crime fraud discovery of my emails and other communications with my entire legal team, Drummond has not identified *any* evidence, let alone "clear and convincing evidence," that I acted with malice. Specifically, Drummond has no evidence that I ever doubted that Drummond financed the AUC's crimes against humanity and that my statements at issue in this case were true. In sharp contrast, there is an enormous list of the many different sources I had reviewed and relied on before making my 2011 statements.

For a complete listing of all of the evidence I was aware of and relied upon in making the 2011 and 2013 statements, *see* TPC Decl. ¶¶ 2-52 and **Exhibits 1-58** (ECF Nos. 1-64), attached thereto. The *key evidence* I was aware of and considered before I made the 2011 and 2013 statements included:

1.      The information I had gathered in three different major investigations confirming Drummond's relationship to the AUC before filing each of the three human rights cases against Drummond for financing the AUC's crimes against humanity. *See* TPC Decl. ¶¶ 3-6. When I filed the *In re Romero*, *Balcero*, and *Baloco* complaints (**Exhibits 1, 4, and 5** (ECF Nos. 1, 5 and 6) respectively), I had a good faith belief that my allegations made regarding Drummond's financing of the AUC's war crimes were true. *Id*. I also satisfied myself for purposes of Rule 11 that I had a good faith belief in the allegations made about Drummond's relationship to the AUC. *Id.* The evidence that I had gathered in the first case, *In Re Romero*, was sufficient to overcome Drummond's motion for summary judgement and provided me with strong

confirmation that there was more than a reasonable basis for stating in 2011 that Drummond was financing the AUC's crimes against humanity. *See id*. ¶ 3 and **Exhibit 2** (ECF No. 2) (partial denial of summary judgement in *In Re Romero*). Even though there was ultimately a defense verdict, our post-trial interviews with jurors indicated they found sufficient evidence that Drummond paid the AUC to murder the Drummond union leaders, but found the murders were not "in furtherance of" the Colombian civil conflict, a requirement for liability as a war crime. Thus, at the time I made the 2011 Statements, I was aware that the *Romero* jury found our evidence of Drummond's collaboration with the AUC credible. *Id*. ¶ 4 and **Exhibits 3A and 3B** (ECF Nos. 3 and 4) (juror questionnaires).

2.  **Exhibit 6** (ECF No. 7), notes drafted by Cyrus Freidheim, Chiquita's CEO and Chair of the Board from March 2002 to May 2004. They indicate that Mr. Freidheim knew that Drummond was supporting the AUC, and when Drummond stopped making payments to the AUC, some Drummond employees were kidnapped.

3.  **Exhibit 7A** (ECF No. 9), an article by Dorothy Kosich, *Activists Pursue Drummond Coal Over Colombian Union Leader Murders*, Mineweb, May 29, 2009. *See* TPC Decl. ¶ 9. The article states:

> Former AUC [United Self-Defense Forces of Columbia] head Salvatore Mancuso has testified both in court and before U.S. congressional committees that Drummond Company and its subsidiary Drummond Ltd. "had provided substantial support to the AUC and had paid the AUC to assassinate the top union leaders at the Drummond coal mine in Cesar Province, Colombia."

4.  Mancuso later ***confirmed*** under oath that Drummond was a major funder of the AUC when he testified before the Colombian JEP. Specially, he testified:

> [B]asically, there were many companies in the country that contributed to the cause of self-defense. Drummond was one of them, for example." **Exhibit 8** (ECF No. 10) (Day 1 Mancuso JEP Testimony) at 65.

Here it is also important to go, well, it is not such a border zone, but Venezuela is next to it, which is the department of Cesar, bordering Venezuela, and the relations with Drummond happened, with the coal transporters, with the gas stations, with the care of the railway line so that they could export the extracted coal. ***These situations occurred to the point that Drummond's security chief, a Mr. James Atkins, North American, he was a member of the CIA, Rodrigo Tovar, or Jorge 40 talked to me, he told me this gentleman asked for a meeting with him. I told him to go to the meeting to see what interest they had. His name is John Atkins, James or John, I do not remember. Jorge 40, Rodrigo Tovar, spoke directly with this gentleman and received certain information,*** I believe that there or not, I don't remember very well, I have to reconstruct it, ***he gave the list of some Drummond union members, that the Self-Defense Forces gave us...they were assassinated, they were assassinated.*** The security chiefs or security advisors of Drummond were General Medina, General Tovar and I think Medina was also there, they were in Monteria, in Brigade 11." **Exhibit 9** (ECF No. 11) (Day 2 Mancuso JEP Testimony) at 2:52-57 (emphasis added).

5.    The many articles and statements I reviewed prior to making my 2011 statements listed in **Exhibit 7** (ECF No. 8) include the transcript of an April 24, 2007 Congressional Hearing on funding to paramilitary groups in Colombia during which several members of Congress, including of Rep. Eliot L. Engel, at the time Chair of the House Foreign Affairs Committee, cited "credible reports" that Drummond was financing the AUC. **Exhibit 10** (ECF No. 12) is the transcript of the Hearing, and Drummond references are at 7-9, 39, and 117.

6.    I interviewed many Drummond workers, including those who were on the Drummond bus when armed AUC members took union President Locarno and Vice President Orcasita off the bus and executed them. Most of the workers told me what they saw but declined to provide a Declaration because they were afraid they would face violent retaliation. One worker, Juan Carlos Rojas, did provide a Declaration, **Exhibit 11** (ECF No. 13). Mr. Rojas stated under oath there was a convoy of three buses that had pulled out of the Drummond mining compound. He was on the same bus as Mr. Locarno and Mr. Orcasita. Eight heavily armed men in the back of a pickup truck pulled over the bus. Several of the armed men boarded the bus and asked for the "man with the gun." They were referring to Mr. Locarno; as the

President of the Drummond union, he was known to be armed for self-protection. The armed men pulled Mr. Locarno off the bus and shot him. They then identified Mr. Orcasita and took him away. He was found dead the next day. Others were very clear in saying that the armed men were with the AUC and they clearly knew which bus the union leaders were on.

