IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| DRUMMOND COMPANY, INC. et al., } | |
| } | |
| Plaintiffs, } | |
| } | |
| v. } | Case No.: 2:11-cv-3695-RDP |
| } | |
| TERRENCE P. COLLINGSWORTH, } | |
| et al., } | |
| } | |
| Defendants. } | |

**MEMORANDUM OPINION**

This matter is before the court on three Motions for Summary Judgment: (1) Defendant Terrence P. Collingsworth's ("Collingsworth") Motion for Summary Judgement (Doc. # 818); (2) Defendant Conrad & Scherer, LLP's ("C&S") Motion for Summary Judgment (Doc. # 819); and (3) Plaintiff Drummond Company, Inc.'s ("Drummond") Motion for Partial Summary Judgment (Doc. # 821). Each motion has been fully briefed. (Docs. # 825-26, 829-32, 834-40).

**I.   Introduction**

In the First Amended Complaint in this case, Drummond has asserted a single defamation claim against Defendants Collingsworth and C&S. (Doc. # 73). Each of the summary judgment motions are related to that claim.

Collingsworth makes two arguments in support of his Motion for Summary Judgment: (1) that the allegedly defamatory statements were true, and (2) that Drummond cannot show that Collingsworth acted with malice in making the allegedly defamatory statements. (Doc. # 818 at 5-6). As the court will discuss below, these arguments are patently frivolous. Without question, there are genuine issues of material fact for a jury to resolve as to both of these issues.

C&S argues that it is entitled to summary judgment because: (1) Collingsworth is entitled to summary judgment based on his own Motion and therefore C&S cannot be held vicariously liable for his statements; and (2) Collingsworth was not acting within the line and scope of his employment with C&S when he made the allegedly defamatory statements at issue. (Doc. # 819 at 5). While not patently frivolous like Collingsworth's Motion, C&S's Motion is due to be denied because there is a question of fact for a jury to resolve regarding the vicarious liability issue.

Drummond makes the following arguments in support of its Motion for Partial Summary Judgment: (1) Collingsworth was acting within the line and scope of his employment with C&S; (2) C&S ratified his conduct; and (3) the statements are defamatory as a matter of law. (Doc. # 821 at 2). Again, there is at least a genuine issue of material fact on the question of the line and scope issue that must be decided by a jury.

## II.     Background

The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the non-moving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

Since 2002, Collingsworth and his associates have filed multiple lawsuits against Drummond and its executives alleging that Drummond was complicit in a series of crimes with a paramilitary group in Colombia called the Autodefensas Unidas de Colombia ("AUC").

Collingsworth's first lawsuit against Drummond, *Romero v. Drummond Co., Inc., et al.*, alleged that Drummond collaborated with the AUC to murder Colombian union leaders Valmore Locarno Rodriguez, Victor Hugo Orcasita Amaya, and Gustave Soler. (Northern District of Alabama Case No. 7:03-cv-00575-KOB, Doc. # 1). The original Complaint was filed on March 13, 2003 by Collingsworth and other attorneys. (*Id.*). On July 26, 2007, a jury rejected the claims Collingsworth advanced on behalf of his clients. (Case No. 7:03-cv-00575-KOB, Doc. # 486). Specifically, the jury found that Drummond was not liable for the killings of Locarno, Orcasita, and Soler. (*Id.* at 1). The jury also found that Augusto Jimenez, the president of Colombian operations for Drummond, was not liable for these murders. (*Id.* at 2). The jury's verdict was affirmed on appeal. *Romero v. Drummond Co., Inc.*, 552 F.3d 1303, 1324 (11th Cir. 2008).

The next year, C&S hired Collingsworth, in February 2008. (Doc. # 831 at 17). C&S employed Collingsworth to start and lead a human rights litigation practice group at the firm. (*Id.* at 18). Before C&S hired Collingsworth, Bill Scherer, a named partner of C&S, knew that Collingsworth had tried the *Romero* case to a jury, and that the jury had returned a verdict in Drummond's favor. (*Id.*). Collingsworth became the managing partner of C&S's Washington, D.C. office. (*Id.* at 17-18).

