FILED
2026 Jun-02  PM 04:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| DRUMMOND COMPANY, INC. et al., | } | |
| | } | |
| Plaintiffs, | } | |
| | } | |
| v. | } | |
| | } | **Case No.: 2:11-cv-3695-RDP** |
| TERRENCE P. COLLINGSWORTH, et al., | } | |
| | } | |
| Defendants. | } | |
| | } | |

| | | |
|---|---|---|
| DRUMMOND COMPANY, INC., et al., | } | |
| | } | |
| Plaintiffs, | } | |
| | } | |
| v. | } | |
| | } | **Case No.: 2:15-cv-506-RDP** |
| TERRENCE P. COLLINGSWORTH, et al., | } | |
| | } | |
| Defendants. | } | |
| | } | |

### MEMORANDUM OPINION ON NEW TRIAL MOTIONS

Before the court are Defendants Terrence P. Collingsworth and International Rights Advocates Inc.'s Motion for New Trial (*Defamation Case* Doc. # 1244; *RICO Case* Doc. # 756).[1] The Motions have been fully briefed and are ripe for decision. After careful review, and for the reasons explained below, Defendants' Motion is due to be denied.

---

[1] For brevity and ease of citation, the court refers to documents filed in Case No.: 2:11-cv-3695-RDP as *Defamation* and Case No.: 2:15-cv-506-RDP as *RICO*.

For the most part, these motions raise objections and arguments that were raised before and at trial and that were overruled. When the objections were previously made, the court heard argument, engaged with counsel, made rulings, and explained the bases for its rulings. This memorandum is entered with the understanding that the court has already explained its rulings on a number of these issues. The court's rationale for each such ruling is adopted here. The purpose of this opinion is to rule again on these matters (as they have been raised again) and give an overview of its reasoning. The court does not intend to write anew or supplant its previous adjudication of these matters.

## I.     Standards of Review

The court begins by explaining the standards of review for each of Defendants' motions.

### A.     Motion for New Trial under Rule 59(a)

A court may grant a motion for "a new trial on all or some of the issues . . . for any reason for which a new trial has . . . been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "New trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great – not merely the greater – weight of the evidence." *Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1312-13 (11th Cir. 2013) (cleaned up). A court may also grant a new trial under Rule 59 if the "damages are excessive, or . . . the trial was not fair . . . and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016) (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)).

### B.     Motion for Remittitur under Rule 59(e)

Federal Rule of Civil Procedure 59(e) permits a court to alter or amend a judgment. When the jury's award "is for an identifiable amount that is not permitted by law, the court may simply modify the jury's verdict to that extent and enter judgment for the correct amount." *Johansen v.*

*Combustion Eng'g, Inc.*, 170 F.3d 1320, 1330 (11th Cir. 1999). A court may also reduce the jury's award where "the jury's damage award exceeds the amount established by the evidence." *Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1266 (11th Cir. 2008) (cleaned up).

Excessive and arbitrary punitive damage awards infringe on a defendant's due process rights. *State Farm Mut. Auto. Ins. v. Campbell*, 538 U.S. 408, 416 (2003). Courts have "a mandatory duty to correct an unconstitutionally excessive verdict so that it conforms to the requirements of the due process clause." *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1331 (11th Cir. 1999). In reviewing a punitive damages award under the Due Process Clause, the following guideposts must be considered: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *Campbell*, 538 U.S. at 418 (citing guideposts set forth in *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)). Where, as here, the compensatory award is not an equitable remedy, "the Seventh Amendment 'requires that an order of remittitur be accompanied by an offer for a new trial.'" *Collins v. Koch Foods Inc.*, 454 F. Supp. 3d 1174, 1187 n.11 (N.D. Ala. 2020) (quoting *Brown v. Ala. Dept. of Transp.*, 597 F.3d 1160, 1184 (11th Cir. 2010)).

"A court's dominant consideration when evaluating a punitive damages award is the first *Gore* guidepost, the reprehensibility of the defendant's conduct." *Brown v. Ramada Birmingham Airport*, No. 2:17-CV-01671-RDP, 2020 WL 6384427, at *2 (N.D. Ala. Oct. 30, 2020) (citing *Gore*, 517 U.S. at 575). And, in determining the level of reprehensibility at issue, a court must consider: "(1) whether the harm caused was physical as opposed to economic; (2) whether the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; (3) whether the target of the conduct was financially vulnerable; (4) whether the conduct involved

3

repeated actions or was an isolated incident; and (5) whether the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1283 (11th Cir. 2008) (citing *EEOC v. W&O, Inc.*, 213 F.3d 600, 614-15 (11th Cir. 2000)).

## II.    Analysis

To determine whether Defendants are entitled to a new trial, the court must assess whether the verdict is against the great weight of the evidence. *See Lamonica*, 711 F.3d at 1312-13. The court may also grant a new trial under Rule 59 if the "damages are excessive, or . . . the trial was not fair . . . and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *McGinnis*, 817 F.3d at 1254 (quoting *Montgomery Ward & Co.*, 311 U.S. at 251).

### A.    Defendants' Challenges to Pretrial Rulings (other than Motions in Limine)

Defendants contend that each of the following pretrial rulings was erroneous and warrants a new trial. The court already addressed these issues and the bases for its rulings before and at trial. The court readopts its explanations and summarizes its rationale below.

#### 1.    Consolidation of the Defamation and RICO Claims

Defendants argue that consolidating the Defamation and RICO cases for trial was error that resulted in jury confusion and inflated damages. They are wrong.

Under Federal Rule of Civil Procedure 42(a), a court may consolidate actions presenting common questions of law or fact and has "broad discretion to determine whether and to what extent consolidation is appropriate." *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, No. 3:19MD2885, 2021 WL 2783898, at *1 (N.D. Fla. July 2, 2021). In exercising that discretion, the court considers: (1) the risk of inconsistent adjudications of common factual and legal issues; (2) the burden of multiple lawsuits; (3) the time consolidation would save; and (4) the relative expense of separate trials. *Eghnayem v. Boston Sci. Corp.*, 873 F.3d 1304, 1313 (11th Cir. 2017). "District

judges in this circuit have been urged to make good use of Rule 42(a) in order to expedite the trial and eliminate unnecessary repetition and confusion." *Young v. City of Augusta*, 59 F.3d 1160, 1169 (11th Cir. 1995) (cleaned up).

All of the *Eghnayem* factors favored consolidation here. As the court explained in its August 2025 order denying the motion to preclude consolidated trials, even a cursory review of the summary judgment record reveals the substantial overlap of material facts between the two cases. (*RICO* Doc. # 399 at 2). Both cases arose out of the same core conduct – Collingsworth's pattern of attacking and suing Drummond, and (as the jury found) falsely accusing Drummond of Financing the AUC and being complicit in extrajudicial killings. The same extensive evidence was relevant to both cases. That evidence bore on Collingsworth's conduct, including the falsity and malice elements of the defamation claim, as well as the RICO enterprise, its pattern of racketeering, its predicate acts, and the conspiracy elements of the RICO claim. (*RICO* Doc. # 399 at 4).[2] Trying the cases separately would have meant presenting much of the same evidence twice, and having separate juries assess the same testimony and documents. This would have imposed an extraordinary and unnecessary burden on the parties, the court, and the members of the public called to serve as jurors. It could also have led to inconsistent factual adjudications.

Finally, Defendants' claim that the jury was confused is simply unsupported by the record. The court instructed the jury on the separate claims and applicable standards, and employed separate verdict forms with special interrogatories designed to keep the issues distinct and clear. (*See generally RICO* Doc. # 706; *Defamation* Doc. # 1194). The jury returned verdicts against Defendants and there is no evidence or indication of confusion. Defendants' motion on this ground

---

[2] Defendants' reliance on *Molever v. Levenson*, 539 F.2d 996 (4th Cir. 1976) is misplaced. In *Molever*, consolidation was improper because the consolidated action "tendered no question of law or fact like those in the derivative and defamation suits." *Id*. at 1003. That is the opposite of the situation here.

is due to be denied.

### 2. Joinder of Defaulted Defendants Otero and van Bilderbeek

Defendants next argue that the court erred by denying their motion to sever defaulted defendants Otero and Van Bilderbeek from trial. They were named defendants in the RICO portion of the trial. Defendants contend that the presence of the defaulted defendants and the jury's awareness of the default judgments entered against them prejudiced Collingsworth and IRAdvocates by predisposing the jury to find liability against all members of the alleged enterprise. The motion is without merit. The court already addressed these issues and the bases for its rulings before and at trial. Nevertheless, the court readopts these explanations and summarizes its rationale.

As a threshold matter, Defendants waived this argument through prolonged inaction. Otero and Van Bilderbeek were defaulted in April 2024, more than eighteen months before trial. Despite that, Defendants raised no severance issue at the August 25, 2025 pretrial conference and waited until November 30, 2025, the day before trial began, to file their motion addressing this argument. In addition to potential waivers, the timeliness of a severance motion is a factor courts in this Circuit weigh heavily against relief. *See United States v. Johnson*, 713 F.2d 633, 641 (11th Cir. 1983); *Diaz v. Jaguar Rest. Group, LLC*, 627 F.3d 1212, 1213–15 (11th Cir. 2010). Defendants cannot sit on their rights for over a year and then demand last-minute restructuring of the trial on the eve of jury selection.

