FILED

2026 Jun-18  PM 03:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **DRUMMOND COMPANY, INC. et al.,** | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:11-cv-3695-RDP** |
| | } | |
| **TERRENCE P. COLLINGSWORTH,** | } | |
| **et al.,** | } | |
| | } | |
| **Defendants.** | } | |

### MEMORANDUM OPINION AND ORDER ON
### PLAINTIFFS' RENEWED MOTION FOR SANCTIONS

This matter is before the court on the Renewed Motion for Sanctions filed by Plaintiffs Drummond Company, Inc. and Drummond Ltd. ("Drummond"). (Doc. # 1245). Defendant Terrence P. Collingsworth, the subject of the Motion, has responded to the Motion (Doc. # 1247), and Drummond has filed a reply (Doc. # 1252). For the reasons discussed below, the Motion is due to be granted.

Drummond's Motion contends that the court should sanction Collingsworth because he perpetrated a fraud on the court and otherwise engaged in misconduct in this case and, in doing so, has jeopardized "the integrity of the judicial process in the Northern District of Alabama[.]" (Doc. # 1245 at 7). Drummond argues that to allow Collingsworth to escape sanctions "'would be an open invitation to others to abuse the judicial process' in the Northern District of Alabama." *Id*. (citing *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc*., 561 F.3d 1298, 1306 (11th Cir. 2009). Drummond requests that the court impose the following sanctions:

1. Award its attorneys' fees and costs "related to Collingsworth's misconduct in this case";

2. Dismiss, with prejudice, *Marisol Melo Penaloza, et al., v. Drummond Company, Inc., et al.*, 2:13-cv-393-RDP (N.D. Ala.);

3. Hold Collingsworth in contempt;

4. Permanently revoke Collingsworth's *pro hac vice* admission in this court;

5. Order Collingsworth to publicly file and serve a copy of the court's sanctions order on his clients, opposing counsel, and the judge presiding over every pending state or federal case in which he is counsel of record, *and* require Collingsworth to provide sworn verification of his compliance with this sanction listing every proceeding in which he files the sanctions order;

6. Direct the Clerk of Court to serve a copy of the sanctions order on the National Discipline Bank operated by the American Bar Association, the Alabama State Bar Association, the D.C. Bar Association, and any other applicable licensing authorities for further investigation and disciplinary action;

7. Refer Collingsworth to the U.S. Attorney for the Northern District of Alabama for further proceedings as the U.S. Attorney deems appropriate;

8. Require Collingsworth to submit, under penalty of perjury, a listing of all proceedings in any jurisdiction, in the U.S. or elsewhere, where he is aware that the testimony of the following witnesses has been submitted and/or relied on: Jaime Blanco, Charris, El Tigre, Samario, Gelvez Albarracin, Libardo Duarte, Peinado, and Yuca; and

9. Award any other relief that the court may deem appropriate.

(*Id.* at 7-8, 30).

In response to Drummond's Motion, Collingsworth argues that: (1) the pretrial record does not support imposing sanctions (Doc. # 1247 at 2-5); and (2) the RICO jury verdict cannot be the basis for Drummond's new claims for sanctions (*Id.* at 6-10). Collingsworth characterizes Drummond's renewed request for sanctions as "nothing but a wish list for punitive measures based on the jury's verdict." (*Id.* at 2). Collingsworth asserts that although "there certainly were initial disclosure violations by Mr. Collingsworth," and he "acknowledged making a false statement to the Court in 2014," Drummond "does not identify any conduct that would allow a civil contempt

2

order, nor does Drummond identify any Order of this Court that Mr. Collingsworth has failed to comply with that could serve as the foundation for a finding of civil contempt." (*Id*. at 4-5). As best the court can glean, Collingsworth's position is that the only sanctions this court could impose on him are the ones previously requested by Drummond in its earlier sanctions motions. (*Id*. at 6-7).

In its Reply, Drummond argues that it is settled law that district courts not only may *sua sponte* raise the issue of sanctions, but also may impose sanctions not requested by a party. (Doc. # 1252 at 10) (citing *Sciarretta v. Lincon Nat'l Life Ins. Co*., 778 F.3d 1205, 1212-13 (11th Cir. 2015) (collecting cases). Drummond also points out that even Collingsworth's Opposition to its Motion for Sanctions continues his pattern of misrepresenting facts to the court:

> Collingsworth likewise falsely asserts that "[e]very exhibit Drummond introduced at trial that involved witness payments, communications about witness payments, meetings with witnesses, or any other issue associated with Drummond's allegations, was produced by Defendants close to a **decade before the trial**."

Doc. # 1252 (quoting Doc. 1247 at 4) (emphasis in original). The court is well aware – and the record makes plain – that the production of documents evidencing witness payments, many of which were introduced by Drummond at trial, was still ongoing throughout 2022 and 2023. (*See, e.g*., # Docs. 693, 694, 695, 724).

I.    **Relevant Facts**

The court presumes some familiarity with this Defamation case and the related Racketeer Influenced and Corrupt Organizations Act ("RICO") case. (Case No. 2:15-cv-00506-RDP).

Defendant Collingsworth is a Defendant in these cases; in addition, since April 2016, he has also appeared *pro hac vice* as counsel of record for Defendant IRAdvocates in the RICO case.[1]

---

[1] Collingsworth is the founder of IRAdvocates. https://www.internationalrightsadvocates.org/leadership (last

(Docs. # 1055 at 3; 470, 472; Case No. 2:15-cv-506-RDP, Docs. # 75, 77,78, 79). Collingsworth has been litigating in the Northern District of Alabama on a *pro hac vice* basis since 2002. (Doc. # 1055 at 2). He is a practicing attorney with over thirty-five (35) years of experience. (Docs. # 1245; 1055 at 2).

### A.    Litigation Background

Since 2002, Collingsworth and his associates have filed multiple lawsuits in this court against Drummond and its executives alleging that Drummond was complicit with a paramilitary group in Colombia called the Autodefensas Unidas de Colombia ("AUC") in a series of murders.

The first lawsuit in which Collingsworth represented plaintiffs suing Drummond, *Romero v. Drummond Co., Inc., et al.*, alleged that Drummond had collaborated with the AUC to murder Colombian union leaders Valmore Locarno Rodriguez, Victor Hugo Orcasita Amaya, and Gustave Soler. (Case No. 7:03-cv-00575-KOB, Doc. # 1). On July 26, 2007, a jury rejected that claim, finding in favor of Drummond. (Case No. 7:03-cv-00575-KOB, Doc. # 486). The jury's verdict was affirmed on appeal. *Romero v. Drummond Co., Inc.*, 552 F.3d 1303, 1324 (11th Cir. 2008).

On March 20, 2009, Collingsworth and other attorneys filed a second action against Drummond, *Baloco, et al., v. Drummond Co., Inc., et al.*. (Case No. 7:09-cv-00557-RDP, Doc. # 1). In this second case, Collingsworth's clients again alleged that Drummond was responsible for the union leaders' murders. (*Id.*). This court dismissed that case, and the dismissal was affirmed on appeal. *Baloco v. Drummond Co., Inc.*, 767 F.3d 1229, 1252 (11th Cir. 2014), *cert. denied*, 577 U.S. 957 (2015).

---

visited June 18, 2026); *see also* Doc. # 1217 at 1546:9-24).

A third case filed by Collingsworth, *Doe, et al. v. Drummond Co., Inc., et al.*, made similar allegations regarding the murders and further alleged that Drummond paid the AUC through an independent food services company owned by Jaime Blanco. (Case No. 2:09-cv-01041-RDP ("*Balcero*")[2], Doc. # 1). In *Balcero*, this court granted summary judgment for Drummond and its executives. That ruling that was affirmed on appeal. *Doe, et al. v. Drummond Co., Inc., et al.*, 782 F.3d 576, 613 (11th Cir. 2015), *cert. denied*, 577 U.S. 957 (2016).

Between January and September 2011, Collingsworth wrote three letters – two to the Government of the Netherlands and one to Itochu Corporation, a company that was in negotiations to purchase an interest in Drummond's Colombian subsidiary – stating as "objective facts" that Drummond was complicit with the AUC in the murders of hundreds of Colombians, and urging the recipients of the letters to cease all business ties with Drummond. (Doc. # 73 ¶¶ 14, 21, 27). On October 21, 2011, following Collingsworth's refusal to publish a retraction, Drummond filed this Defamation case. (Doc. # 1).

On February 26, 2013, Collingsworth filed a fourth case making the same or similar allegations that Drummond was complicit in the union members' murders, *Marisol Melo Penaloza, et al. v. Drummond Company, Inc. et al.* ("*Melo*"). (Case No. 2:13-cv-00393-RDP, Doc. # 1). The *Melo* case remains pending in this court but has been stayed. (Case No. 2:13-cv-00393-RDP, Docs. # 98, 102).

### B.    Collingsworth's Payments to Witnesses and the Witnesses' Changed Testimony

Many of the witnesses on whom Collinsworth claims to have relied in asserting allegations

---

[2] Plaintiffs in this third lawsuit filed an amended complaint which disclosed their identities. (Case No. 2:09-cv-01041-RDP, Doc. # 56). The lead Plaintiff's name was Balcero. (*Id*.).

that Drummond was complicit in the union members' murders had originally given contrary sworn testimony. (*See, e.g.*, Doc. # 775-4). Specifically, their initial testimony in Colombia's Justice & Peace Process[3] either did not implicate Drummond in the murders or affirmatively indicated that Drummond was *not* complicit with the AUC in the murders. (*Id.*). These witnesses later changed their sworn testimony and implicated Drummond in the murders, but only after Collingsworth and his team met with them, and in instances reflected in the record, paid them or their family members various sums of money. (*Id.*). In some cases, the payments to the witnesses were significant and made regularly over multiple years. (*Id.*; Docs. # 298-1 ¶ 7; 1217 at 1420-25; *see, e.g.*, 337-17 at 4) (Collingsworth writes in an email to undisclosed recipients "I would just add that we are supporting Charris's family so if he is not cooperating we will pull the plug").

In 2007, 2008, and 2009, Jhon Jairo Esquivel Cuadrado ("El Tigre") testified numerous times in the Justice & Peace Process, but at that time never implicated Drummond with respect to any involvement with the AUC. (Doc. # 417 at 24).

In April 2009, Alcides Manuel Mattos Tabares ("Samario") testified before Colombian authorities and denied any knowledge of Drummond collaborating with the AUC. (Case No. 2:09-cv-01041-RDP, Doc. # 396-10 at 100-08). In November 2009, Samario again testified in the Justice & Peace Process and again denied any knowledge of Drummond's complicity with the AUC. (*Id.* at 85-100).