7.      I interviewed Jaime Blanco Maya in approximately December 2010 about Drummond's financing of the AUC and Drummond's role in the execution of the union leaders at Drummond. He later signed an October 14, 2011 Declaration, **Exhibit 12** (ECF No. 14), which confirmed under oath the key facts he told to me in the December 2010 interview. He told me that James Adkins, the former CIA agent who became Drummond's head of security in Colombia, raised the prospect of engaging the AUC to protect Drummond from the FARC guerillas, who were attacking the Drummond rail line. Adkins later confirmed to Mr. Blanco that he had discussed the issue with Garry Drummond who had approved a plan to provide regular support to the AUC and that Adkins would bring regular cash payments of $10,000 to provide monthly payments to the AUC. **Exhibit 12** (ECF No. 14), Blanco Decl. at ¶¶ 19-20. Adkins gave the first $10,000 payment to Mr. Blanco, who delivered it to AUC Commander El Tigre. *Id*. Shortly thereafter, Adkins approached Mr. Blanco with a scheme for Blanco to overcharge Drummond for food services and provide the overage to the AUC, rather than have Adkins bring cash payments down from the U.S. *Id*. ¶¶ 21-23. Mr. Blanco also told me, and confirmed in his Declaration, that Drummond officials, including Adkins, were responsible for paying the AUC to murder the Drummond union leaders. *Id*. ¶¶ 36-39. Mr. Blanco also provided testimony under oath at a Letters Rogatory Hearing that confirmed these aspects of his original statements to me. Jaime Blanco 4.19.12 Dep., attached hereto as **Exhibit 13** (ECF No. 15). In addition, Mr. Blanco provided deposition testimony on December 11, 2023, **Exhibit 14** (ECF No. 16) (Blanco Dep. at

122-25), that also confirmed his knowledge that Drummond paid the AUC through the overage of his food service charges to Drummond. I believed Mr. Blanco's consistent statements to me about the role of Drummond and Adkins in funding the AUC's crimes against humanity.

8.    The Colombian Special Prosecutor heard the same testimony from Jaime Blanco as I did, and Mr. Blanco became the star witness in the Prosecution of Drummond's senior officers for financing the AUC's crimes against humanity. Based on my reasonable and good faith belief that Drummond was financing the AUC's crimes against humanity that I held ***before*** I made the 2011 Statements, I provided most, if not all, of the evidence I had supporting my belief that Drummond financed the AUC's crimes against humanity to the Colombian Special Prosecutor, who conducted an extensive independent investigation, interviewing and taking sworn testimony from numerous witnesses. Based on this independent confirmation of the evidence, on September 10, 2018 ***the Special Prosecutor indicted nine Drummond officials for financing the AUC's crimes against humanity***. *See* **Exhibit 49A** (ECF No. 54) (9.10.18 Indictment) and **Exhibit 49B** (ECF No. 55) (English translation). The Prosecutor specifically named nine Drummond executives as responsible for the AUC financing: (1) James Adkins, (2) Delbert Lee Lobb, (3) Jose Miguel Linares Martinez, (4) Augusto Jimenez Mejia, (5) Luis Carlos Rodriguez Victoria, (6) Jorge Garzon Hernandez, (7) Alfredo Santander Araujo Castro, (8) Ricardo Linero Gonzalez, and (9) Roberto Guillermo Escobar Londoño.

9.    The Special Prosecutor specifically rejected Drummond's accusations that I had bribed the key witnesses and cited her own independent investigation of the witnesses and evidence as the basis for first going forward with a prosecution against its current president, Jose Miguel Linares, and its past president, Augusto Jimenez. *See* **Exhibit 50** (ECF No. 56) (12.16.20 Decision).

10.     Drummond has since tried all possible legal maneuvers to kill the prosecution of its officers, including initiating internal administrative appeals to the Superior Court of the District of Bogotá. On May 29, 2023, the Court affirmed the Special Prosecutor's decision to proceed to trial with Linares and Jimenez. *See* **Exhibit 51** (ECF No. 57). The Court confirmed Drummond, acting through Linares and Jimenez, facilitated substantial financial flows to the AUC, which were crucial for their operations. These transactions formed a consistent pattern of financial support that allowed the AUC to maintain and even expand their control over several regions. Also, Drummond provided logistical support to the AUC, including transportation, procurement of weapons, and other supplies essential for the paramilitary group to sustain their activities and dominance. This support was instrumental in enabling the AUC to carry out operations. *Id.* and TPC Decl. ¶ 49. The Court concluded the decision to proceed to trial is supported by a robust body of evidence and legal argumentation that collectively suggest the accused played significant roles in crimes that had grave implications for public safety and order. **Exhibit 51** (ECF No. 57) and TPC Decl. ¶ 49.

11.     Mr. Blanco has repeatedly and consistently testified under oath about the payment scheme to fund the AUC that he implemented under Adkins' direction. The Special Prosecutor retained a forensic expert who examined Blanco's accounting records and confirmed Blanco's testimony that this scheme was the main way Drummond funneled payments to the AUC. *See* **Exhibit 15** (ECF No. 17) (original report) and **Exhibit 16** (ECF No. 18) (confirmation of the report). The forensic investigation of Blanco's accounting records is a key piece of evidence confirming Drummond financed the AUC.

12.     Special Prosecutor No. 251 found Jaime Blanco's testimony to be particularly credible. As a result of this testimony, the JEP agreed that Jaime Blanco had fulfilled the

program's requirements and issued an order on October 19, 2021 to grant him his freedom. **Exhibit 52** (ECF No. 58).