On March 20, 2009, Collingsworth, with other attorneys, filed a second action against Drummond, *Baloco, et al., v. Drummond Co., Inc., et al.* (Northern District of Alabama Case No. 7:09-cv-00557-RDP, Doc. # 1). In this second case, Collingsworth's clients again alleged that Drummond was responsible for the union leaders' murders. (*Id.*). That case was dismissed, and the dismissal was affirmed on appeal. *Baloco v. Drummond Co., Inc.*, 767 F.3d 1229, 1252 (11th Cir. 2014), *cert. denied*, 577 U.S. 957 (2015).

A third case filed by Collingsworth, *Doe, et al. v. Drummond Co., Inc., et al.*, made similar allegations regarding the murders and alleged that Drummond paid the AUC through an independent food services company owned by Jaime Blanco. (Northern District of Alabama Case No. 2:09-cv-01041-RDP, Doc. # 1).[1] This court granted summary judgment in favor of Drummond and its executives in that case, a ruling that was also affirmed on appeal. *Doe, et al. v. Drummond Co., Inc., et al.*, 782 F.3d 576, 613 (11th Cir. 2015), *cert. denied*, 577 U.S. 957 (2016).

At issue in this defamation case are letters written by Collingsworth between January and September 2011. Despite a jury finding that Drummond was not liable for the union members' murders, Collingsworth wrote three letters – two to the Government of the Netherlands and one to Itochu Corporation, a company that was in negotiations to purchase an interest in Drummond's Colombian subsidiary – stating as "objective facts" that Drummond was complicit with the AUC in the murders of hundreds of Colombians, and urging the recipients of the letters to cease all business ties with Drummond. (Doc. # 73 ¶¶ 14, 21, 27). Also at issue is a 2013 interview of Collingsworth on Alternativa Latina on 88.7 FM Radio at Hofstra University that was published on the internet and during which Collingsworth made numerous statements regarding Drummond's alleged complicity in murder and collaboration with a terrorist organization. (Doc. # 79 ¶ 33).

In May 2010, Collingsworth, then the managing partner of C&S's Washington, D.C. office, entered into an attorney-client relationship with Albert Van Bilderbeek. (Doc. # 831 at 20). Van Bilderbeek had previously alleged that Drummond stole oil and gas rights from his company, Llanos Oil. (*Id.* at 22). On December 14, 2010, Van Bilderbeek asked Collingsworth to "email me

---

[1] Plaintiffs, in this third lawsuit, filed an amended complaint, which disclosed their identities. (Case No. 2:09-cv-01041-RDP, Doc. # 56). The lead Plaintiff's name was Balcero. (*Id.*).

4

a letter (with letterhead and signed) addressed to" the Dutch Prime Minister and other Dutch officials. (*Id*.). Thereafter, Collingsworth sent the first two allegedly defamatory letters to the Dutch government. (*Id*. at 22-23). Collingsworth published the allegedly defamatory letters on C&S letterhead. (Docs. # 830 at 6-7; 837 at 6).

On June 17, 2011, Van Bilderbeek sent Collingsworth an article regarding Itochu Corporation's purchase of an interest in Drummond's Colombian mining operation and directed Collingsworth to "have your office write Itochu Corp. to inform them of your lawsuit." (Doc. # 831 at 24). On September 9, 2011, Collingsworth entered into a series of agreements with Van Bilderbeek, NICOX BV, Herman de Leeuw, and James Ellwood (the "NICOX Agreements"). (*Id*.). On September 19, 2011, ten days after he signed the NICOX Agreements, Collingsworth sent the third allegedly defamatory letter to the President and CEO of Itochu Corporation. (*Id*.). Some or all of the letters Collingsworth sent to the Dutch Government or Itochu were published on Llanos Oil's website. (*Id*. at 26).

The parties disagree about whether C&S had prior knowledge of or approved of Collingsworth sending the letters. (*Id*. at 26-27).

Despite having lost on his claims before the *Romero* jury, Collingsworth asserts that he had a good faith belief that the information in the letters was true based on certain declarations he obtained that pre-date his letters. (Doc. # 818 at 21).[2] However, not only had a jury already rejected those claims, but also many of the witnesses Collinsworth claims to have relied on in forming that belief had originally testified in the Justice & Peace Initiative that Drummond was *not* complicit with the AUC in the murders. (*See, e.g*., Doc. # 775-4). Furthermore, these witnesses changed their

---

[2] The record contains what Defendants contend is evidence that post-dates the letters. But, that evidence is irrelevant to Collingsworth's belief as to the truth of the matters contained in the letters at the time he wrote them.