Even setting aside waiver and untimeliness, severance was unwarranted on the merits. Under Federal Rules of Civil Procedure 21 and 42, a court has broad discretion in deciding whether to sever claims or order separate trials, considering factors such as judicial economy, prejudice, and the risk of inconsistent judgments. Fed. R. Civ. P. 21, 42; *see Hendrix v. Raybestos-Manhattan, Inc.*, 776 F.2d 1492, 1495 (11th Cir. 1985); *Weatherly v. Ala. State Univ.*, 728 F.3d 1263, 1270

(11th Cir. 2013) (establishing that the decision to sever is reviewed for abuse of discretion); *Fritz v. American Home Shield Corp.*, 751 F.2d 1152, 1154 (11th Cir. 1985). A joint trial is appropriate where there is "clearly substantial overlap in the issues, facts, evidence, and witnesses required for claims against multiple defendants." *Allstate Ins. Co. v. Vizcay*, 826 F.3d 1326, 1333 (11th Cir. 2016) (quoting *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1301 (11th Cir. 2001)). That was obviously the case here. The claims against Collingsworth and IRAdvocates arose from the same alleged enterprise and involved the same facts, witnesses, and legal theories as the claims against Otero and Van Bilderbeek. As the jury found, Collingsworth and IRAdvocates were members of the same enterprise as Otero and Van Bilderbeek. Because RICO liability is joint and several, the jury also needed to assess damages on an enterprise-wide basis, which required a single proceeding. Separate trials would have imposed significant and unnecessary burdens on the parties, the court, and the jury pool. (*RICO* Doc. # 662 at 3). And, separate trials actually would have been error because of the danger of inconsistent rulings and treatment by separate juries of the members of the same enterprise.

Defendants' concern about jury prejudice fares no better. As the court explained when denying the severance motion, the risk of prejudice could be and was addressed through jury instructions. (*RICO* Doc. # 662 at 3). The court instructed the jury on multiple occasions that the defaults against Otero and Van Bilderbeek had no bearing on whether Collingsworth and IRAdvocates were liable, and that it could not attribute the defaults to the non-defaulting defendants. (*RICO* Doc. # 720 at 473:19-474:2, *RICO* Doc. # 743 at 3458:17-22). The court also provided the jury with a verdict form with special interrogatories. (*RICO* Doc. # 706). In the Eleventh Circuit, juries are presumed to follow the court's instructions. *Brink v. Direct Gen. Ins. Co.*, 38 F.4th 917, 924 (11th Cir. 2022) (quoting *Adams v. Wainwright*, 709 F.2d 1443, 1447 (11th Cir. 1983)). Defendants cannot point to any actual evidence of jury confusion, and their speculation

alone is insufficient to overcome the presumption that the jury followed the court's instructions. *See Barfield v. APRO Intl., Inc.*, 781 F. App'x 900, 905-06 (11th Cir. 2019) (unpublished); *United States v. Scott*, 579 F. App'x 930, 934-35 (11th Cir. 2014) (unpublished); *United States v. Esteban-Rios*, 291 F. App'x 284, 286 n.1 (11th Cir. 2008) (unpublished). Accordingly, Defendants' motion on this ground is due to be denied.

### 3.    Declining to Stay the Case Pending the Colombian Criminal Proceedings

Defendants next argue that the court erred by declining to stay the trial pending resolution of the Colombian criminal proceedings. Defendants sought a stay based on an ongoing criminal trial in Colombia involving two officers of Drummond's Colombian operations, arguing that the Colombian court's resolution of whether Drummond financed the AUC would be determinative of the claims against Collingsworth in these cases. The motion was properly denied. The court already addressed these issues and the bases for its rulings before and at trial. Nevertheless, the court readopts these explanations and summarizes its rationale.

First, federal law is clear that a stay "must not be immoderate." *Ortega Trujillo v. Conover & Co. Commc'ns*, 221 F.3d 1262, 1264 (11th Cir. 2000). "[A] stay is immoderate and hence unlawful unless so framed in its inception that its force will be spent within reasonable limits, so far at least as they are susceptible of prevision and description." *Id*. (quoting *Landis v. North Am. Co.*, 299 U.S. 248, 257 (1936)). The Eleventh Circuit has accordingly held that "a stay order which is immoderate and involves a protracted and indefinite period of delay is impermissible." *King v. Cessna Aircraft Co.*, 505 F.3d 1160, 1172 (11th Cir. 2007).

Second, Defendants' motion to stay rested entirely on speculation. Defendants presented no concrete evidence that the Colombian proceedings would conclude anytime soon, and the evidence actually before the court, drawn from comparable Colombian proceedings against

*Chiquita*, suggested just the opposite. (*RICO* Doc. # 393 at 4-5). Indeed, as best the court could tell, the Colombian proceedings are still at the pre-trial stage; the trial has not yet begun. And, the system in Colombia is different from the one here. Even when that trial actually begins, it could take months to finish it, and likely there would be additional time needed before the Columbian court could enter a final judgment. Speculation that a foreign criminal trial might produce a useful result is not a sufficient basis for an indefinite stay.

Third, Defendants' argument that a Colombian conviction would be "determinative" of the issues here also does not hold up. Even if a guilty verdict were admitted into evidence, it would carry no preclusive effect and would amount to no more than one additional data point for the jury to weigh. (*RICO* Doc. # 393 at 5-6). Further, even putting aside the question of whether the Colombian courts have had the opportunity to appreciate the effect of bought-and-paid-for witnesses, the Colombian proceedings, and the cases before this court involve different parties, different laws, and different issues, meaning principles of international comity provided no basis for a stay. (*RICO* Doc. # 393 at 6-7). Defendants' suggestion that the jury was left with a distorted picture because it could not consider the Colombian prosecution conflates the question of admissibility (and, to be clear, the evidence proffered by Defendants had significant admissibility issues) with the threshold question of whether to stay the entire trial indefinitely. These decade-old cases must not reasonably be held up any further pending the uncertain and potentially years-long resolution of a foreign criminal proceeding. Accordingly, Defendants' motion on this ground is due to be denied.

### 4.    Defendants' Motions for a Continuance

Defendants moved for a continuance of the December 1, 2025 trial date two times: first in October 2025, after C&S settled with Drummond, and again in November 2025, after

Collingsworth's original choice of substitute counsel[3] suffered a health emergency. Both motions were properly denied. The court already addressed these issues and the bases for its rulings before and at trial. Nevertheless, the court readopts these explanations and summarizes its rationale.

A trial court has broad discretion over continuance requests, and that discretion "will be disturbed only in extreme cases." *Arabian Am. Oil Co. v. Scarfone*, 939 F.2d 1472, 1479 (11th Cir. 1991). In exercising that discretion, courts consider four factors: (1) the moving party's diligence in readying its case for trial; (2) the likelihood that a continuance would remedy the need for one; (3) the inconvenience to the court and opposing party; and (4) the harm to the moving party from denial. *Romero v. Drummond Co.*, 552 F.3d 1303, 1320 (11th Cir. 2008). As the court found in denying Defendants' first motion, none of those factors favored a continuance. (*RICO* Doc. # 569 at 16).[4]

As to the first factor, Collingsworth was not diligent in preparing for trial. He chose (and it was his deliberate choice) to represent himself and IRAdvocates for nearly a decade before trial. Collingsworth argues that he hoped C&S's counsel would aid him in presenting a defense, but when they settled, he needed help. However, C&S moved for separate trials in July 2025 and expressly cited the risk of "guilt by association." (*RICO* Doc. # 569 at 10-11). When that occurred, Collingsworth should have recognized that he could not rely on C&S's counsel to carry any primary burden at trial. Yet, he made no apparent effort during that window to retain independent counsel or to independently prepare to try the case himself. That failure is particularly notable

---

[3] Collingsworth has often changed counsel in these cases. During the span of this litigation, he has had some nineteen lawyers who have represented him, each of whom withdrew. (*Defamation* Docs. # 32, 194, 366, 376, 381, 385, 386, 464, 1236; *RICO* Docs. # 39, 40, 70, 746). Indeed, his current trial counsel has asked to withdraw. (*Defamation* Doc. # 1236; *RICO* Doc. # 746).

[4] The second motion for continuance, filed on November 17, 2025 following Collingsworth's original choice of counsel's health emergency, was denied for the same reasons. (*RICO* Doc. # 606 at 1).

given that he had been litigating these matters for years and, by his own account, knew the underlying facts better than anyone. The possibility that C&S might settle shortly before trial was hardly unforeseeable in complex multiparty litigation, and Collingsworth cited no authority suggesting that a party may simply rely on a co-defendant's counsel to try their case. *See Monfore v. Phillips*, 778 F.3d 849, 852 (10th Cir. 2015).

Regarding the second factor, there was no reliable basis to conclude that a continuance would have solved Collingsworth's problem. When his original choice of counsel appeared at the October 30, 2025 hearing, counsel made clear that his willingness to take the case depended on factors beyond simply obtaining more time, including unresolved reservations about the case itself and uncertainty about financial arrangements. (*RICO* Doc. # 569 at 8). At that time, the court was clear. Collingsworth had previously acknowledged he was his own counsel, represented he was his own trial counsel, and understood he was responsible for his representation. Whether any counsel would ultimately agree to represent Collingsworth and IRAdvocates was, at best, speculative.

As to the third factor, a continuance would have imposed significant burdens on both Drummond and the court. Drummond had devoted substantial resources to trial preparation and arranged for out-of-state witnesses to appear. The court had reserved its entire December and January calendar for a trial expected to last some six weeks (it went seven) and had already begun summoning 250 jurors. (*RICO* Doc. # 569 at 13-14). Further, the court told all parties of its pending retirement and that passing this case to another judge would be wholly inefficient and unfair.

Finally, whatever hardship Collingsworth faced was largely of his own making. He is an experienced attorney with over 35 years of practice who had litigated these very cases in this courthouse for years and had represented himself and IRAdvocates throughout that time. He had ample notice and opportunity to prepare. His failure to do so does not entitle him to a new trial.

11

And, the court's view at this point is that his many attempts at delay evidences gamesmanship.

### 5.      Drummond-C&S Settlement Agreement

Defendants argue they were entitled to review the complete Drummond-C&S settlement agreement to assess Drummond's motivations and potentially introduce it to the jury. This argument lacks merit. The court already addressed these issues and the bases for its rulings before and at trial. Nevertheless, the court readopts these explanations and summarizes its rationale.

As an initial matter, Defendants failed to cite any authority for the proposition that being permitted only an *in camera* review of the financial terms (the only terms relevant to setoff and other trial issues) of a confidential settlement agreement constitutes grounds for a new trial. That failure alone is sufficient to reject this argument.