---

[3] "In July 2005, Colombia passed Law 975, known as the Justice and Peace Law. The law provided a framework for the demobilization of illegal armed groups, though in practice it was applied primarily to the United Self-Defense Forces of Colombia (AUC). It sought to address the grave human rights violations and breaches of international humanitarian law committed during decades of armed conflict by imposing alternative sentences on those responsible in exchange for truth telling and reparations for the victims." https://www.ictj.org/latest-news/justice-and-peace-law-20-years-lessons-colombia%E2%80%99s-transitional-justice-process (last visited June 18, 2026). That is, the persons who participated in the process were the people who were responsible for the crimes and/or murders.

In late 2008, Collingsworth and/or his team promised El Tigre and Samario a contingency fee in *Balcero,* the third case against Drummond, and an upfront cash payment in exchange for their "declarations." (Docs. # 775, § IV-B; 775-109 (October 23, 2008 text messages to Collingsworth regarding "the proposal for 10% and 15,000 upfront w/signed DECL" for one person and stating that "now the question is how much we would pay for the second decl [] no money will be passed until decls are received"); 775-87 (December 12, 2008 email from Collingsworth stating, "I can transfer the funds as soon as the two declarations we discussed are ready"); 775-88 (December 26, 2008 email to Collingsworth stating, "He understands that he won't get paid as soon as the decls are turned in").

Also in late 2008, Collingsworth and/or his team promised Ivan Otero, a criminal attorney representing El Tigre and Samario in Colombia, a contingency fee in the litigation against Drummond. In early 2009, Otero was paid $80,000 after he secured El Tigre's and Samario's declarations implicating Drummond in the murders. (Docs. # 775 at 51-52; 775-109; 775-87; 775-88; 775-108 at 44-59; 775-110 (March 20, 2009 email from Collingsworth providing "the wire information for Ivan Otero to whom we have agreed to send $80,000."); 775-111 (March 27, 2009 email from Collingsworth insisting that Ivan Otero be paid because he has "the declarations in hand").

Between 2011 and 2015, Collingsworth and/or his team paid El Tigre and Samario $2,700 per month in exchange for their testimony. (Docs. # 417 at 25; 180-6 at 2-3 (May 22, 2011 email from Collingsworth to Bill Scherer and others stating that he "need[ed] to pay $2700 per month to maintain until we get the dep[osition]s in the can," referring to the contemplated depositions of El Tigre and Samario).

Virtually every witness who offered testimony against Drummond in *Balcero* had received payments from Defendants. (Docs. # 280 at ¶¶ 23 (Gelvez), 26-30 (Charris), 40-53 (Blanco), 58-61 (Duarte), 65-72 (El Tigre & Samario), 344 ("UNDISPUTED that the families of the witnesses who provided letters rogatory testimony in *Balcero* implicating Drummond received security assistance"); 417 at 16).

The court summarized the record evidence about the payments made by Collingsworth and/or his team to these witnesses and their families in its Memorandum Opinion on the cross-motions for summary judgment in the RICO case this way:

> In late 2008, C&S and Collingsworth began making monthly payments for the benefit of a witness who used the alias "Halcon," and they continued making payments for Halcon's benefit until 2012. (Docs. # 318-15 at 9-10; 318-22 at 381-82; 337-1 at 395-96, 408-09).
>
> C&S and Collingsworth made payments on behalf of Jairo de Jesus Charris Castro ("Charris") to Charris's wife. (Docs. # 318-14; 318-15 at 7-9; 298-1 ¶ 7). Ramirez and his assistant, Gilma Yineth Baeza Acosta ("Baeza"), served as a conduit for the payments to Charris. (Docs. # 317-2; 317-3; 317-4; 317-5; 317-6). Between September 2009 and December 2015, roughly on a monthly basis, seventy-five payments in the approximate amounts of $840 to $860 were provided directly to Charris' wife via Ramirez and Baeza. (Docs. # 298-1 ¶ 7; 337-17 at 4 (Collingsworth writes in an email to undisclosed recipients "I would just add that we are supporting Charris's family so if he is not cooperating we will pull the plug"); Docs. # 337-19; 337-20).
>
> On November 28, 2011, "[w]ithin seven days" of Jose Gelvez Albarracin (a.k.a. "El Canoso") signing a declaration in *Balcero*, a wire transfer in the amount of $2,084 was made from C&S's account to the Colombian bank account of El Canoso's wife. (Doc. # 177 ¶ 112; Doc. # 317-7). Notably, this payment was made after El Canoso had reported that his family was safe. (Docs. # 318-15 at 4, 9; 318-17 ¶ 23; 337-21 at 2).
>
> C&S and Collingsworth made multiple payments to Libardo Duarte's family totaling approximately $6,000. (Docs. # 318-16; 318-17 at 20-21; 318-31 at 137-43). On or about April 18, 2011, C&S and Collingsworth sent a $2,500 payment to Duarte's family member, Leydi Johana Perez Valencia. (Docs. # 317-1 ¶ 58; 317-10). On or about April 29, 2011, C&S and Collingsworth sent a $2,500 payment to Duarte's family member, Katerin Durango Avendano. (Docs. # 317-1 ¶ 59; 317-11). On or about May 21, 2011, Collingsworth provided a $1,102.54 payment to

8

Duarte and/or his family. (Doc. # 317-1 ¶ 60).

In early 2009, C&S and/or Collingsworth paid Ivan Otero $80,000 after he delivered the declarations of Jhon Jairo Esquivel Cuadrado ("El Tigre") and Alcides Manuel Mattos Tabares ("Samario"). (Docs. # 337-25; 337-26). On October 7, 2010, Collinsworth sent an email to his team, including Ramirez, complaining about a statement El Tigre had given to a prosecutor that contradicted his statements to Defendants. (Doc. # 343-5). In February 2011, Collingsworth and C&S sent a $5,000 payment to Otero, and internal C&S emails reflect that $3,600 of this payment was provided to El Tigre and Samario and/or their families. (Docs. # 317-8 at 3-4; 342 at 11). In May 2011, Collingsworth gave a $5,400 cash payment to Otero, and Otero subsequently gave some of that money to El Tigre and Samario and/or their families. (Docs. # 317-19 at 3; 342 at 11). From June 2011 through at least November 2015, C&S and Collingsworth, roughly on a monthly basis, sent fifty-one payments in the amounts of $2,700 to Otero, who then delivered approximately $2,000 of that money to El Tigre, Samario, and/or their families. (Docs. # 342 at 11; 337-16; 317-21 at 222-23). On May 22, 2011, Collingsworth emailed others at C&S stating that they needed to continue making the monthly payments for El Tigre and Samario "until we get the deps in the can." (Doc. # 337-16 at 2). C&S's emails about setting up the monthly $2,700 payments to Otero indicate that $700 of those amounts was for Otero, and the remainder was support for the living expenses of the families of El Tigre and Samario. (Doc. # 335-7 at 2). But, those emails make clear that the payments must be made "until the depos are done." In this email chain, Collingsworth instructed that "we can just call it security." (*Id*.). The $2,700 monthly payments to Otero were treated by C&S as "firm expenditures" and the payments C&S made were "part of its business." (Doc. # 317-19 at 436).

On August 24, 2011, Collingsworth was communicating with Ramirez about Ramirez's coordination with the director of prisons in Colombia to gain permission to take the depositions of imprisoned witnesses. (Doc. # 351-2 at 2). On August 25, 2011, Collingsworth and Lorraine Leete emailed about making certain payments to ensure that they had permission to take the depositions. (*Id*. at 1). In this series of emails, Collingsworth indicated that he had spoken to van Bilderbeek about funding. (*Id*.).

On September 9, 2011, Collingsworth entered into a series of agreements between and among van Bilderbeek, NICOX BV, Herman de Leeuw, and James Ellwood (collectively, the "NICOX Agreements"). (Doc. # 318-47). Under these agreements, Collingsworth and van Bilderbeek split $1,500,000, with each of them getting $750,000. (Doc. # 337-1 at 245). C&S lawyer Christian Levesque witnessed the agreements. (Docs. # 256-4 at 5; 256-6 at 4; 256-9 at 5; 256-10 at 3). Collingsworth pledged his contingency fee interest in *Balcero*, in which C&S was counsel of record for the plaintiffs, as security for at least one of these agreements. (Doc. # 256-4 at 4).

9

[]

In 2010 and 2011, Jaime Blanco Maya ("Blanco") was "short of money" and "didn't have the means to pay [his criminal defense] attorneys' expenses." (Doc. # 317-17 at 14-15). A portion of the funds flowing from the NICOX agreements was sent to Otero to be made available to Blanco for the benefit of his lawyers. (Docs. # 318-22 at 241-42; 337-36 at 1 (Blanco "is not working on his declaration until he gets this funding"); 337-32 at 2 (Blanco's "second payment of fees is due since he signed the declaration")). If Blanco had not received money from Collingsworth, Blanco would have had to sell his assets, sell his car, or borrow money to pay his attorneys. (Doc. # 317-17 at 81).

In September 2011, Collingsworth sent, or caused to be sent, a $60,000 payment for Blanco's use via Otero. (Docs. # 317-12; 317-13; 342 at 15). In December 2011, Collingsworth sent, or caused to be sent, a $25,000 payment for Blanco's use via Otero. (Docs. # 317-14; 317-15; 342 at 15-16). In July 2012, Collingsworth sent, or caused to be sent, a $35,000 payment for Blanco's use via Otero. (Docs. # 317-16; 317-13 at 24-25).

(Case No. 2:15-cv-00506-RDP, Doc. # 363 at 5-8).

On May 23, 2012, Jim Carroll, an attorney at Conrad & Scherer, LLP ("C&S") where Collingsworth was working at the time, who had been asked to evaluate the strengths and weaknesses of the *Balcero* case, sent a memorandum recommending that the firm terminate the firm's and Collingsworth's involvement in the Drummond cases. (Doc. # 775-4). Carroll described the witnesses on whom Collingsworth relied to establish the truth of the accusations that Drummond was involved in the murders as follows: they were "untrustworthy," they "have changed their stories," "[i]t appears [Collingsworth] has made payments directly or indirectly to one or more of the witnesses," "the witnesses are criminals, convicts, and poor people vulnerable to bribery and threats," and Collingsworth "has paid [] $100,000 to get Jaime Blanco to testify." (*Id*.). Neither the firm, nor Collingsworth, terminated their involvement in *Balcero*.

C.      **Collingsworth's Obstruction During Discovery About the Witness Payments**

During the course of this Defamation case, the payments made by Collingsworth to these witnesses came to the attention of Drummond who in turn notified the court about them.

10

Drummond propounded discovery requests to Collingsworth about the payments, but Collingsworth resisted that discovery.

At an October 10, 2013, hearing on a Motion to Compel filed by Drummond, Collingsworth's then-counsel represented to the court that all documents responsive to discovery about witness payments had been produced. (Doc. # 417 at 14 (citing Doc. # 43)). Collingsworth, who was seated next to his lawyer at the counsel table, made no effort to correct this misrepresentation, even though he knew "full well that all documents related to witness payments had *not* been produced." (*Id.* at 14) (citing Doc. #280, ¶¶ 233, 234, 235) (emphasis in original).