13.     Drummond would not be threatening or bribing witnesses, its "bribes or bullets" strategy to suppress evidence, if it had no relationship to the AUC. At his December 11, 2023 deposition, Mr. Blanco testified that Drummond's lawyer, Jaime Bernal Cuellar, offered that he would try to use his influence to get Blanco a reduced sentence and that Drummond would pay him $10,000 U.S. per month while he was incarcerated and a $2 million U.S. payment when he was released if he did not implicate Drummond in the murder of the union leaders. *See* **Exhibit 17** (ECF No. 19) (Blanco Dep. at 92:22-94:4).

14.     My two interviews with Jhon Jairo Esquivel Cuadrado (alias "El Tigre"). He then provided me with a Declaration dated December 3, 2009, attached hereto as **Exhibit 19** (ECF No. 21). In the Declaration, he describes his personal knowledge that in November 1999, Drummond arranged to provide monthly support to the AUC to allow the AUC to drive FARC out of Drummond's areas of operation. *Id*. ¶¶ 5-15.

15.     My two interviews with Alcides Mattos Tabares (a/k/a Samario). He then provided me with a Declaration dated December 4, 2009, attached hereto as **Exhibit 20** (ECF No. 22). In the Declaration, he describes his personal knowledge that Drummond arranged to provide monthly support to the AUC to allow the AUC to drive FARC out of Drummond's areas of operation. *Id*. ¶¶ 5-10.

16.     **Exhibit 23** (ECF No. 25), the May 2006 Declaration of Rafael Garcia that he witnessed a Drummond manager provide a "suitcase filled with money" to a representative of the AUC leader Rodrigo Tovar Pupo (Jorge 40) to assassinate the leaders of the Drummond union, Valmore Locarno Rodriguez and Victor Hugo Orcasita Amaya. In that Declaration, Garcia

identified the Drummond official as Drummond Ltd. President Augusto Jimenez. He later corrected this in an April 21, 2009 Declaration, **Exhibit 24** (ECF No. 26), and he identified the official as Drummond's Director of Community Relations, Alfredo Araujo. *Id*. ¶¶ 6-7.

17.    ***Drummond hired Lieutenant Colonel Julian Villate Leal, the former leader of a right-wing extremist execution squad to be its senior security officer***. According to a 1998 report by the Robert F. Kennedy Center for Justice and Human Rights, **Exhibit 25** (ECF No. 27), private security companies and members of the Colombian military launched a program called "Operation Dragon," which targeted human rights activists for execution. The Report revealed that Operation Dragon targeted "over 175 union leaders, human rights workers and members of the political opposition." *Id.* at 1. Lt. Col. Villate was the head of Operation Dragon, and a raid on his home uncovered documents indicating that he possessed the security plans provided to the targeted human rights activists in the witness protection plans established by the government of Colombia. The government agencies that were supposed to be protecting these witnesses were aware of Operation Dragon. *Id*. at 1-2. Several of the union leaders on the Operation Dragon hit list were threatened by AUC members and were referred to as "Indumiles." *Id*. at 2. In Lt. Col. Villate's papers seized in the raid, he too referred to the targeted individuals as "Indumiles." *Id*. Villate acknowledged in his May 22, 2012 deposition that after the public scandal over the exposure of Operation Dragon, on July 9, 2005, Drummond hired him to be the security coordinator for Drummond's port in Colombia. *See* **Exhibit 26** (ECF No. 28) at 31:15-19, 38:7-12. Drummond was aware of the allegations of Villate's participation in Operation Dragon when the company hired him. *Id*. at 33:14-34:13.

18.    Drummond also hired Jim Adkins, a former (and current) CIA officer, to be head of security in Colombia. Adkins was fired (on a temporary basis) by the CIA for his role in the

Nicaraguan Contra scandal. Adkins was found by Lawrence Walsh, appointed as Independent Counsel to investigate the Iran-Contra conspiracy, to have violated the law by providing support to the Contras, falsifying CIA financial accounts to hide his crime, and lying to investigators. **Exhibit 27** (ECF No. 29) (Independent Counsel Walsh's final report to Congress). Drummond was aware of Adkins' history when they hired him, and Adkins went on to use his experience hiding payments to work out a scheme with Jaime Blanco to overcharge Drummond for food services and funnel the overage to the AUC as Drummond's contribution. As noted, Jaime Blanco has repeatedly testified under oath about this payment scheme he implemented under Adkins' direction. *See, e.g.*, **Exhibit 17** (ECF No. 19) (Blanco Dep. at 122-25).

19.     My two interviews with Jimmy Rubio. At the second interview, Mr. Rubio provided me with his May 13, 2004 Declaration, attached hereto as **Exhibit 29** (ECF No. 31). He was an employee of the Drummond mine in Colombia and was active in the union there, SINTRAMIENERGETICA. *Id.* ¶ 2. He rose to the position of Secretary of Education. *Id.* ¶ 3. His sister was killed by the AUC in 2002. *Id.* Then, AUC Commander Tolemaida was about to kill him because he was on a hit list, but a Colombian military officer intervened. *Id.* ¶ 4. Mr. Rubio then sought out the regional head of the AUC, Alexander Pianeta Vargas, to find out why he and other members of his family were on the list, at which point Vargas agreed to take them off the list. *Id.* ¶ 5. Mr. Rubio knew where to find Commander Vargas, and he often saw him on Drummond property collecting fuel and supplies. Vargas told him that Vargas had permission "from above" to use the Drummond facilities. *Id.* ¶ 6. It was well known that the AUC was regularly present at the Drummond facilities.

20.     A few weeks before the union leaders Locarno and Orcasita were murdered, Mr. Rubio saw Vargas coming out of the offices of Drummond's Director of Community Relations,

Alfredo Araujo, in Valledupar. Commander Vargas told him that he was picking up his monthly quota from Araujo, and he showed Mr. Rubio two checks made out to Vargas and signed by Araujo. **Exhibit 29** (ECF No. 31) ¶ 6. Vargas also told Mr. Rubio that Araujo and his family had set up the AUC in the region. *Id*.