5

sworn testimony and implicated Drummond, but that was after Collingsworth and his team paid them various sums of money. (*See, e.g.*, Doc. # 775-4).

After these letters were sent, on May 23, 2012, an attorney at C&S sent a memorandum recommending that C&S terminate the firm's and Collingsworth's involvement in the Drummond cases. The lawyer described the witnesses on whom Collingsworth relied on to establish the truth of the accusations in the letters as follows: "untrustworthy," they "have changed their stories," "[i]t appears [Collingsworth] has made payments directly or indirectly to one or more of the witnesses," "the witnesses are criminals, convicts, and poor people vulnerable to bribery and threats," and Collingsworth "has paid [] $100,000 to get Jaime Blanco to testify." (Doc. # 775-4). The court has previously written to Collingsworth's dishonesty in explaining these payments to the court. (Doc. # 417). Consistently, the memo referenced above indicates that Collingsworth "does not appear credible at this point," and it was sent long before Collingsworth repeatedly lied to this court. (Doc. # 775-79).

In support of his Motion for Summary Judgment on the issue of truth, Collingsworth cites to a December 3, 2009 declaration from El Tigre, a December 4, 2009 declaration from Samario, and a May 2006 declaration from Rafael Garcia. (Doc. # 818 at 21). He contends this evidence suggests the statements in his letters that Drummond was paying the AUC and was complicit in the AUC's murders were true. (*Id.*).

In 2007, 2008, and 2009, El Tigre testified numerous times in the Justice & Peace process in Colombia, but at that point did not implicate Drummond with respect to any involvement with the AUC. (Doc. # 417 at 24).

6

In April 2009, Samario testified before Colombian authorities and denied any knowledge of Drummond's collaborating with the AUC. (Northern District of Alabama Case No. 2:09-cv-01041-RDP, Doc. # 396-10 at 100-08). In November 2009, Samario testified in the Justice & Peace process in Colombia and again denied any knowledge of Drummond's complicity with the AUC. (*Id*. at 85-100).

In late 2008, Collingsworth and/or his team had promised El Tigre and Samario a contingency fee in the third case against Drummond (*Balcero*) and an upfront cash payment in exchange for their declarations. (Docs. # 775, § IV-B; 775-109 (October 23, 2008 text messages to Collingsworth regarding "the proposal for 10% and 15,000 upfront w/signed DECL" for one person and stating that "now the question is how much we would pay for the second decl [] no money will be passed until decls are received"); 775-87 (December 12, 2008 email from Collingsworth stating "I can transfer the funds as soon as the two declarations we discussed are ready"); 775-88 (December 26, 2008 email to Collingsworth stating "He understands that he won't get paid as soon as the decls are turned in"); 775-110 (March 20, 2009 email from Collingsworth providing "the wire information for Ivan Otero to whom we have agreed to send $80,000."); 775-111 (March 27, 2009 email from Collingsworth insisting that Ivan Otero be paid because he has "the declarations in hand"). Also in late 2008, Collingsworth and/or his team had promised El Tigre and Samario's criminal attorney, Ivan Otero, a contingency fee in the litigation against Drummond, and in early 2009 Defendants paid him $80,000 after he produced El Tigre's and Samario's declarations. (Docs. # 775 at 51-52; 775-109; 775-87; 775-88; 775-110; 775-111; 775-108 at 44-59). Between 2011 and 2015, Defendants paid El Tigre and Samario $2,700 per month in exchange for their testimony. (Docs. # 417 at 25; 180-6 at 2-3 (May 22, 2011 email from

7

Collingsworth to Bill Scherer and others stating that he "need[ed] to pay $2700 per month to maintain until we get the dep[osition]s in the can," referring to the contemplated depositions of El Tigre and Samario).

Notably, every witness who offered letters rogatory testimony against Drummond in *Balcero* had received payments from Defendants. (Docs. # 280 at ¶¶ 23 (Gelvez), 26-30 (Charris), 40-53 (Blanco), 58-61 (Duarte), 65-72 (El Tigre & Samario), 344 ("UNDISPUTED that the families of the witnesses who provided letters rogatory testimony in *Balcero* implicating Drummond received security assistance"); 417 at 16).