In any event, under Alabama law, the only information a defendant is entitled to present to the jury regarding a settlement is the fact of the pro tanto settlement and the amount. *Morris v. Laster*, 821 So. 2d 923, 930 (Ala. 2001). Here, Defendants already knew the settlement amount. (*RICO* Doc. # 609 at 8:18-20). Therefore, they knew everything they were entitled to know.

As to the RICO claim, setoff occurs only after the court trebles the jury's verdict, so the jury had no need to know the settlement terms or amount at all. *See William Inglis & Sons Baking Co. v. Cont'l Baking Co.*, 981 F.2d 1023, 1024 (9th Cir. 1992) ( "[S]ettlement payments should be deducted from the damages after they have been trebled."); *Sciambra v. Graham News Co.*, 841 F.2d 651, 657 (5th Cir. 1988) ( "[W]e agree . . . that the court should treble the amount of damage award . . . before deducting the amount of the . . . settlement."); *State of N.Y. v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1086 (2d Cir. 1988); *Morley v. Cohen*, 888 F.2d 1006, 1014 (4th Cir. 1989) ("The [settlement] deduction should be made after trebling."); *Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1310 (7th Cir. 1987) ("We conclude that setting-off damages after trebling is more likely to effectuate the purposes behind RICO."); *Allstate Ins. Co. v. Palterovich*, 653 F. Supp. 2d

1306, 1333 (S.D. Fla. 2009) ("[T]he value of settlements that Plaintiffs have reached with various Defendants in this case should be deducted after trebling."). In fact, it would have been error to admit that evidence.

Defendants' argument that the complete agreement was necessary to show Drummond's improper motive in filing these cases fares no better. The only case they cite for this proposition is an unpublished California district court decision that did not involve a settlement agreement. *Unsworth v. Musk*, No. 2:18-CV-08048-SVW-JC, 2019 WL 8221086, at *7-8 (C.D. Cal. Nov. 27, 2019). "Courts have held in numerous contexts that a party's motivation for bringing a lawsuit is irrelevant." *Crystal Lagoons U.S. Corp. v. Oasis Amenities, LLC*, No. 8:23-CV-519-TPB-AEP, 2025 WL 2263888, at *1 (M.D. Fla. Aug. 7, 2025) (citing *Tallman v. Freedman Anselmo Lindberg, L.L.C.*, No. 11-3201, 2013 WL 2631754, at *3 (C.D. Ill. June 12, 2013)). Accordingly, Defendants' motion on this ground is due to be denied.

### 6.    Denial of Motion for Recusal

Defendants next argue that the court erred by not recusing itself. Like other maneuvers in this case, this suggests gamesmanship. The court already addressed these issues and the bases for its rulings before and at trial. Nevertheless, the court readopts these explanations and summarizes its rationale.

"Recusal is governed by two statutes – 28 U.S.C. §§ 144 and 455." *Matthews v. State Farm Fire & Cas. Co.*, 817 F. App'x 731, 735 (11th Cir. 2020). "To warrant recusal under § 144, the moving party must allege facts that would convince a reasonable person that bias actually exists." *Christo v. Padgett*, 223 F.3d 1324, 1333 (11th Cir. 2000) (citation omitted). The standard for recusal under § 455(a) "is whether an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt about the judge's impartiality." *United States v. Patti*, 337 F.3d 1317, 1321 (11th Cir. 2003) (quoting

13

*Parker v. Connors Steel Co.*, 855 F.2d 1510, 1524 (11th Cir. 1988)). "[O]pinions held by judges as a result of what they learned in earlier proceedings are not subject to deprecatory characterization as 'bias' or 'prejudice.'" *Liteky v. United States*, 510 U.S. 540, 551, 555-56 (1994) ("[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion . . . .").

The court correctly denied Defendants' recusal motion on multiple independent grounds. First, the motion was untimely. Courts in this circuit require parties to act with "absolute diligence" in raising disqualification "at the earliest possible moment after learning of facts giving rise to a belief of a demonstration of bias." *Huff v. Standard Life Ins. Co.*, 643 F. Supp. 705, 707 (S.D. Fla. 1986). The statements Defendants relied on in their recusal motion were made as far back as 2015 and 2016, yet the motion was not filed until January 2025, nearly a decade later. Collingsworth offered no adequate justification for this extraordinary delay. And even his fallback argument – that the summary judgment rulings were the "first manifestation" of bias warranting recusal – is undercut by the fact that after those very rulings, rather than promptly seeking disqualification, he joined in a request to set the case for trial. (*See Defamation* Doc. # 852 at 3).

Second, and even more to the point, the motion was legally insufficient on the merits. In the Eleventh Circuit, alleged bias must stem from an extrajudicial source to warrant disqualification, not from a judge's reactions to conduct within the litigation itself. *Jaffe v. Grant*, 793 F.2d 1182, 1188-89 (11th Cir. 1986). Collingsworth identified no extrajudicial or personal source of bias whatsoever. The court's expressions of displeasure were directly attributable to Collingsworth's own litigation conduct, including his admitted false statements to the court. Such expressions are "neither inappropriate, nor grounds for recusal." *Liteky*, 510 U.S. at 555-56.

Further, the Supreme Court has made clear that judicial remarks critical of or even hostile

14

to a party "ordinarily do not support a bias or partiality challenge" unless they reveal an extrajudicial source of bias or "such a high degree of favoritism or antagonism as to make fair judgment impossible," and that even "a stern and short-tempered judge's ordinary efforts at courtroom administration . . . remain immune." *Id*. at 555-56. The court's occasional admonishments that Collingsworth answer questions directly fall nowhere near that threshold. Likewise, the adverse rulings Collingsworth complained of provide no basis for recusal. *In re Kunsman*, 752 F. App'x 938, 939 (11th Cir. 2018).

Far from demonstrating the kind of "deep-seated . . . antagonism that would make fair judgment impossible," *Liteky*, 510 U.S. at 551, the trial record reflects a court that repeatedly expressed patience with Collingsworth as a witness and was even praised by defense counsel for being "kind and gentle." (*See, e.g.*, *RICO* Doc. # 729 at 1780:22-1781:4; *RICO* Doc. # 740 at 3134:13-20). As the court explained in its ruling on Defendants' Motion to Recuse, "there is nothing in Collingsworth's Motion, Reply, or Declarations indicating that, in all these many years, there is any extrajudicial source of alleged bias against him. Nor is there any indication that there is any personal source for the alleged bias." (*RICO* Doc. # 376 at 4-5).[5] Accordingly, Defendants' motion on this ground is due to be denied.

## B.    Evidentiary Rulings

Defendants contend that each of the following evidentiary rulings was erroneous and warrants a new trial. The court already addressed these issues and the bases for its rulings before and at trial. Nevertheless, the court readopts these explanations and summarizes its rationale.

### 1.    Material from Colombian Criminal Prosecution

---

[5] Moreover, the court actually gave Collingsworth the benefit of the doubt on certain trial issues. For example, although his spoliation of documents likely indicated the propriety of a mandatory jury instruction on that issue, the court refrained and instead gave a permissive instruction to the jury.

Defendants "now seek a new trial based on the erroneous exclusion of the Colombian prosecution documents." (*Defamation* Doc. # 1244 at 22). They recycle arguments that the court already addressed – for example, under *Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F.4th 1278, 1300 (11th Cir. 2022), this evidence should have been admitted. (*Id.*). In response, Drummond notes that the "[c]ourt correctly excluded these documents under Rules 403, 609, 803, and 805." (*Defamation* Doc. # 1249 at 28 (citing *Defamation* Doc. # 1034 at 28)). Drummond points out that Defendants' Motion "does nothing to rectify this Court's concerns regarding authentication," and "[t]he mere fact of an indictment has minimal relevance or probative value." (*Id.* at 28-29 (citing *Pearson v. Deutsche Bank AG*, 2023 WL 2784966, at *2 (S.D. Fla. Apr. 5, 2023)). Drummond further argues that Defendants completely fail to address "the numerous hearsay issues presented by these documents." (*Id.*). Defendants' reply argues that these purported "findings of fact" should have been admitted and "[a]ny risk of undue prejudice could have been addressed by a limiting instruction." (*Defamation* Doc. # 1250 at 24).

Before trial, Defendants filed a Motion in Limine seeking to allow the presentation of evidence about the Colombian criminal prosecution of Drummond's executives. (*Defamation* Doc. # 878). Drummond filed a Motion in Limine seeking to exclude this evidence. (*Defamation* Doc. # 906). The court excluded the evidence for several reasons, including questions about how any of this evidence could be authenticated and the fact that the "evidence" consists of unproven allegations. (*Defamation* Doc. # 1034 at 3). The court noted that Defendants argued that this evidence "comes in under *Carrizosa*." (*Id.*). But, as the court noted, in *Carrizosa* the district court had excluded on hearsay grounds evidence of a Colombian indictment for purposes of summary judgment, and the Eleventh Circuit held that the district court erred because the evidence fell within the business records and the public records hearsay exceptions. (*Id.* (citing *Carrizosa,* 47 F.4th at 1297-1300)). The court explained, however, that the Eleventh Circuit in *Carrizosa* "said nothing

about whether the indictment was relevant or would be admissible at trial under Rule 403." (*Id.* (citing *Carrizosa* 47 F.4th at 1297-1300.). In excluding this evidence, the court concluded that the evidence "is due to be excluded under Rule 403 because it would be of little relevance, is highly prejudicial, and is a waste of time." (*Id.*). The court further noted that, "as there has been no conviction, [the evidence] is also inadmissible under Rule 609." (*Id.*).

Defendants' argument for a new trial is that if the jury had heard the allegations of the criminal indictment, "[t]he jury would never have accepted Drummond's outrageous assertion that Mr. Collingsworth completely fabricated Drummond's collaboration with the AUC." (*Defamation* Doc. # 1244 at 22).

Rather than rely on the untested allegations against Drummond compiled by the Colombian prosecutor, Defendants could have compiled the underlying evidence in an admissible form and presented that evidence at trial. Federal Rule of Evidence 609 allows for the impeachment of a witness with evidence of a criminal *conviction*, but there has been no conviction of Drummond or its executives in Colombia.