On April 2, 2014, Drummond filed its first Motion for Sanctions against Collingsworth and C&S. (Doc. # 104). The court set that Motion for a hearing on April 21, 2014. (Doc. # 111). At the hearing, counsel for Collingsworth and C&S was asked by the court: "Is there a witness that I have received testimony from [from Colombia] that didn't receive a security payment?" (Doc. # 417 at 15) (citing Doc. #123 at 30:1-31:19). Although the question was intentionally directed to his counsel, Collingsworth volunteered to answer the question:

> Your Honor, the shortest way to the truth is to ask me the question. Thank you. Our papers have made it clear and I will say that a lot of the new ambush allegations that they've made, each time they make one if we get a chance to show you the facts, the facts clear up any misunderstanding of what happened. There were exactly in this case three witnesses whose family members were moved because they received death threats, and those were Charris, Gelvez, and Duarte. Those are the witnesses whose family members were moved. There was an additional person named Halcon who was participating in Drummond 1 way out there and I had little to do with that. I never met the guy. … So the three witnesses that I've mentioned, Charris, Gelvez, and Duarte, are the family members of those people who were relocated.

(*Id.* at 15 (citing Doc. #123 at 30:1-31:19)). The court followed up on this statement, asking "[a]re those the only three besides Halcon who received security payments?" (*Id.*) (citing Doc. #123 at 30:1-31:19). Collingsworth responded: "[t]hat's correct." (*Id.*) "As of the date Collingsworth made

11

that statement (April 21, 2014), *every* witness who had testified in letters rogatory proceedings in *Balcero* against Drummond had received payments." (*Id.* at 16) (citing (Doc. #280, ¶ 344). This includes Samario, El Tigre, and Charris, who as of April 2014 were *still* receiving monthly payments in connection with their testimony against Drummond. (*Id.*) (citing Doc. #280, ¶ 345).

As the April 21, 2014 hearing continued, "counsel for Defendants was *directly* asked about any payments made to Jaime Blanco." (*Id.*) (citing Doc. #123 at 21:3-9) (emphasis in original). Counsel represented that "there was no payment made" and Collingsworth, who "was seated at the counsel table when this statement was made, and did nothing to correct it." (*Id.*) (citing Doc. #123 at 21:3-9). "Collingsworth has [since] admitted that his statements (and his attorney's) made in court that day were false." (*Id.*) (citing Doc. #389 at 112).

On September 1, 2, and 3, 2015, the court held an evidentiary hearing to evaluate the whether to apply the crime-fraud exception to Collingsworth and C&S's asserted work product and attorney-client privilege objections related to discovery about the witness payments. (Doc. # 417 at 2). The court noted that the assertion of privilege claims had become a roadblock to the parties' discovery requests concerning these payments. (*Id.*).

After that 2015 evidentiary hearing, the court identified numerous false statements and/or representations made by Collingsworth in discovery about the witness payments:

- The False Representation: On July 5, 2011, Collingsworth signed interrogatory responses in *Balcero*. One of the interrogatories asked for a description of anything of value offered or given by Plaintiffs, or anyone on behalf of Plaintiffs, to any former paramilitary or potential witness. (Doc. #280, ¶¶ 78, 80). Collingsworth's response to this interrogatory was: "Plaintiffs have provided Duarte with hamburgers and other food on several occasions, which were served during meetings to discuss the facts in his February 2011 Declaration. Additionally, Plaintiffs are providing reasonable transportation, food, and lodging costs for Plaintiffs who will be deposed in Alabama between July 18-23, 2011. Plaintiffs have paid to relocate Plaintiff Claudia Balcero and her family after she and her family

12

received death threats as a result of participating in this lawsuit." (Doc. #280, ¶ 81).

The Reality: *This representation [] was false*. At the time Collingsworth signed this interrogatory response, Defendants' litigation team had made payments to Halcon, Duarte, El Tigre, Samario, and Charris. (Doc. #280, ¶ 82). In fact, all of the people who were giving letters rogatory testimony in *Balcero* had been paid; those payments were not revealed to Drummond until after paramilitaries gave their trial testimony. (Doc. #389 at 159-60). Also at this time Collingsworth had discussed with Blanco the possibility of getting Blanco's legal fees paid by Albert van Bilderbeek. (Doc. #280, ¶ 83).

- The False Representation: On November 8, 2011 Collingsworth opposed a motion to compel filed in *Balcero*. (Doc. #280, ¶ 86). In that filing, Collingsworth referenced an interrogatory seeking information related to payments to witnesses and stated: "Plaintiffs provided responsive information relating to all Plaintiffs and witnesses and have not withheld responsive information on the grounds of attorney client privilege as it relates to Plaintiffs or witnesses in this case." (Doc. #280, ¶ 88).

  The Reality: *This representation to the court was false.* At the time Collingsworth filed this opposition, Defendants' litigation team had made payments to no less than six individuals: Halcon, Duarte, El Tigre, Charris, Samario, and Blanco. (Doc. #280, ¶ 88). *See* July 5, 2011 bullet point *supra*.

- The False Representation: On March 8, 2012 the court held a telephonic hearing in the then-active *Balcero* case. Collingsworth was asked by the court: "What is your relationship [in the *Balcero* case] with Llanos other than representing officials at Llanos in whatever legal matters you're representing them?" (Doc. #280, ¶ 95). Collingsworth responded: "There is no relationship other than that . . . . I have attorney-client agreements with two individuals who are principals in the company. . . . The two individuals are the two van Bilderbeek brothers." (Doc. #280, ¶ 96; Doc. #174-23).

  The Reality: *This representation to the court was false*. At the time Collingsworth represented to the court that Llanos Oil had "no relationship" to the *Balcero* case, Albert van Bilderbeek of Llanos Oil had made two payments to Jaime Blanco, a key witness in the *Balcero* case, totaling in excess of $60,000. (Doc. #280, ¶ 97; Doc. #174-2; Doc. #174-20). Collingsworth facilitated these payments and himself contacted Albert van Bilderbeek in July 2011 and requested that van Bilderbeek pay Blanco's legal fees of $150,000. (Doc. #280, ¶ 38; Doc. #174-2; Doc. #174-20).

- The False Representation: On April 19, 2012, Jaime Blanco gave the first part of his letters rogatory testimony in *Balcero*. (Doc. #280, ¶ 101). Collingsworth asked Blanco "Have you had any promises or benefits provided to you?" (Doc. #280, ¶ 102). Blanco responded: "No, no kind whatsoever." (Doc. #280, ¶ 103).

  The Reality: *This representation to the court was false*. As of the date of the testimony, Blanco had already received at least two payments from Albert van Bilderbeek. (Doc. #280, ¶¶ 104, 106).

- The False Representation: On May 16, 2012, Collingsworth signed an amended response to the interrogatory in *Balcero* asking him to disclose anything of value offered or given to witnesses. (Doc. #280, ¶ 109). Collingsworth's amended response did not disclose the arrangement with Mr. Blanco. (Doc. #280, ¶ 111).

  The Reality: *This representation [] was false*. At the time Collingsworth signed this May 16, 2012 interrogatory response, he had facilitated several payments to Blanco. (*See supra*).

- The False Representation: On July 1, 2013, Drummond moved to compel responses [to] its First and Second written discovery requests, setting forth documentary evidence of Defendants' payments to three witnesses – Halcon, Charris, and Duarte. (Doc. #280, ¶ 115). On July 18, 2013 Defendants filed a response to the motion to compel. That response states: "First, all of the 'evidence' Drummond has was produced by Plaintiffs in the *Balcero* case, and Plaintiffs produced every responsive document they had." (Doc. #280, ¶ 117).

  The Reality: *This representation to the court was false*. At the time Defendants represented to the court that they had already produced every responsive document they had, they had not disclosed the payments to Blanco, El Tigre, or Samario. (Doc. #280, ¶¶ 118-124).

- The False Representation: On July 13, 2013 Collingsworth submitted a declaration testifying that he had produced documents reflecting payments to Duarte, Charris, and Halcon. (Doc. #280, ¶¶ 125, 126).

  The Reality: *This representation to the court was false*. In his declaration Collingsworth did not disclose any payments to Blanco, El Tigre, or Samario. (Doc. #280, ¶ 127). At this time Collingsworth had also facilitated three payments to Blanco from Albert van Bilderbeek. (Doc. #280, ¶ 131).

- The False Representation: On July 22, 2013 Drummond served IRAdvocates with a subpoena seeking any and all documents "related or

referring to payments to individuals incarcerated in Colombia, including but not limited to … Jaime Blanco Maya…Jhon Jairo Esquivel Cuadrado [El Tigre]…[and]…Alcides Manuel Mattos Tabares [Samario]." (Doc. #280, ¶¶ 135, 136). The same subpoena also sought any and all documents "related or referring to payments to any family members of any individuals incarcerated in Colombia, including but not limited to… Jaime Blanco Maya…Jhon Jairo Esquivel Cuadrado [El Tigre]…[and]…Alcides Manuel Mattos Tabares [Samario]." (Doc. #280, ¶ 137). Finally, the subpoena sought any and all documents related to requests for payment by any of the above-named individuals for payment, as well as documents related to requests for payment by any of the above-named individuals'' family members for payment." (Doc. #280, ¶¶ 138, 139).

On August 16, 2013 Collingsworth signed a declaration in support of a motion to quash[] the subpoena to IRAdvocates. (Doc. #280, ¶ 140). In that declaration, Collingsworth stated that he had provided all responsive documents within the context of the *Balcero* action.   (Doc. #280, ¶ 141).

The Reality: *This representation to the court was false*. At the time Collingsworth submitted his declaration, Defendants had not disclosed the payments to Blanco, El Tigre, or Samario. (Doc. #280, ¶ 142).

- The False Representation: On October 24, 2013, Collingsworth signed a supplemental brief in support of the motion to quash the subpoena to IRAdvocates. (Doc. #280, ¶ 164). That brief stated that the files for Conrad & Scherer and IRAdvocates had both been searched and that "responsive documents were produced. On the documents produced, it will be clear from which entity the document originated." (Doc. #280, ¶ 165).

  The Reality: *This representation to the court was false*. At the time Collingsworth submitted this brief, none of the documents reflecting payments to El Tigre, Samario, or Blanco had been produced or logged. (Doc. #280, ¶ 167).