21.     A few days before the murder of the union leaders, Mr. Rubio ran into Vargas and another AUC leader, Nicolas Capitolino, who boasted about killing union leaders from the oil workers' union. Vargas then said there was going to be another big operation. **Exhibit 29** (ECF No. 31) ¶ 7. After the Drummond union leaders were murdered, Capitolino boasted to Mr. Rubio that he had participated in the murders, and that someone from inside Drummond had assisted in identifying the bus that Locarno and Orcasita were on to aid the assassination. Capitolino showed Mr. Rubio Locarno's gun, which he took from him after he was murdered. *Id*. ¶ 8.

22.     Mr. Rubio personally told me when I was preparing him for his deposition that was scheduled prior to the *Romero* case that he would testify to all of the facts in his declaration and would add details regarding other AUC leaders and members he had seen at Drummond's facilities. By this time, Mr. Rubio had fled for his life because, as he told me, he "knew too much about Drummond and the AUC." He was living in Venezuela with his wife in a small town near the Colombian border. On March 18, 2005, a few days before Mr. Rubio was to be deposed in the *Romero*/*Drummond* case, his father-in-law, who still lived in Colombia, was murdered. *See* April 1, 2005 Declaration of Jimmy Rubio, attached hereto as **Exhibit 30** (ECF No. 32) ¶ 5. According to Mr. Rubio, "my father-in-law's tongue was cut out when he was murdered – a sign that he was killed because he, or others close to him, such as myself, was speaking out against the paramilitaries. ***I have no doubt that this gruesome murder occurred so that I did not testify in this case***." *Id*. (emphasis added). Showing the effectiveness of Drummond's "bribery or

bullets" strategy, Mr. Rubio disappeared and did not testify at the *Romero* trial.

23.     I knew that Drummond and the AUC were systematically engaging in their "bribery or bullets" strategy because many potential witnesses were terrified of providing testimony against Drummond because they or their families would face violent retaliation. I had no choice but to offer security assistance, most often funds to relocate the families of threatened witnesses. If there was a credible death threat against a witness or a family member, I considered it my legal and ethical duty to take what steps I could to keep that person safe. My promise to these witnesses was legal, ethical, and necessary. *See* TPC Decl. ¶ 31. Four extremely qualified experts later confirmed this. Former DEA agent Javier F. Peña, Declaration attached as **Exhibit 33** (ECF No. 35), stated under oath that it was standard practice in Colombia for the DEA to provide security assistance for witness informants because the AUC was known for executing informants. He recently provided an April 23, 2024 updated opinion confirming the necessity of protecting witnesses, attached as **Exhibit 33A** (ECF No. 36). Stephen J. T'Kach, former director of U.S. Justice Department's Witness Security Program, Declaration attached as **Exhibit 34** (ECF No. 38), stated under oath that witness relocation as a form of security was standard practice for the DOJ. On April 25, 2024, Joseph Paonessa, Chief Operations Officer (Ret.) for the Federal Witness Security Program at U.S. Department of Justice (DOJ), submitted an updated opinion, attached as **Exhibit 34A** (ECF No. 37) about witness protection programs based on the facts of this case. He specifically rejected and refuted the speculative opinion of Drummond's expert Harwood that the security assistance I provided in this case was bribery. *Id*. at 3, 29-30. And finally, Legal Ethics Scholar Professor Charles W. Wolfram, Declaration attached as **Exhibit 35** (ECF No. 39), stated under oath that the security assistance in this case was ethical and necessary. Again, I believed the AUC would not have been protecting

Drummond from potential witness testimony if Drummond was not financing the AUC.

24.     The main implementer of Drummond's "bullets or bribery" strategy was AUC Commander Oscar Jose Ospino Pacheco, alias Tolemaida. He is the sole AUC witness in the *Balcero* case to provide Drummond with a declaration that denies there was a relationship between Drummond and the AUC. I knew from numerous interviews, including with Jaime Blanco, El Tigre, Samario, and my co-counsel, Ivan Otero, that Drummond paid Tolemeida to bribe and/or threaten various AUC witnesses to keep quiet about Drummond's relationship with the AUC. *See* TPC Decl. ¶ 37.

25.     Confirming that Drummond paid Tolemaida to implement its "bribery or bullets" strategy is **Exhibit 44** (ECF No. 49), the February 28, 2012 Declaration of Javier Ernesto Ochoa Quiñonez (alias "El Mecanico"). He states:

> The day after I executed my declaration, on May 29, 2007, I was visited by Alexander Pianeta. He said that he was there on behalf of my AUC Commander, alias "Tolemaida", and that if I valued my family, I would not speak about Drummond. He also said that if I retracted my statement, Tolemaida would take care of me financially. The threat against my family was a serious one. As I stated in my May 28, 2007 statement, I was constantly concerned about whether I could say the wrong thing and endanger my family.

*Id.* ¶ 5. He also states:

> In 2010, my commander, Tolemaida, was arrested and was in La Picota prison in Bogota. I was taken, along with another AUC colleague, "JJ," by bus to La Picota and we met with Tolemaida. He said to us both that he was going to meet with Garry Drummond to make sure that we were all well provided for because we did not talk about Drummond. Tolemaida promised me 200 million Colombian pesos if I remained quiet about Drummond. Tolemaida also told us we had nothing to worry about because our good friend from Drummond, Alfredo Araujo, now had a son working as the Secretary to the Attorney General. Tolemaida showed me a letter from Araujo's son telling Tolemaida that he could count on his collaboration and support.

*Id.* ¶ 8. Additionally, he says, "It is common knowledge and I personally heard from several sources that Tolemaida received over one million U.S. dollars from Drummond to keep us all

quiet, however, he never sent me or my family any money." *Id.* ¶ 9.