During the course of this defamation litigation, these payments made by Collingsworth to the witnesses came to the attention of Drummond and thereafter the court. "Drummond served discovery requests about the methods Collingsworth and his litigation team had used in the alien tort cases to secure testimony from the witnesses, including information about any payments made to the witnesses." *Drummond Co., Inc. v. Conrad & Scherer, LLP*, 885 F.3d 1324, 1330 (11th Cir. 2018). On multiple occasions, Collingsworth lied about having made these payments, including: (1) in responses to discovery, (2) in pleadings filed with the court, and (3) in multiple declarations filed with the court. (Doc. # 417 at 8-15). Ultimately, Collingsworth lied directly to the court about how many witnesses had been paid. (Doc. # 417 at 15-17 (citing Doc. # 123)).

As of 2015, Collingsworth remained a partner in good standing with C&S, but he has since left the firm. (Docs. # 830 at 10; 390 at 414).

## II. Legal Standard

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

8

show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on his allegations made in the complaint; instead, as the party bearing the burden of proof at trial, he must come forward with at least some evidence to support each element essential to his case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or

9

denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

### III.   Discussion

Plaintiff's Amended Complaint asserts one defamation claim against Defendants. (Doc. # 73 at 12-13). Again, this claim is based on three allegedly defamatory letters written by Collingsworth on C&S letterhead and a 2013 radio interview in which he repeated the allegedly false statements contained in the letters. (Docs. # 73 ¶¶ 13-27, 33; 817-2; 817-8; 817-10).

Collingsworth's January 18, 2011 letter contained the following allegedly defamatory statements:

> A. that "hundreds of Colombian citizens . . . had a family member murdered by paramilitary forces working on behalf of Drummond;"
>
> B. that Drummond "has an atrocious human rights record;"
>
> C. that Drummond "made an alliance with the United Self Defense Forces of Colombia ('AUC'), the umbrella paramilitary group in Colombia;"
>
> D. that the "AUC was designated a terrorist organization by the U.S. government in 2001, yet Drummond continued its unlawful alliance until 2006, when the

10

>> AUC demobilized as part of the Justice and Peace program in Colombia;"
>
> E. that "[a]s a matter of objective fact, with Drummond's support," a particular Front of the AUC "went from a small band of 20 thugs to a fighting force of 150 well equipped and trained soldiers;" and
>
> F. that "Drummond's mandate to the AUC led to the violent slaughter of hundreds of innocent civilians."

(Docs. # 73 ¶ 14; 817-2).

Collingsworth's February 4, 2011 letter contained the following allegedly defamatory statements:

> A. that Drummond able to "get away with murder;"
>
> B. that there were "hundreds of Colombian victims of Drummond's human rights violations."

(Docs. # 73 ¶¶ 17-24; 817-8).

Collingsworth's September 19, 2011 letter contained the following allegedly defamatory statements:

> A. that Drummond "has a record of major human rights crimes;" and
>
> B. that he professes to provide "the facts about Drummond's direct involvement in war crimes and other major human rights violations in Colombia."

(Docs. # 73 ¶¶ 26-29; 817-10).

In an August 26, 2013 interview on Alternativa Latina, Collingsworth made numerous statements regarding Drummond's alleged complicity in murder and alleged collaboration with a terrorist organization. (Doc. # 73 ¶¶ 33-34). When discussing an ongoing union strike in Colombia, Collingsworth stated: "after they killed, after the union leaders were killed in 2001, eventually obviously new leadership did come forward with much better security. And I think it would be very difficult for Drummond to solve their problems with the union again by having the union

11

leaders assassinated." (*Id*. ¶ 33).

### A. The Elements of a Defamation Claim

In Alabama, the elements of a typical defamation claim are:

> 1) a false and defamatory statement concerning the plaintiff;
>
> 2) an unprivileged communication of that statement to a third party;
>
> 3) fault amounting at least to negligence on the part of the defendant; and
>
> 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication of the statement.