The court had a sound legal basis for excluding the Colombian prosecution documents, including Federal Rule of Evidence 403 (its probative value is substantially outweighed by a danger of unfair prejudice) and Rule 609 (there has been no conviction).   Moreover, an indictment is "only a charge that itself proves nothing." *McGhee v. Joutras*, No. 94 C 7052, 1996 WL 706919, at *5 (N.D. Ill. Dec. 5, 1996); *see also Baxter Health Care Corp. v. Spectramed Inc.*, No. SA CV 89-131 AHSRWRX, 1992 WL 340763, at *4 (C.D. Cal. Aug. 27, 1992) (explaining that the mere fact of an indictment has minimal relevance or probative value). Defendants' Motion has not established that the court's reasoning was legally erroneous. Thus, the exclusion of the Colombian prosecution documents does not warrant a new trial.

## 2.    Expert Testimony of Javier Peña, Joseph Paonessa, and Jan

**Jacobwitz**

Defendants argue that a new trial is warranted because the court excluded the testimony of three of their expert witnesses, Javier Peña, Joseph Paonessa, and Jan Jacobwitz. (*Defamation* Doc. # 1244 at 25-29. Drummond responds that Defendants "offer no meaningful legal analysis of the error(s) supposedly committed in excluding these witnesses." (*Defamation* Doc. # 1249 at 32). Drummond also notes that all these witnesses were "disclosed and designated—by C&S, not Collingsworth—as a rebuttal witness to Drummond's expert, Bernard Harwood, who Drummond did not call at trial to testify." (*Id.*). In their Reply, Defendants accuse Drummond of making "several specious arguments to justify the exclusion of these witnesses," but they fail to engage with the substance of the arguments.

None of these witnesses were listed on Collingsworth and IRAdvocates' Witness List. (*Defamation* Doc. # 1023). They were listed on Conrad & Scherer, LLP and William R. Scherer, Jr.'s Initial Trial Witness List as "witnesses who may be presented at trial." (*Defamation* Doc. # 1026 at 1-2). However, their expert reports indicate that their proposed opinions were offered in rebuttal to Drummond's expert, Bernard Harwood, who did not testify at trial.

### a.       Exclusion of Javier Peña

Peña worked for the United States Drug Enforcement Administration for thirty years. (*Defamation* Doc. # 390 at 284:19-285:2). His anticipated testimony related to "the propriety of offering security assistance to witnesses or their family in Colombia." (*Defamation* Doc. # 918-1 at 3).

Peña's 2024 Declaration states that he was retained by C&S to provide "*rebuttal* to the suggestion by Drummond expert Bernard Harwood that payments to witnesses, who expressed concerns about their own safety and that of their families, should be considered improper efforts to bribe the witness." (*Defamation* Doc. # 918-1 at 3) (emphasis added). Harwood was engaged to

18

provide rebuttal testimony to Defendants' anticipated witness, Professor Stephen H. Hobbs. (*Defamation* Doc. # 1035 at 5 (citing *Defamation* Doc. # 898-1 at 2)). The court excluded Harwood's testimony about the propriety of offering security to witnesses because there was no need to rebut the testimony of Professor Hobbs, who was not listed on Defendants' witness lists. (*Id*. at 5-6). Because neither Hobbs nor Harwood testified at trial, the court properly excluded Peña's testimony; there was nothing for Peña to rebut. *Banuchi v. City of Homestead*, 606 F. Supp. 3d 1262, 1284 (S.D. Fla. 2022) (holding opinion of expert was moot because opposing expert was excluded and there was nothing to rebut) (citing *Caldwell v. City of San Francisco*, No. 12-CV-01892-DMR, 2021 WL 1391464, at *8 (N.D. Cal. Apr. 13, 2021) ("Because [expert]'s testimony is largely excluded, the rebuttal and reply opinions addressing that testimony are also excluded.")). Moreover, "there is a distinct difference between a sanctioned government program supervised by the DEA and surreptitious private payments [by] counsel in a civil case." (*Defamation* Doc. # 1035 at 17).

Defendants' contention that the exclusion of Peña's testimony warrants a new trial misses the mark.

### b.    Exclusion of Joseph Paonessa

Paonessa previously served as Chief Operations Officer for the Federal Witness Security Program (WitSec), U.S. Department of Justice (DOJ), U.S. Marshals Service (USMS), in Washington, D.C. (*Defamation* Doc. # 917-1 at 3). Like Peña, Paonessa was retained by Defendants to respond Harwood's proposed testimony suggesting that witnesses and their families who received financial assistance for the stated purpose of protecting them from harm in Colombia were bribed. (*Id*.). Because Harwood did not testify at trial, the court properly excluded Paonessa's testimony as there was nothing for him to rebut. *Banuchi*, 606 F. Supp. 3d at 1284; *Caldwell*, 2021 WL 1391464, at *8. And, as with Peña, what happens in this country's federal witness protection

19

program is irrelevant. Of course, even in the United States's program, where witnesses had received subsistence payments, the fact of those payments must be disclosed to the court. (*Defamation* Doc. # 390 at 377-78).

The argument that the exclusion of Paonessa's testimony warrants a new trial is without merit.

### c.    Exclusion of Jan Jacobowitz

Jacobowitz, too, was engaged as an expert to prepare a rebuttal report to address Harwood's March 7, 2024, Supplemental Report. (*Defamation* Doc. # 919-1 at 3). Further, her opinions included the opinion that "*Disclosed*, Reasonable Payments to Fact Witnesses are Permissible." (*Id*. at 7) (emphasis added). Because Harwood did not testify at trial, the court properly excluded Jacobowitz's testimony. There was nothing for her to rebut. *Banuchi*, 606 F. Supp. 3d at 1284; *Caldwell*, 2021 WL 1391464, at *8. Further, the opinion does not bear on the facts here inasmuch as Defendants' payments to witnesses were neither voluntarily disclosed (*Defamation* Doc. # 417 (outlining the substantial efforts taken to conceal the payments)), nor reasonable (*Defamation* Doc. # 1217 at 1414-25 (comparing the relative value of a dollar in the United States to the value of that dollar in Colombia)).

The argument that the exclusion of Jacobowitz's testimony warrants a new trial is baseless.

### 3.    Admission of Drummond's Expert Witness Mauricio Santamaria

Mauricio Santamaria was listed as a primary witness on Drummond's Trial Witness List. (*Defamation* Doc. # 1025 at 5). He was disclosed at a witness in March 2024. (*Defamation* Doc. # 965 at 2). Santamaria was designated as a witness to testify about what the payments to Colombian witnesses, expressed in U.S. dollars, would actually mean to a person living in Colombia at the time the payments were made. (*Id*).

Defendants argue that Santamaria's testimony was misleading because even if there were

20

only one payment, he "extrapolated this payment into an annual income amount." (*Defamation* Doc. # 1244 at 29). Drummond responds that Santamaria's testimony "contextualized" the payments made by Defendants "for the jury". (*Defamation* Doc. # 1249 at 35). Drummond also notes that, any weaknesses in the factual underpinnings of Santamaria's opinion go to weight, not admissibility, and could have been more than fairly and adequately explored on cross-examination. (*Defamation* Doc. # 1249 at 36 (citing *Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1285 (11th Cir. 2015)). In reply, Defendants again do not engage with the substance of Drummond's argument, but simply make the following conclusory statement:

> Defendants demonstrated it was error to allow Drummond's proffered expert, Mauricio Santamaria, to provide his extremely misleading and confusing testimony to the jury. Doc. No. 756 at 25. Drummond provides nothing to excuse the serious prejudice that was caused by this misleading testimony. See DR Opp at 23-25.

(*Defamation* Doc. # 1250 at 17).

The relevance of Santamaria's testimony was illustrated by the court's question about the relative value of the payments at the 2014 crime-fraud hearing. There, the court noted that it was "interested to know: At $1,000 a month for subsistence, how that compares to simply covering living expenses and whether there may be something else in there that would be beneficial to a witness who is being supplied security payments." (*Defamation* Doc. # 389 at 55-56). As this court noted in allowing Santamaria's testimony, contextualizing the payments is "highly relevant" and, further:

> [T]o the extent Defendants quibble with some aspects of Santamaria's testimony, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois, UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).

(*Defamation* Doc. # 1035 at 4).

Defendants had a full and fair opportunity to explore any weaknesses in Santamaria's

21

testimony on cross-examination. Their objections go to weight, not admissibility. And, they have not raised any valid *Daubert* objections to his admissibility. Accordingly, admission of his testimony does not warrant a new trial.

### 4.    Precluding Defendants From Characterizing Drummond's Claims as SLAPP Suits and Collingsworth as a Human Rights Lawyer

On August 22, 2025, Drummond filed its Motion in Limine No. 11 – Regarding Defendants Referring to Themselves as "Human Rights" Lawyers or Using Other Improper Characterizations. (*Defamation* Doc. # 913). The Motion sought to exclude Defendants from characterizing themselves as "human rights" lawyers or "human rights defenders" or characterizing the defamation case as a SLAPP lawsuit or "lawfare." (*Id.*). On October 14, 2025, the court granted that Motion in part. (*Defamation* Doc. # 1034 at 21). The court explained that "[s]uch characterizations are irrelevant, prejudicial, and encourage the jury to make a decision based on emotion or speculation rather than evidence." (*Id.*). But, the court made clear that Collingsworth could certainly explain the work he does and the scope of his practice, including his human rights work. He did just that, extensively showing the jury photos of his work with underprivileged children.

On November 30, 2025, the eve of trial, Defendants asked the court to revisit its decision on this issue. They argued that "such evidence is relevant to the claims and defenses and not unduly prejudicial." (*Defamation* Doc. # 1138 at 2-3). On December 2, 2025, the court denied the Motion to Reconsider. (*Defamation* Doc. # 1148). The court explained that "a characterization is not evidence," and the characterizations Defendants sought to employ were "blatantly designed to provoke an emotional response from the jury and engender sympathy for Defendants." (*Id.* at 2).