- The False Representation: On July 22, 2013 Drummond served Daniel Kovalik with a subpoena seeking any and all documents "related or referring to payments to individuals incarcerated in Colombia, including but not limited to … Jaime Blanco Maya…Jhon Jairo Esquivel Cuadrado [El Tigre]…[and]…Alcides Manuel Mattos Tabares [Samario]." (Doc. #280, ¶¶ 171, 172). The same subpoena also sought any and all documents "related or referring to payments to any family members of any individuals incarcerated in Colombia, including but not limited to… Jaime Blanco Maya…Jhon Jairo Esquivel Cuadrado [El Tigre]…[and]…Alcides Manuel Mattos Tabares [Samario]." (Doc. #280, ¶ 173). Finally, the subpoena sought any and all documents related to requests for payment by any of the

15

above-named individuals for payment, as well as documents related to requests for payment by any of the above-named individuals'' family members for payment." (Doc. #280, ¶¶ 174, 175).

On August 19, 2013, Collingsworth signed a declaration in support of a motion to quash the subpoena served on Kovalik.[] (Doc. #280, ¶ 177). That declaration stated that in connection with the *Balcero* litigation, "I have provided all responsive, non-privileged, and relevant documents in my custody, possession, or control, and I interpreted my obligation to produce documents as including documents in the custody, possession or control of those who work with me on a case. Thus, the subpoena…to Daniel Kovalik… is duplicative of requests already made to me as a defendant in the libel action and/or duplicative of requests that were made to Plaintiffs in the *Balcero* action." (Doc. #280, ¶ 178).

The Reality: *This representation to the court was false*. At the time Collingsworth submitted his declaration, Defendants had not produced any documents disclosing the payments to Blanco, El Tigre, or Samario. (Doc. #280, ¶ 179).

- The False Representation: On November 5, 2013, Collingsworth signed a declaration in support of Defendants' reply brief on the motion to quash. (Doc. #280, ¶ 186). In that declaration he testified: "the sole promise I made to any witness in *Balcero* was that if they testified and they or a family member received a credible death threat, we would do whatever we could to provide security or to provide a safe haven until such time as the danger had subsided." (Doc. #280, ¶ 187).

  The Reality: *This representation to the court was false*. At the time Collingsworth submitted his declaration, he had already facilitated at least three payments to Blanco from Albert van Bilderbeek that had nothing to do with "security." (Doc. #280, ¶ 188).

- The False Representation: On July 25, 2013 Drummond served a subpoena on Parker Waichman LLP seeking any and all documents "related or referring to payments to individuals incarcerated in Colombia, including but not limited to … Jaime Blanco Maya…Jhon Jairo Esquivel Cuadrado [El Tigre]…[and]…Alcides Manuel Mattos Tabares [Samario]." (Doc. #280, ¶¶ 193, 194). The same subpoena also sought any and all documents "related or referring to payments to any family members of any individuals incarcerated in Colombia, including but not limited to… Jaime Blanco Maya…Jhon Jairo Esquivel Cuadrado [El Tigre]…[and]…Alcides Manuel Mattos Tabares [Samario]." (Doc. #280, ¶ 195). Finally, the subpoena sought any and all documents related to requests for payment by any of the above-named individuals for payment, as well as documents related to

16

requests for payment by any of the above-named individuals' family members for payment." (Doc. #280, ¶¶ 196, 197).

On August 8, 2013, in objecting to the Parker Waichman subpoena, Defendants cited Collingsworth's July 31, 2013 declaration which represented that all of the documents requested had already been produced in the *Balcero* case. (Doc. #280, ¶ 199).

The Reality: *This representation to the court was false.* At the time Defendants served these objections and represented that all responsive documents had already been produced, Defendants had not disclosed the payments to Blanco, El Tigre, or Samario. (Doc. #280, ¶ 200).

- The False Representation: On August 19, 2013, Collingsworth submitted a declaration in support of a motion to quash the Parker Waichman subpoena.[] (Doc. #280, ¶ 203). That declaration stated that in connection with the *Balcero* litigation, "I have provided all responsive, non-privileged, and relevant documents in my custody, possession, or control, and I interpreted my obligation to produce documents as including documents in the custody, possession or control of those who work with me on a case. Thus, the subpoena…to Parker Waichman… is duplicative of requests already made to me as a defendant in the libel action and/or duplicative of requests that were made to Plaintiffs in the *Balcero* action." (Doc. #280, ¶ 204).

  The Reality: *This representation to the court was false.* At the time this declaration was submitted, Defendants had not disclosed the payments to Blanco, El Tigre, or Samario. (Doc. #280, ¶ 205).

- The False Representation: On October 23, 2013, Collingsworth signed a declaration in support of the reply brief on the motion to quash the Parker Waichman subpoena. (Doc. #280, ¶ 222). In that declaration he testified "the sole promise I made to any witness in *Balcero* was that if they testified and they or a family member received a credible death threat, we would do whatever we could to provide security or to provide a safe haven until such time as the danger had subsided." (Doc. #280, ¶ 223).

  The Reality: *This representation to the court was false.* At the time Collingsworth submitted his declaration, he had already facilitated at least three payments to Blanco from Albert van Bilderbeek that had nothing to do with security. (Doc. #280, ¶ 224).

(Doc. # 417 at 8-13).

There were other false representations made by Collingsworth, but this list is illustrative – and troubling. (*Id*. at 4-15). To reiterate, on multiple occasions Collingsworth has presented false or incomplete information about having made payments to witnesses: (1) in sworn responses to discovery, (2) in pleadings filed with the court, (3) in multiple sworn declarations filed with the court. (*Id*. at 8-15). Collingsworth also failed to correct statements made by his counsel to the court that he knew to be false. (*Id*.). Ultimately, although he was not under oath at the time, Collingsworth lied directly to the court about how many witnesses had been paid. (*Id*. at 15-17 (citing Doc. # 123)).

On March 27, 2015, Drummond filed its RICO case against Collingsworth (and others) related to the implications of Collingsworth's payments to these witnesses and his obstruction of discovery about those payments. (Case No.: 2:15-CV-506-RDP, Doc. # 1).

On December 7, 2015, the court issued its Memorandum Opinion and Order finding (1) that Drummond had presented a *prima facie* showing that the crime-fraud exception to the work product and attorney-client privilege should apply, (2) that Defendants (Collingsworth and his now-former firm C&S) had not rebutted that showing, and (3) that the exception should be applied here to pierce the work-product and attorney-client-privilege objections asserted by Collingsworth and C&S related to discovery about the witness payments. (Doc. # 417). The crimes or wrongs the court considered were "fraud on the court, witness bribery, [and] suborning perjury." (*Id*. at 7). Recognizing the import of this decision, and also realizing that discovery into sensitive and privileged material is like the proverbial toothpaste that cannot be put back in the tube, the court gave Collingsworth and C&S the benefit of the doubt and certified its ruling for interlocutory appeal. (*Id*. at 49-50). On March 24, 2018, the Eleventh Circuit affirmed the relevant portions of the crime-fraud order. (Docs. # 417, 498, 509).

Since that time, Drummond has repeatedly asked the court to sanction Collingsworth for his litigation conduct. (Docs. # 775, 843, 1245). The court has also *sua sponte* raised the issue of sanctions against Collingsworth.[4] On January 7, 2022, the court issued a Show Cause Order requiring Collingsworth to show cause why sanctions should not be imposed against him for "interposing unnecessary delay in this already old case" by asserting a "spurious" "wholesale objections" to the Special Master's Amended Reports and Recommendations regarding documents on Defendants' Privilege Logs. (Doc. # 694). The court did not impose sanctions at that time because, in response to the Show Cause Order, "the parties (and Collingsworth) appear to have, *finally*, come up with a method of streamlining the remainder of the crime-fraud review process." (Doc. # 706) (emphasis in original).

In the end, the court determined at that time that (1) "the better course of action [was] to rule upon the merits motions before addressing the sanctions motions" (Doc. # 824), and (2) it "would prefer to allow a jury to consider the merits of the defamation case before addressing potential sanctions for Defendants' litigation conduct." (Doc. # 847 at 3).

On December 10, 2024, the court resolved the parties' respective dispositive motions in both the Defamation and RICO cases. (Docs. # 841, 842; Case No. 2:15-cv-00506-RDP, Docs. # 363, 364). The result was that both cases would be tried. (*Id.*).

### D.    Spoliation of Evidence

Before trial, the court addressed Drummond's Motion for Spoliation Sanctions. (*Id*. at 4). On May 20, 2025, the court granted that Motion. (Doc. # 855). The court found the following facts in relation to the spoliation issue:

---

[4] A district court may raise the issue of sanctions *sua sponte*. *Sciarretta*, 778 F.3d at 1212-13 (collecting cases).

While working at C&S and actively litigating against Drummond, from May 2008 through March 2010, Collingsworth used a Dell Latitude laptop. (Case No. 2:11-cv-03695-RDP, Doc. # 794-1 at 10). Thereafter, Collingsworth switched to using an HP Compaq desktop that he used from March 2010 through May 2010. (*Id.*). Data from the Dell Latitude laptop was transferred to the HP Compaq desktop. The Dell Latitude laptop was cleared, sent to Collingsworth's residence, and later disposed of at an e-cycle recycling center. (*Id.*).

From May 2010 through January 2011, Collingsworth started using a Dell Optiplex desktop. When he made this switch, information from his HP Compaq desktop was transferred to the Dell Optiplex desktop. The HP Compaq desktop was sent Collingsworth's residence, and was later disposed at an e-cycle recycling center. (*Id.*).

Collingsworth used an Acer Netbook for short period of time in 2011. The Acer Netbook was sent to Ecuador. (*Id.*).

In January 2011, Collingsworth began using a MacBook laptop. (*Id.*). Data from the old Dell Optiplex desktop was transferred to MacBook. (*Id.*).

C&S did not take responsibility for computers that were the personal property of employees. (Case No. 2:11-cv-03695-RDP, Doc. # 791-1 at 3). Collingsworth used the MacBook as his primary work computer from February 2011 until June 2013. (*Id.*; Case No. 2:11-cv-03695-RDP, Doc. # 791-8 at 3; Case No. 2:11-cv-03695-RDP, Doc. # 287-2 at 155-56; Case No. 2:11-cv-03695-RDP, Doc. # 794-1 at 10). Collingsworth was aware that C&S's Information Technology department did not support the MacBook. (*Id.*).

Also in January 2011, data from the Dell Optiplex desktop was saved to a Seagate external hard drive. (Case No. 2:11-cv-03695-RDP, Doc. # 794-1 at 26; Case No. 2:11-cv-03695-RDP, Doc. # 791-3 at 17; Case No. 2:11-cv-03695-RDP, Doc. # 791-7 at 10). On December 8, 2014, this same Seagate external hard drive was accessed by Collingsworth's Dell Vostro desktop. (Case No. 2:11-cv-03695-RDP, Doc. # 794-1 at 26; Case No. 2:11-cv-03695-RDP, Doc. # 791-3 at 17).