26.     Also confirming that Drummond paid Tolemaida to implement its "bribery or bullets" strategy is the December 4, 2009 Declaration of Samario (**Exhibit 20**) (ECF No. 22), in which he says:

> I understand that Drummond wanted to hide the truth of what had happened, having testimonies that excluded the company's participation in the homicides of the unionists. To that end, Alexander Pianeta, alias "Reyes," an army official and member of the Front, was taken to Bogotá in order to testify that all the actions had been carried out due to the fact that the unionists had been members of the guerrillas. Initially, they had me in mind. "Tolemaida" had offered me, through alias "Cebolla," a huge sum of money so that I testified to that extent, that the deaths were a product of their militancy in subversion. Sometime later, the lawyer José Daza Ortíz, who attended to the business interests of "Tolemaida" and of the Front, confirmed the offer of money that was made to me.

*Id.* ¶ 20.

27.     **Exhibit 43** (ECF No. 48) is a December 17, 2008 email communication from attorney Joaquin Perez to various U.S. Department of Justice lawyers, that was forwarded again to the lawyers on April 9, 2009, and to me shortly thereafter. In the email, Mr. Perez is making a factual proffer on behalf of two of his clients, AUC commanders Raul Hasbun and Juan Carlos Pacheco, alias "Tolemaida." Mr. Perez specifically proffered that Tolemaida could testify that "Jim lnu (last name unknown)," who he identified as an ex-CIA officer who was "Drummond's head of security" [clearly referring to Jim Adkins] authorized a payment of $20,000 to "eliminate the union leaders." *Id.* at 3-4. There is no dispute that Tolemaida led the operation to assassinate the union leaders and his proffer describes the details. *Id.* at 4. Tolemaida also proffered that after the murder of the union leaders, "[c]ontact between Drummond and the paramilitaries continued thereafter. Jim Adkins later met with AUC Commander Jorge 40." *Id*. at 4.

28.     Another example of Drummond's "bribery or bullets" strategy is the threats I

believe Drummond orchestrated against Carmen Josefa Amaya Daza, a plaintiff in the *Romero/Drummond I* case. Her son, Victor Orcasita, is one of the Drummond union leaders who was murdered. She was deposed by Drummond in that case on April 7, 2005. A few weeks later, on May 8 and 9, she received threatening phone calls. *See* Declaration of Carmen Josefa Amaya Daza, attached hereto as **Exhibit 31** (ECF No. 33) ¶ 2. Shortly thereafter, on May 17, 2005, she received a threat from the AUC written inside a sympathy card. It stated, "because you are a snitch, talking and complaining to the gringos, what's going to happen to you is the same thing that happened to your son, you are going to have to leave town, this is serious, because we don't mess around." *Id.* ¶ 2 & attachment thereto. The reason she was targeted by the AUC is clear – she testified against the AUC's financier, Drummond.

29.     The testimony Jairo Jesus Charris Castro had provided to Colombian prosecutors. He stated as early as 2009 that, as a member of the AUC, he conspired with Drummond officials to murder the Drummond union leaders. Charris first provided a declaration in roughly June 2009 to my team detailing Drummond's connections to the AUC. **Exhibit 36** (ECF No. 40) is this first handwritten declaration provided by Charris. Prior to providing my team with a declaration, Charris' testimony was taken on several occasions by Colombian authorities. On May 7, 2009, Charris testified to a Colombian prosecutor that the murder of Drummond union leaders Orcasita and Locarno was planned by Drummond executives. *See* **Exhibit 37** (ECF No. 41), at DRUM0000016-17 and TPC Decl. ¶ 32. Charris also testified in this proceeding that he had not disclosed these details in the previous two statements taken shortly after his arrest because he was concerned for his family's safety, as they still lived in La Loma, Cesar, which is near the Drummond mine. **Exhibit 37** (ECF No. 41) at DRUM0000036. He was aware that, under Colombian law against self-incrimination, witnesses are not required to remain silent in

order to protect themselves under the law against self-incrimination, as they are in the United States. Under Colombian law, witnesses are no longer testifying under penalty of perjury – in other words, they are allowed to lie – when testifying about their own participation in criminal acts, as "[t]he oath . . . will not have negative penal effects insofar as the testimony refers to his own conduct." **Exhibit 38** (ECF No. 42) is an excerpt of the July 28, 2005 decision by the Colombian Constitutional Court confirming the effect of this law.

30.      **Exhibit 39** (ECF No. 43), at DRUM00000470, in which Charris testified on June 23, 2009 to the details of Drummond's connections to the AUC and Drummond executives' roles in the murders of the union leaders. In this hearing before Colombian authorities, Charris also expressed concern for his family's safety, since they still lived in La Loma, and he was worried that Drummond would retaliate against them because of his testimony against Drummond. *Id*. at DRUM00000491.

31.      **Exhibit 40A** (ECF No. 44) is Day 1 of the May 2012 Charris Deposition in the *Balcero* case. In his testimony, he confirmed and elaborated on his prior testimony that Drummond officials coordinated the murder of the Drummond union leaders with the AUC. *See id.* at 11:13-12:6. Charris testified:

> I have been in danger from the time I've started clarifying the facts as to the death of the union members. For this reason . . . Drummond headed by Mr. Garry Drummond and Mr. Adkins would not really rest until they would put me down inside or outside the jail, and this danger would be extended to my family members as well because there are too many powerful people such as Drummond in general and a former commander of the AUC, Oscar Jose Ospino Pacheco, alias Tolemaida . . . .

*Id*. at 12:15-13:7.