*Moore v. Cecil*, 109 F.4th 1352, 1365 (11th Cir. 2024). To prevail in this case, Drummond must also show that Collingsworth acted with actual malice. "Because of the expressive freedom guaranteed by the First Amendment, a defendant may not be held liable for defaming a public figure about a matter of public concern unless he is shown to have 'acted with actual malice.'" *Berisha v. Lawson*, 973 F.3d 1304, 1310 (11th Cir. 2020) (citing *Silvester v. Am. Broad. Cos.*, 839 F.2d 1491, 1493 (11th Cir. 1988) and *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270-83 (1964)). Here, Drummond has readily accepted the burden of proving *Sullivan* actual malice, and for that reason the court has determined that to prevail on its defamation claim in this case, Drummond must "establish *Sullivan* actual malice, including falsity, by clear and convincing evidence." (Doc. # 767 at 2 (citing Doc. # 88 at 15) and at 9).

### B. There is a Genuine Issue of Material Fact About Whether Collingsworth's Statements Were False.

In support of his Motion for Summary Judgment, Collingsworth submitted his own declaration (Doc. # 814) and, based on that document, he argues that Drummond cannot establish either the falsity element of its prima facie case or malice. Collingsworth's declaration set forth

stories published in the press as a basis for establishing that the allegedly defamatory statements in the letters were true. But those stories mostly report on the allegations *made* – and *not proven* – in the cases Collingsworth filed against Drummond. And again, a jury had already found against Collingsworth's position on the claims made in the *Romero* case – well before he made the allegedly defamatory statements at issue here. That is, the jury found that neither Drummond nor its president of Colombian operations was liable for Locarno, Orcasita, and Soler's deaths. (Case No. 7:03-cv-00575-KOB, Doc. # 486 at 1-2). Furthermore, there is a question of fact for a jury to resolve about Collingsworth's own credibility.

    Collingsworth also relies on affidavits obtained from various people, many of whom are convicted murderers. And, there is an even bigger problem. Many of these declarants changed their sworn testimony to implicate Drummond, but only after Collingsworth and C&S paid them.[3] They initially testified that Drummond was not involved in the killings. Then, they received money from Collingsworth and his associates. After that receipt, they changed their stories. Clearly, whether these sources are credible is a genuine issue of material fact for a jury to decide. Even Collingsworth's Motion for Summary Judgment repeatedly raises the issue of the credibility of witnesses. (Doc. # 818 at 7 ("There is no *credible* evidence in the record"), 8 ("There is no credible evidence in the record that"), 9 ("There is no credible evidence in the record that"), 10 ("There is no credible evidence in the record that"). Credibility is an issue for a jury to resolve. "Ordinarily the right to determine the credibility of witnesses belongs to the jury and, therefore, it is inappropriate to take an issue from the jury when resolution of that issue requires the court to

---

[3] *See* Doc. # 363 in *Drummond Co., Inc. v. Collingsworth*, 2:15-cv-506-RDP (Memorandum Opinion in the parties' companion RICO case denying summary judgment in part and discussing in more detail the payments Defendants made to witnesses in the underlying litigation).

13

weigh the credibility of witnesses." *Hibiscus Assocs. Ltd. v. Bd. of Trustees of Policemen & Firemen Ret. Sys. of City of Detroit*, 50 F.3d 908, 919 (11th Cir. 1995) (citing *Kridler v. Bituminous Cas. Corp.*, 409 F.2d 88, 91 (5th Cir. 1969)); *see also United States v. Lindstrom*, 698 F.2d 1154, 1161 (11th Cir. 1983) ("the issue of a witness' credibility is committed to the providence of the jury").

In addition to the concerns about the credibility of the witnesses from whom Collingsworth obtained declarations implicating Drummond, the court also has serious concerns about Collingsworth's credibility based on his conduct in this litigation. (Docs. # 417, 775-74). Even members of his former firm, C&S, had similar concerns about both Collingsworth's and these witnesses' credibility. (Doc. # 775-74 (Collingsworth "does not appear credible at this point").

The evidence in the Rule 56 record provides ample evidence creating a genuine issue of material fact about not only Collingsworth's credibility, but also the credibility of the witnesses who provided the declarations on which Collingsworth relies to establish that the matters in his letters were true. A jury, not the court, must resolve the issues of falsity and credibility.