The court reiterated that Drummond's Defamation case could not be considered a SLAPP (Strategic Lawsuit Against Public Participation) lawsuit for two reasons: (1) "Alabama does not have an anti-SLAPP statute," and (2) "anti-SLAPP statutes prohibit *meritless* defamation claims." (*Id*.). The fact that Drummond's Defamation claim survived Defendants' Motion for Summary Judgment necessarily meant that the claim was neither meritless nor a SLAPP lawsuit. (*Id*.).

Defendants' Motion for New Trial mischaracterizes the court's ruling on these issues. They argue that the court's ruling was based "solely on FRE 403" and that "[t]hese cases are prototypical examples of SLAPP suits." (*Defamation* Doc. # 1244 at 30). Drummond's response is based on the actual reasoning set forth by the court for its decision: (1) Alabama does not have an anti-SLAPP statute, and (2) Drummond's claim cannot be meritless because it survived summary judgment. (*Defamation* Doc. # 1249 at 37). In reply, Defendants appear to argue that the court should have ignored the law in Alabama, should have allowed these characterizations, and they would have won a trial if the court had sone so. (*Defamation* Doc. # 1250 at 18).

Defendants have not shown that the court committed any legal error in its ruling requiring Defendants to try the case based on evidence rather than characterizations designed to entice a jury to reach a verdict based on sympathy. The court's application of the law and the exclusion of these inflammatory characterizations is no basis for a new trial.

### 5. Exclusion of Colonel Villate, Operation Dragon, and Jim Adkins' conduct while employed by the CIA

Drummond moved in limine to exclude evidence related to, among other things, the Operation Dragon investigation into Julian Villate Leal and the investigation of Jim Adkins' actions in the Iran-Contra scandal while he was employed by the CIA. (*Defamation* Doc. # 937). The court excluded this evidence based on Federal Rule of Evidence 404(b) which provides that evidence of other crimes, wrongs, or acts is "not admissible to prove a person's character in order

to show that on a particular occasion the person acted in accordance with the character." (*Defamation* Doc. # 1034 at 18). Defendants argued that they did not intend to offer this evidence for this reason, but instead to show Collingsworth's state of mind and "why he believed Drummond 'must have done bad things.'" (*Id*. at 18-19) (citing *Defamation* Doc. # 937 at 4). The court held that "the prejudice of a jury drawing the 'acted in accordance with' inference (even if instructed not to) substantially outweighs the marginal relevance of the evidence, particularly in light of the remoteness of the information."   (*Id*. at 19). For example, the "Final Report" regarding Adkins's involvement in the Iran Contra issues (which, again, occurred years earlier during his employment with the CIA) was dated August 4, 1993 and addressed events taking place in 1986, nine years before Adkins was hired by Drummond, and ten years before Defendants say the AUC was even formed. (*Defamation* Doc. # 1034 at 19 (citing Plaintiffs' Second Amended Complaint ¶ 139, *Jane Doe et al v. Drummond Co., Inc et al*, No. 2:09-cv-01041-RDP (N.D. Ala. June 14, 2010), Doc. # 55)).

Defendants' Motion for New Trial does not even address the evidentiary basis for the court's ruling. (*Defamation* Doc. # 1244 at 30-31 (not mentioning either Rule 404(b) of the Federal Rules of Evidence)). Drummond responds to Defendants' arguments as follows:

> Despite previously asserting that they "will not argue that 'Drummond hired bad people and they therefore must have done bad things,'" Defamation Doc. 937 at 3-4 of 7, Defendants now claim that "this was strong evidence that Drummond built a team of people to work with the AUC to cleanse its workplace and area of operation of anyone thought to be leftist" and "[t]he Court's exclusion of this evidence . . . prevented the jury from learning of Drummond's calculated staffing of security personnel who would collaborate with the AUC in targeting union leaders for execution." RICO Doc. 756 at 31 of 55. In other words, Defendants' Rule 59 argument is one they previously disclaimed because it is meritless.

(*Defamation* Doc. # 1249 at 38).

The purpose for which Defendants claim this evidence should have been admitted at trial is the one that Federal Rule of Evidence 404(b) precludes – *i.e.*, using prior bad acts to prove a

24

person's character in order to show that on a particular occasion the person acted in accordance with the character.

Defendants have (1) not provided legal support for the argument that the court committed any legal error in excluding this evidence, and (2) failed to address the rule of evidence providing for the exclusion of this evidence. Accordingly, this issue provides no basis for a new trial.

### 6.    IRAdvocates's Result in the *Chiquita* Trial

Defendants argue that they should have been allowed to present the verdict from a bellwether trial in the *Chiquita* litigation "to demonstrate that IRAdvocates does not exist to file fraudulent cases to extort settlements." (*Defamation* Doc. # 1244 at 32). In support of this argument, Defendants cite no cases (or even the Federal Rules of Evidence). (*Id*.). Drummond points out that "Collingsworth testified at length regarding IRAdvocates' formation, history, purpose, its other litigation, and the 'good deeds' performed by IRAdvocates." (*Defamation* Doc. # 1249 at 40 (citing *Defamation* Docs. # 1223 at 2237-2238, 1219 at 1767-1773)). In reply, Defendants again cite no legal support for the proposition that exclusion of this evidence was legal error. They simply argue that the *Chiquita* evidence "was essential evidence to establish that IRAdvocates is a legitimate and successful non-profit legal advocacy organization." (*Id*. at 19).

Drummond moved in limine to exclude evidence regarding either *the verdict or judgment* in the *Chiquita* case or the plea agreement/factual proffer entered into by Chiquita with the DOJ. C&S responded that the evidence was relevant to "numerous issues," including Drummond's RICO claims. (*Defamation* Doc. # 1034 at 17).

> The court excluded this evidence because:
>
> Drummond and Chiquita are entirely separate companies. Nothing about Chiquita's operations is indicative of anything about Drummond or its operations. The verdict against Chiquita and its plea agreement would not make any fact issue related to this case more or less probable than it would be without the evidence. Even if the evidence about Chiquita had some minimal relevance, and it does not, admission

25

of the information regarding Chiquita would be highly prejudicial and encourage the jury to speculate that if Chiquita did it, Drummond must have also. Allowing this evidence would also be a waste of time. Defendants have secured no verdicts against Drummond.

(*Id.*).

Defendants have provided no legal or evidentiary basis showing that the exclusion of this evidence was legal error. Collingsworth presented evidence at trial regarding IRAdvocates's formation and purpose. The real purpose for the admission of the *Chiquita* evidence is to have the jury infer that Drummond, one "powerful multinational," acted in accordance with another powerful multinational, Chiquita's, prior bad acts. (*See Defamation* Doc. # 1244 at 30). This is not an admissible purpose and provides no basis for a new trial.

### 7.    JFP Proceedings

Defendants next seek a new trial based on the court's exclusion of a document issued by the Colombian Special Jurisdiction for Peace ("JFP") containing findings related to Jaime Blanco's testimony about Drummond's alleged payments to the AUC. (*RICO* Doc. # 756 at 33). They argue the document should have been admitted under Rule 803(8)(A)(iii) as factual findings from a legally authorized investigation, and alternatively as relevant to Blanco's credibility considering Drummond's attacks on him at trial. The court remains unpersuaded.

Before trial, the court denied Drummond's motion to exclude JFP evidence without prejudice, reserving ruling until the evidence was actually proffered at trial. (*Defamation* Doc. # 1034 at 16-17). When Defendants sought to introduce the JFP document at trial, the court excluded it on several grounds: lack of authentication, hearsay, and double hearsay, the absence of a certified translation, and the concern that admitting the JFP's assessment of Blanco's credibility would improperly invade the province of the jury. (*RICO* Doc. # 742 at 3289:7-20).

Each of those grounds was sound. Defendants' primary argument – that the JFP document qualifies as a public record under Rule 803(8)(A)(iii) – fails on controlling Eleventh Circuit authority holding that rule inapplicable to judicial findings. *See United States v. Jones*, 29 F.3d 1549, 1554 (11th Cir. 1994); *United States v. $125,938.62 Proceeds of Certificates of Deposit*, 537 F.3d 1287, 1292 (11th Cir. 2008). But, even beyond the hearsay problem with the document itself, the statements made by Blanco and other third parties within the JFP document constitute hearsay within hearsay, and Defendants offered no theory under which that inner layer of hearsay would be independently admissible. *See* Fed. R. Evid. 805 (providing that "[h]earsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule").

The court was also correct to exclude the JFP document under Rule 403. The JFP proceeding did not involve Drummond as a party, and Drummond was prohibited from participating in it. A document reflecting another tribunal's credibility assessment of a witness reached through a non-adversarial process in which the opposing party had no voice carries minimal probative value. *Cf. Bischoff v. Osceola Cty.*, 222 F.3d 874, 876-81 (11th Cir. 2000) ("[T]he Supreme Court has recognized the importance of direct witness observation for making determinations of credibility. According to the Court, '[p]articularly where credibility and veracity are at issue . . . written submissions are a wholly unsatisfactory basis for decision.'") Any limited probative value was also substantially outweighed by the risk of unfair prejudice and the likelihood of jury confusion about the nature and purpose of the JFP. Defendants' suggestion that a limiting instruction could have cured those risks is unpersuasive; a limiting instruction cannot rehabilitate evidence that is not admissible in the first place. *See United States v. Lawson*, 459 F. Supp. 2d 1200, 1206 (M.D. Ala. 2006) ("A limiting instruction cannot make non-probative evidence probative.").

This jury was also in the best position to assess the issue because it heard Collingsworth's evidence about the matters and also heard evidence about Collingsworth's payments to the JFP witnesses. Again, many (if not all) of these witnesses either (1) swore that Drummond was not involved in the killings or (2) did not initially implicate Drummond in their JFP testimony. It was only after meeting with Collingsworth and being paid by him that they "recanted" and testified about Drummond. The court was correct to exclude the JFP document, and Defendants' motion for a new trial on this basis is due to be denied.

### 8.    North Birmingham Litigation & David Roberson

Defendants next argue the court erred by excluding evidence of the North Birmingham environmental litigation and the conviction of former Drummond Vice President David Roberson.[6] They contend that this evidence was necessary to show the jury that Drummond's reputation had been damaged by causes independent of Collingsworth's defamatory letters. (*RICO* Doc. # 756 at 34).