The Seagate external hard drive is now unavailable and there is no explanation as to why it is missing. (Case No. 2:11-cv-03695-RDP, Doc. # 794-1 at 26; Case No. 2:11-cv-03695-RDP, Doc. # 791-3 at 17; Case No. 2:11-cv-03695-RDP, Doc. # 791-7 at 10).

Collingsworth also used an Apple iPad from 2010 through August 2013. (Case 2:11-cv-03695-RDP, Doc. # 287-5 at ¶ 37; Case 2:11-cv-03695-RDP, Doc. # 287-6 at 4).

[]

In 2013, Drummond initiated discovery in the 2011 Defamation case focused on payments made by Collingsworth and C&S to witnesses in the underlying cases against Drummond. On February 28, 2013, while Collingsworth still had the MacBook and iPad, Drummond served its First Request for Production of Documents on Defendants. One of those requests sought all of Collingsworth's communications with Llanos Oil or its principals, Hendrik and Albert van Bilderbeek. (Case No. 2:11-cv-03695-RDP, Doc. # 43-6 at 18-19). On April 3, 2013, again while Collingsworth was still in possession of the MacBook and iPad, Drummond served its second set of requests for production, one of which requested all of Collingsworth's emails with Ivan Otero. (Case No. 2:11-cv-03695-RDP, Doc. # 43-12 at 5).

Around this time, Collingsworth decided to give the MacBook to his niece. (Case No. 2:11-cv-03695-RDP, Doc. # 300-4 at 4; Case No. 2:11-cv-03695-RDP, Doc. # 794-1 at 10). In exchange, his brother-in-law (that is, his niece's father) bought Collingsworth a HP laptop. (*Id.*). Collingsworth claims that, after he gave the MacBook to his niece, it was stolen. (*Id.*).

During the period of time Collingsworth was using the iPad and the MacBook as his primary work computer (that is, from January 2011 – June 2013), and before that (when he was using computers from which the data was transferred to the MacBook), he was coordinating payments to witnesses in Columbia from whom he was seeking testimony implicating Drummond in the Colombian murders, the underlying basis for the cases he filed against Drummond. (Case No. 2:15-cv-00506-RDP, Doc. # 363 at 5 - 9).

In April 2013, before he gave the MacBook away, Collingsworth wanted to have his new HP laptop computer set up. (Case No. 2:11-cv-03695-RDP, Doc. # 287-3 at 2). He instructed Maggie Crosby at C&S not to worry about transferring any old emails from the MacBook to the new computer. (*Id.*). So, only limited data from the MacBook was transferred to HP laptop. (Case No. 2:11-cv-03695-RDP, Doc. # 794-1 at 10).

[]

On July 22, 2013, Drummond served IRAdvocates with a subpoena seeking any and all documents "related or referring to payments to individuals incarcerated in Colombia, including but not limited to" Blanco, El Tigre, and Samario. ([Doc. # 280] at ¶¶ 135, 136). On August 16, 2013 Collingsworth signed a declaration in which he stated that he had provided all responsive documents within the context of the *Balcero* action. (*Id.* at ¶ 141). However, again, at that time, Defendants had not disclosed the payments to Blanco, El Tigre, or Samario. (*Id.* at ¶ 142). Similar false representations about what witnesses had been paid in *Balcero* continued to be made through October 2013. (Case No. 2:11-cv-03695-RDP, Doc. # 417 at 8-14).

In August 2013, Collingsworth disposed of the iPad he ha[d] used since 2010 at a computer recycling center. (Case 2:11-cv-03695-RDP, Doc. # 287-5 at ¶ 37; Case 2:11-cv-03695-RDP, Doc. # 287-6 at 4).

In November 2013, Drummond issued a subpoena to Microsoft seeking the identity and email usage information of Baeza Acosta, a Colombian law student who was employed by C&S, and Toro Lopez, a Colombian attorney with whom Defendants' legal team consulted on matters of Colombian law. (Case No. 2:11-cv-03695-RDP, Doc. # 74 at 7). On November 25, 2013, Collingsworth and C&S moved to quash that subpoena or for a protective order. (*Id.*).

[]

[On April 21, 2014, t]he court entered an Order quashing the Microsoft subpoena, but essentially ordered Defendants Collingsworth and C&S to institute a litigation hold. Specifically, the court ordered them to:

> continue to maintain and preserve in their present form all computer servers, hard drives, email accounts, and all other electronic files or data storage systems which have been utilized by Defendants' litigation team during their entire pursuit of litigation against Drummond.

(Case No. 2:11-cv-03695-RDP, Doc. # 119 at 1).

By at least July 10, 2014, Collingsworth and C&S were aware that there were periods of time for which Collingsworth's emails were "missing." (Case No. 2:15-cv-00506-RDP, Doc. # 278-4 at 2). In a July 10, 2014 email, C&S employee Charity Ryerson emailed Collinsworth about the period for which they did not have emails for him. (*Id.*). She referred to this as his "email failure." (*Id.*).

On July 11, 2014, Ryerson emailed other C&S personnel that "another exciting twist in this is that there is about an 18 month period in which Terry's emails are lost. Sometime in 2010 and 2011 as I recall … He will probably need to explain this in an affidavit at some point." (Case No. 2:11-cv-03695-RDP, Doc. # 776-3 at 2). When asked about missing emails in July 2014, Collingsworth stated "it may be that [the emails] were lost on [his] mac when [he] gave it to [his] niece[.]" (Case No. 2:15-cv-00506-RDP, Doc. # 278-4 at 2).

Despite the fact that (1) the defamation case was filed in 2011, and (2) the court ordered something akin to a litigation hold in April 2014, C&S did not institute a litigation hold on the C&S Exchange server and the IRAdvocates Exchange server until July 7, 2014, and July 10, 2014, respectively. (Case No. 2:11-cv-03695-RDP, Doc. # 791-1 at 4).

The now-missing Seagate external hard drive that contained some of the information from Collingsworth's computers was in Defendants' possession after

the court's April 2014 order to maintain devices, including hard drives, and after the litigation hold was instituted. (Case No. 2:11-cv-03695-RDP, Doc. # 794-1 at 26; Case No. 2:11-cv-03695-RDP, Doc. # 791-3 at 17; Case No. 2:11-cv-03695-RDP, Doc. # 791-7 at 10).

(Doc. # 855 at 3-10).

Based on this evidence, the court concluded:

When Collingsworth got the new HP laptop to replace the MacBook, he transferred *some* data from the MacBook, but he instructed his assistant not to worry about transferring any old emails to the new computer. Only limited data from the MacBook was transferred. (*Id.*). These appear to be deliberate and intentional decisions made at a time when (1) Collingsworth and C&S unquestionably had a duty to preserve evidence for *already pending* litigation and (2) they understood questions were being raised about their conduct in the litigation. As a consequence, at least some information from the following computers is unavailable:

(1) the Dell Latitude laptop Collingsworth used from May 2008 – March 2010,

(2) the HP Compaq desktop Collingsworth used from March 2010 – May 2010;

(3) the Dell Optiplex desktop Collingsworth used from May 2010 – January 2011;

(4) the Acer Netbook Collingsworth used in 2011; and

(5) the MacBook laptop Collingsworth used from January 2011 – June 2013.

(*Id.*).

Also missing is whatever information that was on the iPad he used from 2011 through August 2013, because that device was disposed of at a recycling center in August 2013, after the two sets of Drummond's document requests had been served. (Case 2:11-cv-03695-RDP, Doc. # 287-5 at ¶ 37; Case 2:11-cv-03695-RDP, Doc. # 287-6 at 4).

(*Id.* at 17). The court held that it "ha[d] no hesitation in drawing the conclusion that Collingsworth acted deliberately with the intent to deprive Drummond of not only the information on the MacBook (by only preserving some of it and then giving the computer to his niece in Brazil), but also did the same thing with respect to whatever information may have been on the iPad." (*Id.* at 19). Although a more stringent remedy arguably would have been appropriate (*e.g.*, a mandatory

adverse inference instruction), the court ordered that a permissive adverse inference jury instruction would be given at trial. (*Id*. at 22).

### E.    Collingsworth's Trial Testimony

On July 16, 2025, the court set the Defamation and RICO cases for trial on December 1, 2025. (Doc. # 871; Case No. 2:15-cv-00506-RDP, Doc. # 393). The cases were tried together from December 1, 2025 through January 15, 2026.

On December 10, 2025, the following exchange occurred during Collingsworth's testimony

> Q. (By Mr. Wells) Here you're saying you need to wire $25,000 to Ivan Otero, the lawyer for Jaime Blanco, correct?
>
> A. That's what it says, but it's not – that's not really accurate.
>
> Q. It's not true, is it?
>
> A. I said it's not accurate. There is a difference.

(Doc. # 1217 at 1547:10-15).

On December 11, 2025, the following exchange occurred during Collingsworth's testimony:

> Q. (By Mr. Wells) So we had a hearing in the *Balcero* case on March 8th, 2012. Do you see that?
>
> A. Yep.
>
> Q. And you were asked by the Court, Here's what I'm asking about right now: First, what is the relationship between Llanos and Drummond? And your answer was, There is no -- they are competitors in Drummond -- excuse me -- in Colombia. I believe that Llanos has a claim in the world court against the government of Colombia that relates to a disputed title to some oil rights that Drummond holds. And you continue, There is no relationship to this case, Your Honor.
>
> A. What was the date?
>
> Q. Well, before we go back, did I read that correctly?

24

A. Yes.

Q. March 8th, 2012. And you agree that's right in the middle of all these payments we just talked about?

A. Yes.

Q. And that is not a true representation, is it, Mr. Collingsworth?

A. I think it's more complicated than yes or no. Sorry.

Q. Is this one of those inaccurate representations?

A. I'm sorry. What's the question?

Q. Well, you had a problem yesterday with true, false, so I was just going to give you your term. Would you call it an inaccurate representation?

A. It does depend on some of the terms that you use there.

Q. That Llanos Oil has nothing to do with the Drummond case when one of its owners just paid, by that point, $85,000 to Jaime Blanco, the most important witness in the Drummond case?

A. And –

Q. That's no relationship to the Drummond case to you?

A. No, that's true. There is a relationship.

Q. So it was a false representation to the Court, agreed?

A. It was inaccurate, yes.

(Doc. # 1218 at 1623:16-1625:2).

On December 15, 2025, the following exchange occurred during Collingsworth's testimony:

Q. And isn't it also true, Mr. Collingsworth, that you have lied to both Drummond and this Court in the *Balcero* case?

A. I have said some inaccurate statements, yes.

Q. And isn't it true that you have lied to both Drummond and this Court in this case, the defamation case?

A. I have made some inaccurate statements, yes.

(Doc. # 1220 at 2015:7-12).