32.      **Exhibit 41** (ECF No. 46) is an April 2, 2008 email Charris sent to Drummond Ltd. President Augusto Jimenez, stating that "the multinational Drummond was the one that

ordered the job on the 3 union leaders," and that Jim Adkins had told Charris that the murder of

the Drummond union leaders "was authorized by Mr. Gary Drummond, Augusto Jiménez,

Alfredo Araujo, General Peña Rios and Colonel Luis Carlos Rodriguez." Charris sent this email

before his arrest, long before he met anyone from my team in July 2008. He further stated, "I am

a witness to all the coordinations between the company Drummond and the AUC." *Id.*

33.     My three interviews with Jose Gelvez Albarracin, another paramilitary

commander. After the three interviews, all prior to 2011, Gelvez provided me with a hand-

written statement detailing Drummond's relationship with the AUC on February 25, 2011,

**Exhibit 42** (ECF No. 47). This Declaration confirmed what Mr. Gelvez had previously told me

about Drummond's relationship to the AUC.

34.     My 2010 interview with Hugues Manuel Rodríguez Fuentes, alias "Commander

Barbie." *See* TPC Decl. ¶ 41. He told me he grew up with and was good friends with Rodrigo

Tovar Pupo, who became Commander of the Northern Block of the AUC and went by the alias

"Jorge 40." Also in the close social circle with Commander Barbie and Jorge 40 were Jaime

Blanco Maya and Drummond Vice President Alfredo Araujo Castro. They all socialized together

and, in particular, the families of Alfredo Araujo and Jorge 40 were very close. While he was a

Commander in the AUC, Hugues Rodriguez, through his company, Rodriguez Fuentes

Investments Ltd., sold land to Drummond. His friend Alfredo Araujo acted on behalf of

Drummond Company Ltd. in these transactions. Hugues Rodriguez left me with no doubt that

there were strong business and social relationships between Drummond officials and the AUC,

including him.

35.     My 2009 interview with AUC Commander Edgar Ariel Cordoba Trujillo, alias 57.

*See* TPC Decl. ¶ 41. He told me that in late 2001, Jorge 40 approached him and said that

Drummond needed a new system to provide support to the AUC and to continue to get military and security cooperation from the AUC. He said Drummond wanted to set up a security company that would function as an instrument to receive money from the mining company, which would then be transferred to the AUC. He told me he gave Jorge 40 the names of 40 reliable people from the Magdalena area that could be used as employees of the security company that Drummond would set up. All of the names he provided had ties to the AUC.

36.     **Exhibit 45** (ECF No. 50), a 2006 cable drafted by the U.S. Embassy in Bogota. It reported that Drummond hired demobilized AUC members as security guards. The cable relayed that Drummond attributed security improvements to "ramped up private security operations" along the rail line but noted that many of Drummond's security guards "are former paramilitary who had operated in the area." My reasonable inference from that information is that Drummond formally hired the former AUC members who had been providing Drummond with security for years, trusted them, and made them employees when they were able.

37.     **Exhibit 46** (ECF No. 51) is the March 1, 2012 Declaration of Jose Aristides Peinado Martinez he provided to me after I had interviewed him in 2011. He stated that he was employed by Jaime Blanco at his food service company, ISA. And he was also a member of the AUC. *Id*. ¶¶ 5-6. He was assigned by Jaime Blanco to coordinate between Drummond management and the AUC. He often relayed messages between his AUC Commander El Tigre and Drummond managers. *Id*. ¶¶ 6, 10. On one occasion in early 2000, he was informed by El Tigre that Jorge 40 had ordered them to go to the Drummond mine and pick up a large amount of cash from security director Colonel Lineros to purchase guns for the AUC. He drove with El Tigre to the Drummond compound where they were given free access through the security gates. Lineros gave El Tigre a large amount of cash, which he later transferred to Jorge 40. He also

stated that after the weapons were purchased, he and El Tigre met again with Lineros, who directed them to do a "cleansing operation" in certain towns along the rail line, which they did. *Id*. ¶¶ 13-14. Finally, he stated under oath that in early January, 2001, he attended a meeting in the office of Jaime Blanco Maya with Blanco, Charris, Colonel Lineros, and Alfredo Araujo, Drummond's Director of Community Relations. At this meeting, Alfredo Araujo told the group that the Americans ("gringos") wanted the leaders of the Drummond union killed. He described in detail his personal participation in the operation to kill the union leaders and that Drummond paid the AUC for this service. *Id*. ¶¶ 15-21.

38.     **Exhibit 47** (ECF No. 52) is the June 27, 2012 Declaration of Oscar David Perez Bertel, alias "Yuca." This confirmed my reasonable and good faith belief that Drummond was financing the AUC's crimes against humanity. He confirmed what he previously had told me: that he personally participated in the operation to kill the Drummond union leaders, which Drummond had paid the AUC to perform. *Id*. ¶¶ 14-16. ***Yuca stated that his AUC unit coordinated with "Drummond's security along the railroad line" and "carried out a cleansing campaign along the Drummond rail line."*** *Id*. ¶ 7 (emphasis added). He also stated that while he was in prison, he was visited several times by Drummond's lawyers to keep quiet about Drummond and to state only that the union leaders were murdered because they were guerillas. *Id*. ¶¶ 18-19.

39.     **Exhibit 48** (ECF No. 53) is a June 2014 Report prepared by a Dutch NGO, PAX, The Dark Side of Coal. Among other issues, the Report relates the evidence from PAX's independent investigation confirming that Drummond financed the AUC's crimes against humanity. This very credible report confirmed my reasonable and good faith belief that Drummond was financing the AUC's crimes against humanity.