### C. There is a Genuine Issue of Material Fact About Whether Collingsworth Acted with Actual Malice.

Much of the same evidence that creates a genuine issue of material fact about falsity also creates a genuine issue of material fact about malice. Collingsworth filed claims against Drummond alleging that it was complicit in the AUC's killing of union members in Colombia. Numerous witnesses testified under oath either that Drummond was not so involved or that they were not aware of any such involvement. A jury found Drummond and the President of its Colombian operation not liable for the murders.

14

A jury could conclude also that Collingsworth and C&S arranged for these witnesses to be paid. (*See, e.g.*, Doc. # 775-109 (October 23, 2008 text messages to Collingsworth regarding "the proposal for 10% and 15,000 upfront w/signed DECL" for one person "now the question is how much we would pay for the second decl [] no money will be passed until decls are received"); 775-87 (December 12, 2008 email from Collingsworth stating "I can transfer the funds as soon as the two declarations we discussed are ready"); (417 at 25; 180-6 (May 22, 2011 email from Collingsworth stating that he "need[ed] to pay $2700 per month to maintain until we get the dep[osition]s in the can," referring to the contemplated depositions of El Tigre and Samario).

"Actual malice is a subjective test, requiring the plaintiff to show that the defendant 'actually entertained serious doubts as to the veracity of the published account, or was highly aware that the account was probably false.'" *Moore v. Cecil*, 109 F.4th 1352, 1365 (11th Cir. 2024) (quoting in part *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702-03 (11th Cir. 2016)). Defendants argue "actual malice cannot be found where 'the publisher's allegations are supported by a multitude of previous reports upon which the publisher reasonably relied.'" *Id*. at 1366 (quoting *Rosanova v. Playboy Enters., Inc*., 580 F.2d 859, 862 (5th Cir. 1978)). However, the reports Defendants point to are largely based on press stories regarding the *allegations* Collingsworth made about Drummond, which a jury resolved against his clients at trial.

In this case, "[t]he issue of actual malice on the part of defendants seems peculiarly inappropriate for disposition by summary judgment because it concerns 'motive, intent, and subjective feelings and reactions.'" *Loveless v. Graddick*, 325 So. 2d 137, 143 (1975) (quoting *Goldwater v. Ginzburg*, 261 F. Supp. 784, 788 (S.D.N.Y. 1966), *aff'd*, 414 F.2d 324 (2d Cir. 1969)). The fact that witnesses changed their sworn testimony to support Collingsworth's theory

15

after he paid them (sometimes with significant sums of money) is more than sufficient to create a triable issue of fact on the issue of malice. Collingsworth was aware that multiple witnesses gave sworn testimony that they were *not* aware of Drummond being involved with the AUC or the union members murders. Collingsworth then paid the witnesses. Thereafter, he obtained declarations contradicting their prior sworn testimony. "In cases 'involving the reporting of a third party's allegations, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.'" *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 278 (S.D. N.Y. 2013), *aff'd*, 807 F.3d 541 (2d Cir. 2015), and *aff'd*, 622 F. App'x 67 (2d Cir. 2015) (quoting *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989)). There is sufficient evidence in the Rule 56 record from which a reasonable juror could conclude that Collingsworth acted with malice by paying for false and defamatory testimony against Drummond.

Collingsworth's repeated lies – to this court and to others – about the payments he made to witnesses is also relevant to this question. Not only did Collingsworth pay these witnesses who changed their stories to provide him with helpful testimony, but he also materially misled the court about the number of payments and who received the funds. And he did so repeatedly – in discovery responses; in pleadings filed with the court; and in open court. If this doesn't raise a question of fact for a jury about actual malice, the court is not sure what could ever raise such an inference.

Because there is sufficient evidence in the Rule 56 record to raise a genuine issue of material fact as to whether Collingsworth acted in good faith or with actual malice when he published the letters in question and conducted the interview, that issue must be resolved by a jury.

### D.     Vicarious Liability

C&S has moved for summary judgment on the issue of whether the alleged defamatory

16

statements were made within the line and scope of Collingsworth's employment with C&S.

"Partnership law imposes vicarious liability on a partner for the wrongful acts or omissions of other partners in the ordinary course of business. Ala. Code 1975, § 10-8-53. This is because partners are agents of one another and are, by the very definition of the term 'agent,' acting on behalf of one another and subject to each other's control." *Carlton v. Alabama Dairy Queen, Inc.*, 529 So. 2d 921, 922-23 (Ala. 1988) (citing *Orr, Jackson & Co. v. Perry*, 81 So. 150 (1919)); *see also Tucker v. Graves*, 88 So. 40, 42 (Ala. Ct. App. 1920) (partners are liable "as joint tortfeasors for the [] act of a partner [who was] acting within the line and scope of the firm's business").