The argument fails at the threshold because Defendants never raised it below. At trial, the only basis defense counsel offered for admitting the conviction was that it bore on "the credibility of Drummond officers," (*RICO* Doc. # 722 at 650:3-652:11), and that the conviction was another potential source of reputational injury for Drummond (*RICO* Doc. # 725 at 1200:13-1202:10). The court rejected that argument and expressly invited Defendants to proffer any other basis for admission. (*See id.*). Defendants did not proffer the evidence for admission at trial.[7] A party who

---

[6] "The North Birmingham Litigation refers to cases brought in 2017 against two lawyers from the firm of Balch & Bingham and a former Drummond Company, Inc. Vice President, David Roberson. That case alleged that payments made to a state legislator's non-profit organization were illegal. The other case is a civil case filed in 2019 by Roberson against Balch & Bingham and Drummond alleging that he was wrongfully convicted." (*RICO* Doc. # 552 at 19-20).

[7] This is the relevant portion of the trial transcript where the court invites Defendants to proffer the conviction:

THE COURT: Thereabout. I think it's apples and oranges in this case. So proffer is there. I mean,

fails to take up an invitation to proffer cannot advance a new theory for the first time in a motion for new trial, and the argument is forfeited on that ground alone. *See Est. of Pidcock v. Sunnyland Am., Inc.*, 726 F. Supp. 1322, 1334 (S.D. Ga. 1989) ("As a general rule, a motion [for] new trial should not be 'employed to introduce evidence that was available at trial but was not proffered, to relitigate old issues, to advance new theories, or to secure a rehearing on the merits.'")

Even setting aside waiver, the argument fails on the merits. Collingsworth's defamatory letters were published about seven years before the North Birmingham litigation and David Roberson conviction arose. Under Alabama law, a plaintiff's reputation is measured at the time of publication, and events occurring years later cannot retroactively reduce the damages attributable to the earlier wrong. *See Webb v. Gray*, 62 So. 194, 198 (Ala. 1913) ("[T]he evidence must relate to the character or reputation of the plaintiff as fixed *before* the publication of the words complained of.") (emphasis added). The conviction of a single Drummond employee for bribery in connection with an environmental cleanup matter in Jefferson County years after the fact had no bearing on what Drummond's reputation was at the time Collingsworth's statements were made. As the court observed at trial, the two matters were "apples and oranges." (*RICO* Doc. # 725 at 1202:2).

The evidence was also properly excluded under Rule 403. Even if the North Birmingham litigation and David Roberson conviction had some limited probative value (it had none), it was substantially outweighed by the risk of prejudice and jury confusion. Admitting it would have

---

you've asked -- you've proffered it before, right?
MR. BRYAN: I didn't put the document in the record.
THE COURT: You can do that.
MR. BRYAN: All right. We'll do that after break or after the conclusion of the testimony.
THE COURT: Okay.
MR. BRYAN: Thank you.

(*RICO* Doc. # 725 at 1202:2-10). After this exchange, Defendants did not proffer the document.

required the parties to try a separate trial within this one about the full circumstances of the North Birmingham investigation, the scope of Roberson's authority, and the effect (if any) of those events on Drummond's standing in the local community. But, the defamation campaign targeted Drummond's business dealings in Europe years before the North Birmingham matter. So, while it had effects here in Alabama, it targeted Drummond's European buyers and occurred well before. That kind of collateral detour is precisely what Rule 403 is designed to prevent. *See Anderson v. WBMG-42*, 253 F.3d 561, 567 (11th Cir. 2001) (excluding evidence that "would have in effect generated a mini-trial on collateral issues" based on Rule 403).

Finally, as the court noted in its motion in limine ruling, any use of the North Birmingham litigation to suggest that Drummond acted in conformity with other alleged misconduct would violate Rule 404(b) (*RICO* Doc. # 552 at 19-20), and Defendants identified no recognized exception to that prohibition that would apply to the North Birmingham litigation or David Roberson conviction. The court was correct to exclude this evidence, and Defendants' motion for a new trial on this basis is due to be denied.

### 9.    Testimony of Jairo de Jesús Charris Castro

Defendants argue the court erred by excluding the testimony of Jairo de Jesús Charris Castro, characterizing the exclusion as the product of bias and "Drummond's manipulation of the [c]ourt." (*RICO* Doc. # 756 at 36). The record does not support this argument. The court excluded Charris's testimony for two main reasons: (1) his repeated refusal to cooperate in discovery, and (2) the lack of any procedure that would allow Drummond to meaningfully cross-examine him.

On the first point, Charris failed to testify during fact discovery on at least three separate occasions. (*RICO* Doc. # 312 at 2-3). His letters rogatory testimony in Colombia was scheduled and then cancelled. (*Id.* at 2). At a rescheduled hearing, he appeared but refused to answer questions. (*Id.* at 3). At a third hearing, he again refused to testify. (*Id.*). When Defendants made a

30

fourth attempt to depose Charris, discovery had already closed and the court granted a protective order. (*RICO* Docs. # 584; 652 at 2). Defendants never moved to reconsider that ruling in the year and a half that followed, yet listed Charris on their witness list as a live trial witness. (*Defamation* Doc. # 1023).

On the second point, serious questions surrounded Charris's credibility that Drummond had never had the opportunity to explore. After Charris testified in the *Balcero* case, it came to light that Defendants had made around seventy-five payments of $ 840 to $ 860 per month directly to Charris's wife between September 2009 and December 2015. (*RICO* Doc. # 363 at 5-6). Collingsworth also wrote in an email that he was "supporting Charris's family so if he is not cooperating we will pull the plug." (*Id*.). And, he infamously told his firm that the payments had to continue until the "deps [are] in the can." (PX 2098). Drummond had never had the opportunity to depose Charris about these payments or their potential effect on his testimony.

In its prior orders, the court attempted to find conditions under which Charris's testimony could fairly be admitted. (*Defamation* Doc. # 1073). Those efforts were ultimately unsuccessful. Defendants had initially represented that Charris would appear live at trial, but because he is a convicted felon in Colombia, there was little to no chance he would be allowed to enter the United States. Defendants instead proposed a remote deposition in Colombia on the eve of trial. The court concluded that, because it had "no confidence that Defendants' current plan would allow Plaintiff to get anywhere near the bottom of the critical questions about Charris's changed testimony after receiving payment," Charris should be excluded as a witness. (*RICO* Doc. # 652 at 4).[8]

---

[8] The court also noted that once it indicated it would allow Charris's testimony under certain conditions, Defendants scheduled his remote deposition within forty-eight hours. This raised questions about the extent of Defendants' control over Charris and why he had refused to testify on so many prior occasions. (*RICO* Doc. # 652 at 5). And, these questions of control and unholy dealings are heightened by the fact that on one occasion, when Charris did not present testimony, Collingsworth did not attend the proceedings. This raises serious questions about Collingsworth's prior knowledge of Charris's refusal and his control over that witness.

Exclusion of a witness's testimony due to a failure to cooperate in discovery is well within a court's discretion. *See Harewood v. Braithwaite*, No. 09-CV-2874 PKC RML, 2013 WL 5366391, at \*3-4 (E.D.N.Y. Sept. 23, 2013); *Brown v. Dirga*, No. 3:15CV01086(JCH), 2016 WL 6080618, at \*6 (D. Conn. Oct. 11, 2016); *Northbrook Excess & Surplus Ins. Co. v. Pine Top Ins. Co.*, No. 83 C 3150, 1988 WL 142218, at \*1 (N.D. Ill. Dec. 28, 1988) ("A court surely can bar the testimony of a witness who refuses to submit to a deposition."). In contrast, Defendants offered no legal authority in support of their position and did not explain how Charris's testimony could have been admitted in a manner that would have permitted meaningful cross-examination. The court was correct to exclude Charris, and Defendants' motion for a new trial on this basis is due to be denied.

### 10.    Testimony of Magistrate Judge Herman Johnson

Defendants next argue that the court abused its discretion by excluding Judge Johnson, who years before taking the bench as a U.S. Magistrate Judge was Collingsworth's co-counsel in the *Romero* trial. Collingsworth contends that even though that trial resulted in a verdict for Drummond, Judge Johnson would have testified to facts supporting the allegation that Drummond paid the AUC to murder its union leaders and corroborated Collingsworth's good-faith belief in the truth of his statements. The court disagrees.

Defendants' Rule 59 motion does not meaningfully engage any of those grounds, cites no legal authority, and gives no explanation as to what admissible testimony Judge Johnson could have offered. That failure is itself a sufficient reason to deny the motion. Moreover, the court excluded Judge Johnson on three independent grounds, each of which remains sound: (1) Defendants failed to disclose him in their Rule 26 disclosures; (2) Defendants did not establish that his testimony would be admissible, relevant, or important; and (3) Drummond would have been prejudiced by his appearance as a surprise witness at trial. (*RICO* Doc. # 584 at 6-9.)

First, Defendants failed to disclose Judge Johnson in their Rule 26 disclosures. Rule 26 requires a party to disclose individuals it "may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(i). Defendants argue that disclosure was unnecessary because Judge Johnson was "equally known" to both sides as lead trial counsel in *Romero*. That argument confuses familiarity with a person's identity with notice that the person will be called as a witness. Drummond had no reason to expect that Collingsworth would seek to call his former co-counsel as a fact witness. Simply knowing who someone is does not oblige a party to prepare for their testimony. As the court explained in its pretrial ruling, "[t]here was no reason for Drummond to expect that lawyers trying cases with Collingsworth might have factual information that he or IRAdvocates may use to support their defenses." (*RICO* Doc. # 584 at 6). Judge Johnson was not disclosed and was properly excluded.[9]

Second, Defendants did not establish that Judge Johnson's testimony would have been admissible. Defendants offered two theories as to relevance: (1) Judge Johnson could testify to facts supporting the allegation that Drummond paid the AUC to murder its union leaders, and (2) he could speak to Collingsworth's subjective good-faith belief in that allegation. Neither is persuasive.