On December 16, 2025, the following exchange occurred during Collingsworth's testimony:

Q. (By Mr. Wells) So, Mr. Collingsworth, during *Balcero*, this -- the following interrogatory was asked to you on behalf of your clients: Describe the attorney-client relationship between Terry Collingsworth and/or any other lawyer who represents any plaintiff in connection with this litigation and any other Colombian paramilitary, any person disclosed on Plaintiff's Rule 26 disclosures, or any other potential witness in this matter. And the response, last sentence: Subject to and without waiving these objections, Plaintiffs respond that there are no other attorney-client relationships. Did I read that correctly?

A. You did.

Q. And you just told us, at this time, it was your understanding that Ivan Otero both represented El Tigre and Samario and was one of the plaintiffs' lawyers in *Balcero*; correct?

A. Yes.

Q. So that is a lie; right?

A. What time -- what's the date of those?

MR. WELLS: Let's go to Mr. Collingsworth's signature page on the last page.

Q. September 9th, 2011.

A. So, no, that was not accurate.

Q. Not accurate? Not a lie; not accurate in your words; correct?

A. That's correct.

(Doc. # 1222 at 2082:16-2083:17).

On December 17, 2025, the following exchange occurred during Collingsworth's testimony:

Q. This is another sworn declaration by you, Mr. Collingsworth. Do you see that?

26

A. Yes.

Q. Filed by you in this Court, correct?

A. Yes.

Q. And you say in here that Ivan Otero never represented Jaime Blanco and never got any compensation for doing so, right?

A. For representing Jaime Blanco, yeah.

Q. And do you remember that email we looked at a while back where you were telling Parker Waichman that you need $25,000 [from] them, for Jaime Blanco's lawyer, Ivan Otero, to work on his declaration?

A. We went over that a lot, yes.

Q. So that right here we just read was false as well under oath, correct?

A. No. It was inaccurate to say originally that he was Jaime Blanco's lawyer.

Q. And without dragging you through all of these, there were a number of filings, both briefs and sworn declarations, where you continually represented that the only witnesses whose families had received any sort of assistance were Charris, Duarte, and Gelvez, correct?

A. Until we -- what we fully disclosed in -- somewhere between October and December 2014, yes.

Q. And those were lies, correct? You did not disclose El Tigre, Samario, or Jaime Blanco, did you?

A. For most of that time -- I'm going to say no.

(Doc. # 1223 at 2302:4-2303:6).

The same day, Collingsworth gave the following testimony about a text mentioning his bank account:

Q. Just so our record is clear. So you're telling Albert van Bilderbeek in this text, My sole U.S. account is now blocked. Right?

A. That's what it says.

Q. So that's an odd way to say my only account is blocked. Do you have an offshore account that you have not disclosed to us?

27

A. No, I do not.

Q. So your sole U.S. account, you really meant your only account?

A. Yes.

Q. Anywhere in the world?

A. Anywhere.

(Doc. # 1223 at 2245:1-24). However, in an email chain between Frank Van Lint, Albert van Bilderbeek, and others dated September 2011, which was produced by Van Lint in response to a subpoena, Van Lint states that certain "compensation [] to Terry Collingsworth" could "go directly into Terry's account in Zurich." (Doc. # 1245-1 at 10).

Further, from at least January 2013 through midway through 2014, Collingsworth maintained and testified that he had not disclosed the payments made to El Tigre and Samario because he "forgot." (Doc. #389 at 165). His December 17, 2025 testimony at trial on that issue told a different story:

> Q. [] And you never disclosed to Drummond or the Court prior to El Tigre giving his trial testimony, or Samario for that matter, that either one of their families were receiving payments, did you?
>
> A. We did not disclose our security plans to Drummond at that time.
>
> Q. And you also did not disclose it all the way up until November of 2014. Do you remember that?
>
> A. Yes. We disclosed it in response to an order of the Court and we fully complied. I don't -- that's enough.
>
> []
>
> Q. And, Mr. Collingsworth, El Tigre and Samario were leaders of a Front of the AUC that you allege killed hundreds and hundreds of people, right?
>
> A. Yes.
>
> Q. Including close to 100 of your clients, correct?

A. That's correct.

Q. And you didn't disclose to your clients, either, that you were paying for the support of the families of their husbands', brothers', family members' murderers, did you?

A. We didn't disclose our security plans to anybody until I was ordered to do so.

(Doc. # 1223 at 2234:13-2235:22).

### F.    The Jury Verdicts

On January 15, 2026, the jury returned verdicts in favor of Drummond in both the Defamation and RICO cases.

On the Defamation claim, the jury found that (1) Collingsworth had made a false statement about Drummond, (2) the statement was defamatory, (3) Collingsworth published the statement to another person, and (4) Drummond proved by clear and convincing evidence that Collingsworth made the statement with actual malice. (Doc. # 1194).

On the RICO claims, the jury (1) found that Plaintiffs Drummond Company, Inc. and Drummond Ltd. had proven each of the elements necessary to establish both their substantive RICO claim and their RICO conspiracy claim, and (2) awarded Plaintiffs $68,000,000 in damages caused by the RICO enterprise and/or the RICO conspirators. (Case No.: 2:15-CV-506-RDP, Doc. # 706). The jury found that Drummond had proven that Defendants Collingsworth and IRAdvocates had committed each of the following RICO predicate acts: (1) Witness Bribery; (2) Witness Tampering; (3) Obstruction of Justice; (4) Money Laundering; (5) Wire Fraud; and (6) Extortion. (*Id.*).

### G.    Collingsworth's Opposition to Drummond's Motion for Sanctions

Collingsworth's Opposition to Drummond's Motion for Sanctions was filed *pro se,* is electronically signed, and was filed by Collingsworth himself. (Doc. # 1247). In that Opposition,

29

Collingsworth states:

> Every exhibit Drummond introduced at trial that involved witness payments, communications about witness payments, meetings with witnesses, or any other issue associated with Drummond's allegations, was produced by Defendants close to a **decade before the trial**.

(Doc. # 1247 at 4) (emphasis in original).

Attached to its reply, Drummond filed an Appendix which purports to list the dates on which the exhibits it introduced at trial were produced. (Doc. # 1252-1). Whether Collingsworth disputes the dates of production listed on the Appendix, it is undisputed that the arduous process of reviewing Defendants' objections to the production of documents evidencing witness payments, many of which were used by Drummond at trial, was still ongoing throughout 2022 and 2023, a mere two to three years before trial. (*See, e.g.*, # Docs. 693, 694, 695, 724).

## II.    Applicable Law

Below, the court reviews relevant rules, laws, and doctrines from which a court's authority to impose sanctions is derived.

### A.    Rule 11

Under Federal Rule of Civil Procedure 11(b), "[b]y presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney . . . certifies that to the best of the [attorney]'s knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," the paper "is not being presented for any improper purpose" and "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(1), (b)(2). "If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may

impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1). The "order imposing a sanction must describe the sanctioned conduct and explain the basis for the sanction." Fed. R. Civ. P. 11(c)(6).

The Rule "imposes an objective standard of reasonable inquiry which does not mandate a finding of bad faith." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 47 (1991). The Rule 11 analysis focuses instead on "the signer's conduct" "at the time of filing." *Jones v. Int'l Riding Helmets, Ltd.*, 49 F.3d 692, 695 (11th Cir. 1995) (emphasis omitted). The court must "determine whether a reasonable attorney in like circumstances could believe his actions were factually and legally justified." *Kaplan v. DaimlerChrysler, A.G.*, 331 F.3d 1251, 1255 (11th Cir. 2003).

"The court has significant discretion in determining what sanctions, if any, should be imposed for a violation, subject to the principle that the sanctions should not be more severe than reasonably necessary to deter repetition of the conduct by the offending person or comparable conduct by similarly situated persons." Fed. R. Civ. P. 11, advisory committee's note to 1993 amendment. Appropriate considerations in deciding whether to impose a sanction and the type of sanction to impose include:

> Whether the improper conduct was willful, or negligent; whether it was part of a pattern of activity, or an isolated event; whether it infected the entire pleading, or only one particular count or defense; whether the person has engaged in similar conduct in other litigation; whether it was intended to injure; what effect it had on the litigation process in time or expense; whether the responsible person is trained in the law; what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case; what amount is needed to deter similar activity by other litigants[.]

*Id.*

To be clear, Rule 11 does not apply to discovery issues and motions under Rules 26 through 37. Fed. R. Civ. P. 11(d).

31

### B.    Alabama Rules of Professional Conduct

Collingsworth is not a lawyer licensed in Alabama. Nevertheless, in his Motion for Admission *Pro Hac Vice*, he agreed "to abide by any local rules applicable in this District, the Alabama State Bar Code of Professional Courtesy and the Lawyer's Creed, and this Court's CM/ECF requirements." (Doc. # 470 at 2).

Rule 3.3(a)(1) of the Alabama Rules of Professional Conduct prohibits attorneys from "knowingly [m]ak[ing] a false statement of material fact or law to a tribunal."

Under Rule 8.4 of the Alabama Rules of Professional Conduct, titled "Misconduct, [i]t is professional misconduct for a lawyer to:

(a) Violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

[]

(c) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation;

(d) Engage in conduct that is prejudicial to the administration of justice;

[]

(g) Engage in any other conduct that adversely reflects on his fitness to practice law."

### C.    Northern District of Alabama Local Rule 83.1(f)

Northern District of Alabama Local Rule 83.1(f) provides that attorneys may be sanctioned for violating the court's Local Rules, the Alabama Rules of Professional Conduct, or the American Bar Association Model Rules of Professional Conduct. "Discipline under this Rule may consist of disbarment, suspension, censure, reprimand, removal from a particular case . . . monetary sanctions, or any other sanction the court may deem appropriate." N.D. Ala. Local Rule 83.1(f).

### D.    Federal Rule of Civil Procedure 26

Federal Rule of Civil Procedure 26 governs disclosures and general discovery obligations. Under Rule 26(g), "every discovery request, response, or objection must be signed by at least one attorney of record in the attorney's own name[.]" Fed. R. Civ. P. 26(g)(1). "By signing, an attorney or party certifies that to the best of the person's knowledge, information, and belief formed after a reasonable inquiry: (A) with respect to a disclosure, it is complete and correct as of the time it is made; and (B) with respect to a discovery request, response, or objection, it is . . . consistent with these rules[.]" Fed. R. Civ. P. 26(g)(1)(A), (B)(i).

"Rule 26(g) imposes an affirmative duty to engage in pretrial discovery in a responsible manner that is consistent with the spirit and purposes of" the discovery rules. Fed. R. Civ. P. 26 advisory committee's note to 1983 amendment. "In addition, Rule 26(g) is designed to curb discovery abuse by explicitly encouraging the imposition of sanctions." *Id*. "Because of the asserted reluctance to impose sanctions on attorneys who abuse the discovery rules, . . . , Rule 26(g) makes explicit the authority judges [] have to impose appropriate sanctions and requires them to use it." *Id*.