The sheer volume of **_39_** varied key sources described above, and **Exhibits 1-58** (ECF

Nos. 1-64) to my Declaration, with **Exhibit 7** (ECF No. 8) including **_64_** distinct news articles,

that supported my belief that Drummond financed the AUC's crimes against humanity requires

that the Court grant summary judgment. In *Berisha v. Lawson*, 973 F.3d 1304 (11th Cir. 2020),

the Eleventh Circuit held that even if some sources for a belief in the truth of an alleged

defamatory statement lack credibility and defendant could "nitpick each source for one reason or

another," the "wealth of evidence considered altogether does not permit a reasonable juror to

find clear and convincing proof that [defendant] Lawson held serious doubts about the depiction

of [plaintiff] in his book." *Id*. at 1312-14. The defendants in *Berisha* had multiple sources of

information and it was the collective impact of the evidence supporting defendants' statement

that compelled a grant of summary judgment. ***The defendants' "reliance on these many***

***independent sources, alone, . . . defeat[s] any claim of actual malice." Id.* at 1313 (emphasis**

added) (citing *Rosanova v. Playboy Enters*., 580 F.2d 859, 862 (5th Cir. 1978)) **("[S]ubjective**

***awareness of probable falsity . . . cannot be found where, as here, the publisher's allegations***

***are supported by a multitude of previous reports upon which the publisher reasonably relied."***

(emphasis added)).

Thus, based on the volume and variety of the many sources I relied on in making any

statements regarding Drummond's financing of the AUC's crimes against humanity, even if

Drummond responds with an attack on specific sources, based on *Berisha*, this "does not permit

a reasonable juror to find clear and convincing proof" that I acted with malice because **_"reliance_**

***on these many independent sources, <u>alone</u>, . . . defeat[s] any claim of actual malice." Berisha,***

973 F.3d at 1312-13 (emphasis added).

In addition, as noted, whether I acted with malice "is a ***subjective*** test, which asks whether the publisher '***in fact*** entertained serious doubts as to the truth of his publication.'" *Silvester,* 839 F.2d at 1498 (11th Cir. 1988) (emphasis added) (citation omitted). *See also Rosanova*, 580 F.2d at 862 (holding that a showing of malice requires "subjective awareness of probable falsity."); *Lovingood v. Discovery Communs., Inc*., 800 Fed. Appx. 840, 850 (11th Cir. 2020) ("[Plaintiff] has identified no such evidence showing that anyone at Discovery had actual doubts about the scene or real awareness that the scene might be problematic."); *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc*., 6 F.4th 1247, 1252-53 (11th Cir. 2021) (holding that the Plaintiff "does not plead any facts that would allow us to infer that [Defendant] doubted the veracity of its [assertion]" in affirming a Rule 12(b) dismissal of a defamation complaint).

Drummond has absolutely no evidence that I ever doubted my assertions that Drummond was financing the AUC's war crimes. Because of my many investigations and numerous sources of information, I never once doubted that Drummond was financing the AUC's crimes against humanity. *See* TPC Decl. ¶ 2. This alone precludes a finding of malice.

Finally, numerous courts have held that a thorough investigation prior to making the alleged defamatory statement precludes a finding of malice. For example, in *Klayman v. City Pages*, 650 F. App'x 744 (11th Cir. 2016), the Court held that to show malice, "a plaintiff must produce evidence 'showing that the defendant purposely avoided further investigation with the intent to avoid the truth.'" *Id*. at 750-51 (citation omitted). Similarly, in *Silvester v. Am. Broad. Companies, Inc*., 839 F.2d 1491, 1498-99 (11th Cir. 1988), the Eleventh Circuit affirmed a dismissal on summary judgement based on lack of malice because "Defendants have proffered evidence that the jai alai segment was thoroughly researched through interviews with experts,

including various law enforcement authorities who were investigating jai alai." Here, the undisputed material fact is that I conducted thorough investigations before I filed any of three human rights cases against Drummond alleging that Drummond was financing the AUC prior to 2011, when I made the statements at issue. TPC Decl. ¶¶ 2-6 and **Exhibits 1, 4, and 5** (ECF Nos. 1, 5, and 6). There is no evidence or allegation that my investigations were fatally inadequate. Further, in part because of the knowledge I acquired in my investigations, I never doubted that Drummond financed the AUC's crimes against humanity.

Based on the vast and varied sources of facts supporting my statements that Drummond was financing the AUC's crimes against of humanity, the lack of any evidence that I ever doubted my subjective belief that Drummond financed the AUC's crimes against humanity, and my thorough investigations confirming that Drummond financed the AUC's crimes against humanity before I filed each of three human rights complaints against Drummond making that very allegation, summary judgement should be granted and Drummond's defamation claim should be dismissed. The "wealth of evidence considered altogether does not permit a reasonable juror to find clear and convincing proof" that I acted with malice in stating that Drummond financed the AUC's crimes against humanity. *Berisha*, 973 F.3d at 1312-14.

As Drummond has the burden of proof on this issue, Defendants, as the moving parties "need show only that the opponent cannot sustain [its] burden at trial." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting William W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)). In this case, Drummond's burden is very high – it must prove with "clear and convincing evidence" that I acted with malice. Drummond simply cannot meet its burden that I

acted with malice in stating my strong belief based on substantial evidence that Drummond financed the AUC's crimes against humanity.

### B.  Drummond Cannot Prove With "Clear and Convincing Evidence" that the Alleged Defamatory Statements Were False.

As noted, in addition to establishing malice, Drummond must also prove with "clear and convincing evidence" that my statements were false. ECF No. 767 at 4 (November 30, 2023 Order). The Court need not reach the falsity issue if the Court finds I lacked malice because ***both*** elements are required for Drummond to prevail on summary judgement. *Id*. at 4-6.

All of the evidence discussed in the malice section above, and that is detailed in TPC Decl. at ¶¶ 2-52, make it impossible for Drummond to prevail at trial with its heavy burden of proving falsity. Drummond is likely, however, to continue its incredible blanket denial by its executives that any of them ever even met an AUC member. TPC Decl. at ¶¶ 51-52.