As the Alabama Supreme Court has noted,

> in cases where a servant's deviation from the master's business is slight and not unusual, a court may determine, as a matter of law, that the servant was still executing the master's business. On the other hand, with a very "marked and unusual" deviation, the court may determine that the servant is not on his master's business at all. Cases falling between these two extremes must be regarded as involving a question of fact to be left to the jury.

*Hendley v. Springhill Mem'l Hosp.*, 575 So. 2d 547, 550 (Ala. 1990) (citing *Avco Corp. v. Richardson*, 234 So. 2d 556 (Ala. 1970)). Indeed, Alabama state courts have observed that "[s]ummary judgment on the issue of agency is generally inappropriate, because this issue usually is a question to be determined by the trier of fact." *Carlton*, 529 So. 2d at 23; *see also Kennedy v. W. Sizzlin Corp.*, 857 So. 2d 71, 77 (Ala. 2003) ("We recognize that a summary judgment on the issue of agency is generally inappropriate because agency is a question of fact to be determined by the trier of fact.").

Here, the parties dispute whether Collingsworth was acting within the line and scope of C&S's business at the time he wrote the letters and was interviewed.[4] There is sufficient evidence

---

[4] Based on the fact that Collingsworth was still a partner in good standing with C&S in 2015, Drummond

17

in the record for a jury to decide that C&S is responsible for Collingsworth's allegedly defamatory statements. A jury could conclude, based on the Rule 56 evidence before the court, that Collingsworth wrote the letters on C&S letterhead and made his statements in the interview in the line and scope of his employment with C&S. Therefore, a jury must resolve the issue of C&S's liability for Collingsworth's alleged defamatory letters and interview.

### E. At Least Some of the Statements in the Letters Are Defamatory Per Se.

Drummond has also moved for partial summary judgment on the issue of whether the letters are defamatory as a matter of law. Under Alabama law, the test for determining whether an allegedly defamatory statement is per se unlawful rests on whether "the language used exposes the plaintiff to public ridicule or contempt" or there is "an imputation of an indictable offense involving infamy or moral turpitude[.]" *Ponder v. Lake Forest Prop. Owners Ass'n*, 214 So. 3d 339, 350 (Ala. Civ. App. 2015). Furthermore, "[w]here the publication is libelous per se, the law presumes it to be false and, therefore, prompted by malice." *Id.* at 351 (citing *McGraw v. Thomason*, 93 So.2d 741, 742 (1957)).

The plain meaning of certain portions of the letters imply that Drummond was involved in "murder," "human rights violations," "human rights crimes," "war crimes," and conspired with a "terrorist organization." (Docs. # 817-2; 817-8; 817-10). All of these accuse Drummond of indictable criminal offenses which involve "infamy or moral turpitude." *See Cottrell v. Nat'l Collegiate Athletic Ass'n*, 975 So. 2d 306, 346 (Ala. 2007) (infamy involves "conviction of an infamous crime and the consequent loss of honor and credit"; "[m]oral turpitude signifies an inherent quality of baseness, vileness, depravity"). Other portions of the letters are not defamatory

---

further argues that C&S ratified Collingsworth's conduct of writing the letters and conducting the interview. However, the Rule 56 record is insufficiently developed on this issue, so it, too, must be resolved by a jury.

per se.

## IV.  Conclusion

For the reasons discussed above, the court concludes there are genuine issues of material fact that must be resolved by a jury. The one exception to this determination is that *some* of the allegedly defamatory statements in Collingsworth's letters are defamatory per se. Defendants' Motions for Summary Judgment (Docs. # 818, 819) are due to be denied. Drummond's Motion for Partial Summary Judgment (Doc. # 821) is due to be granted in part and denied in part. The court will consider as part of the pretrial conference how these issues will be addressed at trial.

A separate order will be entered.

**DONE** and **ORDERED** this December 10, 2024.

_____
**R. DAVID PROCTOR**
CHIEF U.S. DISTRICT JUDGE