As to the first theory, Judge Johnson has no first-hand knowledge of events in Colombia. He was merely co-counsel at a trial. Any information he may have had necessarily was derived from other people during that prior litigation, making it hearsay and not based on personal knowledge. Further, presumably, swaths of the knowledge would be subject to some privilege as well. (*RICO* Doc. # 584 at 7-8.) As to the second theory, a third party is not competent to testify about another person's state of mind. *United States v. Benner*, 442 F. App'x 417, 422 (11th Cir.

---

[9] Notably, Natacha Thys, another of Collingsworth's *Romero* co-counsel, was properly disclosed and was permitted to testify. The difference in outcome reflects the difference in compliance.

2011). Moreover, the defamation standard is a subjective one: the key question here was whether Collingsworth himself actually doubted the truth of his statements. The beliefs of a third party are simply not relevant to that inquiry. *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702-03 (11th Cir. 2016).

Third, admitting Judge Johnson's testimony would have unfairly prejudiced Drummond. Because he was never disclosed, Drummond had no opportunity to depose him or to conduct discovery into the substance of his expected testimony. Defendants suggested that a last-minute deposition could have remedied this, but that proposal both underestimates and understates the problem. Drummond was deprived of years of discovery it would have conducted had it known this witness might testify. Allowing him to take the stand for the first time at trial would have left Drummond unable to meaningfully confront his testimony, whatever that testimony may have been. Accordingly, Defendants' motion for a new trial on this basis is due to be denied.

### C.      Drummond's Closing Argument

Defendants argue that remarks made by Drummond's counsel during closing argument were so inflammatory and prejudicial as to require a new trial. This argument fails for several independent reasons.

First, Defendants did not object to Drummond's closing argument or request a curative instruction. The Eleventh Circuit's general rule is that "a timely objection is necessary to bring to the district court's attention errors in counsel's arguments." *Oxford Furniture Cos. v. Drexel Heritage Furnishings, Inc.*, 984 F.2d 1118, 1128 (11th Cir. 1993). Requiring a timely objection prevents counsel from "sandbagging" the court by remaining silent and then, if the result is unsatisfactory, claiming error. *Id*. Defendants could have objected to Drummond's closing argument outside the presence of the jury during (1) the lunch break during Drummond's argument or (2) the extended break caused by a juror medical emergency, but they did not. That silence

weighs heavily against their argument for two reasons. First, if there had been a meritorious objection, the court could have cured it with an instruction. Second, the absence of an objection and raising the issue now suggests more gamesmanship.

Putting aside the lack of a timely objection, on the merits, the remarks at issue do not meet the standard for a new trial. Improper statements by counsel will not justify a new trial "unless the remarks were such as to impair gravely the calm and dispassionate consideration of the case by the jury." *Ruiz v. Wing*, 991 F.3d 1130, 1141 (11th Cir. 2021) (quoting *Vineyard v. County of Murray*, 990 F.2d 1207, 1213 (11th Cir. 1993)).

Defendants have identified two comments out of a closing argument spanning some two hours and approximately 80 pages of trial transcript: (1) counsel's suggestion that a verdict for Drummond would spare future generations of the Drummond family from association with the accusations at issue; and (2) counsel's observation during the RICO continuity argument that "something else is going on." Neither, viewed in the context of the argument as a whole, rises to the level of impairing the jury's calm and dispassionate consideration of the case. *See Ruiz*, 991 F.3d at 1141.

As to the first comment, the jury heard testimony from Nathaniel Drummond that he has two young children, (*RICO* Doc. # 720 at 583:6-8), and that the accusations against Drummond have been deeply personal and affect "anybody with [his] last name here in Birmingham." (*RICO* Doc. # 722 at 694:13-695:5). Counsel's closing argument that the jury's verdict could spare future generations of the Drummond family from bearing the weight of these accusations was a fair inference from that testimony, not a statement of facts not in evidence.

As to the second comment, the jury heard testimony about (1) a $1.5 million NICOX BV loan, the proceeds of which never made it into what Collingsworth claimed was his "sole" bank account, (*RICO* Doc. # 743 at 3546:2-23; *see* PX 1460; PX 1461; PX 1462; PX 843; PX 1206; PX

1213; PX 1215), and (2) money paid to witness Jaime Blanco came from an account belonging to a litigation funding company. (*RICO* Doc. # 743 at 3546:24-3548:8). Viewed in that context, the comment does not rise to the level of impairing the jury's calm and dispassionate consideration of the case. *See Ruiz*, 991 F.3d at 1141.

Finally, Defendants' reliance on *Moeinpour v. Bd. of Trs. of the Univ. of Ala.*, 762 F. Supp. 3d 1129 (N.D. Ala. 2025), is misplaced. The new trial in that case was driven by plaintiff's and counsel's repeated and intentional violations of this court's motion in limine orders. Defendants have identified no such violation by Drummond's counsel here. Accordingly, this ground for a new trial is due to be denied.

### D.    Jury Instructions

Defendants identify three alleged errors in the jury instructions: (1) telling the jury of the default judgment against Otero and Van Bilderbeek, (2) failing to provide element-by-element instructions for RICO violations, and (3) failing to require specific criminal intent for all RICO predicate acts. The court has addressed and rejected the first argument. *See supra* Part II.A.2. The two remaining arguments are addressed, in turn, below. They also lack merit.

First, and taking these arguments slightly out of order, the court did provide element-by-element instructions for Drummond's substantive RICO claim, the RICO conspiracy claim, and each predicate act. (*RICO* Doc. # 704 at 25-42). The instructions covered each element of the substantive RICO claim under 18 U.S.C. § 1962(c), the RICO conspiracy claim under 18 U.S.C. § 1962(d), and each alleged (and ultimately proven) predicate act, including witness bribery, witness tampering, obstruction of justice, money laundering, wire fraud, and extortion. (*Id.*). The court also confirmed on the record that it would "instruct [the jury] on the elements," "tell them that each of the elements have to be established," and "they have to be unanimous about which predicate acts were proved." (*RICO* Doc. # 743 at 3429:6-9). The court's instructions followed the

36

Eleventh Circuit Pattern Jury Instructions for both RICO claims, and Defendants do not explain how these instructions were deficient. (*See RICO* Doc. # 642 at 23-37).

Second, the court did instruct the jury on intent. When Defendants raised this issue at trial, the court clarified that it had not declined to include an intent instruction, but rather that intent was "already in there" and that it had added intent language "into a couple other places" to make clear that "the acts have to be intentional and there has to be intentional conduct." (*RICO* Doc. # 743 at 3416:8-11). The plain language of the jury instructions bears this out. The jury was required to find that Collingsworth and/or IRAdvocates "*intentionally* participated through a pattern of racketeering activity," that "[r]acketeering activity includes *intentional* acts that violate certain federal laws," and intent was incorporated into the instructions for witness bribery, witness tampering, money laundering, and wire fraud. (*RICO* Doc. # 704 at 25, 28, 30-34) (emphasis added).

Finally, the argument about instructions concerning Otero and Van Bilderbeek loses sight of a basic concept: they are defendants in the RICO case. They defaulted, but that fact does not change their status as parties. The court has already explained why the damage claims against them necessarily had to be tried to the jury alongside the damage claims against Collingsworth and IRAdvocates – *i.e.*, they were all members of the same RICO enterprise and RICO conspiracy. The court also took care to explain why the default by Otero and Van Bilderbeek could not play any role in determining whether Collingsworth and IRAdvocates violated RICO. It was absolutely necessary for the court to explain to the jury effect of default in Otero and Van Bilderbeek. The jury had to understand that it was not assessing their liability, only whether the enterprise caused damages and the extent of those damages. The court correctly instructed on each of those matters.

Because the court properly instructed the jury on both the elements of the RICO claims and the requisite intent for each predicate act, and properly instructed on the defaulted defendants,

Defendants' motion for a new trial on the basis of jury instruction error is due to be denied.

###### E.    Remittitur

Defendants argue that the jury's damage awards must be reduced on three grounds: (1) the RICO damages award of $68 million exceeds the evidentiary support in the record; (2) the presumed defamation damages award is unsupported by the evidence; and (3) awarding both treble RICO damages and punitive defamation damages constitutes an unlawful double recovery. None of these arguments is persuasive.

###### 1.    The RICO damages award is supported by the evidence.

Remittitur is appropriate only where "the jury's damage award exceeds the amount established by the evidence." *Rodriguez*, 518 F.3d at 1266 (cleaned up). After careful review, the court concludes the jury's award of $68 million in RICO damages is appropriate under that standard.

Under 18 U.S.C. § 1964(c), a private RICO plaintiff may recover for injuries that "flow from [the defendant's] predicate acts." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985) ("[T]he compensable injury necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise.")

Defendants argue the award must be capped at $26,654,611.80 – the figure Drummond sought at trial – because the jury's award is excessive in light of the evidence. But, that argument ignores evidence that Defendants themselves introduced at trial. During cross-examination of Nathaniel Drummond, Defendants admitted into evidence Drummond's financial statements for its Colombian coal operations from 2009 to 2015. (*RICO* Doc. # 722 at 670:16-676:24; *RICO* Doc. # 710-15). Those records showed, and Nathaniel Drummond confirmed, that Drummond's coal sales revenue fell by approximately $1 billion between 2012 and 2015. (*RICO* Doc. # 722 at

38

692:18-694:2). Nathaniel Drummond also testified that during this period, customers stopped buying Drummond's coal because of the allegations the Enterprise published, forcing Drummond to sell to replacement customers at lower prices. (*RICO* Doc. # 722 at 688:6-16).

"[T]he jury enjoys substantial discretion in awarding damages within the range shown by the evidence, and while the jury may not pull figures out of a hat, its verdict does not fail for a lack of exhaustive or dispositive evidence so long as a rational basis exists for the calculation." *United States v. Sullivan*, 1 F.3d 1191, 1196 (11th Cir. 1993) (citing *Nieman-Marcus Group, Inc. v. Dworkin*, 919 F.2d 368, 372 (5th Cir. 1990)). Defendants point to other evidence the jury could have considered in assessing damages, including testimony regarding broader declines in European coal usage and cyclical reductions in coal sales. (*See RICO* Doc. # 756 at 47-48). But, those arguments do not establish that the verdict exceeded the evidence; they simply confirm the jury had a factual dispute to resolve. That is the jury's function – it is not the court's. *Walls v. Button Gwinnett Bancorp, Inc.*, 1 F.3d 1198, 1200 (11th Cir. 1993); *Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1559 (11th Cir. 1988).