### E.    28 U.S.C. § 1927

Under 28 U.S.C. § 1927, titled "Counsel's liability for excessive costs," "[a]ny attorney or other person admitted to conduct cases in any court of the United States . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. "Unlike Rule 11, which is aimed primarily at pleadings, under section 1927 attorneys are obligated to avoid dilatory tactics throughout the entire litigation." *Peer v. Lewis*, 606 F.3d 1306, 1314 (11th Cir. 2010) (quoted authority omitted).

"To justify an award of sanctions pursuant to section 1927, an attorney must engage in unreasonable and vexatious conduct; this conduct must multiply the proceedings; and the amount of the sanction cannot exceed the costs occasioned by the objectionable conduct." *Schwartz v. Millon Air, Inc*., 341 F.3d 1220, 1225 (11th Cir. 2003). "An attorney multiplies the proceedings unreasonably and vexatiously 'only when the attorney's conduct is so egregious that it is 'tantamount to bad faith.'" *Peer*, 606 F.3d at 1314 (quoting *Amlong & Amlong, P.A. v. Denny's, Inc*., 500 F.3d 1230, 1239 (11th Cir. 2007)).

**F.      The Court's Inherent Authority to Sanction Bad Faith Conduct**

District courts are also vested with the inherent authority "to control admission to its bar and to discipline attorneys who appear before it." *Chambers*, 501 U.S. at 43. Courts may "sanction bad-faith conduct by means of the inherent power" even if "that conduct could also be sanctioned under the statute or the Rules." *Id*. at 50. The court's inherent authority to sanction litigation misconduct applies to a lawyer or a party. *In re Sunshine Jr. Stores, Inc*., 456 F.3d 1291, 1304 (11th Cir. 2006). Collingsworth is both a lawyer and a party in this case.

To impose sanctions based on its inherent authority, a court must find that a lawyer or party acted "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers*, 501 U.S. at 44, 45-46 (quoted authority omitted); *accord Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998) ("The key to unlocking a court's inherent power is a finding of bad faith."). Whereas the standard for use of Rule 11 is objective, the standard for use of inherent authority is subjective. *Purchasing Power, LLC v. Bluestem Brands, Inc*., 851 F.3d 1218, 1223-24 (11th Cir. 2017). Courts may not sanction an attorney under their inherent powers without a finding of "subjective bad faith." *Id.* at 1224. Subjective bad faith can be shown either (1) by direct evidence of the attorney's subjective bad faith, or (2) by evidence of conduct "so egregious that it could only be committed in bad faith."

34

*Id.* at 1224-25. An attorney may "demonstrate[ ] bad faith by delaying or disrupting the litigation or hampering enforcement of a court order" or by attempting to perpetrate a fraud on the court. *Chambers*, 501 U.S. at 46, 50-51. "Black's Law Dictionary identifies dishonesty as the core of bad faith." *Boe v. Marshall*, 767 F. Supp. 3d 1226, 1279 (M.D. Ala. 2025) (citing *Black's Law Dictionary* (12th ed. 2024) (defining "bad faith" as "[d]ishonesty of belief, purpose, or motive")).

"'[T]he inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct [] for these rules are not substitutes for the inherent power.'" *In re Mroz*, 65 F.3d 1567, 1575 (11th Cir. 1995) (cleaned up) (quoting *Chambers*, 501 U.S. at 46, 49).

### G.    Available Sanctions

Sanctions imposed under a district court's inherent power must be "reasonable and appropriate." *Martin v. Automobili Lamborghini Exclusive, Inc.*, 307 F.3d 1332, 1335 (11th Cir. 2002) (per curiam) (internal citations omitted). Sanctions for attorney misconduct "must never be hollow gestures; their bite must be real." *Id*. at 1337. When a district court finds that attorneys have acted in bad faith, it may impose a variety of possible sanctions, including an "assessment of attorneys' fees and costs, disqualification of counsel, and monetary penalties payable to the clerk of court." *Kleiner v. First Nat. Bank of Atlanta*, 751 F.2d 1193, 1209 (11th Cir. 1985) (cleaned up). Sanctions are available related to a range of misconduct and can vary "from a simple reprimand to an order dismissing the action with or without prejudice." *Mingo v. Sugar Cane Growers Co-op. of Fla.*, 864 F.2d 101, 102 (11th Cir. 1989). *See also Chambers*, 501 U.S. at 44-45 (holding that sanctions available under the court's inherent powers include the "severe sanction" of "outright dismissal of a lawsuit" and, by necessity, "less severe sanction[s]" as well).

### III.    Findings and Conclusions

Based on the facts and law referenced above, the court makes the following factual findings

and legal conclusions. Where "there is bad-faith conduct in the course of litigation" and "in the informed discretion of the court [other sources of sanctioning authority are not] up to the task, the court may safely rely on its inherent power." *Chambers*, 501 U.S. at 50. Courts may "sanction bad-faith conduct by means of the inherent power" even if "that conduct could also be sanctioned under the statute or the Rules." *Id*. "The court finds itself in a situation where [Collingsworth's] misconduct sanctionable under [other sources of sanctioning authority] is 'intertwined within conduct that only the inherent power could address.'" *Rivera v. Triad Props. Corp.*, 2026 WL 915744, at *27 (N.D. Ala. Mar. 31, 2026) (citing *Chambers*, 501 U.S. at 51). Thus, the court need not "categoriz[e] individual instances of misconduct under each authority," but relies on the authorities set forth above "and its inherent authority to determine the appropriate sanctions." *Id*. (citing *Chambers*, 501 U.S. at 51).

Collingsworth's argument that the record does not support an award of sanctions is wholly without merit. His conduct in this court, which is detailed above, is *far* more extreme than, for example, the inappropriate use of artificial intelligence in preparing a court filing. In a case where the misuse of AI resulted in the filing of a pleading with hallucinated citations, another member of this court imposed the following sanctions on the lawyer misusing AI:

> (1) temporary suspension [] from practice in the Northern District of Alabama for a period of three months, (2) disqualification [] from further participation in this case, (3) referral [] to applicable licensing authorities, (4) payment [] of the defendants' attorney's fees incurred directly because of the misconduct, and (5) a public reprimand[].

*Rivera*, 2026 WL 915744, at *31.

The record establishes that Collingsworth's bad-faith conduct in this and the related litigation is extensive. It unquestionably supports an award of sanctions against him. The imposition of sanctions is not based simply on the RICO jury verdict. To be clear, the jury's RICO

verdict certainly supports a finding that Collingsworth's conduct warrants sanctions. After all, jury found the Collingsworth and IRAdvocates had engaged in (1) witness bribery; (2) witness tampering; (3) obstruction of justice; (4) money laundering; (5) wire fraud; and (6) extortion. (Case No.: 2:15-CV-506-RDP, Doc. # 706). But, the factual record establishing Collingsworth's bad-faith conduct is much more extensive. That record includes, among other things: (1) the record before the court, as summarized above, (2) the evidentiary record supporting the court's crime-fraud order finding that Drummond had made a prima facie showing of the crimes of "fraud on the court, witness bribery, [and] suborning perjury," (3) the RICO summary judgment record; (4) the court's spoliation sanctions record and order, (5) Collingsworth's trial testimony; and (6) the jury's RICO verdict.

"Every lawyer is an officer of the court" and an attorney "always [owes] a duty of candor to the tribunal." *Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1095 (11th Cir. 1994); *see also Kendrick v. Sec'y, Fla. Dep't Corr.*, 2022 WL 2388425, at *3 (11th Cir. July 1, 2022) (*pro se* litigants "owe the same duty of candor to the court as imposed on any other litigant"). "[L]awyers[, in particular,] should know that if they make false statements in court proceedings, they will no longer have the professional opportunity to participate in those proceedings." *Rivera*, 2026 WL 915744, at *32.

Collingsworth repeatedly violated his duty of candor to the tribunal. Collingsworth paid at least six witnesses (or their families) and, after he did so, they changed their sworn testimony to support claims prosecuted by Collingsworth against Drummond. When this came to light, and Drummond sought to conduct discovery into these payments, Collingsworth: (1) presented false, incomplete, or misleading information in sworn responses to discovery, pleadings filed with the court, and multiple sworn declarations filed with the court, and (2) lied directly to the court. (Doc. # 417 at 8-17). He also filed frivolous objections during the Special Master's privilege review to

obstruct discovery into the payments. (Doc. # 694). Finally, at trial, faced with the evidence of his obstruction that Drummond accumulated, Collingsworth admitted that he made "inaccurate statements" to this court in both the *Balcero* case and this Defamation case. (Doc. # 1220 at 2015:7-12).

The court has no hesitation in making the affirmative finding that Collingsworth acted in bad faith in this case and the underlying cases he filed against Drummond. Dishonesty is "the core of bad faith." *Boe*, 767 F. Supp. 3d at 1279 (citing *Black's Law Dictionary* (12th ed. 2024)). Accordingly, the court finds that sanctions against Collingsworth are warranted under the court's inherent authority to sanction bad-faith conduct. To be sure, the court notes that the same conduct the court sanctions under its inherent authority would also warrant imposing sanctions under Rule 11, Alabama Rule of Professional Conduct 3.3 and 8.4, the court's Local Rule 83.1(f), Federal Rules of Civil Procedure 26, and/or 28 U.S.C. § 1927.

## IV.     Appropriate Sanctions

"To rectify the bad-faith misconduct in this case and vindicate the lawful authority of federal courts to keep proceedings free from falsehoods," the court focuses on sanctions "that the court finds likely to deter future similar misconduct." *Johnson v. Dunn*, 792 F. Supp. 3d 1241, 1265 (N.D. Ala. 2025); *see also Boe*, 767 F. Supp. 3d at 1295-97 (imposing sanctions to serve deterrence purposes).

Below the court addresses whether the imposition of each of the requested sanctions would (1) set things right in these cases, and (2) is necessary or appropriate to deter the type of conduct Collingsworth engaged in here.

### A.     Fees, Costs, and Expenses

"When a court uses its inherent authority to award a sanction in the form of attorney's fees,

legal fees awarded 'must be compensatory rather than punitive'—at least in civil litigation." *J.C. Penney Corp., Inc. v. Oxford Mall, LLC*, 100 F.4th 1340, 1347 (11th Cir. 2024) (citing *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108 (2017)). "Because the purpose of this fee-shifting mechanism is to reimburse the victim, a causal connection is required between the fees awarded and the sanctioned party's misconduct." *Id*. (citing *Goodyear*, 581 U.S. at 108-09). ""[T]he complaining party may only recover those fees it would not have incurred "but for" its opponent's misconduct." *Id*. (citing *Goodyear*, 581 U.S. at 109). Collingsworth engaged in a years-long campaign of bad faith and obstructive conduct in this court and he has heretofore gone unpunished. Thus, an award of fees, costs, and expenses incurred by Drummond as a result of Collingsworth's bad-faith conduct is entirely appropriate. The fees, costs, and expenses the court contemplates as a sanction relate to the unnecessary prolonging of the crime-fraud review process and the prosecution of Drummond's sanctions motions. These fees, costs, and expenses are separate from any legal fees the jury considered in awarding damages.