However, recently discovered notes of a November 6, 2000 meeting of former Drummond CEO and President Mike Tracy and his security team (**Exhibit 57**) (ECF No. 63) expose the lie and prove beyond doubt that Drummond was using the Colombian military to coordinate with AUC groups patrolling the Drummond rail line to protect against FARC attacks. The notes reflect Drummond's coordination of security with the military:

"Full Coordination w/ Military"

"Need more mobility of troops in the area . . . . Army needs to be able to move faster."



"Military is willing to make move if they could find enemy and move troops quicker."

These notes reflect Drummond's suspicion that some of its own personnel were collaborating with the guerrillas and include Tracy's chilling conclusion that there needs to be a cleansing of "bad personnel." The Drummond union leaders were executed a few months after Tracy made the comment.

"Need equipment to intercept telephone calls, thinks guerilas are talking w/ our personnel."

"Need to clean the company of a few bad personnel. Edgar has the names. These are causing problems to the company."

Most significant, Tracy acknowledges there was a "paramilitary stronghold" near Drummond's rail line:

"This attack was near paramilitary stronghold, and they were there soon (minutes) after the attack. . . . Blast was close to two paramilitary groups (in between the two). Large # of paramilitaries in the area."

They confirm that the paramilitaries were associated with the Colombian army and, as we know, Drummond was providing major support to the army:

"Paramilitaries are associated w/ Army but people will make connection between the two if Israel [which trained and provided arms to paramilitaries] is connected w/ Army."

They reflect the seriousness of the discussions underway at Drummond regarding the options for preventing further FARC attacks:

"Need to attack g[ue]rillas in the mountains. Need to kill g[ue]rillas. Need to help find leaders of g[ue]rilla group in the mountains. Need to monitor cell phone calls with equipment to find g[ue]rilla leaders. Bring wrath to these people every time we find out info."

Finally, Tracy's notes reflect Drummond's related goal of hiding from public view the extent of its own active participation in the war fought by the military and its paramilitary collaborators against the guerrillas:

"All this needs to be done by military so we don't get identified as target."

Six days later, Tracy meets with then-president of the company, Garry Neil Drummond, and his notes reflect that Drummond observed that the "affiliation of union leaders with guerrillas" was not appreciated and that he needed the "names of troublemakers."

Drummond's executives all committed perjury in their coordinated denial of any knowledge of or interaction with any AUC members. Every single Drummond executive we deposed in *Balcero* testified under oath that they had never even ***met*** a paramilitary despite operating in Magdalena and Cesar Provinces, areas all indisputably under AUC control. *See, e.g.*, **Exhibit 53** (ECF No. 189) at 7 (excerpts of testimony from Garry Drummond, Mike Tracy, and Alfredo Araujo).

While I will be taking further action in response to Drummond's exposed and systematic perjury, for purposes of this motion, **Exhibit 57** (ECF No. 63) precludes Drummond from proving with "clear and convincing evidence" that the statements at issue about Drummond financing the AUC were false. Any further denial of its financing of the AUC at this point lacks all credibility to constitute "evidence" sufficient to create a material question of fact on the issue of falsity.

If, somehow, the Court finds that Drummond has put the issue of falsity in dispute, then the Court should also consider there is a high likelihood that Drummond's current and former presidents, Linares and Jimenez respectively, are going to jail for their role in financing the AUC's crimes against humanity. *See* TPC Decl. at ¶¶ 47-48 and **Exhibits 49A-52** (ECF Nos. 54-58) (describing status of the Colombian Prosecution). The conviction of the Drummond executives for financing the AUC's crimes against humanity, the very issue I stated truthfully about Drummond, should be conclusive on the issue and preclude Drummond from proving by "clear and convincing evidence" it is false. Drummond's assertion in its Reply Brief to its sanctions motion that the looming conviction of Linares and Jimenez is a mere distraction is ludicrous. ECF. No. 789 at 34-35. A conviction of Drummond's key managers for financing the AUC's crimes against humanity would be conclusive evidence that my statements were true and

would preclude Drummond from establishing with "clear and convincing evidence" the statements were false.

If the Court has any doubt that Drummond cannot prove with "clear and convincing evidence" my statements are false, resolution of the falsity issue should be deferred until the Colombian criminal prosecution is completed.

## V.        CONCLUSION

Drummond's frivolous defamation SLAPP suit, pending for over **13 years**, is due to be dismissed. During this time, Drummond, with its unlimited resources, achieved its goals in filing the SLAPP suit with smashing success. Drummond forced me and Conrad & Scherer to spend enormous time and millions of dollars defending ourselves from this frivolous case. I was personally damaged in significant ways, including suffering lost income, employment opportunities, awards, and damage to my hard-earned reputation. I have also suffered serious and ongoing emotional distress from the false attacks Drummond has made accusing me of maliciously lying about Drummond's role in funding the AUC's crimes against humanity and of bribing witnesses. After all of this time, Drummond has utterly failed to identify any evidence that I acted with the required malice. Regardless of allegations of discovery violations or any other alleged misconduct, Drummond's defamation case fails on the merits and must be dismissed.

Respectfully submitted this 17th day of June, 2024,


/s/Terrence P. Collingsworth
Terrence P. Collingsworth
INTERNATIONAL RIGHTS ADVOCATES
621 Maryland Avenue NE
Washington, D.C. 20002
Telephone: (202) 543-5811
tc@iradvocates.org

## CERTIFICATE OF SERVICE

I hereby certify that, on June 17, 2024, I electronically filed the foregoing with the United States District Court for the Northern District of Alabama by using the CM/ECF system, which will send a notice of filing to all registered users, including counsel for all parties.

Date: June 17, 2024

/s/ Terrence P. Collingsworth
Terrence P. Collingsworth
(D.C. Bar No. 471830)
INTERNATIONAL RIGHTS ADVOCATES
621 Maryland Avenue, NE
Washington, D.C. 20002
Telephone: (202) 543-5811
tc@iradvocates.org

39