Nor does the jury's decision to award a figure different from either party's request provide grounds for remittitur. The jury was entitled to consider the evidence, reject both sides' proposed figures, and settle on an amount it found reasonable. *Sullivan*, 1 F.3d at 1196; *Luria Bros. & Co. v. Pielet Bros. Scrap Iron & Metal*, Inc., 600 F.2d 103, 115 (7th Cir. 1979) ("The jury is entitled to disregard the damages asked for if they do not agree with the computations or if other evidence is introduced from which jurors could draw their own conclusions."). Because the award is supported by the evidence, the court will not speculate about the jury's precise calculation. *See Hughes v. Priderock Cap. Partners, LLC*, 812 F. App'x 828, 836-37 (11th Cir. 2020) (citing

*Murphy v. Georgia- Pac. Corp.*, 628 F.2d 862, 870 n.18 (5th Cir. 1980);[10] *Krause v. Dresser Indus., Inc.*, 910 F.2d 674, 679 (10th Cir. 1990); *Chuy v. Phila. Eagles Football Club*, 595 F.2d 1265, 1279 n.19 (3d Cir. 1979) (en banc) ("[I]t is well accepted that a court will not inquire into the calculation methods employed by the jury during its deliberations.").

And, although the court need not inquire into the jury's calculation, the award is readily explainable by reference to evidence in the record. Drummond's financial statements show that Drummond's profit margin on coal sales declined by 6.8% between 2010 and 2011. Specifically, Drummond's profit margin fell from 19.2% in 2010 ($405,549,000 net income on $2,107,199,000 in revenue) to 12.4% in 2011 ($278,719,000 net income on $2,245,688,000 in revenue). Applying that 6.8% loss figure to the approximately $1 billion decline in coal sales revenue yields $68,000,000, the amount the jury awarded in RICO damages. (*RICO* Doc. # 710-15; *RICO* Doc. # 722 at 692:18-694:2). This is one explanation for the jury's RICO verdict. But, most importantly, it is an explanation that shows the damage award finds support in the record. Beyond that, it is not for this court to inquire.

Defendants' argument that the award is unsupported by the record evidence falls short.

### 2. The defamation damages award is supported by the evidence.

Because the court exercises diversity jurisdiction over Drummond's defamation claim, it applies Alabama law in reviewing the jury's award on that claim. *Moore v. Sen. Majority PAC*, No. 4:19-CV-1855-CLM, 2023 WL 7220943, at *38 (N.D. Ala. Sept. 29, 2023), *rev'd and remanded on other grounds sub nom. Moore v. Cecil*, No. 23-13531, 2026 WL 1109336 (11th Cir. Apr. 24, 2026). Alabama law allows a trial court to set aside or remit a jury's damage award for only two reasons: (1) the jury based its number on "bias, passion, prejudice, corruption, or other

---

[10] All decisions of the former Fifth Circuit announced before October 1, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

improper motive," or (2) the number "is totally unsupported by the evidence." *Hammond v. City of Gadsden*, 493 So. 2d 1374, 1378 (Ala. 1986). In making that assessment, the court presumes the verdict is correct and views the evidence in the light most favorable to the prevailing party. *Ala. River Grp., Inc. v. Conecuh Timber, Inc.*, 261 So.3d 226, 263 (Ala. 2017). If neither ground is established, the Alabama Constitution requires the court to leave the verdict undisturbed. *Hammond*, 493 So. 2d at 1378 (citing Ala. Const.. Art. I, § 11 (1901)). Defendants argue that the presumed damages award on Drummond's defamation claim is unsupported by the evidence. That assertion is off target.

To begin with, Drummond was not required to present any damages evidence at all on this claim. Statements imputing indictable criminal conduct constitute defamation per se, which relieves the plaintiff of any obligation to prove actual harm. *Nelson v. Lapeyrouse Grain Corp.*, 534 So.2d 1085, 1092 (Ala. 1988). The court has already found that Collingsworth's statements were defamatory per se. (*Defamation* Doc. # 841 at 18). Under Alabama law, such statements "are deemed to be injurious as a matter of law, and damages are presumed." *Tanner v. Ebbole*, 88 So. 3d 856, 872 (Ala. Civ. App. 2011). No evidence of a specific dollar amount of harm is required to sustain a presumed damages award. *See Pensacola Motor Sales, Inc. v. Daphne Auto., LLC*, 155 So. 3d 930, 942 (Ala. 2013).

Although Drummond was not required to present evidence of actual or reputational harm to recover on its defamation claim, *Nelson*, 534 So.2d at 1092, it still did so. Nathaniel Drummond testified that Collingsworth's statements severely impacted Drummond Company and the Drummond family, affecting its business relationships, its standing in the community, and the personal lives of family members and shareholders. (*RICO* Doc. # 722 at 694:15-695:5). After receiving publication of the false statements, a German customer compared Drummond to the Nazis. (*RICO* Doc. # 720 at 601:17-602:14). In fact, Drummond was forced to create an entirely

41

new department to respond to the allegations in the defamatory letters. (*RICO* Doc. # 724 at 944:18-944:10). Under Alabama law, the evidence presented at trial is more than sufficient to uphold the jury's verdict. *See Pensacola Motor Sales*, 155 So. 3d at 943-44; *Liberty Nat'l Life Ins. Co. v. Daugherty*, 840 So. 2d 152, 163 (Ala. 2002).

### 3.    The damage awards are not an unlawful double recovery.

Defendants argue that awarding both treble damages on the RICO claims and punitive damages on the defamation claim constitutes an impermissible double recovery. This argument fails because the two awards compensate for entirely different injuries.

The jury's award of presumed and punitive damages on Drummond's defamation claim addressed harm to Drummond's reputation. Of course, reputational harm is not compensable under RICO, which limits recovery to injuries to "business or property." 18 U.S.C. § 1964(c); *see Sedima*, 473 U.S. at 496; *Grogan v. Platt*, 835 F.2d 844, 847 (11th Cir. 1988). Consistent with that limitation, Drummond sought only economic damages under RICO and made no claim for reputational harm there. Conversely, Drummond sought no economic damages under its defamation claim. Nor is there any indication the jury awarded economic damages in returning its defamation verdict. The two awards thus address distinct injuries: reputational on one side, and economic on the other. The cases Defendants cite do not support a different result. Each involved a plaintiff seeking duplicative damages under multiple legal theories for exactly the same wrong. *See, e.g., Palm Beach Atl. College, Inc. v. First United Fund, Ltd.*, 928 F.2d 1528, 1545-47 (11th Cir. 1991) (barring both treble and punitive damages where both claims arose from a single wrong under Florida law). That is not the case here.

Because the RICO and defamation awards redress different injuries, there is no double recovery. Defendants' motion for remittitur is due to be denied.

### 4.     Collingsworth's Ability to Pay

Finally, Collingsworth also argues that the court should consider his ability to pay any judgment against him in ruling on his motion for remittitur. "While as a practical matter, [Drummond] may be unable to actually collect on this judgment, matters of collectability are generally irrelevant to questions of liability." *United States v. Caldwell*, No. 1:12-CV-4155-AT, 2013 WL 7121181, at *1 (N.D. Ga. Aug. 28, 2013). Moreover, the court has reason to question whether Collingsworth is as financially constrained as he claims. At trial, Collingsworth gave the following testimony:

> Q. Just so our record is clear. So you're telling Albert van Bilderbeek in this text, My sole U.S. account is now blocked. Right?
> A. That's what it says.
> Q. So that's an odd way to say my only account is blocked. Do you have an offshore account that you have not disclosed to us?
> A. No, I do not.
> Q. So your sole U.S. account, you really meant your only account?
> A. Yes.
> Q. Anywhere in the world?
> A. Anywhere.

(*Defamation* Doc. # 2245:1-24). However, a September 2011 email produced by Frank Van Lint references routing compensation to Collingsworth "directly into Terry's account in Zurich." (*Defamation* Doc. # 1245-1 at 10). If Collingsworth maintained an undisclosed foreign account, his sworn denials at trial cast serious doubt on the credibility of his claimed financial hardship.

Collingsworth's argument is particularly misplaced as it relates to the RICO claims. The verdict on those claims is against all members of the conspiracy and against the Enterprise. This includes Collingsworth, but also encompasses IRAdvocates (who the jury also found was a member of both the conspiracy and the Enterprise and committed predicate acts), Otero (who defaulted on the issue of RICO substantive and conspiracy liability), and Van Bilderbeek (who did the same).

The jury found that Defendants functioned as members of a common RICO enterprise and participated in the conduct of that Enterprise's affairs through a pattern of racketeering activity. The injury found by the jury was the product of that collective conduct and is not reasonably divisible among the individual participants. Consistent with longstanding principles governing civil RICO liability, each liable defendant is jointly and severally responsible for the entirety of the damages award. Accordingly, the judgment may be enforced against any defendant found liable under RICO for the full amount of the verdict, as trebled pursuant to 18 U.S.C. § 1964(c).

The jury also found that Defendants conspired to violate RICO. Joint and several liability is particularly extensive in the context of RICO conspiracies, where the theory of collective responsibility is especially strong.

Finally, Defendants Bill Scherer and Conrad & Scherer were sued under RICO and settled their claims on the eve of trial. The parties are briefing the impact of that settlement as it relates to contribution and allocation.

The bottom line is this: even though ability to pay is not a factor for the court to consider at this juncture, Collingsworth is not the only one on the hook as it relates to the RICO damages verdict.

## III.    Conclusion

For the reasons explained above, Defendants' Motion is due to be denied. A separate order will be entered.

**DONE** and **ORDERED** this June 2, 2026.

R. DAVID PROCTOR
SENIOR U.S. DISTRICT JUDGE

44