### B.    Dismissal of the *Melo* Case

*Melo* is the fourth in a line of cases that Collingsworth has prosecuted against Drummond alleging that it was complicit in murders in Colombia. Based on varying legal grounds, the other three cases were lost. The sole remaining defendant in *Melo* is the Estate of Garry N. Drummond. (Case No. 2:13-cv-00393-RDP, Docs. # 93, 95-1).

A court "may ... dismiss a case under its inherent authority, which it possesses as a means of managing its own docket so as to achieve the orderly and expeditious disposition of cases." *McNair v. Johnson*, 143 F.4th 1301, 1306-07 (11th Cir. 2025) (cleaned up). A court's dismissal under its inherent authority "can be either with or without prejudice to refiling." *McNair*, 143 F.4th at 1306; *see also Mingo v. Sugar Cane Growers Co-Op of Fla*., 864 F.2d 101, 102 (11th Cir. 1989)

(per curiam) (stating that "sanctions imposed [upon dilatory litigants] can range from a simple reprimand to an order dismissing the action with or without prejudice"). Dismissal with prejudice as a sanction "is warranted only upon a 'clear record of delay or willful contempt and a finding that lesser sanctions would not suffice.'" *Mingo*, 864 F.2d at 102 (quoting *Goforth v. Owens*, 766 F.2d 1533, 1535 (11th Cir. 1985) (emphasis omitted)). "A dismissal without prejudice, by contrast, doesn't require a finding of willfulness or bad faith because its consequences are less severe." *McNair*, 143 F.4th at 1306 (emphasis in original).

The Eleventh Circuit has held that a *pro se* litigant's failure to disclose previous lawsuits is an abuse of the judicial process that warrants dismissal of an action. *See Redmon v. Lake County Sheriff's Office*, 414 F. App'x 221, 225 (11th Cir. 2011). In *Redmon*, the Eleventh Circuit affirmed the dismissal of a prisoner's civil-rights complaint that did not disclose a previous lawsuit. *Id*. at 226. The court reasoned, "[a]lthough *pro se* pleadings are held to a less stringent standard than pleadings drafted by attorneys, a plaintiff's *pro se* status will not excuse mistakes regarding procedural rules." *Id*. at 225-26 (citing *McNeil v. United States*, 508 U.S. 106, 113 (1993)). It certainly follows that if failure to disclose previous lawsuits constitutes a lack of candor to a tribunal and an abuse of the judicial process warranting dismissal of a case, then attorney Collingsworth's campaign of witness bribery and tampering, obstruction, falsehoods, and other wrongs requires at least as stringent a sanction to deter future and further abuses of the judicial process. Moreover, much of the testimony that would be admitted in *Melo* is critically infected by Collingsworth's witness payments. Accordingly, the dismissal of *Melo* is an appropriate sanction for Collingsworth's bad-faith conduct here.

### C.    Contempt

Although Collingsworth's conduct during this litigation has clearly demonstrated his

40

contempt for the court, the judicial process, opposing parties and counsel, and numerous rules and standards of conduct governing lawyers' conduct, a court's inherent power "must be exercised with restraint and discretion." *Purchasing Power*, 851 F.3d at 1223 (citing *Chambers*, 501 U.S. at 44-45). "The dual purpose of [the court's inherent] power is to vindicate judicial authority without resorting to a contempt of court sanction and to make the prevailing party whole." *Id.* (citing *Chambers*, 501 U.S. at 46). Again, sanctions imposed under the court's inherent authority "must be compensatory rather than punitive[.]" *J.C. Penney Corp., Inc.*, 100 F.4th at 1347; *see also Romero v. Drummond Co.*, 480 F.3d 1234, 1242 (11th Cir. 2007) (citing *United States v. K S & W Offshore Eng'g, Inc.*, 932 F.2d 906, 908 (11th Cir.1991) ("[T]he imposition of a penalty against attorneys for a punitive purpose [i]s a criminal contempt sanction.")).

Requiring Collingsworth to pay Drummond's attorneys' fees, costs, and expenses resulting from his bad-faith conduct, and the dismissal of *Melo* are designed to remedy the harm caused by Collingsworth's bad faith, sanctionable conduct. A contempt of court sanction appears to the court to be inappropriately punitive in nature. Therefore, the court declines to impose a contempt sanction.

### D.    Revocation of *pro hac vice* admission in this District

The scope of a federal court's inherent power includes the power to control admission to its bar and to discipline, suspend, or disbar the members of its bar. This includes out-of-state attorneys privileged to appear *pro hac vice*. *Chambers*, 501 U.S. at 43.

Revoking Collingsworth's *pro hac vice* admission to practice in this court is one way to ensure that he will not engage in any future conduct that is prejudicial to the administration of justice or that exhibits a lack of candor to the tribunal in this court. His course of conduct in this court is more than sufficient to justify revocation of his *pro hac vice* admission. *See Eagan v..*

41

*Jackson*, 855 F.Supp. 765, 791 (E.D. Pa. 1994) (finding that revocation of *pro hac vice* status was an appropriate sanction for violating the rule on candor to the tribunal where counsel's various misrepresentations were considered collectively). For these reasons, revocation of Collingsworth's *pro hac vice* admission in this court is a fitting method of deterring any further similar conduct by Collingsworth in this court.

### E.    Notification to Other Courts, Bar Associations, and Disciplinary Authorities

Federal courts in Alabama have regularly imposed public reprimands with limited publication to address a range of misconduct. They have done so recently. For example, to remedy the misuse of AI which resulted in the filings of pleadings with hallucinated citations. *Rivera*, 2026 WL 915744, at *31; *Johnson*, 792 F. Supp. 3d at 1266-67; *United States v. McGee*, 806 F. Supp. 3d 1264, 1276 (S.D. Ala. 2025). In a different context, another member of this court has also issued public reprimands for judge-shopping (manipulating the court's random case-assignment procedures) and intentional misrepresentations made to judicial investigatory panel. *Boe*, 767 F. Supp. 3d at 1330-31. If public reprimands with publication requirements were appropriate for the much milder misconduct in those case, they are certainly appropriate here. Notification of other courts and authorities is one method by which this court can deter similar conduct by Collingsworth or conduct similar to Collingsworth's by other counsel in other courts. Accordingly, the court will ensure that other courts, bar associations, and disciplinary authorities where Collingsworth practices are notified of this order and the sanctions imposed by the court.

### F.    Referral to the United States Attorney

The course of conduct engaged in by Collingsworth in this and the related cases, detailed above, may implicate criminal conduct. (*See, e.g.*, Doc, # 417; Case No.: 2:15-CV-506-RDP, Doc. # 706). As another means of deterring similar conduct by Collingsworth or other counsel in any

42

court, the court will refer this matter to the United States Attorney for the Northern District of Alabama to investigate whether Collingsworth has engaged in any criminal behavior. *See Boe*, 767 F. Supp. 3d at 1331 (directing the Clerk of Court to refer this matter to the U.S. Attorney for the Middle District of Alabama to investigate whether attorney engaged in any criminal conduct).

### G.      Required Affidavit

Another method of curing any prejudice caused by Collingsworth's witness payments and other conduct in this and the related cases is to require Collingsworth to submit an affidavit or declaration under penalty of perjury listing all proceedings in any jurisdiction worldwide where he is aware that the testimony of the Jaime Blanco, Charris, El Tigre, Samario, Gelvez Albarracin, Libardo Duarte, Peinado, and/or Yuca has been submitted to the court or relied upon in any way in the litigation. The court imposes this requirement as more fully detailed below.

## V.      Conclusion

As the Honorable Liles C. Burke noted in the *Boe* case, "[n]o case is worth the price of one's integrity." *Id.* at 1329. The court takes the actions set forth below "[t]o rectify the bad-faith misconduct in this case and vindicate the lawful authority of federal courts to keep [court] proceedings free from falsehoods[.]" *Johnson*, 792 F. Supp. 3d at 1265.

It is **ORDERED** as follows:

1. Collingsworth **SHALL** pay the legal fees and costs incurred by Drummond as a result of Collingsworth's bad-faith misconduct described in this Memorandum Opinion and Order;[5]

---

[5] The court expects that Collingsworth will seek appellate review of this ruling. Within fourteen days following either (1) expiration of the time to appeal or (2) a mandate issued by the Eleventh Circuit on that appeal, the parties **SHALL** meet and confer and submit a proposal for determining the fees and costs incurred by Drummond as a result of Collingsworth's bad-faith misconduct.

2. By separate order, the court will dismiss *Marisol Melo Penaloza, et al., v. Drummond Company, Inc., et al.*, Case No. 2:13-cv-393-RDP (N.D. Ala.);

3. Collingsworth's *pro hac vice* admission in the Northern District of Alabama is **PERMANENTLY REVOKED**;

4. The court **PUBLICLY REPRIMANDS** Terrence P. Collingsworth for the bad-faith misconduct described in this Memorandum Opinion and Order. To effectuate his public reprimand, the court **ORDERS** as follows: In every pending state or federal case or proceeding in which he is counsel of record, Collingsworth **SHALL** provide a copy of this Memorandum Opinion and Order to: (1) his client(s), (2) opposing counsel, and (3) the judge presiding over the matter. Collingsworth **SHALL** comply with this requirement **within fourteen days of the date of this Memorandum Opinion and Order**, and **SHALL** certify to the court that he has fulfilled this requirement **within 24 hours of completion**;

5. The Clerk of Court is **DIRECTED** to serve a copy of this Memorandum Opinion and Order on the National Discipline Bank operated by the American Bar Association, the Alabama State Bar Association, the District of Columbia Bar Association, the Florida Bar Association, and any other applicable licensing authorities for further investigation and disciplinary action;

6. The Clerk of Court is **DIRECTED** to refer this matter to the United States Attorney for the Northern District of Alabama to investigate whether Collingsworth has engaged in any criminal conduct; and

7. **Within thirty (30) days of the entry of this Memorandum Opinion and Order**, Collingsworth **SHALL** file with this court an affidavit or declaration under penalty of

perjury containing a list of all proceedings in any jurisdiction worldwide where he is aware that the testimony of Jaime Blanco, Charris, El Tigre, Samario, Gelvez Albarracin, Libardo Duarte, Peinado, and/or Yuca, has been submitted to the court or relied upon in any way in the litigation. In addition, Collingsworth **SHALL** provide each tribunal listed in his filing a copy of this Memorandum Opinion and Order, and his filing with this court **SHALL** certify that he has complied with this provision.

**DONE** and **ORDERED** this June 18, 2026.

_____
**R. DAVID PROCTOR**
SENIOR U.S. DISTRICT JUDGE